AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

| LODGED |
| CLERK, U.S. DISTRICT COURT |
| 06/22/2020 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: _____ CLO _____ DEPUTY |

for the

Central District of California

UNITED STATES OF AMERICA,

       Plaintiff,

       v.

JOSE LUIS HUIZAR,

       Defendant.

Case No.   **2:20-mj-02910**

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.  In or about the date of February 2013 to the present, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1962(d) | RICO Conspiracy |

This criminal complaint is based on these facts:

  *Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*ANDREW CIVETTI*
*Complainant's signature*

_____
Andrew Civetti, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    6/22/2020
_____     _____
*Judge's signature*

City and state:  Los Angeles, California     Hon. Patrick J. Walsh, U.S. Magistrate Judge
_____     *Printed name and title*

## Table of Contents

I.    INTRODUCTION..........................................1

II.   PURPOSE OF THIS AFFIDAVIT............................3

III.  RELEVANT PERSONS AND ENTITIES.......................3

      (1)  The City of Los Angeles........................4

      (2)  Public Officials and Their Associates..........6

      (3)  Developers and Their Associates................7

      (4)  Consultants and Lobbyists......................9

IV.   SUMMARY OF THE INVESTIGATION.......................10

V.    SUMMARY OF PROBABLE CAUSE..........................12

VI.   STATEMENT OF PROBABLE CAUSE........................18

      A.   The CD-14 Enterprise..........................18

           (1)  Beginning of the CD-14 Enterprise.........18

           (2)  CD-14 Enterprise as an Organization.......20

           (3)  Common Purposes of the CD-14 Enterprise...22

           (4)  CD-14 Enterprise as a Continuing Unit.....25

      B.   Project E Bribery Scheme......................26

           (1)  Benefits to HUIZAR at Casinos.............27

           (2)  HUIZAR Assists in Saving Individual 1's Job
                and Receives Funds to Settle His Sexual
                Harassment Lawsuit........................31

           (3)  Official Acts by HUIZAR...................39

      C.   Project C Bribery Scheme......................45

      D.   Project D Bribery Scheme......................54

           (1)  Early Corrupt Relationship with Company D..55

           (2)  Consulting Fees from Company D in Exchange
                for Official Acts.........................58

           (3)  Additional Benefits from Company D in
                Exchange for Official Acts................67

E.   **Project M Bribery Scheme**........................75

    (1)   First $25,000 PAC Contributions............76

    (2)   Second $25,000 PAC Contributions...........79

    (3)   Third $25,000 PAC Contributions............80

    (4)   Fourth $50,000 PAC Contributions...........82

F.   **Businessperson A Scheme**........................91

    (1)   Financial Benefits for Business
Opportunities with Developers..............91

    (2)   $25,000 PAC Contribution for City
Resolution.................................92

    (3)   Cash Payment for Pressure on Developer to
Hire Businessperson A......................94

G.   **Additional Pay-to-Play Conduct**.................95

    (1)   CD-14 Developers/Proxies' PAC Contributions
to Benefit Relative A'1 Campaign and CD-14
Enterprise.................................95

    (2)   CD-14 Developers/Proxies' Contributions to
HUIZAR Campaigns and Officeholder Accounts.99

    (3)   CD-14 Developers/Proxies' Contributions to
School that Employed Relative A-1 as a
Fundraiser................................100

    (4)   Steering CD-14 Developers to Preferred
Firms.....................................101

H.   **HUIZAR's Concealment of Illicit Benefits**.......102

    (1)   Transporting of Cash into United States and
Structuring to Avoid Reporting
Requirements..............................102

    (2)   Money Laundering through Family Members...104

I.   **HUIZAR's Additional Concealment of Pay-to-Play
Scheme**........................................111

    (1)   Concern About Detection...................111

    (2)   False Statements on Loan Application......113

    (3)   Failure to Report on Forms 700 and Tax
Returns...................................113

(4)   Concealment of Large Cash Sum at
              Residence................................113

**J.     HUIZAR's Obstructionist Conduct**...............115

VII. CONCLUSION.........................................116

## **AFFIDAVIT**

I, Andrew Civetti, being duly sworn, declare and state as follows:

## **I.   INTRODUCTION**

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since September 2015.  I am currently assigned to a Public Corruption Squad, where I specialize in the investigation of corrupt public officials, including bribery, fraud against the government, extortion, money laundering, false statements, and obstruction of justice.  In addition, I have received training in the investigation of public corruption and other white-collar crimes.

2.   I am currently one of the agents assigned to an investigation of alleged public corruption throughout the City of Los Angeles (the "City"), California related to a suspected "pay-to-play" scheme (the "Federal Investigation").  The Federal Investigation involves multiple City officials, developers, investors, consultants, lobbyists, and other close associates working in furtherance of the potentially illegal schemes.

3.   The Federal Investigation has centered around JOSE LUIS HUIZAR, the current elected and sitting City Council representative for Council District 14 ("CD-14"), a district which houses many significant development projects in the City. HUIZAR's last term as Councilmember expires at the end of 2020 and HUIZAR intended to have Relative A-1 succeed him in this powerful seat, while he planned his next career move, which

included a potential run for Los Angeles Mayor or City Attorney.
The Federal Investigation has revealed that HUIZAR operated a
pay-to-play scheme in the City, utilizing and commodifying the
powerful Council seat of CD-14, whereby he solicited and
accepted financial benefits from international (primarily
Chinese) and domestic developers with projects in the City in
exchange for favorable official actions.  Those corrupt
relationships were often facilitated by consultants, such as
George Chiang, Justin Kim, and lobbyists, who interfaced between
HUIZAR, his "Special Assistant" George Esparza, and developers
willing to pay bribes to enrich themselves, keep HUIZAR in
power, and facilitate HUIZAR's succession plan vis-à-vis
Relative A-1.  HUIZAR operated his pay-to-play scheme through
the CD-14 Enterprise, through means that included bribery and
numerous additional predicate RICO acts.[1]  The CD-14 Enterprise
was composed of those in HUIZAR's inner-circle who have jointly
cultivated an illicit relationship mutually dependent on the
political power of HUIZAR and CD-14, the success of development
projects in CD-14, and the financial opportunities created by
each.

    4.   Esparza and Chiang have each agreed to plead guilty to
a violation of 18 U.S.C. § 1962(d) (Racketeering Influenced and
Corrupt Organizations Conspiracy), and have each signed a
cooperation plea agreement outlining their understanding and

---

    [1] What qualifies as "racketeering activity," or RICO
predicates, is set forth in 18 U.S.C. § 1961.

agreement of the purposes of the "CD-14 Enterprise" and their participation in it.

## II.   PURPOSE OF THIS AFFIDAVIT

5.    This affidavit is made in support of a criminal complaint against and arrest warrant for **JOSE LUIS HUIZAR** for a violation of Title 18, United States Code, Section 1962(d) (Racketeer Influenced and Corrupt Organizations Conspiracy).

6.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, information obtained from other agents and witnesses, evidence obtained from search warrants, authorized wire and electronic interceptions in this investigation, interviews, records, and other sources, as detailed further below.  This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III.   RELEVANT PERSONS AND ENTITIES

7.    Based on my knowledge of the investigation, below is general background on certain relevant persons and entities. Although this investigation currently includes other witnesses, subjects, and targets, this affidavit focuses on the persons and entities most relevant to the requested criminal complaint.

(1)   <u>The City of Los Angeles</u>

8.    Based on my knowledge of the investigation and review of publicly available information, all legislative power in the City of Los Angeles is vested in the City Council and exercised by ordinance subject to a veto by the Mayor.  The City is divided into fifteen City Council Districts covering different geographic areas.  The City Council is composed of fifteen members elected from single-member districts.

9.    Based on my review of City records and my interviews with various individuals familiar with City processes, within the City, large-scale development projects require a series of applications and approvals prior to, during, and after construction.  These applications and approvals occur in various City departments, including the City Council, the Planning and Land Use Management ("PLUM") Committee, the Economic Development Committee, the Los Angeles Planning Department, the Los Angeles Department of Building and Safety ("LADBS"), the Area Planning Commission, the City Planning Commission ("CPC"), and the Mayor's Office.

10.   Each part of the City approval process requires official actions by public officials.  These include resolutions, entitlements, variances, general plan amendments, subsidies, incentives, public benefits, scheduling agendas for the various committees, and overall approvals.  The process allows for public hearings, feasibility studies, environmental impact reports, and other steps in the life of development projects.

11.  Even for projects that are not going through the City approval process, City officials can benefit a project or take adverse action against a project by advocating for, pressuring, or seeking to influence other City officials, departments, business owners, and stakeholders.

12.  Developers typically hire consultants and/or lobbyists to assist in guiding projects through the development process and City departments, including interfacing with the City Council office that represents the district in which the project is located.

13.  According to the California Fair Political Practices Commission ("FPPC") and the Los Angeles City Ethics Commission websites, under the California Political Reform Act, Cal. Gov. Code Sections 81000, et seq., every elected official and public employee who made or influenced governmental decisions is required to submit a Statement of Economic Interest, also known as the Form 700.  The Form 700 is filed annually in April for the previous year.  The Form 700 is designed to provide transparency and accountability, including by: (1) providing the public with information about an official's personal financial interests to determine whether officials were making decisions free from conflicts of interest; and (2) reminding the public official of potential conflicts of interest so the official could abstain from making or participating in governmental decisions that would raise those conflicts of interest.

(2)   <u>Public Officials and Their Associates</u>

14.   **<u>JOSE HUIZAR</u>** was first elected to the Los Angeles City
Council's District 14 ("CD-14") in 2005 and was re-elected in
2007, 2011, and, in what will be his final term, 2015, set to
expire at the end of 2020.  HUIZAR served as Chair of the PLUM[2]
Committee until he was stripped of that position in November
2018.  He was also a member of the City's Economic Development
Committee until November 2018.  HUIZAR has been at the forefront
of expanding hotel and hospitality service in Downtown Los
Angeles and has worked closely with various entities to promote
and encourage new businesses to open in Downtown Los Angeles.
According to information gathered in this investigation, HUIZAR
was interested in, among other positions, running for Mayor of
Los Angeles or Los Angeles City Attorney when his term ended in
2020.

15.   <u>Relative A-1</u>, <u>Relative A-2</u>, and <u>Relative A-3</u> are close
relatives of HUIZAR.  Beginning no later than 2007, Relative A-1
received a bi-weekly payment of approximately $2,500 from Law
Firm A as part of her employment with Law Firm A where she was
tasked with marketing and business development.  Between

---

[2] The PLUM Committee of the City Council has extensive
influence over the zoning in Downtown Los Angeles.  HUIZAR has
undertaken an initiative as the Chair to overhaul the City's
entire zoning guidelines.  The City Council holds public
hearings on certain real estate developments that affect the
City's general plan for development.  These hearings will
typically take place before the PLUM Committee, which will make
a recommendation to City Council.  Following that hearing, there
will be a vote before the full City Council regarding whether to
amend the general plan.  In addition, PLUM is a step of the
approval process for development projects seeking to build in
Los Angeles.  PLUM also handles the appeals process for project
approvals.

approximately July 2012 and January 2016, Relative A-1 also received regular payments from High School A, totaling approximately $150,000, as a fundraiser.  In or about September 2018, Relative A-1 formally announced her candidacy to succeed HUIZAR as Councilmember for CD-14.

16.  George Esparza worked for the City as HUIZAR's Special Assistant in CD-14 until on or about December 31, 2017.  On May 27, 2020, Esparza was charged by information with a violation of 18 U.S.C. § 1962(d) (RICO conspiracy) in United States v. George Esparza, 20-CR-208-JFW.  In a plea agreement filed the same day, Esparza admitted, among other things, that he was a member of the CD-14 Enterprise, along with HUIZAR, and that Esparza facilitated multiple bribes to HUIZAR in exchange for HUIZAR's support on development projects in CD-14.  Esparza also admitted to lying to the FBI during interviews in June and July 2017.  Esparza's factual basis is attached as **Exhibit 1**.  Esparza's guilty plea hearing has not yet been scheduled.

17.  Individual 1 was the General Manager of the LADBS until in or about May 2016.  In or about May 2016, Individual 1 was appointed by the Mayor as the City's Deputy Mayor of Economic Development.  In or about July 2017, Individual 1 retired from the City and officially began working with George Chiang consulting and lobbying on behalf of developers.

(3)  Developers and Their Associates

18.  Developer C, owner of Company C, is a real estate owner and developer who owns commercial properties in the City, including a property located in CD-14, purchased in 2008 for $9

7

million.  Developer C was planning on building a mixed-use
development on the property to include 14,000 square feet of
commercial space and over 200 residential units ("Project C").

19.  <u>Chairman D</u>, a Chinese national, owns Company D which,
according to its website, is one of the top real estate
companies in China with projects worldwide.  Company D, through
its subsidiaries, acquired a property located in CD-14 in 2014,
which it planned to redevelop into a mixed-use development that
was to include 80,000 square feet of commercial space, 650
residential units, and 300 hotel rooms ("Project D").  Company D
expected that the development would be valued at several hundred
million dollars.

20.  <u>Chairman E</u> is the Chairman and President of Company E,
a China-based real estate development company with more than $1
billion invested in projects worldwide and, according to its
website, one of China's top developers.  Chairman E is a Chinese
national and billionaire.  Company E, through its subsidiaries,
acquired two development properties in the City in 2010 and
2011, respectively, including a property located in CD-14
("Property E").  Chairman E planned to redevelop Property E into
the tallest tower west of the Mississippi River, specifically, a
77-story skyscraper featuring a mix of residential and
commercial uses ("Project E").

21.  <u>Executive M</u> is a principal partner of Company M, a
domestic real estate development company that owns multiple
development projects nationwide and located in the City,
including Project M located in CD-14.  Project M is a mixed-use

development that is to include 39,000 square feet of commercial space and approximately 400 residential units.

             (4)  <u>Consultants and Lobbyists</u>

22.  <u>George Chiang</u> is a real estate broker and consultant with multiple clients in CD-14.  Beginning in approximately July 2017, Chiang and Individual 1 formally began working together at a real estate brokerage and consulting firm with an office in downtown Los Angeles.  On May 13, 2020, Chiang was charged by information with a violation of 18 U.S.C. § 1962(d) (RICO conspiracy) in <u>United States v. George Chiang</u>, 20-CR-203-JFW. In a plea agreement filed the same day, Chiang admitted, among other things, that he was a member of the CD-14 Enterprise, along with HUIZAR, and that Chiang facilitated bribes to HUIZAR in exchange for HUIZAR's support for a development project in CD-14.  Chiang's factual basis is attached as **<u>Exhibit 2</u>**. Chiang's guilty plea hearing is currently scheduled for June 26, 2020.

23.  <u>Justin Kim</u> is a real estate appraiser and consultant for real estate developers with projects in the City and a major fundraiser for HUIZAR.  On March 19, 2020, Kim was charged by information with a violation of 18 U.S.C. § 666 (federal program bribery) in <u>United States v. Justin Kim</u>, CR-20-154-JFW.  In a plea agreement filed the same day, Kim admitted facilitating a cash bribe of $500,000 to HUIZAR from Developer C in exchange for HUIZAR's help in resolving a union appeal on a project.  Kim also admitted to lying to the FBI in interviews in May and July

2017.  Kim's factual basis is attached as **Exhibit 3**.  On June 3, 2020, Kim entered his guilty plea.

24.  Lobbyist B is a consultant and lobbyist for real estate developers with projects in the City and a major fundraiser for HUIZAR.  Lobbyist B is a principal officer of a political action committee ("PAC"), PAC A, which was formed to primarily benefit Relative A-1's campaign for the CD-14 seat. Beginning in 2014, Lobbyist B was a consultant and lobbyist hired by Company M to work on Project M.

## IV.   SUMMARY OF THE INVESTIGATION

25.  In approximately August 2015, the FBI began investigating HUIZAR for soliciting and accepting bribes and kickbacks from Chairman E in Las Vegas, Nevada.  During the course of the investigation, agents gathered information from a variety of sources, including the following: (1) confidential human sources; (2) historical e-mail tolls, including for HUIZAR's personal e-mail account; (3) pen register data for numerous phones, including HUIZAR's personal and City phones; (4) search warrants of numerous e-mail accounts, including HUIZAR's personal e-mail account; (5) financial records from banks for multiple individuals, including HUIZAR and his relatives, Relative A-1, Relative A-2, and Relative A-3, and known associates; (6) records from casinos, airlines, phone and e-mail providers, and other third parties; (7) GPS location information for numerous phones, including HUIZAR's personal phone; and (8) City records, public filings and other publicly available information relating to development projects.  The

investigation employed various additional investigative techniques, including surveillance (throughout Los Angeles and Las Vegas), vehicle tracking devices, and pole cameras at known meeting locations.

26.   The United States District Court authorized multiple Title III wire and electronic interception orders for telephones being used by certain subjects of the investigation.   The Court also authorized the interception of audio and visual, non-verbal conduct via closed circuit television (CCTV), through the installation of video and audio bugs in an office in downtown Los Angeles.[3]

27.   On November 5, 2018, the Honorable Alexander F. McKinnon, United States Magistrate Judge, authorized more than a dozen search warrants in this investigation, including of HUIZAR's person, residence, City Hall office, and Boyle Heights office.   The FBI executed search warrants on November 7, 2018, including at HUIZAR's residence and offices.   The searches resulted in the seizure of approximately $129,000 in cash from

---

[3] In certain points below, I summarize wire and electronic communications that investigators intercepted pursuant to court orders.   In other points, I quote from or paraphrase agents' understanding of those interceptions.   As noted in my affidavit, certain recordings capture conversations in Chinese.   For such conversations, I relied on an FBI-approved Chinese linguist to provide me the content of the communication.   For all recorded communications, I do not represent those summaries to be verbatim transcriptions of interceptions, as they were only prepared for the purpose of near-real-time assistance to the ongoing investigation and because transcripts frequently change and evolve as investigators and monitors become more familiar with the facts of a case and engage in multiple playbacks of recordings.   All interpretations of said calls are based on my training, experience, knowledge of this investigation, and my personal review of calls/texts.

HUIZAR's residence (as detailed further below), along with
multiple subjects' phones, boxes of physical evidence, and
digital devices.

28.   Since November 2018, I believe the FBI and United
States Attorney's Office have interviewed more than 75
individuals, including subjects of the investigation who agreed
to voluntarily provide information, as discussed further below.
Based on information we learned from these individuals and
additional sources, FBI Special Agents requested and obtained
additional search warrants for persons, phones, e-mail accounts,
and locations.   In total, to date, I believe the investigation
has obtained more than 50 search warrants.   Below I summarize
the information and evidence obtained thus far from these
various investigative tools and where relevant to the requested
complaint and arrest warrant.   This investigation remains
ongoing.

## V.   SUMMARY OF PROBABLE CAUSE

29.   The above-described investigation has revealed
evidence to establish probable cause that HUIZAR committed a
violation of 18 U.S.C. § 1962(d).   In particular, the
investigation to date has developed probable cause to believe
that:

30.   HUIZAR, Individual 1, Esparza, Chiang, and others were
members and associates of the CD-14 Enterprise, a criminal
organization whose members and associates engaged in, among
other things, bribery, mail and wire fraud (including through
the deprivation of the honest services of City officials and

employees), extortion, interstate and foreign travel in aid of
racketeering enterprises, money laundering, structuring, and
obstruction of justice.  The CD-14 Enterprise operated within
the Central District of California and elsewhere.

31.  The CD-14 Enterprise, including its leaders, members,
and associates, constituted an "enterprise," as defined by Title
18, United States Code, Section 1961(4), that is, a group of
individuals associated in fact.  The CD-14 Enterprise
constituted an ongoing organization whose members functioned as
a continuing unit for a common purpose of achieving the
objectives of the enterprise.  The CD-14 Enterprise engaged in,
and its activities affected, interstate and foreign commerce.

32.  The objectives of the CD-14 Enterprise included, but
were not limited to, the following:

a.   enriching the members and associates of the CD-14
Enterprise through means that included bribery, extortion, and
mail and wire fraud, including through the deprivation of the
honest services of City officials and employees;

b.   advancing the political goals and maintaining the
control and authority of the CD-14 Enterprise by elevating
members and associates of the CD-14 Enterprise to, and
maintaining those individuals' placement in, prominent elected
office, through means that included bribery and mail and wire
fraud, including through the deprivation of the honest services
of City officials and employees;

c.    concealing the financial activities of the CD-14 Enterprise, through means that included money laundering and structuring; and

d.    protecting the CD-14 Enterprise by concealing the activities of its members and associates and shielding the CD-14 Enterprise from detection by law enforcement, the City, the public, and others, through means that included obstructing justice.

33.  Beginning no later than February 2013, and continuing to the present, in Los Angeles County, within the Central District of California and elsewhere, HUIZAR, a person employed by and associated with the CD-14 Enterprise, which enterprise engaged in, and its activities affected, interstate and foreign commerce, conspired with others, including Individual 1, Esparza, and Chiang, to unlawfully and knowingly violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the CD-14 Enterprise's through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of multiple acts:

a.    involving bribery, in violation of California Penal Code Sections 31, 67, 67.5(b), 68 and 182(a)(1);

b.    indictable under Title 18, United States Code, Sections 1341, 1343, and 1346 (Mail and Wire Fraud, including through the Deprivation of Honest Services);

14

   c. indictable under Title 18, United States Code, Section 1951 (Extortion);

   d. indictable under Title 18, United States Code, Section 1952 (Interstate and Foreign Travel in Aid of Racketeering Enterprises);

   e. indictable under Title 18, United States Code, Sections 1956 and 1957 (Money Laundering);

   f. indictable under Title 18, United States Code, Section 1512 (Obstruction of Justice and Witness Tampering); and

   g. indictable under Title 31, United States Code, Section 5324 (Structuring Transactions to Evade Reporting Requirement).

34. It was a further part of the conspiracy that HUIZAR agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

35. HUIZAR and other members and associates of the CD-14 Enterprise agreed to conduct the affairs of the CD-14 Enterprise through the following means, among others:

   a. In order to enrich its members and associates, the CD-14 Enterprise operated a pay-to-play scheme within the City, wherein public officials demanded and solicited financial benefits from developers and their proxies in exchange for official acts.  Specifically, through a scheme that involved bribery, mail and wire fraud, and extortion, HUIZAR, Esparza, Individual 1, and other City officials demanded, solicited, accepted and agreed to accept from developers and their proxies,

including Chiang, some combination of the following types of
financial benefits, among others: (1) cash; (2) consulting and
retainer fees; (3) favorable loans; (4) casino chips at casinos;
(5) flights on private jets and commercial airlines; (6) stays
at luxury hotels; (7) expensive meals; (8) spa services; (9)
event tickets to concerts, shows, and sporting events; (10)
escort and prostitution services; and (11) other gifts.

b.     In exchange for such financial benefits from
developers and their proxies, HUIZAR, Esparza, Individual 1 and
other City officials agreed to perform and performed the
following types of official acts, among others: (1) filing
motions in various City committees to benefit projects; (2)
voting on projects in various City committees, including the
PLUM Committee, and City Council; (3) taking, or not taking,
action in the PLUM Committee to expedite or delay the approval
process and affect project costs; (4) exerting pressure on other
City officials to influence the approval process of projects;
(5) negotiating with and exerting pressure on labor unions to
resolve issues on projects; (6) exerting pressure on developers
with projects pending before the City to affect their business
practices; and (7) taking official action to enhance the
professional reputation and marketability of businesspersons in
the City.

c.     In order to protect and hide the financial
payments that flowed from the developers and their proxies to
the public officials, the CD-14 Enterprise engaged in money
laundering and other activities to conceal monetary transactions

16

and bribe payments.  Specifically, members and associates of the
CD-14 Enterprise engaged in the following activities, among
others: (1) storing large amounts of cash in one's residence;
(2) providing cash to family members and associates; (3)
directing payments to family members, associates, and entities
to avoid creating a paper trail between the developers, their
proxies, and public officials; (4) using family members and
associates to pay expenses; (5) depositing cash at ATMs and
banks in amounts under $10,000 to avoid bank reporting
requirements; and (6) failing to disclose payments and benefits
received on Form-700s and on tax returns.

       d.   In order to maintain its power and control,
members and associates of the CD-14 Enterprise used their
positions and relationships to illicitly ensure a political
power base filled with their allies and to obtain significant
official City positions, resources, and financial support.
Specifically, through bribery, members and associates of the CD-
14 Enterprise raised funds from developers and their proxies
with projects in CD-14 for the following, among others:
(1) HUIZAR's re-election campaigns and officeholder accounts;
(2) Relative A-1's election campaign for the CD-14 seat; and (3)
Political Action Committees designed to benefit Relative A-1's
election campaign.

       e.   In order to protect the CD-14 Enterprise and
avoid detection by law enforcement, the City, the public, and
others, members and associates of the CD-14 Enterprise engaged
in the following types of obstructive conduct: (1) lying to law

enforcement in an effort to impede the investigation into criminal conduct of the CD-14 Enterprise; (2) attempting to corruptly influence the statements of others to law enforcement; and (3) using encrypted messaging applications, including those utilizing a self-destructing message system, to communicate about the affairs of the CD-14 Enterprise.

## VI.   STATEMENT OF PROBABLE CAUSE

### A.   The CD-14 Enterprise

36.   Unless otherwise noted below, my knowledge of the facts summarized in this subsection is based on my review of relevant e-mail and text communications and intercepted wire and electronic communications referenced and quoted herein,[4] interviews of certain relevant individuals (including Esparza, Chiang, and Kim), and review of City records and other publicly available documents.

#### (1)   Beginning of the CD-14 Enterprise

37.   The CD-14 Enterprise was an alliance that was forged and created by HUIZAR and Individual 1 in around 2013, at a time when each of them faced significant threats to their political and professional careers.  HUIZAR was the City Councilmember for CD-14, while Individual 1 was the interim General Manager (top position) of the LADBS.  At that time, Individual 1 had a close relationship with Chinese developers with projects in Los Angeles.  In 2013, Individual 1 introduced HUIZAR and Esparza to one such developer, Chairman E, who owned a hotel in HUIZAR's

---

[4] Any quoted dialogue below is based on my personal review and understanding of a recording or otherwise captured communication.

district.  As detailed below, this was the start of a corrupt
relationship that developed between HUIZAR and Chairman E,
fostered by Individual 1, including Chairman E providing direct
and indirect financial benefits to HUIZAR and Esparza on over a
dozen trips to casinos in Las Vegas, and Chairman E funding an
approximately $600,000 settlement of HUIZAR's sexual harassment
lawsuit filed by a former CD-14 staffer.  Individual 1
facilitated the settlement arrangement around the same time that
HUIZAR introduced a motion to help save Individual 1's job due
to a pending merger of his department with the Planning
Department that threatened Individual 1's future as a
significant City official.

38.  As detailed below, in early 2014, Individual 1
developed a relationship with Chiang, and closely mentored
Chiang into becoming a lead consultant for Chinese developers in
CD-14.  With Individual 1's help, Chiang developed a close and
corrupt relationship with HUIZAR and Esparza, including
facilitating bribes from his clients, primarily Chinese
developers, including Chairman D.

39.  After the initial corrupt relationship was established
between HUIZAR, Individual 1, and Chairman E beginning in 2013
and centered around ensuring the success of Chinese development
companies in the City and monopolizing their provided benefits,
the CD-14 Enterprise began operating and expanding into an
ongoing pay-to-play scheme.  Members, associates, and allies of
the CD-14 Enterprise developed and perpetuated a pay-to-play
scheme within the City of Los Angeles, whereby public officials

solicited and accepted financial benefits from developers, often
facilitated through consultants and lobbyists, in exchange for
taking official acts and other action to benefit the developers
and their projects in Los Angeles.

(2)   CD-14 Enterprise as an Organization

40.   The concerted pay-to-play scheme operating in the City
demonstrates the way the CD-14 Enterprise members operated as an
informal organization.  As described in more detail below, the
pay-to-play scheme followed similar patterns wherein HUIZAR
(with the help of Esparza) targeted and solicited financial
benefits from developers with projects pending in his district
or with hearings pending before the City.  HUIZAR and Esparza
often made their requests through consultants and lobbyists, who
then relayed those requests and demands to developers who were
willing to participate in the scheme or who were afraid to not
participate in the scheme.  The financial benefits developers
provided included cash, event tickets, political donations, or
other benefits and contributions.

41.   In addition to the corrupt schemes themselves,
additional factors point to the members of the CD-14 Enterprise
operating as an organization.  CD-14 Enterprise members and
associates considered HUIZAR the leader, evidenced by their
repeated reference to him as the "boss."  For example, in calls
and text messages, Chiang and Kim, among others, used the term
"boss" to refer to HUIZAR when discussing matters relevant to
the CD-14 Enterprise's goals, even though they did not work for
HUIZAR or the City.

42.   When discussing matters relevant to the CD-14 Enterprise, CD-14 Enterprise members and associates also referred to themselves as a discrete entity, using terms such as "City family," "CD-14 stakeholders," "brothers and sisters," and "our group."  According to Esparza, HUIZAR used the term "Friends of the Office" to refer to certain consultants with whom he had a close relationship and who were in HUIZAR's inner-circle, including Chiang, Kim, Lobbyist B, HUIZAR Associate 3[5] and others.

43.   Members of the CD-14 Enterprise acknowledged that the group all centered around HUIZAR.  For example, on June 11, 2017, in a call with Chiang, Esparza stated: "I think everyone is in the same boat" and referred to HUIZAR as "**the guy we're investing so much time, energy, resource in.**"

44.   Members of the CD-14 Enterprise also acknowledged that HUIZAR was the leader of their criminal enterprise.  For example, on May 3, 2017, in a telephone call, Chiang and Esparza discussed the possibility of law enforcement detecting their bribery schemes.  Esparza stated: "If shit does hit the fan, it's like, 'Hey man, **we were all told, [HUIZAR] told us to do it.**'"  Chiang responded: "I understand that, **but we can really be [HUIZAR]'s accessories** because the first thing he is going to do is throw all the dirt on you."

---

[5] HUIZAR Associate 3 is a close associate of and fundraiser for HUIZAR who operated a company in the City.

(3)   Common Purposes of the CD-14 Enterprise

45.   Members of the CD-14 Enterprise had several common purposes, including (1) establishing, maintaining, and monopolizing the pay-to-play scheme they established with HUIZAR to all continue profiting from the corrupt system, (2) perpetuating the pay-to-play scheme by getting Relative A-1 to succeed HUIZAR when his term expired in 2020, and (3) protecting the CD-14 Enterprise so it could continue its operation without detection by law enforcement, the City, or the public.

46.   As the City Councilmember for CD-14, which included Downtown Los Angeles, HUIZAR had immediate jurisdiction over a large number of development projects undergoing the application and approval process and who otherwise sought City assistance. During the time HUIZAR was the CD-14 Councilmember, his district was undergoing a historic real estate development boom.  As the Chair of the powerful PLUM Committee, which had City-wide jurisdiction over projects, including projects outside of CD-14, HUIZAR had control of the PLUM agenda, and therefore controlled which projects were slated for a vote in the approval process. Members of the CD-14 Enterprise recognized the great powers HUIZAR held, and had a common purpose of maintaining HUIZAR in power and fulfilling his needs to benefit from the pay-to-play scheme, which they also used to benefit themselves.

47.  For example, on April 6, 2018, Individual 1 described HUIZAR's power in the Los Angeles development process to a Chinese developer in a phone call:

"[I]f you are in the [PLUM] committee, but **HUIZAR does not put you on the agenda, then, then, your project will not see the light of day for a long time**, because it's up to the chairman [HUIZAR] whether the agenda is your project or not…. **[His] power is so great** … that even if [the Department of City] Planning approves, and [the City] Planning Commission makes all the changes, such as changing or reducing the number of your units, etcetera, PLUM, which stands for Planning and Land Use Management, the committee chaired by JOSE [HUIZAR], can still completely reverse everything."

48.  Based on information obtained during the interception periods and from search warrants, HUIZAR had long been planning to run Relative A-1 for HUIZAR's CD-14 City Council seat in 2020.  Moreover, HUIZAR planned to use this succession plan to further the CD-14 Enterprise's goals, including by extending his political power and leveraging additional financial benefits.

49.  Based on digitally seized information from HUIZAR's computer, as early as June 2016, HUIZAR created a document titled "TO DO LIST," in which, among other things, he listed his "Next Political Steps" including the following sub-headings: (1) Senate; (2) City-Wide; and (3) "[Relative A-1] For CD 14."  On April 9, 2017, HUIZAR e-mailed himself a document titled "TO DO LIST."  In this version, HUIZAR's "Next Political Steps" included the following sub-headings: (1) Senate; (2) City-Wide; (3) City Attorney; and (4) "[Relative A-1] For CD 14."  Under the Relative A-1 sub-heading, HUIZAR included: "[Relative A-1] needs to legally change her last name [to HUIZAR]."

50.  On April 24, 2017, Esparza had a meeting with HUIZAR at HUIZAR's house.  After the meeting, Esparza called

Businessperson A.[6]  Esparza explained: "So, [HUIZAR] was like, 'No, George you have to, I don't trust anyone else.  You know, and **we gotta make sure we get [Relative A-1] elected**, and then, you know, whenever you decide to, **if I run for Mayor**, run **for City Attorney**.' He's like, 'Maybe you get a, become a lobbyist and **you, everyone has to go through you to, you know.**'"

51.  In short, I believe HUIZAR planned to exploit his position as the CD-14 Councilmember and Chair of the PLUM Committee to pressure developers who needed his vote to contribute to PACs to benefit Relative A-1.  This would allow him to ensure his succession plan, which would also keep him and his allies (like Esparza) in power and thus able to continue to benefit from their illicit schemes.  As described in further detail below, HUIZAR often targeted developers for contributions shortly before he was slated to vote on their projects and at times delayed projects by removing them from the PLUM Committee agenda while commitments were solicited and negotiated.  Many of those developers were willing to pledge their commitment for $50,000 or $100,000, because HUIZAR's vote was a high-value commodity they very much desired.  Moreover, they feared not contributing as requested would anger HUIZAR who would then take adverse action (including inaction) on their projects.

---

[6] Businessperson A operated businesses in the City relating to major development projects.  In July and August 2017, I personally interviewed Businessperson A in the presence of counsel, regarding aspects of the Federal Investigation including Businessperson A's relationship with HUIZAR and Esparza.  Thereafter, Businessperson A agreed to cooperate with the FBI and to conduct consensually recorded conversations with subjects of the investigation, in exchange for charging considerations.

Expediting development projects and ensuring City approval saved developers huge costs and expenses.  HUIZAR created detailed charts tallying developers' "Commitments to the PAC."  By late 2017 (almost a year before Relative A-1 formally announced her candidacy), those PAC commitments from developers totaled more than $500,000, and HUIZAR's projections for contributions totaled more than $1.2 million.

52.  Members and associates of the CD-14 Enterprise were conscious of the need to protect their illicit activities from detection by law enforcement, the City, and the public.  Esparza, Chiang, Kim, and others frequently referred to HUIZAR and/or the CD-14 Enterprise as "the ship" and discussed making sure that the ship stayed afloat so they could each continue to benefit from it.  CD-14 Enterprise members also repeatedly expressed loyalty to each other in order to protect their mutual interest in the enterprise's survival.

(4)  CD-14 Enterprise as a Continuing Unit

53.  As stated above, based on intercepted and seized communications and interviews of Esparza, Chiang, Kim, and others, members of the CD-14 Enterprise had a long-term plan that included maintaining the status quo and keeping HUIZAR happy while he was in office until 2020, and then elevating HUIZAR to a more powerful position such as City Attorney or Mayor, while Relative A-1 succeeded HUIZAR in the CD-14 seat to allow the pay-to-play scheme to continue operating for at least another 12 years.  They also highlighted how this plan depended on support from the Chinese developers.

54.   For example, on April 28, 2017, in a telephone call between Kim and Esparza, they discussed their long-term plan to maintain their own political and financial interests. Specifically, Esparza stated: "**[Relative A-1] wins, we have another twelve years in the City.**"  Later in the same call, Esparza stated: "You and I have a twenty year plan and we got to where we want to be."  Kim responded: "[T]hat would be ideal."

55.   On May 1, 2017, Esparza told Relative A-1: "just trying to plan for the next 12 years.... Yeah, so we can take over the world.... **I already have like 3 million dollars in commitments....** Dude, we got this. We're done. **Chairman's in, all my Chinese friends are in.**"

### B.   Project E Bribery Scheme

56.   Unless otherwise noted below, my knowledge of the facts summarized below is based on my review of relevant e-mail and text communications and intercepted wire and electronic communications referenced and quoted herein, interviews of certain relevant individuals (including Esparza), review of City records and publicly available documents, airline records, bank records, and casino records.

57.   In or around February 2013, Individual 1, then the Interim General Manager of LADBS, introduced HUIZAR and Esparza to Chairman E at a dinner in the City.  Chairman E owned Company E, one of China's leading real estate development companies. Chairman E also owned Property E, located in CD-14, and another property located in a different City district.

58.   Between March 2013 and November 2018, Chairman E,
aided and abetted by Individual 1 and others, provided financial
benefits directly and indirectly to HUIZAR, in exchange for
HUIZAR's assistance to Chairman E and Company E in HUIZAR's
official capacity on an ongoing and as-needed basis and related
to specific matters.  HUIZAR, Chairman E, Individual 1, and
others established a mutually beneficial agreement to exchange a
stream of benefits for official acts and to further the CD-14
Enterprise's goals.  Specifically, Chairman E provided HUIZAR
financial benefits in over a dozen trips to casinos in Las Vegas
and a trip to Australia.  After HUIZAR filed a motion to help
save Individual 1's job as General Manager of LADBS, Chairman E,
at Individual 1's urging, provided $600,000 to help HUIZAR
resolve a sexual harassment lawsuit filed by a former CD-14
employee.  The amount and source of the payment were never
publicly disclosed.  In exchange, Chairman E asked for a series
of favors from HUIZAR over time.  Ultimately, Chairman E
provided over $800,000 in benefits to HUIZAR so that HUIZAR
would assist Chairman E's plans to redevelop his property in CD-
14 and build the tallest building west of the Mississippi River.

(1)   Benefits to HUIZAR at Casinos

59.   In March 2013, HUIZAR, Esparza, Chairman E, and
Executive Director E[7] traveled on a private jet to a casino in
Las Vegas, Nevada.  During this trip, HUIZAR and Esparza
accepted financial benefits in the form of flights on private

---

[7] Executive Director E was the Executive Director of Company E and worked directly for Chairman E in the City.

27

jets, a stay in a luxurious five-bedroom villa at a casino, meals, alcohol, and approximately $10,000 in casino gambling chips from Chairman E.

60. Based on my review of casino records, flight records, relevant communications, and interviews of Esparza, between March 2013 and February 2017,[8] HUIZAR traveled to Las Vegas casinos with Chairman E on at least the following dates, and was offered and/or accepted benefits in the form of expenses including flights, hotel rooms, spa services, meals, alcohol, prostitution/escort services, and casino gambling chips in the following approximate amounts:

| No. | Date(s) | Casino(s) | Expenses (group)[9] | Gambling chips (HUIZAR) |
|-----|---------|-----------|---------------------|-------------------------|
| 1 | 03/22/2013 to 03/24/2013 | Casino 4 | $56,704 | $10,000 |
| 2 | 12/30/2013 to 01/02/2014 | Casino 4 | $54,141 | $10,000 |
| 3 | 06/07/2014 to 06/08/2014 | Casino 1/ Casino 4 | $61,635 | $10,000 |
| 4 | 06/14/2014 to 06/15/2014 | Casino 1/ Casino 4 | $17,844 | $10,000 |
| 5 | 08/22/2014 to | Casino 1 | $138,233 | $13,500 |

[8] Based on the evidence I have obtained, February 2017 appears to be the last trip that HUIZAR and Esparza took to Las Vegas with Chairman E.  In approximately June 2017, the FBI interviewed Esparza and asked him about his trips to Las Vegas and consequently, as far as I am aware, HUIZAR's and Esparza's trips to Las Vegas with Chairman E ceased after that interview, likely because they became concerned that our investigation had possibly observed their incriminating conduct there.

[9] Group expenses refer to the value of casino "comps" for members of Chairman E's group on each of these trips with HUIZAR, including benefits that HUIZAR did not personally utilize (e.g., multiple rooms on a single night).

| No. | Date(s) | Casino(s) | Expenses (group)[9] | Gambling chips (HUIZAR) |
|---|---|---|---|---|
| | 08/25/2014 | | | |
| 6 | 03/13/2015 to 03/14/2015 | Casino 1 | $30,952 | $20,000 |
| 7 | 03/28/2015 to 03/30/2015 | Casino 1 | $39,185 | $10,000 |
| 8 | 05/01/2015 to 05/03/2015 | Casino 1 | $2,676 | $10,000 |
| 9 | 07/07/2015 to 07/08/2015 | Casino 1 | $32,682 | $65,000 |
| 10 | 10/28/2015 to 10/30/2015 | Casino 2 | $96,681 | $10,000 |
| 11 | 12/11/2015 to 12/13/2015 | Casino 3 | $35,974 | $10,000 |
| 12 | 02/12/2016 to 02/13/2016 | Casino 2 | $60,798 | $10,000 |
| 13 | 02/26/2016 to 02/28/2016 | Casino 3 | $40,095 | $10,000 |
| 14 | 04/30/2016 to 05/02/2016 | Casino 1/ Casino 2 | $127,256 | $10,000 |
| 15 | 05/05/2016 to 05/07/2016 | Casino 1/ Casino 3 | $16,475 | $10,000 |
| 16 | 05/13/2016 to 05/16/2016 | Casino 1 | $649 | $10,000 |
| 17 | 07/14/2016 to 07/17/2016 | Casino 3 | $1,123 | $10,000 |
| 18 | 08/05/2016 to 08/07/2016 | Casino 2 | $60,463 | $11,000 |
| 19 | 02/04/2017 to 02/06/2017 | Casino 2/ Casino 3 | $16,822 | $10,000 |
| | | **TOTAL:** | **$890,388** | **$259,500** |

61.   Casino surveillance cameras captured HUIZAR and
Esparza gambling with Chairman E and Executive Director E,
including HUIZAR accepting casino chips from Chairman E.  On
several occasions, casino surveillance cameras also captured
HUIZAR himself cashing out casino chips that he accepted from
Chairman E at casinos.  For example, the below screenshot from
surveillance video captured during HUIZAR's August 5 to August
7, 2016 trip to Casino 2, captures HUIZAR cashing out casino
chips (that he had obtained from Chairman E) and taking cash
from the teller.



(2)   <u>HUIZAR Assists in Saving Individual 1's Job and
Receives Funds to Settle His Sexual Harassment
Lawsuit</u>

62.   As was widely publicized in the media at the time, on
June 7, 2013, a sexual harassment lawsuit was filed against
HUIZAR by a former CD-14 employee.  Thereafter, HUIZAR, who was
up for re-election in 2015, and Individual 1 strategized on how
to raise funds to settle the lawsuit and save HUIZAR's career.
In return for HUIZAR's efforts in his official capacity to save
Individual 1's job by preventing the consolidation of the
Planning Department and the LADBS, Individual 1 orchestrated and
facilitated an arrangement whereby Chairman E provided $600,000
in collateral for HUIZAR to obtain a personal loan from Bank 1
for $570,000 to confidentially pay the sexual harassment
settlement and legal fees.

63.   On October 7, 2013, Individual 1 e-mailed HUIZAR
talking points regarding an upcoming motion to prevent the
consolidation of the Planning Department and the LADBS.  The
same day, Individual 1 followed up by text message: "just e-
mailed you the talking points. Thank you so much sir!"
Individual 1 opposed the consolidation of the two departments
because it would mean losing his powerful position as Interim
General Manager of LADBS and forcing Individual 1 to leave LADBS
or work below the then-head of the Planning Department, with
whom Individual 1 did not get along.

64.   On October 8, 2013, at Individual 1's request, HUIZAR
filed an amended motion and spoke in favor of preventing the

consolidation of the two departments.  The same day, Individual 1 expressed his gratitude to HUIZAR in a text message: "You are such an eloquent speaker! UNBELIEVABLE! Please accept my deepest, most sincere gratitude. Believe me or not, I have [t]ears in my eyes! I am actually crying! Thank you, thank you, thank you!"

65.  On October 17, 2013, HUIZAR and Individual 1 discussed the sexual harassment lawsuit filed against HUIZAR.  HUIZAR wrote in a text message: "Lets talk later [Individual 1]. The lawsuit was filed. Speaking with my attorneys now."  Individual 1 responded: "The chairman [E] asks if there is anything that he can help. Please call me. Thanks."  Individual 1 later wrote: "I'll brief the chairman [E]."

66.  On October 18, 2013, Individual 1 coordinated a meeting between HUIZAR and Chairman E to discuss Chairman E's financial help regarding the lawsuit.  Individual 1 wrote: "[Chairman E] wants to see you before he leaves.[10] Can you come to the hotel now? May be you can bring the cigars. Please call me."

67.  On November 5, 2013, Individual 1 e-mailed HUIZAR a motion to present regarding the proposed consolidation of the City departments.  The same day, Individual 1 wrote to HUIZAR in a text message: "Good morning sir, I heard that the item (motion) may go consent this morning at council. If it goes consent, then I guess we do not need to do the amendment. If it

---

[10] Chairman E resided in China but frequently visited Los Angeles.

is called special, then can you please introduce the amendment? Please advise."

68.   On November 6, 2013, HUIZAR forwarded the motion and e-mail from Individual 1 to another public official writing: "Don't mention I got this from [Individual 1]. Please print and have ready for me to submit to council today on this item."

69.   Based on my knowledge of the investigation, the consolidation of the Planning Department and LADBS did not take place, and Individual 1 was able to maintain his position as the General Manager of LADBS.  Based on my interview of several witnesses, Individual 1 often credited HUIZAR for saving his career.  For example, at a dinner held at a downtown Los Angeles restaurant attended by HUIZAR, Esparza, Chairman E, Individual 1, and other City officials, Individual 1 raised a toast for HUIZAR and credited HUIZAR for saving his job.

70.   On December 19, 2013, Individual 1 forwarded a "HUIZAR Re-Election Campaign – Donation Form" to Chairman E by e-mail. Based on my knowledge of the investigation, I believe that Individual 1 was assisting HUIZAR in requesting contributions from Chairman E towards HUIZAR's re-election campaign.  Because Chairman E is a Chinese citizen, I am aware from my conversations with the assigned AUSAs that he is prohibited from contributing to any U.S. elections.[11]

71.   During the subsequent months, HUIZAR, coordinating through Individual 1, came to an agreement with Chairman E for

---

[11] 52 U.S.C. § 30121: Contributions and donations by foreign nationals.

Chairman E to fund the settlement of HUIZAR's sexual harassment lawsuit.  Chairman E instructed Executive Director E and Employee E[12] to execute the necessary paperwork to effectuate the financial transactions.

72.  On July 18, 2014, Individual 1 continued coordinating discussions between HUIZAR and Chairman E regarding the settlement funds.  Individual 1 wrote to HUIZAR in a text message: "Chairman [E] called me last night and we had a great conversation. Will there be a good time to talk this morning?" Individual 1 later followed up: "Sir, [Executive Director E] and I called you at around 2. You didn't pick up. Please call me at your convenience."

73.  Beginning in August 2014, HUIZAR, Esparza, and Executive Director E, communicated by e-mail with Attorney E, who was retained by Executive Director E to draft and execute the necessary paperwork to effectuate the financial transactions transferring funds to HUIZAR.  For example, on August 10, 2014, Attorney E wrote an e-mail to Esparza and Executive Director E explaining: "A retainer agreement will be signed between [Executive Director E]'s company in Hong Kong and ... my office."  Attorney E then requested the company's name in Hong Kong and the signatory.

74.  On August 17, 2014, HUIZAR e-mailed Esparza, Executive Director E, and Attorney E regarding settlement funds for the

---

[12] Employee E was an employee of Company E and worked directly for Chairman E and Executive Director E in the City. At Chairman E's direction, Employee E was the sole representative of Holding Company E, a Hong Kong company, in handling Holding Company E's funds in the United States.

sexual harassment lawsuit, writing: "[P]laintiff attorney is asking for a deadline of Tuesday noon to sign settlement. otherwise they pull the settlement offer. let me know as soon as money has been transferred and available. i just need to know it is there before we sign it."

75.   On August 20, 2014, Individual 1 and HUIZAR discussed coordinating meetings with Chairman E to discuss the settlement funds.  Individual 1 asked HUIZAR in a text message: "did you have a chance to talk to the chairman last night?"  HUIZAR responded: "No. Didn't hear anything."  Individual 1 then suggested: "I think you should call [Executive Director E] to find out the latest."  Later the same day, Individual 1 asked: "Have you set up a meeting with the chairman?"  Several hours later, Individual 1 wrote: "[Executive Director E] told me that you me[t] with the chairman and things have been worked out. Right?"  HUIZAR responded: "Yes. I have been running around today. Can I call [you] in half hour?"

76.   On or about August 22, 2014, HUIZAR executed a Promissory Note with Holding Company E, wherein Holding Company E agreed to wire $600,000 to HUIZAR.  The Promissory Note provided that the principal and all accrued interest would be due and payable as one "balloon payment of $800,000" no later than August 22, 2020.

77.   On August 25, 2014, Individual 1 wrote to HUIZAR to check in regarding settlement fund discussions: "Good morning sir. I hope you did well in [Las Vegas]. Do you have a good time to talk?"  In an earlier text message on June 14, 2014,

Individual 1 wrote to HUIZAR: "I'll tell the chairman. I'll confirm the Vegas trip with him and report back to you."  As discussed above, records show that HUIZAR and Chairman E traveled to Las Vegas together from August 22-25, 2014.  Based on my knowledge of the investigation and these communications, I believe that Individual 1 was aware that HUIZAR traveled to Las Vegas with Chairman E.

78.  On September 3, 2014, Attorney E e-mailed HUIZAR about finalizing the Promissory Note: "When we meet I would like for you to sign a copy of this Promissory Note that is witnessed by [Employee E], the representative of [Holding Company E]."  The same day, HUIZAR responded to the e-mail, writing: "can you find out before we go if I can simply state the purpose of loan is: 'for personal use.' Would that be sufficient. **I obviously do not want to state that it is for settlement**."  Based on my knowledge of the investigation and the context of these communications, I believe this evidences HUIZAR's desire to conceal the source of his settlement funds and his corrupt relationship with Chairman E.

79.  On September 15, 2014, HUIZAR instructed Individual 1: "hold off on asking chairman. George [Esparza] told me that [Executive Director E] was frustrated that we keep asking him. [Executive Director E] said that chairman [E] will call china tonight. Lets wait til tomorrow to see what happens." Individual 1 responded: "Will do sir!"  Based on my knowledge of the investigation and context of the communications, I believe this confirms HUIZAR and Individual 1 had an agreement that

Chairman E would be the person directing the movement of money from China to a bank in the United States to fund HUIZAR's lawsuit settlement and help save HUIZAR's political career.

80.  On September 17, 2014, Bank 1 opened a Certificate of Deposit account under Holding Company E, ending in 0407 ("the CD Account").  Based on my review of bank records, HUIZAR and Holding Company E were both listed as "owner" on the CD Account, and Employee E was listed as the authorized signor.

81.  On September 19, 2014, Individual 1 wrote to HUIZAR: "Everything good sir?" HUIZAR confirmed: "Yes" and "Thank u."

82.  Based on my review of bank records, sometime before September 22, 2014, $600,000 was wired to an attorney trust account in California.  Subsequently, a check was issued from the attorney trust account to Holding Company E in the amount of $600,000.

83.  On September 22, 2014, Chairman E caused Holding Company E to deposit the $600,000 check into the CD Account as a Certificate of Deposit.  Based on my review of bank records, the CD had a maturity beginning date of September 17, 2014 and a term of 60 months.

84.  On September 23, 2014, HUIZAR caused Bank 1 to issue a loan to HUIZAR for $570,000, using the $600,000 from Chairman E in the CD Account as collateral for the loan.  The "Note, Security Agreement and Disclosure Statement" for the loan was signed by HUIZAR as the borrower and Employee E as the grantor. The loan provided for 60 monthly payments, with the total amount

to be repaid as $656,687.47, and the first interest payment due on October 23, 2014.

85.   On September 23, 2014, HUIZAR authorized a transfer of $570,000 from his personal loan account at Bank 1 to a bank account for the law firm that represented HUIZAR in the sexual harassment lawsuit to pay for the settlement of the lawsuit.

86.   On December 4, 2014, Bank 1 sent an e-mail to HUIZAR and Employee E, the signatory on the Promissory Note and guarantor on HUIZAR's loan, requesting the foreign address of Holding Company E in connection with the loan.  Employee E forwarded the request to Executive Director E and another Company E employee.  Because Employee E, Executive Director E, and another Company E employee were involved in managing the account of Holding Company E, I believe Chairman E directed the actions of his employees in arranging the financial transaction to benefit HUIZAR.

87.   On December 4, 2014, HUIZAR sent a text message to Esparza, writing: "Tell [Executive Director E] that [Employee E] needs to send address of foreign company to [Bank 1]. I got notice today that they have been asking her for it and if they don't get it, **it will instigate an audit and we don't want that**. Have her send address tomorrow."  I believe this is further evidence that HUIZAR was concerned that an "audit" would lead to detection of the financial arrangement between Company E and HUIZAR.

88.   On March 3, 2015, HUIZAR was re-elected as Councilmember for CD-14.

89.   On May 10, 2016, HUIZAR forwarded a request from Bank 1 regarding paperwork for the loan to Chairman E, via Esparza and Executive Director E.  This again confirms that Chairman E was directly involved in the loan arrangement of Holding Company E.

90.   Based on my review of bank records, on December 12, 2018, after HUIZAR failed to make interest payments on his personal loan for three consecutive months, Bank 1 applied the collateral provided by Chairman E to the amount HUIZAR owed on the loan, totaling $575,269.61, which meant that HUIZAR would no longer have to pay this amount to the bank.

(3)   Official Acts by HUIZAR

91.   In exchange for the $600,000 collateral for HUIZAR's personal loan and during the time Chairman E was also supplying financial benefits to HUIZAR at casinos, Chairman E asked for a series of benefits from HUIZAR.

92.   On May 17, 2013, an employee of Company E e-mailed Esparza requesting a "favor" from HUIZAR on behalf of Chairman E, relating to a visa application for another Company E employee.  HUIZAR complied with the request and signed a letter on official letterhead addressed to the United States Consulate General in Guangzhou, China, supporting a visa application for the Director of Finance for Company E.

93.   Based on my review of e-mails and text messages, between June 2013 and December 2013, Chairman E, through Individual 1, enlisted HUIZAR's help to negotiate and resolve a

parking lot dispute with the owners of a plot of land adjacent to Property E.

94.   In June 2013, Chairman E and Individual 1 enlisted HUIZAR's help regarding Chairman E's son's admission to a southern California university.  On June 4, 2013, Chairman E sent an e-mail to HUIZAR, writing: "I would be grateful if you could do me a favor to help contact with [the school] about my son's [application] status."  Thereafter, HUIZAR agreed to contact a high-ranking official at the school regarding the application.  HUIZAR facilitated a meeting between Chairman E's son and the high-ranking official.  On June 15, 2013, Individual 1 sent an e-mail to Chairman E's son, copying Chairman E, writing: "Attached is a letter from you to [the high-ranking school official] thanking him for his help and guidance. Please sign, scan, and e-mail the letter back to you so I can mail the letter to him on your behalf."

95.   Based on my review of e-mails and text messages, between July 2013 and October 2013, Chairman E asked for HUIZAR to arrange a meeting with the head of a labor union, which had a dispute related to Property E.

96.   In 2014, to benefit Chairman E's reputation in the business community, HUIZAR introduced and signed a resolution before the City Council recognizing Chairman E for his achievements and contributions to the economy of CD-14, which the City Council signed and adopted.

97.  On June 27, 2017, Esparza put a Company E employee in touch with a HUIZAR staff member to facilitate resolving union issues at Chairman E's two hotels in Los Angeles.

98.  Most significantly, Chairman E provided bribes to HUIZAR because, as the Chair of the PLUM Committee and CD-14 Councilmember, HUIZAR was poised to significantly benefit Chairman E's desire and plans to redevelop Property E and transform it into a 77-story skyscraper, making it the tallest building west of the Mississippi River.  This project would require official acts from HUIZAR at various stages of the City approval process, as explained further below.

99.  On March 10, 2016, Chairman E sent an e-mail to Executive Director E regarding the "land-use planning" for Property E and the engagement of a consulting firm for Project E.

100. On July 24, 2016, Executive Director E and a consultant discussed the expansion project in a text message conversation.  The consultant wrote: "We are supposed to get together with the Chairman [E] on Thursday and go over the expansion of two hotels."  Executive Director E responded: "Chairman [E] wants a conference call with you and [Individual 1] on Monday."

101. Based on my review of calendar entries, briefing memoranda, e-mails, and text messages, on August 4, 2016, HUIZAR, Individual 1, senior officials from the Planning Department, and senior CD-14 staff members met with Chairman E and his team to discuss the expansion of Property E, including

41

Chairman E's interest in pursuing Transient Occupancy Tax
rebates, Transfer of Floor Area Rights, and other incentives
from the City.

102. According to Esparza, in or around August 2016, on a
private jet flight back from Las Vegas, Chairman E requested
HUIZAR's assistance in hiring a consultant on Project E.  HUIZAR
agreed to help.  Thereafter, on August 15, 2016, Esparza texted
HUIZAR regarding Project E: "Reminder boss to decide what land
use expediters you want to recommend to the Chairman [E]."

103. On October 19, 2016, Executive Director E forwarded an
e-mail and attachment prepared by Chairman E to HUIZAR regarding
Project E.  The attachment was a draft letter from HUIZAR to
Chairman E on HUIZAR's official letterhead, referencing Chairman
E's "application for the Los Angeles Highest Building Project
[Project E]" and a recent meeting attended by HUIZAR, Individual
1, and other City officials regarding Project E.  On October 20,
2016, HUIZAR signed the official letter after revising it to
remove the reference to Individual 1 and noting: "The proposed
project may result in one of the largest buildings in the City
of Los Angeles."  At HUIZAR's direction, Esparza then sent the
letter by e-mail to Chairman E.

104. On December 16, 2016, Esparza forwarded an e-mail to
HUIZAR from City Staffer A-2,[13] listing a number of consultants,
writing: "Hi Boss, Here is the list of land use consultants per
[City Staffer A-2]'s past recommendations. Chairman [E] would

---

[13] City Staffer A-2 works for the City on HUIZAR's staff in
CD-14.

like us to schedule interviews on Monday."  On December 12, 2016, HUIZAR sent the list of consultants to Executive Director E by e-mail, who then forwarded the list to Chairman E.

105. On May 9, 2017, in a telephone call, Esparza and Executive Director E discussed the financial relationship between Chairman E and HUIZAR.  Specifically, Executive Director E stated that Chairman E expected to lay out "everything in front of" HUIZAR at an upcoming trip to Cabo San Lucas, which referred to the assistance Chairman E expected from HUIZAR on Project E.  Executive Director E stated that "otherwise Chairman [E] [will] ask [HUIZAR] to ... pay back that $600,000 already." When Esparza stated that "[HUIZAR]'s not going to do that either," Executive Director E responded: "Chairman [E] will push him."

106. On May 9, 2017, in a telephone call between Esparza and another CD-14 staffer, Esparza stated: "Chairman [E] should have all the leverage in the world [be]cause of what [HUIZAR] owes [Chairman E]."

107. On June 11, 2018, Company E filed an application with the Planning Department to expand and redevelop Property E.  The application listed four specific requested actions/entitlements: (1) vesting tentative tract map; (2) specific plan project permit compliance; (3) transfer of floor area of greater than 50,000 square feet; and (4) master conditional use permit for on-site sale and consumption of alcohol for five establishments. Each of these entitlements would need approvals in the PLUM Committee and City Council.

108. Based on my review of evidence seized from digital devices, in or around August 2018, Chairman E paid for a trip for HUIZAR to a golf resort in Northern California, including private jet round trip transportation, accommodations, meals, and other costs.  During the trip and in the months thereafter, Chairman E agreed to support Relative A-1's campaign for the CD-14 seat, including by hosting a fundraiser in November 2018 and pledging to raise or contribute $50,000 to benefit the campaign.

109. On September 4, 2018, during a conversation at Chiang and Individual 1's office, Chiang and Individual 1 discussed fundraising for Relative A-1's campaign, including the contemplated $50,000 contribution by Chairman E.  Chiang stated: "I think we are bringing the money very quickly."  Individual 1 replied: "If we bring some of ours too eventually, you know, because [HUIZAR and Relative A-1] have also both Chairmen [D and E]."  Chiang responded: "Actually for Chairman [E] $50,000." Individual 1 then replied: "I mean the Chairman [E] is very, very, very generous, Chairman [E] is very generous for that ... $50,000."

110. On September 24, 2018, HUIZAR met with Businessperson A, who was then working at the direction of the FBI, at a restaurant in Los Angeles.  During the recorded meeting, HUIZAR told Businessperson A that Chairman E was going to host a fundraising event for Relative A-1 at one of Chairman E's hotels on November 9, 2018, with the goal of raising $100,000.

C.   **Project C Bribery Scheme**

111. Unless otherwise noted below, my knowledge of the facts summarized below is based on my review of relevant e-mail and text communications and intercepted wire and electronic communications referenced and quoted herein, interviews of relevant individuals (including Esparza and Kim), review of City records and publicly available documents, and bank records.

112. In the summer of 2016, Labor Organization A filed an appeal requesting to suspend all activity to implement one of Developer C's development projects, Project C, that required City approval, until Project C was brought into compliance with the requirements of the California Environmental Quality Act ("CEQA") by correcting certain deficiencies (the "appeal").  The appeal prevented Project C from progressing through the rest of the City approval processes, including approvals by the PLUM Committee and City Council.

113. Between August 2016 and July 2017, Developer C agreed to fund a $500,000 cash bribe designed to benefit HUIZAR, through Esparza and Kim, in exchange for HUIZAR's assistance on Project C.  Developer C, through Kim, initially provided $400,000 in cash that Developer C intended for HUIZAR between February and March 2017.  HUIZAR directed Esparza to hide $200,000 of the total bribe payment for HUIZAR.  Esparza and Kim each kept a portion of the remaining $200,000 bribe payment for themselves as kickbacks for facilitating the bribe.  In exchange, Developer C, through Kim and Esparza, sought to use HUIZAR's influence as the Councilmember of CD-14 and Chair of

45

the PLUM Committee to pressure Labor Organization A to withdraw, abandon, or otherwise lose its appeal opposing Project C, thereby allowing the project to move forward in its City approval process.

114. On September 1, 2016, at HUIZAR's request, City Staffer A-2 briefed HUIZAR regarding Project C, noting that "Justin Kim will be requesting your support in denying the appeal," and that the CEQA component was "appealable to PLUM/City Council."

115. On September 1, 2016, Esparza, Kim, and HUIZAR had dinner together and then visited a Korean karaoke establishment in Los Angeles.  During the karaoke meeting, Kim asked HUIZAR for assistance with the appeal on Project C, and HUIZAR agreed to help.  Kim then called Developer C and asked him to join the group at karaoke, which Developer C did.

116. On September 2, 2016, Esparza and Kim met for lunch in Los Angeles.  At HUIZAR's direction, Esparza expressed to Kim that HUIZAR would not help Project C for free and that HUIZAR's help would require a financial benefit in exchange for his help ensuring Project C moved forward through the City approval process.

117. On January 17, 2017, Esparza, HUIZAR, Kim, and Developer C's business associates met at HUIZAR's City Hall office to discuss, among other things, Project C.  During a private meeting that included only HUIZAR, Esparza, and Kim, Kim again asked HUIZAR for assistance with the appeal, and HUIZAR responded that he could help.

46

118. In or around January 2017, at the direction of HUIZAR, Esparza learned that resolving the appeal on Project C would save Developer C an estimated $30 million on development costs.

119. On January 19, 2017, Esparza documented his conversations with HUIZAR in a note to himself on his phone,[14] writing: "Just had talk with Councilman HUIZAR at 5pm about asking Justin Kim for 1.2mil for taking care of [Labor Organization A] 500 for him 500 for Justin 200 for me."

120. In or around January 2017, based on his conversations with HUIZAR and Lobbyist C,[15] Esparza told Kim that it would cost approximately $1.2 million to $1.4 million to get HUIZAR to resolve the appeal and allow Project C to move forward in the City approval process.

121. Between February 2, 2017 and February 10, 2017, Esparza had individual text message conversations with HUIZAR and Kim, discussing the negotiation of the bribe payment and the amount of the bribe payment from Developer C to HUIZAR.

122. In approximately February 2017, Esparza and Kim had discussions regarding the negotiation of the bribe amount.  Kim conveyed a counteroffer of $500,000 cash from Developer C for HUIZAR.  Esparza then conveyed this counteroffer to HUIZAR, stating specifically that HUIZAR would get $300,000 total and

---

[14] The FBI seized ESPARZA's phone and I have reviewed his notes.

[15] Lobbyist C is a consultant and lobbyist for real estate developers with projects in the City, including Company H, and a close associate of the Executive Director of Labor Organization A.

Kim would get $200,000 total for facilitating the bribery scheme.

123. In approximately February and March 2017, Esparza and HUIZAR discussed the appeal.  HUIZAR instructed Esparza to speak to Lobbyist C, a close associate of the Executive Director of Labor Organization A.  Subsequently, HUIZAR discussed the appeal with Lobbyist C.  HUIZAR conveyed to Lobbyist C that HUIZAR would oppose the appeal in the PLUM committee.  Lobbyist C agreed to discuss the issue with the Executive Director of Labor Organization A.

124. On February 14, 2017, Esparza had a text message conversation with Lobbyist C about setting up a private meeting between Lobbyist C and HUIZAR.  Specifically, Esparza wrote: "My boss [HUIZAR] asked if you guys can have a one on one on Tuesday at 830am?... Just you and the Councilman."

125. On February 21, 2017, Esparza documented his conversations with HUIZAR in a note to himself on his phone, writing: "Councilmember [HUIZAR] will talk to [Labor Organization A] and withdraw and at the end of the day we can kill any cpc."  Based on my knowledge of the investigation, I believe "we can kill any cpc" to mean that HUIZAR, as the Chair of the PLUM Committee, had the ability to "kill," "fix" or "reverse" any action by the CPC in the PLUM Committee.  As noted above, members and associates of the CD-14 Enterprise, including HUIZAR and Individual 1, emphasized this power that HUIZAR held as a way to leverage financial benefits for the enterprise.

126. On February 22, 2017, Esparza had a text message conversation with Lobbyist C about another private meeting at HUIZAR's request.  Specifically, Esparza wrote: "Hi [Lobbyist C], free tomorrow to meet? Councilman asked me to meet with you."  Lobbyist C responded: "Yea."  Esparza then wrote: "I still need to talk to you one on one per my bosses [HUIZAR] request."  Lobbyist C responded: "No problem."

127. On March 1, 2017, Esparza had a text message conversation with Lobbyist C regarding the appeal. Specifically, Esparza asked: "Everything good?"  Lobbyist C then replied: "Think so, You?"  Esparza responded: "Yes sir.. just checking in."

128. On March 3, 2017, Lobbyist C sent Esparza a text message regarding the appeal on Project C, writing: "Appeal dropped today."  Esparza then informed Kim that HUIZAR had held up his end of the bargain and helped resolve the appeal.

129. According to Kim, in approximately February or March 2017, Kim met with Developer C at Developer C's office in Los Angeles and received a paper bag from Developer C containing $400,000 in cash, which was intended to be a bribe Developer C agreed to pay for HUIZAR's assistance in resolving the appeal. After receiving $400,000 in cash from Developer C, Kim met with Esparza in a car outside Developer C's office and gave Esparza cash to deliver to HUIZAR.  Kim kept some cash for himself for facilitating the bribe payment.

130. According to Esparza, he met Kim in Esparza's car outside Developer C's office on two separate occasions in

February and March 2017 to pick up cash from Kim.  According to Esparza, Esparza also kept some money for himself for facilitating the bribe payment, and ultimately told HUIZAR he only received approximately $200,000 in cash from Kim.

131. Evidence obtained from Esparza's phone further corroborates these events.

a.    On March 14, 2017 at approximately 2:30 p.m., Esparza sent a text message to Kim that asked: "Address again please."  Kim provided the address for Company C.  At approximately 2:34 p.m., Esparza entered "[Company C], [Company C address], Los Angeles, US" into his Waze application.[16] [17] Esparza then texted Kim: "I'm on the corner. Wait for u in my car."

b.    A couple hours later on March 14, 2017, at 4:48 p.m., Esparza sent a text message to HUIZAR, asking: "Are you home?"  HUIZAR responded: "Yes."  Esparza then wrote: "Can I stop by? Just finished meeting with Justin [Kim]."

---

[16] Waze is a GPS navigation software application. It works on smartphones and tablet computers that have GPS support. It provides turn-by-turn navigation information and user-submitted travel times and route details, while downloading location-dependent information over a mobile telephone network.

[17] Esparza's Waze activities were seized pursuant a federal search warrant.

c.   The same day, Esparza took several photographs of the cash he received from Kim, including the following photograph that was taken with Esparza's iPhone at approximately 5:10 p.m., based on the photograph's metadata:



132. Later that day, at approximately 5:15 p.m., HUIZAR and Esparza met at HUIZAR's residence.  According to Esparza, Esparza told HUIZAR that Developer C had provided $400,000 in cash to date, and that Developer C would provide the remaining $100,000 later.  Esparza stated that Kim had provided $200,000 of that cash to Esparza, and that Kim kept the remaining $200,000 as his share for facilitating the bribe.  At the meeting, Esparza showed HUIZAR a liquor box filled with cash. According to Esparza, HUIZAR told Esparza to hold on to and hide the money at Esparza's residence until HUIZAR asked for it. HUIZAR told Esparza that Esparza could have $100,000 of the

$300,000 total amount HUIZAR expected to receive from Developer C, meaning HUIZAR's share of the bribe was $200,000.

      a.  Photographs and videos from Esparza's iPhone corroborate that Esparza took a liquor box filled with cash to HUIZAR's residence on March 14, 2017, including the following photograph taken at 5:15 p.m., based on the photograph's metadata:



    133. On December 28, 2017, HUIZAR and Esparza met at City Hall and, in HUIZAR's private bathroom, discussed various topics, including Esparza's interviews with the FBI and the cash bribe Esparza was holding for HUIZAR.  I have listened to a copy of a recording of this meeting and reviewed the associated transcript.  Specifically, during that conversation, HUIZAR stated: "And secondly, um, look, uh, I have a lot of expenses now that with [Relative A-1] running, [Relative A-1]'s not going to be working anymore. I'm gonna need money. Um, that is mine,

right? That is mine." According to Esparza, he understood
HUIZAR to be referring to the $200,000 cash when stating "that
is mine." Esparza affirmed the $200,000 cash bribe money was
HUIZAR's. HUIZAR and Esparza agreed to wait until April 1,
2018, for Esparza to provide the $200,000 cash owed to HUIZAR,
to allow some cooling off period after Esparza's June and July
2017 interviews with the FBI in hopes that it would decrease the
likelihood of law enforcement discovering the cash.

134. In or around April 2018, HUIZAR and Esparza
communicated by telephone and agreed to postpone their meeting
to deliver HUIZAR's bribery cash to October 1, 2018.

135. In or around September and October 2018, HUIZAR sent
Esparza a series of unanswered text messages regarding the
October 1, 2018 meeting and expected delivery of HUIZAR's cash
bribe. Specifically, on September 30, 2018, HUIZAR wrote: "Hey
George [Esparza]. Tomorrow is October first. When we gonna
meet?" On October 4, 2018, HUIZAR wrote: "Hey George [Esparza].
So we gonna meet up like u said we would after October?"

136. On October 5, 2018, HUIZAR and Kim met at a hotel in
Pasadena. According to Kim, HUIZAR asked Kim to turn off his
phone during the meeting, which Kim believed was to ensure their
meeting was not recorded. HUIZAR stated that he had not gotten
his share and held up two fingers, which Kim believed referred
to the $200,000, which was HUIZAR's share of the bribe payment
from Developer C in exchange for HUIZAR's help with the appeal.
HUIZAR explained that he did not get his share of the bribe
payment because Esparza was still holding on to the cash.

137. HUIZAR continued to try to meet with Esparza to obtain HUIZAR's portion of the bribe proceeds.  On October 14, 2018, HUIZAR sent a text message to Esparza, writing: "George [Esparza]. I've been trying to connect with you. We have a meeting that was supposed to occur on October 1."  On October 20, 2018, HUIZAR wrote: "George [Esparza]. I've been trying to reach u. When are we going to meet and square up?"  On October 22, 2018, HUIZAR wrote: "Sounds like u don't ever want to meet and face up to your commitment to meet on October 1 and u are using other pretexts as to why u don't want to meet. You are using excuses as for the real reason u don't want to meet and u know it. U told me October. Now What? Each time comes up and u don't want to meet at all? U want it all and that's the real reason why you don't want to meet and are using all kind of excuses. One more time, when are we going to meet?"

138. On April 10, 2019, the U.S. Attorney's Office and FBI interviewed HUIZAR, who was present with counsel.  At the beginning of this interview, HUIZAR was advised that lying to the government was a crime.  During the interview, regarding the Project C bribery scheme, HUIZAR falsely stated (a) regarding the hundreds of thousands of dollars cash payment Kim provided to Esparza, HUIZAR told Esparza "that is yours, I do not want it"; and that (b) HUIZAR had never asked Esparza for any of that cash.

### D.   Project D Bribery Scheme

139. Unless otherwise noted below, my knowledge of the facts summarized below is based on my review of relevant e-mail

and text communications and intercepted wire and electronic communications referenced and quoted herein, interviews of relevant individuals (including Chiang and Esparza), review of City records and publicly available documents, and bank records.

(1)   Early Corrupt Relationship with Company D

140. Beginning in early 2014, Individual 1 facilitated the introduction of HUIZAR to Company D and Chairman D.  For example, on March 24, 2014, Individual 1 sent Esparza an e-mail, writing: "Below is the website of [Company D] which is in Chinese.  You need to use Google Translation. The name of the Chairman is [Chairman D]."

141. On August 21, 2014, Employee D sent an e-mail to HUIZAR and General Manager D[18] requesting HUIZAR's assistance regarding an American Disabilities Act ("ADA") compliance issue at one of Company D's hotels in the City.

142. On August 26, 2014, Employee D sent an e-mail to HUIZAR, a CD-14 staffer, and General Manager D that stated: "I just got a call from Building and Safety Department of LA City, and a meeting with them is confirmed tomorrow morning to discuss about our ADA challenge. Thanks so much again for JOSE [HUIZAR] and you for helping us with this. Looking forward to meeting you again in person in the near future."

143. On August 27, 2014, Individual 1 confirmed to HUIZAR that he helped resolve the ADA issue for Company D, writing in a text message: "I took care of the disabled access issue for the

---

[18] General Manager D was the general manager of Project D until he was terminated from that role in approximately January 2017.

[Company D] Hotel already. I told them that you asked me to help. They were very appreciative."

144. On September 19, 2014, Employee D sent an e-mail to Esparza, writing: "Hi George [Esparza], Please find in the attachment for the electronic tickets of Katy Perry's concert tomorrow. Hope your boss [HUIZAR] and his family will enjoy it." The e-mail attached three tickets valued at approximately $1,000 total. Esparza subsequently forwarded the e-mail and tickets to HUIZAR.

145. On November 4, 2014, Individual 1 sent a text message to HUIZAR, writing: "I will be having dinner with chairman [D] tonight. I also knew that you will have dinner with him Thursday. I just want to touch base with you as to what George Chiang and I should tell him."

146. On November 4, 2014, Chiang sent an e-mail to Esparza with the subject line "HUIZAR Fundraising," writing: "Can you get me in touch with [HUIZAR]? [Individual 1] and I had dinner with [Company D] last night regarding pledging their support so I want to discuss this to prepare the Councilman's dinner with them this Thursday."

147. Based on my review of calendar entries, e-mails and text messages, on November 26, 2014, HUIZAR, Esparza, Chiang, Chairman D, and Relative A-1 met over dinner at Property D. At the meeting, HUIZAR and Chairman D discussed Company D's financial support for HUIZAR and HUIZAR's support for Project D.

148. On September 7, 2015, Individual 1, in his capacity as the then General Manager of LADBS, communicated with HUIZAR and

56

Chiang regarding Project D.  Specifically, Individual 1 sent a group text message to HUIZAR and Chiang, writing: "Per our conversation a few days ago, I am sending you this text message to suggest to you the names of the people whom you should invite to the biweekly [Company D]-Planning meeting.  On [Company D] side, [General Manager D], George Chiang, (whom I include in this text message), and [an attorney] should be invited. They may bring others. On the Planning side, [a Planning official] should be invited and you need to demand his presence. I am certain that he would bring others. [A public official] represented the mayor's office should also be invited. At your first meeting, please stress that this will be a standing biweekly meeting until the TFAR matter is determined. Please let me know if there is anything that I can be is assistance. Best, [Individual 1]."

149. On September 8, 2015, Chiang sent a group text message to HUIZAR and Individual 1, writing: "Dear JOSE [HUIZAR] and [Individual 1], thank you for making this arrangement possible. As the clock ticks, the chairman [D] is beginning to feel weary about our progress. I just need to make sure that he sees the light at the end of the tunnel. Once again, thank you both for all of your support hopefully I can bring some good news within the near future. Like always, please let me know if I can be helpful. Thanks, George [Chiang]."

150. In or around 2015 or 2016, HUIZAR, through Esparza, asked Chiang to have Company D set up a monthly retainer with

Law Firm A, from which Relative A-1 received bi-weekly paychecks of approximately $2,500.

151. According to Chiang, in approximately 2016, at a meeting that Chiang attended, HUIZAR told Chairman D that there was no need to involve the City's Mayor in the approval process of Project D because HUIZAR was the one in control of the PLUM committee.  HUIZAR stated that the City's Mayor could not provide help to Chairman D and it was HUIZAR who drove the project.  In addition, HUIZAR told Chiang privately to tell Chairman D that as far as the success of Project D was concerned, Chairman D did not need anyone else in the City but HUIZAR.

> (2)  Consulting Fees from Company D in Exchange for Official Acts

152. Between November 2015 and November 2016, HUIZAR solicited financial benefits from Company D, including from Chairman D, General Manager D, and Chiang in exchange for HUIZAR's official acts to benefit Project D.  Specifically, Chairman D and General Manager D agreed to provide indirect financial benefits to HUIZAR in the form of consulting fees to HUIZAR Associate 1[19] in exchange for HUIZAR introducing a motion to benefit Project D.

153. Based on my review of e-mail and text messages, and my interviews of Esparza and Chiang, on November 11, 2015, HUIZAR, Chiang, Esparza, Chairman D, and General Manager D met over

---

[19] HUIZAR Associate 1 is a close associate of HUIZAR, and operated Company A in the City.

dinner at a restaurant in Arcadia, California.  According to
Chiang, who translated the conversations, HUIZAR and Chairman D
discussed HUIZAR's support for Project D.  In the same
conversation, HUIZAR asked Chairman D to hire one of HUIZAR's
associates, who later turned out to be HUIZAR Associate 1, on
Project D.  Chairman D told HUIZAR to discuss the details with
General Manager D.

154. On November 16, 2015, Chiang sent an e-mail to
Esparza, copying General Manager D, confirming the new agreement
between HUIZAR and Chairman D.  Chiang stated: "Now with a
common consensus in place for [Project D], we would like to roll
this project full speed ahead. Therefore, I would like to
request the biweekly standing meeting to restart.... From this
point on, we would like to communicate all aspects of our
project with your [CD-14] office FIRST prior to any other
offices in the city family.... [P]lease be ready to coordinate
with Mayor's office, Planning Department, and all other related
parties so we can drive on a singular track."

155. On December 2, 2015, HUIZAR sent a text message to
Chiang checking in on the status of Chairman D's agreement to
hire HUIZAR Associate 1, writing: "Any response from chairman
[D]?"  Based on my knowledge of the investigation and the
context of communications, I believe HUIZAR was checking on the
arrangement whereby Chairman D would hire HUIZAR Associate 1.

156. On December 8, 2015, HUIZAR and Chiang had a
conversation via text message regarding the response from
Chairman D.  Chiang wrote: "Hi Councilman [HUIZAR], let me know

when you have time to chat really quick." HUIZAR responded: "On phone or in person?" To avoid discussing the corrupt arrangement on the phone, Chiang responded: "Better in person just need ... no more than 15 min." Based on my knowledge of the investigation, members and associates of the CD-14 Enterprise often met in person to discuss incriminating topics in order to not document such conversations or have them over the phone in an effort to evade law enforcement detection.

157. On December 8, 2015, as part of the new agreement, HUIZAR and Chiang met in person at a coffee shop in Los Angeles to discuss a consulting agreement to pay HUIZAR's Associate. At the meeting, Chiang told HUIZAR that General Manager D would work with HUIZAR on retaining HUIZAR's Associate. HUIZAR told Chiang that Relative A-1 would be involved with getting the retainer consummated.

158. Between December 8, 2015 and December 16, 2015, at a meeting at the site of Project D, General Manager D asked Chiang if Chiang's consulting company could hire HUIZAR's Associate if, in return, Company D would increase the retainer with Chiang to cover that cost. Chiang declined.

159. On December 13, 2015, at General Manager D's direction, Chairman D's relative traveled from Vancouver, Canada to Los Angeles, California to discuss the arrangement whereby Chairman D's relative would pay HUIZAR Associate 1 for purported real estate advice from Relative A-1. I have reviewed flight records and e-mail communications confirming this trip.

160. On December 16, 2015, Chiang facilitated an introduction between Relative A-1 and Chairman D's relative. Based on my review of text messages, Relative A-1 met with Chairman D's relative at a café in Pasadena, California, to discuss an arrangement whereby Chairman D's relative's company would pay a company affiliated with HUIZAR's Associate, purportedly for real estate advice.

161. On April 11, 2016, HUIZAR sent a text message to Chiang, writing: "How is [Relative A-1] agreement going? Has everything been set up with [HUIZAR Associate 1]?"

162. On April 19, 2016, HUIZAR sent a text message to Chiang, stating that HUIZAR "would like to briefly speak with [General Manager D]" about an "[u]pdate on some of my meetings with [Relative A-1]." Chiang responded: "Let me call [General Manager D] right now and get back to you."

163. Based on my review of text messages, on April 20, 2016, HUIZAR and General Manager D met at a restaurant in Los Angeles to discuss the arrangement whereby Company D would provide a concealed retainer payment to HUIZAR Associate 1 through Chairman D's relative.

164. On April 26, 2016, HUIZAR sent a text message to Chiang and asked: "Everything good?" Chiang responded, "Yes sir!" HUIZAR subsequently answered: "Cool. The more I think about our project, the more I get excited about it. Let's meet every two weeks or so to see how things are going.... I think it'll be great!"

165. In May 2016, Company A and Chairman D's relative's company executed an agreement whereby Company A would purportedly "provide marketing analysis for Real Estate and Land Development Opportunities in the Greater Southern California Area in the total amount of $11,000.00 per month for services rendered.  The term of this agreement is one (1) year with one (1) option year."  In reality, Chiang prepared the monthly marketing analysis reports and delivered them to HUIZAR, who then provided them to HUIZAR Associate 1, who collected the $11,000 monthly retainer.  HUIZAR, Chiang, Chairman D, and General Manager D understood that the monthly retainer payments were intended to be and were indirect bribe payments to HUIZAR in exchange for HUIZAR's official acts to benefit Project D.

166. On May 31, 2016, HUIZAR and Chiang had a conversation via text message regarding HUIZAR obtaining the monthly reports purportedly prepared by Company A (but in fact prepared by Chiang) pursuant to the consulting agreement with Chairman D's relative regarding real estate and land development opportunities.

**Real Estate Report #1**

167. On May 31, 2016, Chiang delivered to HUIZAR his first real estate report that they intended would be passed off as being created by Company A pursuant to its $11,000 per month consulting agreement with Chairman D's relative.

168. Between May 31, 2016 and June 8, 2016, HUIZAR met with HUIZAR's Associate and delivered the first real estate report he received from Chiang.

169. On June 8, 2016, HUIZAR's Associate caused his employee to send an e-mail to Chairman D's relative transmitting the first report and first invoice for May 2016.

170. On June 15, 2016, pursuant to the consulting agreement, Chairman D's relative sent the first wire payment of $11,000 to Company A, to a Union Bank account ending in 6345.

171. On June 27, 2016, Company A issued $11,000 in three checks from the account ending in 6345, in the following amounts: (1) $5,000 to a company controlled by HUIZAR Associate 1; (2) $5,000 to HUIZAR Associate 1; and (3) $1,000 to HUIZAR Associate 1's relative.

**Real Estate Report #2**

172. On July 1, 2016, Chiang met with HUIZAR at a coffee shop in Los Angeles, where Chiang delivered his second real estate report.

173. On July 14, 2016, HUIZAR met with HUIZAR's Associate and delivered the second real estate report he received from Chiang.

174. On July 14, 2016, HUIZAR's Associate caused his employee to send an e-mail to Chairman D's relative transmitting the second report and second invoice for June 2016.

175. On July 19, 2016, pursuant to the consulting agreement, Chairman D's relative sent the second wire payment of $11,000 to Company A, to a Union Bank account ending in 6345.

176. On July 26, 2016, Company A issued $10,000 in two checks of $5,000 each from the account ending in 6345, to HUIZAR Associate 1.

**Real Estate Report #3**

177. On August 1, 2016, Chiang met with HUIZAR at a restaurant in Los Angeles, where Chiang delivered his third real estate report.

178. On August 10, 2016, HUIZAR met with HUIZAR's Associate at a restaurant and delivered the third real estate report he received from Chiang.

179. On August 11, 2016, HUIZAR's Associate caused his employee to send an e-mail to Chairman D's relative transmitting the third report and third invoice for July 2016.

180. On August 17, 2016, pursuant to the consulting agreement, Chairman D's relative sent the third wire payment of $11,000 to Company A, to a Union Bank account ending in 6345.

**Real Estate Report #4**

181. On September 2, 2016, Chiang met with HUIZAR at a coffee shop in Los Angeles, where Chiang delivered his fourth real estate report.

182. On September 8, 2016, HUIZAR met with HUIZAR's Associate and delivered the fourth real estate report he received from Chiang.

183. On September 8, 2016, HUIZAR's Associate caused his employee to send an e-mail to Chairman D's relative transmitting the fourth report and fourth invoice for August 2016.

184. On September 9, 2016, pursuant to the consulting agreement, Chairman D's relative sent the fourth wire payment of $11,000 to Company A, to a Union Bank account ending in 6345.

185. On September 16, 2016, Company A issued $11,000 in three checks from the account ending in 6345, in the following amounts: (1) $5,000 to a company controlled by HUIZAR Associate 1; (2) $5,000 to HUIZAR Associate 1; and (3) $1,000 to HUIZAR Associate 1's relative.

**Real Estate Report #5**

186. On October 4, 2016, Chiang met with HUIZAR at HUIZAR's residence, where Chiang delivered his fifth real estate report.

187. On October 14, 2016, HUIZAR met with HUIZAR's Associate over breakfast and delivered the fifth real estate report he received from Chiang.

188. On October 14, 2016, HUIZAR's Associate caused his employee to send an e-mail to Chairman D's relative transmitting the fifth report and fifth invoice for September 2016.

189. On November 14, 2016, pursuant to the consulting agreement, Chairman D's relative sent the fifth wire payment of $11,000 to Company A, to a Union Bank account ending in 6345.

190. On November 17, 2016, Company A issued $10,300 in two checks from the account ending in 6345, in the following amounts: (1) $4,500 to a company controlled by HUIZAR Associate 1; and (2) $5,800 to HUIZAR Associate 1.

**Real Estate Report #6**

191. On November 3, 2016, Chiang met with HUIZAR at a coffee shop in Los Angeles, where Chiang delivered his sixth and final real estate report.

192. On November 3, 2016, HUIZAR met with HUIZAR's Associate and delivered the sixth real estate report he received from Chiang.

193. On November 23, 2016, HUIZAR's Associate caused his employee to send an e-mail to Chairman D's relative transmitting the sixth report and sixth invoice for October 2016.

194. On November 30, 2016, pursuant to the consulting agreement, Chairman D's relative sent the sixth wire payment of $11,000 to Company A, to a Union Bank account ending in 6345.

195. On December 8, 2016, Company A issued a $10,000 check from the account ending in 6345 to HUIZAR Associate 1.

**Official Acts by HUIZAR**

196. On November 22, 2016, HUIZAR, in his official capacity, presented a written motion in the Economic Development committee to benefit Project D.

197. On December 13, 2016, the City Council adopted the Project D motion HUIZAR presented.  HUIZAR voted "yes" on the matter in City Council.

198. On December 13, 2016, Chiang, HUIZAR, and General Manager D met at the site of Project D to discuss Project D and HUIZAR's agreement to expedite the project going forward.

199. Based on my search of HUIZAR's residence on November 7, 2018, HUIZAR's computer seized from his residence, and HUIZAR's email account, HUIZAR created various "TO DO LIST" documents outlining his political and financial plans, including a section he titled "Business Development."  For example, on July 14, 2016, HUIZAR sent an attachment titled "June 2016" to

himself by e-mail.  The attachment was a Word document with the heading "TO DO LIST."  Under the "Business Development" section, HUIZAR included Company A as a sub-heading with the following notations below: "Establish K with Real Estate Advice with [Relative A-1] (120 k/year): June 1?" and "[HUIZAR Associate 1] Support per [another individual]."  Based on my knowledge of the investigation, I believe this entry to mean that HUIZAR expected to establish a contract for real estate advice between Company A and Relative A-1 that would pay Relative A-1 $120,000 per year beginning on June 1, 2016, which would mean approximately $10,000 per month.  Beginning in June 2016, Company A received $11,000 per month from Chairman D's relative for purported real estate advice.  I believe this suggests that HUIZAR expected some type of financial arrangement whereby Company A and HUIZAR Associate 1 would funnel a portion of the consulting fees it received from Chairman D's relative to HUIZAR through Relative A-1.

> (3)  <u>Additional Benefits from Company D in Exchange for Official Acts</u>

200. Between February 2017 and October 2018, HUIZAR solicited additional financial benefits from Company D, including from Chairman D and Chiang, in exchange for HUIZAR's additional official acts to benefit Project D by moving it further along in the City approval process.  Specifically, Chiang and Chairman D (a) agreed to facilitate a trip to China for HUIZAR and his family that was funded, at least in part, by Chiang and Chairman D; (b) committed $100,000 to benefit

Relative A-1's campaign for the CD-14 seat; and (c) provided event tickets and other miscellaneous expenses at HUIZAR's request, all in exchange for HUIZAR facilitating the approval of Project D in the CPC, PLUM Committee, and City Council.

201. On February 9, 2017, HUIZAR requested Chiang's assistance in coordinating a trip to China for HUIZAR and his family. Specifically, HUIZAR wrote to Chiang in a text message: "Dates available: April 14-23. Me, wife, and 3 kids would be going... We would need visas... I think I may have mine .. can u help with that?"

202. In or around April 2017, at HUIZAR's request, Chiang organized and coordinated a trip for HUIZAR and his family members to visit Chairman D in China. Chiang coordinated and paid approximately $500 for visa fees, and arranged for transportation for HUIZAR and his family in Hong Kong.

203. Between April 15, 2017 and April 23, 2017, HUIZAR and his family visited Chairman D in Hong Kong and China. Chairman D paid for certain transportation, meals, and lodging for HUIZAR and his family members.

204. On April 27, 2017, at HUIZAR's request, Chiang provided concert tickets to HUIZAR worth approximately $1,572.

205. On May 2, 2017, in a telephone call, Chiang and Esparza discussed the mutually beneficial financial relationship between Chinese developers and HUIZAR and Individual 1. Specifically, Esparza told Chiang: "Looking from your perspective, you bank on [Individual 1], and [HUIZAR]'s office to do, one of the main points with [HUIZAR], for your Chinese

clients for example, 'entitlements, PLUM,' you got to use that and we gotta keep making his motherfucking, him happy."

206. On May 10, 2017, in a telephone call, Esparza told Chiang: "So today we had a productive day where [HUIZAR] told [City Staffer A-2], let's streamline the [Company D] project."

207. On May 13, 2017, via a text message conversation, HUIZAR expressed his eagerness to benefit Chairman D in connection with Project D.  HUIZAR wrote to Chiang: "But the 2 tower is better for chairman [D] and his choice? [Because] if he wanted the 3 towers and that is the best choice, we can make that happen."

208. On May 19, 2017, at HUIZAR's request, Chiang paid approximately $1,000 for alcohol for a party for Relative A-2.

209. On May 20, 2017, during a telephone call with an associate, Esparza confirmed HUIZAR's intention to keep the China trip discreet, stating: "China was supposed to, China was a real, you know, he didn't pay for that shit, that was a real you know fucking low key thing."

210. On June 19, 2017, at HUIZAR's request, Chiang provided concert tickets to HUIZAR worth $1,670.

211. On June 22, 2017, during a telephone call, Chiang and Individual 1 discussed HUIZAR's request for benefits from Chiang.  Specifically, Individual 1 asked: "so what is the deal now with [HUIZAR] going to uh, Cuba or whatever?"  Chiang explained that HUIZAR asked him to coordinate a trip to Cuba for HUIZAR and a woman with whom he was having an affair. Individual 1 then asked: "So he just wanted you to do what, to

... pay for all the trips, is that what he wants?"  Chiang then
stated that HUIZAR would have to get special visas, and
explained that this would risk potentially exposing their
corrupt relationships: "I told [HUIZAR], I said look, we're all
gonna be on record and if something happens, everything,
everyone's dead."

212. On June 23, 2017, in a telephone call, Chiang and Kim
discussed using HUIZAR's influence as a councilmember going
forward and HUIZAR's requests for financial benefits.
Specifically, Kim stated: "this is my agenda, not only do I want
to make money, George [Chiang], I want to show you and other
Chinese developer, assuming [HUIZAR] is there, how much
motivation he's going to have to push everything around for my
project, those are my agenda."  In response, Chiang asked if
HUIZAR understood "what he needs to do in three and a half
years."  Kim replied: "Yes, yes. Everything is set. You're gonna
see some differences, alright George?"  Chiang then asked to
meet with Kim, stating that HUIZAR was asking for "some very
stupid requests."  Kim responded: "I'm not going to make a
comment," to which Chiang stated: "Yeah, let's not talk about
this on the phone."

213. On August 24, 2017, Chiang asked for HUIZAR's help on
Project D.  Specifically, Chiang sent a text message to HUIZAR,
writing: "Hi Boss, wanted to give you heads up: [A Company D
employee] spoke to chairman [D] and CPC [City Planning
Commission] needs to be 9/14/17 otherwise the loan commitment
from lender will be lost for the project."  The next day, Chiang

again sent a message to HUIZAR, writing: "Hi Boss, we met with planning yesterday and went through the outstanding items for 9/14/17 CPC. We would need a motion from your office to direct the TFAR allocation by next week before council recess to make the 9/14/17 CPC hearing."

214. On August 24, 2017, in a telephone call, Chiang told Individual 1: "Do or die, because if we lose the September 14 [CPC hearing date], then we lose all loan commitments from the lender ... you know, probably not looking at a project." Individual 1 responded: "You mentioned to [HUIZAR] this is a big issue."  Chiang responded: "Yes, yes, I did, I told him ... the motion is very important in order for us to move forward.... We all spoke to the Chairman [D], and the Chairman [D] is willing to make a lot of sacrifices."

215. On September 1, 2017, at Chiang's request, HUIZAR presented a written motion in the PLUM committee to benefit Company D, allowing Project D to move forward with its application and approval process before the CPC and City Council.  The same day, HUIZAR notified Chiang that he held up his end of the bargain to help Company D.  Specifically, HUIZAR wrote to Chiang in a text message: "We got the motion in today."

216. In or around September 2017, HUIZAR used his official position to pressure other officials, including officials in the Planning Department and in the Mayor's office, to influence the approval of Project D by the CPC.

217. On September 14, 2017, HUIZAR wrote to Chiang in a text message: "Congrats. Yeah we [CD-14 office] were calling

71

mayors office to tell his commission to calm down. It's expected from cpc they throw a lot of junk at projects these days.  Not over but make sure u relay to chairman [D] that we were helpful."

218. On September 14, 2017, in a telephone call, HUIZAR told Chiang: "You know, whatever it was, we'll fix it in PLUM.... Did the boss [Chairman D], you call the boss [Chairman D] already? ... Did you tell him that my office was helpful?" Chiang responded: "I told [Chairman D] everything."  HUIZAR then stated: "Okay, cool, cool, cool. Good, good.... Do we have a schedule for PLUM already?"

219. In or around November 2017, HUIZAR asked Chiang to make a commitment on behalf of Company D to contribute $100,000 to Relative A-1's campaign in exchange for continued favorable official acts by HUIZAR to benefit Project D.  Chiang, on behalf of Company D, told HUIZAR he could confirm Chairman D's commitment of $100,000 to PAC A.

220. On November 16, 2017, at HUIZAR's direction, Esparza created a spreadsheet titled "IE [Independent Expenditure] HUIZAR Strategy," which included a $100,000 contribution from Company D with Chiang listed in the "Notes" column.

221. On December 4, 2017, HUIZAR created a spreadsheet titled "Initial Commitments to PAC," which included a $100,000 contribution from George Chiang.

222. On December 5, 2017, the PLUM Committee, including HUIZAR, voted to approve Project D.

223. On December 12, 2017, the City Councilmembers present at a hearing voted to adopt the PLUM Committee report for Project D, which approved the entitlements and allowed Company D to move forward in the City approval process.

224. Based on my review of text messages and my interview of Chiang, on January 24, 2018, HUIZAR, Chiang, Chairman D, Individual 1, and Relative A-1 met for dinner at Chairman D's hotel in San Gabriel, California.  At the dinner, Chairman D pledged his commitment and support for Relative A-1's campaign for the CD-14 seat.

225. On February 12, 2018, via a text message conversation, HUIZAR and Chiang further confirmed the agreement to have Company D contribute to PAC A to benefit Relative A-1's campaign.  HUIZAR wrote to Chiang: "fundraiser for PAC will call u today."

226. On March 9, 2018, HUIZAR submitted a resolution in the PLUM Committee to benefit Company D, allowing Project D to move forward in its approval process.

227. On March 20, 2018, the City Councilmembers present at a hearing voted to adopt the Company D resolution submitted by HUIZAR on March 9, 2018.

228. On March 29, 2018, HUIZAR and Chiang met at HUIZAR's residence to discuss Company D's support and the $100,000 contribution to the PAC to benefit Relative A-1's campaign. Later the same day, HUIZAR acknowledged Chiang's agreement to facilitate a contribution to Relative A-1's campaign, writing in a text message to Chiang: "Thanks again for all your help."

229. On April 23, 2018, Chiang wrote to Individual 1 via text message: "Below are items I'm talking to [HUIZAR] about: 1) tell [HUIZAR] that [Chairman D] is coming in June, we can talk about the PAC at that time."

230. On April 23, 2018, HUIZAR and Chiang met at HUIZAR's residence to discuss HUIZAR's continued support for Project D in exchange for Company D's agreement to contribute $100,000 to PAC A to benefit Relative A-1's campaign.

231. On May 18, 2018, HUIZAR met with Chiang and Individual 1 for breakfast at a restaurant in Boyle Heights.  According to Chiang, HUIZAR stated that he needed the PAC contribution as soon as possible.  HUIZAR stated he wanted the contribution now so that when Relative A-1 announced her candidacy, she would have money to pour into the campaign and scare other potential candidates from running against her.  HUIZAR stated that other developers already contributed in amounts of $50,000, $100,000, and $200,000.

232. On June 12, 2018, the City Council, including HUIZAR, voted to approve the Development Agreement for Project D.  The same day, HUIZAR wrote to Chiang in a text message: "Da [Development Agreement] for [Company D] just passed council today.  Does that mean project has been fully entitled? Is that our last vote?"

233. On June 18, 2018, HUIZAR wrote to Chiang in a text message: "When is the chairman [D] coming in to town? We need to finalize pac stuff. Thanks."

74

234. On July 30, 2018, the ordinance authorizing the execution of the Development Agreement for Project D went into effect.  The same day, HUIZAR wrote to Chiang in a text message: "any news on when [Chairman D] is coming in to town? Hoping to catch dinner with him and talk about [Relative A-1] campaign." Chiang responded: "Hi Boss, [Individual 1] is working on it. I let you know after I see him in office tomorrow."

235. On October 8, 2018, HUIZAR followed up regarding Company D's commitment to PAC A, writing to Chiang in a text message: "Hey George [Chiang]... have time to meet soon to tie up some loose ends re the [Company D] project?"

236. On October 16, 2018, HUIZAR and Chiang met at HUIZAR's residence and discussed Company D's agreement to contribute to PAC A to benefit Relative A-1's campaign, as promised, in exchange for HUIZAR taking multiple official acts to benefit Project D.

### E.    Project M Bribery Scheme

237. Unless otherwise noted, my knowledge of the facts summarized below is based on my review of relevant e-mail and text communications and intercepted wire and electronic communications referenced and quoted herein, review of City records and publicly available documents, PAC records, and bank records.

238. HUIZAR, Lobbyist B, and Executive M agreed to a scheme whereby Company M would provide direct and indirect financial benefits at HUIZAR's request in exchange for HUIZAR's assistance

on Project M, located in CD-14 and pending in the City approval
process.

          (1)   <u>First $25,000 PAC Contributions</u>

     239. Beginning in approximately 2014, Executive M enlisted
Lobbyist B to facilitate a relationship with HUIZAR, whereby
Company M would request HUIZAR's assistance on a number of
issues related to Project M, and provide financial support to
HUIZAR in return.  For example, on September 7, 2015, Lobbyist B
sent Executive M a text message, writing: "Don't forget dinner
with HUIZAR tomorrow at [a restaurant]... He is bringing [City
Staffer A-2]."  Executive M responded: "Perfect. Can I bring
that gift?"  Lobbyist B replied: "Yes. I told him it was largely
social but conversation likely would also drift to [Project M]
and [another Company M project in CD-14]."

     240. On November 14, 2015, Executive M wrote to Lobbyist B
in a text message: "Id like to set up a meeting with [City
Staffer A-2]. If possible in next two weeks."  Lobbyist B
replied: "I requested a meeting with HUIZAR, but he is gone next
week. Could get with [City Staffer A-2], solo, if you want."
Executive M answered: "Whatever you think is best. Also, Pls
remind me to talk to you about how we can get [a City Planning
official] recognition. Maybe a call or letter from mayor or
HUIZAR. Important as he will be critical for [another Company M
project in the City] and [Project M]."

     241. Based on my review of a briefing memorandum prepared
by City Staffer A-2, on November 24, 2015, at HUIZAR's
direction, City Staffer A-2 met with Executive M and Lobbyist B

to discuss entitlement issues for Project M.  Thereafter, City
Staffer A-2 briefed HUIZAR, explaining: "[Company M] will be
asking you today about the possibility of you initiating the
[General Plan Amendment]."  Company M needed a General Plan
Amendment as an initial step in its City approval process, which
would include approvals with respect to affordable housing
conditions and the height of the project, among other things.

242. In or around August 2016, Executive M and Lobbyist B
had discussions via text message regarding the General Plan
Amendment for Project M.  Specifically, on August 2, 2016,
Executive M wrote: "We have a real problem. [The Planning
Department] did not approve our gpa [General Plan Amendment]
again. Let's talk asap in the morning."  On August 11, 2016,
Lobbyist B wrote to Executive M: "I got the meeting request in?
How we doing on the [General Plan Amendment] motion, etc?...
Spoke to HUIZAR. We will meet ne[x]t Thursday and he will
introduce the motion to initiate."

243. Based on my review of a briefing memorandum prepared
by City Staffer A-2, on August 18, 2016, HUIZAR, Lobbyist B, and
Executive M met at HUIZAR's City Hall office to discuss Project
M.  At the meeting, Lobbyist B and Executive M asked HUIZAR to
file a motion to initiate a General Plan Amendment for Project
M.  HUIZAR agreed to initiate the General Plan Amendment, either

by exerting pressure on the Planning Department to do so or by filing a motion.

244. On or about August 26, 2016, after urging from HUIZAR and his staff, the Planning Department approved the General Plan Amendment initiation for Project M.

245. Based on my review of text messages and e-mails, in September 2016, less than a month after HUIZAR had provided significant assistance to Company M and Executive M, HUIZAR asked Lobbyist B for contributions to PAC B from Lobbyist B's clients with projects pending in CD-14, including from Executive M on behalf of Company M in exchange for HUIZAR's support on the projects.  Lobbyist B agreed to convey the requests to his clients.

246. On October 13, 2016, Esparza sent a text message to Lobbyist B providing the information for PAC B, and adding: "according to my boss that's for [another developer] and [Company M]. He said he spoke to u about it."

247. On October 13, 2016, Lobbyist B sent an e-mail to Executive M, passing on information for PAC B he received from Esparza.  Executive M replied: "Timing and amount?"  Lobbyist B then wrote: "25K as soon as possible."

248. On October 26, 2016, Executive M wrote to Lobbyist B in a text message: "I should have checks by tomorrow. All I need is the letter. Would it be worth setting up a quick drink or coffee with JOSE [HUIZAR] when we deliver? Could be good to talk big picture, etc."  I understand this to mean Executive M wanted to discuss the progress and future of Company M's project with

78

HUIZAR at the same time Executive M presented HUIZAR $25,000 in political contributions on behalf of Company M.

249. On October 31, 2016, Lobbyist B sent a text message to Esparza, writing: "When can I get [Executive M] in with JOSE [HUIZAR] to deliver the checks?"

250. On November 9, 2016, Executive M's company made three contributions for $8,333.33 each from three separate entities, totaling $25,000, to PAC B, at HUIZAR's request, and in exchange for HUIZAR's continued help on Project M.

(2)  Second $25,000 PAC Contributions

251. Based on my review of text messages, on February 15, 2017, HUIZAR and Lobbyist B met for lunch in Downtown Los Angeles to discuss various projects.  At the lunch, HUIZAR asked Lobbyist B for an additional $25,000 contribution to PAC B from Company M, which Lobbyist B agreed to convey to Executive M.

252. On February 21, 2017, Lobbyist B informed Esparza that Executive M "acknowledged the conversation with JOSE [HUIZAR]" but did not respond on details about Company M's contribution to the PAC.

253. On February 25, 2017, HUIZAR sent a text message to Esparza, writing: "Any update on [Executive M] 25k?"

254. On March 17, 2017, Company M made a contribution for $25,000 to PAC B, at HUIZAR's request, in exchange for  HUIZAR's continued help on Project M.

255. On March 20, 2017, Executive M sent an e-mail to Lobbyist B, writing: "Do you think we are in a more favored status with JOSE [HUIZAR] compared to [another developer]?"

256. On May 5, 2017, in a telephone call, HUIZAR and Lobbyist B discussed Company M's contribution to PAC B at HUIZAR's request.  HUIZAR and Lobbyist B found out that the PAC publicly disclosed Company M as a top donor for a political ally of HUIZAR.  Lobbyist B told HUIZAR that a reporter was "asking who asked us for the donation, but we, we're not gonna respond to that."  HUIZAR responded: "Thank you very much. I appreciate that."  Lobbyist B stated: "No of course."  Lobbyist B then stated: "When I told George [Esparza], I said, look, my two things that I gotta protect you know ... [Company M] and gotta protect you."  HUIZAR responded: "Yeah, gotcha, gotcha."  HUIZAR then stated "we can't be sloppy about this and trust, uh, [HUIZAR Associate 2[20]], but, anyway, we will save that conversation for tomorrow, ok?"  Based on my knowledge of the investigation and context of these communications, I believe HUIZAR and Lobbyist B were concerned about the public finding out that HUIZAR directed Company M to contribute to PAC B because it would risk exposing the corrupt relationship he was fostering with Company M through Lobbyist B.  Lobbyist B was expressing loyalty to HUIZAR and their mutual interest in protecting both HUIZAR and Company M.

    (3)  <u>Third $25,000 PAC Contributions</u>

257. On January 8, 2018, HUIZAR and Lobbyist B had a discussion via text message regarding Project M and Company M's

---

[20] HUIZAR Associate 2 is a close associate and fundraiser for HUIZAR, who created and operated a political action committee ("PAC"), PAC B, which, at times, was used to benefit HUIZAR's political causes.

willingness to contribute to their newly established PAC A. Specifically, HUIZAR wrote: "Let's do the pac stuff later this week. See u there at 6. What's purpose of tonight's meeting? Are they [Company M] gonna help with pac?"  Lobbyist B replied: "[Executive M] wants to talk about their [Project M] and see if you're comfortable with the height and affordability levels." HUIZAR answered: "Are they gonna help with pac?"  Lobbyist B replied: "I'm sure they will, however - as your friend - let's discuss this in a different text thread," because Lobbyist B knew that HUIZAR conditioning his official assistance on Project M on their financial support for PAC A was incriminating.

258. On February 23, 2018, HUIZAR and Lobbyist B had a discussion via text message regarding PAC A.  Specifically, Lobbyist B wrote: "Are you checking the Confide App for texting on your iPhone?"  Lobbyist B further wrote: "I was going to text you about your meeting with [PAC A's attorney]. Wanted to see if we got any clarification. Confide is good for texting because it is like Snap Chat...message disappears."  Based on my knowledge of this investigation, various members and associates of the CD-14 Enterprise utilized Confide to have illicit communications in an effort to avoid documenting their incriminating conversations.

259. On May 8, 2018, Executive M and Lobbyist B had a discussion via text message regarding a meeting with the Planning Department scheduled for the same day for Project M. Specifically, Executive M wrote: "Very important that [City Staffer A-2] calls [a Planning Department official] letting them

know he supports the height etc. please please make sure this happens prior." Lobbyist B later wrote: "[City Staffer A-2] will let them know their position, and then make the changes in PLUM." Executive M later wrote: "This would be a disaster if they took a position to deny[.] This meeting seems to be a really bad idea now. When does JOSE [HUIZAR] get back?" Lobbyist B responded: "Spoke with [City Staffer A-2]. He will speak with [the Planning Department official], and then call me to report back prior to our meeting."

260. On May 8, 2018, at HUIZAR's direction, City Staffer A-2 provided CD-14's position and encouraged a Planning Department official to approve Project M to allow the project to proceed to a hearing before the City Planning Commission.

261. On June 14, 2018, the City Planning Commission approved Project M, allowing it to move forward to a hearing before the PLUM Committee and ultimately City Council. The City Planning Commission imposed certain conditions for approval, including specific affordable housing requirements that would ensure a significant percentage of low-income individuals had an opportunity for housing at the project.

262. On June 20, 2018, Company M made two contributions for $12,500 each from two separate entities, totaling $25,000, to PAC A, at HUIZAR's direction, in exchange for his help on Project M.

(4)   Fourth $50,000 PAC Contributions

263. On August 9, 2018, Lobbyist B sent an e-mail to Executive M regarding Project M's upcoming hearing before the

82

PLUM Committee, writing: "We need to address the Labor issue. Seriously...we need to take [the executive of Labor Organization B] off the chess board."

264. On September 4, 2018, in a text message, Lobbyist B told Executive M: "I have a one-on-one meeting with JOSE [HUIZAR] tonight at his house. You're number one on agenda." That same day, based on my review of additional text messages and calendar entries, HUIZAR met with Lobbyist B regarding the Labor Organization B issue Company M was facing on Project M. During the meeting, Lobbyist B requested, on behalf of Executive M, for HUIZAR to vote against Labor Organization B's appeal by approving Project M in the PLUM Committee.  HUIZAR told Lobbyist B that if he were to vote against the labor union in PLUM, then Executive M would have to make it worthwhile.

265. Based on my review of text messages and calendar entries, on September 6, 2018, at approximately 11:30 a.m., Lobbyist B and Executive M met to discuss Project M and resolve its labor issue.  During the meeting, Lobbyist B discussed with Executive M that they needed to make it worthwhile for HUIZAR's intervention with Labor Organization B.  Executive M and Lobbyist B agreed that Company M should offer to HUIZAR to make an additional $50,000 contribution to PAC A.

266. Based on my review of additional text messages and calendar entries, later that day, on September 6, 2018, at approximately 12:20 p.m., in a text message, Lobbyist B asked HUIZAR: "Hi...can you and I please chat for five minutes after [another project] meeting?"  After a meeting for another project

scheduled at 1:30 p.m., HUIZAR and Lobbyist B met outside a restaurant in Boyle Heights to discuss the new arrangement with Executive M, wherein HUIZAR would assist Project M to resolve its labor union issue in exchange for an additional $50,000 contribution to a PAC to benefit Relative A-1's campaign.  At the meeting, Lobbyist B conveyed the offer of an additional $50,000 contribution to PAC A, and HUIZAR agreed to accept the contribution in exchange for voting to approve Project M over objections by Labor Organization B.  HUIZAR also requested a private meeting with Executive M.  At approximately 3:10 p.m., in a text message, Lobbyist B asked Executive M: "Can you do dinner with HUIZAR on Tuesday, 9-25?"

267. On September 10, 2018, in a text message, Lobbyist B asked HUIZAR: "Re: [Company M] & [Project M]. You are meeting with [Executive M] on 9-25 to negotiate public benefits package. Could we target PLUM on 10-02 with the clear understanding that the item gets pulled from agenda with no deal? [City Staffer A-2] is waiting for direction from you before scheduling."

268. On September 11, 2018, in a text message, HUIZAR asked Lobbyist B: "Hey, let's talk about your fundraiser for [Relative A-1] before event and who U are inviting. I want to make sure we are hitting people up for right amount and we are not calling same people."  Lobbyist B replied: "Of course." HUIZAR then asked: "Oct 11 still good for you?"  Based on my knowledge of the investigation, Lobbyist B planned to host a fundraiser for Relative A-1 on October 11, 2018.  Just after the text messages with HUIZAR, Lobbyist B, in a text message, told Executive M:

84

"Plan on 10-02 PLUM. But let's discuss..."  Based on the context
of the text messages, timing of the text messages, and my
knowledge of the investigation, I believe Lobbyist B's statement
"but let's discuss..." to be in reference to, among other
things, the need to make the contribution in exchange for the
PLUM approval.

269. On September 12, 2018, while HUIZAR was negotiating
the additional financial benefit he sought from Executive M and
Company M, HUIZAR used his official position as the PLUM Chair
to postpone his Committee's hearing on Project M to October 2,
2018, thereby causing the project to be delayed.

270. Based on my review of calendar entries, on September
14, 2018, Lobbyist B, Executive M, and City Staffer A-2 had a
meeting to discuss Project M.

271. On September 24, 2018 at approximately 10:12 a.m., in
a text message, Lobbyist B told HUIZAR: "We are meeting
[Executive M] tomorrow for dinner. Do you still want [DTLA
Restaurant], or would you like someplace a bit more private?"
At approximately 12:46 p.m., in a text message, Executive M
asked Lobbyist B: "Any news?"  Lobbyist B replied: "Not yet.
Still working on it."  Shortly thereafter, in a text message,
Executive M stated: "On call with ceo. What's up?"  Lobbyist B
replied: "Meeting is moved to breakfast on 10-04 @ 9 AM."
Executive M replied: "But that pushes our date??? This is a
disaster."  Lobbyist B responded: "Yes....it pushes the date.
It's going to get done."

272. On September 26, 2018, in a text message, Lobbyist B asked Executive M: "any chance you can do your one on one dinner with HUIZAR THIS Friday, 9-28?"  Executive M replied: "Yes. I'm assuming hearing date is the same?"

273. Based on my review of calendar entries, on September 27, 2018, HUIZAR and Lobbyist B had a meeting at HUIZAR's residence.

274. On September 28, 2018, HUIZAR and Executive M had a private meeting to discuss HUIZAR's support for Project M, its approval in the PLUM Committee, and Company M's support for the PAC to benefit Relative A-1's campaign.  During the same conversation, Executive M offered to provide opposition research to HUIZAR on two young female former HUIZAR staffers who had filed sexual harassment lawsuits against HUIZAR, and HUIZAR agreed.

275. On September 28, 2018, after the meeting with Executive M, HUIZAR sent a text message to Lobbyist B, writing: "Good meeting with [Executive M]. He is willing to help [Relative A-1] committee. He will collect from consultant/contractors. We didn't discuss amount. Please enlist him for your event and ask him to collect 15-20 k for your event."

276. On October 1, 2018, in a text message, HUIZAR told Lobbyist B: "Also, thanks for meeting for your fundraiser. As u know it'll take a while for your targets to collect checks. Please hit them up ASAP. Also, I've downloaded targets and amounts to [fundraiser] for 11th event. Thank u!"  Based on my

knowledge of the investigation, I believe "targets" to mean clients and developers associated to Lobbyist B, including Executive M, that HUIZAR and Lobbyist B were specifically targeting for contributions for PAC A to support Relative A-1.

277. Later that day, October 1, 2018, in a text message, Lobbyist B asked HUIZAR: "Can you please give me a ring tonight about [another project]? I made the ask and they agreed, but need to discuss union issue with you."  Based on the context of the text message and my knowledge of the investigation, I understand "ask" to mean a contribution.  I believe this message further portrays the corrupt relationship between HUIZAR and Lobbyist B, specifically Lobbyist B's facilitating HUIZAR's "pay-to-play" scheme, i.e. "ask" (benefit to HUIZAR) in exchange for union issue resolution (official act).

278. Based on my review of City records, on October 2, 2018, HUIZAR used his official position as the PLUM Chair to postpone his committee's hearing on Project M to October 16, 2018.

279. On October 11, 2018, HUIZAR, Executive M, and Lobbyist B attended a fundraiser for Relative A-1 hosted by Lobbyist B. At the fundraiser, Executive M provided HUIZAR the opposition research against the young female staffers he had promised as part of their agreement for HUIZAR to help Project M.

280. On October 13, 2018, Executive M sent a text message to Lobbyist B regarding the upcoming PLUM Committee hearing for Project M, asking: "Anyone else on plum we should connect with?" Lobbyist B replied: "I was thinking about it but I really don't

want to call attention to it. I would rather let JOSE [HUIZAR] power play it through."

281. On October 16, 2018, HUIZAR voted to deny the union appeal and to approve Project M in the PLUM Committee, including accepting certain modifications requested by Company M. Specifically, the PLUM Committee accepted Company M's preferred modifications to the affordable housing restrictions, thereby undoing the more stringent requirements recommended by the City Planning Commission.  As a result of HUIZAR's approval and undoing the CPC recommendations, Company M obtained significant reductions to Project M's affordable housing requirements. Specifically, based on my interviews of various public officials, HUIZAR's approval of Company M's modifications decreased low-income individuals' access to the project while ensuring Company M obtained an estimated $14 million in net savings.

282. That same day after the PLUM approval, in a text message, Lobbyist B told Executive M: "Let's talk tomorrow. I'm seeing JOSE [HUIZAR] on Thursday, so I know he will bring up follow up on a few items."  Executive M replied: "Ok. Thanks again."  Based on the context and timing of the text messages, and my knowledge of the investigation, I believe "follow up on a few items" to mean HUIZAR would inquire about the additional PAC commitment they had previously agreed upon.

283. Based on my review of text messages and calendar entries, on October 18, 2018, HUIZAR and Lobbyist B had a meeting at HUIZAR's residence.

88

284. On October 26, 2018, HUIZAR and Lobbyist B attended a World Series game at Dodger's Stadium.  Based on my review of receipts, one of Lobbyist B's clients paid approximately $10,571 for four tickets for Lobbyist B and HUIZAR.

285. On October 28, 2018, in a text message, Lobbyist B told Executive M: "I was with [HUIZAR] on Friday night. He still wants the meeting with you, he and [Labor Organization B] so you can shake hands in front of him. I have a request in for the meeting. Let's chat about it later today."

286. On October 30, 2018, in a text message, Lobbyist B told Executive M: "Okay...so, update. No meeting with [Labor Organization B] is necessary. All good for tomorrow in Council on [Project M]. JOSE [HUIZAR] is asking that in your communications with [Labor Organization B] you let them know you're bringing them to the table because of our mutual friend. Make sense?"  Based on the context of the messages and my knowledge of the investigation, I believe "our mutual friend" to be HUIZAR.

287. On October 31, 2018, the date Project M was before City Council, at approximately 10:35 a.m., in a text message, HUIZAR told Lobbyist B: "Get in touch with [Labor Organization B] right away please. It has other implications. Thank u."  At approximately 10:38 a.m., Lobbyist B sent a text message to Executive M: "U around? [HUIZAR] text me wanting to know when the call is done. So please do it on the sooner side...thanks." Shortly thereafter Lobbyist B replied to HUIZAR: "Spoke with [Executive M]...he's calling [Labor Organization B]."  HUIZAR

89

then answered: "Let me know when call is complete."  At approximately 1:50 p.m., Lobbyist B asked Executive M: "Let me know when you call [Labor Organization B]. I'm seeing [HUIZAR] twice tomorrow, so I know it will come up."  Executive M then replied: "Just left him a vm. Just connected. Good call with him."  At approximately 1:35 p.m., in a text message, HUIZAR asked: "Done?" and Lobbyist B replied: "[Executive M] and [labor union] spoke. All good."  At approximately 3:24 p.m., HUIZAR responded with a thumbs up emoji.

288. That same day, on October 31, 2018, HUIZAR voted to approve Project M in City Council.

289. October 31, 2018, Executive M sent an e-mail to the owners of Company M and other employees, writing: "Great news, we just received final unanimous approval for [Project M] by city council.  Although today is bit of a formality (PLUM is where the discretion usually happens), this is the final step." Executive M highlighted the benefits Company M was able to secure in PLUM from HUIZAR, writing: "our obligations related to rent [affordable housing] restrictions and union involvement are minimal compared to other future projects in the area." Executive M also touted "the entitlement of the tallest building in the arts district by 3 times (35 stories) in a wealthy opinionated hipster community" as a "truly amazing" accomplishment.

290. Based on my review of calendar entries, on November 1, 2018, at approximately 12:30 p.m., HUIZAR had a meeting with Lobbyist B.  That same day at approximately 4:51 p.m., Lobbyist

B and Executive M had a discussion via text message regarding contributions to PAC A.  Specifically, Lobbyist B wrote: "Can we meet up next week and go through the HUIZAR political stuff?"  Based on my knowledge of the investigation, I believe "political stuff" refers to political contributions, and in this particular context, the contribution to PAC A that Executive M agreed to make in exchange for HUIZAR's help on Project M.

      **F.**    **Businessperson A Scheme**

          (1)   Financial Benefits for Business Opportunities with Developers

291. Businessperson A was a business owner with businesses operating in CD-14.  Based on my interviews of Businessperson A, HUIZAR met Businessperson A in approximately 2016 or 2017 through Chairman E and Executive Director E.  Before Businessperson A began cooperating with law enforcement in August 2017, Businessperson A requested assistance from HUIZAR to enhance Businessperson A's financial prospects. Specifically, Businessperson A asked HUIZAR to use his official position to make introductions to developers and advocate that such developers use Businessperson A's business.[21]  In order to

---

[21] Businessperson A has also admitted that he provided benefits to then-Councilmember Mitchell Englander in exchange for introductions to developers, as detailed in the indictment filed on January 16, 2020, and unsealed on March 9, 2020, against Englander in United States v. Mitchell Englander, CR-20-35-JFW, charging violations of 18 U.S.C. § 1001 (false statements) and 18 U.S.C. § 1512 (obstruction).  On March 27, 2020, the government filed a plea agreement, in which Englander agreed to plead guilty to one count of a scheme to falsify material facts, in violation of 18 U.S.C. § 1001.  Englander's guilty plea hearing is currently scheduled for July 7, 2020.

facilitate this scheme, Businessperson A provided HUIZAR at
least the below financial benefits:

      a.  From approximately January 2017 to June 2017,
according to Businessperson A, HUIZAR accepted approximately
$10,000 in cash from Businessperson A on a monthly basis in
exchange for HUIZAR arranging meetings for Businessperson A with
developers in the City.

      b.  From approximately January 2017 to July 2017, at
HUIZAR's request, Businessperson A paid for hotel accommodations
in Los Angeles for HUIZAR totaling approximately $10,000, on
approximately 21 separate occasions, based on receipts.  On a
number of those occasions, at HUIZAR's request, Businessperson A
also paid approximately $300 in cash per occasion for "massage
services" utilized by HUIZAR.  According to Businessperson A, on
other occasions, HUIZAR would use the Businessperson A funded
hotel accommodations for discreet encounters with a woman with
whom he was having an affair.

      c.  From approximately June 2016 to June 2017, HUIZAR
also accepted other gifts from Businessperson A valued at
approximately $18,000 total, including expensive suits, shoes,
golf items, and meals, based on receipts.

      (2)  <u>$25,000 PAC Contribution for City Resolution</u>

    292. On or about March 11, 2018, HUIZAR met with
Businessperson A, who, unbeknownst to HUIZAR, had then begun
acting at the direction of the FBI, on a golf course in the
City.  Based on my interview of Businessperson A after the
meeting and my review of the recorded meeting, HUIZAR asked

Businessperson A to contribute to Relative A-1's campaign. Businessperson A stated that he would support the campaign but that he needed help from HUIZAR to provide an official resolution from the City recognizing Businessperson A's business. HUIZAR agreed to provide a City resolution and asked Businessperson A to contribute $25,000 to Relative A-1's campaign.[22]

293. In approximately March 2018, at HUIZAR's request, Businessperson A, while acting at the direction of the FBI, sent a check for $25,000 by U.S. Mail to PAC B intended to benefit Relative A-1's campaign.

294. On or about May 31, 2018, HUIZAR met with Businessperson A, who was acting at the direction of the FBI, at HUIZAR's City Hall office. Based on my interview of Businessperson A after the meeting and my review of the recorded meeting, as promised when Businessperson A agreed to contribute $25,000 to Relative A-1's campaign, HUIZAR presented a City resolution recognizing Businessperson A to promote Businessperson's business and reputation in the City. At this meeting, HUIZAR confirmed the PAC received Businessperson A's $25,000 contribution, adding that "the people who have the PAC, they know ... you're interested in helping [Relative A-1]. So it's sitting there for the right time." This statement

---

[22] On January 3, 2019, the U.S. Attorney's Office and FBI interviewed HUIZAR, who was present with counsel. At the beginning of this interview, HUIZAR was advised that lying to the government was a crime. During the interview, regarding the Businessperson A bribery scheme, HUIZAR falsely stated that he did not ask Businessperson A to contribute $25,000 to Relative A-1's campaign.

corroborates the fact that HUIZAR utilized PAC B as his personal financial vehicle to benefit Relative A-1's future campaign for the CD-14 seat.

(3)  Cash Payment for Pressure on Developer to Hire Businessperson A

295. On August 25, 2018, HUIZAR met with Businessperson A, who was acting at the direction of the FBI, at a golf course in the City.  Based on my interview of Businessperson A after the meeting and my review of the recorded meeting, during the meeting, HUIZAR asked Businessperson A for additional contributions to benefit Relative A-1's campaign.  During the same conversation, HUIZAR stated: "I'll go down a list of people that I could start introducing you to ... people ... that I know need my help.... Like for example, right now, [Company M] needs me.... So I could re-introduce them to you."  Further, Businessperson A and HUIZAR agreed that HUIZAR could "push" developers at these meetings to hire Businessperson A. Specifically, Businessperson A asked, regarding these meetings: "Yeah, maybe a little ... push, what do you think?" HUIZAR responded: "Yeah ... for right now they feel pressure, but they need me."

296. In September 2018, HUIZAR accepted a $15,000 cash payment in exchange for HUIZAR pressuring Company M to hire Businessperson A's company.  Specifically, on September 24, 2018, HUIZAR met with Businessperson A, who was acting at the direction of the FBI, at a restaurant in the City.  Based on my interview of Businessperson A after the meeting and my review of

94

the recorded meeting, during the meeting, HUIZAR accepted
$15,000 in cash from Businessperson A, who provided the cash
concealed in an envelope, which HUIZAR then covered with a
napkin.  During this meeting, HUIZAR stated that he had a
meeting with Company M the following day and that Company M's
project was coming up for approval soon.  HUIZAR stated that
Company M "need[s] a lot of help from my office," which was
meant to convey that Company M would feel pressure to do as
HUIZAR requested or risk adverse action taken against their
project.  HUIZAR assured Businessperson A that he would make
sure Company M scheduled a meeting with Businessperson A.  At
the end of the meeting, after Businessperson A had departed,
HUIZAR counted the cash inside the envelope, as I saw in
surveillance video from the restaurant.

297. At a dinner with Executive M on September 28, 2018,
HUIZAR asked Executive M to have a meeting with Businessperson
A.

G.   **Additional Pay-to-Play Conduct**

(1)   CD-14 Developers/Proxies' PAC Contributions to
Benefit Relative A'1 Campaign and CD-14
Enterprise

298. As discussed above, beginning no later than June 2016,
HUIZAR and others planned to have Relative A-1 succeed him as
Councilmember for CD-14 when his term ended and he was no longer
eligible for re-election in 2020, in order to maintain a
political stronghold in the City and perpetuate the pay-to-play
scheme that he and others had implemented.  In furtherance of

this plan, HUIZAR, Esparza, Lobbyist B, HUIZAR Associate 3, and others established a PAC that publicly was purported to benefit a broad array of candidates and causes but was, in fact, primarily intended to benefit Relative A-1's campaign.  HUIZAR, Esparza, Lobbyist B, HUIZAR Associate 3, and others thereafter pressured developers with projects in CD-14 to contribute to the PAC in exchange for favorable treatment of their projects, including in the PLUM Committee, Economic Development Committee, and City Council.  In addition, HUIZAR sought to convey to developers and their proxies that those who did not contribute as requested by HUIZAR would risk adverse action in the City process taken against their projects.

299. On May 10, 2017, in a telephone call, Esparza and Chiang discussed how HUIZAR was using a PAC to obtain additional financial benefits from developers in exchange for not taking adverse action against them.  Specifically, Esparza told Chiang: "[HUIZAR's] approach is that he's going to um, strong arm everyone ... to the PAC. [Company D], [Company F[23]]. 'This is what I want right now. This is my wife, this is what we are doing.' So his idea in his mind is that okay, people are going to support us because they don't want people to fuck with projects, you know."

300. On May 11, 2017, in a telephone call, Esparza and Executive Director E discussed punishing a developer who was not

---

[23] Company F is a China-based real estate development company that owned a development project located in CD-14.

providing financial benefits to HUIZAR by withholding approvals for the developer's project.  Specifically, Esparza said: "[Company G[24]] has not come through with any other commitments to us, to you, so you know, why even be helpful to them, you know, that's my thing... So I'm going to tell [HUIZAR] that I spoke to you and let's just continue to ignore them, you know.  We are not going to help them."  Executive Director E then added: "And even [Individual 1] doesn't want you guys to work with [Company G]."

301. On June 2, 2017, in a telephone call, HUIZAR, Relative A-1, and Lobbyist B discussed establishing a PAC to support Relative A-1's campaign.  Lobbyist B explained: "the PAC ... that's going to be strictly political money and, you know, two years from now, or three years, there'll be a million dollars in there.  You won't be able to direct it, but there'll be people, you know, [who] are like minded."

302. On September 14, 2017, HUIZAR and Esparza had a text message conversation regarding compiling a list of donors to target for fundraising for Relative A-1's campaign, which they referred to as the "Executive 2" strategy meetings, focusing on developers with upcoming hearings before the PLUM Committee, which HUIZAR chaired.  HUIZAR texted Esparza: "Please get the [City Staffer A-2] list that he gave u about projects going to cpc and plum and let's discuss me and u at every Thursday exec.#2 meeting."

---

[24] Company G is a China-based real estate development company that owned a development project located in CD-14.

303. On October 18, 2017, a political account supervisor sent an initial Statement of Organization for PAC A to the California Secretary of State by U.S. mail.  Lobbyist B was listed as an "additional principal officer" of the PAC.

304. On October 20, 2017, HUIZAR and Esparza had another conversation about targeting developers with projects pending before committees on which HUIZAR sat in order to obtain financial benefits from them.  HUIZAR intended to capitalize on the developers' fear that HUIZAR would take adverse action against those pending projects if they failed to contribute as requested.  Specifically, HUIZAR texted Esparza: "[Company H] is on economic development committee on Tuesday for tot [Transient Occupancy Tax rebates]. Have u spoken with those guys?"  Esparza responded: "Hey boss, here is a quick update. Just had my last meeting. [Company I]/[Lobbyist I]- good. [Company H]/[Lobbyist C]- good. [Company J]/[Consultant J]- good. All commitments have been made."[25]

305. On October 24, 2017, HUIZAR again sought to confirm with Esparza that certain developers and consultants committed to contribute to the Relative A-1 campaign before taking action on the projects in the Economic Development and PLUM Committees. Specifically, HUIZAR texted Esparza: "[Company H] is in committee today..." HUIZAR then followed up: "Everything being handled?"  Esparza responded: "Yes sir." HUIZAR then texted:

---

[25] Company I owns a real estate development project located outside of CD-14 that needed approvals in the PLUM and Economic Development Committees in order to move forward.  Company H and Company J are domestic real estate development companies that each own development projects located in CD-14.

"The [Company I] sign district is in committee today."  Esparza responded: "Yes. Being handled as well."

306. On December 4, 2017, HUIZAR created a spreadsheet titled "Initial Commitments to PAC," listing companies and consultants and contribution amounts, totaling $500,000.  Several of those listed had pending projects in HUIZAR's district, which I believe HUIZAR deliberately targeted in order to secure the requested contributions by exploiting their concern that adverse action would be taken against their projects without the requested contributions, including the following:

| Company | Commitment | Notes |
|---------|-----------|-------|
| [Company H] | $25,000 | [Lobbyist C] |
| [Company I] | $25,000 | [Lobbyist I] |
| [Company J] | $50,000 | [Consultant J] |

307. On March 26, 2018, Company H followed through with its commitment to HUIZAR and made a contribution of $10,000 to PAC B, at HUIZAR's request and Lobbyist C's direction.

308. On June 19, 2018, Company J followed through with its commitment to HUIZAR and made a contribution of $25,000 to PAC A, at HUIZAR's request and Consultant J's direction.

(2)  CD-14 Developers/Proxies' Contributions to HUIZAR Campaigns and Officeholder Accounts

309. On May 18, 2015, at HUIZAR's direction, Esparza created a document titled "HUIZAR Debt Finance Plan," which documented HUIZAR's solicitation efforts of contributions from developers, consultants, and allies towards HUIZAR's 2015 re-

election campaign debt.  Many of the developers and consultants had projects in CD-14 and/or were going through the City approval process and were targeted by HUIZAR for that reason. The plan included: (1) $40,000 from Justin Kim; (2) $20,000 from Chairman E; (3) $20,000 from Company G (through Executive Director E); (4) $10,000 from Company D; and (5) $10,000 from Individual 1.

           (3)   <u>CD-14 Developers/Proxies' Contributions to School that Employed Relative A-1 as a Fundraiser</u>

310. Beginning in or around March 2015, at HUIZAR's direction, Esparza solicited donations to High School A's annual gala event from developers and consultants with projects pending in HUIZAR's district.  Part of the money raised from the gala event was used to pay salaried employees, including Relative A-1.

311. Consistent with this plan, on May 18, 2015, Esparza created a document titled "[High School A] Fundraising Plan." The document included commitments from: (1) Company D for $10,000; (2) Chairman E for $20,000; (3) Company F for $10,000; and (4) Company L[26] for $30,000.

312. In or around September 2015, at HUIZAR's request, the following companies, among others, made contributions to High School A's annual gala: (1) $25,000 by Company L; (2) $10,000 by

---

[26] Company L is a China-based real estate development company that owned a development project located in CD-14.

Company D; (3) $10,000 by Company F; and (4) $5,000 by Company K.[27]

(4)   Steering CD-14 Developers to Preferred Firms

313. Beginning in or around 2012, HUIZAR asked developers with projects pending in CD-14 to hire specific firms that were owned by his associates (including HUIZAR Associate 1, HUIZAR Associate 3, and Lobbyist B) or that employed Relative A-1.

314. In or around 2012, HUIZAR pressured Developer N to hire HUIZAR Associate 3 as a consultant on Developer N's development project in CD-14.  Developer N complied with the request.

315. In or around May 2013, HUIZAR organized a dinner between Developer N, HUIZAR Associate 3, and a partner of Law Firm A, which paid Relative A-1 a bi-weekly salary of $2,500. Developer N understood that HUIZAR was asking Developer N to hire Law Firm A because it paid Relative A-1 and in exchange for HUIZAR's support on the development project pending in CD-14.

316. In or around March 2014, HUIZAR organized a meeting with Company D and HUIZAR Associate 1, and encouraged Company D to hire HUIZAR Associate 1 as a consultant on Project D.

317. In or around 2016, HUIZAR directed Esparza to schedule meetings between HUIZAR, Relative A-1, partners of Law Firm A, and developers with projects pending in HUIZAR's district.  At these meetings, HUIZAR encouraged developers to hire Law Firm A because it employed HUIZAR Relative A-1.  For example, on

_____

[27] Company K is a China-based real estate development company that owned a development project located in CD-14.

February 25, 2016, HUIZAR instructed Esparza by text message:
"Please work it out with George [Chiang] ... to set up a meeting
with [Developer K] and [Law Firm A partner] ... Let them know
that [Relative A-1] works at [Law Firm A] and we want to make
introduction to see if [the company] ever needs legal defense.
Please keep me posted."

318. In or around 2017, at HUIZAR's request, a developer
with projects pending in CD-14 agreed to hire HUIZAR Associate 3
as a consultant with a monthly retainer of $10,000.

### H.   **HUIZAR's Concealment of Illicit Benefits**

#### (1)   Transporting of Cash into United States and Structuring to Avoid Reporting Requirements

319. On January 1, 2016, HUIZAR, Esparza, Chairman E, and
Executive Director E traveled to Australia (the "January 2016
Australia trip"), where HUIZAR and Esparza accepted financial
benefits from Chairman E, including private jet flights for
Esparza, a $10,980 commercial airline ticket for HUIZAR, hotels,
meals, alcohol, and other expenses.  In addition, Chairman E
provided HUIZAR and Esparza casino chips, which HUIZAR and
Esparza cashed out in Australian dollars.

320. After the January 2016 Australia trip, HUIZAR and
Esparza discussed evading bank reporting requirements by
converting Australian dollars to American dollars in an effort
to conceal their financial relationship with Chairman E, to
avoid law enforcement detection, and to protect the CD-14
Enterprise.  Specifically, on February 8, 2016 and February 9,
2016, HUIZAR and Esparza had a conversation via text message

102

regarding evading bank reporting requirements when converting
Australian dollars they received from Chairman E.  Esparza told
HUIZAR about the exchange rate, adding: "They are asking me for
my drivers license and social security for IRS record. Do you
think it's fine to leave my info?"  HUIZAR responded: "No. Maybe
we can change a little at a time...under 10 k in future."
HUIZAR also wrote: "Don't exchange if they are asking u for all
that info."  HUIZAR later instructed Esparza: "Go to the other
place tomorrow and take 9 k. See if they change 9 k without
getting your social security number."  HUIZAR added: "Even if
they take your social security, it doesn't mean that they will
report to irs. They probably will just keep it for their records
but not do anything with tax reporting."  Esparza responded: "Ok
cool. I'll go tomorrow."  Esparza later wrote: "I exchanged 10k
today. Will do another tomorrow. If it's under 10k, they will
not report."

321. Photographs from Esparza's iPhone also corroborate the above events, including a photograph that, based on metadata, was taken on February 8, 2016, and that shows Australian dollars in front of an excerpt of HUIZAR's calendar for CD-14 meetings:



(2)   Money Laundering through Family Members

322. In order to conceal and disguise the nature, source, ownership, and control of proceeds from HUIZAR's pay-to-play scheme, HUIZAR funneled cash bribe payments through family members to deposit into family member accounts, and thereafter caused the family members to pay HUIZAR's expenses, including HUIZAR's credit card bills and the interest on HUIZAR's loan from Bank 1 of $570,000.  I have reviewed bank records showing large cash deposits by family members, mostly in 100-dollar

bills, into their personal bank accounts, followed by checks or electronic transfers to HUIZAR or toward HUIZAR's expenses.  On some occasions, bank surveillance footage captured Relative A-2 depositing an envelope containing a large sum of cash.  I have also reviewed intercepted communications and text messages confirming that HUIZAR asked Relative A-2 for blank checks in her name in furtherance of his money laundering scheme.

323. In November 2018, I participated in interviews with Relative A-2 and Relative A-3 regarding financial transactions involving HUIZAR.  At the beginning of their respective interviews, Relative A-2 and Relative A-3 were each informed that lying to the FBI was a crime.  During their respective FBI interviews, Relative A-2 and Relative A-3 both falsely denied that HUIZAR gave them cash.

324. In January 2020, I participated in an interview with Relative A-3 and Relative A-3's counsel pursuant to a proffer agreement.[28]  During the proffer, Relative A-3 admitted that HUIZAR provided cash to Relative A-3 and asked Relative A-3 to pay HUIZAR's expenses.  Relative A-3 also admitted Relative A-3 had lied to the FBI in November 2018 about these topics.

325. In February 2020, I participated in an interview with Relative A-2 and Relative A-2's counsel pursuant to a proffer agreement.  During the proffer, Relative A-2 admitted that

_____

[28] Under the terms of the proffer agreement, the government is allowed to make derivative use of the information provided to it.  The government agrees only not to use the information against the provider of the information in the government's case-in-chief against that person, provided the person is entirely truthful in the proffer session.

HUIZAR provided large sums of cash to Relative A-2 and asked Relative A-2 to provide HUIZAR blank checks for Relative A-2's checking account, which HUIZAR filled out and wrote to pay HUIZAR's expenses.

326. Based on my review of bank records and knowledge of this investigation, between approximately January 2014 and September 2017, HUIZAR caused Relative A-2 to deposit approximately $108,300 in cash into Relative A-2's checking account and thereafter pay approximately $110,722 directly or indirectly to HUIZAR, on at least the following occasions:

| Date | Description | Cash Deposit | Payment to HUIZAR |
|------|-------------|--------------|-------------------|
| 01/08/14 | HUIZAR deposited check from Relative A-2 into his checking account | | $15,000 |
| 04/08/14 | HUIZAR deposited check from Relative A-2 into his checking account | | $5,000 |
| 11/03/14 | Relative A-2 deposited cash into checking account | $5,000 | |
| 11/18/14 | HUIZAR deposited check from Relative A-2 into his checking account | | $4,900 |
| 12/03/14 | Relative A-2 deposited cash into checking account | $7,000 | |
| 12/11/14 | Relative A-2 wrote check to pay HUIZAR's credit card bill | | $7,000 |
| 03/12/15 | Relative A-2 deposited cash into checking account | $10,000 | |
| 03/12/15 | HUIZAR deposited check from Relative A-2 into his checking account | | $10,000 |

| Date | Description | Cash Deposit | Payment to HUIZAR |
|------|-------------|--------------|-------------------|
| 04/08/15 | Relative A-2 deposited cash into checking account | $10,000 | |
| 04/21/15 | Relative A-2 wrote a check to HUIZAR's loan interest to Bank 1 | | $4,272.66 |
| 04/22/15 | Relative A-2 deposited cash into checking account | $2,300 | |
| 04/23/15 | Relative A-2 made electronic payment to pay HUIZAR's credit card | | $8,000 |
| 07/03/15 | Relative A-2 deposited cash into checking account | $9,000 | |
| 07/05/15 | Relative A-2 wrote a check to HUIZAR's loan interest to Bank 1 | | $2,895.91 |
| 07/13/15 | Relative A-2 wrote check to pay HUIZAR's credit card bill | | $2,492.45 |
| 07/14/15 | Relative A-2 wrote check to pay HUIZAR's property taxes | | $2,640.51 |
| 08/19/15 | Relative A-2 deposited cash into checking account | $8,100 | |
| 08/19/15 | Relative A-2 wrote a check to HUIZAR's loan interest to Bank 1 | | $2,895.92 |
| 08/24/15 | Relative A-2 made electronic payment to pay HUIZAR's credit card bill | | $1,844.10 |
| 08/24/15 | Relative A-2 made electronic payment to pay HUIZAR's credit card bill | | $3,042.47 |
| 01/04/16 | Relative A-2 deposited cash into checking account | $2,900 | |
| 01/06/16 | Relative A-2 wrote check to pay HUIZAR's credit card bill | | $704.57 |

| Date | Description | Cash Deposit | Payment to HUIZAR |
|---|---|---|---|
| 01/23/16 | Relative A-2 wrote a check to HUIZAR's loan interest to Bank 1 | | $2,895.91 |
| 01/25/16 | Relative A-2 deposited cash into checking account | $13,000 | |
| 01/27/16 | Relative A-2 wrote check to pay HUIZAR's credit card bill | | $7,730.22 |
| 04/27/17 | Relative A-2 deposited cash into checking account | $9,000 | |
| 04/29/17 | Relative A-2 wrote a check to HUIZAR's loan interest to Bank 1 | | $2,900.97 |
| 06/02/17 | Relative A-2 deposited cash into checking account | $9,000 | |
| 06/08/17 | Relative A-2 wrote check to pay HUIZAR's credit card bill | | $12,755.11 |
| 06/23/17 | Relative A-2 wrote a check to HUIZAR's loan interest to Bank 1 | | $2,895.91 |
| 06/27/17 | Relative A-2 deposited cash into checking account | $6,000 | |
| 07/19/17 | Relative A-2 deposited cash into checking account | $8,000 | |
| 07/27/17 | Relative A-2 wrote check to pay HUIZAR's credit card bill | | $10,955.91 |
| 09/19/17 | Relative A-2 deposited cash into checking account | $9,000 | |
| | TOTAL: | $108,300 | $110,722 |

327. Based on my review of bank records and knowledge of this investigation, between approximately November 2013 and March 2017, HUIZAR provided cash to Relative A-3 and caused Relative A-3 to pay approximately $132,891 directly or indirectly to HUIZAR, on at least the following occasions:

| Date | Description | Cash Deposit | Payment to HUIZAR |
|------|-------------|--------------|-------------------|
| 11/27/13 | HUIZAR deposited two $7,500 checks from Relative A-3 into his checking account | | $15,000 |
| 01/08/14 | HUIZAR deposited check from Relative A-3 into his checking account | | $10,000 |
| 08/04/14 | HUIZAR deposited check from Relative A-3 into his checking account | | $10,000 |
| 08/29/14 | HUIZAR deposited check from Relative A-3 into his checking account | | $10,000 |
| 12/23/14 | Relative A-3 wrote a check to pay HUIZAR's legal fees | | $10,000 |
| 11/16/15 | HUIZAR deposited check from Relative A-3 into his checking account | | $9,000 |
| 11/19/15 | Relative A-3 wrote a check to pay HUIZAR's credit card bill | | $4,915.92 |
| 12/30/15 | HUIZAR deposited check from Relative A-3 into his checking account | | $9,000 |
| 09/22/16 | Relative A-3 wrote a check to pay HUIZAR's credit card bill | | $2,836.52 |
| 09/22/16 | Relative A-3 wrote a check to pay HUIZAR's loan interest to Bank 1 | | $7,263.51 |
| 11/09/16 | Relative A-3 wrote a check to pay HUIZAR's credit card bill | | $5,451.68 |

| Date | Description | Cash Deposit | Payment to HUIZAR |
|---|---|---|---|
| 12/23/16 | Relative A-3 deposited cash into checking account | $10,000 | |
| 12/23/16 | Relative A-3 wrote a check to pay fee for HUIZAR's party | | $24,694.53 |
| 02/17/17 | Relative A-3 deposited cash into checking account | $10,000 | |
| 02/17/17 | Relative A-3 made electronic payment to pay HUIZAR's credit card bill | | $7,263.52 |
| 02/27/17 | Relative A-3 deposited cash into checking account | $6,000 | |
| 03/10/17 | Relative A-3 deposited cash into checking account | $3,000 | |
| 03/13/17 | Relative A-3 made electronic payment to HUIZAR's credit card bill | | $7,464.99 |
| | TOTAL: | $29,000 | $132,891 |

328. Based on my review of bank records and knowledge of this investigation, between approximately April 2016 and February 2017, HUIZAR provided cash to Relative A-1 and caused Relative A-1 to deposit approximately $5,400 in cash into Relative A-1's checking account, and thereafter pay for household expenses, on at least the following occasions:

| Date | Description | Cash Deposit |
|---|---|---|
| 04/05/16 | Relative A-1 deposited cash into checking account | $500 |
| 06/23/16 | Relative A-1 deposited cash into checking account | $400 |

110

| Date | Description | Cash Deposit |
|------|-------------|--------------|
| 08/16/16 | Relative A-1 deposited cash into checking account | $500 |
| 09/15/16 | Relative A-1 deposited cash into checking account | $500 |
| 11/09/16 | Relative A-1 deposited cash into checking account | $800 |
| 12/02/16 | Relative A-1 deposited cash into checking account | $1,000 |
| 12/06/16 | Relative A-1 deposited cash into checking account | $500 |
| 12/21/16 | Relative A-1 deposited cash into checking account | $500 |
| 01/30/17 | Relative A-1 deposited cash into checking account | $500 |
| 02/08/17 | Relative A-1 deposited cash into checking account | $200 |
| | **TOTAL:** | **$5,400** |

I.    **HUIZAR's Additional Concealment of Pay-to-Play Scheme**

(1)   Concern About Detection

329. HUIZAR, Esparza, and Chairman E attempted to conceal their corrupt relationship, their trips to Las Vegas and other locations, and the benefits provided and accepted at casinos.

330. On October 28, 2015, HUIZAR sent a text message to Esparza about an upcoming trip to Las Vegas with Chairman E and Executive Director E, writing: "Check to see if [private] airplane checks your id. If they don't, maybe I fly with u

111

guys." Esparza responded: "Yes. [Executive Director E] says they check Id."

331. On February 28, 2016, HUIZAR and Esparza had a conversation via text messages regarding avoiding documentation of their joint trip to Las Vegas and the money they received there. Esparza wrote: "No need to book flight. You can take plane back with chairman [E]." HUIZAR asked: "They don't check id?" Esparza responded: "No Id." Later that day, HUIZAR instructed Esparza: "When u have a chance, go and cash chips little by little bc if [Chairman E] loses, u won't be able to cash." Esparza responded: "Yes. That's what I'm doing."

332. On July 13, 2016, HUIZAR and Esparza had a conversation via text message regarding an upcoming trip to Las Vegas with Chairman E and Executive Director E, and their concern about HUIZAR being identified as traveling with Chairman E and Executive Director E. HUIZAR wrote: "Let me know who is there and how [Chairman E] is doing [in terms of gambling winnings] so that I can determine if I go or not." Esparza responded that "the sheriff we met before" was part of the group. HUIZAR later asked: "If sheriff guy there maybe I shouldn't go?" The same day, HUIZAR asked Esparza by text: "Is [casino] strict about ID?" Esparza responded: "Not at all," adding: "Haven't checked my ID and I've been playing."

333. On July 14, 2016, HUIZAR warned Esparza to avoid discussing their trips to Las Vegas with Chairman E by phone, writing in an e-mail: "We should limit types of conversations we just had on phone. For future reference. My bad."

334. On July 14, 2016, HUIZAR again warned Esparza to avoid phone discussions regarding Las Vegas trips with Chairman E, writing in a text message: "Hey we should watch what we say on phone." Esparza responded: "You're right. We always have to be safe."

(2) <u>False Statements on Loan Application</u>

335. In a further effort to conceal the benefits HUIZAR received from Chairman E, in March 2016, HUIZAR failed to report his Bank 1 loan for $570,000 that was facilitated by Chairman E and Individual 1 on HUIZAR's mortgage refinance application with Bank of America. Specifically, on March 24, 2016, HUIZAR signed and submitted a Uniform Residential Loan Application to Bank of America, intentionally omitting the Bank 1 loan from HUIZAR's liabilities.

(3) <u>Failure to Report on Forms 700 and Tax Returns</u>

336. In an effort to conceal the benefits HUIZAR received from developers as part of the pay-to-play scheme, based on my review of HUIZAR's Forms 700, HUIZAR failed to report any of the financial benefits discussed above on his Form 700. Based on my knowledge of the investigation, HUIZAR also failed to report any of these referenced financial benefits on his tax returns for the years 2014, 2015, 2016, and 2017.

(4) <u>Concealment of Large Cash Sum at Residence</u>

337. On November 7, 2018, I participated in a search of HUIZAR's residence pursuant to a federal search warrant. During the search, agents recovered approximately $129,000 in cash hidden in a closet inside the residence. The photographs below

113

document cash found in the residence, including: (1) cash inside HUIZAR's suit jacket pocket; (2) cash concealed in large envelopes and wrapped in a t-shirt; and (3) cash in red envelopes with Chinese characters.







### J.  <u>HUIZAR's Obstructionist Conduct</u>

338. Based on my review of intercepted communications, text messages, e-mails, and interviews of Esparza and Businessperson A, in 2017, HUIZAR learned from multiple sources, including from Esparza, Chairman E, and Businessperson A, that the FBI was investigating him, among others.  For example, on June 20, 2017, Esparza told HUIZAR that he was interviewed by the FBI earlier that day.  HUIZAR asked Esparza about the FBI's questions, and whether the FBI asked questions about Businessperson A and Chairman E.  HUIZAR instructed Esparza not to tell anyone that Esparza disclosed the content of his FBI interview to HUIZAR.

339. Thereafter, HUIZAR and Esparza discussed the importance of withholding incriminating information from law enforcement.  For example, on December 28, 2017, in a conversation in HUIZAR's private bathroom in City Hall, Esparza referred to his FBI interviews the prior summer: "I did everything I could to make sure you're protected. And I just really hope you know that."  In response, HUIZAR stated: "Yeah, and that's why I said we are both in this together.... We're in it together."  By this I believe HUIZAR intended to reassure Esparza that he similarly would not disclose incriminating information about them to law enforcement.

340. HUIZAR also had discussions with Businessperson A about his FBI interviews and similarly encouraged Businessperson A not to disclose incriminating information to law enforcement. For example, on October 27, 2018, HUIZAR instructed Businessperson A not mention anything about parties or

"dessert," meaning HUIZAR's use of escort/prostitution services, which Businessperson A had provided at parties Businessperson A hosted.

## VII. <u>CONCLUSION</u>

341. Based on the foregoing facts, there is probable cause to believe that HUIZAR has committed a violation of 18 U.S.C. § 1962(d) (RICO conspiracy), including by agreeing to accept at least approximately $1.5 million in financial benefits from multiple sources, to include cash, settlement funds, luxury trips and gifts, and political contributions in exchange for official acts.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>22nd</u>day of
June, 2020

_____
HONORABLE PATRICK J. WALSH
UNITED STATES MAGISTRATE JUDGE

Exhibit 1

1

**ATTACHMENT A**

2

FACTUAL BASIS

3 **A.    The CD-A Enterprise**

4         1.    Throughout the period described in the attached

5 Information, the Council District A Enterprise ("CD-A Enterprise"),

6 located in the City of Los Angeles ("the City"), is and was a

7 criminal enterprise composed of a group of individuals associated for

8 a common purpose of engaging in a course of conduct, which course

9 includes bribery, extortion, honest services fraud, money laundering,

10 structuring, and obstruction of justice, to achieve the goals of the

11 enterprise.    The goals of the CD-A Enterprise included, but were not

12 limited to:

13              a.    enriching the members and associates of the CD-A

14 Enterprise;

15              b.    advancing the political goals and maintaining the

16 control and authority of the CD-A Enterprise by elevating members and

17 associates of the CD-A Enterprise to, and maintaining those

18 individuals' placement in, prominent political positions;

19              c.    concealing the financial activities of the CD-A

20 Enterprise through money laundering and structuring; and

21              d.    protecting the CD-A Enterprise by obstructing justice.

22         2.    The CD-A Enterprise was led by Councilmember A,

23 Councilmember for CD-A, who had jurisdiction over a large number of

24 development projects undergoing the application and approval process

25 in the City.    Members and associates of the CD-A Enterprise conspired

26 with one another to facilitate bribery schemes that would provide

27 Councilmember A and other City officials financial benefits and keep

28

DEFT. INITIALS *G.E*

1  Councilmember A in power and maintain the CD-A Enterprise's political

2  stronghold in the City.

3      3.    In exchange, Councilmember A and members and associates of

4  the CD-A Enterprise would take official action to ensure certain

5  development projects and CD-A Enterprise associates received favored

6  treatment from the City and thereby secure their bribe-financed

7  influence.  In addition, members and associates of the CD-A

8  Enterprise sought political contributions from developers and their

9  proxies (e.g., lobbyists, consultants, etc.) to benefit Councilmember

10  A and allies in exchange for official acts to benefit those

11  developers and their proxies.

12      4.    In order to protect and hide the financial payments that

13  flowed from the developers and their proxies to the public officials,

14  members and associates of the CD-A Enterprise engaged in money

15  laundering and other illegal activities to conceal monetary

16  transactions and bribe payments.

17      5.    In order to protect the CD-A Enterprise and avoid law

18  enforcement detection, members and associates of the CD-A Enterprise

19  engaged in the following types of obstructive conduct: (1) lying to

20  law enforcement in an effort to impede the investigation into

21  criminal conduct of the CD-A Enterprise; and (2) attempting to

22  corruptly influence the statements of others to law enforcement.

23      6.    As a result of its bribery, extortion, honest services

24  fraud, money laundering, and structuring conduct, throughout the

25  period described in the attached Information, and as known to

26  defendant ESPARZA, CD-A Enterprise members and associates engaged in,

27  and their activities in some way affected, commerce between one state

28  and another state.

DEFT. INITIALS 𝓖.𝓔                2

1  **B.    Defendant's Role in the CD-A Enterprise**

2       7.    Beginning no later than February 2013, and continuing at

3  least until November 2018, defendant ESPARZA was a member of the CD-A

4  Enterprise.  In that capacity, defendant ESPARZA conspired and agreed

5  with other CD-A Enterprise members that a conspirator would commit at

6  least two racketeering acts, in the form of conspiracy to commit

7  bribery, honest services fraud, and structuring, which acts had a

8  relationship to one another and the CD-A Enterprise, and posed a

9  threat of continued criminal activity.  Defendant ESPARZA became a

10 member of this conspiracy knowing of this object, knowing it was

11 illegal, and intending to help accomplish it.

12      8.    Defendant ESPARZA was Councilmember A's Special Assistant

13 and an employee of the City from September 2009 until December 31,

14 2017.

15      9.    Defendant ESPARZA, along with other members and associates

16 of the CD-A Enterprise, operated and helped to operate a pay-to-play

17 scheme within the City, wherein public officials solicited and

18 demanded direct and indirect financial benefits from developers and

19 their proxies in exchange for official acts.  In exchange for such

20 financial benefits from developers and their proxies, defendant

21 ESPARZA and Councilmember A agreed to perform and performed the

22 following types of official acts, among others: (1) filing motions

23 and voting on projects in various City committees, including City

24 Council; (2) taking, or not taking, action on the Planning and Land

25 Use Management ("PLUM") Committee to influence the approval process

26 and project costs; (3) negotiating with and exerting pressure on

27 labor unions and other City entities to resolve issues on projects;

28 (4) exerting pressure on developers with projects pending before the

DEFT. INITIALS *G.E.*                 3

City to affect their business practices; and (5) taking official action to enhance the professional reputation and marketability of businesspersons in the City.

10. Also in furtherance of the racketeering conspiracy, defendant ESPARZA facilitated and participated in at least the following schemes:

   1.   Project E Bribery Scheme

11. In or around February 2013, Individual 1, then the Interim General Manager of the Los Angeles Department of Building and Safety ("LADBS"), introduced defendant ESPARZA and Councilmember A to Chairman E at a dinner in Los Angeles, California. Chairman E, a Chinese national and billionaire, owned Company E, one of China's leading real estate development companies. Chairman E also owned Property E, located in CD-A, and another property, located in another Council District in the City.

12. Between March 2013 and November 2018, Chairman E, aided and abetted by Individual 1 and others, provided financial benefits directly and indirectly to defendant ESPARZA and Councilmember A, in exchange for defendant ESPARZA's and Councilmember A's assistance to Chairman E and Company E in Councilmember A's official capacity as a City Councilmember on an ongoing and as-needed basis and related to specific matters. Defendant ESPARZA, Councilmember A, Chairman E, Individual 1, and others established a mutually beneficial agreement to exchange a stream of benefits for official acts and to further the CD-A Enterprise's goals. Specifically, Chairman E provided defendant ESPARZA and Councilmember A financial benefits in over a dozen trips to casinos in Las Vegas and Australia. Between June 2014 and January 2018, defendant ESPARZA personally accepted at least approximately

DEFT. INITIALS *GE*                    4

$32,000 in gambling chips, plus flights on private jets and commercial airlines, stays at luxurious hotels, expensive meals and alcohol, spa services, event tickets, and escort services from Chairman E.

13. For example, on January 1, 2016, defendant ESPARZA, Councilmember A, Chairman E, and Executive Director E, Chairman E's right hand man, traveled to Australia (the "January 2016 Australia trip"), where defendant ESPARZA and Councilmember A accepted financial benefits from Chairman E, including private jet flights for defendant ESPARZA, a $10,980 commercial airline ticket for Councilmember A, hotels, meals, alcohol, and other expenses. In addition, Chairman E provided defendant ESPARZA and Councilmember A casino chips, which defendant ESPARZA and Councilmember A cashed out in Australian dollars.

14. After the January 2016 Australia trip, defendant ESPARZA and Councilmember A discussed evading bank reporting requirements in converting Australian dollars to American dollars in an effort to conceal their financial relationship with Chairman E, to avoid law enforcement detection, and to protect the CD-A Enterprise. Specifically, on February 8, 2016 and February 9, 2016, defendant ESPARZA and Councilmember A had a conversation via text message regarding evading bank reporting requirements when converting Australian dollars they received from Chairman E. Defendant ESPARZA told Councilmember A about the exchange rate, adding: "They are asking me for my drivers license and social security for IRS record. Do you think it's fine to leave my info?" Councilmember A responded: "No. Maybe we can change a little at a time...under 10 k in future." Councilmember A also wrote: "Don't exchange if they are asking u for

DEFT. INITIALS *G.E*                    5

1    all that info." Councilmember A later instructed defendant ESPARZA

2    by text message: "Go to the other place tomorrow and take 9 k. See if

3    they change 9 k without getting your social security number."

4    Councilmember A added: "Even if they take your social security, it

5    doesn't mean that they will report to irs. They probably will just

6    keep it for their records but not do anything with tax reporting."

7    Defendant ESPARZA responded: "Ok cool. I'll go tomorrow." Defendant

8    ESPARZA later wrote: "I exchanged 10k today. Will do another

9    tomorrow. If it's under 10k, they will not report."

10       15.  Between approximately July 2014 and September 2014,

11   Chairman E, at Individual 1's urging and with defendant ESPARZA's

12   knowledge, facilitated the payment of $600,000 to help Councilmember

13   A privately and confidentially resolve a sexual harassment lawsuit

14   filed against Councilmember A during the time Councilmember A was

15   facing re-election.  Specifically, on June 7, 2013, a sexual

16   harassment lawsuit was filed against Councilmember A by a former CD-A

17   employee.  Thereafter, Councilmember A, Chairman E, and Individual 1

18   orchestrated an arrangement whereby Chairman E secured $600,000 in

19   collateral for Councilmember A to obtain a personal loan from a bank

20   for $570,000 to privately pay the sexual harassment settlement and

21   legal fees and resolve it without publicly disclosing details.

22   Defendant ESPARZA and Executive Director E, on behalf of Chairman E,

23   facilitated the arrangement.  Councilmember A expressed to defendant

24   ESPARZA the need to conceal this arrangement, including concealing

25   the fact that Chairman E was the source of the $600,000 collateral.

26       16.  In exchange for the $600,000 collateral for Councilmember

27   A's personal loan, Chairman E asked for a series of benefits from

28   defendant ESPARZA and Councilmember A during the time Chairman E was

DEFT. INITIALS *6.E*                    6

1  also supplying financial benefits to defendant ESPARZA and
2  Councilmember A.

3      17.  For example, in 2014, to benefit Chairman E's reputation in
4  the City's business community, Councilmember A introduced and signed
5  a resolution before the City Council recognizing Chairman E for
6  Chairman E's achievements and contributions to the economy of CD-A,
7  which the City Council signed and adopted.

8      18.  Most significantly, Chairman E provided bribes to defendant
9  ESPARZA and Councilmember A because, as the Chair of the PLUM
10 Committee and CD-A Councilmember, Councilmember A was poised to
11 significantly benefit Chairman E's desire and plans to redevelop
12 Property E and transform it into a 77-story skyscraper, making it the
13 tallest building west of the Mississippi River ("Project E").
14 Project E would require official acts from Councilmember A at various
15 stages of the City approval process.

16     19.  On August 4, 2016, Councilmember A, Individual 1, senior
17 officials from the Planning Department, and senior CD-A staff members
18 met with Chairman E and his team to discuss Project E, including
19 Chairman E's interest in pursuing Transient Occupancy Tax ("TOT")
20 rebates, Transfer of Floor Area Rights ("TFAR"), and other incentives
21 from the City.

22     20.  In or around August 2016, on a private jet flight back from
23 Las Vegas, Chairman E requested Councilmember A's assistance in
24 hiring a consultant on Project E.  Thereafter, on August 15, 2016,
25 defendant ESPARZA texted Councilmember A regarding Project E:
26 "Reminder boss to decide what land use expediters you want to
27 recommend to the Chairman [E]."

28

DEFT. INITIALS  *G.E*              7

21.  On December 16, 2016, defendant ESPARZA forwarded an e-mail to Councilmember A from City Staffer A-2, a CD-A staff member, listing a number of consultants, writing: "Hi Boss, Here is the list of land use consultants per [City Staffer A-2]'s past recommendations.  Chairman [E] would like us to schedule interviews on Monday."

22.  On April 27, 2017, in a telephone call between defendant ESPARZA and Executive Director E, the two discussed a proposed consultant for Project E.  Defendant ESPARZA stated: "So, remember, the Chairman [E] was gonna hire [a specific consultant]? ... [Councilmember A] wanted me to tell the Chairman [E] not to hire him anymore."  When Executive Director E asked why, defendant ESPARZA responded: "Because, ah, [Councilmember A] can't trust him ... he's too loyal to another elected official....  So [Councilmember A] doesn't think it's a good idea, it's not a good idea to, to put him on the project."

23.  Chairman E brought up Project E on numerous occasions in the presence of defendant ESPARZA and Councilmember A.  Chairman E, through translation provided by Executive Director E, expressed to Councilmember A that Chairman E wanted to build the tallest tower west of the Mississippi.  In response, Councilmember A expressed support of the project.

24.  On May 9, 2017, in a telephone call, defendant ESPARZA and Executive Director E discussed the relationship between Chairman E and Councilmember A.  Executive Director E stated that Chairman E expected to lay everything in front of Councilmember A at an upcoming trip to Cabo San Lucas, which defendant ESPARZA understood to refer to the assistance Chairman E expected from Councilmember A on Project

DEFT. INITIALS *G.E*                    8

E.   Executive Director E added that Chairman E was "going to make [Councilmember A] think that, make it, otherwise Chairman [E] ask him to, uh, pay back that $600,000 already. Last night."  When defendant ESPARZA stated that "[Councilmember A]'s not going to do that either," Executive Director E responded: "Chairman [E] will push him."  According to Executive Director E, Chairman E raised this issue with Councilmember A the previous evening at the same time that Chairman E told Councilmember A that Chairman E heard from multiple sources that the FBI was looking into Councilmember A.

25.   On May 9, 2017, in a telephone call between defendant ESPARZA and another CD-A staffer, defendant ESPARZA stated: "Chairman [E] should have all the leverage in the world [be]cause of what [Councilmember A] owes [Chairman E]."  Defendant ESPARZA meant that Chairman E expected Councilmember A's assistance on Project E, or any other requested assistance, from Councilmember A because of the financial benefits Chairman E had provided to Councilmember A.

### 2.   Project C Bribery Scheme

26.   In the summer of 2016, Labor Organization A filed an appeal requesting to suspend all activity to implement one of Developer C's development projects, Project C, that required City approval until Project C was brought into compliance with the requirements of the California Environmental Quality Act ("CEQA") by correcting certain deficiencies (the "appeal").  The appeal prevented Project C from progressing through the rest of the City approval processes, including approvals by the PLUM Committee and City Council.

27.   Between August 2016 and July 2017, Developer C agreed to fund a $500,000 cash bribe designed to benefit Councilmember A, through defendant ESPARZA and Justin Kim ("Kim"), in exchange for

DEFT. INITIALS _G.E_                9

Councilmember A's assistance on Project C.  Developer C, through Kim, initially provided $400,000 in cash that Developer C intended for Councilmember A between February and March 2017.  Councilmember A directed defendant ESPARZA to hold on to $200,000 of the total bribe payment for Councilmember A.  Defendant ESPARZA and Kim each kept a portion of the remaining $200,000 bribe payment for themselves as kickbacks for facilitating the bribe.  In exchange, Developer C, through Kim and defendant ESPARZA, sought to use Councilmember A's influence as the Councilmember of CD-A and Chair of the PLUM Committee to pressure Labor Organization A to withdraw, abandon, or otherwise lose its appeal opposing Project C, thereby allowing the project to move forward in its City approval process.

28.  On September 1, 2016, defendant ESPARZA, Kim, and Councilmember A had dinner together and then visited a Korean karaoke establishment in Los Angeles.  During the karaoke meeting, Kim asked Councilmember A for assistance with the appeal on Project C, and Councilmember A agreed to help.  Kim then called Developer C and asked him to join the group at karaoke, which Developer C did.

29.  On September 2, 2016, defendant ESPARZA and Kim met for lunch in Los Angeles.  At Councilmember A's direction, defendant ESPARZA expressed to Kim that Councilmember A would not help Project C for free and that Councilmember A's help would require a financial benefit in exchange for help ensuring Project C moved forward through the City approval process.

30.  On January 17, 2017, defendant ESPARZA, Councilmember A, Kim, and Developer C's business associates met at Councilmember A's City Hall office to discuss, among other things, Project C.  During a private meeting that included only defendant ESPARZA, Councilmember

DEFT. INITIALS *G.E*                    10

1  A, and Kim, Kim again asked Councilmember A for assistance with the

2  appeal, and Councilmember A responded that he could help.

3      31.  In or around January 2017, at the direction of

4  Councilmember A, defendant ESPARZA learned that resolving the appeal

5  on Project C would save Developer C an estimated $30 million on

6  development costs.

7      32.  In or around January 2017, based on conversations with

8  Councilmember A and Lobbyist C, defendant ESPARZA told Kim that it

9  would cost approximately $1.2 million to $1.4 million to get

10 Councilmember A to resolve the appeal and allow Project C to move

11 forward in the City approval process.

12     33.  Between February 2, 2017 and February 10, 2017, defendant

13 ESPARZA had individual text message conversations with Councilmember

14 A and Kim, discussing the negotiation of the bribe payment and the

15 amount of the bribe payment from Developer C to Councilmember A.

16     34.  In approximately February 2017, defendant ESPARZA and Kim

17 had discussions regarding the negotiation of the bribe amount.  Kim

18 conveyed a counteroffer of $500,000 cash from Developer C for

19 Councilmember A.  Defendant ESPARZA then conveyed this counteroffer

20 to Councilmember A.

21     35.  In approximately February 2017, defendant ESPARZA and Kim

22 met at a restaurant in Los Angeles to discuss the bribe amount.

23 Defendant ESPARZA and Kim discussed that Developer C agreed to pay

24 $500,000 in cash in exchange for Councilmember A's assistance in

25 resolving the appeal so that Project C could move forward in the City

26 approval process, including approvals by the PLUM Committee and City

27 Council.  Thereafter, defendant ESPARZA conveyed this agreed-upon

28 bribe payment amount to Councilmember A, stating specifically that

DEFT. INITIALS _G.E_                11

Councilmember A would get $300,000 total and Kim would get $200,000 total for facilitating the bribery scheme.

36. In approximately February and March 2017, defendant ESPARZA and Councilmember A discussed the appeal. Councilmember A instructed defendant ESPARZA to speak to Lobbyist C, a close associate of the Executive Director of Labor Organization A. Subsequently, Councilmember A told defendant ESPARZA that Councilmember A discussed the appeal with Lobbyist C. Councilmember A conveyed to Lobbyist C that Councilmember A would oppose the appeal in the PLUM committee. Lobbyist C agreed to discuss the issue with the Executive Director of Labor Organization A.

37. On February 14, 2017, defendant ESPARZA had a text message conversation with Lobbyist C about setting up a private meeting between Lobbyist C and Councilmember A. Specifically, defendant ESPARZA wrote: "My boss [Councilmember A] asked if you guys can have a one on one on Tuesday at 830am?... Just you and the Councilman."

38. On February 22, 2017, defendant ESPARZA had a text message conversation with Lobbyist C about another private meeting at Councilmember A's request. Specifically, defendant ESPARZA wrote: "Hi [Lobbyist C], free tomorrow to meet? Councilman asked me to meet with you." Lobbyist C responded: "Yea." Defendant ESPARZA then replied: "I still need to talk to you one on one per my bosses [Councilmember A] request." Lobbyist C responded: "No problem."

39. On March 1, 2017, defendant ESPARZA had a text message conversation with Lobbyist C regarding the appeal. Specifically, defendant ESPARZA asked: "Everything good?" Lobbyist C then replied: "Think so, You?" Defendant ESPARZA responded: "Yes sir.. just checking in."

DEFT. INITIALS _G.E_                12

40.  On March 3, 2017, Lobbyist C sent defendant ESPARZA a text message regarding the appeal on Project C, writing: "Appeal dropped today."  Defendant ESPARZA then informed Kim that Councilmember A had held up Councilmember A's end of the bargain and helped resolve the appeal.

41.  On March 14, 2017, defendant ESPARZA and Councilmember A met at Councilmember A's residence.  Defendant ESPARZA told Councilmember A that Developer C had provided $400,000 in cash to date, and that Developer C would provide the remaining $100,000 later.  Defendant ESPARZA stated that Kim had provided $200,000 of that cash to defendant ESPARZA.  At the meeting, defendant ESPARZA showed Councilmember A a liquor box filled with approximately $200,000 cash.  Councilmember A told defendant ESPARZA to hold on to and hide the money at defendant ESPARZA's residence until Councilmember A asked for it.  Defendant ESPARZA understood this was because Councilmember A wanted to hide the money.  Councilmember A told defendant ESPARZA that defendant ESPARZA could have $100,000 of the $300,000 total amount Councilmember A expected to receive from Developer C.

42.  In or around July 2017, defendant ESPARZA asked Executive Director E to hold on to approximately $250,000 in cash for defendant ESPARZA because defendant ESPARZA feared that law enforcement would search his residence and find the illicit cash.  This cash was comprised of the cash provided by Kim as part of the Project C bribery scheme for Councilmember A and defendant ESPARZA and additional cash defendant ESPARZA received from Chairman E and Businessperson A, as discussed below.  Executive Director E agreed to hide the cash for defendant ESPARZA.

DEFT. INITIALS *G.E*                    13

43.  On December 28, 2017, defendant ESPARZA and Councilmember A met at City Hall and, in Councilmember A's private bathroom, discussed various topics, including defendant ESPARZA's interviews with the FBI, and the cash bribe defendant ESPARZA was holding for Councilmember A.  Specifically, during that conversation, Councilmember A stated: "And secondly, um, look, uh, I have a lot of expenses now that with [Relative A-1] running, [Relative A-1]'s not going to be working anymore.  I'm gonna need money.  Um, that is mine, right?  That is mine."  Defendant ESPARZA understood that Councilmember A was referring to the $200,000 cash bribe payment from Developer C via Kim that Councilmember A had asked defendant ESPARZA to hide at defendant ESPARZA's residence.  Defendant ESPARZA affirmed the bribe money was for Councilmember A.  Defendant ESPARZA and Councilmember A agreed to wait until April 1, 2018, for defendant ESPARZA to provide the $200,000 cash owed to Councilmember A, to allow some cooling off period after defendant ESPARZA's interviews with the FBI in hopes that it would decrease the likelihood of law enforcement discovering the cash.  However, defendant ESPARZA never gave Councilmember A the outstanding $200,000 cash because defendant ESPARZA was concerned about the FBI corruption investigation, so instead defendant ESPARZA gave the money to Executive Director E to hide.

3.  <u>Businessperson A Retainer Payment Scheme</u>

44.  Businessperson A was a business owner with businesses operating in CD-A.  Defendant ESPARZA and Councilmember A met Businessperson A in approximately 2016 or 2017 through Chairman E and Executive Director E.  Businessperson A requested assistance from defendant ESPARZA and Councilmember A to enhance Businessperson A's

DEFT. INITIALS _G.E_                    14

1    financial prospects.  Specifically, Businessperson A asked defendant
2    ESPARZA and Councilmember A to use their official positions to make
3    introductions to developers and advocate that such developers use
4    Businessperson A's business.

5        45.   In order to facilitate this scheme, Businessperson A
6    provided defendant ESPARZA retainer payments for his services.
7    Specifically, from approximately January 2017 to June 2017, defendant
8    ESPARZA accepted approximately $8,000 to $10,000 in cash from
9    Businessperson A on a monthly basis in exchange for defendant ESPARZA
10   arranging meetings for Businessperson A with developers in the City.
11   On several occasions, Businessperson A provided the cash to defendant
12   ESPARZA in the bathroom during meetings in restaurants.

13            4.   Businessperson A Funds June 2017 Las Vegas Trip

14       46.   On or around June 1, 2017, defendant ESPARZA traveled to
15   Las Vegas with, among others, Businessperson A, then CD-12
16   Councilmember Mitchell Englander, City Staffer B, Lobbyist A, and
17   Developer A (the "June 2017 Las Vegas trip").  During the June 2017
18   Las Vegas Trip, defendant ESPARZA, Englander, City Staffer B, and
19   others each received at least the following benefits directly or
20   indirectly (via hotel "comps") from Businessperson A: a hotel room at
21   a Las Vegas Casino and Hotel, transportation to and from the hotel,
22   casino chips to gamble, dinner and drinks at the hotel restaurant
23   totaling approximately $2,481 (for the group), bottle service at a
24   nightclub for which Businessperson A paid approximately $25,000 and
25   Developer A paid an approximately additional $10,000 (for the group
26   and others).

27       47.   After the group returned to their hotel in the early
28   morning of June 2, 2017, Businessperson A told defendant ESPARZA and

DEFT. INITIALS *G.E*                    15

1  Englander that Businessperson A was going to order female escorts to
2  come to their hotel.  When two escorts arrived to the hotel,
3  Businessperson A paid approximately $300-400 in cash for the escorts'
4  services for Businessperson A and defendant ESPARZA and instructed
5  one of the escorts to go to Englander's hotel room to provide him
6  escort services.

7       48.  On or about June 5, 2017, defendant ESPARZA and
8  Councilmember A discussed the June 2017 Las Vegas trip in a telephone
9  call.  Specifically, Councilmember A asked about the use of escorts
10 during the trip, referring to "girls" that defendant ESPARZA and
11 Businessperson A sent to Englander.  Defendant ESPARZA confirmed the
12 use of escorts during the trip.

13 **C.   FBI's Interviews of Defendant ESPARZA**

14      49.  On June 20, 2017, the FBI interviewed defendant ESPARZA
15 regarding a public corruption investigation.  At the beginning of
16 this interview, defendant ESPARZA was advised that lying to the FBI
17 was a crime.  During the interview, defendant ESPARZA falsely stated
18 that he had no knowledge of any City official helping on a project in
19 exchange for money, gifts, or campaign contributions.  During the
20 interview, the FBI told defendant ESPARZA there was a Grand Jury
21 investigation and asked defendant ESPARZA not to reveal the interview
22 to others because it may negatively impact the federal investigation.
23 Defendant ESPARZA told the FBI he understood he should not reveal
24 such information to others.

25      50.  Nevertheless, on June 20, 2017, the same day as his first
26 FBI interview, and in the days shortly thereafter, defendant ESPARZA
27 disclosed to numerous associates, including Councilmember A, Kim, and
28 Executive Director E, that he was interviewed by the FBI.  For

DEFT. INITIALS _G.E_                16

example, on June 20, 2017, defendant ESPARZA told Councilmember A about his interview with the FBI. Councilmember A was worried that the FBI would ask questions about Businessperson A and Chairman E. Councilmember A instructed defendant ESPARZA not to tell anyone that defendant ESPARZA disclosed information to Councilmember A about the FBI interview.

51. On July 1, 2017, the FBI again interviewed defendant ESPARZA. At the beginning of this interview, defendant ESPARZA was advised that lying to the FBI was a crime. During the second FBI interview, defendant ESPARZA falsely stated that: (1) other than the June 2017 Las Vegas trip with then-Councilmember Englander, defendant ESPARZA was not aware of any chip sharing with any other councilmember in Las Vegas; (2) Councilmember A told defendant ESPARZA to be cooperative with and not hide information from the FBI; (3) Executive Director E had no City business with defendant ESPARZA; (4) Kim did not have City business with defendant ESPARZA; and (5) defendant ESPARZA did not know of anyone paying money to City officials.

52. On July 12, 2017, defendant ESPARZA and Kim met in person in a car near defendant ESPARZA's residence, and then drove around in the car. During this meeting, defendant ESPARZA and Kim discussed the content of their recent respective FBI interviews, in which both defendant ESPARZA and Kim lied to the FBI and deliberately failed to disclose information regarding the Project C bribery scheme. During this meeting, Kim asked if defendant ESPARZA wanted the remaining $100,000 from Developer C. Due to defendant ESPARZA's concern that the FBI investigation was closing in on him and Councilmember A,

DEFT. INITIALS *G.E*                    17

defendant ESPARZA declined to take possession of the outstanding
bribery money at that time.

**D.    Defendant ESPARZA's Concealment of Benefits**

        53.    Defendant ESPARZA did not report any of the financial
benefits from Chairman E, Developer C, Kim, or Businessperson A as
gifts on his applicable Form 700s.

DEFT. INITIALS *G.E*                    18

Exhibit 2

1                       **ATTACHMENT A**

2                       FACTUAL BASIS

3 **A.**   **Background on Relevant Persons and Entities**

4     1.   Defendant GEORGE CHIANG ("CHIANG") was a real estate broker

5 and development consultant in the Los Angeles (the "City"). From

6 2006 to 2014, defendant CHIANG was primarily engaged in property

7 management and the sale of residential and commercial property in the

8 San Gabriel Valley.

9     2.   In or around January 2014, defendant CHIANG met Individual

10 1 at an event hosted by Company D. Shortly thereafter, Individual 1

11 invited defendant CHIANG to lunch, where Individual 1 explained that

12 he had been working for the City for nearly 30 years and was a very

13 well respected General Manager of the Los Angeles Department of

14 Building and Safety ("LADBS"). Individual 1 inquired whether

15 defendant CHIANG would be interested in becoming a consultant to

16 downtown Los Angeles area development projects and, if so, stated

17 that Individual 1 would mentor defendant CHIANG and introduce him to

18 important City officials. During the lunch meeting, Individual 1

19 indicated that his goal was to ensure the success of Chinese projects

20 in Los Angeles, and that defendant CHIANG was qualified and would be

21 a good fit. Defendant CHIANG understood that Individual 1 needed

22 someone who did not work for the City to interface with the Chinese

23 companies. Defendant CHIANG agreed to accept Individual 1's

24 proposal.

25     3.   In or around September 2014, Individual 1 instructed

26 defendant CHIANG to open a corporation in order to accomplish

27 Individual 1's goals. Defendant CHIANG established a corporation

28 offering consulting services under the name Synergy Alliance

DEFT. INITIALS *G.C.*

1   Advisors, Inc. ("Synergy").  After defendant CHIANG established

2   Synergy, Individual 1 directed defendant CHIANG on how to interact

3   with City officials with respect to property development and

4   introduced defendant CHIANG to various City officials, including

5   Councilmember A and other elected officials.

6        4.   Beginning in approximately 2014, defendant CHIANG was a

7   close political ally of Councilmember A, the Councilmember for

8   Council District A ("CD-A") in the City, member of the Planning and

9   Land Use Management ("PLUM") committee and member of the Economic

10   Development committee.  Defendant CHIANG was also a close political

11   ally of City Staffer A-1, Councilmember A's Special Assistant and

12   employee of the City.  Through these relationships, defendant CHIANG

13   developed a business relationship with Justin Kim ("Kim"), a major

14   fundraiser for Councilmember A.

15        5.   Individual 1 was the Deputy Mayor for Economic Development

16   from approximately May 2016 to June 30, 2017.

17        6.   On or around August 1, 2017, Individual 1 created a real

18   estate firm and established a corporation.  Individual 1 was the sole

19   owner of Individual 1's Company.

20        7.   On or around August 15, 2017, defendant CHIANG and

21   Individual 1 created a real estate consulting and brokerage firm and

22   established a corporation under the name CCC Investment Group, Inc.

23   ("CCC Investment").  Defendant CHIANG and Individual 1 agreed to be

24   partners of CCC Investment and to share its profits equally.

25   **B.   The CD-A Enterprise**

26        8.   Throughout the period described in the attached

27   Information, the Council District A Enterprise ("CD-A Enterprise"),

28   located in the City, is and was a criminal enterprise composed of a

DEFT. INITIALS _G.C._       2

1   group of individuals associated for a common purpose of engaging in a
2   course of conduct, which course includes bribery and honest services
3   fraud to achieve the goals of the enterprise.  The goals of the CD-A
4   Enterprise included, but were not limited to:

5          a.   enriching the members and associates of the CD-A
6   Enterprise;

7          b.   advancing the political goals and maintaining the
8   control and authority of the CD-A Enterprise by elevating members and
9   associates of the CD-A Enterprise to, and maintaining those
10  individuals' placement in, prominent political positions;

11         c.   protecting the CD-A Enterprise from detection and
12  prosecution by concealing the financial benefits flowing to City
13  officials, through means that included indirect payments to family
14  members, close associates, and consultants.

15     9.   The CD-A Enterprise was led by Councilmember A,
16  Councilmember for CD-A, who had jurisdiction over a large number of
17  development projects undergoing the application and approval process
18  in the City.  Members and associates of the CD-A Enterprise conspired
19  with one another to facilitate bribery schemes that would provide
20  Councilmember A and other City officials financial benefits and keep
21  members in power to maintain the CD-A Enterprise's political
22  stronghold in the City.

23     10.  In exchange, Councilmember A, Individual 1, and members and
24  associates of the CD-A Enterprise, would take official action to
25  ensure certain development projects and CD-A Enterprise associates
26  received favored treatment from the City and thereby secure their
27  bribe-financed influence.  In addition, members and associates of the
28  CD-A Enterprise sought political contributions from developers and

DEFT. INITIALS _G.C._                3

1   their proxies (e.g., lobbyists, consultants, etc.) to benefit

2   Councilmember A and his allies in exchange for official acts to

3   benefit those developers and their proxies, including defendant

4   CHIANG.

5       11.  As a result of its bribery and honest services fraud,

6   throughout the period described in the attached Information, and as

7   known to defendant CHIANG, CD-A Enterprise members and associates

8   engaged in, and their activities in some way affected, commerce

9   between one state and another state.

10  **C.   Defendant CHIANG's Role in the CD-A Enterprise**

11      12.  Beginning no later than January 2014, and continuing at

12  least until December 2018, defendant CHIANG was a member of the CD-A

13  Enterprise.  In that capacity, defendant CHIANG conspired and agreed

14  with other CD-A Enterprise members that a conspirator would commit at

15  least two racketeering acts, in the form of conspiracy to commit

16  bribery and honest services fraud, which acts had a relationship to

17  one another and the CD-A Enterprise, and posed a threat of continued

18  criminal activity.  Defendant CHIANG became a member of this

19  conspiracy knowing of this object, knowing it was illegal, and

20  intending to help accomplish it.

21      13.  Defendant CHIANG, along with other members and associates

22  of the CD-A Enterprise, operated and helped to operate pay-to-play

23  schemes within the City, wherein public officials solicited and

24  demanded direct and indirect financial benefits from developers and

25  their proxies in exchange for official acts.  Specifically, through a

26  scheme that involved bribery and honest services fraud, defendant

27  CHIANG and Individual 1 offered, facilitated, and provided some

28  combination of the following types of financial benefits to public

DEFT. INITIALS  *G.C.*          4

1  officials, among others: (1) cash; (2) consulting and retainer fees;

2  (3) political contributions; (4) event tickets to concerts, shows,

3  and sporting events; and (5) other gifts.

4      14.  In exchange for such financial benefits from developers and

5  their proxies, Councilmember A and Individual 1 agreed to exert and

6  did exert pressure on other City officials to influence the approval

7  process for projects favored by the CD-A Enterprise.  In addition,

8  Councilmember A agreed to and did file motions and vote on projects

9  in various City bodies, including City Council and the PLUM

10  Committee, to benefit such projects.

11      15.  In order to advance the goals of and ensure the continued

12  existence of the CD-A Enterprise, defendant CHIANG, City Staffer A-1,

13  Individual 1, and Kim strategized ways to "protect" Councilmember A

14  to ensure Councilmember A's power and relevance within the City.

15  Defendant CHIANG coordinated with Councilmember A, City Staffer A-1,

16  Individual 1, and Kim to ensure a succession plan that would maintain

17  financial opportunities for each of them after Councilmember A's term

18  as Councilmember of CD-A expired in 2020.  On multiple occasions,

19  defendant CHIANG discussed with Councilmember A, City Staffer A-1,

20  and Individual 1 the need to ensure Relative A-1 was elected for

21  their own political and financial benefit.

22      16.  Also in furtherance of the racketeering conspiracy,

23  defendant CHIANG facilitated and participated in at least the

24  following schemes.

25  D.    **Project D Bribery Schemes**

26          a)  *Early Corrupt Relationship between Company D and*

27              *Councilmember A*

28      17.  In 2014, Company D, a China-based real estate development

DEFT. INITIALS  *G.C.*          5

1  company, through its subsidiaries, acquired Property D located in CD-

2  A and planned to redevelop the property ("Project D").

3      18.  In or around January 2015, defendant CHIANG began working

4  as one of the consultants for Company D on Project D, earning

5  approximately $5,000 per month.

6      19.  Between March 2014 and September 2015, defendant CHIANG and

7  Individual 1 facilitated introductions between Councilmember A and

8  Company D and its Chairman, Chairman D.  For example, on November 4,

9  2014, defendant CHIANG sent an e-mail to City Staffer A-1 with the

10 subject line "Councilmember A Fundraising," writing: "Can you get me

11 in touch with the [Councilmember A]? [Individual 1] and I had dinner

12 with [Company D] last night regarding pledging their support so I

13 want to discuss this to prepare the Councilman's dinner with them

14 this Thursday."  In the subsequent months, defendant CHIANG provided

15 in-kind contributions to Councilmember A's re-election campaign,

16 including printers, stamps, and food.

17     20.  In or around September 2015, at Councilmember A's request,

18 Company D contributed $10,000 to a high school gala event.

19     21.  In or about 2015 or 2016, both Councilmember A and City

20 Staffer A-1 asked defendant CHIANG to ask General Manager D to meet

21 with an attorney, with the stated hope that Company D would hire the

22 attorney to provide legal services for Company D.  Later, defendant

23 CHIANG learned that Relative A-1 worked at this law firm, when, on

24 February 25, 2016, City Staffer A-1 forwarded to defendant CHIANG a

25 text message from Councilmember A stating that "[Relative A-1] works

26 at [the attorney] law firm."

27     22.  In approximately 2016, at a meeting that defendant CHIANG

28 attended, Councilmember A told Chairman D that there was no need to

DEFT. INITIALS _G.C._              6

1  involve the City's Mayor in the approval process of Project D because
2  Councilmember A was the one in control of the PLUM committee.
3  Councilmember A stated that the City's Mayor could not provide help
4  to Chairman D and it was Councilmember A who drove the project.  In
5  addition, Councilmember A told defendant CHIANG privately to tell
6  Chairman D that as far as Project D was concerned, Chairman D did not
7  need anyone else but Councilmember A.  Defendant CHIANG understood
8  this to mean that Councilmember A wanted all of Chairman D's benefits
9  including contributions and money to be directed toward Councilmember
10  A and not other City officials.

11          *b)*   *$66,000 Bribe to Councilmember A in Exchange for*
12                 *Project D Motion*

13      23.  Between November 2015 and November 2016, Councilmember A
14  solicited financial benefits from Company D, including from defendant
15  CHIANG (its consultant), Chairman D, and General Manager D, in
16  exchange for Councilmember A's official acts to benefit Project D.
17  Specifically, Chairman D and General Manager D agreed to provide
18  indirect financial benefits to Councilmember A in the form of
19  consulting fees to an associate of Councilmember A in exchange for
20  Councilmember A introducing a motion to benefit Project D.  Defendant
21  CHIANG facilitated part of this arrangement, as described further
22  below.

23      24.  On November 11, 2015, defendant CHIANG and Councilmember A,
24  City Staffer A-1, Chairman D, and General Manager D met over dinner
25  at a restaurant in Arcadia, California.  At the meeting, defendant
26  CHIANG translated for Councilmember A and Chairman D as they
27  discussed obtaining Councilmember A's support for Project D.  In
28  addition, in the same conversation, Councilmember A asked Chairman D

DEFT. INITIALS  *G.C.*          7

1  to hire Councilmember A's associate on Project D.  Chairman D told

2  Councilmember A to discuss the details with General Manager D.

3      25.  On November 16, 2015, defendant CHIANG sent an email to

4  City Staffer A-1, copying General Manager D, confirming the new

5  agreement between Councilmember A and Chairman D.  Defendant CHIANG

6  wrote: "Now with a common consensus in place for [Project D], we

7  would like to roll this project full speed ahead.  Therefore, I would

8  like to request the biweekly standing meeting to restart.... From

9  this point on, we would like to communicate all aspects of our

10  project with your [CD-A] office FIRST prior to any other offices in

11  the city family.... [P]lease be ready to coordinate with Mayor's

12  office, Planning Department, and all other related parties so we can

13  drive on a singular track."

14      26.  On December 8, 2015, as part of this new agreement,

15  defendant CHIANG and Councilmember A met in person at a coffee shop

16  in Los Angeles to discuss a consulting agreement to pay one of

17  Councilmember A's associates.  At the meeting, defendant CHIANG told

18  Councilmember A that General Manager D would work with Councilmember

19  A on retaining Councilmember A's associate, who defendant CHIANG

20  later learned was Councilmember A's Associate.  Councilmember A told

21  defendant CHIANG that Relative A-1 would be involved with getting the

22  retainer consummated.

23      27.  Between December 8, 2015 and December 16, 2015, at a

24  meeting at Property D, General Manager D asked defendant CHIANG if

25  defendant CHIANG's consulting firm Synergy could hire Councilmember

26  A's Associate if, in return, Company D would increase the retainer

27  with Synergy to cover that cost.  Defendant CHIANG stated he would

28

DEFT. INITIALS  G.C.          8

1  not be involved with this arrangement because he felt it was not

2  legal.

3      28.  On December 16, 2015, defendant CHIANG facilitated an

4  introduction between Relative A-1 and a person he knew at the time as

5  "Auntie," who defendant CHIANG later learned was Chairman D's

6  relative.  Defendant CHIANG understood that the two would meet to

7  discuss an arrangement facilitated by Relative A-1 whereby Chairman

8  D's relative's company would pay a company affiliated with

9  Councilmember A's Associate.

10     29.  In May 2016, Company A, a real estate company registered to

11 Councilmember A's Associate's relative, but actually operated by

12 Councilmember A's Associate, and Chairman D's relative's company

13 executed an agreement whereby Company A would purportedly "provide

14 marketing analysis for Real Estate and Land Development Opportunities

15 in the Greater Southern California Area in the total amount of

16 $11,000.00 per month for services rendered.  The term of this

17 agreement is one (1) year with one (1) option year."  In reality,

18 defendant CHIANG prepared the monthly marketing analysis reports and

19 delivered them to Councilmember A, who then provided them to

20 Councilmember A's Associate, who collected the $11,000 monthly

21 retainer.  Defendant CHIANG, Councilmember A, Chairman D, and General

22 Manager D understood that the monthly retainer payments were intended

23 to be and were indirect bribe payments to Councilmember A in exchange

24 for Councilmember A's official acts to benefit Project D.

25     30.  On May 31, 2016, defendant CHIANG and Councilmember A had a

26 conversation via text message regarding Councilmember A obtaining the

27 monthly reports purportedly prepared by Company A (but in fact

28 prepared by defendant CHIANG) pursuant to the consulting agreement

DEFT. INITIALS  G. C.              9

1  with Chairman D's relative regarding real estate and land development

2  opportunities.

3      31.  **Real Estate Report #1:** On May 31, 2016, defendant CHIANG

4  delivered to Councilmember A his first real estate report that they

5  intended would be passed off as being created by Company A pursuant

6  to its $11,000 per month consulting agreement with Chairman D's

7  relative.

8      32.  **Real Estate Report #2:** On July 1, 2016, defendant CHIANG

9  met with Councilmember A at a coffee shop in Los Angeles, where

10  defendant CHIANG delivered his second real estate report.

11      33.  **Real Estate Report #3:** On August 1, 2016, defendant CHIANG

12  met with Councilmember A at a restaurant in Los Angeles, where

13  defendant CHIANG delivered his third real estate report.

14      34.  **Real Estate Report #4:** On September 2, 2016, defendant

15  CHIANG met with Councilmember A at a coffee shop in Los Angeles,

16  where defendant CHIANG delivered his fourth real estate report.

17      35.  **Real Estate Report #5:** On October 4, 2016, defendant CHIANG

18  met with Councilmember A at Councilmember A's residence, where

19  defendant CHIANG delivered his fifth real estate report.

20      36.  **Real Estate Report #6:** On November 3, 2016, defendant

21  CHIANG met with Councilmember A at a coffee shop in Los Angeles,

22  where defendant CHIANG delivered his sixth and final real estate

23  report.

24      37.  On November 22, 2016, Councilmember A, in Councilmember A's

25  official capacity, presented a written motion in the Economic

26  Development committee to benefit Project D (the "Project D motion").

27      38.  On December 9, 2016, defendant CHIANG and Councilmember A

28  met to discuss Councilmember A's filing of the Project D motion in

DEFT. INITIALS _G.C._            10

1   exchange for retainer fees facilitated by defendant CHIANG, Chairman

2   D, and General Manager D to Councilmember A's Associate.

3       39.  On December 10, 2016, defendant CHIANG wrote to Individual

4   1 in a text message: "please don't tell [Councilmember A] [I] told

5   you about the meeting I had with [Councilmember A]. [Councilmember

6   A] told me not to tell anyone even [City Staffer A-1]."  Defendant

7   CHIANG was referring to the financial arrangement Councilmember A had

8   with Company D, and believed that Councilmember A did not want to

9   reveal this arrangement with Company D to anyone, including City

10  Staffer A-1.

11      40.  On December 13, 2016, the City Council adopted the Project

12  D motion Councilmember A presented on November 22, 2016.

13  Councilmember A voted "yes" on the matter in City Council.

14      41.  On December 13, 2016, defendant CHIANG, Councilmember A,

15  and General Manager D met at Property D to discuss Project D and

16  Councilmember A's agreement to expedite the project going forward.

17          c)  *Additional Benefits to Councilmember A and Other City*

18              *Officials in Exchange for Official Acts*

19      42.  Between April 2017 and October 2018, Councilmember A

20  solicited additional financial benefits from Company D, including

21  from defendant CHIANG and Chairman D, in exchange for Councilmember

22  A's additional official acts to benefit Project D.  Specifically,

23  defendant CHIANG and Chairman D agreed to facilitate a trip to China

24  for Councilmember A and Councilmember A's family that was funded, at

25  least in part, by defendant CHIANG and/or Chairman D, committed

26  $100,000 to benefit Relative A-1's campaign for the CD-A seat,

27  provided event tickets and other miscellaneous expenses at

28  Councilmember A's request, in exchange for Councilmember A

DEFT. INITIALS  G.C.                11

1  facilitating the approval of Project D in the City Planning

2  Commission ("CPC"), and approving Project D in the PLUM Committee,

3  and City Council.

4      43.  In or around April 2017, at Councilmember A's request,

5  defendant CHIANG organized and coordinated a trip for Councilmember A

6  and Councilmember A's family members to visit Chairman D in China.

7  Defendant CHIANG coordinated and paid approximately $500 for visa

8  fees, and arranged for transportation for Councilmember A and the

9  family in Hong Kong.

10     44.  Between April 15, 2017 and April 23, 2017, Councilmember A

11  and Councilmember A's family visited Chairman D in Hong Kong and

12  China.

13     45.  On April 27, 2017, at Councilmember A's request, defendant

14  CHIANG provided concert tickets to Councilmember A worth

15  approximately $1,572.

16     46.  On May 19, 2017, at Councilmember A's request, defendant

17  CHIANG paid approximately $1,000 for alcohol for a party for

18  Councilmember A's relative.

19     47.  On May 21, 2017, City Staffer A-1 requested event tickets

20  from defendant CHIANG for City Staffer A-2, a CD-A staff member, who

21  had been working on Project D.  Specifically, City Staffer A-1 wrote:

22  "Also, can we please work on three tickets for lakers? Any game.

23  Want to take care of [City Staffer A-2].  I can let [City Staffer A-

24  2] know u were the one getting him 4 tickets."  On May 22, 2017,

25  defendant CHIANG purchased four Lakers tickets for approximately

26  $630, and subsequently gave the tickets to City Staffer A-1 to

27  provide to City Staffer A-2.

28

DEFT. INITIALS __G.C.__                    12

1     48.  On June 19, 2017, at Councilmember A's request, defendant

2 CHIANG provided concert tickets to Councilmember A worth

3 approximately $1,670.

4     49.  On August 24, 2017, defendant CHIANG asked for

5 Councilmember A's help on Project D.  Specifically, defendant CHIANG

6 sent a text message to Councilmember A, writing: "Hi Boss, wanted to

7 give you heads up: [A Company D employee] spoke to chairman [D] and

8 CPC needs to be 9/14/17 otherwise the loan commitment from lender

9 will be lost for the project."  The next day, defendant CHIANG again

10 sent a message to Councilmember A, writing: "Hi Boss, we met with

11 planning yesterday and went through the outstanding items for 9/14/17

12 CPC.  We would need a motion from your office to direct the TFAR

13 allocation by next week before council recess to make the 9/14/17 CPC

14 hearing."

15     50.  On September 1, 2017, at defendant CHIANG's request,

16 Councilmember A presented a written motion in the PLUM committee to

17 benefit Company D, allowing Project D to move forward with its

18 application and approval process before the CPC and City Council.

19     51.  On September 1, 2017, Councilmember A wrote to defendant

20 CHIANG in a text message: "We got the motion in today."  Defendant

21 CHIANG understood this message to convey that Councilmember A held up

22 Councilmember A's end of the bargain to help Company D in exchange

23 for financial benefits provided by defendant CHIANG and Company D.

24     52.  In or around September 2017, Councilmember A used

25 Councilmember A's official position to pressure other officials,

26 including officials in the Planning Department and in Mayor's office,

27 to influence the approval of Project D by the CPC.

28

DEFT. INITIALS *G.C.*     13

1      53.  In or around November and December 2017, Councilmember A

2 asked defendant CHIANG to make a commitment on behalf of Company D to

3 contribute $100,000 to Relative A-1's campaign in exchange for

4 favorable official acts by Councilmember A to benefit Project D.

5 Defendant CHIANG, on behalf of Company D, confirmed Chairman D's

6 commitment of $100,000 to a Political Action Committee ("PAC"), PAC

7 A, that was created by Councilmember A, among others, to benefit

8 Relative A-1's campaign.

9      54.  On December 5, 2017, the PLUM Committee, including

10 Councilmember A, voted "yes" on the approval of Project D.

11     55.  On December 12, 2017, the City Council members present at

12 hearing voted to adopt the PLUM Committee report for Project D, which

13 approved the entitlements and allowed Company D to move forward in

14 the City approval process.

15     56.  In early 2018, defendant CHIANG provided approximately $800

16 in cash to City Staffer A-1.

17     57.  On January 24, 2018, defendant CHIANG, Chairman D,

18 Individual 1, Councilmember A, and Relative A-1 met for dinner at

19 Chairman D's property in San Gabriel, California.  At the dinner,

20 Chairman D pledged Chairman D's commitment and support for Relative

21 A-1's campaign for the CD-A seat.

22     58.  On March 9, 2018, Councilmember A submitted a resolution in

23 the PLUM Committee to benefit Company D, allowing Project D to move

24 forward in its approval process.

25     59.  On March 20, 2018, the City Council members present at the

26 hearing voted to adopt the Company D resolution submitted by

27 Councilmember A on March 9, 2018.

28

DEFT. INITIALS _G.C._         14

1      60. On March 29, 2018, defendant CHIANG and Councilmember A met

2  at Councilmember A's residence to discuss Company D's support and the

3  $100,000 contribution to PAC A to benefit Relative A-1's campaign.

4      61. On March 29, 2018, Councilmember A acknowledged defendant

5  CHIANG's agreement to facilitate a contribution to Relative A-1's

6  campaign, writing in a text message to defendant CHIANG: "Thanks

7  again for all your help."

8      62. On April 23, 2018, defendant CHIANG wrote to Individual 1

9  via text message: "Below are items I'm talking to [Councilmember A]

10  about: 1) tell [Councilmember A] that [Chairman D] is coming in June,

11  we can talk about the PAC at that time."

12      63. On April 23, 2018, defendant CHIANG and Councilmember A met

13  at Councilmember A's residence to discuss Councilmember A's continued

14  support for Project D in exchange for Company D's agreement to

15  contribute $100,000 to the PAC to benefit Relative A-1's campaign.

16      64. On May 18, 2018, defendant CHIANG and Individual 1 met with

17  Councilmember A for breakfast at a restaurant in Boyle Heights.

18  Councilmember A stated that Councilmember A needed a PAC contribution

19  as soon as possible. Councilmember A stated Councilmember A wanted

20  the contribution now so that when Relative A-1 announced the

21  candidacy, Relative A-1 would have money to pour into the campaign

22  and scare everyone else from running against Relative A-1.

23  Councilmember A stated that other developers already contributed in

24  amounts of $50,000, $100,000, and $200,000.

25      65. On June 12, 2018, the City Council, including Councilmember

26  A, voted to approve the Development Agreement for Project D. The

27  same day, Councilmember A wrote to defendant CHIANG in a text

28  message: "Da [Development Agreement] for [Company D] just passed

DEFT. INITIALS _G.C._      15

1    council today.  Does that mean project has been fully entitled?  Is

2    that our last vote?"

3         66.  On June 18, 2018, Councilmember A wrote to defendant CHIANG

4    in a text message: "When is the chairman [D] coming in to town?  We

5    need to finalize pac stuff.  Thanks."

6         67.  On July 30, 2018, the ordinance authorizing the execution

7    of the Development Agreement for Project D went into effect.  The

8    same day, Councilmember A wrote to defendant CHIANG in a text

9    message: "any news on when [Chairman D] is coming in to town?  Hoping

10   to catch dinner with [Chairman D] and talk about [Relative A-1's]

11   campaign."  Defendant CHIANG responded: "Hi Boss, [Individual 1] is

12   working on it.  I let you know after I see [Individual 1] in office

13   tomorrow."

14        68.  On October 8, 2018, Councilmember A followed up regarding

15   Company D, writing to defendant CHIANG in a text message: "Hey GEORGE

16   [CHIANG]... have time to meet soon to tie up some loose ends re the

17   [Company D] project?"  Defendant CHIANG understood Councilmember A to

18   be referencing the $100,000 commitment to the PAC to benefit Relative

19   A-1's campaign, which was in exchange for Councilmember A's help with

20   Project D.

21        69.  On October 16, 2018, defendant CHIANG and Councilmember A

22   met at Councilmember A's residence and discussed Company D's

23   agreement to contribute to the PAC to benefit Relative A-1's

24   campaign, as promised, in exchange for Councilmember A taking

25   multiple official acts to benefit Project D.

26              d)   *Financial Benefits to Individual 1 in Exchange for*

27                   *Official Acts*

28        70.  Between January 2017 and June 2017, defendant CHIANG and

DEFT. INITIALS  _G.C._              16

1  Individual 1 agreed that Individual 1 would assist defendant CHIANG
2  and Project D in exchange for future payments to Individual 1.
3  Specifically, Individual 1 agreed to perform and did perform official
4  acts in the capacity of Deputy Mayor of Economic Development to
5  benefit Project D.  In addition, starting in January 2017, while
6  Individual 1 was still Deputy Mayor, Individual 1 prepared an action
7  item list for Project D on a weekly basis, led project meetings, and
8  assigned tasks to defendant CHIANG and others to move the project
9  forward.  In exchange, defendant CHIANG agreed to share the lucrative
10  consulting fee and bonus payments from Company D with Individual 1.

11      71.  In or around January 2017, while Individual 1 was the
12  Deputy Mayor for Economic Development, defendant CHIANG, Individual
13  1, and Individual 1's relative strategized to have Synergy, defendant
14  CHIANG's consulting firm, take over navigating the City approval
15  process for Project D.  Defendant CHIANG negotiated a lucrative
16  consulting contract with Company D that included a monthly retainer
17  of $35,000.  The consulting contract was later modified to include
18  three significant bonus payments: (1) $100,000 for successfully
19  completing a Planning Department advisory hearing in May 2017; (2)
20  $150,000 for CPC approval in September 2017; and (3) $185,000 for
21  PLUM Committee and City Council approval in December 2017.  Defendant
22  CHIANG agreed with Individual 1 to pay a portion of these fees to
23  Individual 1, in exchange for Individual 1's assistance on Project D
24  in Individual 1's official capacity as Deputy Mayor.  As Deputy
25  Mayor, Individual 1 exerted power over and influence on various City
26  departments, including the Planning Department and the CPC.

27      72.  On January 13, 2017, defendant CHIANG, Individual 1, and
28  Individual 1's relative communicated via group text messages

DEFT. INITIALS  _G.C._           17

1  regarding Synergy taking control of the City approval process for

2  Project D.  Defendant CHIANG wrote: "Hi Dailo [brother], met with

3  chairman [D] again today.  [Chairman D] had already instructed us to

4  move forward on the project.  I need to spend some time and lay

5  everything out.  So I need to skip training tomorrow to put my

6  thoughts into context and send it to you and [Individual 1's

7  relative].  Also, my retainer has been confirmed verbally so I need

8  [Individual 1's relative] to modify it on paper for signature.  Thank

9  you!"  Individual 1 responded: "No problem.  We should meet after you

10 put your thoughts together."

11      73.  On January 26, 2017, defendant CHIANG discussed Synergy

12 taking over Project D with Individual 1 and another consultant.

13 Specifically, defendant CHIANG wrote to Individual 1 and Synergy

14 Consultant in a text message: "Hi Dailo [brother], everything went as

15 planned.  Chairman [D] spent the first part of meeting yelling at

16 everything about how their current approach is wrong.  Now Synergy

17 takes full control.  Then he walked out.  The meeting was

18 productive."

19      74.  On February 3, 2017, defendant CHIANG sent a text message

20 to Individual 1, writing: "Meeting with chairman [D] was good report

21 to you tomorrow.  Thank you!"

22      75.  On February 8, 2017, Individual 1, using Individual 1's

23 power and influence as the Deputy Mayor, coordinated a meeting

24 between a Planning Department official and representatives of Company

25 D, including defendant CHIANG and Chairman D.

26      76.  On or around March 13, 2017, Individual 1 used Individual

27 1's official position as the Deputy Mayor to pressure subordinate

28 City officials to take favorable official actions on Project D.

DEFT. INITIALS  G.C.                18

1 Specifically, on March 13, 2017, Individual 1 sent a group text
2 message to defendant CHIANG, Individual 1's relative, and Synergy
3 Consultant: "Hi [Synergy Consultant], talked to [Fire Department
4 Official] about travel distance and tract map.  He still help.  Make
5 sure we pay expedite for the the fire review of three tract map.
6 [...] Still wait for [Transportation Department Official] to call
7 back."  Defendant CHIANG responded: "Thank you Dailo [brother]!"
8 Synergy Consultant responded: "You are the greatest...I will call
9 [Fire Department Official] first."

10     77.  On March 28, 2017, defendant CHIANG informed Individual 1
11 about his negotiations with Company D on the Synergy consulting
12 payments, in which Individual 1 had a vested interest, specifically
13 the agreement to receive a portion of the consulting fees and bonus
14 payments.  Specifically, defendant CHIANG wrote to Individual 1 in a
15 text message: "Last night I spoke to chairman [D] about late monthly
16 payment and stop of service [Chairman D] said it was all
17 misunderstanding asked me to go to [Company D] office this afternoon.
18 Let me know if you want to have meeting today?  Completely up to you
19 but I will drop by regardless to drop everything off.  Thank you!"

20     78.  On March 28, 2017, Company D paid Synergy a monthly
21 retainer fee of $35,000 by check.

22     79.  On March 28, 2017, Company D paid Synergy $46,666 by check
23 as back pay for monthly retainers for February 2017 and January 2017.

24     80.  On May 18, 2017, Company D issued a $100,000 check as the
25 first bonus payment to Synergy for successfully reaching the Planning
26 Department advisory hearing scheduled on May 24, 2017.

27     81.  Consistent with his agreement to share the bonus payment
28 with Individual 1, defendant CHIANG asked Individual 1 if Individual
DEFT. INITIALS  G.C.          19

1 wanted Individual 1's share of the first bonus payment in check
form.  Individual 1 told defendant CHIANG to wait until later and
that Individual 1 preferred getting a bigger check at a later date.

    82.  On or around June 22, 2017, in a telephone call, Individual
1 asked defendant CHIANG "when are you going to . . . get the cash
for me for the 20 grand?"  Defendant CHIANG responded, "I got it
sitting in the car," referring to $20,000 cash.  Individual 1 then
instructed defendant CHIANG to "just keep it there for now."

    83.  In early 2017, Individual 1 explained to defendant CHIANG
that the Mayor's office had influence over CPC and the CPC
commissioners.  Defendant CHIANG understood that as Deputy Mayor,
Individual 1 had influence over the CPC and that Individual 1 knew
how to influence the CPC's approval of Project D.

    84.  On or around August 3, 2017, defendant CHIANG, Individual
1, and City Staffer D, a senior City official working for
Councilmember D, met at Individual 1 and defendant CHIANG's office to
discuss Project D.  Individual 1 asked City Staffer D to speak to
Mayor staffer 1 to ask Mayor staffer 1 to put pressure on the CPC to
approve Project D.  City Staffer D agreed to do so.

    85.  On or about August 8, 2017, Individual 1 had a meeting with
City Staffer D's relative in downtown Los Angeles at the office of
CCC Investment.  At the meeting, Individual 1 and City Staffer D's
relative discussed an arrangement for a consulting agreement.

    86.  On or about August 29, 2017, at Individual 1's request,
defendant CHIANG executed a consulting agreement between CCC
Investment and City Staffer D's relative.  The consulting agreement
provided for compensation of $1,000 per month, effective September 1,
2017, for four consecutive months.  At Individual 1's request,

DEFT. INITIALS _G.C._         20

1   between October 2017 and December 2017, CCC Investment ultimately

2   paid City Staffer D's relative approximately $2,000 for "consulting

3   services."

4       87.   On September 14, 2017, Individual 1 confirmed that

5   Individual 1 influenced Company D's CPC approval and that Individual

6   1 expected a second bonus payment from Company D, in the form of a

7   portion of defendant CHIANG's bonus, for reaching the second CPC

8   hearing milestone.  Specifically, after the CPC approval, Individual

9   1 sent a text message to Individual 1's relative, writing: "CPC

10  approved [Project D]! We are moving on to PLUM."  Individual 1's

11  relative responded: "Good news for milestones."  Individual 1 then

12  wrote: "[Mayor official 1] and [Mayor official 2] talked to the

13  commissioners.  [City Staffer D] asked [Mayor staffer 1].  You know

14  who asked [City Staffer D]."  Individual 1's relative responded:

15  "Congrats!"  Individual 1 answered: "To all of us! Still waiting for

16  the 2nd payment."

17      88.   On October 19, 2017, Company D issued a $150,000 check as

18  the second bonus payment to Synergy for Project D successfully

19  completing the CPC hearing on September 14, 2017.

20      89.   On December 14, 2017, Company D issued a $185,000 check as

21  the third bonus payment to Synergy for Project D successfully

22  completing the PLUM hearing on December 5, 2017, and the City Council

23  hearing on December 12, 2017.

24      90.   Between January 2017 and December 2017, Company D paid

25  Synergy approximately $772,536 in consulting fees and bonuses for its

26  work on Project D.  During that time period, Synergy paid Individual

27  1's company $93,939.97, and Individual 1's relative $19,000.  This

28  approximately $112,000 paid by defendant CHIANG through Synergy

DEFT. INITIALS  G.C.           21

1   indirectly to Individual 1 was in exchange for Individual 1's actions

2   in shepherding Project D through the various City approval processes

3   while Individual 1 was Deputy Mayor.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFT. INITIALS _G.C._                    22

Exhibit 3

**ATTACHMENT A**

FACTUAL BASIS

1.    Defendant and the USAO agree to the statement of facts provided below and agree that this statement of facts is sufficient to support a plea of guilty to the charge described in this agreement but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

**A.    Defendant JUSTIN KIM's Role in CD-A**

2.    Defendant JUSTIN KIM ("KIM") was a real estate appraiser, consultant, and fundraiser in the City of Los Angeles (the "City"). The City government received more than $10,000 per fiscal year in funds from the United States in the form of grants, contracts, subsidies, loans, guarantees, insurance, and other forms of federal assistance.  Defendant KIM was one of the top fundraisers for Councilmember A who was the City councilmember for Council District A ("CD-A").  Defendant KIM was motivated to be one of Councilmember A's top fundraisers in order to, at least in part, gain and maintain access to real estate and business opportunities in CD-A.

3.    Beginning in early 2017, defendant KIM also was a close political ally of City Staffer A-1, Councilmember A's staff member and an employee of the City.  Defendant KIM and City Staffer A-1 strategized ways to protect Councilmember A to ensure Councilmember A's power and relevance within the City, including repeatedly discussing being loyal to Councilmember A, because, at least in part, it meant securing future financial opportunities for defendant KIM and City Staffer A-1.  Defendant KIM frequently referred to Councilmember A as defendant KIM's "boss."  Defendant KIM supported

DEFT. INITIALS _JK_

1   Councilmember A's and City Staffer A-1's succession plan that would
2   maintain or increase financial opportunities for at least defendant
3   KIM and City Staffer A-1 after Councilmember A's term as
4   councilmember of CD-A expired.  These discussions included plans to
5   support the election of Councilmember A's relative for the CD-A seat,
6   ensuring political control for their allies in CD-A, and developing a
7   bribery scheme in CD-A, discussed further below.  On multiple
8   occasions, defendant KIM discussed with City Staffer A-1 the need to
9   ensure Councilmember A's relative was elected for their own political
10  and potential financial benefit and their own twelve-year plan, which
11  was based on Councilmember A's relative succeeding Councilmember A as
12  the councilmember for CD-A.

13       4.   On or around June 22, 2017, defendant KIM met with
14  Councilmember A, City Staffer A-1, and Lobbyist B and discussed
15  establishing two political action committees ("PAC") to raise money
16  for the campaign of Councilmember A's relative.  During this meeting,
17  Councilmember A suggested creating a second PAC and having defendant
18  KIM find an associate to serve as the "face" of the PAC to disguise
19  Councilmember A's involvement and the PAC's connection to CD-A.

20       5.   In sum, defendant KIM was motivated to help Councilmember A
21  maintain power in CD-A by getting Councilmember A's relative elected,
22  because, at least in part, defendant KIM would be poised to
23  financially benefit from potential illicit schemes in CD-A.  This
24  plan included potentially offering and providing financial benefits
25  in the hopes of receiving favored treatment by Councilmember A and
26  Councilmember A's staff, which would increase business opportunities
27  for defendant KIM.

28

DEFT. INITIALS _JK_.                    2

**B.   Project C Bribery Scheme**

         a.   The Bribery Agreement and Payment

    6.   Between August 2016 and July 2017, Developer C, owner of Company C, agreed to provide a $500,000 cash bribe to Councilmember A, through defendant KIM, in exchange for Councilmember A's assistance on Developer C's development project (the "bribery scheme"). Project C was a planned residential complex in CD-A.

    7.   Developer C, through defendant KIM, initially provided $400,000 in cash that was intended for Councilmember A between February and March 2017. In exchange, Developer C, through defendant KIM and City Staffer A-1, sought to use Councilmember A's influence as the councilmember of CD-A and a member of the Planning and Land Use Management ("PLUM") Committee to cause a labor organization to withdraw or abandon its appeal on Project C, thereby allowing the project to move forward in its City approval process.

    8.   In the summer of 2016, Labor Organization A filed an appeal requesting to suspend all activity to implement Project C that required City approval until Project C was brought into compliance with the requirements of CEQA [California Environmental Quality Act] by correcting certain deficiencies (the "appeal"). The appeal prevented Project C from progressing through the rest of the City approval processes, including approvals by the PLUM Committee and City Council.

    9.   On August 8, 2016, Developer C called defendant KIM and asked defendant KIM to obtain Councilmember A's assistance with the appeal, which could ultimately reach the PLUM Committee of which Councilmember A was a member.

DEFT. INITIALS _J.K._                3

1      10.  On August 9, 2016, Developer C sent a copy of the appeal to

2  defendant KIM by e-mail, which defendant KIM then forwarded to City

3  Staffer A-1.  On August 10, 2016, City Staffer A-1 confirmed

4  receiving the e-mail.

5      11.  On September 1, 2016, defendant KIM, Councilmember A, City

6  Staffer A-1, and another individual had dinner together and then

7  visited a Korean karaoke establishment in Los Angeles (the "karaoke

8  meeting").  During the karaoke meeting, defendant KIM asked

9  Councilmember A for assistance with the appeal on Project C, and

10  Councilmember A agreed to help.  Defendant KIM then called Developer

11  C and asked Developer C to join the karaoke meeting, which Developer

12  C did.

13      12.  On September 2, 2016, defendant KIM and City Staffer A-1

14  met for lunch in Los Angeles.  City Staffer A-1 expressed to

15  defendant KIM that Councilmember A would not help Project C for free

16  and that Councilmember A would require a financial benefit in

17  exchange for help ensuring Project C moved forward through the City

18  approval process.

19      13.  On September 3, 2016, defendant KIM and Developer C met at

20  a bowling alley in Little Tokyo.  Defendant KIM conveyed to Developer

21  C the message from Councilmember A and City Staffer A-1, namely that

22  Councilmember A's assistance on Project C would require that

23  Councilmember A receive a financial benefit.

24      14.  On January 17, 2017, defendant KIM, Councilmember A, and

25  Developer C's business associates met at Councilmember A's City Hall

26  office to discuss, among other things, Project C.  Shortly before the

27  meeting, City Staffer A-1 sent defendant KIM a series of text

28  messages, writing: "Let's you and I meet with [the] CM [Councilmember

DEFT. INITIALS _J.K._         4

```
 1   A] after to talk about [Project C][.]  Make those ask about ...
 2   [Labor Organization A]."  Defendant KIM responded: "Yes."  During a
 3   private portion of the meeting that included only defendant KIM,
 4   Councilmember A, and City Staffer A-1, defendant KIM again asked
 5   Councilmember A for assistance with the appeal, and Councilmember A
 6   responded that Councilmember A could help.  Councilmember A stated
 7   that Councilmember A wanted defendant KIM to be a major supporter
 8   when Councilmember A's relative ran for Councilmember A's seat as the
 9   councilmember for CD-A.  Defendant KIM understood this to mean that
10   he would have to, among other things, agree to provide or facilitate
11   significant campaign contributions to Councilmember A's relative's
12   future campaign.
13        15.  On January 18, 2017, defendant KIM and City Staffer A-1 met
14   at a coffee shop in Little Tokyo.  During this meeting, City Staffer
15   A-1 told defendant KIM that Lobbyist C stated it would cost
16   approximately $1.2 million to $1.4 million to hire a lobbyist to
17   attempt to resolve the appeal and allow Project C to move forward in
18   the City approval process.  After this meeting, defendant KIM
19   conveyed the cost of $1.2 million to $1.4 million to Developer C.
20   Developer C made a counteroffer for Councilmember A to resolve the
21   appeal for $500,000 in cash.
22        16.  In approximately February 2017, defendant KIM conveyed
23   Developer C's counteroffer of $500,000 cash to City Staffer A-1.
24   Defendant KIM understood that City Staffer A-1 then conveyed this
25   counteroffer to Councilmember A.
26        17.  Between February 2, 2017 and February 10, 2017, defendant
27   KIM had individual text message conversations with City Staffer A-1
28
```

DEFT. INITIALS _J.K._                5

1 | and Developer C, discussing the negotiation of the bribe payment and
2 | the amount of the bribe payment from Developer C to Councilmember A.

3 |     18. In approximately February 2017, defendant KIM and City
4 | Staffer A-1 met at a restaurant in Los Angeles to discuss the bribe
5 | payment amount. Defendant KIM and City Staffer A-1 discussed that
6 | Developer C agreed to pay $500,000 in cash in exchange for
7 | Councilmember A's assistance in resolving the appeal so that Project
8 | C could move forward in the City approval process, including
9 | approvals by the PLUM Committee and City Council.

10 |     19. In approximately February or March 2017, defendant KIM met
11 | with Developer C at a commercial building in Los Angeles and received
12 | a paper bag from Developer C containing $400,000 in cash, which was
13 | intended to be a bribe Developer C agreed to pay for Councilmember
14 | A's assistance in resolving the appeal. After receiving $400,000 in
15 | cash from Developer C, defendant KIM met with City Staffer A-1 in a
16 | car in Los Angeles, and gave City Staffer A-1 cash to deliver to
17 | Councilmember A. Defendant KIM kept some cash for himself for, at
18 | least in part, facilitating the bribe payment.

19 |     20. In approximately February or March 2017, City Staffer A-1
20 | conveyed to defendant KIM that Councilmember A helped resolve the
21 | appeal. Soon thereafter, defendant KIM informed Developer C that
22 | Councilmember A held up Councilmember A's end of the agreement and
23 | helped resolve the appeal.

24 |     b.   FBI Interviews of Defendant KIM

25 |     21. On May 18, 2017, the FBI conducted a voluntary interview of
26 | defendant KIM regarding a public corruption investigation (the "first
27 | FBI interview"). At the beginning of the interview, defendant KIM
28 | was advised that lying to the FBI was a crime. During the interview,

DEFT. INITIALS _JK_.       6

1   defendant KIM sought to conceal his close relationship with City

2   Staffer A-1. For example, when asked about City Staffer A-1 in

3   Councilmember A's office, defendant KIM stated that he was not that

4   close to City Staffer A-1 and understated the frequency with which

5   they communicated with each other. During the interview, the FBI

6   told defendant KIM there was a federal grand jury investigation and

7   asked defendant KIM not to reveal the interview to others because it

8   may negatively impact the federal investigation. Defendant KIM told

9   the FBI he agreed to not reveal such information to others.

10      22. Nevertheless, on May 18, 2017, approximately one hour after

11   the first FBI interview, defendant KIM called City Staffer A-1 and

12   informed City Staffer A-1 that he believed someone was providing

13   information to law enforcement and that law enforcement was

14   conducting surveillance of one of City Staffer A-1's local hangouts.

15      23. On July 10, 2017, the FBI again conducted a voluntary

16   interview of defendant KIM (the "second FBI interview"). At the

17   beginning of the interview, defendant KIM was advised that lying to

18   the FBI was a crime. During the second FBI interview, defendant KIM

19   falsely stated that: (1) he had no "asks" of anyone in City Council;

20   (2) he had no work with any City employees; (3) he did not know of

21   anyone that worked for the City who did favors for people in exchange

22   for money, campaign contributions, or any other benefit; and (4) he

23   never provided any type of benefits including money or items to City

24   Staffer A-1. Defendant KIM knew these statements were false because,

25   approximately just two months prior to the second FBI interview, he

26   coordinated a cash bribe payment to Councilmember A and City Staffer

27   A-1 in exchange for their help with Project C. Moreover, defendant

28   KIM had personally delivered, on behalf of Developer C, cash to City

DEFT. INITIALS _JN_         7

1  Staffer A-1, a City staffer, that was meant by Developer C for

2  Councilmember A, a City official, in order to secure their help.

3      24.  On July 12, 2017, just two days after defendant KIM's

4  second FBI interview, defendant KIM and City Staffer A-1 met in

5  person in a car near City Staffer A-1's residence, and then drove

6  around in the car.  During this meeting, defendant KIM and City

7  Staffer A-1 discussed the content of their recent respective FBI

8  interviews, in which both defendant KIM and City Staffer A-1 lied to

9  the FBI and deliberately failed to disclose information regarding the

10  Project C bribery scheme.  During this meeting, defendant KIM asked

11  City Staffer A-1 if Councilmember A wanted the remaining $100,000

12  from Developer C, which City Staffer A-1 declined.

13          c.   The Remaining $100,000 Due for the Bribery Scheme

14      25.  In or around July 2017, defendant KIM falsely told

15  Developer C that Councilmember A asked for the remaining $100,000

16  bribe payment.  Developer C agreed to provide the remaining $100,000

17  of the agreed-upon $500,000 bribe payment to be paid to Councilmember

18  A for resolving the appeal.  Defendant KIM met with Developer C at a

19  commercial building in Los Angeles and received an additional

20  $100,000 in cash from Developer C.  Instead of providing this money

21  to Councilmember A, defendant KIM kept this money for himself.

22          d.   Defendant KIM and Councilmember A Meet Regarding the

23              Bribery Scheme

24      26.  On October 5, 2018, defendant KIM and Councilmember A met

25  at a hotel in Pasadena.  Councilmember A asked defendant KIM to turn

26  off his cellphone during the meeting, likely to ensure their meeting

27  was not recorded.  Councilmember A stated something to the effect of:

28  "I didn't get my share," while simultaneously holding up two fingers.

DEFT. INITIALS _JK._                   8

1  Defendant KIM understood this to mean $200,000, which was
2  Councilmember A's share of the bribe payment from Developer C in
3  exchange for Councilmember A's help with the appeal.  Councilmember A
4  explained that Councilmember A did not get Councilmember A's share of
5  the bribe payment from Developer C because City Staffer A-1 was still
6  holding on to the cash.
7           e.    Developer C Advises Defendant KIM to Conceal the
8                 Bribery Scheme
9     27.   The FBI seized defendant KIM's phone pursuant to a federal
10  search warrant on March 5, 2019.  On or about March 20, 2019,
11  defendant KIM met Developer C at a coffee shop in Little Tokyo to
12  discuss the FBI investigation.  Defendant KIM told Developer C that
13  he was very scared.  Defendant KIM disclosed to Developer C that he
14  told his attorney about the $400,000 bribe payment.  Developer C got
15  upset and told defendant KIM he should have lied to defendant KIM's
16  attorney about the amount.  Developer C stated that now Developer C
17  could not match defendant KIM's story.  Months earlier, Developer C
18  informed defendant KIM that, years earlier, Developer C's business
19  was raided by law enforcement who seized a large sum of cash.
20           f.    Defendant KIM's Failure to Declare Income Related to
21                 the Bribery Scheme
22     28.   Defendant KIM failed to declare any of the cash he received
23  from Developer C for his role in facilitating the bribery scheme on
24  his federal income tax return for 2017, as required.
25
26
27
28

DEFT. INITIALS _JQK_                9