FILED
CLERK, U.S. DISTRICT COURT

7/30/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DD _____ DEPUTY

1

2

3

4

5

6

7

8                   UNITED STATES DISTRICT COURT

9            FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                   October 2019 Grand Jury

11   UNITED STATES OF AMERICA,        CR 2:20-cr-00326-JFW

12           Plaintiff,               I N D I C T M E N T

13           v.                       [18 U.S.C. § 1962(d): Racketeer
                                      Influenced and Corrupt
14   JOSE LUIS HUIZAR,                Organizations Conspiracy; 18
                                      U.S.C. §§ 1341, 1343, 1346: Honest
15           Defendant.               Services Mail and Wire Fraud; 18
                                      U.S.C. § 1952(a)(3): Interstate
16                                    and Foreign Travel in Aid of
                                      Racketeering; 18 U.S.C.
17                                    § 666(a)(1)(B): Bribery Concerning
                                      Programs Receiving Federal Funds;
18                                    18 U.S.C. § 1956(a)(1)(B)(i),
                                      (a)(2)(B)(i): Money Laundering; 18
19                                    U.S.C. § 1014: False Statements to
                                      a Financial Institution; 18 U.S.C.
20                                    § 1001(a)(2): Making False
                                      Statements; 31 U.S.C.
21                                    § 5324(a)(3): Structuring of
                                      Currency Transactions to Evade
22                                    Reporting Requirements; 26 U.S.C.
                                      § 7201: Attempt to Evade and
23                                    Defeat the Assessment and Payment
                                      of Income Tax; 18 U.S.C.
24                                    §§ 981(a)(1)(C), 982(a)(1),
                                      982(a)(2), and 1963, 26 U.S.C.
25                                    § 7301, 28 U.S.C. § 2461(c), 31
                                      U.S.C. § 5317: Criminal
26                                    Forfeiture]

27

28

1

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

A.   BACKGROUND ON CITY PROCESSES

1.   The City of Los Angeles (the "City") was a government that received more than $10,000 per fiscal year in funds from the United States, including for the years 2013 through 2020, in the form of grants, contracts, subsidies, loans, guarantees, insurance, and other forms of federal assistance.  All legislative power in the City was vested in the City Council and was exercised by ordinance subject to a veto by the Mayor.  The City was divided into fifteen City Council Districts covering different geographic areas.  The City Council was composed of fifteen members elected from single-member districts.

2.   Within the City, large-scale development projects required a series of applications and approvals prior to, during, and after construction.  These applications and approvals occurred in various City departments, including the City Council, the Planning and Land Use Management ("PLUM") Committee, the Economic Development Committee, the Los Angeles Planning Department, the Los Angeles Department of Building and Safety ("LADBS"), the Area Planning Commission, the City Planning Commission ("CPC"), and the Mayor's Office.

3.   Each part of the City approval process required official actions by public officials.  These included entitlements, variances, general plan amendments, subsidies, incentives, public benefits, scheduling agendas for the various committees, and overall approvals.

4.   Even for projects that were not going through the City approval process, City officials could benefit a project or take

adverse action against a project by advocating for or against the project, including by pressuring or seeking to influence other City officials, departments, business owners, and stakeholders.

5.   Developers typically hired consultants and/or lobbyists to assist in guiding projects through the development process and City departments, including by interfacing with the City Council office that represented the district in which the project was located.

6.   Under the California Political Reform Act, every elected official and public employee who made or influenced governmental decisions was required to submit a Statement of Economic Interest, also known as the Form 700, annually.

7.   To prevent former City officials from exercising or appearing to exercise improper influence over City decisions, the Los Angeles Municipal Code contained "revolving door" restrictions.  The restrictions imposed a lifetime ban on receiving compensation to attempt to influence City action on a specific matter in which the City official personally and substantially participated in during their City service.  The restrictions also imposed a one-year ban, or "cooling-off" period, during which the City official was prohibited from attempting to influence action on a matter pending before the City official's former City agency for compensation.

B.   RELEVANT PERSONS AND ENTITIES

   (1)   **City Officials and Their Associates**

8.   Defendant JOSE LUIS HUIZAR was the Councilmember for Council District 14 ("CD-14"), first elected in 2005, and re-elected in 2007, 2011, and 2015.  Defendant HUIZAR was the Chair of the PLUM Committee, a body appointed by the City Council President that oversaw many of the most significant commercial and residential

development projects in the City.  Defendant HUIZAR also served on the Economic Development Committee.  As a public official employed by the City, defendant HUIZAR owed a fiduciary duty to the City and citizens of the City to perform the duties and responsibilities of defendant HUIZAR's office free from bias, conflicts of interest, self-enrichment, self-dealing, concealment, deceit, fraud, kickbacks, and bribery.

9.   Relative A-1, Relative A-2, and Relative A-3 were close relatives of defendant HUIZAR.  Beginning no later than 2007, Relative A-1 received a bi-weekly payment of approximately $2,500 from Law Firm A as part of her employment with Law Firm A, which tasked her with marketing and business development.  Between approximately July 2012 and January 2016, Relative A-1 also received regular payments from High School A, totaling approximately $150,000, as a fundraiser.  In or about September 2018, Relative A-1 formally announced her candidacy to succeed defendant HUIZAR as Councilmember for CD-14.

10.  HUIZAR Associate 1 was a close associate of defendant HUIZAR and operated Company A in the City.

11.  HUIZAR Associate 2 was a close associate and fundraiser for defendant HUIZAR, who created and operated a political action committee ("PAC"), PAC B, which at times was used to benefit defendant HUIZAR's political causes.

12.  HUIZAR Associate 3 was a close associate of and fundraiser for defendant HUIZAR and operated a company in the City.

13.  George Esparza worked for the City as defendant HUIZAR's Special Assistant in CD-14 until on or about December 31, 2017.

14.   City Staffer A-2 worked for the City on defendant HUIZAR's staff in CD-14.

15.   Individual 1 was the General Manager of the LADBS until in or about May 2016.  In or about May 2016, Individual 1 was appointed by the Mayor as the City's Deputy Mayor of Economic Development.  In or about July 2017, Individual 1 retired from the City and officially began working with George Chiang, consulting and lobbying on behalf of developers.

**(2)  Developers and Their Associates**

16.   Businessperson A operated businesses in the City relating to major development projects.

17.   Developer C, owner of Company C, was a real estate owner and developer who owned commercial properties in the City, including a property located in CD-14, purchased in 2008 for $9 million. Developer C was planning on building a mixed-use development on the property to include 14,000 square feet of commercial space and over 200 residential units ("Project C").

18.   Chairman D, a Chinese national, owned Company D which, according to its website, was one of the top real estate companies in China with projects worldwide.  Company D, through its subsidiaries, acquired a property located in CD-14 in 2014, which it planned to redevelop into a mixed-use development that was to include 80,000 square feet of commercial space, 650 residential units, and 300 hotel rooms ("Project D").  Company D expected that the development would be valued at several hundred million dollars.

19.   General Manager D was the general manager of Project D until he was terminated from that role in approximately January 2017.

20.   Chairman E was the Chairman and President of Company E, a China-based real estate development company with more than $1 billion invested in projects worldwide and, according to its website, one of China's top developers.  Chairman E was a Chinese national and billionaire.  Company E, through its subsidiaries, acquired two development properties in the City in 2010 and 2011, respectively, including a property located in CD-14 ("Property E").  Chairman E planned to redevelop Property E into the tallest tower west of the Mississippi River, specifically, a 77-story skyscraper featuring a mix of residential and commercial uses ("Project E").

21.   Executive Director E was the Executive Director of Company E and worked directly for Chairman E in the City.

22.   Employee E was an employee of Company E and worked directly for Chairman E and Executive Director E in the City.  At Chairman E's direction, Employee E was the sole representative of Holding Company E, a Hong Kong company, in handling Holding Company E's funds in the United States.

23.   Company F, Company G, Company K, and Company L were China-based real estate development companies that each owned development projects located in CD-14.

24.   Company H and Company J were domestic real estate development companies that each owned development projects located in CD-14.

25.   Company I owned a real estate development project located outside of CD-14 that needed approvals in the PLUM and Economic Development Committees in order to move forward in the City approval process.

26.   Company M was a domestic real estate development company that owned multiple development projects nationwide and located in the City, including Project M located in CD-14.  Project M was a mixed-use development that was to include 125,000 square feet of commercial retail and office floor area and approximately 475 live/work dwelling units.  Executive M was a principal partner of Company M representing Los Angeles.

27.   Developer N owns a domestic real estate development company with a major development project located in CD-14.

**(3)   Consultants and Lobbyists**

28.   George Chiang was a real estate broker and consultant with multiple clients in CD-14.  Beginning in approximately July 2017, Chiang and Individual 1 formally began working together at a real estate brokerage and consulting firm with an office in downtown Los Angeles.

29.   Justin Kim was a real estate appraiser and consultant for real estate developers with projects in the City and a major fundraiser for defendant HUIZAR.

30.   Lobbyist B was a consultant for real estate developers with projects in the City and a major fundraiser for defendant HUIZAR. Lobbyist B was a principal officer of PAC A, which purported to be a "general purpose" committee, but in fact was formed to primarily benefit Relative A-1's campaign for the CD-14 seat.  Beginning in 2014, Lobbyist B was a consultant hired by Company M to work on Project M.

31.   Lobbyist C was a consultant and lobbyist for real estate developers with projects in the City, including Company H, and a close associate of the Executive Director of Labor Organization A, an

7

unincorporated association of individuals and labor organizations that included labor unions.

32.  These Introductory Allegations are incorporated by reference into each count of this Indictment.

COUNT ONE

[18 U.S.C. § 1962(d)]

A.   THE RACKETEERING ENTERPRISE

At times relevant to this Indictment:

33.   Defendant HUIZAR, Esparza, Individual 1, Chiang, and others known and unknown to the Grand Jury, were members and associates of the CD-14 Enterprise, a criminal organization whose members and associates engaged in, among other things: bribery; mail and wire fraud, including through the deprivation of the honest services of City officials and employees; extortion; interstate and foreign travel in aid of racketeering; money laundering; structuring; and obstruction of justice.  The CD-14 Enterprise operated within the Central District of California and elsewhere.

34.   The CD-14 Enterprise, including its leaders, members, and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact.  The CD-14 Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.  The CD-14 Enterprise engaged in, and its activities affected, interstate and foreign commerce.

B.   OBJECTIVES OF THE ENTERPRISE

35.   The objectives of the CD-14 Enterprise included, but were not limited to, the following:

a.   enriching the members and associates of the CD-14 Enterprise through means that included: bribery; extortion; and mail and wire fraud, including through the deprivation of the honest services of City officials and employees;

9

1         b.   advancing the political goals and maintaining control

2 and authority of the CD-14 Enterprise by elevating members and

3 associates of the CD-14 Enterprise to, and maintaining those

4 individuals' placement in, prominent elected office, through means

5 that included bribery and mail and wire fraud, including through the

6 deprivation of the honest services of City officials and employees;

7         c.   concealing the financial activities of the CD-14

8 Enterprise, through means that included money laundering and

9 structuring; and

10        d.   protecting the CD-14 Enterprise by concealing the

11 activities of its members and associates and shielding the CD-14

12 Enterprise from detection by law enforcement, the City, the public,

13 and others, through means that included obstructing justice.

14 C.   <u>RICO CONSPIRACY</u>

15     36.  Beginning on a date unknown to the Grand Jury, but no later

16 than February 2013, and continuing to the present, in Los Angeles

17 County, within the Central District of California and elsewhere,

18 defendant HUIZAR, a person employed by and associated with the CD-14

19 Enterprise, which engaged in and its activities affected interstate

20 and foreign commerce, conspired with others known and unknown to the

21 Grand Jury, including Individual 1, Esparza, and Chiang, to

22 unlawfully and knowingly violate Title 18, United States Code,

23 Section 1962(c), that is, to conduct and participate, directly and

24 indirectly, in the conduct of the affairs of the CD-14 Enterprise

25 through a pattern of racketeering activity, as that term is defined

26 in Title 18, United States Code, Sections 1961(1) and 1961(5),

27 consisting of multiple acts:

28

a.    involving bribery, in violation of California Penal Code Sections 31, 67, 67.5(b), 68 and 182(a)(1);

b.    indictable under Title 18, United States Code, Sections 1341, 1343, and 1346 (Mail and Wire Fraud, including through the Deprivation of Honest Services);

c.    indictable under Title 18, United States Code, Section 1951 (Extortion);

d.    indictable under Title 18, United States Code, Section 1952 (Interstate and Foreign Travel in Aid of Racketeering);

e.    indictable under Title 18, United States Code, Sections 1956 and 1957 (Money Laundering);

f.    indictable under Title 18, United States Code, Section 1512 (Obstruction of Justice and Witness Tampering); and

g.    indictable under Title 31, United States Code, Section 5324 (Structuring Transactions to Evade Reporting Requirement).

37.   It was a further part of the conspiracy that defendant HUIZAR agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

D.    MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED

38.   Defendant HUIZAR and other members and associates of the CD-14 Enterprise agreed to conduct the affairs of the CD-14 Enterprise through the following means, among others:

a.    In order to enrich its members and associates, the CD-14 Enterprise operated a pay-to-play scheme within the City, wherein public officials demanded and solicited financial benefits from developers and their proxies in exchange for official acts.

11

Specifically, through a scheme that involved bribery, mail and wire fraud, and extortion, defendant HUIZAR, Esparza, Individual 1, and other City officials demanded, solicited, accepted, and agreed to accept from developers and their proxies, including Chiang, some combination of the following types of financial benefits, among others: (1) cash; (2) consulting and retainer fees; (3) favorable loans; (4) gambling chips at casinos; (5) political contributions; (6) flights on private jets and commercial airlines; (7) stays at luxury hotels; (8) expensive meals; (9) spa services; (10) event tickets to concerts, shows, and sporting events; (11) escort and prostitution services; and (12) other gifts.

b.    In exchange for such financial benefits from developers and their proxies, defendant HUIZAR, Esparza, Individual 1, and other City officials agreed to perform and performed the following types of official acts, among others: (1) presenting motions and resolutions in various City committees to benefit projects; (2) voting on projects in various City committees, including the PLUM Committee, and City Council; (3) taking, or not taking, action in the PLUM Committee to expedite or delay the approval process and affect project costs; (4) exerting pressure on other City officials to influence the approval process of projects; (5) using their office to negotiate with and exert pressure on labor unions to resolve issues on projects; (6) leveraging voting and scheduling power to pressure developers with projects pending before the City to affect their business practices; and (7) introducing or voting on City resolutions to enhance the professional reputation and marketability of businesspersons in the City.

1          c.   To hide the money, bribes, and other personal benefits

2   that flowed from the developers and their proxies to the public

3   officials, the CD-14 Enterprise engaged in money laundering and other

4   concealment activities.  Specifically, members and associates of the

5   CD-14 Enterprise engaged in the following activities, among others:

6   (1) storing large amounts of cash in one's residence; (2) providing

7   cash to family members and associates; (3) directing payments to

8   family members, associates, and entities to avoid creating a paper

9   trail between the developers, their proxies and public officials; (4)

10   using family members and associates to pay expenses; (5) depositing

11   and exchanging cash at ATMs and banks in amounts under $10,000 to

12   avoid bank reporting requirements; and (6) failing to disclose

13   payments and benefits received on Forms 700 and on tax returns.

14          d.   In order to maintain its power and control, members

15   and associates of the CD-14 Enterprise used their positions and

16   relationships to illicitly ensure it maintained a political power

17   base filled with their allies and obtained significant official City

18   positions, resources, and financial support.  Specifically, through

19   bribery, members and associates of the CD-14 Enterprise raised funds

20   from developers and their proxies with projects in CD-14 for the

21   following, among others: (1) defendant HUIZAR's re-election campaigns

22   and officeholder accounts; (2) Relative A-1's election campaign for

23   the CD-14 seat; and (3) PACs designed to benefit Relative A-1's

24   election campaign.

25          e.   In order to protect the CD-14 Enterprise and avoid

26   detection by law enforcement, the City, the public, and others,

27   members and associates of the CD-14 Enterprise engaged in the

28   following conduct: (1) lying to law enforcement in an effort to

impede the investigation into criminal conduct of the CD-14 Enterprise; (2) attempting to corruptly influence the statements of others to law enforcement; and (3) using encrypted messaging applications, including those utilizing a self-destructing message system, to communicate about the affairs of the CD-14 Enterprise.

E.   <u>OVERT ACTS</u>

39.   In furtherance of the conspiracy and to accomplish the object of the conspiracy, on or about the following dates, defendant HUIZAR and others known and unknown to the Grand Jury, committed and caused to be committed various overt acts within the Central District of California, and elsewhere, including the following:

**(1)   Project E Bribery Scheme**

<u>Overt Act No. 1:</u>   In or around February 2013, Individual 1, then the Interim General Manager of LADBS, introduced defendant HUIZAR and Esparza to Chairman E, who owned Company E and Property E (located in CD-14), and another property located in a different City district.

**Benefits to Defendant HUIZAR at Casinos**

<u>Overt Act No. 2:</u>   In March 2013, defendant HUIZAR, Esparza, Chairman E, and Executive Director E traveled on a private jet to a casino in Las Vegas, Nevada.

<u>Overt Act Nos. 3-21:</u>   Between March 2013 and February 2017, defendant HUIZAR traveled to Las Vegas casinos with Chairman E on the following dates, and was offered and/or accepted benefits, including flights, hotel rooms, spa services, meals, alcohol, prostitution/escort services, and casino gambling chips in the following approximate amounts:

| Overt Act No. | Date(s) | Casino(s) | Expenses (group) | Gambling chips (HUIZAR) | Gambling chips (Esparza) |
|---|---|---|---|---|---|
| 3 | 03/22/2013 to 03/24/2013 | Casino 4 | $56,704 | $10,000 | $2,000 |
| 4 | 12/30/2013 to 01/02/2014 | Casino 4 | $54,141 | $10,000 | $2,000 |
| 5 | 06/07/2014 to 06/08/2014 | Casino 1/ Casino 4 | $61,635 | $10,000 | $2,000 |
| 6 | 06/14/2014 to 06/15/2014 | Casino 1/ Casino 4 | $17,844 | $10,000 | $2,000 |
| 7 | 08/22/2014 to 08/25/2014 | Casino 1 | $138,233 | $13,500 | $2,000 |
| 8 | 03/13/2015 to 03/14/2015 | Casino 1 | $30,952 | $20,000 | $2,000 |
| 9 | 03/28/2015 to 03/30/2015 | Casino 1 | $39,185 | $10,000 | $2,000 |
| 10 | 05/01/2015 to 05/03/2015 | Casino 1 | $2,676 | $10,000 | $2,000 |
| 11 | 07/07/2015 to 07/08/2015 | Casino 1 | $32,682 | $65,000 | $2,000 |
| 12 | 10/28/2015 to 10/30/2015 | Casino 2 | $96,681 | $10,000 | $2,000 |
| 13 | 12/11/2015 to 12/13/2015 | Casino 3 | $35,974 | $10,000 | $2,000 |
| 14 | 02/12/2016 to 02/13/2016 | Casino 2 | $60,798 | $10,000 | $2,000 |
| 15 | 02/26/2016 to 02/28/2016 | Casino 3 | $40,095 | $10,000 | $2,000 |
| 16 | 04/30/2016 to 05/02/2016 | Casino 1/ Casino 2 | $127,256 | $10,000 | $2,000 |
| 17 | 05/05/2016 to 05/07/2016 | Casino 1/ Casino 3 | $16,475 | $10,000 | $2,000 |

| Overt Act No. | Date(s) | Casino(s) | Expenses (group) | Gambling chips (HUIZAR) | Gambling chips (Esparza) |
|---|---|---|---|---|---|
| 18 | 05/13/2016 to 05/16/2016 | Casino 1 | $649 | $10,000 | $2,000 |
| 19 | 07/14/2016 to 07/17/2016 | Casino 3 | $1,123 | $10,000 | $2,000 |
| 20 | 08/05/2016 to 08/07/2016 | Casino 2 | $60,463 | $11,000 | $2,000 |
| 21 | 02/04/2017 to 02/06/2017 | Casino 2/ Casino 3 | $16,822 | $10,000 | $2,000 |
| | | | **TOTAL:** $890,388 | **$259,500** | **$38,000** |

**Defendant HUIZAR Helps Save Individual 1's Job and then Receives $600,000 to Settle Defendant HUIZAR's Sexual Harassment Lawsuit During His Reelection Campaign**

Overt Act No. 22:   On October 7, 2013, Individual 1 e-mailed defendant HUIZAR "talking points" regarding an upcoming motion to prevent the consolidation of the Planning Department and the LADBS, which would cost Individual 1's powerful position as Interim General Manager of LADBS.

Overt Act No. 23:   On October 8, 2013, at Individual 1's request, defendant HUIZAR presented an amended motion and spoke in favor of preventing the consolidation of the two departments, and Individual 1 expressed his gratitude to defendant HUIZAR in a text message: "You are such an eloquent speaker! UNBELIEVABLE! Please accept my deepest, most sincere gratitude. Believe me or not, I have [t]ears in my eyes!  I am actually crying! Thank you, thank you, thank you!".

Overt Act No. 24:   On October 17, 2013, defendant HUIZAR and Individual 1 discussed the sexual harassment lawsuit filed against

16

defendant HUIZAR, and traded text messages about how Individual 1 would facilitate Chairman E's assistance with the lawsuit. Specifically, Individual 1 wrote: "The chairman [E] asks if there is anything that he can help."

Overt Act No. 25:   On October 18, 2013, Individual 1 coordinated a meeting between defendant HUIZAR and Chairman E to discuss Chairman E's financial help regarding the lawsuit.

Overt Act No. 26:   On November 5, 2013, Individual 1 e-mailed defendant HUIZAR a motion to present regarding the proposed consolidation of the City departments, and wrote to defendant HUIZAR in a text message: "I heard that the item (motion) may go consent this morning at council. If it goes consent, then I guess we do not need to do the amendment. If it is called special, then can you please introduce the amendment? Please advise."

Overt Act No. 27:   On November 6, 2013, defendant HUIZAR forwarded the motion and e-mail from Individual 1 to another public official, writing: "Don't mention I got this from [Individual 1]. Please print and have ready for me to submit to council today on this item."

Overt Act No. 28:   On December 19, 2013, Individual 1 forwarded by e-mail, a "HUIZAR Re-Election Campaign – Donation Form" to Chairman E, who was a foreign national prohibited from contributing to a U.S. election.

Overt Act No. 29:   On June 14, 2014, Individual 1 sent a text message to defendant HUIZAR, writing: "I'll confirm the Vegas trip with [Chairman E] and report back to you."

Overt Act No. 30:   On July 18, 2014, Individual 1, via text message, continued coordinating discussions between defendant HUIZAR and Chairman E regarding the settlement funds.

Overt Act No. 31:   In or around August 2014, defendant HUIZAR, Esparza, and Executive Director E communicated by e-mail with Attorney E, who was retained by Executive Director E to draft and execute the necessary paperwork to effectuate the financial transactions transferring funds to defendant HUIZAR.

Overt Act No. 32:   On August 17, 2014, defendant HUIZAR e-mailed Esparza, Executive Director E, and Attorney E regarding settlement funds for the sexual harassment lawsuit, writing: "[P]laintiff attorney is asking for a deadline of Tuesday noon to sign settlement. otherwise they pull the settlement offer. let me know as soon as money has been transferred and available. i just need to know it is there before we sign it."

Overt Act No. 33:   On August 20, 2014, Individual 1 and defendant HUIZAR, via text messages, discussed coordinating meetings with Chairman E to discuss the settlement funds.

Overt Act No. 34:   On or about August 22, 2014, defendant HUIZAR executed a Promissory Note with Holding Company E, wherein Holding Company E agreed to wire $600,000 to defendant HUIZAR.  The Promissory Note provided that the principal and all accrued interest would be due and payable as one "balloon payment of $800,000" no later than August 22, 2020.

Overt Act No. 35:   On August 25, 2014, Individual 1 reached out to defendant HUIZAR by text message regarding settlement fund discussions.

<u>Overt Act No. 36:</u>   On September 3, 2014, defendant HUIZAR communicated with Attorney E by e-mail regarding the transfer of funds for his settlement.  Specifically, after Attorney E assured defendant HUIZAR that the Promissory Note would remain concealed, defendant HUIZAR responded: "can you find out before we go if I can simply state the purpose of loan is: 'for personal use.' Would that be sufficient[?] I obviously do not want to state that it is for settlement."

<u>Overt Act No. 37:</u>   On September 15, 2014, defendant HUIZAR instructed Individual 1: "hold off on asking chairman [E]. George [Esparza] told me that [Executive Director E] was frustrated that we keep asking him. [Executive Director E] said that chairman [E] will call china tonight. Lets wait til tomorrow to see what happens."

<u>Overt Act No. 38:</u>   On September 17, 2014, defendant HUIZAR and Chairman E caused Bank 1 to open a Certificate of Deposit account under Holding Company E ("the CD Account"), listing defendant HUIZAR and Holding Company E as "owner," and listing Employee E as the authorized signor.

<u>Overt Act No. 39:</u>   On September 19, 2014, Individual 1 wrote to defendant HUIZAR: "Everything good sir?" Defendant HUIZAR confirmed: "Yes" and "Thank u."

<u>Overt Act No. 40:</u>   Before on or about September 22, 2014, Chairman E caused $600,000 to be wired from a bank account in Hong Kong to an Interest on Lawyer Trust Account at a bank in Arcadia, California, and subsequently caused a check to be issued from that account to Holding Company E for $600,000.

Overt Act No. 41:   On September 22, 2014, Chairman E caused Holding Company E to deposit the $600,000 check into the CD Account as a Certificate of Deposit.

Overt Act No. 42:   On September 23, 2014, defendant HUIZAR caused Bank 1 to issue a loan to defendant HUIZAR for $570,000, using the $600,000 in the CD Account provided by Chairman E as collateral for the loan.  The loan provided for 60 monthly payments, with the total amount to be repaid as $656,687.47, and the first interest payment due on October 23, 2014.

Overt Act No. 43:   On September 23, 2014, defendant HUIZAR authorized a transfer of $570,000 from his personal loan account at Bank 1 to a bank account for the law firm that represented defendant HUIZAR in the sexual harassment lawsuit, to pay for the settlement of the lawsuit.

Overt Act No. 44:   On December 4, 2014, Employee E forwarded an e-mail containing a request from Bank 1 sent to Employee E and defendant HUIZAR regarding the loan to Executive Director E and another Company E employee.

Overt Act No. 45:   On December 4, 2014, defendant HUIZAR sent a text message to Esparza, writing: "Tell [Executive Director E] that [Employee E] needs to send address of foreign company to [Bank 1]. I got notice today that they have been asking her for it and if they don't get it, it will instigate an audit and we don't want that. Have her send address tomorrow."

Overt Act No. 46:   On May 10, 2016, defendant HUIZAR forwarded an e-mail request from Bank 1 regarding paperwork for the loan to Chairman E, via Esparza and Executive Director E.

<u>Overt Act No. 47</u>:   On December 12, 2018, defendant HUIZAR caused himself to be enriched by $575,269.61, by failing to make interest payments on his personal loan for three consecutive months, and thereby allowing the collateral Chairman E provided to Bank 1 to be applied to the remaining balance defendant HUIZAR owed on the loan.

**Requests to Defendant HUIZAR**

<u>Overt Act No. 48</u>:   On May 17, 2013, Chairman E caused an employee of Company E to e-mail Esparza requesting a "favor" from defendant HUIZAR relating to a visa application for another Company E employee.

<u>Overt Act No. 49</u>:   In or around May 17, 2013, defendant HUIZAR signed a letter on official letterhead addressed to the United States Consulate General in Guangzhou, China, supporting a visa application for the Director of Finance for Company E.

<u>Overt Act No. 50</u>:   On June 4, 2013, Chairman E sent an e-mail to defendant HUIZAR, enlisting his help regarding Chairman E's son's admission to a Southern California university, writing: "I would be grateful if you could do me a favor to help contact with [the school] about my son's [application] status."   Thereafter, defendant HUIZAR facilitated a meeting between Chairman E's son and a high-ranking school official.

<u>Overt Act No. 51</u>:   On July 13, 2013, Company E, through a Company E employee, asked via e-mail for defendant HUIZAR to arrange a meeting with the head of a labor union, which had a dispute related to Property E.

<u>Overt Act No. 52</u>:   On September 27, 2013, as part of Chairman E's ongoing effort to enlist defendant HUIZAR's help to negotiate and

21

resolve a parking lot dispute with the owners of a plot of land adjacent to Property E, defendant HUIZAR and Individual 1 discussed scheduling meetings via text messages.

Overt Act No. 53:   In April 2014, to benefit Chairman E's reputation in the business community, defendant HUIZAR introduced and signed a resolution before the City Council recognizing Chairman E for his achievements and contributions to the economy of CD-14, which the City Council signed and adopted.

Overt Act No. 54:   On June 27, 2017, at defendant HUIZAR's direction, Esparza put a Company E employee in touch with a CD-14 staff member to discuss and facilitate resolving union issues at Chairman E's two hotels in Los Angeles.

Overt Act No. 55:   On March 10, 2016, Chairman E sent an e-mail to Executive Director E regarding the "land-use planning" for Property E and the engagement of a consulting firm for Project E.

Overt Act No. 56:   On July 24, 2016, Executive Director E discussed the expansion project in a text message conversation with a consultant.  After the consultant asked whether they were "supposed to get together with the Chairman [E] on Thursday and go over the expansion of two hotels," Executive Director E responded: "Chairman [E] wants a conference call with you and [Individual 1] on Monday."

Overt Act No. 57:   On August 4, 2016, defendant HUIZAR, Individual 1, and Chairman E met with senior officials from the Planning Department, senior CD-14 staff members, and members of Chairman E's team to discuss the expansion of Property E, including Chairman E's interest in pursuing Transient Occupancy Tax rebates, Transfer of Floor Area Rights ("TFAR"), and other incentives from the City.

<u>Overt Act No. 58:</u>  In or around August 2016, on a private jet flight back from Las Vegas, Chairman E requested defendant HUIZAR's assistance in hiring a consultant on Project E, and defendant HUIZAR agreed to help.

<u>Overt Act No. 59:</u>  On August 15, 2016, Esparza texted defendant HUIZAR regarding Project E: "Reminder boss to decide what land use expediters you want to recommend to the Chairman [E]."

<u>Overt Act No. 60:</u>  On October 19, 2016, Executive Director E forwarded an e-mail and attachment prepared by Chairman E to defendant HUIZAR regarding Project E.  The attachment was a draft letter from defendant HUIZAR to Chairman E on defendant HUIZAR's official letterhead, referencing Chairman E's "application for the Los Angeles Highest Building Project [Project E]" and a recent meeting attended by defendant HUIZAR, Individual 1, and other City officials regarding Project E.

<u>Overt Act No. 61:</u>  On October 20, 2016, defendant HUIZAR signed the official letter after revising it to remove the reference to Individual 1 and noting: "The proposed project may result in one of the largest buildings in the City of Los Angeles."  At defendant HUIZAR's direction, Esparza then sent the letter by e-mail to Chairman E.

<u>Overt Act No. 62:</u>  On December 16, 2016, Esparza forwarded an e-mail to defendant HUIZAR from City Staffer A-2, listing a number of consultants, writing: "Hi Boss, Here is the list of land use consultants per [City Staffer A-2]'s past recommendations. Chairman [E] would like us to schedule interviews on Monday."

1       Overt Act No. 63:  On December 19, 2016, defendant HUIZAR sent

2   the list of consultants to Executive Director E by e-mail, who then

3   forwarded the list to Chairman E by e-mail.

4       Overt Act No. 64:  On May 9, 2017, in a telephone call, Esparza

5   and Executive Director E discussed the financial relationship between

6   Chairman E and defendant HUIZAR.  Specifically, Executive Director E

7   stated that Chairman E expected to lay out "everything in front of"

8   defendant HUIZAR at an upcoming trip to Cabo San Lucas, which

9   referred to the assistance Chairman E expected from defendant HUIZAR

10  on Project E.  Executive Director E stated that "otherwise Chairman

11  [E] [will] ask [defendant HUIZAR] to ... pay back that $600,000

12  already."  Esparza stated that defendant HUIZAR is "not going to do

13  that either," referring to paying back the $600,000.  Executive

14  Director E then responded: "Chairman [E] will push him."

15      Overt Act No. 65:  On May 9, 2017, in a telephone call between

16  Esparza and another CD-14 staffer, Esparza stated: "Chairman [E]

17  should have all the leverage in the world [be]cause of what

18  [defendant HUIZAR] owes [Chairman E]."

19      Overt Act No. 66:  On June 11, 2018, Company E filed an

20  application with the Planning Department to expand and redevelop

21  Property E, which included, among other things, a request for a TFAR

22  entitlement, which would need approval in the PLUM Committee and City

23  Council.

24      Overt Act No. 67:  In or around August 2018, Chairman E paid

25  for a trip for defendant HUIZAR to a golf resort in Northern

26  California, including private jet round trip transportation,

27  accommodations, meals, and other costs.  During the trip, Chairman E

28  agreed to support Relative A-1's campaign for the CD-14 seat,

including by hosting a fundraiser in November 2018 and pledging to raise or contribute $50,000 to benefit the campaign.

Overt Act No. 68:   On September 4, 2018, during a conversation at Chiang's and Individual 1's office, Individual 1 and Chiang discussed fundraising for Relative A-1's campaign, including the contemplated $50,000 contribution by Chairman E.  Individual 1 stated that defendant HUIZAR and Relative A-1 have "both Chairmen," referring to the fact that both Chairman E and Chairman D had committed to financially support Relative A-1's election campaign.

Overt Act No. 69:   On September 24, 2018, defendant HUIZAR met with Businessperson A, who was then working at the direction of the FBI, at a restaurant in Los Angeles.  During the meeting, defendant HUIZAR told Businessperson A that Chairman E was going to host a fundraising event for Relative A-1 at one of Chairman E's hotels on November 9, 2018, with the goal of raising $100,000.

### (2)  Project C Bribery Scheme

Overt Act No. 70:   On August 8, 2016, after Labor Organization A filed an appeal that prevented Project C from progressing through the City approval process, Developer C asked Kim to obtain defendant HUIZAR's assistance in dealing with the appeal, which could ultimately reach the PLUM Committee, which defendant HUIZAR chaired.

Overt Act No. 71:   On August 9, 2016, Developer C sent a copy of the appeal to Kim by e-mail, which Kim then forwarded to Esparza by e-mail.

Overt Act No. 72:   On September 1, 2016, defendant HUIZAR received a written brief from City Staffer A-2 regarding Project C, which noted that "Justin Kim will be requesting your support in

25

denying the appeal," and that a certain component of the appeal would reach the PLUM Committee and City Council.

Overt Act No. 73:   On September 1, 2016, Esparza, Kim, and defendant HUIZAR had dinner together and then visited a Korean karaoke establishment, where Kim asked defendant HUIZAR for assistance with the appeal on Project C, and defendant HUIZAR agreed to help.  Kim then called Developer C and asked him to join the group at karaoke, which Developer C did.

Overt Act No. 74:   On September 2, 2016, Esparza and Kim met for lunch in Los Angeles.  At defendant HUIZAR's direction, Esparza expressed to Kim that defendant HUIZAR would not help Project C for free and that defendant HUIZAR would require a financial benefit in exchange for his help ensuring Project C moved forward through the City approval process.

Overt Act No. 75:   On September 3, 2016, Kim and Developer C met at a bowling alley in Little Tokyo, where Kim conveyed to Developer C the message from defendant HUIZAR and Esparza, namely, that defendant HUIZAR's assistance on Project C would require that defendant HUIZAR receive a financial benefit.

Overt Act No. 76:   On January 17, 2017, defendant HUIZAR, Esparza, Kim, and Developer C's business associates met at defendant HUIZAR's City Hall office to discuss, among other things, Project C. During a private meeting that included only defendant HUIZAR, Esparza, and Kim, Kim again asked defendant HUIZAR for assistance with the appeal, and defendant HUIZAR responded that he could help. Defendant HUIZAR also stated that defendant HUIZAR wanted Kim to be a major supporter when Relative A-1 ran for the CD-14 seat.

Overt Act No. 77:   In or around January 2017, at the direction of defendant HUIZAR, Esparza obtained information indicating that resolving the appeal on Project C would save Developer C an estimated $30 million on development costs.

Overt Act No. 78:   On January 19, 2017, defendant HUIZAR and Esparza discussed asking Developer C for $ 1.2 million to resolve the Labor Organization A appeal, with $500,000 to be paid to defendant HUIZAR, $500,000 to be paid to Kim, and $200,000 to be paid to Esparza.

Overt Act No. 79:   In or around January 2017, based on his conversations with defendant HUIZAR and Lobbyist C, Esparza told Kim that it would cost approximately $1.2 million to $1.4 million to convince defendant HUIZAR to resolve the appeal and allow Project C to move forward in the City approval process.

Overt Act No. 80:   Between February 2, 2017 and February 10, 2017, Esparza had individual text message conversations with defendant HUIZAR and Kim, discussing the negotiation of the bribe payment and the amount of the bribe payment from Developer C to defendant HUIZAR.

Overt Act No. 81:   In approximately February 2017, Esparza and Kim had discussions regarding the negotiation of the bribe amount. Kim conveyed a counteroffer of $500,000 cash from Developer C for defendant HUIZAR.  Esparza then conveyed this counteroffer to defendant HUIZAR, stating specifically that defendant HUIZAR would obtain $300,000 total and Kim would receive $200,000 total for facilitating the bribery scheme.

Overt Act No. 82:   In approximately February 2017, Esparza and defendant HUIZAR discussed the appeal, and defendant HUIZAR

instructed Esparza to speak to Lobbyist C, a close associate of the
Executive Director of Labor Organization A.

Overt Act No. 83:   On February 14, 2017, Esparza had a text
message conversation with Lobbyist C about setting up a private
meeting between Lobbyist C and defendant HUIZAR.  Specifically,
Esparza wrote: "My boss [defendant HUIZAR] asked if you guys can have
a one on one on Tuesday at 830am?... Just you and the Councilman."

Overt Act No. 84:   On February 21, 2017, defendant HUIZAR and
Esparza discussed the appeal, and defendant HUIZAR stated that he
would talk to Lobbyist C to encourage Labor Organization A to
withdraw the appeal.  Defendant HUIZAR also told Esparza that the
appeal could be denied in the PLUM Committee.  Esparza then
documented this conversation via notes on his phone.

Overt Act No. 85:   In approximately February 2017, defendant
HUIZAR discussed the appeal with Lobbyist C, and conveyed that
defendant HUIZAR would oppose the appeal in the PLUM committee.
Lobbyist C agreed to discuss the issue with the Executive Director of
Labor Organization A.

Overt Act No. 86:   On February 22, 2017, Esparza had a text
message conversation with Lobbyist C about a private meeting at
defendant HUIZAR's request.  Specifically, Esparza wrote: "I still
need to talk to you one on one per my bosses [defendant HUIZAR]
request."

Overt Act No. 87:   On March 1, 2017, Esparza had a text message
conversation with Lobbyist C about the status of the appeal.

Overt Act No. 88:   On March 3, 2017, Lobbyist C sent Esparza a
text message regarding the appeal on Project C, writing: "Appeal

28

dropped today." Esparza then informed Kim that defendant HUIZAR had held up his end of the bargain and helped resolve the appeal.

Overt Act No. 89: In early March 2017, Kim informed Developer C that defendant HUIZAR held up his end of the agreement and helped resolve the appeal.

Overt Act No. 90: On March 14, 2017, Kim met with Developer C at Developer C's office in Los Angeles and received cash from Developer C, which was intended to be a bribe Developer C agreed to pay for defendant HUIZAR's assistance in resolving the appeal.

Overt Act No. 91: On March 14, 2017, Esparza sent a text message to Kim that asked: "Address again please." Kim provided the address for Developer C's office, which Esparza entered into his Waze application. Esparza then texted Kim: "I'm on the corner. Wait for u in my car."

Overt Act No. 92: On March 14, 2017, Kim met with Esparza in a car outside Developer C's office and gave Esparza cash to deliver to defendant HUIZAR, but Kim kept some cash for himself for facilitating the bribe payment.

Overt Act No. 93: On March 14, 2017, Esparza sent a text message to defendant HUIZAR, asking: "Are you home?" Defendant HUIZAR responded: "Yes." Esparza then wrote: "Can I stop by? Just finished meeting with Justin [Kim]."

Overt Act No. 94: On March 14, 2017, defendant HUIZAR and Esparza met at defendant HUIZAR's residence. Esparza told defendant HUIZAR that Developer C had provided $400,000 in cash, and that Developer C would provide the remaining $100,000 later. Esparza stated that Kim had provided $200,000 of that cash to Esparza. At the meeting, Esparza showed defendant HUIZAR a liquor box filled with

1  cash.  Defendant HUIZAR told Esparza to hold on to and hide the money
2  at Esparza's residence until defendant HUIZAR asked for it.
3  Defendant HUIZAR told Esparza that Esparza could have $100,000 of the
4  $300,000 total amount defendant HUIZAR expected to receive from
5  Developer C, meaning defendant HUIZAR's share of the bribe was
6  $200,000.

7      <u>Overt Act No. 95:</u>  In or around July 2017, Developer C met with
8  Kim at Developer C's office in Los Angeles and, intending it to be a
9  bribe to defendant HUIZAR, provided Kim with an additional $100,000
10  in cash, which Kim kept for himself.

11      <u>Overt Act No. 96:</u>  On December 28, 2017, defendant HUIZAR and
12  Esparza met at City Hall and, in defendant HUIZAR's private bathroom,
13  discussed various topics, including Esparza's interviews with the FBI
14  and the cash bribe Esparza was holding for defendant HUIZAR.
15  Specifically, during that conversation, defendant HUIZAR stated: "I
16  have a lot of expenses now that [Relative A-1]'s running. [Relative
17  A-1] is not going to be working anymore.... Um, that is mine, right?
18  ... That is mine."  Esparza affirmed the $200,000 cash bribe money
19  was defendant HUIZAR's.  Defendant HUIZAR and Esparza agreed to wait
20  until April 1, 2018, for Esparza to provide the $200,000 cash owed to
21  defendant HUIZAR, to allow some cooling off after Esparza's
22  interviews with the FBI in hopes that it would decrease the
23  likelihood of law enforcement discovering the cash.

24      <u>Overt Act No. 97:</u>  In or around April 2018, defendant HUIZAR
25  and Esparza communicated by telephone and agreed to postpone their
26  meeting to deliver defendant HUIZAR's $200,000 in bribery cash to
27  October 1, 2018.

28

1    Overt Act No. 98:   On September 30, 2018, as part of a series

2    of unanswered text messages he sent to Esparza regarding the expected

3    delivery of defendant HUIZAR's cash bribe, defendant HUIZAR wrote:

4    "Hey George. Tomorrow is October first. When we gonna meet?"

5    Overt Act No. 99:   On October 4, 2018, defendant HUIZAR wrote

6    to Esparza: "Hey George. So we gonna meet up like u said we would

7    after October?"

8    Overt Act No. 100:   On October 5, 2018, defendant HUIZAR and

9    Kim met at a hotel in Pasadena, where defendant HUIZAR asked Kim to

10   turn off his phone to ensure their meeting was not recorded.

11   Defendant HUIZAR stated that he had not gotten his share and held up

12   two fingers, referring to the $200,000, which was defendant HUIZAR's

13   share of the bribe payment from Developer C in exchange for defendant

14   HUIZAR's help with the appeal, because Esparza was still holding on

15   to the cash.

16   Overt Act No. 101:   On October 14, 2018, defendant HUIZAR sent a

17   text message to Esparza, writing: "George. I've been trying to

18   connect with you. We have a meeting that was supposed to occur on

19   October 1."

20   Overt Act No. 102:   On October 20, 2018, defendant HUIZAR wrote

21   to Esparza via text message: "George. I've been trying to reach u.

22   When are we going to meet and square up?"

23   Overt Act No. 103:   On October 22, 2018, defendant HUIZAR wrote

24   to Esparza via text message: "Sounds like u don't ever want to meet

25   and face up to your commitment to meet on October 1 and u are using

26   other pretexts as to why u don't want to meet. You are using excuses

27   as for the real reason u don't want to meet and u know it. U told me

28   October. Now What? Each time comes up and u don't want to meet at

31

1  all? U want it all and that's the real reason why you don't want to
2  meet and are using all kind of excuses. One more time, when are we
3  going to meet?"

### (3)  Project D Bribery Scheme

**Early Corrupt Relationship with Company D**

6  Overt Act No. 104:  On March 24, 2014, Individual 1 facilitated
7  the introduction of defendant HUIZAR to Company D and Chairman D via
8  an e-mail to Esparza.

9  Overt Act No. 105:  On August 21, 2014, Employee D sent an e-
10 mail to defendant HUIZAR and General Manager D requesting defendant
11 HUIZAR's assistance regarding an American Disabilities Act ("ADA")
12 compliance issue at one of Company D's hotels in the City.

13 Overt Act No. 106:  On August 26, 2014, Employee D sent an e-
14 mail to defendant HUIZAR, a CD-14 staffer, and General Manager D that
15 stated: "I just got a call from Building and Safety Department of LA
16 City, and a meeting with them is confirmed tomorrow morning to
17 discuss about our ADA challenge. Thanks so much again for JOSE
18 [HUIZAR] and you for helping us with this."

19 Overt Act No. 107:  On August 27, 2014, Individual 1 confirmed
20 to defendant HUIZAR that he helped resolve the ADA issue for Company
21 D, writing in a text message: "I took care of the disabled access
22 issue for the [Company D] Hotel already. I told them that you asked
23 me to help. They were very appreciative."

24 Overt Act No. 108:  On September 19, 2014, Employee D sent three
25 Katy Perry concert tickets valued at approximately $1,000 total for
26 defendant HUIZAR and his family, by e-mail to Esparza, which Esparza
27 then forwarded to defendant HUIZAR.

28

Overt Act No. 109:  On November 4, 2014, Individual 1 sent a text message to defendant HUIZAR, writing: "I will be having dinner with chairman [D] tonight. I also knew that you will have dinner with him Thursday. I just want to touch base with you as to what George Chiang and I should tell him."

Overt Act No. 110:  On November 4, 2014, Chiang sent an e-mail to Esparza with the subject line "HUIZAR Fundraising," writing: "Can you get me in touch with [HUIZAR]? [Individual 1] and I had dinner with [Company D] last night regarding pledging their support so I want to discuss this to prepare the Councilman's dinner with them this Thursday."

Overt Act No. 111:  On November 26, 2014, defendant HUIZAR, Esparza, Chiang, Chairman D, and Relative A-1 met over dinner at Property D, where defendant HUIZAR and Chairman D discussed Company D's support for defendant HUIZAR and defendant HUIZAR's support for Project D.

Overt Act No. 112:  On September 7, 2015, Individual 1, in his capacity as the then General Manager of LADBS, communicated with defendant HUIZAR and Chiang via group text message regarding organizing meetings with various City departments to help Project D, writing "please stress that this will be a standing biweekly meeting until the TFAR matter is determined. Please let me know if there is anything that I can be is assistance."

Overt Act No. 113:  On September 8, 2015, Chiang sent a group text message to defendant HUIZAR and Individual 1, writing: "Dear JOSE [HUIZAR] and [Individual 1], thank you for making this arrangement possible.  As the clock ticks, the chairman [D] is beginning to feel weary about our progress. I just need to make sure

33

1   that he sees the light at the end of the tunnel. Once again, thank
2   you both for all of your support hopefully I can bring some good news
3   within the near future. Like always, please let me know if I can be
4   helpful."

5      Overt Act No. 114:  In or around 2015 or 2016, defendant HUIZAR,
6   through Esparza, asked Chiang to have Company D set up a monthly
7   retainer with Law Firm A, from which Relative A-1 received bi-weekly
8   paychecks of approximately $2,500.

9      Overt Act No. 115:  In approximately 2016, at a meeting that
10  included defendant HUIZAR, Chiang, and Chairman D, defendant HUIZAR
11  asked Chiang to relay to Chairman D that: (1) there was no need to
12  involve the City's Mayor in the approval process of Project D because
13  defendant HUIZAR was the one in control of the PLUM committee; (2)
14  the City's Mayor could not provide help to Chairman D because it was
15  defendant HUIZAR who drove the project; and (3) as far as the success
16  of Project D was concerned, Chairman D did not need anyone else in
17  the City but defendant HUIZAR.

18     Overt Act No. 116:  On or around September 28, 2016, at
19  defendant HUIZAR's request, Company D made a contribution of $25,000
20  to a homelessness initiative.

21     **Consulting Fees in Exchange for Official Acts**

22     Overt Act No. 117:  On November 11, 2015, defendant HUIZAR,
23  Chiang, Esparza, Chairman D, and General Manager D met over dinner at
24  a restaurant in Arcadia, California.  Defendant HUIZAR and Chairman D
25  discussed defendant HUIZAR's support for Project D.  In the same
26  conversation, defendant HUIZAR asked Chairman D to hire one of
27  defendant HUIZAR's associates, who later turned out to be HUIZAR

28

34

Associate 1, on Project D.   Chairman D told defendant HUIZAR to discuss the details with General Manager D.

Overt Act No. 118:   On November 16, 2015, Chiang sent an e-mail to Esparza, copying General Manager D, confirming the new agreement between defendant HUIZAR and Chairman D.  Chiang stated: "Now with a common consensus in place for [Project D], we would like to roll this project full speed ahead. Therefore, I would like to request the biweekly standing meeting to restart.... From this point on, we would like to communicate all aspects of our project with your [CD-14] office FIRST prior to any other offices in the city family.... [P]lease be ready to coordinate with Mayor's office, Planning Department, and all other related parties so we can drive on a singular track."

Overt Act No. 119:   On December 2, 2015, defendant HUIZAR sent a text message to Chiang regarding the status of Chairman D's agreement to hire HUIZAR Associate 1, writing: "Any response from chairman [D]?"

Overt Act No. 120:   On December 8, 2015, defendant HUIZAR and Chiang had a conversation via text message regarding the response from Chairman D.  Chiang wrote: "Hi Councilman [HUIZAR], let me know when you have time to chat really quick."  Defendant HUIZAR responded: "On phone or in person?"  Chiang responded: "Better in person just need ... no more than 15 min."

Overt Act No. 121:   On December 8, 2015, defendant HUIZAR and Chiang met in person at a coffee shop in Los Angeles to discuss a consulting agreement to pay HUIZAR Associate 1.  Chiang told defendant HUIZAR that General Manager D would work with defendant HUIZAR on retaining HUIZAR Associate 1.  Defendant HUIZAR informed

Chiang that Relative A-1 would be involved with getting the retainer consummated.

Overt Act No. 122:  Between December 8, 2015 and December 16, 2015, at a meeting at the site of Project D, General Manager D asked Chiang if Chiang's consulting firm would hire HUIZAR Associate 1 if, in return, Company D would increase the retainer with the firm to cover that cost, which Chiang declined.

Overt Act No. 123:  On December 13, 2015, at General Manager D's direction, Chairman D's relative traveled from Vancouver, Canada to Los Angeles, California to discuss the arrangement whereby Chairman D's relative would pay HUIZAR Associate 1 for purported real estate advice from Relative A-1.

Overt Act No. 124:  On or about December 16, 2015, defendant HUIZAR caused Relative A-1 to meet with Chairman D's relative to discuss an arrangement whereby Chairman D's relative's company would pay a company affiliated with HUIZAR Associate 1, purportedly for real estate advice.

Overt Act No. 125:  On April 11, 2016, defendant HUIZAR sent a text message to Chiang, writing: "How is [Relative A-1] agreement going? Has everything been set up with [HUIZAR Associate 1]?"

Overt Act No. 126:  On April 19, 2016, defendant HUIZAR sent a text message to Chiang, stating that defendant HUIZAR "would like to briefly speak with [General Manager D]" about an "[u]pdate on some of my meetings with [Relative A-1]."  Chiang responded: "Let me call [General Manager D] right now and get back to you."

Overt Act No. 127:  On April 20, 2016, defendant HUIZAR and General Manager D met at a restaurant in Los Angeles to discuss the

arrangement whereby Chairman D's relative would provide a retainer payment to HUIZAR Associate 1.

Overt Act No. 128:  On April 26, 2016, defendant HUIZAR sent a text message to Chiang and asked: "Everything good?"  Chiang responded: "Yes sir!"  Defendant HUIZAR subsequently answered: "Cool. The more I think about our project, the more I get excited about it. Let's meet every two weeks or so to see how things are going.... I think it'll be great!"

Overt Act No. 129:  In May 2016, Company A and Chairman D's relative's company executed an agreement whereby Company A would purportedly "provide marketing analysis for Real Estate and Land Development Opportunities in the Greater Southern California Area in the total amount of $11,000.00 per month for services rendered."  In reality, Chiang prepared the monthly marketing analysis reports and delivered them to defendant HUIZAR, who then provided them to HUIZAR Associate 1, who collected the $11,000 monthly retainer.  Defendant HUIZAR, Chiang, Chairman D, and General Manager D understood that the monthly retainer payments were intended to be and were indirect bribe payments to defendant HUIZAR in exchange for defendant HUIZAR's official acts to benefit Project D.

Overt Act No. 130:  On May 31, 2016, defendant HUIZAR and Chiang had a conversation via text message regarding defendant HUIZAR obtaining the monthly reports purportedly prepared by Company A (but in fact prepared by Chiang) pursuant to the consulting agreement with Chairman D's relative regarding real estate and land development opportunities.

### *Real Estate Report #1*

<u>Overt Act No. 131:</u>  On May 31, 2016, Chiang delivered to defendant HUIZAR his first real estate report that they intended would be passed off as being created by Company A pursuant to its $11,000 per month consulting agreement with Chairman D's relative.

<u>Overt Act No. 132:</u>  Between May 31, 2016 and June 8, 2016, defendant HUIZAR met with HUIZAR Associate 1 and delivered the first real estate report he received from Chiang.

<u>Overt Act No. 133:</u>  On June 8, 2016, HUIZAR Associate 1 caused his employee to send an e-mail to Chairman D's relative transmitting the first report and invoice for May 2016.

<u>Overt Act No. 134:</u>  On June 15, 2016, pursuant to the consulting agreement, Chairman D's relative sent a wire payment of $11,000 to Company A, to a Union Bank account.

<u>Overt Act No. 135:</u>  On June 27, 2016, Company A issued $11,000 in three checks from the Union Bank account, in the following amounts: (1) $5,000 to a company controlled by HUIZAR Associate 1; (2) $5,000 to HUIZAR Associate 1; and (3) $1,000 to HUIZAR Associate 1's relative.

### *Real Estate Report #2*

<u>Overt Act No. 136:</u>  On July 1, 2016, Chiang met with defendant HUIZAR at a coffee shop in Los Angeles, where Chiang delivered his second real estate report.

<u>Overt Act No. 137:</u>  On July 14, 2016, defendant HUIZAR met with HUIZAR Associate 1 and delivered the second real estate report he received from Chiang.

<u>Overt Act No. 138:</u>  On July 14, 2016, HUIZAR Associate 1 caused his employee to send an e-mail to Chairman D's relative transmitting the second report and invoice for June 2016.

<u>Overt Act No. 139:</u>  On July 19, 2016, pursuant to the consulting agreement, Chairman D's relative sent a wire payment of $11,000 to Company A, to the Union Bank account.

<u>Overt Act No. 140:</u>  On July 26, 2016, Company A issued $10,000 in two checks of $5,000 each from the Union Bank account, to HUIZAR Associate 1.

### *Real Estate Report #3*

<u>Overt Act No. 141:</u>  On August 1, 2016, Chiang met with defendant HUIZAR at a restaurant in Los Angeles, where Chiang delivered his third real estate report.

<u>Overt Act No. 142:</u>  On August 10, 2016, defendant HUIZAR met with HUIZAR Associate 1 at a restaurant and delivered the third real estate report he received from Chiang.

<u>Overt Act No. 143:</u>  On August 11, 2016, HUIZAR Associate 1 caused his employee to send an e-mail to Chairman D's relative transmitting the third report and invoice for July 2016.

<u>Overt Act No. 144:</u>  On August 17, 2016, pursuant to the consulting agreement, Chairman D's relative sent a wire payment of $11,000 to Company A, to the Union Bank account.

### *Real Estate Report #4*

<u>Overt Act No. 145:</u>  On September 2, 2016, Chiang met with defendant HUIZAR at a coffee shop in Los Angeles, where Chiang delivered his fourth real estate report.

<u>Overt Act No. 146:</u>  On September 8, 2016, defendant HUIZAR met with HUIZAR Associate 1 and delivered the fourth real estate report he received from Chiang.

<u>Overt Act No. 147:</u>  On September 8, 2016, HUIZAR Associate 1 caused his employee to send an e-mail to Chairman D's relative transmitting the fourth report and invoice for August 2016.

<u>Overt Act No. 148:</u>  On September 9, 2016, pursuant to the consulting agreement, Chairman D's relative sent a wire payment of $11,000 to Company A, to the Union Bank account.

<u>Overt Act No. 149:</u>  On September 16, 2016, Company A issued $11,000 in three checks from the account ending in 6345, in the following amounts: (1) $5,000 to a company controlled by HUIZAR Associate 1; (2) $5,000 to HUIZAR Associate 1; and (3) $1,000 to HUIZAR Associate 1's relative.

### *Real Estate Report #5*

<u>Overt Act No. 150:</u>  On October 4, 2016, Chiang met with defendant HUIZAR at defendant HUIZAR's residence, where Chiang delivered his fifth real estate report.

<u>Overt Act No. 151:</u>  On October 14, 2016, defendant HUIZAR met with HUIZAR Associate 1 over breakfast and delivered the fifth real estate report he received from Chiang.

<u>Overt Act No. 152:</u>  On October 14, 2016, HUIZAR Associate 1 caused his employee to send an e-mail to Chairman D's relative transmitting the fifth report and invoice for September 2016.

<u>Overt Act No. 153:</u>  On November 14, 2016, pursuant to the consulting agreement, Chairman D's relative sent a wire payment of $11,000 to Company A, to the Union Bank account.

Overt Act No. 154:  On November 17, 2016, Company A issued $10,300 in two checks from the Union Bank account, in the following amounts: (1) $4,500 to a company controlled by HUIZAR Associate 1; and (2) $5,800 to HUIZAR Associate 1.

**Real Estate Report #6**

Overt Act No. 155:  On November 3, 2016, Chiang met with defendant HUIZAR at a coffee shop in Los Angeles, where Chiang delivered his sixth and final real estate report.

Overt Act No. 156:  On November 3, 2016, defendant HUIZAR met with HUIZAR Associate 1 and delivered the sixth real estate report he received from Chiang.

Overt Act No. 157:  On November 23, 2016, HUIZAR Associate 1 caused his employee to send an e-mail to Chairman D's relative transmitting the sixth report and invoice for October 2016.

Overt Act No. 158:  On November 30, 2016, pursuant to the consulting agreement, Chairman D's relative sent a wire payment of $11,000 to Company A, to the Union Bank account.

Overt Act No. 159:  On December 8, 2016, Company A issued a $10,000 check from the Union Bank account to HUIZAR Associate 1.

**Official Acts by Defendant HUIZAR**

Overt Act No. 160:  On November 22, 2016, defendant HUIZAR presented a written motion in the Economic Development committee to benefit Project D.

Overt Act No. 161:  On December 13, 2016, defendant HUIZAR voted "yes" in the City Council to adopt the Project D motion defendant HUIZAR had presented.  Later that day, defendant HUIZAR, Chiang, and General Manager D met at the site of Project D to discuss Project D

41

1    and defendant HUIZAR's agreement to expedite the project going

2    forward.

3        **Additional Benefits from Company D and Defendant HUIZAR's**

4        **Official Acts**

5        <u>Overt Act No. 162:</u>  On February 9, 2017, defendant HUIZAR

6    requested via text message Chiang's assistance in coordinating a trip

7    to China for defendant HUIZAR and his family, including requesting

8    his help in obtaining visas for his family.

9        <u>Overt Act No. 163:</u>  In or around April 2017, at defendant

10   HUIZAR's request, Chiang organized and coordinated a trip for

11   defendant HUIZAR and his family members to visit Chairman D in China,

12   including paying approximately $500 for visa fees and arranging for

13   transportation for defendant HUIZAR and his family in Hong Kong.

14       <u>Overt Act No. 164:</u>  Between April 15, 2017 and April 23, 2017,

15   when defendant HUIZAR and his family visited Chairman D in Hong Kong

16   and China, Chairman D paid for certain transportation, meals, and

17   lodging for defendant HUIZAR and his family members.

18       <u>Overt Act No. 165:</u>  On April 27, 2017, at defendant HUIZAR's

19   request, Chiang provided concert tickets to defendant HUIZAR worth

20   approximately $1,572 total.

21       <u>Overt Act No. 166:</u>  On May 2, 2017, in a telephone call, Chiang

22   and Esparza discussed the mutually beneficial financial relationship

23   between Chinese developers and defendant HUIZAR and Individual 1.

24   Specifically, Esparza told Chiang: "Looking from your perspective,

25   you bank on [Individual 1], and [defendant HUIZAR]'s office to do,

26   one of the main points with [defendant HUIZAR], for your Chinese

27   clients for example, 'entitlements, PLUM,' you got to use that and we

28   gotta keep making his motherfucking, him happy."

Overt Act No. 167:  On May 10, 2017, in a telephone call, Esparza told Chiang: "So today we had a productive day where [defendant HUIZAR] told [City Staffer A-2], let's streamline the [Company D] project."

Overt Act No. 168:  On May 13, 2017, via a text message conversation, defendant HUIZAR expressed his willingness to benefit Chairman D in connection with Project D.  Defendant HUIZAR wrote to Chiang: "But the 2 tower is better for chairman [D] and his choice? [Because] if he wanted the 3 towers and that is the best choice, we can make that happen."

Overt Act No. 169:  On May 19, 2017, at defendant HUIZAR's request, Chiang paid approximately $1,000 for alcohol for a party for Relative A-2.

Overt Act No. 170:  On May 20, 2017, during a telephone call with an associate, Esparza confirmed defendant HUIZAR's intention to keep the China trip discreet, stating: "China was supposed to, China was a real, you know, he didn't pay for that shit, that was a real you know fucking low key thing."

Overt Act No. 171:  On June 19, 2017, at defendant HUIZAR's request, Chiang provided concert tickets to defendant HUIZAR worth $1,670.

Overt Act No. 172:  On June 22, 2017, during a telephone call, Chiang and Individual 1 discussed defendant HUIZAR's request for benefits from Chiang.  Specifically, Chiang explained that defendant HUIZAR asked him to coordinate a trip to Cuba for defendant HUIZAR and a woman with whom he was having a secret romantic relationship. Individual 1 then asked: "So he just wanted you to do what, to ... pay for all the trips, is that what he wants?"  Chiang then stated

that defendant HUIZAR would have to get special visas, and explained that this would risk potentially exposing their corrupt relationships: "I told [HUIZAR], I said look, we're all gonna be on record and if something happens, everything, everyone's dead."

Overt Act No. 173:  On June 23, 2017, in a telephone call, Chiang and Kim discussed using defendant HUIZAR's influence as a councilmember going forward and defendant HUIZAR's requests for financial benefits.  Specifically, Kim stated: "this is my agenda, not only do I want to make money, George [Chiang], I want to show you and other Chinese developer, assuming [defendant HUIZAR] is there, how much motivation he's going to have to push everything around for my project, those are my agenda."  In response, Chiang asked if defendant HUIZAR understood "what he needs to do in three and a half years."  Kim replied: "Yes, yes. Everything is set. You're gonna see some differences, alright George?"  Chiang then asked to meet with Kim, stating that defendant HUIZAR was asking for "some very stupid requests."  Kim responded: "I'm not going to make a comment," to which Chiang stated: "Yeah, let's not talk about this on the phone."

Overt Act No. 174:  On August 24, 2017, Chiang asked for defendant HUIZAR's help on Project D.  Specifically, Chiang sent a text message to defendant HUIZAR, writing: "Hi Boss, wanted to give you heads up: [A Company D employee] spoke to chairman [D] and CPC [City Planning Commission] needs to be 9/14/17 otherwise the loan commitment from lender will be lost for the project."  The next day, Chiang again sent a message to defendant HUIZAR, writing: "Hi Boss, we met with planning yesterday and went through the outstanding items for 9/14/17 CPC. We would need a motion from your office to direct

44

the TFAR allocation by next week before council recess to make the 9/14/17 CPC hearing."

Overt Act No. 175:  On August 24, 2017, in a telephone call, Chiang told Individual 1: "Do or die, because if we lose the September 14 [CPC hearing date], then we lose all loan commitments from the lender ... you know, probably not looking at a project." Individual 1 responded: "You mentioned to [defendant HUIZAR] this is a big issue."  Chiang responded: "Yes, yes, I did, I told him ... the motion is very important in order for us to move forward.... We all spoke to the Chairman [D], and the Chairman [D] is willing to make a lot of sacrifices."

Overt Act No. 176:  On September 1, 2017, at Chiang's request, defendant HUIZAR presented a written motion in the PLUM committee to benefit Company D, allowing Project D to move forward with its application and approval process before the CPC and City Council.

Overt Act No. 177:  On September 1, 2017, defendant HUIZAR wrote to Chiang in a text message: "We got the motion in today," which Chiang understood to mean that defendant HUIZAR held up his end of the bargain to help Company D.

Overt Act No. 178:  On September 14, 2017, defendant HUIZAR confirmed that he and his office exerted pressure on other City officials, writing to Chiang in a text message: "Congrats. Yeah we [CD-14 office] were calling mayors office to tell his commission to calm down. It's expected from cpc they throw a lot of junk at projects these days.  Not over but make sure u relay to chairman [D] that we were helpful."

Overt Act No. 179:  On September 14, 2017, in a telephone call, defendant HUIZAR told Chiang: "You know, whatever it was, we'll fix

it in PLUM.... Did the boss [Chairman D], you call the boss [Chairman D] already? ... Did you tell him that my office was helpful?"  Chiang responded: "I told [Chairman D] everything."  Defendant HUIZAR then stated: "Okay, cool, cool, cool. Good, good.... Do we have a schedule for PLUM already?"

Overt Act No. 180:  In or around November 2017, defendant HUIZAR asked Chiang to make a commitment on behalf of Company D to contribute $100,000 to Relative A-1's campaign in exchange for continued favorable official acts by defendant HUIZAR to benefit Project D.  Chiang, on behalf of Company D, told defendant HUIZAR he could confirm Chairman D's commitment of $100,000 to PAC A.

Overt Act No. 181:  On November 16, 2017, at defendant HUIZAR's direction, Esparza created a spreadsheet titled "IE [Independent Expenditure] HUIZAR Strategy," which included a $100,000 contribution from Company D with Chiang listed in the "Notes" column.

Overt Act No. 182:  On December 4, 2017, defendant HUIZAR created a spreadsheet titled "Initial Commitments to PAC," which included a $100,000 contribution from Chiang.

Overt Act No. 183:  On December 5, 2017, defendant HUIZAR voted to approve Project D in the PLUM Committee.

Overt Act No. 184:  On January 9, 2018, at defendant HUIZAR's direction, Esparza sent an e-mail to defendant HUIZAR, attaching a spreadsheet titled "IE [Independent Expenditure] HUIZAR Strategy," which included a $100,000 contribution from Company D with Chiang listed in the "Notes" column, and a spreadsheet titled "Copy of Commitments," which included a $100,000 contribution from Company D.

Overt Act No. 185:  On January 16, 2018, defendant HUIZAR sent an e-mail to his fundraiser, attaching a spreadsheet titled "Initial

Commitments to PAC," which included a $100,000 contribution from Chiang with Chiang listed in the "Notes" column.

Overt Act No. 186:  On January 24, 2018, defendant HUIZAR, Chiang, Chairman D, Individual 1, and Relative A-1 met for dinner at Chairman D's hotel in San Gabriel, California, where Chairman D pledged his commitment and support for Relative A-1's campaign for the CD-14 seat.

Overt Act No. 187:  On February 12, 2018, defendant HUIZAR wrote to Chiang in a text message: "fundraiser for PAC will call u today," in furtherance of the agreement to have Company D contribute to PAC A to benefit Relative A-1's campaign.

Overt Act No. 188:  On March 9, 2018, defendant HUIZAR submitted a resolution in the PLUM Committee to benefit Company D, allowing Project D to move forward in its approval process.

Overt Act No. 189:  On March 29, 2018, defendant HUIZAR and Chiang met at defendant HUIZAR's residence to discuss Company D's support and the $100,000 contribution to the PAC to benefit Relative A-1's campaign.

Overt Act No. 190:  On April 23, 2018, Chiang wrote to Individual 1 via text message that the list of items he was talking to defendant HUIZAR about included "tell [defendant HUIZAR] that [Chairman D] is coming in June, we can talk about the PAC at that time."

Overt Act No. 191:  On April 23, 2018, defendant HUIZAR and Chiang met at defendant HUIZAR's residence to discuss defendant HUIZAR's continued support for Project D in exchange for Company D's agreement to contribute $100,000 to PAC A to benefit Relative A-1's campaign.

Overt Act No. 192:  On May 18, 2018, defendant HUIZAR met with Chiang and Individual 1 for breakfast at a restaurant in Boyle Heights, where defendant HUIZAR stated that he needed the PAC contribution as soon as possible and that he wanted the contribution now so that when Relative A-1 announced her candidacy, she would have money to pour into the campaign and scare other potential candidates from running against her.  Defendant HUIZAR stated that other developers already contributed in amounts of $50,000, $100,000, and $200,000.

Overt Act No. 193:  On June 12, 2018, defendant HUIZAR voted in the City Council to approve the Development Agreement for Project D, and wrote to Chiang in a text message: "Da [Development Agreement] for [Company D] just passed council today. Does that mean project has been fully entitled? Is that our last vote?"

Overt Act No. 194:  On June 18, 2018, defendant HUIZAR wrote to Chiang in a text message: "When is the chairman [D] coming in to town? We need to finalize pac stuff. Thanks."

Overt Act No. 195:  On July 30, 2018, after the ordinance authorizing the execution of the Development Agreement for Project D went into effect, defendant HUIZAR wrote to Chiang in a text message: "any news on when [Chairman D] is coming in to town? Hoping to catch dinner with him and talk about [Relative A-1] campaign."  Chiang responded: "Hi Boss, [Individual 1] is working on it. I let you know after I see him in office tomorrow."

Overt Act No. 196:  On October 8, 2018, defendant HUIZAR followed up regarding Company D's commitment to PAC A, writing to Chiang in a text message: "Hey George [Chiang]... have time to meet soon to tie up some loose ends re the [Company D] project?"

1    <u>Overt Act No. 197:</u>  On October 16, 2018, defendant HUIZAR and

2    Chiang met at defendant HUIZAR's residence and discussed Company D's

3    agreement to contribute to PAC A to benefit Relative A-1's campaign,

4    as promised, in exchange for defendant HUIZAR taking multiple

5    official acts to benefit Project D.

6                    **(4)  <u>Project M Bribery Scheme</u>**

7         **$25,000 Contribution to PAC B**

8         <u>Overt Act No. 198:</u>  On August 18, 2016, defendant HUIZAR met

9    with Lobbyist B and Executive M at defendant HUIZAR's City Hall

10   office to discuss Project M.  At the meeting, Lobbyist B and

11   Executive M asked defendant HUIZAR to file a motion to initiate a

12   General Plan Amendment for Project M.  Defendant HUIZAR agreed to

13   initiate the General Plan Amendment, either by exerting pressure on

14   the Planning Department to do so or by filing a motion.

15        <u>Overt Act No. 199:</u>  On or about August 26, 2016, defendant

16   HUIZAR and his staff urged the Planning Department to approve the

17   General Plan Amendment initiation for Project M, which the Planning

18   Department did.

19        <u>Overt Act No. 200:</u>  In September 2016, less than a month after

20   defendant HUIZAR had provided significant assistance to Company M and

21   Executive M, defendant HUIZAR asked Lobbyist B for contributions to

22   PAC B from Lobbyist B's clients with projects pending in CD-14,

23   including from Executive M on behalf of Company M.  Lobbyist B agreed

24   to convey the requests to his clients.

25        <u>Overt Act No. 201:</u>  On October 10, 2016, defendant HUIZAR sent

26   an e-mail to Esparza and another CD-14 staffer, writing: "I spoke

27   with [Lobbyist B] already about [another developer] and [Company M]

28   contributions to [HUIZAR Associate 2] Account.  He is on board.  Work

                                  49

1  with him to get them in.  Get [Lobbyist B] the [HUIZAR Associate 2]

2  acco[u]nt name and number etc."

3      Overt Act No. 202:  On October 13, 2016, Esparza sent a text

4  message to Lobbyist B, providing the information for PAC B and

5  adding: "according to my boss that's for [another developer] and

6  [Company M]. He said he spoke to u about it."

7      Overt Act No. 203:  On October 13, 2016, Lobbyist B sent an e-

8  mail to Executive M, passing on the information for PAC B he received

9  from Esparza.  Executive M replied: "Timing and amount?"  Lobbyist B

10  then wrote: "25K as soon as possible."

11      Overt Act No. 204:  On October 14, 2016, Lobbyist B sent an e-

12  mail to Executive M, attaching a remit form for PAC B, and writing:

13  "HUIZAR is asking that contributions be directed to this committee.

14  Please hold off if you are processing a contribution to the other

15  primary committee."

16      Overt Act No. 205:  On October 26, 2016, Executive M wrote to

17  Lobbyist B in a text message about the $25,000 PAC B contributions:

18  "I should have checks by tomorrow. All I need is the letter. Would it

19  be worth setting up a quick drink or coffee with JOSE [HUIZAR] when

20  we deliver? Could be good to talk big picture, etc."

21      Overt Act No. 206:  On or about October 27, 2016, at defendant

22  HUIZAR's direction, Company M sent three checks from three separate

23  entities, payable to PAC B in the amount of $8,333.33 for a total of

24  $25,000, by U.S. Mail to the Company M office in Los Angeles,

25  California.

26      Overt Act No. 207:  On October 31, 2016, Lobbyist B sent a text

27  message to Esparza, writing: "When can I get [Executive M] in with

28  JOSE [HUIZAR] to deliver the checks?"

**Additional $25,000 Contribution to PAC B**

Overt Act No. 208:  On February 15, 2017, defendant HUIZAR met Lobbyist B for lunch in downtown Los Angeles to discuss various projects.  At the lunch, defendant HUIZAR asked Lobbyist B for an additional $25,000 contribution to PAC B from Company M, which Lobbyist B agreed to convey to Executive M.

Overt Act No. 209:  On February 15, 2017, Executive M paid approximately $1,778.33 for a dinner for defendant HUIZAR and CD-14 staff at a restaurant in Los Angeles, which was reimbursed by Company M.

Overt Act No. 210:  On February 21, 2017, Lobbyist B informed Esparza via text message that Executive M "acknowledged the conversation with JOSE [HUIZAR]" regarding Company M's additional contribution to PAC B.

Overt Act No. 211:  On February 24, 2017, Executive M sent an e-mail to another Company M employee with the subject line "questions regarding HUIZAR PAC," copying Lobbyist B, and writing: "You can direct any specific questions on the PAC to [Lobbyist B], who is cc'd."

Overt Act No. 212:  On February 25, 2017, defendant HUIZAR sent a text message to Esparza, writing: "Any update on [Executive M] 25k?"

Overt Act No. 213:  On or about March 2, 2017, at defendant HUIZAR's direction, Company M sent a check for $25,000 made payable to PAC B by U.S. Mail to PAC B in Sacramento, California.

Overt Act No. 214:  On March 20, 2017, Executive M sent an e-mail to Lobbyist B, writing: "Do you think we are in a more favored status with JOSE [HUIZAR] compared to [another developer]?"

Overt Act No. 215:  On May 5, 2017, in a telephone call, defendant HUIZAR and Lobbyist B discussed Company M's contribution to PAC B at defendant HUIZAR's direction.  Defendant HUIZAR and Lobbyist B found out that PAC B publicly disclosed Company M as a top donor for a Los Angeles City Council candidate.  Lobbyist B told defendant HUIZAR that a reporter was "asking who asked us for the donation, but we, we're not gonna respond to that."  Defendant HUIZAR responded: "Thank you very much. I appreciate that."  Lobbyist B stated: "No of course."  Lobbyist B then stated: "When I told George [Esparza], I said, look, my two things that I gotta protect you know ... [Company M] and gotta protect you."  Defendant HUIZAR stated "we can't be sloppy about this and trust, uh, [HUIZAR Associate 2], but, anyway, we will save that conversation for tomorrow, ok?"

Overt Act No. 216:  On May 9, 2017, Executive M sent an e-mail to Lobbyist B asking about the media inquiry regarding the Company M campaign contribution to PAC B in support of a Los Angeles City Council candidate.  Lobbyist B responded by e-mail, reminding Executive M that the PAC B contribution "was an 'ask' from JOSE HUIZAR."

Overt Act No. 217:  On August 24, 2017, Executive M sent an e-mail to another Company M employee who was seeking input on a fundraising event for defendant HUIZAR, writing: "I would recommend not making this contribution as we go through certain channels to make sure it has impact."

**$25,000 Contribution and Additional $25,000 Commitment to PAC A**

Overt Act No. 218:  In or around January 2018, defendant HUIZAR spoke with Lobbyist B regarding Project M's approval in the PLUM Committee and City Council.  Specifically, they discussed that

Company M wanted the City to approve Project M with a 5% affordable housing requirement, while defendant HUIZAR initially insisted on 11% affordable housing.  Lobbyist B told defendant HUIZAR that Executive M was concerned he would suffer significant professional consequences, including the loss of his job with Company M, if Project M was not approved, and that if Project M did not obtain its preferred affordable housing requirements it would threaten the viability of the project altogether.

Overt Act No. 219:  On January 5, 2018, Lobbyist B sent a text message to Executive M, writing: "We are confirmed for dinner with HUIZAR on Monday [January 8, 2018]."

Overt Act No. 220:  On January 8, 2018, defendant HUIZAR and Lobbyist B had a discussion via text message regarding Project M and Company M's willingness to contribute to their newly established PAC, PAC A.  Specifically, defendant HUIZAR wrote: "Let's do the pac stuff later this week. See u there at 6. What's purpose of tonight's meeting? Are they [Company M] gonna help with pac?"  Lobbyist B replied: "[Executive M] wants to talk about their [Project M] and see if you're comfortable with the height and affordability levels."  Defendant HUIZAR answered: "Are they gonna help with pac?"  Lobbyist B replied: "I'm sure they will, however - as your friend - let's discuss this in a different text thread" in order to avoid documenting defendant HUIZAR's conditioning his official assistance with Project M on Company M's financial support for PAC A.

Overt Act No. 221:  On February 23, 2018, defendant HUIZAR and Lobbyist B had a discussion via text message regarding PAC A. Specifically, Lobbyist B wrote: "Are you checking the Confide App for texting on your iPhone?"  Lobbyist B further wrote: "I was going to

text you about your meeting with [PAC A's attorney]. Wanted to see if we got any clarification. Confide is good for texting because it is like Snap Chat...message disappears."

Overt Act No. 222:  On March 1, 2018, defendant HUIZAR met with Lobbyist B and discussed Company M's contributions to PAC A. Specifically, defendant HUIZAR asked for a $50,000 contribution to PAC A to be paid in two installments, $25,000 as soon as possible and another $25,000 by the end of the year, after Project M was approved. Lobbyist B agreed to convey the request to Executive M.

Overt Act No. 223:  On March 14, 2018, Lobbyist B met with Executive M and relayed defendant HUIZAR's request to have Company M contribute $50,000 to PAC A, which Lobbyist B explained was designed to benefit Relative A-1's campaign for the CD-14 seat.  Executive M agreed.

Overt Act No. 224:  On March 14, 2018, at approximately 4:00 p.m., defendant HUIZAR met with Lobbyist B to discuss PAC A, including the fact that Executive M agreed to have Company M contribute to PAC A.

Overt Act No. 225:  On March 15, 2018, Lobbyist B sent an e-mail to Executive M with the subject line "[PAC A]," writing: "this is the committee we previously discussed," and attaching a contribution form for PAC A.

Overt Act No. 226:  On March 26, 2018, defendant HUIZAR sent an e-mail to himself, attaching a document titled "Fundraising Plan." The document included, among other things, company and individual names, contribution amounts, and the person responsible for soliciting contributions to PAC A and PAC B.  Under the PAC A

1    section, the document included an entry for Company M for $50,000,

2    and listing Lobbyist B.

3        Overt Act No. 227:  On April 13, 2018, defendant HUIZAR sent an

4    e-mail to Lobbyist B, attaching a document titled "[PAC A]" that

5    included, among other things, an entry for Company M for $50,000,

6    with the note: "B/4 June. 2 checks. 2 Entities."

7        Overt Act No. 228:  On May 8, 2018, Executive M and Lobbyist B

8    had a discussion via text message regarding a meeting with the

9    Planning Department scheduled for the same day for Project M.

10   Specifically, Executive M wrote: "Very important that [City Staffer

11   A-2] calls [a Planning Department official] letting them know he

12   supports the height etc. please please make sure this happens prior."

13   Lobbyist B later wrote: "[City Staffer A-2] will let them know their

14   position, and then make the changes in PLUM."  Executive M later

15   wrote: "This would be a disaster if they took a position to deny[.]

16   This meeting seems to be a really bad idea now. When does JOSE

17   [HUIZAR] get back?"  Lobbyist B responded: "Spoke with [City Staffer

18   A-2]. He will speak with [the Planning Department official], and then

19   call me to report back prior to our meeting."

20       Overt Act No. 229:  On May 8, 2018, defendant HUIZAR's caused

21   City Staffer A-2 to advocate CD-14's position and encourage a

22   Planning Department official to approve Project M to allow the

23   project to proceed to a hearing before the City Planning Commission.

24       Overt Act No. 230:  On May 22, 2018, Executive M received an e-

25   mail from Employee M, a Company M employee, sent to the CEO, with the

26   subject "[PAC A]," seeking approval for a $25,000 check to PAC A,

27   noting: "We have discussed this in the past."

28

1    <u>Overt Act No. 231:</u>  On or about June 13, 2018, at defendant

2    HUIZAR's direction, Company M sent two checks from two separate

3    entities, each made payable to PAC A, in the amount of $12,500 each

4    for a total of $25,000, by U.S. Mail to the Company M office in Los

5    Angeles, California, around the same time that the City Planning

6    Commission approved Project M, allowing it to move forward to a

7    hearing before the PLUM Committee and ultimately City Council.

8    **Additional $50,000 Commitment to PAC A in Exchange for Defendant**

9    **HUIZAR's Help on Project M**

10   <u>Overt Act No. 232:</u>  On August 9, 2018, Lobbyist B sent an e-mail

11   to Executive M regarding Project M's upcoming hearing before the PLUM

12   Committee, writing: "We need to address the Labor issue.

13   Seriously...we need to take [the executive of a labor union] off the

14   chess board."  Lobbyist B and Executive M believed the labor union

15   was an issue that could affect Project M's approval in the PLUM

16   Committee with the potential to create delays, increase costs,

17   threaten the viability of Project M, resulting in negative

18   repercussions for Executive M personally, including the potential

19   loss of his job.

20   <u>Overt Act No. 233:</u>  On September 4, 2018, in an e-mail,

21   Executive M asked Lobbyist B: "Any updates on HUIZAR meeting?"

22   Lobbyist B responded: "I'm having a one-on-one meeting with [HUIZAR],

23   and you're #1 on the agenda."

24   <u>Overt Act No. 234:</u>  On September 4, 2018, defendant HUIZAR met

25   with Lobbyist B regarding the labor union issue Company M was facing

26   on Project M.  During the meeting, Lobbyist B requested on behalf of

27   Executive M for defendant HUIZAR to vote against the labor union's

28   appeal by approving Project M in the PLUM Committee.  Defendant

HUIZAR explained that voting against the labor union, which he considered an ally, could have negative ramifications on Relative A-1's campaign.  Because of this risk, defendant HUIZAR told Lobbyist B that if he were to vote against the labor union in the PLUM Committee, then Company M would have to make it worthwhile, which Lobbyist B understood to mean that defendant HUIZAR expected a financial benefit from Company M in exchange for his efforts with the labor union.

Overt Act No. 235:  On September 6, 2018, Lobbyist B and Executive M met to discuss Project M and resolving its labor issue. During the meeting, Lobbyist B discussed with Executive M that they needed to make it worthwhile for defendant HUIZAR's intervention with the labor union.  Executive M and Lobbyist B agreed that Company M should offer to make an additional $50,000 contribution to PAC A. Company M had previously agreed to contribute $50,000, and paid the first installment in June 2018.  This additional $50,000 contribution would bring the total agreed-upon contributions on behalf of Company M to PAC A to $100,000 in exchange for defendant HUIZAR's assistance with Project M.

Overt Act No. 236:  On September 6, 2018, defendant HUIZAR and Lobbyist B met outside a restaurant in Boyle Heights to discuss the new arrangement with Executive M.  At the meeting, Lobbyist B conveyed the offer of an additional $50,000 contribution to PAC A, bringing the total to $100,000, and defendant HUIZAR agreed to accept the contribution in exchange for voting to approve Project M over objections by the labor union.  Defendant HUIZAR also requested a private meeting with Executive M.

1    Overt Act No. 237:  On September 6, 2018, Lobbyist B asked
2    Executive M via text message "Can you do dinner with HUIZAR on
3    Tuesday, 9-25?"

4    Overt Act No. 238:  On September 10, 2018, in a text message,
5    Lobbyist B asked defendant HUIZAR: "Re: [Company M] & [Project M].
6    You are meeting with [Executive M] on 9-25 to negotiate public
7    benefits package. Could we target PLUM on 10-02 with the clear
8    understanding that the item gets pulled from agenda with no deal?
9    [City Staffer A-2] is waiting for direction from you before
10   scheduling."

11   Overt Act No. 239:  On September 11, 2018, in a text message,
12   defendant HUIZAR asked Lobbyist B: "Hey, let's talk about your
13   fundraiser for [Relative A-1] before event and who U are inviting. I
14   want to make sure we are hitting people up for right amount and we
15   are not calling same people."  Lobbyist B replied: "Of course."
16   Defendant HUIZAR then asked: "Oct 11 still good for you?"

17   Overt Act No. 240:  On September 11, 2018, just after the text
18   messages with defendant HUIZAR, Lobbyist B sent a text message to
19   Executive M stating: "Plan on 10-02 PLUM. But let's discuss..."

20   Overt Act No. 241:  On September 12, 2018, while defendant
21   HUIZAR was negotiating the additional financial benefit he sought
22   from Executive M and Company M, defendant HUIZAR used his official
23   position as PLUM Committee Chair to postpone the committee's hearing
24   on Project M to October 2, 2018, thereby causing the project to be
25   delayed until after he met with Executive M.

26   Overt Act No. 242:  On September 24, 2018, Lobbyist B told
27   defendant HUIZAR via text message: "We are meeting [Executive M]

28

58

1   tomorrow for dinner. Do you still want [a restaurant in downtown Los

2   Angeles], or would you like someplace a bit more private?"

3       Overt Act No. 243:   On September 24, 2018, Lobbyist B to

4   Executive M via text message: "Meeting is moved to breakfast on 10-04

5   @ 9 AM."  Executive M replied: "But that pushes our date??? This is a

6   disaster."  Lobbyist B responded: "Yes....it pushes the date. It's

7   going to get done."

8       Overt Act No. 244:   On September 26, 2018, in a text message,

9   Lobbyist B asked Executive M: "any chance you can do your one on one

10  dinner with HUIZAR THIS Friday, 9-28?"  Executive M replied: "Yes.

11  I'm assuming hearing date is the same?"

12      Overt Act No. 245:   On September 28, 2018, defendant HUIZAR and

13  Executive M met to discuss defendant HUIZAR's support for Project M,

14  its approval in the PLUM Committee, and Company M's support for the

15  PAC to benefit Relative A-1's campaign.  During the same

16  conversation, Executive M offered to provide opposition research to

17  defendant HUIZAR on a young female former CD-14 staffer who planned

18  to file a lawsuit against defendant HUIZAR, and defendant HUIZAR

19  accepted this offer.  As part of their negotiation to help Project M,

20  defendant HUIZAR and Executive M also discussed Company M hiring

21  defendant HUIZAR after he left office.

22      Overt Act No. 246:   On September 28, 2018, defendant HUIZAR sent

23  a text message to Lobbyist B, writing: "Good meeting with [Executive

24  M]. He is willing to help [Relative A-1] committee. He will collect

25  from consultant/contractors. We didn't discuss amount. Please enlist

26  him for your event and ask him to collect 15-20 k for your event."

27

28

1      <u>Overt Act No. 247:</u>  On October 2, 2018, defendant HUIZAR used
2   his official position as the PLUM Committee Chair to postpone his
3   committee's hearing on Project M to October 16, 2018.

4      <u>Overt Act No. 248:</u>  On October 11, 2018, defendant HUIZAR,
5   Executive M, Employee M, and Lobbyist B attended a fundraiser for
6   Relative A-1 hosted by Lobbyist B.  At the fundraiser, Executive M
7   provided defendant HUIZAR the opposition research against the young
8   female staffer he had promised as part of their agreement for
9   defendant HUIZAR to help Project M.

10      <u>Overt Act No. 249:</u>  On October 13, 2018, Executive M sent a text
11   message to Lobbyist B regarding the upcoming PLUM Committee hearing
12   for Project M, asking: "Anyone else on plum we should connect with?"
13   Lobbyist B replied: "I was thinking about it but I really don't want
14   to call attention to it. I would rather let JOSE [HUIZAR] power play
15   it through."

16      <u>Overt Act No. 250:</u>  On October 16, 2018, defendant HUIZAR voted
17   to deny the union appeal and to approve Project M in the PLUM
18   Committee, including accepting certain modifications requested by
19   Company M.  Specifically, the PLUM Committee accepted Company M's
20   preferred modifications to the affordable housing restrictions,
21   thereby undoing the more stringent requirements recommended by the
22   City Planning Commission.  As a result of defendant HUIZAR's approval
23   and undoing the CPC recommendations, Company M obtained significant
24   reductions to Project M's affordable housing requirements, from 11%
25   "Very Low Income" units to 6% "Moderate Income" units.  Specifically,
26   defendant HUIZAR's approval of Company M's modifications decreased
27   low-income individuals' access to the project while ensuring Company
28   M obtained an estimated $14 million in net savings.

Overt Act No. 251:  On October 16, 2018, after the PLUM
Committee approval, in a text message, Lobbyist B told Executive M:
"Let's talk tomorrow. I'm seeing JOSE [HUIZAR] on Thursday, so I know
he will bring up follow up on a few items," referring to Company M's
commitment to contribute the remaining $75,000 to PAC A.

Overt Act No. 252:  On October 18, 2018, defendant HUIZAR and
Lobbyist B had a meeting at defendant HUIZAR's residence, where
defendant HUIZAR raised Company M's commitment to contribute to PAC
A.

Overt Act No. 253:  On October 31, 2018, defendant HUIZAR voted
to approve Project M in City Council.

Overt Act No. 254:  On October 31, 2018, Executive M wrote an e-
mail to the owners of Company M and other employees, writing: "Great
news, we just received final unanimous approval for [Project M] by
city council.  Although today is bit of a formality (PLUM is where
the discretion usually happens), this is the final step."  Executive
M highlighted the benefits Company M was able to secure in PLUM from
defendant HUIZAR, writing: "our obligations related to rent
[affordable housing] restrictions and union involvement are minimal
compared to other future projects in the area."  Executive M also
touted "the entitlement of the tallest building in the arts district
by 3 times (35 stories) in a wealthy opinionated hipster community"
as a "truly amazing" accomplishment.

Overt Act No. 255:  On or around October 31, 2018, Lobbyist B
updated a document tracking commitments and contributions made to PAC
A.  Among other things, the document had an entry for Company M with
the figure $25,000 in the column titled "Paid," and $75,000 in the

1  column titled "Committed."  In addition, in the "Comments" column,

2  the entry for Company M stated "$75K by December."

3      Overt Act No. 256:  On November 1, 2018, Lobbyist B wrote to

4  Executive M via text message, asking for a meeting to "go through the

5  HUIZAR political stuff," referring to the $75,000 contribution to PAC

6  A Company M had committed to defendant HUIZAR in exchange for

7  defendant HUIZAR's now successful help with Project M.

8                    **(5)  Businessperson A Scheme**

9      **Financial Benefits for Business Opportunities with Developers**

10     Overt Act Nos. 257-289: On or about at least the following

11  dates, in exchange for defendant HUIZAR using his official position

12  to make introductions to developers and to advocate that such

13  developers use Businessperson A's business to enhance Businessperson

14  A's financial prospects, defendant HUIZAR accepted financial benefits

15  from Businessperson A, including cash, hotel rooms,

16  prostitution/escort services, meals, and other gifts in the following

17  approximate amounts:

| Overt Act No. | Date | Financial benefit | Amount |
|---|---|---|---|
| 257 | 06/13/2016 | suit and shirts | $6,000 |
| 258 | 11/18/2016 | meal | $1,210.88 |
| 259 | 11/18/2016 | shirts | $1,869.03 |
| 260 | January 2017 | cash | $10,000 |
| 261 | 01/13/2017 | hotel accommodation | $286.13 |
| 262 | 01/19/2017 | hotel accommodation | $483.36 |
| 263 | February 2017 | cash | $10,000 |
| 264 | March 2017 | cash | $10,000 |
| 265 | 03/15/2017 | hotel accommodation | $561.10 |

| Overt Act No. | Date | Financial benefit | Amount |
|---|---|---|---|
| 266 | 03/25/2017 | resort accommodation | $298.36 |
| 267 | 03/25/2017 | golf club accommodation | $432.75 |
| 268 | April 2017 | cash | $10,000 |
| 269 | 04/06/2017 | hotel accommodation | $311.12 |
| 270 | 04/24/2017 | hotel accommodation | $423.58 |
| 271 | 04/28/2017 | hotel accommodation | $572.61 |
| 272 | May 2017 | cash | $10,000 |
| 273 | 05/03/2017 | hotel accommodation | $456.25 |
| 274 | 05/09/2017 | hotel accommodation | $381.64 |
| 275 | 05/15/2017 | hotel accommodation | $968.87 |
| 276 | 05/17/2017 | hotel accommodation | $346.75 |
| 277 | 05/19/2017 | hotel accommodation | $273.64 |
| 278 | 05/22/2017 | hotel accommodation | $335.66 |
| 279 | 05/24/2017 | hotel accommodation | $810.88 |
| 280 | 05/30/2017 | hotel accommodation | $519.56 |
| 281 | June 2017 | cash | $10,000 |
| 282 | 06/02/2017 | hotel accommodation | $336.36 |
| 283 | 06/05/2017 | hotel accommodation | $79.75 |
| 284 | 06/08/2017 | hotel accommodation | $475.20 |
| 285 | 06/12/2017 | statue | $920.00 |
| 286 | 06/12/2017 | shoes | $449.32 |
| 287 | 06/12/2017 | suits | $10,451.75 |
| 288 | 06/19/2017 | hotel accommodation | $1,513.49 |
| 289 | 06/26/2017 | hotel accommodation | $322.33 |

| Overt Act No. | Date | Financial benefit | Amount |
|---|---|---|---|
| | | TOTAL: | $91,090 |

**$25,000 Contribution to PAC B in Exchange for City Resolution**

Overt Act No. 290:  On or about March 11, 2018, defendant HUIZAR met with Businessperson A, who, unbeknownst to defendant HUIZAR, had then begun acting at the direction of the FBI, on a golf course in the City.  Defendant HUIZAR asked Businessperson A to contribute to Relative A-1's campaign.  Businessperson A stated that he would support the campaign, but that he needed help from defendant HUIZAR to provide an official resolution from the City recognizing Businessperson A's business.  Defendant HUIZAR agreed to provide a City resolution and asked Businessperson A to contribute $25,000 to Relative A-1's campaign.

Overt Act No. 291:  On or about March 23, 2018, at defendant HUIZAR's request, Businessperson A sent a check in the amount of $25,000 made payable to PAC B by U.S. Mail from Los Angeles County to PAC B in Sacramento, California, intended to benefit Relative A-1's campaign.

Overt Act No. 292:  On or about April 10, 2018, defendant HUIZAR caused the CD-14 office to issue a City resolution in the form of a certificate of recognition signed by all City Council members, recognizing Businessperson A to promote Businessperson A's business and reputation in the City.

Overt Act No. 293:  On or about May 31, 2018, defendant HUIZAR met with Businessperson A, who was acting at the direction of the FBI, at defendant HUIZAR's City Hall office.  As promised when Businessperson A agreed to contribute $25,000 to Relative A-1's

campaign, defendant HUIZAR delivered the City resolution recognizing Businessperson A.  At this meeting, defendant HUIZAR confirmed the PAC received Businessperson A's $25,000 contribution, adding that "the people who have the PAC, they know ... you're interested in helping [Relative A-1]. So it's sitting there for the right time."

**Cash Payment for Pressure on Developer to Hire Businessperson A**

Overt Act No. 294:  On August 25, 2018, defendant HUIZAR met with Businessperson A, who was acting at the direction of the FBI, at a golf course in the City.  During the meeting, defendant HUIZAR asked Businessperson A for additional contributions to benefit Relative A-1's campaign.  During the same conversation, defendant HUIZAR stated: "I'll go down a list of people that I could start introducing you to ...  people ... that I know need my help.... Like for example, right now, [Company M] needs me.... So I could re-introduce them to you."  Businessperson A asked, regarding these meetings, whether HUIZAR could "push" the developers to hire Businessperson A.  Defendant HUIZAR responded: "Yeah ... for right now they feel pressure, but they need me."

Overt Act No. 295:  On September 24, 2018, defendant HUIZAR met with Businessperson A, who was acting at the direction of the FBI, at a restaurant in the City.  During the meeting, defendant HUIZAR accepted $15,000 in cash from Businessperson A, who provided the cash concealed in an envelope, which defendant HUIZAR then covered with a napkin.  During this meeting, defendant HUIZAR stated that he had a meeting with Company M the following day and that Company M's project was coming up for approval soon.  Defendant HUIZAR stated that Company M "need[s] a lot of help from my office," by which defendant HUIZAR meant that Company M would feel pressure to hire

Businessperson A at defendant HUIZAR's request because Company M needed defendant HUIZAR to perform favorable official acts in support of Company M's project and not take adverse official acts in opposition to the project.  Defendant HUIZAR assured Businessperson A that he would make sure Company M scheduled a meeting with Businessperson A.  At the end of the meeting, after Businessperson A had departed, defendant HUIZAR counted the cash inside the envelope.

Overt Act No. 296:  On September 28, 2018, at a dinner with Executive M, defendant HUIZAR asked Executive M to meet with Businessperson A.

### (6)  Additional Pay-to-Play Conduct

**CD-14 Developers/Proxies' PAC Contributions to Benefit Relative A-1's Campaign and CD-14 Enterprise**

Overt Act No. 297:  In or around May 2017, defendant HUIZAR, Lobbyist B, HUIZAR Associate 3, and Esparza agreed to establish a PAC that publicly was purported to benefit a broad array of candidates and causes but was, in fact, primarily intended to benefit Relative A-1's campaign to succeed defendant HUIZAR as Councilmember for CD-14.  Defendant HUIZAR agreed with Lobbyist B, HUIZAR Associate 3, and Esparza to pressure developers with projects in CD-14 to contribute to the PAC in exchange for favorable treatment and to avoid adverse action against their projects in the PLUM Committee, Economic Development Committee, and City Council.

Overt Act No. 298:  On May 10, 2017, in a telephone call, Esparza and Chiang discussed how defendant HUIZAR was using a PAC to obtain additional financial benefits from developers in exchange for not taking adverse action against them.  Specifically, Esparza told Chiang: "[defendant HUIZAR's] approach is that he's going to um,

strong arm everyone ... to the PAC. [Company D], [Company F]. 'This is what I want right now. This is my [relative], this is what we are doing.' So his idea in his mind is that okay, people are going to support us because they don't want people to fuck with projects, you know."

Overt Act No. 299:  On May 11, 2017, in a telephone call, Esparza and Executive Director E discussed punishing a developer who was not providing financial benefits to defendant HUIZAR by withholding approvals for the developer's project.  Specifically, Esparza said: "[Company G] has not come through with any other commitments to us, to you, so you know, why even be helpful to them, you know, that's my thing... So I'm going to tell [defendant HUIZAR] that I spoke to you and let's just continue to ignore them, you know. We are not going to help them."  Executive Director E then added: "And even [Individual 1] doesn't want you guys to work with [Company G]."

Overt Act No. 300:  On June 2, 2017, in a telephone call, defendant HUIZAR, Relative A-1, and Lobbyist B discussed establishing a PAC to support Relative A-1's campaign.  Lobbyist B explained: "the PAC ... that's going to be strictly political money and, you know, two years from now, or three years, there'll be a million dollars in there.  You won't be able to direct it, but there'll be people, you know, [who] are like minded."

Overt Act No. 301:  On June 22, 2017, defendant HUIZAR met with Lobbyist B, Esparza, and Kim and discussed establishing a PAC to raise money for Relative A-1's campaign.  During this meeting, defendant HUIZAR suggested having Kim find an associate to serve as

1   the "face" of the PAC to disguise defendant HUIZAR's involvement and

2   the PAC's connection to CD-14.

3       Overt Act No. 302:   On September 14, 2017, defendant HUIZAR and

4   Esparza had a text message conversation regarding compiling a list of

5   donors to target for fundraising for Relative A-1's campaign, which

6   they referred to as the "Executive 2" strategy meetings, focusing on

7   developers with upcoming hearings before the PLUM Committee, which

8   defendant HUIZAR chaired.   Defendant HUIZAR texted Esparza: "Please

9   get the [City Staffer A-2] list that he gave u about projects going

10  to cpc and plum and let's discuss me and u at every Thursday exec.#2

11  meeting."

12      Overt Act No. 303:   On October 20, 2017, defendant HUIZAR and

13  Esparza had a conversation about targeting developers with projects

14  pending before committees on which defendant HUIZAR sat in order to

15  obtain financial benefits from them.   Specifically, defendant HUIZAR

16  texted Esparza: "[Company H] is on economic development committee on

17  Tuesday for tot [Transient Occupancy Tax rebates]. Have u spoken with

18  those guys?"   Esparza responded: "Hey boss, here is a quick

19  update. Just had my last meeting. [Company I]/[Lobbyist I]-

20  good. [Company H]/[Lobbyist C]- good. [Company J]/[Consultant J]-

21  good. All commitments have been made."

22      Overt Act No. 304:   On October 24, 2017, defendant HUIZAR again

23  sought to confirm with Esparza that certain developers and

24  consultants committed to contribute to PACs to benefit Relative A-1's

25  campaign before taking favorable actions on the projects in the

26  Economic Development and PLUM Committees.   Specifically, defendant

27  HUIZAR texted Esparza: "[Company H] is in committee today..."

28  Defendant HUIZAR then followed up: "Everything being handled?"

Esparza responded: "Yes sir." Defendant HUIZAR then texted: "The [Company I] sign district is in committee today." Esparza responded: "Yes. Being handled as well."

Overt Act No. 305:  On December 4, 2017, defendant HUIZAR created a spreadsheet titled "Initial Commitments to PAC," listing companies, consultants, and contribution amounts, totaling $500,000.  Several of those listed had pending projects in defendant HUIZAR's district, which defendant HUIZAR, including the following:

| Company | Commitment | Notes |
|---|---|---|
| [Company H] | $25,000 | [Lobbyist C] |
| [Company I] | $25,000 | [Lobbyist I] |
| [Company J] | $50,000 | [Consultant J] |

Overt Act No. 306:  On March 26, 2018, defendant HUIZAR caused Company H to make a contribution of $10,000 to PAC B.

Overt Act No. 307:  On June 19, 2018, defendant HUIZAR caused Company J to make a contribution of $25,000 to PAC A.

**CD-14 Developers/Proxies' Contributions to Defendant HUIZAR Campaigns and Officeholder Accounts**

Overt Act No. 308:  On May 18, 2015, at defendant HUIZAR's direction, Esparza created a document titled "HUIZAR Debt Finance Plan," which documented defendant HUIZAR's solicitation efforts of contributions from developers, consultants, and allies towards defendant HUIZAR's 2015 re-election campaign debt, including many developers and consultants who had projects in CD-14 and/or were going through the City approval process.  The plan included: (1) $40,000 from Kim; (2) $20,000 from Chairman E; (3) $20,000 from

Company G through Executive Director E; (4) $10,000 from Company D;
and (5) $10,000 from Individual 1.

**CD-14 Developers/Proxies' Contributions to School that Employed
Relative A-1 as a Fundraiser**

Overt Act No. 309:  Beginning in or around March 2015, at
defendant HUIZAR's direction, Esparza solicited donations to High
School A's annual gala event from developers and consultants with
projects pending in defendant HUIZAR's district.  Part of the money
raised from the gala event was used to pay salaried employees,
including Relative A-1.

Overt Act No. 310:  On May 18, 2015, Esparza created a document
titled "[High School A] Fundraising Plan."  The document included
commitments from: (1) Company D for $10,000; (2) Chairman E for
$20,000; (3) Company F for $10,000; and (4) Company L for $30,000.

Overt Act No. 311:  On or around September 28, 2015, defendant
HUIZAR attended High School A's annual gala, which, at defendant
HUIZAR's request, was sponsored by the following companies, among
others, in the following amounts: (1) $25,000 by Company L; (2)
$10,000 by Company D; (3) $10,000 by Company F; and (4) $5,000 by
Company K.

**Steering CD-14 Developers to Preferred Firms**

Overt Act No. 312:  In or around 2012, defendant HUIZAR
pressured Developer N to hire HUIZAR Associate 3 as a consultant on
Developer N's development project in CD-14.  Developer N complied
with the request.

Overt Act No. 313:  In or around May 2013, defendant HUIZAR
organized a dinner between Developer N, HUIZAR Associate 3, and a
partner of Law Firm A, which paid Relative A-1 a bi-weekly salary of

$2,500.  Developer N understood that defendant HUIZAR was asking Developer N to hire Law Firm A because it paid Relative A-1 and in exchange for defendant HUIZAR's support on the development project pending in CD-14.

Overt Act No. 314:  In or around March 2014, defendant HUIZAR organized a meeting with Company D and HUIZAR Associate 1, and encouraged Company D to hire HUIZAR Associate 1 as a consultant on Project D.

Overt Act No. 315:  On February 25, 2016, defendant HUIZAR instructed Esparza by text message: "Please work it out with George [Chiang] ... to set up a meeting with [Developer K] and [Law Firm A partner] ... Let them know that [Relative A-1] works at [Law Firm A] and we want to make introduction to see if [the company] ever needs legal defense. Please keep me posted."

Overt Act No. 316:  In or around 2017, at defendant HUIZAR's request, Company O with projects pending in CD-14 agreed to hire HUIZAR Associate 3 as a consultant with a monthly retainer of $10,000.

**(7)  Defendant HUIZAR's Concealment of Illicit Benefits**
**Transporting of Cash into United States and Structuring to Avoid Reporting Requirements**

Overt Act No. 317:  On January 1, 2016, defendant HUIZAR, Esparza, Chairman E, and Executive Director E traveled to Australia, where defendant HUIZAR and Esparza accepted financial benefits from Chairman E, including private jet flights for Esparza, a $10,980 commercial airline ticket for defendant HUIZAR, hotels, meals, alcohol, and other expenses.  In addition, Chairman E provided

1  defendant HUIZAR and Esparza casino gambling chips, which defendant

2  HUIZAR and Esparza cashed out in Australian dollars.

3      Overt Act No. 318:  After the Australia trip, defendant HUIZAR

4  and Esparza discussed evading bank reporting requirements by

5  converting Australian dollars to American dollars.  Specifically, on

6  February 8, 2016, Esparza told defendant HUIZAR via text message:

7  "They are asking me for my drivers license and social security for

8  IRS record. Do you think it's fine to leave my info?"  Defendant

9  HUIZAR responded: "No. Maybe we can change a little at a time...under

10 10 k in future."  Defendant HUIZAR also wrote: "Don't exchange if

11 they are asking u for all that info."  Defendant HUIZAR later

12 instructed Esparza: "Go to the other place tomorrow and take 9 k. See

13 if they change 9 k without getting your social security number."

14 Defendant HUIZAR added: "Even if they take your social security, it

15 doesn't mean that they will report to irs. They probably will just

16 keep it for their records but not do anything with tax reporting."

17     Overt Act No. 319:  On February 9, 2016, at defendant HUIZAR's

18 direction, Esparza exchanged 10,000 Australian dollars into American

19 dollars.  Esparza then reported to defendant HUIZAR in a text

20 message: "I exchanged 10k today. Will do another tomorrow. If it's

21 under 10k, they will not report."  Defendant HUIZAR then told Esparza

22 to ask for a better exchange rate the next day.

23     Overt Act No. 320:  On February 10, 2016, at defendant HUIZAR's

24 direction, Esparza exchanged another 10,000 Australian dollars into

25 American dollars.

26     Overt Act No. 321:  On February 14, 2016, defendant HUIZAR

27 texted Esparza: "(1). U back?  How did chairman [E] do? (2). For last

28 batch to exchange, I think it is 12,800 (correct?). ...see if u can

72

bargain with either of two places in dtla for more than .68.  The
Australian dollar has gotten stronger and is close to .72 official
exchange." Esparza responded: "I came home. Chairman [E] is up 2mil.
Ok. I'll see if I can get close to .72."

Overt Act No. 322:  On February 17, 2016, at defendant HUIZAR's
direction, Esparza exchanged another 12,800 Australian dollars into
American dollars, and confirmed to defendant HUIZAR by text message:
"I was able to get you .69 exchange rate" and that "chairman [E] won
3 mil."  Defendant HUIZAR responded: "Wow. Wow. Wow."

**Money Laundering through Family Members**

Overt Act Nos. 323-356:  On or about the below dates, in order
to conceal and disguise the nature, source, ownership, and control of
proceeds from defendant HUIZAR's pay-to-play scheme, defendant HUIZAR
caused Relative A-2 to deposit cash into Relative A-2's checking
account and thereafter pay defendant HUIZAR directly or indirectly:

| Overt Act No. | Date | Description | Cash Deposit | Payment to Defendant HUIZAR |
|---|---|---|---|---|
| 323 | 01/08/14 | Defendant HUIZAR deposited check from Relative A-2 into his checking account | | $15,000 |
| 324 | 04/08/14 | Defendant HUIZAR deposited check from Relative A-2 into his checking account | | $5,000 |
| 325 | 11/03/14 | Relative A-2 deposited cash into checking account | $5,000 | |
| 326 | 11/18/14 | Defendant HUIZAR deposited check from Relative A-2 into his checking account | | $4,900 |
| 327 | 12/03/14 | Relative A-2 deposited cash into checking account | $7,000 | |

| Overt Act No. | Date | Description | Cash Deposit | Payment to Defendant HUIZAR |
|---|---|---|---|---|
| 328 | 12/11/14 | Relative A-2 wrote check to pay defendant HUIZAR's credit card bill | | $7,000 |
| 329 | 03/12/15 | Relative A-2 deposited cash into checking account | $10,000 | |
| 330 | 03/12/15 | Defendant HUIZAR deposited check from Relative A-2 into his checking account | | $10,000 |
| 331 | 04/08/15 | Relative A-2 deposited cash into checking account | $10,000 | |
| 332 | 04/21/15 | Relative A-2 wrote a check for defendant HUIZAR's loan interest to Bank 1 | | $4,272.66 |
| 333 | 04/22/15 | Relative A-2 deposited cash into checking account | $2,300 | |
| 334 | 04/23/15 | Relative A-2 made electronic payment to pay defendant HUIZAR's credit card | | $8,000 |
| 335 | 07/03/15 | Relative A-2 deposited cash into checking account | $9,000 | |
| 336 | 07/05/15 | Relative A-2 wrote a check for defendant HUIZAR's loan interest to Bank 1 | | $2,895.91 |
| 337 | 07/13/15 | Relative A-2 wrote check to pay defendant HUIZAR's credit card bill | | $2,492.45 |
| 338 | 07/14/15 | Relative A-2 wrote check to pay defendant HUIZAR's property taxes | | $2,640.51 |
| 339 | 08/19/15 | Relative A-2 deposited cash into checking account | $8,100 | |
| 340 | 08/19/15 | Relative A-2 wrote a check to defendant HUIZAR's loan interest to Bank 1 | | $2,895.92 |

| Overt Act No. | Date | Description | Cash Deposit | Payment to Defendant HUIZAR |
|---|---|---|---|---|
| 341 | 08/24/15 | Relative A-2 made electronic payment to pay defendant HUIZAR's credit card bill | | $1,844.10 |
| 342 | 08/24/15 | Relative A-2 made electronic payment to pay defendant HUIZAR's credit card bill | | $3,042.47 |
| 343 | 01/04/16 | Relative A-2 deposited cash into checking account | $2,900 | |
| 344 | 01/06/16 | Relative A-2 wrote check to pay defendant HUIZAR's credit card bill | | $704.57 |
| 345 | 01/23/16 | Relative A-2 wrote a check for defendant HUIZAR's loan interest to Bank 1 | | $2,895.91 |
| 346 | 01/25/16 | Relative A-2 deposited cash into checking account | $13,000 | |
| 347 | 01/27/16 | Relative A-2 wrote check to pay defendant HUIZAR's credit card bill | | $7,730.22 |
| 348 | 04/27/17 | Relative A-2 deposited cash into checking account | $9,000 | |
| 349 | 04/29/17 | Relative A-2 wrote a check for defendant HUIZAR's loan interest to Bank 1 | | $2,900.97 |
| 350 | 06/02/17 | Relative A-2 deposited cash into checking account | $9,000 | |
| 351 | 06/08/17 | Relative A-2 wrote check to pay defendant HUIZAR's credit card bill | | $12,755.11 |
| 352 | 06/23/17 | Relative A-2 wrote a check for defendant HUIZAR's loan interest to Bank 1 | | $2,895.91 |
| 353 | 06/27/17 | Relative A-2 deposited cash into checking account | $6,000 | |

| Overt Act No. | Date | Description | Cash Deposit | Payment to Defendant HUIZAR |
|---|---|---|---|---|
| 354 | 07/19/17 | Relative A-2 deposited cash into checking account | $8,000 | |
| 355 | 07/27/17 | Relative A-2 wrote check to pay defendant HUIZAR's credit card bill | | $10,955.91 |
| 356 | 09/19/17 | Relative A-2 deposited cash into checking account | $9,000 | |
| | | TOTAL: | $108,300 | $110,722 |

Overt Act Nos. 357-374:  On or about the below dates, in order to conceal and disguise the nature, source, ownership, and control of proceeds from defendant HUIZAR's pay-to-play scheme, defendant HUIZAR provided cash to Relative A-3 and caused Relative A-3 to pay defendant HUIZAR directly or indirectly:

| Overt Act No. | Date | Description | Cash Deposit | Payment to Defendant HUIZAR |
|---|---|---|---|---|
| 357 | 11/27/13 | Defendant HUIZAR deposited two $7,500 checks from Relative A-3 into his checking account | | $15,000 |
| 358 | 01/08/14 | Defendant HUIZAR deposited check from Relative A-3 into his checking account | | $10,000 |
| 359 | 08/04/14 | Defendant HUIZAR deposited check from Relative A-3 into his checking account | | $10,000 |
| 360 | 08/29/14 | Defendant HUIZAR deposited check from Relative A-3 into his checking account | | $10,000 |

| Overt Act No. | Date | Description | Cash Deposit | Payment to Defendant HUIZAR |
|---|---|---|---|---|
| 361 | 12/23/14 | Relative A-3 wrote a check to pay defendant HUIZAR's legal fees | | $10,000 |
| 362 | 11/16/15 | Defendant HUIZAR deposited check from Relative A-3 into his checking account | | $9,000 |
| 363 | 11/19/15 | Relative A-3 wrote a check to pay defendant HUIZAR's credit card bill | | $4,915.92 |
| 364 | 12/30/15 | Defendant HUIZAR deposited check from Relative A-3 into his checking account | | $9,000 |
| 365 | 09/22/16 | Relative A-3 wrote a check to pay defendant HUIZAR's credit card bill | | $2,836.52 |
| 366 | 09/22/16 | Relative A-3 wrote a check to pay defendant HUIZAR's loan interest to Bank 1 | | $7,263.51 |
| 367 | 11/09/16 | Relative A-3 wrote a check to pay defendant HUIZAR's credit card bill | | $5,451.68 |
| 368 | 12/23/16 | Relative A-3 deposited cash into checking account | $10,000 | |
| 369 | 12/23/16 | Relative A-3 wrote a check to pay fee for defendant HUIZAR's party | | $24,694.53 |
| 370 | 02/17/17 | Relative A-3 deposited cash into checking account | $10,000 | |
| 371 | 02/17/17 | Relative A-3 made electronic payment to pay defendant HUIZAR's credit card bill | | $7,263.52 |
| 372 | 02/27/17 | Relative A-3 deposited cash into checking account | $6,000 | |

| Overt Act No. | Date | Description | Cash Deposit | Payment to Defendant HUIZAR |
|---|---|---|---|---|
| 373 | 03/10/17 | Relative A-3 deposited cash into checking account | $3,000 | |
| 374 | 03/13/17 | Relative A-3 made electronic payment to defendant HUIZAR's credit card bill | | $7,464.99 |
| | | TOTAL: | $29,000 | $132,891 |

Overt Act Nos. 375-384:  On or about the below dates, in order to conceal and disguise the nature, source, ownership, and control of proceeds from defendant HUIZAR's pay-to-play scheme, defendant HUIZAR caused Relative A-1 to deposit cash into Relative A-1's checking account, and thereafter pay for household expenses:

| Overt Act No. | Date | Description | Amount |
|---|---|---|---|
| 375 | 04/05/16 | Cash deposit | $500 |
| 376 | 06/23/16 | Cash deposit | $400 |
| 377 | 08/16/16 | Cash deposit | $500 |
| 378 | 09/15/16 | Cash deposit | $500 |
| 379 | 11/09/16 | Cash deposit | $800 |
| 380 | 12/02/16 | Cash deposit | $1,000 |
| 381 | 12/06/16 | Cash deposit | $500 |

| Overt Act No. | Date | Description | Amount |
|---|---|---|---|
| 382 | 12/21/16 | Cash deposit | $500 |
| 383 | 01/30/17 | Cash deposit | $500 |
| 384 | 02/08/17 | Cash Deposit | $200 |
| | | **TOTAL:** | **$5,400** |

## (8)  Defendant HUIZAR's Additional Concealment of Pay-to-Play Scheme

### Defendant HUIZAR's Concern About Detection

Overt Act No. 385:  On October 28, 2015, in an effort to attempt to conceal his corrupt relationship with Chairman E, their trips to Las Vegas, and the benefits provided and accepted at casinos, defendant HUIZAR sent a text message to Esparza about an upcoming trip to Las Vegas with Chairman E and Executive Director E, writing: "Check to see if [private] airplane checks your id. If they don't, maybe I fly with u guys."  Esparza responded: "Yes. [Executive Director E] says they check Id."

Overt Act No. 386:  On February 28, 2016, defendant HUIZAR and Esparza had a conversation via text messages regarding avoiding documentation of their joint trip to Las Vegas and the money they received there.  Esparza wrote: "No need to book flight. You can take plane back with chairman [E]."  Defendant HUIZAR asked: "They don't check id?"  Esparza responded: "No Id."  Later that day, defendant HUIZAR instructed Esparza: "When u have a chance, go and cash chips little by little bc if [Chairman E] loses, u won't be able to cash."  Esparza responded: "Yes. That's what I'm doing."

1    Overt Act No. 387:  On July 13, 2016, defendant HUIZAR and

2  Esparza had a conversation via text message regarding an upcoming

3  trip to Las Vegas with Chairman E and Executive Director E, and their

4  concern about defendant HUIZAR being identified as traveling with

5  Chairman E and Executive Director E.  Defendant HUIZAR wrote: "Let me

6  know who is there and how [Chairman E] is doing [in terms of gambling

7  winnings] so that I can determine if I go or not."  Esparza responded

8  that "the sheriff we met before" was part of the group.  Defendant

9  HUIZAR later asked: "If sheriff guy there maybe I shouldn't go?"  The

10 same day, defendant HUIZAR asked Esparza by text: "Is [casino] strict

11 about ID?"  Esparza responded: "Not at all," adding: "Haven't checked

12 my ID and I've been playing."

13   Overt Act No. 388:  On July 14, 2016, defendant HUIZAR warned

14 Esparza to avoid discussing their trips to Las Vegas with Chairman E

15 by phone, writing in an e-mail: "We should limit types of

16 conversations we just had on phone. For future reference. My bad."

17   Overt Act No. 389:  On July 14, 2016, defendant HUIZAR again

18 warned Esparza to avoid phone discussions regarding Las Vegas trips

19 with Chairman E, writing in a text message: "Hey we should watch what

20 we say on phone."  Esparza responded: "You're right. We always have

21 to be safe."

22   **Failure to Report on Forms 700 and Tax Returns**

23   Overt Act Nos. 390-397:  On or about the following dates, in an

24 effort to conceal the benefits defendant HUIZAR received from

25 developers as part of the pay-to-play scheme, defendant HUIZAR failed

26

27

28

to report any of the financial benefits discussed above on his Forms 700 or tax returns for the calendar years 2014, 2015, 2016, and 2017:

| Overt Act No. | Date | Description |
|---|---|---|
| 390 | April 2015 | 2014 Form 700 |
| 391 | April 2015 | 2014 Tax Return |
| 392 | April 2016 | 2015 Form 700 |
| 393 | April 2016 | 2015 Tax Return |
| 394 | April 2017 | 2016 Form 700 |
| 395 | April 2017 | 2016 Tax Return |
| 396 | April 2018 | 2017 Form 700 |
| 397 | April 2018 | 2017 Tax Return |

**Concealment of Large Cash Sum at Residence**

Overt Act No. 398:  On or about November 7, 2018, defendant HUIZAR possessed approximately $129,000 in cash hidden at his residence, which was made up of cash payments defendant HUIZAR had accepted from Chairman E and Businessperson A.

**(9)  Defendant HUIZAR's Obstructionist Conduct**

Overt Act No. 399:  On June 20, 2017, after Esparza told defendant HUIZAR that he was interviewed by the FBI and defendant HUIZAR asked Esparza about the FBI's questions, and whether the FBI

81

asked questions about Businessperson A and Chairman E, defendant
HUIZAR instructed Esparza not to tell anyone that Esparza disclosed
the content of his FBI interview to defendant HUIZAR.

Overt Act No. 400:  On December 28, 2017, in a conversation in
defendant HUIZAR's private bathroom in City Hall, Esparza referred to
his FBI interviews the prior summer: "I did everything I could to
make sure you're protected. And I just really hope you know that."
In response, defendant HUIZAR stated: "Yeah, and that's why I said we
are both in this together.... We're in it together."

Overt Act No. 401:  On October 27, 2018, defendant HUIZAR
instructed Businessperson A not to disclose incriminating information
to the FBI, including instructing Businessperson A not to mention
anything about parties or "dessert," meaning defendant HUIZAR's use
of escort/prostitution services, which Businessperson A had provided
at parties Businessperson A hosted.

Overt Act No. 402:  On April 10, 2019, during an interview with
the U.S. Attorney's Office and FBI during which defendant HUIZAR was
advised, in the presence of counsel, that lying to the government was
a crime, defendant HUIZAR falsely stated that: (a) he told Esparza
that the hundreds of thousands of dollars cash payment Kim provided
to Esparza was "yours, I do not want it"; and (b) he did not discuss
Esparza giving defendant HUIZAR the money from Kim in April 2018.

COUNTS TWO THROUGH FIFTEEN

[18 U.S.C. §§ 1341, 1343, 1346, 2(b)]

A.   THE SCHEME TO DEFRAUD

40.   Beginning on an unknown date but no later than February 2013, and continuing to the present, in Los Angeles County, within the Central District of California, and elsewhere, defendant HUIZAR, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud the City of Los Angeles and its citizens of their right to the honest services of their public officials through bribery and kickbacks, materially false and fraudulent pretenses and representations, and the concealment of material information, which violation affected at least one financial institution.

B.   MEANS AND METHODS OF THE SCHEME TO DEFRAUD

41.   The scheme to defraud operated, in substance, in the following manner:

a.   In exchange for his official acts, defendant HUIZAR and his co-schemers would demand, solicit, accept, and agree to accept from developers and their proxies financial benefits, including: (1) cash; (2) consulting and retainer fees; (3) favorable loans; (4) gambling chips at casinos; (5) political contributions; (6) flights on private jets and commercial airlines; (7) stays at luxury hotels; (8) expensive meals; (9) spa services; (10) event tickets to concerts, shows, and sporting events; (11) escort and prostitution services; and (12) other gifts.

b.   In exchange for the bribes and kickbacks from co-schemer developers and their proxies, defendant HUIZAR and his co-schemers would agree to perform and perform the following types of

83

official acts, among others: (1) presenting motions and resolutions in various City committees to benefit projects; (2) voting on projects in various City committees, including the PLUM Committee, and City Council; (3) taking, or not taking, action in the PLUM Committee to expedite or delay the approval process and affect project costs; (4) exerting pressure on other City officials to influence the approval process of projects; (5) using their office to negotiate with and exert pressure on labor unions to resolve issues on projects; (6) leveraging voting and scheduling power to pressure developers with projects pending before the City to affect their business practices; and (7) introducing or voting on City resolutions to enhance the professional reputation and marketability of businesspersons in the City.

        c.    Defendant HUIZAR and his co-schemers would conceal their scheme by: (1) storing large amounts of cash in their residences; (2) providing cash to family members and associates; (3) directing payments to family members, associates, and entities to avoid creating a paper trail between the developers, their proxies and public officials; (4) using family members and associates to pay expenses; (5) depositing cash at ATMs and banks in amounts under $10,000 to avoid bank reporting requirements; (6) failing to disclose payments and benefits received on Forms 700 and on tax returns; (7) lying to law enforcement; (8) attempting to corruptly influence the statements of others to law enforcement; and (9) using encrypted messaging applications, including those utilizing a self-destructing message system, to communicate about their scheme.

C. <u>USE OF WIRES</u>

    42.  On or about the dates set forth below, within the Central District of California and elsewhere, defendant HUIZAR, for the purpose of executing the above-described scheme to defraud, transmitted and caused the transmission of the following items by means of wire communication in interstate and foreign commerce:

| **Project E** | | |
|---|---|---|
| <u>COUNT</u> | <u>DATE</u> | <u>WIRE TRANSMISSION</u> |
| TWO | 09/23/2014 | Bank wire of $570,000 from defendant HUIZAR's Bank 1 account ending in 0407 to a Wells Fargo account ending in 7209 in Los Angeles County, which was routed through Minnesota. |
| THREE | 10/19/2016 | E-mail from Executive Director E to defendant HUIZAR, forwarding an e-mail and attachment from Chairman E regarding Project E, which traveled between two locations in Los Angeles County through a Google server located outside of California. |
| FOUR | 12/19/2016 | E-mail from defendant HUIZAR to Executive Director E providing recommendations for consultants for Project E, which traveled between two locations in Los Angeles County through a Google server located outside of California. |

| **Project C** | | |
|---|---|---|
| <u>COUNT</u> | <u>DATE</u> | <u>WIRE TRANSMISSION</u> |
| FIVE | 08/09/2016 | E-mail from Kim to Esparza, forwarding an e-mail from Developer C attaching a copy of the labor union appeal filed against Project C, which traveled between two locations in Los Angeles County through a Google server located outside of California. |

| Project D | | |
|---|---|---|
| COUNT | DATE | WIRE TRANSMISSION |
| SIX | 06/15/2016 | Wire bank transfer of $11,000 from a bank account in Canada to a Union Bank account ending in 6345 in Pasadena, California. |
| SEVEN | 07/19/2016 | Wire bank transfer of $11,000 from a bank account in Canada to a Union Bank account ending in 6345 in Pasadena, California. |
| EIGHT | 08/17/2016 | Wire bank transfer of $11,000 from a bank account in Canada to a Union Bank account ending in 6345 in Pasadena, California. |
| NINE | 09/09/2016 | Wire bank transfer of $11,000 from a bank account in Canada to a Union Bank account ending in 6345 in Pasadena, California. |
| TEN | 11/14/2016 | Wire bank transfer of $11,000 from a bank account in Canada to a Union Bank account ending in 6345 in Pasadena, California. |
| ELEVEN | 11/30/2016 | Wire bank transfer of $11,000 from a bank account in Canada to a Union Bank account ending in 6345 in Pasadena, California. |
| TWELVE | 01/09/2018 | E-mail from Esparza to defendant HUIZAR, attaching two documents titled "Copy of Commitments" and "IE Huizar Strategy," which traveled between two locations in Los Angeles County through a Google server located outside of California. |
| THIRTEEN | 01/16/2018 | E-mail from defendant HUIZAR to his fundraiser, attaching a document titled "Initial Commitments to PAC," which traveled between two locations in Los Angeles County through a Google server located outside of California. |

D.    USE OF MAIL

      43.   On or about the dates set forth below, within the Central

District of California and elsewhere, defendant HUIZAR, for the

86

purpose of executing the above-described scheme to defraud, willfully
caused the following items to be placed in an authorized depository
for mail matter to be sent and delivered by the United States Postal
Service according to the directions thereon:

| COUNT | DATE | MAILING |
|---|---|---|
| FOURTEEN | 03/28/2018 | An envelope containing a check in the amount of $25,000 made payable to PAC B sent from Businessperson A in Los Angeles County to PAC B. |
| FIFTEEN | 06/13/2018 | An envelope containing two checks from two separate entities, each made payable to PAC A, in the amount of $12,500 each for a total of $25,000, to the Company M office in Los Angeles County. |

COUNTS SIXTEEN THROUGH NINETEEN

[18 U.S.C. §§ 1952(a)(3), 2(b)]

44.  On or about the dates set forth below, within the Central District of California and elsewhere, defendant HUIZAR knowingly and intentionally traveled and willfully caused travel in interstate and foreign commerce, as set forth below, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity, namely, bribery, in violation of California Penal Code Sections 67, 67.5, and 68, and, thereafter performed and attempted to perform acts to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of the unlawful activity, as set forth below:

| COUNT | DATE | TRAVEL | SUBSEQUENT ACTS |
|-------|------|--------|-----------------|
| SIXTEEN | 01/01/2016 | Defendant HUIZAR and Chairman E traveled from Los Angeles, California to Australia. | Between January 1 and 10, 2016, defendant HUIZAR caused, induced, and procured Chairman E to pay group expenses, and accepted approximately 32,800 in Australian currency from Chairman E, in exchange for defendant HUIZAR agreeing to perform official acts to benefit Project E. |

| COUNT | DATE | TRAVEL | SUBSEQUENT ACTS |
|-------|------|--------|-----------------|
| SEVENTEEN | 04/30/2016 | Defendant HUIZAR and Chairman E traveled from Los Angeles, California to Las Vegas, Nevada. | Between April 30, 2016 and May 2, 2016, defendant HUIZAR caused, induced, and procured Chairman E to pay approximately $127,256 in group expenses, and accepted approximately $10,000 in casino gambling chips from Chairman E, in exchange for defendant HUIZAR agreeing to perform official acts to benefit Project E. |
| EIGHTEEN | 08/05/2016 | Defendant HUIZAR and Chairman E traveled from Los Angeles, California to Las Vegas, Nevada. | Between August 5 and August 7, 2016, defendant HUIZAR caused, induced, and procured Chairman E to pay approximately $60,463 in group expenses, and accepted approximately $11,000 in casino gambling chips from Chairman E, in exchange for defendant HUIZAR agreeing to perform official acts to benefit Project E. |
| NINETEEN | 02/04/2017 | Defendant HUIZAR and Chairman E traveled from Los Angeles, California to Las Vegas, Nevada. | Between February 4 and February 6, 2017, defendant HUIZAR caused, induced, and procured Chairman E to pay approximately $16,822 in group expenses, and accepted approximately $10,000 in casino gambling chips from Chairman E, in exchange for defendant HUIZAR agreeing to perform official acts to benefit Project E. |

COUNT TWENTY

[18 U.S.C. § 666(a)(1)(B)]

45.    Between in or about August 1, 2015 and in or about December 2018, in Los Angeles County, within the Central District of California, defendant HUIZAR, an agent of the City of Los Angeles, corruptly solicited and demanded for the benefit of himself and others, and accepted and agreed to accept, something of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the City of Los Angeles having a value of $5,000 or more.  Specifically, defendant HUIZAR solicited, demanded, accepted, and agreed to accept financial benefits from Chairman E, including casino gambling chips, accommodations, and travel expenses, and approximately $575,000 in collateral applied to defendant HUIZAR's personal loan from Bank 1, intending to be influenced and rewarded in connection with Project E, including in: (1) presenting motions and resolutions in various City committees to benefit Project E; (2) voting on Project E in various City committees, including the PLUM Committee, and City Council; (3) taking action in the PLUM Committee to expedite the approval process of Project E; and (4) exerting pressure on other City officials to influence the approval process of Project E.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT TWENTY-ONE

[18 U.S.C. § 666(a)(1)(B)]

46.  Between on or about August 8, 2016, and on or about July 31, 2017, in Los Angeles County, within the Central District of California, defendant HUIZAR, an agent of the City of Los Angeles, corruptly solicited and demanded for the benefit of himself and others, and accepted and agreed to accept, something of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the City of Los Angeles having a value of $5,000 or more.  Specifically, defendant HUIZAR solicited, demanded, accepted, and agreed to accept from Developer C $500,000 in cash, intending to be influenced and rewarded in connection with Project C, including in: (1) pressuring Labor Organization A to dismiss its appeal against Project C and (2) voting to deny Labor Organization A's appeal against Project C in the PLUM Committee.

COUNT TWENTY-TWO

[18 U.S.C. § 666(a)(1)(B)]

47.   Between in or about June 2016 and in or about November 2016, in Los Angeles County, within the Central District of California, defendant HUIZAR, an agent of the City of Los Angeles, corruptly solicited and demanded for the benefit of himself and others, and accepted and agreed to accept, something of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the City of Los Angeles having a value of $5,000 or more.  Specifically, defendant HUIZAR solicited, demanded, accepted, and agreed to accept from Chairman D's relative $66,000 in consulting fees paid to HUIZAR Associate 1, intending to be influenced and rewarded in connection with Project D, including in: (1) presenting motions and resolutions in various City committees to benefit Project D; (2) voting on Project D in various City committees, including the PLUM Committee, and City Council; (3) taking action in the PLUM Committee to expedite the approval process of Project D; and (4) exerting pressure on other City officials to influence the approval process of Project D.

COUNT TWENTY-THREE

[18 U.S.C. § 666(a)(1)(B)]

48.   Between in or about November 2017 and in or about November 2018, in Los Angeles County, within the Central District of California, defendant HUIZAR, an agent of the City of Los Angeles, corruptly solicited and demanded for the benefit of himself and others, and agreed to accept, something of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the City of Los Angeles having a value of $5,000 or more.  Specifically, defendant HUIZAR solicited, demanded, and agreed to accept from Chairman D a $100,000 campaign contribution to benefit Relative A-1's campaign for the CD-14 seat, intending to be influenced and rewarded in connection with Project D, including in: (1) voting to approve Project D in the PLUM Committee and City Council and (2) presenting a resolution in the PLUM Committee to benefit Project D.

1

## COUNT TWENTY-FOUR

2

[18 U.S.C. § 666(a)(1)(B)]

3      49.  Between in or about January 2018 and in or about November

4  2018, in Los Angeles County, within the Central District of

5  California, defendant HUIZAR, an agent of the City of Los Angeles,

6  corruptly solicited and demanded for the benefit of himself and

7  others, and agreed to accept, something of value from a person,

8  intending to be influenced and rewarded in connection with a

9  business, transaction, and series of transactions of the City of Los

10  Angeles having a value of $5,000 or more.  Specifically, defendant

11  HUIZAR solicited, demanded, and agreed to accept $100,000 in the form

12  of contributions to PAC A from Company M, intending to be influenced

13  and rewarded in connection with Project M, including in: (1) voting

14  to deny a labor union's appeal against Project M in the PLUM

15  Committee and (2) voting to approve Project M in the PLUM Committee

16  and City Council.

17

18

19

20

21

22

23

24

25

26

27

28

COUNT TWENTY-FIVE

[18 U.S.C. § 666(a)(1)(B)]

50.   Between in or about March 2018 and in or about May 2018, in Los Angeles County, within the Central District of California, defendant HUIZAR, an agent of the City of Los Angeles, corruptly solicited and demanded for the benefit of himself and others, and accepted and agreed to accept, something of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the City of Los Angeles having a value of $5,000 or more.  Specifically, defendant HUIZAR solicited, demanded, accepted, and agreed to accept $25,000 in the form of a contribution to PAC B from Businessperson A, intending to be influenced and rewarded in connection with providing a City resolution to enhance the professional reputation and marketability of Businessperson A and his business.

COUNTS TWENTY-SIX THROUGH TWENTY-NINE

[18 U.S.C. §§ 1956(a)(1)(B)(i), 2(b)]

51.  On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendant HUIZAR, knowing that the property involved in each of the financial transactions described below represented the proceeds of some form of unlawful activity, knowingly conducted and attempted to conduct and willfully caused to be conducted, the following financial transactions affecting interstate commerce, which transactions, in fact, involved the proceeds of specified unlawful activity, namely, bribery, in violation of California Penal Code Sections 67, 67.5, and 68, mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that each of the transactions was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity:

| COUNT | DATE | FINANCIAL TRANSACTION |
|---|---|---|
| TWENTY-SIX | 04/27/2017 | The deposit of $9,000 in cash into Relative A-2's Checking Account. |
| TWENTY-SEVEN | 04/29/2017 | The issuance of a check for $2,800.97 from Relative A-2's Checking Account to pay the interest on defendant HUIZAR's Bank 1 Loan. |
| TWENTY-EIGHT | 06/02/2017 | The deposit of $9,000 in cash into Relative A-2's Checking Account. |
| TWENTY-NINE | 06/08/2017 | The issuance of a check for $12,755.11 from Relative A-2's Checking Account to pay defendant HUIZAR's Chase Credit Card bill. |

COUNT THIRTY

[18 U.S.C. §§ 1956(a)(2)(B)(i), 2(b)]

52.  On or about January 10, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendant HUIZAR knowingly transported, transmitted, transferred, and willfully caused to be transported, transmitted, and transferred, monetary instruments, namely, approximately 32,800 in Australian currency, to a place in the United States from and through a place outside the United States, namely, Australia, knowing that the monetary instruments involved in the transportation, transmission, and transfer represented the proceeds of some form or unlawful activity, and which monetary instruments, in fact, involved the proceeds of specified unlawful activity, namely, bribery, in violation of California Penal Code Sections 67, 67.5, and 68, mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343, and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, location, ownership, and control of the proceeds of said specified unlawful activity.

COUNT THIRTY-ONE

[31 U.S.C. § 5324(a)(3)]

53.   On or about the dates set forth below, in Los Angeles County, within the Central District of California, defendant HUIZAR, knowingly and for the purpose of evading the reporting requirements of Section 5313(a) of Title 31, United States Code, and the regulations promulgated thereunder, structured and assisted in structuring, and attempted to structure and assisted in structuring, the following financial transactions with one or more domestic financial institutions:

| DATE | DESCRIPTION |
|------|-------------|
| 02/09/2016 | At the direction of defendant HUIZAR, who knew the reporting requirements and intended to evade them, Esparza exchanged 10,000 Australian dollars into U.S. currency at a currency exchange institution in the City. |
| 02/10/2016 | At the direction of defendant HUIZAR, who knew the reporting requirements and intended to evade them, Esparza exchanged 10,000 Australian dollars into U.S. currency at a currency exchange institution in the City. |
| 02/17/2016 | At the direction of defendant HUIZAR, who knew the reporting requirements and intended to evade them, Esparza exchanged 12,800 Australian dollars into U.S. currency at a currency exchange institution in the City. |

COUNT THIRTY-TWO

[18 U.S.C. § 1014]

54.  On or about March 24, 2016, in Los Angeles County, within the Central District of California, defendant HUIZAR knowingly made a false statement and report for the purpose of influencing the action of Bank of America, an institution the deposits of which were then federally insured, in connection with an application, advance, commitment, and loan, in that defendant HUIZAR signed and submitted to Bank of America a Uniform Residential Loan Application, intentionally omitting from defendant HUIZAR's liabilities a loan owed by defendant HUIZAR to Bank 1 in the amount of $570,000, when in fact, as he then knew, defendant HUIZAR had a loan from Bank 1 in the amount of $570,000.

COUNT THIRTY-THREE

[18 U.S.C. § 1001(a)(2)]

55.  On or about April 10, 2019, in Los Angeles County, within the Central District of California, in a matter within the jurisdiction of the executive branch of the government of the United States, namely, the FBI and U.S. Attorney's Office, defendant HUIZAR knowingly and willfully made materially false statements and representations to the FBI and U.S. Attorney's Office, knowing that these statements and representations were untrue.  Specifically, regarding the Project C bribery scheme, defendant HUIZAR falsely stated that: (a) he told Esparza that the hundreds of thousands of dollars cash payment Kim provided to Esparza was "yours, I do not want it"; and (b) he did not discuss Esparza giving defendant HUIZAR the money from Kim in April 2018.  In fact, as defendant HUIZAR then knew, in March 2017, defendant HUIZAR instructed Esparza to hold onto and hide the $200,000 cash at Esparza's residence for defendant HUIZAR; and, in December 2017, defendant HUIZAR confirmed with Esparza the cash was defendant HUIZAR's and directed Esparza to hold onto the money for defendant HUIZAR until April 2018.

COUNT THIRTY-FOUR

[26 U.S.C. § 7201]

56.  Between in or about January 2017 through in or about April 2018, in Los Angeles County, within the Central District of California, and elsewhere, defendant HUIZAR willfully attempted to evade and defeat income tax due and owing by him and his spouse to the United States of America, for the calendar year 2017, by committing the following affirmative acts, among others:

a.  Causing Relative A-1, Relative A-2, and Relative A-3 to deposit cash bribes defendant HUIZAR received into bank accounts owned by Relative A-1, Relative A-2, and Relative A-3 (the "Relative Accounts").

b.  Using funds in the Relative Accounts to pay for defendant HUIZAR's expenses, including credit card bills and interest on a Bank 1 loan.

c.  Preparing, signing, and filing with the California Fair Political Practices Commission a false Form 700, intentionally omitting, among other things, income and financial benefits defendant HUIZAR accepted in the calendar year 2017.

d.  Causing to be prepared, and signing and causing to be signed, a false and fraudulent United States Individual Income Tax Return, Form 1040, which was submitted to the Internal Revenue Service.  On that tax return, defendant HUIZAR reported and caused to be reported that his and his spouse's joint taxable income on line 43 for the calendar year 2017 was $115,887, and that the amount of tax due and owing thereon as stated on line 63 was $20,389.  In fact, as defendant HUIZAR then knew, defendant HUIZAR and his spouse had joint taxable income for the calendar year 2017 that was greater than the

amount reported on the tax return, and as a result of such additional taxable income, there was additional tax due and owing to the United States of America.

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 1963]

1.    Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 1963, and Title 28 United States Code, Section 2461(c), in the event of the defendant's conviction of the offense set forth in Count One of this Indictment.

2.    The defendant, if so convicted, shall forfeit to the United States of America the following:

a.    Any interest the convicted defendant has acquired or maintained as a result of such offense;

b.    Any interest in, security of, claim against, or property or contractual right of any kind affording a source or influence over, any enterprise which the convicted defendant has established, operated, controlled, conducted, or participated in the conduct of, as a result of such offense;

c.    Any property constituting, or derived from, any proceeds which the convicted defendant obtained, directly or indirectly, from racketeering activity as a result of such offense; and

d.    To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a), (b), and (c).

3.    Pursuant to Title 18, United States Code, Section 1963(m), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant,

the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982]

1.     Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(2), and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction of the offenses set forth in any of Counts Two and Thirty-Two of this Indictment.

2.     The defendant, if so convicted, shall forfeit to the United States of America the following:

a.     All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense; and

b.     To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.     Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b) and Title 28, United States Code, Section 2461(c), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been

substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION THREE

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction of the offenses set forth in any of Counts Three through Twenty-Five of this Indictment.

2. The defendant, if so convicted, shall forfeit to the United States of America the following:

a. All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to any such offense; and

b. To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION FOUR

[18 U.S.C. § 982 and 28 U.S.C. § 2461(c)]

1.   Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(1) and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction of the offenses set forth in any of Counts Twenty-Six through Thirty of this Indictment.

2.   The defendant, if so convicted, shall forfeit to the United States of America the following:

a.   Any property, real or personal, involved in such offense, and any property traceable to such property; and

b.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 18, United States Code, Section 982(b)(2), the defendant, if so convicted, shall forfeit substitute property, if, by any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.  Substitution of assets shall not be ordered, however, where the convicted defendant acted merely as an

108

intermediary who handled but did not retain the property in the course of the money laundering offense unless the defendant, in committing the offense or offenses giving rise to the forfeiture, conducted three or more separate transactions involving a total of $100,000.00 or more in any twelve-month period.

FORFEITURE ALLEGATION FIVE

[31 U.S.C. § 5317]

1.    Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 31, United States Code, Section 5317, and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction of the offense set forth in Count Thirty-One of this Indictment.

2.    The defendant, if so convicted, shall forfeit to the United States of America the following:

a.    All property, real or personal, involved in the offense and any property traceable thereto; and

b.    To the extent that such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p) and Title 31, United States Code, Section 5317(c)(1)(B), the defendant, if so convicted, shall forfeit substitute property, if, by any act or omission of the defendant, the property described in the preceding, or any portion thereof; (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION SIX

[26 U.S.C. § 7301 and 28 U.S.C. § 2461(c)]

1.   Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 26, United States Code, Section 7301, and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction of the offense set forth in Count Thirty-Four of this Indictment.

2.   The defendant, if so convicted, shall forfeit to the United States of America the following:

a.   Any property sold or removed by the defendant in fraud of the internal revenue laws, or with design to avoid payment of such tax, or which was removed, deposited, or concealed, with intent to defraud the United States of such tax or any part thereof;

b.   All property manufactured into property of a kind subject to tax for the purpose of selling such taxable property in fraud of the internal revenue laws, or with design to evade the payment of such tax;

c.   All property whatsoever, in the place or building, or any yard or enclosure, where the property described in subsection (a) or (b) is found, or which is intended to be used in the making of property described in subsection (a), with intent to defraud the United States of tax or any part thereof, on the property described in subsection (a);

d.   All property used as a container for, or which shall have contained, property described in subsection (a) or (b);

e.   Any property (including aircraft, vehicles, vessels, or draft animals) used to transport or for the deposit or concealment

of property described in subsection (a) or (b), or any property used to transport or for the deposit or concealment of property which is intended to be used in the making or packaging of property described in subsection (a); and

f.   To the extent that such property is not available for forfeiture, a sum of money equal to the total value of the property described in this paragraph.

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has

///
///
///
///
///
///
///
///
///
///
///
///
///

1    been placed beyond the jurisdiction of the court; (d) has been

2    substantially diminished in value; or (e) has been commingled with

3    other property that cannot be divided without difficulty.

4

5                                        A TRUE BILL

6

7                                        /s/
                                   _____
8                                        Foreperson

9

10   NICOLA T. HANNA
     United States Attorney

11

12   *Brandon Fox*

13   BRANDON D. FOX
     Assistant United States Attorney

14   Chief, Criminal Division

15   MACK E. JENKINS
     Assistant United States Attorney
     Chief, Public Corruption and
16      Civil Rights Section

17   VERONICA DRAGALIN
     Assistant United States Attorney
18   Public Corruption and Civil
        Rights Section

19

20   MELISSA MILLS
     Assistant United States Attorney
21   Public Corruption and Civil
        Rights Section

22

23

24

25

26

27

28