1          **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3        **HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE**

4

5   UNITED STATES OF AMERICA,        )
                                     )
6            PLAINTIFF,              )     CASE NO.
                                     )
7            vs.                     )     CR 20-326-JFW
                                     )
8   JOSE LUIS HUIZAR,                )
                                     )     PAGES 1 TO 68
9            DEFENDANT.              )
    _____ )

10

11

12

13                   **REPORTER'S TRANSCRIPT OF**
                     **TRIAL SETTING CONFERENCE**
14                 **WEDNESDAY, AUGUST 5, 2020**
                          **8:04 A.M.**
15                 **LOS ANGELES, CALIFORNIA**

16

17

18

19

20

21

22

23
                    _____

              **MIRANDA ALGORRI, CSR 12743, RPR, CRR**
24                 FEDERAL OFFICIAL COURT REPORTER
                   350 WEST 1ST STREET, SUITE 4455
25                 LOS ANGELES, CALIFORNIA 90012
                      MIRANDAALGORRI@GMAIL.COM

1          **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4          NICOLA T. HANNA
          UNITED STATES ATTORNEY
5          BY:  MACK JENKINS
          BY:  VERONICA DRAGALIN
6          BY:  MELISSA MILLS
          Assistant United States Attorneys
7          United States Courthouse
          312 North Spring Street
8          Los Angeles, California 90012

9
    **FOR THE DEFENDANT:**
10
          HILARY L. POTASHNER
11          FEDERAL PUBLIC DEFENDER
          BY:  CAREL ALE
12          BY:  CHARLES SNYDER
          Deputy Federal Public Defenders
13          Central District of California
          321 East Second Street
14          Los Angeles, California 90012

15
    ALSO PRESENT:
16
          Special Agent Andrew Civetti
17          Special Agent Tony Logan

18

19

20

21

22

23

24

25

|    |                                                                         |
|----|-------------------------------------------------------------------------|
| 1  | **LOS ANGELES, CALIFORNIA; WEDNESDAY, AUGUST 5, 2020**                  |
| 2  | **8:04 A.M.**                                                           |
| 3  | **---**                                                                 |
| 4  |                                                                         |
| 5  | THE CLERK:  Calling CR 20-326-JFW, United States                        |
| 6  | of America versus Jose Luis Huizar.                                     |
| 7  | Counsel, please state your appearances.                                 |
| 8  | MR. JENKINS:  Good morning, Your Honor.                                 |
| 9  | Mack Jenkins, Veronica Dragalin,                                        |
| 10 | Special Agent Andrew Civetti, AUSA Melissa Mills, and in the            |
| 11 | jury box Special Agent Tony Logan from the FBI on behalf of the         |
| 12 | United States.                                                          |
| 13 | MS. ALE:  Good morning, Your Honor.                                     |
| 14 | Carel Ale and Charles Snyder from the Office of                         |
| 15 | the Federal Public Defender on behalf of Mr. Huizar who is              |
| 16 | present and out of custody today.                                       |
| 17 | THE COURT:  All right.  Good morning to all.                            |
| 18 | This matter is on the Court's calendar for a                            |
| 19 | Trial Setting Conference.  Before I set a trial date in this            |
| 20 | matter, I'm going to ask Government counsel to advise us of the         |
| 21 | nature of the charges alleged in this 117-page Indictment and          |
| 22 | how the Government expects to prove those charges at trial.  I          |
| 23 | will ask the Government to tell me the estimated number of              |
| 24 | witnesses that the Government intends to call, its trial                |
| 25 | estimate, and the status of discovery and whether or not there         |

were any searches and whether or not the defendant made any
statements that the Government intends to use at trial.

Because of the scope of the Indictment, I'm going
to ask counsel to discuss the Government's evidence with
respect to the overt acts charged in the RICO conspiracy.  I
think that will capture a great deal of the evidence --
Project E bribery scheme which is alleged overt acts 1 through
69, the Project C bribery scheme which is captured by overt
acts 70 to 103, the Project D bribery scheme which is overt
acts 104 to 197, the Project M bribery scheme which is overt
acts 199 to 256, and the Businessperson A scheme, overt acts
290 to 296.

I've got some specific questions about the money
laundering charges and whether or not the Government intends to
supersede the Indictment to add any of the individuals that are
named in those counts as well as the tax count which is
Count 34 which is alleged against the defendant.

So who is going to speak on behalf of the
Government?

MR. JENKINS:  I will, Your Honor.  Mr. Jenkins.

THE COURT:  All right.  Mr. Jenkins.

MR. JENKINS:  Yes, Your Honor.

Count 1, as the Court noted, charges the
racketeering conspiracy, and I will get to the supporting
evidence that the Court requested but outlining the remainder

1    of the substantive counts.

2                    Counts 2 through 4 charge honest services fraud

3    by wire.  Those are Counts 2 through 4.

4                    Counts 16 through 19 charge violations of the

5    travel act related to trips to Las Vegas and Australia during

6    which it was alleged Council Member -- Defendant Huizar

7    accepted bribes during those trips.

8                    Count 20 is a substantive federal program bribery

9    violation related to $575,000 in collateral that is alleged to

10   have been received by Defendant Huizar from Chairman E as part

11   of a bribery scheme.

12                   Counts 20 through 25, all of those are federal

13   program bribery schemes.

14                   Counts 26 through 29 relate to money laundering

15   facilitated by a person identified as Relative A-2 on behalf of

16   Defendant Huizar.

17                   Count 30 is another form of money laundering or

18   it is alleged that Defendant Huizar caused a co-conspirator to

19   transport bribery proceeds back from Australia that were

20   provided by Chairman E.

21                   Count 31 is a structuring allegation related to

22   the same co-conspirator acting on behalf of Defendant Huizar

23   attempting to evade reporting requirements and the transactions

24   related to that Australian bribe money.

25                   Count 32 alleges a bank fraud, specifically a

1   false statement related to Defendant Huizar's failure to

2   include that $575,000 collateral/loan that was provided to him

3   by Chairman E and which should have been reported as a

4   liability on his loan application.

5          Count 33 charges false statement related to our

6   interview with Defendant Huizar who was present with counsel,

7   advised that lying to the FBI was a crime, and it was alleged

8   that he lied during that interview about his desire to receive

9   bribe money from Developer E through Justin Kim and

10  co-conspirator George Esparza.

11         Finally, Count 34 relates to tax evasion,

12  specifically 2017, and failures to report money received, bribe

13  money received, and efforts to launder money in order to

14  conceal income which also affected the accuracy of that tax

15  return.

16         I will focus now, before going to the remainder

17  of the Court's questions, focus on the specific schemes if you

18  would like at this point, or I could move to your other

19  questions related to the trial estimate.

20         THE COURT:  No.  You can focus on the schemes.

21  Obviously the -- I'm going to ask you to do it in summary form.

22  I'm particularly interested in you addressing -- for each of

23  those schemes identify the parties, the entities, and the

24  approximate dates, the amount of the alleged bribe, who paid

25  the bribe and who received the bribe, and whether or not there

1    are any cooperating witnesses who are percipient to each of

2    those bribery schemes who will be testifying on behalf of the

3    Government.

4                    MR. JENKINS:  Yes, Your Honor.  Beginning with

5    page 14, the Project E bribery scheme as alleged in Count 1 of

6    the RICO conspiracy count, in summary, that alleges that

7    Chairman E, who owns a hotel in the downtown Los Angeles area

8    and who did so at the time, became acquainted with then Council

9    Member Huizar through Individual One who at the time was a

10   high-level government official.

11                    THE COURT:  Let me interrupt you.

12                    Are we going to continue to use these

13   descriptions of these entities and these individuals now that

14   we have what appears to be almost the end of or the conclusion

15   of the investigation?

16                    MR. JENKINS:  Yes, Your Honor.  For two reasons.

17   One, the investigation is -- remains ongoing as to many of

18   these other entities that are obscured or masked as we

19   described.  The DOJ policy is for entities or persons that are

20   implicated but not yet charged in crimes.

21                    THE COURT:  You think they're masked, but

22   everybody can pretty much figure them out.  Certainly the press

23   has no difficulty making inferences as to who these -- several

24   of these individuals are or the companies involved.  I am not

25   as familiar with the evidence at this point in time.  So my

1   problem is, every time I read something, I've got to go back

2   and figure out, okay, who is this individual and which scheme

3   does he fit in -- he or she and which time period.

4           If you're going to continue, as you say, masking

5   these individuals, I would ask that you prepare a list that you

6   can file in camera which will -- I have started one, but it

7   just gets to be -- gets to be too cumbersome in terms of

8   matching these various descriptions with actual names of real

9   people.

10          MR. JENKINS:  Understood, Your Honor.  And we

11  have such a list that I am prepared to provide to the Court in

12  camera at this point now.

13          THE COURT:  Okay.  I don't need it today.  Just

14  file it -- you can actually -- you don't need to file it in

15  camera.  You can just leave a copy of it with Shannon, and then

16  I will be able to -- every time I read this -- when you're

17  reading on page 85 and a name comes up and I have to figure out

18  who you are talking about.

19          In any event, I interrupted you.  Go ahead.

20          MR. JENKINS:  Thank you, Your Honor.

21          And for the people who have been publicly

22  charged, we will use their names as we did in the Indictment.

23  We understand the Court's concern.  And at some point we do

24  expect to identify them, and at the Court's direction, we can

25  do so.  We were just advising that the policy of the office is

1     to do it in the way we did.

2              THE COURT:  Are you prepared to do that in the

3     near future?

4              MR. JENKINS:  Yes, Your Honor.

5              THE COURT:  How long?  By when?

6              MR. JENKINS:  We are prepared to do it now as to

7     ones that have been reported by the media, or the next step

8     would be when they were charged if any are to be charged.

9              THE COURT:  Well, I don't know how we can -- I

10    will throw this out.  If you are prepared to identify certain

11    of these individuals and certain of the entities that you feel

12    comfortable disclosing, perhaps it would be appropriate to file

13    a -- I don't know what you are going to call it -- a list of

14    parties -- I will let you be creative in terms of the title --

15    but then you can publicly file that, and then it will be

16    available to the press so they don't have to continue to make

17    assumptions as to who these people are.  If you can do that

18    within the next ten days, I think -- or earlier, that would be

19    helpful.

20             MR. JENKINS:  Very well, Your Honor.  We will run

21    that up the chain, and that sounds doable.  But for purposes of

22    today, we will continue in --

23             THE COURT:  Aren't you the end of the chain?

24             MR. JENKINS:  Not on this case, Your Honor.

25             The Count 1 Project E bribery scheme, the summary

as described was that Company E and its chairman became

acquainted with Council Member Huizar through Individual One in

February of 2013.  We believe quickly thereafter, specifically

in March, so the next month in 2013, Defendant Huizar and this

Chairman E began the onset of a corrupt relationship

particularly through luxury trips to Las Vegas, among other

places, where Chairman E would provide various forms of

financial benefits both directly and indirectly to

Defendant Huizar, specifically chips and -- gambling chips in

the thousands of dollars, luxury hotel stays.

Because Chairman E was known as a high level

gambling player, he got various comps including hotel rooms

that would retail up to $30,000 per night, and he allowed

Defendant Huizar and others to utilize.

We believe, based off the evidence, that that

relationship progressed and continued up and through 2018,

included over a dozen trips.  Such trips, the benefits also

included things like spas, trips to restaurants, and other

benefits provided to Defendant Huizar.

The witnesses who will testify to the facts

therein including percipient witnesses who were on those trips

include George Esparza, Defendant Huizar's special assistant at

the time.  There is also Executive E who was described as a

right-hand person of Chairman E who also testified about the

benefits provided from Chairman E to Defendant Huizar and his

1    special assistant George Esparza.

2              In addition, there is voluminous casino

3    surveillance evidence of Defendant Huizar gambling with chips

4    provided by Chairman E and one specific occasion that caught

5    the attention of the casino surveillance.  Defendant Huizar was

6    observed with over $60,000 in chips.  Because, at that point

7    the casino surveillance that identified Defendant Huizar as a

8    council member in the City of Los Angeles as part of their

9    normal surveillance and security to protect themselves and

10   concerns relating to money laundering and other illicit

11   activity, they have forms that they require called PEP forms,

12   politically exposed person, where they want to identify

13   potential politicians to ensure they are using their own money.

14             During one such trip, when the $60,000 in front

15   of Defendant Huizar provided by Chairman E was being utilized,

16   the casino representative encountered Defendant Huizar, asked

17   him to fill out a form that would confirm his identity and the

18   course of the chips he was playing with.  Defendant Huizar

19   declined, immediately left the table after speaking briefly

20   with Executive E, left the $60 ,000 on the table, and departed

21   soon thereafter and did not return to Las Vegas to that casino

22   for some time after.  We have interviewed the people involved

23   in that encounter including executive employee and others who

24   witnessed that.

25             The others -- other evidence from that will

1   include cashout documentation, that is, evidence that

2   Defendant Huizar would cash out chips, and that would be

3   documented by casinos in terms of how much money he cashed out.

4   The casinos also note particularly when people cash out

5   significant amounts of money but never cash in.  I mean, they

6   don't go to a cashier and here is my $2,000, please provide me

7   chips.  That is ordinarily documented.  So when someone,

8   particularly a council member, cashes out chips, there is no

9   record of a cash in, that attracts the attention of casino

10  surveillance, and that was monitored at several casinos.

11          That relationship continued through other trips

12  to Australia as alleged in the Indictment and the trip to

13  Northern California most recently.

14          THE COURT:  So of all of those trips to Vegas --

15  Las Vegas, Australia, et cetera, how much is the Government --

16  what is the Government's evidence going to show in terms of how

17  much was received by the defendant?

18          MR. JENKINS:  Yes, Your Honor.

19          THE COURT:  Just approximately.

20          MR. JENKINS:  Certainly.  And there's two

21  different ways to evaluate it.  One is the gambling chips.

22  Sort of the easiest way is direct benefits, gambling chips, and

23  that's 260 -- approximately $260,000.  In addition, according

24  to the chart on pages 15 and 16, we have alleged what we

25  describe as group expenses.  Again, that relates to things that

1    Defendant Huizar participated in and enjoyed.  I think the

2    $30,000 per night luxury suite but so did others.  So without

3    itemizing each for each person, we refer to those as group

4    expenses provided by Chairman E that Defendant Huizar enjoyed

5    some part of, and that was approximately $900,000.

6              THE COURT:  All right.  So in exchange for that,

7    what was -- what was Chairman E or his company asking of the

8    defendant, if anything?  What is the Government's theory as to

9    that?

10             MR. JENKINS:  Yes, Your Honor.  We believe there

11   were several "asks" by the chairman to benefit his company

12   which was a hotel -- which is a hotel in downtown Los Angeles

13   that he had bought earlier -- prior to the relationship with

14   Defendant Huizar.  He was the owner of this hotel among -- and

15   another property in the city.  Originally there were several

16   favors asked by Chairman E, but the most specific ones that we

17   would rely on is first a 2014 city council resolution for a

18   Chinese national business who was one of the first Chinese

19   nationals to take over a downtown Los Angeles hotel in order to

20   curry business support and other favorable treatment by the

21   city community.  He sought a resolution from the city council

22   highlighting his contributions to the local economy.

23             Jose Huizar provided such resolution, and that

24   resolution was widely hailed or was highlighted by the chairman

25   to others in the company as a significant benefit that would

1    essentially vouch for his new project or his new hotel and its

2    business.

3              In addition, during the progression of the

4    relationship between Defendant Huizar and Chairman E,

5    Chairman E made it clear that he wanted his downtown LA hotel

6    to be transformed into the largest tower west of the

7    Mississippi which would create specifically a 77-floor mixed

8    retail space which would come at significant costs to the

9    company and at the same time would require significant city

10   entitlement process, and he needed and wanted Defendant Huizar

11   to help along that process.

12             THE COURT:  And was the help given?

13             MR. JENKINS:  It was not, Your Honor.  I take it

14   back.  It depends what specific help we are discussing.

15             The project itself in October of 2018, I believe,

16   there is -- June -- thank you, Ms. Dragalin -- in June of 2018,

17   there was an application to do just what was described, that

18   is, transform this hotel into the largest tower west of the

19   Mississippi.  Prior to that -- in October 2018, that

20   application was made, but before any votes could be taken on it

21   in November '18, the FBI raided city hall including

22   Jose Huizar's council district office, his Boyle Heights

23   office, his residence, and other locations as was widely

24   reported in the media.

25             We believe, because of that public intervention,

1    it stalled Chairman E's interests in Defendant Huizar's ability

2    to help at that point.  Prior to that point, there was a

3    meeting at city hall including the chairman and

4    Defendant Huizar, including Individual One, including

5    Defendant Huizar's planning director and others from the City

6    where that -- the plan was discussed.  So there was this

7    meeting related to the tower prior to that.  And ultimately we

8    believe or allege that there is an agreement to help, and the

9    help was in process prior to our public intervention into --

10    via the search warrants.

11            THE COURT:  All right.  Is this the funding --

12    the alleged funding of the -- some 5- or $600,000 settlement of

13    the lawsuit that the defendant was involved in?

14            MR. JENKINS:  That is, say, the next part of the

15    Project E bribery scheme.  There is essentially the trips part

16    component, and then, in addition, during that time period, as

17    you described, Chairman E facilitated by Individual One in

18    short allowed Defendant Huizar, who was in a contested

19    re-election at the time, to privately and confidentially settle

20    a sexual harassment lawsuit filed by an individual with whom he

21    had an affair who was suing him.  And he provided -- that is,

22    Chairman E provided approximately $600,000 to confidentially

23    settle that lawsuit via a collateral and loan to

24    Defendant Huizar.

25            I believe that is another in a stream of benefits

1    theory, another significant benefit that was provided to

2    Defendant Huizar for the same purposes described.

3              THE COURT:  This was done by way of a posting of

4    collateral for a loan that Mr. Huizar obtained and

5    ultimately -- I mean, he defaulted on the loan, and the bank

6    foreclosed on the collateral that had been posted by Chairman E

7    or Chairman E's company?

8              MR. JENKINS:  That is correct, Your Honor.  That

9    occurred in December of 2018 and was approximately $570,000.

10             THE COURT:  Is that the basis for the false

11   statement count that is alleged in Count 32?

12             MR. JENKINS:  That is correct, Your Honor.

13             THE COURT:  Okay.

14             MR. JENKINS:  That forms essentially the core of

15   the Project E bribery scheme.

16             THE COURT:  All right.  There were other issues

17   that you alleged in this Indictment that Chairman E made a

18   request of Mr. Huizar and that is a letter of recommendation

19   for his son at USC, some visa application support, and there

20   was a labor union issue.  What was the labor union issue?

21             MR. JENKINS:  Our understanding from interviews

22   related to the labor union or interviews with the labor union

23   is that Chairman E's hotels or hotel -- I think both of them --

24   had issues, basically human resource issues, with labor and

25   were having disputes resolving those -- were having issues

1    resolving those disputes with the labor unions regarding these

2    H.R. issues.  According to the labor union, Jose Huizar reached

3    out to try to litigate or mitigate those disputes on behalf of

4    Chairman E or Chairman E's company.

5              THE COURT:  Let's move on with project -- bribery

6    Project C.  What is the overview of the evidence the Government

7    will offer for that project?

8              MR. JENKINS:  Yes, Your Honor.  Project C, which

9    begins on page 25 of the Indictment, relates to a separate

10   project and separate developer referred to as Developer C.

11   This developer became aware that a significant project, his

12   second largest property -- he is a developer who owns multiple

13   properties -- his second largest property that he was seeking

14   to redevelop had a labor union issue.  Specifically, the labor

15   union had filed an appeal on the project which threatened to

16   slow down or halt the project or increase the project costs.

17             At this time Developer C engaged Justin Kim who

18   was at the time a known and close ally of Defendant Huizar, one

19   of his top fundraisers.  Justin Kim's actual job related to

20   real estate appraisal.  According to Justin Kim, he contacted

21   George Esparza, then Defendant Huizar's special assistant,

22   seeking help, seeking Jose Huizar's help resolving this appeal

23   on behalf of David Lee.

24             After much back and forth, it was decided that

25   that help, according to Defendant Huizar through

1    George Esparza, that it would cost Developer C financial

2    benefits in order for Defendant Huizar to weigh in,

3    particularly because Defendant Huizar is publicly known to be

4    an ally of labor unions.  So in the event that he took any

5    action that was adverse to a labor union, it could cost him

6    political clout.  So he wanted it to cost financial -- it would

7    be a trade or required financial benefits for him to risk that

8    clout.

9              Ultimately it was agreed from Developer C who

10   offered $500,000 in cash to make the appeal issue go away.

11   That money was in summary provided from Developer C to

12   Justin Kim to George Esparza who I believe on at least one

13   occasion traveled to Defendant Huizar's home the same day he

14   had obtained hundreds of thousands of dollars in cash in a

15   paper bag.  George Esparza transferred that money to a liquor

16   box, a small Jack Daniel's, some liquor box, transported it to

17   Defendant Huizar's home, showed Defendant Huizar that

18   Justin Kim and Developer C had come through on their end of the

19   bargain because at that point the appeal had been dropped

20   meaning that Defendant Huizar held up his end of the bargain.

21             According to George Esparza, during that

22   conversation which occurred in March 2017, Defendant Huizar was

23   concerned of having cash -- that large amount of cash in his

24   home, particularly during the time where there was rumors of an

25   FBI investigation into him.  According to George Esparza, he

1    said, *You keep it, hide it, hold on to it for me.*

2               That interaction, including the money, the

3    delivery or, I would say, the attempted delivery to

4    Jose Huizar's house up to his doorstep was documented by

5    George Esparza in videos and photographs describing what he was

6    doing, how much was in there, and Defendant Huizar's response.

7               That money then was taken back by George Esparza

8    for safekeeping who ultimately transferred it to executive

9    employee E or Executive E who worked for Chairman E because

10   George Esparza also became concerned about having that large

11   stash of cash in his house.

12              Ultimately, as the FBI investigation progressed

13   including interviews of George Esparza, George Esparza became

14   concerned that at least some part of their scheme was

15   discovered.  So instead of providing the money to

16   Defendant Huizar, he kept it with Executive E.

17              During that time George Esparza and

18   Defendant Huizar had multiple text conversations or, I should

19   say, Defendant Huizar had multiple text conversations with

20   George Esparza who largely unanswered -- largely did not

21   respond to those text messages.  Defendant Huizar's messages

22   were essentially, *We had a plan.  We had a meeting.  We were*

23   *supposed to meet.  Why aren't we meeting up?*  Messages to that

24   effect.

25              According to George Esparza, the intent of those

1    messages was Defendant Huizar wanted his share of the bribery

2    cash, and that included Defendant Huizar showing up uninvited

3    at George Esparza's house, according to George Esparza, to

4    collect the money.  Ultimately, as alleged in the Indictment,

5    various meeting dates between the two came and went, and

6    George Esparza did not provide the money.

7                    And in one recorded conversation prior to that,

8    in Defendant Huizar's private city hall bathroom, he made clear

9    that he expected that money, that he was entitled to that

10   money, and that he needed that money because his wife,

11   Richelle Rios, was running for re-election -- excuse me --

12   running to succeed him in the election.

13                   THE COURT:  So she -- so Mr. Huizar never

14   received any part of that money?

15                   MR. JENKINS:  That is correct, Your Honor.

16                   THE COURT:  So the only one that received part of

17   that money is Esparza?

18                   MR. JENKINS:  In addition, Justin Kim --

19                   THE COURT:  And Kim kept the 100,000.

20                   MR. JENKINS:  That is correct, Your Honor.

21                   THE COURT:  So Esparza got 100-; Kim got 100-.

22   What happened to the rest of it?  It went back to Developer C?

23                   MR. JENKINS:  No.  We're not sure -- at this

24   point we are still evaluating the ultimate breakdown.  That's

25   why it's sort of, as the Court points out, is not entirely

1    clear of the breakdown.  What is accurate is David Lee provided

2    in total $500,000.  The evidence is that his intent is that was

3    to supply Defendant Huizar and take care of the appeal issue.

4    Ultimately Defendant Huizar received none of that money, and it

5    was ultimately split between George Esparza to help with

6    resolving the appeal and his efforts in addition with

7    Justin Kim and his efforts in facilitating the bribe.

8                    THE COURT:  I may have missed it, but ultimately

9    what happened with the appeal?

10                   MR. JENKINS:  The appeal was dropped, Your Honor.

11                   THE COURT:  It was dropped.

12                   MR. JENKINS:  Yes.  Prior to the money being

13   provided by Developer Lee, it was confirmed that it was

14   dropped, and that information was conveyed from George Esparza

15   to Justin Kim to David to Developer C.

16                   THE COURT:  According to overt act 78, this

17   compensation or this money started out to be a million two.  It

18   was supposed to be 500,000 for the defendant, 500,000 to Kim,

19   and 200,000 to Esparza, but apparently Developer C or

20   representatives of Developer C came back with a counteroffer of

21   500,000.  That is how it ended up?

22                   MR. JENKINS:  Yes, Your Honor.

23                   THE COURT:  And who is percipient to the original

24   conversations setting the $1.2 million amount of the alleged

25   bribe?

1           MR. JENKINS:  That would be the testimony of

2    George Esparza, Defendant Huizar's special assistant.  In

3    addition, Defendant Esparza made a habit of documenting

4    contemporaneously his conversations with Defendant Huizar

5    particularly when they related to criminal conduct.  So there

6    is, according to the metadata, notes consistent with that

7    conversation, but ultimately the percipient witness is

8    George Esparza.

9           THE COURT:  Is there anything other than

10   Mr. Esparza's testimony?

11          MR. JENKINS:  In addition to his notes, not that

12   we are aware of at this time, Your Honor.

13          THE COURT:  Okay.  And that forms the basis for I

14   believe the Count 33 which is the false statement?

15          MR. JENKINS:  Let me just confirm that,

16   Your Honor.

17          THE COURT:  April 2019 false statement?

18          MR. JENKINS:  Yes.  That is correct.

19          THE COURT:  All right.  Let's move on to

20   Project D.

21          MR. JENKINS:  Yes, Your Honor.  Project D relates

22   to a separate Chinese national developer with a separate hotel

23   and project in Council District 14, Defendant Huizar's

24   district.  Similarly this relationship was facilitated by

25   Individual One, more specifically meaning introduced by

1   Individual One.  After that point the individuals on behalf of

2   Company D, which included various employees, made various

3   requests of Defendant Huizar including help with certain

4   activities related to their hotel.

5           Defendant Huizar and Individual One provided,

6   according to the evidence, some of that assistance.  Around the

7   same time Individual One and Defendant Huizar began soliciting

8   financial benefits or contributions -- and contributions from

9   development -- from Company D and its chairman.  At some point

10  the conversations continued including about the need for the

11  council member to help Project D which at the time was going

12  through very significant redevelopment efforts, efforts that,

13  according to Chairman D, had been delayed or otherwise not on

14  his time schedule which could potentially cost Chairman D and

15  Company D the viability of that project.

16          Accordingly, at some point it became clear that

17  Defendant Huizar, in addition to asking for contributions, also

18  had other ideas of how Chairman D and Company D could be

19  helpful to Defendant Huizar including by hiring an associate of

20  Defendant Huizar.

21          In addition, there were other requests that were

22  discussed including hiring Defendant Huizar's wife by

23  Company D.  In addition, there was, as I mentioned, the

24  political contributions.  During this time there was continual

25  efforts by Company D and its chairman and its employees and

1    Individual One to ensure that Project D achieved its various

2    entitlements, and the project moved forward in a timely

3    fashion.

4              Ultimately there were -- one of the first schemes

5    alleged beginning at page 34 related to consulting fees to an

6    associate alleged as Huizar Associate One related to a scheme

7    that was purported to be a real estate arrangement or agreement

8    that originally was purported to include Defendant Huizar's

9    wife as a participant in the real estate process that she was

10   supposed to provide information that would be ultimately

11   provided to China related to Southern California property

12   values and real estate opportunities.

13             According to testimony including from

14   Defendant Huizar's wife, she had no interest in such

15   opportunity, had no expertise or knowledge of such real estate

16   opportunities, and declined to participate because she thought

17   it was suspicious.

18             Instead, George Chiang, a consultant who worked

19   with Individual One and one of the individuals who is alleged

20   to participate in the racketeering enterprise with

21   Defendant Huizar, ultimately he was the one that prepared these

22   real estate reports that ultimately were purchased by a

23   relative of Chairman D according -- pursuant to an agreement by

24   which $11,000 per month will be provided to these reports.  The

25   $11,000 per month was provided ultimately to Huizar Associate

1    One.

2              According to Huizar Associate One, he did very

3    little to earn any of this money.  He did not understand what

4    the point of the arrangement was about, but he continued to

5    accept the money for six months and accepted what he thought to

6    be real estate appraisals, property values from -- he was

7    unaware that the source of the information was, in fact,

8    George Chiang who was at that time working in association with

9    Chairman D.

10             THE COURT:  Wait.  All these real estate reports

11   1 through 6, those are all designed to accomplish the payment

12   that Mr. Huizar apparently made request to pay or hire his

13   associate because Company D, or whoever was involved in

14   Project D, did not want to make these direct payments.  So they

15   concocted this scheme of the preparation of these real estate

16   reports, and it was a backdoor way of funneling the money to

17   the individual that Huizar asked the company to hire?

18             MR. JENKINS:  Exactly, Your Honor.

19             THE COURT:  All right.  So I understand the

20   benefits that were flowing.  But my question is, in exchange

21   for those benefits, what did Mr. Huizar do with respect to this

22   Project D?  What's the conduct or acts that the Government is

23   going to that either promoted the approval process of Project D

24   or what did he do?  That's the key question.  Is this an

25   undeveloped piece of property, Project D, or was this a rehab?

1          MR. JENKINS:  This was a redevelopment project

2   involving a current large hotel in downtown Los Angeles that

3   Company D also wanted to transform, and according to internal

4   documentation, they believed that the transformation would

5   result in a property worth in the hundreds of millions of

6   dollars.

7          Defendant Huizar at the time where, according to

8   similar internal communications, Chairman D was concerned that

9   the project purportedly foreseen to be worth those hundreds of

10  millions of dollars would not come to fruition.  So Chairman D

11  was putting out a lot of pressure including on George Chiang to

12  make his project happen.

13          What ultimately happened directly because of

14  Defendant Huizar is, on November 22nd, 2016, which is overt act

15  160, Defendant Huizar presented a written motion in the

16  Economic Development Committee on which he sat to benefit

17  Project D.  Those such motions -- there is essentially various

18  benefits or entitlements which are, generally speaking, things

19  that project needed to have done, needed to get done in order

20  for the project to succeed.  I think, for example, if it wants

21  to transform a house into a hotel, there would be -- and that

22  is not the exact example.  But if that was the request, there

23  would be multiple City approvals needed to change zoning or ask

24  for other tax benefits or seek height adjustments or develop

25  affordable housing requirements.

1          So specifically here there was an Economic

2     Development Committee motion that was presented by

3     Defendant Huizar.  Subsequently he voted on the project himself

4     again to just, using shorthand, move the project forward, and

5     he did so on more than one occasion.  In an internal

6     communication with George Esparza, he made it clear that this

7     project needed to be streamlined, and our allegation is that is

8     a result of the bribes that he was being provided from

9     Chairman D.

10          THE COURT:  But he doesn't control the votes on

11     that committee.  There are other members of the committee that

12     had to vote on the motion.  He may have submitted it, but it

13     couldn't be approved unless other -- I don't know what the --

14     if it's a majority of the committee or how many members on the

15     committee.  And isn't it customary or it's not unusual for a

16     council member to submit a motion to various committees seeking

17     approval of various projects or various other items of business

18     before the City?  I mean, that is the nature of the political

19     fundraising.  And looking at a project and determining that the

20     project meets the requirements of the City and it's in the best

21     interest of the City and simply submitting a motion doesn't

22     mean that it is going to be approved or passed or adopted.

23          Was there any opposition to the motion?

24          MR. JENKINS:  According to internal

25     documentation, the project having struggled through the entire

1    process for many years including there was prior lawyers, prior

2    lobbyists, or others associated that were ultimately fired or

3    terminated from the project because of the lack of success or

4    maybe lack of timeliness of the success.

5           Your Honor is absolutely correct that the city

6    council job, including Defendant Huizar's, is to vote on things

7    and standing alone, that is absolutely part of their job.  And

8    it's also correct that some of those votes actually may benefit

9    the City or benefit the constituents.  However, it is an

10   official act according to McDonnell.  However, when any amount

11   of money is taken with the idea that it would influence that

12   decision, whether it did or not or whether that decision was

13   actually ultimately beneficial to the community is irrelevant.

14   In fact, it makes it still a crime.

15          And the evidence, at least as alleged in the

16   Indictment, was that Defendant Huizar was accepting money

17   directly and indirectly in representing that it would influence

18   his decision.  Ultimately, whether it did or not, again, we

19   would argue is irrelevant, but it is still a violation of his

20   fiduciary duties and also under federal law bribery.

21          THE COURT:  Well, just to summarize this

22   Project D, the Government's theory is that the -- there was a

23   certain amount of money that was paid by Company D to the

24   defendant for his assistance in moving Project D through the

25   approval process.

1            What is the total amount of money that, just

2    ballpark, that we are talking about?

3            MR. JENKINS:  Yes.  There's two forms.  There is

4    the $66,000 in total that went to Huizar Associate One.  The

5    other stream of benefits here would be the $100,000 PAC

6    contribution.  That is essentially the next part of the scheme

7    that, according to witnesses, that Defendant Huizar requested

8    in exchange for his help on the project.  So 66,000 to Huizar

9    Associate One and then an agreement for an additional $100,000

10   to PAC that was designed to benefit Defendant Huizar's wife.

11           THE COURT:  And the -- what happened to

12   Project D?  Were all the entitlements approved, and was it a

13   completed project?

14           MR. JENKINS:  It is still an ongoing project, but

15   all the requested assistance that was requested of

16   Defendant Huizar was provided, and it moved through the City

17   approval process significantly at that time meaning that it was

18   slowed for a long period of time and, during this period of

19   time, it was streamlined and the requested approvals were made.

20   So it is on track to be a successful project, but it is still

21   going through.

22           THE COURT:  So basically -- and I'm not that

23   familiar -- basically it went through the approval pro --

24   through the approval process, and they're now just doing

25   whatever they are doing to construct it?

1      MR. JENKINS:  That is my general understanding

2  also.  I don't know the specific details, but we have talked to

3  the company that, according to the company, it is a viable

4  project that is no longer in the risk of not receiving the

5  entitlements.  But I do believe there is a lot of construction

6  and related things still to occur.

7      THE COURT:  Why don't we move on to Project M.

8      MR. JENKINS:  Yes, Your Honor.  Project M which

9  begins on page --

10      THE COURT:  49.

11      MR. JENKINS:  Thank you.  Yes.  49.  This relates

12  to a domestic development company, Company M and its project in

13  the Arts District which, fast-forward a little bit, became --

14  was a significant success to Company M according to the

15  internal documentation because of the height of the project

16  was -- set a new precedent and was significantly higher than

17  any other Arts District project.

18      In addition, it was able to obtain significant

19  benefits to the company by reducing the amount and the levels

20  of affordable housing meaning that there was a smaller

21  percentage and a higher amount which ultimately meant that a

22  company would make more money and affordable housing would be

23  more difficult for people below that income and would

24  require -- and would create a fewer amount of affordable

25  housing units than was requested by the City's own planning

1    commission.

2            Starting at the beginning essentially this, as

3    alleged in the Indictment, became -- the relationship with

4    Executive M who worked for -- controlled the Los Angeles area

5    for Company M, Lobbyist B who is alleged to be a close

6    associate fundraiser and -- close associate and fundraiser of

7    Defendant Huizar.  He also helped with a PAC, PAC A, which is

8    discussed in the Indictment as a PAC that was purported to be a

9    general purpose committee which means that it was supposed to

10   help various causes and not one specific candidate.  But

11   according to Defendant Huizar and Lobbyist B, its true purpose

12   was to benefit Defendant Huizar's ultimate campaign to succeed

13   in Council District 14.

14           The relationship between Executive M, Lobbyist B,

15   and Defendant Huizar ultimately concluded in what is alleged as

16   a bribe that Defendant Huizar requested be paid to this PAC A,

17   ultimately $100,000 as alleged in the Indictment, in exchange

18   for help on that Project M which I previously described which

19   ultimately occurred meaning the project similarly achieved its

20   request.  And some of the requests, as I outlined, were notable

21   because they were very different from what was approved by the

22   City's own planning commission.

23           And, in fact, they were overruled by

24   Defendant Huizar in the PLUM committee which he chaired, the

25   Planning & Land Use Management Committee.  It made Executive M

```
 1   and Company M, as alleged in the Indictment, net approximately
 2   $14 million in benefits.  In addition, Executive M who,
 3   according to the evidence, felt that his job was in danger if
 4   this project didn't succeed, and it was paid success bonuses in
 5   the hundreds of thousands of dollars for successful projects
 6   succeeded, and he was very pleased with that result.  And in
 7   sum, that is the short summary.
 8                   THE COURT:  Is there an insider in this
 9   Project M?  Is Esparza percipient to the conduct that you have
10   just outlined?
11                   MR. JENKINS:  Lobbyist B will testify to the
12   facts related to the communications between Lobbyist B and
13   Defendant Huizar and Lobbyist B and Executive M.
14                   In addition, there are -- there's documentary
15   evidence consistent with that, meaning e-mails and some
16   communications.  In addition -- that's the core of it,
17   Your Honor, actually.
18                   THE COURT:  And this Project M needed an
19   amendment to the general plan in order for it to be successful?
20                   MR. JENKINS:  That is my understanding,
21   Your Honor.
22                   THE COURT:  And the general plan is approved --
23   how does one amend a general plan in the city government?
24                   MR. JENKINS:  We will have a city expert explain
25   it much more articulately than I could now.  But our
```

1   understanding is it is generally a big "ask," meaning it does

2   take various levels of approval and in some ways it is sort of

3   a threshold that needs to be achieved before you can move

4   forward with your project.

5           THE COURT:  And, again, there are many moving

6   parts to the approval process.  Mr. Huizar in and of himself

7   may have influence over certain of the other individuals who

8   are responsible for making those decisions, but he cannot make

9   that decision on his own.

10          MR. JENKINS:  I think that is technically

11  correct.  Absolutely.  However, as we pointed out, in terms of

12  moving parts, Defendant Huizar was on almost all of them

13  meaning, as the council member of CD 14, where the project was,

14  other members will testify that essentially the informal rule

15  is, if that project is supported by the council member or not

16  supported by the council member, that weighs significantly.  In

17  addition, as the chair of the PLUM commission, if certain -- if

18  Defendant Huizar doesn't put something on the PLUM calendar, it

19  is essentially frozen in time.

20          THE COURT:  Right.  On the other hand, if this is

21  something -- and I don't know the process, and I'm sure there

22  is going to be some evidence of it.  This particular Project M

23  and the amendment to the general plan may or may not have been

24  beneficial to the city.

25          MR. JENKINS:  I think that is absolutely right,

1    Your Honor.

2            THE COURT:  So it is the Government's theory that

3    the amendment to the general plan allowing this particular

4    project to go forward as desired by the developers was not in

5    the interest of the city.

6            MR. JENKINS:  We don't make that allegation,

7    Your Honor.

8            THE COURT:  That's the only way it makes sense.

9    If you're paying somebody for assistance in moving something

10   forward, why would it be improper to move a project along

11   that's in the best interest of the city?

12           MR. JENKINS:  According to the Supreme Court case

13   law, the motive behind the acceptance of money in exchange for

14   a project is irrelevant.

15           THE COURT:  It may be irrelevant, but you're

16   going to try this case to a jury.  Obviously I'm not today

17   making any evidentiary rulings in terms of the evidence that is

18   going to come in or the evidence that is not going to come in,

19   but if you have a project that's in the best interest of the

20   city -- I don't doubt your reliance on the Supreme Court.  But

21   as a practical matter, it is not going to have much jury appeal

22   if the project was beneficial for the city, but if it hadn't

23   been Mr. Huizar, it would have been some other politician who

24   promoted the project and ultimately amended the general plan to

25   allow the project to go forward.

```
 1              MR. JENKINS:  Yes, Your Honor.  I think it's a
 2   fair point in terms of jury appeal.  I have three responses.
 3   One --
 4              THE COURT:  I know you are very persuasive.
 5              MR. JENKINS:  Thank you, Your Honor.
 6              The first response is it will not be unanimous by
 7   any means that this project was to benefit the constituents.  I
 8   think I'm not going to disclaim that some people may feel that
 9   way, but in fact the City's own planning commission had
10   significant reservations about this project when it got to that
11   stage.  So the general plan amendment whether this project
12   could -- should be built is step one in a threshold matter.
13              But what that project should ultimately be, there
14   is a host and variety of different opinions in the city of
15   Los Angeles.  In the city of Los Angeles, some people like
16   large projects, some people hate large projects.  Some people
17   like signage.  Some people hate signage.
18              The specific example here most problematically is
19   it's in the Arts District across from skid row where the
20   homelessness right now is rampant.  The City Planning
21   Commission said has been advertised by the defendant himself
22   homelessness is a major issue.  He had the opportunity to
23   ensure that this project had a significant amount of affordable
24   housing at a low level.  You can set affordable housing --
25   there are different levels.  Low, medium --
```

1        THE COURT:  I don't mean to interrupt you.  I
2  understand where you're going with this, but we will see how
3  the evidence unfolds.
4        In terms of development in the city of
5  Los Angeles or in any community, there are always people
6  against it or people in favor of it and how anything ever gets
7  built is sometimes a mystery.
8        In any event, let's move on to the final scheme
9  which is Businessperson A.  And my understanding of
10  Businessperson A -- and you can correct me if I'm wrong -- that
11  this individual was working with the FBI in connection with the
12  conduct that you have alleged in these overt acts 290 and 296?
13        MR. JENKINS:  No, Your Honor.  You are correct
14  that at some point Businessperson A started working with the
15  FBI.  That was not until August 2017.  The allegations in overt
16  acts 257 through -- this is the chart -- 257 through 269 all
17  preceded his work on behalf of the FBI.
18        THE COURT:  All right.  So after he engaged in
19  the activities that you have alleged in these overt acts, he
20  decided that he would cooperate with the FBI and provide the
21  FBI with the information that is alleged in these overt acts.
22        MR. JENKINS:  That is correct, Your Honor.
23        THE COURT:  Okay.  And just in the thumbnail,
24  what were the -- what was the -- what were the -- what was
25  Businessperson A getting out of the -- what did he expect in

```
 1    return for the contributions that you have alleged to the PAC?
 2                 MR. JENKINS:  Yes.  The contributions as
 3    enumerated, the cash, hotel accommodations, and other suits and
 4    luxury items.
 5                 THE COURT:  Is that that whole list of items
 6    including suits and shirts?
 7                 MR. JENKINS:  Yes, Your Honor.
 8                 THE COURT:  And shoes?
 9                 MR. JENKINS:  Yes.
10                 THE COURT:  Pair of shoes?
11                 MR. JENKINS:  I would describe them as luxury
12    attire, but yes, Your Honor.  In exchange for those benefits,
13    among others provided by Businessperson A, it is our
14    understanding based on interviews --
15                 THE COURT:  Does he simply drop off a pair of
16    $400 shoes, or how are they sized?
17                 MR. JENKINS:  My understanding from various
18    witnesses is that Defendant Huizar, oftentimes George Esparza,
19    and Businessperson A would travel to custom locations that
20    would make suits, for example, where he would get fitted, get a
21    suit, and Businessperson A would provide the money in cash
22    directly to the --
23                 THE COURT:  So Businessperson A had a tab at this
24    place, and they would go in and order various items, and then
25    they never paid -- they didn't have to pay for them.
```

```
 1              MR. JENKINS:  Businessperson A actually paid in
 2   cash.
 3              THE COURT:  Paid in cash.
 4              MR. JENKINS:  He has receipts for those.
 5              THE COURT:  I didn't mean to interrupt you.  Go
 6   ahead.
 7              MR. JENKINS:  Not at all, Your Honor.
 8              In exchange for those and other benefits,
 9   Businessperson A, who had various businesses, sort of generally
10   speaking, who could benefit by being hired as a subcontractor
11   to development projects.  Again, a large hotel, a large
12   redevelopment, he could provide certain amenities that would
13   benefit one or two of his companies.  He had multiple
14   companies.  He requested --
15              THE COURT:  Was this the cabinetmaker?
16              MR. JENKINS:  It is, Your Honor.
17              THE COURT:  So the cabinetmaker that was involved
18   in Mr. Englander's case?
19              MR. JENKINS:  It is the same Businessperson A
20   that provided cash to then Council Member Englander, yes.  For
21   a similar reason, here, clearly the relationship was more
22   developed according to the evidence, meaning more interactions,
23   more trips, more benefits but the same purpose.  He could
24   benefit Businessperson A.
25              He or she could benefit by introductions and
```

1    advocacy by Council Member Huizar who had a very close

2    relationship, as evidenced by this Indictment, with various

3    developers, various lobbyists, various chairmen who, when

4    looking who to hire for certain aspects of a project and

5    wanting to please the council member who chaired PLUM, who was

6    the council member in their district, it is -- we would argue

7    and allege it is an easy give to the council member to hire the

8    council member's friend, hire someone the council member

9    recommends, hire someone the council member introduces you to,

10   and essentially Businessperson A was paying for that

11   opportunity which was provided on multiple occasions.

12                THE COURT:  But isn't that the way that business

13   is done?

14                MR. JENKINS:  No, Your Honor.  Not legally.

15                THE COURT:  You have a relationship with

16   Developer A, and I'm a cabinet builder, and you know me.  I

17   build good cabinets.  So you arrange a lunch between the three

18   of us, we go to lunch, and we talk about what a great

19   cabinetmaker I am.  Obviously the point or suggestion is to the

20   developer that you should hire Judge Walter to build your

21   cabinets because he's a good cabinetmaker.

22                Those kinds of conversations and those kinds of

23   introductions, I would take it, before the pandemic, happened

24   multiple times on a daily basis, not just with respect to City

25   employees or councilmen but -- and I guess what you're going to

1    tell me is there is a distinction between that conduct by a

2    city councilman who receives what you have alleged to be bribes

3    which are contributions to what looks like they're Political

4    Action Committees -- there's a distinction between that and

5    private individuals doing that.

6                So my example, if you ended up receiving a trip

7    to Las Vegas from me for the introduction, that wouldn't be a

8    crime.

9                MR. JENKINS:  Standing alone that may not be a

10   crime, Your Honor.

11               THE COURT:  Private individuals.  My hypothetical

12   is taking your title of assistant and taking my title as a

13   judge, three individuals getting together for an introduction

14   for purposes of doing business.  The business relationship is

15   formed, and I make a lot of money building cabinets.  And in

16   exchange for that, I call you up one day and say, hey, here is

17   a week at the hotel of your choice in Las Vegas and it's on me.

18   That's not a crime, is it?

19               MR. JENKINS:  That is correct, Your Honor.

20               THE COURT:  Pardon me?

21               MR. JENKINS:  That is correct, Your Honor.  It is

22   not.

23               THE COURT:  Okay.

24               MR. JENKINS:  So the difference here is, one,

25   when it is a city official, there is a host of different

1  applications including that, if the city official accepts money

2  with the idea that it's solicited to influence his decision one

3  way or the other in his official capacities, whatever he does

4  as a result of that, that is illegal, meaning his taking of the

5  money at that point, meaning he is being paid because that

6  individual wants him to use his official capacity to influence

7  an official account is illegal.

8           THE COURT:  All right.  Let me stop you.

9           So then we are talking about the evidence, and

10  you're talking about the defendant's -- in this case, the

11  defendant's intent in receiving that money.  So do you have any

12  direct evidence of the defendant's intent that I'm going to --

13  there has been "X" dollars paid and now I'm going to go out and

14  I'm going to do "X" in exchange for the money that has been

15  paid to me?  Or is it all circumstantial evidence?

16           MR. JENKINS:  It is direct evidence based off

17  Businessperson A's testimony of conversations with the

18  defendant.

19           THE COURT:  So he's going to say I told the

20  defendant that I'm going to give him "X" amount of dollars.  In

21  exchange, he's going to introduce me to various developers?

22           MR. JENKINS:  I would say not in that exact

23  sentence, but in that exact conversation, yes.  In addition,

24  there is recorded evidence of this.

25           THE COURT:  And why is that -- I understand the

1   defendant is a council member, but why would that impact his,

2   for lack of a better word, his official duties?  Yes, he is a

3   councilman, but now he knows Businessman A who makes cabinets

4   and -- I guess it's the connection -- the payment to the

5   Political Action Committee that makes it a crime?

6                   MR. JENKINS:  Two parts.  Very good question.

7   One is the payment that is requested whether it is to the

8   Political Action Committee or by way of suits and shirts or by

9   way of cash under the table.  That payment, particularly here,

10  it was never recorded which suggests there is some illicit

11  intent.  That payment alone may be a gift violation, may be an

12  ethics violation.  But if there are just these payments that

13  were not reported but it shows illicit intent, the crime is not

14  completed there.

15                  THE COURT:  But there is no quid pro quo here for

16  conduct in his capacity as a city councilman.

17                  MR. JENKINS:  It's a good question; so I'm taking

18  a little while to answer it.

19                  The next step is when that conversation occurs,

20  which, again, where there is evidence directly from

21  Businessperson A, from George Esparza, from other developers

22  who are at these meetings, then the crime becomes when what is

23  leveraged by the council member is, developer, either

24  implicitly or explicitly, if you don't hire my friend, you're

25  not going to get your project approved or you risk adverse

```
 1   action in CPC or PLUM or city council.  So that developer
 2   thinking, okay, well, we need cabinets.  We might as well hire
 3   Businessperson A and not risk Council Member Huizar's ire by
 4   not hiring his friend.
 5                THE COURT:  I understand.  The businessperson --
 6   is it a man or woman?
 7                MR. JENKINS:  He is a man.
 8                THE COURT:  All right.  So the businessman in
 9   this case I was trying to figure out because it's different
10   than -- I mean, it's the same theory, but it's a round -- in a
11   roundabout fashion.
12                MR. JENKINS:  Exactly, Your Honor.
13                THE COURT:  All right.  Okay.
14                MR. JENKINS:  In addition, that businessperson
15   also paid for a similar resolution that -- not as -- a similar
16   resolution that Chairman E previously got but not as
17   significant but who also alleged that is also what he was
18   paying for.
19                THE COURT:  These resolutions are basically
20   saying he's a good guy?
21                MR. JENKINS:  It depends.  There's actually
22   various kinds of resolutions.
23                THE COURT:  You know what you see on TV every
24   night, somebody standing there and they hold up a resolution
25   saying Mr. Jenkins is the prosecutor of the year recognized by
```

1    the City.

2                    MR. JENKINS:  Hopefully one day, Your Honor.  But

3    at this point, there's different kinds of resolutions.

4                    THE COURT:  But what do they -- all it does is --

5    okay.  I mean, I guess they have a benefit, but I'm having a

6    hard time seeing the real benefit and, more importantly, paying

7    thousands and thousands of dollars to have the resolution

8    passed.  But I'm sure you're going to have very powerful

9    evidence of that.

10                   MR. JENKINS:  And I believe that concludes the

11   five schemes, Your Honor.

12                   THE COURT:  All right.  Then let's move to

13   something that -- and I'm trying to get through this because

14   now I want to start focusing on more specific items, and that

15   is statements that were made by the -- made by the defendant.

16   I realize that, if I'm correct, Count 33 is the one that you

17   have charged as a false statement.  We discussed that false

18   statement and the evidence around that.

19                   This was an interview -- how does this interview

20   on April 10, 2019, come to be?  And who -- who are the

21   participants?  And is this a *Miranda* warning that is provided?

22                   MR. JENKINS:  I will answer all of that,

23   Your Honor.

24                   The short version is that, after the execution of

25   various search warrants targeting Defendant Huizar and others,

1    he retained counsel immediately on the spot.  Shortly
2    thereafter, counsel and the U.S. Attorney's Office engaged in
3    negotiation discussions, and there were three interviews where
4    Defendant Huizar was represented by counsel, the first on
5    December 18, 2018.  There is another interview on
6    January 3rd, 2019.  And then what underlies Count 33 is the
7    interview of April 10, 2019.
8               Defendant Huizar was represented by two retained
9    counsel.  The interviews took place at that counsel's offices
10   on behalf of the Government with some combination of myself,
11   AUSA Veronica Dragalin, AUSA Melissa Mills,
12   Special Agent Andrew Civetti, and Special Agent Tony Logan.
13   The interviews were not recorded at Defendant Huizar's request.
14   The interviews covered a host of topics, and they were covered
15   by what is called a proffer agreement which is essentially a
16   letter agreement in very short form, provides limited use
17   immunity.
18               THE COURT:  My notes -- I just started looking at
19   this over the weekend.  I had four interviews.  There was the
20   April 10, 2019, interview, and then there were three additional
21   interviews.  So there are only three -- the December 18 -- the
22   December 2018, January of '19, and April of '19?
23               MR. JENKINS:  Yes, Your Honor.  The three that
24   you just --
25               THE COURT:  All right.  And were there any

1    admissions made during the course of any of those interviews?

2              MR. JENKINS:  Admissions, yes.  It's sort of

3    complicated to get into the details, and they were pursuant to

4    a proffer agreement.

5              THE COURT:  Let me interrupt you.

6              The Government doesn't intend or the Government

7    can't use any of the statements that were made during any of

8    these except for the -- obviously the false statement that is

9    charged based on the terms of the proffer agreement?

10             MR. JENKINS:  Our position is that we can.

11   Whether we will or not is yet to be decided, but we provided

12   notice to prior counsel and the current counsel that we --

13   because we believe he violated the terms of that written

14   proffer agreement according to its own terms, we are no longer

15   bound by it.  At this point, I would have to double check, but

16   the evidence that is presented in the Indictment is based off

17   independent evidence.

18             THE COURT:  Is it inappropriate this morning to

19   discuss the admissions made by the defendant during those

20   proffers?

21             MR. JENKINS:  I believe that is correct that we

22   would prefer not to do so in open court, Your Honor.

23             THE COURT:  All right.  But there were admissions

24   made during those proffers?

25             MR. JENKINS:  That is a fair assessment, yes,

1   Your Honor.

2              THE COURT:  And the Government has not decided as

3   to whether or not it will attempt to use it but has given

4   notice to counsel?

5              MR. JENKINS:  That is accurate, Your Honor.

6              THE COURT:  All right.  And I take it that

7   those -- although they weren't recorded, that there was a 302

8   prepared?

9              MR. JENKINS:  According by all accounts very

10  lengthy and detailed 302s that are approximately 20 pages.

11             THE COURT:  Agent Civetti is very thorough in his

12  documentation.

13             MR. JENKINS:  You are correct, Your Honor.

14             THE COURT:  You didn't take any notes, did you?

15             MR. JENKINS:  No, Your Honor.  I was doing the

16  talking.

17             THE COURT:  Okay.  So that answers my question

18  with respect to statements.

19             The next question I have is with respect to

20  search warrants.  I'm being guarded here because I have read

21  some in camera materials that -- let me just ask the broad

22  question.

23             I take it, in addition to the search warrant for

24  the defendant's residence and his office, there were other

25  search warrants that were sought and executed in this case?

1      MR. JENKINS:  Yes, Your Honor.  Both directly as
2  to Defendant Huizar and co-conspirators and others.
3      THE COURT:  All right.  So of all of the search
4  warrants as to individuals other than the defendant, this
5  defendant is not going to have any standing to challenge those
6  search warrants; correct?
7      MR. JENKINS:  That is my understanding, yes,
8  Your Honor.
9      THE COURT:  Does the defense dispute that or is
10  it too soon for you to -- I realize you're new to the case.  So
11  if you're uncomfortable in responding to any of my questions, I
12  fully understand that because I'm sure there is a great deal of
13  discovery.  But have you had any chance to look at this issue?
14      MS. ALE:  No, Your Honor.  We haven't received
15  the search warrants yet.
16      THE COURT:  Okay.
17      MS. ALE:  Just briefly, Your Honor, as to the
18  characterization of Mr. Huizar's statements as admissions, we
19  have not yet had an opportunity to review those --
20      THE COURT:  I understand.  That's why I deferred
21  any discussion of those statements that were made during those
22  proffers.  So I want to make sure you have an opportunity to
23  look at all the discovery, and if there is going to be
24  litigation over that issue, we will decide it.  So I'm not --
25  I'm trying to get a sense of timing in terms of what is

1    involved in the motion practice in this case.

2                    There was a search of Mr. Huizar's residence.

3    Let me ask the Government.  Were there digital devices that

4    were seized, and has the search of those digital devices been

5    completed and ready to turn over to the defense?

6                    MR. JENKINS:  Yes.  And mostly there is one --

7    there were multiple devices seized including the defendant's

8    personal phone, laptops, and other devices.  There was a -- and

9    those have all been processed, reviewed, and ready to -- I

10   would say ready to be downloaded to a platform that can be

11   viewable.  But that process is still taking time, but we have

12   completed our portion of review.

13                    THE COURT:  All right.  So those would be

14   available -- if the defendant dropped off a hard drive, they

15   would be available to download on the platform that the defense

16   would deliver to the Government?

17                    MR. JENKINS:  Yes, Your Honor.  That is the part

18   that is in process.  We are currently, I think as we speak,

19   downloading other digital evidence that the Court may be aware

20   of that is going first.  But we are in the process of

21   downloading a series of digital evidence, and they have

22   provided a hard drive.

23                    There is one additional phone that was seized

24   later in the investigation that we have not been able to

25   access; so that search continues.

```
 1                    THE COURT:  And the warrant that was executed at

 2      the defendant's office, all those materials -- I remember

 3      seeing a picture of somebody parading out a bunch of files.

 4      Has the Government made a determination in terms of what it is

 5      going to return to the defendant and what it is going to keep

 6      as evidence?

 7                    MR. JENKINS:  Some digital -- at least one phone

 8      has been returned.  In terms of hard copy documents, they have

 9      been reviewed.  We haven't made a determination of what -- if

10      anything is to be returned.

11                    THE COURT:  And were there computers in his

12      office that were also seized?

13                    MR. JENKINS:  The Government computers, they were

14      seized.  And I believe in conversations with the city

15      attorney's office, we are working with whether to provide

16      them -- so the City documents and City digital devices, whether

17      we are going to return it to the City.  So that is an ongoing

18      conversation.

19                    THE COURT:  But your analysis of those devices

20      has been completed?

21                    MR. JENKINS:  Yes, Your Honor.

22                    THE COURT:  Okay.  Then the other question I have

23      is were there any wiretaps in this case?

24                    MR. JENKINS:  There were, Your Honor.

25                    THE COURT:  And how many different applications
```

1   and how many different target telephones were intercepted?  And

2   the more important question is how many calls were intercepted,

3   and does the Government have any estimate as to the number of

4   those calls that it might seek to introduce as evidence at

5   trial?

6           MR. JENKINS:  Generally, yes, Your Honor.

7   Working, if I recall correctly, backwards in your -- forward in

8   your questions, there are approximately eight applications for

9   interceptions of various kinds meaning texts, wire or phones,

10  and in addition audio/video bug that took place over the time

11  period of April 2017 to November 2018 with an approximate

12  six-month break and other sort of breaks in between.  But,

13  again, there is approximately eight applications.  The number

14  of phones were approximately six phones, and in addition, the

15  audio/video bug that we mentioned.

16          Specifically as to Defendant Huizar's phone, it

17  was intercepted over an approximately 60-day time period.

18  There's sort of various ways to calculate the amount of data.

19  The best way and most efficient way, at least we found helpful,

20  is how many pages the line sheets are, meaning those are pretty

21  fully transcribed of the communications, texts or phones that

22  were intercepted.

23          As for Defendant Huizar, the 60-day intercepted

24  period was around 400 pages.  By comparison, the other phones

25  that were intercepted that we are currently processing to

1  provide in discovery would include, for example, George Chiang,

2  and his pages were 1,500 approximately.  So by comparison,

3  Defendant Huizar's 403 pages is smaller than George Chiang.

4             THE COURT:  When you say line sheets, is that --

5  are those -- do those represent the conversations that the

6  Government intends to introduce into evidence, or those

7  represent the entirety of the conversations that were

8  intercepted during the 60-day period of time?

9             MR. JENKINS:  The latter.

10            THE COURT:  Okay.

11            MR. JENKINS:  So the biggest picture is that

12  403 pages.  And then the best evidence of what we currently

13  intend -- and we are pretty diligent.  We wouldn't want to

14  limit ourselves to it, but the calls that are referenced in the

15  Indictment itself are the ones we currently intend to

16  introduce.  We haven't limited it to that, but those are

17  certainly a significant amount and significant source of the

18  evidence.

19            THE COURT:  So there won't be any difficulty in

20  preparing transcripts for those?

21            MR. JENKINS:  No, Your Honor.  They are largely

22  transcribed verbatim.  They are draft format but largely

23  already prepared that way.

24            THE COURT:  And all of the wiretap information,

25  the affidavits, the applications, that is all available for the

1  defendant?

2           MR. JENKINS:  That will be, I think -- we will

3  turn to the next phase of the production.

4           We have a current production right now that is

5  going to include all of the recordings and the line sheets,

6  meaning what is available probably tomorrow.  Probably tomorrow

7  will be the actual content of the recordings and the

8  transcribed line sheets.  The underlying applications and host

9  of other pleadings are still being processed for various

10  reasons.  But we are getting through in some ways the good

11  stuff and still working on discovery, and we can get to that.

12           THE COURT:  I may have misheard you, but I

13  thought you -- you referred to an audio or a video bug.

14           MR. JENKINS:  Yes, Your Honor.

15           THE COURT:  What was that?  What is that?

16           MR. JENKINS:  There were two locations that were

17  not locations of Defendant Huizar's that were for approximately

18  a 60-day period.  Pursuant to court order, there were

19  audio/video bugs installed by the FBI.

20           THE COURT:  And was the defendant captured on any

21  of those?

22           MR. JENKINS:  I do not believe so, Your Honor.

23  And there is nothing in the Indictment that relies on such

24  interceptions.

25           THE COURT:  Okay.

1          MR. JENKINS:  There may be one interception not

2   of the defendant but his reference in the Indictment as

3   AUSA Dragalin points out to me.

4          THE COURT:  So we talked about the seizures, the

5   search warrants, the wiretaps.  What other types of documentary

6   evidence -- obviously you have -- I'm sure, based upon this

7   type of a case, you're going to have a lot of documents

8   relating to bank records, Las Vegas casino records, airline

9   records.  And there is a whole -- how many pages of those

10  documents do you think are out there?

11         MR. JENKINS:  Yes.  I will break it down as

12  best --

13         THE COURT:  Actually, it's easier just to -- are

14  those ready to give to the defense?

15         MR. JENKINS:  Some yes and some no.  So things

16  like the -- as you pointed out, the e-mails -- we did various

17  e-mail search warrants.  Those are ready.  Actually, I will go

18  through what's ready right now.

19         There are various e-mail search warrants that

20  underlie several of the allegations in the Indictment.  There

21  are seven custodians of e-mails, meaning seven people's e-mails

22  we intercepted.  That's ready to go.  The line sheets and

23  recordings that we just discussed as to four of the phones that

24  were intercepted will be produced along with the audio.

25  There's about 15,000 FBI reports that relate to various

1   interviews including attachments, photos, and other documents

2   that were provided.  That is all ready to go as of ideally

3   tomorrow.  It's being processed right now.

4                THE COURT:  All those written by Agent Civetti?

5                MR. JENKINS:  Too many of them but not all of

6   them.  There were various agents dutifully helping out.  Not

7   all Agent Civetti.

8                There is significant -- in total what would be

9   available tomorrow is around 83,000 pages in addition to the

10  four custodians of the interceptions.

11               THE COURT:  That should be easy.  Mr. Snyder can

12  review those over the weekend.  It will be ready on Monday.

13               MR. SNYDER:  Yes, Your Honor.

14               MR. JENKINS:  That was, in fact, his quote when

15  we told him that I believe.  But he tells us he was joking.

16               In addition, what is still being processed is

17  some of the things Your Honor just mentioned meaning bank

18  records, casino records, third-party productions.  Those are

19  taking additional time to process in addition to obviously the

20  pandemic.  All of our documents are stored offsite because

21  Department of Justice process is different -- different items

22  there.  And then our paralegals are working remotely.  So we

23  are trying to work through it as fast as we can, but we do have

24  a lot of material.

25               In addition, there are certain things like PII or

1    personal identifying information, again, date of birth or

2    addresses and certain business information that we have to

3    review and redact in order to provide to the defense and make

4    sure we are not inadvertently disclosing anything that should

5    remain private.  That is on its way.

6              THE COURT:  I believe I signed a protective order

7    yesterday that you folks had submitted.

8              MR. JENKINS:  Yes, Your Honor.

9              THE COURT:  All right.  The final questions that

10   I have -- maybe you answered this.  The Count 34 tax returns

11   for the years 2017 and 2018, were those joint returns?

12             MR. JENKINS:  Yes, Your Honor.

13             THE COURT:  Is there any intention on the part of

14   the Government to charge the other filer or the other signer of

15   those returns?

16             MR. JENKINS:  At this point, Your Honor, the

17   determination, subject to new or different evidence being

18   obtained, is there are no plans to charge the other signer.

19             THE COURT:  Were these professionally prepared or

20   prepared by the defendant?

21             MR. JENKINS:  They were professionally prepared,

22   Your Honor.

23             THE COURT:  All right.  And the amounts of money

24   the Government claims were underreported for those years was

25   what?

1          MR. JENKINS:  Just to clarify, it actually just

2    charges 2017 return.  That is a number that is still being

3    evaluated.  It could be anywhere from $50,000 to over

4    $2 million.  We are still evaluating basically how to calculate

5    income, but it would be in that range.

6          THE COURT:  All right.  And then I think we

7    discussed it, but let me go back.  On the money laundering

8    counts where we have money laundering through family members --

9    Relative A-1, A-2, and A-3 -- does the Government have any

10   intention of naming any of those individuals?

11         MR. JENKINS:  At this point, Your Honor, subject

12   to any new or different evidence being obtained, they provided

13   statements pursuant to letter immunity.  We expect them to

14   testify as to that, but we currently have no plans to charge

15   them.

16         THE COURT:  All right.  Let's talk about it.  How

17   many --

18         MR. JENKINS:  Witnesses, Your Honor?

19         THE COURT:  I lost my train of thought.  There is

20   one other note that I have.

21         The search of the defendant's residence took

22   place in November of 2018?

23         MR. JENKINS:  Yes.  November 7, 2018.

24         THE COURT:  And one of the items that was seized

25   was the -- was $129,000 in cash?

1           MR. JENKINS:  That is correct, Your Honor.

2           THE COURT:  And that, the Government's theory is,

3   came from Chairman E and businessperson -- Businessman A?

4           MR. JENKINS:  Yes.  That is our understanding.

5           THE COURT:  All right.  How many witnesses --

6   your estimate to the number of witnesses you will be calling?

7           MR. JENKINS:  Yes, Your Honor.  Our current

8   estimate as charged would be approximately 40 to 50 witnesses.

9   I can outline if Your Honor --

10          THE COURT:  How many cooperators?

11          MR. JENKINS:  There currently will be four.

12  However, we are -- it is an ongoing investigation, and we

13  anticipate there will be additional.

14          THE COURT:  And how many will be testifying

15  pursuant to immunity?

16          MR. JENKINS:  At this point none of the four, no.

17  Zero of the four will be testifying pursuant to immunity.

18  Three --

19          THE COURT:  What was the purpose of the immunity

20  grant if they're not going to testify?

21          MR. JENKINS:  So let me rephrase it.  I guess it

22  depends what the Court means by "cooperators."  I was referring

23  to people who actually have been charged with criminal conduct

24  who in return for expected or hoped leniency will be testifying

25  on behalf of the Government, and that is referencing

1    George Esparza, Justin Kim, George Chiang.  As to the prior

2    questions, the relatives will be testifying pursuant to letter

3    immunity which does not mean they will not be charged.  It just

4    means we will not use their statements against them to charge

5    them.  But as I pointed out, at this point we don't have plans

6    to charge them based off the evidence.

7                     THE COURT:  But they will be testifying.

8                     MR. JENKINS:  Yes, Your Honor.

9                     THE COURT:  Okay.

10                    MR. JENKINS:  Just to clarify, Businessperson A,

11   we have not yet determined any resolution.  Businessperson A is

12   not currently charged, and his resolution has not been

13   determined.

14                    THE COURT:  How many experts does the Government

15   expect to call?

16                    MR. JENKINS:  Approximately -- depending on if we

17   can consolidate, I would say five to six.  Just a few examples

18   would be either a City process expert or PLUM expert, FBI CART

19   examiner which does essentially their cyber extractions,

20   somebody from the FPPC or Fair Political Practices Commission,

21   and potentially someone from City ethics would discuss certain

22   reporting requirements such as the Form 700 or the revolving

23   door policy that covers City employees.

24                    THE COURT:  You know, I don't want to go back,

25   but I guess I missed -- I didn't miss but we didn't discuss --

1    because you're -- from what you said before, one of your

2    theories is that, when I was talking about my cabinetmaker

3    example, that there is a -- one of the differences is that

4    the -- that these -- I don't want to mischaracterize it.  It

5    was the Government's theory that these payments were -- the

6    majority of these payments should have been disclosed on

7    various financial disclosure forms that are required by the

8    City?

9              MR. JENKINS:  Yes, Your Honor.

10             THE COURT:  The Government's evidence is that

11   they were not.

12             MR. JENKINS:  Yes, Your Honor.

13             THE COURT:  Okay.  And those are captured by

14   overt acts 317 to 384 commencing at paragraph 71, the

15   concealment of illicit benefits?

16             MR. JENKINS:  Yes, Your Honor.

17             THE COURT:  Okay.  And the final question I have

18   is what is the Government seeking to forfeit in this case?

19             MR. JENKINS:  At this point they are general

20   notice allegations, and we discussed with our -- we have two

21   assigned forfeiture AUSA's who unfortunately are not here.  But

22   they have advised -- right now it is a notice allegation

23   meaning nothing has been seized that we are seeking to forfeit.

24   We have not identified specific assets.  But according to the

25   case law, including in racketeering, there are various things

1   that are subject to forfeit if they can be identified.  I would

2   also defer the more specifics to our asset forfeiture AUSA's.

3   But that is our current understanding to the notice allegation

4   or general allegation.

5             THE COURT:  Those forfeiture issues are -- I'm

6   very familiar with the forfeiture allegations.  I would

7   encourage you to, as you have indicated, consult with your

8   forfeiture AUSA's because waiting until the last minute runs

9   into nothing but problems in terms of trying to instruct the

10   jury.  I have had that -- I have had that issue and that

11   problem before.  So I encourage you to become educated and rely

12   on those people who have some expertise in the forfeiture area.

13             MR. JENKINS:  Yes, Your Honor.  We will do so

14   definitely.

15             THE COURT:  All right.  I think -- so the

16   Government's estimate in terms of the amount of time to try

17   this case is -- I notice you filed a notice of complex case

18   which I agree with, but your current estimate is how many days?

19             MR. JENKINS:  For the Government's case in chief,

20   15 to 20 trial days.

21             THE COURT:  All right.  And how many exhibits do

22   you think you're going to have?

23             MR. JENKINS:  I expect it to be voluminous, in

24   the hundreds.  We haven't yet begun that process, but I think

25   we can expect that it will be voluminous.

```
 1              THE COURT:  Hundreds or thousands?
 2              MR. JENKINS:  A lot of evidence is going to be
 3    recordings and testimony.  So while it is a complex case, a lot
 4    of it will be percipient.  But to be conservative, it could
 5    reach the thousands.  I don't want to understate it also.
 6              THE COURT:  I have a procedure that you may or
 7    may not be familiar with with respect to the exchange of those
 8    trial exhibits in terms of when it gets closer to trial to try
 9    to resolve -- it's basically a disclosure of all the trial
10    exhibits to the defense and then a meet and confer so you can
11    resolve any objections, and then I will work with counsel to
12    resolve those objections because there is nothing that delays a
13    trial more than fighting about objections to exhibits which
14    typically are going to come in.  In any event, we will deal
15    with that.
16              MR. JENKINS:  Yes, Your Honor.  Understood.
17              THE COURT:  All right.  So unless the Government
18    has anything to add, I'm going to -- I have a couple questions
19    for the defense.
20              I think what I'm going to do is I'm going to set
21    a trial in this matter for September -- I'm sorry -- September
22    29th of 2020.  That is really going to be a placeholder date.
23    I'm going to issue a Criminal Trial Order today based upon that
24    date.  But what I want to do is I want to have counsel within
25    the next ten days meet and confer and discuss discovery.  And I
```

```
 1   know that you're rolling out this discovery, but I want you to
 2   meet and confer and set some benchmarks in terms of when you
 3   believe you will be able to produce all the discovery.
 4              And I want you to discuss motion practice and
 5   then prepare a proposed stipulation setting forth a schedule
 6   that counsel believe is an appropriate schedule for the conduct
 7   of the pretrial matters in this case and also a trial date, and
 8   then I will look at the stipulation.  And if it is acceptable,
 9   I will sign off, and if not, we may have another hearing so I
10   can better understand the dates you selected.
11              I will ask you to file that stipulation by -- I
12   don't have a calendar down here but August 14th.  Do you think
13   that is a doable date?
14              MR. JENKINS:  Yes, Your Honor.
15              MS. ALE:  Yes, Your Honor.
16              THE COURT:  Okay.  There is one additional issue
17   that I want to raise with the defense, and that is the -- I
18   have reviewed the pleadings that resulted in the order
19   conditionally appointing counsel for the defendant.  That
20   ex parte application, the first one was filed in early June.
21   The ex parte application for the appointment of the Office of
22   the Federal Public Defender was denied by the magistrate judge
23   who heard that motion or reviewed those pleadings.  The finding
24   was the defendant had not satisfied his burden to establish
25   that the appointment of the Office of the Federal Public
```

1    Defender as counsel to the defendant is warranted at this time,

2    and the application was denied without prejudice.

3              That application was subsequently renewed in a

4    second request in July in an in camera filing, and that

5    resulted in the order of magistrate judge on July 24 of

6    obviously this year for the appointment of the Federal Public

7    Defender's Office with an order of contribution by Mr. Huizar

8    of $3,000 per month.  That appears as docket No. 31.

9              I intend to look at the -- I have looked at and I

10   have some concerns that Mr. Huizar may not qualify for the

11   appointment of counsel.

12             MS. ALE:  Your Honor, sorry to interrupt.  I

13   believe that this may be a matter --

14             THE COURT:  You can be seated and get closer to

15   the microphone because I'm having a hard time hearing you.  I

16   know we're all hampered, but go ahead.

17             MS. ALE:  Thank you, Your Honor.  I believe this

18   may be a matter that is best discussed out of the presence of

19   the public and the Government.  This is usually an issue

20   decided between the defendant and the Court.

21             THE COURT:  Well, it may be.  But I have some

22   questions that I'm going to require you to respond to.  You can

23   respond to them in camera.  They're very general.  So I don't

24   necessarily agree with you that it should not be a -- I don't

25   necessarily disagree with you.

1          My analysis is hampered by the lack of specific

2    information.  So I'm going to order the defendant to provide a

3    personal declaration addressing the issues with respect to home

4    equity, the proceeds from the rental property, and a

5    description as to the liability that was included in the

6    financial affidavit.  And I'm going to ask that there be a

7    current balance sheet prepared by a professional accountant.

8          I know that the financial affidavit that you use

9    in many of these cases -- in most all of these cases is a form.

10   But when you have a case of this complexity in terms of

11   financial information, even though there was a schedule

12   attached to the financial affidavit, it didn't provide me

13   sufficient information with respect to certain of those

14   entities.  So I'm going to need an elaboration of the schedule

15   that is attached to the financial affidavit which was signed on

16   July 14 of 2020.

17         So if -- I was going to ask or set a deadline for

18   that of August 17th.  Is that something that you think you can

19   accomplish by August 17th, or do you need more time?

20         MS. ALE:  I believe that is sufficient time,

21   Your Honor.

22         THE COURT:  Okay.  And I will allow you to file

23   that in camera.  But I want a much more thorough analysis of

24   the schedule, the items that are listed in the schedule because

25   I have my concerns that Mr. Huizar may not qualify for the

1    services of a public defender.  We will cross that bridge after

2    I have an opportunity to review your filing.

3                    MS. ALE:  Understood, Your Honor.  I would just

4    flag that I do believe we attached as one of the exhibits a

5    statement regarding the proceeds of the rental sale.  To the

6    extent it is not included in the application or the Court

7    doesn't have that, we will provide that in the filing on the

8    17th.

9                    THE COURT:  Okay.  So you are saying it was not

10   attached.

11                   MS. ALE:  I don't remember offhand at the moment.

12                   THE COURT:  I didn't see it.

13                   MS. ALE:  I can provide that to the Court.

14                   THE COURT:  Okay.  I know there were some

15   declarations that were submitted in connection with the

16   application, but I need much more detail in terms of the

17   information that is set forth in those -- in that schedule and

18   those declarations.

19                   All right.  I appreciate counsel's efforts this

20   morning.  I know there's going to be a substantial amount of

21   work that is going to be involved in this case.  It's my

22   observation that having good counsel in this case is going to

23   be beneficial to all concerned because a lot of these issues

24   that typically arise in these type of cases are able to be

25   resolved by good counsel who understand their -- the strengths

1    and weaknesses of their cases and can make the preparation and

2    the trial go a lot smoother.  So I look forward to working with

3    both of you.

4              Does the Government have anything else?

5              MR. JENKINS:  No.  We appreciate the Court's

6    comments and will endeavor to live up to them.

7              MS. ALE:  Nothing further from the defense.

8              THE COURT:  All right.  With that we will be in

9    recess.  Everybody stay safe.

10             MR. JENKINS:  Thank you, Your Honor.  You too.

11             (Proceedings concluded at 9:53 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL REPORTER

            I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME
COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR
THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT
PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE
FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE
STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE
ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
THE UNITED STATES.

                    DATED THIS  7TH  DAY OF AUGUST, 2020.


                    /S/ MIRANDA ALGORRI
                    _____
                    MIRANDA ALGORRI, CSR NO. 12743, CRR
                    FEDERAL OFFICIAL COURT REPORTER