FILED
CLERK, U.S. DISTRICT COURT

11/12/2020

CENTRAL DISTRICT OF CALIFORNIA
BY:    DM    DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2019 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>      v.<br><br>JOSE LUIS HUIZAR,<br>RAYMOND SHE WAH CHAN,<br>  aka "She Wah Kwong,"<br>WEI HUANG,<br>SHEN ZHEN NEW WORLD I, LLC,<br>DAE YONG LEE,<br>  aka "David Lee,"<br>940 HILL, LLC,<br><br>      Defendants. | CR 20-326(A)-JFW<br><br>F I R S T<br>S U P E R S E D I N G<br>I N D I C T M E N T<br><br>[18 U.S.C. § 1962(d): Racketeer Influenced and Corrupt Organizations Conspiracy; 18 U.S.C. §§ 1341, 1343, 1346: Honest Services Mail and Wire Fraud; 18 U.S.C. § 1952(a)(3): Interstate and Foreign Travel in Aid of Racketeering; 18 U.S.C. §§ 666(a)(1)(B), (a)(2): Bribery Concerning Programs Receiving Federal Funds; 18 U.S.C. §§ 1956(a)(1)(B)(i), (a)(2)(B)(i): Money Laundering; 18 U.S.C. § 1014: False Statements to a Financial Institution; 18 U.S.C. § 1519: Alteration of Records in Federal Investigations; 18 U.S.C. § 1001(a)(2): Making False Statements; 31 U.S.C. § 5324(a)(3): Structuring of Currency Transactions to Evade Reporting Requirements; 26 U.S.C. § 7201: Attempt to Evade and Defeat the Assessment and Payment of Income Tax; 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), 982(a)(2), and 1963, 26 U.S.C. § 7301, 28 U.S.C. § 2461(c), 31 U.S.C. § 5317: Criminal Forfeiture] |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

At times relevant to this First Superseding Indictment:

A.   BACKGROUND ON CITY PROCESSES

1.   The City of Los Angeles (the "City") was a government that received more than $10,000 per fiscal year in funds from the United States, including for the years 2013 through 2020, in the form of grants, contracts, subsidies, loans, guarantees, insurance, and other forms of federal assistance.  All legislative power in the City was vested in the City Council and was exercised by ordinance subject to a veto by the Mayor.  The City was divided into fifteen City Council Districts covering different geographic areas.  The City Council was composed of fifteen members elected from single-member districts.

2.   Within the City, large-scale development projects required a series of applications and approvals prior to, during, and after construction.  These applications and approvals occurred in various City departments, including the City Council, the Planning and Land Use Management ("PLUM") Committee, the Economic Development Committee, the Los Angeles Planning Department, the Los Angeles Department of Building and Safety ("LADBS"), the Area Planning Commission, the City Planning Commission ("CPC"), and the Mayor's Office.

3.   Each part of the City approval process required official actions by public officials.  These included entitlements, variances, permits, general plan amendments, subsidies, incentives, public benefits, scheduling agendas for the various committees, and overall approvals.

4.    Even for projects that were not going through the City approval process, City officials could benefit a project or take adverse action against a project by advocating for or against the project, including by pressuring or seeking to influence other City officials, departments, business owners, and stakeholders.

5.    Developers typically hired consultants and/or lobbyists to assist in guiding projects through the development process and City departments, including by interfacing with the City Council office that represented the district in which the project was located.

6.    Under the California Political Reform Act, every elected official and public employee who made or influenced governmental decisions was required to submit a Statement of Economic Interest, also known as the Form 700, annually.

7.    To prevent former City officials from exercising or appearing to exercise improper influence over City decisions, the Los Angeles Municipal Code contained "revolving door" restrictions.  The restrictions imposed a lifetime ban on receiving compensation to attempt to influence City action on a specific matter in which the City official personally and substantially participated in during their City service, either personally or through an agent.  The restrictions also imposed a one-year ban, or "cooling-off" period, during which the City official was prohibited from attempting to influence action, either personally or through an agent, on a matter pending before any City agency for compensation.

B.    RELEVANT PERSONS AND ENTITIES

        (1)  **City Officials and Their Associates**

8.    Defendant JOSE LUIS HUIZAR was the Councilmember for Council District 14 ("CD-14"), first elected in 2005, and re-elected

3

in 2007, 2011, and 2015.  Defendant HUIZAR was the Chair of the PLUM Committee, a body appointed by the City Council President that oversaw many of the most significant commercial and residential development projects in the City.  Defendant HUIZAR also served on the Economic Development Committee.  As a public official employed by the City, defendant HUIZAR owed a fiduciary duty to the City and citizens of the City to perform the duties and responsibilities of defendant HUIZAR's office free from bias, conflicts of interest, self-enrichment, self-dealing, concealment, deceit, fraud, kickbacks, and bribery.

9.   HUIZAR Relative 1, HUIZAR Relative 2, and HUIZAR Relative 3 were close relatives of defendant HUIZAR.  Beginning no later than 2007, HUIZAR Relative 1 received a bi-weekly payment of approximately $2,500 from Law Firm A as part of her employment with Law Firm A, which tasked her with marketing and business development.  Between approximately July 2012 and January 2016, HUIZAR Relative 1 also received regular payments from High School A, totaling approximately $150,000, as a fundraiser.  In or about September 2018, HUIZAR Relative 1 formally announced her candidacy to succeed defendant HUIZAR as Councilmember for CD-14.

10.   HUIZAR Associate 1 was a close associate of defendant HUIZAR and operated Company A in the City.

11.   HUIZAR Associate 2 was a close associate and fundraiser for defendant HUIZAR, who created and operated a political action committee ("PAC"), PAC B, which at times was used to benefit defendant HUIZAR's political causes.

12.   HUIZAR Associate 3 was a close associate of and fundraiser for defendant HUIZAR and operated a company in the City.

4

13.   George Esparza worked for the City as defendant HUIZAR's Special Assistant in CD-14 until on or about December 31, 2017.

14.   City Staffer A-2 worked for the City on defendant HUIZAR's staff in CD-14.

15.   Defendant RAYMOND SHE WAH CHAN, also known as "She Wah Kwong," was the General Manager of the LADBS until in or about May 2016.  In or about May 2016, defendant CHAN was appointed by the Mayor as the City's Deputy Mayor of Economic Development.  As a public official employed by the City, defendant CHAN owed a fiduciary duty to the City and citizens of the City to perform the duties and responsibilities of defendant CHAN's office free from bias, conflicts of interest, self-enrichment, self-dealing, concealment, deceit, fraud, kickbacks, and bribery.  In or about July 2017, defendant CHAN retired from the City and officially began working with George Chiang, consulting and lobbying on behalf of developers.  In August 2017, defendant CHAN established LABXG, Inc. and opened a bank account for LABXG, Inc., for the purpose of, among other things, receiving payments from Chiang and making payments to himself.

16.   CHAN Relative 1 was a close relative of defendant CHAN.

**(2)  Developers and Their Associates**

17.   Defendant WEI HUANG was the Chairman and President of a China-based real estate development company with more than $1 billion invested in projects worldwide and, according to its website, one of China's top developers.  Defendant HUANG was a Chinese national and billionaire.  Defendant HUANG, through U.S. subsidiaries and affiliates, acquired two development properties in the City in 2010 and 2011, respectively, including the L.A. Grand Hotel Downtown located in CD-14.  Beginning in February 2018, defendant HUANG was

5

the Chief Executive Officer of defendant SHEN ZHEN NEW WORLD I, LLC ("SHEN ZHEN COMPANY").  In June 2018, defendants HUANG and SHEN ZHEN COMPANY applied to redevelop the L.A. Grand Hotel into a 77-story skyscraper featuring a mix of residential and commercial uses ("L.A. Grand Hotel Project").

18.  Defendant SHEN ZHEN COMPANY was a California limited liability company registered with the California Secretary of State in 2010.  In 2011, defendant SHEN ZHEN COMPANY acquired the L.A. Grand Hotel Downtown located at 333 S. Figueroa Street in CD-14 for $90 million.

19.  Executive Director E was the Executive Director of defendant SHEN ZHEN COMPANY, and worked directly for defendant HUANG in the City.

20.  General Manager E was the general manager of the L.A. Grand Hotel, employee of defendant SHEN ZHEN COMPANY, and worked directly for defendant HUANG in the City.

21.  Employee E was an employee of defendant SHEN ZHEN COMPANY, and worked directly for defendant HUANG and Executive Director E in the City.  At defendant HUANG's direction, Employee E was the sole representative of Holding Company E, a Hong Kong company, in handling Holding Company E's funds in the United States.

22.  Defendant 940 HILL, LLC was a limited liability company registered with the California Secretary of State in June 2008.  In 2008, defendant 940 HILL, LLC acquired a property located at 940 South Hill Street in CD-14 for $9 million.

23.  Defendant DAE YONG LEE, also known as "David Lee," was a real estate owner and developer who owned commercial properties in the City.  Defendant LEE was the majority owner of defendant 940

6

HILL, LLC.  Defendants LEE and 940 HILL, LLC were planning on building a mixed-use development on the property to include 14,000 square feet of commercial space and over 200 residential units ("940 Hill Project").

24.  Fuer Yuan, a Chinese national, owned a Chinese real estate company which, according to its website, developed projects worldwide.  Yuan, through the U.S. subsidiary Jia Yuan USA Co., Inc. ("Jia Yuan") acquired the Luxe City Center Hotel located at 1020 S. Figueroa Street in CD-14 in 2014, and planned to redevelop it into a mixed-use development that was to include 80,000 square feet of commercial space, 650 residential units, and 300 hotel rooms, valued at $700 million ("Luxe Hotel Project").

25.  General Manager D was the general manager of the Luxe Hotel Project, and an agent of Jia Yuan, until he was terminated from that role in approximately January 2017.

26.  Company F, Company G, Company K, and Company L were China-based real estate development companies that each owned development projects located in CD-14.

27.  Company H and Company J were domestic real estate development companies that each owned development projects located in CD-14.

28.  Company I owned a real estate development project located outside of CD-14 that needed approvals in the PLUM and Economic Development Committees in order to move forward in the City approval process.

29.  Company M was a domestic real estate development company that owned multiple development projects nationwide and located in the City, including Project M located in CD-14.  Project M was a

7

mixed-use development that was to include 125,000 square feet of commercial retail and office floor area and approximately 475 live/work dwelling units.  Executive M was a principal partner of Company M representing Los Angeles.

30.  Developer N owned a domestic real estate development company with a major development project located in CD-14.

31.  Businessperson A operated businesses in the City relating to major development projects, and began covertly working at the direction of the FBI as part of its investigation of City corruption, which included allegations described in this First Superseding Indictment, in approximately August 2017.

**(3)  Consultants and Lobbyists**

32.  George Chiang was the owner of Synergy Alliance Advisors ("Synergy") and a real estate broker and consultant with multiple clients in CD-14, including Jia Yuan, for whom he acted as an agent in his interactions with City officials.  Beginning in approximately July 2017, Chiang and defendant CHAN formally began working together at a real estate brokerage and consulting firm, CCC Investment Inc., with an office in downtown Los Angeles.

33.  Justin Kim was a real estate appraiser and consultant for real estate developers with projects in the City and a major fundraiser for defendant HUIZAR.

34.  Morris Goldman, also known as "Morrie Goldman," was a consultant for real estate developers with projects in the City and a major fundraiser for defendant HUIZAR.  Goldman was a principal officer of PAC A, which purported to be a "general purpose" committee, but in fact was formed to primarily benefit HUIZAR

8

Relative 1's campaign for the CD-14 seat.  Beginning in 2014, Goldman was a consultant hired by Company M to work on Project M.

35.  Lobbyist C was a consultant and lobbyist for real estate developers with projects in the City, including Company H, and a close associate of the Executive Director of Labor Organization A, an unincorporated association of individuals and labor organizations that included labor unions.

36.  These Introductory Allegations are incorporated by reference into each count of this First Superseding Indictment.

COUNT ONE

[18 U.S.C. § 1962(d)]

[DEFENDANTS HUIZAR AND CHAN]

A.    THE RACKETEERING ENTERPRISE

At times relevant to this First Superseding Indictment:

37.   Defendant JOSE LUIS HUIZAR, defendant RAYMOND SHE WAH CHAN, George Esparza, George Chiang, and others known and unknown to the Grand Jury, were members and associates of the CD-14 Enterprise, a criminal organization whose members and associates engaged in, among other things: bribery; mail and wire fraud, including through the deprivation of the honest services of City officials and employees; extortion; interstate and foreign travel in aid of racketeering; money laundering; structuring; and obstruction of justice.  The CD-14 Enterprise operated within the Central District of California and elsewhere.

38.   The CD-14 Enterprise, including its leaders, members, and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact.  The CD-14 Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.  The CD-14 Enterprise engaged in, and its activities affected, interstate and foreign commerce.

B.    OBJECTIVES OF THE ENTERPRISE

39.   The objectives of the CD-14 Enterprise included, but were not limited to, the following:

a.    enriching the members and associates of the CD-14 Enterprise through means that included: bribery; extortion; and mail

and wire fraud, including through the deprivation of the honest services of City officials and employees;

b.   advancing the political goals and maintaining control and authority of the CD-14 Enterprise by elevating members and associates of the CD-14 Enterprise to, and maintaining those individuals' placement in, prominent elected office, through means that included bribery and mail and wire fraud, including through the deprivation of the honest services of City officials and employees;

c.   concealing the financial activities of the CD-14 Enterprise, through means that included money laundering and structuring; and

d.   protecting the CD-14 Enterprise by concealing the activities of its members and associates and shielding the CD-14 Enterprise from detection by law enforcement, the City, the public, and others, through means that included obstructing justice.

C.   <u>RICO CONSPIRACY</u>

40.   Beginning on a date unknown to the Grand Jury, but no later than February 2013, and continuing to the present, in Los Angeles County, within the Central District of California and elsewhere, defendants HUIZAR and CHAN, persons employed by and associated with the CD-14 Enterprise, which engaged in and its activities affected interstate and foreign commerce, conspired with each other and others known and unknown to the Grand Jury, including George Esparza and George Chiang, to unlawfully and knowingly violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the CD-14 Enterprise through a pattern of racketeering activity, as that term

is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of multiple acts:

a. involving bribery, in violation of California Penal Code Sections 31, 67, 67.5(b), 68 and 182(a)(1);

b. indictable under Title 18, United States Code, Sections 1341, 1343, and 1346 (Mail and Wire Fraud, including through the Deprivation of Honest Services);

c. indictable under Title 18, United States Code, Section 1951 (Extortion);

d. indictable under Title 18, United States Code, Section 1952 (Interstate and Foreign Travel in Aid of Racketeering);

e. indictable under Title 18, United States Code, Sections 1956 and 1957 (Money Laundering);

f. indictable under Title 18, United States Code, Section 1512 (Obstruction of Justice and Witness Tampering); and

g. indictable under Title 31, United States Code, Section 5324 (Structuring Transactions to Evade Reporting Requirement).

41. It was a further part of the conspiracy that defendants HUIZAR and CHAN each agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

D. MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED

42. Defendants HUIZAR and CHAN and other members and associates of the CD-14 Enterprise agreed to conduct the affairs of the CD-14 Enterprise through the following means, among others:

a. In order to enrich its members and associates, the CD-14 Enterprise operated a pay-to-play scheme within the City, wherein

12

public officials demanded and solicited financial benefits from developers and their proxies in exchange for official acts. Specifically, through a scheme that involved bribery, mail and wire fraud, and extortion, defendant HUIZAR, defendant CHAN, George Esparza, and other City officials demanded, solicited, accepted, and agreed to accept from developers and their proxies, including George Chiang, some combination of the following types of financial benefits, among others: (1) cash; (2) consulting and retainer fees; (3) favorable loans; (4) gambling chips at casinos; (5) political contributions; (6) flights on private jets and commercial airlines; (7) stays at luxury hotels; (8) expensive meals; (9) spa services; (10) event tickets to concerts, shows, and sporting events; (11) escort and prostitution services; and (12) other gifts.

b.   In exchange for such financial benefits from developers and their proxies, defendant HUIZAR, defendant CHAN, George Esparza, and other City officials agreed to perform and performed the following types of official acts, among others: (1) presenting motions and resolutions in various City committees to benefit projects; (2) voting on projects in various City committees, including the PLUM Committee, and City Council; (3) taking, or not taking, action in the PLUM Committee to expedite or delay the approval process and affect project costs; (4) exerting pressure on other City officials to influence the approval and/or permitting process of projects; (5) using their office to negotiate with and exert pressure on labor unions to resolve issues on projects; (6) leveraging voting and scheduling power to pressure developers with projects pending before the City to affect their business practices; and (7) introducing or voting on City resolutions to

enhance the professional reputation and marketability of businesspersons in the City.

        c.   To hide the money, bribes, and other personal benefits that flowed from the developers and their proxies to the public officials, the CD-14 Enterprise engaged in money laundering and other concealment activities. Specifically, members and associates of the CD-14 Enterprise engaged in the following activities, among others: (1) storing large amounts of cash in one's residence; (2) providing cash to family members and associates; (3) directing payments to family members, associates, and entities to avoid creating a paper trail between the developers, their proxies and public officials; (4) using family members and associates to pay expenses; (5) depositing and exchanging cash at ATMs and banks in amounts under $10,000 to avoid bank reporting requirements; and (6) failing to disclose payments and benefits received on Forms 700 and on tax returns.

        d.   In order to maintain its power and control, members and associates of the CD-14 Enterprise used their positions and relationships to illicitly ensure it maintained a political power base filled with their allies and obtained significant official City positions, resources, and financial support. Specifically, through bribery, members and associates of the CD-14 Enterprise raised funds from developers and their proxies with projects in CD-14 for the following, among others: (1) defendant HUIZAR's re-election campaigns and officeholder accounts; (2) HUIZAR Relative 1's election campaign for the CD-14 seat; and (3) PACs designed to benefit HUIZAR Relative 1's election campaign.

e.   In order to protect the CD-14 Enterprise and avoid detection by law enforcement, the City, the public, and others, members and associates of the CD-14 Enterprise engaged in the following conduct: (1) lying to law enforcement in an effort to impede the investigation into criminal conduct of the CD-14 Enterprise; (2) attempting to corruptly influence the statements of others to law enforcement; and (3) using encrypted messaging applications, including those utilizing a self-destructing message system, to communicate about the affairs of the CD-14 Enterprise.

E.   <u>OVERT ACTS</u>

43.   In furtherance of the conspiracy and to accomplish the object of the conspiracy, on or about the following dates, defendants HUIZAR and CHAN and others known and unknown to the Grand Jury, committed and caused to be committed various overt acts within the Central District of California, and elsewhere, including the following:

(1)   <u>**L.A. Grand Hotel Bribery Scheme**</u>

<u>Overt Act No. 1:</u>   In or around February 2013, defendant CHAN, then the Interim General Manager of LADBS, introduced defendant HUIZAR and George Esparza to Wei Huang, who owned Shen Zhen Company and the L.A. Grand Hotel (located in CD-14), and another property located in a different City district.

<u>Overt Act No. 2:</u>   In May 2013, defendants HUIZAR and CHAN coordinated by e-mail and text messages with Wei Huang and George Esparza to arrange a trip for defendant HUIZAR and CD-14 staff members to visit Huang in China.

**a.    Benefits to Defendant HUIZAR at Casinos**

<u>Overt Act No. 3</u>:    In March 2013, defendant HUIZAR traveled on a private jet with George Esparza, Wei Huang, and Executive Director E to Las Vegas, Nevada.

<u>Overt Act Nos. 4-22</u>:  Between March 2013 and February 2017, defendant HUIZAR and George Esparza traveled to Las Vegas casinos with Wei Huang, Executive Director E, and, at times, General Manager E on the following dates, and was offered and/or accepted benefits, including flights, hotel rooms, spa services, meals, alcohol, prostitution/escort services, and casino gambling chips in the following approximate amounts:

| Overt Act No. | Date(s) | Casino(s) | Expenses (group) | Gambling chips (HUIZAR) | Gambling chips (Esparza) |
|---|---|---|---|---|---|
| 4 | 03/22/2013 to 03/24/2013 | Casino 4 | $56,704 | $10,000 | $2,000 |
| 5 | 12/30/2013 to 01/02/2014 | Casino 4 | $54,141 | $10,000 | $2,000 |
| 6 | 06/07/2014 to 06/08/2014 | Casino 1/ Casino 4 | $61,635 | $10,000 | $2,000 |
| 7 | 06/14/2014 to 06/15/2014 | Casino 1/ Casino 4 | $17,844 | $10,000 | $2,000 |
| 8 | 08/22/2014 to 08/25/2014 | Casino 1 | $138,233 | $13,500 | $2,000 |
| 9 | 03/13/2015 to 03/14/2015 | Casino 1 | $30,952 | $20,000 | $2,000 |
| 10 | 03/28/2015 to 03/30/2015 | Casino 1 | $39,185 | $10,000 | $2,000 |
| 11 | 05/01/2015 to 05/03/2015 | Casino 1 | $2,676 | $10,000 | $2,000 |
| 12 | 07/07/2015 to | Casino 1 | $32,682 | $65,000 | $2,000 |

| Overt Act No. | Date(s) | Casino(s) | Expenses (group) | Gambling chips (HUIZAR) | Gambling chips (Esparza) |
|---|---|---|---|---|---|
| | 07/08/2015 | | | | |
| 13 | 10/28/2015 to 10/30/2015 | Casino 2 | $96,681 | $10,000 | $2,000 |
| 14 | 12/11/2015 to 12/13/2015 | Casino 3 | $35,974 | $10,000 | $2,000 |
| 15 | 02/12/2016 to 02/13/2016 | Casino 2 | $60,798 | $10,000 | $2,000 |
| 16 | 02/26/2016 to 02/28/2016 | Casino 3 | $40,095 | $10,000 | $2,000 |
| 17 | 04/30/2016 to 05/02/2016 | Casino 1/ Casino 2 | $127,256 | $10,000 | $2,000 |
| 18 | 05/05/2016 to 05/07/2016 | Casino 1/ Casino 3 | $16,475 | $10,000 | $2,000 |
| 19 | 05/13/2016 to 05/16/2016 | Casino 1 | $649 | $10,000 | $2,000 |
| 20 | 07/14/2016 to 07/17/2016 | Casino 3 | $1,123 | $10,000 | $2,000 |
| 21 | 08/05/2016 to 08/07/2016 | Casino 2 | $60,463 | $11,000 | $2,000 |
| 22 | 02/04/2017 to 02/06/2017 | Casino 2/ Casino 3 | $16,822 | $10,000 | $2,000 |
| | | TOTAL: | $890,388 | $259,500 | $38,000 |

**b.    Defendant HUIZAR Helps Save Defendant CHAN's Job and then Receives $600,000 to Settle Defendant HUIZAR's Sexual Harassment Lawsuit During His Reelection Campaign**

Overt Act No. 23:    On October 7, 2013, defendant CHAN e-mailed defendant HUIZAR "talking points" regarding an upcoming motion to prevent the consolidation of the Planning Department and the LADBS,

17

which would cost defendant CHAN's powerful position as Interim

General Manager of LADBS.

Overt Act No. 24:   On October 8, 2013, at defendant CHAN's

request, defendant HUIZAR presented an amended motion and spoke in

favor of preventing the consolidation of the two departments, and

defendant CHAN expressed his gratitude to defendant HUIZAR in a text

message: "You are such an eloquent speaker! UNBELIEVABLE! Please

accept my deepest, most sincere gratitude. Believe me or not, I have

[t]ears in my eyes! I am actually crying! Thank you, thank you, thank

you!".

Overt Act No. 25:   On October 17, 2013, defendants HUIZAR and

CHAN discussed the sexual harassment lawsuit filed against defendant

HUIZAR, and traded text messages about how defendant CHAN would

facilitate Wei Huang's assistance with the lawsuit.  Specifically,

defendant CHAN wrote: "The chairman [Huang] asks if there is anything

that he can help."

Overt Act No. 26:   On October 18, 2013, defendant CHAN

coordinated a meeting between defendant HUIZAR and Wei Huang to

discuss Huang's financial help regarding the lawsuit.

Overt Act No. 27:   On November 5, 2013, defendant CHAN e-mailed

defendant HUIZAR a motion to present regarding the proposed

consolidation of the City departments, and wrote to defendant HUIZAR

in a text message: "I heard that the item (motion) may go consent

this morning at council. If it goes consent, then I guess we do not

need to do the amendment. If it is called special, then can you

please introduce the amendment? Please advise."

Overt Act No. 28:   On November 6, 2013, defendant HUIZAR

forwarded the motion and e-mail from defendant CHAN to another public

official, writing: "Don't mention I got this from [defendant CHAN].
Please print and have ready for me to submit to council today on this
item."

Overt Act No. 29:   On June 14, 2014, defendant CHAN sent a text
message to defendant HUIZAR, writing: "I'll confirm the Vegas trip
with [Wei Huang] and report back to you."

Overt Act No. 30:   On July 18, 2014, defendant CHAN, via text
message, continued coordinating discussions between defendant HUIZAR
and Wei Huang regarding the settlement funds.

Overt Act No. 31:   In or around August 2014, defendant HUIZAR,
George Esparza, and Executive Director E communicated by e-mail with
Attorney E, who was retained by Executive Director E to draft and
execute the necessary paperwork to effectuate the financial
transactions transferring funds to defendant HUIZAR.

Overt Act No. 32:   On August 17, 2014, defendant HUIZAR e-
mailed George Esparza, Executive Director E, and Attorney E regarding
settlement funds for the sexual harassment lawsuit, writing:
"[P]laintiff attorney is asking for a deadline of Tuesday noon to
sign settlement. otherwise they pull the settlement offer. let me
know as soon as money has been transferred and available. i just need
to know it is there before we sign it."

Overt Act No. 33:   On August 20, 2014, defendants CHAN and
HUIZAR, via text messages, discussed coordinating meetings with Wei
Huang to discuss the settlement funds.

Overt Act No. 34:   On or about August 22, 2014, defendant
HUIZAR executed a Promissory Note with Holding Company E, wherein
Holding Company E agreed to wire $600,000 to defendant HUIZAR.  The
Promissory Note provided that the principal and all accrued interest

would be due and payable as one "balloon payment of $800,000" no later than August 22, 2020.

Overt Act No. 35:   On August 25, 2014, defendant CHAN reached out to defendant HUIZAR by text message regarding settlement fund discussions.

Overt Act No. 36:   On September 3, 2014, defendant HUIZAR communicated with Attorney E by e-mail regarding the transfer of funds for his settlement.  Specifically, after Attorney E assured defendant HUIZAR that the Promissory Note would remain concealed, defendant HUIZAR responded: "can you find out before we go if I can simply state the purpose of loan is: 'for personal use.' Would that be sufficient[?] I obviously do not want to state that it is for settlement."

Overt Act No. 37:   On September 15, 2014, defendant HUIZAR instructed defendant CHAN: "hold off on asking chairman [Wei Huang]. George [Esparza] told me that [Executive Director E] was frustrated that we keep asking him. [Executive Director E] said that chairman [Huang] will call china tonight. Lets wait til tomorrow to see what happens."

Overt Act No. 38:   On September 17, 2014, defendant HUIZAR, in conjunction with Wei Huang, caused Bank 1 to open a Certificate of Deposit account under Holding Company E ("the CD Account"), listing defendant HUIZAR and Holding Company E as "owner," and listing Employee E as the authorized signor.

Overt Act No. 39:   On September 19, 2014, defendant CHAN wrote to defendant HUIZAR: "Everything good sir?" Defendant HUIZAR confirmed: "Yes" and "Thank u."

<u>Overt Act No. 40:</u>   Before on or about September 22, 2014, defendant HUIZAR, in conjunction with Wei Huang, caused $600,000 to be wired from a bank account in Hong Kong to an Interest on Lawyer Trust Account at a bank in Arcadia, California, and subsequently caused a check to be issued from that account to Holding Company E for $600,000.

<u>Overt Act No. 41:</u>   On September 22, 2014, defendant HUIZAR, in conjunction with Wei Huang, caused Holding Company E to deposit the $600,000 check into the CD Account as a Certificate of Deposit.

<u>Overt Act No. 42:</u>   On September 23, 2014, defendant HUIZAR caused Bank 1 to issue a loan to defendant HUIZAR for $570,000, using the $600,000 in the CD Account provided by Wei Huang as collateral for the loan.  The loan provided for 60 monthly payments, with the total amount to be repaid as $656,687.47, and the first interest payment due on October 23, 2014.

<u>Overt Act No. 43:</u>   On September 23, 2014, defendant HUIZAR authorized a transfer of $570,000 from his personal loan account at Bank 1 to a bank account for the law firm that represented defendant HUIZAR in the sexual harassment lawsuit, to pay for the settlement of the lawsuit.

<u>Overt Act No. 44:</u>   On December 4, 2014, Employee E forwarded an e-mail containing a request from Bank 1 sent to Employee E and defendant HUIZAR regarding the loan to Executive Director E and another Shen Zhen Company employee.

<u>Overt Act No. 45:</u>   On December 4, 2014, defendant HUIZAR sent a text message to George Esparza, writing: "Tell [Executive Director E] that [Employee E] needs to send address of foreign company to [Bank 1]. I got notice today that they have been asking her for it and if

they don't get it, it will instigate an audit and we don't want that. Have her send address tomorrow."

Overt Act No. 46:   On May 10, 2016, defendant HUIZAR forwarded an e-mail request from Bank 1 regarding paperwork for the loan to Wei Huang, via George Esparza and Executive Director E.

Overt Act No. 47:   On June 22, 2017, defendant CHAN and George Chiang, in a telephone call, discussed defendant CHAN's integral role, along with Wei Huang and Executive Director E, in saving defendant HUIZAR's career by helping resolve the 2013 sexual harassment lawsuit against defendant HUIZAR.  Specifically, defendant CHAN stated: "I consider [HUIZAR] an ally, as my brother."  Chiang replied: "but the issue is that you already put ... your ass on fire for [HUIZAR], you did a lot of stuff for him."  Later in the conversation, Chiang continued: "without you doing that [HUIZAR] would not be here today."  Defendant CHAN responded: "[N]ot just me, but you know with uh, [Executive Director E], and [not] without ... Chairman [Huang]."

Overt Act No. 48:   On October 23, 2018, in a telephone call between George Chiang and City Staffer A-2, Chiang told City Staffer A-2 that defendant HUIZAR needed help finding a source for the hundreds of thousands of dollars required to settle the sexual harassment lawsuit against him because the City would not pay it. Chiang then explained: "You are my brother so I'm going to tell you this .... JOSE [HUIZAR] still has to give RAY [CHAN] the respect, because, RAY [CHAN] really really helped out JOSE [HUIZAR] on the [sexual harassment lawsuit] shit.  Because RAY [CHAN] was there for him and without RAY [CHAN], I don't think, I really think that JOSE [HUIZAR] would have just resigned."

<u>Overt Act No. 49:</u>   On December 12, 2018, defendant HUIZAR caused himself to be enriched by $575,269.61, by failing to make interest payments on his personal loan for three consecutive months, and thereby allowing the collateral Wei Huang provided to Bank 1 to be applied to the remaining balance defendant HUIZAR owed on the loan.

**c.   Requests to Defendant HUIZAR**

<u>Overt Act No. 50:</u>   On May 17, 2013, George Esparza received an e-mail from an employee of a Shen Zhen Company affiliate entity requesting a "favor" from defendant HUIZAR relating to a visa application for another Shen Zhen Company affiliate employee.

<u>Overt Act No. 51:</u>   On or around May 17, 2013, defendant HUIZAR signed a letter on official letterhead addressed to the United States Consulate General in Guangzhou, China, supporting a visa application for the Director of Finance for a Shen Zhen Company affiliate entity.

<u>Overt Act No. 52:</u>   On June 4, 2013, defendant HUIZAR received an e-mail from Wei Huang in which Huang enlisted defendant HUIZAR's help regarding Huang's son's admission to a Southern California university.  The email stated: "I would be grateful if you could do me a favor to help contact with [the school] about my son's [application] status."  Thereafter, defendant HUIZAR facilitated a meeting between Huang's son and a high-ranking school official.

<u>Overt Act No. 53:</u>   On July 13, 2013, defendant HUIZAR received an e-mail from a Shen Zhen Company employee asking defendant HUIZAR to arrange a meeting with the head of a labor union, which had a dispute related to the L.A. Grand Hotel.

<u>Overt Act No. 54:</u>   On September 27, 2013, as part of Wei Huang's ongoing effort to enlist defendant HUIZAR's help to negotiate

23

and resolve a parking lot dispute with the owners of a plot of land adjacent to the L.A. Grand Hotel, defendants HUIZAR and CHAN discussed scheduling meetings via text messages.

Overt Act No. 55:   In April 2014, to benefit Wei Huang's reputation in the business community, defendant HUIZAR introduced and signed a resolution before the City Council recognizing Huang for his achievements and contributions to the economy of CD-14, which the City Council signed and adopted.

Overt Act No. 56:   On June 27, 2017, at defendant HUIZAR's direction, George Esparza put General Manager E in touch with a CD-14 staff member to discuss and facilitate resolving union issues at Wei Huang's two hotels in the City.

Overt Act No. 57:   On May 4, 2016, defendant CHAN, in his capacity as General Manager of LADBS, agreed to meet with consultants for Shen Zhen Company to discuss the "hotel expansion study" and "Chairman Huang's idea ... to test the maximum allowable development" for the property and defendant CHAN's "help to get started."

Overt Act No. 58:   In or around July 2016, defendant CHAN participated in a conference call with Wei Huang and consultants hired by Shen Zhen Company to discuss the expansion of the L.A. Grand Hotel, and the City's approvals for the development project.

Overt Act No. 59:   On August 4, 2016, defendants HUIZAR and CHAN met with Wei Huang and senior officials from the Planning Department, senior CD-14 staff members, and members of Huang's team to discuss the expansion of the L.A. Grand Hotel, including Huang's interest in pursuing Transient Occupancy Tax rebates, Transfer of Floor Area Rights ("TFAR"), and other incentives from the City.

<u>Overt Act No. 60:</u>  In or around August 2016, on a private jet flight back from Las Vegas, defendant HUIZAR had a conversation with Wei Huang in which Huang requested assistance in hiring a consultant on the L.A. Grand Hotel Project, and defendant HUIZAR agreed to help.

<u>Overt Act No. 61:</u>  On August 15, 2016, George Esparza texted defendant HUIZAR regarding the L.A. Grand Hotel Project: "Reminder boss to decide what land use expediters you want to recommend to the Chairman [Wei Huang]."

<u>Overt Act No. 62:</u>  On October 18, 2016, George Esparza received a text message sent by Executive Director E at Wei Huang's request. The text message requested Esparza's assistance to get a letter signed by defendant HUIZAR regarding the L.A. Grand Hotel Project, explaining: "The reason for the letter is to get money from china for [t]he [L.A. Grand Hotel] project at downtown."

<u>Overt Act No. 63:</u>  On October 19, 2016, defendant HUIZAR received an e-mail and attachment forwarded by Executive Director E that was prepared by Wei Huang regarding the L.A. Grand Hotel Project.  The attachment was a draft letter from defendant HUIZAR to Huang on defendant HUIZAR's official letterhead, referencing Huang's "application for the Los Angeles Highest Building Project [the L.A. Grand Hotel Project]" and a recent meeting attended by defendant HUIZAR, defendant CHAN, and other City officials regarding the L.A. Grand Hotel Project.

<u>Overt Act No. 64:</u>  On October 20, 2016, defendant HUIZAR signed the official letter after revising it to remove the reference to defendant CHAN and noting: "The proposed project may result in one of the largest buildings in the City of Los Angeles."  At defendant

HUIZAR's direction, George Esparza then sent the letter by e-mail to Wei Huang.

Overt Act No. 65:   On December 16, 2016, George Esparza forwarded an e-mail to defendant HUIZAR from City Staffer A-2, listing a number of consultants, writing: "Hi Boss, Here is the list of land use consultants per [City Staffer A-2]'s past recommendations. Chairman [Wei Huang] would like us to schedule interviews on Monday."

Overt Act No. 66:   On December 19, 2016, George Esparza received a voicemail from General Manager E that stated: "Hi George, this is [General Manager E], I am with Chairman [Wei Huang] right now in a meeting regarding the L.A. [Grand Hotel] project. So when you get a chance call me back and we would like to find out if you get a chance get a hold of the contact regarding this program."

Overt Act No. 67:   On December 19, 2016, defendant HUIZAR sent the list of consultants to Executive Director E by e-mail, who then forwarded the list to Wei Huang by e-mail.

Overt Act No. 68:   On May 9, 2017, in a telephone call, George Esparza discussed with Executive Director E the financial relationship between defendant HUIZAR and Wei Huang.  Specifically, Executive Director E stated that Huang expected to lay out "everything in front of" defendant HUIZAR at an upcoming trip to Cabo San Lucas, which referred to the assistance Huang expected from defendant HUIZAR on the L.A. Grand Hotel Project.  Executive Director E stated that "otherwise Chairman [Huang] [will] ask [defendant HUIZAR] to ... pay back that $600,000 already."  Esparza stated that defendant HUIZAR was "not going to do that either," referring to

paying back the $600,000.  Executive Director E then responded: "Chairman [Huang] will push him."

Overt Act No. 69:  On May 9, 2017, in a telephone call, George Esparza told a CD-14 staffer: "Chairman [Wei Huang] should have all the leverage in the world [be]cause of what [defendant HUIZAR] owes [Huang]."

Overt Act No. 70:  On July 19, 2018, after Shen Zhen Company had filed an application with the Planning Department on June 11, 2018, to expand and redevelop the L.A. Grand Hotel, which included, among other things, a request for a TFAR entitlement, which would need approval in the PLUM Committee and City Council, defendant HUIZAR received a text message from General Manager E stating: "Hello JOSE, this is [General Manager E] from the LA hotel, hope all is well. Chairman Huang is coming to US next week, he would like to meet with you and your staff to discuss the [L.A. Grand] hotel expansion project. Can you make time to see us?"  Defendant HUIZAR responded that he "would prefer to meet [Huang] first for dinner."

   **d.   CD-14 Enterprise Members' Solicitation of Political Contributions by Foreign Nationals to Help Maintain the Enterprise's Political Power**

Overt Act No. 71:  On December 19, 2013, defendant CHAN forwarded by e-mail a "HUIZAR Re-Election Campaign – Donation Form" to Wei Huang, who was a foreign national prohibited from contributing to a U.S. election.

Overt Act No. 72:  On April 12, 2016, defendant HUIZAR sent a text message to George Esparza confirming that a fundraiser event for a federal political candidate at Huang's hotel was "confirmed with Chairman [Huang]."

<u>Overt Act No. 73:</u>   On April 19, 2016, defendant HUIZAR sent a text message to George Esparza regarding fundraising efforts for a federal political candidate, including directing Esparza to conceal the true source of certain contributions from the political candidate's fundraiser, confirming "we are set for the 200 k as discussed. 50 k [one individual] 80 k chairman [Wei Huang] 70 k between me and [Executive Director E]."  Defendant HUIZAR then wrote: "[The fundraiser] still thinks it is 50 k Justin [Kim], 50 k Indian dude and me 100 k. Keep it that way."

<u>Overt Act No. 74:</u>   On April 27, 2016, George Esparza received a voicemail from General Manager E stating that General Manager E was with Wei Huang and wanted to discuss the fundraiser for the federal political candidate.

<u>Overt Act No. 75:</u>   On February 9, 2017, George Esparza received a voicemail from General Manager E stating that Wei Huang wanted to meet with defendant HUIZAR at the L.A. Grand Hotel with a state political candidate.

<u>Overt Act No. 76:</u>   On February 28, 2017, George Chiang sent a group text message to defendant CHAN and CHAN Relative 1 about a fundraiser for the state political candidate, writing: "[Executive Director E] had a 20k quota from chairman Huang. So the breakdown was 20k JOSE [HUIZAR] and 28k [Executive Director E]. Just between us. By the way, looks like that 58k check is the only one tonight. Overheard [Executive Director E] telling ... the campaign manager that chairman Huang will write a big check before the night is over."  Chiang then added: "Sorry I meant JOSE [HUIZAR] 20k and [Executive Director E] 38k. On the other hand [the political candidate] knows that the entire 58k was support gathered by you [defendant CHAN]."

<u>Overt Act No. 77:</u>  In or around August 2018, defendant HUIZAR traveled with Wei Huang to a golf resort in Northern California, and accepted benefits from Huang, including private jet round trip transportation, accommodations, meals, and other costs.  During the trip, defendant HUIZAR requested and Huang agreed to support HUIZAR Relative 1's campaign for the CD-14 seat, including by hosting a fundraiser in November 2018 and pledging to raise or contribute $50,000 to benefit the campaign.

<u>Overt Act No. 78:</u>  On September 4, 2018, during a conversation at the CCC Investment office, defendant CHAN and George Chiang discussed fundraising for HUIZAR Relative 1's campaign, including the contemplated $50,000 contribution by Wei Huang.  Defendant CHAN stated that defendant HUIZAR and HUIZAR Relative 1 have "both Chairmen," referring to the fact that both Huang and Fuer Yuan, who were both foreign nationals, had committed to financially support HUIZAR Relative 1's election campaign.

<u>Overt Act No. 79:</u>  On September 24, 2018, defendant HUIZAR met with Businessperson A, who was then working at the direction of the FBI, at a restaurant in Los Angeles.  During the meeting, defendant HUIZAR told Businessperson A that Wei Huang was going to host a fundraising event for HUIZAR Relative 1 at one of Huang's hotels on November 9, 2018, with the goal of raising $100,000.

<u>Overt Act No. 80:</u>  On October 17, 2018, defendant HUIZAR sent a text message to General Manager E, writing: "The chairman [Wei Huang] and I had spoken about setting up a fundraiser for [HUIZAR Relative 1] on November 9 at [Huang's hotel]. Checking in to see if we are still planning it. Can u send me your email to send a draft

Invitation for event and can u also check with chairman if we are still moving forward with event?"

Overt Act No. 81:    On October 18, 2018, defendant HUIZAR received a text message from General Manager E sent on behalf of Wei Huang, confirming that Huang would allow his hotel to host the fundraiser for HUIZAR Relative 1, writing: "Chairman [Huang] agree with the arrangement. [Huang's relative] will be the contact person at [Huang's hotel] handle all the detail."

Overt Act No. 82:    On November 5, 2018, defendant HUIZAR sent a text message to General Manager E, writing: "I didn't get around to confirming the November 9 event with chairman [Wei Huang] with [Huang's relative] as we discussed. We are rescheduling the nov 9 event. Please let Chairman know if we can reschedule for end of November and if we can confirm a date."

Overt Act No. 83:    On November 5, 2018, defendant HUIZAR sent defendant CHAN a text message, writing: "Hey RAY [CHAN]. We are rescheduling the nov 9 event. Hopefully u can still raise the funds for the event as we discussed when rescheduled."  Defendant CHAN replied: "Yes sir!"

Overt Act No. 84:    On November 6, 2018, defendant CHAN sent defendant HUIZAR a text message confirming defendant CHAN had received $12,500 in contributions to HUIZAR Relative 1's campaign, and expected another $12,500 by November 16, 2018.

### (2)  **940 Hill Bribery Scheme**

Overt Act No. 85:    On August 8, 2016, after Labor Organization A filed an appeal that prevented the 940 Hill Project from progressing through the City approval process, Justin Kim received a telephone call from David Lee, asking Kim to obtain defendant

HUIZAR's assistance in dealing with the appeal, which could ultimately reach the PLUM Committee, which defendant HUIZAR chaired.

Overt Act No. 86:   On August 9, 2016, Justin Kim received a copy of the appeal from David Lee by e-mail, which Kim then forwarded to George Esparza by e-mail.

Overt Act No. 87:   On September 1, 2016, defendant HUIZAR received a written brief from City Staffer A-2 regarding the 940 Hill Project, which noted that "Justin Kim will be requesting your support in denying the appeal," and that a certain component of the appeal would reach the PLUM Committee and City Council.

Overt Act No. 88:   On September 1, 2016, defendant HUIZAR, George Esparza, and Justin Kim had dinner together and then visited a Korean karaoke establishment, where Kim asked defendant HUIZAR for assistance with the appeal on the 940 Hill Project, and defendant HUIZAR agreed to help.  Kim then called David Lee and asked him to join the group at karaoke, which Lee did.

Overt Act No. 89:   On September 2, 2016, George Esparza and Justin Kim met for lunch in Los Angeles.  At defendant HUIZAR's direction, Esparza expressed to Kim that defendant HUIZAR would not help the 940 Hill Project for free and that defendant HUIZAR would require a financial benefit in exchange for his help ensuring the 940 Hill Project moved forward through the City approval process.

Overt Act No. 90:   On September 3, 2016, Justin Kim met with David Lee at a bowling alley in Little Tokyo, where Kim conveyed to Lee the message from defendant HUIZAR and George Esparza, namely, that defendant HUIZAR's assistance on the 940 Hill Project would require that defendant HUIZAR receive a financial benefit.

Overt Act No. 91:   On January 17, 2017, defendant HUIZAR, George Esparza, and Justin Kim met with David Lee's business associates at defendant HUIZAR's City Hall office to discuss, among other things, the 940 Hill Project.  During a private meeting that included only defendant HUIZAR, Esparza, and Kim, Kim again asked defendant HUIZAR for assistance with the appeal, and defendant HUIZAR responded that he could help.  Defendant HUIZAR also stated that defendant HUIZAR wanted Kim to be a major supporter when HUIZAR Relative 1 ran for the CD-14 seat.

Overt Act No. 92:   In or around January 2017, at the direction of defendant HUIZAR, George Esparza obtained information indicating that resolving the appeal on the 940 Hill Project would save David Lee an estimated $30 million on development costs.

Overt Act No. 93:   On January 19, 2017, defendant HUIZAR and George Esparza discussed asking David Lee for $1.2 million to resolve the Labor Organization A appeal, with $500,000 to be paid to defendant HUIZAR, $500,000 to be paid to Justin Kim, and $200,000 to be paid to Esparza.

Overt Act No. 94:   In or around January 2017, based on his conversations with defendant HUIZAR and Lobbyist C, George Esparza told Justin Kim that it would cost approximately $1.2 million to $1.4 million to convince defendant HUIZAR to resolve the appeal and allow the 940 Hill Project to move forward in the City approval process.

Overt Act No. 95:   Between February 2, 2017 and February 10, 2017, George Esparza had a text message conversation with defendant HUIZAR discussing the negotiation of the bribe payment and the amount of the bribe payment from David Lee to defendant HUIZAR, while at the

32

same time having a text message conversation with Justin Kim about the same issues.

Overt Act No. 96:   In approximately February 2017, George Esparza and Justin Kim had discussions regarding the negotiation of the bribe amount.  Kim conveyed a counteroffer of $500,000 cash from David Lee for defendant HUIZAR.  Esparza then conveyed this counteroffer to defendant HUIZAR, stating specifically that defendant HUIZAR would obtain $300,000 total and Kim would receive $200,000 total for facilitating the bribery scheme.

Overt Act No. 97:   In approximately February 2017, George Esparza and defendant HUIZAR discussed the appeal, and defendant HUIZAR instructed Esparza to speak to Lobbyist C, a close associate of the Executive Director of Labor Organization A.

Overt Act No. 98:   On February 14, 2017, George Esparza had a text message conversation with Lobbyist C about setting up a private meeting between Lobbyist C and defendant HUIZAR.  Specifically, Esparza wrote: "My boss [defendant HUIZAR] asked if you guys can have a one on one on Tuesday at 830am?... Just you and the Councilman."

Overt Act No. 99:   On February 21, 2017, defendant HUIZAR and George Esparza discussed the appeal, and defendant HUIZAR stated that he would talk to Lobbyist C to encourage Labor Organization A to withdraw the appeal.  Defendant HUIZAR also told Esparza that the appeal could be denied in the PLUM Committee.  Esparza then documented this conversation via notes on his phone.

Overt Act No. 100:   In approximately February 2017, defendant HUIZAR discussed the appeal with Lobbyist C, and conveyed that defendant HUIZAR would oppose the appeal in the PLUM committee.

Lobbyist C agreed to discuss the issue with the Executive Director of Labor Organization A.

Overt Act No. 101:   On February 22, 2017, George Esparza had a text message conversation with Lobbyist C about a private meeting at defendant HUIZAR's request.  Specifically, Esparza wrote: "I still need to talk to you one on one per my bosses [defendant HUIZAR] request."

Overt Act No. 102:   On March 1, 2017, George Esparza had a text message conversation with Lobbyist C about the status of the appeal.

Overt Act No. 103:   On March 3, 2017, George Esparza received a text message from Lobbyist C regarding the appeal on the 940 Hill Project, which stated: "Appeal dropped today."  Esparza then informed Justin Kim that defendant HUIZAR had held up his end of the bargain and helped resolve the appeal.

Overt Act No. 104:   In early March 2017, Justin Kim informed David Lee that defendant HUIZAR held up his end of the agreement and helped resolve the appeal.

Overt Act No. 105:   On March 14, 2017, Justin Kim met with David Lee at Lee's office in Los Angeles and received cash from Lee, which was intended to be a bribe from Lee to pay for defendant HUIZAR's assistance in resolving the appeal.

Overt Act No. 106:   On March 14, 2017, George Esparza sent a text message to Justin Kim that asked: "Address again please."  Kim provided the address for David Lee's office, which Esparza entered into his Waze application.  Esparza then texted Kim: "I'm on the corner. Wait for u in my car."

Overt Act No. 107:   On March 14, 2017, Justin Kim met with George Esparza in a car outside David Lee's office and gave Esparza

34

cash to deliver to defendant HUIZAR, but Kim kept some cash for himself for facilitating the bribe payment.

Overt Act No. 108:  On March 14, 2017, George Esparza sent a text message to defendant HUIZAR, asking: "Are you home?"  Defendant HUIZAR responded: "Yes."  Esparza then wrote: "Can I stop by? Just finished meeting with Justin [Kim]."

Overt Act No. 109:  On March 14, 2017, defendant HUIZAR and George Esparza met at defendant HUIZAR's residence.  Esparza told defendant HUIZAR that David Lee had provided $400,000 in cash, and that Lee would provide the remaining $100,000 later.  Esparza stated that Justin Kim had provided $200,000 of that cash to Esparza.  At the meeting, Esparza showed defendant HUIZAR a liquor box filled with cash.  Defendant HUIZAR told Esparza to hold on to and hide the money at Esparza's residence until defendant HUIZAR asked for it. Defendant HUIZAR told Esparza that Esparza could have $100,000 of the $300,000 total amount defendant HUIZAR expected to receive from Lee, meaning defendant HUIZAR's share of the bribe was $200,000.

Overt Act No. 110:  In or around July 2017, Justin Kim met with David Lee at Lee's office in Los Angeles.  In that meeting, Lee provided Kim an additional $100,000 in cash, which they understood was meant to be a bribe to defendant HUIZAR, but which Kim kept for himself.

Overt Act No. 111:  On December 28, 2017, defendant HUIZAR and George Esparza met at City Hall and, in defendant HUIZAR's private bathroom, discussed various topics, including Esparza's interviews with the FBI and the cash bribe Esparza was holding for defendant HUIZAR.  Specifically, during that conversation, defendant HUIZAR stated: "I have a lot of expenses now that [HUIZAR Relative 1]'s

running. [HUIZAR Relative 1] is not going to be working anymore....
Um, that is mine, right? ... That is mine." Esparza affirmed the
$200,000 cash bribe money was defendant HUIZAR's. Defendant HUIZAR
and Esparza agreed to wait until April 1, 2018, for Esparza to
provide the $200,000 cash owed to defendant HUIZAR, to allow some
cooling off after Esparza's interviews with the FBI in hopes that it
would decrease the likelihood of law enforcement discovering the
cash.

Overt Act No. 112: In or around April 2018, defendant HUIZAR
and George Esparza communicated by telephone and agreed to postpone
their meeting to deliver defendant HUIZAR's $200,000 in bribery cash
to October 1, 2018.

Overt Act No. 113: On September 30, 2018, as part of a series
of unanswered text messages he sent to George Esparza regarding the
expected delivery of defendant HUIZAR's cash bribe, defendant HUIZAR
wrote: "Hey George. Tomorrow is October first. When we gonna meet?"

Overt Act No. 114: On October 4, 2018, defendant HUIZAR wrote
to George Esparza via text message: "Hey George. So we gonna meet up
like u said we would after October?"

Overt Act No. 115: On October 5, 2018, defendant HUIZAR met
with Justin Kim at a hotel in Pasadena, where defendant HUIZAR asked
Kim to turn off his phone to ensure their meeting was not recorded.
Defendant HUIZAR stated that he had not gotten his share and held up
two fingers, referring to the $200,000, which was defendant HUIZAR's
share of the bribe payment from David Lee in exchange for defendant
HUIZAR's help with the appeal, because George Esparza was still
holding on to the cash.

<u>Overt Act No. 116:</u>  On October 14, 2018, defendant HUIZAR wrote to George Esparza via text message: "George. I've been trying to connect with you. We have a meeting that was supposed to occur on October 1."

<u>Overt Act No. 117:</u>  On October 20, 2018, defendant HUIZAR wrote to George Esparza via text message: "George. I've been trying to reach u. When are we going to meet and square up?"

<u>Overt Act No. 118:</u>  On October 22, 2018, defendant HUIZAR wrote to George Esparza via text message: "Sounds like u don't ever want to meet and face up to your commitment to meet on October 1 and u are using other pretexts as to why u don't want to meet. You are using excuses as for the real reason u don't want to meet and u know it. U told me October. Now What? Each time comes up and u don't want to meet at all? U want it all and that's the real reason why you don't want to meet and are using all kind of excuses. One more time, when are we going to meet?"

### (3)  <u>**Luxe Hotel Bribery Schemes**</u>

#### a.  **Early Corrupt Relationship with Jia Yuan**

<u>Overt Act No. 119:</u>  On March 24, 2014, defendant CHAN facilitated the introduction of defendant HUIZAR to Jia Yuan and Fuer Yuan via an e-mail to George Esparza.

<u>Overt Act No. 120:</u>  On August 21, 2014, defendant HUIZAR received an e-mail from Employee D, which copied General Manager D, requesting defendant HUIZAR's assistance regarding an American Disabilities Act ("ADA") compliance issue at the Luxe Hotel located in CD-14.

<u>Overt Act No. 121:</u>  On August 26, 2014, defendant HUIZAR received an e-mail from Employee D, sent to defendant HUIZAR, a CD-14

staffer, and General Manager D, that stated: "I just got a call from Building and Safety Department of LA City, and a meeting with them is confirmed tomorrow morning to discuss about our ADA challenge. Thanks so much again for JOSE [HUIZAR] and you for helping us with this."

Overt Act No. 122:  On August 27, 2014, defendant CHAN confirmed to defendant HUIZAR that he helped resolve the ADA issue for Jia Yuan, writing in a text message: "I took care of the disabled access issue for the [Luxe] Hotel already. I told them that you asked me to help. They were very appreciative."

Overt Act No. 123:  On September 19, 2014, George Esparza forwarded to defendant HUIZAR an e-mail from Employee D that attached three Katy Perry concert tickets valued at approximately $1,000 total for defendant HUIZAR and his family.

Overt Act No. 124:  On November 4, 2014, defendant CHAN sent a text message to defendant HUIZAR, writing: "I will be having dinner with chairman [Fuer Yuan] tonight. I also knew that you will have dinner with him Thursday. I just want to touch base with you as to what George Chiang and I should tell him."

Overt Act No. 125:  On November 4, 2014, George Chiang sent an e-mail to George Esparza with the subject line "HUIZAR Fundraising," writing: "Can you get me in touch with [defendant HUIZAR]? [Defendant CHAN] and I had dinner with [Jia Yuan] last night regarding pledging their support so I want to discuss this to prepare the Councilman's dinner with them this Thursday."

Overt Act No. 126:  On November 26, 2014, defendant HUIZAR, George Esparza, and George Chiang met with Chairman Fuer Yuan and HUIZAR Relative 1 over dinner at the Luxe Hotel, where defendant

HUIZAR and Yuan discussed Jia Yuan's support for defendant HUIZAR and defendant HUIZAR's support for the Luxe Hotel Project.

Overt Act No. 127:  On September 7, 2015, defendant CHAN, in his capacity as General Manager of LADBS, communicated with defendant HUIZAR and George Chiang via group text message regarding organizing meetings with various City departments to help the Luxe Hotel Project, writing "please stress that this will be a standing biweekly meeting until the TFAR matter is determined. Please let me know if there is anything that I can be is assistance."

Overt Act No. 128:  On September 8, 2015, George Chiang sent a group text message to defendants HUIZAR and CHAN, writing: "Dear JOSE [HUIZAR] and RAY [CHAN], thank you for making this arrangement possible.  As the clock ticks, the chairman [Fuer Yuan] is beginning to feel weary about our progress. I just need to make sure that he sees the light at the end of the tunnel. Once again, thank you both for all of your support hopefully I can bring some good news within the near future. Like always, please let me know if I can be helpful."

Overt Act No. 129:  In or around 2015 or 2016, defendant HUIZAR, through George Esparza, asked George Chiang to have Jia Yuan set up a monthly retainer with Law Firm A, from which HUIZAR Relative 1 received bi-weekly paychecks of approximately $2,500.

Overt Act No. 130:  In approximately 2016, at a meeting that included defendant HUIZAR, George Chiang, and Fuer Yuan, defendant HUIZAR asked Chiang to relay to Yuan that: (1) there was no need to involve the City's Mayor in the approval process of the Luxe Hotel Project because defendant HUIZAR was the one in control of the PLUM committee; (2) the City's Mayor could not provide help to Yuan

because it was defendant HUIZAR who drove the project; and (3) as far as the success of the Luxe Hotel Project was concerned, Yuan did not need anyone else in the City but defendant HUIZAR.

**b.    Consulting Fees in Exchange for Official Acts**

Overt Act No. 131:  On November 11, 2015, defendant HUIZAR, George Chiang, and George Esparza met with Fuer Yuan and General Manager D over dinner at a restaurant in Arcadia, California. Defendant HUIZAR and Yuan discussed defendant HUIZAR's support for the Luxe Hotel Project.  In the same conversation, defendant HUIZAR asked Yuan to hire one of defendant HUIZAR's associates, who later turned out to be HUIZAR Associate 1, on the Luxe Hotel Project.  Yuan told defendant HUIZAR to discuss the details with General Manager D.

Overt Act No. 132:  On November 16, 2015, George Chiang sent an e-mail to George Esparza, copying General Manager D, confirming the new agreement between defendant HUIZAR and Fuer Yuan.  Chiang stated: "Now with a common consensus in place for [the Luxe Hotel Project], we would like to roll this project full speed ahead. Therefore, I would like to request the biweekly standing meeting to restart.... From this point on, we would like to communicate all aspects of our project with your [CD-14] office FIRST prior to any other offices in the city family.... [P]lease be ready to coordinate with Mayor's office, Planning Department, and all other related parties so we can drive on a singular track."

Overt Act No. 133:  On December 2, 2015, defendant HUIZAR sent a text message to George Chiang regarding the status of Fuer Yuan's agreement to hire HUIZAR Associate 1, writing: "Any response from chairman [Yuan]?"

<u>Overt Act No. 134:</u>  On December 8, 2015, defendant HUIZAR and George Chiang had a conversation via text message regarding the response from Fuer Yuan.  Chiang wrote: "Hi Councilman [HUIZAR], let me know when you have time to chat really quick."  Defendant HUIZAR responded: "On phone or in person?"  Chiang responded: "Better in person just need ... no more than 15 min."

<u>Overt Act No. 135:</u>  On December 8, 2015, defendant HUIZAR and George Chiang met in person at a coffee shop in Los Angeles to discuss a consulting agreement to pay HUIZAR Associate 1.  Chiang told defendant HUIZAR that General Manager D would work with defendant HUIZAR on retaining HUIZAR Associate 1.  Defendant HUIZAR informed Chiang that HUIZAR Relative 1 would be involved with getting the retainer consummated.

<u>Overt Act No. 136:</u>  Between December 8, 2015 and December 16, 2015, George Chiang met with General Manager D at the Luxe Hotel, where General Manager D asked Chiang if Chiang's consulting firm would hire HUIZAR Associate 1 if, in return, Jia Yuan would increase the retainer with the firm to cover that cost, which Chiang declined.

<u>Overt Act No. 137:</u>  On or about December 16, 2015, defendant HUIZAR caused HUIZAR Relative 1 to meet with Fuer Yuan's relative, who had traveled to Los Angeles at General Manager D's direction, to discuss an arrangement whereby Yuan's relative's company would pay a company affiliated with HUIZAR Associate 1, purportedly for real estate advice.

<u>Overt Act No. 138:</u>  On April 11, 2016, defendant HUIZAR sent a text message to George Chiang, writing: "How is [HUIZAR Relative 1] agreement going? Has everything been set up with [HUIZAR Associate 1]?"

1    <u>Overt Act No. 139:</u>  On April 19, 2016, defendant HUIZAR sent a

2  text message to George Chiang, stating that defendant HUIZAR "would

3  like to briefly speak with [General Manager D]" about an "[u]pdate on

4  some of my meetings with [HUIZAR Relative 1]."  Chiang responded:

5  "Let me call [General Manager D] right now and get back to you."

6    <u>Overt Act No. 140:</u>  On April 20, 2016, defendant HUIZAR met

7  with General Manager D at a restaurant in Los Angeles to discuss the

8  arrangement whereby Yuan's relative would provide a retainer payment

9  to HUIZAR Associate 1.

10    <u>Overt Act No. 141:</u>  On April 26, 2016, defendant HUIZAR sent a

11  text message to George Chiang and asked: "Everything good?"  Chiang

12  responded: "Yes sir!"  Defendant HUIZAR subsequently answered: "Cool.

13  The more I think about our project, the more I get excited about it.

14  Let's meet every two weeks or so to see how things are going.... I

15  think it'll be great!"

16    <u>Overt Act No. 142:</u>  In May 2016, defendant HUIZAR caused Company

17  A and Fuer Yuan's relative's company to execute an agreement whereby

18  Company A would purportedly "provide marketing analysis for Real

19  Estate and Land Development Opportunities in the Greater Southern

20  California Area in the total amount of $11,000.00 per month for

21  services rendered."  In reality, Chiang prepared the monthly

22  marketing analysis reports and delivered them to defendant HUIZAR,

23  who then provided them to HUIZAR Associate 1, who collected the

24  $11,000 monthly retainer.  Defendant HUIZAR, Chiang, and General

25  Manager D understood that the monthly retainer payments were intended

26  to be and were indirect bribe payments to defendant HUIZAR in

27  exchange for defendant HUIZAR's official acts to benefit the Luxe

28  Hotel Project.

Overt Act No. 143:  On May 31, 2016, defendant HUIZAR and George Chiang had a conversation via text message regarding defendant HUIZAR obtaining the monthly reports purportedly prepared by Company A (but in fact prepared by Chiang) pursuant to the consulting agreement with Fuer Yuan's relative regarding real estate and land development opportunities.

***Real Estate Report #1***

Overt Act No. 144:  On May 31, 2016, George Chiang delivered to defendant HUIZAR his first real estate report that they intended would be passed off as being created by Company A pursuant to its $11,000 per month consulting agreement with Fuer Yuan's relative.

Overt Act No. 145:  Between May 31, 2016 and June 8, 2016, defendant HUIZAR met with HUIZAR Associate 1 and delivered the first real estate report he received from George Chiang to HUIZAR Associate 1, who subsequently caused Company A to collect $11,000 from Fuer Yuan's relative as a consulting fee for the report on June 27, 2016.

***Real Estate Report #2***

Overt Act No. 146:  On July 1, 2016, defendant HUIZAR met with George Chiang at a coffee shop in Los Angeles, where Chiang delivered his second real estate report.

Overt Act No. 147:  On July 14, 2016, defendant HUIZAR met with HUIZAR Associate 1 and delivered the second real estate report he received from George Chiang to HUIZAR Associate 1, who subsequently caused Company A to collect $11,000 from Fuer Yuan's relative as a consulting fee for the report on July 26, 2016.

*Real Estate Report #3*

<u>Overt Act No. 148:</u> On August 1, 2016, defendant HUIZAR met with George Chiang at a restaurant in Los Angeles, where Chiang delivered his third real estate report.

<u>Overt Act No. 149:</u> On August 10, 2016, defendant HUIZAR met with HUIZAR Associate 1 at a restaurant and delivered the third real estate report he received from George Chiang to HUIZAR Associate 1, who subsequently caused Company A to collect $11,000 from Fuer Yuan's relative as a consulting fee for the report on August 17, 2016.

*Real Estate Report #4*

<u>Overt Act No. 150:</u> On September 2, 2016, defendant HUIZAR met with George Chiang at a coffee shop in Los Angeles, where Chiang delivered his fourth real estate report.

<u>Overt Act No. 151:</u> On September 8, 2016, defendant HUIZAR met with HUIZAR Associate 1 and delivered the fourth real estate report he received from George Chiang to HUIZAR Associate 1, who subsequently caused Company A to collect $11,000 from Fuer Yuan's relative as a consulting fee for the report on September 16, 2016.

*Real Estate Report #5*

<u>Overt Act No. 152:</u> On October 4, 2016, defendant HUIZAR met with George Chiang at defendant HUIZAR's residence, where Chiang delivered his fifth real estate report.

<u>Overt Act No. 153:</u> On October 14, 2016, defendant HUIZAR met with HUIZAR Associate 1 over breakfast and delivered the fifth real estate report he received from George Chiang to HUIZAR Associate 1, who subsequently caused Company A to collect $11,000 from Fuer Yuan's relative as a consulting fee for the report on November 17, 2016.

1    ***Real Estate Report #6***

2    <u>Overt Act No. 154:</u>  On November 3, 2016, defendant HUIZAR met

3    with George Chiang at a coffee shop in Los Angeles, where Chiang

4    delivered his sixth and final real estate report.

5    <u>Overt Act No. 155:</u>  On November 3, 2016, defendant HUIZAR met

6    with HUIZAR Associate 1 and delivered the sixth real estate report he

7    received from George Chiang to HUIZAR Associate 1, who subsequently

8    caused Company A to collect $11,000 from Fuer Yuan's relative as a

9    consulting fee for the report on December 8, 2016.

10   ***Official Acts by Defendant HUIZAR***

11   <u>Overt Act No. 156:</u>  On November 22, 2016, defendant HUIZAR

12   presented a written motion in the Economic Development committee to

13   benefit the Luxe Hotel Project.

14   <u>Overt Act No. 157:</u>  On December 13, 2016, defendant HUIZAR voted

15   "yes" in the City Council to adopt the Luxe Hotel Project motion

16   defendant HUIZAR had presented.

17   <u>Overt Act No. 158:</u>  On December 13, 2016, after the City Council

18   vote, defendant HUIZAR and George Chiang met with General Manager D

19   at the Luxe Hotel to discuss the Luxe Hotel Project and defendant

20   HUIZAR's agreement to expedite the project going forward.

21        **c.   Additional Benefits from George Chiang and Defendant**

22             **HUIZAR's Official Acts**

23   <u>Overt Act No. 159:</u>  On February 9, 2017, defendant HUIZAR

24   requested via text message George Chiang's assistance in coordinating

25   a trip to China for defendant HUIZAR and his family, including

26

27

28

requesting Chiang's help in obtaining visas for defendant HUIZAR's family.

Overt Act No. 160:  In or around April 2017, at defendant HUIZAR's request, George Chiang organized and coordinated a trip for defendant HUIZAR and his family members to visit Fuer Yuan in China, including paying approximately $500 for visa fees and arranging for transportation for defendant HUIZAR and his family in Hong Kong.

Overt Act No. 161:  Between April 15, 2017 and April 23, 2017, when defendant HUIZAR and his family visited Fuer Yuan in Hong Kong and China, defendant HUIZAR and his family members accepted benefits valued at approximately $1,400 from Yuan, including for certain transportation, meals, and lodging.

Overt Act No. 162:  On April 27, 2017, at defendant HUIZAR's request, George Chiang provided concert tickets to defendant HUIZAR worth approximately $1,572 total.

Overt Act No. 163:  On May 2, 2017, in a telephone call, George Chiang and George Esparza discussed the mutually beneficial financial relationship between Chinese developers and defendants HUIZAR and CHAN.  Specifically, Esparza told Chiang: "Looking from your perspective, you bank on [defendant CHAN], and [defendant HUIZAR]'s office to do, one of the main points with [defendant HUIZAR], for your Chinese clients for example, 'entitlements, PLUM,' you got to use that and we gotta keep making his motherfucking, him happy."

Overt Act No. 164:  On May 10, 2017, in a telephone call, George Esparza told George Chiang: "So today we had a productive day where [defendant HUIZAR] told [City Staffer A-2], let's streamline the [Luxe Hotel] project."

1        <u>Overt Act No. 165</u>:  On May 13, 2017, via a text message

2    conversation, defendant HUIZAR expressed his willingness to benefit

3    Fuer Yuan in connection with the Luxe Hotel Project.  Specifically,

4    defendant HUIZAR stated to George Chiang: "But the 2 tower is better

5    for chairman [Yuan] and his choice? [Because] if he wanted the 3

6    towers and that is the best choice, we can make that happen."

7        <u>Overt Act No. 166</u>:  On May 19, 2017, at defendant HUIZAR's

8    request, George Chiang paid approximately $1,000 for alcohol for a

9    party for HUIZAR Relative 2.

10       <u>Overt Act No. 167</u>:  On June 19, 2017, at defendant HUIZAR's

11   request, George Chiang provided concert tickets to defendant HUIZAR

12   worth approximately $1,670.

13       <u>Overt Act No. 168</u>:  On June 22, 2017, during a telephone call,

14   defendant CHAN and George Chiang discussed defendant HUIZAR's request

15   for benefits from Chiang.  Specifically, Chiang explained that

16   defendant HUIZAR asked him to coordinate a trip to Cuba for defendant

17   HUIZAR and a woman with whom he was having a secret romantic

18   relationship.  Defendant CHAN then asked: "So he just wanted you to

19   do what, to ... pay for all the trips, is that what he wants?"

20   Chiang then stated that defendant HUIZAR would have to get special

21   visas, and explained that this would risk potentially exposing their

22   corrupt relationships: "I told [HUIZAR], I said look, we're all gonna

23   be on record and if something happens, everything, everyone's dead."

24       <u>Overt Act No. 169</u>:  On June 23, 2017, in a telephone call,

25   George Chiang and Justin Kim discussed using defendant HUIZAR's

26   influence as a councilmember going forward and defendant HUIZAR's

27   requests for financial benefits.  Specifically, Kim stated: "this is

28   my agenda, not only do I want to make money, George [Chiang], I want

to show you and other Chinese developer, assuming [defendant HUIZAR] is there, how much motivation he's going to have to push everything around for my project, those are my agenda."  In response, Chiang asked if defendant HUIZAR understood "what he needs to do in three and a half years."  Kim replied: "Yes, yes. Everything is set. You're gonna see some differences, alright George?"  Chiang then asked to meet with Kim, stating that defendant HUIZAR was asking for "some very stupid requests."  Kim responded: "I'm not going to make a comment," to which Chiang stated: "Yeah, let's not talk about this on the phone."

Overt Act No. 170:  On August 24, 2017, George Chiang asked for defendant HUIZAR's help on the Luxe Hotel Project.  Specifically, Chiang sent a text message to defendant HUIZAR, writing: "Hi Boss, wanted to give you heads up: [A Jia Yuan employee] spoke to chairman [Fuer Yuan] and CPC [City Planning Commission] needs to be 9/14/17 otherwise the loan commitment from lender will be lost for the project."  The next day, Chiang again sent a message to defendant HUIZAR, writing: "Hi Boss, we met with planning yesterday and went through the outstanding items for 9/14/17 CPC. We would need a motion from your office to direct the TFAR allocation by next week before council recess to make the 9/14/17 CPC hearing."

Overt Act No. 171:  On August 24, 2017, in a telephone call, George Chiang told defendant CHAN: "Do or die, because if we lose the September 14 [CPC hearing date], then we lose all loan commitments from the lender ... you know, probably not looking at a project."  Defendant CHAN responded: "You mentioned to [defendant HUIZAR] this is a big issue."  Chiang responded: "Yes, yes, I did, I told him ... the motion is very important in order for us to move forward.... We

48

all spoke to the Chairman [Fuer Yuan], and the Chairman [Yuan] is willing to make a lot of sacrifices."

Overt Act No. 172:  On September 1, 2017, at George Chiang's request, defendant HUIZAR presented a written motion in the PLUM committee to benefit Jia Yuan, allowing the Luxe Hotel Project to move forward with its application and approval process before the CPC and City Council.

Overt Act No. 173:  On September 1, 2017, defendant HUIZAR wrote to George Chiang in a text message: "We got the motion in today," which Chiang understood to mean that defendant HUIZAR held up his end of the bargain to help Jia Yuan.

Overt Act No. 174:  On September 14, 2017, defendant HUIZAR confirmed that he and his office exerted pressure on other City officials, writing to George Chiang in a text message: "Congrats. Yeah we [CD-14 office] were calling mayors office to tell his commission to calm down. It's expected from cpc they throw a lot of junk at projects these days.  Not over but make sure u relay to chairman [Fuer Yuan] that we were helpful."

Overt Act No. 175:  On September 14, 2017, in a telephone call, defendant HUIZAR told George Chiang: "You know, whatever it was, we'll fix it in PLUM.... Did the boss [Fuer Yuan], you call the boss already? ... Did you tell him that my office was helpful?"  Chiang responded: "I told [Yuan] everything."  Defendant HUIZAR then stated: "Okay, cool, cool, cool. Good, good.... Do we have a schedule for PLUM already?"

Overt Act No. 176:  In or around November 2017, defendant HUIZAR asked George Chiang to make a commitment on behalf of Jia Yuan to contribute $100,000 to HUIZAR Relative 1's campaign in exchange for

continued favorable official acts by defendant HUIZAR to benefit the Luxe Hotel Project. Chiang, on behalf of Jia Yuan, told defendant HUIZAR he could confirm Fuer Yuan's commitment of $100,000 to a PAC.

Overt Act No. 177: On November 16, 2017, at defendant HUIZAR's direction, George Esparza created a spreadsheet titled "IE [Independent Expenditure] HUIZAR Strategy," which included a $100,000 contribution from Jia Yuan with George Chiang listed in the "Notes" column.

Overt Act No. 178: On December 4, 2017, defendant HUIZAR created a spreadsheet titled "Initial Commitments to PAC," which included a $100,000 contribution attributed to George Chiang.

Overt Act No. 179: On December 5, 2017, defendant HUIZAR voted to approve the Luxe Hotel Project in the PLUM Committee.

Overt Act No. 180: On January 9, 2018, at defendant HUIZAR's direction, George Esparza sent an e-mail to defendant HUIZAR, attaching a spreadsheet titled "IE [Independent Expenditure] HUIZAR Strategy," which included a $100,000 contribution from Jia Yuan with Chiang listed in the "Notes" column, and a spreadsheet titled "Copy of Commitments," which included a $100,000 contribution from Jia Yuan.

Overt Act No. 181: On January 16, 2018, defendant HUIZAR sent an e-mail to his fundraiser, attaching a spreadsheet titled "Initial Commitments to PAC," which included a $100,000 contribution attributed to George Chiang with Chiang listed in the "Notes" column.

Overt Act No. 182: On January 24, 2018, defendants HUIZAR and CHAN and George Chiang met with Fuer Yuan and HUIZAR Relative 1 for dinner at Yuan's hotel in San Gabriel, California, where Yuan pledged

his commitment and support for HUIZAR Relative 1's campaign for the CD-14 seat.

Overt Act No. 183:  On February 12, 2018, defendant HUIZAR wrote to George Chiang in a text message: "fundraiser for PAC will call u today," in furtherance of the agreement to have Jia Yuan contribute to a PAC to benefit HUIZAR Relative 1's campaign.

Overt Act No. 184:  On March 9, 2018, defendant HUIZAR submitted a resolution in the PLUM Committee to benefit Jia Yuan, allowing the Luxe Hotel Project to move forward in its approval process.

Overt Act No. 185:  On March 29, 2018, defendant HUIZAR and George Chiang met at defendant HUIZAR's residence to discuss Jia Yuan's support and the $100,000 PAC contribution to benefit HUIZAR Relative 1's campaign.

Overt Act No. 186:  On April 23, 2018, George Chiang wrote to defendant CHAN via text message that the list of items he was talking to defendant HUIZAR about included "tell [defendant HUIZAR] that [Fuer Yuan] is coming in June, we can talk about the PAC at that time."

Overt Act No. 187:  On April 23, 2018, defendant HUIZAR and George Chiang met at defendant HUIZAR's residence to discuss defendant HUIZAR's continued support for the Luxe Hotel Project in exchange for Jia Yuan's agreement to contribute $100,000 to a PAC to benefit HUIZAR Relative 1's campaign.

Overt Act No. 188:  On May 18, 2018, defendants HUIZAR and CHAN met with George Chiang for breakfast at a restaurant in Boyle Heights, where defendant HUIZAR stated that he needed the PAC contribution as soon as possible and that he wanted the contribution now so that when HUIZAR Relative 1 announced her candidacy, she would

have money to pour into the campaign and scare other potential candidates from running against her.  Defendant HUIZAR stated that other developers already contributed in amounts of $50,000, $100,000, and $200,000.  Defendant CHAN and Chiang told defendant HUIZAR that Jia Yuan agreed to his request and would contribute $100,000 to the PAC after HUIZAR Relative 1's formal announcement in September 2018.

Overt Act No. 189:  On June 12, 2018, defendant HUIZAR voted in the City Council to approve the Development Agreement for the Luxe Hotel Project, and wrote to George Chiang in a text message: "Da [Development Agreement] for [Jia Yuan] just passed council today. Does that mean project has been fully entitled? Is that our last vote?"

Overt Act No. 190:  On June 18, 2018, defendant HUIZAR wrote to George Chiang in a text message: "When is the chairman [Fuer Yuan] coming in to town? We need to finalize pac stuff. Thanks."

Overt Act No. 191:  On or about July 9, 2018, defendant CHAN created a document titled "Synergy/CCC Action Items," to document, among other things, the political contributions he had solicited for and promised to defendant HUIZAR.  Defendant CHAN included the following entry under a subsection titled "[Jia Yuan] – Chairman Yuan": "PAC (After announcement in Sep ([talked to] JH [JOSE HUIZAR] 5/18)) / Nonprofit ([wait for] Yuan's arrival ([talked to] JH [JOSE HUIZAR] 5/18))."

Overt Act No. 192:  On July 30, 2018, after the ordinance authorizing the execution of the Development Agreement for the Luxe Hotel Project went into effect, defendant HUIZAR wrote to George Chiang in a text message: "any news on when [Fuer Yuan] is coming in to town? Hoping to catch dinner with him and talk about [HUIZAR

Relative 1] campaign."  Chiang responded: "Hi Boss, [defendant CHAN] is working on it. I let you know after I see him in office tomorrow."

Overt Act No. 193:  On October 16, 2018, defendant HUIZAR and George Chiang met at defendant HUIZAR's residence and discussed Jia Yuan's agreement to contribute to a PAC to benefit HUIZAR Relative 1's campaign, as promised, in exchange for defendant HUIZAR taking multiple official acts to benefit the Luxe Hotel Project.

**d.   Benefits from George Chiang to Defendant CHAN in Exchange for His Official Acts**

Overt Act No. 194:  In or around early 2017, defendant CHAN agreed with George Chiang that Chiang would pay a portion of the Synergy consulting fees to defendant CHAN, in exchange for defendant CHAN's assistance on the Luxe Hotel Project in defendant CHAN's official capacity as Deputy Mayor of Economic Development, including for exerting power over and influence on various City departments, including the Planning Department and the CPC, to benefit the Luxe Hotel Project.

Overt Act No. 195:  On January 13, 2017, defendant CHAN, who was then Deputy Mayor of Economic Development, George Chiang, and CHAN Relative 1 discussed Synergy taking control of the City approval process for the Luxe Hotel Project.  Specifically, Chiang wrote in a group text message to defendant CHAN and CHAN Relative 1 that he "met with chairman [Fuer Yuan] again today. He had already instructed us to move forward on the project. I need to spend some time and lay everything out. So I need to skip training tomorrow to put my thoughts into context and send it to you and [CHAN Relative 1]. Also, my retainer has been confirmed verbally so I need [CHAN Relative 1] to modify it on paper for signature. Thank you!"  Defendant CHAN

responded: "No problem. We should meet after you put your thoughts together."

Overt Act No. 196:   On January 26, 2017, defendant CHAN discussed Synergy taking over the Luxe Hotel Project with George Chiang and another consultant.  Specifically, Chiang wrote to defendant CHAN and Synergy Consultant 1 in a text message: "everything went as planned. Chairman [Fuer Yuan] spent the first part of meeting yelling at everything about how their current approach is wrong. Now Synergy takes full control. Then he walked out. The meeting was productive."

Overt Act No. 197:   On January 26, 2017, George Chiang wrote to defendant CHAN and Synergy Consultant 1 in a text message: "We need to generate a list of questions for planning department about the process. I will work in it tomorrow."

Overt Act No. 198:   On February 3, 2017, George Chiang sent a text message to defendant CHAN, writing: "Meeting with chairman [Fuer Yuan] was good report to you tomorrow. Thank you!"

Overt Act No. 199:   On February 8, 2017, defendant CHAN, using his power and influence as Deputy Mayor, coordinated a meeting between the Deputy Planning Director and representatives of Jia Yuan, including George Chiang and Fuer Yuan.

Overt Act No. 200:   On or around March 13, 2017, defendant CHAN used his official position as Deputy Mayor to pressure subordinate City officials to take favorable official actions on the Luxe Hotel Project.  Specifically, defendant CHAN sent a group text message to George Chiang, CHAN Relative 1, and Synergy Consultant 1: "Hi [Synergy Consultant 1], talked to [a Fire Department official] about travel distance and tract map. He still help. Make sure we pay

expedite for the the fire review of three tract map. [...] Still wait for [a Transportation Department official] to call back." Chiang responded: "Thank you [Brother]!" Synergy Consultant 1 responded: "You are the greatest...I will call [the Fire Department official] first."

Overt Act No. 201: On March 28, 2017, George Chiang informed defendant CHAN, via text message, about his negotiations with Jia Yuan on the status of the Synergy consulting fees and bonus payments.

Overt Act No. 202: On May 12, 2017, defendant CHAN had a meeting in Hollywood to discuss the upcoming CPC hearing for the Luxe Hotel Project with Planning Commission Official 1, who had the ability to impose requirements on the Luxe Hotel Project that would increase costs for Jia Yuan, and who needed to vote to approve the Luxe Hotel Project at the CPC hearing. At the meeting, defendant CHAN, in his capacity as Deputy Mayor, exerted pressure over a Mayor-appointed public official and urged Planning Commission Official 1 to approve the Luxe Hotel Project.

Overt Act No. 203: On or around May 18, 2017, George Chiang accepted from Jia Yuan a $100,000 check as the first bonus payment to Synergy for successfully reaching the Planning Department advisory hearing scheduled on May 24, 2017.

Overt Act No. 204: In or around May 2017, George Chiang asked defendant CHAN if defendant CHAN wanted his share of the first bonus payment in check form, and defendant CHAN told Chiang to wait until later and that he preferred getting a bigger check at a later date.

Overt Act No. 205: On or around June 22, 2017, in a telephone call, defendant CHAN asked George Chiang "when are you going to ... get the cash for me for the 20 grand?" Chiang responded: "I got it

sitting in the car," referring to $20,000 cash.  Defendant CHAN then instructed Chiang to "just keep it there for now" and stated that he was "trying to use cash on everything."

Overt Act No. 206:  On August 11, 2017, during the time in which City laws prohibited defendant CHAN from lobbying City officials and ten days after he created LABXG, Inc., defendant CHAN sent a group text message to Chiang and Synergy Consultant 1: "Good morning [Synergy Consultant 1], can you please email me whatever you have drafted on our proposal in handling the permits for Jia Yuan?  George [Chiang] and I may talk to Chairman [Yuan] today. The purpose is just to convince him that we will be the one running the show."

Overt Act No. 207:  On August 19, 2017, defendant CHAN sent George Chiang a text message, writing: "Working on a 1 pager, in English and Chinese, that layouts all the departments, permits, and clearances for the [Jia Yuan] project. Chairman [Yuan]."  Defendant CHAN then added: "To show the complexity of our work. Will be done tomorrow. Then you revise and w chat to him. That will be our tool for discussion."

Overt Act No. 208:  On September 14, 2017, in a telephone call, defendant CHAN told an associate: "The big job, the [Jia Yuan] job, they approved it in Planning Commission, but we were so worried because there is, there's a thick head, who is the uh, who's the president of the Commission.  And uhhh, luckily, we use, we pull all the political, you know, chains, we got the Council, we got the Mayor's office, talked to him and so, so you know, he modified the conditions a little bit but it's still good, okay.  So we're very happy, very happy."  Defendant CHAN added: "It has to go to PLUM, is the Planning and Land Use Committee, which is a Council Committee,

and then go to Council, but those are easy, those are all good brothers, okay?  This is the toughest one."

Overt Act No. 209:  On September 14, 2017, after the CPC approved the Luxe Hotel Project, defendant CHAN sent a text message to CHAN Relative 1, writing: "CPC approved [the Luxe Hotel Project]! We are moving on to PLUM."  CHAN Relative 1 responded: "Good news for milestones," referring to the bonus payments paid by Jia Yuan to Synergy.  Defendant CHAN then wrote: "[Mayor Official 1] and [Mayor Official 2] talked to the commissioners. [City Staffer D] asked [Mayor Staffer 1]. You know who asked [City Staffer D]."  CHAN Relative 1 responded: "Congrats!"  Defendant CHAN answered: "To all of us! Still waiting for the 2nd payment," referring to the second bonus payment to be paid by Jia Yuan to Synergy.

Overt Act No. 210:  On September 30, 2017, George Chiang issued a check from Synergy to CHAN Relative 1 for $8,450.

Overt Act No. 211:  On or around October 19, 2017, George Chiang accepted from Jia Yuan a check to Synergy for $150,000 as the second bonus payment for successfully completing the CPC hearing for the Luxe Hotel Project.

Overt Act No. 212:  On October 28, 2017, George Chiang issued a check from Synergy to LABXG Inc. for $36,432.74, which was a portion of defendant CHAN's payment for the official acts defendant CHAN performed on the Luxe Hotel Project while he was Deputy Mayor.

Overt Act No. 213:  On October 31, 2017, George Chiang issued a check from Synergy to CHAN Relative 1 for $6,550.

Overt Act No. 214:  On or about December 14, 2017, George Chiang accepted from Jia Yuan a check to Synergy for $185,000 as the third bonus payment.

<u>Overt Act No. 215:</u>  On December 27, 2017, George Chiang issued a check from Synergy to LABXG Inc., for defendant CHAN, for $33,507.23, with "revenue split" in the memo line of the check.

e. **Defendant CHAN's Indirect Bribe Payments to City Officials through Relatives**

<u>Overt Act No. 216:</u>  On January 2, 2017, defendant CHAN sent an e-mail to George Chiang and CHAN Relative 1, with an attached chart depicting "People Who Influence the Project," referring to the Luxe Hotel Project.  The "Elected Officials" who influenced the project included defendant HUIZAR in CD-14, Councilmember D in CD-D, and the "Public Officials" who influenced the project included City Commissioner 1.

*City Staffer D's Relative*

<u>Overt Act No. 217:</u>  On or around August 3, 2017, during the time in which City laws prohibited defendant CHAN from lobbying City officials, defendant CHAN, George Chiang, and City Staffer D, who worked as a staff member for City Councilmember D, had a meeting at the CCC Investment office to discuss the Luxe Hotel Project, during which defendant CHAN asked City Staffer D to speak to Mayor Staffer 1 to ask Mayor Staffer 1 to put pressure on the CPC to approve the Luxe Hotel Project, and City Staffer D agreed to do so.

<u>Overt Act No. 218:</u>  On or about August 8, 2017, defendant CHAN had a meeting with City Staffer D's relative at the CCC Investment office, during which defendant CHAN and City Staffer D's relative discussed an arrangement for a consulting agreement that would pay City Staffer D's relative.

<u>Overt Act No. 219:</u>  On or about August 29, 2017, at defendant CHAN's request, George Chiang executed a consulting agreement between

CCC Investment and City Staffer D's relative, which provided for compensation of $1,000 per month, effective September 1, 2017, for four consecutive months.

Overt Act No. 220:  Between October 2017 and December 2017, defendant CHAN caused CCC Investment to pay City Staffer D's relative approximately $2,000 for "consulting services."

### City Commissioner 1's Relative

Overt Act No. 221:  On November 30, 2017, defendant CHAN directed Businessperson A, who was acting at the direction of the FBI, to hire City Commissioner 1's Relative because City Commissioner 1, who oversaw certain City entities such as the Bureau of Engineering, could help defendant CHAN and Businessperson A obtain additional business in the City.

Overt Act No. 222:  On April 15, 2018, defendant CHAN, through George Chiang, caused City Commissioner 1 to send an e-mail seeking to influence a Bureau of Engineering official to take favorable official action on the Luxe Hotel Project, writing: "Can I please ask for your leadership in reviewing the requests of this project and advising what we can do to assist them moving forward? Thank you [official] and please advise how I can support the process."

Overt Act No. 223:  On April 16, 2018, defendant CHAN explained to Businessperson A, who was acting at the direction of the FBI, that City Commissioner 1 is "our brother" and had a current need for money because City Commissioner 1 only made between $100,000 and $120,000 in salary, so the more money Businessperson A could provide to City Commissioner 1's Relative at that time, the better.

Overt Act No. 224:  On April 17, 2018, during a telephone call, defendant CHAN highlighted to George Chiang their need for City

Commissioner 1 to take official acts favorable to the Luxe Hotel Project, stating: "We need [City Commissioner 1].... Make sure that [City Commissioner 1] will personally give the [Bureau of Engineering staff members] a call [and] explain the situation."

Overt Act No. 225:  On April 25, 2018, during a meeting at the CCC Investment office between defendant CHAN, City Commissioner 1's Relative, and Businessperson A, who was acting at the direction of the FBI, defendant CHAN told City Commissioner 1's Relative that City Commissioner 1 could help her get projects for Businessperson A.

Overt Act No. 226:  On May 1, 2018, at defendant CHAN's direction, George Chiang sent an e-mail to City Commissioner 1, writing: "Hi Brother [City Commissioner 1], first of all, thank you for all of your help [with the Luxe Hotel Project]. I sent a thank you email to all of your staff who were assisting us. Currently, timing has become more critical for our shoring permit approval [for the Luxe Hotel Project]. Therefore, I want to make two meeting requests[.]"

Overt Act No. 227:  On May 10, 2018, at defendant CHAN's direction, George Chiang sent an e-mail to City Commissioner 1 and another City official regarding a Luxe Hotel Project permit, writing: "I want to thank you for your time in meeting with [another consultant] and I. Your input is well taken and we will work diligently under your direction.  Your help and assistance to drive this project are greatly appreciated."

Overt Act Nos. 228-232: On or about the following dates, as part of defendant CHAN's plan to influence City Commissioner 1's official acts to help the Luxe Hotel Project, defendant CHAN caused

Businessperson A to pay City Commissioner 1's Relative by check from Businessperson A's business account ending in 3898.

| Overt Act No. | Date | Description | Amount |
|---|---|---|---|
| 228 | 06/13/18 | April/May 2018 consulting fee | $2,210 |
| 229 | 08/13/18 | June 2018 consulting fee | $1,400 |
| 230 | 08/13/18 | July 2018 consulting fee | $5,000 |
| 231 | 09/04/18 | August 2018 consulting fee | $5,000 |
| 232 | 10/29/18 | September 2018 consulting fee | $2,500 |
| | | **TOTAL:** | **$16,110** |

Overt Act No. 233:  On October 11, 2018, defendant CHAN met with City Commissioner 1 and other consultants at the CCC Investment office to discuss City Commissioner 1's continued help on the Luxe Hotel Project.

*City Staffer A-2's Relative*

Overt Act No. 234:  On June 14, 2018, during a meeting between defendant CHAN and Businessperson A, who was acting at the direction of the FBI, defendant CHAN explained the idea of secretly providing financial benefits via a "finder's fee" to City Staffer A-2 because City Staffer A-2 "sees more projects than anybody" and thus could help their projects.  Defendant CHAN further explained: "[City Staffer A-2] is very useful, but I would like to keep it under wraps"

61

by creating a fake consulting contract with City Staffer A-2's mother that hid its true purpose.

Overt Act No. 235:  On June 15, 2018, after a meeting between defendant CHAN, Businessperson A, and City Staffer A-2, defendant CHAN instructed Businessperson A to pay City Staffer A-2 $10,000 to $20,000, but to not draft any agreements until City Staffer A-2 directed the first project to Businessperson A.

Overt Act No. 236:  On September 28, 2018, defendant CHAN met Businessperson A, and City Staffer A-2 for dinner at a restaurant in Pasadena, California, during which they discussed the secret financial arrangement whereby Businessperson A, following the instruction of defendant CHAN, agreed to pay City Staffer A-2 commission for any developers City Staffer A-2 introduced to Businessperson A.  Defendant CHAN further suggested that Businessperson A provide a $5,000 "sign-on bonus" to City Staffer A-2 in addition to the commission, and that Businessperson A could conceal the payment to City Staffer A by routing it to City Staffer A-2's brother's company.  When Businessperson A placed a $10,000 check on the table for City Staffer A-2, defendant CHAN stated that he would hold on to City Staffer A-2's payment for City Staffer A-2.

Overt Act No. 237:  On October 9, 2018, defendant CHAN and City Staffer A-2 discussed scheduling a dinner between a developer, Businessperson A, defendant CHAN, and City Staffer A-2.  Defendant CHAN wrote in a text message to City Staffer A-2: "Brother, I don't think it's a good idea to meet in downtown. What do you think?"  City Staffer A-2 responded that he agreed "no dtla."

Overt Act No. 238:  On October 11, 2018, when Businessperson A suggested a downtown Los Angeles restaurant for the meeting between

the developer, City Staffer A-2, defendant CHAN, and Businessperson A, defendant CHAN responded by text message: "DTLA is no good."

Overt Act No. 239:  On October 25, 2018, defendant CHAN attended a dinner where City Staffer A-2 introduced Businessperson A to a developer with projects pending in CD-14.  After the developer left the dinner meeting, defendant CHAN instructed Businessperson A to draft a Memorandum of Understanding and to send it to defendant CHAN for review, adding that once the "MOU" was signed, Businessperson A needed to "take care of the thing," referring to Businessperson A paying City Staffer A-2 as part of their secret financial arrangement.

Overt Act No. 240:  On or about October 28, 2018, defendant CHAN drafted a document titled "Synergy/CCC Action Items," which included a section titled "Fund Raising" with an entry for City Staffer A-2, noting: "Set aside (10 from [Businessperson A] + 1.5 from CCC)." Under a section titled "[Businessperson A]," the document included: "MOU / Reserve 10 for [City Staffer A-2]," which referred to defendant CHAN's plan for Businessperson A to pay City Staffer A-2 $10,000 as part of their secret financial arrangement.

### (4)  **Project M Bribery Scheme**

**a.    $25,000 Contribution to PAC B**

Overt Act No. 241:  On August 18, 2016, defendant HUIZAR met with Morrie Goldman and Executive M at defendant HUIZAR's City Hall office to discuss Project M.  At the meeting, Goldman and Executive M asked defendant HUIZAR to file a motion to initiate a General Plan Amendment for Project M.  Defendant HUIZAR agreed to initiate the General Plan Amendment, either by exerting pressure on the Planning Department to do so or by filing a motion.

Overt Act No. 242:  On or about August 26, 2016, defendant HUIZAR and his staff urged the Planning Department to approve the General Plan Amendment initiation for Project M, which the Planning Department did.

Overt Act No. 243:  In September 2016, less than a month after defendant HUIZAR had provided significant assistance to Company M and Executive M, defendant HUIZAR asked Morrie Goldman for contributions to PAC B from Goldman's clients with projects pending in CD-14, including from Executive M on behalf of Company M.  Goldman agreed to convey the request to his clients.

Overt Act No. 244:  On October 10, 2016, defendant HUIZAR sent an e-mail to George Esparza and another CD-14 staffer, writing: "I spoke with [Morrie Goldman] already about [another developer] and [Company M] contributions to [HUIZAR Associate 2] Account.  He is on board.  Work with him to get them in.  Get [Goldman] the [HUIZAR Associate 2] acco[u]nt name and number etc."

Overt Act No. 245:  On October 13, 2016, George Esparza sent a text message to Morrie Goldman, providing the information for PAC B and adding: "according to my boss that's for [another developer] and [Company M]. He said he spoke to u about it."

Overt Act No. 246:  On October 13, 2016, Morrie Goldman sent an e-mail to Executive M, passing on the information for PAC B he received from George Esparza.  Executive M replied: "Timing and amount?"  Goldman then wrote: "25K as soon as possible."

Overt Act No. 247:  On October 14, 2016, Morrie Goldman sent an e-mail to Executive M, attaching a remit form for PAC B, and writing: "HUIZAR is asking that contributions be directed to this committee.

Please hold off if you are processing a contribution to the other primary committee."

Overt Act No. 248:  On October 26, 2016, Morrie Goldman received an e-mail from Executive M about the $25,000 PAC B contributions, which stated: "I should have checks by tomorrow. All I need is the letter. Would it be worth setting up a quick drink or coffee with JOSE [HUIZAR] when we deliver? Could be good to talk big picture, etc."

Overt Act No. 249:  On or about October 27, 2016, defendant HUIZAR caused Company M to send three checks from three separate entities, payable to PAC B in the amount of $8,333.33 for a total of $25,000, by U.S. Mail to the Company M office in Los Angeles, California.

Overt Act No. 250:  On October 31, 2016, Morrie Goldman sent a text message to George Esparza, writing: "When can I get [Executive M] in with JOSE [HUIZAR] to deliver the checks?"

**b.   Additional $25,000 Contribution to PAC B**

Overt Act No. 251:  On February 14, 2017, defendant HUIZAR sent a text message to George Esparza, writing: "at dinner make sure u remind me to get [Company M] to do 25 k for [PAC B] on measure h."

Overt Act No. 252:  On February 15, 2017, defendant HUIZAR met Morrie Goldman for lunch in downtown Los Angeles to discuss various projects.  At the lunch, defendant HUIZAR asked Goldman for an additional $25,000 contribution to PAC B from Company M, which Goldman agreed to convey to Executive M.

Overt Act No. 253:  On February 15, 2017, at a dinner at a Los Angeles restaurant for which Company M paid approximately $1,778,

defendant HUIZAR requested and Executive M committed to paying $25,000 to PAC B on behalf of Company M.

Overt Act No. 254:   On February 21, 2017, Morrie Goldman informed George Esparza via text message that Executive M "acknowledged the conversation with JOSE [HUIZAR]" regarding Company M's additional contribution to PAC B.

Overt Act No. 255:   On February 22, 2017, Morrie Goldman wrote to Executive M in a text message: "We never connected about your conversation with HUIZAR on Measure H. They want to connect with you about getting a check for their Measure H mailer targeting DTLA."

Overt Act No. 256:   On February 24, 2017, Morrie Goldman received an e-mail from Executive M sent to another Company M employee with the subject line "questions regarding HUIZAR PAC," which stated: "You can direct any specific questions on the PAC to [Goldman], who is cc'd."

Overt Act No. 257:   On February 25, 2017, defendant HUIZAR sent a text message to George Esparza, writing: "Any update on [Executive M] 25k?"

Overt Act No. 258:   On or about March 2, 2017, defendant HUIZAR caused Company M to send a check for $25,000 made payable to PAC B by U.S. Mail to PAC B in Sacramento, California.

Overt Act No. 259:   On March 20, 2017, Morrie Goldman received an e-mail from Executive M, which stated: "Do you think we are in a more favored status with JOSE [HUIZAR] compared to [another developer]?"

Overt Act No. 260:   On May 5, 2017, in a telephone call, defendant HUIZAR and Morrie Goldman discussed Company M's contribution to PAC B at defendant HUIZAR's direction.  Defendant

HUIZAR and Goldman found out that PAC B publicly disclosed Company M as a top donor for a Los Angeles City Council candidate. Goldman told defendant HUIZAR that a reporter was "asking who asked us for the donation, but we, we're not gonna respond to that." Defendant HUIZAR responded: "Thank you very much. I appreciate that." Goldman stated: "No of course." Goldman then stated: "When I told George [Esparza], I said, look, my two things that I gotta protect you know ... [Company M] and gotta protect you." Defendant HUIZAR stated "we can't be sloppy about this and trust, uh, [HUIZAR Associate 2], but, anyway, we will save that conversation for tomorrow, ok?"

Overt Act No. 261: On May 9, 2017, Morrie Goldman received an e-mail from Executive M asking about the media inquiry regarding the Company M campaign contribution to PAC B in support of a Los Angeles City Council candidate. Goldman responded by e-mail, reminding Executive M that the PAC B contribution "was an 'ask' from JOSE HUIZAR."

c. **$25,000 Contribution and Additional $25,000 Commitment to PAC A**

Overt Act No. 262: In or around January 2018, defendant HUIZAR spoke with Morrie Goldman regarding Project M's approval in the PLUM Committee and City Council. Specifically, they discussed that Company M wanted the City to approve Project M with a 5% affordable housing requirement, while defendant HUIZAR initially insisted on 11% affordable housing. Goldman told defendant HUIZAR that Executive M was concerned he would suffer significant professional consequences, including the loss of his job with Company M, if Project M was not approved, and that if Project M did not obtain its preferred

affordable housing requirements it would threaten the viability of the project altogether.

Overt Act No. 263:  On January 5, 2018, Morrie Goldman sent a text message to Executive M, writing: "We are confirmed for dinner with HUIZAR on Monday [January 8, 2018]."

Overt Act No. 264:  On January 8, 2018, defendant HUIZAR and Morrie Goldman had a discussion via text message regarding Project M and Company M's willingness to contribute to their newly established PAC, PAC A.  Specifically, defendant HUIZAR wrote: "Let's do the pac stuff later this week. See u there at 6. What's purpose of tonight's meeting? Are they [Company M] gonna help with pac?"  Goldman replied: "[Executive M] wants to talk about their [Project M] and see if you're comfortable with the height and affordability levels."  Defendant HUIZAR answered: "Are they gonna help with pac?"  Goldman replied: "I'm sure they will, however - as your friend - let's discuss this in a different text thread" in order to avoid documenting defendant HUIZAR's conditioning his official assistance with Project M on Company M's financial support for PAC A.

Overt Act No. 265:  On February 23, 2018, defendant HUIZAR and Morrie Goldman had a discussion via text message regarding PAC A. Specifically, Goldman wrote: "Are you checking the Confide App for texting on your iPhone?"  Goldman further wrote: "I was going to text you about your meeting with [PAC A's attorney]. Wanted to see if we got any clarification. Confide is good for texting because it is like Snap Chat...message disappears."

Overt Act No. 266:  On March 1, 2018, defendant HUIZAR met with Morrie Goldman and discussed Company M's contributions to PAC A. Specifically, defendant HUIZAR asked for a $50,000 contribution to

PAC A to be paid in two installments, $25,000 as soon as possible and another $25,000 by the end of the year, after Project M was approved. Goldman agreed to convey the request to Executive M.

Overt Act No. 267:  On March 14, 2018, Morrie Goldman met with Executive M and relayed defendant HUIZAR's request to have Company M contribute $50,000 to PAC A, which Goldman explained was designed to benefit HUIZAR Relative 1's campaign for the CD-14 seat.  Executive M agreed.

Overt Act No. 268:  On March 14, 2018, at approximately 4:00 p.m., defendant HUIZAR met with Morrie Goldman to discuss PAC A, including the fact that Executive M agreed to have Company M contribute to PAC A.

Overt Act No. 269:  On March 15, 2018, Morrie Goldman sent an e-mail to Executive M with the subject line "[PAC A]," writing: "this is the committee we previously discussed," and attaching a contribution form for PAC A.

Overt Act No. 270:  On March 26, 2018, defendant HUIZAR sent an e-mail to himself, attaching a document titled "Fundraising Plan." The document included, among other things, company and individual names, contribution amounts, and the person responsible for soliciting contributions to PAC A and PAC B.  Under the PAC A section, the document included an entry for Company M for $50,000, and listed Morrie Goldman.

Overt Act No. 271:  On April 13, 2018, defendant HUIZAR sent an e-mail to Morrie Goldman, attaching a document titled "[PAC A]" that included, among other things, an entry for Company M for $50,000, with the note: "B/4 June. 2 checks. 2 Entities."

1    <u>Overt Act No. 272:</u>  On May 8, 2018, Morrie Goldman had a
2    discussion via text message with Executive M regarding a meeting with
3    the Planning Department scheduled for the same day for Project M.
4    Specifically, Executive M wrote: "Very important that [City Staffer
5    A-2] calls [a Planning Department official] letting them know he
6    supports the height etc. please please make sure this happens prior."
7    Goldman later wrote: "[City Staffer A-2] will let them know their
8    position, and then make the changes in PLUM."  Executive M later
9    wrote: "This would be a disaster if they took a position to deny[.]
10   This meeting seems to be a really bad idea now. When does JOSE
11   [HUIZAR] get back?"  Goldman responded: "Spoke with [City Staffer A-
12   2]. He will speak with [the Planning Department official], and then
13   call me to report back prior to our meeting."

14   <u>Overt Act No. 273:</u>  On May 8, 2018, defendant HUIZAR caused City
15   Staffer A-2 to advocate CD-14's position and encourage the Planning
16   Department official to approve Project M to allow the project to
17   proceed to a hearing before the City Planning Commission.

18   <u>Overt Act No. 274:</u>  On or about June 13, 2018, defendant HUIZAR
19   caused Company M to send two checks from two separate entities, each
20   made payable to PAC A, in the amount of $12,500 each for a total of
21   $25,000, by U.S. Mail to the Company M office in Los Angeles,
22   California, around the same time that the City Planning Commission
23   approved Project M, allowing it to move forward to a hearing before
24   the PLUM Committee and ultimately City Council.

25   <u>Overt Act No. 275:</u>  On June 18, 2018, Morrie Goldman and
26   Employee M discussed sending the Company M checks to PAC A per
27   defendant HUIZAR's request during the same conversation as discussing
28   the official acts Company M needed from defendant HUIZAR, namely, the

scheduling of Project M for hearing before the PLUM Committee.
Specifically, after Goldman provided the address for PAC A to send
the Company M contribution checks, Employee M responded that the
checks would be sent that day.  Employee M then wrote: "Will we be
able to make the July 31st plum?"  Goldman later explained they would
know "[w]hen HUIZAR decides his schedule for July," adding: "He
sometimes takes an extra week. PLUM could still happen but without
HUIZAR. I think we should wait for a meeting where he is there."
Employee M responded: "We would want [HUIZAR] there."

> **d.    Additional $50,000 Commitment to PAC A in Exchange for Defendant HUIZAR's Help on Project M**

Overt Act No. 276:  On August 9, 2018, Morrie Goldman sent an e-
mail to Executive M regarding Project M's upcoming hearing before the
PLUM Committee, writing: "We need to address the Labor issue.
Seriously...we need to take [the executive of a labor union] off the
chess board."  Goldman and Executive M believed the labor union was
an issue that could affect Project M's approval in the PLUM Committee
with the potential to create delays, increase costs, threaten the
viability of Project M, resulting in negative repercussions for
Executive M personally, including the potential loss of his job.

Overt Act No. 277:  On August 14, 2018, Morrie Goldman and
Employee M discussed the status of Project M and defendant HUIZAR's
position on the project.  Specifically, Goldman explained: "I did
speak to HUIZAR last night. I do think we will need one more meeting
with him.  I think he will get 'there,' just think it will a bit more
painful that we hope."  Employee M then asked: "More painful meaning
more money?"  Goldman then explained that defendant HUIZAR "stressed

that it is a heavy lift" even with community support because "[i]t is the hit he will take with housing advocates and LA Times."

Overt Act No. 278:  On September 4, 2018, Morrie Goldman received an e-mail from Executive M, asking: "Any updates on HUIZAR meeting?"  Goldman responded: "I'm having a one-on-one meeting with [HUIZAR], and you're #1 on the agenda."

Overt Act No. 279:  On September 4, 2018, defendant HUIZAR met with Morrie Goldman regarding the labor union issue Company M was facing on Project M.  During the meeting, Goldman requested on behalf of Executive M for defendant HUIZAR to vote against the labor union's appeal by approving Project M in the PLUM Committee.  Defendant HUIZAR explained that voting against the labor union, which he considered an ally, could have negative ramifications on HUIZAR Relative 1's campaign.  Because of this risk, defendant HUIZAR told Goldman that if he were to vote against the labor union in the PLUM Committee, then Company M would have to make it worthwhile, which Goldman understood to mean that defendant HUIZAR expected a financial benefit from Company M in exchange for his efforts with the labor union.

Overt Act No. 280:  On September 6, 2018, Morrie Goldman and Executive M met to discuss Project M and resolving its labor union issue.  During the meeting, Goldman discussed with Executive M that they needed to make it worthwhile for defendant HUIZAR's intervention with the labor union.  Executive M and Goldman agreed that Company M should offer to make an additional $50,000 contribution to PAC A. Company M had previously agreed to contribute $50,000, and paid the first installment in June 2018.  This additional $50,000 contribution would bring the total agreed-upon contributions on behalf of Company

M to PAC A to $100,000 in exchange for defendant HUIZAR's assistance with Project M.

Overt Act No. 281:  On September 6, 2018, defendant HUIZAR and Morrie Goldman met outside a restaurant in Boyle Heights to discuss the new arrangement with Executive M.  At the meeting, Goldman conveyed the offer of an additional $50,000 contribution to PAC A, bringing the total to $100,000, and defendant HUIZAR agreed to accept the contribution in exchange for voting to approve Project M over objections by the labor union.  Defendant HUIZAR also requested a private meeting with Executive M.

Overt Act No. 282:  On September 6, 2018, Morrie Goldman asked Executive M via text message: "Can you do dinner with HUIZAR on Tuesday, 9-25?"

Overt Act No. 283:  On September 10, 2018, in a text message, Morrie Goldman asked defendant HUIZAR: "Re: [Company M] & [Project M]. You are meeting with [Executive M] on 9-25 to negotiate public benefits package. Could we target PLUM on 10-02 with the clear understanding that the item gets pulled from agenda with no deal? [City Staffer A-2] is waiting for direction from you before scheduling."

Overt Act No. 284:  On September 11, 2018, in a text message, defendant HUIZAR asked Morrie Goldman: "Hey, let's talk about your fundraiser for [HUIZAR Relative 1] before event and who U are inviting. I want to make sure we are hitting people up for right amount and we are not calling same people."  Goldman replied: "Of course."  Defendant HUIZAR then asked: "Oct 11 still good for you?"

1      <u>Overt Act No. 285:</u>  On September 11, 2018, just after the text

2  messages with defendant HUIZAR, Morrie Goldman sent a text message to

3  Executive M stating: "Plan on 10-02 PLUM. But let's discuss..."

4      <u>Overt Act No. 286:</u>  On September 12, 2018, while defendant

5  HUIZAR was negotiating the additional financial benefit he sought

6  from Executive M and Company M, defendant HUIZAR used his official

7  position as PLUM Committee Chair to postpone the committee's hearing

8  on Project M to October 2, 2018, thereby causing the project to be

9  delayed until after he met with Executive M.

10      <u>Overt Act No. 287:</u>  On September 24, 2018, Morrie Goldman told

11  defendant HUIZAR via text message: "We are meeting [Executive M]

12  tomorrow for dinner. Do you still want [a restaurant in downtown Los

13  Angeles], or would you like someplace a bit more private?"

14      <u>Overt Act No. 288:</u>  On September 24, 2018, Morrie Goldman told

15  Executive M via text message: "Meeting is moved to breakfast on 10-04

16  @ 9 AM."  Executive M replied: "But that pushes our date??? This is a

17  disaster."  Goldman responded: "Yes....it pushes the date. It's going

18  to get done."

19      <u>Overt Act No. 289:</u>  On September 26, 2018, in a text message,

20  Morrie Goldman asked Executive M: "any chance you can do your one on

21  one dinner with HUIZAR THIS Friday, 9-28?"  Executive M replied:

22  "Yes. I'm assuming hearing date is the same?"

23      <u>Overt Act No. 290:</u>  On September 28, 2018, defendant HUIZAR and

24  Executive M met to discuss defendant HUIZAR's support for Project M,

25  its approval in the PLUM Committee, and Company M's support for the

26  PAC to benefit HUIZAR Relative 1's campaign.  During the same

27  conversation, Executive M offered to provide opposition research to

28  defendant HUIZAR on a young female former CD-14 staffer who planned

to file a lawsuit against defendant HUIZAR, and defendant HUIZAR accepted this offer.  As part of their negotiation to help Project M, defendant HUIZAR and Executive M also discussed Company M hiring defendant HUIZAR after he left office.

Overt Act No. 291:  On September 28, 2018, defendant HUIZAR sent a text message to Morrie Goldman, writing: "Good meeting with [Executive M]. He is willing to help [HUIZAR Relative 1] committee. He will collect from consultant/contractors. We didn't discuss amount. Please enlist him for your event and ask him to collect 15-20 k for your event."

Overt Act No. 292:  On October 2, 2018, defendant HUIZAR used his official position as the PLUM Committee Chair to postpone his committee's hearing on Project M to October 16, 2018.

Overt Act No. 293:  On October 11, 2018, defendant HUIZAR, Executive M, Employee M, and Morrie Goldman attended a fundraiser for HUIZAR Relative 1 hosted by Goldman.  At the fundraiser, Executive M provided defendant HUIZAR the opposition research against the young female staffer he had promised as part of their agreement for defendant HUIZAR to help Project M.

Overt Act No. 294:  On October 13, 2018, Morrie Goldman and Executive M had a text message conversation regarding the upcoming PLUM Committee hearing for Project M.  Executive M asked: "Anyone else on plum we should connect with?"  Goldman replied: "I was thinking about it but I really don't want to call attention to it. I would rather let JOSE [HUIZAR] power play it through."

Overt Act No. 295:  On October 16, 2018, defendant HUIZAR voted to deny the union appeal and to approve Project M in the PLUM Committee, including accepting certain modifications requested by

Company M.  Specifically, the PLUM Committee accepted Company M's preferred modifications to the affordable housing restrictions, thereby undoing the more stringent requirements recommended by the City Planning Commission.  As a result of defendant HUIZAR's approval and undoing the CPC recommendations, Company M obtained significant reductions to Project M's affordable housing requirements, from 11% "Very Low Income" units to 6% "Moderate Income" units.  Specifically, defendant HUIZAR's approval of Company M's modifications decreased low-income individuals' access to the project while ensuring Company M obtained an estimated $14 million in net savings.

Overt Act No. 296:  On October 16, 2018, after the PLUM Committee approval, in a text message, Morrie Goldman told Executive M: "Let's talk tomorrow. I'm seeing JOSE [HUIZAR] on Thursday, so I know he will bring up follow up on a few items," referring to Company M's commitment to contribute the remaining $75,000 to PAC A.

Overt Act No. 297:  On October 18, 2018, defendant HUIZAR and Morrie Goldman had a meeting at defendant HUIZAR's residence, where defendant HUIZAR raised Company M's commitment to contribute to PAC A.

Overt Act No. 298:  On October 31, 2018, defendant HUIZAR voted to approve Project M in City Council, which caused Executive M to write an e-mail to the owners of Company M and other employees: "Great news, we just received final unanimous approval for [Project M] by city council.  Although today is bit of a formality (PLUM is where the discretion usually happens), this is the final step."  Executive M highlighted the benefits Company M was able to secure in PLUM from defendant HUIZAR, writing: "our obligations related to rent [affordable housing] restrictions and union involvement are minimal

76

compared to other future projects in the area." Executive M also touted "the entitlement of the tallest building in the arts district by 3 times (35 stories) in a wealthy opinionated hipster community" as a "truly amazing" accomplishment.

Overt Act No. 299:  On or around October 31, 2018, Morrie Goldman updated a document tracking commitments and contributions made to PAC A.  Among other things, the document had an entry for Company M with the figure $25,000 in the column titled "Paid," and $75,000 in the column titled "Committed."  In addition, in the "Comments" column, the entry for Company M stated "$75K by December."

Overt Act No. 300:  On November 1, 2018, Morrie Goldman wrote to Executive M via text message, asking for a meeting to "go through the HUIZAR political stuff," referring to the $75,000 contribution to PAC A Company M had committed to defendant HUIZAR in exchange for defendant HUIZAR's now successful help with Project M.

(5)   **Businessperson A Schemes**

a.   **Financial Benefits for Business Opportunities with Developers**

Overt Act Nos. 301-333: On or about at least the following dates, in exchange for defendant HUIZAR using his official position to make introductions to developers and to advocate that such developers use Businessperson A's business to enhance Businessperson A's financial prospects, defendant HUIZAR accepted financial benefits from Businessperson A, including cash, hotel rooms, prostitution/escort services, meals, and other gifts in the following approximate amounts:

| Overt Act No. | Date | Financial benefit | Amount |
|---|---|---|---|
| 301 | 06/13/2016 | suit and shirts | $6,000 |
| 302 | 11/18/2016 | meal | $1,210.88 |
| 303 | 11/18/2016 | shirts | $1,869.03 |
| 304 | January 2017 | cash | $10,000 |
| 305 | 01/13/2017 | hotel accommodation | $286.13 |
| 306 | 01/19/2017 | hotel accommodation | $483.36 |
| 307 | February 2017 | cash | $10,000 |
| 308 | March 2017 | cash | $10,000 |
| 309 | 03/15/2017 | hotel accommodation | $561.10 |
| 310 | 03/25/2017 | resort accommodation | $298.36 |
| 311 | 03/25/2017 | golf club accommodation | $432.75 |
| 312 | April 2017 | cash | $10,000 |
| 313 | 04/06/2017 | hotel accommodation | $311.12 |
| 314 | 04/24/2017 | hotel accommodation | $423.58 |
| 315 | 04/28/2017 | hotel accommodation | $572.61 |
| 316 | May 2017 | cash | $10,000 |
| 317 | 05/03/2017 | hotel accommodation | $456.25 |
| 318 | 05/09/2017 | hotel accommodation | $381.64 |
| 319 | 05/15/2017 | hotel accommodation | $968.87 |
| 320 | 05/17/2017 | hotel accommodation | $346.75 |
| 321 | 05/19/2017 | hotel accommodation | $273.64 |
| 322 | 05/22/2017 | hotel accommodation | $335.66 |
| 323 | 05/24/2017 | hotel accommodation | $810.88 |
| 324 | 05/30/2017 | hotel accommodation | $519.56 |

| Overt Act No. | Date | Financial benefit | Amount |
|---|---|---|---|
| 325 | June 2017 | cash | $10,000 |
| 326 | 06/02/2017 | hotel accommodation | $336.36 |
| 327 | 06/05/2017 | hotel accommodation | $79.75 |
| 328 | 06/08/2017 | hotel accommodation | $475.20 |
| 329 | 06/12/2017 | statue | $920.00 |
| 330 | 06/12/2017 | shoes | $449.32 |
| 331 | 06/12/2017 | suits | $10,451.75 |
| 332 | 06/19/2017 | hotel accommodation | $1,513.49 |
| 333 | 06/26/2017 | hotel accommodation | $322.33 |
| | | **TOTAL:** | **$91,090** |

### b.   $25,000 Contribution to PAC B in Exchange for City Resolution

Overt Act No. 334:  On or about March 11, 2018, defendant HUIZAR met with Businessperson A, who, unbeknownst to defendant HUIZAR, was then acting at the direction of the FBI, on a golf course in the City.  Defendant HUIZAR asked Businessperson A to contribute to HUIZAR Relative 1's campaign.  Businessperson A stated that he would support the campaign, but that he needed help from defendant HUIZAR to provide an official resolution from the City recognizing Businessperson A's business.  Defendant HUIZAR agreed to provide a City resolution and asked Businessperson A to contribute $25,000 to HUIZAR Relative 1's campaign.

Overt Act No. 335:  On or about March 23, 2018, defendant HUIZAR caused Businessperson A to send a check in the amount of $25,000 made payable to PAC B by U.S. Mail from Los Angeles County to PAC B in

Sacramento, California, intended to benefit HUIZAR Relative 1's campaign.

Overt Act No. 336:  On or about April 10, 2018, defendant HUIZAR caused the CD-14 office to issue a City resolution in the form of a certificate of recognition signed by all City Council members, recognizing Businessperson A to promote Businessperson A's business and reputation in the City.

Overt Act No. 337:  On or about May 31, 2018, defendant HUIZAR met with Businessperson A, who was acting at the direction of the FBI, at defendant HUIZAR's City Hall office.  As promised when Businessperson A agreed to contribute $25,000 to HUIZAR Relative 1's campaign, defendant HUIZAR delivered the City resolution recognizing Businessperson A.  At this meeting, defendant HUIZAR confirmed the PAC received Businessperson A's $25,000 contribution, adding that "the people who have the PAC, they know ... you're interested in helping [HUIZAR Relative 1]. So it's sitting there for the right time."

**c.   Cash Payment for Pressure on Developer to Hire Businessperson A**

Overt Act No. 338:  On August 25, 2018, defendant HUIZAR met with Businessperson A, who was acting at the direction of the FBI, at a golf course in the City.  During the meeting, defendant HUIZAR asked Businessperson A for additional contributions to benefit HUIZAR Relative 1's campaign.  During the same conversation, defendant HUIZAR stated: "I'll go down a list of people that I could start introducing you to ...  people ... that I know need my help.... Like for example, right now, [Company M] needs me.... So I could re-introduce them to you."  Businessperson A asked, regarding these

meetings, whether HUIZAR could "push" the developers to hire Businessperson A.  Defendant HUIZAR responded: "Yeah ... for right now they feel pressure, but they need me."

Overt Act No. 339:  On September 24, 2018, defendant HUIZAR met with Businessperson A, who was acting at the direction of the FBI, at a restaurant in the City.  During the meeting, defendant HUIZAR accepted $15,000 in cash from Businessperson A, who provided the cash concealed in an envelope, which defendant HUIZAR then covered with a napkin.  During this meeting, defendant HUIZAR stated that he had a meeting with Company M the following day and that Company M's project was coming up for approval soon.  Defendant HUIZAR stated that Company M "need[s] a lot of help from my office," by which defendant HUIZAR meant that Company M would feel pressure to hire Businessperson A at defendant HUIZAR's request because Company M needed defendant HUIZAR to perform favorable official acts in support of Company M's project and not take adverse official acts in opposition to the project.  Defendant HUIZAR assured Businessperson A that he would make sure Company M scheduled a meeting with Businessperson A.  At the end of the meeting, after Businessperson A had departed, defendant HUIZAR counted the cash inside the envelope.

### (6)  Additional Pay-to-Play Conduct

a.   **CD-14 Developers/Proxies' PAC Contributions to Benefit HUIZAR Relative 1's Campaign and CD-14 Enterprise**

Overt Act No. 340:  In or around May 2017, defendant HUIZAR, George Esparza, Morrie Goldman, and HUIZAR Associate 3 agreed to establish a PAC that publicly was purported to benefit a broad array of candidates and causes but was, in fact, primarily intended to benefit HUIZAR Relative 1's campaign to succeed defendant HUIZAR as

Councilmember for CD-14.  Defendant HUIZAR agreed with Esparza, Goldman, and HUIZAR Associate 3 to pressure developers with projects in CD-14 to contribute to the PAC in exchange for favorable treatment and to avoid adverse action against their projects in the PLUM Committee, Economic Development Committee, and City Council.

Overt Act No. 341:  On May 10, 2017, in a telephone call, George Esparza and George Chiang discussed how defendant HUIZAR was using a PAC to obtain additional financial benefits from developers in exchange for not taking adverse action against them.  Specifically, Esparza told Chiang: "[Defendant HUIZAR's] approach is that he's going to um, strong arm everyone ... to the PAC. [Jia Yuan], [Company F]. 'This is what I want right now. This is my [relative], this is what we are doing.' So his idea in his mind is that okay, people are going to support us because they don't want people to fuck with projects, you know."

Overt Act No. 342:  On May 11, 2017, in a telephone call, George Esparza and Executive Director E discussed punishing a developer who was not providing financial benefits to defendant HUIZAR by withholding approvals for the developer's project.  Specifically, Esparza said: "[Company G] has not come through with any other commitments to us, to you, so you know, why even be helpful to them, you know, that's my thing... So I'm going to tell [defendant HUIZAR] that I spoke to you and let's just continue to ignore them, you know. We are not going to help them."  Executive Director E then added: "And even [defendant CHAN] doesn't want you guys to work with [Company G]."

Overt Act No. 343:  On June 2, 2017, in a telephone call, defendant HUIZAR, HUIZAR Relative 1, and Morrie Goldman discussed

establishing a PAC to support HUIZAR Relative 1's campaign.  Goldman
explained: "the PAC ... that's going to be strictly political money
and, you know, two years from now, or three years, there'll be a
million dollars in there.  You won't be able to direct it, but
there'll be people, you know, [who] are like minded."

Overt Act No. 344:  On June 22, 2017, defendant HUIZAR met with
George Esparza, Morrie Goldman, and Justin Kim and discussed
establishing a PAC to raise money for HUIZAR Relative 1's campaign.
During this meeting, defendant HUIZAR suggested having Kim find an
associate to serve as the "face" of the PAC to disguise defendant
HUIZAR's involvement and the PAC's connection to CD-14.

Overt Act No. 345:  On September 14, 2017, defendant HUIZAR and
George Esparza had a text message conversation regarding compiling a
list of donors to target for fundraising for HUIZAR Relative 1's
campaign, which they referred to as the "Executive 2" strategy
meetings, focusing on developers with upcoming hearings before the
PLUM Committee, which defendant HUIZAR chaired.  Defendant HUIZAR
instructed Esparza via text message: "Please get the [City Staffer A-
2] list that he gave u about projects going to cpc and plum and let's
discuss me and u at every Thursday exec.#2 meeting."

Overt Act No. 346:  On October 20, 2017, defendant HUIZAR and
George Esparza had a conversation about targeting developers with
projects pending before committees on which defendant HUIZAR sat in
order to obtain financial benefits from them.  Specifically,
defendant HUIZAR instructed Esparza via text message: "[Company H] is
on economic development committee on Tuesday for tot [Transient
Occupancy Tax rebates]. Have u spoken with those guys?"  Esparza
responded: "Hey boss, here is a quick update. Just had my last

meeting. [Company I]/[Lobbyist I]- good. [Company H]/[Lobbyist C]-
good. [Company J]/[Consultant J]- good. All commitments have been
made."

Overt Act No. 347:  On October 24, 2017, defendant HUIZAR again
sought to confirm with George Esparza that certain developers and
consultants committed to contribute to PACs to benefit HUIZAR
Relative 1's campaign before taking favorable actions on the projects
in the Economic Development and PLUM Committees.  Specifically,
defendant HUIZAR told Esparza via text message: "[Company H] is in
committee today..." Defendant HUIZAR then followed up: "Everything
being handled?"  Esparza responded: "Yes sir."  Defendant HUIZAR then
texted: "The [Company I] sign district is in committee today."
Esparza responded: "Yes. Being handled as well."

Overt Act No. 348:  On December 4, 2017, defendant HUIZAR
created a spreadsheet titled "Initial Commitments to PAC," listing
companies, consultants, and contribution amounts, totaling
$500,000.  Several of those listed had pending projects in defendant
HUIZAR's district or before a committee that defendant HUIZAR
chaired, including the following:

| Company | Commitment | Notes |
|---|---|---|
| [Company H] | $25,000 | [Lobbyist C] |
| [Company I] | $25,000 | [Lobbyist I] |
| [Company J] | $50,000 | [Consultant J] |

Overt Act No. 349:  On March 26, 2018, defendant HUIZAR caused
Company H to make a contribution of $10,000 to PAC B.

Overt Act No. 350:  On June 19, 2018, defendant HUIZAR caused
Company J to make a contribution of $25,000 to PAC A.

####### b. CD-14 Developers/Proxies' Contributions to Defendant HUIZAR Campaigns and Officeholder Accounts

<u>Overt Act No. 351:</u>  On May 18, 2015, at defendant HUIZAR's direction, George Esparza created a document titled "HUIZAR Debt Finance Plan," which documented defendant HUIZAR's solicitation efforts of contributions from developers, consultants, and allies towards defendant HUIZAR's 2015 re-election campaign debt, including many developers and consultants who had projects in CD-14 and/or were going through the City approval process.  The plan included: (1) $40,000 from Justin Kim; (2) $20,000 from Wei Huang; (3) $20,000 from Company G through Executive Director E; (4) $10,000 from Jia Yuan; and (5) $10,000 from defendant CHAN.

####### c. CD-14 Developers/Proxies' Contributions to School that Employed HUIZAR Relative 1 as a Fundraiser

<u>Overt Act No. 352:</u>  Beginning in or around March 2015, at defendant HUIZAR's direction, George Esparza solicited donations to High School A's annual gala event from developers and consultants with projects pending in defendant HUIZAR's district.  Part of the money raised from the gala event was used to pay salaried employees, including HUIZAR Relative 1.

<u>Overt Act No. 353:</u>  On May 18, 2015, George Esparza created a document titled "[High School A] Fundraising Plan."  The document included commitments from: (1) Jia Yuan for $10,000; (2) Wei Huang for $20,000; (3) Company F for $10,000; and (4) Company L for $30,000.

<u>Overt Act No. 354:</u>  On or around May 24, 2015, defendant CHAN created a document titled "JH," referencing defendant HUIZAR, which included a subsection titled "School" with commitments from: (1) Fuer

Yuan for $10,000, through George Chiang; (2) Developer K for $20,000, through George Esparza; and (3) Company L for $30,000, through George Esparza.

Overt Act No. 355:  On or around September 28, 2015, defendant HUIZAR attended High School A's annual gala, which, at defendant HUIZAR's request, was sponsored by the following companies, among others, in the following amounts: (1) $25,000 by Company L; (2) $10,000 by Jia Yuan; (3) $10,000 by Company F; and (4) $5,000 by Company K.

**d.   Steering CD-14 Developers to Preferred Firms**

Overt Act No. 356:  In or around 2012, defendant HUIZAR pressured Developer N to hire HUIZAR Associate 3 as a consultant on Developer N's development project in CD-14.  Developer N complied with the request.

Overt Act No. 357:  In or around May 2013, defendant HUIZAR organized a dinner between Developer N, HUIZAR Associate 3, and a partner of Law Firm A, which paid HUIZAR Relative 1 a bi-weekly salary of $2,500.  Developer N understood that defendant HUIZAR was asking Developer N to hire Law Firm A because it paid HUIZAR Relative 1 and in exchange for defendant HUIZAR's support on the development project pending in CD-14.

Overt Act No. 358:  In or around March 2014, defendant HUIZAR organized a meeting with Jia Yuan and HUIZAR Associate 1, and encouraged Jia Yuan to hire HUIZAR Associate 1 as a consultant on the Luxe Hotel Project.

Overt Act No. 359:  On February 25, 2016, defendant HUIZAR instructed George Esparza by text message: "Please work it out with George [Chiang] ... to set up a meeting with [Developer K] and [Law

Firm A partner] ... Let them know that [HUIZAR Relative 1] works at [Law Firm A] and we want to make introduction to see if [the company] ever needs legal defense. Please keep me posted."

Overt Act No. 360:  In or around 2017, defendant HUIZAR caused Company O, which had projects pending in CD-14 and before defendant HUIZAR's committees, to hire HUIZAR Associate 3 as a consultant with a monthly retainer of $10,000.

(7)  Defendant HUIZAR's Concealment of Illicit Benefits

a.  Transporting of Cash into United States and Structuring to Avoid Reporting Requirements

Overt Act No. 361:  On January 1, 2016, defendant HUIZAR and George Esparza traveled with Wei Huang and Executive Director E to Australia, where defendant HUIZAR and Esparza accepted financial benefits from Huang, including a $10,980 commercial airline ticket for defendant HUIZAR, private jet flights for Esparza, hotels, meals, alcohol, and other expenses.  In addition, defendant HUIZAR and Esparza accepted casino gambling chips from Huang, which defendant HUIZAR and Esparza cashed out in Australian dollars.

Overt Act No. 362:  After the Australia trip, defendant HUIZAR and George Esparza discussed evading bank reporting requirements by converting Australian dollars to American dollars.  Specifically, on February 8, 2016, Esparza told defendant HUIZAR via text message: "They are asking me for my drivers license and social security for IRS record. Do you think it's fine to leave my info?"  Defendant HUIZAR responded: "No. Maybe we can change a little at a time...under 10 k in future."  Defendant HUIZAR also wrote: "Don't exchange if they are asking u for all that info."  Defendant HUIZAR later instructed Esparza: "Go to the other place tomorrow and take 9 k. See

if they change 9 k without getting your social security number." Defendant HUIZAR added: "Even if they take your social security, it doesn't mean that they will report to irs. They probably will just keep it for their records but not do anything with tax reporting."

Overt Act No. 363: On February 9, 2016, at defendant HUIZAR's direction, George Esparza exchanged 10,000 Australian dollars into American dollars. Esparza then reported to defendant HUIZAR in a text message: "I exchanged 10k today. Will do another tomorrow. If it's under 10k, they will not report." Defendant HUIZAR then told Esparza to ask for a better exchange rate the next day.

Overt Act No. 364: On February 10, 2016, at defendant HUIZAR's direction, George Esparza exchanged another 10,000 Australian dollars into American dollars.

Overt Act No. 365: On February 14, 2016, defendant HUIZAR asked George Esparza via text messages: "(1). U back? How did chairman [Wei Huang] do? (2). For last batch to exchange, I think it is 12,800 (correct?). ...see if u can bargain with either of two places in dtla for more than .68. The Australian dollar has gotten stronger and is close to .72 official exchange." Esparza responded: "I came home. Chairman [Huang] is up 2mil. Ok. I'll see if I can get close to .72."

Overt Act No. 366: On February 17, 2016, at defendant HUIZAR's direction, George Esparza exchanged another 12,800 Australian dollars into American dollars, and confirmed to defendant HUIZAR by text message: "I was able to get you .69 exchange rate" and that "chairman [Wei Huang] won 3 mil." Defendant HUIZAR responded: "Wow. Wow. Wow."

**b. Money Laundering through Family Members**

Overt Act Nos. 367-400: On or about the below dates, in order to conceal and disguise the nature, source, ownership, and control of

proceeds from defendant HUIZAR's pay-to-play scheme, defendant HUIZAR caused HUIZAR Relative 2 to deposit cash into HUIZAR Relative 2's checking account and thereafter pay defendant HUIZAR directly or indirectly:

| Overt Act No. | Date | Description | Cash Deposit | Payment to Defendant HUIZAR |
|---|---|---|---|---|
| 367 | 01/08/14 | Defendant HUIZAR deposited check from HUIZAR Relative 2 into his checking account | | $15,000 |
| 368 | 04/08/14 | Defendant HUIZAR deposited check from HUIZAR Relative 2 into his checking account | | $5,000 |
| 369 | 11/03/14 | HUIZAR Relative 2 deposited cash into checking account | $5,000 | |
| 370 | 11/18/14 | Defendant HUIZAR deposited check from HUIZAR Relative 2 into his checking account | | $4,900 |
| 371 | 12/03/14 | HUIZAR Relative 2 deposited cash into checking account | $7,000 | |
| 372 | 12/11/14 | HUIZAR Relative 2 wrote check to pay defendant HUIZAR's credit card bill | | $7,000 |
| 373 | 03/12/15 | HUIZAR Relative 2 deposited cash into checking account | $10,000 | |
| 374 | 03/12/15 | Defendant HUIZAR deposited check from HUIZAR Relative 2 into his checking account | | $10,000 |
| 375 | 04/08/15 | HUIZAR Relative 2 deposited cash into checking account | $10,000 | |
| 376 | 04/21/15 | HUIZAR Relative 2 wrote a check for defendant HUIZAR's loan interest to Bank 1 | | $4,272.66 |
| 377 | 04/22/15 | HUIZAR Relative 2 deposited cash into checking account | $2,300 | |

89

| Overt Act No. | Date | Description | Cash Deposit | Payment to Defendant HUIZAR |
|---|---|---|---|---|
| 378 | 04/23/15 | HUIZAR Relative 2 made electronic payment to pay defendant HUIZAR's credit card | | $8,000 |
| 379 | 07/03/15 | HUIZAR Relative 2 deposited cash into checking account | $9,000 | |
| 380 | 07/05/15 | HUIZAR Relative 2 wrote a check for defendant HUIZAR's loan interest to Bank 1 | | $2,895.91 |
| 381 | 07/13/15 | HUIZAR Relative 2 wrote check to pay defendant HUIZAR's credit card bill | | $2,492.45 |
| 382 | 07/14/15 | HUIZAR Relative 2 wrote check to pay defendant HUIZAR's property taxes | | $2,640.51 |
| 383 | 08/19/15 | HUIZAR Relative 2 deposited cash into checking account | $8,100 | |
| 384 | 08/19/15 | HUIZAR Relative 2 wrote a check to defendant HUIZAR's loan interest to Bank 1 | | $2,895.92 |
| 385 | 08/24/15 | HUIZAR Relative 2 made electronic payment to pay defendant HUIZAR's credit card bill | | $1,844.10 |
| 386 | 08/24/15 | HUIZAR Relative 2 made electronic payment to pay defendant HUIZAR's credit card bill | | $3,042.47 |
| 387 | 01/04/16 | HUIZAR Relative 2 deposited cash into checking account | $2,900 | |
| 388 | 01/06/16 | HUIZAR Relative 2 wrote check to pay defendant HUIZAR's credit card bill | | $704.57 |
| 389 | 01/23/16 | HUIZAR Relative 2 wrote a check for defendant HUIZAR's loan interest to Bank 1 | | $2,895.91 |
| 390 | 01/25/16 | HUIZAR Relative 2 deposited cash into checking account | $13,000 | |

| Overt Act No. | Date | Description | Cash Deposit | Payment to Defendant HUIZAR |
|---|---|---|---|---|
| 391 | 01/27/16 | HUIZAR Relative 2 wrote check to pay defendant HUIZAR's credit card bill | | $7,730.22 |
| 392 | 04/27/17 | HUIZAR Relative 2 deposited cash into checking account | $9,000 | |
| 393 | 04/29/17 | HUIZAR Relative 2 wrote a check for defendant HUIZAR's loan interest to Bank 1 | | $2,900.97 |
| 394 | 06/02/17 | HUIZAR Relative 2 deposited cash into checking account | $9,000 | |
| 395 | 06/08/17 | HUIZAR Relative 2 wrote check to pay defendant HUIZAR's credit card bill | | $12,755.11 |
| 396 | 06/23/17 | HUIZAR Relative 2 wrote a check for defendant HUIZAR's loan interest to Bank 1 | | $2,895.91 |
| 397 | 06/27/17 | HUIZAR Relative 2 deposited cash into checking account | $6,000 | |
| 398 | 07/19/17 | HUIZAR Relative 2 deposited cash into checking account | $8,000 | |
| 399 | 07/27/17 | HUIZAR Relative 2 wrote check to pay defendant HUIZAR's credit card bill | | $10,955.91 |
| 400 | 09/19/17 | HUIZAR Relative 2 deposited cash into checking account | $9,000 | |
| | | **TOTAL:** | **$108,300** | **$110,722** |

Overt Act Nos. 401-418:  On or about the below dates, in order to conceal and disguise the nature, source, ownership, and control of proceeds from defendant HUIZAR's pay-to-play scheme, defendant HUIZAR

91

provided cash to HUIZAR Relative 3 and caused HUIZAR Relative 3 to
pay defendant HUIZAR directly or indirectly:

| Overt Act No. | Date | Description | Cash Deposit | Payment to Defendant HUIZAR |
|---|---|---|---|---|
| 401 | 11/27/13 | Defendant HUIZAR deposited two $7,500 checks from HUIZAR Relative 3 into his checking account | | $15,000 |
| 402 | 01/08/14 | Defendant HUIZAR deposited check from HUIZAR Relative 3 into his checking account | | $10,000 |
| 403 | 08/04/14 | Defendant HUIZAR deposited check from HUIZAR Relative 3 into his checking account | | $10,000 |
| 404 | 08/29/14 | Defendant HUIZAR deposited check from HUIZAR Relative 3 into his checking account | | $10,000 |
| 405 | 12/23/14 | HUIZAR Relative 3 wrote a check to pay defendant HUIZAR's legal fees | | $10,000 |
| 406 | 11/16/15 | Defendant HUIZAR deposited check from HUIZAR Relative 3 into his checking account | | $9,000 |
| 407 | 11/19/15 | HUIZAR Relative 3 wrote a check to pay defendant HUIZAR's credit card bill | | $4,915.92 |
| 408 | 12/30/15 | Defendant HUIZAR deposited check from HUIZAR Relative 3 into his checking account | | $9,000 |
| 409 | 09/22/16 | HUIZAR Relative 3 wrote a check to pay defendant HUIZAR's credit card bill | | $2,836.52 |
| 410 | 09/22/16 | HUIZAR Relative 3 wrote a check to pay defendant HUIZAR's loan interest to Bank 1 | | $7,263.51 |

| Overt Act No. | Date | Description | Cash Deposit | Payment to Defendant HUIZAR |
|---|---|---|---|---|
| 411 | 11/09/16 | HUIZAR Relative 3 wrote a check to pay defendant HUIZAR's credit card bill | | $5,451.68 |
| 412 | 12/23/16 | HUIZAR Relative 3 deposited cash into checking account | $10,000 | |
| 413 | 12/23/16 | HUIZAR Relative 3 wrote a check to pay fee for defendant HUIZAR's party | | $24,694.53 |
| 414 | 02/17/17 | HUIZAR Relative 3 deposited cash into checking account | $10,000 | |
| 415 | 02/17/17 | HUIZAR Relative 3 made electronic payment to pay defendant HUIZAR's credit card bill | | $7,263.52 |
| 416 | 02/27/17 | HUIZAR Relative 3 deposited cash into checking account | $6,000 | |
| 417 | 03/10/17 | HUIZAR Relative 3 deposited cash into checking account | $3,000 | |
| 418 | 03/13/17 | HUIZAR Relative 3 made electronic payment to defendant HUIZAR's credit card bill | | $7,464.99 |
| | | **TOTAL:** | **$29,000** | **$132,891** |

Overt Act Nos. 419-428: On or about the below dates, in order to conceal and disguise the nature, source, ownership, and control of proceeds from defendant HUIZAR's pay-to-play scheme, defendant HUIZAR caused HUIZAR Relative 1 to deposit cash into HUIZAR Relative 1's checking account, and thereafter pay for household expenses:

| Overt Act No. | Date | Description | Amount |
|---|---|---|---|
| 419 | 04/05/16 | Cash deposit | $500 |

| Overt Act No. | Date | Description | Amount |
|---|---|---|---|
| 420 | 06/23/16 | Cash deposit | $400 |
| 421 | 08/16/16 | Cash deposit | $500 |
| 422 | 09/15/16 | Cash deposit | $500 |
| 423 | 11/09/16 | Cash deposit | $800 |
| 424 | 12/02/16 | Cash deposit | $1,000 |
| 425 | 12/06/16 | Cash deposit | $500 |
| 426 | 12/21/16 | Cash deposit | $500 |
| 427 | 01/30/17 | Cash deposit | $500 |
| 428 | 02/08/17 | Cash Deposit | $200 |
| | | **TOTAL:** | **$5,400** |

### (8)   Additional Concealment of Pay-to-Play Scheme

a.   CD-14 Enterprise Members' Concern About Detection

Overt Act No. 429:   On October 28, 2015, in an effort to attempt to conceal his corrupt relationship with Wei Huang, their trips to Las Vegas, and the benefits provided and accepted at casinos, defendant HUIZAR sent a text message to George Esparza about an upcoming trip to Las Vegas with Huang and Executive Director E, writing: "Check to see if [private] airplane checks your id. If they

94

don't, maybe I fly with u guys." Esparza responded: "Yes. [Executive Director E] says they check Id."

Overt Act No. 430:  On February 28, 2016, defendant HUIZAR and George Esparza had a conversation via text messages regarding avoiding documentation of their joint trip to Las Vegas and the money they received there.  Esparza wrote: "No need to book flight. You can take plane back with chairman [Wei Huang]." Defendant HUIZAR asked: "They don't check id?" Esparza responded: "No Id." Later that day, defendant HUIZAR instructed Esparza: "When u have a chance, go and cash chips little by little bc if [Huang] loses, u won't be able to cash." Esparza responded: "Yes. That's what I'm doing."

Overt Act No. 431:  On July 13, 2016, defendant HUIZAR and George Esparza had a conversation via text message regarding an upcoming trip to Las Vegas with Wei Huang and Executive Director E, and their concern about defendant HUIZAR being identified as traveling with Huang and Executive Director E.  Defendant HUIZAR wrote: "Let me know who is there and how [Huang] is doing [in terms of gambling winnings] so that I can determine if I go or not." Esparza responded that "the sheriff we met before" was part of the group.  Defendant HUIZAR later asked: "If sheriff guy there maybe I shouldn't go?"  The same day, defendant HUIZAR asked Esparza by text: "Is [casino] strict about ID?" Esparza responded: "Not at all," adding: "Haven't checked my ID and I've been playing."

Overt Act No. 432:  On July 14, 2016, defendant HUIZAR warned George Esparza to avoid discussing their trips to Las Vegas with Wei Huang by phone, writing in an e-mail: "We should limit types of conversations we just had on phone. For future reference. My bad."

Overt Act No. 433:  On July 14, 2016, defendant HUIZAR again warned George Esparza to avoid phone discussions regarding Las Vegas trips with Wei Huang, writing in a text message: "Hey we should watch what we say on phone."  Esparza responded: "You're right. We always have to be safe."

Overt Act No. 434:  On June 21, 2017, in a telephone call, defendant CHAN and George Chiang discussed collecting $20,000 in cash from an individual the following day.  After Chiang told defendant CHAN that he had talked to the individual, defendant CHAN admonished: "don't put it on e-mail, don't put it on e-mail."  Chiang reassured defendant CHAN: "No, no, no, it's not in e-mail ... I left a voicemail on his cell phone."

Overt Act No. 435:  On September 5, 2018, moments after defendant CHAN agreed to an interview with the FBI and stated that he would not disclose the interview to anyone, defendant CHAN disclosed to George Chiang that he had just received an "interesting call" from the FBI requesting an interview with him, and Chiang responded: "I hope this is not about JOSE [HUIZAR]."

Overt Act No. 436:  On September 12, 2018, after defendant CHAN was interviewed by FBI agents in the CCC Investment office, defendant CHAN immediately inspected the chairs in which the agents sat to search for hidden recording equipment he suspected of being placed there by the agents.

b.   **Defendant HUIZAR's Failure to Report on Forms 700 and Tax Returns**

Overt Act Nos. 437-444:  On or about the following dates, in an effort to conceal the benefits defendant HUIZAR received from developers as part of the pay-to-play scheme, defendant HUIZAR failed

to report any of the financial benefits discussed above on his Forms 700 or tax returns for the calendar years 2014, 2015, 2016, and 2017:

| Overt Act No. | Date | Description |
|---|---|---|
| 437 | April 2015 | HUIZAR 2014 Form 700 |
| 438 | April 2015 | HUIZAR 2014 Tax Return |
| 439 | April 2016 | HUIZAR 2015 Form 700 |
| 440 | April 2016 | HUIZAR 2015 Tax Return |
| 441 | April 2017 | HUIZAR 2016 Form 700 |
| 442 | April 2017 | HUIZAR 2016 Tax Return |
| 443 | April 2018 | HUIZAR 2017 Form 700 |
| 444 | April 2018 | HUIZAR 2017 Tax Return |

c.   **Defendant HUIZAR's Concealment of Large Cash Sum at Residence**

Overt Act No. 445:  On or about November 7, 2018, defendant HUIZAR possessed approximately $129,000 in cash hidden at his residence, which was made up of cash payments defendant HUIZAR had accepted from Wei Huang and Businessperson A.

### **(9)** <u>Obstructionist Conduct</u>

**a.    Defendant HUIZAR's Witness Tampering**

<u>Overt Act No. 446:</u>  On June 20, 2017, after George Esparza told defendant HUIZAR that he was interviewed by the FBI and defendant HUIZAR asked Esparza about the FBI's questions, and whether the FBI asked questions about Businessperson A and Wei Huang, defendant HUIZAR instructed Esparza not to tell anyone that Esparza disclosed the content of his FBI interview to defendant HUIZAR.

<u>Overt Act No. 447:</u>  On December 28, 2017, in a conversation in defendant HUIZAR's private bathroom in City Hall, after George Esparza referred to his FBI interviews the prior summer and stated that he did everything to make sure defendant HUIZAR was protected, defendant HUIZAR stated: "Yeah, and that's why I said we are both in this together.... We're in it together."

<u>Overt Act No. 448:</u>  On October 27, 2018, defendant HUIZAR instructed Businessperson A not to disclose incriminating information to the FBI, including instructing Businessperson A not to mention anything about parties or "dessert," meaning defendant HUIZAR's use of escort/prostitution services, which Businessperson A had provided at parties Businessperson A hosted.

**b.    Defendant HUIZAR's False Statements**

<u>Overt Act No. 449:</u>  On April 10, 2019, during an interview with the U.S. Attorney's Office and FBI during which defendant HUIZAR was advised, in the presence of counsel, that lying to the government was a crime, defendant HUIZAR falsely stated that: (a) he told George Esparza that the hundreds of thousands of dollars cash payment Justin Kim provided to Esparza was "yours, I do not want it"; and (b) he did

not discuss Esparza giving defendant HUIZAR the money from Kim in April 2018.

### c.   Defendant CHAN's Attempted Witness Tampering

Overt Act No. 450:  On or about November 24, 2018, defendant CHAN drafted a document that he later provided to Businessperson A, which appeared to serve as a script for Businessperson A summarizing defendant CHAN's version of the facts regarding defendant CHAN's plan to have Businessperson A pay City Staffer A-2 a "finder's fee" for developer referrals to Businessperson A while City Staffer A-2 was a City official and performing official acts to benefit defendant CHAN's clients (the "script").  In his script, defendant CHAN omitted at least the following the material facts: (a) that defendant CHAN agreed to personally "set aside" $10,000 from Businessperson A for City Staffer A-2 as an initial payment for introducing a developer to Businessperson A; (b) that defendant CHAN was the architect of the arrangement; and (c) that defendant CHAN had devised various ways to conceal the payment's true source and purpose.

Overt Act No. 451:  On November 24, 2018, defendant CHAN met with Businessperson A, who was acting at the direction of the FBI, at a restaurant in Monterey Park, California, to discuss the FBI and grand jury investigation into defendant HUIZAR and development companies in the City.  During the meeting, defendant CHAN disclosed that he and George Chiang received a grand jury subpoena, and provided the script to Businessperson A.  Defendant CHAN further instructed Businessperson A that he needed to remember three things: (1) City Staffer A-2 was leaving the office; (2) Businessperson A asked City Staffer A-2 to help introduce buyers for Businessperson A's cabinets; and (3) City Staffer A-2 did not take money from

99

Businessperson A.  Defendant CHAN again instructed Businessperson A to remember these three things and directed Businessperson A to repeat them back.  Defendant CHAN also instructed Businessperson A to contact City Commissioner 1's Relative to terminate the financial relationship that defendant CHAN had also orchestrated.

> **d.    Defendant CHAN's False and Misleading Statements to the FBI**
>
> Overt Act No. 452:  On November 7, 2018, during a recorded interview with the FBI, during which defendant CHAN was advised that lying to the government was a crime, defendant CHAN falsely stated that: (a) he was "not involved" and had "no involvement" in the settlement of defendant HUIZAR's 2013 sexual harassment lawsuit; (b) "Chairman [Wei Huang] doesn't have anything ... in front of JOSE [HUIZAR]'s district ... that needs JOSE [HUIZAR]'s help or involvement"; and (c) "[Huang] never asked JOSE [HUIZAR] for anything," including help on Huang's hotel.

COUNTS TWO THROUGH SEVENTEEN

[18 U.S.C. §§ 1341, 1343, 1346, 2(b)]

[ALL DEFENDANTS]

A.   THE SCHEME TO DEFRAUD

44.   Beginning on an unknown date but no later than February 2013, and continuing to the present, in Los Angeles County, within the Central District of California, and elsewhere, defendants JOSE LUIS HUIZAR, RAYMOND SHE WAH CHAN, WEI HUANG, SHEN ZHEN COMPANY, DAE YONG LEE, and 940 HILL, LLC, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud the City of Los Angeles and its citizens of their right to the honest services of their public officials through bribery and kickbacks, materially false and fraudulent pretenses and representations, and the concealment of material information, which violation affected at least one financial institution.

B.   MEANS AND METHODS OF THE SCHEME TO DEFRAUD

45.   The scheme to defraud operated, in substance, in the following manner:

a.   In exchange for their official acts, defendants HUIZAR and CHAN, and their co-schemers would demand, solicit, accept, and agree to accept from developers and their proxies, including from defendants HUANG, SHEN ZHEN COMPANY, LEE, and 940 HILL LLC, who would give, offer, and agree to give, financial benefits, including: (1) cash; (2) consulting and retainer fees; (3) favorable loans; (4) gambling chips at casinos; (5) political contributions; (6) flights on private jets and commercial airlines; (7) stays at luxury hotels; (8) expensive meals; (9) spa services; (10) event

101

tickets to concerts, shows, and sporting events; (11) escort and prostitution services; and (12) other gifts.

b.    In exchange for the bribes and kickbacks from co-schemer developers and their proxies, including from defendants HUANG, SHEN ZHEN COMPANY, LEE, and 940 HILL LLC, who would give, offer, and agree to give financial benefits, defendants HUIZAR and CHAN and their co-schemers would agree to perform and perform the following types of official acts, among others: (1) presenting motions and resolutions in various City committees to benefit projects; (2) voting on projects in various City committees, including the PLUM Committee, and City Council; (3) taking, or not taking, action in the PLUM Committee to expedite or delay the approval process and affect project costs; (4) exerting pressure on other City officials to influence the approval process of projects; (5) using their office to negotiate with and exert pressure on labor unions to resolve issues on projects; (6) leveraging voting and scheduling power to pressure developers with projects pending before the City to affect their business practices; and (7) introducing or voting on City resolutions to enhance the professional reputation and marketability of businesspersons in the City.

c.    Defendants HUIZAR, CHAN, HUANG, SHEN ZHEN COMPANY, LEE, and 940 HILL, LLC and their co-schemers would conceal their scheme by: (1) storing large amounts of cash in their residences; (2) providing cash to family members and associates; (3) directing payments to family members, associates, and entities to avoid creating a paper trail between the developers, their proxies and public officials; (4) using family members and associates to pay expenses; (5) depositing cash at ATMs and banks in amounts under

$10,000 to avoid bank reporting requirements; (6) failing to disclose payments and benefits received on Forms 700 and on tax returns; (7) lying to law enforcement; (8) attempting to corruptly influence the statements of others to law enforcement; and (9) using encrypted messaging applications, including those utilizing a self-destructing message system, to communicate about their scheme.

C.  USE OF WIRES

46.  On or about the dates set forth below, within the Central District of California and elsewhere, the following defendants, for the purpose of executing the above-described scheme to defraud, transmitted and caused the transmission of the following items by means of wire communication in interstate and foreign commerce:

| L.A. Grand Hotel Project | | | |
|---|---|---|---|
| COUNT | DEFENDANT(S) | DATE | WIRE TRANSMISSION |
| TWO | HUIZAR; CHAN; HUANG; SHEN ZHEN COMPANY | 09/23/2014 | Bank wire of $570,000 from defendant HUIZAR's Bank 1 account ending in 0407 to a Wells Fargo account ending in 7209 in Los Angeles County, which was routed through Minnesota. |
| THREE | HUIZAR; CHAN; HUANG; SHEN ZHEN COMPANY | 10/19/2016 | E-mail from Executive Director E to defendant HUIZAR, forwarding an e-mail and attachment from defendant HUANG regarding the L.A. Grand Hotel Project, which traveled between two locations in Los Angeles County through a Google server located outside of California. |

| L.A. Grand Hotel Project | | | |
|---|---|---|---|
| COUNT | DEFENDANT(S) | DATE | WIRE TRANSMISSION |
| FOUR | HUIZAR; CHAN; HUANG; SHEN ZHEN COMPANY | 12/19/2016 | E-mail from defendant HUIZAR to Executive Director E providing recommendations for consultants for the L.A. Grand Hotel Project, which traveled between two locations in Los Angeles County through a Google server located outside of California. |

| 940 Hill Project | | | |
|---|---|---|---|
| COUNT | DEFENDANT(S) | DATE | WIRE TRANSMISSION |
| FIVE | HUIZAR; LEE; 940 HILL, LLC | 08/09/2016 | E-mail from Justin Kim to George Esparza, forwarding an e-mail from defendant LEE attaching a copy of the labor union appeal filed against the 940 Hill Project, which traveled between two locations in Los Angeles County through a Google server located outside of California. |

| Luxe Hotel Project | | | |
|---|---|---|---|
| COUNT | DEFENDANT(S) | DATE | WIRE TRANSMISSION |
| SIX | HUIZAR | 06/15/2016 | Wire bank transfer of $11,000 from a bank account in Canada to a Union Bank account ending in 6345 in Pasadena, California. |
| SEVEN | HUIZAR | 07/19/2016 | Wire bank transfer of $11,000 from a bank account in Canada to a Union Bank account ending in 6345 in Pasadena, California. |

| Luxe Hotel Project | | | |
|---|---|---|---|
| <u>COUNT</u> | <u>DEFENDANT(S)</u> | <u>DATE</u> | <u>WIRE TRANSMISSION</u> |
| EIGHT | HUIZAR | 08/17/2016 | Wire bank transfer of $11,000 from a bank account in Canada to a Union Bank account ending in 6345 in Pasadena, California. |
| NINE | HUIZAR | 09/09/2016 | Wire bank transfer of $11,000 from a bank account in Canada to a Union Bank account ending in 6345 in Pasadena, California. |
| TEN | HUIZAR | 11/14/2016 | Wire bank transfer of $11,000 from a bank account in Canada to a Union Bank account ending in 6345 in Pasadena, California. |
| ELEVEN | HUIZAR | 11/30/2016 | Wire bank transfer of $11,000 from a bank account in Canada to a Union Bank account ending in 6345 in Pasadena, California. |
| TWELVE | CHAN | 10/28/2017 | Bank wire of $36,432.74 from Synergy Chase Bank account ending in 9050 to defendant CHAN's East West Bank account ending in 9279 in Los Angeles County, which was routed through Florida. |
| THIRTEEN | CHAN | 12/27/2017 | Bank wire of $33,507.23 from Synergy Chase Bank account ending in 9050 to defendant CHAN's East West Bank account ending in 9279 in Los Angeles County, which was routed through Florida. |

| Luxe Hotel Project | | | |
| --- | --- | --- | --- |
| COUNT | DEFENDANT(S) | DATE | WIRE TRANSMISSION |
| FOURTEEN | HUIZAR; CHAN | 01/09/2018 | E-mail from George Esparza to defendant HUIZAR, attaching two documents titled "Copy of Commitments" and "IE Huizar Strategy," which traveled between two locations in Los Angeles County through a Google server located outside of California. |
| FIFTEEN | HUIZAR; CHAN | 01/16/2018 | E-mail from defendant HUIZAR to his fundraiser, attaching a document titled "Initial Commitments to PAC," which traveled between two locations in Los Angeles County through a Google server located outside of California. |

D.   USE OF MAIL

47.   On or about the dates set forth below, within the Central District of California and elsewhere, defendant HUIZAR, for the purpose of executing the above-described scheme to defraud, willfully caused the following items to be placed in an authorized depository for mail matter to be sent and delivered by the United States Postal Service according to the directions thereon:

| Businessperson A | | | |
| --- | --- | --- | --- |
| COUNT | DEFENDANT(S) | DATE | MAILING |
| SIXTEEN | HUIZAR | 03/28/2018 | An envelope containing a check in the amount of $25,000 made payable to PAC B sent from Businessperson A in Los Angeles County to PAC B. |

106

| Project M | | | |
|---|---|---|---|
| COUNT | DEFENDANT(S) | DATE | MAILING |
| SEVENTEEN | HUIZAR | 06/13/2018 | An envelope containing two checks from two separate entities, each made payable to PAC A, in the amount of $12,500 each for a total of $25,000, sent to the Company M office in Los Angeles County. |

COUNTS EIGHTEEN THROUGH TWENTY-ONE

[18 U.S.C. §§ 1952(a)(3), 2(b)]

[DEFENDANTS HUIZAR, HUANG, AND SHEN ZHEN COMPANY]

48.  On or about the dates set forth below, within the Central District of California and elsewhere, defendants JOSE LUIS HUIZAR, WEI HUANG, and SHEN ZHEN COMPANY, acting through its agent, knowingly and intentionally traveled and willfully caused travel in interstate and foreign commerce, as set forth below, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity, namely, bribery, in violation of California Penal Code Sections 67, 67.5, and 68, and, thereafter performed and attempted to perform acts to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of the unlawful activity, as set forth below:

| COUNT | DATE | TRAVEL | SUBSEQUENT ACTS |
|-------|------|--------|-----------------|
| EIGHTEEN | 01/01/2016 | Defendants HUIZAR and HUANG, acting as an agent of defendant SHEN ZHEN COMPANY, traveled from Los Angeles, California to Australia. | Between January 1 and 10, 2016, defendant HUIZAR agreed to accept, and defendant HUANG, as an agent of defendant SHEN ZHEN COMPANY, agreed to pay, group expenses and approximately 32,800 in Australian currency, in exchange for defendant HUIZAR agreeing to perform official acts to benefit the L.A. Grand Hotel Project. |

| COUNT | DATE | TRAVEL | SUBSEQUENT ACTS |
|---|---|---|---|
| NINETEEN | 04/30/2016 | Defendants HUIZAR and HUANG, acting as an agent of defendant SHEN ZHEN COMPANY, traveled from Los Angeles, California to Las Vegas, Nevada. | Between April 30, 2016 and May 2, 2016, defendant HUIZAR agreed to accept, and defendant HUANG, as an agent of defendant SHEN ZHEN COMPANY, agreed to pay, approximately $127,256 in group expenses and accepted approximately $10,000 in casino gambling chips, in exchange for defendant HUIZAR agreeing to perform official acts to benefit the L.A. Grand Hotel Project. |
| TWENTY | 08/05/2016 | Defendants HUIZAR and HUANG, acting as an agent of defendant SHEN ZHEN COMPANY, traveled from Los Angeles, California to Las Vegas, Nevada. | Between August 5 and August 7, 2016, defendant HUIZAR agreed to accept, and defendant HUANG, as an agent of defendant SHEN ZHEN COMPANY, agreed to pay, approximately $60,463 in group expenses, and accepted approximately $11,000 in casino gambling chips, in exchange for defendant HUIZAR agreeing to perform official acts to benefit the L.A. Grand Hotel Project. |

| COUNT | DATE | TRAVEL | SUBSEQUENT ACTS |
|---|---|---|---|
| TWENTY-ONE | 02/04/2017 | Defendants HUIZAR and HUANG, acting as an agent of defendant SHEN ZHEN COMPANY, traveled from Los Angeles, California to Las Vegas, Nevada. | Between February 4 and February 6, 2017, defendant HUIZAR agreed to accept, and defendant HUANG, as an agent of defendant SHEN ZHEN COMPANY, agreed to pay, approximately $16,822 in group expenses, and accepted approximately $10,000 in casino gambling chips, in exchange for defendant HUIZAR agreeing to perform official acts to benefit the L.A. Grand Hotel Project. |

COUNT TWENTY-TWO

[18 U.S.C. §§ 666(a)(1)(B), 2(a)]

[DEFENDANTS HUIZAR AND CHAN]

49.   Between on or about October 28, 2015 and in or about December 2018, in Los Angeles County, within the Central District of California, defendant JOSE LUIS HUIZAR, an agent of the City of Los Angeles, aided and abetted by defendant RAYMOND SHE WAH CHAN, corruptly solicited and demanded for the benefit of himself and others, and accepted and agreed to accept, something of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the City of Los Angeles having a value of $5,000 or more.  Specifically, defendant HUIZAR, aided and abetted by defendant CHAN, solicited, demanded, accepted, and agreed to accept financial benefits from Wei Huang, including casino gambling chips, accommodations, and travel expenses, and approximately $575,000 in collateral applied to defendant HUIZAR's personal loan from Bank 1, intending to be influenced and rewarded in connection with the L.A. Grand Hotel Project, including in: (1) presenting motions and resolutions in various City committees to benefit the L.A. Grand Hotel Project; (2) voting on the L.A. Grand Hotel Project in various City committees, including the PLUM Committee, and City Council; (3) taking action in the PLUM Committee to expedite the approval process of the L.A. Grand Hotel Project; and (4) exerting pressure on other City officials to influence the approval process of the L.A. Grand Hotel Project.

COUNT TWENTY-THREE

[18 U.S.C. § 666(a)(2)]

[DEFENDANTS HUANG AND SHEN ZHEN COMPANY]

50.   Between on or about October 28, 2015 and in or about December 2018, in Los Angeles County, within the Central District of California, defendants WEI HUANG and SHEN ZHEN COMPANY corruptly gave, offered, and agreed to give something of value to a person, intending to influence and reward Jose Luis Huizar in connection with a business, transaction, and series of transactions of the City of Los Angeles having a value of $5,000 or more.  Specifically, defendants HUANG and SHEN ZHEN COMPANY gave, offered, and agreed to give financial benefits to Huizar and George Esparza, including casino gambling chips, accommodations, and travel expenses, and approximately $575,000 in collateral applied to Huizar's personal loan from Bank 1, intending to influence and reward Huizar in connection with the L.A. Grand Hotel Project, including in: (1) presenting motions and resolutions in various City committees to benefit the L.A. Grand Hotel Project; (2) voting on the L.A. Grand Hotel Project in various City committees, including the PLUM Committee, and City Council; (3) taking action in the PLUM Committee to expedite the approval process of the L.A. Grand Hotel Project; and (4) exerting pressure on other City officials to influence the approval process of the L.A. Grand Hotel Project.

COUNT TWENTY-FOUR

[18 U.S.C. § 666(a)(1)(B)]

[DEFENDANT HUIZAR]

51.   Between on or about August 8, 2016, and on or about July 31, 2017, in Los Angeles County, within the Central District of California, defendant JOSE LUIS HUIZAR, an agent of the City of Los Angeles, corruptly solicited and demanded for the benefit of himself and others, and accepted and agreed to accept, something of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the City of Los Angeles having a value of $5,000 or more.  Specifically, defendant HUIZAR solicited, demanded, accepted, and agreed to accept from Dae Yong Lee $500,000 in cash, intending to be influenced and rewarded in connection with the 940 Hill Project, including in: (1) pressuring Labor Organization A to dismiss its appeal against the 940 Hill Project and (2) voting to deny Labor Organization A's appeal against the 940 Hill Project in the PLUM Committee.

COUNT TWENTY-FIVE

[18 U.S.C. § 666(a)(2)]

[DEFENDANTS LEE AND 940 HILL, LLC]

52.  Between on or about August 8, 2016, and on or about July 31, 2017, in Los Angeles County, within the Central District of California, defendants DAE YONG LEE and 940 HILL, LLC corruptly gave, offered, and agreed to give something of value to a person, intending to influence and reward Jose Luis Huizar in connection with a business, transaction, and series of transactions of the City of Los Angeles having a value of $5,000 or more.  Specifically, defendants LEE and 940 HILL, LLC gave, offered, and agreed to give Huizar, George Esparza, and Justin Kim $500,000 in cash, intending to influence and reward Huizar and Esparza in connection with the 940 Hill Project, including in: (1) pressuring Labor Organization A to dismiss its appeal against the 940 Hill Project and (2) voting to deny Labor Organization A's appeal against the 940 Hill Project in the PLUM Committee.

COUNT TWENTY-SIX

[18 U.S.C. § 666(a)(1)(B)]

[DEFENDANT HUIZAR]

53.   Between in or about June 2016 and in or about November 2016, in Los Angeles County, within the Central District of California, defendant JOSE LUIS HUIZAR, an agent of the City of Los Angeles, corruptly solicited and demanded for the benefit of himself and others, and accepted and agreed to accept, something of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the City of Los Angeles having a value of $5,000 or more.  Specifically, defendant HUIZAR solicited, demanded, accepted, and agreed to accept from Fuer Yuan's relative $66,000 in consulting fees paid to HUIZAR Associate 1, intending to be influenced and rewarded in connection with the Luxe Hotel Project, including in: (1) presenting motions and resolutions in various City committees to benefit the Luxe Hotel Project; (2) voting on the Luxe Hotel Project in various City committees, including the PLUM Committee, and City Council; (3) taking action in the PLUM Committee to expedite the approval process of the Luxe Hotel Project; and (4) exerting pressure on other City officials to influence the approval process of the Luxe Hotel Project.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT TWENTY-SEVEN

[18 U.S.C. §§ 666(a)(1)(B), 2(a)]

[DEFENDANTS HUIZAR AND CHAN]

54.   Between in or about November 2017 and in or about November 2018, in Los Angeles County, within the Central District of California, defendant JOSE LUIS HUIZAR, an agent of the City of Los Angeles, aided and abetted by defendant RAYMOND SHE WAH CHAN, corruptly solicited and demanded for the benefit of himself and others, and agreed to accept, something of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the City of Los Angeles having a value of $5,000 or more.   Specifically, defendant HUIZAR, aided and abetted by defendant CHAN, solicited, demanded, and agreed to accept from Fuer Yuan a $100,000 campaign contribution to benefit HUIZAR Relative 1's campaign for the CD-14 seat, intending to be influenced and rewarded in connection with the Luxe Hotel Project, including in: (1) voting to approve the Luxe Hotel Project in the PLUM Committee and City Council and (2) presenting a resolution in the PLUM Committee to benefit the Luxe Hotel Project.

COUNT TWENTY-EIGHT

[18 U.S.C. § 666(a)(1)(B)]

[DEFENDANT CHAN]

55.  Between in or about January 2017 and in or about December 2017, in Los Angeles County, within the Central District of California, defendant RAYMOND SHE WAH CHAN, an agent of the City of Los Angeles, corruptly solicited and demanded for the benefit of himself and others, and agreed to accept, something of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the City of Los Angeles having a value of $5,000 or more.  Specifically, defendant CHAN solicited, demanded, and agreed to accept from George Chiang approximately $20,000 cash, $69,939 in check payments to LABXG, Inc., and $15,000 in check payments to CHAN Relative 1, intending to be influenced and rewarded in connection with the Luxe Hotel Project, including in pressuring officials from the City Planning Commission, Planning Department, and other City departments to expedite and vote to approve the Luxe Hotel Project on favorable terms.

117

COUNT TWENTY-NINE

[18 U.S.C. § 666(a)(1)(B)]

[DEFENDANT HUIZAR]

56.   Between in or about January 2018 and in or about November 2018, in Los Angeles County, within the Central District of California, defendant JOSE LUIS HUIZAR, an agent of the City of Los Angeles, corruptly solicited and demanded for the benefit of himself and others, and agreed to accept, something of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the City of Los Angeles having a value of $5,000 or more.  Specifically, defendant HUIZAR solicited, demanded, and agreed to accept from Company M $100,000 in contributions to PAC A, intending to be influenced and rewarded in connection with Project M, including in: (1) scheduling Project M on the PLUM agenda; (2) voting to deny a labor union's appeal against Project M in the PLUM Committee; and (3) voting to approve Project M in the PLUM Committee and City Council.

COUNT THIRTY

[18 U.S.C. § 666(a)(1)(B)]

[DEFENDANT HUIZAR]

57.   Between in or about March 2018 and in or about May 2018, in Los Angeles County, within the Central District of California, defendant JOSE LUIS HUIZAR, an agent of the City of Los Angeles, corruptly solicited and demanded for the benefit of himself and others, and accepted and agreed to accept, something of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the City of Los Angeles having a value of $5,000 or more.  Specifically, defendant HUIZAR solicited, demanded, accepted, and agreed to accept from Businessperson A a $25,000 contribution to PAC B, intending to be influenced and rewarded in connection with providing a City resolution to enhance the professional reputation and marketability of Businessperson A and his business.

COUNTS THIRTY-ONE THROUGH THIRTY-FOUR

[18 U.S.C. §§ 1956(a)(1)(B)(i), 2(b)]

[DEFENDANT HUIZAR]

58.   On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendant JOSE LUIS HUIZAR, knowing that the property involved in each of the financial transactions described below represented the proceeds of some form of unlawful activity, knowingly conducted and attempted to conduct and willfully caused to be conducted, the following financial transactions affecting interstate commerce, which transactions, in fact, involved the proceeds of specified unlawful activity, namely, bribery, in violation of California Penal Code Sections 67, 67.5, and 68, mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that each of the transactions was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity:

| COUNT | DATE | FINANCIAL TRANSACTION |
|---|---|---|
| THIRTY-ONE | 04/27/2017 | The deposit of $9,000 in cash into HUIZAR Relative 2's Checking Account. |
| THIRTY-TWO | 04/29/2017 | The issuance of a check for $2,800.97 from HUIZAR Relative 2's Checking Account to pay the interest on defendant HUIZAR's Bank 1 Loan. |
| THIRTY-THREE | 06/02/2017 | The deposit of $9,000 in cash into HUIZAR Relative 2's Checking Account. |
| THIRTY-FOUR | 06/08/2017 | The issuance of a check for $12,755.11 from HUIZAR Relative 2's Checking Account to pay defendant HUIZAR's Chase Credit Card bill. |

COUNT THIRTY-FIVE

[18 U.S.C. §§ 1956(a)(2)(B)(i), 2(b)]

[DEFENDANT HUIZAR]

59.   On or about January 10, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendant JOSE LUIS HUIZAR knowingly transported, transmitted, transferred, and willfully caused to be transported, transmitted, and transferred, monetary instruments, namely, approximately 32,800 in Australian currency, to a place in the United States from and through a place outside the United States, namely, Australia, knowing that the monetary instruments involved in the transportation, transmission, and transfer represented the proceeds of some form or unlawful activity, and which monetary instruments, in fact, involved the proceeds of specified unlawful activity, namely, bribery, in violation of California Penal Code Sections 67, 67.5, and 68, mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343, and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, location, ownership, and control of the proceeds of said specified unlawful activity.

COUNT THIRTY-SIX

[31 U.S.C. § 5324(a)(3); 18 U.S.C. § 2(b)]

[DEFENDANT HUIZAR]

60.   On or about the dates set forth below, in Los Angeles County, within the Central District of California, defendant JOSE LUIS HUIZAR, knowingly and for the purpose of evading the reporting requirements of Section 5313(a) of Title 31, United States Code, and the regulations promulgated thereunder, structured, assisted in structuring, and willfully caused the structuring of the following financial transactions with one or more domestic financial institutions:

| DATE | DESCRIPTION |
|------|-------------|
| 02/09/2016 | Defendant HUIZAR caused Esparza to exchange 10,000 Australian dollars into U.S. currency at a currency exchange institution in the City. |
| 02/10/2016 | Defendant HUIZAR caused Esparza to exchange 10,000 Australian dollars into U.S. currency at a currency exchange institution in the City. |
| 02/17/2016 | Defendant HUIZAR caused Esparza to exchange 12,800 Australian dollars into U.S. currency at a currency exchange institution in the City. |

COUNT THIRTY-SEVEN

[18 U.S.C. § 1014]

[DEFENDANT HUIZAR]

61.  On or about March 24, 2016, in Los Angeles County, within the Central District of California, defendant JOSE LUIS HUIZAR knowingly made a false statement and report for the purpose of influencing the action of Bank of America, an institution the deposits of which were then federally insured, in connection with an application, advance, commitment, and loan, in that defendant HUIZAR signed and submitted to Bank of America a Uniform Residential Loan Application, intentionally omitting from defendant HUIZAR's liabilities a loan owed by defendant HUIZAR to Bank 1 in the amount of $570,000, when in fact, as he then knew, defendant HUIZAR had a loan from Bank 1 in the amount of $570,000.

COUNT THIRTY-EIGHT

[18 U.S.C. § 1519]

[DEFENDANTS LEE AND 940 HILL, LLC]

62.   Between on or about March 18, 2019 and April 13, 2019, in Los Angeles County, within the Central District of California, and elsewhere, defendants DAE YONG LEE and 940 HILL, LLC knowingly altered, falsified, and made a false entry in records and documents with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of the United States Department of Justice, and in relation to such matter. Namely, defendants LEE and 940 HILL, LLC altered, falsified, and made a false entry in 940 HILL, LLC accounting and tax records for the calendar year 2018, with the intent to impede a grand jury investigation into the matter, by: (a) falsely recording a $500,000 payment as an expenditure incurred on December 31, 2018; and (b) falsely categorizing the $500,000 as a legitimate business expenditure for resolving the Labor Organization A appeal.  In fact, as defendants LEE and 940 HILL, LLC then knew, defendants LEE and 940 HILL, LLC made a series of payments totaling $500,000 in 2017, and they were bribe payments and not legitimate business expenses.

COUNT THIRTY-NINE

[18 U.S.C. § 1001(a)(2)]

[DEFENDANT CHAN]

63.   On or about November 7, 2018, in Los Angeles County, within the Central District of California, in a matter within the jurisdiction of the executive branch of the government of the United States, namely, the FBI, defendant RAYMOND SHE WAH CHAN knowingly and willfully made materially false statements and representations to the FBI, knowing that these statements and representations were untrue. Specifically, defendant CHAN falsely stated that: (a) he was "not involved" and had "no involvement" in the settlement of Jose Luis Huizar's 2013 sexual harassment lawsuit; (b) "Chairman [Wei Huang] doesn't have anything ... in front of Jose [Huizar]'s district ... that needs Jose [Huizar]'s help or involvement"; and (c) "[Huang] never asked Jose [Huizar] for anything," including help on Huang's hotel.  In fact, as defendant CHAN then knew, defendant CHAN was present during conversations with Huizar and Huang about the details of the lawsuit settlement and helped encourage Huang to facilitate and fund the settlement.  Moreover, defendant CHAN knew that Huang had a project in Huizar's district and had asked Huizar for help. Indeed, defendant CHAN participated in conversations and meetings to enlist Huizar's help, at Huang's request, to resolve issues at the L.A. Grand Hotel, and to discuss entitlements for the L.A. Grand Hotel Project that required City approvals, including from Huizar and his CD-14 staff.

COUNT FORTY

[18 U.S.C. § 1001(a)(2)]

[DEFENDANT HUIZAR]

64.  On or about April 10, 2019, in Los Angeles County, within the Central District of California, in a matter within the jurisdiction of the executive branch of the government of the United States, namely, the FBI and U.S. Attorney's Office, defendant JOSE LUIS HUIZAR knowingly and willfully made materially false statements and representations to the FBI and U.S. Attorney's Office, knowing that these statements and representations were untrue.  Specifically, regarding the 940 Hill Project bribery scheme, defendant HUIZAR falsely stated that: (a) he told George Esparza that the hundreds of thousands of dollars cash payment Justin Kim provided to Esparza was "yours, I do not want it"; and (b) he did not discuss Esparza giving defendant HUIZAR the money from Kim in April 2018.  In fact, as defendant HUIZAR then knew, in March 2017, defendant HUIZAR instructed Esparza to hold onto and hide the $200,000 cash at Esparza's residence for defendant HUIZAR; and, in December 2017, defendant HUIZAR confirmed with Esparza the cash was defendant HUIZAR's and directed Esparza to hold onto the money for defendant HUIZAR until April 2018.

COUNT FORTY-ONE

[26 U.S.C. § 7201]

[DEFENDANT HUIZAR]

65.   Between in or about January 2017 through in or about April 2018, in Los Angeles County, within the Central District of California, and elsewhere, defendant JOSE LUIS HUIZAR willfully attempted to evade and defeat income tax due and owing by him and his spouse to the United States of America, for the calendar year 2017, by committing the following affirmative acts, among others:

a.   Causing HUIZAR Relative 1, HUIZAR Relative 2, and HUIZAR Relative 3 to deposit cash bribes defendant HUIZAR received into bank accounts owned by HUIZAR Relative 1, HUIZAR Relative 2, and HUIZAR Relative 3 (the "Relative Accounts").

b.   Using funds in the Relative Accounts to pay for defendant HUIZAR's expenses, including credit card bills and interest on a Bank 1 loan.

c.   Preparing, signing, and filing with the California Fair Political Practices Commission a false Form 700, intentionally omitting, among other things, income and financial benefits defendant HUIZAR accepted in the calendar year 2017.

d.   Causing to be prepared, and signing and causing to be signed, a false and fraudulent United States Individual Income Tax Return, Form 1040, which was submitted to the Internal Revenue Service.   On that tax return, defendant HUIZAR reported and caused to be reported that his and his spouse's joint taxable income on line 43 for the calendar year 2017 was $115,887, and that the amount of tax due and owing thereon as stated on line 63 was $20,389.   In fact, as defendant HUIZAR then knew, defendant HUIZAR and his spouse had joint

127

taxable income for the calendar year 2017 that was greater than the amount reported on the tax return, and as a result of such additional taxable income, there was additional tax due and owing to the United States of America.

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 1963]

1.     Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 1963, and Title 28 United States Code, Section 2461(c), in the event of any defendant's conviction of the offense set forth in Count One of this First Superseding Indictment.

2.     Any defendant so convicted shall forfeit to the United States of America the following:

(a)   Any interest the convicted defendant has acquired or maintained as a result of such offense;

(b)   Any interest in, security of, claim against, or property or contractual right of any kind affording a source or influence over, any enterprise which the convicted defendant has established, operated, controlled, conducted, or participated in the conduct of, as a result of such offense;

(c)   Any property constituting, or derived from, any proceeds which the convicted defendant obtained, directly or indirectly, from racketeering activity as a result of such offense; and

(d)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a), (b), and (c).

3.     Pursuant to Title 18, United States Code, Section 1963(m), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the

property described in the preceding paragraph, or any portion thereof
(a) cannot be located upon the exercise of due diligence; (b) has
been transferred, sold to or deposited with a third party; (c) has
been placed beyond the jurisdiction of the court; (d) has been
substantially diminished in value; or (e) has been commingled with
other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982]

1.    Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(2), and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in any of Counts Two through Seventeen or Thirty-Seven of this First Superseding Indictment.

2.    Any defendant so convicted shall forfeit to the United States of America the following:

(a)  All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense; and

(b)  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b, any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION THREE

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in any of Counts Eighteen through Thirty of this First Superseding Indictment.

2.   Any defendant so convicted shall forfeit to the United States of America the following:

(a)   All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to any such offense; and

(b)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION FOUR

[18 U.S.C. § 982 and 28 U.S.C. § 2461(c)]

1.    Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(1) and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction of the offenses set forth in any of Counts Thirty-One through Thirty-Five of this First Superseding Indictment.

2.    The defendant, if so convicted, shall forfeit to the United States of America the following:

(a)  Any property, real or personal, involved in such offense, and any property traceable to such property; and

(b)  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 18, United States Code, Section 982(b)(2), the defendant, if so convicted, shall forfeit substitute property, if, by any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.  Substitution of assets shall not be ordered, however, where the convicted defendant acted merely as an

intermediary who handled but did not retain the property in the course of the money laundering offense unless the defendant, in committing the offense or offenses giving rise to the forfeiture, conducted three or more separate transactions involving a total of $100,000.00 or more in any twelve-month period.

FORFEITURE ALLEGATION FIVE

[31 U.S.C. § 5317]

1.    Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 31, United States Code, Section 5317, and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction of the offense set forth in Count Thirty-Six of this First Superseding Indictment.

2.    The defendant, if so convicted, shall forfeit to the United States of America the following:

(a)  All property, real or personal, involved in the offense and any property traceable thereto; and

(b)  To the extent that such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p) and Title 31, United States Code, Section 5317(c)(1)(B), the defendant, if so convicted, shall forfeit substitute property, if, by any act or omission of the defendant, the property described in the preceding, or any portion thereof; (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION SIX

[26 U.S.C. § 7301 and 28 U.S.C. § 2461(c)]

1.    Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 26, United States Code, Section 7301, and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction of the offense set forth in Count Forty-One of this First Superseding Indictment.

2.    The defendant, if so convicted, shall forfeit to the United States of America the following:

(a)  Any property sold or removed by the defendant in fraud of the internal revenue laws, or with design to avoid payment of such tax, or which was removed, deposited, or concealed, with intent to defraud the United States of such tax or any part thereof;

(b)  All property manufactured into property of a kind subject to tax for the purpose of selling such taxable property in fraud of the internal revenue laws, or with design to evade the payment of such tax;

(c)  All property whatsoever, in the place or building, or any yard or enclosure, where the property described in subsection (a) or (b) is found, or which is intended to be used in the making of property described in subsection (a), with intent to defraud the United States of tax or any part thereof, on the property described in subsection (a);

(d)  All property used as a container for, or which shall have contained, property described in subsection (a) or (b);

(e)  Any property (including aircraft, vehicles, vessels,

136

or draft animals) used to transport or for the deposit or concealment of property described in subsection (a) or (b), or any property used to transport or for the deposit or concealment of property which is intended to be used in the making or packaging of property described in subsection (a); and

(f)   To the extent that such property is not available for forfeiture, a sum of money equal to the total value of the property described in this paragraph.

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has

///
///
///
///
///
///
///
///
///
///
///
///

137

1    been placed beyond the jurisdiction of the court; (d) has been

2    substantially diminished in value; or (e) has been commingled with

3    other property that cannot be divided without difficulty.

4

5                                          A TRUE BILL

6

7                                          ___/S/___

8                                          Foreperson

9

10   NICOLA T. HANNA
     United States Attorney

11

12   *Brandon Fox*

13   BRANDON D. FOX
     Assistant United States Attorney
     Chief, Criminal Division

14

15   MACK E. JENKINS
     Assistant United States Attorney
     Chief, Public Corruption and
16      Civil Rights Section

17   VERONICA DRAGALIN
     Assistant United States Attorney
18   Public Corruption and Civil
        Rights Section

19

20   MELISSA MILLS
     Assistant United States Attorney
     Public Corruption and Civil
21      Rights Section

22

23

24

25

26

27

28