CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
CAREL ALE (Bar No. 283717)
Email: Carel_Ale@fd.org
CHARLES J. SNYDER (Bar No. 287246)
Email: Charles_Snyder@fd.org
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Jose Huizar

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>JOSE HUIZAR,<br><br>　　　　Defendant. | Case No. 20-CR-326-JFW<br><br>**JOSE HUIZAR'S MOTION TO COMPEL DISCOVERY; DECLARATION OF COUNSEL**<br><br>Date:　March 22, 2021<br>Time:　8:00 a.m.<br>Ctrm:　7A – Hon. John F. Walter |

TO THE UNITED STATES ATTORNEY AND COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT, on March 22, 2021 at 8:00 a.m., or as soon thereafter as may be heard, Jose Huizar will and hereby does move for an order requiring the government to produce discovery responsive to the following requests:

1. "For the grand jury proceedings in this case, please describe any modification(s) to your pre-COVID (i.e., normal) grand-jury procedures and provide any orders

1

requiring or authorizing those modifications. Examples of modifications might include grand jurors appearing by video, witnesses wearing masks or testifying remotely, and so on."

2. "Please provide the legal instructions that you used to inform the grand jury about the counts ultimately returned in the Indictment. In other words, if you instructed the grand jury that a certain offense required certain elements, please produce those instructions."

Mr. Huizar bases this motion on the attached memorandum and declaration, the files and records in this case, and any other argument or evidence that the Court may consider.

                                                  Respectfully submitted,

                                                  CUAUHTEMOC ORTEGA
                                                  Federal Public Defender

Dated: February 22, 2021                    /s/ Charles J. Snyder
                                                  Carel Alé
                                                  Charles J. Snyder
                                                  Deputy Federal Public Defenders
                                                  Attorneys for Jose Huizar

# MEMORANDUM

**REQUEST 1:** *"For the grand jury proceedings in this case, please describe any modification(s) to your pre-COVID (i.e., normal) grand-jury procedures and provide any orders requiring or authorizing those modifications. Examples of modifications might include grand jurors appearing by video, witnesses wearing masks or testifying remotely, and so on."*

The COVID-19 pandemic has visited unprecedented changes upon our lives and institutions. This Court's operations have been no exception. The Central District of California has not conducted a single jury trial for an entire year based on the determination that gathering 20-something people in a room poses such an immitigable risk that, despite the Speedy Trial Act and Speedy Trial Clause of the United States Constitution, presumed-innocent pretrial detainees will simply have to wait. For most of the last year, in-person hearings have also been suspended. And even today, the Court strictly forbids any courtroom gathering with more than 10 people.

Yet, while trials have been suspended and in-person proceedings strictly curtailed, one piece of the criminal-justice machine has continued to turn. Since June, with the blessing of the District Court, and with only a brief interruption, the grand jury has consistently met, returning new indictments like the ones issued in this case.

Because the grand jury is also a 20-something group of people gathered in a room,[1] this duality raises a natural question: if the risks of in-person proceedings are as grave as the ongoing trial suspension suggests, how have the grand jury's normal operations been altered to mitigate them? Are witnesses wearing masks or appearing by VTC? Are the jurors all in the same physical location? Did the government drop certain jurors in the middle of its long-running presentation in order generate more physical distance, and if so, how were those decisions made? What orders has the Court issued governing COVID-era grand-jury proceedings, and how have those orders impacted the grand jury's operation?

---

[1] As this Court knows, a trial jury requires 12 jurors and, often, some number of alternates. The grand jury requires a minimum of 16 jurors – and up to 23 – along with prosecutors, witnesses, court reporters, and so on.

1

Mr. Huizar's first request seeks answers to those and other legitimate questions. So far the government has refused to provide them, suggesting in meet-and-confer conversations that doing so would somehow imperil an incident of grand-jury secrecy. The government's suggestion is wrong.

The rule of grand jury secrecy applies to "matters" occurring before the grand jury. See Fed. R. Crim. P. 6(e). Because Rule 6 doesn't define what a "matter" is, courts have tied the definition to the underlying purposes of keeping certain grand jury events secret. Courts have thus applied grand jury secrecy to the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of the jurors, and the like. On the other hand, because they don't interfere with the purposes of secrecy, courts have held that things like a court's charge to the grand jury, or the dates on which a grand jury began or ended its term, are not protected by grand jury secrecy. 2 Susan Brenner, Federal Grand Jury: A Guide to Law and Practice (2nd ed. 2020) § 16:11. Most germane to Mr. Huizar's first request, the Ninth Circuit has held that Rule 6(e) does not cover information or records relating to the "procedural aspects of the empaneling and operation of" a grand jury. See In re Special Grand Jury (for Anchorage, Alaska), 674 F.2d 778, 779 & n.1 (9th Cir. 1982).

In this case, the grand jury returned a splashy, exquisitely-detailed, 100-plus page First Superseding Indictment in the midst of a raging pandemic. Because the Indictment is the grand jury's document, not the prosecutors' document, that means, conceptually, that the grand jury did this only after considering all of the evidence underlying each paragraph and sentence. While that would have been a mighty task under any circumstances, it is even more remarkable during an unprecedented viral plague that has generally prevented the exact conduct in which the grand jury would have had to engage: putting a bunch of people in a room, for hours at a time, over several weeks or months, and having a meaningful, independent-of-the-government debate about an extraordinarily voluminous, detailed, and complex record.

Mr. Huizar's first discovery request seeks to understand how, mechanically, the

grand jury in this case went about its inquest in order to evaluate potential motion practice.² This is exactly the type of outside-the-envelope, non-substantive information about the grand jury's "empaneling and operation" that the Ninth Circuit has deemed beyond the rule of secrecy. A response to this request would reveal nothing about any grand juror's identity, the substance of any witness's testimony, the direction of any investigation, or the grand jury's deliberation. In short, this request does not ask the government to reveal any "matter" before the grand jury, meaning the rule of grand-jury secrecy doesn't apply. The Court should thus grant Mr. Huizar's first request and order the government to disclose "any modification(s) to your pre-COVID (i.e., normal) grand-jury procedures and provide any orders requiring or authorizing those modifications."

> **REQUEST 2**: *"Please provide the legal instructions that you used to inform the grand jury about the counts ultimately returned in the Indictment. In other words, if you instructed the grand jury that a certain offense required certain elements, please produce those instructions."*

Mr. Huizar's second request seeks the legal instructions provided to the grand jury for the offenses ultimately charged. As this Court undoubtedly knows, what is and isn't a federal crime is often the subject of significant dispute in federal corruption cases.³ Even for the best prosecutors in the country, with decades of legal training, the line between noncriminal conduct, ethical breaches, state-law offenses, and federal bribery can sometimes be hard to divine. This has been particularly true over the last 30 years, during which time prosecutorial innovation has consistently expanded, while

---

² For purposes of Rule 16, "materiality" exists "so long as 'the information . . . help[s] [the defendant] prepare,'" even if that help is "simply caus[ing] a defendant to completely abandon a planned defense and take an entirely different path." United States v. Hernandez-Meza, 720 F.3d 760, 768 (9th Cir. 2013) (everything omitted).

³ A predictable response might be that certain things described in the Indictment unquestionably constitute federal bribery. But, of course, the Indictment only reflects the government's partial, one-sided version of the evidence, often based entirely on the statements of admitted criminals and liars. Many of the "facts" contained in the Indictment are likely to be disputed. Others are so lacking in context as to be misleading. Others may be true, but don't support the legal conclusions that the government intends to draw. And others on their face do not appear to be crimes.

3

the line encircling federal bribery has consistently contracted. From McNally v. United States, 483 U.S. 350, 360 (1987),[4] to McCormick v. United States, 500 U.S. 257, 272 (1991),[5] to United States v. Sun-Diamond Growers of California, 526 U.S. 398, 406-07 (1999),[6] to Skilling v. United States, 561 U.S. 358, 408-09 (2010),[7] to McDonnell v. United States, ___U.S.___, 136 S. Ct. 2355, 2373 (2016),[8] to Kelly v. United States, ___U.S.___, 140 S. Ct. 1565, 1571-72 (2020),[9] the Supreme Court has, in one high-

---

[4] "Rather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials, we read § 1341 as limited in scope to the protection of property rights."

[5] "Whatever ethical considerations and appearances may indicate, to hold that legislators commit [a federal crime] when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, 'under color of official right.' To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation."

[6] Rejecting government's interpretation of § 201(c), which would have authorized federal bribery convictions without a quid-pro-quo showing, because it would lead to "peculiar" and dangerous results: "That these examples are not fanciful is demonstrated by the fact that counsel for the United States maintained at oral argument that a group of farmers would violate § 201(c)(1)(A) by providing a complimentary lunch for the Secretary of Agriculture in conjunction with his speech to the farmers concerning various matters of USDA policy – so long as the Secretary had before him, or had in prospect, matters affecting the farmers."

[7] Construing honest-services-fraud statute narrowly to require hard, quid-pro-quo bribery, and explaining that any other reading "would raise the due process concerns underlying the vagueness doctrine."

[8] In federal prosecution of state official, requiring that bribery "quo" be a meaningful exercise of official authority, and rejecting broader standard offered by the government, explaining that it would "chill . . . officials' interactions with the people they serve and thus damage their ability effectively to perform their duties," would rely on an "assumption that the Government will use [its power] responsibly," would prevent "ordinary people [from] understand[ing] what conduct is prohibited," would "encourage arbitrary and discriminatory enforcement," and would involve "the Federal Government in setting standards of good government for local and state officials."

[9] "The fraud statutes, we held in McNally, were limited in scope to the protection of property rights. They did not authorize federal prosecutors to set standards of disclosure and good government for local and state officials. Congress responded to that decision by enacting a law barring fraudulent schemes to deprive another of the intangible right of honest services – regardless of whether the scheme sought to divest

profile corruption prosecution after the next, rejected federal prosecutors expansive readings of vague federal statutes in favor of narrower constructions.

Simultaneously, in the past decade, the Court has developed a robust campaign-finance jurisprudence, the loose upshot of which is that the government cannot make a crime out of political contributions except in cases of true "quid pro quo[s]," meaning "a direct exchange of an official act for money." McCutcheon v. Fed. Election Comm'n, 572 U.S. 185, 192 (2014) (citations omitted).[10] As the Court has repeatedly explained, "'[i]ngratiation and access are not corruption,'" but instead "embody a central feature of democracy – that constituents [financially] support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns." 572 U.S. at 192 (quoting Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 360 (2010)). As a result, while the "line between quid pro quo corruption and general influence may seem vague at times," in cases involving political contributions, "the distinction must be respected," and courts must "err on the side of protecting political speech" in order to "safeguard basic First Amendment rights." McCutcheon, 572 U.S. at 209 (everything omitted).

Against this backdrop, the question of "what is and isn't a federal crime" will

---

the victim of any property. § 1346. But the vagueness of that language led this Court to adopt a limiting construction [in Skilling], confining the statute to schemes involving bribes or kickbacks. We specifically rejected a proposal to construe the statute as encompassing undisclosed self-dealing by a public official, even when he hid financial interests. The upshot is that federal fraud law leaves much public corruption to the States (or their electorates) to rectify."

[10] While developed more fully in recent years, this jurisprudence has a long lineage. See, e.g., McCormick, 500 U.S. at 272-73 ("Serving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator. It is also true that campaigns must be run and financed. Money is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done. Whatever ethical considerations and appearances may indicate, to hold that legislators commit [a federal crime] when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is . . . unrealistic . . . . To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation.").

once again be of paramount importance in this case. The government's instructions to the grand jury will help to answer that question, or will at least help to crystallize likely areas of dispute.

One would think that, tactics aside, the government should have no problem disclosing what it believes the governing law to be. After all, it charged Mr. Huizar with serious federal crimes, instructed a grand jury about the elements of those crimes, and presumably intends to ask this Court to instruct a trial jury based on its existing understanding of the law. For the government, expressing a clear view of what is and isn't a federal crime should be straightforward and noncontroversial.

Yet the government has resisted Mr. Huizar's second request, claiming that, while the crimes with which he's charged have been publicly disclosed – indeed, trumpeted enthusiastically in the press – the law used to charge him with those crimes must be kept secret. As justification for that position, the government claims that keeping the law underpinning known charges secret is an important incident to the grand-jury process. But both as a matter of law and tradition, this too is wrong.

Despite the general mystique surrounding grand jury proceedings, grand-jury secrecy has always been instrumental, not reflexive, and always focused on protecting the institution of the grand jury, not the government's strategic advantage. U.S. Indus., Inc. v. U.S. Dist. Court for S. Dist. of Cal., Cent. Div., 345 F.2d 18, 22 (9th Cir. 1965) ("Grand jury secrecy is, of course, not an end in itself. Grand jury secrecy is maintained to serve particular ends."). As enumerated by the Supreme Court, grand-jury secrecy serves five legitimate functions:

> (1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.

6

United States v. Procter & Gamble Co., 356 U.S. 677, 682 & n.6 (1958). Rule 6(e) protects "matters" before the grand jury to advance these interests, but not to indiscriminately shield everything within the room. Thus, while secrecy rightly covers witness testimony and substantive deliberations, the Ninth Circuit has held that it does not shield the "ground rules" according to which the grand jury conducted its review. United States v. Alter, 482 F.2d 1016, 1029 (9th Cir. 1973) (confirming that defendant had a right to receive copy of requested grand jury instructions).[11]

In keeping with these principles, several district courts in the Ninth Circuit have rightly concluded that "[t]he legal instructions given to the grand jury regarding the charges on which they [deliberated] are a part of the 'ground rules' by which the grand jury conduct[ed] its proceedings." United States v. Belton, No. 14-CR-00030-JST, 2015 WL 1815273, at *3 (N.D. Cal. Apr. 21, 2015) (collecting cases). As those courts explain, legal instructions are not secret because they don't "reveal the substance of the grand jury's deliberative process or other information that would compromise the secrecy that Rule 6 seeks to protect." Id.; see also, e.g., United States v. Booth, No. 2:08-CR-283-RCJ, 2012 WL 2782598, at *6 (D. Nev. July 9, 2012) ("The Ninth Circuit has suggested in dicta that a defendant is entitled to see the instructions to the grand jury . . . . The Court will therefore grant the motion, ordering only the release of the instructions to the grand jury, including any colloquy explaining the instructions, with any identifying information of jurors redacted."); United States v. Talao, No. CR-97-0217-VRW, 1998 WL 1114043, at *12 (N.D. Cal. Aug. 14, 1998) ("While the government prosecutor has no obligation to give the grand jury legal instructions, if the government instructed this grand jury, those legal instructions should be disclosed to

---

[11] As another example of the instrumental nature of grand jury secrecy, Rule 6(e) covers things that cannot in any literal sense be considered "matters occurring before a grand jury" – like, for example, grand jurors' identities. In re Special Grand Jury (for Anchorage, Alaska), 674 F.2d at 782. This is consistent with any fair reading of the Supreme Court and Ninth Circuit's grand-jury secrecy cases, which show that courts have not been overburdened by literalism when defining "matters occurring before a grand jury," but have instead expanded and contracted the language as necessary to serve the well-established and historic purposes of grand-jury secrecy.

7

defendants [without further showing because] the Ninth Circuit has said that such ground rules are not secret."). Indeed, particularly when it comes to publicly-charged offenses, keeping secret the government-drafted instructions used to support those charges does nothing to further the grand jury process. If anything, it undermines the integrity of the institution by suggesting that the law itself is an item to be kept from public view, a secret shared only behind closed doors between prosecutors and grand jurors.

In addition to being wrong as a legal matter, the government's position on Mr. Huizar's second request is also wholly counterproductive. Since 2015, the government has conducted roughly 150 interviews, captured hundreds (if not thousands) of hours of recordings, generated nearly two million pages of document discovery, seized dozens of devices (of which 20 have so far been produced), and collected reams of evidence across the nation and globe. The defense has and will continue to request substantial amounts of additional discovery, and even without those requests, substantial additional discovery should be forthcoming. The defense also needs to conduct its own factual investigation, which, unlike most of the government's five-year inquiry, has been weighed down by the pandemic.[12] And the Indictment charges dozens of complex offenses, many wrapped in the additional layer of RICO, a number of which arrive before this Court at the repeatedly-problematic intersection of federal bribery, corruption, and campaign-finance law.

In a case of this size and complexity, why wait until the end to find out what the government thinks is a crime? Why wait to begin focusing the areas in dispute? Why not try to avoid the results in McNally, McCormick, Sun-Diamond, Skilling, McDonnell, Kelly, and many other high-profile political prosecutions, where the

---

[12] In truth, the government began actively investigating Mr. Huizar in June 2010, but its initial inquiry led nowhere. Five years into its quest, the government heard that Mr. Huizar was gambling in Las Vegas, at which point its focus shifted to bribery and development. So, while the current version of the investigation has been ongoing for five years, the government has really been working on this case for over a decade.

government's errors were ultimately corrected, but it took years, multiple appeals, and in some cases retrials to get things right?

This Court has said that it doesn't want to try this case twice. The Indictment suggests a real danger that the government intends to throw everything at the wall without drawing clear distinctions between noncriminal conduct, ethical violations, state-law offenses, and federal crimes. Not only would ordering the government to produce the instructions be right as a legal matter, it would substantially advance the progress and accuracy of the case by sharpening the issues and allowing Mr. Huizar to bring legal disputes to the fore well in advance of trial.

As John Wooden used to say: "if we don't have time to do it right, when will we have time to do it over?" The Court should grant Mr. Huizar's second request.[13]

|  | Respectfully submitted,<br>CUAUHTEMOC ORTEGA<br>Federal Public Defender |
|---|---|
| Dated: February 22, 2021 | /s/ *Charles J. Snyder*<br>Carel Alé<br>Charles J. Snyder<br>Deputy Federal Public Defenders<br>Attorneys for Jose Huizar |

---

[13] Even if the Court believes that the instructions <u>are</u> "matters" covered by grand jury secrecy, it can and should exercise its discretion to order disclosure. As with the initial question of which "matters" are covered by secrecy, the disclosure determination depends on the need of the party seeking disclosure and the "policy considerations for grand jury secrecy as they apply to the request for disclosure under consideration." <u>U.S. Indus.</u>, 345 F.2d at 21. Thus, "if the reasons for maintaining secrecy do not apply at all in a given situation, or apply to only an insignificant degree, the party seeking the disclosures should not be required to demonstrate a large compelling need." <u>Id.</u> Here, given the fluidity of the law and shotgun Indictment, there is a significant need to understand what the government believes is and is not criminal, and on what bases it told the grand jury it could charge Mr. Huizar with certain crimes. Further, especially post-indictment, when the charges are already public, there is no colorable argument that the legitimate justifications for grand-jury secrecy warrant keeping the legal instructions secret. <u>See id.</u> at 22 (reduced need for secrecy post-indictment); <u>Douglas Oil Co. of California v. Petrol Stops Nw.</u>, 441 U.S. 211, 222 (1979) (same).

In the alternative, the Court can simply require the government to produce an early copy of the instructions that it believes apply to the charged offenses. While Mr. Huizar acknowledges that this would be unusual in a normal case, this is not a normal case. The government will eventually have to disclose what it believes the law to be. There is no reason, other than tradition, to delay that disclosure until shortly before trial. Mr. Huizar, the Court, and the progress of this proceeding would benefit greatly from a clear, early understanding of what the government thinks is and isn't a crime.

9

**DECLARATION OF CHARLES J. SNYDER**

I, Charles J. Snyder, declare as follows:

1. I am a California-licensed attorney appointed to represent Jose Huizar in this matter. Unless otherwise stated, I make this declaration based on personal knowledge and, if called to testify, would attest to its contents under oath.

2. On January 28, 2021, I sent the government a discovery letter requesting the two items that are the subject of the current motion.

3. On February 5, 2021, all counsel of record met and conferred about the requested discovery (among other topics). During that call, the government explained its position, including the bases for its position, and I explained Mr. Huizar's position, including the bases for his position. At the conclusion of the call, the government indicated that it could not agree to produce documents responsive to Mr. Huizar's second discovery request, but might be open to producing documents responsive to the first, at least with a court order. The government asked that I send it a written draft of Mr. Huizar's argument on the first request to see if we could avoid motion practice.

4. On February 8, 2021, I sent the government a written draft of Mr. Huizar's argument for his first discovery request, which was substantially the same as the one above. The following day, the government indicated that it could not agree to produce documents responsive to that request and that I should include that issue in a motion.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed February 22, 2021 at Los Angeles, California.

                                                  */s/ Charles J. Snyder*
                                                  Charles J. Snyder