1        **UNITED STATES DISTRICT COURT**

2    **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3       **HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE**

4

5   **UNITED STATES OF AMERICA,**          )
                                            )
6            **PLAINTIFF,**                 )        **CASE NO.**
                                            )
7            **vs.**                        )        **CR 20-326-JFW**
                                            )
8   **JOSE LUIS HUIZAR, et al.,**           )
                                            )        **PAGES 1 TO 56**
9            **DEFENDANTS.**                )
    _____)

10

11

12

13            **REPORTER'S TRANSCRIPT OF**
                  **MOTION HEARING**
14        **MONDAY, SEPTEMBER 20, 2021**
                   **8:04 A.M.**
15          **LOS ANGELES, CALIFORNIA**

16

17

18

19

20

21

22
    _____
23
          **MIRANDA ALGORRI, CSR 12743, RPR, CRR**
24        FEDERAL OFFICIAL COURT REPORTER
          350 WEST 1ST STREET, SUITE 4455
25        LOS ANGELES, CALIFORNIA 90012
          MIRANDAALGORRI@GMAIL.COM

| 1 | **APPEARANCES OF COUNSEL:** |

2

3  **FOR THE PLAINTIFF:**

4      NICOLA T. HANNA
        UNITED STATES ATTORNEY
5      BY:  MACK JENKINS
        BY:  VERONICA DRAGALIN
6      BY:  MELISSA MILLS
        Assistant United States Attorneys
7      United States Courthouse
        312 North Spring Street
8      Los Angeles, California 90012

9

10  **FOR THE DEFENDANT HUIZAR:**

        HILARY L. POTASHNER
11      FEDERAL PUBLIC DEFENDER
        BY:  CAREL ALE
12      BY:  CHARLES SNYDER
        BY:  ADAM OLIN
13      Deputy Federal Public Defenders
        Central District of California
14      321 East Second Street
        Los Angeles, California 90012

15

16  **FOR DEFENDANT CHAN:**

17      BRAUN & BRAUN, LLP
        BY:  HARLAND BRAUN
18      10880 Wilshire Boulevard
        Suite 1020
19      Los Angeles, California 90024

20

21  **FOR THE DEFENDANT SHEN ZHEN NEW WORLD I:**

        LAW OFFICES OF RICHARD M. STEINGARD
22      BY:  RICHARD M. STEINGARD
        800 Wilshire Boulevard
23      Suite 1050
        Los Angeles, California 90017

24

25

```
 1                     APPEARANCES OF COUNSEL CONTINUED:

 2


 3
     FOR THE DEFENDANTS LEE AND 940 HILL:
 4
          BIRD MARELLA BOXER WOLPERT NESSIM DROOKS LINCENBERG & RHOW
 5        BY:  ARIEL A. NEUMAN
          BY:  RAY SEILIE
 6        1875 Century Park East
          23rd Floor
 7        Los Angeles, California 90067

 8
     KOREAN INTERPRETERS:
 9
          Myoung Sun Lim
10        Kyung Ha Kim

11
     ALSO PRESENT:
12
          Special Agent Andrew Civetti
13

14

15

16

17

18

19

20

21

22

23

24

25
```

08:04AM

1          **LOS ANGELES, CALIFORNIA; MONDAY, SEPTEMBER 20, 2021**

2                              **8:04 A.M.**

3                                **---**

4

08:04AM  5          THE CLERK:  Calling CR 20-326(A)-JFW,

6    United States of America versus Jose Luis Huizar, et al.

7          Counsel, please state your appearances.

8          MR. JENKINS:  Good morning, Your Honor.

9          Mack Jenkins, Veronica Dragalin, Melissa Mills on

08:04AM 10   behalf of the United States.  Joining us in the audience is FBI

11   Special Agent Andrew Civetti.

12          MR. STEINGARD:  Good morning, Your Honor.

13          Richard Steingard for Shen Zhen New World I, LLC.

14          MR. NEUMAN:  Ariel Neuman and Ray Seilie on

08:04AM 15   behalf of Dae Yong Lee being assisted by the Korean language

16   interpreter and on behalf of 940 Hill, LLC.

17          MS. ALÉ:  Good morning, Your Honor.

18          Carel Alé from the federal public defender along

19   with Charles Snyder and Adam Olin, and Mr. Huizar is present

08:04AM 20   and also sitting in the audience.

21          MR. STEINGARD:  Judge, we're trying to track down

22   Mr. Braun who represents Ray Chan.  We know he's in the

23   building.  We sent someone to locate him.

24          THE COURT:  All right.  Good morning to all.

08:05AM 25   This matter is on the Court's calendar this morning in

1    connection with two motions.

2              Is that Mr. Braun who just arrived?

3              MR. BRAUN:  Yes, Your Honor.

4              THE COURT:  Mr. Braun, do you want to state your

08:05AM  5    appearance for the record, please?

6              MR. BRAUN:  Harland Braun, B-r-a-u-n, with my

7    client who is present.

8              THE COURT:  All right.  As I indicated, we have

9    two motions on calendar this morning.  The first motion that I

08:05AM  10   will consider is Mr. Neuman's motion on behalf of Mr. Lee and

11   940 Hill.  That is the Motion to Compel further disclosure of

12   redacted discovery re key cooperating witness.  That motion was

13   filed on August 23rd.  It appears -- the public version appears

14   as docket No. 213.  The under seal version appears as

08:06AM  15   docket No. 217.  The Government filed its opposition on

16   August 30th, and that appears as docket No. 221.  And the

17   defendants' reply was filed on September 6, and that appears as

18   docket No. 226.

19              The background with respect to this motion is as

08:06AM  20   follows: The First Superseding Indictment charges Mr. Lee and

21   940 Hill with an honest services wire fraud in violation of

22   Title 18 Section 1343 and 1346 as alleged in Count 5.  And

23   the -- alleging -- it also alleges bribery in violation of

24   18 United States Code Section 666(a)(2) which is in -- alleged

08:07AM  25   in Count 25, and it charges the defendants with alteration of

records in a federal investigation in violation of

18 United States Code Section 1519.

Can I ask the interpreter to move the microphone

away so I don't pick up your voice?

08:07AM    These charges stem from the defendant's alleged

agreement to give two public officials, city council member

Jose Huizar and his special assistance George Esparza, $500,000

in cash intending to influence them in connection with the

940 Hill project including pressuring a work labor organization

08:08AM    CREED LA to dismiss its appeal against the 940 Hill project

and/or voting to deny the labor organization's appeal against

the 940 Hill project in the PLUM committee.

Justin Kim, a cooperator, is a key witness in

establishing the defendants' participation in the scheme to

08:08AM    defraud.  He, according to the discovery, served as a middleman

between the defendants and the public officials.

In their Motion to Compel further disclosure

redacted in the discovery, the defendants move for an order to

compel the Government to disclose the redacted portions of

08:09AM    certain documents that are attached in the under seal version

of the motion to counsel's declaration.  Those documents are

numbered Casino -- and I'm going to only use the last three

digits of the Bates number -- Casino624, which is Exhibit 1;

Casino637 which is Exhibit 2; Casino372 which is Exhibit 3;

08:10AM    Casino381 which is Exhibit 4; Casino068 which is Exhibit 5;

```
 1   Casino827 which is Exhibit 6; Casino531 which is Exhibit 7; and
 2   Casino097 which is Exhibit 8; and Casino098 which is Exhibit 9.
 3   These redacted documents are attached as Exhibits 1 through 9
 4   to counsel's declaration.
 5          The defendants believe that the redacted
 6   information may be subject to disclosure under
 7   Brady versus Maryland and Giglio versus the United States.  The
 8   redacted documents consist of three FBI interview reports or
 9   302's of proffer sessions with Mr. Kim which are Exhibits 1, 3,
10   and 5, and two sets of notes -- I can't tell whose notes they
11   are -- from those same proffer sessions, Exhibit 2 and
12   Exhibit 4, and four reports of interviews, again, 302s with
13   confidential sources.  Those appear as documents -- or
14   Exhibits 6, 7, 8, and 9.
15          The Government represents that the redacted
16   materials consist of identifying information of confidential
17   sources and information about potential criminal matters
18   unrelated to the charges in this case and, two -- and that is
19   specifically related to Exhibit 6 through 9.  And, two, the
20   information provided by Mr. Kim on subject matters unrelated to
21   the charges in this case and the concerned ongoing
22   investigations also have been redacted, and those appear in
23   Exhibits 1 through 5.
24          With respect to Exhibit 7, the Government
25   represents that the redacted material does not contain any
```

additional references to a city staffer who was referred to in

the First Superseding Indictment as A-2 who became Mr. Huizar's

planning director.  And based on that representation, the

defendants in their reply at page 4, footnote No. 2, have

08:12AM   withdrawn their request for further disclosure relating to that

document.

Accordingly, there are only eight documents at

issue in defendants' Motion to Compel.  In footnote No. 2 of

the Government's opposition, the Government offered to provide

08:13AM   the Court with the cited documents it referenced when

describing its claimed evidence supporting the charges against

Defendants Lee and 940 Hill.

The Court accepted the Government's invitation,

and I issued a text entry on September 10 which ordered the

08:13AM   Government to deliver but not file courtesy copies of those

documents on or before September 13th.  On September 13th,

instead of providing the Court with the documents it referred

to in footnote No. 2, the Government provided the Court with

unredacted exhibits, Exhibits 1 through 9, which were attached

08:14AM   to counsel's declaration.

In any event, to clarify any confusion, the Court

did not order or request the Government to provide unredacted

copies of Exhibits 1 through 9.  On September 13th, the

Government apparently realized that it had not responded to the

08:14AM   Court's text entry and delivered courtesy copies of those cited

documents apparently out of an abundance of caution.

The legal standard that is applicable to this motion is well-known.  Although there is no general constitutional right to discovery in a criminal case, there are three sources establishing the Government's disclosure obligations.  Federal Rule of Criminal Procedure 16 establishes guidelines for pretrial production of certain limited materials including items material to the preparation of the defense.  In addition, under *Brady versus Maryland* and its progeny including *Giglio*, the Government must disclose to the defense evidence in its possession that is exculpatory or favorable to the defense or, as the 9th Circuit held in *United States versus Blanco* at 392 F.3d 381, material that bears on credibility of a significant witness in the case.

In addition under section 3500 of the *Jencks Act*, statements by a Government witness that relate to the subject matter of a witness's testimony are required to be disclosed after the witness has testified.

There is at least one limitation on these disclosure obligations that is relevant to this case, and that is, as the Supreme Court recognized in *Roviaro*, R-o-v-i-a-r-o, at 353 U.S. 53, the Government has a limited privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with the enforcement of that law to conceal the identity of those

confidential sources.

To overcome this privilege, the burden of proof is on the defendants to show the need for the disclosure. Defendants must make a concrete showing that a confidential source's identity is relevant and helpful to the defense of the accused or is essential to the fair determination of the cause. A mere suspicion that the identity will prove relevant and helpful is not -- helpful is insufficient.

As the 9th Circuit stated in *Beltran* at 915 F.2d, in determining whether defendants have met their burden for overcoming a limited privilege, the Court must examine, one, degree of the informant's involvement in the criminal activity, the relationship between the defendants' asserted defense, and the likely testimony of the informant, the Government's interest in nondisclosure. And the Court must balance the public interest in protecting the flow of information against the individual's right to prepare his defense.

As to the five documents relating to the Kim proffers which are the 302s and the two sets of notes, the Government's position regarding its disclosure obligation, in my view, is unclear. The Government appears to simultaneously contend that the redacted materials do not contain *Brady/Giglio* material but also appear to implicitly recognize that some of the materials may have some exculpatory value or impeachment value to the defendants.

1           Indeed, instead of just unequivocally claiming

2 that the Kim materials are not subject to disclosure under

3 *Brady* or *Giglio*, the Government argues it should not be

4 required to disclose the redacted information at this time.

08:18AM 5 Because any impeachment information would be cumulative,

6 defendants' need for the information is outweighed by the

7 Government's interest in ongoing investigations and the request

8 is premature.

9           So I'm going to hear from counsel with respect to

08:18AM 10 this motion.  First let me confirm that -- the Government

11 apparently, based upon counsel's declaration on June 16th,

12 allowed counsel to review the exhibits relating to --

13 Exhibits 1 through 5 relating to the Kim proffers.  It

14 partially unredacted the redactions which allowed counsel to

08:19AM 15 take notes, and those notes were included in the declaration of

16 counsel in support of this motion.

17           However, the Government did not produce any

18 further unredacted documents with respect to Exhibits 6 -- 7

19 has now been withdrawn -- but 8 and 9; is that correct?

08:20AM 20           MS. DRAGALIN:  Yes, Your Honor.  That's correct.

21           THE COURT:  All right.  In terms of the

22 Government's argument that Mr. Kim may or may not be called as

23 a witness, I question that argument because it appears to me

24 that Mr. Kim is going to be a key witness for the Government

08:20AM 25 with respect to the charges against the defendants with respect

1    to the alleged bribe of $500,000 that was paid in connection

2    with the CREED appeal on 940 South Hill.  Based upon my notes,

3    it appears that the CREED appeal was filed on August 8 of 2016.

4    I'm going to ask the Government to clarify.

08:21AM    5         The defense, if my memory serves me, takes the

6    position or implies that, with respect to the contact between

7    Mr. Lee and Mr. Kim with respect to request for Mr. Huizar's

8    help in connection with that appeal, that the initial contact

9    was made by Mr. Kim to Mr. Lee.

08:22AM    10         But my review of the materials seems to be that

11   it was Mr. Lee who called Mr. Kim and asked for Mr. Huizar's

12   help and Mr. Lee then sent the documents related to the CREED

13   appeal to Mr. Kim.  Mr. Lee apparently went to Mr. Kim because

14   he knew that Mr. Kim was Mr. Huizar's friend and/or fundraiser.

08:22AM    15   And then Mr. Lee forwarded the e-mail to Mr. Esparza, and then

16   Mr. Esparza set up a meeting with Mr. Huizar.

17         And then we have the dinner meeting and the

18   meeting at the karaoke bar at which Mr. Lee -- apparently

19   Mr. Lee was not present at that dinner meeting, but one of his

08:23AM    20   partners in another project was there.  And then Mr. Kim during

21   that meeting asked for help.  Mr. Huizar said he would help,

22   and then Mr. Kim asked Mr. Lee to join them, and then Mr. Lee

23   met with Mr. Huizar and the rest of the folks at the karaoke

24   bar after dinner.

08:23AM    25         Then we have the negotiations with respect to the

amount of the alleged bribe.  At one point in time in January

of 2017, it was -- Mr. Lee was advised that the involvement

could cost in excess of a million dollars, and Mr. Lee

concluded that that was too much and ultimately an amount was

agreed to of $500,000.  Then we go on in terms of the evidence

with respect to the cash, the $400,000 that was paid and

Mr. Esparza going to Mr. Huizar's house with 200,000 --

apparently, according to the Government's evidence, $200,000

cash in some kind of a box and discussing the fact that Mr. Lee

would pay the hundred thousand dollars at a later date.

          So it seems to me that Mr. Kim is going to be

a -- an important, if not -- I don't see how the Government

with prove its case without Mr. Kim.

          MS. DRAGALIN:  Your Honor --

          THE COURT:  You may remain seated during the

course of the hearing.  Just make sure the microphones are

close to you.  It's difficult to pick up the voices.

          MS. DRAGALIN:  Your Honor, we have assumed that

Justin Kim would be a witness in determining what should be

produced to the defense.  And so for that reason, we have taken

a broad view and produced what would be considered *Jencks*

statements of Justin Kim, and we have produced those very

early.  We have produced additional material that may be

considered *Brady/Giglio* impeachment, evidence with respect to

Mr. Kim.

1         However, Mr. Kim does come with a lot of baggage.

2    He lied to Mr. Lee to get an additional hundred thousand

3    dollars.  He lied to the FBI repeatedly.  So we are considering

4    a scenario in which we could prove this case without his

08:26AM   5    testimony, and we believe that may be possible at trial.  It is

6    something we are considering.  But for purposes of discovery,

7    we have assumed that he will be a Government witness.

8         THE COURT:  So you have assumed he's a Government

9    witness, and so you're complying with your discovery

08:26AM  10    obligations as if he is going to be a Government witness.

11         MS. DRAGALIN:  Yes, Your Honor.

12         THE COURT:  All right.  Because I was confused

13    because in your papers, you didn't -- that was not clear.

14         Who was it that -- are my notes or my memory

08:27AM  15    correct that it was Mr. Kim who initiated the conversations

16    with Mr. Lee -- I'm sorry.  Mr. Lee initiated the conversations

17    with Mr. Kim?  It doesn't make any sense otherwise.

18         MS. DRAGALIN:  Yes, Your Honor.  It was Mr. Lee

19    who initially sought the help of Jose Huizar.  I believe the

08:27AM  20    defendants' position is that the idea for the bribe came not

21    from Mr. Lee but from Justin Kim, Jose Huizar, George Esparza,

22    one of the three.  And the Government agrees with that.  It is

23    alleged in the Indictment it was, in fact, Jose Huizar who came

24    up with the demand for money in exchange for this official act.

08:27AM  25         THE COURT:  Right.  And that was communicated

|   | through Esparza to Kim. |
|---|---|
| 1 | through Esparza to Kim. |
| 2 | MS. DRAGALIN:  Yes, Your Honor. |
| 3 | THE COURT:  And what happened -- as this goes, |
| 4 | I've read some of the other motions.  What happened to the |
| 5 | CREED appeal?  It looks like the appeal was filed on August 8 |
| 6 | of 2016.  These negotiations and these contacts between Kim, |
| 7 | Lee, Esparza, Mr. Huizar begin sometime in September of 2016 |
| 8 | and carried on through early part of 2017.  And then I can't |
| 9 | get a clear understanding of what happened with respect to the |
| 10 | CREED appeal. |

11    There was apparently a hearing that was scheduled

12  in February of 2017.  I can't tell whether or not the hearing

13  actually occurred or -- I do know, based upon the First

14  Superseding Indictment and some of the discovery, that the

15  appeal on -- it looks like around March -- early March of 2017,

16  the appeal was either dismissed, dropped, or I can't figure out

17  what happened to it.  What happened to it?

18    MS. DRAGALIN:  It was CREED LA voluntarily

19  dismissed its appeal on March 3rd, 2017.

20    THE COURT:  Voluntarily dismissed its appeal as

21  to -- and the reason why they voluntarily dismissed the appeal

22  is the Government's theory?

23    MS. DRAGALIN:  There was no reason given for it

24  at the time, Your Honor.  It was just dismissed.

25    THE COURT:  Pardon me?

08:28AM

08:28AM

08:29AM

08:29AM

08:30AM

1       MS. DRAGALIN:  The appeal was dismissed at the

2  time without providing a reason by CREED L.A.

3       THE COURT:  What is the Government's evidence in

4  terms of why it was dismissed?

08:30AM    5       MS. DRAGALIN:  The Government's theory of the

6  case is that Jose Huizar used his official position to pressure

7  the Labor Organization to drop its appeal.

8       THE COURT:  What is the official act?

9       MS. DRAGALIN:  The official act, Your Honor, was

08:30AM   10  to resolve this appeal using whatever means were necessary.

11  And Jose Huizar as the chairman of the PLUM committee who would

12  ultimately hear that appeal had the power to vote against the

13  appeal.  He, as a sitting councilman of the district in which

14  this project was pending, also had significant power to

08:30AM   15  pressure other officials if it became necessary to have the

16  appeal be rejected or dismissed at a different level.  He also

17  had the power as a sitting councilman who ultimately would vote

18  on this appeal to get this appeal dismissed in other ways which

19  is how he did it behind closed doors and in a way that wasn't

08:31AM   20  immediately obvious to the public which was to pressure the

21  lobbyist of this Labor Organization to convince the

22  Labor Organization to drop the appeal.

23       THE COURT:  That was Chris whose last name I

24  can't pronounce?  I will call him Chris M.?

08:31AM   25       MS. DRAGALIN:  Yes, Your Honor.

1         THE COURT:  He is the brother of the CEO of

2 CREED?  CREED is not a labor union, as I understand.  It's a

3 503 corporation?

4         MS. DRAGALIN:  It's an organization that as its

08:31AM 5 members has different labor unions be parts of the

6 organization, yes, Your Honor.

7         THE COURT:  So does the Government have any

8 evidence as to what, if anything, CREED received for its

9 dismissal of the appeal?

08:32AM 10         MS. DRAGALIN:  There is no evidence to suggest

11 that CREED received any type of monetary payment or portion of

12 cash to dismiss its appeal.  The evidence will show that

13 George Esparza and Jose Huizar used negotiation tactics with

14 respect to promises of future projects to get the

08:32AM 15 Labor Organization to drop its appeal.

16         THE COURT:  So Chris M. nor the brother Jeff M.

17 didn't receive anything in return?

18         MS. DRAGALIN:  There is no evidence to suggest

19 they received any cash payment or money.

08:32AM 20         THE COURT:  There was some reference I have in my

21 notes that there was some labor agreement on one of Mr. Lee's

22 other projects in Little Tokyo that was used as a bargaining

23 chip in connection with the dropping of this appeal?

24         MS. DRAGALIN:  Yes, Your Honor.  That was the

08:33AM 25 future project that was used as a leveraging tool.

1            THE COURT:  All right.  I guess the problem I

2    have with the Government's position -- now it's been

3    clarified -- the Government is approaching the -- its discovery

4    obligations with respect to Mr. Kim as -- on the assumption

08:33AM  5    that Mr. Kim is going to be a witness.

6            So the problem I have is it seems to me -- on

7    these *Brady* and *Giglio* issues, I have -- I may have a different

8    approach than most courts.  I think it's the Government's

9    obligation to take a position with respect to whether or not

08:34AM 10    these materials or any material satisfies *Giglio* and/or *Brady*

11    for purposes of the Government's obligation to produce those

12    materials.  I only review these materials in camera as a last

13    resort because, in the first instance, it's the Government's

14    obligation.  And obviously if the Government makes a mistake

08:34AM 15    and does not fulfill its obligation to disclose these

16    materials, then it runs the risk of the case being dismissed.

17            So I don't understand why because basically

18    you're -- it's a moving target.  Some of these materials --

19    some of the information may be -- should be disclosed, and

08:35AM 20    others should not.  Why the Government can't just take an

21    unequivocal position, apparently as it did with respect to

22    Exhibit 7, and that's really all the defendant wants is a

23    representation by the Government that it is not subject to --

24    not subject to disclosure, and then that's the end of the

08:35AM 25    story.

1          Instead, we have a position where, as I said,

2     it's a moving target.  We find ourselves with motion practice

3     which, quite frankly, these are not my favorite motions.  This

4     one, it's very tailored because there's not that many exhibits.

08:35AM  5     But I don't intend to be the Government's sounding board with

6     respect to future disclosures in terms of their discovery

7     obligations.  So that's the problem I have with the

8     Government's position.

9          Mr. Neuman, with respect to -- I just want to

08:36AM  10    confirm that you have in June -- I think it was June 16.  Not

11    you but one of your colleagues or one of your associates -- had

12    the opportunity to review the partially unredacted Exhibits 1

13    through 5 and made various -- very extensive notes, and those

14    notes ended up in the declaration.  It seemed to me, when I

08:37AM  15    went back and pieced together the information that was --

16    continued to be redacted after the review of those documents,

17    that in large part the redactions were simply names of

18    individuals who were involved in the conduct or the activities

19    that were further described in the 302s.

08:37AM  20         MR. NEUMAN:  Thank you, Your Honor.  It's not

21    quite accurate.  As to Exhibits 1 through 5, there's

22    essentially two categories of documents as I understand it.

23    Exhibits 1 and 2 I believe fit into the Court's description

24    just now where we reviewed -- we were allowed to review the

08:38AM  25    redacted portions.  Certain names of officials and their

```
 1    staffers continue to be redacted.  I don't know if anything
 2    else was redacted, but our impression was that it was largely
 3    just the names as to Exhibits 1 and 2.
 4              THE COURT:  Same thing with respect to 3.
 5              MR. NEUMAN:  No.  With respect to 3 and 4 -- and
 6    then 5 is sort of on its own.  With respect to 3 and 4,
 7    significant portions of both documents remain redacted.  I will
 8    tell the Court what really raised our antenna to some extent as
 9    to these documents is Exhibit 3 is the 302 of the
10    April 29, 2009 interview, and Exhibit 4 is the notes of that
11    interview.  What was -- what we were allowed to review was
12    different between the two documents based on our notes,
13    meaning, let's just say, on the notes we saw certain
14    information that was not unredacted in the 302.  We don't know
15    what to do with that except it suggests that this wasn't a
16    streamlined approach of this is what they need to see, this is
17    what they don't need to see.
18              THE COURT:  Whose notes are they, by the way?
19              MR. NEUMAN:  I assume the FBI agent, but I don't
20    know.
21              THE COURT:  Let me ask the Government.
22              MS. DRAGALIN:  Yes, Your Honor.  It is the FBI
23    agent taking notes who ultimately wrote the report.
24              THE COURT:  Is that Agent Civetti?
25              MS. DRAGALIN:  I believe one of them is actually
```

1   Agent Robert Logan, and the second one -- since both agents'

2   names appear on the 302, I am not entirely confident.  However,

3   we do have Agent Civetti sitting in the courtroom.  He may be

4   able to answer that question.

08:39AM   5         THE COURT:  It's not important as long as I know

6   they are agent notes.

7         MR. NEUMAN:  Your Honor, just to finish off the

8   thoughts, as to Exhibit 5, it appeared to us that this was both

9   one where certain names were redacted -- continued to be

08:39AM   10   redacted and it appeared potentially material continued to be

11   redacted.  This is going from memory and from our notes.  So we

12   sort of have these three categories, as I would call them,

13   based on our impression of what we were seeing.

14         And then the other three documents that we have

08:40AM   15   remaining are slightly different, but I will address those when

16   the Court is ready.

17         THE COURT:  All right.  Well, you can go ahead

18   because I am -- this is your time to argue the motion.

19         MR. NEUMAN:  So, first of all, as to those other

08:40AM   20   documents, just to finish off, no redactions were removed

21   meaning as to the description of or interview of somebody who

22   we don't know regarding Justin Kim, and there is a first

23   portion that we have been allowed to see in the discovery and a

24   second portion that was redacted.  We don't know what's there.

08:40AM   25   It appears to be continued description regarding Justin Kim,

and the Government doesn't say otherwise.  But we don't know, and we don't know who gave that interview.

As to Exhibits 8 and 9, those are interviews of unknown persons regarding Chris Modrezjewski, Chris M., who the Court was just talking about.  The unredacted portion -- we don't know who the interviewed persons were, and we don't know what's under the redacted portions.  Nothing was removed as to those.  So just so the Court understands what we have and haven't seen.

As to the Kim portions, I will start there.  I think the Court's description -- and I take issues with some of the factual assertions obviously, but the description of Kim's centrality is exactly what we believe to be the case.  I, quite frankly, am not sure how the Government could ever prove this case without Justin Kim.  He is the only person who even the Government alleges spoke to Mr. Lee about the supposed bribe, and he can never testify as to Mr. Lee's knowledge and intent.

THE COURT:  What was the $500,000 for?

MR. NEUMAN:  Well, there's other explanations, Your Honor.  I'm not prepared to state it unequivocally today. I believe the evidence will show it is not necessarily for a bribe and that Mr. Kim may have lied, as he did to any number of people, he may have lied to Mr. Lee about what it was for.

For instance, the Court referenced the $1 million plus first price, so to speak.  That was for a lobbyist as at

least the Government describes it, that it would cost 1.2 for a lobbyist.

THE COURT:  Right.  They were trying to gauge how much it would be -- how much the alleged -- the amount of the alleged bribe in connection with the amount of money that they would have to spend on a lobbyist in order to fight the CREED appeal as I understand the Government's theory.

MR. NEUMAN:  That is the Government's theory. The reality is there is no witness to the conversation between Mr. Kim and Mr. Lee.  So the only person who can say what Mr. Kim told Mr. Lee the purpose of any payment was for is Mr. Kim.  And --

THE COURT:  And he said it was for a bribe.

MR. NEUMAN:  That's his testimony.  But his testimony is actually different than what counsel said today. From what I recall from the discovery, Mr. Kim says that it was Mr. Lee who came up with the bribe which is what the Court just said initially.  We heard today from counsel, no, the Government's theory is that it came from the top down, from Huizar and Esparza.

So there's these inconsistencies, first of all. That is sort of beside the point for purposes of today.  The bigger point I think is that, without Mr. Kim, they just don't have a case against Mr. Lee and 940 Hill.  Now, there is a world -- just to spin out, one could imagine a world where a

1   payment was made to settle an appeal and that was the belief of

2   why the payment was made.  And, in fact, Chris M. and Jeff M.

3   in my review of the discovery say they were not pressured by

4   anybody to drop the appeal.

08:44AM   5             So I think there are a lot of issues with the

6   case.  But in terms of what we are discussing today, without

7   Mr. Kim, there is nobody who can say what Mr. Lee allegedly

8   knew and believed if and when he paid that money.  In fact,

9   Mr. Kim is the only one who allegedly gets the money from

08:44AM   10  Mr. Lee.  So, again, without him there's just no -- there isn't

11  anything to tie Mr. Lee or 940 Hill to the necessary knowledge

12  and intent.

13             THE COURT:  All right.

14             MR. NEUMAN:  And then as to Chris M. -- I guess

08:44AM   15  just moving back, Your Honor, in terms of the documents -- we

16  have gone on to the point of why Mr. Kim is so central.  As to

17  the documents, I -- we raised this in our motion, and I don't

18  want to belabor the point.  But it's concerning as well beyond

19  these sort of inconsistent redactions or what we were allowed

08:45AM   20  to review in Exhibits 3 and 4 the fact that the Government was

21  apparently not intending to disclose even the stuff we saw to

22  us until we pushed is concerning.  I think the discussion of

23  payments -- demands for cash payments and discussion of cash

24  payments to other officials is directly relevant as *Brady* and

08:45AM   25  *Giglio* potentially.

1          And as to Chris M., especially given what we

2  understand may have happened, if there is evidence in

3  Exhibits 7 and -- excuse me -- 8 and 9 regarding a corrupt

4  relationship between Chris M. and officials regarding CREED,

08:45AM    5  regarding appeals and how they were handled --

6          THE COURT:  I'm sorry.  Go ahead.

7          MR. NEUMAN:  If there is -- and this is part of

8  the problem as to these exhibits.  I don't know what they are

9  as to 8 and 9.  I see the first portions which suggest an

08:46AM   10  untoward and unnecessarily close relationship between Chris M.

11  and members of the PLUM committee, and I can imagine a world

12  where this was a shakedown between CREED and Huizar.  Again,

13  Mr. Lee potentially was told, you're paying off CREED.  You're

14  not paying off Huizar.

08:46AM   15          So without knowing what's there and without being

16  told, it's difficult to argue obviously.

17          THE COURT:  Right.

18          MR. NEUMAN:  But that is the position we find

19  ourselves in.

08:46AM   20          THE COURT:  All right.  Let me hear from the

21  Government as to why you can't take an unequivocal position.

22          MS. DRAGALIN:  Your Honor, apologies if it wasn't

23  clear in the opposition.  We have taken a clear position to the

24  defense attorneys during the meet and confer positions {sic}.

08:47AM   25  Our position is this is not *Brady/Giglio* material.

1          THE COURT:  All right.  Then there is no issue.

2          MR. NEUMAN:  The only issue I find, Your Honor,

3    is -- I will take the representation, and I have no reason to

4    doubt counsel good faith.

08:47AM   5          I do have concerns, first of all, some of this we

6    have now seen as to Exhibits 1 and 2 where the names continue

7    to be unredacted.  My position is, and I think as the Court

8    sees from our declarations, this is *Brady/Giglio*, but it's

9    unusable without the names of the people involved.  And the

08:47AM   10   only reason they're keeping it secret is because it's

11   sensitive.  These are public officials that they don't want us

12   to know about for some reason.

13         So I have a problem with it, with the position.

14   I also think the fact that we were shown different things as to

08:47AM   15   Exhibits 3 and 4 calls the representation into question.  But,

16   again, I have no basis to otherwise question what the

17   Government is saying.  I just have concerns is what I can say.

18         THE COURT:  All right.  Let me make the following

19   ruling.

08:48AM   20         MR. SNYDER:  Your Honor, if I can briefly add

21   something.  Charles Snyder on behalf of Mr. Huizar who joined

22   in the motion.

23         I was just going to -- unless the Court doesn't

24   want to hear anything else.

08:48AM   25         THE COURT:  I'm always interested in what you

| | |
|---|---|
| | 1  have to say, Mr. Snyder. |
| | 2             MR. SNYDER:  Thank you, Your Honor. |
| | 3             One more point about the centrality of Mr. Lee, |
| | 4  the Government can't prove what's in the Indictment without |
| 08:48AM | 5  Mr. Lee.  I'm sorry.  Without Mr. Kim.  So what's alleged in |
| | 6  the Indictment is a single payment that occurred in March which |
| | 7  was the alleged payoff. |
| | 8             THE COURT:  That was the 400,000. |
| | 9             MR. SNYDER:  Correct. |
| 08:48AM | 10            THE COURT:  Mr. Kim kept 100-, and 200- went to |
| | 11  the -- went into the box and was delivered to Mr. Huizar's |
| | 12  home.  At that point in time, he didn't want it, told |
| | 13  Mr. Esparza hold on to it.  And then Mr. Esparza apparently |
| | 14  later on stiffed him.  There was an effort by Mr. Huizar in |
| 08:49AM | 15  order to have Mr. Esparza respond to his various efforts to |
| | 16  contact him, presumably with respect to where the $200,000 was |
| | 17  located. |
| | 18            MR. SNYDER:  Correct.  That is one version of |
| | 19  events. |
| 08:49AM | 20            THE COURT:  All right.  What's your version? |
| | 21            MR. SNYDER:  George Esparza told a different |
| | 22  version.  So there are two people involved in this. |
| | 23            THE COURT:  So what is your version? |
| | 24            MR. SNYDER:  George Esparza's version of events |
| 08:49AM | 25  was that there was a payoff in February, and then there was a |

1  payoff in March.  In the Indictment the Government rejects that

2  version of events and adopts Mr. Kim's version of events.  So

3  the only way that the Government can prove what's alleged in

4  the Indictment is by having Mr. Kim testify at trial.

08:50AM  5          THE COURT:  Well, I don't think there is any

6  doubt that that is true.  I mean, if the Government is going to

7  attempt to do it, I'm sure you will be -- you will all be very

8  delighted if the Government chooses not to call Mr. Kim --

9  right? -- because he's the key witness.  Without the key

08:50AM  10  witness, in your view, those counts that have been alleged

11  against Mr. Huizar and against Mr. Kim and 940 Hill will go by

12  the wayside.

13          MR. SNYDER:  Sure.  If they're dismissed, yes, we

14  would be more than happy with that.

08:50AM  15          THE COURT:  Well, I'm not going to dismiss them.

16  I'm telling you how is it going to survive a Rule 29 motion if

17  Mr. Kim doesn't testify?

18          MR. SNYDER:  I just think the point is, you know,

19  there's kind of been, as the Court was suggesting -- and I

08:50AM  20  don't want to continue talking any more than I have to.  As the

21  Court was suggesting, you know, there is a little bit of

22  movement about is this person going to testify?  Is he not

23  going to testify?

24          THE COURT:  Well, I'm going to solve that.

08:51AM  25          MR. SNYDER:  Understood, Your Honor.  Thank you.

1          THE COURT:  All right.  Anything else from

2  anybody?

3          All right.  Hearing nothing, the Court previously

4  set a deadline for the Government to produce all *Brady/Giglio*

08:51AM   5  material for March 25th of 2022.  That was during our hearing

6  in May and in docket No. 187.  As such, the Government is

7  currently in compliance with its discovery obligations.

8          Given the limited nature of the redacted

9  materials in the documents at issue in this motion, the Court

08:51AM  10  concludes there is no compelling reason to advance that

11  deadline.  The trial in this case is not set until May 24th of

12  2022, and the defendants will have more than sufficient time to

13  evaluate any additional disclosures provided by the Government

14  and to effectively use that information at trial.  And to the

08:52AM  15  extent defendants contend that they need additional time, they

16  certainly are free to request a continuance of the trial at

17  that time.

18          Apparently I was incorrect.  The Government has

19  made a final decision with respect to the materials that are at

08:52AM  20  issue in this motion.  They do not -- the Government does not

21  intend to disclose them.  In any event, the Government is

22  obligated to make a final decision and take an unequivocal

23  position at the very latest by the March 25th deadline.

24          What I'm going to order is that the Government

08:52AM  25  confirm that on or before March 25th the Government shall

08:53AM

produce all *Brady/Giglio* material and confirm in a declaration

that it has produced all *Giglio/Brady* material.  And as to any

material withheld, the prosecutor or the assistants shall file

a declaration identifying the materials withheld and provide a

full and complete explanation as to why the Government refuses

to produce those materials.

08:53AM

I'm well aware that, without reviewing the actual

documents or materials, the defendants, in essence, are forced

to simply take the Government's word that the information is

not exculpatory, is not favorable to the defense, and lacks

impeachment value.  Although the Court is confident that the

Government will comply with all of its discovery obligations in

this case or risk dismissal of the First Superseding

Indictment, the Court out of an abundance of caution, if

08:54AM

necessary, will conduct a limited in camera review of documents

subject to the defendants' Motion to Compel after the

Government files the declaration required by the Court.

In addition, in order to assist the Government in

making any future disclosure decisions, I note that I am not

08:54AM

persuaded that the case law supports the Government's position

that its interest in protecting the integrity of an ongoing

investigation outweighs the defendants' right to *Brady/Giglio*

material and the right to prepare their defense.

As the 9th Circuit stated in *United States versus*

08:54AM

*Olson* at 704 F.3d, the 9th Circuit has repeatedly held that

1    materials from ongoing investigations unfavorable under *Brady*.

2    Indeed, information veering adversely on the credibility of a

3    prosecution witness is favorable under *Brady* regardless of

4    whether or not it was part of any investigation at all.

08:55AM   5            As the Court said in *Everhart versus*

6    *United States* at 217 WL at 1345573, although the information

7    described by the Government in that case deals with ongoing

8    investigation, it's still impeachment evidence that the

9    Government must disclose.  The fact that the investigation is

08:55AM   10   ongoing can be taken into consideration by the trier of fact

11   when weighing the impeachment value of such evidence.

12            The Government contends that these cases only

13   held that, when a Government witness is the subject of an

14   ongoing investigation for criminal conduct or misconduct, the

08:55AM   15   Government must disclose evidence under *Brady/Giglio* even if

16   the outcome of the investigation is pending.  But the

17   Government argues that these cases do not address the

18   Government's interest in protecting the integrity of ongoing

19   criminal investigations as here do not target the witness.

08:56AM   20            In cases where the criminal investigation does

21   not target the witness, the Government contends that the Court

22   must balance the Government's interest in protecting the

23   integrity of the ongoing criminal investigation against the

24   defendant's need for that information.

08:56AM   25            In my view, the cases cited by the Government,

however, do not clearly support limiting the disclosure of *Brady/Giglio* material based upon the Government's need to protect the integrity of ongoing criminal investigations.  For example, in *United States versus Gill* at 58 F.3d 1414, the 9th Circuit affirmed the district court's decision to limit the defendant's cross-examination of the Government's witness to protect the identity of a -- of confidential information and to avoid compromising an ongoing investigation, the 9th Circuit concluded that the district court's decision to deny disclosure of that information relating to the ongoing investigation did not constitute error because the disclosure would provide no exculpatory information and could compromise ongoing investigations.  Importantly, in that case the information did not appear to be subject to disclosure under *Brady* or *Giglio*.

In any event, it's not necessary for the Court to decide this issue until it is required to conduct an in camera review of any of the Kim materials or any other materials that the Government decides should not be disclosed.

With respect to confidential source materials, Exhibits 6, 8, and 9, the Government asserts the defendants have not met their burden to overcome the limited privilege in protecting confidential sources, and the information is not subject to disclosure under Rule 16, *Brady/Giglio*, or the *Jencks Act*.

With respect to the identity of confidential

08:58AM

informants, the Court agrees with the Government at least at
this stage defendants have not met their burden for disclosure.
As discussed, the defendant must make a concrete showing that a
confidential source identity is relevant and helpful to the
defense of the accused or is essential to a fair determination
of a cause.

08:58AM

        In determining whether defendants have met their
burden for overcoming unlimited privilege, the Court considers
the degree of the informant's involvement in the criminal
activity, the relationship between the defendant's asserted
defense, and the likely testimony of the informant, and the
Government's interest in nondisclosure.

08:58AM

        According to the Government, the confidential
informants at issue in Exhibits 6, 8, and 9 are not involved in
any known or suspected criminal activity, have no connections
to the allegations in the First Superseding Indictment, and are
not expected to testify at trial.  Moreover, defendants have
failed to offer a plausible or compelling theory of how the
identity of these sources will serve their defense other than

08:59AM

their identities may somehow lead to tangential impeachment
information.

        Based upon my review of Exhibits 6, 8, and 9 and
the Government's representation, I tentatively conclude that
the redacted information is not subject to disclosure under

08:59AM

*Brady* or *Giglio*.  However, out of an abundance of caution, I

1    will conduct a final in camera review of these three exhibits.

2              Just as I ordered with respect to the Kim

3    materials, the Government on or before March 25th shall produce

4    all *Giglio* material and confirm in a declaration it has

09:00AM   5    produced all *Giglio* material.  And any material withheld, the

6    AUSAs shall file a declaration identifying the materials

7    withheld and provide a full and complete explanation as to why

8    the Government refuses to produce the materials.  That's the

9    only way that I will be able to make any determination as to

09:00AM   10   whether or not they should be produced.

11             So in conclusion, for all of the foregoing

12   reasons, the Court denies the defendants' motion.

13             MR. NEUMAN:  Just to inquire, Your Honor, as to

14   the materials that the Government continues to withhold in

09:00AM   15   March and files the declaration, is the Court going to

16   automatically conduct an in camera review or only upon further

17   motion of the defense just so --

18             THE COURT:  Only upon further motion of the

19   defense.

09:00AM   20             You know, I suspect that just as disclosure in --

21   I don't understand the Government's unwillingness to provide

22   the information.  But just as the -- I mean, the amount of

23   redacted material with respect to Exhibit 7 goes on for three

24   pages.

09:01AM   25             Apparently, whatever conversations took place

between counsel and the Government, you were convinced and

withdrew the motion as to Exhibit 7 which, in reviewing these

materials, I question why a similar conversation couldn't have

occurred with respect to 6, 8, and 9 because those contain far

09:02AM   less information and, further, unrelated to any issues raised

by the first -- raised in this case.

So I continue to encourage counsel to meet and

confer so that we don't have these issues.

MR. NEUMAN:  Thank you, Your Honor.

09:02AM   THE COURT:  All right.  The next motion that we

have is Mr. Steingard's motion for reconsideration of the date

for Government's disclosure of exhibit list which was filed on

August 20th, docket No. 209.  The Government filed its

opposition on August 30th.  It appears as docket No. 225.  The

09:03AM   defendants filed a reply on September 7th which appears as

docket No. 227.  I issued a text entry ordering the Government

to provide what now has become known as the enhanced index

which was received by the Court.

The Government produced this in the form of a

09:04AM   disc, a CD?

MR. JENKINS:  Yes, Your Honor.

THE COURT:  All right.  I'm going to start with a

tab for the Government for making copies.  I require paper

copies for courtesy copies.  I appreciate that the materials

09:04AM   are on a CD.  But in order for me to look at them, I'm of the

old school, and I use paper copies.  So unless the

Government -- and my fee for making copies is very significant.

MR. JENKINS:  Understood, Your Honor, on both

counts.

THE COURT:  All right.  And, Mr. Steingard, I

don't seem to be receiving courtesy copies from you.  I have

yet to receive any courtesy copies which are required under the

Criminal Trial Order.  So I call that to your attention so you

can tell whomever in your office that is responsible for

delivering courtesy copies or arranging to deliver of courtesy

copies that I haven't gotten any yet.

MR. STEINGARD:  I will attend to that immediately

after this Court appearance.  I was unaware of that.  Thank

you.

THE COURT:  All right.  The defendants' motion

for reconsideration is to request the Court to advance the

current deadline of February 15th of 2022 and order the

Government to produce a list of all of its trial exhibits on or

before October 1st of this year which is in a couple weeks.

Defendants argue that the defendant {sic} has reneged on its

agreement to meet with defense counsel on an informal basis to

disclose the exhibits.  The Government on the other hand argues

that it has complied with and exceeded what was contemplated by

the Court's order regarding the disclosure of exhibits and did

not renege on its willingness to meet with the defendant.

09:07AM

Based upon the correspondence that was attached to the motion, Mr. Steingard immediately after the May 10 of 2021 hearing where I had attempted to propose a solution to the disclosure of exhibits, sent an e-mail to the Government proposing four meetings and the discussion of the exhibits, and he broke down the content of each of those four meetings.  I don't see where the Government ever agreed to or, more importantly, ever met with Mr. Steingard or any of the defense counsel with respect to the discussion of the exhibits.

09:07AM

So let me hear from the Government.  Apparently I missed -- I might have missed the meeting that took place.  So why didn't the Government -- why hasn't the Government met with defense counsel?

I just wanted to confirm I obviously don't have access to and don't want access to the drive upon which all of these exhibits apparently appear.  I find it strange that the Government doesn't have a ready stack of exhibits that it could provide the defense with respect to the various allegations of this First Superseding Indictment.  Also, the Complaint was very extensive, and I can't imagine that whoever was the drafter or the scriber of the Complaint or First Superseding Indictment or the original Indictment for that matter didn't have a full set of documents that would assist in providing the very specific information that is set forth in the overt acts.

09:09AM

What happened to those documents, or am I wrong

1   that those documents didn't exist?

2          MR. JENKINS:  You are not wrong, but you are

3   certainly not alone in your impression on how ideally such a

4   prosecution and investigation would develop.  In fact, there is

09:09AM   5   certainly not somewhere a box of documents either physically or

6   electronically that is entitled evidence in Huizar case or

7   evidence for Huizar Complaint.

8          In fact, there are three different distinct

9   databases that do not speak to each other.  The FBI has a

09:10AM   10   proprietary database.  The U.S. Attorney's Office has a

11   different database.  And then we host re third-party vendor in

12   South Carolina, vendor that carries additional documents.  None

13   of those databases unfortunately speak to each other, and it

14   makes things very difficult when we're transmitting here

09:10AM   15   millions of pages of documents in different places.

16          What I can answer your question with is it is

17   also very true that the detailed Indictment, the detailed

18   Complaint is a result of review of evidence.  However, that is

19   a multi-year iterative process that is built upon

09:10AM   20   Special Agent Andrew Civetti, myself, AUSA Dragalin, other

21   agents having series of meetings and discussions over a

22   multi-year period, and that developed, and that ultimately

23   developed into a complaint affidavit or the Indictment.

24          As we made clear to the defense on several

09:11AM   25   occasions and in our papers, the best way -- the same way we

are doing it now is we track the affidavits, the wiretap

affidavit, the search warrant affidavits which build off each

other.  For the complaint affidavit, Special Agent Civetti

didn't redo years of investigation or go into a conference room

09:11AM   and review all of the evidence for days or weeks.  He built on

prior affidavits that did portions of that investigation.

THE COURT:  But when you're having these -- when

you're having these meetings, you don't sit around a table and

talk in the abstract.  You sit around the table and presumably

09:11AM   review various documents that either support or don't

support -- do not support an allegation that you're going to

include in the Indictment or the First Superseding Indictment.

So what happened to those documents?

MR. JENKINS:  Those documents are in some

09:12AM   combination either in the FBI database, are in various folders

for various filings in the U.S. Attorney's Office database.

And the way we do it is like that.  Either we sit around a

conference room or more often on the phone because the FBI is

in Westwood and we are downtown, and we will ask

09:12AM   Special Agent Civetti, I remember seeing an e-mail that said

this.  Can you double check that?  Yes.  Sometimes he would

send that e-mail, but when we're talking about hundreds of

e-mails, we would confirm -- we would have him confirm his

representation.

09:12AM   So in some cases we rely a lot on the FBI's

1   database, confirming it, double confirming, triple confirming

2   on things that we do not physically have possession of.  We

3   then recreate it for certain purposes and confirm it on our

4   end.

09:12AM  5          Ultimately those documents become -- get sent to

6   us in various forms.  But, again, not as if it's easily

7   categorized here is the evidence for Count 1, here is the

8   evidence for Count 2 because that is not how they are organized

9   on the FBI side.  It is, here is a million pages of bank

09:13AM  10   documents.  Here are a thousand e-mails from different people.

11   Special Agent Civetti is here if you want to ask about his

12   organizational process because clearly it is great and we rely

13   on it a lot and try to replicate it on our side.

14          And then we need to triple replicate it when we

09:13AM  15   are using Bates stamped versions which is currently the issue,

16   meaning we could provide some documents that we know, for

17   example, that we attach to a complaint.  But to get Bates

18   stamped versions of documents, we then do the same process we

19   have told them.  We look at the Indictment.  It says e-mail

09:13AM  20   from Jose Huizar to Ray Chan on this date.  We go and search in

21   that third-party database or e-mails, for those names, for that

22   date, and we provide that.

23          THE COURT:  Let me interrupt you.

24          So this third-party database, that has been

09:13AM  25   provided to defense counsel?

| | | |
|---|---|---|
| | 1 | MR. JENKINS:  Yes, Your Honor. |
| | 2 | THE COURT:  And defense counsel have been |
| | 3 | educated in terms of how one searches that database? |
| | 4 | MR. JENKINS:  Yes, Your Honor. |
| 09:14AM | 5 | THE COURT:  So you're both working through the |
| | 6 | First Superseding Indictment in an effort to locate those |
| | 7 | documents related to the allegations of that First Superseding |
| | 8 | Indictment in the same manner? |
| | 9 | MR. JENKINS:  Yes, Your Honor.  That is my |
| 09:14AM | 10 | understanding, Your Honor. |
| | 11 | THE COURT:  Well, at least that's the way the |
| | 12 | Government has been doing it. |
| | 13 | So you're searching -- and the list of |
| | 14 | exhibits -- I, quite frankly, was surprised that there were as |
| 09:14AM | 15 | few exhibits -- there's only 15 pages of exhibits that are in |
| | 16 | this detailed list.  I guess those are the ones that have the |
| | 17 | Bates numbers.  I couldn't figure out what pages 16, 17 -- |
| | 18 | 17 through 29 there were -- actually, it's 16 through 29. |
| | 19 | Do you have that in front of you?  They're just |
| 09:15AM | 20 | blank.  There's a column that says "count number," and it says |
| | 21 | "production volume" and it's Casino production 001.  That runs |
| | 22 | from pages 16 through 29.  What are those? |
| | 23 | MR. JENKINS:  The first -- this is why we |
| | 24 | provided in CD format.  I have it electronically which makes |
| 09:16AM | 25 | for Excel spreadsheets more intuitive, easy to read.  It sounds |

like you're looking at a portion of a realm.  And so if --
because the Excel -- there's multiple rows in
Excel Spreadsheet.  So it starts with Bates number in the far
left column.  The second column is file name.

09:16AM    THE COURT:  I have those for pages 1 through 16.
I guess what you're telling me is that whoever I had copy this
didn't copy the entirety of the other pages?

MR. JENKINS:  It appears so, Your Honor.
Unfortunately that is the downside of Excel.  You have to
09:16AM    format it correctly to print all the relevant information.

THE COURT:  It's also the downside of just giving
me a CD.

MR. JENKINS:  It is, Your Honor.  And that is
correct.

09:16AM    THE COURT:  All right.  Mr. Steingard, I will
hear from you.  I understand I have -- I sense your
understandable frustration, but I don't know -- we have an
outside date of February 15th.  It was my hope that these would
be -- the exhibits would be produced on a rolling basis, which
09:17AM    they have.  However, we have disclosure dates now for the
second batch of November 1st and then the third batch of
January 10th with the representation that the full list will be
provided on February 15th.

Based on the rather outmoded system that the
09:18AM    Government has for searching for these exhibits, I don't know

what more we can expect.  You have the same database that the

Government has.  You have the same ability and, quite frankly,

based upon what Mr. Neuman has done in his Motion to Compel

further discovery as well as the motions to strike certain of

09:18AM   the counts as well as the Motion to Dismiss the Indictment, I

think the defense is probably -- has far exceeded finding these

documents than what I would have expected because you're able

to lay out in very extensive and elaborate form the

Government's theory and certainly in the motions that are

09:19AM   coming up, especially the severance motion, explaining why

these -- certain of these cases should be severed.

So I don't know what more I can do other than to

urge the Government to add additional manpower since you have

the same ability of the Government.  It seems to me it is a

09:19AM   colossal waste of resources for each side to be doing it on

their own.  But that is the nature of the beast.

MR. STEINGARD:  Let me respond, Your Honor.

This is not a motion that we had any desire to

bring ever.  We circled back to your idea on May 10 that the

09:19AM   prosecution and the defense could sit around in an informal

manner and figure this out.  I brazenly, I suppose, suggested

that, rather than sitting with each lawyer and thereby having

to repeat things over and over again, maybe we could simplify

the process by doing it by groups.  I didn't think that was a

09:20AM   bad idea, but it was just a suggestion.

1          The response from the Government has been

2    anything but the enthusiasm that they expressed here when

3    Your Honor suggested this idea.  Really what I'm asking,

4    Your Honor, is this what you contemplated when you threw it out

09:20AM  5    that four-and-a-half months later the Government would have

6    identified roughly 70 of the 450 overt acts and four of the

7    subsequent counts.  Four-and-a-half months later.

8          THE COURT:  Well, it's certainly not something

9    that I contemplated, but I don't know what a meeting would have

09:21AM  10   accomplished in terms of the speed with which the Government is

11   able to find these documents, meaning it's probably worthless

12   until the Government at least had the first batch of documents.

13         MR. STEINGARD:  There never was a meeting.

14         THE COURT:  I know there wasn't a meeting.  The

09:21AM  15   Government obviously takes the position that they concluded

16   that what you were asking for was a reverse proffer which I

17   agree with you.  There is no such thing as -- you didn't

18   request a reverse proffer.  All they had to do was call you and

19   ask you -- most of these issues, in my view, can be worked out.

09:21AM  20   But no, it's not what I had in mind.  But I also -- and I went

21   back and looked at the transcript.  Apparently I did not focus,

22   as I should have, what Mr. Jenkins was telling me with respect

23   to how the Government is -- how the Government has to go

24   through this database and search this database to find these

09:22AM  25   documents.

```
 1              Let me ask Mr. Jenkins.  How many individuals --
 2   how many people are responsible for searching?
 3              MR. JENKINS:  There are three AUSAs, three
 4   agents, one to two paralegals.
 5              THE COURT:  And how much of your time do you
 6   spend searching the database?
 7              MR. JENKINS:  The answer would be different for
 8   each person, but it is the priority of myself and
 9   AUSA Dragalin.  So I would say in excess of 60 percent for us
10   and AUSA Mills as well.  Agent Civetti, Agent Logan, and
11   Agent Johnson, this is a primary case of theirs, but I don't
12   know specific proportion of their workflow.
13              MR. STEINGARD:  Your Honor, I should tell you
14   we're not bringing this because we have done the work and we
15   have got the material and we're faster than them.  We actually
16   hired an outside service.  I have an outside service and my own
17   staff digging through.  And by the way, I'm only looking at
18   probably 100 overt acts because that's all that -- not even
19   100 -- apply to my client.
20              We cannot on our own locate these.  And I just --
21   I'm --
22              THE COURT:  What are "these"?
23              MR. STEINGARD:  These overt acts that are
24   identified in the Indictment.  The first 20 overt acts against
25   my client reference these trips to Las Vegas and the money that
```

1    was passed around there.  And in the actual -- in the criminal

2    Complaint, they actually have snapshots from surveillance

3    videos.  We can't find those at all.  But it seems like --

4            THE COURT:  Have you called Jenkins --

09:24AM  5    Mr. Jenkins and asked where they were?

6            MR. STEINGARD:  Actually it was Ms. Dragalin.

7    And we had that conversation quite some time ago.  We have

8    attempted to do what they are doing unsuccessfully.  That's the

9    only reason we are here.  And you're right -- I think I speak

09:24AM 10    for my colleagues -- a certain amount of frustration that

11    four-and-a-half months after you proposed this idea this is all

12    the Government can give us.  This is all they can tell us that

13    they can locate in three databases, this U.S. Attorney's

14    Office.

09:24AM 15            And I just find it difficult to believe in part

16    because, when they issued an Indictment, there was at least a

17    theoretical possibility that the defendants would say we want

18    our trial in 70 days.  That's theoretical.  And they have to

19    think, okay, they are entitled to that.  We have to be able to

09:25AM 20    try our case within 70 days.  That was always my assumption

21    when an Indictment came down, that the Government was prepared

22    to try its case within the speedy trial framework.  It rarely

23    happens, I know.  But that was always my assumption.

24            Here what we have is a situation in which the

09:25AM 25    Government is telling us -- what are we?  A year now from the

Indictment issuing -- that this is the best they can tell us

about where their exhibits are.

And, Your Honor, if you say, hey, I trust they're

doing the best they can and, you know, you don't want to alter

09:25AM   the dates, so be it.  But I thought it was important -- we

thought it was important --

THE COURT:  No.  I --

MR. STEINGARD:  -- to bring it to your attention

to express our frustration and see if -- you had said before,

09:26AM   when we get to the time of the first series of motions, we will

take a look and adjust the dates accordingly.  You now have

this on your lap unfortunately that this is the best the

Government tells us they can do.

THE COURT:  All right.  I'm prepared to rule.

09:26AM   Anything else?

MR. STEINGARD:  I don't know if my co-counsel

have anything to add.

MR. JENKINS:  Your Honor, just from the

Government briefly.

09:26AM   Just for the record, when we say that no meeting

took place, no in-person meeting.  But we have had several

phone calls, as he just alluded to, on these exact topics.  We

end every conversation or e-mail with, if you have further

questions, please call us.

09:26AM   So I want to make clear that we have afforded

1    ourselves a significant amount of time responding to very

2    detailed questions and oftentimes -- for example, our paralegal

3    will do work that is available to the same counterparts,

4    converting things to PDF, doing things, going above and beyond

09:26AM   5    her job to help them do theirs.

6              We do take issue that somehow we are stalling in

7    a case where we have offered several times to go above and

8    beyond the Court's order.  I get that they are frustrated and

9    dissatisfied but, unless you think we are secretly hiding this

09:27AM  10    evidence, we are going above and beyond the Court's order.

11             We invited the Court to weigh in because clearly

12    there is a miscommunication.  We think we are exceeding

13    expectations, they think we are failing, and the Court has some

14    questions.  We certainly take issue we are not trying

09:27AM  15    100 percent to go beyond our expectations as outlined by the

16    Court and, when there are issues, call us.  And we have had

17    lots of conversations with each counsel, except for Mr. Braun,

18    on that exact score.

19             MR. STEINGARD:  Perhaps there is a solution here.

09:27AM  20    I don't mean to forestall your order.  Perhaps the problem is

21    these large gaps between the productions.  We would be happy to

22    receive them on a monthly basis.  We don't need the formality

23    necessarily.  We love that.  It's helpful.  But we don't need

24    the formality.  We can get for a particular overt act six

09:28AM  25    documents one month, and they may supplement that a month later

```
 1    and say, by the way, we found others we want to use for that
 2    overt act.  That would be fine.
 3                 So maybe the solution is on October 1, on
 4    November 1, on December 1, and January 2 the Government can
 5    produce a chart like this of whatever progress they have made
 6    rather than having us sitting on our hands.  And I assure you,
 7    Your Honor, we are not asking for anything that we haven't
 8    attempted to locate already.
 9                 THE COURT:  Well, do you have a list of that
10    which you attempted to locate but couldn't find that you
11    provided to the Government and asked them for assistance?
12                 MR. STEINGARD:  No.  But happy to do that.
13                 THE COURT:  That seems to me, if the Government
14    is more than willing to assist --
15                 MR. STEINGARD:  They will have that in a week,
16    Your Honor.  I will get that to them in a week.
17                 THE COURT:  Okay.  All right.  This is going to
18    be my ruling.
19                 As an initial matter, there is a disconnect
20    between the defendant and the Government regarding the -- what
21    the Court ordered or required with respect to the Government's
22    exhibit list at the May 10 hearing.  The Court set a formal
23    deadline for the Government to disclose its exhibit list, and
24    that deadline is February 15 of 2022 and set forth in
25    document 187.
```

1        Although the Court proposed an earlier informal

2   disclosure of exhibits, the Court reiterated that the formal

3   Government's exhibit list was not due until February 15th.

4        With respect to the informal disclosure of the

5   exhibits, I went back and looked at the transcript, and I

6   stated that maybe there is an alternative where we could have

7   the Government provide each defendant with the documents that

8   they expect without putting them on a list, just a range of

9   documents that they expect are relevant to what they intend to

10  offer at trial and walk through some of these exhibits with

11  each defense counsel to give them a little more focus and then,

12  when the exhibit list is produced in January, it will make more

13  sense.

14        I went on to say, so it's in everybody's

15  interest, it seems to me, starting with the Government to start

16  making these informal disclosures to the defense with respect

17  to these exhibits with a view that the date that I gave to come

18  up with a formal list and that at least the Government has

19  taken steps to accomplish what I think your legitimate issues

20  that have been raised with respect to what is to be done with

21  these million pieces of paper.

22        The defense agreed to the Court's proposal.  The

23  Government agreed to the Court's proposal with certain caveats.

24  The Government warned that they needed to go through the same

25  cumbersome process the defendants were going through.  They

needed to go through the overt acts in the First Superseding

Indictment, search the Government's production, and find the

documents with relevant Bates numbers.

            The Government expressly informed the Court and

09:31AM   the defendants -- and I'm quoting from the transcript -- "So

we're following -- so we're doing a lot of parallel track

things, but we are happy to produce the exhibits.  This is not

something that we are withholding or we have some magic exhibit

list with exact Bates numbers somewhere.  That's simply not the

09:31AM   case.  We have talked to all defense counsel.  That's simply

not the case.  We have talked to all defense counsel.  We have

been working productively, and I'm happy to go about that with

the Court's indulgence.  Again, we don't have a strict timeline

or there is not exclusionary penalty for not meeting certain

09:31AM   deadlines."

            Importantly in response to the Government's

concerns regarding a strict timeline or potential penalty for

not meeting certain deadlines, the Court assured the Government

that, "Until I get a sense that either the Government or the

09:32AM   defense is not acting in good faith, there is not going to be

any penalties."

            After reviewing the detailed exhibit list lodged

with the Court on September 14th, the Court was quite surprised

and, quite frankly, disappointed that the Government had not

09:32AM   made more progress in disclosing its exhibits to the

defendants.  However, the Court does not believe the Government

is acting in bad faith.  Indeed, it seems to the Court that the

Government is simply not as far along in preparing this case as

some of the defendants or the Court expected that they would

be.

Unfortunately the Government does not have an

informal exhibit list prepared or a box of key documents

already collected.  And it's important to note that it's

undisputed that the Government has made full and complete

production of documents to defendants with the exception of

some unspecified additional discovery in another external hard

drive referred to in footnote No. 1 on the defendants' motion.

Accordingly, because it does not appear to the

Court that the Government is acting in bad faith, the Court

will not penalize the Government, nor will the Court advance

the deadline for the Government to produce its formal exhibit

list.  The defendants will have the Government's exhibit list

three months before the May 24 of 2022 trial which the Court

considers to be sufficient time for the defendants to prepare

for trial, especially given that the detailed First Superseding

Indictment in this case amply previews the Government's case in

chief.

The Court's informal proposal was an attempt to

manage this case such that the preparation for trial and the

presentation of its exhibits at trial would proceed as

1    efficiently as possible.  And although the informal process has

2    not proceeded as the Court contemplated, the Government has not

3    violated any of the Court's orders.

4              Accordingly, the defendants' motion for

09:34AM    5    reconsideration is denied.

6              The Government, however, shall continue to

7    informally disclose exhibits to the defendants based on the

8    timeline proposed, i.e., the second batch will be disclosed no

9    later than November 1st and the third batch on January 10th

09:34AM   10    with the formal list of exhibits due on February 15th of 2022.

11             In the meantime, it appears that defendants are

12    more than capable of searching the Government's production for

13    the most important exhibits.  And as we discussed, to the

14    extent that defense is unable to locate those exhibits, it's my

09:34AM   15    understanding that a list will be prepared and provided to the

16    Government for its assistance.

17             The Government's case is not a secret.  As the

18    defendants repeatedly state, the Complaint and First

19    Superseding Indictment are lengthy talking documents.  Those

09:35AM   20    documents lay out the Government's case and review of the

21    substance of the key documents.  The Government asserts that

22    defendants are able to search the discovery database for dates

23    and quoted language in the First Superseding Indictment to find

24    the corresponding e-mail, text message, line sheets, wire

09:35AM   25    calls, et cetera, by Bates number and further asserts that it

1    has on more than one occasion assisted the defense counsel in

2    this process.

3                    I think Mr. Steingard has a good suggestion.   To

4    the extent that the Government can make interim disclosure of

09:35AM   5    exhibits prior to the November 1st deadline, that it would be

6    helpful.

7                    The only thing I can offer to the defense is

8    that, if you conclude in February of -- February 15th -- I'm

9    going to issue the Court's amended Criminal Trial Order showing

09:36AM   10   the next step with respect to the pretrial exhibit stipulation.

11   But if you find that the number of exhibits are simply too

12   overwhelming, I certainly don't encourage it, but I will

13   understand and will certainly entertain an appropriate

14   continuance of the trial to allow you to make sure that

09:36AM   15   everybody is on the same page with respect to these exhibits.

16                    MR. STEINGARD:   Thank you.

17                    THE COURT:   All right.   Anything else from the

18   Government?

19                    MR. JENKINS:   Nothing from the Government.   Thank

09:36AM   20   you, Your Honor.

21                    THE COURT:   Anything else from the defense?

22                    MR. STEINGARD:   Nothing.   Not from me.

23                    MR. NEUMAN:   No.   Not from me.

24                    THE COURT:   All right.   Thank you very much.

09:37AM   25                    (Proceedings concluded at 9:37 a.m.)



1              CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7   THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8   PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10  STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11  ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13  THE UNITED STATES.

14

15          DATED THIS  21ST  DAY OF OCTOBER, 2021.

16

17

18          /S/ MIRANDA ALGORRI

19          _____
            MIRANDA ALGORRI, CSR NO. 12743, CRR
20          FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25