CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
CAREL ALE (Bar No. 283717)
Email: Carel_Ale@fd.org
CHARLES J. SNYDER (Bar No. 287246)
Email: Charles_Snyder@fd.org
ADAM OLIN (Bar No. 298380)
Email: Adam_Olin@fd.org
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Jose Huizar

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>JOSE LUIS HUIZAR,<br><br>        Defendant. | Case No. CR-20-326-JFW<br><br>**JOSE HUIZAR'S MOTION TO SUPPRESS EVIDENCE DERIVED FROM THE UNLAWFUL SEIZURE AND SEARCH OF 39 MONTHS OF PERSONAL EMAILS; DECLARATION OF COUNSEL; REQUEST FOR EVIDENTIARY HEARING ON *FRANKS* ISSUE**<br><br>Date:  January 31, 2022<br>Time:  8:00 a.m.<br>Ctrm: 7A – Hon. John F. Walter |

TO THE ACTING UNITED STATES ATTORNEY AND HER COUNSEL OF

RECORD: PLEASE TAKE NOTICE THAT, at 8:00 a.m. on January 31, 2022, or as

soon thereafter as may be heard, Jose Huizar will, and hereby does, move for an order

suppressing the 2016 seizure and search of his personal emails and all derivative fruits.

Huizar bases this motion on the attached memorandum and declaration, the files and records in this case, and any other argument or evidence that the Court may consider.

Respectfully submitted,
CUAUHTEMOC ORTEGA
Federal Public Defender

Dated: November 15, 2021          /s/ *Charles J. Snyder*

Carel Alé
Charles J. Snyder
Adam Olin
Deputy Federal Public Defenders
Attorneys for Jose Huizar

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ....................................................................................... 1

II. FACTUAL BACKGROUND ..................................................................... 3

    A.    In July 2016, as part of a fledging bribery investigation, the government applied for a warrant to search 39 months of Huizar's personal emails. ............................................................................... 3

    B.    The affidavit supporting the warrant application admitted that the government lacked probable cause for federal bribery and provided no basis for obtaining all of Huizar's personal emails for 39 months. ............ 4

    C.    In a 61-page warrant application seeking search authority for Huizar's email account, Agent Civetti intentionally hid the fact that the government had six months of pen-register data for the target account showing that Huizar exchanged no emails with Huang/Zheng and just one with Chan. ......................................................................................... 6

    D.    A magistrate judge approved the warrant without change on the morning it was requested. ................................................................... 8

    E.    The resulting search confirmed that the warrant was strikingly overbroad. ........................................................................................ 8

III. ARGUMENT ......................................................................................... 9

    A.    The warrant affidavit clearly failed to establish probable cause for bribery, clearly failed to identify a nexus between Huizar's emails and evidence of bribery, and clearly failed to justify reviewing all of Huizar's emails for 39 months, including over a year before the first known trip to Las Vegas. ............................................................... 9

        1.    Crime PC: the warrant affidavit *admittedly* failed to establish probable cause for any of the listed bribery offenses. ............................................. 11

            a.    The warrant affidavit admittedly failed to offer a particularized, non-speculative basis for finding specific intent. ................................................................. 11

            b.    The warrant affidavit admittedly failed to provide a particularized, nonspeculative basis for finding an illegal *quo*. ........................................................................ 13

        2.    Place PC: the warrant affidavit failed to provide a nexus between Huizar's emails and a crime for which probable cause existed. ................ 14

        3.    Scope PC: the warrant affidavit obviously failed to provide probable cause for search all of Huizar's personal emails for 39 months, including over a year before the first known trip to Las Vegas. ................ 15

    B.    The warrant authorizing the unfettered seizure and search of all of Huizar's emails for 39 months was facially overbroad and lacking in particularity. ................................................................................... 18

i

**TABLE OF CONTENTS**

PAGE

C.    A neutral and independent judge would not have issued the warrant had Agent Civetti truthfully disclosed all of the material facts.................20

D.    If the government's search involved a preservation copy of Huizar's email account, that would separately violate the Fourth Amendment and require suppression.........................................................24

IV.    CONCLUSION..................................................................25

# TABLE OF AUTHORITIES

**PAGE(S)**

**Federal Cases**

*Andresen v. Maryland,*
    427 U.S. 463 (1976) ........................................................................ 15

*United States v. Bridges,*
    344 F.3d 1010 (9th Cir. 2003) ...................................................... 16

*by Hunter v. Bryant,*
    502 U.S. 224 (1991) ........................................................................ 11

*United States v. Cardwell,*
    680 F.2d 75 (9th Cir.1982) ...................................................... 18, 20

*United States v. Cervantes,*
    703 F.3d 1135 (9th Cir. 2012) ...................................................... 12

*United States v. Comprehensive Drug Testing, Inc.,*
    621 F.3d 1162 (9th Cir. 2010) ...................................................... 16

*United States v. Cotterman,*
    709 F.3d 952 (9th Cir. 2013) .......................................................... 9

*Ctr. Art Galleries-Hawaii, Inc. v. United States,*
    875 F.2d 747 (9th Cir. 1989) ............................................ 16, 18, 19

*United States v. DeLeon,*
    979 F.2d 761 (9th Cir. 1992) ........................................................ 21

*Franks v. Delaware,*
    438 U.S.154 (1978) ........................................................................ 21

*United States v. Garza,*
    980 F.2d 546 (9th Cir. 1992) ........................................................ 21

*Gasho v. United States,*
    39 F.3d 1420 (9th Cir. 1994) ........................................................ 11

*In re Grand Jury Subpoenas Dated Dec.*
    10, 1987, 926 F.2d 847 (9th Cir. 1991) .................................. 15, 18

*United States v. Grant,*
    682 F.3d 827 (9th Cir. 2012) ........................................................ 10

iii

# TABLE OF AUTHORITIES

**PAGE(S)**

*United States v. Hill,*
  459 F.3d 966 (9th Cir. 2006) ................................................................ 19, 20

*Johnson v. United States,*
  333 U.S. 10 (1948) ........................................................................................ 20

*Kennedy v. Los Angeles Police Dep't,*
  901 F.2d 702 (9th Cir. 1989) ...................................................................... 11

*United States v. Kow,*
  58 F.3d 423 (9th Cir. 1995) ................................................................... 16, 19

*USA v. Liang Chen,*
  2020 WL 6585803 (N.D. Cal. Nov. 10, 2020) ......................................... 16

*United States v. Lopez,*
  482 F.3d 1067 (9th Cir. 2007) ..................................................................... 11

*United States v. Lustyik,*
  57 F.Supp.3d 213 (S.D.N.Y. 2014) ............................................................ 15

*Malley v. Briggs,*
  475 U.S. 335 (1986) ....................................................................................... 10

*Man-Seok Choe v. Torres,*
  525 F.3d 733 (9th Cir. 2008) ....................................................................... 11

*McDonnell v. United States,*
  136 S.Ct. 2355 (2016) .................................................................................... 13

*United States v. Michaelian,*
  803 F.2d 1042 (9th Cir. 1986) ..................................................................... 10

*Mills v. Graves,*
  930 F.2d 729 (9th Cir. 1991) ....................................................................... 21

*United States v. Nora,*
  765 F.3d 1049 (9th Cir. 2014) ..................................................................... 10

*United States v. Perkins,*
  850 F.3d 1109 (9th Cir. 2017) ..................................................................... 21

iv

# TABLE OF AUTHORITIES

**PAGE(S)**

*Riley v. California*,
   573 U.S. 373 (2014)...................................................................... 9

*United States v. Rubio*,
   727 F.2d 786 (9th Cir. 1983) ...................................................... 10

*United States v. SDI Future Health, Inc.*,
   568 F.3d 684 (9th Cir. 2009) ...................................................... 20

*Matter of Search of Info. Associated With Four Redacted Gmail Accts.*,
   371 F.Supp.3d 843 (D. Or. 2018) .......................................... 16, 19

*United States v. Spilotro*,
   800 F.2d 959 (9th Cir. 1986) ...................................................... 18

*United States v. Stanert*,
   762 F.2d 775 (9th Cir. 1985) .................................................. 9, 21

*United States v. Underwood*,
   725 F.3d 1076 (9th Cir. 2013) .................................................... 12

*United States v. Washington*,
   797 F.2d 1461 (9th Cir. 1986) ..................................................... 9

*United States v. Whitney*,
   633 F.2d 902 (9th Cir.1980) ....................................................... 15

*Wilson v. Russo*,
   212 F.3d 781 (3d Cir. 2000) ....................................................... 21

**State Cases**

*People v. Camarella*,
   54 Cal.3d 592 (1991) ................................................................. 10

**Federal Statutes**

18 U.S.C. § 371 ............................................................................... 4

18 U.S.C. § 666 ............................................................................... 4

18 U.S.C. § 1341 ............................................................................. 4

18 U.S.C. §1343 .............................................................................. 4

# TABLE OF AUTHORITIES

**PAGE(S)**

18 U.S.C. §1346 ........................................................................... 4

18 U.S.C. § 1951 .......................................................................... 4

18 U.S.C. § 1956 .......................................................................... 4

18 U.S.C. § 2703 ........................................................................ 24

31 U.S.C. § 5324 .................................................................... 4, 15

**Other Authorities**

U.S. Const. amend. I ................................................................... 13

U.S. Const. amend. IV ........................................................... *passim*

6 Wayne R. LaFave, <u>Search & Seizure</u> (6th ed. 2021) ............................ 9, 14

Orin S. Kerr, <u>The Fourth Amendment Limits of Internet Content Preservation</u>, 65 St. Louis U. L.J. (2021) .................................................. 24

# TABLE OF EXHIBITS

| Exhibit | Description | Page(s) |
|---|---|---|
| 1 | July 1, 2016 Warrant for Jose Huizar's Email Account | *passim* |
| 2 | July 1, 2016 Warrant Application for Jose Huizar's Email Account | *passim* |
| 3 | Pen-Register Data for Jose Huizar's Email Account | 7 |
| 4 | Pen-Register Data for Wei Huang's Email Account | N/A |
| 5 | Pen-Register Data for Ricky Zheng's Email Account | N/A |
| 6 | FD-302 for Review of Jose Huizar's Email Account Dated January 25, 2017 | 8 |

vii

# I. **INTRODUCTION**

In July 2016, still in the early days of its investigation, the government applied for a warrant to seize and read 39 months of Jose Huizar's personal emails in connection with a nascent bribery inquiry looking at Huizar, Wei Huang, Shen Zen New World Group, and Ricky Zheng.  When the government applied for the warrant, neither Huang, Zheng, Shen Zen, nor Shen Zen's domestic subsidiary had – or had had – business before the Council or one of Huizar's Council Committees.  As a result, although the warrant affidavit cited benefits that Huizar allegedly received during trips with Huang and Zheng to Las Vegas, it conceded that it "remain[ed] unclear what official acts," if any, might have been sought from Huizar in return.

Another way of saying that is: when the government first applied for a warrant to search all of Huizar's personal emails for over three years, it admittedly had no non-speculative evidence of either a bribery *pro* or a bribery *quo*.  Yet, despite lacking probable cause for two of the three elements of federal bribery, despite the absence of a demonstrated nexus between a crime for which probable cause existed and Huizar's email account, and despite failing to explain how unsupported speculation about bribery involving a small group of people justified reviewing *all* of Huizar's emails for 39 months, the government obtained a warrant from a duty magistrate judge allowing it to seize and review the entirety of Huizar's personal email account dating back to April 2013.

This highly-intrusive search of more than three years of Huizar's personal emails violated the Fourth Amendment for several reasons.  *First*, the affidavit supporting the warrant *admittedly* failed to supply probable cause for the federal bribery and bribery-related offenses that the government claimed to be investigating.  *Second*, the affidavit plainly failed to establish a nexus between Huizar's email account and any identified federal offense for which probable cause existed.  And, *third*, the warrant was extraordinarily, self-evidently overbroad and lacking in particularity.

Separately, but compounding these problems, the warrant affidavit intentionally

1

omitted facts that, if disclosed, should have further caused a neutral and independent judge to deny the application.  Among other things, the affidavit stated that the government had "reviewed many of the development projects in Huizar's District 14 in order to determine the influence [that Huizar] had as a public official over [Huang, Zheng, and Shen Zen]," and suggested that Huang's DTLA property stood to benefit from Huizar's assistance.  But the affidavit failed to disclose the actual results of that "review": that neither Huang, Zheng, nor Shen Zen had any projects or business that might have reached Huizar at Council or Committee at any point during the search period, and also had nothing pending when the government sought the warrant.  In addition, despite describing other evidence in detail, including cell-phone toll records, the government hid from the magistrate that it already had six months of pen-register information for the email account it was seeking to search, as well as pen-register data for email accounts associated with Huang and Zheng.  Had the government not only disclosed the existence of that data but what it revealed, the magistrate would have learned that Huizar had *no* email exchanges with either Huang or Zheng during the entire six-month period preceding the application.  In a warrant application seeking evidence of official bribery involving Huang and Zheng in Huizar's email account, it is hard to imagine any two facts – no object and no emails – that could be more material.

Not only is suppression appropriate under these circumstances, a contrary decision would have striking implications both for the privacy of elected officials and the separation of powers.[1]  For better or worse, nearly all politicians in the United States receive benefits from individuals and entities within their spheres of influence. The receipt of a benefit, even an improperly-disclosed one, does not come close to establishing probable cause for a federal bribe.  If the mere identification of a *quid* plus

---

[1] Most sitting officials, including City Councilmembers, are prohibited from using public resources in electoral campaigns.  As a result, incumbents typically use personal email accounts to conduct political business.  Given the inherently politically nature of corruption cases, and given that federal prosecutors are answerable to political appointees, there is a serious potential for abuse if prosecutors are granted easy access to a politician's personal emails, and thus the inner workings their political campaigns.

rank speculation about a *pro* and *quo* is enough for sweeping and unfettered email warrants, federal law enforcement effectively has free reign to rummage through the private email accounts of every politician in the country.  All an agent has to do is say: this person took Councilmember X on a fancy trip, or this lobbyist bundled contributions for Councilmember Y, and that person or lobbyist *might* want something within the elected official's sphere of influence, so even though I know nothing else, give me access to *all* of the official's personal emails so I can do some poking around.

That is unquestionably not the law.  To the contrary, the speculative search and seizure of 39 months of Huizar's private emails is the exact "exploratory rummaging" that the Fourth Amendment exists to guard against.  And the government further violated the Fourth Amendment in this case by intentionally withholding obviously-material facts that, if disclosed, would have led to the denial of the warrant.  For the reasons summarized above and detailed below, the Court should suppress the direct and derivative fruits of the search of Huizar's personal email account.[2]

## II.  FACTUAL BACKGROUND

### A. In July 2016, as part of a fledging bribery investigation, the government applied for a warrant to search 39 months of Huizar's personal emails.

In July 2016, FBI SA Andrew Civetti submitted a search warrant application to a duty magistrate judge.  The application requested authorization to seize and search all content and non-content records associated with Huizar's personal email account dating back to April 1, 2013.  Snyder Decl., Ex. 1 ¶ 10.  The application further proposed a three-part search procedure: (1) the government would create a "search team" comprised of "law enforcement agents and/or individuals assisting law enforcement and acting at their direction"; (2) Yahoo!, Inc. would provide the government search team with all of the content and non-content records for the account dating back to

---

[2] Because of the complexity of the investigation, Huizar is currently unable to identify all of the derivative evidence obtained as a result of the unlawful search of his emails.  Should the Court grant his motion, he requests a further hearing to determine the proper scope of the exclusionary remedy.

April 1, 2013; and (3) the search team would review everything related to the account and seize any records that it, it its judgment, constituted "evidence, contraband, fruits, or instrumentalities" of six statutory violations: 18 U.S.C. § 371 (conspiracy (to commit bribery)), 18 U.S.C. § 666 (federal program bribery), 18 U.S.C. §§ 1341, 1343, 1346 (honest-services wire and mail fraud (bribery)), 18 U.S.C. § 1951 (Hobbs Act extortion (bribery)), 18 U.S.C. § 1956 (money laundering (predicated on bribery)), and 31 U.S.C. § 5324(a)(3) (structuring).  *See* Ex. 1 ¶¶ 1-3, 11.  Although the warrant purported to identify examples of the evidence subject to seizure, *id.* ¶¶ 11.a.i-v, it ultimately authorized the government to review and seize everything in the account, *id.* ¶ 11.b.

**B. The affidavit supporting the warrant application admitted that the government lacked probable cause for federal bribery and provided no basis for obtaining all of Huizar's personal emails for 39 months.**

As support for the email warrant request, Agent Civetti submitted a 61-page application, including 36-page affidavit.  The affidavit had six principal sections: (1) Introduction (*id.* ¶¶ 1-4), (2) Summary of the Investigation (*id.* ¶¶ 5-13), (3) Preservation Requests (*id.* at 8-9), (4) Statement of Probable Cause (*id.* ¶¶ 14-37), (5) Background on E-Mail and Social Media Accounts and the Provider (*id.* at 29-35); and (6) Request for Non-Disclosure.  Within the Probable Cause section, the affidavit had several additional subsections, which, in substance: (i) introduced Huizar, Huang, Zheng, and Shen Zen (*id.* ¶¶ 14-15), (ii) described gambling trips that the group took to Las Vegas and benefits that Huizar may have received on those trips (*id.* ¶¶ 16-17, 22-23), (iii) outlined financial records suggesting that Huizar deposited money obtained during the gambling trips into family members' accounts (*id.* ¶¶ 18-21), briefly speculated about hypothetical official acts, mostly not mentioning Huizar (*id.* ¶¶ 24-31), described the frequency of calls between Huizar, Huang, Zheng, George Esparza, and Raymond Chan (*id.* ¶¶ 32-34), and tried to draw some connection between Huizar's email account and a hypothetical bribery scheme (*id.* ¶¶ 35-37).

Upon closer review, there is a marked difference between the subsections describing the trips that Huizar took to Las Vegas and the potential benefits he received

4

(*id.* ¶¶ 16-22), and those attempting to establish probable cause for a bribe (*id.* ¶¶ 24-31), a nexus between suspicion of criminal activity and Huizar's email account, and a justification for searching all of his personal emails with everybody dating back to April 2013 (*id.* ¶¶ 35-37).  In the former sections, Agent Civetti offered particularized detail about the benefits that Huizar allegedly received from Huang, as well as financial records suggesting that Huizar deposited money in family members' accounts.  *Id.* ¶¶ 16-23.  In the section entitled "Official Acts," however, he admitted that "it [was] unclear what [if any] official acts Jose Huizar has performed [or might have been asked to perform] in exchange for the payments he received from Wei Huang."  *Id.* ¶  24.  While Agent Civetti described Huizar's job duties as a Councilmember, he failed to connect anything that Huizar did with anything sought by Huang, Zheng, or Shen Zen.  Further, after stating earlier in his affidavit that he "reviewed many of the development projects in Huizar's District 14 in order to determine the influence [Huizar] had as a public official over [Huang, Zheng, and Shen Zen]," Agent Civetti tellingly omitted the results of that review, including that neither Huang, Zheng, nor Shen Zen had business pending before Council or one of Huizar's Committees at any point between April 2013 and July 2016.  *See id.* ¶ 25.

After offering nothing more than vague generalities about Huizar, Agent Civetti described a convoluted theory involving minor building-code violations and Chan in his capacity as General Manager of LADBS, an agency in which Mr. Huizar had no role.  *Id.* ¶¶ 25-31.  In describing that theory, Agent Civetti mentioned Huizar once, stating that he worked had "very closely" with Chan.  As support for that assertion, Agent Civetti noted that Huizar's website mentioned a 2008 initiative with which Chan, among many others, was tangentially involved.  *Id.* ¶ 26.  Other than the conclusory claim that Huizar and Chan worked "very closely," Agent Civetti drew no connection between Huizar and the supposed code scheme, no connection between Chan and any benefits, and no connection whatsoever to Huizar's email account.  *Id.* ¶¶ 25-31.

In the final two paragraphs of the Probable Cause section, Agent Civetti offered

5

information about the "Use of the Subject Account."  Under that heading, Agent Civetti asserted flatly that "[t]here is probable cause to believe that [Huizar] is using the [email account] in connection with and in furtherance of the [conjectural] bribery and money laundering schemes and that evidence of those crimes will be found in the [email account]."  *Id.* ¶ 35.  As the sole support for that assertion, Agent Civetti noted that Huizar had used his email address to book five Southwest Airlines flights to Las Vegas.  *Id.*  Based on that, and in support of a warrant seeking 39 months of private emails with all of Huizar's contacts, Agent Civetti speculated that the "content of [Huizar's emails] will provide evidence related to the [still-undefined] bribery and money laundering schemes."  *Id.* ¶ 36.  In so doing, he offered no rationale for searching *all* of Huizar's communications with *all* of his contacts during the 39-month period covered by the search warrant, as opposed to just communications relating to Huang, Zheng, and Shen Zen.  Further, after previously stating that the "first known trips" to Las Vegas occurred in April 2014, *id.* ¶ 12, he failed to provide any basis for seizing and searching all of Huizar's emails dating back to April 2013, more than a year before the first known trip.

**C. In a 61-page warrant application seeking search authority for Huizar's email account, Agent Civetti intentionally hid the fact that the government had six months of pen-register data for the target account showing that Huizar exchanged no emails with Huang/Zheng and just one with Chan.**

At various points in his affidavit, Agent Civetti offered a detailed discussion of pen-register data for cell phones (*id.* ¶¶ 32-34),[3] noted that the government sent preservation letters for Huizar's email account (*id.* at 8-9), and attempted to draw some tenuous connection between hypothetical bribery involving Huang and Zheng and Huizar's email account (*id.* ¶¶ 35-37).  Yet, at no point in his 36-page affidavit did he mention that the government already had extensive pen-register data for the account that it was seeking to search, as well as pen-register data for accounts associated with

---

[3] The call data showed, unsurprisingly, that Huizar was in contact with Zheng and Huang around the times of they all took trips to Las Vegas together.  Typically, people do not accidentally go on trips together, but instead communicate about them before, during, and after.

6

Huang and Zheng.

In fact, in November 2015, the government obtained trap-and-trace authorization for Huizar's email account, granting it access to pen-register data for all traffic into and out of the target account.  Snyder Decl. ¶ 4.  Over the next six months, the government obtained four additional extensions, the last of which was granted on June 16, 2016.  *Id.* Along with obtaining pen-register data for Huizar's email account, the government also obtained pen-register data for accounts associated with Huang and Zheng.  *Id.*

What that pen-register data showed was entirely inconsistent with the impression conveyed by the application.  Rather than suggesting that evidence of a "bribery and money laundering" scheme involving Huang and Zheng would be found in the account, the pen-register data showed that Huizar exchanged zero emails with Huang or Zheng for the six months preceding the warrant application.  *Id.*, Ex. 3.  It further showed that, over the same time period, Huizar exchanged just one email with with Chan.  *Id.*

Had Agent Civetti disclosed the existence of this data, the magistrate could have, at a minimum, requested additional information about what the pen-register information revealed.  Had Agent Civetti disclosed the information itself, the magistrate would have seen that, in fact, the government already knew exactly who Huizar was communicating with using his email account, including that he was not communicating at all with Huang and Zheng – the supposed bribers in the conjectural scheme.  The magistrate would have also learned that the government could have substantially narrowed its request to accounts associated with Huang, Zheng, travel providers, and the like, but intentionally chose not to when seeking its warrant.

**D. A magistrate judge approved the warrant without change on the morning it was requested.**

On July 1, 2016, Agent Civetti presented a 61-page warrant application to a duty magistrate.  At 11:37 a.m., the judge stamped the warrant without change.  Exs. 1-2.

**E. The resulting search confirmed that the warrant was strikingly overbroad.**

In a post-search 302, Agent Civetti described his analysis of the warrant return.

Synder Decl., Ex. 6.  There, Agent Civetti wrote that he had reviewed 27,356 records from Huizar's private email account, of which 496 (including things like flight records) were deemed pertinent, for a hit rate under 2%.  Of those deemed-pertinent records, 137 (or 28%) were somehow "deemed pertinent, but outside the scope of the . . . warrant."  *Id.*  Meanwhile, Agent Civetti was exposed to 2,045 records that he deemed attorney-client privileged (569% more than the number of pertinent records covered by the warrant), and 375 that he deemed protected by the spousal privilege (104% more than the number of pertinent records covered by the warrant).[4]  The remaining 25,000 or so records were largely personal communications, including campaign discussions, that Huizar reasonably but incorrectly assumed were free from government intrusion.

## III.  ARGUMENT

**A. The warrant affidavit clearly failed to establish probable cause for bribery, clearly failed to identify a nexus between Huizar's emails and evidence of bribery, and clearly failed to justify reviewing all of Huizar's emails for 39 months, including over a year before the first known trip to Las Vegas.**

Private email accounts, like cell phones, contain extraordinary amounts of sensitive personal materials.  *See Riley v. California*, 573 U.S. 373, 396 (2014) ("[A] cell phone search would typically expose to the government far more than the most exhaustive search of a house").  In Fourth Amendment terms, those sensitive personal materials constitute "papers" and "effects" protected against "unreasonable searches and seizures."  U.S. Const. amend. IV.  "The express listing of papers [in the Fourth Amendment] 'reflects the Founders' deep concern with safeguarding the privacy of thoughts and ideas – what we might call freedom of conscience – from invasion by the government."  *United States v. Cotterman*, 709 F.3d 952, 964 (9th Cir. 2013).  The

---

[4] As of the date of this filing, Huizar has not received complete copies of his seized devices and accounts, and the volume and disorganization of the discovery has made parsing the materials extraordinarily burdensome.  As a result, and as suggested by other concurrently-filed motions, Huizar is still attempting to determine whether, where, and how often the government may have invaded privilege and/or reviewed materials without legal authorization.  In this instance, the warrant contained no taint protocol and it appears that Agent Civetti, the lead case agent, was making the initial privilege determinations on his own, while also deeming materials that were almost certainly not "readily apparent" contraband as pertinent to the case.  *But see* Ex. 1 ¶ 5.

8

1   "need to prevent general, exploratory rummaging in a person's belongings" is thus

2   particularly acute where "papers" are involved because documents "tend to involve

3   broad disclosures of the intimacies of private lives, thoughts and transactions." *United*

4   *States v. Washington*, 797 F.2d 1461, 1468 (9th Cir. 1986) (everything omitted).

5       While law enforcement may sometimes invade these intimacies, the Fourth

6   Amendment provides that "no warrants shall issue, but upon probable cause, supported

7   by Oath or affirmation, and particularly describing the place to be searched, and the

8   persons or things to be seized." U.S. Const. amend. IV.  When presented with a

9   warrant application, a judge's job is to independently determine, based solely on the

10  information presented in the warrant affidavit, whether there is probable cause to search

11  a particular location.  *United States v. Stanert*, 762 F.2d 775, 778 (9th Cir. 1985).

12      Probable cause to search requires an agreement of "time; crime; objects; and

13  place."  6 Wayne R. LaFave, Search & Seizure (6th ed. 2021) § 3.7(d).  In other words,

14  to obtain a search warrant for a given location, law enforcement must identify

15  particularized facts establishing a fair probability that (1) a person committed a defined

16  crime, (2) evidence of which will be found in a particular place, (3) at the time of the

17  search.  *United States v. Nora*, 765 F.3d 1049, 1058-60 (9th Cir. 2014); *United States v.*

18  *Rubio*, 727 F.2d 786, 793 (9th Cir. 1983).

19      While the existence of a warrant is often indicative of good faith, suppression

20  remains the "appropriate remedy when a warrant" or part of a warrant "is based on an

21  affidavit so lacking in indicia of probable cause as to render official belief in its

22  existence entirely unreasonable."  *United States v. Grant*, 682 F.3d 827, 836 (9th Cir.

23  2012) (everything omitted); *Nora*, 765 F.3d at 1058-60.  Suppression also remains the

24  appropriate remedy if the warrant is "so facially overbroad as to preclude reasonable

25  reliance by the executing officers."  *United States v. Michaelian*, 803 F.2d 1042, 1046

26  (9th Cir. 1986).[5]  In this case, as discussed below, the warrant affidavit was so clearly

27  _____

28      [5] Though sometimes muddled in the caselaw, the good-faith analysis asks *not*

9

lacking in crime, nexus, and scope probable cause that reliance on the warrant was entirely unreasonable.

**1. Crime PC: the warrant affidavit *admittedly* failed to establish probable cause for any of the listed bribery offenses.**

**a. The warrant affidavit admittedly failed to offer a particularized, non-speculative basis for finding specific intent.**

In order to find probable cause to search for evidence of a crime, a Court must first find probable cause to believe that a crime has actually occurred.  While this showing does not always require probable cause for every element, probable cause for specific-intent crimes *does* require probable cause for the specific intent. *United States v. Lopez*, 482 F.3d 1067, 1073 (9th Cir. 2007); *Gasho v. United States,* 39 F.3d 1420, 1428 (9th Cir. 1994); *Kennedy v. Los Angeles Police Dep't*, 901 F.2d 702, 705 (9th Cir. 1989), *over'd on other grounds by Hunter v. Bryant*, 502 U.S. 224, 228 (1991).  Thus, probable cause for federal bribery requires articulable facts showing not simply that an official accepted a benefit, but that he or she did so in exchange for agreeing to take official action on a specific matter.  *See* Docket Nos. 229, 231, 235, 259, 268, 269, 270 (setting out the law for bribery); *see also Man-Seok Choe v. Torres*, 525 F.3d 733, 738 (9th Cir. 2008) (in extradition bribery proceeding, granting writ of habeas corpus and finding no probable cause where allegations identified a benefit to the official (a *quid*) and a specific and focused matter on which action was wanted (a *quo*), but failed to identify any facts suggesting an illicit agreement (a *pro*)).

---

simply whether a warrant issued – which would be an easy binary question – but "'whether a reasonably well-trained officer would have known that the search was illegal *despite the magistrate's authorization*.'"  *Malley v. Briggs*, 475 U.S. 335, 345-46 (1986) (quoting *Leon v. United States*, 468 U.S. 897, 922 & n.23 (1984)) (emph. added).  "If a well-trained officer should reasonably have known that the affidavit failed to establish probable cause (and hence that he should not have sought a warrant), exclusion is required under . . . *Leon*, and a court may not rely on the fact that a warrant was issued in assessing objective reasonableness of the officer's conduct in seeking the warrant."  *People v. Camarella*, 54 Cal.3d 592, 596 (1991) (In Bank).  As the Supreme Court explained in *Malley*, this is because, while "in an ideal system an unreasonable request for a warrant would be harmless, because no judge would approve it . . . ours is not an ideal system[,]"  475 at 345.  Rather "it is possible that a magistrate, working under docket pressures . . . will fail to perform as a magistrate should."  *Id.* at 345-46.

Perhaps it would be one thing if the warrant affidavit in this case had stated that Huang had three development applications likely to reach Huizar, but Agent Civetti wasn't sure which of the three on which he might want assistance. While Huizar doesn't agree that that would actually supply probable cause absent some particularized facts regarding an agreement, probable cause might not be so obviously lacking that the government could squeak by on good faith.

But, here, Agent Civetti "reviewed many of the development projects in Huizar's District 14 in order to determine the influence [Huizar] had as a public official over [Huang, Zheng, and Shen Zen]." While he never says directly what the review uncovered, coming out of it, he *admitted* that the government could not even identify the general topic of a hypothetical bribe (the *quo*), let alone particularized facts suggesting an intent to take action on a specific and focused matter in exchange for a benefit (the *pro*). The only basis for leaping from *quid* to bribe is raw speculation that Huang might conceptually want something from Huizar at some point – even though no thing or illicit agreement was actually identified – so any benefits that Huizar received must be evidence of a bribe. There is no universe in which that showing could constitute fact-based probable cause of a federal bribe.

Indeed, the entire affidavit contains just one conclusory statement, embedding multiple unsupported leaps, attempting to supply the *pro* and *quo* elements of bribery. In paragraph 24, Agent Civetti writes:

> [B]ased on my training and experience, discussions with other FBI agents, as well as my review of all the evidence in this case, I believe the payments from Wei Huang to Jose Huizar are bribes and/or kickbacks because Jose Huizar failed to disclose them on his financial disclosure Form 700, and because it appears Jose Huizar is concealing and laundering those payments through close family members.

From a probable cause perspective, most of that statement is meaningless. Agent Civetti's nine months of experience as an agent (*id.* ¶ 1), "discussions" with unidentified people about unknown things, and review of "the evidence" amount to nothing in probable-cause terms. *United States v. Cervantes*, 703 F.3d 1135, 1139-40

11

(9th Cir. 2012) ("While [an officer's] training and experience are factors to be considered, it is incumbent upon the arresting or searching officer to explain the nature of his expertise or experience and how it bears upon the facts which prompted the officer to arrest or search.  Conclusory statements and a general claim of expertise will not suffice.") (everything omitted); *United States v. Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2013) ("Conclusions of the affiant unsupported by underlying facts cannot be used to establish probable cause").  The entirety of the government's *bribery* showing is thus that the payments must have been bribes because, despite the absence of an identified *quo*, and without *any* particularized evidence of a *quo*, Huizar did not properly disclose the money and may have deposited it in family members' accounts.

Whatever else that might suggest, without major conjectural leaps that are entirely unsupported by particularized information, those facts do not come close to establishing probable cause for *federal bribery*, including probable cause that Huizar intended to take action or be influenced on some specific government matter at the time that the payments were received.  The affidavit thus obviously and admittedly failed to supply probable cause for the specific intent required to commit federal bribery.

### b. The warrant affidavit admittedly failed to provide a particularized, nonspeculative basis for finding an illegal *quo*.

As discussed at length in the motions to dismiss, public-official bribery is an offense ringed in on all sides by Constitutional concerns, where each of the elements serves an essential function.  A local official's receipt of a benefit from a constituent, even an improperly-disclosed one, is not only not a federal bribe, but may be protected by the First Amendment.  It is only the receipt of a benefit coupled with an agreement to take action on a specific and focused government matter that makes that receipt of a benefit a bribe.

In *McDonnell*, which was decided on June 26, 2016, the Supreme Court elaborated on the fundamental importance of the *quo*, including proof that the *quo* involve some official exercise of sovereign authority.  *McDonnell v. United States*, 136

S.Ct. 2355 (2016).  As the Court explained there, without requiring proof of an official act, federal law risks sweeping in or chilling a range of conduct that is not only not criminal, but protected by the Constitution.  *Id.* at 2372-73.

Despite *McDonnell*'s emphasis on the critical importance of the *quo*, Agent Civetti repeatedly admitted that the government lacked any particularized facts suggesting that Huang wanted anything specific from Huizar, let alone that he wanted something involving the formal exercise of government power.  While Agent Civetti at certain points intimated that Huang seemed "poised to benefit financially if the rapid expansion of downtown Los Angeles hotel and hospitality services continue[d]," Ex. 2 ¶ 9, saying that is no more than saying that Huang might benefit from a rising tide. That may be true as far as it goes, but it would also be true for every single one of Huizar's constituents.  If that plus a benefit is probable cause for *bribery*, bribery probable cause exists for every politician in the country.

That was obviously not the law under *McDonnell*, which, on July 1, 2016, should have been ringing in the ears of every public-corruption agent and prosecutor in the country.  To the contrary, without particularized facts pointing to an actionable *quo*, it was impossible to find probable cause for a federal bribe.  Because the government repeatedly admitted that it lacked those facts, the affidavit obviously and admittedly failed to establish probable cause for federal bribery.

### 2. Place PC: the warrant affidavit failed to provide a nexus between Huizar's emails and a crime for which probable cause existed.

"Even if there is probable cause – or even absolute certainty – that certain described items are presently to be found in a certain described place, a lawful basis for search has not been established unless it is also shown to be probable that those items constitute the fruits, instrumentalities, or evidence of crime."  LaFave, <u>Search & Seizure</u>, <u>supra</u>, (6th ed. 2021) § 3.7(d).  In this case, the warrant application stated that the government expected to find evidence of "bribery and money laundering schemes" in Huizar's email account. Ex. 2 ¶ 35.  But because the government failed to establish

13

probable cause for bribery, it failed to establish a nexus between Huizar's email account and evidence of bribery (or bribery-predicated money laundering). While the warrant application also cited the structuring statute, 31 U.S.C. § 5324(a)(3), it did not purport to establish a nexus between structuring and Huizar's email account, let alone a structuring-related basis for searching all of his emails for three years. *Id.* ¶¶ 35-36. The affidavit thus obviously failed to establish probable cause to believe that evidence of a federal offense for which probable cause existed would be in Huizar's emails.

### 3. Scope PC: the warrant affidavit obviously failed to provide probable cause for search all of Huizar's personal emails for 39 months, including over a year before the first known trip to Las Vegas.

Whether framed as a lack of probable cause or overbreadth, the scope of a warrant is limited by the probable-cause showing. *United States v. Whitney,* 633 F.2d 902, 907 (9th Cir.1980) ("The command to search can never include more than is covered by the showing of probable cause to search"). This limitation prevents a "general, exploratory rummaging in a person's belongings." *Andresen v. Maryland,* 427 U.S. 463, 480 (1976) (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 467 (1971)). In practice, the concept of scope can be defined as a requirement that there be probable cause to search or seize the specific items identified in the warrant. *United States v. Lustyik*, 57 F.Supp.3d 213, 228 (S.D.N.Y. 2014) ("[A] warrant is overbroad if its description of the objects to be seized is broader than can be justified by the probable cause upon which the warrant is based").

In the Ninth Circuit, "[c]ourts have repeatedly invalidated warrants authorizing a search which exceeded the scope of the probable cause shown in the affidavit." *In re Grand Jury Subpoenas Dated Dec*. 10, 1987, 926 F.2d 847, 857 (9th Cir. 1991) (citations omitted). Though there is no hard formula where evaluating scope, courts generally consider a number of intuitive factors, including: (1) whether the government has shown that the entire area or set of materials sought to be searched is permeated by

14

crime, or instead just a subset;[6] (2) whether the warrant is limited to the subject matter and people for which probable cause of criminality exists, or instead covers everything in a particular location;[7] and (3) whether the entire time period covered by the warrant is supported by probable cause, or instead starts too early or ends too late.[8]

The affidavit and warrant in this case flunk *all* of those tests.

First, unlike a drug house or business "permeated by fraud," the warrant affidavit contained no evidence indicating that a substantial portion of Huizar's emails would contain evidence of criminal activity.  Thus, even if the warrant affidavit had established probable cause for bribery (it obviously and admittedly did not), the wholesale seizure and search of Huizar's entire personal email account was completely unsupported.

Second, with no meaningful restrictions on either the production or the review, the warrant was ultimately not limited to the topics or people for which the affidavit

---

[6] *See, e.g., United States v. Bridges*, 344 F.3d 1010, 1018 (9th Cir. 2003) (invalidating warrant, reversing order denying suppression, and vacating conviction based on warrant that authorized the search and seizure of all documents in a location without showing probable cause that everything in the location was reasonably likely to contain evidence of criminal activity); *United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995) ("Despite its length and complexity, [the agent's] affidavit did not establish the probable cause required to justify the widespread seizure of documents authorized by the warrant in this case").

[7] *See, e.g., Ctr. Art Galleries-Hawaii, Inc. v. United States*, 875 F.2d 747, 751 (9th Cir. 1989) (where affidavit only established probable cause to believe that a gallery was selling forged Dali artwork, invalidating warrant authorizing seizure of materials unrelated to Dali), *superseded on other grounds by rule as recognized in J.B. Manning Corp. v. United States*, 86 F.3d 926 (9th Cir. 1996); *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162 (9th Cir. 2010) (affirming suppression orders where warrant affidavit supplied probable cause for lab's interactions with 10 baseball players, but government seized and reviewed all of lab's records with all players).

[8] *See, e.g., Kow*, 58 F.3d at 427 (though framed as a particularity problem, invalidating warrant where it "did not limit the scope of the seizure to a time frame within which the suspected criminal activity took place"); *Matter of Search of Info. Associated With Four Redacted Gmail Accts.*, 371 F.Supp.3d 843, 845 (D. Or. 2018) ("[T]he search warrants challenged here, which require Google to disclose to the government the 'contents of all emails associated with the Email Account[s,]' are overbroad because it is unreasonable to compel a provider to disclose every email in its client's account when the provider is able to disclose only those emails the government has probable cause to search"); *USA v. Liang Chen*, No. 17-CR-00603-BLF-1, 2020 WL 6585803, at *8 (N.D. Cal. Nov. 10, 2020) ("Courts in this district have found search warrants overbroad when the date range exceeds the reasonable scope of probable cause").

purported to supply probable cause – bribery, luxury travel, Huang, Zheng, Shen Zen, and Chan – but instead allowed the government to review all of Huizar's sensitive and private emails for over three years. This is true even though the government had email addresses for Huang, Zheng, Esparza, and Chan and pen-register data for Huizar, Huang, Zheng, and Esparza, and could therefore have significantly narrowed its requests to the people and subjects for whom it purported to have probable cause. As a result of the unfettered access afforded by the warrant, the case agent ended up reviewing everything: over 27,000 email records, including 2,045 attorney-client privileged communications, 375 spousal-privileged communications, and emails containing pictures of Huizar's children, friends, and family, internal communications about campaign strategy, and so on. The warrant affidavit provided absolutely no basis for reviewing all of Huizar's emails with all of his contacts for over three years.

Third, the date range covered by the warrant was indefensibly long. As just one example, the warrant affidavit stated that the first known trips to Las Vegas occurred in April 2014. Ex. 2 ¶ 12. But, with no explanation at all, the government sought and obtained authorization to search emails dating back to April 2013, an entire year for which it did not even attempt to show crime and place probable cause.

Stepping back, the intrusiveness of this warrant is hard to overstate. Private email accounts may, and often do, include important medical and financial records, intimate communications with family and friends, sensitive business plans, and many more things that people rightly assume should be free from government review. In addition, in the case of an elected official, private email accounts contain details about campaign strategy and communications, easy access to which invites the possibility of politically-motivated abuse. The wholesale seizure and search of any private citizen's personal email account, and maybe especially a sitting politician's, is an extraordinary privacy invasion. Given the limited grounds for which the government purported to show probable cause, the sweeping warrant that it received was so facially overbroad that no agent could have reasonably believed it was adequately supported.

16

**B. The warrant authorizing the unfettered seizure and search of all of Huizar's emails for 39 months was facially overbroad and lacking in particularity.**

In addition to requiring probable cause, the Fourth Amendment requires that a search warrant "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Ninth Circuit describes this requirement as one of "specificity," involving dual considerations of "particularity and breadth." *In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d at 856-57. "Particularity is the requirement that the warrant must clearly state what is sought," while "[b]readth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." *Id.* (everything omitted). The specificity requirement seeks to make "general searches under a warrant impossible," to prevent "the seizure of one thing under a warrant describing another," *United States v. Cardwell*, 680 F.2d 75, 77 (9th Cir.1982) (cleaned up) (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)), and to foreclose "exploratory searches and indiscriminate rummaging through a person's belongings," *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986)

What the specificity requirement demands "depend[s] on the circumstances of the case and the type of items involved." *Ctr. Art Galleries-Hawaii*, 875 F.2d at 749. In determining whether a warrant is sufficiently specific, the Ninth Circuit generally directs courts to consider three factors: "(1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued." *Spilotro*, 800 F.2d at 963–64.

The warrant in this case instructed Yahoo to give the government every email in Huizar's account for 39 months (Ex. 1 ¶ 10), allowed the government to review every email in the account (*id.* ¶¶ 3-4, 7), and permitted the government to permanently seize

17

every email in the account (*id.* ¶ 11.b).  For the reasons described above, that authority was strikingly overbroad compared to the probable cause that the government purported to offer.  *See Kow*, 58 F.3d at 427 (holding that seizure of every document in a business violated the Fourth Amendment because, "[d]espite its length and complexity, [the] affidavit did not establish the probable cause required to justify the widespread seizure of documents authorized by the warrant," and the affidavit did not claim that the government was unable to segregate documents); *Ctr. Art Galleries-Hawaii*, 875 F.2d at 751 (where affidavit established probable cause that only a specific part of a business was fraudulent, warrant granted authority to seize and search broader set of records was overbroad, especially with no claim that the records could not be segregated).

The warrant was also far broader than it should have been given the information available to the government at the time it was issued.  In July 2016, the government had identified a specific (albeit conjectural) theory of bribery – luxury trips to Las Vegas involving Huang and Zheng – and email addresses for each of the people that it alleged were part of the scheme.  But while both Yahoo and the government were capable of limiting the seizure – or at least the search – by subject, person, and/or key term, the warrant instead allowed the government to review everything in the account.  *Matter of Search of Info. Associated With Four Redacted Gmail Accts.*, 371 F.Supp.3d at 845 ("[I]t is unreasonable to compel a provider to disclose every email in its client's account when the provider is able to disclose only those emails the government has probable cause to search"); *United States v. Hill*, 459 F.3d 966, 975 (9th Cir. 2006) ("Although computer technology may in theory justify blanket seizures . . . the government must still demonstrate to the magistrate [judge] *factually* why such a broad search and seizure authority is reasonable . . . . Thus, there must be some threshold showing before the government may seize the haystack to look for the needle.") (emphasis in original) (everything omitted).

Finally, although it is true that, at bottom, the warrant contained an objective

18

standard by which to determine what was to be searched and seized, that standard was simply to seize and search *everything* in the account.  While objective, that command wholly defeats the purpose of the specificity requirement.[9]

Indeed, the warrant in this case was "practically begging the search team" to review records involving "every person" who communicated with Huizar during the covered 39-month period.  *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 705 (9th Cir. 2009) (finding warrant overbroad and ordering partial suppression).  But while "the warrant in this case authorized a wholesale [search and seizure], the supporting affidavit did not explain why such [broad authority] was necessary."  *Hill*, 459 F.3d at 975.  Given the limited grounds for which the government purported to show probable cause and its ability to limit the search, the blanket search and seizure authority that it received was so facially lacking in specificity as to preclude reasonable reliance.

## C. A neutral and independent judge would not have issued the warrant had Agent Civetti truthfully disclosed all of the material facts.

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence," but that "those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."  *Johnson v. United States*, 333 U.S. 10, 13-14 (1948).  Police and agents corrupt the warrant process and undermine the judicial officer's role by recklessly or intentionally including false statements in a warrant affidavit without which probable cause would not have been found.  *United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017) (everything omitted).

---

[9] To the extent that the warrant directed the government to search for evidence of certain crimes, "'limiting' the search to only records that are evidence of the violation of a certain statute is generally not enough."  *Cardwell*, 680 F.2d at 78.  As the Ninth Circuit explained in *Cardwell*, "such a limitation force[s] the executing officers to make a legal distinction between [legal] records and records that are not [legal], which they [a]re not qualified to do."  *Id.* (everything omitted).  In any event, in this case, the warrant wasn't so limited, but instead allowed for the review and seizure of everything.

19

A defendant can challenge the validity of an affidavit if he makes a substantial preliminary showing that (1) the affiant "knowingly and intentionally, or with reckless disregard for the truth" inserted a false statement in the warrant affidavit, and (2) the affidavit cannot support a finding of probable cause without the allegedly false information. *Franks v. Delaware*, 438 U.S.154, 155-56 (1978). The *Franks* rule applies not only to warrants that contain false or misleading statements, but also to warrants that contain deliberate or reckless omissions of facts that tend to mislead. *Stanert*, 762 F.2d at 781. "Omissions are made with reckless disregard if an officer withholds a fact in his ken that 'any reasonable person would have known . . . was the kind of thing the judge would wish to know.'" *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000) (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir.1993)); *United States v. Garza*, 980 F.2d 546, 551 (9th Cir. 1992) (omitted facts "rise to the level of misrepresentation" if they "cast doubt on the existence of probable cause"). If, after an evidentiary hearing, the Court finds that a reasonable judicial officer would have been misled by false or omitted information, suppression is required. *United States v. DeLeon*, 979 F.2d 761, 763 (9th Cir. 1992). "There is no 'good faith' exception" for "a warrant based upon knowing or recklessly made falsehoods in the affidavit[.]" *Mills v. Graves*, 930 F.2d 729, 733 (9th Cir. 1991).

In this case, when the government applied for a warrant to search Huizar's emails, the two critical questions were: (1) was there a bribe involving Huang, Zheng, and Shen Zen and, (2) more importantly, would evidence of that bribe be found in Huizar's email account? Within those questions were further questions, including: (1)(a) what could Huang have wanted from Huizar, (1)(b) what could Huizar have done for Huang, (2)(a) how did Huizar use the target account generally, and (2)(b) how often did Huizar use the target account to communicate with the people from whom he was supposedly receiving bribes? Any judge receiving the warrant application in this case would have wanted to know the answers to those questions. And, in fact, the government had critical information relevant to those answers, but repeatedly chose to

20

1    withhold or obscure it because the inferences it invited were unfavorable.

2            As to the first set of questions – what might Huang want from Huizar? – Agent

3    Civetti stated that he had "reviewed many of the development projects in Huizar's

4    District 14 in order to determine the influence [that Huizar] had as a public official over

5    [Huang, Zheng, and Shen Zen]."  Ex. 2 ¶ 9.  Rather that providing the results of that

6    review, however, Agent Civetti repeatedly intimated that Huang and Shen Zen had

7    already sought and were continuing to seek assistance from Huizar in his capacity as

8    Chair of PLUM in connection with the hotel that Shen Zen owned in DTLA.[10]

9            But at the time that he submitted his affidavit, Agent Civetti necessarily knew

10   from his "review" that neither Huang, Zheng, nor Shen Zen had any projects or

11   business that might have reached Huizar at Council or Committee at any point during

12   the search period.  He also knew that neither Huang, Zheng, nor Shen Zen had a

13   pending development application or business likely to reach Huizar at the time that he

14   applied for the warrant.  Rather than disclosing those facts to the magistrate, and

15   thereby providing an unfavorable answer to the first question (Q: "What did Huang

16   want from Huizar?" A: "So far as we can tell, nothing significant."), he chose to

17   withhold the information and suggest that Huang was angling for high-value assistance

18   with one of many "mixed-use mega developments in the pipeline for downtown Los

19

20           [10] Ex. 2 ¶ 9 ("There have been a series of mixed-use mega developments in the
21   pipeline for downtown Los Angeles, and several of these developments are owned by
     Chinese-based companies, including [Shen Zen], the entity used to purchase the LA
22   Hotel Downtown. Accordingly, [Shen Zen] appears poised to benefit financially if the
     rapid expansion of downtown Los Angeles hotel and hospitality service continues.");
23   *id.* ¶ 14.d ("Huizar has been at the forefront of expanding hotel and hospitality service
     in downtown Los Angeles and has worked closely with various entities to promote and
24   encourage new businesses to open in downtown Los Angeles."); *id.* ¶ 25 ("As stated
     above . . . Huizar is the Chairman of the PLUM Committee for the City Council.  The
25   PLUM Committee has extensive influence over the zoning in downtown Los Angeles.
     In fact, according to . . . Huizar's website, he has undertaken an initiative as the
26   Chairman of the PLUM Committee to overhaul the City of Los Angeles' ("the City")
     entire zoning guidelines."); *id.* ¶ 33 ("[T]he interplay and frequency of these
27   communications between these specific individuals further support my belief that . . .
     *Huang has given and continues to give bribes and kickbacks to . . . Huizar in return for*
28   *official acts that benefit  . . . Huang and his business interests in downtown Los*
     *Angeles*) (emph. added).

                                             21

Angeles . . . owned by [a] Chinese-based compan[y]."  There was no basis for that claim other than the hunch of an "officer engaged in the often competitive enterprise of ferreting out crime," and the magistrate would have known that had the true facts about Agent Civetti's review been disclosed.

Maybe more importantly, Agent Civetti hid from the magistrate the months of email pen-register data that he had for Huizar, Huang, and Zheng, all of which was wholly inconsistent with the impression he sought to convey through his application. At the time that he applied for the warrant, Agent Civetti had more than six months of pen-register data for the email account he was seeking to search showing *zero* emails between Huizar, Huang, and Zheng, and *one* email between Huizar and Chan.  Agent Civetti also had message-level detail showing every person and entity with whom Huizar exchanged emails for more than half a year preceding the search.  Not only did that information refute the notion that evidence of Huang-related bribery would be found in Huizar's personal email account, it showed that the government could have significantly restricted its warrant application.

Yet, without even mentioning the pen-register data for the target account, Agent Civetti sought an unrestricted warrant to read *all* of Huizar's emails for 39 months, including during the time period where he knew for a fact exactly with whom Huizar was communicating by email.  Any fair-minded judge would have wanted to know about the existence of this information.  But rather than disclosing it – or even that it existed – it never came up once in Agent Civetti's 36-page affidavit.  Instead, he discussed *cell phone* pen-register records in detail, and invited the Court to conclude that similar evidence would be found in Huizar's email account.  There was no basis for that claim – and, in fact, the available evidence suggested otherwise – but the magistrate never knew that because the true facts were not disclosed.

To be clear, the ultimate probable-cause question was not simply whether probable cause for a crime existed, but whether there was probable cause to believe that evidence of bribery involving Huang, Zheng, and Shen Zen would be found in Huizar's

22

email account.  No facts could be more material to that question than that: (1) for the entire period covered by the warrant, and at the time that the application was filed, neither Huang, Zheng, nor Shen Zen had any discernable business likely to reach Huizar at Council or Committee; and (2) that there were no emails between the supposed bribers (Huang and Zheng) and the target account, and just one email between Huizar and Chan, with whom the government claimed he was "very close."

For the many reasons discussed above, the warrant in this case should have never been granted at all.  But even assuming, counterfactually, that Agent Civetti's warrant was just sufficient to edge over the line of probable cause, it would have and should have been denied had he disclosed all the material facts.  Recognizing that, he and the prosecution team took matters into their own hands by withholding key information from the magistrate.  While already a separate basis for suppression, the baseline weakness of the warrant application amplifies the importance of Agent Civetti's omissions and compounds the consequences of withholding, which independently requires suppression under *Franks*.

### D. If the government's search involved a preservation copy of Huizar's email account, that would separately violate the Fourth Amendment and require suppression.

As described in the warrant application, the government sent several preservation letters to Yahoo requiring it to preserve copies of Huizar's email account under 18 U.S.C. § 2703(f).  Ex. 2 at 8-9.  Those warrantless seizures of Huizar's email account violated the Fourth Amendment.  See Orin S. Kerr, The Fourth Amendment Limits of Internet Content Preservation, 65 St. Louis U. L.J. (2021), https://scholarship.law.slu.edu/lj/vol65/iss4/3.  To the extent that the copy of Huizar's account searched by the government involved material derived from one or more of the preservation copies, the search violated the Fourth Amendment and requires suppression.  *Id.*

///

///

23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.  CONCLUSION

For the reasons above, the Court should grant this motion and suppress the direct and derivative fruits of the search of Huizar's personal email account.

Respectfully submitted,
CUAUHTEMOC ORTEGA
Federal Public Defender

Dated: November 15, 2021

/s/ *Charles J. Snyder*

Carel Alé
Charles J. Snyder
Adam Olin
Deputy Federal Public Defenders
Attorneys for Jose Huizar

24