CUAUHTÉMOC ORTEGA (Bar No. 257443)
Federal Public Defender
CAREL ALÉ (Bar No. 283717)
Email: Carel_Ale@fd.org
CHARLES J. SNYDER (Bar No. 287246)
Email: Charles_Snyder@fd.org
ADAM OLIN (Bar No. 298380)
Email: Adam_Olin@fd.org
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for José Luis Huizar

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSÉ LUIS HUIZAR, *et al.*,<br><br>Defendants. | Case No. 20-CR-326-JFW-1<br><br>**JOSÉ LUIS HUIZAR'S NOTICE OF MOTION AND MOTION TO SUPPRESS PRIVILEGED ATTORNEY-CLIENT COMMUNICATIONS; MEMORANDUM; EXHIBITS**<br><br>Date:    January 31, 2022<br>Time:    8:00 a.m.<br>Judge:   Hon. John F. Walter |

TO THE ACTING UNITED STATES ATTORNEY AND COUNSEL OF RECORD: PLEASE TAKE NOTICE THAT, at 8:00 a.m. on January 31, 2022, or as soon thereafter as may be heard, José Luis Huizar will move, and hereby moves, for an order suppressing privileged attorney-client communications and for a hearing where the government can show that all of the evidence it proposes to use, and all of its trial strategy, were derived from legitimate independent sources.

This motion is based on the attached memorandum and exhibits, the files and records in this case, and any other argument or evidence that the Court may consider.

Respectfully submitted,

CUAUHTÉMOC ORTEGA
Federal Public Defender

Dated: November 15, 2021        By        /s/ Carel Alé
                                          Carel Alé
                                          Charles J. Snyder
                                          Adam Olin
                                          Deputy Federal Public Defenders
                                          Attorneys for José Huizar

# **TABLE OF CONTENTS**

I. INTRODUCTION...................................................................................................1

II. Statement of facts ................................................................................................2

III. ARGUMENT ......................................................................................................4

    A. Applicable Law................................................................................................4

    B. A Joint-Client Relationship Existed With Regard to the PAC and Esparza and Goldman's Disclosures About Legal Advice Pertaining to the PAC Must Be Suppressed ........................................................................................................7

      1. A Joint-Client Relationship Was Established Between Huizar, Kim, Goldman, and Kaufman.................................................................................................7

      2. The June 29, 2017 and the June 2018 Calls Were Privileged Because the Joint Clients Sought and Received Confidential Legal Advice About the PAC ........8

      3. All of the Joint Clients Did Not Agree to Waive the Privilege .........................8

      4. Descriptions of the June 29, 2017 and June 2018 Calls Must Be Suppressed ...9

    C. Kaufman's Legal Invoices, and Esparza's Statements Regarding those Invoices, Are Privileged and Must Be Suppressed...........................................................9

    D. The Government Must Prove that the Evidence it Intends to Use at Trial Is Not Derived from Its Impermissible Review of Privileged Information................10

IV. CONCLUSION ................................................................................................13

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*F.D.I.C. v. Ogden Corp.*,
    202 F.3d 454 (1st Cir. 2000) ................................................................... 5, 7, 8, 9

*Griffith v. Davis*,
    161 F.R.D. 687 (C.D. Cal. 1995) .................................................................. 4, 8

*Hunt v. Blackburn*,
    128 U.S. 464 (1888) .......................................................................................... 4

*In re Grand Jury Witness*,
    695 F.2d 359 (9th Cir. 1982) ....................................................................... 9, 10

*In re Hotels Nevada, LLC*,
    458 B.R. 560 (Bankr. D. Nev. 2011) ............................................................. 4, 7

*In re Teleglobe Commc'ns Corp.*
    493 F.3d 345 (3d Cir. 2007) ...................................................................5, 7, 8, 9

*Ironwood Country Club v. Liberty Ins. Underwriters, Inc.*,
    No. EDCV1300996VAPDTBX, 2014 WL 12558790 (C.D. Cal. Mar. 24, 2014) ............... 9

*Kastigar v. United States*,
    406 U.S. 441 (1972) .......................................................................................... 6

*KD ex rel. Dieffenbach v. United States*,
    715 F. Supp. 2d 587 (D. Del. 2010) .................................................................. 4

*Matter of Grand Jury Subpoena Duces Tecum Dated Nov. 16, 1974*,
    406 F. Supp. 381 (S.D.N.Y. 1975) .................................................................... 5

*Silverthorne Lumber Co. v. United States*,
    251 U.S. 385 (1920) .......................................................................................... 6

*Sky Valley Ltd. Partnership v. ATX Sky Valley, Ltd.*,
    150 F.R.D. 648 (N.D. Cal. 1993) ...................................................................... 5

*SmithKline Beecham Corp. v. Apotex Corp.*,
    232 F.R.D. 467 (E.D. Pa. 2005) ........................................................................ 1

*United States v. BDO Seidman, LLP*,
    492 F.3d 806 (7th Cir. 2007) ............................................................................. 4

*United States v. Danielson*,
    325 F.3d 1054 (9th Cir. 2003) ............................................................... 6, 11, 12

*United States v. Haynes*,
   216 F.3d 789 (9th Cir. 2000) ................................................................................5

*United States v. Orman*,
   417 F. Supp. 1126 (D. Colo. 1976)................................................................6, 11

*United States v. Neill*,
   952 F. Supp. 834 (D.D.C. 1997).....................................................................11, 12

*United States v. Ramirez*,
   976 F.3d 946 (9th Cir. 2020) ..............................................................................11

*United States v. Richey*,
   632 F.3d 559 (9th Cir. 2011) .......................................................................4, 8, 9

*United States v. Ruehle*,
   583 F.3d 600 (9th Cir. 2009) ................................................................................4

*United States v. SDI Future Health, Inc.*,
   464 F. Supp. 2d 1027 (D. Nev. 2006)...................................................................5

*Upjohn Co. v. United States*,
   449 U.S. 383 (1981)..............................................................................................4

*Wong Sun v. United States*,
   371 U.S. 471 (1963).......................................................................................6, 11

**State Cases**

*Gruzen v. State*,
   267 Ark. 380 (1979).............................................................................................6

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Political campaigns are huge logistical operations. José Huizar's campaign team was no different. It consisted of attorneys, campaign managers, fundraising consultants, financial directors, treasurers, and the like. Stephen Kaufman was Huizar's longtime election law attorney. He is barred in California and is a "recognized authority in the field of campaign finance and election law [and] represents elected officials, candidates, PACs, labor unions, corporations, non-profit organizations, ballot measure campaigns, political parties, major donors, lobbying firms, and government agencies on a wide variety of campaign finance, election, and governmental ethics matters."[1]

Like a political campaign, a political action committee ("PAC") is a complex operation. When Huizar and fundraising consultants Morrie Goldman and Justin Kim sought to create a PAC, they turned to Kaufman for legal advice. Accordingly, Goldman, Kim, Huizar, and George Esparza (Huizar's assistant[2]) had many communications with Kaufman related to the creation and operation of what became "PAC A."

Though the Government understood that Kaufman was Huizar's attorney in Huizar's individual capacity and as a joint-client with regards to the PAC, it intruded on privileged communications to develop its case. The government did this by wiretapping a June 29, 2017 phone call where Kaufman gave Huizar, Esparza, Kim, and Goldman legal advice about forming a PAC and also by having Esparza and Goldman describe that privileged call to the government. The government further intruded on Huizar's attorney-

---

[1] *Our Team*, Kaufman Legal Group, http://kaufmanlegalgroup.com/stephen-j-kaufman/ (last visited Nov. 9, 2021).

[2] As a "Special Assistant," (ECF No. 74 ¶ 34), Esparza was Huizar's agent for purposes of the attorney-client privilege, *see SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 476–77 (E.D. Pa. 2005) ("Presence of a third-party, such as a consultant, does not destroy attorney-client privilege where that party is the client's agent or possesses a commonality of interest with the client."). Esparza was essentially Huizar's personal assistant; he drove Huizar to his meetings, managed his schedule, printed out emails, and traveled with him when necessary. (Ex. A (Goldman 302, Dec. 5, 2018) at Casino_0365053; *see generally* ECF No. 74.)

client privilege by asking Esparza to read invoices describing Kaufman's legal representation of Huizar; the invoices reflected the work Kaufman performed as part of the representation, even describing legal research topics. The government asked Esparza to read the invoices even though the government itself described the invoices *during the interview* as "MAY BE PRIVILEGED[.]" (Ex. B (Notes re Esparza Interview, June 6, 2019) at Casino_0364703) (emphasis in original).)

These communications and statements containing privileged communications and everything derived therefrom must be suppressed.[3]

## II.   STATEMENT OF FACTS

Sometime in 2017, Huizar and Goldman decided to form a political action committee. They retained Kaufman, Huizar's election law attorney, to advise them regarding the creation and operation of a PAC. (Ex. A at Casino_0365056; (Ex. C (Esparza 302, Dec. 12, 2018).) Goldman, Huizar, Esparza (Huizar's assistant), and Shawn Kuk (Huizar staffer) had multiple conversations with Kaufman about the PAC. (Ex. A at Casino_0365056.)

One such conversation occurred on June 29, 2017. On that date, Huizar, Goldman, Esparza, and Kim had a call with Kaufman to discuss the legal parameters and rules associated with forming and operating a PAC. (Ex. D (Linesheet,[4] June 29, 2017) at 1436–37; *id.* at 1439; *id.* at 1439–40.) The government described the conversation as

---

[3] Seven months have passed since the Government represented to the Court at the April 5, 2021 hearing that "99%" of the discovery it would rely on in its case-in-chief had been produced. (*See* ECF No. 172.) Carefully choosing its words, the government elected not to mention that the majority of *all* discovery—not just the discovery it intends to use for its case in chief—has yet to be produced. The defendants continue to wait. The Government has not even produced Huizar's own devices, including his cell phone or computers. Because Huizar cannot challenge the use of privileged materials that have not been disclosed, he reserves the right to seek suppression of further privileged materials as they come to light.

[4] A "Linesheet" is the government's contemporaneous transcription of a call reviewed pursuant to a wiretap.

2

"Conference call discussing the creation of a new PAC that Huizar will support." (*Id.* at 1434.)

In about June 2018, Kaufman reached out to Goldman and Charlie Shoemaker, the treasurer for the PAC who himself was also an attorney. (*Id.* at Casino_0365057.) Kaufman, Goldman, and Shoemaker discussed contributions to the PAC and legal advice related to what sorts of contribution requests would cross the line. (*Id.*)

Less than a year later, Goldman and Esparza disclosed Kaufman's legal advice regarding the PAC and Kaufman's individual representation of Huizar to the government. On December 5, 2018, Goldman met for the first time with the government. (Ex. A.) Under a section heading, "Political Action Committee," the 302 Report describes Goldman's disclosures to the government about Kaufman's legal advice pertaining to the formation and operation of the PAC. (*Id.* at Casino_0365056–57.)

During Esparza's June 6, 2019 interview with the government, Esparza told the government that he was copied on all of Kaufman's invoices to Huizar and that the invoices delineated Kaufman's legal advice to Huizar as well as Kaufman's legal research in relation to his representation of Huizar. (Ex. E (Esparza 302, June 6, 2019) at Casino_0364682.) After Esparza disclosed this, Assistant United States Attorney Veronica Dragalin advised Esparza to not expand on the information on the invoices provided by Kaufman for the time being. (*Id.* at Casino_0364683.) The government noted the privilege issue, describing Kaufman's legal advice to Huizar, and specifically the invoices, as "MAY BE PRIVILEGED - but GE copied on it" (Ex. B at Casino_364703.) Resolving the privilege issue in its mind, the government nonetheless later asked Esparza to discuss Kaufman's representation of Huizar. As the interview goes on, Esparza appears to review an email ("Email 22") containing an invoice from Kaufman describing his legal representation of Huizar. (Ex. E at Casino_0364689; *see also id.* at Casino_0364694–95 (reviewing "Email 58"); Ex. B at Casino_0364706; *id.* at Casino_0364708.) In fact, it describes the nature of the legal research as well.

The government at no point asked either Esparza or Goldman about the scope of Kaufman's representation.

### III. ARGUMENT

**A.     Applicable Law**

"The attorney-client privilege protects confidential communications between attorneys and clients, which are made for the purpose of giving legal advice."[5] *United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011). This privilege is critical to the fair administration of justice. "The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Such advice "can only be safely and readily availed of when free from the consequences or the apprehension of disclosure." *Hunt v. Blackburn*, 128 U.S. 464, 470 (1888).

In cases where two or more people are represented by the same attorney, the privilege remains. "Under the joint-client privilege, clients may jointly retain (or one client may retain for the joint benefit of others) an attorney as their common agent on a legal matter of common interest." *In re Hotels Nevada, LLC*, 458 B.R. 560, 570 (Bankr. D. Nev. 2011). In such an arrangement, "communications among joint clients and their counsel . . . are protected from disclosure to others." *Griffith v. Davis*, 161 F.R.D. 687, 693 (C.D. Cal. 1995); *see also* 1 McCormick On Evid. § 91.1 (8th ed.) ("When two or more persons, each having an interest in some problem, or situation, jointly consult an attorney, their confidential communications, though known to each other, will of course be privileged in a controversy of either or both of the clients with the outside world").

---

[5] Federal common law controls the privilege inquiry in a criminal case. *See United States v. Ruehle*, 583 F.3d 600, 608 (9th Cir. 2009). The concept of joint-client privilege exists within that body of law. *See, e.g.*, *United States v. BDO Seidman, LLP*, 492 F.3d 806 (7th Cir. 2007) (applying joint-client privilege in defeating an IRS subpoena). The federal courts may consider how state courts apply the privilege. *See, e.g.*, *KD ex rel. Dieffenbach v. United States*, 715 F. Supp. 2d 587, 592 (D. Del. 2010) ("A federal court may analogize to the state privilege and what a state court would do to guide the development of federal common law.").

"The principal purpose of the joint client privilege is . . . to encourage the fullest possible communication between joint clients—and between them and their joint lawyer—with respect to matters related to the joint representation." *Sky Valley Ltd. Partnership v. ATX Sky Valley, Ltd.*, 150 F.R.D. 648, 653 (N.D. Cal. 1993).

"Like single-client representation, nothing prevents joint representation from arising by implication." *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 362 (3d Cir. 2007). "[C]ourts may consider multiple factors, including but not limited to matters such as payment arrangements, allocation of decision-making roles, requests for advice, attendance at meetings, frequency and content of correspondence, and the like." *F.D.I.C. v. Ogden Corp.*, 202 F.3d 454, 461 (1st Cir. 2000); *see also In re Teleglobe*, 493 F.3d at 363 ("The keys to deciding the scope of a joint representation are the parties' intent and expectations, and so a district court should consider carefully (in addition to the content of the communications themselves) any testimony from the parties and their attorneys on those areas."). A finding of a joint-client relationship is supported when a putative client reasonably believes that such a relationship existed. *Ogden Corp.*, 202 F.3d at 463. "Thus, for example, where there is consultation among several clients and their jointly retained counsel, allied in a common legal cause, it may reasonably be inferred that resultant disclosures are intended to be insulated from exposure beyond the confines of the group; that inference, supported by a demonstration that the disclosures would not have been made but for the sake of securing, advancing, or supplying legal representation, will give sufficient force to a subsequent claim to the privilege." *Matter of Grand Jury Subpoena Duces Tecum Dated Nov. 16, 1974*, 406 F. Supp. 381, 386 (S.D.N.Y. 1975). The joint-client privilege, like the attorney-client privilege enjoyed by singular clients, is critical to allow fulsome communications and for the fair administration of justice. *See ATX Sky Valley, Ltd.*, 150 F.R.D. at 653.

Accordingly, suppression is the proper remedy when privileged communications of either kind are improperly obtained. *United States v. Haynes*, 216 F.3d 789, 803 (9th Cir. 2000); *United States v. SDI Future Health, Inc.*, 464 F. Supp. 2d 1027, 1047 (D.

Nev. 2006) ("The general remedy for violation of the attorney-client privilege is to suppress introduction of the privileged information at trial.").

"In [*Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920)], it was said that [] knowledge gained by the Government's own wrong [] cannot be used."[6] *Gruzen v. State*, 267 Ark. 380, 393 (1979). Thus, in addition to suppression, the Government must establish—at a hearing—that the evidence it intends to use at trial is not derived from its impermissible review of privileged information. *See Kastigar v. United States*, 406 U.S. 441, 453–54 (1972) (requiring the government to "affirmatively establish a legitimate source for the prosecution wholly independent" of compelled testimony); *see also Wong Sun v. United States*, 371 U.S. 471, 485 (1963) ("The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all.") (quoting *Silverthorne*, 251 U.S. at 392). "It is true that once the Government has improperly interfered with the attorney-client relationship . . . the prosecutor has the 'heavy burden' of showing non-use." *United States v. Danielson*, 325 F.3d 1054, 1072 (9th Cir. 2003) (internal quotations in original).

---

[6] "The basic concept of due process is fair play. The test of our system of legal jurisprudence should be measured by the interest we take in safeguarding the fundamental rights of an accused. A defendant is entitled to a fair determination of his guilt. Fair trials insure our concern with due process and contribute to what we believe is the proper administration of criminal justice. It is only in this way that we prevent the undermining and mockery of justice. The most fundamental of a reviewing court's duties is to see to it both that the end result in a case is just and correct and that the means utilized are fair and proper. Such is the essence of due process of law." *United States v. Orman*, 417 F. Supp. 1126, 1136 (D. Colo. 1976) (cleaned up).

## B. A Joint-Client Relationship Existed With Regard to the PAC and Esparza and Goldman's Disclosures About Legal Advice Pertaining to the PAC Must Be Suppressed

### 1. A Joint-Client Relationship Was Established Between Huizar, Kim, Goldman, and Kaufman

The evidence "points clearly and convincingly to a joint client relationship." *Ogden Corp.*, 202 F.3d at 463. As evidenced most clearly by the conversation itself, Huizar, Goldman, and Kim jointly sought Kaufman's legal advice about how to create and operate a PAC. (Ex. D at 1434 ("Conference call discussing the creation of a new PAC that Huizar will support."); *id.* at 1436–37; (Ex. B); *see In re Teleglobe*, 493 F.3d at 363 ("a district court should consider carefully . . . the content of the communications"). Their inquiries to Kaufman and stated concerns all demonstrate that they intended and believed that they had "jointly retain[ed] . . . [Kaufman] as their common agent on a legal matter of common interest."[7] *In re Hotels Nevada*, 458 B.R. at 570. *See Ogden Corp.*, 202 F.3d at 463 ("[T]he correspondence evinces a coordinated legal strategy sufficient to lead a reasonable person standing in [Huizar's] shoes to infer that [Kaufman] had become [their] attorney"). (*See, e.g.*, Ex. D at 1437.)

Other communications, too, support that the parties intended to form a joint-client relationship. For example, a few weeks earlier, on May 31, 2017, Goldman and Esparza discussed their need to seek counsel from Kaufman: "you and I need to go meet with Kaufman. We need to discuss the structure [of the PAC]." (Ex. F (Linesheet, May 31, 2017) at 1095.) *See Ogden Corp.*, 202 F.3d at 461 (joint-client relationship exists where clients "cooperat[e] in fact toward the achievement of a common objective"). And, eventually, Goldman became a "principal officer" of the PAC, (ECF No. 74 ¶ 34), further

---

[7] Alternatively, at a minimum, Huizar may have "retain[ed] [Kaufman] for the joint benefit of [himself, Goldman, and Kim] . . . as their common agent on a legal matter of common interest." *In re Hotels Nevada,* 458 B.R. at 570. The analysis remains the same.

7

supporting that he intended to obtain legal advice regarding the PAC's formation during that June 29, 2017 call.

In sum, the circumstances and the parties' conduct indicate a joint-client relationship was created.

### 2. The June 29, 2017 and the June 2018 Calls Were Privileged Because the Joint Clients Sought and Received Confidential Legal Advice About the PAC

The June 29, 2017 and the June 2018 calls were privileged. The purpose of the calls was to obtain legal advice, and it was made in confidence. *Richey*, 632 F.3d at 566 ("privilege exists where [] legal advice of any kind is sought [] from a professional adviser in his capacity as such, [and is] made in confidence"). During the June 29, 2017 call, the joint clients were requesting and receiving legal advice and their statements indicate their belief they were the only persons on the call. (*See* Ex. D at 1436); *Griffith*, 161 F.R.D. at 695 ("The decisive inquiry is whether the client reasonably understood the conference to be confidential.") (internal quotations omitted). Similarly, Goldman's June 2018 call with Kaufman and Shoemaker described legal advice pertaining to the PAC. (Ex. A at Casino_0365057.)

These were privileged communications protected by the joint-client privilege.

### 3. All of the Joint Clients Did Not Agree to Waive the Privilege

"[W]aiving the joint-client privilege requires the consent of all joint clients." *In re Teleglobe*, 493 F.3d at 363; *see also Ogden Corp.*, 202 F.3d at 463 ("A joint attorney-client relationship remains intact until it is expressly terminated or until circumstances arise that readily imply *to all the joint clients* that the relationship is over.") (emphasis in original). Accordingly, one joint client cannot "unilaterally waive the privilege as to any of the other joint clients' communications or as to any of its communications that relate to the other joint clients." *In re Teleglobe*, 493 F.3d at 363. Nor can an agent of a client unilaterally waive the privilege. *Nat'l Sec. Couns.*, 969 F.3d at 411–12.

The government has never claimed that Huizar waived his privilege as to Kaufman's legal representation concerning the PAC. But in several interviews with the Government, both Esparza and Goldman unlawfully recounted privileged communications and the government accepted the information without appearing to even inquire about the scope of representation or a waiver. Further, Esparza, as Huizar's agent, could not unilaterally waive on Huizar's behalf.

### 4. Descriptions of the June 29, 2017 and June 2018 Calls Must Be Suppressed

The June 29, 2017 and June 2018 calls are "permanently protected" unless "the protection [is] waived." *Richey*, 632 F.3d at 566; *see also Ogden Corp.*, 202 F.3d at 463 ("A joint attorney-client relationship remains intact until it is expressly terminated or until circumstances arise that readily imply *to all the joint clients* that the relationship is over.")

Here, both Esparza and Goldman described the June 29, 2017 call and Goldman described the June 2018 call to the Government without consent of all the joint clients. (Ex. C at Casino_0364457; Ex. A at Casino_0365056.). Esparza and Goldman unlawfully disclosed privileged communications; thus, their statements about Kaufman's legal representation, and everything derived therefrom, must be suppressed. *See In re Teleglobe*, 493 F.3d at 363 (explaining that one joint client cannot "unilaterally waive the privilege as to any of the other joint clients' communications or as to any of its communications that relate to the other joint clients").

## C. Kaufman's Legal Invoices, and Esparza's Statements Regarding those Invoices, Are Privileged and Must Be Suppressed

"[B]ills, ledgers, statements, time records and the like which also reveal the nature of the services provided, such as researching particular areas of law, [] fall within the privilege." *In re Grand Jury Witness*, 695 F.2d 359, 362 (9th Cir. 1982); *see also Ironwood Country Club v. Liberty Ins. Underwriters, Inc.*, No. EDCV1300996VAPDTBX, 2014 WL 12558790, at *8 (C.D. Cal. Mar. 24, 2014) ("Here,

the invoices . . . included detailed descriptions of the legal issues [the attorney] researched . . . Thus, the [invoices] are confidential communications").

Since at least 2012, Kaufman had been Huizar's election law attorney. But when, on June 6, 2019, the Government interviewed Esparza it allowed him to describe—and read verbatim—invoices sent from Kaufman to Huizar. (Ex. B.) Those invoices "revealed," *inter alia*, that Kaufman "research[ed] particular areas of law." *In re Grand Jury Witness*, 695 F.2d at 362. For example, "email 58" included legal bills from Kaufman for research pertaining to a particular legal area. (*Id.*) Again, "email 22" included invoices from Kaufman for research on another legal matter. (*Id.*) These were clearly invoices pertaining to legal representation of Huizar and the government was well aware of the privilege issue. In the government's notes it wrote: "MAY BE PRIVILEGED - but GE copied." (*Id.* at Casino_364703.) The government's notes show a clear misunderstanding of attorney-client privilege law; they appear to assume that because Esparza was copied on the invoice, Huizar had waived attorney-client privilege. The government should have known that Esparza, as Huizar's assistant and agent, could not unilaterally waive the privilege, and had no legal right to disclose those invoices. *Nat'l Sec. Couns.*, 969 F.3d at 411–12.

The government cannot circumvent attorney-client privilege by having Huizar's assistant read privileged communications to them. The invoices, Esparza's statements regarding the invoices, and everything derived from the invoices and statements, must be suppressed.

**D.  The Government Must Prove that the Evidence it Intends to Use at Trial Is Not Derived from Its Impermissible Review of Privileged Information**

Where, as here, the government "acted affirmatively to intrude into the attorney-client relationship and thereby to obtain the privileged information," "the burden shifts to the Government" to show that "all of the evidence it proposes to use, and all of its trial

strategy, were derived from legitimate independent sources."[8] *Danielson*, 325 F.3d at 1071, 72 (cleaned up); *see also United States v. Neill*, 952 F. Supp. 834, 840 (D.D.C. 1997) ("an intrusion may result in a constitutional violation if [attorney-client] privileged information is intentionally obtained and used to the defendant's detriment at trial"). "Strategy in this context is a broad term that includes, but is not limited to, such things as decisions about the scope and nature of the investigation, about what witnesses to call (and in what order), about what questions to ask (and in what order), about what lines of defense to anticipate in presenting the case in chief, and about what to save for possible rebuttal." *Danielson*, 325 F.3d at 1074.

Here, the government intruded into the attorney-client relationship, knew it was doing so, and relied on those privileged communications to build its case. The government knew that Kaufman was an attorney, and the nature of the June 29, 2017 conversation clearly evidences Kaufman is dispensing legal advice. Similarly, the government knew Kaufman's invoices were privileged—early in that interview with Esparza, "AUSA Dragalin advised Esparza to refrain from expanding on any information related to invoices provided by Kaufman." (Ex. E at Casino_0364683; Ex. E at Casino_364703. ("MAY BE PRIVILEGED - but GE copied.").) But shortly thereafter, Esparza was asked to read from the invoices. (Ex. E at Casino_0364689, 94–95.); *see*

---

[8] Any intrusion into attorney-client privileged communications can constitute a Sixth Amendment violation of a defendant's right to counsel, even during the investigatory phase. *United States v. Orman*, 417 F. Supp. 1126, 1136 (D. Colo. 1976) (holding that a Sixth Amendment violation occurs when the government "(1) gains information, (2) relating to a charge then pending or being investigated, (3) from overhearing conversations by counsel expected to be confidential, and (4) the information is divulged before or during trial on that charge to the counsel handling the prosecution of that charge") (citation omitted). Similarly, an unlawful Fourth Amendment search occurs when the Government exceeds the scope of a wiretap, *see United States v. Ramirez*, 976 F.3d 946, 952 (9th Cir. 2020) ("[A] search or seizure pursuant to an otherwise valid warrant is unreasonable under the Fourth Amendment to the extent it exceeds the scope of that warrant), meaning evidence derived therefrom would be excluded as fruit of the poisonous tree, *Wong Sun*, 371 U.S. at 484–87.

*Neill*, 952 F. Supp. at 840 ("These intrusions were not accidental; they were deliberate and intentional.").

The government's intrusion impacted the government's investigation. For example, one of the research topics in the invoice appears to reference the alleged LA Grand Hotel scheme. (Ex. E at Casino 0364682.) Additionally, the government prepared an outline to interview Goldman based on information gleaned from the June 29, 2017 call. (Ex. G (Outline re Goldman Interview, Dec. 5, 2018) at Casino 0365064–65.) The outline shows that the government prepared to ask Goldman at his interview about the PACs formation and Kaufman's representation. (*Id.*) And Overt Act 340 appears to reference the June 29, 2017 call: "In or around May 2017, [] Huizar, [] Esparza, [] Goldman, and [Kim] agreed to establish a PAC . . . primarily intended to benefit Richelle Huizar's campaign." Several other allegations in the First Superseding Indictment appear similarly related to the privileged call. (*See, e.g.*, ECF No. 74 ¶¶ 34, 42(d); Overt Acts 193, 340, 343, 344). There may also be other privileged calls that the Government relied on which have yet to come to light. (*See* Ex. A at Casino_0365057 (describing that the joint-clients "had *multiple* conversations with Kaufman about the PAC") (emphasis added). The government's review of privileged communications was "used to [Huizar's] detriment." *Neill*, 952 F. Supp. at 841. Only a hearing will reveal the extent to which the Government relied on privileged communications.

Accordingly, a hearing should be held where the government is required to show that "all of the evidence it proposes to use, and all of its trial strategy, were derived from legitimate independent sources." *Danielson*, 325 F.3d at 1072.

//
//
//
//

## IV. CONCLUSION

For the foregoing reasons, Mr. Huizar respectfully requests that the Court suppress at trial all privileged communications with Kaufman and hold a hearing for the government to show that all of the evidence it proposes to use, and all of its trial strategy, were derived from legitimate independent sources.

Respectfully submitted,

CUAUHTÉMOC ORTEGA
Federal Public Defender

Dated: November 15, 2021   By   /s/ Carel Alé
Carel Alé
Charles J. Snyder
Adam Olin
Deputy Federal Public Defenders
Attorneys for José Huizar