# EXHIBIT 2

AO 106 (Rev. 04/10) Application for a Search Warrant (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

FILED
CLERK, U.S. DISTRICT COURT
JUL - 1 2016
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Information associated with account identified as Jose███████.net that is stored at premises controlled by Yahoo, Inc. Sunnyvale, CA 94089.

Case No.

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the ___Northern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

Code Section(s)                    Offense Description
                                   See attached Affidavit

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

_____
*Applicant's signature*

FBI SA ANDREW CIVETTI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7-1-16

_____
*Judge's signature*

City and state: Los Angeles, California

Alicia G. Rosenberg, U.S. Magistrate Judge
*Printed name and title*

AUSA: D. Miller 213-894-2216

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

This warrant applies to information associated with the account identified as Jose███████████.net and believed to be used by JOSE HUIZAR that is stored at premises controlled by Yahoo!, Inc., a company that accepts service of legal process at its headquarters located in Sunnyvale, California.

SUBJECT TO PROTECTIVE ORDER – Sensitive Materials

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

## I.  SEARCH PROCEDURE

1.  The search warrant will be presented to personnel of Yahoo!,Inc. (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.  To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.  The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the agent who serves the search warrant.

4.  With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  In conducting this search, the search team shall take notes regarding how it conducts the search.

5.  If the search team encounters immediately apparent contraband or other evidence of a crime outside the scope of the

i

items to be seized, the team shall immediately discontinue its search pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

6.    The search team will complete its search of the content records as soon as is practicable but not to exceed 60 days from the date of receipt from the PROVIDER of the response to this warrant.  If additional time is needed, the government may seek an extension of this time period from the Court within the original 60-day period.

7.    Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court.  Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.    The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.    Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

ii

## II.  INFORMATION TO BE DISCLOSED BY THE PROVIDER

10.  To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.  All contents of all wire and electronic communications associated with the SUBJECT ACCOUNT, limited to that which occurred on or after April 1, 2013, including:

i.  All e-mails, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including stored or preserved copies of messages sent to and from the account, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each e-mail or message, and any related documents or attachments.

ii.  All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures or photos, videos, notes, texts, links, user profiles, account settings, access logs, and files.

iii. All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken.

iii

b.   All other records and information, including:

i.   All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT described above in Section II.10.a, including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations.

ii.  All subscriber information pertaining to the SUBJECT ACCOUNT, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), other account names or e-mail addresses associated with the account, telephone numbers, physical addresses, and other identifying information regarding the subscriber, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records.

iii. Any information showing the location of the user of a SUBJECT ACCOUNT, including while sending or receiving a message using a SUBJECT ACCOUNT or accessing or logged into a SUBJECT ACCOUNT.

III. <u>INFORMATION TO BE SEIZED BY THE GOVERNMENT</u>

11.  For each SUBJECT ACCOUNT listed in Attachment A, the search team may seize:

a.   All information described above in Section II.10.a that constitutes evidence, contraband, fruits, or

iv

instrumentalities of violations of 18 U.S.C. §§ 371
(Conspiracy), 666 (Bribery and Kickbacks Concerning Federal
Funds), 1341, 1343, and 1346 (Deprivation of Honest Services),
1951 (Extortion), and 1956 (Money Laundering), and 31 U.S.C. §
5324(a)(3) (Structuring a Financial Transaction to Evade a
Reporting Obligation), those violations involving JOSE HUIZAR,
WEI HUANG, RICKY ZHENG, GEORGE ESPARZA, and RAYMOND CHAN
occurring after April 1, 2013, namely:

   i. Information relating to who created,
accessed, or used the SUBJECT ACCOUNT, including records about
their identities and whereabouts.

   ii. All records relating WEI HUANG, RICKY ZHENG,
GEORGE ESPARZA, RAYMOND CHAN, SHENZHEN NEW WORLD GROUP, SHENZHEN
NEW WORLD INVESTMENT, INC., and the LA Hotel Downtown.

   iii. All records relating to Las Vegas, including
any receipts, reservation confirmations, flight itineraries,
photographs, and bank records relating to Southwest Airlines,
the Palazzo, Caesar's Palace, the Wynne, and the Cosmopolitan.

   iv. All financial records, including those
relating JOSE HUIZAR, his mother, Isidra Huizar, and his
brother, Salvador Huizar, and their respective bank accounts
ending in #0843, #2634, and #3900.

   b. All records and information described above in
Sections II.10.a and II.10.b.

v

## IV.   <u>PROVIDER PROCEDURES</u>

12.   IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.   The PROVIDER shall send such information to:

SA Andrew Civetti



13.   IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant. IT IS FURTHER ORDERED that the PROVIDER shall not notify any person, including the subscriber(s) of each account identified in Attachment A, of the existence of the warrant.

SUBJECT TO PROTECTIVE ORDER – Sensitive Materials                 Casino_0358065

# EXHIBIT  A

Casino_0358066



Confidential Treatment Requested by Las Vegas Sands Corp.

LVSC-HUIZAR-S1-001831

Casino_0358067



Confidential Treatment Requested by Las Vegas Sands Corp.

LVSC-HUIZAR-S1-001832



Confidential Treatment Requested by Las Vegas Sands Corp.

LVSC-HUIZAR-S1-001833



Confidential Treatment Requested by Las Vegas Sands Corp.

LVSC-HUIZAR-S1-001834



Confidential Treatment Requested by Las Vegas Sands Corp.

LVSC-HUIZAR-S1-001835

Casino_0358071



Confidential Treatment Requested by Las Vegas Sands Corp.

LVSC-HUIZAR-S1-001836



Confidential Treatment Requested by Las Vegas Sands Corp.

LVSC-HUIZAR-S1-001837

# EXHIBIT  B

Casino_0358074



Confidential Treatment Requested by Las Vegas Sands Corp.  LVSC-HUIZAR-S1-001839

Casino_0358075



Confidential Treatment Requested by Las Vegas Sands Corp                                    LVSC HUIZAR S1 001838

# EXHIBIT  C

Casino_0358077

*SUBJECT TO PROTECTIVE ORDER – Sensitive Materials*
Case 2:20-cr-00326-JFW   Document 307-3   Filed 12/16/21   Page 22 of 63   Page ID #:7472

Page 1 of 1



https://c2.staticflickr.com/8/7318/16337389717_ec782154c8_b.jpg                6/30/2016

SUBJECT TO PROTECTIVE ORDER – Sensitive Materials                Casino_0358078

*SUBJECT TO PROTECTIVE ORDER – Sensitive Materials



https://planefinder.net/images/5983902:Photo:682144.jpg

6/30/2016



Confidential Treatment Requested by Las Vegas Sands Corp

LVSC-HUIZAR-SI-001827

Casino_0358080



Confidential Treatment Requested by Las Vegas Sands Corp

I VSC-HUIZAR-S1-001828



Confidential Treatment Requested by Las Vegas Sands Corp

LVSC-HUIZAR-S1-001829



Confidential Treatment Requested by Las Vegas Sands Corp.

LVSC-HUIZAR-S1-001830

## AFFIDAVIT

I, Andrew Civetti, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed for approximately nine months.  I am currently assigned to the Public Corruption Squad, where I specialize in the investigation of corrupt public officials, including bribery, fraud against the government, extortion, and money laundering.  In addition, I have received training in the investigation of public corruption and other white collar crimes.

2.   I make this affidavit in support of an application for a search warrant for information associated with the account identified as Jose█████████████.net and believed to be used by JOSE HUIZAR (the "SUBJECT ACCOUNT") that is stored at premises controlled by Yahoo!, Inc. (the "PROVIDER"), a provider of electronic communication and remote computing services, headquartered at Sunnyvale, California.[1]  The information to be

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in
(footnote cont'd on next page)

searched is described in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require the PROVIDER to disclose to the government copies of the information (including the content of communications) described in Section II of Attachment B.  Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B.  Attachments A and B are incorporated herein by reference.

3.  As described more fully below, I respectfully submit there is probable cause to believe that the information associated with the SUBJECT ACCOUNT constitutes evidence, contraband, fruits, or instrumentalities of criminal violations

---

which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

[2] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d).  To obtain the basic subscriber information, which do not contain content, the government needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To obtain additional records and other information--but not content-- pertaining to subscribers of an electronic communications service or remote computing service, the government must comply with the dictates of section 2703(c)(1)(B), which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The requested warrant calls for both records containing content (see Attachment B paragraph 11.10.a) as well as subscriber records and other records and information that do not contain content (see Attachment B paragraph II.10.b).

2

of 18 U.S.C. §§ 371 (Conspiracy), 666 (Bribery and Kickbacks

Concerning Federal Funds), 1341, 1343, and 1346 (Deprivation of

Honest Services), 1951 (Extortion), and 1956 (Money Laundering),

and 31 U.S.C. § 5324(a)(3) (Structuring a Financial Transaction

to Evade a Reporting Obligation).

4.     The facts set forth in this affidavit are based upon

my personal observations, my training and experience, and

information obtained from other agents and witnesses.  This

affidavit is intended to show merely that there is sufficient

probable cause for the requested warrant and does not purport to

set forth all of my knowledge of or investigation into this

matter.  Unless specifically indicated otherwise, all

conversations and statements described in this affidavit are

related in substance and in part only.

## II.   SUMMARY OF THE INVESTIGATION

5.     The FBI is currently investigating JOSE HUIZAR, a

sitting member of the Los Angeles City Council since 2005, for

soliciting and accepting bribes and kickbacks from WEI HUANG,

the President and Chairman of SHENZHEN NEW WORLD GROUP, a

Chinese-based real estate development company, and from RICKY

ZHENG, the company's Executive Director.  The bribes and

kickbacks include gambling chips at Las Vegas casinos, many of

which JOSE HUIZAR has converted to cash.  SHENZHEN NEW WORLD

GROUP owns and operates "the LA Hotel Downtown" in JOSE HUIZAR's

District 14.  As set forth below, the SUBJECT ACCOUNT has been

identified as a private e-mail account JOSE HUIZAR used to

3

arrange flights to and from Las Vegas, as well as to communicate with his Special Assistant at the City Council, GEORGE ESPARZA, someone who accompanied JOSE HUIZAR on at least one of his 2014 trips to Las Vegas with WEI HUANG and RICKY ZHENG, and where GEORGE ESPARZA witnessed WEI HUANG sharing casino chips with JOSE HUIZAR.

6.      The FBI's investigation began after the FBI received information from the Las Vegas Sands Corporation (owners of the Palazzo Hotel in Las Vegas) that JOSE HUIZAR had been a frequent guest of WEI HUANG at its Palazzo Hotel and had received approximately $79,000 in chips from WEI HUANG during his gaming activities.  JOSE HUIZAR eventually cashed out approximately $36,500 of the chips provided to him by WEI HUANG and failed to report any of it, either as income or as a gift, on his California Form 700 (Statement of Economic Interests).  The FBI has reviewed surveillance footage and hotel records provided by the Palazzo showing (1) JOSE HUIZAR, GEORGE ESPARZA, WEI HUANG, and RICKY ZHENG gambling together at the hotel, (2) JOSE HUIZAR cashing out thousands of dollars in chips that he did not purchase, and (3) JOSE HUIZAR and GEORGE ESPARZA traveling with WEI HUANG and RICKY ZHENG on the hotel's private jet.

7.      The trips to the Palazzo took place between June 2014 and July 2015.  I have reviewed bank records belonging to JOSE HUIZAR and several of his close family members and friends during this timeframe.  The bank records reveal that on several occasions JOSE HUIZAR's close family members made large cash deposits into their personal bank accounts around the time of

4

SUBJECT TO PROTECTIVE ORDER – Sensitive Materials                    Casino_0358087

JOSE HUIZAR's trips with WEI HUANG and RICKY ZHENG, and then used the proceeds from those same bank accounts to pay JOSE HUIZAR's credit card bills and to write checks to JOSE HUIZAR in large amounts (e.g., $10,000).  In other words, there is probable cause to believe that JOSE HUIZAR has used his close family member's bank accounts to launder bribe payments that he received from WEI HUANG and RICKY ZHENG.

8.    I have also reviewed currency transaction reports generated by other casinos in Las Vegas, as well as flight records provided by Southwest Airlines, and although the FBI is still waiting to receive additional records from the casinos, together they indicate that WEI HUANG and JOSE HUIZAR have continued to take trips to Las Vegas together and have done so right up until May 2016, the date of the most recent flight records obtained by the FBI.  In fact, between April 2016 and May 2016 alone, records indicate that JOSE HUIZAR traveled to Las Vegas on three separate occasions and that he did so during the same time that WEI HUANG was known to have taken out close to $1 million in chips at the Cosmopolitan, Caesar's Palace, and the Wynn casinos.

9.    However, it remains unclear what official acts JOSE HUIZAR has taken in exchange for the bribe and kickbacks payments he received from WEI HUANG.  I have reviewed many of the development projects in JOSE HUIZAR's District 14 in order to determine the influence JOSE HUIZAR had as a public official over WEI HUANG, RICKY ZHENG, SHENZHEN NEW WORLD GROUP, and the LA Hotel Downtown.  According to JOSE HUIZAR's website

5

(www.josehuizar.com) and several news articles written by the media, JOSE HUIZAR is the Chair of the City's Planning and Land Use Management (or "PLUM") Committee and has been at the forefront of expanding hotel and hospitality service in downtown Los Angeles.[3]  There have been a series of mixed-use mega developments in the pipeline for downtown Los Angeles, and several of these developments are owned by Chinese-based companies, including SHENZHEN NEW WORLD INVESTMENT INC., the subsidiary of SHENZHEN NEW WORLD GROUP, the entity used to purchase the LA Hotel Downtown.  Accordingly, SHENZHEN NEW WORLD INVESTMENT INC. appears poised to benefit financially if the rapid expansion of downtown Los Angeles hotel and hospitality service continues.

10.  As Chairman of the PLUM Committee, JOSE HUIZAR also worked closely with RAYMOND CHAN, the former General Manager of the Los Angeles Department of Building and Safety ("LADBS"). LADBS has jurisdiction over the LA Hotel Downtown and has received several complaints, which I have reviewed, about the hotel between 2013 and 2015 through its Code Enforcement Bureau,

---

[3] As set forth below, the PLUM Committee has extensive influence over the zoning in downtown Los Angeles.  In fact, according to JOSE HUIZAR's website, he has undertaken an initiative as the Chairman of the PLUM Committee to overhaul the City of Los Angeles' ("the City") entire zoning guidelines.  See infra ¶ 24.  According to websites I have reviewed (lacity.org and www.lafla.org/pdf/PublicParticipation_ ENGLISH.pdf), the Los Angeles City Council holds public hearings on certain real estate developments that affect the City's general plan for development.  These hearings will typically take place before the PLUM committee, which will make a recommendation.  Following that hearing, there will be a vote before the full Council regarding whether to amend the general plan.

6

including what one complainant described as a "serious violation" relating to the safety of lighting fixtures being used to remodel the hotel. All of these complaints are listed as being closed out (i.e., completely resolved), yet LA City Investigator #1, someone who worked inside LADBS, has reported that some of those complaints were closed out before the proper permits had been issued.

11. According to LA City Investigator #1, who has provided reliable information to the FBI in the past, an employee at LADBS once told LA City Investigator #1 that the LA Hotel Downtown (owned by WEI HAUNG) often received complaints about its hotel and the treatment of its employees, but those complaints never went anywhere because the owner of the hotel was "friends" with RAYMOND CHAN. This is corroborated by toll records, which show that between June 1, 2014 and August 7, 2015, around the time the last of these complaints was closed out, RAYMOND CHAN exchanged 303 calls and 225 text messages with RICKY ZHENG, the Executive Director of SHENZHEN NEW WORLD GROUP.

12. RAYMOND CHAN's contact with RICKY ZHENG and WEI HUANG is likely going to increase, because on May 27, 2016, Los Angeles Mayor Eric Garcetti appointed RAYMOND CHAN to become an Interim Deputy Mayor for Economic Development, including leading efforts to create jobs, attract investment, and make the city more business-friendly. This will likely involve WEI HUANG, who has already made substantial economic investments in Los Angeles. Indeed, on April 23, 2014, shortly before their first known trips to Las Vegas together, JOSE HUIZAR introduced a

7

resolution before the Los Angeles City Council recognizing WEI HUANG for his achievements and contributions to the Economy of District 14, a resolution the Los Angeles City Council ultimately adopted.

13. I have also reviewed toll records for the cellular telephone accounts belonging to JOSE HUIZAR, GEORGE ESPARZA, WEI HUANG, and RICKY ZHENG. In summary, between June 2014 (around the time of JOSE HUIZAR's and WEI HUANG's first known trip to the Palazzo together) and August 2015 (around the time of what is believed to be their last known trip to the Palazzo together), JOSE HUIZAR exchanged approximately 7 calls with WEI HUANG and approximately 143 calls with RICKY ZHENG, including 6 on March 14, 2014, the day JOSE HUIZAR, WEI HUANG, and RICKY ZHENG were in Las Vegas together and the same day JOSE HUIZAR cashed out approximately $20,000 in chips that he did not purchase. The toll records further show that RICKY ZHENG was in almost constant contact with JOSE HUIZAR's Special Assistant, GEORGE ESPARZA, and former LADBS General Manager, RAYMOND CHAN, during this time period. In fact, GEORGE ESPARZA and RAYMOND CHAN were among the top five people RICKY ZHENG, who is a businessman and not a public official, texted during this time period.

## III. <u>PRESERVATION REQUESTS</u>

On or about November 9, 2015, March 3, 2016 and June 8, 2016, the FBI sent the PROVIDER a preservation letter requesting that information associated with the SUBJECT ACCOUNT be

8

preserved for 90 days pursuant to 18 U.S.C. § 2703(f).  Other than what has been described herein, to my knowledge the United States has not attempted to obtain the contents of the SUBJECT ACCOUNT by other means.

## IV.  STATEMENT OF PROBABLE CAUSE

JOSE HUIZAR

14.  On or about June 16, 2016, I reviewed the website www.josehuizar.com and learned, among other things, the following about JOSE HUIZAR:

a.    JOSE HUIZAR was first elected to the Los Angeles City Council's District 14 in 2005 and was overwhelmingly re-elected in 2007, 2011, and in what will be his final term, 2015.[4]

b.    JOSE HUIZAR received a Bachelor of Arts degree from the University of California, Berkley, a Master's Degree in Public Affairs and Urban Planning from Princeton University, and a Juris Doctorate from UCLA School of Law.

c.    Prior to joining the City Council, JOSE HUIZAR served as a member and President of the Los Angeles Unified School District's Board of Education.  He is married to Richelle Rios with whom he has four children.

d.    JOSE HUIZAR currently serves as Chair of the Planning & Land Use Management (PLUM) committee, where he is working directly with the City's Planning Department to overhaul

---

[4] On or about June 23, 2016, I confirmed that the City of Los Angeles received more than $10,000 per fiscal year in funds from the United States in 2013, 2014, 2015 and 2016._____

9

the City's zoning code guidelines.  JOSE HUIZAR has been at the forefront of expanding hotel and hospitality service in downtown Los Angeles and has worked closely with various entities to promote and encourage new businesses to open in downtown Los Angeles.

WEI HUANG, RICKY ZHENG & SHENZHEN NEW WORLD GROUP

15.  On or about June 16, 2016, I reviewed the website www.culturalnews.com, as well as law enforcement databases, and learned, among other things, the following about WEI HUANG, RICKY ZHENG, and SHENZHEN NEW WORLD GROUP:

a.   WEI HUANG is the Chairman and President of SHENZHEN NEW WORLD GROUP, one of China's most influential development companies.

b.   RICKY ZHENG is the Executive Director of SHENZHEN NEW WORLD GROUP.

c.   SHENZHEN NEW WORLD COMPANY is headquartered in Shenzhen China and is a multi-faceted, privately-held enterprise specializing in commercial and real estate development.  Under the name of SHENZHEN NEW WORLD GROUP, the company has holdings in hotels, retail, information technology, trade, newspaper publishing and restaurants.  During the past decade, it has invested more than $1.42 billion in projects worldwide.

d.   In or about March 2010, SHENZHEN NEW WORLD COMPANY purchased the Marriott Downtown Los Angeles, a 469-room

10

hotel located in downtown Los Angeles (District 14) for $90 million, which it operates as the LA Hotel Downtown.[5]

THE TRIPS TO THE PALAZZO IN LAS VEGAS

16.  On or about July 20, 2015, Jonathan Solomon, a Senior Vice President and Global Chief Compliance Officer for the Las Vegas Sands Corporation, contacted the FBI's Los Angeles Field Office to report suspicious activity between JOSE HUIZAR and WEI HUANG at the Palazzo Hotel ("the Palazzo").

17.  On or about September 2, 2015, FBI Special Agent Teresa Tampubolon traveled to Las Vegas, Nevada to meet with Mr. Solomon and to review gambling records and surveillance footage from the Palazzo.  Special Agent Teresa Tampubolon also participated in several interviews of employees who worked at the Palazzo and at the Las Vegas Sands Corporation.  During her trip Special Agent Teresa Tampubolon learned, among other things, the following:

a.  According to Jonathan Bell, the Vice President of Cage and Credit Operations at the hotel, WEI HUANG made a total of five trips to the Palazzo between June 2014 and September 2015:

| # | ARRIVAL | DEPARTURE |
|---|---------|-----------|
| 1 | 6/14/14 | 6/15/14 |

---

[5] Based on my training and experience, I know that hotels of this size operate in interstate commerce.  For example, the LA Hotel Downtown offers its rooms to international and out-of-state travelers on websites such as Priceline and boasts having a restaurant, bar, and gift shop, which I know are often stocked with items purchased internationally and from out-of-state.

| 2 | 8/24/14 | 8/25/14 |
| 3 | 3/13/15 | 3/14/15 |
| 4 | 3/28/15 | 3/30/15 |
| 5 | 7/7/15 | 7/8/15 |

All of WEI HUANG's trips to the hotel overlapped with JOSE HUIZAR's presence and/or gaming activity at the hotel. WEI HUANG reserved for each of these trips what the hotel described as a "Presidential Suite," a luxurious room that the hotel estimated to cost approximately $7,000 per night. The suite, which is almost 7,000 square feet in size, can include amenities such as personalized butler service for the guests. It can also be given as a "comp" to high-end players such as WEI HUANG because of how much money they spend on gambling at the Palazzo. See Ex. A.[6]

     b. According to hotel records, WEI HUANG has received comps valuing $6,025,246 from the Palazzo and has lost approximately $12,964,555 gambling there. As a result, WEI HUANG was permitted to gamble in high-end areas of the Palazzo such as the "Paiza Club," a gambling area located on the 50th floor of the hotel that is accessible only to players who have

---

    [6] In addition to the trip information provided to Special Agent Tampubolon by Jonathan Bell, I determined through my own review of flight and hotel records there was an additional trip to Las Vegas from June 7, 2014 to June 8, 2014, because Southwest Airline travel records show JOSE HUIZAR traveled on those dates to and from Las Vegas and that his trip overlapped with a time period when WEI HUANG was known to be in Las Vegas.

12

Casino_0358095

$300,000 in front money or credit at the Palazzo.  See Ex. B.
Although there are no records indicating whether JOSE HUIZAR
stayed in the Presidential Suite reserved by WEI HUANG on the
same nights he was engaged in gaming activities at the hotel, no
rooms were separately reserved at the hotel under JOSE HUIZAR's
name during his five visits to the Palazzo.

      c.   Moreover, on three of the five trips, JOSE HUIZAR
flew with WEI HUANG on the hotel's private jet.  See Ex. C.  The
first time, JOSE HUIZAR and his wife accompanied WEI HUANG on a
returning flight from Las Vegas to Los Angeles.  The second
time, JOSE HUIZAR accompanied WEI HUANG on a returning flight
from Las Vegas to Los Angeles.  The third time, JOSE HUIZAR and
GEORGE ESPARZA, JOSE HUIZAR's Special Assistant at the City
Council, accompanied WEI HUANG on the hotel's private jet to and
from Las Vegas.

      d.   Mr. Bell reviewed the hotel's gambling records
and determined that over the course of the five trips, JOSE
HUIZAR's net chip "buy-in" was approximately $79,100, which
represents the value of the chips he used in connection with his
gaming activity.  Although JOSE HUIZAR's buy-in was
approximately $79,100, his total lifetime "drop" at the hotel
was $0.  In other words, there was no indication that JOSE
HUIZAR purchased the chips with which he was gambling at the
hotel.  Of his approximately $79,100 chip buy-in, JOSE HUIZAR
"cashed-out" (i.e., took home as cash) a total of $36,500.

      e.   Mr. Bell determined that during the first trip,
JOSE HUIZAR cashed out approximately $3,000 and attempted to

Casino_0358096

cash out another $6,300 just 90 minutes later.  The second transaction was denied because it could not be verified that the chips belonged to JOSE HUIZAR.  During the second trip, JOSE HUIZAR cashed out $5,000 and an additional $8,500 the following day.  During the third trip, JOSE HUIZAR cashed out $20,000. JOSE HUIZAR did not cash out any chips during his fourth and fifth trips to the Palazzo.[7]

   f. JOSE HUIZAR's gaming activities came to the attention of Mr. Bell during his fifth and final trip to the Palazzo.  Mr. Bell was notified that JOSE HUIZAR was going to be a guest of WEI HUANG and would be accompanying WEI HUANG on the hotel's private jet.  Mr. Bell and his staff researched JOSE HUIZAR and discovered that he was a member of the Los Angeles City Council, which made him what the hotel referred to as a Politically Exposed Person ("PEP").  This meant JOSE HUIZAR had to fill out certain paperwork in order to participate in gaming activities at the hotel.  The paperwork was designed to identify JOSE HUIZAR's source of wealth and demonstrate that he had a suitable independent source of income with which to gamble and was not using government funds to gamble.  Since Mr. Bell and his staff identified JOSE HUIZAR as a PEP before he arrived at the Palazzo, they entered JOSE HUIZAR's name into the hotel's

---

[7] On or about June 23, 2016, I reviewed the California Forms 700, Statement of Economic Interests and the Financial Disclosure Statement Forms 60 that JOSE HUIZAR submitted to the Fair Political Practices Commission (the "FPPC") for the years 2014 and 2015, and observed that he did not disclose any of this money on his forms, not as a gift or as income.

14

computer system to alert them when JOSE HUIZAR attempted to use his player's card at the hotel.

g.    Stephen Fryson, who has worked in the gambling industry for approximately 16 years and has extensive experience observing, reviewing, and classifying gaming activity, was working as the hotel's Evening Shift Manager of Table Games on July 7, 2015, the first night of JOSE HUIZAR's fifth trip to the Palazzo with WEI HUANG.  Mr. Fryson was in charge of all dealers and pit managers that evening and helped set up a playing area for WEI HUANG in "Parlor 8," a salon reserved for high-end players who often bet with $25,000 to $100,000 chips.  The hotel closely monitors the gaming activity of the players in Parlor 8.

h.    Mr. Fryson observed some of WEI HUANG's gaming activity that evening and positively identified JOSE HUIZAR as one of WEI HUANG's guests.  According to gaming records and Mr. Fryson's staff, WEI HUANG passed JOSE HUIZAR $65,000 in gaming chips on July 7, 2015.

i.    Mr. Fryson explained that there are two ways to pass chips: pushing chips and sharing chips.  Pushing chips occurs when a player purchases chips with his or her own money and "pushes" a portion of those chips to someone to use to gamble.  However, once the other person is done gambling, all of the chips are returned to the player who originally purchased them, who then cashes out the chips and pockets the winnings. When this happens, only the player who purchased the chips is being rated by the hotel.  On the other hand, sharing chips occurs when a player purchases chips with his or her own money

15

and "shares" a portion of those chips with someone else, but never reclaims those chips as their own.  Instead, the person to whom they were given can cash out the chips and keep the winnings for himself.  The play of both players is rated by the hotel whenever the chips are being shared in this manner.

     j.  Mr. Fryson said WEI HUANG shared the $65,000 in chips with JOSE HUIZAR in Parlor 8, he did not push them.  Mr. Fryson said his staff in Parlor 8 confirmed this and began rating JOSE HUIZAR's play while in Parlor 8 using a player rating card.  At one point during the evening, WEI HUANG and his guests decided to leave Parlor 8 and take a break from gaming.  WEI HUANG and his guests, including JOSE HUIZAR, left their gaming chips at the table in Parlor 8, so they could continue playing when they returned.  Pit Manager Grace Soo confirmed that JOSE HUIZAR left approximately $17,800 in chips at the table.

     k.  WEI HUANG went to eat dinner at the Paiza Club, but JOSE HUIZAR went to the main floor of the Palazzo and began gambling with another guest of WEI HUANG.[8]  JOSE HUIZAR sat down at one of the gambling tables and handed the dealer his player's card.  The dealer swiped the card and saw the alert that Mr. Bell and his staff had entered into the hotel's computer system

---

[8] SA Teresa Tampubolon reviewed the surveillance footage from the hotel that night and determined that JOSE HUIZAR went to the main floor of the hotel to gamble with RICKY ZHENG and GEORGE ESPARZA.  GEORGE ESPARZA was seated right next to JOSE HUIZAR while WEI HUANG was sharing chips with JOSE HUIZAR in Parlor 8 and when Ms. Flynn confronted JOSE HUIZAR about the PEP paperwork on the casino floor.

16

earlier that day after learning that JOSE HUIZAR was a PEP. Mr. Fryson was notified and asked Kathy Flynn, a Senior Credit Executive at the hotel, to meet with JOSE HUIZAR on the casino floor and have him fill out the PEP paperwork.

l.   Ms. Flynn told JOSE HUIZAR that she knew he was associated with his local city council and that he needed to fill out the PEP paperwork in order to continue gambling at the hotel. JOSE HUIZAR looked over the PEP paperwork twice and refused to fill out the paperwork both times. Although Ms. Flynn did not feel like JOSE HUIZAR was agitated by her request to complete the paperwork, she did feel like he was trying to "stay under the radar."

m.   Since JOSE HUIZAR did not fill out the paperwork, Mr. Fryson escorted him out of the hotel's gaming area. Mr. Fryson allowed JOSE HUIZAR's friend (whom Special Agent Teresa Tampubolon later identified as GEORGE ESPARZA) to cash out approximately $50 in chips as they were leaving the casino floor.

n.   According to Pit Manager Grace Soo, when WEI HUANG returned to Parlor 8 after getting something to eat, he played the $17,800 JOSE HUIZAR had left at the table before being forced to leave the gaming area of the Palazzo.

ANALYSIS OF FINANCIAL RECORDS

18.   I have reviewed financial records belonging to JOSE HUIZAR and his close family and friends for the last several years, including around the time of JOSE HUIZAR's trips to the Palazzo with WEI HUANG and RICKY ZHENG. For example, I reviewed

17

financial records belonging to JOSE HUIZAR, his mother, Isidra Huizar, his brother, Salvador Huizar, and his wife, Richelle Rios.  In summary, my review of these financial records has revealed that JOSE HUIZAR's mother and brother made several large cash deposits into their bank accounts and then used the proceeds from those bank accounts to pay JOSE HUIZAR's debts and to write checks to JOSE HUIZAR in large amounts (e.g., $10,000). Based on my training and experience, and all of the evidence I have reviewed in this case, it appears JOSE HUIZAR has used these bank accounts to launder bribe and kickbacks payments he received from WEI HUANG and RICKY ZHENG while in Las Vegas.

19.  Below is a list of several financial transactions that took place around the time of JOSE HUIZAR's five trips to the Palazzo with WEI HUANG and RICKY ZHENG.  In total, around the time JOSE HUIZAR cashed out approximately $36,500 in chips at the Palazzo, his close family members deposited approximately $29,000 in cash into their bank accounts, and transferred approximately $35,132.96 directly or indirectly to JOSE HUIZAR.[9]

| Date | Event | Amount | Source |
|---|---|---|---|
| 6/14/14 | JOSE HUIZAR Cashes Out Palazzo Trip #1 | $3,000 | Palazzo |
| 6/14/14 | JOSE HUIZAR's Failed Cash Out Palazzo Trip #1 | $6,500 | n/a |
| 8/4/14 | JOSE HUIZAR deposits check into his checking account | $10,000 | Salvador's checking account |

[9] On or about June 23, 2016, I spoke with David Richter from Citi Bank, Rebecca LNU from Bank of America, and Marissa LNU from Wells Fargo and confirmed that the bank accounts belonging to JOSE HUIZAR, Isidra Huizar, and Salvador Huizar are insured by the Federal Deposit Insurance Corporation (FDIC).

18

|  | ending in #0843 |  | ending in #3900 |
|---|---|---|---|
| 8/24/14 | JOSE HUIZAR Cashes Out Palazzo Trip #2 | $5,000 | Palazzo |
| 8/25/14 | JOSE HUIZAR Cashes Out Palazzo Trip #2 | $8,500 | Palazzo |
| 8/29/14 | JOSE HUIZAR deposits check into his checking account ending in #0843 | $10,000 | Salvador's checking account ending in #3900 |
| 3/12/15 | Isidra deposits cash into her checking account ending in #2634 | $10,000 | $100 bills |
| 3/12/15 | JOSE HUIZAR deposits check into his checking account ending in #0843 | $10,000 | Isidra's checking account ending in #2634 |
| 3/13/15 | JOSE HUIZAR Cashes Out Palazzo Trip #3 | $20,000 | Palazzo |
| 3/28/15 | JOSE HUIZAR No Cash Out Palazzo Trip #4 | $0 | n/a |
| 4/8/15 | Isidra deposits cash into her checking account ending in #2634 | $10,000 | $100 bills |
| 7/7/15 | JOSE HUIZAR Leaves Chips on Table Palazzo Trip #5 | $17,800 | n/a |
| 7/13/15 | Isidra deposits cash into her checking account ending in #2634 | $9,000 | $100 bills |
| 7/13/15 | Isidra writes check to pay off JOSE HUIZAR's credit card ending in #5798 | $2,492.45 | Isidra's checking account ending in #2634 |
| 7/14/15 | Isidra writes check to pay JOSE HUIZAR's LA County Property Taxes | $2,640.51 | Isidra's checking account ending in #2634 |

20.  I examined the bank account records we obtained for
JOSE HUIZAR to see if there were any cash withdrawals or other
financial transactions shortly before or during his trips to the
Palazzo that would indicate JOSE HUIZAR indirectly paid for the
chips he used to gamble and cash out at the Palazzo.  I found
none.

SUBJECT TO PROTECTIVE ORDER – Sensitive Materials

21.   I also reviewed financial transactions that were not as close in time to JOSE HUIZAR's trips to Las Vegas, but which show a similar trend of JOSE HUIZAR's close family member (his mother) making large cash deposits into her bank account and then using the proceeds from that same bank account to pay JOSE HUIZAR's credit card bills and to write checks to JOSE HUIZAR in large amounts (e.g., $10,000).   In total, JOSE HUIZAR's mother deposited approximately $30,200 in $100 bills into her bank account and transferred approximately $39,900 directly or indirectly to JOSE HUIZAR.   Based on my review of Isidra Huizar's checking account, it appears that she is retired and that her only source of income is the $2,446.76 she receives each month from Social Security, Steelworkers Pension and Butcher & Provis Pension.

| Date | Event | Amount | Source |
|------|-------|--------|--------|
| 1/8/14 | JOSE HUIZAR deposits check into his checking account ending in #0843 | $15,000 | Isidra's checking account ending in #2634 |
| 4/8/14 | JOSE HUIZAR deposits check into his checking account ending in #0843 | $5,000 | Isidra's checking account ending in #2634 |
| 11/03/14 | Isidra deposits cash into her checking account ending in #2634 | $5,000 | $100 bills |
| 11/18/14 | JOSE HUIZAR deposits check into his checking account ending in #0843 | $4,900 | Isidra's checking account ending in #2634 |
| 12/3/14 | Isidra deposits cash into her checking account ending in #2634 | $7,000 | $100 bills |
| 12/11/14 | Isidra writes check to pay off JOSE HUIZAR's credit card ending in #5798 | $7,000 | Isidra's checking account ending in #2634 |

SUBJECT TO PROTECTIVE ORDER – Sensitive Materials                    Casino_0358103

| 4/22/15 | Isidra deposits cash into her checking account ending in #2634 | $2,300 | $100 bills |
| 4/23/15 | Isidra makes electronic payment to pay off JOSE HUIZAR's credit card ending in # | $8,000 | Isidra's checking account ending in #2634 |
| 1/4/16 | Isidra deposits cash into her checking account ending in #2634 | $2,900 | $100 bills |
| 1/25/16 | Isidra deposits cash into her checking account ending in #2634 | $13,000 | $100 bills |

ADDITIONAL TRIPS TO LAS VEGAS

22.  On June 10, 2016, I reviewed flight records produced by Southwest Airlines relating to JOSE HUIZAR's travel to Las Vegas between April 2016 and May 2016.  According to those records, JOSE HUIZAR flew to Las Vegas on Southwest Airlines on April 30, 2016.  I know from transaction reports generated by the Cosmopolitan Hotel and Casino and from toll records that JOSE HUIZAR flew to Las Vegas one day after WEI HUANG purchased approximately $25,000 in chips from the Cosmopolitan and one day after WEI HUANG exchanged five telephone calls with JOSE HUIZAR.

23.  Shortly thereafter, JOSE HUIZAR made two more trips to Las Vegas that appeared to overlap with trips made by WEI HUANG. According to transaction reports, WEI HUANG was back in Las Vegas on May 5 and 6, 2016, during which time he purchased over $400,000 in chips from Caesar's Palace Hotel and Casino. According to Southwest Airlines' flight records, on the last day WEI HUANG was known to be at Caesar's Palace, May 6, 2016, JOSE HUIZAR flew back from Las Vegas to Los Angeles.  Then, on May 15 and 16, 2016, WEI HUANG returned to Las Vegas and, according to

21

transaction reports, purchased over $50,000 in chips from the
Wynn Hotel and Casino.  According to Southwest Airlines' flight
records, on the last day WEI HUANG was known to be at the Wynn,
May 16, 2016, JOSE HUIZAR flew from Las Vegas back to Burbank,
California.

OFFICIAL ACTS

    24.  As stated above, without being privy to the actual
communications between the individuals named herein, it is
unclear what official acts JOSE HUIZAR has performed in exchange
for the payments he received from WEI HUANG.  However, based on
my training and experience, discussions with other FBI agents,
as well as my review of all the evidence in this case, I believe
the payments from WEI HUANG to JOSE HUIZAR are bribes and/or
kickbacks because JOSE HUIZAR failed to disclose them on his
financial disclosure Form 700, and because it appears JOSE
HUIZAR is concealing and laundering those payments through close
family members, who are making large cash deposits and then
funneling that money directly or indirectly to JOSE HUIZAR.

    25.  As stated above, JOSE HUIZAR is the Chairman of the
PLUM Committee for the City Council.  The PLUM Committee has
extensive influence over the zoning in downtown Los Angeles.  In
fact, according to JOSE HUIZAR's website, he has undertaken an
initiative as the Chairman of the PLUM Committee to overhaul the
City of Los Angeles' ("the City") entire zoning guidelines.

    26.  As stated above, JOSE HUIZAR also worked very closely
with RAYMOND CHAN, the former General Manager of LADBS.  For
example, according to JOSE HUIZAR's website, in 2008 he launched

22

an initiative to revitalize certain parts of downtown Los
Angeles called "Bring Back Broadway" and worked closely with
RAYMOND CHAN in furtherance of this initiative, who is also on
its Board of Trustees.

27. On or about October 21, 2015, LA City Investigator #1,
someone who worked for LADBS until on or about June 24, 2016,
provided the FBI with several customer complaints that had been
filed against the LA Hotel Downtown since SHENZHEN NEW WORLD
GROUP bought the hotel in 2010.  I reviewed those complaints and
learned the following:

a.  On or about May 29, 2013, Complainant #1
contacted the LADBS Code Enforcement Bureau and complained that
the LA Hotel Downtown had committed a "serious violation"
relating to an electrical safety issue.  Complainant #1 pointed
out that the hotel was under renovation and restroom mirror
light fixtures were being installed without the proper "UL"
certification and were "Non-Wet" location approved fixtures.
Complainant #1 insisted that it was a "cover up" and said even
the chandeliers in the ballrooms were "Non UL."  Complainant #1
claimed that someone was using counterfeit UL stickers and was
installing fixtures that were outside of the original plan
drawings.

b.  On or about May 31, 2013, Complainant #2
contacted LADBS Code Enforcement and lodged a similar complaint
about the light fixtures.  Complainant #2 alleged that the "plan
checker" was not doing his job and requested LADBS have its plan
checker "review and address these issues going on at the job

23

site." That same day, someone else, Complainant #3, contacted LADBS and complained about essentially the same things. Complainant #3 said the fixtures were being imported directly from China and were already creating electrical shortages. Complainant #3 also complained that the hotel manager was "asking [them] to perform certain tasks [they were] not at all comfortable [with doing] at [that] time."

       c. On or about June 5, 2015, Complainant #4 contacted LADBS Code Enforcement and complained that the hotel was installing new laundry equipment, which were heavy duty commercial cleaning machines. Complainant #4 said the machines required walls to be moved, concrete and sewer connections to be altered, and possibly a gas driven iron/press to be connected. Complaintant #4described this as creating a "serious potential for safety compromises."

       d. LADBS Inspector #1 responded to the June 5, 2015 complaint on or about June 20, 2015 and observed violations when he got to the hotel. LADBS Inspector #1 issued an order related to the electrical and plumbing at the hotel and ordered the hotel to comply by June 24, 2015. According to LADBS Inspector #1, by July 24, 2015 the hotel had obtained "all required plumbing permits and approvals" and "all required electrical permits and approvals." With respect to the hotel remodeling the basement, LADBS Inspector #1 advised the hotel to either: (1) demolish and remove all construction done without the required permits, (2) restore building to its original approved

24

condition, or (3) obtain the required permits to do the work and allow for proper inspection.

28.  On or about May 9, 2016, I spoke with LA City Investigator #1 about the LADBS complaints set forth above to determine whether the 2013 and 2015 complaints against the LA Hotel Downtown were properly resolved.  According to LA City Investigator #1, on or about May 26, 2016, he went with LADBS Inspector #2 to the LA Hotel Downtown to examine the work mentioned in the 2013 and 2015 complaints.  Upon entering the hotel, LADBS Inspector #2 commented to LA City Investigator #1 that the LA Hotel Downtown was where LADBS had held its 2015 Christmas Party.

29.  LADBS Inspector #2 observed that the new laundry equipment and heavy duty commercial cleaning machines referenced in the 2015 complaint were still in place.  LA City Investigator #1 and LADBS Inspector #2 did not feel like they had the expertise to determine whether the complaints filed in 2013 about the light fixtures had been properly corrected and resolved.  LA City Investigator #1 and LADBS Inspector #2 did determine that the proper permits had been obtained for the work referenced in the 2015 complaint, but those permits were not obtained until November 3, 2015, several months after July 2015, when the complaint was closed out on the basis that the hotel had purportedly obtained "all required plumbing permits and approvals."

30.  According to LA City Investigator #1, the LA Downtown Hotel did have several other permits issued and pending around

25

this time period and said it was possible this may have just
been an oversight of some sort.  However, an employee at LADBS
once told LA City Investigator #1 that the LA Hotel Downtown was
often receiving complaints about its hotel and the treatment of
its employees, but those complaints never went anywhere because
the owner of the hotel was "friends" with RAYMOND CHAN.  In
fact, according to toll records, between June 1, 2014 and August
7, 2015, around the time this complaint was resolved, RAYMOND
CHAN exchanged 303 calls and 225 text messages with RICKY ZHENG,
the Executive Director of SHENZHEN NEW WORLD GROUP.

31.  Moreover, RAYMOND CHAN has now become directly
involved with business development in Los Angeles as Interim
Deputy Mayor, where is responsible for overseeing economic
development in Los Angeles, including leading efforts to create
jobs, attract investment, and make the city more business
friendly.  This will likely entail direct contact with
businessmen like WEI HUANG, who has made substantial economic
investments in the City of Los Angeles.  Indeed, on April 23,
2014, shortly before their first known trip to the Palazzo, JOSE
HUIZAR introduced a resolution before the Los Angeles City
Council recognizing WEI HUANG for his achievements and
contributions to the economy of District 14, which the Los
Angeles City Council ultimately adopted.

TOLL ANALYSIS

32.  I have reviewed toll records for the cellular
telephone accounts belonging to JOSE HUIZAR, GEORGE ESPARZA, WEI
HUANG, and RICKY ZHENG.  Between June 2014 (around the time of

26

the first trip to Palazzo) and August 2015 (around the time of the last trip to Palazzo), JOSE HUIZAR exchanged approximately 7 calls with WEI HUANG and approximately 143 calls with RICKY ZHENG, including 6 on March 14, 2014, the day JOSE HUIZAR, WEI HUANG, and RICKY ZHENG were in Las Vegas together and JOSE HUIZAR cashed out approximately $20,000 in chips.

33.  These toll records further show that RICKY ZHENG was in almost constant contact with JOSE HUIZAR's Special Assistant, GEORGE ESPARZA, who accompanied JOSE HUIZAR on one of his trips to Palazzo with WEI HUANG and RICKY ZHENG, and that RICKY ZHENG had similar contact with RAYMOND CHAN, someone JOSE HUIZAR worked closing with in overseeing hotel development in downtown Los Angeles.  In fact, GEORGE ESPARZA and RAYMOND CHAN, two public officials with close ties to JOSE HUIZAR, were among the top five people RICKY ZHENG texted during this time period. Based on my training and experience and knowledge of this investigation, the interplay and frequency of these communications between these specific individuals further support my belief that WEI HUANG has given and continues to give bribes and kickbacks to JOSE HUIZAR in return for official acts that benefit WEI HUANG and his business interests in downtown Los Angeles, bribes and kickbacks which JOSE HUIZAR has attempted to conceal by failing to disclose them on his financial disclosure forms with the state and by laundering them through his close family members' bank accounts.

34.  According to recent toll records, JOSE HUIZAR and WEI HUANG have remained in contact with each other, including around

27

the times of their trips to Las Vegas.  Specifically, JOSE
HUIZAR and WEI HUANG exchanged 10 calls between April 25, 2016
and May 20, 2016.

USE OF THE SUBJECT ACCOUNT

35.  There is probable cause to believe that JOSE HUIZAR is
using the SUBJECT ACCOUNT in connection with and in furtherance
of the bribery and money laundering schemes and that evidence of
those crimes will be found in the SUBJECT ACCOUNT.  According to
Southwest Airline's records, JOSE HUIZAR used the SUBJECT
ACCOUNT in connection with reserving flights from Las Vegas on
March 15, 2015, May 01, 2015, May 13, 2015, May 6, 2016 and May
16, 2016.  As set forth above, May 5, 2016, May 6, 2016, May 15,
2016 and May 16, 2016 are the same days hotel records indicate
that WEI HUANG was in Las Vegas and purchased over $400,000 in
chips from Caesar's Palace and $50,000 in chips from the Wynn.

36.  Moreover, based on the evidence to date, it appears
that JOSE HUIZAR's trips to Las Vegas, where WEI HUANG provides
him tens of thousands of dollars' worth of chips, are integral
to the suspected scheme to provide bribes and kickbacks to JOSE
HUIZAR in exchange for official acts that benefit WEI HUANG and
his substantial economic interests in Downtown Los Angeles.
Thus, JOSE HUIZAR's use of the SUBJECT ACCOUNT to arrange for
these trips establishes the likelihood that the content of these
messages will provide evidence related to the bribery and money
laundering schemes.  This evidence could include, but is not
limited to: (1) the dates and times of other trips to Las Vegas
with WEI HUANG; (2) other luxury trips that correspond to trips

28

with WEI HUANG; (3) details of other arrangements made for such trips, including lodging, transportation, etc. (or the lack of such arrangements, which could suggest that someone else is providing them for JOSE HUIZAR); (4) communications identifying other individuals and possible coconspirators related to these trips; and (5) e-mail confirmations that JOSE HUIZAR utilized the various services provided him during these luxury trips.

37.   Further, reviewing the content of the SUBJECT ACCOUNT will provide investigators opportunities to further investigate these luxury trips, namely, by providing: geographical locations; the persons/co-conspirators involved in these luxury trips; an identifiable pattern of these luxury trips; and dates and locations of future luxury trips.   Further investigation, such as surveillance, will allow for more specific investigatory tools that will enhance investigators' ability to learn the precise nature of the bribery and money laundering schemes (or, to the contrary, provide legitimate explanations for these luxury trips and the associations and interactions between the named individuals).

### V.   BACKGROUND ON E-MAIL AND SOCIAL MEDIA ACCOUNTS AND THE PROVIDER

38.   In my training and experience, and discussions with senior agents, I have learned that providers of e-mail and/or social media services offer a variety of online services to the public.   Providers, like PROVIDER, allow subscribers to obtain accounts like a SUBJECT ACCOUNT.   Subscribers obtain an account

29

by registering with the PROVIDER.  During the registration process, the PROVIDER asks subscribers to provide basic personal information.  Therefore, the computers of the PROVIDER are likely to contain stored electronic communications and information concerning subscribers and their use of the PROVIDER's services, such as account access information, e-mail or message transaction information, and account application information.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.

39.  In my training and experience, and discussions with senior agents, e-mail and social media providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail or social media account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.

1.  In my training and experience, and discussions with senior agents, providers of e-mail and social media often maintain have access to and store information related to the location of the users of accounts they service.  That

30

information may be obtained by the provider in a number of ways. For example, a user may access the provider's services by running an application on the user's phone or mobile device, which application has access to the location information residing on the phone or mobile device, such as Global Positioning System (GPS) information.  It may also be accessible through "check-in" features that some providers offer that allows users to transmit or display their location to their "friends" or "acquaintances" via the provider.

2.  In my training and experience, and discussions with senior agents, e-mail and social media providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, e-mail and social media providers often have records of the Internet Protocol ("IP") address used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNT.

31

3.    In my training and experience, and discussions with
senior agents, e-mail and social media account users will
sometimes communicate directly with the service provider about
issues relating to the account, such as technical problems,
billing inquiries, or complaints from other users.  Providers of
e-mails and social media services typically retain records about
such communications, including records of contacts between the
user and the provider's support services, as well records of any
actions taken by the provider or user as a result of the
communications.  In my training and experience, such information
may constitute evidence of the crimes under investigation
because the information can be used to identify the user(s) of a
SUBJECT ACCOUNT.

4.    I know from my training and experience, and
discussions with senior agents, that the complete contents of an
account may be important to establishing the actual user who has
dominion and control of that account at a given time.  Accounts
may be registered in false names or screen names from anywhere
in the world with little to no verification by the service
provider.  They may also be used by multiple people.  Given the
ease with which accounts may be created under aliases, and the
rarity with which law enforcement has eyewitness testimony about
a defendant's use of an account, investigators often have to
rely on circumstantial evidence to show that an individual was
the actual user of a particular account.  Only by piecing
together information contained in the contents of an account may
an investigator establish who the actual user of an account was.

32

Often those pieces will come from a time period before the
account was used in the criminal activity.  Limiting the scope
of the search would, in some instances, prevent the government
from identifying the true user of the account and, in other
instances, may not provide a defendant with sufficient
information to identify other users of the account.  Therefore,
the contents of a given account, including the e-mail addresses
or account identifiers and messages sent to that account, often
provides important evidence regarding the actual user's dominion
and control of that account.  For the purpose of searching for
content demonstrating the actual user(s) of a SUBJECT ACCOUNT, I
am requesting a warrant requiring the PROVIDER to turn over all
information associated with a SUBJECT ACCOUNT with the date
restriction included in Attachment B for review by the search
team.

    5.    Relatedly, the government must be allowed to determine
whether other individuals had access to a SUBJECT ACCOUNT.  If
the government were constrained to review only a small
subsection of an account, that small subsection might give the
misleading impression that only a single user had access to the
account.

    6.    I also know based on my training and experience, and
discussions with senior agents, that criminals discussing their
criminal activity may use slang, short forms (abbreviated words
or phrases such as "lol" to express "laugh out loud"), or
codewords (which require entire strings or series of
conversations to determine their true meaning) when discussing

33

their crimes.  They can also discuss aspects of the crime without specifically mentioning the crime involved.  In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and paren :) to convey a smile or agreement) to discuss matters.  "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures set forth in Attachment B, is necessary to find all relevant evidence within the account.

     7.   As set forth in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER under seal until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

          a.   I make that request because I believe it might be impossible for the PROVIDER to authenticate information taken from a SUBJECT ACCOUNT as its business record without the original production to examine.  Even if the PROVIDER kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the PROVIDER to keep a copy for the entire pendency of the investigation and/or case.  If the

34

original production is destroyed, it may be impossible for the PROVIDER to examine a particular document found by the search team and confirm that it was a business record of the PROVIDER's taken from a SUBJECT ACCOUNT.

b.   I also know from my training and experience, and discussions with senior agents,  that many accounts are purged as part of the ordinary course of business by providers.  For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted.  As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account.  Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

## VI.   REQUEST FOR NON-DISCLOSURE

8.   Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding the PROVIDER not to notify any person, including the subscriber(s) of the SUBJECT ACCOUNT, of the existence of the warrant because there is reason to believe that such notification will result in (1) flight from prosecution; (2) destruction of or tampering with evidence; (3) intimidation of potential witnesses; and (4) otherwise seriously jeopardizing the investigation.

35

## VII. CONCLUSION

9.    Based on the foregoing, I request that the Court issue the requested search warrant.

_____
ANDREW CIVETTI, Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
on July ⏐ , 2016.

ALICIA G. ROSENBERG
_____
UNITED STATES MAGISTRATE JUDGE

36