TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MACK E. JENKINS (SBN: 242101)
Assistant United States Attorney
Chief, Public Corruption & Civil Rights Section
VERONICA DRAGALIN (SBN: 281370)
MELISSA MILLS (SBN: 248529)
Assistant United States Attorneys
Public Corruption & Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2091/0647/0627
    Facsimile: (213) 894-7631
    E-mail: Mack.Jenkins@usdoj.gov
            Veronica.Dragalin@usdoj.gov
            Melissa.Mills@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 20-326(A)-JFW |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT HUIZAR'S AMENDED MOTION TO SUPPRESS EMAIL EVIDENCE (CR 307) |
| v. | |
| JOSE LUIS HUIZAR, et al. | Date:      January 31, 2022 |
| Defendants. | Time:       8:00 a.m. |
| | Location: Courtroom of the Hon. John F. Walter |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Mack E. Jenkins, Veronica Dragalin, and Melissa Mills, hereby files its Opposition to Defendant HUIZAR's Amended Motion to Suppress Evidence (CR 307).

1        This opposition is based upon the attached memorandum of points

2   and authorities, the files and records in this case, and such further

3   evidence and argument as the Court may permit.

4   Dated: December 20, 2021         Respectfully submitted,

5                                    TRACY L. WILKISON
                                     United States Attorney
6
                                     SCOTT M. GARRINGER
7                                    Assistant United States Attorney
                                     Chief, Criminal Division
8

9

10                                   _____
                                     MELISSA MILLS
11                                   MACK E. JENKINS
                                     VERONICA DRAGALIN
12                                   Assistant United States Attorneys

13                                   Attorneys for Plaintiff
                                     UNITED STATES OF AMERICA
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.   INTRODUCTION...................................................1

II.  STATEMENT OF FACTS............................................1

     A.   The Search Warrant.....................................1

     B.   The Supporting Affidavit...............................2

          1.   Evidence of HUIZAR's Acceptance of Financial
               Benefits from HUANG...............................2

          2.   Evidence of HUIZAR'S Money Laundering and
               Concealment of Benefits From HUANG................4

          3.   Additional Evidence...............................5

          4.   HUIZAR's Use of the Subject Account in Connection
               With the Subject Offenses.........................7

     C.   Attachment B to the Search Warrant.....................8

     D.   The Search and Seizure.................................8

III. ARGUMENT......................................................9

     A.   The Search Warrant Was Supported by Probable Cause.....9

     B.   The Search Warrant Was Sufficiently Particularized and
          Not Overbroad.........................................14

     C.   The Agents Reasonably Relied on the Warrant in Good
          Faith.................................................19

     D.   A Drafting Error Did Not Affect the Search or Seizure
          and Did Not Invalidate the Warrant....................20

     E.   The Warrant Contained No Material Misstatements or
          Omissions —— Deliberate, Reckless, or Otherwise.......21

     F.   Defendant Is Not Entitled to a Franks Hearing.........23

     G.   Suppression Here Would Contravene the Purpose of the
          Exclusionary Rule.....................................24

     H.   Preservation Requests Do Not Violate the Fourth
          Amendment.............................................25

IV.  CONCLUSION...................................................25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

Butz v. Economou,
       438 U.S. 478 (1978).........................................16

Herring v. United States,
       555 U.S. 135 (2009).........................................24

Illinois v. Gates,
       462 U.S. 213 (1983)..........................................9

Kaley v. United States,
       134 S.Ct. 1090 (2014).......................................9

Man Seok-Choe v. Torres,
       525 F.3d 733 (9th Cir. 2008)............................13, 14

Matter of Search of Information Associated With Four Redacted Gmail Accounts,
       371 F.Supp.3d 843 (D. Or. 2018)............................17

Messerschmidt v. Millender,
       565 U.S. 535 (2012).........................................21

United States v. Adjani,
       452 F.3d 1140 (9th Cir. 2006)..............................16

United States v. Alvarez,
       190 F. Supp. 3d 885 (N.D. Cal. 2016).......................21

United States v. Basey,
       2021 WL 1396274 (D. Alaska 2021)...........................25

United States v. Comprehensive Drug Testing, Inc.,
       621 F.3d 1162 (9th Cir. 2010)..............................16

United States v. Cummings,
       2020 WL 1983342 (D. Ariz. 2020)............................16

United States v. Flores,
       802 F.3d 1028 (9th Cir. 2015).....................15, 16, 17

United States v. Hattrick,
       182 Fed. Appx. 649 (9th Cir.2006)..........................21

United States v. Hill,
       459 F.3d 966 (9th Cir. 2006)...............................14

United States v. Jefferson,
    566 F.3d 928 (9th Cir. 2009)...................................25

United States v. Kyllo,
    37 F.3d 526 (9th Cir. 1994)...................................23

United States v. Lee,
    106 U.S. 196 (1882)...........................................16

United States v. Lei Shi,
    525 F.3d 709 (9th Cir. 2008)..................................14

United States v. Leon,
    468 U.S. 897 (1984).......................................19, 20

United States v. Lopez,
    482 F.3d 1067 (9th Cir. 2007).................................13

United States v. Martinez,
    2020 WL 3050767 (N.D. Cal. 2020).............................16

United States v. McDonnell,
    136 S. Ct. 2355 (2016)...............................11, 12, 13

United States v. Rosenow,
    2018 WL 6064949 (S.D. Cal. 2018).............................25

United States v. SDI Future Health, Inc.,
    568 F.3d 684 (9th Cir. 2009)..................................14

United States v. Sears,
    411 F.3d 1124 (9th Cir. 1988)................................25

United States v. Silver,
    948 F.3d 538 (2d Cir. 2020)..................................18

United States v. Spilotro,
    800 F.2d 959 (9th Cir. 1986).................................15

United States v. Wardlow,
    951 F.2d 1115 (9th Cir. 1991)................................23

United States v. Woolard,
    2021 WL 694008 (W.D. Wash., Feb. 23, 2021)...................16

**Statutes**

18 U.S.C. § 371................................................2

18 U.S.C. § 666...............................................12

ii

18 U.S.C. § 2703..........................................1, 8, 20, 25

31 U.S.C. § 5324(a)(3).........................................2

1
<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2
**I.     INTRODUCTION**

3
Defendant JOSE HUIZAR ("defendant" or "HUIZAR"), a former Los

4
Angeles City Councilmember who is charged with engaging in a years-

5
long racketeering enterprise of staggering scope and audacity, now

6
moves to suppress his own records and communications evidencing his

7
criminal conduct, which the government properly obtained by a

8
lawfully issued federal search warrant.  (Defendant's Amended Motion

9
to Suppress ("Def. Mot.") at CR 307.)  The warrant was supported by

10
ample probable cause, contained no material misrepresentations or

11
omissions, and complied with the Fourth Amendment's particularity and

12
reasonableness requirements.

13
Defendant's attack on this 2016 warrant hopes to sweep away

14
later-obtained evidence of his crimes as fruits of an allegedly

15
poisonous tree.  But there was no poison here.  Defendant's motion is

16
bereft of any factual or legal support for his exaggerated contention

17
that the warrant was not only unconstitutionally deficient, but "so

18
facially overbroad that no agent could have reasonably believed it

19
was adequately supported."  Defendant also fails to identify any

20
material issue of factual dispute, and he is not entitled to any

21
hearing.  The motion should be denied.

22
**II.    STATEMENT OF FACTS**

23
**A.    The Search Warrant**

24
On July 1, 2016, the Honorable Alicia G. Rosenberg, United

25
States Magistrate Judge, issued a search warrant pursuant to 18

26
U.S.C. § 2703 ordering Yahoo to provide to the government certain

27
information related to defendant's Yahoo account.  Def. Ex. 1.  The

28
warrant further authorized the government to search the information

that Yahoo returned and to seize specific items that constitute evidence of six crimes being investigated, namely, 18 U.S.C. §§ 371 (conspiracy), 666 (federal program bribery), 1341/1343/1346 (honest services wire and mail fraud), 1951 (extortion), and 1956 (money laundering); and 31 U.S.C. § 5324(a)(3) (structuring transactions) (collectively, the "Subject Offenses").  Id. at 7-8.  The warrant further narrowed the scope of the search to violations involving four persons in addition to defendant HUIZAR, namely, co-defendant developer WEI HUANG, HUIZAR'S co-conspirator aide GEORGE Esparza, HUANG'S aide Ricky Zheng, and co-defendant City official RAYMOND CHAN.[1]  Id. at 8.  The temporal scope of the warrant was limited to April 1, 2013, and July 1, 2016.  Id.

**B.  The Supporting Affidavit**

The search warrant was supported by a 36-page affidavit sworn to by FBI Special Agent ("SA") Andrew Civetti.  Def. Ex. 2.

1.  Evidence of HUIZAR's Acceptance of Financial Benefits from HUANG

The affidavit detailed evidence from a variety of sources —— including several witnesses, hotel and casino records, flight records, and other evidence —— establishing that between 2014 and 2016, HUIZAR made at least eight gambling trips to Las Vegas with HUANG, a developer with business in HUIZAR'S City Council district. Id. at 40-46, 50-51.  The affidavit noted that HUIZAR and HUANG were at times accompanied on these trips by their respective aides, Esparza and Zheng.  Id. at 40-46.

---

[1] For ease of reference, throughout this Opposition, the government uses all caps for defendants charged in the above-captioned case.

2

The affidavit explained how, on HUIZAR'S fifth and final known trip to the Palazzo casino with HUANG, Palazzo staff detected suspicious activity between the two and provided evidence of that suspicious activity to the FBI.  Id. at 43-46.  That evidence included surveillance footage of HUIZAR gambling with HUANG, Zheng, and Esparza in a high-end gambling salon reserved for high rollers and sharing HUANG'S casino chips; gaming records showing that HUIZAR played and ultimately cashed in tens of thousands of dollars in chips that he did not purchase; and hotel records indicating that HUANG gave HUIZAR private jet transportation and luxury accommodations.  Id.

The affidavit relayed the observations of several Palazzo employees, some of whom described their interactions with HUIZAR when they confronted him and asked him to sign documents intended to confirm that, as an elected official and "politically exposed person," HUIZAR had an independent source of wealth sufficient to demonstrate that he was gambling with his own money.  Id.  According to those employees, HUIZAR refused to sign the documents, gave the impression that he was trying to "stay under the radar," and was escorted out of the gaming area for failing to provide information to allay the casino's suspicions that he was engaging in corrupt activity on its premises.  Id.

In addition to the five Palazzo trips —— which the affidavit noted ended after Palazzo compliance employees identified HUIZAR as a politically exposed person and asked him to certify the source of his gambling money —— the affidavit detailed evidence indicating that HUIZAR accompanied HUANG on three subsequent gambling trips to different Las Vegas casinos in the weeks before the warrant was

1   sought.  Id. at 49-50.  The affidavit cited casino transaction

2   reports showing that HUANG purchased over $475,000 in casino chips

3   over those three trips, airline flight records establishing HUIZAR'S

4   travel to Las Vegas during the timeframes of HUANG'S casino chip

5   purchases, and toll records reflecting five telephone calls between

6   HUIZAR and HUANG the day before one of the trips.  Id.

7           2.   Evidence of HUIZAR'S Money Laundering and Concealment
               of Benefits From HUANG

8

9       The affidavit detailed SA Civetti's comprehensive analysis of

10   financial records for HUIZAR and his wife, brother, and mother during

11   the times of HUIZAR'S known trips to Las Vegas to gamble with HUANG

12   (and sometimes Zheng and Esparza) and take casino chips from HUANG,

13   and explained how those records indicated that HUIZAR had laundered

14   the funds from those cashed-out casino chips through the bank

15   accounts of his family members.  Id. at 46-50.  For instance, SA

16   Civetti described records showing that on August 29, 2014, a few days

17   after HUIZAR cashed out $13,000 during his second Palazzo trip with

18   HUANG, HUIZAR deposited a $10,000 check from his brother into his own

19   checking account.  Id. at 48.  The affidavit similarly detailed

20   several other instances of HUIZAR cashing out chips from his Palazzo

21   trips with HUANG in close proximity to instances where HUIZAR'S

22   mother and brother used their accounts to write him large checks or

23   to pay his bills.  Id. at 47-48.

24       In addition, the affidavit recounted several more instances

25   during the time period covered by the search warrant where HUIZAR'S

26   mother deposited large amounts of cash into her bank account near in

27   time to HUIZAR receiving payments for large amounts from his mother.

28   Id. at 49-50.  The records summarized in the affidavit reflected that

1    HUIZAR'S mother deposited approximately $30,200 in $100 bills into
2    her bank account and transferred approximately $39,900 directly or
3    indirectly to HUIZAR over a two-year period.  Id. at 49.  The
4    affidavit further relayed that based on SA Civetti's review of
5    HUIZAR'S mother's bank account, it appeared that her only source of
6    income was a monthly pension of about $2,500.  Id.

7        Relying on that evidence and his FBI training and experience, SA
8    Civetti concluded that there was probable cause to believe that
9    HUIZAR used his mother's and brother's bank accounts to launder bribe
10   payments that he received from HUANG and Zheng on the casino trips.
11   Id. at 34, 47.  The affidavit further relayed that, based on SA
12   Civetti's review of HUIZAR's required financial disclosures, HUIZAR
13   had failed to disclose any of the benefits (casino chips, luxury
14   travel and accommodations, or other things of value) that the
15   evidence clearly showed him receiving from HUANG, as required by law
16   for a high-ranking public official.  Id. at 33, 43, 51.

17       Citing all of the evidence and his training and experience, SA
18   Civetti asserted his belief that the benefits and payments from HUANG
19   to HUIZAR were illegal bribes and/or kickbacks.  Id. at 51.

20           3.   Additional Evidence

21       SA Civetti candidly relayed that it was at that time unclear
22   what specific official acts HUANG was seeking from HUIZAR in exchange
23   for the casino chips and other benefits.  However, the affidavit
24   relayed certain facts that shed light on what HUIZAR could do for
25   HUANG and what they reasonably might have been seeking.  Id. at 34.
26   The affidavit described HUIZAR's role as a member of the City Council
27   in a district that included downtown Los Angeles, his position as
28   Chairman of the City Council's Planning and Land Use Management

                                    5

("PLUM") Committee, his influence over zoning in downtown Los
Angeles, and his work in promoting and expanding hotel and
hospitality services in downtown Los Angeles.  Id. at 35, 38-39.  It
also described HUANG's role as Chairman of Shenzhen New World Company
("SZNW"), and SZNW's operation of a hotel ("LA Hotel Downtown") in
HUIZAR's district.  Id. at 39-40.  Additionally, the affidavit
explained that a SZNW subsidiary was planning a "mixed-use mega
development" project in HUIZAR's downtown district.  Id. at 35.

The affidavit also noted that in his role as Chairman of the
PLUM Committee, HUIZAR worked closely with CHAN, former General
Manager of the Los Angeles Department of Building and Safety
("LADBS").  Id. The affidavit further explained that LADBS, which had
jurisdiction over SZNW's LA Hotel Downtown, received several
complaints about the hotel between 2013 and 2015, including at least
one serious safety violation.  Id. at 35-36.  All of those complaints
were reportedly completely resolved, but an LADBS insider reported to
the FBI that some of the complaints were closed out without being
actually resolved.  Id.  The LADBS insider further informed the FBI
that the LA Hotel Downtown was often the subject of complaints to
LADBS, but that the complaints never went anywhere because the
hotel's owner was friends with CHAN.  Id.  CHAN's connection to SZNW
was corroborated by toll records showing hundreds of calls and texts
between CHAN and Zheng, the Executive Director of SZNW.  Id. at 37.

In the affidavit, SA Civetti explained that CHAN's contacts with
Zheng and HUANG were likely to increase in light of CHAN's recent
appointment as Interim Deputy Mayor for Economic Development, a role
that would involve leading efforts to create jobs, attract
investment, and make the city more friendly to businesses.  Id. at

6

36.   The affidavit further noted that in April 2014, shortly before their first known trip to Las Vegas together, HUIZAR had introduced a successful City Council resolution recognizing HUANG for his achievements and contributions to the economy of HUIZAR's district. Id. at 36-37.

The affidavit detailed telephone toll records showing seven calls between HUIZAR and HUANG over the approximately yearlong period between their five known trips to the Palazzo, and 143 calls between HUIZAR and Zheng during the same period.  The records further showed Zheng in almost constant contact with both Esparza and CHAN during that period.  More recent toll records confirmed that HUIZAR and HUANG were still in contact, with ten calls exchanged over the four-week period preceding the warrant.

    4.   <u>HUIZAR's Use of the Subject Account In Connection With the Subject Offenses</u>

The affidavit explained that the FBI had identified the Subject Account as a private email account used by HUIZAR. Id. at 30.  The affidavit further detailed evidence that HUIZAR used the Subject Account to arrange flights to and from Las Vegas for the trips during which he was believed to accept bribes from HUANG and Zheng. Id. at 57.  It also established that HUIZAR used this account to communicate with Esparza, who accompanied HUIZAR on at least one such Las Vegas trip with HUANG and Zheng and who was present when HUANG gave casino chips to HUIZAR. Id.  The affidavit noted that based on the evidence detailed therein, it appeared that HUIZAR's gambling trips to Las Vegas were "integral to" the suspected bribery scheme. Id.  For that reason, SA Civetti opined that "JOSE HUIZAR's use of the SUBJECT ACCOUNT to arrange for these trips establishes the likelihood that

the content of these messages will provide evidence related to the bribery and money laundering schemes." Id.

### C. Attachment B to the Search Warrant

Attachment B to the search warrant contained a list of four categories of items of evidence relating to the Subject Offenses to be seized, namely: 1) information relating to who created, accessed, or used the Subject Account, including records about their identities and whereabouts; 2) all records relating to HUANG, Zheng, Esparza, CHAN, SZNW, and the LA Hotel Downtown; 3) all records relating to Las Vegas, including any receipts, reservation confirmations, flight itineraries, photographs, and bank records relating to Southwest Airlines, the Palazzo, Caesar's Palace, the Wynn, and the Cosmopolitan; and 4) all financial records, including those relating to HUIZAR, his mother, his brother, and their respective identified bank accounts. Def. Ex. 1 at 8.[2]

### D. The Search and Seizure

In a report of investigation ("302") attached to defendant's motion, SA Civetti detailed the search team's procedures in executing the warrant. Def. Ex. 7 at 1-2. SA Civetti documented that 27,356 records were reviewed. Id. Of those, 496 were deemed pertinent; 24,440 were deemed non-pertinent; 2,045 were deemed subject to the attorney-client privilege; and 375 were deemed subject to the spousal

---

[2] Attachment B also authorized agents to seize non-content records and information that could be obtained pursuant to 18 U.S.C. § 2703(d). Id. Due to a drafting error, the attachment also obliquely and erroneously indicated that agents could seize all content produced by the provider. The search team did not do so, as detailed below. Id. at 8.

privilege.[3]  Id.  Of the 496 pertinent records, 137 were deemed
pertinent but outside the scope of the current warrant.[4]  Id.

**III.  ARGUMENT**

    **A.    The Search Warrant Was Supported by Probable Cause**

    In determining whether an affidavit contains probable cause, the
issuing magistrate must "make a practical, common-sense decision
whether, given all the circumstances set forth in the affidavit
before him, including the veracity and basis of knowledge of persons
supplying hearsay information, there is a fair probability that
contraband or evidence of a crime will be found in a particular
place."  Illinois v. Gates, 462 U.S. 213, 238 (1983).  "A
magistrate's determination of probable cause should be paid great
deference by reviewing courts," and should be upheld so long as the
magistrate "had a substantial basis for concluding probable cause
existed" based on the totality of the circumstances.  Id. at 238-39.
"Probable cause . . . is not a high bar[.]"  Kaley v. United States,
134 S.Ct. 1090, 1103 (2014).

    Ample probable cause supported the warrant.  SA Civetti detailed
copious evidence from a variety of sources, including the statements

---

    [3] In his motion, defendant states that SA Civetti was "exposed
to" thousands of privileged records.  While defendant does not
suggest that this would be grounds for suppression, the government
notes that the evidence contradicts defendant's conjectural leap.
The 302 states that upon guidance from a prosecutor, potentially
privileged communications (meaning those to or from an email address
associated with a person believed to be a spouse or attorney) "were
not reviewed" and were instead segregated out and maintained in
evidence.  Def. Ex. 7 at 2.

    [4] Defendant expresses confusion about this designation.  Def.
Mot. at 8.  As the 302 explains, upon initial review these records
were found to be pertinent to the overall investigation but beyond
the four narrower categories of material for which the warrant
authorized seizure.  Def. Ex. 7 at 1-2.  The 302 notes that a
rollback warrant would be required to seize those records.  Id. at 2.
No rollback was ultimately sought.

of neutral casino-employee witnesses, video surveillance footage, casino transaction records, hotel and flight records, and other evidence, clearly establishing that HUIZAR, a Los Angeles City Council member, took regular trips to Las Vegas with HUANG, a wealthy developer with current and future business in HUIZAR's district.  The evidence in the affidavit further detailed that during these trips, HUANG provided HUIZAR with tens of thousands of dollars in casino chips that HUIZAR cashed out.  And it describes in detail how HUIZAR sought to cover his tracks, including by laundering those funds and omitting them from his required financial disclosures.

HUIZAR complains that his rights were violated, arguing that the affidavit merely established that he received benefits from HUANG and SZNW. HUIZAR mischaracterizes the affidavit.  In addition to evidence of eight Las Vegas trips where he was lavished with luxury accommodations, casino chips, and other things of value, the affidavit further detailed HUIZAR's deliberate and extensive efforts to conceal those benefits.

For example, the affidavit revealed that HUIZAR —— when confronted by Palazzo casino employees seeking to confirm that, as a politically exposed person, he was gambling with his own money and not public or bribe funds —— refused to provide the requested documentation, instead electing to leave money on the table in lieu of answering questions, and thereafter stopped patronizing that (overly inquisitive) casino with HUANG.  One Palazzo employee said HUIZAR seemed to want to keep his gambling activities with HUANG "under the radar."  The affidavit also detailed SA Civetti's review of financial records indicating that HUIZAR laundered cash through the bank accounts of his family numerous times over the period of his

casino trips with HUANG, including several occasions on or around the precise days of those trips.  Consistent with this varied array of evidence that HUIZAR was not merely the fortuitous beneficiary of lavish no-strings-attached benefits from a developer who happened to have business in his district, the affidavit further described SA Civetti's review of HUIZAR's financial disclosures, on which he was required by law to list the benefits received from HUANG/SZNW.  HUIZAR's failure to comply with that requirement further evidenced his corrupt intent in accepting bribes from HUANG/SZNW.

While SA Civetti forthrightly relayed that the evidence was then unclear as to the specific official act or acts with which HUANG/SZNW sought to obtain HUIZAR's assistance through the bribe payments, the affidavit articulated a number of evidentiarily supported ways that the evidence indicated that HUIZAR could use his position to aid HUANG/SZNW.  For example, it noted HUIZAR's role as chairman of the powerful PLUM Committee and his active work in expanding hotel and hospitality service in downtown Los Angeles —— work from which SZNW "appears poised to benefit financially."  Def. Ex. 2 at 35.[5] Notably, the affidavit indicated that a SZNW subsidiary had at least one "mixed-use mega development[] in the pipeline for downtown Los Angeles," underscoring that HUIZAR —— with his significant influence over zoning and development in downtown Los Angeles —— would soon hold massive sway over HUANG/SZNW.  Id.  The affidavit further described HUIZAR's connection with CHAN, whose department had jurisdiction over SZNW's LA Hotel Downtown and who allegedly quashed

---

[5] A bribe can relate to a pending matter or a matter that "may by law be brought" before the public official in the future.  United States v. McDonnell, 136 S. Ct. 2355, 2369 (2016) (emphasis added).

11

1    safety and other complaints about that hotel without resolving them.

2    It also referenced HUIZAR's 2014 introduction of a formal City

3    resolution honoring HUANG as an economic leader in Los Angeles.

4         The affidavit further relayed that HUIZAR had used the Subject

5    Account to book his travel to and from Las Vegas during the casino

6    trips with HUANG.  It also recounted that HUIZAR used the account ——

7    his personal email —— to communicate with Esparza.  Collectively,

8    this veritable mountain of evidence certainly met the low threshold

9    of establishing a fair probability that evidence of the Subject

10   Offenses would be located in HUIZAR's email account.

11        While defendant would hold the government to much higher

12   standard, apparently requiring it to establish proof of every element

13   of every Subject Offense before it may obtain a search warrant[6], that

14   is not the law.  Lacking any support for that erroneous suggestion,

15   defendant vaguely cites to his own misunderstanding of McDonnell v.

16   United States, 136 S.Ct. 2355 (2016), and suggests that the

17   government cannot obtain a warrant to search for evidence of bribery

18   without establishing ironclad proof of the specific official act for

19   which defendant was bribed.

20        Even assuming that a *conviction* under 18 U.S.C. § 666 (the

21   federal program bribery statute listed in the warrant) would require

22   the identification of a specific official act under McDonnell, (which

23

24   _____

25        [6] Defendant concedes that, as a matter of settled law, a
     probable cause finding "does not always require probable cause for
26   every element."  Def. Mot. at 10.  However, the remainder of his
     argument focuses singularly on the plainly stated lack of clarity at
27   the time of the warrant as to exactly "what official acts JOSE HUIZAR
     has taken in exchange for the bribe and kickbacks payments he
28   received from WEI HUANG" —— suggesting that the government should be
     required to prove every element at the probable-cause stage.

1    it does not[7]) defendant muddles the standard for conviction at trial

2    with the far lower burden of probable cause to obtain a search

3    warrant —— and of course nowhere does McDonnell say that the

4    government must identify and prove a specific official act in order

5    to obtain a search warrant.  McDonnell does not address search

6    warrants or the probable cause standard at all.  Indeed, the cases

7    that defendant cites in support of his assertion that the

8    government's probable-cause showing was deficient merely held that

9    probable cause for specific-intent crimes requires probable cause for

10   the specific intent.  Def. Mot. at 10, citing United States v. Lopez,

11   482 F.3d 1067, 1073 (9th Cir. 2007), and similar cases.  As noted

12   above, the evidence that 1) HUIZAR was perfectly poised to

13   significantly reward HUANG for his showering of benefits; 2) HUIZAR

14   failed to report the lucrative payments and other benefits that he

15   received from HUANG as required by law; 3) he refused to comply with

16   a casino's request to certify that he was gambling with his own

17   money; and 4) he laundered the proceeds of those payments through his

18   family members, collectively established a fair probability of

19   defendant's corrupt specific intent.  No more was required here.[8]

---

21        [7] See Government's Omnibus Opposition to Defendants' Motions to
22   Dismiss Counts and Strike Language From the First Superseding
     Indictment (Dkt. 259 at 8-11) (citing, among other cases, McDonnell,
23   136 S. Ct. at 2371 ("agreement need not be explicit, and the public
     official need not specify the means that he will use to perform his
     end of the bargain.").

25        [8] Defendant further cites to a case where the Ninth Circuit held
     that a private individual could not be extradited for bribery solely
26   on evidence that he received a large payment from a company.  Man
     Seok-Choe v. Torres, 525 F.3d 733, 738 (9th Cir. 2008).  The Court
27   noted that while extradition was sought for the private citizen 's
     alleged bribery of a public official on behalf of the company from
28   which the received payment, the record lacked any evidence that the

                                        *(footnote cont'd on next page)*

                                   13

Finally, while HUIZAR's argument focuses exclusively on one particular element of only one potential crime, bribery, the warrant identified several other Subject Offenses, including money laundering and structuring financial transactions to evade reporting requirements, the probable-cause requirements for which were also unquestionably met by the facts articulated in the affidavit.  Def. Ex. 1 at 8.

### B. The Search Warrant Was Sufficiently Particularized and Not Overbroad

"Particularity is the requirement that the warrant must clearly state what is sought." United States v. Hill, 459 F.3d 966, 973 (9th Cir. 2006).  "Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." United States v. SDI Future Health, Inc., 568 F.3d 684, 702 (9th Cir. 2009) (internal quotation marks omitted). The Ninth Circuit considers three factors in analyzing the breadth of a warrant:

> (1) whether probable cause existed to seize all items of a category described in the warrant; (2) whether the warrant set forth objective standards by which executing officers could differentiate items subject to seizure from those which were not; and (3) whether the government could have described the items more particularly in light of the information available.

United States v. Lei Shi, 525 F.3d 709, 731-32 (9th Cir. 2008).

This warrant was not overbroad.  First, the affidavit set forth facts establishing that probable cause existed to seize each category of information described.  Each category of evidence was relevant and tailored to the Subject Offenses.  The second and third factors also

defendant in that case ever gave anything to the public official, promised him anything, or even met with him.  Id.  This case is wholly inapposite and does nothing to undermine the extensive probable cause supporting the search warrant.

weigh against defendant.  Each of the four categories set clear and objective standards for the government to seize responsive material.  United States v. Flores, 802 F.3d 1028, 1044 (9th Cir. 2015).

Moreover, the search warrant was sufficiently particularized.  Each category of information articulated in the warrant contained a description "specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized."  United States v. Spilotro, 800 F.2d 959, 963 (9th Cir. 1986).

At its heart, defendant's opposition objects to the government's two-step approach in reviewing a large quantity of his emails and seizure of a small fraction thereof.  Defendant waves the numbers — 27,356 emails reviewed, and 496 deemed pertinent — as purported proof that the warrant was insufficiently particularized and "strikingly overbroad," when in fact those numbers only further underscore the thoughtfully targeted nature of the warrant.  Defendant decries the "hit rate under 2%" and ignores the obvious dissonance in his position, which can be paraphrased as follows: "*The warrant was so narrow and particularized that the government didn't seize enough material to justify the search, but the warrant was overbroad and insufficiently particular*."

Defendant then broadens his complaint, lamenting that a search warrant for a personal email account is an "extraordinary privacy invasion" that should, apparently, never be permitted.  Def. Mot. at 16.  Once again, defendant's arguments are entirely unsupported by law, as is his suggestion that a "sitting politician" should enjoy a higher standard of privacy than the rest of the population.  Id.  The Constitution specifically rejects such hubris.  "Our system of jurisprudence rests on the assumption that all individuals, whatever

their position in government, are subject to federal law[.]" <u>Butz v.</u>
<u>Economou</u>, 438 U.S. 478, 505 (1978); <u>see also</u> <u>United States v. Lee</u>,
106 U.S. 196, 220 (1882) ("All the officers of the government, from
the highest to the lowest, are creatures of the law and are bound to
obey it."). HUIZAR's claim here is also puzzling given that those
empowered with the public trust are regularly required to surrender
more privacy, not less, in exchange for that grant of power.
California's Form 700 statutory requirement for financial
disclosures, which defendant abused, is but one such example of this
heightened expectations for our high-level public servants.

Defendant's view of the two-step email review and seizure
approach is not supported by either law or common sense.  The Ninth
Circuit has repeatedly and expressly approved the government's
approach of conducting targeted searches of broad segments of email
and other digital accounts, holding, "'[o]ver-seizing' is an accepted
reality in electronic searching because there is no way to be sure
exactly what an electronic file contains without somehow examining
its contents." <u>Flores</u>, 802 F.3d at 1044, quoting <u>United States v.</u>
<u>Comprehensive Drug Testing, Inc.</u>, 621 F.3d 1162 (9th Cir. 2010); <u>see</u>
<u>also</u> <u>United States v. Adjani</u>, 452 F.3d 1140, 1149-50 (9th Cir. 2006)
("To require such a pinpointed computer search, restricting the
search to an email program or to specific search terms, would likely
have failed to cast a sufficiently wide net to capture the evidence
sought."); <u>United States v. Woolard</u>, 2021 WL 694008 at *6-7 (W.D.
Wash., Feb. 23, 2021); <u>United States v. Martinez</u>, 2020 WL 3050767 at
*3-5 (N.D. Cal. 2020); <u>United States v. Cummings</u>, 2020 WL 1983342 at
*6 (D. Ariz. 2020).

1    In Flores, the Ninth Circuit observed that defendant's argument

2    boiled down to a comparison of the numbers of digital items reviewed

3    (there, 11,000) against the much smaller number seized (there, about

4    100).  802 F.3d at 1046.  The Court's rejection of the precise

5    argument that defendant now raises —— albeit less compellingly, with

6    a higher percentage of "hits" discovered here than in Flores —— dooms

7    his motion.

8    While defendant ignores the binding precedent in Flores, he does

9    cite to a case from a magistrate judge in another district analyzing

10   Flores.  That case held that Flores permitted the court to direct the

11   provider to disclose only those emails within the date range

12   specified in the warrant.  Matter of Search of Information Associated

13   With Four Redacted Gmail Accounts, 371 F.Supp.3d 843 (D. Or. 2018).

14   Defendant's motion then extrapolates the verbiage of this inapposite

15   case to suggest that the warrant here should have required Yahoo to

16   conduct its own search of the materials and provide only those

17   relating to already-known criminal subjects, accounts, or terms.

18   Def. Mot. at 15, 18.  But the law does not require the government to

19   outsource its investigative function to a private company, nor is

20   probable cause necessarily restricted to a defendant's communications

21   with other criminal targets already known to the government at the

22   time of the warrant.

23   In addition to being contrary to settled law, defendant's

24   argument that the government should not be entitled to seize the

25   pertinent emails found in his account pursuant to a lawful search

26   warrant because they were co-mingled with other non-pertinent emails

27   is inconsistent with common sense.  People who commit crimes have

28   everyday obligations and quotidian concerns separate and apart from

17

their criminal conduct, and they rarely maintain a separate email account for the sole purpose of storing evidence of their crimes. Rather, their email accounts — like those of other people — are likely to contain personal communications, records of consumer transactions, spam, and other non-pertinent material.  For that reason, the ratio of pertinent to non-pertinent communications would be expected to be quite low.  Defendant's failure to neatly segregate his criminal communications from all of his other daily business does not entitle him to the windfall of suppression.

Defendant also complains about the temporal limit contained in the search warrant, which allowed the government to search his emails from approximately a year before he performed the official act of introducing a resolution honoring HUANG[9] and about 14 months before his first known trip to Las Vegas to gamble with HUANG and receive casino chips from him.  Defendant cites no legal support for his implicit contention that probable cause is strictly limited to the first known criminal activity, and in any event, the warrant established probable cause to search defendant's email account for some time before those known 2014 events.  For instance, the warrant established a close connection between and among HUIZAR, CHAN, and SZNW, and it articulated evidence indicating that complaints about SZNW's LA Hotel Downtown to CHAN's City department were quietly quashed as early as 2013.

Common sense further supports SA Civetti's conclusion that probable cause existed to search HUIZAR's emails reaching back to

---

[9] A government resolution honoring an individual is "indisputably an official act" post-McDonnell.  <u>United States v. Silver</u>, 948 F.3d 538, 570 (2d Cir. 2020).

about a year before his first known Las Vegas trip with HUANG.  Human relationships, including corrupt relationships, take time to develop, and nothing requires the Court to assume that defendant's criminal intentions and conduct spontaneously emerged during his initial trip to Las Vegas and that he immediately began accepting large bribes from HUANG at that time.  Based on the facts here, one year was an appropriate time period to probe the rapid evolution of this unlikely alliance between a foreign billionaire residing in China and a local City councilmember.[10]

C.   **The Agents Reasonably Relied on the Warrant in Good Faith**

Even if probable cause were lacking, the FBI acted in good faith and was entitled to rely on the warrant.  When evidence is seized by an officer acting in good faith, exclusion is inappropriate because no deterrent interest is served by punishing an officer acting in a mistaken but good-faith belief in the legality of his actions. United States v. Leon, 468 U.S. 897, 922 (1984).

The good-faith exception is available unless any of the four narrow circumstances apply:  (1) "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth"; (2) "the issuing magistrate wholly abandoned his judicial role"; (3) the warrant was "based on an affidavit so lacking in indicia of probable cause as to render

---

[10] The Ninth Circuit in Flores considered, but ultimately declined to decide, whether a warrant — which allowed search of digital communications from the time that the defendant was approximately 17 years old, *six years* before her known criminal conduct — was overbroad for lack of a temporal limit.  Precisely where any such temporal line might be in any given case is open to reasonable debate, but in this case, on the facts in the affidavit, it certainly was no further forward than April 1, 2013.

1   official belief in its existence entirely unreasonable"; or (4) the

2   warrant failed to "particularize the place to be searched or things

3   to be seized." <u>Leon</u>, 468 U.S. at 914-23.  None of these things

4   happened: the judge was not misled, an impartial magistrate executed

5   her judicial role, probable cause was established, and the warrant

6   was sufficiently particularized.[11]

7       **D.   A Drafting Error Did Not Affect the Search or Seizure and**
           **Did Not Invalidate the Warrant**

8

9       Defendant briefly notes a technical error in the warrant.  Def.

10   Mot. at 17-18.  Due to a clerical error, Attachment B to the warrant

11   stated that agents could seize "all records and information described

12   above in Section II.10.a and II.10.b."  (CR 274-1, Attachment B,

13   § III.11.b.)  This provision should have read that the search team

14   could seize "all records and information described above in Section

15   II.10.b" (not II.10.a), which refers to non-content information that

16   can be obtained pursuant to 18 U.S.C. § 2703(d).  That clerical error

17   is of no moment.  The agents executed the warrant in accordance with

18   standard language and seized only the particularized categories of

19   items specifically detailed in the warrant.  Had the warrant been

20

21      [11] Because good faith would clearly apply here even if the
affidavit were found to have insufficient probable cause, defendant's
motion is laced with innuendo and invective in place of facts and law

22   in a futile effort to clear the very high bar of establishing that no
reasonable agent or judge could have possibly believed that there was

23   probable cause for the warrant.  Continuing with the defense
litigation theme of throwing mud at the government charged with

24   investigating public corruption of this kind (<u>see</u> CR 259 at 13-15, n.
5, and n. 7), defendant dismisses SA Civetti's experience and work as

25   an FBI agent as "meaningless" and "amount[ing] to nothing"; hints
that the Honorable Alicia Rosenberg abandoned her judicial role and

26   merely [rubber] "stamped the warrant without change" "on the morning
it was requested"; and charges, with zero evidence, that SA Civetti

27   "hid from the magistrate" an email toll record —— a record that would
have only further bolstered the already overwhelming probable cause

28   for this warrant.  <u>See</u> Def. Mot. at 7, 12, 21.  As explained herein,
defendant's accusations are baseless, as is his motion.

intended to allow the seizure of all content produced by the provider
there would have been no need for the warrant to spell out the four
carefully delineated categories of items to be seized.

Drafting errors do not invalidate an otherwise valid warrant.
See United States v. Alvarez, 190 F. Supp. 3d 885, 895 (N.D. Cal.
2016), citing United States v. Hattrick, 182 Fed. Appx. 649 (9th
Cir.2006) (warrant's mistaken omission of officers' authority to
seize evidence was "a mere technical mistake" that did not require
suppression).  And defendant has of course shown no prejudice from
this minor clerical error, because agents did not seize all content
but executed the warrant in accordance with the list of items to be
seized.

Moreover, this technical error was not obvious from the face of
the warrant, and "any arguable defect would have become apparent only
upon a close parsing" of the warrant.  Messerschmidt v. Millender,
565 U.S. 535, 556 (2012).  The agent's reliance on the warrant, and
Judge Rosenberg's approval of it, notwithstanding a minor drafting
error that did not affect the careful execution of the warrant in
accordance with its narrow and lawful terms, was thus entirely
reasonable.[12]   Id.

**E.    The Warrant Contained No Material Misstatements or
         Omissions ── Deliberate, Reckless, or Otherwise**

Notwithstanding the copious probable cause supporting the
warrant, defendant argues ── with no evidence ── that SA Civetti

_____

[12] Notably, the search team ── clearly unaware of this hidden
defect in the warrant ── did not broadly seize everything in the
account, or even anything close to it.  Rather, agents seized only
those materials that fit within the four categories of permissible
items to be seized.  As defendant notes, these amounted to a narrow
sliver of under 2% of the materials produced.  Def. Mot. at 8.

21

1    deliberately "hid from the magistrate" an additional record that

2    defendant now suggests would have impacted a probable-cause

3    determination in his favor.  However, defendant fails to mention in

4    his description of this "hid[den]" toll record that it reflected,

5    during the six-month period it covered, *hundreds of emails* between

6    HUIZAR and Esparza using their personal email accounts.  The warrant

7    details that Esparza was HUIZAR's aide, suspected co-conspirator in

8    the bribery scheme, companion for at least one of the gambling trips

9    with HUANG and Zheng, and observer of HUANG giving casino chips to

10   HUIZAR.  As HUIZAR's underling and co-conspirator, Esparza was a

11   natural link between HUIZAR on the one side and SZNW, HUANG, and

12   Zheng on the other.  The affidavit described evidence that Esparza

13   (HUIZAR's right-hand man) and Zheng (HUANG's right-hand man) were "in

14   almost constant contact."  Def. Ex. 2 at 56.  On those facts,

15   HUIZAR's communications with Esparza would have been expected to

16   contain the lion's share of the type of evidence sought in the

17   warrant —— specifically, logistical details relating to HUIZAR's

18   bribery-fueled trips to Las Vegas, and similar information on other

19   travel with HUANG.  See id. at 57-58.  And indeed, the toll record

20   that defendant attached to his motion makes clear that HUIZAR and

21   Esparza exchanged hundreds of emails between their personal accounts

22   over a six-month period. Def. Ex. 3.  This evidence would only have

23   further bolstered an already overwhelming volume of probable cause

24   for HUIZAR's email account.

25        Defendant also alleges, with no facts, that SA Civetti

26   deliberately "chose to withhold" information that SZNW did not have

27   projects before HUIZAR during the search period.  As a procedural

28   matter, defendant fails to meet the baseline requirement of providing

1   any factual support for his assertion, dooming this argument at the

2   outset.  See Local Criminal Rule 12-1 (a motion to suppress evidence

3   must be supported by a "declaration on behalf of the defendant,

4   setting forth all facts then known upon which it is contended the

5   motion should be granted."); see also United States v. Wardlow, 951

6   F.2d 1115, 1116 (9th Cir. 1991) (affirming that the defendant "had

7   forfeited his right to a hearing by not properly submitting a

8   declaration.")  Were the Court to reach the merits, this argument

9   would also summarily fail, as SA Civetti did not "repeatedly

10  intimate[] that HUANG and Shen Zen had already sought and were

11  continuing to seek assistance from HUIZAR."  Def. Mot. at 21.  The

12  contrary is true; as defendant himself notes in his very first

13  paragraph, SA Civetti plainly stated that "'it remains unclear what

14  official acts,' if any, might have been sought from HUIZAR in

15  return."  Id. at 1.  Even without that information, no one reviewing

16  a search warrant that *did not* detail concrete acts known to be sought

17  from an official in exchange for bribes would naturally presume that

18  there was already hard unspoken evidence of lots of them.

19       **F.   Defendant Is Not Entitled to a <u>Franks</u> Hearing**

20       To justify a Franks hearing, defendant is required to make two

21  showings.  First, defendant must make a substantial preliminary

22  showing that the affidavit contained a misleading omission, and that

23  the omission resulted from a deliberate or reckless disregard of the

24  truth.  United States v. Kyllo, 37 F.3d 526, 529 (9th Cir. 1994).

25  Second, defendant must establish that had there been no omission, the

26  affidavit would have been insufficient to establish probable cause.

27  Id.  Defendant has done neither, nor has he even attempted to meet

28  his significant burden.  Indeed, his request for a Franks hearing is

                                   23

conveyed only in the caption of his motion; nowhere in the 24-page motion itself does defendant actually request a <u>Franks</u> hearing or explain why he should be entitled to one.[13]

Defendant focuses entirely on the perceived "omission" of one specific record that he believes should have been included in the search warrant application, but he glosses over a critical component of his required showing — namely, that the purported omission was not only misleading, but that the agent acted with deliberate or reckless disregard for the truth.  His bald and unfounded claims that the agent "hid from the magistrate" this toll record does not remotely meet defendant's burden to make a substantial showing of the agent's deliberate or reckless disregard for the truth.  And he makes no effort to show that the toll records rendered the probable cause deficient.  Defendant's barebones and unsupported request for a <u>Franks</u> hearing should be denied.

### G. Suppression Here Would Contravene the Purpose of the Exclusionary Rule

Suppression is an extreme remedy and not an automatic consequence of any Fourth Amendment violation.  Rather "the question turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct."  <u>Herring v. United States</u>, 555 U.S. 135, 137 (2009).  Specifically, "police must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  <u>Id.</u> at 144.  Deterrence is served "only if it can be said that the law enforcement officer had knowledge, or may properly be

---

[13] Similarly, defendant's motion does not request an evidentiary hearing.  He is not entitled to one, as there is no factual dispute.

1  charged with knowledge, that the search was unconstitutional[.]"

2  United States v. Sears, 411 F.3d 1124, 1128 (9th Cir. 1988).  In this

3  case, there was no law enforcement misconduct to deter.  Nor is there

4  any evidence that the judge issuing the challenged search warrant was

5  inclined to "ignore or subvert the Fourth Amendment."  Id.

6      **H.   Preservation Requests Do Not Violate the Fourth Amendment**

7      Finally, defendant summarily asserts that preservation requests

8  to internet service providers pursuant to 18 U.S.C. § 2703(f)

9  constitute a wholesale violation of the Fourth Amendment.  Defendant

10 is wrong.  Yahoo was not a government agent, and thus its actions in

11 preserving defendant HUIZAR's email account to prevent deletion of

12 content and prevent obstruction of a lawful search warrant could not

13 have violated the Fourth Amendment.  See United States v. Basey, 2021

14 WL 1396274 (D. Alaska 2021); United States v. Rosenow, 2018 WL

15 6064949 (S.D. Cal. 2018).  Nor was the preservation itself a search

16 or a seizure.  Temporary preservation by a provider does not

17 interfere with the owner's use or control of an account and is not a

18 "meaningful interference with an individual's possessory interest in

19 that property," and thus it does not constitute a seizure.  United

20 States v. Jefferson, 566 F.3d 928, 933 (9th Cir. 2009).  The

21 government obtains no information pursuant to 2703(f) preservation

22 letters, which merely request that a provider preserve an account to

23 prevent deletion of content, thereby permitting the government to

24 later seek lawful authorization to search it.  For these reasons,

25 2703(f) preservations requests do not violate the Fourth Amendment.

26 **IV.  CONCLUSION**

27     For the foregoing reasons, HUIZAR's motion to suppress email

28 evidence should be denied.