TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MACK E. JENKINS (SBN: 242101)
Assistant United States Attorney
Chief, Public Corruption & Civil Rights Section
VERONICA DRAGALIN (SBN: 281370)
MELISSA MILLS (SBN: 248529)
Assistant United States Attorneys
Public Corruption & Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2091/0647/0627
    Facsimile: (213) 894-7631
    E-mail: Mack.Jenkins@usdoj.gov
            Veronica.Dragalin@usdoj.gov
            Melissa.Mills@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 20-326(A)-JFW |
|---|---|
| Plaintiff, | GOVERNMENT'S OMNIBUS OPPOSITION TO DEFENDANTS JOSE HUIZAR AND SHEN ZHEN NEW WORLD I, LLC'S MOTIONS TO SUPPRESS ON BASIS OF ATTORNEY-CLIENT PRIVILEGE (CR 275 AND CR 281); DECLARATION OF ANDREW CIVETTI |
| v. | |
| JOSE LUIS HUIZAR, et al. | |
| Defendants. | |
| | [Exhibits 1-12 Concurrently Filed Provisionally Under Seal] |
| | Date:      January 31, 2022 |
| | Time:      8:00 a.m. |
| | Location: Courtroom of the Hon. John F. Walter |

Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California and Assistant United States Attorneys Mack E. Jenkins,

1  Veronica Dragalin, and Melissa Mills, hereby files its Omnibus[1]

2  Opposition to defendant JOSE HUIZAR's and defendant SHEN ZHEN NEW

3  WORLD I, LLC's Motion to Suppress Evidence, Dismiss Counts, and

4  Strike Allegations due to Government's Violations of Attorney-Client

5  Privilege (CR 275) and defendant HUIZAR's Motion to Suppress

6  Privileged Attorney-Client Communications (CR 281).

7      This opposition is based upon the attached memorandum of points

8  and authorities, the Declaration of Andrew Civetti, Government

9  Exhibits 1-12 concurrently filed provisionally under seal, the files

10  and records in this case, and such further evidence and argument as

11  the Court may permit.

12  Dated: December 20, 2021          Respectfully submitted,

13                                    TRACY L. WILKISON
                                      United States Attorney
14
                                      SCOTT M. GARRINGER
15                                    Assistant United States Attorney
                                      Chief, Criminal Division
16

17

18                                    VERONICA DRAGALIN
                                      MACK E. JENKINS
19                                    MELISSA MILLS
                                      Assistant United States Attorneys
20
                                      Attorneys for Plaintiff
21                                    UNITED STATES OF AMERICA

22

23

24

25

26

27

28      [1] In order to make the Court's review more efficient, the
   government responds to both related motions in this single filing.

2

1

**TABLE OF CONTENTS**

2   I.    INTRODUCTION..................................................1

3   II.   RELEVANT FACTUAL BACKGROUND...................................2

4         A.   The $600,000 Bribe Disguised as a "Loan" to HUIZAR........2

5              1.   Relevant Indictment Allegations.....................2

6              2.   Warrants for HUIZAR's and Esparza's E-mails.........3

7              3.   Defendant HUIZAR's Production of Purportedly
                    Privileged E-mails to the Government................6
8
               4.   Additional Information Obtained by the Government....7
9
          B.   The Formation of a PAC to Benefit Defendant HUIZAR's
10             Relative..................................................9

11             1.   Relevant Indictment Allegations.....................9

12             2.   Co-Conspirators' Communications with Defendant
                    HUIZAR's Election Attorney..........................9
13
    III.  ARGUMENT.....................................................10
14
          A.   Disguised as Motions to Suppress, Defendants Raise a
15             Claim of Outrageous Government Conduct Premised Upon
               Deliberate Intrusion into the Attorney-Client
16             Relationship.............................................10

17             1.   Legal Standard for Outrageousness Claim............12

18        B.   Defendants Have Failed to Show that the Government
               Deliberately Intruded into an Attorney-Client
19             Relationship that Never Existed with Attorneys
               Yong/Sun.................................................14
20
               1.   Defendants Cannot Show the Government Was
21                  Objectively Aware of an Ongoing, Personal
                    Attorney-Client Relationship with Yong/Sun.........15
22
               2.   Defendants Have Failed to Show They Had an
23                  Attorney-Client Relationship with Yong/Sun.........20

24        C.   Defendant HUIZAR Has Failed to Meet His Burden to
               Establish that the Kaufman Calls and Statements About
25             Invoices Are Protected by the Attorney-Client
               Privilege................................................32
26
               1.   June 29, 2017 Conference Call......................32
27
               2.   June 2018 Call from Kaufman to Goldman and
28                  Shoemaker..........................................34

        3.    Esparza's Statements About Kaufman Invoices.........35

    D.    Defendants Waived Any Purported Privilege................37

        1.    Defendant HUIZAR Voluntarily Produced Yong E-
            mails to the Government During this Criminal Case...38

        2.    Defendants Implicitly Waived Any Purported
            Privilege by Failing to Assert It in a Timely
            Manner............................................39

    E.    Defendants Do Not Meet Their Burden of Showing
        Dismissal or a *Kastigar* Hearing Is Warranted.............41

IV.   CONCLUSION....................................................42

**TABLE OF EXHIBITS**[1]

| Exhibit | Description | Page(s):Line(s) |
|---------|-------------|-----------------|
| 1 | September 6, 2019 FBI Report of Search Warrant Procedures | 3:7; 4:3; 17:8 |
| 2 | August 17, 2014 HUIZAR E-mail with Bates Casino_0000294 | 4:21 |
| 3 | August 22, 2014 HUIZAR E-mail with Bates Casino_0000296-297 | 5:2 |
| 4 | August 22, 2014 HUIZAR E-mail with Bates Casino_0000300-302 | 5:9 |
| 5 | August 22, 2014 HUIZAR E-mail with Bates Casino_0000303-305 | 5:12; 23:2 |
| 6 | August 22, 2014 HUIZAR E-mail with Bates Casino_0000306 | 5:12; 23:2 |
| 7 | August 22, 2014 HUIZAR E-mail with Bates Casino_0000307 | 5:12; 23:2 |
| 8 | August 8, 2014 Esparza E-mail with Bates Casino_0004431 | 6:4; 17:20 |
| 9 | September 4, 2014 Esparza E-mail with Bates Casino_0004530-31 | 6:15 |
| 10 | November 18, 2018 FBI Report of HUIZAR interview | 6:22; 7:28; 40:24 |
| 11 | November 20, 2018 Yan E-mail and Attachments | 8:4; 19:14; 22:12 |
| 12 | March 27, 2019 Mary Andrues E-mail and Subset of HUIZAR Production | 7:6; 29:13; 38:10; 40:26 |

---

[1] Government Exhibits 1-12 are described in the attached Declaration of FBI Special Agent Andrew Civetti, and concurrently filed provisionally under seal.

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

Anderson v. SeaWorld Parks & Ent., Inc.,
5
    329 F.R.D. 628 (N.D. Cal. 2019).............................31, 33

6

Bank Brussels Lambert v. Credit Lyonnaise,
    160 F.R.D. 437 (S.D.N.Y 1995)................................24

7

Beyond Sys. v. Kraft Foods, Inc.,
8
    No. PJM-08-409, 2010 WL 1568480 (D. Md. Aug. 4, 2010)........24

9

Cavallaro v. United States,
    284 F.3d 236 (1st Cir. 2002)................................31

10

Cheeves v. S. Clays, Inc.,
11
    128 F.R.D. 128 (M.D. Ga. 1989)..............................24

12

Chevron Corp. v. Pennzoil Co.,
13
    974 F.2d 1156 (9th Cir. 1992)...............................23

14

Commodity Futures Trading Comm'n v. Weintraub,
15
    471 U.S. 343 (1985)........................................19

16

E.E.O.C. v. BDO USA, L.L.P.,
    876 F.3d 690 (5th Cir. 2017)................................27

17

Fisher v. United States,
18
    425 U.S. 391 (1976)........................................16

19

Flo Pac, LLC v. NuTech, LLC,
    No. WDQ-09-510, 2010 WL 5125447 (D. Md. Dec. 9, 2010)........31

20

Fox News Network, LLC v. U.S. Dep't of the Treasury,
21
    739 F. Supp. 2d 515 (S.D.N.Y. 2010).........................24

22

Gen. Elec. Capital Corp. v. DirectTV, Inc.,
23
    No. 3:97 CV 1901, 1998 WL 849389 (D. Conn. July 30, 1998).....27

24

Gracov Children's Prods., Inc. v. Dressler, Goldsmith, Shore &
    Milnamow, Ltd.,
25
    No. 95 C 1303, 1995 WL 360590 (N.D. Ill. June 14, 1995).......24

26

Griffith v. Davis,
    161 F.R.D. 687 (C.D. Cal. 1995).............................30

27

Harris v. United States,
28
    413 F.2d 316 (9th Cir. 1969)................................28

Hartford Fire Ins. Co. v. Garvey,
        109 F.R.D. 323 (N.D. Cal. 1985)................................16

In re Air Crash Disaster,
        133 F.R.D. 515 (N.D. Ill. 1990)...............................29

In re Bieter Co.,
        16 F.3d 929 (8th Cir. 1994)...................................32

In re Bonanno,
        344 F.2d 830 (2d Cir. 1965)...................................16

In re Carter,
        62 B.R. 1007 (Bankr. C.D. Cal. 1986).........................19

In re Fischel,
        557 F.2d 209 (9th Cir. 1977)..................................26

In re Grand Jury Proc.,
        87 F.3d 377 (9th Cir. 1996)...................................19

In re Grand Jury Proceedings, Cherney,
        898 F.2d 565 (7th Cir. 1990)..................................17

In re Hotels Nevada, LLC,
        458 B.R. 560 (Bankr. D. Nev. 2011)...........................25

In re John Doe Corp.,
        675 F.2d 482 (2d Cir. 1982)...................................24

In re Pac. Pictures Corp.,
        679 F.3d 1121 (9th Cir. 2012)............................25, 30

In re Vitamin C Antitrust Litig.,
        No. MD 06-1738(BMC)(JO), 2011 WL 197583 (E.D.N.Y. Jan. 20, 2011)
        ..............................................................25

Liew v. Breen,
        640 F.2d 1046 (9th Cir. 1981).................................26

Med. Assurance Co., Inc. v. Miller,
        No. 4:08-cv-29, 2010 WL 2710607 (N.D. Ind. July 7, 2010)..16, 17

Nidec Corp. v. Victor Co. of Japan,
        249 F.R.D. 575 (N.D. Cal. 2007)...............................30

Olender v. United States,
        210 F.2d 795 (9th Cir. 1954)..................................28

Pac. Corp. v. GAF Roofing Mfg. Corp.,
        No. 93 Civ. 5125, 1996 WL 29392 (S.D.N.Y. Jan. 25, 1996)......27

_Phillips v. C.R. Bard, Inc.,_
    290 F.R.D. 615 (D. Nev. 2013) ................................ 27

_Pont de Nemours & Co. v. Forma-Pack, Inc.,_
    351 Md. 396, 718 A.2d 1129 (1998) ........................... 29

_Purdee v. Pilot Travel Ctrs., LLC,_
    No. CV407-028, 2008 WL 11350099 (S.D. Ga. Feb. 21, 2008) ...... 16

_Thurmond v. Compaq Computer Corp.,_
    198 F.R.D. 475 (E.D. Tex. 2000) ...................... 28, 35, 36

_Titan Inv. Fund II, LP v. Freedom Mtg. Corp., C.A.,_
    09C-10-259 WCC, 2011 WL 532011 (Del. Super. Ct. Feb. 2, 2011). 24

_United States v. Ary,_
    518 F.3d 775 (10th Cir. 2008) ............................... 40

_United States v. Bauer,_
    132 F.3d 504 (9th Cir. 1997) ................................ 37

_United States v. Chen,_
    99 F.3d 1495 (9th Cir. 1996) ................................ 26

_United States v. Chevron Texaco Corp.,_
    241 F. Supp. 2d 1065 (N.D. Cal. 2002) ....................... 30

_United States v. Constr. Prods. Research, Inc.,_
    73 F.3d 464 (2d Cir. 1996) .................................. 22

_United States v. Danielson,_
    325 F.3d 1054 (9th Cir. 2003) ............................... 13

_United States v. de la Jara,_
    973 F.2d 746 (9th Cir. 1992) ............................ 39, 40

_United States v. Evans,_
    113 F.3d 1457 (7th Cir. 1997) ............................... 31

_United States v. Graf,_
    610 F.3d 1148 (9th Cir. 2010) ............................... 16

_United States v. Gray,_
    876 F.2d 1411 (9th Cir. 1989) ........................... 16, 34

_United States v. Gurolla,_
    333 F.3d 944 (9th Cir. 2003) ................................ 41

_United States v. Haynes,_
    216 F.3d 789 (9th Cir. 2000) ........................... 12, 41

iii

United States v. Huberts,
    637 F.2d 630 (9th Cir. 1980)................................. 26, 28

United States v. Irwin,
    612 F.2d 1182 (9th Cir. 1980)................................. 42

United States v. Lin Lyn Trading, Ltd.,
    149 F.3d 1112 (10th Cir. 1998)................................ 12

United States v. Neill,
    952 F. Supp. 834 (D.D.C. 1997)................................ 13

United States v. Ray,
    No. 20-CR-110 (LJL), 2021 WL 5332318 (S.D.N.Y. Nov. 15, 2021). 12

United States v. Richey,
    632 F.3d 559 (9th Cir. 2011)................................. 16

United States v. Rogers,
    751 F.2d 1074 (9th Cir. 1985)................................ 20

United States v. Rowe,
    96 F.3d 1294 (9th Cir. 1996)................................. 28

United States v. Schafer,
    625 F.3d 629 (9th Cir. 2010)................................. 21

United States v. SDI Future Health, Inc.,
    464 F. Supp. 2d 1027 (D. Nev. 2006).................... 12, 13, 20

United States v. Stringer,
    535 F.3d 929 (9th Cir. 2008)............................. passim

United States v. Tyerman,
    701 F.3d 552 (8th Cir. 2012)................................. 38

United States v. Vasquez,
    26 F.3d 135 (9th Cir. 1994).................................. 12

United States v. Voigt,
    89 F.3d 1050 (3d Cir. 1996)............................. passim

United States v. Wardlow,
    951 F.2d 1115 (9th Cir. 1991)................................ 22

United States v. White,
    970 F.2d 328 (7th Cir. 1992)................................. 13

United States v. Wilson,
    798 F.2d 509 (1st Cir. 1986)................................. 27

Weil v. Inv./Indicators, Research & Mgmt., Inc.,
        647 F.2d 18 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . 30, 32, 38, 39

**Rules**

Fed. R. Crim. Proc. 12(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Other Authorities**

C.D. Cal. Criminal Local Rule 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 33

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3        Defendants JOSE HUIZAR ("HUIZAR") and SHEN ZHEN NEW WORLD I, LLC

4   ("SZNW" and, together with HUIZAR, "defendants") move to suppress

5   records, dismiss counts, and strike allegations in the indictment,

6   arguing that the attorney-client relationship between a Hong Kong

7   shell entity and a disbarred lawyer shields incriminating documents

8   and testimony showing how defendant WEI HUANG secretly financed

9   HUIZAR's sexual harassment lawsuit settlement.  CR 275 ("Def. Mot.

10  1").  HUIZAR separately accuses the government of deliberately

11  intruding into the attorney-client relationship by seizing a wire-

12  intercepted conference call between co-conspirators and HUIZAR's

13  election lawyer and by interviewing co-conspirators about their

14  scheme.  CR 281 ("Def. Mot. 2").  Both motions fail for the same

15  reasons.

16       Including third parties on attorney communications destroys

17  privilege because it breaks confidentiality.  To overcome that

18  inconvenient basic legal premise, defendants distort the concept of

19  the attorney-client relationship and ask this Court to significantly

20  expand this narrow privilege by considering all co-conspirators

21  "joint clients" and/or authorized "agents" to preserve

22  confidentiality.  That defendants had a common criminal purpose with

23  co-conspirators who they chose to include on attorney communications

24  does not give rise to a legitimate common legal interest to establish

25  a joint client privilege.  Having failed to establish that the co-

26  conspirators were all joint clients, defendants cannot meet their

27  burden to so broadly invoke the attorney-client privilege.  Even if

28  they could invoke some expanded privilege, defendants come woefully

short of meeting the high standard for showing that the government deliberately intruded into the attorney-client relationship in violation of their Constitutional rights, which is required to dismiss counts, strike allegations, or suppress the evidence.  This Court should deny both motions.

## II.   RELEVANT FACTUAL BACKGROUND

### A.   The $600,000 Bribe Disguised as a "Loan" to HUIZAR

#### 1.   Relevant Indictment Allegations

The indictment alleges and the government will prove at trial that beginning in October 2013, "defendants HUIZAR and CHAN discussed the sexual harassment lawsuit filed against HUIZAR" and "how defendant CHAN would facilitate Wei Huang's assistance with the lawsuit."  CR 71 ("FSI"), Overt Act 25.  The indictment further alleges that defendants HUIZAR, RAYMOND CHAN, HUANG, SZNW, and their co-conspirators, George Esparza (HUIZAR's aide) and Ricky Zheng (HUANG's aide),[1] eventually effectuated a financial transaction whereby the entity Grace Luck Holdings, Ltd. ("Grace Luck") transferred $600,000 from Hong Kong to a lawyer trust account in Los Angeles, which was then used as collateral for a bank loan to HUIZAR to settle his sexual harassment lawsuit.  Id. at Overt Acts 31-43. The indictment alleges this transaction was a bribe from HUANG/SZNW to HUIZAR.  Id. at ¶¶ 49-50 (Counts 22-23).  In around August 2014, HUIZAR, Esparza, and Zheng began communicating by e-mail with attorney Henry Yong, to draft and execute the necessary paperwork to

---

[1] For ease of reference, throughout this opposition, the government uses all caps only for defendants charged in the indictment in this case.

2

effectuate the financial transactions transferring funds to HUIZAR.
Id. at Overt Acts 31-43.

### 2. Warrants for HUIZAR's and Esparza's E-mails

During this investigation, from July 1, 2016 to November 2018,[2] the government obtained several federal search warrants for the e-mail accounts of, among others, HUIZAR and Esparza. Civetti Decl. ¶ 2, Gov. Ex. 1. During their review, if agents unexpectedly identified a potentially privileged attorney-client communication, they stopped their review and consulted with the assigned prosecutor based on their limited review of the participants and subject of the e-mail. Id. at ¶ 3. If, based on this description, the prosecutor concurred that the e-mail appeared likely to be potentially privileged, agents filtered out all e-mails with those e-mail addresses from their review without reviewing the content. Id. For HUIZAR, the filter included all e-mails with "@walsh," to include any lawyer or staff member of the legal firm Walsh & Associates, APC, which the FBI learned had represented HUIZAR in his personal capacity on the sexual harassment lawsuit filed against him by a former staffer. The filter also included all e-mails with "@kaufman," to include all e-mails with Stephen Kaufman, who agents identified as HUIZAR's election lawyer, and anyone else from the Kaufman Legal Group.[3] For Esparza, in an abundance of caution, the filter also

---

[2] On November 7, 2018, the government's investigation became overt after its public execution of search warrants, after which the government began communicating with criminal defense attorneys representing the various targets of those search warrants. After November 2018, subsequent search warrants targeting defendants included specific "Search Procedures for Handling Potentially Privileged Information," outlined in Attachment B of those subsequent warrants. Civetti Decl. ¶ 2.

[3] See CR 281 (Def. Mot. 2) at 10 ("Since at least 2012, Kaufman had been Huizar's election lawyer.").

3

included "@kaufman," meaning the investigative team did not review e-mail communications between Esparza and anyone with the e-mail address "@kaufman" Id., Gov. Ex. 1 at 3.[4]

During their review of HUIZAR's e-mail account, agents came across e-mails with Henry Yong (at an e-mail address that began with "esqimmigrationlaw," which suggested Yong provided legal advice related to immigration).  Based on a limited review of the substance and context of the communications, their knowledge of the investigation at that time, and in consultation with the assigned prosecutor, agents concluded that the e-mails were not privileged attorney-client communications, for the reasons discussed herein. Civetti Decl. ¶ 4.  Agents seized six e-mails from HUIZAR's e-mail account between HUIZAR and Yong without any other parties in the "to," "from" or "cc" line.  All six e-mails demonstrated that Yong was acting as a go-between for separate parties negotiating a financial transaction:

- August 17, 2014 e-mail from HUIZAR to Yong, writing "Just got an email that the plaintiff attorney is asking for a deadline of Tuesday noon to sign settlement. otherwise they pull settlement offer. let me know as soon as money has been transferred and available."  Id. ¶ 5(a), Gov. Ex. 2.

- August 22, 2014 e-mail from Yong to HUIZAR, asking him to review a draft "Promissory Note," that established a draft agreement by which "Grace Luck Holdings Ltd" would pay a sum of $600,000 through the attorney IOLTA Trust Account of Guodi Sun to a

---

[4] This filter procedure was over-inclusive in that it filtered out all e-mail communications with these e-mail addresses, including e-mail communications that may have copied third parties who broke the confidentiality of the communications.

4

yet to be determined individual or entity referred to only as "Maker." Id. ¶ 5(b), Gov. Ex. 3.

• August 22, 2014 e-mail from HUIZAR to Yong, writing: "This is doc I will sign and have **my attorney** hold for 30 days and execute in event I do not execute a commercial loan within 30 days. Let me know if it is ok with you." (emphasis added). The e-mail attached an unsigned "Promissory Note," similar in substance to the above version, and as alleged in Overt Act 34. Id. ¶ 5(c), Gov. Ex. 4.

• Three iterations of an August 22, 2014 e-mail between HUIZAR and Yong, in which HUIZAR wrote "the attached is what i signed and sent to **my attorney**." Id. ¶¶ 5(d)-(f), Exs. 5, 6, 7 (emphasis added).

Nothing in these e-mail communications demonstrated that HUIZAR had an attorney-client relationship with Yong. In fact, the communications themselves showed that HUIZAR had his own separate attorney on the sexual harassment lawsuit, to which he referred to as "my attorney," and suggested that Yong represented his own client, Grace Luck, in its negotiation and execution of a promissory note for HUIZAR's benefit.

During their review of Esparza's e-mail account, agents seized several e-mails that included Yong (at e-mail address "esqimmigrationlaw") in the "to," "from," or "cc," line. Some of those communications were between Yong and Esparza only, while others included HUIZAR and/or Zheng (at his personal e-mail address). Nothing in these e-mail communications demonstrated that Esparza had an attorney-client relationship with Yong. In the earliest communication from Yong to Esparza on August 8, 2014, Yong warned he

would not be serving in a legal capacity: "I am only licensed in New York and as such, my practice is limited to immigration only. My California licensed partner will handle this transaction." Id. ¶ 6, Gov. Ex. 8.[5] Agents did not seize any e-mail communications between HUIZAR (or Esparza) and any other "partner" or "associate" of Yong during the e-mail review. It was apparent from the communications that Esparza was communicating with Yong regarding the settlement funds for HUIZAR's sexual harassment lawsuit, and that Yong was associated with the entity Grace Luck. Documents from Esparza's e-mail account also showed that Yan Yan was the "sole representative" of Grace Luck in "the signing of any financial and/or legal documentations associated with the loan or planned pledging of a Six Hundred Thousand Dollars (USD $ 600,000.00) Certificate of Deposit as collateral for a loan for Mr. JOSE HUIZAR." Civetti Decl. ¶ 6, Gov. Ex. 9.

### 3. Defendant HUIZAR's Production of Purportedly Privileged E-mails to the Government

On December 18, 2018, pursuant to a proffer agreement and with defense counsel present, HUIZAR voluntarily disclosed information regarding the financial transaction whereby Grace Luck provided the collateral for his bank loan, including the use of an attorney named "Henry." Civetti Decl. ¶ 7, Gov. Ex. 10. Specifically, HUIZAR stated that he "worked with Zheng and an attorney named Henry [Last Name Unknown] to figure out how the money was going to be provided." Id. At no point did HUIZAR or his counsel invoke the attorney-client

---

[5] As defendants recognize, Yong was in fact disbarred by the California State Bar in 2009. CR 275 (Def. Mot. 1) at 4 fn.4.

privilege with respect to those communications or claim that a waiver of any privilege would be necessary to provide such information.[6]

On March 27, 2019, pursuant to the proffer agreement, HUIZAR voluntarily produced to the government many of the e-mail communications defendants now seek to suppress.  Civetti Decl. ¶ 9, Gov. Ex. 12.  The production included e-mails between HUIZAR, Esparza, Zheng and attorney Yong from August 10, 2014 to September 19, 2014, multiple drafts of the Promissory Note, a draft Attorney Fee Agreement, and a purported draft "Joint Venture Agreement."  Id. Nothing in the proffer agreement preserved HUIZAR's ability to later assert or claw back the attorney-client privilege with respect to those communications or any other communications on that topic.  See CR 312-2 (Def. Ex. A) (Dec. 18, 2018 Proffer Agreement).

### 4.   Additional Information Obtained by the Government

As part of its investigation in the case, the government conducted voluntary interviews with other individuals involved in the Grace Luck transaction regarding their involvement in arranging the "loan" from Grace Luck to HUIZAR, including George Esparza, Ricky Zheng, Yan Yan, Henry Yong, Guodi Sun, and bank employees.  See CR 302, Def. Exs. A (February 21, 2019 Zheng Interview), B (June 6, 2019 Esparza Interview), C (October 1, 2019 Yong Interview), I (November 19, 2018 Zheng Interview transcript), J (February 21, 2019 Zheng Interview transcript), K (April 8, 2019 Zheng Interview), L (September 23, 2019 Sun Interview).

---

[6] In fact, after HUIZAR later in the interview stated that he spoke to Stephen Kaufman, his "political attorney," regarding a potential vote on HUANG's project in the City, the government instructed him "not to provide any information protected under attorney-client privilege." Gov. Ex. 10 at 11.

7

On November 20, 2018, Yan Yan, the sole representative of the Hong Kong company Grace Luck, voluntarily provided copies of the transaction documents and her communications with Yong to the government.  See Civetti Decl. ¶ 8, Gov. Ex. 11.  Thereafter, the government obtained additional copies of the communications and transaction documents from Yong and Sun, and, as noted above, HUIZAR himself.  These documents show that Yan executed an "Attorney Fee Agreement" that listed Guodi Sun (not Yong) as the attorney and Grace Luck as the "Clients," and referred to HUIZAR as the "Borrower," and not a client of the attorney.  Id.  The agreement also explicitly set forth the "services to be provided by attorneys," which did not include providing legal advice, but rather facilitating a transaction between the client and lender (Grace Luck) and borrower (HUIZAR), noting that the lender and borrower will execute a promissory note that "will be placed with attorneys for safe keeping" and that the "Lender will wire transfer $600,000 ... that has been deposited in the Attorney IOLTA Client Trust Account to ... Borrower's attorney IOLTA Client Trust Account[.]"  Id.  Storing an executed contract "for safe keeping" does not remotely amount to legal advice.

Defendants HUIZAR and SZNW now seek to suppress e-mails seized from HUIZAR's and Esparza's e-mail accounts, claiming that the government violated their respective attorney-client privilege in reviewing and seizing the communications between HUIZAR and/or Esparza and/or Zheng (the purported clients) and Yong (the purported attorney).  They also seek to suppress testimony from the various individuals involved in consummating the transaction.

### B.   The Formation of a PAC to Benefit Defendant HUIZAR's Relative

#### 1.   Relevant Indictment Allegations

The indictment alleges and the government will prove at trial that in "around May 2017, HUIZAR, George Esparza, Morrie Goldman, and HUIZAR Associate 3 agreed to establish a PAC that publicly was purported to benefit a broad array of candidates and causes but was, in fact, primarily intended to benefit HUIZAR Relative 1's campaign to succeed HUIZAR as Councilmember for CD-14.  Defendant HUIZAR agreed with Esparza, Goldman, and HUIZAR Associate 3 to pressure developers with projects in CD-14 to contribute to the PAC in exchange for favorable treatment and to avoid adverse action against their projects in the PLUM Committee, Economic Development Committee, and City Council."  CR 71 (FSI), Overt Act 340.  The indictment further alleges that "[o]n June 22, 2017, HUIZAR met with George Esparza, Morrie Goldman, and Justin Kim and discussed establishing a PAC to raise money for HUIZAR Relative 1's campaign.  During this meeting, HUIZAR suggested having Kim find an associate to serve as the 'face' of the PAC to disguise HUIZAR's involvement and the PAC's connection to CD-14."  Id. at Overt Act 344.

#### 2.   Co-Conspirators' Communications with Defendant HUIZAR's Election Attorney

During the course of this investigation, FBI agents obtained authorization for several wire interceptions, including on Esparza's phone.  Pursuant to a court order, on June 29, 2017, agents intercepted an approximately 20-minute conference call on Esparza's line that included Justin Kim, Esparza, Morrie Goldman, HUIZAR, and attorney Stephen Kaufman, during which the group discussed the

creation of a new PAC.  CR 295-7 (Def. Ex. G).  The indictment does

not quote from or rely on this particular call, and the government

does not intend to introduce it at trial.  Nevertheless, the

government addresses HUIZAR's claim below that the government invaded

the attorney-client privilege by seizing this particular call and by

subsequently obtaining information from Esparza and Goldman during

their respective voluntary interviews regarding purported legal

advice from attorney Kaufman.

**III. ARGUMENT**

> **A.  Disguised as Motions to Suppress, Defendants Raise a Claim of Outrageous Government Conduct Premised Upon Deliberate Intrusion into the Attorney-Client Relationship**

Defendants HUIZAR and SZNW move to suppress e-mails seized

pursuant to search warrants from HUIZAR's e-mail account and

Esparza's e-mail account, and any subsequently derived evidence

related to those purportedly privileged communications, without

specifically identifying each document or communication they assert

is privileged.  CR 275 (Def. Mot. 1) at 3.  Confusingly, in support

of their motion, defendants filed under seal Defense Exhibit M (CR

302-8),[7] a chart prepared by counsel "enumerating communications

produced by the government relevant to this motion" (CR 275-1 [Snyder

---

[7] Exhibit M includes 68 rows, giving the misleading impression that there are 68 separate communications that are the subject of the motion.  In fact, Exhibit M includes separate rows for e-mails that were part of a single e-mail thread.  For example, the first three rows purport to show three separate e-mail communications, while the seized document is a single e-mail from Zheng to Esparza (not including any attorneys), forwarding an e-mail chain and attachment. Based on the government's review of the documents listed in Exhibit M, the total number of e-mails at issue is 52. (The original version of Exhibit M filed on November 15, 2021 [CR 296-13] contained 60 rows, but for purposes of this opposition, the government assumes the operative version of Exhibit M is the one filed under seal at CR 302-8, hereinafter referred to as "Def. Ex. M.").

Decl.] at ¶ 18), without specifically clarifying if this is the universe of allegedly privileged documents they seek to suppress, and without identifying from which e-mail account the specific communications were seized.[8]  For purposes of this opposition, the government will assume defendants allege that the government improperly reviewed and seized the e-mail communications that included attorney Yong enumerated in Exhibit M that defendants assert are protected by the attorney-client privilege.  See Def. Ex. M; CR 275 (Def. Mot. 1) at 20 (referring to "the Yong emails at issue in this motion").

In addition to moving to suppress purported privileged communications, "defendants ask that the counts and allegations discussing the privileged materials be dismissed or stricken as a sanction for the government's utter disregard for the sanctity of the attorney-client privilege."  CR 275 (Def. Mot. 1) at 19.  This dismissal request is untimely and can be denied on that basis alone.[9] Fed. R. Crim. Proc. 12(c)(3).

Accordingly, although styled as "motions to suppress," defendants' motions actually raise "a claim of outrageous government

---

[8] Based on the Bates numbers, 62 of the 68 e-mails that appear in Exhibit M were seized from Esparza's e-mail account while only five were seized from HUIZAR's account.  Defendants have failed to file the purported privileged communications with the Court (under seal if necessary), and rely instead on what appears to be a privilege log in Exhibit M.  To assist the Court, filed concurrently provisionally under seal as Government Exhibits 3-7 are the five e-mails seized from HUIZAR's account that appear in Exhibit M. (Although there are six rows listing e-mails seized from HUIZAR's account, rows 25 and 29 list the same document (0000296-299).  Def. Ex. M at 2.)  Government Exhibits 8-9 are two e-mails seized from Esparza's account that appear on Exhibit M and are filed as a relevant sampling.

[9] The deadline for filing motions to dismiss pursuant to the Court's order was September 7, 2021.  CR 187.

conduct premised upon deliberate intrusion into the attorney-client relationship," under the Fifth Amendment's Due Process Clause, for which the remedy is dismissal of the indictment or suppression of the evidence.  United States v. Haynes, 216 F.3d 789, 796 (9th Cir. 2000) (citation omitted).  Tellingly, defendants' motions fail to set forth or analyze the high legal standard they must meet to secure their requested relief.[10]

### 1.   Legal Standard for Outrageousness Claim

"A claim of government interference with the attorney-client relationship has three elements: (1) the government was objectively aware of an ongoing, personal attorney-client relationship; (2) the government deliberately intruded into that relationship; and (3), as a result, the defendant suffered actual and substantial prejudice." United States v. Stringer, 535 F.3d 929, 941 (9th Cir. 2008) (citing United States v. Voigt, 89 F.3d 1050, 1067 (3d Cir. 1996)).[11]  The governmental misconduct required to establish such a due process

---

[10] If these were traditional motions to suppress, defendants HUIZAR and SZNW would lack standing to challenge the seizure of e-mails from Esparza's account.  See United States v. Vasquez, 26 F.3d 135 (9th Cir. 1994) ("To establish standing to challenge the legality of a search or seizure, the defendant bears the burden of proving that he had a 'legitimate expectation of privacy' in the items seized or the area searched."); United States v. Ray, No. 20-CR-110 (LJL), 2021 WL 5332318, at *3 (S.D.N.Y. Nov. 15, 2021) (finding defendant lacked standing to challenge digital evidence seized from a computer at his father's apartment, including purported privileged communications between the defendant and his attorneys).

[11] Instead of analyzing the applicable standard, defendants selectively quote from cases raising Sixth Amendment claims, which clearly do not apply here because no criminal charges had yet been initiated.  "The Ninth Circuit adheres to the bright line rule that the Sixth Amendment right to counsel attaches only upon the initiation of formal criminal charges."  United States v. SDI Future Health, Inc., 464 F. Supp. 2d 1027, 1047 (D. Nev. 2006) (holding defendants did not have a viable claim for Sixth Amendment violation resulting from government's intrusion upon the attorney-client relationship); see also United States v. Lin Lyn Trading, Ltd., 149

*(footnote cont'd on next page)*

1   violation must be so outrageous as to "shock the conscience" of the

2   Court.  Voigt, 89 F.3d at 1064-65; see also United States v. SDI

3   Future Health, Inc., 464 F. Supp. 2d 1027, 1053 (D. Nev. 2006)

4   ("[V]iolation of a defendant's attorney-client privilege will only

5   violate defendant's due process rights if the violation was caused by

6   serious governmental misconduct that is outrageous enough to shock

7   the judicial conscience.") (citations omitted).  A defendant "bear[s]

8   both the burden of production and persuasion on his outrageousness

9   claim."  Voigt, 89 F.3d at 1070.

10      "Most cases finding deliberate intrusion into the attorney-

11  client relationship involve government informants who somehow

12  penetrate the attorney-client relationship to obtain confidential or

13  privileged information, and then feed that information to the

14  government."  Stringer, 535 F.3d 929, 941.  Defendants have cited no

15  cases in which a court found a Constitutional violation under the

16  Fifth Amendment based on the government's seizure of documents

17  pursuant to federal search warrants.

18      Standing alone, the failure to identify privileged information

19  obtained by the government is fatal to a claim of outrageousness.

20  F.3d 1112, (10th Cir. 1998) (Sixth Amendment rights not implicated
    where prior to indictment, government agents seized a notebook
21  containing confidential attorney-client communications; seizure of
    attorney-client communications prior to indictment did not become a
22  Sixth Amendment violation once the indictment was filed); United
    States v. White, 970 F.2d 328, 333-334 (7th Cir. 1992) (government's
23  interview of defendants' former bankruptcy attorney regarding whether
    defendants committed bankruptcy fraud did not raise a Sixth Amendment
24  issue because the attorney was not representing defendants in any
    criminal matter at the time the government approached him).
25  Defendant HUIZAR relies on United States v. Danielson, 325 F.3d 1054
    (9th Cir. 2003) and United States v. Neill, 952 F. Supp. 834, 842
26  (D.D.C. 1997), both of which dealt with the Sixth Amendment right and
    involved intrusion into the relationship with a defendant's criminal
27  attorney in the case.  CR 281 (Def. Mot. 2) at 6, 11, 12.  Here, the
    subject e-mails with purported attorneys were from six years before
28  the filing of charges against defendants HUIZAR and SZNW.

                                    13

1   *Voigt*, 89 F.3d at 1070.  Here, the government's seizure of e-mail

2   communications did not deliberately intrude into any attorney-client

3   relationship and defendants have suffered no prejudice because

4   defendants have failed to meet their threshold burden of showing an

5   attorney-client relationship between HUIZAR/SZNW/HUANG (the purported

6   clients) and Henry Yong/Guodi Sun (the purported attorneys).  The

7   government's seizure of a wire-intercepted group conference call with

8   HUIZAR's lawyer that included third parties outside the attorney-

9   client relationship and its subsequent interviews of the involved

10  individuals similarly did not constitute a deliberate intrusion into

11  any attorney-client relationship.

12  **B.   Defendants Have Failed to Show that the Government**
13  **Deliberately Intruded into an Attorney-Client Relationship**
    **that Never Existed with Attorneys Yong/Sun**

14       Defendants seem to argue that because the government has alleged

15  that Grace Luck was essentially a shell entity used by HUANG and SZNW

16  to funnel money to HUIZAR, they can use *Grace Luck*'s attorney-client

17  privilege as a shield for their criminal scheming.  Courts have

18  rejected such spurious claims of privilege.  For example, in *Voigt*,

19  the defendant argued that since the government's case was based on

20  the premise that a trust was essentially his "alter ego" and a

21  fictitious entity, "any legal work [a lawyer] performed for the Trust

22  in reality must have been performed for him personally."  89 F.3d

23  1050, 1069.  "In this way Voigt attempts to bootstrap himself into an

24  attorney-client relationship that is essential to the maintenance of

25  his outrageousness claim," as defendants do here.  Id.  "Voigt

26  cannot have it both ways.  Having abused the corporate structure such

27  that the Trust, in effect, became his 'alter ego,' we think that

28  Voigt may not now rely on that abuse as a shield by claiming a

                                    14

1 personal attorney-client relationship with the attorney for the

2 fraudulent corporate entity." Id.  Here too, having decided to

3 structure the financial transaction through the entity Grace Luck to

4 distance themselves from each other and hide the true nature of their

5 relationship and the bribe payment, defendants cannot now bootstrap

6 themselves into an attorney-client relationship to establish their

7 outrageous government conduct claim.

8         1.   <u>Defendants Cannot Show the Government Was Objectively Aware of an Ongoing, Personal Attorney-Client Relationship with Yong/Sun</u>

9

10     To prevail on their claim for outrageous government conduct

11 based on a deliberate intrusion into the attorney-client privilege,

12 defendants must show that "the government was objectively aware of an

13 ongoing, personal attorney-client relationship" and that "the

14 government deliberately intruded into that relationship." <u>Stringer</u>,

15 535 F.3d at 941.  Thus, the question is not whether such a

16 relationship exists based on the totality of the evidence available

17 today, including evidence subsequently obtained from witness

18 interviews and other sources and charged in the indictment.[12]  The

19 question is whether the agents reviewing the e-mail accounts of

20 HUIZAR and Esparza had an objective reason to conclude there was an

21 "ongoing, personal attorney-client relationship" between Yong (the

22 attorney) and defendants HUIZAR/SZNW/HUANG.  They did not because

23 none existed and an objective review would not demonstrate there was

24 one.

25     The attorney-client privilege exists where: "(1) [ ] legal

26 advice of any kind is sought (2) from a professional legal adviser in

27 _____

28    [12] Even by that standard, defendants' motion fails as discussed below.

15

his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived." United States v. Graf, 610 F.3d 1148, 1156 (9th Cir. 2010).  Because the attorney-client privilege is in derogation of the search for truth, it is "narrowly and strictly construed." United States v. Gray, 876 F.2d 1411, 1415 (9th Cir. 1989); see also Fisher v. United States, 425 U.S. 391, 403 (1976) (holding since attorney-client privilege "has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose").

"The party asserting the attorney-client privilege has the burden of establishing the relationship and privileged nature of the communication." United States v. Richey, 632 F.3d 559, 566 (9th Cir. 2011); see also Hartford Fire Ins. Co. v. Garvey, 109 F.R.D. 323, 327 (N.D. Cal. 1985) ("The proponent of the privilege carries the burden of establishing all elements of the privilege, including confidentiality which is not presumed, ... and non-waiver.").  "That burden is not, of course, discharged by mere conclusory or ipse dixit assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed." In re Bonanno, 344 F.2d 830, 833 (2d Cir. 1965). "The Court should not have to guess or speculate about the applicability of the privilege, for the party asserting it has the affirmative duty to demonstrate that it applies to each document or communication sought to be disclosed." Purdee v. Pilot Travel Ctrs., LLC, No. CV407-028, 2008 WL 11350099, at *1 (S.D. Ga. Feb. 21, 2008) (emphasis added); Med. Assurance Co., Inc. v. Miller, No. 4:08-cv-29,

16

2010 WL 2710607, at *4 (N.D. Ind. July 7, 2010) (privilege "must be made and sustained on a question-by-question or document-by document basis") (emphasis added).

At the time of HUIZAR's e-mails with Yong regarding financing the settlement of his sexual harassment lawsuit, the FBI identified that HUIZAR had legal representation in that lawsuit, the firm Walsh & Associates, and, as a result of that finding, "@walsh" e-mails were excluded from the investigative team's search warrant review. Civetti Decl. ¶ 3, Gov. Ex. 1. In his e-mails to Yong, HUIZAR referred to this other attorney as "my attorney," not "my other attorney" or "my litigation attorney" or any other term to suggest HUIZAR also viewed Yong as his attorney in the matters being discussed. Id., Gov. Exs. 5-7. In addition, FBI agents reviewing the e-mail communications were reasonable in concluding from the face of the communications themselves that Yong was not providing any legal advice but was merely acting as a conduit to funnel $600,000 to HUIZAR through a lawyer trust account. In fact, Yong explicitly advised Esparza that he was not licensed in California, that his practice was "limited to immigration only" and that someone else would handle any purported legal work on "this transaction." Id., Gov. Ex. 8. Lastly, agents were entitled to conclude that HUIZAR's decision to include Esparza, a City employee who was not a party to HUIZAR's personal lawsuit, on these e-mails destroyed the confidentiality of these communications.[13]

---

[13] The fact that Esparza, who had no personal or professional interest in the transaction beyond furthering the criminal conspiracy, may have delivered the cash attorney fee to Sun/Yong does not create an attorney-client relationship between HUIZAR and those attorneys. As an initial matter, a person paying the legal fees for
*(footnote cont'd on next page)*

1        The lack of an attorney-client relationship between HUIZAR and

2   Yong defeats defendants' motion in full.  This is because all

3   communications on Exhibit M were seized from HUIZAR and Esparza,

4   meaning that if HUIZAR was not a client, his/Esparza's inclusion on

5   these communications defeated any potential confidentiality.

6        Even if the Court were to find that an attorney-client

7   relationship existed between HUIZAR and Yong, defendants' claim would

8   still fail as to defendants SZNW/HUANG.  As to defendants SZNW/HUANG

9   as potential clients, defendants cite the government's allegations in

10  the indictment and interview reports to establish that defendants

11  SZNW/HUANG were actually alter ego clients of Yong, even though their

12  names conspicuously appear nowhere on the communications or

13  transaction documents.  CR 275 (Def. Mot. 1) at 3-6.  As noted above,

14  the relevant inquiry is the government's *objective* knowledge at the

15  time the e-mail accounts were reviewed, not the current state of the

16  evidence or what the government may prove at trial.  None of the e-

17  mail communications or draft documents included SZNW or HUANG.  None

18  of the draft documents included SZNW or HUANG, only Grace Luck.

19  Although agents were aware that Zheng had a close relationship with

20  HUANG, the communications did not establish that Zheng was acting as

21  an agent of SZNW or at HUANG's direction during those communications.

22  Zheng used his personal e-mail account (not his SZNW account) in the

23  subject communications.  FBI agents only later confirmed that Zheng

25  a third person is not a client unless the payor also sought legal
    advice from the lawyer.  In re Grand Jury Proceedings, Cherney, 898
26  F.2d 565, 567 (7th Cir. 1990).  In addition, Esparza only confirmed
    the cash payment in an interview on June 6, 2019, so that fact was
27  unknown to the agents at the time they reviewed these e-mails.  See
    CR 302-2 (Def. Ex. B) at Casino_0364683.  That the co-conspirators
28  paid cash to hide their criminal connection did not create a sphere
    of attorney-client privilege protection.

1    and Yan acted at the direction of HUANG through interviews and other

2    investigative means.  Defendants have provided no evidence from the

3    communications themselves that defendants SZNW/HUANG were in fact

4    legitimate clients of Yong.

5        Because the communications themselves did not objectively

6    establish any attorney-client relationship between defendants

7    HUIZAR/SZNW/HUANG and attorney Yong, the government's subsequent

8    interviews and investigation cannot have deliberately intruded into

9    any such attorney-client relationship.

10       Through its investigation, the government was ultimately able to

11   identify the privilege holder for this transaction, Yan.  Yan, as the

12   sole representative of Grace Luck, had the authority to and did waive

13   any potential attorney-client privilege by voluntarily producing e-

14   mail communications and copies of the transaction documents to the

15   government.  Civetti Decl. ¶ 8, Gov. Ex. 11; see Commodity Futures

16   Trading Comm'n v. Weintraub, 471 U.S. 343, 348 (1985) ("[T]he power

17   to waive the corporate attorney-client privilege rests with the

18   corporation's management and is normally exercised by its officers

19   and directors.").  The government's interviews of the attorneys after

20   this waiver did not violate the attorney-client relationship since

21   the client holds the privilege.  See In re Grand Jury Proc., 87 F.3d

22   377, 381 (9th Cir. 1996) ("attorney-client privilege exists for the

23   benefit of the client, not the attorney"); In re Carter, 62 B.R.

24   1007, 1014 (Bankr. C.D. Cal. 1986) ("The client, not his attorney, is

25   the holder of the privilege; only the client can waive the privilege

26   by voluntarily disclosing the protected information or consenting to

27   its disclosure.").

28

1    Furthermore, even if there were a cognizable attorney-client

2    relationship between defendants and attorneys Yong and Sun, the Ninth

3    Circuit has "held that the government's asking a defendant's former

4    attorney to turn over privileged information does not constitute

5    deliberate intrusion on the part of the government when the attorney

6    complies.  The fact that the attorney failed to assert the ethical

7    obligation does not transform [the government's] investigation into

8    governmental misconduct." Stringer, 535 F.3d 929, 942 (quoting United

9    States v. Rogers, 751 F.2d 1074, 1080 (9th Cir. 1985)).  Thus, the

10   interviews did not amount to deliberate intrusion or government

11   misconduct.

12   For these reasons, defendants' claim for outrageous government

13   conduct fails.

14   2.   Defendants Have Failed to Show They Had an Attorney-
          Client Relationship with Yong/Sun

15

16   Defendants' motion fails for an additional reason.  Even taking

17   into account all evidence available today (not the objective

18   information available to the agents at the time of their review),

19   defendants have failed to meet their burden to establish that they

20   were clients of Yong/Sun and that the challenged documents are

21   privileged.  Again, defendants' motion is particularly flawed by

22   their inability to coherently identify a fundamental premise of their

23   motion.  That is, their failure to identify any privileged

24   information obtained by the government is fatal to a claim of

25   outrageousness.  Voigt, 89 F.3d at 1064-65.  In making a claim that

26   the government has improperly obtained "protected attorney-client

27   privileged communications," defendants are "placing the cart before

28   the horse because they ha[ve] not affirmatively established that any

1    of the elicited communications were, in fact, privileged." United
2    States v. SDI Future Health, Inc., 464 F. Supp. 2d 1027, 1053 (D.
3    Nev. 2006).  Here, defendants have failed to meet their burden of
4    identifying privileged communications, let alone that the government
5    was objectively aware of such a privilege, which defeats their
6    motion.  This failure here makes sense; the reason defendants cannot
7    identify any particular privileged information conveyed in these
8    communications is because Yong was not serving in a legal capacity or
9    providing defendants legal advice while serving as a conduit in this
10   transaction.

11        Defendants HUIZAR/SZNW/HUANG have failed to set forth any
12   evidence that they were clients of attorneys Sun and/or Yong, that
13   those attorneys provided legal advice, and that the inclusion of
14   third parties on e-mails preserved confidentiality.  Defendants cite
15   to allegations in the indictment, attach excerpts of reports of
16   interviews, and provide a "privilege log" giving only a high-level
17   summary of the e-mail communications at the center of their motion.
18   All fail to answer the threshold question.  Moreover, they have
19   failed to meet their burden and to comply with the Local Rules.  See
20   Central District of California L.R. 12-1.1 ("A motion to suppress
21   shall be supported by a declaration on behalf of the defendant,
22   setting forth all facts then known upon which it is contended the
23   motion should be granted.  The declaration shall contain only such
24   facts as would be admissible in evidence and shall show affirmatively
25   that the declarant is competent to testify to the matters stated
26   therein."); United States v. Schafer, 625 F.3d 629, 636 (9th Cir.
27   2010) ("[Defendants'] factual statements were raised as unsworn
28   arguments of defense counsel in their pleadings.  The district court

1   would have been well within its rights to reject the request for an

2   evidentiary hearing on this ground alone....   Trial counsel ... would

3   be well advised to follow the rules."); United States v. Wardlow, 951

4   F.2d 1115, 1116 (9th Cir. 1991) ("A broad declaration signed by

5   counsel rather than an individual competent to testify concerning the

6   facts is not sufficient to meet the requirements of [the local

7   rule].").

8            *a.   Grace Luck Was the Purported Client, Not*
                 *Defendants HUIZAR and SZNW/HUANG*

9

10      Defendants concede that "Yan Yan signed the retainer agreement

11   on behalf of the company that provided the funds for the collateral

12   to support the loan."   CR 275-1 (Snyder Decl.) ¶ 5; see also CR 275

13   (Def. Mot. 1) at 5 fn.5.   The executed fee agreement lists Grace Luck

14   as the sole client, and HUIZAR as the "borrower."   Civetti Decl. ¶ 8,

15   Gov. Ex. 11.   Because Grace Luck was the sole client of Yong and Sun,

16   communications between Yong and third parties outside of Grace Luck

17   (like HUIZAR, Esparza, and Zheng) were not privileged communications.

18   Having chosen to structure the financial transaction with this Hong

19   Kong entity, defendants cannot now bootstrap themselves into the

20   attorney-client relationship between Grace Luck and its purported

21   attorneys.

22      As set forth above, defendants have filed no declarations or

23   evidence to establish that defendants HUIZAR/SZWN/HUANG was each a

24   client of Yong.   See United States v. Constr. Prods. Research, Inc.,

25   73 F.3d 464, 473-74 (2d Cir. 1996) (in addition to privilege log,

26   "[o]ther required information, such as the relationship between ...

27   individuals not normally within the privileged relationship, is then

28   typically supplied by affidavit or deposition testimony").   In fact,

during the time of the purportedly privileged e-mails in August and September 2014, HUIZAR had counsel who represented him in the sexual harassment lawsuit and referred to that counsel as "my attorney" when communicating directly with Yong.  Civetti Decl. ¶ 5(d)-(f), Gov. Ex. 5-7.  As to SZNW, defendants have failed to set forth any evidence establishing a corporate relationship between Grace Luck and SZNW. SZNW appears nowhere on the draft or executed documents between Grace Luck and HUIZAR.

Defendants' entire argument relies on a misguided and significant expansion of the "joint client" privilege.  Defendants HUIZAR and SZNW have failed to establish they had a common legal interest with Grace Luck that would make them "joint clients" and keep their communications within the sphere of protected attorney-client communications.  That defendants HUIZAR and HUANG wanted to effectuate a financial transaction wherein HUIZAR "borrowed" $600,000 from Grace Luck did not give rise to any cognizable legal issue on which defendants HUIZAR and SZNW/HUANG shared a common interest. Nowhere in their motion do defendants claim that they sought legal advice (like whether such a transaction violated criminal laws against bribery or money laundering), or any other "legal advice" beyond "how to structure and effectuate the collateral and loan transactions."  CR 275 at 2.  But, as explained below, this was commercial advice, not legal advice.  Nor does the evidence show that the attorneys provided any legal advice.[14]

_____

[14] Defendants self-servingly state, without any evidentiary cite, let alone a declaration, that "[a]fter consulting with an attorney specializing in election law, Huizar determined that obtaining a private loan was the best way to resolve the Godoy lawsuit confidentially." CR 275 (Def. Mot. 1) at 3.  Defendants have not

*(footnote cont'd on next page)*

"The key factor in establishing a community of interest is that the nature of the interest be identical, not similar, and be legal, not solely commercial." Cheeves v. S. Clays, Inc., 128 F.R.D. 128, 130 (M.D. Ga. 1989); Gracov Children's Prods., Inc. v. Dressler, Goldsmith, Shore & Milnamow, Ltd., No. 95 C 1303, 1995 WL 360590, at *5 (N.D. Ill. June 14, 1995) (the community of interest exception applies when the parties "have an identical legal interest with respect to the subject-matter of the legal advice communicated between attorney and client"). Business or commercial common interests will not support a joint or common attorney-client privilege. See In re John Doe Corp., 675 F.2d 482, 489 (2d Cir. 1982) (disclosure for commercial purposes is inconsistent with legal representation purpose); Fox News Network, LLC v. U.S. Dep't of the Treasury, 739 F. Supp. 2d 515, 563 (S.D.N.Y. 2010) (while the common legal interest can exist in a non-litigation setting, it must not merely be a common commercial interest); Beyond Sys. v. Kraft Foods, Inc., No. PJM-08-409, 2010 WL 1568480, at *3 (D. Md. Aug. 4, 2010) (finding no common interest privilege when the evidence merely showed a joint business strategy that included concerns about litigation); Bank Brussels Lambert v. Credit Lyonnaise, 160 F.R.D. 437, 447 (S.D.N.Y 1995) (common defense doctrine "does not encompass a joint business strategy which happens to include as one of its elements concern about litigation"); see also Titan Inv. Fund II, LP v. Freedom Mtg. Corp., C.A., No. 09C-10-259 WCC, 2011 WL 532011 (Del.

provided any notice that they intend to rely on an advice of counsel defense at trial, but the motion demonstrates they use the advice of attorneys as a sword when it serves them. Fairness dictates that a party may not use the attorney-client privilege as both "a sword and a shield." Chevron Corp. v. Pennzoil Co., 974 F.2d 1156, 1162 (9th Cir. 1992) (finding implicit waiver of privilege where defendant claimed to have relied on advice of counsel).

24

Super. Ct. Feb. 2, 2011) (common interest doctrine does not extend to communications that further solely a business purpose rather than a common legal strategy).

The fact that HUANG wanted HUIZAR to successfully settle his sexual harassment lawsuit in order extend the life of their corrupt relationship similarly did not give rise to a common interest to invoke the joint attorney-client privilege.  See, e.g., In re Pac. Pictures Corp., 679 F.3d 1121, 1129 (9th Cir. 2012) (a shared desire to see the same outcome in a legal matter did not constitute a common interest and there was no proof that the parties were pursuing a "joint strategy" in accordance with some form of agreement); In re Vitamin C Antitrust Litig., No. MD 06-1738(BMC)(JO), 2011 WL 197583, at *5 (E.D.N.Y. Jan. 20, 2011) (court refused to apply the common interest doctrine because it found no shared legal interest where a company and an agency wanted the same legal outcome, but the litigation did not have a legal consequence for the agency).

Defendants attempt to maintain a sphere of confidentiality among a group of people that they purport were "joint clients," without making the basic showing that HUIZAR and SZNW (even individually) were clients of attorneys Yong and/or Sun, and without setting forth any caselaw to support their creative theory that the attorney-client privilege can extend to a conglomerate of individuals who jointly communicate with attorneys.[15]  That HUIZAR, SZWN, and HUANG and their

_____

[15] Defendants have failed to cite any cases that apply to the facts of this case and extend the concept of "joint client privilege" so broadly.  To establish the principle of the "joint client privilege," defendants rely primarily on the bankruptcy case In re Hotels Nevada, LLC, 458 B.R. 560, 571 (Bankr. D. Nev. 2011), in which the court found the privilege did not apply.  CR 275 (Def. Mot. 1) at 15; CR 281 (Def. Mot. 2) at 4.

1   co-conspirators shared a common criminal intent that critically

2   depended on HUIZAR remaining in office and atop critical City

3   committees does not bring them within the sphere of the protected

4   attorney-client relationship that may have existed between Grace Luck

5   and its attorneys.

6          b.   *Defendants Have Failed to Establish that Yong and*
              *Sun Provided Any Legal Advice as Opposed to*
7              *Acting Merely in a Clerical Capacity*

8          In addition to failing to show that they were clients,

9   defendants have also failed to show that Yong and Sun provided any

10  legal advice in the e-mails (or testimony) they seek to suppress.

11  "That a person is a lawyer does not, ipso facto, make all

12  communications with that person privileged.  The privilege applies

13  only when legal advice is sought from a professional legal advisor in

14  his capacity as such."  United States v. Chen, 99 F.3d 1495, 1501

15  (9th Cir. 1996) (internal quotation marks and citation omitted).

16  See, e.g., Liew v. Breen, 640 F.2d 1046, 1050 (9th Cir. 1981)

17  (lawyer-client communications were not privileged where the "clients

18  did not approach him for legal advice and assistance, but rather with

19  the aim of finding meritorious litigation to finance"); United States

20  v. Huberts, 637 F.2d 630, 640 (9th Cir. 1980) (no privilege could be

21  asserted when a lawyer was merely a "business agent" and not a "legal

22  advisor"); In re Fischel, 557 F.2d 209, 212 (9th Cir. 1977)

23  (privilege did not apply to "summaries of a client's business

24  transactions with third parties compiled by an attorney from

25  unprivileged facts").

26         Here, the e-mails show that Yong was not acting in the capacity

27  of a legal advisor but instead acted to facilitate the covert

28

                                    26

1   transfer of money from Grace Luck for HUIZAR's benefit.[16]

2   Communications are not privileged when a lawyer functions as a

3   "negotiator" and "messenger" for a business deal, rather than as a

4   lawyer.  United States v. Wilson, 798 F.2d 509, 513 (1st Cir. 1986);

5   see also Ga.-Pac. Corp. v. GAF Roofing Mfg. Corp., No. 93 Civ. 5125,

6   1996 WL 29392, at *4 (S.D.N.Y. Jan. 25, 1996) (attorney-client

7   privilege did not apply to communications while the attorney was

8   acting as a contract negotiator because the attorney was acting in a

9   business capacity rather than executing a traditional function of an

10  attorney); Gen. Elec. Capital Corp. v. DirectTV, Inc., No. 3:97 CV

11  1901, 1998 WL 849389, at *6 (D. Conn. July 30, 1998) ("When he acts

12  as an advisor, the attorney must give predominantly legal advice to

13  retain his client's privilege of non-disclosure, not solely, or even

14  largely, business advice ... in the case where a lawyer responds to a

15  request not made primarily for the purpose of securing legal advice,

16  no privilege attaches to any part of the document.").

17      None of the communications seized from the e-mail accounts

18  identified in Exhibit M reflect any legal advice sought by HUIZAR,

19  Esparza, or Zheng, or legal advice provided by attorney Yong.  The

20  fact that Yong was copied on various communications between the co-

21  conspirators does not render those communications privileged.  See,

22  e.g., E.E.O.C. v. BDO USA, L.L.P., 876 F.3d 690, 696 (5th Cir. 2017)

23  ("documents sent from one corporate officer to another" are not

24  privileged "merely because a copy is also sent to counsel"); Phillips

25

26      [16] In fact, a licensed attorney acting as a legal advisor may
    have asked, including for his own sake, questions about whether it
27  was appropriate or legal for a sitting elected City Councilmember to
    accept $600,000 from a Hong Kong entity connected to a billionaire
28  with hotels in the City.  Defendants do not claim they ever sought
    such legal advice from this attorney.

1    v. C.R. Bard, Inc., 290 F.R.D. 615, 629 (D. Nev. 2013) ("merely
2    copying or 'cc-ing' legal counsel, in and of itself, is not enough to
3    trigger the attorney-client privilege").

4         Yong simply gathered required paperwork to deposit money in the
5    bank for Grace Luck, to later be used as collateral for HUIZAR.  As
6    courts have long recognized, "communications to an attorney in the
7    course of seeking business rather than legal advice are not
8    privileged; nor are communications to an attorney who acts simply as
9    a scrivener of deeds, or who simply deposits money in a bank for his
10   client." Olender v. United States, 210 F.2d 795, 806 (9th Cir. 1954)
11   (citations omitted).  Yong's e-mails outlining the various documents
12   a bank would require for deposit also do not reflect legal advice,
13   because "common sense tells us that there is a difference between
14   merely providing legal information and providing legal 'advice.' ...
15   [T]he attorneys were acting more as 'courier[s] of factual
16   information,' rather than 'legal advisers.'" Thurmond v. Compaq
17   Computer Corp., 198 F.R.D. 475, 483 (E.D. Tex. 2000).  At most, Yong
18   and Sun were "asked for business (as opposed to legal) counsel, [so]
19   no privilege attached." United States v. Rowe, 96 F.3d 1294, 1297
20   (9th Cir. 1996).  Even if this Court were to conclude that Yong acted
21   on behalf of HUIZAR (as opposed to the explicitly defined client,
22   Grace Luck), because Yong was, at most, "an attorney who serves as a
23   business agent to a client ... no confidential relationship
24   attaches." United States v. Huberts, 637 F.2d 630, 640 (9th Cir.
25   1980).  Similarly, submitting paperwork to the bank to facilitate a
26   deposit is not legal advice.  Harris v. United States, 413 F.2d 316,
27   320 (9th Cir. 1969) (recognizing "the general rule that ministerial

28

1   or clerical services performed by an attorney are not within the

2   privilege").

3       Furthermore, courts have been even more reluctant to recognize

4   an attorney-client relationship when the role of the lawyer "is minor

5   or was intended merely to immunize documents from production." In re

6   Air Crash Disaster, 133 F.R.D. 515, 519 (N.D. Ill. 1990); see also

7   E.I. du Pont de Nemours & Co. v. Forma-Pack, Inc., 351 Md. 396, 424,

8   718 A.2d 1129, 1143 (1998) (holding that a company "cannot shield

9   materials from discovery, and confer on them the cloak of

10  confidentiality, simply by routing them through its legal counsel").

11  Here, the seized e-mails themselves reflect this exact motive on the

12  part of HUIZAR to shield this evidence in the future under the cloak

13  of confidentiality.  For example, in an e-mail on September 3, 2014,

14  Yong wrote to HUIZAR and Esparza, noting that a copy of the

15  promissory note "is only for our office internal record and attorney-

16  client privilege will preclude us from revealing this document to

17  anyone."  Civetti Decl. ¶ 9, Gov. Ex. 12 at 45.  Contrary to this

18  tactical assurance from a disbarred and unlicensed attorney that

19  these documents could stay hidden, the attorney-client privilege does

20  not protect executed agreements from disclosure.

21      Defendants have failed to meet their burden of establishing that

22  the e-mail communications sought or provided legal advice.

23                  c.   Defendants Cannot Meet Their Burden to Establish
                         that Disclosure to Esparza Preserved
24                       Confidentiality

25      Esparza was included on almost every e-mail defendants assert is

26  privileged; 62 of 68 rows in Defense Exhibit M were e-mails seized

27  from Esparza's account.  Even assuming there was a cognizable

28  attorney-client relationship between Yong and HUANG/SZNW/Zheng/Grace

                                    29

Luck/HUIZAR as "joint clients," and assuming that the e-mails reflect legal not merely business advice, all of these e-mails lost their confidential nature by inclusion of Esparza, a third party outside any purported attorney-client relationship.

"As with all evidentiary privileges, the burden of proving that the attorney-client privilege applies rests not with the party contesting the privilege, but with the party asserting it.  One of the elements that the asserting party must prove is that it has not waived the privilege."  Weil v. Inv./Indicators, Research & Mgmt., Inc., 647 F.2d 18, 25 (9th Cir. 1981) (internal citation omitted). As the court noted in a case relied on by defendants (CR 275 [Def. Mot. 1] at 16), "neither the existence of a common defense nor the fact that individuals are joint clients satisfies the requirement of confidentiality... [T]he presence of an individual who is not a member of the common defense effort may negate the privilege where that person's presence is known to and accepted by the participants." Griffith v. Davis, 161 F.R.D. 687, 694 (C.D. Cal. 1995).

Attorney-client communications "made in the presence of, or shared with, third-parties destroys the confidentiality of the communications and the privilege protection that is dependent upon that confidentiality."  Nidec Corp. v. Victor Co. of Japan, 249 F.R.D. 575, 578 (N.D. Cal. 2007) (citation omitted).  "If an e-mail with otherwise privileged attachments is sent to a third party, [the client] loses the privilege with respect to that e-mail *and all of the attached e-mails*."  United States v. Chevron Texaco Corp., 241 F. Supp. 2d 1065, 1075 n.6 (N.D. Cal. 2002) (emphasis in original).  Any exception to this rule must be construed narrowly to avoid "creating

an entirely new privilege." <u>In re Pac. Pictures Corp.</u>, 679 F.3d 1121, 1128 (9th Cir. 2012).

Accordingly, courts have applied a high standard in defining third parties who do not break the confidentiality of attorney-client communications.  The inclusion of third parties on "such communications must be more than just useful and convenient, but rather ... the involvement of the third party [must] be nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications." <u>Anderson v. SeaWorld Parks & Ent., Inc.</u>, 329 F.R.D. 628, 633 (N.D. Cal. 2019) (internal quotation marks and citations omitted); <u>Cavallaro v. United States</u>, 284 F.3d 236, 247-48 (1st Cir. 2002) (extending the privilege to agents where the agent is "necessary, or at least highly useful for the effective consultation between the client and the lawyer"); <u>Flo Pac, LLC v. NuTech, LLC</u>, No. WDQ-09-510, 2010 WL 5125447, at *8-10 (D. Md. Dec. 9, 2010) (the third-party presence must be "nearly indispensable" in facilitating attorney-client communications, not just convenient); <u>United States v. Evans</u>, 113 F.3d 1457, 1462-63 (7th Cir. 1997) (conversation between client and lawyer in front of client's friend present for emotional support not privileged).

Thus, including Esparza on e-mail communications and at meetings because of convenience is insufficient to maintain the confidentiality of the attorney-client privilege.[17]  Esparza's role as HUIZAR's aide in the City does not bring him within the sphere of the confidential attorney-client relationship, particularly as it relates

_____

[17] Apparently, the meetings with this attorney sometimes included Esparza's girlfriend, not only Esparza.  <u>See</u> CR 302-3 (Def. Ex. C) at 2.

to clearly non-City business like defending sexual harassment lawsuits. "[T]he disclosure of otherwise privileged documents to [Esparza] in the course of [HUIZAR's] confidential communications with counsel [would] not destroy the privilege" only if "the communications in question fell within the scope of [Esparza's] duties, were made at the behest of his superior, and were made for the purpose of seeking legal advice for [HUIZAR]." In re Bieter Co., 16 F.3d 929, 939-40 (8th Cir. 1994). Esparza was not HUIZAR's employee or agent for the purpose of negotiating settlement funds for a sexual harassment lawsuit in HUIZAR's private capacity. Therefore, the decision to include Esparza on communications with attorneys destroyed any potential privilege that may have attached to those communications.

**C.  Defendant HUIZAR Has Failed to Meet His Burden to Establish that the Kaufman Calls and Statements About Invoices Are Protected by the Attorney-Client Privilege**

### 1.  June 29, 2017 Conference Call

HUIZAR has the burden of showing that at the time it seized the June 29, 2017 call, the government was objectively aware of an ongoing, personal attorney-client relationship and deliberately intruded into that relationship. Thus, HUIZAR has the burden of establishing that the attorney-client privilege attached to the June 29, 2017 call and that the privilege was not waived by the inclusion of multiple third parties on the call. Weil, 647 F.2d 18, 25 ("One of the elements that the asserting party must prove is that it has not waived the privilege."). HUIZAR argues that the call itself shows that "Huizar, Goldman, and Kim jointly sought Kaufman's legal advice about how to create and operate a PAC." CR 275 (Def. Mot. 1)

at 7.[18]  It may be true that all these participants were interested in hearing Kaufman's legal advice, but that alone does not establish that they were each a client in the attorney-client relationship.

HUIZAR asserts, once again without any supporting declaration as required[19] and without any other support in the evidence, that Goldman, Kim, and Esparza "jointly retained Kaufman as their common agent on a legal matter of common interest." CR 281 (Def. Mot. 2) at 7.  During his interview with the FBI, Goldman referred to Kaufman as "HUIZAR's election law attorney." CR 295-1 (Def. Ex. A) at 3. HUIZAR has provided no evidence that Kim or Esparza retained Kaufman on any legal matter at any point.  HUIZAR offers no signed retainer agreements, no invoices, and no evidence that Kim or Esparza ever paid fees to Kaufman.  Kim's role as a fundraiser for HUIZAR did not make him a "joint client" or agent that brought him within the attorney-client privilege.  Similarly, Esparza's role as HUIZAR's aide in the City did not include duties and responsibilities to fundraise or help on HUIZAR's wife's campaign, activity he was prohibited from doing on City time.  As noted above, the inclusion of third parties on privileged "communications must be more than just useful and convenient, but rather ... the involvement of the third party [must] be nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications." Anderson, 329 F.R.D. 628, 633.  Here, there is no evidence that Kim and Esparza served some specialized purpose in facilitating the attorney-client communication during the June 29, 2017 call.

---

[18] Presumably Esparza, who was also a call participant, was also included on this list of "joint clients."

[19] L.R. 12-1.1.

1    Including Kim and Esparza on the call for convenience waived

2    confidentiality of that call.

3         If "joint clients" could be created and established as easily as

4    HUIZAR suggests, to defeat a waiver argument, any person could simply

5    assert that all third parties that were part of a lawyer

6    communication were "joint clients" or "agents."  Courts have

7    repeatedly recognized that the attorney-client privilege must be

8    "narrowly and strictly construed" because it obstructs the search for

9    truth.  <u>Gray</u>, 876 F.2d 1411, 1415.  Here, in the absence of any

10   declarations of the purported clients asserting privilege, HUIZAR

11   comes woefully short of making the basic showing that an attorney-

12   client relationship existed between Goldman/Esparza/Kim and Kaufman,

13   let alone the threshold matter of whether the government was

14   objectively aware of any such relationship at the time of the call.

15   Their inclusion on the call destroyed the confidential nature of the

16   attorney-client communication.[20]

17        2.   <u>June 2018 Call from Kaufman to Goldman and Shoemaker</u>

18        HUIZAR argues that the government committed misconduct in

19   eliciting information from Goldman during a voluntary interview with

20   Goldman's counsel present regarding a June 2018 call from Kaufman to

21   Goldman and Shoemaker.  As an initial matter, courts have found that

22   "the government's asking a defendant's former attorney to turn over

23

24        [20] HUIZAR also claims that Esparza and Goldman described the June
     29, 2017 call to the government, citing to excerpts of their
25   respective interview reports at Defense Exhibit A and C.  CR 281
     (Def. Mot. 2) at 9.  The only reference to Kaufman in Esparza's
26   report does not reveal the contents of the June 29, 2017 call or any
     privileged information: "Goldman also wanted an attorney to handle
27   the filings so they hired Stephen Kaufman."  CR 295-3 (Def. Ex. C).
     The reference to Kaufman in Goldman's report refers to Kaufman as
28   "HUIZAR's election law attorney" and describes advice from Kaufman *to
     Goldman*, not a joint phone call.  CR 295-1 (Def. Ex. A).

                                    34

1  privileged information does not constitute deliberate intrusion on
2  the part of the government when the attorney complies."  Stringer,
3  535 F.3d at 942.  Here, Goldman himself was not an attorney and
4  volunteered information to the government, which means he waived
5  whatever privileged existed.

6      HUIZAR claims the June 2018 call was privileged and makes a
7  blanket assertion that "the purpose of the call[] was to obtain legal
8  advice, and it was made in confidence" and that it "described legal
9  advice pertaining to the PAC."  CR 281 (Def. Mot. 2) at 8.  Because
10 this call was not recorded, HUIZAR's conclusions about it are
11 presumably drawn from Goldman's interview report.  The Goldman
12 interview report that briefly references a June 2018 call does not
13 establish that Goldman and/or Shoemaker were seeking legal advice
14 from Kaufman or that Kaufman provided legal advice about the PAC.
15 The report simply notes that: "In approximately June 2018, Kaufman
16 reached out to Goldman and Shoemaker.  Kaufman said he was getting
17 lots of calls from attorneys of developers saying [that] HUIZAR was
18 calling and asking for contributions for a PAC for RICHELLE [RIOS]."
19 CR 295-1 (Def. Ex. A) at 4.  Nothing in this statement reflects legal
20 advice.  Kaufman was simply relaying factual information to Goldman
21 and Shoemaker.  The attorney-client privilege does not apply when
22 attorneys are "acting more as 'courier[s] of factual information,'
23 rather than 'legal advisers.'"  Thurmond, 198 F.R.D. 475, 483.

24         3.  Esparza's Statements About Kaufman Invoices

25     Defendant HUIZAR argues that the government also "intruded on
26 [his] attorney-client privilege by asking Esparza to read invoices
27 describing Kaufman's legal representation of HUIZAR."  CR 281 (Def.
28 Mot. 2) at 2.  Specifically, defendant claims that on June 6, 2019,

the government interviewed Esparza and "allowed him to describe--and read verbatim--invoices sent from Kaufman to HUIZAR," citing Defense Exhibit B, which is an excerpt of notes from Esparza's interview. Id. at 10.  In his motion, HUIZAR incorrectly represents that "email 58" included legal bills from Kaufman, and that "email 22" included invoices from Kaufman on another legal matter.  Id. at 10.  As the report of interview makes clear, "email 58" was, in fact, an e-mail from Esparza to *Yong* and had nothing to do with Kaufman invoices.  CR 295-5 (Def. Ex. E) at Casino_0364694.  Similarly, "email 22" was from *Yong* to Esparza and Zheng, and again had nothing to do with Kaufman invoices.  Id. at Casino_0364689.  Nothing in the Esparza report of interview suggests that the government allowed Esparza to describe or "read verbatim" from Kaufman invoices.[21]  This argument is particularly puzzling because the report actually reflects that the government specifically "advised ESPARZA to refrain from expanding on any information related to invoices provided by Kauffman for the time being."  Id. at Casino_0364683 (emphasis added).  After this request from the government, Esparza nevertheless volunteered and made limited references to things he remembered from his review of Kaufman invoices in the past.  This by no means supports defendant's allegation that the government asked Esparza to read verbatim from these invoices.[22]

---

[21] Defendant can hardly feign confusion over this issue when the report itself describes the e-mails and the e-mails referenced in the report were all produced with Bates numbers immediately following the report.

[22] In addition, as noted above and significantly undermining defendant's latest hyperbolic complaint of agents' "utter disregard" for applicable privileges, agents proactively filtered out all communications from "@kaufman" e-mail addresses in their review of Esparza's e-mails, demonstrating a careful approach in the treatment
*(footnote cont'd on next page)*

1    As noted above, Esparza's position as HUIZAR's aide in the City

2    did not make Esparza an agent on HUIZAR's personal matters, such as

3    the settlement of a sexual harassment lawsuit, or on campaign-related

4    matters, which Esparza was forbidden from pursuing on City time based

5    on state laws.  Even assuming that HUIZAR's decision to forward his

6    attorney's invoices to Esparza did not itself break the privilege,

7    the limited information Esparza provided regarding the invoices does

8    not come within protected information.  See, e.g., United States v.

9    Bauer, 132 F.3d 504, 509 (9th Cir. 1997) ("not all communications

10   between attorney and client are privileged, including such

11   information as the identity of the client, the amount of the fee, the

12   identification of payment by case file name, the general purpose of

13   the work performed").  Defendant HUIZAR's motion misrepresents the

14   substance of interview reports, creating a non-existent issue from

15   whole cloth.  The government did not at any point ask Esparza to read

16   Kaufman invoices (even though doing so may have been entirely

17   permissible under Bauer, depending on their content, and because

18   Esparza broke the confidentiality of the communications).  In any

19   event, given more compelling evidence otherwise available, the

20   government does not intend to introduce testimony about the Kaufman

21   invoices at trial.

22       D.   **Defendants Waived Any Purported Privilege**

23       Defendants' motion with respect to the Yong communications fails

24   for the additional reason that defendants waived any purported

25   privilege that may have existed to protect those documents.  First,

26   HUIZAR waived the privilege by voluntarily producing the purported

27

28   of communications between Esparza and Kaufman, even though Esparza
     arguably broke any privilege between Kaufman and his client, HUIZAR.

privileged e-mails to the government.  Second, neither defendant took any steps to assert privilege over the purported attorney-client relationship with Yong.  In fact, as early as December 2018, HUIZAR, sitting aside counsel, chose to discuss Yong's role in the $600,000 loan transaction with the government and failed to assert, or even reference, any privilege.  Defendants cannot now credibly claim, three years later, that the government committed misconduct by intruding into this relationship.

### 1.   Defendant HUIZAR Voluntarily Produced Yong E-mails to the Government During this Criminal Case

Defendant HUIZAR's voluntary production of purported privileged communications to the government waived any potential attorney-client privilege protection, and therefore defeats his claim.  Civetti Decl. ¶ 9, Gov. Ex. 12.  His production included many of the e-mail communications and draft documents that appear on defense Exhibit M and are the subject of defendants' motion.

"Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed.  Accordingly, it has been widely held that voluntary disclosure of the content of a privileged attorney communication constitutes waiver of the privilege as to all other such communications on the same subject." Weil v. Inv./Indicators, Rsch. & Mgmt., Inc., 647 F.2d 18, 24 (9th Cir. 1981) (internal citations omitted).  A voluntary disclosure of privileged communications to the government is sufficient to destroy the attorney-client privilege.  See, e.g., United States v. Tyerman, 701 F.3d 552, 559 (8th Cir. 2012) (in felon-in-possession case, defendant's intentional disclosure of gun's location to district attorney through defense counsel during plea negotiations implicitly

waived privilege with respect to communications about gun's location).

Because HUIZAR voluntarily disclosed purported protected material to the government, the waiver of privilege includes both the information actually disclosed as well as undisclosed communications or information on the same subject.  See Weil, 647 F.2d at 24 ("He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder.  He may elect to withhold or disclose, but after a certain point his election must remain final.").  Here, HUIZAR, through his attorneys, chose to produce communications with Yong, as well as attachments to those communications such as draft agreements.  He cannot now claim those documents are privileged and that the government violated his rights in obtaining those documents he voluntarily provided.

> 2.   Defendants Implicitly Waived Any Purported Privilege by Failing to Assert It in a Timely Manner

The Ninth Circuit has recognized that the attorney-client privilege can be waived through a defendant's failure to assert it in a timely manner.  United States v. de la Jara, 973 F.2d 746, 749 (9th Cir. 1992).  "[T]he attorney-client privilege may be waived by implication, even when the disclosure of the privileged material was ... involuntary."  Id. at 750.  "When the disclosure is involuntary [such as a government search warrant], we will find the privilege preserved if the privilege holder has made efforts 'reasonably designed' to protect and preserve the privilege.  Conversely, we will deem the privilege to be waived if the privilege holder fails to pursue all reasonable means of preserving the confidentiality of the privileged matter."  Id. (citation omitted).  In de la Jara, the

government seized a privileged letter through a search warrant, and the defendant "did nothing to recover the letter or protect its confidentiality during the six month interlude between its seizure and introduction into evidence [at trial]." Id. "By immediately attempting to recover the letter, appellant could have minimized the damage caused by the breach of confidentiality. As a result of his failure to act, however, he allowed the mantle of confidentiality which once protected the document to be irretrievably breached, thereby waiving his privilege." Id. (cleaned up).

"When a party delays in asserting protection, however, the adverse party is free to continue to use the material, thereby negating its confidential character. The government's investigation may irreparably rely on the protected information, thereby tainting the investigation. By failing to minimize the damage caused by the breach of confidentiality, the defendant is prohibited from using the privilege or doctrine to prohibit the government's use of the information." United States v. Ary, 518 F.3d 775, 784 (10th Cir. 2008) (citing de la Jara, 973 F.2d 746). The Tenth Circuit in Ary held that defendant waived the attorney-client privilege because "[i]n his communications with the United States Attorney, Ary never identified the contents of the black plastic box as protected under the work-product doctrine or the attorney-client privilege" and "did not assert protection in a timely fashion" but instead "waited six weeks to assert protection after the Rule 16 discovery meeting." Id. at 785.

On December 18, 2018, HUIZAR discussed the use of attorney "Henry" to structure the loan transaction and never asserted privilege over those communications. Id. at ¶ 7, Gov. Ex. 10. In

40

March 2019, HUIZAR produced communications with Henry Yong to the government.  Id. ¶ 9, Gov. Ex. 12.  The HUIZAR and Esparza e-mails that defendants move to suppress on the basis of attorney-client privilege were included in the very first batch of discovery produced to HUIZAR on August 10, 2020 and to SZNW on January 12, 2021.  Civetti Decl. ¶ 10.  Beyond a telephonic meet and confer soon before the filing of the instant motions, defendants did nothing to assert the attorney-client privilege over these communications.  Their failure to assert the attorney-client privilege in a timely manner constitutes additional waiver of the privilege.

> **E.  Defendants Do Not Meet Their Burden of Showing Dismissal or a *Kastigar* Hearing Is Warranted**

Defendants do not come close to meeting the high standard of showing that the government's conduct in this case "violates fundamental fairness and is shocking to the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment."  United States v. Gurolla, 333 F.3d 944, 950 (9th Cir. 2003) (citation and quotation marks omitted).  Defendants' request to suppress evidence on this basis therefore fails.

Even if the Court were to conclude that the government deliberately intruded on the attorney-client relationship, the proper remedy is suppression of tainted evidence, not dismissal of counts.  Dismissal "is drastic, disfavored, and thus used only in the most egregious cases."  Haynes, 216 F.3d 789, 796 (holding that "the court properly refused to dismiss the indictment; suppression of tainted evidence at trial was an appropriate remedy sufficient to cure any prejudice to Haynes and Denton resulting from the intrusion on their attorney-client relationship").  Defendants utterly fail to come

41

1   close to showing the government committed misconduct here much less

2   that this is an "egregious case" warranting dismissal of counts.

3       Defendants' request for a <u>Kastigar</u> hearing must also fail.

4   Violation of the attorney-client privilege implicates the Sixth

5   Amendment right to counsel when the intrusion substantially

6   prejudices the defendant.  <u>See</u> <u>United States v. Irwin</u>, 612 F.2d 1182,

7   1186 (9th Cir. 1980).  As noted above, the Sixth Amendment right to

8   counsel is not implicated here because the e-mails were seized before

9   charges were filed, and the communications were not with defendants'

10  criminal attorneys in this case.  Prejudice occurs when "evidence

11  gained through the interference is used against the defendant at

12  trial," or results "from the prosecution's use of confidential

13  information pertaining to the defense plans and strategy, from

14  government influence which destroys the defendant's confidence in his

15  attorney, and from other actions designed to give the prosecution an

16  unfair advantage at trial." <u>Id.</u> at 1186-87.  Here, the government

17  gained no confidential information pertaining to the defense plans

18  and strategy, since the seized e-mails were from 2014, <u>six years</u>

19  before defendants were charged in this case, and before the Sixth

20  Amendment right attached.  Defendants have failed to show that a

21  <u>Kastigar</u> hearing is required here.

22  **IV.   CONCLUSION**

23      For the foregoing reasons, the government respectfully requests

24  that this Court deny defendants' motions to suppress on the basis of

25  the attorney-client privilege (CR 275 and CR 281) and deny the

26  request for any hearing.

27

28