Richard M. Steingard (SBN 106374)
*rsteingard@SteingardLaw.com*
LAW OFFICES OF RICHARD M. STEINGARD
800 Wilshire Boulevard, Suite 1050
Los Angeles, California 90017
Telephone:  (213) 260-9449
Facsimile:   (213) 260-9450

Attorney for Defendant
SHEN ZHEN NEW WORLD I, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SHEN ZHEN NEW WORLD I, LLC,<br><br>Defendant. | Case No. 2:20-cr-0326(A)-JFW<br><br>**DEFENDANT SHEN ZHEN NEW WORLD I, LLC'S REPLY TO GOVERNMENT OPPOSITION TO MOTION TO SUPPRESS EVIDENCE, DISMISS COUNTS, AND STRIKE ALLEGATIONS DUE TO GOVERNMENT'S VIOLATION OF ATTORNEY-CLIENT PRIVILEGE; DECLARATION OF RICHARD STEINGARD; EXHIBIT**<br><br>Hearing Date:   January 31, 2022<br>Hearing Time:  8:00 a.m.<br><br>**EVIDENTIARY HEARING REQUESTED** |

Defendant Shen Zhen New World I, LLC ("SZNW") hereby replies to the government's opposition to their motion to suppress evidence and dismiss Counts Two and Twenty-Three of the First Superseding Indictment due to the government's violation of the attorney-client privilege.  (ECF 275.)  In responding to the

government's opposition, SZNW requests leave of the Court to supplement the motion with another exhibit – Exhibit O – attached hereto, which is a report of a government interview with SZNW employee Yan Yan.  SZNW also requests an evidentiary hearing to cross-examine FBI Special Agent Andrew Civetti, whose declaration was filed in opposition to the motion, and, to the extent necessary, present sworn testimony in support of the motion.

Respectfully submitted,

Dated:  January 15, 2022

_____/s/_____
RICHARD M. STEINGARD
Attorney for Defendant
Shen Zhen New World I, LLC

# **TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................ 1

II.   ARGUMENT ................................................................................ 3

    A.   The Government's Procedural Arguments Are Baseless ..................... 3

        1.   The Motion Identifies the Evidence to be Suppressed ................. 3

        2.   The Motion is Supported by a Declaration ...................... 4

        3.   The Suppression Motion Was Timely .............................. 5

    B.   The Emails Are Privileged and the Privilege Was Not Waived ........... 6

        1.   Attorney Yong Jointly Represented Huang/SZNW
           and Huizar in the Loan Transaction ................................ 6

        2.   Grace Luck Was Not Yong's Client ............................... 11

        3.   The Emails Were for the Purpose of Obtaining Legal Advice ...... 13

        4.   Esparza was Huizar's Agent for the Purpose of Obtaining
           Legal Advice from Yong ......................................... 15

        5.   SZNW Has Not Waived Privilege ................................. 16

    C.   The Court Should Hold an Evidentiary Hearing to
      Determine Whether the Government Deliberately Intruded
      into the Defendants' Attorney-Client Relationship ........................... 19

1

## **TABLE OF AUTHORITIES**

2

### **FEDERAL CASES**

3

4
*Anten v. Superior Court,*
    233 Cal. App. 4th 1254 (2015) ................................................................2

5

6
*Bank Brussels Lamber v. Credit Lyonnais (Suisse) S.A.,*
    101 F.R.D. 437 (S.D.N.Y. 1995) ........................................................ 8-9

7

8
*Baylor v. Mitchell Rubenstein & Assocs., P.C.,*
    857 F.3d 939 (D.C. Cir. 2017) ..............................................................15

9

10
*Cheeves v. Southern Clays, Inc.,*
    128 F.R.D. 128 (M.D. Ga. 1989) ..........................................................10

11

12
*Commodity Futures Trading Comm'n v. Weintraub,*
    471 U.S. 343 (1985) ...............................................................................7

13

14
*Griffith v. Davis,*
    161 F.R.D. 687 (C.D. Cal. 1995) ..................................................... 9-10

15

16
*Heriot v. Byrne,*
    257 F.R.D. 45 (N.D. Ill. 2009) ..............................................................15

17

18
*In re Bieter Co.,*
    16 F.3d 929 (8th Cir. 1994) ...................................................................15

19

20
*In re Fischel,*
    557 F.2d 209 (9th Cir. 1977) .................................................................14

21

22
*In re Hotels Nevada, LLC,*
    458 B.R. 560 (Bankr. D. Nev. 2011) ......................................................9

23

24
*In re Pacific Pictures Corp.,*
    679 F.3d 1121 (9th Cir. 2012) ..................................................... 4, 8-10

25

26
*In re Regents of University of California,*
    101 F.3d 1386 (Fed. Cir. 1996) ........................................................7, 11

27

28
*In re Reynoso,*
    477 F.3d 1117 (9th Cir. 2007) ..............................................................13

*In re Sealed Case,*
    679 F.2d 793 (D.C. Cir. 1982)....................................................................4

*In re Teleglobe Comms.,*
    493 F.3d 345 (3rd Cir. 2007) ..................................................... 2, 7-10

*Liew v. Breen,*
    640 F.2d 1046 (9th Cir. 1981) ..............................................................14

*North River Ins. Co. v. Philadelphia Reinsurance Corp.,*
    797 F. Supp. 363 (D.N.J. 1992) ...........................................................8

*Olender v. United States,*
    210 F.2d 795 (9th Cir. 1954) ...............................................................14

*Permian Corp. v. United States,*
    664 F.2d 1214 (D.C. Cir. 1981) ...........................................................18

*Ralls v. United States,*
    52 F.3d 223 (9th Cir. 1995) .................................................................14

*United States v. BDO Seidman LLP,*
    492 F.3d 806 (7th Cir. 2007) ...........................................................9, 13

*United States v. Chen,*
    99 F.3d 1495 (9th Cir. 1996) ........................................................ 13-14

*United States v. Christensen,*
    828 F.3d 763 (9th Cir. 2015) ...............................................................14

*United States v. De La Jara,*
    973 F.2d 746 (9th Cir. 1992) ...................................................... 4, 17-18

*United States v. Haynes,*
    216 F.3d 789 (9th Cir. 2000) ...............................................................19

*United States v. Huberts,*
    637 F.2d 630 (9th Cir. 1980) ...............................................................14

*United States v. Marashi,*
    913 F.2d 724 (9th Cir. 1990) ...............................................................19

*United States v. Munoz,*
    233 F.3d 1117 (9th Cir. 2000) ........................................................... 7

*United States v. Patel,*
    2017 WL 3394607 (S.D.N.Y. 2017) ............................................. 19

*United States v. Ruehle,*
    583 F.3d 600 (9th Cir. 2009) ................................................ 13, 19

*United States v. Schwimmer,*
    892 F.2d 237 (2d Cir. 1989) ........................................................ 13

*United States v. Segal,*
    313 F. Supp. 774 (N.D. Ill. 2004) ............................................. 21

*United States v. SDI Future Health, Inc.,*
    464 F. Supp. 2d 1047 (D. Nev. 2006) ......................................... 19

*United States v. Spitzauer,*
    2014 WL 7240266 (E.D. Wash., decided Dec. 19, 2014) ...................... 18

*United States v. Wardlow,*
    951 F.2d 1115 (9th Cir. 1991) ....................................................... 5

*United States v. Zolin,*
    809 F.2d 1411 (9th Cir. 1987) ................................................ 9, 13

*Upjohn v. United States,*
    449 U.S. 383 (1981) .................................................................. 13

*Waggoner v. Snow, Becker, Kroll, Klaris & Krauss,*
    951 F.2d 1115 (9th Cir. 1991) ................................................ 6, 11

**MISELLANEOUS AUTHORITIES**

1 McCormick on Evidence § 91.1 (8th ed.) ................................................. 10

1 Paul R. Rice, Attorney-Client Privilege
in the United States § 4:30 (2011) ...................................................... 9-10

Fed. R. Civ. P. 26 ...................................................................... 4

1

2

Fed. R. Evid. 104 ...................................................................................... 5

Local Crim. R. 12-1.1 ............................................................................... 4

Restatement (Third) of the Law Governing Lawyers (2000) .......................... 2, 7-10

Searching and Seizing Computers and Obtaining Electronic
Evidence in Criminal Investigations § 7(b) (July 2002) ................................... 21-22

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>INDEX OF EXHIBITS</u>**

| Exhibit | Description | Page(s) |
|---------|------------|---------|
| O | FD-302 for Yan Yan interview, Dec. 4, 2018 | 12:2, 12:13 |

1

**REPLY MEMORANDUM**

2

**I.**

3

**INTRODUCTION**

4       Shen Zhen New World I, LLC ("SZNW") and Jose Huizar (collectively "the

5   defendants") have moved to suppress privileged and confidential emails by and

6   between them, their agents, and attorneys Hong Yong and Goudi Sun.  The defendants

7   jointly sought legal guidance from attorney Yong regarding a $600,000 loan from

8   SZNW Chief Executive Officer Wei Huang to Huizar, and their emails, and their

9   agents' emails, with Yong, as well as Yong's emails with co-counsel Sun, relating to

10  the loan were privileged communications which the government may not use for any

11  purpose.  The defendants have also moved to suppress evidence derived from the

12  government's review of the emails, including witness testimony.  Lastly, defendants

13  ask the Court to dismiss counts and allegations relating to the loan because the

14  government deliberately intruded into their attorney-client relationship with Yong and

15  Sun.  (ECF 275, hereinafter "Defts' Mtn.")

16       The government's opposition (ECF 316, hereinafter "Govt. Opp.") takes a

17  scattergun approach.  It raises several baseless procedural arguments purportedly

18  dooming the motion, such as that the motion does not identify the evidence to be

19  suppressed, it does not comply with a local rule requiring a supporting declaration, and

20  is untimely.  As discussed below, the motion adequately identifies the evidence to be

21  suppressed, is supported by a declaration detailing the factual bases for the asserted

22  violations (which are largely undisputed by the government), and was timely filed.

23       As to the substance of the motion, the government advances a series of cascading

24  arguments in the alternative, beginning with the contention that Yong's client on the

25  collateral and loan transactions was Grace Luck Holdings, Ltd., a "shell" company

26  (according to the government) that Huang utilized to provide the collateral to support

27  the loan; and that Grace Luck's "representative," an SZNW employee named Yan Yan,

28  waived the privilege on Grace Luck's behalf.  Alternatively, the government claims that

1

attorney Yong only performed "[c]lerical" work by "gather[ing] required paperwork," and therefore rendered "commercial," rather than legal, advice. The government also contends that the emails were not confidential because Huizar's assistant, George Esparza, was privy to them. Should these arguments fail, the government argues that defendants waived privilege by failing to advise the government of its intrusion at an earlier time.[1]

All of these arguments are without merit as the record before the Court establishes that Huang/SZNW and Huizar jointly sought legal advice from Yong about the loan; Grace Luck had absolutely no contact with Yong other than Yan Yan, on SZNW's instructions, affixing her signature to a few documents; the emails with Yong pertained to legal and not commercial advice; Esparza's involvement in the communications with Yong were explicitly on Huizar's behalf as Huizar's agent; and the defendants did not waive privilege when they timely filed the instant motion.

Finally, the government denies deliberately intruding into the defendants' attorney-client relationship with Yong. The government concedes that the case agent and prosecutors read all the emails, bypassed any review by a government taint team much less a court, and relied on the emails to further its investigation and charge the defendants with loan-related crimes. Nonetheless, the government contends that it did not *deliberately* intrude into the defendants' attorney-client relationship with Yong because, after the case agent read all the emails, he spoke to the prosecutor and then

_____

[1]     The government also claims that Huizar's disclosures of the some of the emails during his proffer sessions constitutes a waiver of the attorney-client privilege. This argument applies solely to Huizar and not SZNW. *In re Teleglobe Comms*, 493 F.3d 345, 363 (3rd Cir. 2007) (citing Restatement (Third) of the Law Governing Lawyers § 72(2) & cmt. e) (Where parties hold a joint attorney-client privilege, any waiver requires the consent of all joint clients, and one client may not unilaterally waive privilege as to other client's communications or as to any of its own communications that relate to other client); *Anten v. Superior Court*, 233 Cal. App. 4th 1254, 1256 (2015) (where parties hold joint attorney-client privilege, waiver by one party does not constitute waiver by other). Accordingly, SZNW does not further discuss this argument.

concluded that they were not privileged.  Left unsaid is why the agent did not follow the government's self-designed protocol which required that they segregate "potentially privileged" emails for a taint team or court's review; what the agent told the prosecutor about the emails and the prosecutor's response; the foundation for the agent's conclusion that the emails were not privileged; why the case agent and prosecutors, after purportedly deeming the emails non-privileged, felt the need to conceal Yong's involvement in the loan from the Court when seeking several warrants; and why the prosecutors did not subsequently recognize the "potentially privileged" nature of the emails after several prospective witnesses told them that Huang and Huizar had retained an attorney to prepare and effectuate the loan.  On this record, an evidentiary hearing is necessary to determine whether the government deliberately intruded into the defendants' attorney-client relationship with Yong.

## II.

## ARGUMENT

### A.    The Government's Procedural Arguments Are Baseless

#### 1.    The Motion Identifies the Evidence to be Suppressed

The government explicitly concedes that the prosecutors and agents reviewed the defendants' emails with Yong and used that evidence to build their case regarding Huang's loan to Huizar.  The government also concedes *sub silentio* that it intentionally concealed the attorneys' involvement with the loan from the Court as part of its warrant applications. Nonetheless, the government incredulously, and incorrectly, argues that the defendants' motion fails to identify the evidence they seek to suppress.  (Govt. Opp. at 10-11.)  In fact, the defendants' motion is replete with references to the privileged emails, and Exhibit M to the motion pinpoints the specific emails that defendants seek to suppress.[2]  The motion also names the prospective witnesses whose testimony about

---

[2]    The defendants filed a privilege log, rather than the actual emails, out of an abundance of caution to ensure that they did not waive privilege.  *See United States v.*

the loan transactions should be suppressed because their statements were derived from the government's review of the privileged emails as George Esparza, Ricky Zheng, Yan Yan, Hock Yong, and Guodi Sun.[3]  In short, the motion sufficiently defines the relief sought.

### 2.    The Motion is Supported by a Declaration

The government argues that the defendants failed to include a supporting declaration in support of their motion to suppress evidence in violation of Local Rule 12-1.1.  (Govt. Opp. at 21-22.)  In fact, the motion is supported by a declaration from Huizar's counsel authenticating the privilege log which summarizes the emails, the reports and transcripts of pre-indictment statements made by the government's prospective witnesses, and the case agent's affidavits in support of warrants.  The motion also relies on allegations in the First Superseding Indictment which are not in dispute.  These are all facts known by the defendants – and unchallenged or rebutted by the government – upon which they contend that the motion should be granted and would be admissible in evidence at a hearing on the defendants' motion. Local Crim. R. 12-1.1.

_____

*De La Jara*, 973 F.2d 746, 749 (9th Cir. 1992) (failure to pursue all reasonable means of preserving confidentiality of material may way privilege by implication); *see also In re Pacific Pictures Corp.*, 679 F.3d 1121, 1128 (9th Cir. 2012) (declining to adopt rule that privilege holder may selectively waive privilege).  Since the government possesses the emails and has already reviewed them, it cannot reasonably claim to be prejudiced by the defendants' failure to file the emails with the Court.  *Cf.* Fed. R. Civ. P. 26(b)(5)(A)(ii) (party claiming privilege over withheld discovery must "describe the nature of the documents … not produced or disclosed … in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim").  If the Court believes it should review the emails to resolve the motion, the defendants will file the emails *in camera* provided that such filing is not deemed a waiver of the privilege.  *See In Re Sealed Case*, 676 F.2d 793, 804-5 (D.C. Cir. 1982) (district and appellate courts reviewed documents *in camera* to determine whether they were privileged).

[3]    The testimony of witnesses from East West Bank concerning the loan should also be suppressed if the evidence establishes that their statements were derived from the government's review of privileged emails.

In "decid[ing] any preliminary question about whether ... a privilege exists, ... the court is not bound by the evidence rules, except those on privilege." Fed. R. Evid. 104(a) (emphasis added).  Accordingly, the defendants may rely on the privilege log, reports and transcripts of witness statements, the case agent's affidavits, and the First Superseding Indictment to establish that their emails with attorney Yong are privileged.  To the extent that factual issues necessary to the resolution of the motion are disputed, defendants have issued subpoenas to George Esparza, Ricky Zheng and Yan Yan to testify at the upcoming hearing.  (Declaration of Richard Steingard ("Steingard Decl.") at ¶ 7.)

This case is distinguished from *United States v. Wardlow*, 951 F.2d 1115 (9th Cir. 1991) (per curiam), cited by the government.  (Govt. Opp. at 22.)  In *Wardlaw*, the Ninth Circuit affirmed a district court's denial of an evidentiary hearing on a motion to suppress evidence obtained in violation the Fourth Amendment due to the defendant's failure to file a declaration that complied with the local rule.  *Id.* at 1116.  The Court stated, "Wardlow merely submitted a declaration prepared and signed by counsel, containing a broad assertion that the statement of facts in Wardlow's memorandum of points and authorities was based on discovery received by Wardlow's counsel.  A broad declaration signed by counsel rather than an individual competent to testify concerning the facts is not sufficient to meet the requirements of [the] rule ...."  *Id*.  The declaration and supporting exhibits filed in this case are far different than that submitted in *Wardlow*; moreover, unlike the Fourth Amendment claim raised in *Wardlow*, preliminary questions necessary to a determination of whether the emails that the defendants seek to suppress are protected by the attorney-client privilege are not subject to the rules of evidence.  Fed. R. Evid. 104(a).

### 3.  The Suppression Motion Was Timely

The government argues that the Court should deny the motion as untimely under the Court's scheduling order because the defendants seek the dismissal of charges related to the loan due to the government's deliberate intrusion into their attorney-client

1   relationship.  (Govt. Opp.  at 11.)  When the Court ordered the defendants to file

2   motions to dismiss by September 7, 2021, it made clear that a motion to dismiss

3   referred to "a motion that attacks the legal sufficiency of the Indictment" or a motion

4   "attacking the Indictment."  (RT 4/5/21: 34-35, 39.)  The defendants' motion does not

5   attack the indictment or its legal sufficiency and, therefore, is not subject to the

6   September 7, 2021 filing deadline.

7   **B.**   **The Emails Are Privileged And The Privilege Was Not Waived**

8        The emails between Zheng, Huizar, Esparza and Yong, as well as those between

9   Yong and Sun, and Yong and Yan, regarding the loan are protected under the attorney-

10   client privilege.  Zheng (acting on behalf of SZNW and its Chief Executive Officer

11   Huang) and Huizar retained attorney Yong to provide legal advice and prepare the

12   proper documents to effectuate the loan.  Yong thereafter did exactly that which he was

13   retained to do, and the emails reflect that work process.  Besides Yan's signature on a

14   few documents as Grace Luck's "representative" – a company she did not even know

15   existed – Grace Luck had no contact with Yong and was not Yong's client in the loan

16   transaction.  Yan's production of emails and documents to the government did not

17   waive the joint attorney-client privilege held by SZNW and Huizar.  Esparza's

18   inclusion in the emails did not breach their confidentiality because he was Huizar's

19   agent for the purpose of conveying information and obtaining guidance from Yong.

20   Lastly, SZNW did not waive privilege because it did not notify the government earlier

21   about the intrusion into the attorney-client relationship.

22        **1.**   **Attorney Yong Jointly Represented Huang/SZNW and Huizar in the**

23        **Loan Transaction**

24        The government's claim that Huang/SZNW and Huizar were not Yong's clients

25   is legally and factually flawed.  "An attorney-client relationship is formed when an

26   attorney renders legal advice directly to a client who has consulted him seeking legal

27   counsel."  *Waggoner v. Snow, Becker, Kroll, Klaris & Krauss*, 991 F.2d 1501, 1505

28   (9th Cir. 1993) (citations omitted).  The attorney-client relationship "hinges upon the

client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice." *In re Regents of University of California*, 101 F.3d 1386, 1390 (Fed. Cir. 1996) (internal quotations omitted).  In determining whether a corporate entity, such as SZNW, had an attorney-client relationship, the Court considers the belief of those persons authorized to act on behalf of the entity. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985).

An attorney may represent two clients on the same matter where both clients consent and there is no substantial risk of the lawyer being unable to fulfill his duties to both.  *Teleglobe*, 493 F.3d at 362 (citing Restatement (Third) of the Law Governing Lawyers §§ 128-131) (2000)).  The joint representation begins when the two clients "convey their desire for representation, and the lawyer consents."  *Id.* (citing Restatement (Third) of the Law Governing Lawyers § 14).  As with single-client representation, joint representation may arise by implication.  *Id.*; *see also United States v. Munoz*, 233 F.3d 1117, 1128 (9th Cir. 2000) (attorney-client relationship for purpose of joint privilege may be formed by express or implied contract). Communications between joint clients and their common attorney are deemed confidential and, therefore, protected from compelled disclosure to persons outside the joint representation. *Teleglobe*, 493 F.3d at 363.

Here, SZNW (through Huang and Zheng) and Huizar both conveyed their desire for representation by Yong in the loan transaction, and Yong consented to jointly representing both.  The operative facts are not in dispute.  SZNW's Chief Executive Officer Huang instructed SZNW's Executive Director Zheng to retain a lawyer to prepare the appropriate documents for Huang to loan Huizar money to settle a pending sexual harassment lawsuit.  (Defts' Mtn., Ex. A at 4; Ex. K at 1.)  Zheng retained attorney Yong who was licensed to practice law in New York and worked with attorney

Guodi Sun who was licensed to practice law in California.[4]  (*Id*., Ex. A at 4; *see also* FSI 19 (Overt Act 31, referring to Yong as "Attorney E").)  According to Esparza, Huizar used Yong on Zheng's recommendation.  (Ex. B at 6.)  Yong was retained "to draft and execute the necessary paperwork" for the loan.  (FSI at 21 (Overt Act 41).)  After consulting with Zheng and Huizar, Yong drafted several iterations of a promissory note.  (FSI at 19-20 (Overt Act 34); Defts' Mtn., Ex. C at 2.)  Huizar specifically sought and received Yong's advice about whether the loan proceeds could be deposited into a certificate of deposit account to be used as collateral for a separate bank loan which was ultimately incorporated as a condition of the loan.  (FSI at 20 (Overt Act 36)), Defts' Mtn., Ex. C at 2.)  Huizar paid Yong $5,000 for his services.  (Defts' Mtn., Ex B at 5.)  From these undisputed facts, the Court may reasonably conclude that SZNW (through Huang and Zheng) and Huizar jointly consulted with Yong in his capacity as a lawyer and manifested their intention to seek his professional legal advice.

The government's argument that Huang and Huizar's mutual interest in the settlement of Huizar's sexual harassment lawsuit is not a "common interest" sufficient to invoke a joint attorney-client privilege (Govt. Opp. at 25) conflates the "common interest" privilege and the "joint-client" privilege.[5]  *See Teleglobe*, 493 F.3d at 359-66

---

[4]     Although the government's opposition characterizes Yong as a "disbarred attorney" and notes that he was disbarred in California in 2009 (Govt. Opp. at 1, 6), it does not dispute that, during the relevant period, he was licensed to practice law in New York and worked with attorney Sun who was licensed to practice law in California.

[5]     Several reasons contribute to the confusion over terminology.  The "common interest rule" is also known as the "joint defense rule."  *Pacific Pictures*, 679 F.3d at 1129; *see also Teleglobe*, 493 F.3d at 363-64 (equating "common-interest privilege" with "joint-defense privilege").  The "joint-client" privilege considers the "extent of the legal matter of *common interest*" in order to limit the joint client relationship. *Teleglobe*, 493 F.3d at 363 (quoting Restatement (Third) of the Law Governing Lawyers § 75 cmt. c).  Courts have used the term "'common interest' doctrine" to describe the situation "when multiple persons are represented by the same attorney."

(distinguishing "oft-confused" joint-client and common interest privileges); *Griffith v. Davis*, 161 F.R.D. 687, 691-93 (C.D. Cal. 1995) (distinguishing common defense doctrine from joint-client doctrine). "[T]he 'common interest' ... rule is an exception to ordinary waiver rules designed to allow attorneys for different clients pursuing a common legal strategy to communicate with each other." *Pacific Pictures*, 679 F.3d at 1129 (citations omitted). It requires that "the communication [be made] in pursuit of a joint strategy in accordance with some form of agreement – whether written or unwritten. *Id.* (citation omitted); *see also United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007) ("common interest doctrine extends attorney-client privilege to otherwise non-confidential communications ... [and] only will apply where the parties undertake a joint effort with respect to a common legal interest"). The common interest privilege applies when separate counsel represents parties. *Pacific Pictures*, 679 F.3d at 1129; *Teleglobe*, 493 F.3d at 365; *United States v. Zolin*, 809 F.2d 1411, 1417 (9th Cir. 1987) ("'common interest' rule protects communications made when a nonparty sharing the client's interests is present at a confidential communication between the attorney and a client"), *vacated on other grounds* 491 U.S. 554 (1989).

By contrast, the "joint-client" privilege applies when one lawyer represents two or more parties in the same matter. *Teleglobe*, 493 F.3d at 362-63. "Under the joint-client privilege, clients may jointly retain (or one client may retain for the benefit of others) an attorney as their common agent on a legal matter of common interest." *In re Hotels Nevada, LLC*, 458 B.R. 560, 570 (Bankr. D. Nev. 2011). "With respect to matters of common interest, each joint client may be privy to the other's communications without the attorney-client privilege protection being waived by that

---

*Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 446 (S.D.N.Y. 1995) (quoting *North River Ins. Co. v. Philadelphia Reinsurance Corp.*, 797 F. Supp. 363, 366 (D.N.J. 1992)). Nevertheless, "[t]he common interest doctrine subsumes a number of principles that are sometimes characterized as separate rules and are at other times conflated into a single axiom." *Id.* (citations omitted).

9

breach of confidentiality." *Id.* (citing *Griffith*, 161 F.R.D. at 693); 1 Paul R. Rice, Attorney-Client Privilege in the United States § 4:30 (2011); Restatement (Third) of the Law Governing Lawyers § 75 (2000)); *see also* 1 McCormick on Evidence § 91.1 (8th ed) (discussing joint-client privilege).  Unlike the common interest privilege where "a shared desire to see the same outcome in a legal matter is insufficient to bring a communication between two parties within this exception," *Pacific Pictures*, 679 F.3d at 1129 (citation omitted), the joint-client privilege applies where the parties who are jointly represented by the same attorney have a sufficient common interest such that "there is no substantial risk of the lawyer being unable to fulfill [his] duties to [both]." *Teleglobe*, 493 F.3d at 362 (citation omitted); *see also id*. at 363 ("co-client relationship is limited by 'the extent of the legal matter of common interest'") (citing Restatement (Third) of the Law Governing Lawyers § 75 cmt. c).

The common interest between Huang/SZNW and Huizar for which they jointly sought Yong's representation was a loan to settle Huizar's sexual harassment lawsuit. This shared understanding supported, and did not undermine, their common interest in ensuring that the loan was legally and properly documented.  Yong jointly represented Huang/SZNW and Huizar for this purpose as there was no substantial risk that he could not fulfill his duties to both.[6]  *Teleglobe*, 493 F.3d at 362.  Because SZNW and Huizar were both clients of Yong in the matter of the loan, their emails with Yong about the loan are subject to the joint-client privilege.

---

[6]      Suggesting that any divergence of interests between Huang/SZNW and Huizar is fatal to their privilege claim, the government quotes *Cheeves v. Southern Clays, Inc.*, 128 F.R.D. 128, 130 (M.D. Ga. 1989), that "'[t]he key factor in establishing a community of interest is that the nature of the interest be identical, not similar, and be legal, not solely commercial.'" (Govt. Opp. at 24.)  In *Cheeves*, the court granted a motion to compel production of documents over a claim of privilege objection after finding a waiver from the privilege holder's voluntary disclosure of the documents to successor entities who had acquired it.  128 F.R.D. at 131.  In doing so, the court specifically distinguished the situation in this case where the parties claiming a common interest "both consult with the same attorney" and the communication is "based on such a . . . direct transaction between the joint clients of an attorney." *Id.*

### 2. Grace Luck Was Not Yong's Client

Rather than acknowledging Huang/SZNW and Huizar as Yong's clients, the government relies on a partially signed "Attorney Fee Agreement" between Grace Luck and attorney Sun to argue that Grace Luck was Yong's client and claims Yan later waived Grace Luck's privilege when she produced documents to the government relating to the loan. (Govt. Opp. at 19, 22; Ex. 11). Yet, even if fully executed, the retainer agreement does not establish that Grace Luck was Yong's client, much less that it was Yong's sole client in the loan transaction.

A formal contract is not dispositive of the existence of an attorney-client relationship. *Waggoner*, 991 F.2d at 1505. Rather, "[a]n attorney-client relationship is formed when an attorney renders legal advice directly to a client who has consulted him seeking legal counsel." *Id*. As discussed in the preceding section, the existence of an attorney-client relationship "hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice." *Regents of University of California*, 101 F.3d at 1390.

Grace Luck is identified in the First Superseding Indictment as "Holding Company E" and is described by the government in its opposition as a "shell entity." (FSI 6 (¶ 21); Govt. Opp. at 1, 24.) In fact, as the government has repeatedly represented, Huang used Grace Luck as the funding source for the collateral that he (Huang) posted to support the bank's loan to Huizar. (RT 8/5/20 at 6:2-4, 15:21-24, 16:3-9.)[7] Yan had absolutely nothing to do with Grace Luck; she was a SZNW

---

[7]    *See also* RT 12/8/20 at 6:20-24, 11:7-10, 14:2-25; Gov't Omnibus Opp. to Def. Mot. to Dismiss, ECF 259 at 17-19 (referencing "collateral provided by defendant Huang to defendant Huizar to secure a loan from Bank 1"); USAO Press Release, Nov. 30, 2020, https://www.justice.gov/usao-cdca/pr/new-indictment-rico-case-against-former-la-city-councilman-jose-huizar-adds-5, *New Indictment in RICO Case Against Former L.A. City Councilman Jose Huizar Adds 5 Defendants, Including a Former Deputy Mayor* ("Huang also provided $600,000 in collateral to fund a settlement of a sexual harassment lawsuit filed against Huizar by a former CD-14 staffer".).

employee who worked for its Chief Executive Officer, Huang, and directly under its Executive Director, Zheng.  (FSI 6 (¶ 21); Ex. O at 1-2.)  At Huang and Zheng's direction, Yan was instructed to sign documents relating to the loan as Grace Luck's "representative."  (*Id*.)  The government's suggestion that Yan's compelled and uninformed signature establishes Grace Luck as Yong's sole client and Yan as its legal representative authorized to waive the attorney-client privilege is fallacious.

In fact, the government well knows that Grace Luck was not Yong's client based on its own interviews with Yong, Yan and Esparza.  Yong made clear that he had no contact with anyone who actually *worked* for Grace Luck.  (Defts. Mtn., Ex. C at 2, 4.)  Yong stated, "Yan worked for Huang" and that "Yan was the only Grace Luck representative that Yong communicated with."  (*Id*.)  Yan confirmed Yong's account, stating that at the time the of the loan she worked for Huang and SZNW and that Zheng "was her boss."  (Ex. O at 1-2.)  Yan also said she "did not know what Grace Luck Holding was or who ran it" and only signed documents because Zheng "order[ed]" her to do so.  (*Id*. at 2.)  Yan said she "did not know what she was signing ... and did not know who the loan was from, but knew she was there on behalf of the company (Shenzhen New World)."  (*Id*.)  Esparza independently confirmed Yong and Yan's statements, saying that he "remembered Yan Yan was assigned as the main person associated with Grace Luck.  Esparza did not know how Yan Yan got involved because she was an employee with the Sheraton hotel.  Esparza did not know if Grace Luck was a real company but it was used to transfer the money…  Esparza was surprised when he saw Yan Yan [at the bank to sign loan documents] and recognized her.  Esparza knew she was not part of Grace Luck and thought she was just a trusted staff member of the hotel."  (Defts' Mtn., Ex. B at 8, 9.)  Esparza added that he "believed Yan Yan was asked to be the front person for Grace Luck.  Yan Yan worked at Huang's hotel as an Administrative Assistant so Esparza thought it was weird that she would then be designated as the face of Grace Luck."  (*Id*. at 11.)

1    The government's opposition does not challenge these statements or offer any

2    facts in rebuttal.  Thus, the government's claims that Yong had an attorney-client

3    relationship with Grace Luck, and that Yan waived the attorney-client privilege, are

4    baseless.

5    ### 3.    The Emails were for the Purpose of Obtaining Legal Advice

6    The government next argues that the emails are not privileged because Yong was

7    hired for "commercial advice," not legal advice.  (Govt. Opp. at 23).  According to the

8    government, Yong "simply gathered required paperwork to deposit money in the bank

9    for Grace Luck" and "[a]cted [m][erely in a [c]lerical [c]apacity."  (*Id*. at 23, 26.)[8]  This

10   argument mischaracterizes the facts and misapplies the law.

11   The attorney-client privilege applies when legal advice "of any kind" is sought.

12   *United States v. Ruehle*, 583 F.3d 600, 609 (9th Cir. 2009).  The privilege does not

13   depend on whether the advice was sought in anticipation of or during the pendency of

14   litigation.  *BDO Seidman,* 492 F.3d at 815; *United States v. Schwimmer*, 892 F.2d 237,

15   243-44 (2d Cir. 1989); *see also Zolin*, 809 F.2d at 1417 (rejecting argument that

16   litigation must be pending for common interest privilege to apply).  To the contrary,

17   "[m]uch of what lawyers actually do for a living consists of helping their clients

18   comply with the law."  *United States v. Chen*, 99 F.3d 1495, 1500 (9th Cir. 1996)

19   (citing *Upjohn v. United States*, 449 U.S. 383, 392 (1981)).  This includes the

20   preparation of legal instruments and contracts.  *In re Reynoso*, 477 F.3d 1117, 1125

21   (9th Cir. 2007) (citation omitted).  Because "[t]his valuable social service ... cannot be

22   performed effectively if clients are scared to tell their lawyers what they are doing, for

23   fear that their lawyers will be turned into government informants ... [a] client is entitled

24

25   _____

26   [8]    The government relies on Agent Civetti's conclusion that Yong and Sun did not
     perform legal services.  (*Id*.)  Agent Civetti could only make such a "finding" after
27   thoroughly reviewing and analyzing the Huizar and Esparza emails with counsel,
     thereby circumventing the government's taint procedures for "potentially privileged"
28   documents.  In any event, Agent Civetti's conclusion was legally and factually
     incorrect.

1  to hire a lawyer, and have his secrets kept, for legal advice regarding the client's

2  business affairs." *Chen*, 99 F.3d at 1500-01 (internal citation omitted).

3          As noted above, the government does not dispute the underlying facts detailed in

4  the defendants' motion which demonstrate that SZNW (through Huang and Zheng) and

5  Huizar sought *legal* counsel from attorney Yong relating to the loan.  Specifically, the

6  defendants sought an attorney's guidance about structuring, crafting, and documenting

7  a loan in compliance with the law and properly authenticating that loan.  The emails

8  were in furtherance of these purposes or otherwise directly or indirectly revealed

9  confidential attorney-client communications about Huang/SZNW and Huizar's

10  common interest in the loan and were, therefore, privileged.  *See United States v.*

11  *Christensen*, 828 F.3d 763, 802-03 (9th Cir. 2015) (attorney-client communication that

12  directly or indirectly reveals confidential communication is privileged regardless of

13  whether communication contains legal advice) (citation omitted); *see also Ralls v.*

14  *United States*, 52 F.3d 223, 225 (9th Cir. 1995) (privilege attaches to identity of fee-

15  payer and fee arrangement which are generally not protected "where disclosure would

16  convey information which ordinarily would be conceded to be part of the usual

17  privileged communication between attorney and client").

18          In contrast to Yong's work in preparing loan documents, the government relies

19  on cases involving strictly administrative or commercial advice.  (Govt. Opp. at 26-28.)

20  These cases are inapposite and wholly distinguishable from this case.  *See e.g.*, *Liew v.*

21  *Breen*, 640 F.2d 1046, 1050 (9th Cir. 1981) (communications concerned the attorney's

22  identification of meritorious litigation by others that needed financing); *United States v.*

23  *Huberts*, 637 F.2d 630, 640 (9th Cir. 1980) (communications concerned the sale of

24  equipment that the lawyer oversaw); *In re Fischel*, 557 F.2d 209, 212 (9th Cir. 1977)

25  (communication consisted of summaries of the client's business transactions which the

26  lawyer compiled from non-privileged information); *Olender v. United States*, 210 F.2d

27  795, 806 (9th Cir. 1954) (attorney employed as an accountant to prepare net worth

28  statements and tax returns).  None of these cases concern an attorney retained and

consulted about preparing the proper documentation to effectuate a somewhat complicated collateral and loan transaction.  The government's attempt to redefine Yong's work as "gather[ing] paperwork" in a "[c]lerical [c]apacity" fails.

### 4.    Esparza was Huizar's Agent for the Purpose of Obtaining Legal Advice from Yong

Continuing its litany of arguments in the alternative, the government claims that the emails with Yong were not confidential because Zheng and Huizar shared them with Esparza.  (Govt. Opp. at 29-32.)  The government does not dispute the legal principal that the attorney-client privilege attaches to communications between the attorney and the privilege holder's agent.  *Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 857 F.3d 939, 949-50 (D.C. Cir. 2017); *see also Heriot v. Byrne*, 257 F.R.D. 645, 665 (N.D. Ill. 2009) ("attorney-client privilege applies to third parties who are agents of either the lawyer or the client").  Nonetheless, the government argues that Esparza's duties as the Special Assistant to Huizar in Council District 14, did not include facilitating Yong's legal advice about the loan (Govt. Opp. at 31-32), as if that claim, even if true, would preclude Esparza from being Huizar's agent.

Misrepresenting a passage from *In re Bieter Co.*, 16 F.3d 929, 939-40 (8th Cir. 1994), the government states "'the disclosure of otherwise privileged documents to [Esparza] in the course of [Huizar's] confidential communications with counsel [would] not destroy the privilege' *only if* 'the communications in question fell within the scope of [Esparza's] duties, were made at the behest of his superior, and were made for the purpose of seeking legal advice for [Huizar]'" (Govt. Opp. at 32 (emphasis added).)  In *Bieter*, the court held that the attorney-client privilege applied to communications between an independent consultant hired by the client and the client's lawyer, and the disclosure of privileged documents to the consultant in course of his confidential communications with the attorney did not destroy the privilege.  *Id*. at 938-39.  Notably, the court's found that the communications were made for the purpose of seeking legal advice, the client had directed the consultant to communicate with

counsel for the purpose of securing legal advice, the subject matter of the communications were within the scope of the consultant's duties, and the communications were not disseminated beyond the consultant and the client, *id*. at 939-40.  All these facts are present here.

As the government is well-aware from its interviews with Esparza (who is a cooperating witness), Esparza's communications with Yong were at Huizar's direction and for the sole purpose of seeking Yong's legal assistance about the loan on Huizar's behalf.  Huizar directed Esparza to communicate with Yong for this purpose, and the emails were not disseminated beyond the joint clients, Esparza and the attorneys.  Indeed, the report of the government's interview reflects these facts: Esparza stated, "During the time Godoy filed the lawsuit against Huizar, Esparza described his role as 'Huizar's guy.'  Esparza position was like an executive assistant, he handled ordering phone records, filling out questions regarding the harassment (Huizar and Esparza would discuss how to amend them after Esparza filled them out), and printed emails." (Defts' Mtn., Ex. B at 2.)  Esparza added that his "role in the settlement was to be a middle man, he did what Huizar asked him to do, mainly printing documents and emailing them.  Esparza probably paid attention to the items at the time but did not have a full understanding of what was going on with the settlement."  (*Id*. at 2-3)  Likening himself to Zheng's role as Huang's agent for the loan, which the government concedes, Esparza stated that he "was Huizar's middle man and Zheng was Huang's middle man."  (*Id*. at 3.)

In other words, Esparza was Huizar's agent for the purpose of obtaining legal advice from Yong about the loan.

### 5.    SZNW Has Not Waived Privilege

If all else fails, the government argues that that the defendants implicitly waived privilege by first raising it when the parties met and conferred regarding this motion. (Govt. Opp. at 39-41; *see also* Snyder Decl. ¶¶ 3-4 (parties met and conferred regarding motion on October 14 and 18, 2021).)  The government correctly notes that it provided

the privileged emails to SZNW in its initial discovery production on January 12, 2021

(Govt. Opp. at 41; Civetti Decl. at ¶ 10), but omits several significant, illuminating

facts.  The Yong emails constituted approximately *60* pages but were buried within

over *12,000* pages of non-privileged emails from Huizar and Esparza's email accounts,

which were themselves contained in almost *two million* pages of documents.

(Steingard Decl. at ¶ 3.)  In addition to the documents, the government's initial

production included thousands of Title III audio recordings for four wiretaps, and a

massive amount of GPS Tracker Data for six cell phones, Pen Register Data for 28 pen

registers, and Cellebrite Reports for twelve phones.  (*Id*.)  The government's

subsequent productions in February, March, April, and September 2021 raised the total

discovery for defendants to review to well over two million pages of documents.  (*Id.* at

¶ 4.)

     Under these circumstances, SZNW cannot be deemed to have implicitly waived

the privilege because it first conferred with the government about this issue in October

2021 and filed its motion one month later.  Indeed, the government recently explained

its long delays in locating *its own trial exhibits*, stating that the process of searching,

locating, and identifying specific documents within the voluminous discovery is a

painstakingly slow and time-consuming effort.  (9/20/21 RT 38-41.)  This assertion

certainly holds true for the defendants who, unlike the government, were reviewing this

enormous amount of discovery for the first time.  It thus seems disingenuous for the

government to defend its delays in locating its own exhibits while simultaneously

claiming that SZNW implicitly waived its privilege with respect to the emails by failing

to assert a privilege at an earlier date.

     The government reliance on *United States v. De La Jara*, 973 F.2d 746 (9th Cir.

1992) is misplaced.  There, the defendant objected <u>during trial</u> to the admission of a

letter from his attorney that the government had discovered during the execution of a

search warrant.  The Court held that the defendant waived privilege because the

defendant did "nothing to recover the letter or protect its confidentiality during the six-

month interlude between its seizure and introduction into evidence." *Id.* at 750.  The court stated that by not "minimiz[ing] the damage caused by the breach of confidentiality ... [the defendant] allowed 'the mantle of confidentiality which once protected the document' to be 'irretrievably breached,' thereby waiving his privilege. *Id.* at 750 (quoting *Permian Corp. v. United States*, 664 F.2d 1214, 1220 (D.C. Cir. 1981)).

*De La Jara's* reasoning presupposes that the defendants knew that the government was in possession of the privileged documents and waited until trial before claiming privilege.  Unlike *De La Jara*, SZNW had no knowledge prior to its review of the discovery that the government possessed the privileged emails and thereafter timely raised the issue in a pretrial suppression motion.  Also, unlike *De La Jara*, SZNW never had an opportunity to minimize the damage caused by the government's review of these privileged emails – the government possessed them for *five years* before they were even produced to SZNW – and SZNW's assertion of privilege seven months prior to trial did not cause the confidentiality of the emails to be irretrievably breached.  *See United States v. Western Titanium, Inc.*, 2010 WL 3789775, *5 (S.D. Cal., decided Sept. 27, 2010) (distinguishing *De La Jara's* holding that "the failure to take any action to protect the confidentiality of documents seized by the Government may result in waiver" and finding that the defendants did not waive their privilege because "Defendants clearly *did* take action to preserve their privilege [] [b]y filing their third  motion [and] timely plac[ing] their objections to the seizure of the documents and the taint review process before the Court") (emphasis in original); *United States v. Spitzauer*, 2014 WL 7240266, at *5 (E.D. Wash., decided Dec. 19, 2014) (rejecting implicit waiver because defendant's decision "to conduct an independent investigation to determine the scope" of the invasion before filing motion to suppress and dismiss was "a reasonable means of preserving the privilege in this matter").

///

///

1
2
3

## C.   THE COURT SHOULD HOLD AN EVIDENTIARY HEARING TO DETERMINE WHETHER THE GOVERNMENT DELIBERATELY INTRUDED INTO THE DEFENDANTS' ATTORNEY-CLIENT RELATIONSHIP

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

SZNW's suppression motion is based on the unremarkable legal principle that the government may not rely on privileged attorney-client communications to prosecute the client who holds the privilege. *See United States v. Patel*, 2017 WL 3394607, at *6 (S.D.N.Y. 2017) ("when the Government obtains access to a defendant's email account, the Government is not entitled to rely on privileged materials contained therein").  The "general remedy" for violation of the attorney-client privilege is to suppress introduction of the privileged information at trial." *Id.*; *SDI Future Health,* 464 F. Supp. 2d at 1047.  The Ninth Circuit has not decided whether evidence derived from the government's review of privileged materials must also be suppressed. *Cf. United States v. Marashi*, 913 F.2d 724, 731 n.11 (9th Cir. 1990) (declining to decide whether evidence derived from intrusion into marital privilege should be suppressed).  The Ninth Circuit has recognized, however, that the "fruit of the poisonous tree" may be invoked as a deterrent to government misconduct relating to its review of privileged information. *Ruehle*, 583 F.3d at 606 n.6 (government misconduct intruding into attorney-client privilege could support suppression of derivative evidence).  A deliberate intrusion into the attorney-client relationship may also warrant dismissal of the charges. *United States v. Haynes*, 216 F.3d 789, 796 (9th Cir. 2000); *SDI Future Health*, 464 F. Supp. 2d at 1053.

22
23
24
25
26
27
28

Agent Civetti's affidavits in support of search warrants and a wiretap order, as well his declaration in opposition to this motion, detail how the government came into possession of the emails.  The government does not deny that it relied on the emails to further its investigation and charge the defendants with offenses relating to the loan.  Rather, the government relies on Agent Civetti's declaration to argue that it did not *deliberately* intrude into the defendants' attorney-client relationship with Yong because

Agent Civetti reviewed the emails, conferred with the prosecutor, and thereafter concluded that the emails were not privileged. (Govt. Opp. at 14-19.)

Agent Civetti's declaration raises more questions than answers.[9]  For instance, Agent Civetti asserts that the government had prearranged protocols for him to review the emails for "potentially privileged" materials which he was to segregate out and not review.  (Civetti Decl. at ¶¶ 2-3; Ex. 1.)[10]  He notes that, as to some of Huizar and Esparza's emails, he *recognized* email addresses as being associated with Huizar's attorneys (or Huizar or Esparza's spouse), immediately isolated those emails, and did not review them.  (Civetti Decl. at ¶ 3.)  Yet, as to *unfamiliar* attorney-email addresses such as attorney Yong's, Agent Civetti states that he made no effort to separate them but instead reviewed them and then "consult[ed]" with AUSA Mack Jenkins.  (*Id.*)

While the government's use of "taint teams" has been oft criticized (Defts' Mtn. at 20, n.10), the procedures used in this case were even more problematic.  By his own admission, Agent Civetti thoroughly reviewed the Yong emails, thereby circumventing the government's own protocol to separate such "potentially privileged" items.  The very fact that Agent Civetti felt the need to consult with government counsel about the emails indicates that, objectively and subjectively, he knew the emails were at least "*potentially* privileged" and should not have been reviewed under the protocol purportedly utilized by the government.

---

[9]  On January 14, 2022, defense counsel requested that the government make Agent Civetti available for cross-examination at the hearing.  (Steingard Decl. at ¶ 8, citing Local Rule 12-1.3 ("Any declarant in connection with a motion to suppress shall be made available for cross-examination at the hearing of the motion, unless no party desires to cross-examine the declarant.").)  The government agreed to do so.  (*Id.*)

[10]  *See also* Gov't Opp. Huizar's Mot. to Suppress Email Evidence.  (ECF 314 at 9, n. 3) ("The 302 [outlining Agent Civetti's procedures for examining emails] states that upon guidance from a prosecutor, potentially privileged communications (meaning those to or from an email address associated with a person believed to be a spouse or attorney) 'were not reviewed' and were instead segregated out and maintained in evidence.").

In addition, the government has not disclosed the nature of Agent Civetti's conversation with AUSA Jenkins or how many such conversations occurred;[11] nor has it revealed Agent Civetti's training or background concerning the attorney-client privilege such that he was competent to make such a determination.  Notwithstanding its failure to provide this critical information, the government asks that the Court find its conduct to be wholly proper.

Most troubling, the government makes no reference to, and provide no explanation for, its intentional concealment of Yong's involvement with the loans when it described the many emails to the Court in several warrant applications.  As detailed in defendants' motion, the government took pains to omit Yong's role from the warrant applications to the point where they misrepresented the intended recipient of one of Huizar's emails to Yong.  (Defts' Mtn., at 7-9, Ex. F at 53.)  The government's *intentional* concealment of Yong's involvement with the loan from the Court indicates an *awareness* that, had this fact been disclosed, the Court would likely have raised concerns about a violation of an attorney-client privilege, and thus reflects a *deliberate* intrusion into privileged communications.

Furthermore, the government had multiple chances to recognize the privilege and preserve the privilege.  The prosecutors and agents interviewed prospective witnesses about the loan and were clearly and unequivocally told that Yong provided legal services to the defendants in connection with the loan.  (Defts' Mtn., at 9-13, detailing government's witness interviews.)  Even then, the government made no effort to rectify its misconduct or submit the related emails to the Court for *in camera* review, as is required when the government comes into possession of potentially privileged material

---

[11]    On December 28, 2021, defense counsel requested that the government produce any reports, emails and notes reflecting communications between Agent Civetti and AUSA Jenkins concerning the government's review of the Yong emails.  (Steingard Decl. at ¶ 5.)  On January 10, 2022, AUSA Jenkins responded that he and Agent Civetti "reviewed our documents and we have nothing to produce in response to [the defense] request." (*Id*. at ¶ 6.)

during a criminal investigation.  *See United States v. Segal,* 313 F. Supp 2d 774, 776-7 (N.D. Ill. 2004), citing United States Department of Justice, *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations* § 7(b) (July 2002).

In sum, the circumstances surrounding the government's review of and reliance on emails by and between the defendants, their agents, and attorneys are sufficient to require an evidentiary hearing to determine whether the government deliberately intruded into the defendants' attorney-client relationship.

Respectfully submitted,

Dated:  January 15, 2022

               /s/
RICHARD M. STEINGARD
Attorney for Defendant
Shen Zhen New World I, LLC