CUAUHTÉMOC ORTEGA (Bar No. 257443)
Federal Public Defender
CAREL ALÉ (Bar No. 283717)
(E-Mail: Carel_Ale@fd.org)
CHARLES J. SNYDER (Bar No. 287246)
(E-Mail: Charles_Snyder@fd.org)
ADAM OLIN (Bar No. 298380)
(E-Mail: Adam_Olin@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
JOSÉ LUIS HUIZAR

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSÉ LUIS HUIZAR, *et al.*,<br><br>Defendant. | Case No. 20-CR-326-JFW-1<br><br>**DEFENDANT JOSÉ LUIS HUIZAR'S REPLY ISO MOTION TO SUPPRESS EVIDENCE [ECF NO. 275]**<br><br>Hearing Date: January 31, 2022<br>Hearing Time: 8:00 a.m. |

# TABLE OF CONTENTS

I. INTRODUCTION ..........................................................................................................1

II. BACKGROUND ..........................................................................................................2

    A. The Government Obtains and Reviews Privileged Communications .........2

    B. Armed With Those Privileged Communications, the Government Continues Investigating the Privileged Material and Induces Mr. Huizar to Re-Produce The Documents ...................................................................3

III. ARGUMENT ..............................................................................................................4

    A. The Fruit of the Poisonous Tree Doctrine Applies to Constitutional Violations, Including Fifth Amendment Due Process ..................................4

    B. The Government's Conduct Was Outrageous Within the Meaning of the Fifth Amendment ..........................................................................................4

        1. The Government Was Objectively Aware of the Attorney-Client Relationship Based on the July 2016 Warrant Returns ......................5

        2. The Government Deliberately Intruded Into the Attorney-Client Relationship to Advance Its Investigation ..........................................6

        3. Mr. Huizar Suffered Substantial Prejudice From the Violation ........8

    C. The Limited Remedy of Excluding the Privileged Communications Is Appropriate Here ..........................................................................................9

IV. CONCLUSION ........................................................................................................10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Oregon v. Elstad*,
  470 U.S. 298 (1985) ........................................................................................ 4

*State v. Joly*
  --- N.W.2d ----; 2021 WL 935704, at *2 (Mich. Ct. App. 2021) .................... 7, 9

*United States v. $493,850.00 in U.S. Currency*,
  518 F.3d 1159 (9th Cir. 2008) ........................................................................ 4

*United States v. Marshank*,
  777 F. Supp. 1507 (N.D. Cal. 1991) ............................................................ 4, 9

*United States v. Ramirez*,
  976 F.3d 946 (9th Cir. 2020) ........................................................................ 10

*United States v. Shrum*,
  908 F.3d 1219 (10th Cir. 2018) .................................................................... 10

*United States v. Stringer*,
  535 F.3d 929 (9th Cir. 2008) ......................................................................... 4

# I. INTRODUCTION

The government obtained and reviewed privileged emails between José Huizar, his shared counsel, and his agents, and then used that information to develop its case. The Court should suppress their use, as well as the fruits of that invasion of privilege, for the reasons set forth in the Motion and defendant Shen Zhen New World I, LLC's contemporaneously filed Reply.[1] Mr. Huizar files this separate, limited Reply for the purpose of addressing the government's assertion that Mr. Huizar is not entitled to relief because he produced certain of those emails during the proffer process, years after the government's violation of his privilege.

Suppression is warranted because any waiver was itself the fruit of the government's blatant disregard for Mr. Huizar's attorney-client privilege, rising to a Fifth Amendment due process violation. Tracing the history of the investigation reveals that the government first learned of the loan and collateral transaction at issue by reviewing warrant returns containing privileged documents. The government then took that information and expanded the scope of its investigation, requesting additional warrants relating to the transaction that were carefully shorn of any reference to the attorneys involved. More than two years after first acquiring these privileged emails, the government confronted Mr. Huizar with the transaction in a December 2018 proffer, which was in turn followed by government interviews of nearly everyone else involved in the transaction, including the two attorneys themselves. The government's deliberate, ongoing exploitation of Mr. Huizar's privilege merits suppressing all the fruits of that initial violation.

For these reasons, Mr. Huizar respectfully requests that the Court grant the Motion for the substantive reasons detailed in the Reply submitted by SZNW.

---

[1] Mr. Huizar joins in that Reply.

1

## II. BACKGROUND

**A.   The Government Obtains and Reviews Privileged Communications**

The government began obtaining broad search warrants to capture the email accounts of Mr. Huizar and Esparza (among others) in 2016. (*See, e.g.*, ECF No. 308, Ex. D (July 2016 search warrant for Mr. Huizar's Yahoo account); ECF No. 308, Ex. E (July 2016 search warrant for Esparza's Google account).) However, the government was unaware of the loan and collateral transaction at that time. Indeed, the affidavit in support of the 2016 warrant for Mr. Huizar's account suggests Wei Huang bribed Mr. Huizar through gambling chips provided during trips to Las Vegas. (ECF No. 308, Ex. D at 3–4; *see also id.* at 5 (noting that "it remains unclear what official acts JOSE HUIZAR has taken in exchange for the bribe and kickbacks he received from WEI HUANG").)[2] That affidavit therefore made no reference to any such transaction. But given the breadth of the warrant request—all records over a more than three year period relating, *inter alia*, to "WEI HUANG, RICKY ZHENG, GEORGE ESPARZA, RAYMOND CHAN, SHENZHEN NEW WORLD GROUP, SHENZHEN NEW WORLD INVESTMENT, INC., and the LA Hotel Downtown"—the communications at issue in this Motion were captured.

Subsequent warrant applications make clear that the government reviewed the privileged communications and relied upon them to progress their investigation, all prior to any contact with Mr. Huizar. For example, in a February 2017 search warrant application for Mr. Huizar's Yahoo account, the case agent described the loan and collateral transaction based upon seized emails. (ECF No. 308, Ex. F at 52–54; *see also id.* Ex. H (May 2017 Title III application) at 90 (describing how the 2016 search warrants "provided information related to … the $600,000 Godoy settlement payment" and "were successful in providing information to advance the investigation".) As described in the Motion, the involvement of attorneys, as well as the seeking and the provision of legal

---

[2] For clarity, Mr. Huizar uses the exhibits' internal pagination, as opposed to ECF-generated pagination.

advice, were apparent on the face of the communications. (ECF No. 275 at 7–8.) Hence, by no later than February 2017, the government had acquired and analyzed these privileged documents and exploited them to advance the investigation.

**B.     Armed With Those Privileged Communications, the Government Continues Investigating the Privileged Material and Induces Mr. Huizar to Re-Produce The Documents**

After more than two years of reviewing the privileged communications and expanding its investigation, the government conducted an interview of Mr. Huizar under a proffer agreement. (Civetti Decl. ¶ 7; Gov. Ex. 10.)[3] The interview was far ranging and touched upon numerous substantively different topic areas. (*See generally* Gov. Ex. 10 (comprising a seventeen page FD-302).) But toward the end (assuming the 302 was chronological), Mr. Huizar discussed, at a high level, some aspects of the collateral and loan transaction. (*Id.* at 12–15 (noting that Mr. Huizar told the government he "worked with ZHENG and an attorney named HENRY LNU to figure out how the money was going to be provided").) And then in February 2019, the government interviewed Zheng at length regarding the particulars of the transaction. (ECF No. 302, Ex. J (11/11/2018 Zheng 302).) And in March 2019, amidst a series of attorney and client proffers, Mr. Huizar produced some emails related to the transaction that the government had already acquired through its prior warrants. (*See* Gov. Ex. 12.) From there, the government embarked on a far wider investigation into the transaction, culminating in the interviewing of Yong and Sun, the two attorneys involved. (ECF No. 302, Exs. C; L.) Ultimately, the transaction ripened into the core of the government's claims with respect to Mr. Huizar's relationship to Huang and SZNW.

---

[3] Agent Civetti's declaration is filed at ECF No. 316-1 and the government's exhibits were filed provisionally under seal at ECF No. 317.

3

### III. ARGUMENT

### A. The Fruit of the Poisonous Tree Doctrine Applies to Constitutional Violations, Including Fifth Amendment Due Process

While generally the violation of a non-constitutional evidentiary privilege like the attorney-client privilege does not require the suppression of derivative evidence, the government's conduct here rises to a Fifth Amendment violation, which does. *See Oregon v. Elstad*, 470 U.S. 298, 305–06 (1985) (holding *Wong Sun* limited to constitutional violations); *United States v. $493,850.00 in U.S. Currency*, 518 F.3d 1159, 1164 (9th Cir. 2008) ("[The exclusionary rule] bars the admission of evidence obtained in violation of the U.S. Constitution, as well as fruit of the poisonous tree.") (cleaned up); *see also United States v. Marshank*, 777 F. Supp. 1507, 1523–24 (N.D. Cal. 1991) (dismissing indictment on grounds including Fifth Amendment due process for violation of attorney-client privilege).

### B. The Government's Conduct Was Outrageous Within the Meaning of the Fifth Amendment

An invasion of attorney-client privilege constitutes a Fifth Amendment due process violation where the government's conduct is outrageous. A claim of outrageous government conduct premised on the intrusion into the attorney-client relationship requires the defendant to show: "(1) the government was objectively aware of an ongoing, personal attorney-client relationship; (2) the government deliberately intruded into that relationship; and (3), as a result, the defendant suffered actual and substantial prejudice." *United States v. Stringer*, 535 F.3d 929, 941 (9th Cir. 2008).

The government's multi-year exploitation of attorney-client privileged materials to advance its investigation, selectively editing warrant applications to hide the involvement of attorneys in this transaction, and confrontation of Mr. Huizar with the fruits of that conduct in order to induce a waiver to cure its prior violation, is outrageous.

1. **The Government Was Objectively Aware of the Attorney-Client Relationship Based on the July 2016 Warrant Returns**

The government was objectively aware of an attorney-client relationship between Mr. Huizar, SZNW/Wei Huang, and Yong and Sun after reviewing the returns of the July 2016 search warrants. As described in the Motion, the case agent reviewed the emails, concluded none involved a potential claim of privilege, and passed them on to the prosecuting attorneys. (ECF No. 275 at 6.) And the government cannot assert the emails were lost among the volume of the production. The case agent states in his declaration that he consulted with one of the prosecuting attorneys upon finding Yong's "esqimmigrationlaw" account. (Civetti Decl. ¶ 4.) After consultation with the attorney, the case agent believed the communications were not privileged. (*Id.*) But the case agent's conclusion is impossible to square with the documents on their face, which include retainer agreements, emails to and from attorneys, and discussions of what attorneys had recommended. (*See generally* ECF 308, Ex. B (Esparza 6/6/2019 302 at 5–17).)[4] At minimum, the government was on objective notice of the high risk of a privileged relationship from the returns of the July 2016 warrants alone. But instead of conducting additional investigation to confirm or disprove that relationship, the government treated them as unprivileged and exploited them to advance its investigation.

Hence, the government's opposition on this point essentially collapses into a dispute on the merits as to whether attorney-client privilege existed between Mr. Huizar, SZNW/Wei Huang, and Yong and Sun. Given that the case agent consulted with the prosecuting attorneys regarding these very emails, as opposed to a taint team, the government cannot now assert that it was unaware of the predicate facts that establish the privilege. Further, by the time the government induced Mr. Huizar to produce the same emails it already possessed, the government knew from its interview of Zheng the extent of Yong and Sun's involvement. (*See* ECF No. 275 at 9–11.) The government was

---

[4] SZNW's concurrently filed Reply moreover addresses the merits of why the communications were privileged.

5

subjectively wrong in their conclusion, but they were objectively aware of the relationship.

### 2. The Government Deliberately Intruded Into the Attorney-Client Relationship to Advance Its Investigation

The government's continued exploitation of the privileged materials constitutes a deliberate intrusion into the attorney-client relationship. After obtaining the privileged emails in July 2016, the government learned of the collateral and loan transaction and weaponized that intrusion in multiple ways. They include:

- Additional search warrants targeting the transaction whose affidavits relied upon privileged information and hid the involvement of attorneys;
- Questioning Mr. Huizar about the transaction, armed with the details of a privileged relationship;
- Interviewing witnesses about their participation in the transaction, including the privilege holders agents, Esparza and Zheng, and the attorneys Yong and Sun; and
- Inducing Mr. Huizar to produce emails already in the government's possession.

The government only learned of the loan and collateral transaction from reviewing the privileged emails. As the case agent's affidavit in support of the May 2017 Title III warrant explained, the 2016 warrants "provided information related to … the $600,000 Godoy settlement payment" and "were successful in providing information to advance the investigation". (ECF No. 308, Ex. H (May 2017 Title III application) at 90 (describing how the 2016 search warrants "provided information related to … the $600,000 Godoy settlement payment" and "were successful in providing information to advance the investigation".) And the conspicuous absence of any reference to the transaction in the July 2016 warrant applications further demonstrates that the government was unaware of

this aspect of what would become their case before reviewing the privileged communications.

A recent decision of the Michigan Court of Appeals is instructive. In *People v. Joly*, the court affirmed the trial court's finding of a Fifth Amendment due process violation and decision to suppress derivative evidence of that violation where the investigating detective, through a search warrant, found a privileged email, and relied on the contents of that email to investigate. --- N.W.2d ----; 2021 WL 935704, at *2 (Mich. Ct. App. 2021). With respect to an intentional invasion, the court noted:

> "it was not the apparent *inadvertent* discovery of the privileged email that is particularly troublesome here but rather what happened *after* the discovery. After learning of the privileged email, the detective did not attempt to segregate the email, turn the case over to another detective or a different law-enforcement office, seek guidance from the court officer who signed the warrant, or work with the prosecutor to develop some other measure to separate the investigation from the privileged information that the detective learned from reading the email (and could not realistically unlearn). Instead, the detective doubled-down on the breach and used the privileged information to further his investigation of defendant…. This can only be characterized as a deliberate intrusion into the substance of the attorney-client relationship."

*Id.* at 7 (emphasis in original). So too here, where the government took little to no steps to address the privilege, but instead affirmatively used privilege information to develop its case into avenues it would not have found absent that privilege invasion.

The deliberateness of the government's intrusion is moreover evidenced by the manner in which the involvement of the attorneys in the transaction was concealed in post-2016 warrant applications. For example, in support of the February 2017 warrant application for Mr. Huizar's Yahoo account, the affidavit provides that on August 17, 2014, Mr. Huizar "emailed Esparza and Zheng," regarding a "deadline of Tuesday noon to sign settlement." (ECF No. 308, Ex. F (February 2017 Warrant Application for Huizar's Yahoo Account) at 53.) But Yong, rather than Esparza or Zheng, was the addressee of the email, and the only individual not referenced in the affidavit. (*See* ECF No. 302, Ex. M (Chart of Privileged Emails) at 14.) And nowhere in the section relating

to the transaction does the affidavit make reference to Yong, Sun, or any lawyers other than counsel in the Godoy lawsuit. (*See* ECF No. 308, Ex. F (February 2017 Warrant Application for Huizar's Yahoo Account) at 52–54.)[5] Instead, the affidavit simply asserts that "HUIZAR, assisted by ESPARZA … and ZHENG … established a purported joint venture with" Grace Luck. (*Id.* at 52.) Other warrant applications similarly excised any involvement by Yong, Sun, or attorneys more generally. (*See, e.g.*, ECF No. 308, Ex. G (February 2017 Warrant Application for Esparza's Gmail Account).) There was no legitimate reason to hide the involvement of counsel from the loan transaction if, as the government contends, Yong and Sun were acting in a "clerical" capacity, or there was no privilege.

The government's continued exploitation of the privileged materials, coupled with the concealment of the attorneys' involvement in the transaction, demonstrates that the invasion was deliberate.

### 3. Mr. Huizar Suffered Substantial Prejudice From the Violation

The government's deliberate, ongoing invasion of Mr. Huizar's privilege confronted him with the Hobson's choice of having to either potentially waive privilege over information the government already had, or refuse the government's requests and thereby jeopardize the potential for a favorable outcome from the proffering process. The pre-charging proffering process is a delicate, high-pressure negotiation that requires making decisions quickly and on limited information. An interviewee proffering desires to cooperate with the government to the extent possible without prejudicing his or her ability to adequately defend the matter should it ripen to prosecution. Thus, the calculus of whether to comply with the government's "requests"—which are, of course, backed with the implicit threat of criminal prosecution—necessarily requires evaluating the value of the refusal. Where, as here, the government already has the information, refusal

---

[5] In contrast, the First Superseding Indictment describes this exchange as: "On August 17, 2014, defendant HUIZAR e-mailed George Esparza, Executive Director E, and Attorney E regarding settlement funds for the sexual harassment lawsuit," specifically referring to "a deadline of Tuesday noon to sign settlement." (ECF No. 74 at ¶ 32.)

8

is counterproductive and would only communicate to the government that the collaborative process should end, to the interviewee's detriment. That the government even knew about this transaction at all, putting them in a position to question Mr. Huizar about it at his December 2018 proffer, created the same issue. *See Joly*, --- N.W.2d ----; 2021 WL 935704, at *8 (finding prejudice established where the state would not have found the evidence absent exploitation of the privileged information).

The most likely conclusion is the government belatedly realized it had potentially used privileged materials to develop a core component of its case and sought to "cure" the violation through a potential waiver years later. Indeed, the very fact the government asked for the documents at all, despite already having had them for more than two years, suggests that the government's motive was unrelated to investigating new facts. In essence, the government violated Mr. Huizar's attorney-client privilege, investigated using the fruits of that invasion, and then leveraged those fruits to bootstrap a later waiver to "cure" its initial wrongdoing. The Court should not countenance the government's violation of Mr. Huizar's privilege simply because it successfully wielded the results of that violation against him.

## C. The Limited Remedy of Excluding the Privileged Communications Is Appropriate Here

The Court is vested with wide discretion in the appropriate remedy for a due process violation in this context, ranging from outright dismissal to suppression. *Marshank*, 777 F. Supp. at 1522 (citing *United States v. Rogers*, 751 F.2d 1074, 1078 (9th Cir. 1985)); *Joly*, --- N.W.2d ----; 2021 WL 935704, at *8–9 (affirming suppression of evidence found resulting from due process violation founded on deliberate invasion of attorney-client privilege). In light of the violation here, the Court should suppress the documents seized in violation of attorney-client privilege and the fruits of that violation. Those fruits include any purported waiver by Mr. Huizar of privilege, as even knowing and voluntary waivers of rights that are the fruit of a constitutional violation can be suppressed. *See, e.g.*, *United States v. Ramirez*, 976 F.3d 946, 959 (9th Cir. 2020) ("It is

well established that, under the fruits of the poisonous tree doctrine, evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible, despite a person's voluntary consent, unless the evidence obtained was purged of the primary taint.") (cleaned up); *United States v. Shrum*, 908 F.3d 1219, 1234 (10th Cir. 2018) ("This means the fruit of the poisonous tree doctrine may also extend to invalidate consents which *are* voluntary in the traditional sense.") (cleaned up, emphasis in original).[6] Because, as described above, there is no evidence that the government had any independent awareness of the loan and collateral transaction prior to reviewing the privileged emails, suppressing the fruits, and not simply the emails resulting from the July 2016 warrants, is appropriate.

## IV. CONCLUSION

For the above reasons, Mr. Huizar respectfully requests the Court grant the Motion to Suppress.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: January 15, 2022      By  */s/ Adam Olin*
―――――――――――――――――
Carel Alé
Charles J. Snyder
Adam Olin
Deputy Federal Public Defenders
Attorneys for José Luis Huizar

---

[6] While most of these cases involve "consent" under the Fourth or Fifth Amendments, as opposed to waiver, the same logic would apply.

10