1  CUAUHTEMOC ORTEGA (Bar No. 257443)
   Federal Public Defender
2  CAREL ALÉ (Bar No. 283717)
   Email: Carel_Ale@fd.org
3  CHARLES J. SNYDER (Bar No. 287246)
   Email: Charles_Snyder@fd.org
4  ADAM OLIN (Bar No. 298380)
   Email: Adam_Olin@fd.org
5  Deputy Federal Public Defenders
6  321 East 2nd Street
   Los Angeles, California 90012-4202
7  Telephone: (213) 894-2854
   Facsimile: (213) 894-0081
8
9  Attorneys for José Luis Huizar

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. JOSÉ LUIS HUIZAR, *et al.*, Defendants. | Case No. 20-CR-326-JFW-1<br><br>**JOSE LUIS HUIZAR'S REPLY ISO MOTION TO SUPPRESS PRIVILEGED ATTORNEY-CLIENT COMMUNICATIONS; DECLARATION; EXHIBIT**<br><br>Hearing Date: January 31, 2022<br>Hearing Time: 8:00 a.m. |

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................1

II. ARGUMENT ..............................................................................................................2

    A. A Joint-Client Relationship Was Formed Between Huizar, Goldman, Kim, and Kaufman ........................................................................2

    B. The Privilege Was Not Waived by Esparza's Presence Because He Was Huizar's Agent .............................................................................5

        1. Esparza Was a City Employee *and* Huizar's Private, Personal Assistant ..............................................................................................5

        2. The Government's Caselaw Is Inapposite .........................................8

    C. Descriptions of the June 29, 2017 and June 2018 Calls by Esparza and Goldman Must Be Suppressed ..................................................9

        1. The June 29, 2017 Conference Call......................................................9

        2. The June 2018 Call ..............................................................................10

    D. Esparza's Statements Regarding the Invoices Must Be Suppressed ...........................................................................................................11

    E. A *Kastigar* Hearing Is Necessary to Ensure a Fair Trial ...........................13

III. CONCLUSION .........................................................................................................14

## TABLE OF AUTHORITIES

**Cases**                                                         **Page(s)**

*Anderson v. SeaWorld Parks and Ent.*,
   329 F.R.D. 628 (N.D. Cal. 2019) ................................................................. 8

*Behunin v. Superior Court*,
   9 Cal. App. 5th 833 (2017) ........................................................................ 8

*In re Bieter Co.*,
   16 F.3d 929 (8th Cir. 1994) ....................................................................... 6

*Cavallaro v. United States*,
   284 F.3d 236 (1st Cir. 2002) ...................................................................... 9

*Diamond Resorts U.S. Collection Dev., LLC v. US Consumer Att'ys, P.A.*,
   519 F. Supp. 3d 1184 (S.D. Fla. 2021) ...................................................... 5

*Flo Pac, LLC v. NuTech, LLC*,
   No. WDQ-09-510, 2010 WL 5125447 (D. Md. Dec. 9, 2010) .............. 6, 9

*In re Grand Jury Witness*,
   695 F.2d 359 (9th Cir. 1982) ............................................................. 12, 13

*Hilton-Rorar v. State & Fed. Commc'ns Inc.*,
   No. 5:09-CV-01004, 2010 WL 1486916 (N.D. Ohio Apr. 13, 2010) ...... 12

*In re Hotels Nevada, LLC*,
   458 B.R. 560 (Bankr. D. Nev. 2011) ...................................................... 4, 5

*HPD Lab'ys, Inc. v. Clorox Co.*,
   202 F.R.D. 410 (D.N.J. 2001) ................................................................. 12

*In re Int'l Oil Trading Co., LLC*,
   548 B.R. 825 (Bankr. S.D. Fla. 2016) ................................................... 6, 7

*Kastigar v. United States*,
   406 U.S. 441 (1972) ............................................................ 1, 10, 11, 14

*Silverthorne Lumber Co. v. United States*,
   251 U.S. 385 (1920) ................................................................................ 14

*Smith v. Trans Am Trucking, Inc.*,
   No. CIVA 306CV483-RJCDCK, 2008 WL 943368 (W.D.N.C. Apr. 7,
   2008) ......................................................................................................... 6

*SmithKline Beecham Corp. v. Apotex Corp.*,
    232 F.R.D. 467 (E.D. Pa. 2005) ............................................................................. 5

*In re Teleglobe Commc'ns Corp.*,
    493 F.3d 345 (3d Cir. 2007) ......................................................................... 2, 5, 10

*United States v. Bauer*,
    132 F.3d 504 (9th Cir. 1997) ................................................................................ 13

*United States v. Danielson*,
    325 F.3d 1054 (9th Cir. 2003) .............................................................................. 13

*United States v. Evans*,
    113 F.3d 1457 (7th Cir. 1997) ................................................................................ 9

*United States v. Kovel*,
    296 F.2d 918 (2d Cir. 1961) ........................................................................ *passim*

*United States v. Orman*,
    417 F. Supp. 1126 (D. Colo. 1976) ...................................................................... 13

*United States v. Ruehle*,
    583 F.3d 600 (9th Cir. 2009) .................................................................................. 8

**Other Authorities**

8 Wigmore, Evidence (McNaughton Rev. 1961), § 2317 ........................................ 12

## TABLE OF EXHIBT

| Exhibit | Description | Page(s) and Line(s) |
|---------|-------------|---------------------|
| 1 | Transcript of Government's December 5, 2019 Interview of Morrie Goldman (filed under seal) | 3:9-26; 10:7-9; 10:17-20; 11:1-6; 14:1-4. |

## REPLY IN SUPPORT OF MOTION TO SUPPRESS

### I. INTRODUCTION

Jose Huizar's ("Huizar") Motion seeks to suppress the June 29, 2017 and June 2018 calls, the later descriptions of those calls by Esparza and Goldman during interviews with the government, Esparza's statements about Kaufman's legal invoices, and all the evidence derived therefrom. Additionally, because the discovery does not reveal the extent to which the government relied on privileged communications to aid its investigation, Huizar requests a *Kastigar* hearing so that the government can prove that the evidence it intends to use at trial was derived from legitimate independent sources.

The government's positions are not entirely clear. Regarding the June 29, 2017 call, the government alleges that it "does not intend to introduce [the call] at trial." (ECF No. 316 ("Opp'n") at 10:3.) Nevertheless, the government dedicates multiple pages to explain that the call was not privileged. (*See id.* at 9:21–10:8, 32:14–34:16.) Additionally, it adds that the "indictment does not quote from or rely on this particular call," (*id.* at 10:1–2), but the government does not detail the extent to which it used the privileged information to aid its investigation which led to the information in the indictment, nor does it explain whether it seeks to introduce Esparza and Goldman's statements describing the call, (*see id.* at 34 n. 20.) Regarding the June 2018 call, the government argues that it was not privileged, but does not state whether it intends to use Goldman's statements describing the call at trial. (*See id.* at 35:6–23.) Lastly, the government claims that it "does not intend to introduce testimony about the Kaufman invoices at trial," (*id.* at 37:19–21), but also dedicates substantial space to argue that they are not privileged, (*see id.* at 35:24–37:21.)

In any event, the government's arguments miss the mark.

## II. ARGUMENT

### A. A Joint-Client Relationship Was Formed Between Huizar, Goldman, Kim, and Kaufman

The government claims that "if joint clients could be created and established as easily as Huizar suggests, to defeat a waiver argument, any person could simply assert that all third parties . . . were joint clients or agents."[1] (Opp'n at 34:3–6 (internal quotations omitted).) But that is not what Huizar "suggests"—he does not claim a privilege exists just because he said so. Rather, he explains that a joint-client relationship was formed because the evidence proves that the parties intended and expected their communications to be privileged. *See In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 363 (3d Cir. 2007).

To be sure, the government's claim that a joint client-relationship is "without any [] support in the evidence" is demonstrably false. (*See* Opp'n at 33:4–7.) And the government, having conducted the interviews, knows this. Huizar attached the conference-call Linesheet and explained how the conversation evidenced an intent to create a joint-client relationship. (Mot. at 7:7–17; *id.*, Ex. D); *see In re Teleglobe*, 493 F.3d at 363 ("a district court should consider carefully . . . the content of the communications"). To ensure confidentiality, the participants first checked that no one else was on the call. (Mot., Ex. D at 1436.) Then, Huizar began the conversation by saying: "*We* . . . are interested in beginning a PAC." (*Id.*) This clearly evidences an intent to jointly receive legal advice. *See In re Teleglobe*, 493 F.3d at 363 ("The keys to deciding the scope of a joint representation are the parties' intent and expectations"). Then, Huizar, Goldman, and Kim each asked various questions to Kaufman to aid their understanding about forming a PAC. (Mot., Ex. D.) Additionally, Huizar attached Linesheets of other communications and explained how those conversations support that

---

[1] That same argument could be made in single-client representation, *i.e.*, any person could simply assert that their conversation with an attorney was privileged. In any event, "[l]ike single-client representation, nothing prevents joint representation from arising by implication." *In re Teleglobe*, 493 F.3d at 363.

same conclusion. (Mot. at 7:18–8:2.) Lastly, citing the indictment, he explained that Goldman became a principal officer of the PAC; therefore, it was logical for him to obtain legal advice regarding its formation and operation. (*Id.* at 7:23–8:2.) Though the indictment is not evidence, the government cannot reasonably contradict its own allegations. (*See* ECF No. 74 ("FSI") ¶ 34.) Plus, the government admits that "around 2017, Huizar, [] Esparza, [] Goldman, and Huizar Associate 3 agreed to establish a PAC." (Opp'n at 9:5–6.) The government cannot now argue that those parties lacked intent to seek legal advice regarding the "establish[ment]" of that PAC. (*See id.*)

The government's argument is particularly jarring and disingenuous given that during Goldman's interview, Goldman told the government that Kaufman provided legal advice related to the PAC to the group, described that legal advice, and the government refers to it as "advice" from Kaufman. (Ex. 1 at 15 (Transcript of December 5, 2018 Goldman Interview).) Indeed, Goldman told the government that he "had a conversation with Steve Kaufman, who is [] actually [Huizar]'s political attorney. . . . He's an election law guru. He said to me . . .," and then went on to tell the government the legal advice Kaufman provided. (*Id.*) Goldman told the government that he "had no less than five calls with Kaufman on this. I know that [Huizar] had at least two conversations, if not more, with Kaufman about it. George [Esparza] was on a call with me and Kaufman about it. The treasurer that we got for it is a guy names Charlie Shoemaker, . . . The key point here, and I can't stress this enough, and this was like five phone calls and conversations specifically about it . . . ." (*Id.* at 15–16.) Goldman then recounts the "key point" from Kaufman's legal advice. AUSA Dragalin then asked Goldman, "So, it was conversations between you and Kaufman, and then conversations between you and [Huizar]? Was it also conversation with you and Jose and George? Or no, George and Kaufman—" (*Id.*) To which Goldman replied, "Multiple. All of the above." (*Id.*) At that point, it was clear that the privilege was jointly possessed.

3

As AUSA Dragalin then paraphrased, "So, that's sort of your understanding of it from *advice from Steve Kaufman*, et cetera, et cetera." (*Id.* at 16 (emphasis added).) Goldman responds, "Et cetra, yeah." (*Id.*)

At another point during that proffer, Goldman explained to the government, that "*we*," meaning those involved in the PAC, had a contract with a fundraiser and "*we were*" going to pay her a certain amount. (*Id.* at 19 (emphasis added).) As a result of Kaufman's advice, "we talked about, 'Well, okay, let's see if we can find somebody else.'" (*Id.* at 19–20.) At other times, Goldman describes other conversations the group had with Kaufman, "Like I said, I know he discussed it with [Kaufman]. I must have told him at least 10 times. I know George was in the room some of the times. I know George was on the phone with me and [Kaufman] and Charlie, where [Kaufman] again said . . . ." (*Id.* at 20.) As Goldman told the government, "these were conversations that *we* had had with [Kaufman]." (*Id.* at 20 (emphasis added).)

The government's contention that Goldman, Kim, Kaufman, and Huizar (and Esparza as Huizar's agent) did not have a joint-client relationship and did not jointly seek and obtain legal advice from Kaufman in that capacity, is flatly contradicted by the transcript of and the government's *own description* of Goldman's statements. Its argument otherwise lacks credibility and merit.

Additionally, the government completely ignores that "[u]nder the joint-client privilege, clients may jointly retain (*or one client may retain for the joint benefit of others*) an attorney as their common agent on a legal matter of interest." *In re Hotels Nevada, LLC*, 458 B.R. 560, 570 (Bankr. D. Nev. 2011) (emphasis added); (*see also* Mot. at 7 n.7 (explaining that, at a minimum, Huizar retained Kaufman for the parties' joint benefit).) In fact, the government's main points *support* this. For example, the government explains that Kaufman was Huizar's election law attorney,[2] (Opp'n at 33:8–9), and admits that "[i]t may be true that all these participants were interested in hearing

---

[2] Indeed, the government knew that Kaufman was Huizar's attorney, yet it listened to their privileged communications anyway.

4

Kaufman's legal advice," (*id.* at 33:1–2.) In other words, Huizar retained an attorney to counsel the primary actors of the PAC regarding its formation and operation, that is, on a "legal matter of common interest." *In re Hotels Nevada*, 458 B.R. at 570. Certainly, to form the PAC, and as future leaders of the to-be-formed PAC, Kim and Goldman wanted Kaufman's counsel. (*See* FSI ¶ 34; Mot., Ex. F; Mot., Ex. C at Casino_0364457.) This clear intent weighs heavily in favor of a joint-client relationship. *See In re Teleglobe*, 493 F.3d at 363. As another example, the government argues that "no evidence [was presented] that Kim or Esparza ever paid fees to Kaufman." (Opp'n at 33:12–13). But this, too, merely supports that Huizar retained Kaufman for the "joint benefit of others." *In re Hotels Nevada*, 458 B.R. at 570.

In short, the evidence supports that a joint attorney-client relationship was formed.

**B.   The Privilege Was Not Waived by Esparza's Presence Because He Was Huizar's Agent**

Huizar need only show by a preponderance of the evidence that Esparza was his agent for the privilege to remain intact. *Diamond Resorts U.S. Collection Dev., LLC v. US Consumer Att'ys, P.A.*, 519 F. Supp. 3d 1184, 1199 (S.D. Fla. 2021). Here, that standard is easily met.

    1.    <u>Esparza Was a City Employee *and* Huizar's Private, Personal Assistant</u>

"Presence of a third-party, such as a consultant, does not destroy the attorney-client privilege where that party is the client's agent *or* possesses a commonality of interest with the client."[3] *SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 476–77 (E.D. Pa. 2005) (emphasis added). For example, the privilege is not waived by the presence of non-lawyer employees with "menial or ministerial responsibilit[ies]" such as "secretaries, file clerks . . . and aides of other sorts." *United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961). In fact, as the government's case law explains, the third party

---

[3] Not only was Esparza an agent of Huizar, he also "possesse[d] a commonality of interest with [Huizar]," *SmithKline*, 232 F.R.D. at 476–77, since Esparza's aspirations depended on his use and manipulation of Huizar, and thus the continued existence of Huizar's office.

5

need not even be an employee—even an independent contractor does not necessarily waive the privilege. *Flo Pac, LLC v. NuTech, LLC*, No. WDQ-09-510, 2010 WL 5125447, at *8 (D. Md. Dec. 9, 2010) (collecting cases); *e.g.*, *In re Bieter Co.*, 16 F.3d 929, 937 (8th Cir. 1994) (holding that "disclosure of otherwise privileged documents" to the client's agent, an independent contractor, "did not destroy the privilege"); *see also Smith v. Trans Am Trucking, Inc.*, No. CIVA 306CV483-RJCDCK, 2008 WL 943368, at *3 (W.D.N.C. Apr. 7, 2008) ("the undersigned is not prepared to find that the presence of a court reporter hired to record an interview is distinguishable from other staff or agents of an attorney or client, and thus destroys privilege"); *In re Int'l Oil Trading Co., LLC*, 548 B.R. 825, 833–34 (Bankr. S.D. Fla. 2016) ("Courts have variously applied the agency exception to non-attorney professionals such as accountants, non-testifying experts and consultants, and patent agents.").

      The government does not dispute that the presence of an agent does not waive the privilege. (Opp'n at 33:15–34:2.) Instead, grasping at straws, the government attempts to backpedal from its description of Esparza as Huizar's "Special Assistant," (FSI ¶ 34), to now argue he was not Huizar's agent. (Opp'n at 33:16 (recharacterizing Esparza as Huizar's "aide in the City").) This argument flies in the face of the facts as the government has previously described them.

      Indeed, there is no reasonable argument that Esparza was not Huizar's agent. He was Huizar's agent in every sense of the word. He was both his assistant as a city employee *and* Huizar's personal assistant. Though the government makes much ado

about it[4], Huizar never claimed that Esparza's agency regarding the attorney-client privilege was dependent solely on his employment with the city. (*See* Opp'n 37:1–5.) To the contrary, Esparza's work with Huizar extended beyond his role as a city employee. As Esparza later said, he "did whatever Huizar told him to do." (Mot., Ex. E at Casino_0364689). Huizar was his "boss." (FSI at Overt Act 101.) He was Huizar's driver. (Mot., Ex. A at Casino_0365053.) He assisted Huizar during international travel. (*See* FSI at Overt Act 361.) He paid attorney-fees on Huizar's behalf. (Mot., Ex. E at Casino_0364689, 95.) He "was copied on all invoices." (*Id.* at Casino_0364682.) He solicited campaign donations. (Mot., Ex. C at Casino_0364457, Ex. A at Casino_0365056.) He made political calls on Huizar's behalf. (Ex. A at Casino_0365053.) And he performed other, non-city related assistant tasks for Huizar. (*See generally* FSI.) Put simply, he was Huizar's Special Assistant. The government's futile attempt to recharacterize Esparza as something else—now that it better suits its purposes—should be rejected.

Esparza was Huizar's agent. His presence during the June 29, 2017 call did not destroy the privilege because he was acting per his "menial or ministerial" responsibilities for Huizar. *See Kovel*, 296 F.2d at 92; *see also In re Int'l Oil Trading Co.*, 548 B.R. at 834.

---

[4] The government contends that "Esparza's position as Huizar's aide in the city did not make Esparza an agent on Huizar's personal matters . . . which Esparza was forbidden from pursuing on City time on state laws," (Opp'n at 37:1–5), but does not explain (or cite any case law) as to why that is relevant to a determination that Esparza was Huizar's agent for attorney-client privilege purposes, (*see id.* at 33:15–25; 37:1–5.) Even assuming Esparza only assisted Huizar as a city aide, and even if certain activities were "forbidden," (unclear, as the government cites no "state laws"), the government has utterly failed to show why that would preclude a finding of agency. Indeed, Huizar is not aware of any case law that agency in this context is precluded if the agent was engaged in actions that violated the terms of his employment or state law. Nor should people have to make such a complicated agency determination when they seek legal advice. *Kovel*, 296 F.2d at 922 ("[L]aymen consulting lawyers should not be expected to anticipate niceties perceptible only to judges— and not even to all of them.").

### 2. The Government's Caselaw Is Inapposite

The joint clients conferred privately with Kaufman to receive confidential legal advice. (*See* Mot., Ex. D at 1436.) This is all that was required to secure the privilege. *See Kovel*, 296 F.2d at 922 ("What is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer."). They did not need to make a legal determination as to whether Huizar's personal assistant was legally his agent for the purpose of the attorney-client privilege. As Judge Friendly recognized, "[l]aymen consulting lawyers should not be expected to anticipate niceties perceptible only to judges— and not even to all of them." *Id.* (holding that presence of third-party consultant did not waive the attorney-client privilege).

Relying on California law, the government contends that Esparza's presence "must be nearly indispensable." (Opp'n at 33:18–23 (quoting *Anderson* v. *SeaWorld Parks and Ent.*, 329 F.R.D. 628, 633 (N.D. Cal. 2019) (applying California law).) But federal common law controls the privilege inquiry in a criminal case. *See United States v. Ruehle*, 583 F.3d 600, 608 (9th Cir. 2009). Tellingly, the government's contention is almost a direct quote from *Behunin*, a California case. *See Anderson*, 329 F.R.D. at 633 (quoting *Behunin v. Superior Court*, 9 Cal. App. 5th 833, 849 (2017)). The government omits this critical fact. (*See* Opp'n at 33:18–23.) Nor did it mention that *Anderson* recognized that "*federal law is broader* than [] California law and does not require finding the communication was reasonably necessary for the attorney to provide legal advice." *Anderson*, 329 F.R.D. at 634 (quoting *Behunin*, 9 Cal. App. 5th at 851) (emphasis added).

In any event, Esparza's presence facilitated Huizar's receipt of legal advice. As outlined, Esparza, like most assistants, completed all sorts of tasks for Huizar. Accordingly, it was perfectly reasonable for him to be at attorney-meetings to take notes and generally assist. Plus, he benefitted from and utilized the legal advice as well, because he solicited contributions on behalf of Huizar. (*See* Mot., Ex. C at Casino_0364457, Ex. A at Casino_0365053, 56.)

Esparza's role as Huizar's Special Assistant is patently different from the government's other cases for two primary reasons. (Opp'n at 31:11–20.) *First*, in each case, the third party was not an employee of the client. *Second*, in every case but *United States v. Evans*, 113 F.3d 1457, 1462–63 (7th Cir. 1997), the third party who caused the waiver was an expert consultant—not an assistant of the client or attorney with "menial or ministerial responsibilit[ies]." *Kovel*, 296 F.2d at 921. Thus, in *Flo Pac*, a technological expert's presence during a meeting with a defendant and his attorney waived the privilege because the expert was an employee of the plaintiff. 2010 WL 5125447, at *9. In other words, the expert "was not hired by [defendant] or the attorney."[5] *Id.* Similarly, in *Cavallaro*, "the record [did] not show that any party hired Ernst & Young to assist [the attorneys] in providing legal advice." *Cavallaro v. United States*, 284 F.3d 236, 247–48 (1st Cir. 2002). Lastly, in *Evans*, the client's friend who was present for "emotional support," (Opp'n at 31:20), waived the privilege, 113 F.3d at 1462–63. In contrast, here, Esparza was not there to facilitate the understanding of complex technological concepts—he was a ministerial assistant. *Cf. Cavallaro*, 284 F.3d at 247–48. He was not the opposing party's employee. *Cf. Flo Pac*, 2010 WL 5125447, at *9. And he was not there for moral support. *Cf. Evans*, 113 F.3d at 1462–63.

In sum, Esparza's presence did not waive the privilege.

**C.  Descriptions of the June 29, 2017 and June 2018 Calls by Esparza and Goldman Must Be Suppressed**

1.  <u>The June 29, 2017 Conference Call</u>

Both Esparza and Goldman seemingly described this call to the government. The government writes only one footnote in response, contending that neither Goldman nor Esparza recounted the call during their respective interviews. (Opp'n at 34 n. 20.)

---

[5] Nor was the expert even remotely necessary to facilitate the communication. *Flo Pac*, 2010 WL 5125447, at *9 ("It is manifestly contradictory for [defendant] to first allege that he was the original inventor and therefore had a full understanding of the invention's design and functionality yet later claim that he truly needed the presence and expertise of [the expert] at the [] meeting in order to help [facilitate] understand[ing]").

9

But, as is evident from the transcript from Goldman's interview, that is absolutely false. Indeed, a review of the cursory notes and the transcript unequivocally belies the government's contention that Goldman and Esparza did not describe confidential communications. Esparza told the government what was "said" during the June 29, 2017 meeting. (Mot., Ex. C at Casino_0364475 ("During the initial meeting about the PAC, Huizar said that . . .").) In fact, that entire paragraph in the government's notes seemingly describes the June 29, 2017 call. (*See id.*) Goldman, too, similarly described that call or a closely-related call. (Mot., Ex. A at Casino_0365056–57; Ex. 1 at 15 ("So, I had a conversation with Steve [Kaufman] . . . He said to me, . . .") Even if that advice was in a separate call as the government claims, it would still be privileged because it related to the PAC and, thus, "relate[d] to [the] other joint clients." *See In re Teleglobe*, 493 F.3d at 363 ("[a joint client] may not [] unilaterally waive the privilege. . . as to any of its communications that relate to other joint clients"). That is, the communication related to legal advice about the formation and management of the same PAC. (*See* Mot., Ex. A at Casino_0365056; *id.*, Ex. D at 1437 (Kaufman: "I've had various conversations with most of you on the phone here about this).)

As the government well knows, Goldman described the June 29, 2017 call and "multiple conversations" with Kaufman about the PAC during his interview with the government. (*Id.*, Ex. A at Casino_0365056; Ex. 1 at 16 (AUSA Dragalin: "You said you had numerous conversations.") But only the government can explain the extent to which it relied on that information. What this means is that a *Kastigar* hearing is necessary so that the government can clarify what evidence it obtained derived from that information.

    2.    <u>The June 2018 Call</u>

Here, the government contends that its notes "do[] not establish that Goldman and/or Shoemaker were seeking legal advice from Kaufman or that Kaufman provided legal advice about the PAC." (Opp'n at 35:11–14.) As recounted above, the government knows that to be false.

10

As the government well knows, since it conducted the proffers, Goldman told the government that he and Shoemaker sought legal advice from Kaufman on multiple occasions. (Ex. 1 at 19; *id.* at 20 ("I know he discussed it with [Kaufman]. I must have told him at least 10 times. I know George was in the room some of the times. I know George was on the phone with me and [Kaufman] and Charles, where [Kaufman] again said, . . . ".)

*\*\*\**

In short, Esparza's and Goldman's statements to the government which describe privileged communications must be suppressed, as well as all evidence derived therefrom. But perhaps more importantly, a *Kastigar* hearing must be held so that the government can clarify what privileged information it obtained and relied on.

**D.  Esparza's Statements Regarding the Invoices Must Be Suppressed**

The government does not dispute that, to waive the joint-client privilege, every joint client must agree. (Opp'n at 35:24–37:21). It does not dispute that Huizar, Goldman, and Kim did not agree to waive the privilege. (*See id.*) And it admits that Esparza described Kaufman's legal invoices. (*Id.* at 36:18–20.) Its waiver argument, and argument that the invoices are not privileged, are meritless.[6]

---

[6] The government also spends substantial space criticizing Huizar for not interpreting the government-agent's abbreviated notes of Esparza's interview. (Opp'n at 36:4–22, *id.* at 36 n.'s 22, 23.) For example, the government claims that Huizar "incorrectly represents" that email 22 "included invoices from Kaufman on a[] legal matter." (*Id.* at 36:4–6.) But a plain reading of the notes clearly implies that "email 22" included those invoices. (*See* Mot., Ex. B at Casino_0364706 ("Email 22—when [Esparza] looked back at the Kaufman attorney invoices").) As another example, the government insists that Esparza did not read Kaufman's invoices verbatim. (Opp'n at 36:11–22.) It is not credible that Esparza recalled specific, individual line items from specific invoices that he had not seen in years. (*See id.* at Casino_0364708.)

In any event, these points only emphasize that the government—and only the government—knows exactly what Esparza revealed during his interviews. Accordingly, a *Kastigar* hearing should be held so that the government can clarify what privileged information it received and relied on to build its case.

11

*First*, it contends that Huizar waived the privilege by forwarding Kaufman's invoices to Esparza. Not so. "The attorney-client privilege protects communications between or among a lawyer and client and their representatives or agents." *Hilton-Rorar v. State & Fed. Commc'ns Inc.*, No. 5:09-CV-01004, 2010 WL 1486916, at *4 (N.D. Ohio Apr. 13, 2010); *see also* 8 Wigmore, Evidence (McNaughton Rev. 1961), § 2317, at 618 (explaining that "[a] communication . . . by *any form of agency* employed or set in motion by the client is within the privilege") (emphasis in original). If clients and attorneys could not utilize secretaries, assistants, accountants, etc., the privilege would be completely unworkable. *See Kovel*, 296 F.2d at 921; *see also HPD Lab'ys, Inc. v. Clorox Co.*, 202 F.R.D. 410, 414 (D.N.J. 2001) ("Due to the myriad complexities of modern litigation, attorneys and clients often rely on agents during the course of legal representation."). This position is simply not how legal representation happens. To be sure, when CEOs receive legal advice, they do not review and pay the legal invoices. Here, as Huizar's assistant, Esparza facilitated attorney-client communications—namely, he received legal invoices and made payments on behalf of Huizar. This was perfectly normal and reasonable assistant-level work.

*Second*, the government claims that "[e]ven assuming that Huizar's decision to forward his attorney's invoices to Esparza did not itself break the privilege, the limited information Esparza provided regarding the invoices does not come within protected information." (Opp'n at 37:5–8.) False. The information disclosed by Esparza—which included the "particular areas of law" researched by Kaufman—is squarely within the privilege. *In re Grand Jury Witness*, 695 F.2d 359, 362 (9th Cir. 1982) ("bills, ledgers, statements, time records and the like which also reveal the nature of the services provided, such as researching *particular areas of law*, [] fall within the privilege") (emphasis added); (*see* Mot., Ex. B at Casino_0364706 (explaining how Esparza "looked back at the Kaufman attorney invoices," recounted how Kaufman "spoke about doing research on this particular loan"; *id.* (noting that Esparza saw specific legal topics on the legal bills).)

12

The government's reliance on *Bauer* is misplaced. *See United States v. Bauer*, 132 F.3d 504, 509 (9th Cir. 1997). Indeed, *Bauer* did not involve legal invoices. *Id.* Tellingly, the government does not even attempt to address Huizar's on-point case, *In re Grand Jury Witness*, 695 F.2d at 362. There, the Ninth Circuit explains that "a simple invoice requesting payment for unspecified services rendered reveals nothing more than the amount of the fee and would not normally be privileged." *Id.* But, like here, where "correspondence between attorney and client [] reveals the client's motivation for creation of the relationship or possible litigation strategy" or "reveal[s] the nature of the services provided, such as researching particular areas of law," the communications "ought to be protected." *Id.*

In sum, Esparza's descriptions of the Kaufman invoices, and all evidence derived therefrom, must be suppressed.

### E.    A *Kastigar* Hearing Is Necessary to Ensure a Fair Trial

The government contends that the "indictment does not quote or rely on th[e] [June 29, 2017] call, and [it] does not intend to introduce it at trial." (Opp'n at 10:1–3; *see also id.* at 37:18–21 ("given more compelling evidence otherwise available, the government does not intend to introduce testimony about the Kaufman invoices at trial").) These statements miss the point. The government must prove that "all of the evidence it proposes to use, and all of its trial strategy, *were derived from legitimate independent sources*." *United States v. Danielson*, 325 F.3d 1054, 1072 (9th Cir. 2003) (emphasis added). It is not good enough that the government allegedly did not directly use the privileged communications in the indictment and does not intend to directly introduce it at trial. Our justice system is severely undermined if the government can introduce trial evidence which derived from unlawfully obtained materials. *See United States v. Orman*, 417 F. Supp. 1126, 1136 (D. Colo. 1976) (a defendant is entitled to a "fair determination" and "only in this way that we prevent the undermining and mockery of justice.").

The Court should ensure that Huizar receives such a fair determination, meaning that the government must prove that its "compelling evidence" was obtained from

independent sources, (Opp'n at 37:18–21.) Indeed, even without the benefit of a *Kastigar* hearing, it appears that the government prepared an outline to interview Goldman based on information obtained from the June 29, 2017 call, and then asked about that and other privileged calls. (*See* Mot., Ex. G; Ex. 1.) Information learned during that interview is tainted because it was obtained based on the government's learnings from unlawfully obtained, privileged communications. *See Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920) (explaining that knowledge gained by the government's own wrong cannot be used).

In sum, the government must establish at a hearing that the evidence it intends to use at trial is not derived from its impermissible review of privileged information. *See Kastigar v. United States*, 406 U.S. 441, 453–54 (1972).

### III. CONCLUSION

For the foregoing reasons, Huizar respectfully requests that the Court suppress at trial all privileged communications and evidence derived therefrom, and hold a *Kastigar* hearing.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

Dated: January 15, 2022      By      /s/ Carel Alé
                                     Carel Alé
                                     Charles J. Snyder
                                     Adam Olin
                                     Deputy Federal Public Defenders
                                     Attorneys for José Huizar