CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
CAREL ALE (Bar No. 283717)
Email: Carel_Ale@fd.org
CHARLES J. SNYDER (Bar No. 287246)
Email: Charles_Snyder@fd.org
ADAM OLIN (Bar No. 298380)
Email: Adam_Olin@fd.org
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Jose Huizar

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR-20-326-JFW |
| Plaintiff, | |
| v. | **REPLY ISO MOTION TO SUPPRESS EVIDENCE DERIVED FROM THE UNLAWFUL SEIZURE AND SEARCH OF 39 MONTHS OF HIS PERSONAL EMAILS; REQUEST FOR EVIDENTIARY HEARING ON *FRANKS* ISSUE** |
| JOSE LUIS HUIZAR, | |
| Defendant. | |
| | Date: January 31, 2022 |
| | Time: 8:00 a.m. |
| | Ctrm: 7A – Hon. John F. Walter |

## TABLE OF CONTENTS

PAGE

A.  The affidavit clearly and obviously failed to supply crime, place, and scope probable cause……………………………………………………………………1

B.  The Opposition not only fails to justify the *Franks* violations cited in the motion, it dramatically confirms the point by featuring a false claim that misled the prosecutors in drafting their response……………………………………………….7

C.  Five years after the fact, the government cannot avoid the consequences of a blanket seizure order simply by characterizing it as a "drafting error"…………15

D.  The "binding precedent" for email warrants makes clear that, as with all Fourth Amendment issues, overbreadth and particularity are case-specific……………17

E.  The law affords no deference to redacted affidavits and, in any case, good faith cannot save the search in this case……………………………………………...20

F.  The government has failed to carry its burden of showing that its search did not involve a preservation copy of Huizar's account…………………………………20

i

## TABLE OF AUTHORITIES

PAGE(S)

1

**Federal Cases**

*Malley v. Briggs*,
475 U.S. 335 (1986)..............................................................................14

*McDonnell v. United States*,
136 S.Ct. 2355 (2016)..............................................................................4

*Mills v. Graves*,
930 F.2d 729 (9th Cir. 1991) ..............................................................20

*Perry v. Schwarzenegger*,
591 F.3d 1147 (9th Cir. 2010) ..............................................................17

*Rodis v. City, Cty. of San Francisco*,
558 F.3d 964 (9th Cir. 2009) ..............................................................2

*United States v. Adjani*,
452 F.3d 1140 (9th Cir. 2006) ..........................................................7, 19

*United States v. Alvarez*,
190 F.Supp.3d 885 (N.D. Cal. 2016)..................................................16

*United States v. Cardwell*,
680 F.2d 75 (9th Cir.1982) ..............................................................17

*United States v. Cervantes*,
703 F.3d 1135 (9th Cir. 2012) ..............................................................3

*United States v. Comprehensive Drug Testing, Inc.*,
621 F.3d 1162 (9th Cir. 2010) (en banc)..................................6, 7, 19, 20

*United States v. Flores*,
802 F.3d 1028 (9th Cir. 2015) ..........................................................18, 19

*United States v. Hill*,
459 F.3d 966 (9th Cir. 2006) ..........................................................7, 19

*United States v. Kelley*,
482 F.3d 1047 (9th Cir. 2007) ..............................................................21

*United States v. Lopez*,
482 F.3d 1067 (9th Cir. 2007) ..........................................................2, 3

ii

TABLE OF AUTHORITIES

PAGE(S)

*United States v. Michaelian,*
   803 F.2d 1042 (9th Cir. 1986) ................................................................ 21

*United States v. Ngumezi,*
   980 F.3d 1285 (9th Cir. 2020) ........................................................ 20, 21

*United States v. SDI Future Health, Inc.,*
   568 F.3d 684 (9th Cir. 2009) ........................................................ 14, 17

*United States v. Silver ("Silver II"),*
   948 F.3d 538 (2d Cir. 2020) .................................................................... 2

*United States v. Skoien,*
   614 F.3d 638 (7th Cir. 2010) ................................................................ 18

*United States v. Spilotro,*
   800 F.2d 959 (9th Cir. 1986) ................................................................ 18

*United States v. Twilley,*
   222 F.3d 1092 (9th Cir. 2000) .............................................................. 21

*Wilson v. Russo,*
   212 F.3d 781 (3d Cir. 2000) .................................................................. 11

**Federal Statutes**

18 U.S.C. § 2703(d) ................................................................................ 16

U.S. Const. amend IV .......................................................... 6, 18, 19, 21

**Miscellaneous**

2 LaFave, Search & Seizure
   (2021) § 4.4(c) ...................................................................................... 21

## TABLE OF EXHIBITS

| Exhibit[1] | Description | Page and Line |
|---|---|---|
| 2 | July 1, 2016 Warrant Application for Jose Huizar's Email Account | 3:14, 3:18, 4:20, 6:4, 8:17, 8:18, 9:11 |
| 3 | Pen-Register Data for Jose Huizar's Email Account | 10:20 |
| 7 | June 16, 2016 Application for Extension of Trap-and-Trace Order for Jose Huizar's Email Account | 9:2 |
| 8 | FD-302 Analyzing Trap-and-Trace Data Dated April 19, 2016 | 9:4 |
| 9 | FD-302 Memorializing Trap-and-Trace Orders and Extensions Dated June 21, 2016 | 9:5 |

---

[1] Exhibits 2 and 3 are attached to the initial Declaration of Charles J. Snyder (Docket Nos. 307-3 and 307-4).  Exhibits 7, 8, and 9 are attached to the concurrently-filed Supplemental Declaration of Charles J. Snyder.

1

## REPLY

2

**A. The affidavit clearly and obviously failed to supply crime, place, and scope probable cause.**

3

4      While the Opposition lauds the warrant as supported by "[a]mple probable

5   cause," Opp'n at 9:18, it largely glosses over the central question: probable cause of

6   what?  Authorization to seize and read 39 months of Huizar's private emails didn't turn

7   on the number of words in the warrant affidavit.  Nor did it turn on showing that Huizar

8   took trips to Las Vegas or sought to keep those trips under wraps.  Technically, it didn't

9   even turn on whether there existed probable cause to believe that Huizar was engaged

10  in bribery.  Instead, the question was whether the affidavit contained particularized

11  facts establishing probable cause to believe that *evidence of bribery would be found in*

12  *Huizar's private email account*, and, further, whether any probable cause showing

13  justified *reviewing and seizing, without limitation, every single private email that he*

14  *sent and received for more than three years*.  For the reasons stated in the moving

15  papers and below, the affidavit clearly failed to make these showings and none of the

16  government's claims to the contrary is persuasive.

17      At the outset, the Opposition mischaracterizes Huizar's argument about the

18  standard for establishing crime probable cause.  Contending that Huizar is attempting to

19  require "proof of every element of every Subject Offense," including "ironclad proof of

20  the specific official act for which defendant was bribed," Opp'n at 12:11-19, the

21  government implies that Huizar is seeking to hold it to an impossibly- and unlawfully-

22  high bar.  But the standard to which Huizar seeks to hold the government needs no

23  characterization.  At page 10 of the motion, he writes:

24          In order to find probable cause to search for evidence of a crime, a Court
           must first find probable cause to believe that a crime has actually occurred.
25         While this showing does not always require probable cause for every
           element, probable cause for specific-intent crimes *does* require probable
26         cause for the specific intent.

27  Whatever the government may think about the wisdom of this rule, it has been Ninth

28  Circuit law for at least 30 years.  For a specific-intent crime like bribery, therefore, a

1

warrant affidavit must contain particularized facts establishing probable cause for bribery's specific intent.  *United States v. Lopez*, 482 F.3d 1067, 1073 (9th Cir. 2007).

Whether under *McDonnell*, § 666, or otherwise, the specific intent for federal bribery is neither the intent to receive benefits nor the intent to receive benefits and keep them secret.  Instead, the thing that makes receiving benefits *bribery* is the corrupt intent to be influenced in connection with one or more formal exercises of government power.  The receipt of a benefit, even an undisclosed one, is thus only one-third of the bribery equation.  *See* Gov't Opp'n to MTD, Docket No. 259 at 9:18-21 ("Essential to the crime of bribery is the public official's agreement to be influenced in the performance of an official act [or government business] in exchange for a thing of value"); *United States v. Silver ("Silver II")*, 948 F.3d 538, 577 (2d Cir. 2020) ("It is only upon a showing that, at the time the official accepted the payment, [the official] understood it to be a payment in exchange for official influence on some specific, focused, and concrete matter involving the formal exercise of governmental power that the Government has met its burden.").

The government's caricature notwithstanding, Huizar has never argued that establishing the other two-thirds requires "ironclad proof" of specific official acts. Instead, as the moving papers make clear, his argument is that simply identifying a *quid* and speculating into existence the possibility of an actionable *quo* and *pro* is insufficient for probable cause.  Given that the line separating an ethical violation from a federal bribe is the specific intent to be influenced in connection with the exercise of sovereign authority, that argument is nothing more than a straightforward application of Ninth Circuit law.  *See Rodis v. City, Cty. of San Francisco*, 558 F.3d 964, 969 (9th Cir. 2009) ("Although probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction, we have held that when specific intent is a required element of the offense, the arresting officer must have probable cause for that element in order to reasonably believe that a crime has occurred") (cleaned up); *Lopez*, 482 F.3d at 1072 ("While conclusive evidence of guilt

2

is of course not necessary under this standard to establish probable cause, mere suspicion, common rumor, or even strong reason to suspect are not enough"); *United States v. Cervantes*, 703 F.3d 1135, 1140 (9th Cir. 2012) ("Conclusory statements and a general claim of expertise will not suffice").

Taking a separate tack, the Opposition plucks, stitches together, and at times adds language to the warrant affidavit in an attempt to refute Huizar's claim that the warrant application clearly failed to establish crime, place, and scope probable cause. Ultimately, however, these efforts only confirm that each showing is woefully deficient.

As described in the motion, a glaring hole in the affidavit's crime probable-cause showing was Agent Civetti's admission that he had no specific facts pointing to the object of a hypothetical bribe (the *quo*), let alone particularized facts suggesting an intent to take action on a specific and focused matter in exchange for a benefit (the *pro*). *See* Ex. 2 ¶ 9. As a result, the explicit totality of his *fact-based* bribery showing was that the casino trips must have been bribes because, despite the absence of an identified *quo*, and without any particularized evidence of a *pro*, Huizar did not properly disclose the money and may have deposited it in family members' accounts. *See* Ex. 2 ¶ 24. Since those facts do not come close to establishing *fact-based* probable cause that Huizar intended to take action or be influenced in connection with some specific government matter at the time that any benefits were received, the moving papers argued that crime probable cause was clearly and obviously lacking.

The government devotes the overwhelming majority of its response to identifying portions of the affidavit describing Huizar's receipt of undisclosed benefits (the *quid*), which are almost entirely irrelevant to the issue. *See* Opp'n at 9:18-11:19. When it briefly turns to the *pro* and *quo*, the government cites, with little articulation, (1) that Huizar was Chairman of the PLUM committee and generally supported hotel and hospitality service; (2) Huizar's supposed "close" connection with Chan, whose department had been involved in resolving minor building-code violations at Huang's

3

hotel; and (3) a ceremonial resolution that Huizar presented on Huang's behalf in 2014. *Id.* at 11:10-12:3. None of those facts remotely approaches probable cause for *bribery* for the reasons explained in the moving papers and in the margin.[1]

The Opposition also states that "the affidavit indicated that [Shen Zen] had at least one 'mixed-use mega development in the pipeline for downtown Los Angeles,' underscoring that Huizar – with his significant influence over zoning and development in downtown Los Angeles – would soon hold massive sway over Huang/Shen Zhen." Opp'n at 11:10:12-3 (cleaned up). ***As discussed below, this statement is false: Shen Zen did not have a mixed-use mega-development in the pipeline for DTLA when Agent Civetti filed his application or at any point covered by the warrant***. But even taking it at face value, the affidavit draws no factual connection between any benefit and any hypothetical project. Instead, the very next sentence in the affidavit is that Shen Zen "appears poised to benefit financially if the rapid expansion of downtown Los Angeles hotel and hospitality service continues," which is simply saying that Shen Zen will benefit from Huizar's policy agenda.

In short, without major conjectural leaps entirely unsupported by particularized information, the affidavit does not come close to establishing specific-intent probable cause. Instead, by his own admission, Agent Civetti simply applied for a warrant based on the existence of a *quid* and a hunch, hoping that a review of all of Huizar's emails for 39 months might reveal some articulable basis for a *pro* and a *quo*. Ex. 2 ¶ 24

---

[1] To take each item in turn: (1) saying that Huang might benefit financially from Huizar's general support for hotel and hospitality service is no more than saying that he might benefit from a booming economy; that may be true as far as it goes, but bribery requires something specific and focused, *see McDonnell v. United States*, 136 S.Ct. 2355, 2369 (2016) (support for "economic development" is not actionable as a federal bribe); *see also* Mot'n at 11:1-13:9; (2) other than a conclusory statement that Huizar and Chan were "very close," the affidavit drew no connection between Huizar and a convoluted alleged building code scheme involving LADBS, no connection between Chan and any benefits, and no connection whatsoever to Huizar's email account, *see* Mot'n at 5:18-27; and (3) while the government now apparently suggests that the resolution has some significance, at the time that Agent Civetti submitted his application – fully aware of the resolution – he drew no connection between it and any benefit; instead, he said that he wasn't aware of any official act that Huang might have wanted but intimated that he might want assistance with a DTLA development project.

4

1  ("[W]ithout being privy to the actual communications between the individuals named
2  herein, it is unclear what official acts [Huizar] has performed in exchange for the
3  payments he received from [Huang]").  That was clearly insufficient as a matter of
4  well-settled law.

5        Further, and entirely independent of whether the affidavit established crime
6  probable cause, the moving papers make clear that the affidavit failed to articulate facts
7  establishing place and scope probable cause, including probable cause for seizing and
8  reading every single private email that Huizar sent and received for more than three
9  years.  *See* Mot'n at 13:20-16:28.  The government's response to these points appears
10  largely in a single paragraph:

> The affidavit further relayed that Huizar had used the Subject Account to
> book his travel to and from Las Vegas during the casino trips with Huang.
> It also recounted that Huizar used the account – his personal email – to
> communicate with Esparza. Collectively, this veritable mountain of
> evidence certainly met the low threshold of establishing a fair probability
> that evidence of the Subject Offenses would be located in Huizar's email
> account.

15  Opp'n at 12:4-10.

16        Despite the government's characterization, this "veritable mountain" is anything
17  but.  For one thing, the second sentence is inaccurate.  Although Huizar agrees that
18  information about the traffic into and out of his account *would have been* important to
19  the probable cause determination – and would have led to the denial of the warrant –
20  Agent Civetti hid the six months of pen-register data that he had collected for Huizar's
21  email account, and his affidavit conspicuously avoided the topic.  *See* Section B, *infra.*
22  The Court will therefore search the affidavit in vain for any statement supporting the
23  assertion that the affidavit "recounted that Huizar used the account . . . to communicate
24  with Esparza."[2]  As a result, the "mountain" to which the government refers – which is

26      [2] In a section entitled "The Supporting Affidavit," the Opposition states: "The
27  affidavit further detailed evidence that Huizar used the Subject Account to arrange
    flights to and from Las Vegas for the trips during which he was believed to accept
28  bribes from Huang and Zheng. *Id.* at 57. It also established that Huizar used this

the only particularized place and scope support for a warrant authorizing the wholesale, multi-year review and seizure of every email in a sitting official's private email account – is that Huizar's email account was associated with five flight reservations to Las Vegas. *See* Ex. 2 ¶ 35. No agent could have reasonably believed that that showing supported a such a sweeping and unfettered warrant.

Perhaps sensing danger, the government turns at the end of its probable-cause discussion to an argument about money laundering and structuring. Opp'n at 14:1-7. But as explained in the moving papers, the affidavit never even tried to establish a fact-based link between those offenses and Huizar's email account, so they could not justify the warrant. *See* Mot'n at 13:20-7.

While not directly tied to the probable cause issue, the government also suggests in another section of the Opposition that, so long as a computer is involved, even the thinnest probable-cause showing always justifies an unlimited search. Opp'n at 14:8-19:9. But the Ninth Circuit has rejected this dangerous suggestion. *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1176-77 (9th Cir. 2010) (en banc) ("*CDT III*") ("[The] pressing need of law enforcement for broad authorization to examine electronic records . . . creates a serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant . . . . The process of segregating electronic data that is seizable from that which is not must not become a vehicle for the government to gain access to data which it has no probable cause to collect"). Instead, while a broad electronic warrant may be permissible in some cases, like where "[c]omputer files are easy to disguise or rename," *United States v. Adjani*, 452 F.3d 1140, 1150 (9th Cir. 2006), every case turns on its

---

account to communicate with Esparza, who accompanied Huizar on at least one such Las Vegas trip with Huang and Zheng and who was present when Huang gave casino chips to Huizar." Opp'n at 7:16-24. Though not entirely clear, Huizar believes that the first record cite – "*Id.* at 57" – is referring to ¶ 47 of the affidavit, which states that Huizar's account was associated with five Southwest bookings. The second record cite purports to be referencing the same section of the affidavit, but there is no mention of Huizar's use of the account to communicate with Esparza in ¶ 47 or anywhere else.

6

facts, *United States v. Hill*, 459 F.3d 966, 975 (9th Cir. 2006) ("Although computer technology may in theory justify blanket seizures . . . the government must still demonstrate to the magistrate [judge] *factually* why such a broad search and seizure authority is reasonable") (emph. in original).  In *this* case, the emails sought to be searched were preserved and possessed by a third party; the entirety of the government's showing for the email account was that it was associated with five flight reservations; and, although the government had the ability to limit its search,[3] the warrant allowed the case agent to review and seize *everything* in the email account, without limitation, for 39 months, including an entire year that the affidavit did not even purport to address.  Given the limited grounds for which the government purported to show probable cause, the sweeping warrant that it received was so facially overbroad that no agent could have reasonably believed it was adequately supported.

**B. The Opposition not only fails to justify the *Franks* violations cited in the motion, it dramatically confirms the point by featuring a false claim that misled the prosecutors in drafting their response.**

When the government applied for a warrant to search Huizar's private email

---

[3] In responding to a different motion, the government claims that it avoided privileged materials in Huizar's email account by running electronic searches for the email addresses of Huizar's counsel.  *See* Civett Decl., Docket No. 316-1 ¶ 4,  The government also had email addresses for Huang, Zheng, Chan, and Esparza.  *See* Snyder Decl. ¶ 4.  If it were actually interested in confining its search to that for which the affidavit purported to show probable cause, there is no reason why it could not have similarly run searches for those email addresses and travel/flight accommodations and limited its review to those topics.  But, of course, the whole point was to get a foot in the door and bootstrap that into a wholesale, prosecution-team review of everything in the account, which is the exact danger against which the Ninth Circuit has repeatedly warned.  *CDT III*, 621 F.3d at 1177 ("We recognize the reality that over-seizing is an inherent part of the electronic search process and proceed on the assumption that, when it comes to the seizure of electronic records, this will be far more common than in the days of paper records.  This calls for greater vigilance on the part of judicial officers in striking the right balance between the government's interest in law enforcement and the right of individuals to be free from unreasonable searches and seizures.  The process of segregating electronic data that is seizable from that which is not must not become a vehicle for the government to gain access to data which it has no probable cause to collect.") (emph. added); *see also id.* at 1179 (Kozinski, J., concurring) ("The process of sorting, segregating, decoding and otherwise separating seizable data (as defined by the warrant) from all other data should also be designed to achieve that purpose and that purpose only.  Thus, if the government is allowed to seize information pertaining to ten names, the search protocol should be designed to discover data pertaining to those names only, not to others, and not those pertaining to other illegality.").

account, the reviewing magistrate would have naturally faced a number of subsidiary factual questions: what exactly was the goal of the alleged "bribe" supposed to be (because, without a goal that Huizar could act on, why assume a bribe?); how did Huizar use the email account generally; and how did Huizar use the email account, if at all, in connection with the supposed bribery scheme?  As described in the motion, Agent Civetti intentionally withheld or obscured information about the use of the email account and Huang/Shen Zen's objectives (or lack thereof) that, if disclosed, would have led to the denial of the warrant.

**The email pen-register data.**  The government does not dispute that Agent Civetti had and omitted six months of message-level pen-register data for Huizar's email account when he applied for the warrant.  Nonetheless, it contends that (1) Huizar failed to show that Agent Civetti intentionally withheld the email pen-register data, or, alternatively, (2) that the data was actually inculpatory, but, for unexplained reasons, Agent Civetti decided to leave it out.  Opp'n at 21:22-22:24.

Making the implicit explicit, the premise of the first argument seems to be this: when swearing out a lengthy affidavit seeking to search a sitting politician's email account, Agent Civetti remembered to document each email preservation request (Ex. 2 at 8-9), and also remembered to describe phone pen-register data in detail (*id.* ¶¶ 32-34), but simply forgot that he and the lead prosecutor had filed five successive pen-register applications for the account they were seeking to search in the preceding six months, and forgot the analysis of the pen-register data prepared in April 2016, and forgot the report that he prepared just ten days before seeking the warrant in which he memorialized each pen-register order issued to date.  Not only is this premise unbelievable on its face, it is contrary to the evidentiary record.

As set out in the motion, the government began focusing on Huizar's emails no later than November 2015, when it first sought trap-and-trace authorization for the account.  Snyder Decl. ¶ 4.  Over the next six months – including just two weeks before seeking the warrant – it obtained four additional extensions, each time certifying under

8

oath that the information sought was "relevant to an ongoing investigation."  Snyder
Supp. Decl., Ex. 7.  Not only would Agent Civetti have naturally known about these
applications as the case agent, he would have reviewed the trap-and-trace analysis
prepared in late April 2016, *id.*, Ex. 8, and he memorialized all of the then-obtained
trap-and-trace orders on June 21, 2016, *id.*, Ex. 9.[4]

When he applied for the warrant just ten days later, *the trap-and-trace data was
the key source of information in the government's possession about the central question
raised by the warrant*: how was Huizar's account actually being used, and what
evidence, if any, might be found there?  While clearly aware of this information, Agent
Civetti chose to omit any mention of it in the affidavit, including, if nowhere else, from
a Summary of Investigation that was practically shouting out for its disclosure.  Ex. 2
¶¶ 5-13.  He also chose to omit it despite including information about email
preservation requests, pen-register data for cell phones, and a variety of minimally-
relevant minutiae.  Given what Agent Civetti knew, given what he chose to include,
and given all of the places where disclosure should have naturally occurred, omitting
the data was clearly a deliberate choice.[5]

That being the case, the question becomes: why would Agent Civetti not want
the warrant judge to know about the existence of the trap-and-trace data for the account
he was seeking to search, let alone what it revealed?  While again, to ask the question is
to answer it, the Opposition offers another incredible response.  Although the pen-
register data thoroughly undercut the claim that Huizar's account would contain

---

[4] As stated elsewhere, Huizar has struggled to parse the millions of pages of
document discovery, which includes hundreds of pleadings and thousands of FBI
reports organized neither by subject or date.  Huizar does not know if other reports
contain additional information about Agent Civetti's knowledge of the email pen-
register data.

[5] After obtaining the warrant without mentioning the trap-and-trace data at all,
the government resumed applying for and obtaining extensions of the trap-and-trace
order, each time swearing under other that the data was "relevant to an ongoing
investigation."  Snyder Supp. Decl. ¶ 2.  In other words, while the government was
telling one magistrate that the information was important for its own investigation, it
was withholding it from the magistrate considering its warrant application.

1    evidence of a bribery scheme involving Huang and luxury trips, the government

2    contends that it was nonetheless inculpatory, not exculpatory, because it included

3    "hundreds of emails between Huizar and Esparza."  Opp'n at 22:3-22:24.

4           Initially, Esparza was Huizar's employee and a participant in his campaign, so, at

5    the time of the application, a neutral and informed judge would find it wholly

6    unremarkable that the two were in regular communication.  Indeed, that Huizar was in

7    regular communication with his staffer *but not* with Huang, Zheng, or Chan, and that

8    the pen-register data otherwise lent *no credence* to any speculative theory suggested by

9    the affidavit, would have led a neutral observer away from any conclusion that the

10   email account would contain evidence of bribery.

11          And that is before looking at the pen-register data itself, which would have only

12   solidified that assessment.  While the Opposition refers to "hundreds of emails" with

13   Esparza, it conveniently neglects to mention the "hundreds of emails" that Huizar

14   shared with other staffers, all of which suggested that his communications with Esparza

15   were entirely routine.  For example, an electronic search of the spreadsheet returns

16   Esparza's name in 519 cells; meanwhile, a search for other staffers shows greater or

17   similar frequency of communication, both to personal and work email accounts:

18   "habib" (813 cells), "coca" (733 cells), "leon" (581 cells), "medina" (365 cells),

19   "alvarez" (344 cells), "zenay" (322 cells), "ulisan" (303 cells), "weathingtonmcclean"

20   (301 cells), etc.  Ex. 3.  The Opposition also neglects to mention that the overwhelming

21   majority of emails involving Huizar and Esparza also involved other individuals

22   connected to Huizar's office, and that many of their direct exchanges were to Esparza's

23   City of Los Angeles email account.  *Id.*  Fully appraised of this data, a neutral and

24   informed judge would conclude not only that it undermined the basic premise of the

25   warrant application – that evidence of bribery would be found in Huizar's email

26   account – but that it reflected the routine activities of a politician and employer.

27          Maybe most importantly, however, the government's argument fails the test of

28   historical fact.  In the face of a pending motion, the government now suggests that the

                                              10

pen-register data would have supported its warrant pitch.  But, when Agent Civetti filed the warrant application in July 2016, he was obviously aware of the data, not shy about the volume of information involved in his affidavit, and seeking primarily to convince the warrant judge that evidence of bribery was likely to be found in Huizar's email account.  If the pen-register data were helpful to his cause, as the government now suggests, why did he not mention it once in the affidavit?  Why, instead, did he go out of his way to avoid it at all turns, while at the same time mentioning preservation requests, phone trap-and-trace data, and the like?

The government of course provides no answers to these questions, let alone a declaration from Agent Civetti, because the answer is obvious and unhelpful: Agent Civetti would never have left that information out of his affidavit if he believed that it supported his application.  Instead, because it went to the key issue – whether evidence of Huang-related bribery was likely to be found in Huizar's email account – Agent Civetti would have trumpeted it from the rooftops if he thought it was favorable.  But rather than disclose the data to the judge, which would have triggered hard questions and ultimately the denial of the warrant, Agent Civetti chose to keep the information in his "ken," even though "any reasonable person would have known [it] was the kind of thing the judge would wish to know."  *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000).[6]

**The results of Agent Civetti's "review" and the suggestion that Shen Zen was in line for a mixed-use mega development.**  In addition to withholding all information about the pen-register data, Agent Civetti also repeatedly tried to create the false impression that Huang and Shen Zen had already sought and were continuing to seek assistance from Huizar in his capacity as Chair of PLUM in connection with a DTLA development project.  For example, while stating that he had "reviewed many of the

---

[6] By withholding the detailed information that he had about Huizar, Huang, Zheng, Chan, and Esparza's email accounts, Agent Civetti also deprived the judge of information that could have been used to reasonably limit any warrant that issued.

11

development projects in Huizar's District 14 in order to determine the influence [that Huizar] had as a public official over [Huang, Zheng, and Shen Zen]," Agent Civetti never directly disclosed the negative results of that review. Instead, he left the actual results ambiguous while repeatedly intimating that Huang was angling for high-value assistance, including with a "mixed-use mega development[] in the pipeline for downtown Los Angeles[.]"

The Opposition contends that no magistrate could have been misled on this point because, elsewhere, Agent Civetti stated that he did not know what official acts Huang may have wanted from Huizar. Opp'n at 23:8-18. But, in somewhat remarkable fashion, the Opposition itself proves this to be untrue. At page 11, in an effort to juice the affidavit's deficient probable-cause showing, the government writes:

> Notably, the affidavit indicated that a SZNW subsidiary had at least one "mixed-use mega development[] in the pipeline for downtown Los Angeles," underscoring that HUIZAR – with his significant influence over zoning and development in downtown Los Angeles – would soon hold massive sway over HUANG/SZNW.

Opp'n at 11:19-23. While Huizar agrees that this is the impression that the warrant application sought to convey, it is flatly untrue. At the time that Agent Civetti submitted his warrant application, Shen Zen did not have a mixed-use mega development in the pipeline for DTLA. Nor had it filed any documents relating to a mixed-use mega development in DTLA. Nor did Agent Civetti have any basis in fact for suggesting that it had a mixed-use mega development in the pipeline for DTLA. ***When drafting the Opposition, it therefore appears that the government was misled by its own warrant application on the very point that Huizar said was misleading.***

The government's misimpression reflects the repeated interplay of omission, misdirection, and false suggestion found throughout the affidavit. On the one hand, while Agent Civetti stated that he conducted a review to determine what Huang might have wanted from Huizar, he never actually disclosed the results, which would have foreclosed the exact mistake that the government made in the Opposition. At the same time, Agent Civetti repeatedly intimated that Huang and Shen Zen were seeking

12

1    Huizar's assistance in connection with an extant development project in DTLA.

2         While not a singular example, *see* Mot'n at 21 & n.10, the section of the affidavit

3    that misled the government exemplifies this dynamic.  There, Agent Civetti wrote:

4    "[t]here have been a series of mixed-use mega developments in the pipeline for

5    downtown Los Angeles, and several of these developments are owned by Chinese-

6    based companies, including [Shen Zen], the entity used to purchase the LA Hotel

7    Downtown."  As the Opposition makes plain, this statement was meant to instill a

8    belief that Shen Zen was one of the several "Chinese-based" companies with a "mixed-

9    use mega-development[] in the pipeline" for DTLA over which Huizar would soon

10   hold "massive sway."

11        The truth was that other "Chinese-based" companies having nothing to do with

12   Shen Zen had mixed-use projects in the pipeline for DTLA, but Shen Zen did not.  By

13   lumping all the unrelated "Chinese-based" companies together in a single statement

14   that is, at best, misleading, if not outright false, while at the same time never saying

15   directly that Shen Zen did not have anything in the pipeline (let alone a "mixed-use

16   mega-development" likely to land on Huizar's desk), the goal was to cause a busy

17   reader to think exactly what the government wrote on page 11 of the Opposition.

18        If, with the benefit of time, likely multiple layers of review, and the issue called

19   into focus, the government was misled by its own warrant application on *this critical*

20   *point* – and, indeed, chose to highlight *this particular claim* to demonstrate crime

21   probable cause – how could a busy magistrate under docket pressure be expected to do

22   better?[7]

23

24        [7] Adding a word to a description of the facts in order to invent an argument never
25   made, the government claims that Huizar accused the magistrate of "abandon[ing] her
     judicial role and merely [rubber] 'stamp[ing] the warrant without change' 'on the
26   morning it was requested.'"  Opp'n at 20 & n.11.  While the government may interpret
     the facts as a "rubber stamp" scenario, the moving papers simply described the facts.
27   Regardless of whether the government deems this information relevant, it is relevant to
     the Ninth Circuit and the Supreme Court.  *Malley v. Briggs*, 475 U.S. 335, 345-46
28   (1986) ("It is true that in an ideal system an unreasonable request for a warrant would

13

Recognizing that this is a question with no good answer, the government argues in the alternative that the Court should deny the motion on procedural grounds because Huizar failed to prove a negative: that the *never-disclosed* results of Agent Civetti's "review" turned up no evidence that Huang, Zheng, or Shen Zen had any projects or business that might have reached Huizar at Council or Committee.  *See* Opp'n at 22:25-23:8.  This is a somewhat disconcerting argument given that only Agent Civetti knows for certain the results of his "review," which have never been shared with the defense.  If, in fact, Huizar's factual contention were wrong, one would expect a substantive response.  But if it were right, one would typically expect the government not to hide behind procedural rules and its own failure to disclose information to avoid a Constitutional argument.

In any event, to the extent that Huizar can prove the negative without discovery, the best evidence is found in the Zimas database, which contains parcel-specific planning and zoning information for Shen Zen's DTLA property.  As Zimas makes clear, and as the government presumably knows, Shen Zen did not have any mixed-use mega-development in the pipeline when Agent Civetti applied for the warrant, nor did it have any other projects or business that might have reached Huizar at Council or Committee at any point during the search period, including when Agent Civetti applied for the warrant.  *See* City of Los Angeles, <u>Zimas</u>, http://zimas.lacity.org/ (enter address 333 Figueroa, expand Case Numbers in the left-hand panel).  Thus, while Huizar cannot definitively prove the results of Agent Civetti's review without disclosure, all available evidence indicates that it would have shown that Shen Zen had nothing likely

---

be harmless, because no judge would approve it.  But ours is not an ideal system, and it is possible that a magistrate, working under docket pressures, will fail to perform as a magistrate should."); *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 693 (9th Cir. 2009) ("A magistrate judge took approximately two hours to review the government's affidavit and proposed warrant.  He ultimately concluded that probable cause existed for the search and agreed to issue the proposed search warrant, on the condition that both the affidavit and the search warrant be amended to include protections for patients' medical information. The government made the requested revisions, and the magistrate judge issued the warrant.").

to reach Huizar in the "pipeline" when Agent Civetti sought the warrant, let alone a mixed-use mega-development over which Huizar would soon have "massive sway." Other than the absence of relevant activity in Huizar's email account, it is hard to imagine anything more material. But rather than disclosing those facts directly, Agent Civetti tried to finesse the issue in order to convey the false impression that Shen Zen already had a major project likely to reach Huizar in the hopper.[8]

**C. Five years after the fact, the government cannot avoid the consequences of a blanket seizure order simply by characterizing it as a "drafting error."**

Nearly 20 pages into the Opposition, the government concedes that the warrant that it sought and received allowed agents on the prosecution team not only to review every single email that Huizar sent or received, without limitation, for 39 months, but also to seize every email as well. Opp'n at 20:7-21:20. Unable to defend the scope of the warrant on the merits, the government now writes this off as a "drafting error," asserting five years after the fact, without evidence, having never raised it before, that:

> Due to a clerical error, Attachment B to the warrant stated that agents could seize "all records and information described above in Section II.10.a and II.10.b." (CR 274-1, Attachment B, § III.11.b.) This provision should have read that the search team could seize "all records and information described above in Section II.10.b" (not II.10.a), which refers to non-content information that can be obtained pursuant to 18 U.S.C. § 2703(d).

Initially, given the government's bristling footnote at page 20 of the Opposition, one wonders to whom does the government attributes this self-described "drafting error." If the investigatory process were really as infallible as the government suggests, and if it deserves the deference that the government apparently demands, surely *someone* would have noticed that the warrant's seizure directive included everything in the account, either at the application or execution stage. After all, the command to seize is the most significant component of any warrant. That being the case, it is hard to see how the government can now claim that the language in the seizure order can be

---

[8] While also a separate basis for suppression, the deficiencies in the affidavit's probable cause showing amplify the importance of Agent Civetti's omissions and misstatements and make suppression under *Franks* even more appropriate.

15

chalked up to an error of *drafting* – or why anyone in the government would think that – as opposed to an error of *law*.

Indeed, the only authority that the government cites to support its claim that a dramatically-overbroad warrant can be saved by incanting "drafting error" is *United States v. Alvarez*, 190 F.Supp.3d 885 (N.D. Cal. 2016). But that was a case involving a true grammatical drafting error, where an otherwise-valid warrant stated that officers could seize "gang-related clothing and accessories, such as, *but not including*, blue bandanas and belts." *Id.* at 895. When officers crossed out the words "not including," the trial court held that "[w]here a warrant is otherwise valid, officers are permitted to correct *obvious errors*." *Id.* (emph. added).

Here, not only does the government not explain why the warrant's seizure command was *obviously* in error, in virtually the next breath it claims that it was not. Opp'n at 21:13-14 ("[T]his technical error was not obvious from the face of the warrant"). In fact, even in describing the error, the Opposition is unclear what was supposed to be seized and what wasn't. The government writes that the seizure command "should have read that the search team could seize 'all records and information described above in Section II.10.b' (not II.10.a), which refers to non-content information that can be obtained pursuant to 18 U.S.C. § 2703(d)." But § II.10.b contained content information, so the government's fix for the supposedly-obvious error would have it seize all of the content records nonetheless.[9]

Maybe more to the point, the so-called "error" in this case was not one in a minor portion of an "otherwise valid" warrant. It was an essential part – though not the only part – of what made the warrant *invalid* as a matter of specificity. *See* Mot'n at 17:1-19:12. Again: the warrant in this case instructed Yahoo to give the government every

---

[9] Notably, the case agents executing the warrant not only deemed it appropriate to review every email in the account without limitation, but also to review, segregate, and burn onto evidence DVDs emails that were not readily apparent contraband and not within any specific category listed in the warrant. *See* Mot'n at 8:1-5. Perhaps the government now deems reviewing, segregating, and logging emails into evidence not a seizure, but that is a seizure by any understanding of the term.

16

email in Huizar's account for 39 months, allowed the prosecution team to review every email in the account without limitation, and permitted the government to permanently seize every email in the account. For the reasons described above and in the moving papers, that authority was strikingly overbroad compared to the probable cause that the government purported to offer, as well as its ability to limit the seizure and search to relevant information. The government cites no authority for the proposition that it can simply take a red pen to the warrant five years after the fact, unilaterally declare any infirmities in "error," and carry on with the fruits of its haul, proclaiming "no harm, no foul."[10]

Indeed, the whole purpose of specificity is to curtail general warrants, *United States v. Cardwell*, 680 F.2d 75, 77 (9th Cir.1982) (cleaned up) (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)), and to foreclose "exploratory searches and indiscriminate rummaging through a person's belongings," *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986). If that is not an apt description for a warrant that allowed for the wholesale review and seizure of everything in Huizar's email account by members of the prosecution team, it is hard to imagine what is.

**D. The "binding precedent" for email warrants makes clear that, as with all Fourth Amendment issues, overbreadth and particularity are case-specific.**

In a separate response to Huizar's specificity argument, the government cites

---

[10] In declaring otherwise, the government mocks as "hubris" Huizar's suggestion that the Court consider the privacy implications of its limitless warrant, including his status as an elected official using the email account to conduct political activity. Opp'n at 15:21-16:10. While clearly not a concern for the prosecutors, controlling authorities take a different view. *Perry v. Schwarzenegger*, 591 F.3d 1147, 1162 (9th Cir. 2010) ("Implicit in the right to associate with others to advance one's shared political beliefs is the right to exchange ideas and formulate strategy and messages, and to do so in private. Compelling disclosure of internal campaign communications can chill the exercise of these rights."). But either way, politician or not, the warrant in this case was literally "begging the search team" to review and seize records involving "every person" who communicated with Huizar during the covered 39-month period. *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 705 (9th Cir. 2009) (finding warrant overbroad and ordering partial suppression). The government cites no authority for proceeding on this sweeping authority without making any mention of it at the time, then re-writing the warrant after the fact based on self-acquitting claims of unattributed, consequence-free error.

17

*United States v. Flores*, 802 F.3d 1028 (9th Cir. 2015), and accuses Huizar of ignoring "binding precedent" supporting "targeted searches of broad segments of email and other digital accounts." Opp'n at 16:11-19:9. In particular, the government describes the "holding" of *Flores* as: "over-seizing is an accepted reality in electronic searching because there is no way to be sure exactly what an electronic file contains without somehow examining its contents." *Id.* at 16:11-18 (quoting *Flores*, 802 F.3d at 1045 (quoting *CDT III*, 621 F.3d at 1176, 1177). But *Flores*, which applies the *Spilotro* factors cited in the motion, is no more or less binding than any of the many of fact-bound Fourth Amendment decisions issued by the Ninth Circuit. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) ("Judicial opinions must not be confused with statutes, and general expressions must be read in light of the subject under consideration"). Not one of those cases grants the blank-check authority that the government appears to claim whenever a search involves a computer. Indeed, if anything, the binding precedent is this:

> Although computer technology may in theory justify blanket seizures . . . *the government must still demonstrate to the magistrate [judge] factually why such a broad search and seizure authority is reasonable . . . .* Thus, there must be some threshold showing before the government may seize the haystack to look for the needle.

*United States v. Hill*, 459 F.3d 966, 975 (9th Cir. 2006) (emph. added). And this:

> We recognize the reality that over-seizing is an inherent part of the electronic search process and proceed on the assumption that, when it comes to the seizure of electronic records, this will be far more common than in the days of paper records. *This calls for greater vigilance on the part of judicial officers in striking the right balance between the government's interest in law enforcement and the right of individuals to be free from unreasonable searches and seizures. The process of segregating electronic data that is seizable from that which is not must not become a vehicle for the government to gain access to data which it has no probable cause to collect.*

*CDT III*, 621 F.3d at 1177 (emph. added).

Though the Opposition consistently seeks to avoid the actual words of the warrant – including going so far as to try and write inconvenient ones out of the document, *see* Section C, *supra* – *this case* does not involve "targeted searches" subject

to reasonable limits that appropriately balance the needs of law enforcement with individual privacy.  It involves a warrant that allowed the prosecution team to review and seize every single email in Huizar's account for 39 months, without limitation, based on the fact that the account was associated with five flight bookings, including to read and seize every email sent and received during an entire year that the supporting affidavit did not try to address.  The government cites no case to support that striking authority because no case exists.

Indeed, even a review of the cases that the government *does* cite demonstrates that the law is not as it suggests.  In *Flores*, the Ninth Circuit assumed that the warrant probably *was* temporally overbroad, but concluded, on the facts, that any Fourth Amendment violation was harmless under the doctrine of severance.  802 F.3d at 1045.  There is no similar claim of harmlessness in this case, nor could there be.  In *United States v. Adjani*, 452 F.3d 1140 (9th Cir 2006), the Ninth Circuit rejected the argument that a search within a particular computer should have been more limited, but its reason for doing so was that "[c]omputer files are easy to disguise or rename," and the "government should not be required to trust the suspect's self-labeling when executing a warrant."  *Id.* at 1150.  In this case, the government was searching email files preserved and produced by Yahoo, with files and fields created and maintained by Yahoo, and had the ability to filter the email account to the people and topics for which it purported to have probable cause.  Indeed, it purported to exercise that exact capacity when filtering for privilege.  *See* Civetti Decl. ¶ 4.

The Ninth Circuit's *en banc* opinion in *CDT III* – from which the purported "holding" of *Flores* is drawn – is nothing other than a rebuke of the process employed here.  In *CDT III*, the government obtained a warrant to search an electronic database based on probable cause relating to 10 baseball players.  621 F.3d at 1166.  After obtaining that limited authority, the case agent, rather than a computer technician, went through all of the files in the database, purportedly to separate wheat from chaff, and in the process exposed himself to a range of additional evidence for which probable cause

19

never existed, which he then deemed subject to seizure under the plain view doctrine. *Id.* at 1171-72. Three different district judges and the *en banc* Ninth Circuit rejected the government's conduct in that case, writing, among other things: "[t]he government agents obviously were counting on the search to bring constitutionally protected data into the plain view of the investigating agents." *Id.* at 1171. While this case involves five flights as opposed to ten baseball players, the principle is no different.

**E. The law affords no deference to redacted affidavits and, in any case, good faith cannot save the search in this case.**

If all else fails, the government argues that suppression would still be improper because the government was not culpable in a general sense, Opp'n at 24:16-25:5, or because the doctrine of good faith saves the search, *id.* at 19:11-20:6. Neither argument is correct. Although the flagrancy of the government's conduct may be relevant to the attenuation doctrine, the lack of flagrancy (even if granted) is not some free-floating exception to the exclusionary rule. *United States v. Ngumezi*, 980 F.3d 1285, 1291 (9th Cir. 2020). Further – and importantly – because this case involves a *Franks* violation, there is no good-faith reliance, *Mills v. Graves*, 930 F.2d 729, 733 (9th Cir. 1991), and the ordinary deference afforded to the warrant process does not apply, *United States v. Kelley*, 482 F.3d 1047, 1051 (9th Cir. 2007). After redacting and supplementing the affidavit to account for misstatements and omissions, the "probable cause determination should be made as it would upon a motion to suppress evidence obtained without a warrant," meaning "doubtful or marginal case[s] should be resolved in the defendant's favor." 2 LaFave, Search & Seizure (2021) § 4.4(c). And even were that not the case, the warrant affidavit was so lacking in crime, place, and scope probable cause that it precluded reasonable reliance. *United States v. Michaelian*, 803 F.2d 1042, 1046 (9th Cir. 1986).

**F. The government has failed to carry its burden of showing that its search did not involve a preservation copy of Huizar's account.**

Finally, and entirely separate from the issues above, the motion argued that the government violated the Fourth Amendment by causing Yahoo to create multiple

preservation copies of Huizar's account without any warrant or showing of probable cause. *See* Mot'n at 23:18-26. Rather than attempting to show that no part of those preservation copies was used when executing the warrant and during the search of Huizar's email account, the government relied entirely on the argument that causing warrantless preservation copies to be made was lawful. Because the government has the burden of showing that evidence is "not fruit of the poisonous tree," *United States v. Twilley*, 222 F.3d 1092, 1097 (9th Cir. 2000), if the government's argument is wrong on the merits, suppression is required, *Ngumezi*, 980 F.3d at 1291 (where Fourth Amendment violation is established, government bears the burden of showing that evidence is not the fruit of the poisonous tree or that an exception to the exclusionary rule applies).

Respectfully submitted,
CUAUHTEMOC ORTEGA
Federal Public Defender

Dated: January 18, 2022          /s/ *Charles J. Snyder*

Carel Alé
Charles J. Snyder
Adam Olin
Deputy Federal Public Defenders
Attorneys for Jose Huizar