UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE


UNITED STATES OF AMERICA,       )
                                )
            PLAINTIFF,          )      CASE NO.
                                )
            vs.                 )      CR 20-326-JFW
                                )
JOSE LUIS HUIZAR, et al.,       )
                                )      PAGES 1 TO 114
            DEFENDANTS.         )
_____)


REPORTER'S TRANSCRIPT OF
MOTION HEARING VIA VIDEOCONFERENCING
FRIDAY, JANUARY 7, 2022
8:03 A.M.
LOS ANGELES, CALIFORNIA


_____

MIRANDA ALGORRI, CSR 12743, RPR, CRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, SUITE 4455
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

```
 1                    APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFF:

 4        NICOLA T. HANNA
          UNITED STATES ATTORNEY
 5        BY:  MACK JENKINS
          BY:  VERONICA DRAGALIN
 6        Assistant United States Attorneys
          United States Courthouse
 7        312 North Spring Street
          Los Angeles, California 90012
 8

 9   FOR THE DEFENDANT HUIZAR:

10        HILARY L. POTASHNER
          FEDERAL PUBLIC DEFENDER
11        BY:  CAREL ALE
          BY:  CHARLES SNYDER
12        BY:  ADAM OLIN
          Deputy Federal Public Defenders
13        Central District of California
          321 East Second Street
14        Los Angeles, California 90012

15

16   FOR DEFENDANT CHAN:

17        BRAUN & BRAUN, LLP
          BY:  HARLAND BRAUN
18        10880 Wilshire Boulevard
          Suite 1020
19        Los Angeles, California 90024

20   FOR THE DEFENDANT SHEN ZHEN NEW WORLD I:

21        LAW OFFICES OF RICHARD M. STEINGARD
          BY:  RICHARD M. STEINGARD
22        800 Wilshire Boulevard
          Suite 1050
23        Los Angeles, California 90017

24

25
```

1         **APPEARANCES OF COUNSEL CONTINUED:**

2

3    **FOR THE DEFENDANTS LEE AND 940 HILL:**

4         BIRD MARELLA BOXER WOLPERT NESSIM DROOKS LINCENBERG & RHOW
          BY:  ARIEL A. NEUMAN
5         BY:  RAY SEILIE
          1875 Century Park East
6         23rd Floor
          Los Angeles, California 90067

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|   |   |
|---|---|
| | 1 |

                  **LOS ANGELES, CALIFORNIA; FRIDAY, JANUARY 7, 2022**

                              **8:03 A.M.**

                                 ---

08:03AM   5          THE CLERK:  This is CR 20-326(A)-JFW,

          6   United States of America versus Jose Luis Huizar, et al.

          7          Counsel, please state your appearances.

          8          MR. JENKINS:  Good morning, Your Honor.

          9   Mack Jenkins on behalf of the United States.

08:03AM  10          MS. DRAGALIN:  Good morning, Your Honor.

         11   Veronica Dragalin on behalf of the United States.

         12          MR. SNYDER:  Good morning, Your Honor.

         13          Charles Snyder, Carel Alé, and Adam Olin on

         14   behalf of Mr. Huizar.  Mr. Huizar waived his presence, but he's

08:03AM  15   listening in on the video.

         16          MR. BRAUN:  Good morning, Your Honor.

         17          Harland Braun for defendant Ray Chan who is

         18   attending via video.

         19          MR. STEINGARD:  (Inaudible.)

08:04AM  20          THE COURT:  Mr. Steingard, are you having

         21   problems with your voice, or is it the microphone?

         22          MR. STEINGARD:  (Inaudible.)

         23          THE COURT:  While Mr. Steingard is trying to

         24   repair his -- let's try it again.

08:05AM  25          Mr. Steingard, now you're on mute.

1          THE CLERK:  No, he's not.  I'm wondering if he

2   should log out and log back in.

3          MR. SNYDER:  Another possibility, just to chime

4   in because I've had issues like this before, is if he mutes and

08:05AM  5   he calls in on the phone so he can watch what's happening but

6   participate by phone.  That might work too if nothing else

7   works.

8          THE CLERK:  That is a possibility.

9          Mr. Steingard, do you know how to do that?

08:05AM 10          MR. STEINGARD:  (Inaudible.)

11          THE CLERK:  You sound like Donald Duck on our

12   end.  If you know how or someone is around to help you mute

13   your computer and call in on the phone line, and you will

14   listen to the hearing on your phone and see the video on your

08:05AM 15   computer.

16          MR. NEUMAN:  Good morning, Your Honor.

17          Ariel Neuman and Ray Seilie on behalf of

18   defendants Dae Yong Lee and 940 Hill, LLC.  Mr. Lee has waived

19   his personal appearance and is watching as far as I know.

08:06AM 20          THE COURT:  All right.  Let's try Mr. Steingard

21   again.

22          Good morning to all.  I originally scheduled

23   today's hearing for an in-person hearing which is my

24   preference, but unfortunately, due to the recent surge in

08:09AM 25   COVID-19 cases which has had a significant adverse impact on

1    our court, rather than delay the rulings this morning, I

2    decided to proceed by video.

3                There's some noise.

4                MR. NEUMAN:  Mr. Steingard needs to mute his

08:10AM  5    audio on his computer.  That's the problem.

6                THE COURT:  Okay.  All right.  We have the

7    following motions on calendar this morning.  We have the --

8    Defendant Huizar, Chan, Shen Zhen New World, which I will refer

9    to for the purposes of the hearing today as Shen Zhen, joint

08:10AM 10    Motion to Dismiss and/or strike which was filed on

11    September 7th.  It appears as docket 235.  That motion was

12    joined in by 940 Hill and Mr. Lee in a joinder filed on

13    September 8 of 2021 and appears as docket No. 237.

14                We also have defendant's supplemental Motion to

08:10AM 15    Dismiss Counts 2 through 17 which was filed on behalf of all

16    defendants which appears as docket No. 251, and then we have

17    the motions to sever filed by Mr. Lee and 940 Hill which appear

18    as docket Nos. -- which appear as docket No. 200 and then

19    defendant Shen Zhen's motion to sever which appears as

08:11AM 20    docket No. 201.

21                The motions have been fully briefed.  I intend to

22    hear argument and rule on each of the motions this morning.  I

23    intend to proceed in the following manner:  I will hear

24    argument and rule on the motions to dismiss -- Motion to

08:11AM 25    Dismiss and strike which is docket No. 235 and then

supplemental Motion to Dismiss which is docket No. 251.  And
then I will hear argument and rule on each of the motions to
sever.

First I want to compliment counsel on the
briefing.  I think that the motions have been well briefed by
all parties.  And please keep in mind that I have read all the
papers.  I will hear argument from you this morning, but we
have a lot to cover.  I will only hear argument from counsel if
there are matters that were not covered in your papers.  We
simply don't have time this morning to rehash what's in the
papers.

Given that the defendants have raised several
issues with respect to the joint Motion to Dismiss, I'm going
to take each of the issues separately, and we will hear
argument and rule on each of those issues because obviously the
motion covers a lot of territory.

So I will begin with Count 1 which is the RICO
count which charges Mr. Huizar and Mr. Chan with conspiring to
violate 18 United States Code Section 1962(c) in violation of
1962(d) which criminalizes an agreement to participate in a
RICO enterprise, engage in a pattern of racketeering activity.
The statute defines racketeering activity as a street list of
specifically identified crimes.

In Count 1 the First Superseding Indictment -- of
the First Superseding Indictment, it's alleged that there was

a -- the existence of CD-14 enterprise.  Count 1 defines the

objective of that enterprise as set forth a means by which the

defendants Huizar and Chan and other members and associates of

the CD-14 enterprise agreed to conduct the affairs of the

enterprise.

The racketeering activities identified in Count 1

include bribery, indictable under California Penal Code;

Two, mail and wire fraud including through the

deprivation of honest services, indictable under

18 United States Code Section 1341, 1343, and 1346;

Three, color of right extortion, indictable under

the Hobbs Act which is 18 United States Code Section 1951;

Four, interstate and foreign travel in aid of

racketeering indictable under 18 United States Code

Section 1952(a)(3);

Five, money laundering, indictable under

18 United States Code Section 1956 and 1957;

Six, obstruction of justice and witness

tampering, indictable under 18 United States Code Section 1512;

and,

Seven, structuring transactions to evade

reporting requirements, indictable under 31 USC Section 5324.

Count 1 of the First Superseding Indictment sets

forth 452, acts in furtherance of the conspiracy and to

accomplish the object of the conspiracy.  The overt acts are

organized by specific development projects which were before

Defendant Huizar as the chair of the PLUM Committee and as

council member representing the downtown Los Angeles --

downtown Los Angeles in the Council District 14.  Specifically,

08:16AM  the projects are the L.A. Grand Hotel project, the 940 Hill

project, the Luxe Hotel project, and Project M.

The defendants move to strike many of the overt

acts alleged in Count 1 because they argue that they do not and

cannot support a bribery offense and do not allege racketeering

08:16AM  acts.

The legal standard applicable to this motion is

undisputed and as follows:

As set forth in Federal Rule of Criminal

Procedure 7(c)(1), the Indictment or Information must be plain,

08:17AM  concise, and definite written statement of the essential facts

constituting the offense charged.

As the 9th Circuit stated in *United States versus*

*Boren* at 278 F.3d 911, in evaluating whether an Indictment

charges a cognizable offense, the district is bound by the four

08:17AM  corners of the Indictment.  The Court must accept the truth of

the allegations in the Indictment in analyzing whether a

cognizable offense has been stated.  The Indictment either

states an offense or it doesn't.  There is no reason to conduct

an evidentiary hearing.

08:17AM  An Indictment is sufficient if it contains the

1   elements of the offense charged and fairly informs a defendant

2   of the charge against which he must defend and enables him to

3   plead an acquittal or conviction and bar future prosecutions

4   for the same offense.

5   08:17AM         As the 9th Circuit stated in *United States versus*

6   *Jensen*, a defendant may not properly challenge an Indictment

7   sufficient on its face on the grounds that the allegations are

8   not supported by adequate evidence.  A Motion to Dismiss the

9   Indictment cannot be used as a device for a summary trial of

10  08:18AM  the evidence.

11         Federal Rule of Criminal Procedure 7(d)

12  authorizes the Court, upon defendant's motion, to strike

13  surplusage from the Indictment or Information.  As the

14  9th Circuit stated in *United States versus Ramirez* at

15  08:18AM  710 F.2d 535, the purpose of Rule 7(d) is to protect the

16  defendant against prejudicial or inflammatory allegations that

17  are neither relevant nor material to the charges.

18         Information that is prejudicial yet relevant to

19  the Indictment must be included for any future conviction to

20  08:18AM  stand, and information that is irrelevant need not be struck if

21  there is no evidence that the defendant was prejudiced by its

22  inclusion.  If the language in the Indictment is information

23  which the Government hopes to properly prove at trial, it

24  cannot be considered surplusage no matter how prejudicial it

25  08:19AM  may be provided, of course, it is legally relevant.

```
 1              So with that background, I will hear from --
 2      who's going to argue this morning on behalf of the defendants?
 3              MR. SNYDER:  This is Charles Snyder on behalf of
 4      Mr. Huizar.  I think we split up a little bit of the issues.
 5      For the most part, I think I will be doing most of the
 6      argument.
 7              THE COURT:  Okay.  Since my tentative ruling is
 8      against the defendants, I will hear from you.
 9              MR. SNYDER:  Okay.  So, you know, bearing in mind
10      the Court's -- what the Court said at the beginning that
11      there's been a lot of briefing, I will try to be, you know,
12      brief about this.
13              But I do kind of want to provide a little bit of
14      context.  Obviously the Court has thought a lot about this.
15      But one of the first motions that we filed in this case was the
16      motion for grand jury instructions.  And what we said there and
17      what we're going to continue to say and what we said in this
18      motion is that we're looking for clarity and precision in terms
19      of what it is that our client is alleged to have done that is
20      actually criminal.
21              Obviously the charges in this case are very
22      complicated, and the evidence is going to be voluminous.  And
23      one of the concerns that we have, especially when it comes to
24      Count 1, is that the Government is going to take the kitchen
25      sink approach where they're just throwing everything in front
```

of the jury, and the line is going to be blurred between what

is perfectly lawful conduct, what may be unethical or

distasteful but is not actually criminal, and that narrow band

of behavior that actually violates federal corruption law.

So, you know, I think, when it comes to the RICO

count and our motion, our overarching goal is to get some

clarity about, you know, the essential facts, first, so that we

know what it is we are defending against.  But ultimately I

assume the Government is going to have to say that they have to

prove up whatever is in the Indictment at trial.  And we're

looking to have that Indictment be, you know, some sort of

manageable document that delineates the criminal from the

non-criminal.

I will give you an example of one of the issues

that I think we are dealing with.  Obviously, again, the Court

has thought about this.  But the Indictment -- the RICO count

sets out, you know, five principal schemes.  Just to take one

of those schemes, you have the Businessperson A scheme.  In the

Businessperson A scheme, what the Government alleges is that

Businessperson A provided benefits to Mr. Huizar in exchange

for Mr. Huizar setting up business meetings.  Obviously that is

a familiar allegation because it is the exact same allegation

that was laid in *Englander*.  In there -- in *Englander* the Court

said, well, that is not actionable as federal bribery.

The issue that we are dealing with is what is the

1    proper purpose of maintaining that in the charging instrument

2    as part of a RICO conspiracy where the acts are alleged to be

3    federal bribery?  Is it something that we're supposed to be

4    defending against, or is it not?  And if the Government intends

08:21AM    5    to prove up a case consistent with the First Superseding

6    Indictment, what's going to happen other than a jury

7    substituting its own judgment for what's good or bad or what's

8    right or wrong in place of what the actual legal standard is?

9              I think, you know, one of the things that was

08:22AM   10    alluded to in the recitation of the legal standard and

11    obviously in the Government's papers is that, so long as the

12    Government puts something into the Indictment -- because, of

13    course, the Government drafts the Indictment.  It's not grand

14    jurors sitting there at their computers.  So long as they put

08:22AM   15    something in the Indictment and they denominate an overt act in

16    furtherance of the conspiracy, no matter how irrelevant, no

17    matter how misleading, the Court is powerless to act.  And it

18    just has to remain in the Indictment, and it has to remain a

19    part of the case that the Government intends to prove up at

08:22AM   20    trial.

21              And I guess we just don't think that the Court is

22    so disempowered to deal with that situation.  And we think that

23    it makes sense to deal with it now for a couple reasons which

24    are, number one, we need to know where to focus our attention

08:22AM   25    and what to do with our time.  But, also, waiting until the

1    last minute is going to create all sorts of problems.

2              Again, if the case is presented consistent with

3    the First Superseding Indictment and then at the 11th hour we

4    come in with jury instructions to tell the jurors, by the way,

08:23AM   5    most of what you heard throughout the course of the trial is

6    not actually criminal, it just sounds kind of vaguely

7    distasteful and we know that you didn't like it, I think it's

8    going to be too late to unring the bell.

9              So, again, I understand what the Court is saying.

08:23AM   10   I think it's somewhat consistent with some of the things that

11   were said in the order on Mr. Lee's motion.  But I think the

12   issue we are dealing with here -- and this is something that

13   Mr. Olin, one of Mr. Huizar's lawyers, said is that, you know,

14   if we had received an Indictment that was so bare-bones and

08:23AM   15   lacking in information, if we didn't know, you know, where to

16   focus our energy or what to do, we would all agree there is a

17   remedy for that.  There is something like a bill of particulars

18   or whatever.

19             So what happens when you have an Indictment that

08:23AM   20   has just become a repository of all the wish list evidence that

21   the Government wants to get in front of the jury with no

22   delineation between the criminal and the non-criminal, the

23   official acts and the background information such that, you

24   know, we can't know where to focus our energy?  And, again, we

08:24AM   25   just don't agree that the Court can't do anything about that.

1          One thing I will note is, you know, the Court

2      described the standard on Rule 7.  We also moved under Rule 12.

3      And the motions under Rule 12 are illustrative.  There is a

4      list of motions, but they're not exclusive.  The ultimate

08:24AM   5      standard under Rule 12 is that a motion is allowed so long

6      as -- and the Court can act on any defense objection or request

7      that the Court can determine without a trial on the merits.

8          All we are asking the Court to do is look at the

9      face of the First Superseding Indictment and give this case

08:24AM  10      some structure and clarity between delineating what is criminal

11      and not criminal.

12          So, again, we understand the Court's -- what the

13      Court is saying.  But, you know, we have situations like

14      Businessperson A or, you know, the request to Mr. Huizar in the

08:25AM  15      scheme, you know, supposedly involving the L.A. Grand Hotel

16      which we don't know what to do with those.  Are we defending

17      those or are we not?  What's the jury going to do with those?

18          So that's why we think that the relief we are

19      requesting, particularly in a case of this size and complexity,

08:25AM  20      is not only legally proper, but it makes sense to start to

21      wrangle this case right now.

22          THE COURT:  All right.  The Court makes the

23      following ruling:

24          As the Supreme Court said in *Salinas versus*

08:25AM  25      *United States* at 522 U.S. 52, for a RICO conspiracy, there is

1   no requirement of some overt act or a specific act unlike the

2   general conspiracy provision applicable to federal crimes which

3   requires at least one of the conspirators to have committed an

4   act to effect the object of the conspiracy.

08:25AM   5        As the district court said in *United States*

6   *versus Mills* at 2018 WL 5306947, the Government may find it

7   beneficial to include such overt acts in an Indictment to

8   present a more detailed picture of the scope and context of the

9   conspiracy and a defendant's agreement to participate in that

08:26AM   10  conspiracy.

11        In other words, while an Indictment must allege

12  that the defendant conspired to conduct the affairs of the

13  enterprise through a pattern of racketeering activity, it may

14  allege the commission of overt acts in furtherance of the

08:26AM   15  conspiracy.  It is not uncommon nor does the Court find it

16  improper for the Government to allege overt acts in furtherance

17  of a RICO conspiracy.

18        Moreover, an overt act does not need to itself

19  have to be unlawful and does not need to allege a racketeering

08:26AM   20  act.  As the 2nd Circuit stated in *United States versus*

21  *Yannotti*, Y-a-n-n-o-t-t-i, at 541 F.3d, overt acts are not

22  distinct offenses that must be proven to sustain a RICO

23  conspiracy conviction.  And as the Government argues, although

24  overt acts alleged may not by themselves satisfy, for example,

08:27AM   25  the quo element or official act element of a bribe, that does

not mean that those overt acts are not relevant.

As the Supreme Court stated in *McDonnell* at 136 S.Ct. 2355 -- and I quote -- "It is up to the jury under the facts of the case to determine whether the public official agreed to perform an act at the time of the alleged quid pro quo. The jury may consider a broad range of pertinent evidence including the nature of the transaction to answer that question. Indeed, although setting up a meeting, hosting an event, or calling an official or agreeing to do so by itself will not qualify as an official act or a quo. This is not to say that setting up a meeting, hosting an event, or making a phone call is always an innocent act or is irrelevant in cases like this one. If an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take official action."

In their reply, defendants do not dispute that the overt acts need not be unlawful and do not dispute that the overt acts need to allege racketeering acts. Rather, they claim that these overt acts are prejudicial surplusage because they create a significant risk of juror confusion about what is and isn't a crime and inhibit defendants in their preparation to defend the charges.

I disagree. The Court will clearly instruct the jury on the elements of each of the crimes alleged in the First

Superseding Indictment and the relevant racketeering acts.
Moreover, the Court will require the Government to specify the
quos or official acts in the jury instructions that they
contend support each of the bribery charges.

08:29AM       The Court also concludes that the very detailed
allegations in Count 1 of the First Superseding Indictment as
well as the allegations in subsequent counts more than fairly
inform defendant of the offenses with which they are charged
and allow them to prepare their defense.

08:29AM       For example, the defendants contend that they
remain unsure which allegations charge official acts and which
are merely background.  However, the types of official acts
that are relied on by the Government are set forth in
paragraph 42(b) of Count 1 and 45(b) of Count 2 and include
08:29AM   presenting motions and resolutions in various City committees
to benefit projects;

              Two, voting on projects in various City
committees including the PLUM committee and city council;

              Three, taking or not taking action in the PLUM
08:30AM   committee to expedite or delay the approval process and affect
project costs;

              Four, exerting pressure on other City officials
to influence the approval process of the projects;

              Five, using their office to negotiate with and
08:30AM   exert pressure on labor unions to resolve issues on projects;

Six, leveraging voting and scheduling power to pressure developers with projects pending before the City to affect their business practices; and,

Seven, introducing or voting on City resolutions to enhance the professional reputation and marketability of businesspersons in the city.

These allegations regarding the types of official acts relied on by the Government in combination with the overt acts alleged in Count 1 sufficiently inform the defendant of the official acts with which they are charged.

Finally, with respect to the defendants' argument at pages 22 and 23 of the motion, the Government should strike the solicitation of foreign national allegations because they do not allege racketeering acts.  The allegations in support of a RICO conspiracy are not required to consist solely of racketeering acts.  Indeed, a RICO conspiracy requires the court to -- requires the Government to allege that defendants' plans would, if achieved, violate the RICO Act which requires the Government to establish, for example, a common purpose, the potential existence of an enterprise, and/or its continued threat of criminal activity.

As the First Superseding Indictment indicates, the solicitation of foreign national allegations or overt acts as alleged are acts to help maintain the enterprise's potential political power, not as racketeering acts.

1          Accordingly, the joint motion is denied.

2          The second issue that is raised by the motion is

3    Counts 2 through 17 which charge the defendants with honest

4    services mail and wire fraud in violation of 18 United States

08:32AM   5    Code Sections 1341, 1343, 1346, and Section 2(b) and allege

6    that all defendants participated in a scheme to defraud the

7    City of Los Angeles and its citizens of their right to the

8    honest services of their public officials through bribery and

9    kickbacks.

08:32AM   10          In the means and methods section, the Government

11    alleges that, in exchange for the bribes and kickbacks from

12    Mr. Huang, Shen Zhen, Lee, and 940 Hill, defendants Huizar and

13    Chan agreed to perform and did perform various types of

14    official acts which were set -- which are set forth in

08:33AM   15    paragraph 45(b) at page 103 which I previously just listed and

16    I'm not going to repeat here.

17          The defendants argue that the Court should strike

18    the means and methods five and six because they do not allege

19    official acts.  They also argue that the Court should strike

08:33AM   20    means and method seven because the conduct is time-barred and

21    because the First Superseding Indictment does not allege a

22    valid pro.  The defendants also argue that Court should dismiss

23    Count 2 as time-barred.

24          I will hear from you, Mr. Snyder, if you have

08:34AM   25    anything to add to your papers, but I'm prepared to rule.

1          MR. SNYDER:  I believe for this one Mr. Steingard

2    was going to take a crack at it if he has anything.

3          MR. STEINGARD:  Can you hear me, Your Honor?

4          THE COURT:  I can.  Good morning.

08:34AM    5          MR. STEINGARD:  Good morning.  This is probably

6    the strangest way I have ever presented an argument on video

7    and phone.

8          Your Honor, there are a couple arguments that we

9    we have made on Count 2.  One has to do with the L.A. City

08:34AM   10    Council resolution for Chairman Wei Huang, and the Government

11    does not allege that as an official act, and it is time-barred.

12          Ordinarily, frankly, I could care less about this

13    particular official act as being in or out.  But in this

14    situation, the Government is accusing other people of official

08:35AM   15    acts via other similar L.A. City Council resolutions.  So what

16    you have is a situation in which Mr. Huizar and possibly

17    Mr. Chan are being charged with participating in official -- an

18    official act by passing city council resolutions or moving to

19    pass the city council resolutions but not Shen Zhen.

08:35AM   20          We thought the prudent way of proceeding, whether

21    it be by motion in limine or by making a motion to strike as to

22    Shen Zhen only, would be to bring this to the Court's

23    attention.  I think the fear is how the jury would receive

24    conflicting information and confusing -- perhaps confusing

08:36AM   25    instructions, you can consider these official acts in this

situation but not that situation.  So that was the genesis for
that particular point.

As far as the time-barred allegation, Your Honor,
I think we have laid it out as clearly as we can.  The
Government relies on the proposition that an institution has
been affected.  We believe case law makes it clear that there
has to be much more.  And by the way, it's not just the
9th Circuit.  It's every circuit -- that there has to be much
more than simply affecting -- I'm sorry -- touching upon a
financial institution.  There has to be an actual or intended
effect.  It is not existent here.

So in that situation, Your Honor, we believe
that, because it is time-barred, it should be dismissed.

THE COURT:  All right.  The Court makes the
following ruling:

The Court incorporates the legal standard on the
Motion to Dismiss the Indictment and Motion to Strike that I
previously set forth at the outset of this hearing.

The Court incorporates its order denying
defendants 940 Hill and Lee motion to strike language from
Count 5 and thus denies the motion to strike means and methods
five which alleges using the office to negotiate with and exert
pressure on labor unions to resolve issues on projects.

Without much discussion, at page 23 the
defendants claim that the means and methods six leveraging

voting and scheduling power to pressure developers with

projects pending before the City to affect their business

practices is not an official act capable of serving as a

predicate for an honest services conviction.

08:38AM  The Court disagrees.  The allegation regarding

leveraging voting and scheduling power to pressure developers

presumably refers, for example, to actions like the ones set

forth in overt acts 286, 288, 289, and 292 which relate to

Project M bribery scheme as well as 338 and 339 which relate to

08:38AM  Businessperson A's cash payment for pressure on Company M to

hire Businessperson A.

Overt act 286 states in relation to the Project M

bribery scheme that, on September 12, 2018, while

Defendant Huizar was negotiating the additional financial

08:38AM  benefit he sought from Executive M and Company M,

Defendant Huizar used his official position as PLUM committee

chair to postpone the committee's hearing on Project M to

October 2nd of 2018, thereby causing the project to be delayed

until after he met with Executive M.

08:39AM  As set forth in overt act No. 292, after

Executive M and Mr. Huizar met on September 28 to discuss

Defendant Huizar's support for Project M, its approval in the

PLUM committee and Company M's support for the PAC to benefit

Mr. Huizar's relative's campaign, on October 2nd, 2018,

08:39AM  Defendant Huizar used his official position as the PLUM

1  committee chair to postpone his committee's hearing on

2  Project M to October 16, 2018.

3          Ultimately, after Executive M provided Mr. Huizar

4  with one of the benefits promised to him as alleged in overt

08:40AM  5  act No. 293, at the PLUM committee hearing on October 16th,

6  Defendant Huizar voted to deny the union appeal and to approve

7  Project M in the PLUM committee including accepting certain

8  modifications requested by Executive M, all of which is alleged

9  in overt act No. 295.

08:40AM  10         Relatedly, in overt act Nos. 338 and 339, the

11  Government alleges that Mr. Huizar, in exchange for additional

12  campaign contributions to benefit his relative's campaign,

13  Mr. Huizar promised to exert pressure on Company M to hire

14  Businessperson A and that he promised to do so by agreeing to

08:40AM  15  potentially perform negative official acts related to

16  Project M.

17         Specifically, as alleged in the First Superseding

18  Indictment, Company M needed Mr. Huizar to perform favorable

19  acts in support of Company M's project and not to take any

08:41AM  20  adverse official acts in opposition to that project.  In other

21  words, as the Court reads those allegations, Mr. Huizar

22  promised, in exchange for campaign contributions from

23  Businessperson A, to leverage his voting and scheduling power

24  with respect to Project M in order to pressure the Company M to

08:41AM  25  hire Businessperson A.

1          The Court finds this alleged conduct, which the

2   Court merely uses as an example of means and methods six, i.e.,

3   leveraging voting and scheduling power to pressure developers,

4   falls squarely within the definition of official act as defined

08:41AM  5   in *McDonnell versus the United States*.

6          As discussed in the Court's order denying

7   940 Hill and Mr. Lee's motion to strike language from Count 5,

8   honest services mail and wire fraud based upon bribery

9   allegations as alleged in Counts 2 through 17 requires the

08:42AM 10   Government to prove a quid pro quo, i.e., the payment of

11   something of value in exchange for an official act.

12          In *McDonnell* the Supreme Court set forth the

13   requirements for proving an official act.

14          First, the Government must identify a question,

08:42AM 15   matter, cause, suit, proceeding, or controversy.  That

16   question, matter, cause, suit, proceeding, or controversy must

17   involve a formal exercise of government power that is similar

18   in nature to a lawsuit before a court, a determination before

19   an agency, or a hearing before a committee.  The matter must

08:42AM 20   also be something specific and focused as pending or may by law

21   be brought before a public official.  "Pending" and "may be

22   brought" suggest something that is relatively circumscribed,

23   the kind of thing that can be put in an agenda, tracked for

24   progress, and then checked off as complete.

08:43AM 25          Second, the public official must make a decision

1    or take action on that question, matter, cause, suit,

2    proceeding, or controversy or agree to do so.  That decision or

3    action may include using his official position to exert

4    pressure on another individual to perform an official act or to

08:43AM    5    advise another official knowing or intending that such advice

6    will form the basis for an official act by another official.

7    Setting up a meeting, talking to another official, or

8    organizing an event or agreeing to do so does not fit the

9    definition of official act.

08:43AM    10    Importantly, a public official is not required to

11    actually make a decision or take an action on a question,

12    matter, cause, suit, proceeding, or controversy.  It is enough

13    that the official agrees to do so.  The agreement need not be

14    specific, and the public official need not specify the means he

08:44AM    15    will use to perform his end of the bargain.  Nor must the

16    public official, in fact, intend to perform the official act so

17    long as he agrees to do so.  It is up to the jury under the

18    facts of the case to determine whether the public official

19    agrees to perform an official act at the time of the alleged

08:44AM    20    quid pro quo.

21    Defendants fail to present any persuasive

22    argument or demonstrate why leveraging voting and scheduling

23    power with respect to Project M or any other project cannot

24    constitute an official act.  Indeed, their argument at pages 21

08:44AM    25    to 22 seems to be based upon the erroneous assumption that the

official act alleged is the act of pressuring developers to affect their business practices rather than leveraging a voting and scheduling power to pressure the developers with projects pending before the City to affect their business practices.

Framed properly, however, the leveraging of voting and scheduling power to pressure developers with projects before the City to affect their business practices can constitute an official act.  The Government has identified a question, matter, cause, suit, proceeding, or controversy that involves a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee and that is specific and focused that is pending or may by law be brought before a public official.  For example, the approval of Project M was pending before the PLUM committee when Mr. Huizar was the chair.

Second, the Government adequately alleges that Mr. Huizar made a decision or took action on question, matter, cause, suit, proceeding, or controversy or agreed to do so. Indeed, after negotiating the terms of the benefits Mr. Huizar would receive from Executive M and after having received some of those benefits, Mr. Huizar then set the PLUM committee hearing on Project M for October 16, 2018, and ultimately voted to deny the labor union's appeal and to approve Project M in the PLUM committee.

While voting to deny the labor union's appeal and approving Project M in the PLUM committee is clearly making a decision or taking an action on Project M, so is scheduling Project M for a vote or hearing.  As the Supreme Court stated in *McDonnell* -- and I quote -- "For example, a decision or action to initiate a research study or decision or an action on a qualifying step such as narrowing down a list of potential research topics would qualify as an official act.  Scheduling the hearing on Project M before the PLUM committee, a necessary prerequisite for approval of Project M, is more akin to an action on a qualifying step than a mere setting up of a meeting.

In addition, with respect to Businessperson A, all that is necessary is that Mr. Huizar agreed to take official action, not that he actually performed the official act or that he even intended to perform any official act, and the allegations to support a finding that Mr. Huizar promised to perform negative official acts related to Project M including using his voting and scheduling power on Project M in an effort to put pressure on Company M to hire Businessperson A.

In any event, even if the act of scheduling the vote or leveraging voting and scheduling power to pressure developers could not be considered an official act by itself, in order to strike the relevant allegation, the allegation must

be irrelevant and prejudicial.  The allegation, in my view, is

certainly not irrelevant.  As the Supreme Court stated in

*McDonnell* -- and I quote -- "Of course this is not to say that

setting up a meeting, hosting an event, or making a phone call

08:48AM  is always an innocent act or is irrelevant in cases like this

one.  If an official sets up a meeting, hosts an event, or

makes a phone call on a question or matter that is or could be

pending before another official, that could serve as evidence

of an agreement to take an official act."

08:48AM          The leveraging of Mr. Huizar's scheduling power

of Project M before the PLUM committee serves as evidence of an

agreement to take another official act, i.e., voting to approve

Project M.  And to the extent that defendants argue that the

allegation is prejudicial because it implies an overly broad

08:48AM  definition of official act, the Court concludes that any such

prejudice can and will be addressed and eliminated through the

Court's instructions to the jury at trial.

          As to means and methods seven, introducing or

voting on City resolutions to enhance the professional

08:49AM  reputation and marketability of businesspersons in the city,

likely refers to resolutions for Mr. Huang and Businessperson A

as alleged in overt acts 55 and 336.

          Regarding Mr. Huang, the Government alleges that,

in April of 2014, to benefit Huang's reputation in the business

08:49AM  community, Mr. Huizar introduced and signed a resolution before

the city council recognizing him for his achievements and

contributions to the economy of CD-14 which the city council

signed and adopted as alleged in overt act 55.

Defendants argue that this official act should be

08:49AM   stricken because the First Superseding Indictment does not

allege that the resolution honoring Mr. Huang was an official

act and, even if it did, it would be time-barred because the

resolution benefiting Huang was passed in 2014, more than five

years before the First Superseding Indictment was returned.

08:50AM   Even though the Government did not address these

arguments, the Court will not strike means and methods seven

because the resolution for Businessperson A also supports this

means and method, and this alleged official act is not

time-barred.  Indeed, in overt act 334, the Government alleges

08:50AM   that, on or about March 18, 2018, Businessperson A stated that

he would support Huizar's relative's campaign but that he

needed help from Defendant Huizar to provide an official

resolution from the City recognizing Businessperson A's

business.

08:50AM   Mr. Huizar agreed to provide a City resolution

and asked Businessperson A to contribute $25,000 to his

relative's campaign.  And as alleged in overt act No. 336, on

or about April 10, 2018, Mr. Huizar caused CD-14 office to

issue a City resolution in the form of a certificate of

08:51AM   recognition signed by all city council members recognizing

       1    Businessperson A to promote Businessperson A's business and

       2    reputation in the city.

       3            As the 2nd Circuit held in *United States versus*

       4    *Silver* at 948 F.3d at 538, a City resolution honoring someone

08:51AM   5    is indisputably an official act.  And in this case, the

       6    allegations in the First Superseding Indictment support the

       7    finding of an explicit quid pro quo.  Moreover, the alleged

       8    conduct including the passage of the resolution recognizing

       9    Businessperson A occurred within five years before the First

08:52AM  10    Superseding Indictment was returned.

      11            Accordingly, there is no basis to strike means

      12    and method seven on the grounds that the resolution does not

      13    constitute an official act or because it is time-barred.

      14            Nevertheless, defendants argue that the Court

08:52AM  15    should strike means and method seven as applied to Shen Zhen.

      16    The Court will not parse the First Superseding Indictment in

      17    this manner.  The means and methods listed in the introduction

      18    to Counts 2 through 17 need not apply to each and every

      19    defendant.  Moreover, the Court will require the Government to

08:52AM  20    specify the specific quos or official acts with the jury

      21    instructions that they contend support the bribery charge for

      22    each defendant so there will be no confusion.

      23            With respect to overt act No. 55 regarding the

      24    resolution for Mr. Huang, the Court will not strike the overt

08:52AM  25    act.  The defendants at page 13, footnote 9 concede that this

act is not time-barred under Count 1 -- the defendants concede

that this act is not time-barred under Count 1 and merely argue

that there is no evidence that Mr. Huang received this

de minimus official act.  As the Court has already held, overt

08:53AM  acts need not be unlawful, and the Motion to Dismiss the

Indictment cannot be used as a device for summary trial of the

evidence.

Next, the defendants argue that Count 2 of the

First Superseding Indictment is time-barred.  Count 2 alleges

08:53AM  that, as part of the ongoing honest services fraud scheme, a

wire of $575,000 was sent from Mr. Huizar's bank, which is

defined as Bank 1, to Wells Fargo on September 23rd, 2014.

In support of this count, the Government alleges

that Mr. Huang provided collateral in the amount of $600,000 in

08:54AM  order for Mr. Huizar to qualify for a loan from Bank 1.  After

the collateral was provided and the loan was documented, the

bank then wired on September 23rd, 2014, $575,000 to a

Wells Fargo account to fund the settlement of the sexual

harassment lawsuit that was pending against Mr. Huizar as

08:54AM  alleged in overt acts 25, 26, 30 through 46.

Defendant contends that this count is barred by

the five-year statute of limitations for honest services fraud

as set forth in Title 18 Section 3282(a).  However, as

acknowledged by the defendants, pursuant to Section 3293(2),

08:54AM  the statute of limitations for honest services fraud in

violation of 18 USC 1341, 1343, 1346 is extended to ten years

if the offense affects a financial institution.

Paragraph 44, lines 15 and 16 of the First

Superseding Indictment, alleges that the scheme to defraud

08:55AM  encompassing Counts 2 through 17 affected at least one

financial institution.  As the 9th Circuit held in

*United States versus Stargell*, S-t-a-r-g-e-l-l, at 738 F.3d, a

financial institution need not suffer an actual loss in order

to be affected but only a new or increased risk of loss.

08:55AM  The Court concludes that the First Superseding

Indictment adequately pleads that the offense charged in

Count 2 affected a financial institution and, thus, the

ten-year rather than the five-year statute of limitations

applies.

08:56AM  Indeed, the allegations support a finding that

the collateral provided by Defendant Huang to Defendant Huizar

to secure the -- a loan from Bank 1 was a bribe.  And because

such funds securing the loan can be subject to forfeiture, for

example, under 18 United States Code Section 981(a)(1)(C), the

08:56AM  allegations are sufficient to support a finding that Bank 1 was

subject to an increased risk of loss.

Moreover, the Court notes that the Government

represents at page 19 that discovery in this case further makes

clear that, had Bank 1 representative known the true nature of

08:56AM  the collateral payment, the bank would have denied the request

1    to make a loan to Mr. Huizar under any circumstances because it

2    would have placed the bank at risk of financial loss.  If such

3    evidence is presented at trial, a jury could find the offense

4    charged in Count 2 affected a financial institution.

08:57AM  5         So for the foregoing reasons, defendant's motion

6    to strike Counts 2 through 17 is denied.

7         The next motion that I will take is the Motion to

8    Dismiss Counts 22 and 23.

9         The defendants move to dismiss each of those

08:57AM  10   counts as duplicitous.  Those counts charge the defendants with

11   federal program bribery in violation of 18 United States Code

12   Section 666(a)(1)(B).  Specifically, in Count 22 the Government

13   alleges that, between on or about October 25, 2015, and on or

14   about -- in or about December of 2018, Defendant Huizar, an

08:58AM  15   agent of the City of Los Angeles, aided and abetted by

16   Defendant Chan, corruptly solicited and demanded for the

17   benefit of himself and others and accepted and agreed to accept

18   something of value from a person intending to be influenced and

19   rewarded in connection with a business transaction and series

08:58AM  20   of transactions of the City of Los Angeles having a value of

21   $5,000 or more.

22         Specifically, Defendant Huizar, aided and abetted

23   by Defendant Chan, solicited, demanded, accepted, and agreed to

24   accept financial benefits from Mr. Huang including casino

08:59AM  25   chips, accommodations, travel expenses, and approximately

$575,000 in collateral to secure Mr. Huizar's personal loan from Bank 1 intending to be influenced and rewarded in connection with the L.A. Grand Hotel project including presenting motions and resolutions in various City committees to benefit L.A. Grand Hotel project, voting on the L.A. Grand Hotel project in various City committees including the PLUM committee and city council, taking actions in the PLUM committee to expedite the approval process of the L.A. Grand Hotel project, and exerting pressure on other City officials to influence the approval process of the L.A. Grand Hotel project.

Count 23 makes the same allegations from the perspective of Mr. Huang and Shen Zhen, in other words, from the perspective of bribe-giver.

Defendants argue that those counts are duplicitous.  Specifically, the counts bundle multiple discrete violations of the statute under single counts.  They also argue that some of the acts alleged in Counts 22 and 23 are time-barred.

The legal standard re duplicity is, as the 9th Circuit stated in *United States versus Mancuso* at 718 F.3d 780, an Indictment is duplicitous when it joins two or more distinct and separate offenses into a single count.  In determining whether an Indictment is duplicitous, a Court is not to review the evidence presented at trial to determine

whether it would support charging several crimes rather than one but rather solely to assess whether the Indictment itself can be read to charge only one violation in each count.

In determining whether a count is duplicitous, the Court must carefully examine the statute in question to determine whether congress intended the facts underlying each count can make up a separate unit of the prosecution. The Court determines congressional intent from the statutory language, legislative history, and statutory scheme.

As the Supreme Court emphasized in the *Bell* case at 349 U.S. 81, if in doubt about that intent, because, for example, congress intended unit of prosecution is not clear and unambiguous, doubt will be resolved against turning a single transaction into multiple offenses.

However, as the 1st Circuit stated in the *Newell* case at 658 F.3d 1 -- and I quote -- "The risk of serious unfairness presented by a duplicitous Indictment are apparent. In conditions where jurors disagree among themselves as to just which offenses the evidence supports, the defendant may nevertheless wind up convicted because the jurors agree that the evidence showed that he had committed an offense even if it was ambiguous as to which one. In other words, although a jury may return a guilty verdict even if jurors disagree about how a specific crime was committed, this is quite different from allowing a jury to return a guilty verdict when they disagree

even as to which crime or crimes were committed.

"Secondly, in a criminal case, the Government is still required to prove the defendant's guilt beyond a reasonable doubt.  In aggregating multiple instances of the same crime, the prosecution may bundle together alleged offenses that are strongly supported by the evidence with ones that are only moderately or even weakly supported by the evidence.  If a jury does not specifically indicate that it has assented to each alleged offense, then by assenting to the bundle, it has done no more than indicated its agreement with the proposition the defendant is guilty of some, though perhaps not all, of the charged conduct.

Duplicity is not fatal to an Indictment.  As the 9th Circuit stated in the *Ramirez* case at 273 F.3d 903, which was overruled on other grounds at 484 F.3d 1186, a defendant indicted pursuant to a duplicitous Indictment may be properly prosecuted and convicted if either the Government elects between the charges in the offending count or the Court provides an instruction requiring all members of the jury to agree as to which of the distinct charges the defendant actually committed.

So, Mr. Snyder, if you're on deck for this motion, I will hear briefly from you.

MR. SNYDER:  So I understand -- I don't know if the Court is able to give me any guidance about its thinking.

1   Otherwise, I have some thoughts where it's leaning in terms of

2   the ultimate outcome so I can be helpful.

3         THE COURT:  I didn't understand the last part of

4   what you said.

5         MR. SNYDER:  Sorry.  I was just asking if -- I

6   have things that I can say.  But if the Court can give me some

7   guidance about, you know, if it has thoughts about where it's

8   leaning in terms of the ultimate outcome, I'd like to be as

9   helpful as possible by kind of responding to the pinpoint

10   issues.

11         THE COURT:  Well, my intended ruling is to deny

12   it.

13         MR. SNYDER:  Okay.  So with that being the case,

14   I think the Court correctly laid out the legal standard.  One

15   of the things you said at the start is that the first thing you

16   have to do is correctly identify the unit of prosecution.  And

17   the answer to the unit of prosecution question depends entirely

18   on statute and has nothing to do with, you know, the facts of a

19   given case or the way that the prosecutor intends to charge a

20   given case.

21         You will note that in the opposition there was no

22   effort by the Government to analyze Section 666, to identify an

23   alternative unit of prosecution, or to dispute the unit of

24   prosecution that we set out.

25         So I think that leads to the straightforward

conclusion about what the unit of prosecution is which is, you

know, any corrupt solicitation, demanding an offer, the thing

of value, intending to be influenced in connection with

government business where it is worth at least $5,000.

And that is true even if there are, you know,

what the Government would deem multiple installments directed

at the same ultimate object.  And, you know, that's as a matter

of statute, but it's also reflected in all of the cases that

are actually looking at Section 666 directly.

And for what it's worth, I will note that in many

other cases the Government has taken the position that we are

taking here which is that each instance of the corrupt demand,

solicitation, or offer, even if directed at the same ultimate

thing, needs to be set out separately and proved beyond a

reasonable doubt.

I think that the Government's position on this

seems to be -- and this is quoting from page 39 of the brief --

that, although the statute may allow the Government to charge

each separate act as an individual count, it need not do so.

So in other words, what the Government seems to be saying here

is that, yeah, sure, it could have set these all out as

separate offenses and had an obligation to prove them

separately with evidence, so each trip to Las Vegas or trips

overseas or the loan or each contribution by Company M, but it

also has the discretion to lump everything together.  And in

this case it has decided that it wants to do the latter, and
that is just totally wrong.  That is not how duplicity law
works.

The idea that prosecutors can define and redefine
the crime depending on how it suits their interest in a given
case is, you know, contrary to the bedrock principle duplicity,
but it's also a separation of powers problem because now you
have the Government rewriting the statute as it suits its
interest in each case, including to rewrite the statute in
order to avoid the statute of limitations which is a totally
separate protection that congress has afforded people in our
position.

So it's clear that the Government has control
over many things in this case.  They can decide who to charge,
what to charge, when to charge, how vigorously to pursue a
conviction and a sentence.  But they're not allowed to write
and rewrite the statute as it suits their interest in a given
case, and we're entitled to the law as it's written.  We're
entitled to that protection.

What that means is that they have to set out each
separate unit of prosecution in a separate count, and they have
to prove those beyond a reasonable doubt.

So I think that, you know, the -- I don't know
how much else I have to say about that.  The other thing I was
going to mention was, you know, something that the Court

1    recognized which is, the reason why this is important to us,

2    you know, it is -- we have a situation -- I will give the Court

3    a brief example, and then I know we are pressed for time.

4              But we have a situation where in Counts 22 and 23

09:08AM    5    the Government is describing alleged benefits that were

6    received from 2013 to 2017 spanning from Las Vegas to deposits

7    in the bank to overseas over an extended period of time.  The

8    reality is that in 2013, for example, as far as Mr. Huizar

9    knew, there was no L.A. Grand Hotel project.  And as far as I

09:09AM    10   know, there was no L.A. Grand Hotel project at all.

11             So even setting aside the statute of limitations

12   issue, the Government would have an extraordinarily difficult

13   time proving that, in 2013 when Mr. Huizar went to Las Vegas,

14   he did that with the corrupt intent to be influenced in

09:09AM    15   connection with the project that didn't exist and in his mind

16   didn't exist.

17             But by allowing the Government to just lump

18   everything together, you know, you're going to have the jury,

19   like you said, you know, grouping the weaker and the stronger

09:09AM    20   evidence and just setting out a result.  And I think one of the

21   things that the Court was alluding to was that, okay, we can

22   just give them instructions at the end.  Again, as I was saying

23   before, I don't know that, you know, allowing the Government to

24   present its own differentiated mass of information and then

09:09AM    25   giving an instruction at the end of all that is going to be

1    enough to unring that bell.

2          So I think that -- I will say that I think that

3    we have extremely strong arguments on this issue in particular,

4    and I think that it should be decided in our favor.

09:10AM   5          THE COURT:  All right.  The Court makes the

6    following ruling:

7          I conclude that Counts 22 and 23 are not

8    duplicitous.  As the 1st Circuit stated in *Newell* regarding

9    Section 666, determining whether the challenged counts were

09:10AM   10   duplicitous is no easy matter.  In some cases, the standard for

11   individuating crimes is obvious, with count murders, for

12   instance, by counting bodies.  But in other cases determining

13   how many crimes were committed is much less clear.

14         There are four elements that the Government must

09:10AM   15   prove beyond a reasonable doubt to prove that a defendant

16   committed the offense of bribery under Section 666:

17         One, a corrupt solicitation or offer of anything

18   of value;

19         Two, with the intent of being influenced or

09:11AM   20   influencing any person in connection with a qualifying

21   transaction or series of transactions;

22         Three, where the transaction or series of

23   transactions involves anything of value of $5,000 or more; and,

24         Four, the relevant organization, government, or

09:11AM   25   agency received during a one-year period benefits in excess of

1    $10,000 under a federal program.

2            As the Court held in *Newell*, the statutory text

3    and legislative history did not clearly indicate the intended

4    unit of prosecution of 666.  Because congressional intent is

09:11AM  5    unclear, the Court must resolve any doubts in favor of lenity

6    for the defendants.

7            As the district court in *United States versus*

8    *Nystrom*, N-y-s-t-r-o-m, at 2008 WL 4833984 stated, there is a

9    surprising paucity of federal case law identifying the unit of

09:12AM  10   prosecution for 666.  Some courts, including the *Nystrom* court

11   and the court in the case *Tutein*, T-u-t-e-i-n, at

12   122 F.Supp. 2d 575, concluded that each offer or solicitation

13   under 666 is the appropriate unit of prosecution, i.e., that

14   each act of bribery constitutes a separate offense and may be

09:12AM  15   charged in separate counts.

16           Notably, however, multiple courts have also held

17   that the Government may aggregate multiple instances of 666

18   bribery conduct in a single count where they were part of a

19   single plan or scheme to reach the $5,000 statutory threshold.

09:13AM  20   Those cases are collected at *United States versus Hines* at

21   541 F.3d at 833.

22           The Court concludes that, even though Section 666

23   might allow the Government to charge each separate payment as

24   an individual count, it is not necessarily required that the

09:13AM  25   Government do so.  Instead, depending on the facts and

circumstances, the Court concludes that the Government may elect to charge the series of acts as one ongoing scheme in a single count.

As the 7th Circuit in Yashar at 166 F.3d 873 stated, a prosecutor has a great deal of discretion in deciding whether to charge a course of conduct as a single offense or as multiple offenses.  This discretion in charging is circumscribed to some extent by the principles of duplicity, multiplicity, and double jeopardy.  But even within those confines, a good deal of discretion remains.

The First Superseding Indictment alleges a single ongoing scheme or course of conduct, the Government has stated its intention to proceed on the stream of benefits theory as to Counts 22 and 23.  According to defense counsel at page 2, the Government uses this term to encompass three different theories of bribery prosecution known as the "stream of benefits," "as opportunities arise," and "retainer" theories of bribery.  Those terms have sometimes been used interchangeably by various courts.  The defendant has separately defined each of those theories in their papers.

However, these theories, in my view, are not as clearly defined in the cases as the defendants suggest, and the Court concludes that these theories overlap.  In any event, the different theories are helpful in determining whether Counts 22 and 23 are duplicitous.

1          Importantly, as the 2nd Circuit stated in the

2    *Ganim* case, G-a-n-i-m, at 510 F.3d at 134 and confirmed in

3    *United States versus Silver* which is the 2nd Circuit case that

4    I mentioned before, bribery is not limited to a one-for-one

09:15AM    5    exchange.  It can be accomplished by an ongoing course of

6    conduct.  Moreover, the statute can certainly be read to

7    authorize charging an ongoing scheme in a single count.

8          As the district court in the *Fitzgerald* case at

9    514 F.Supp. 3d 721 stated -- and I quote -- "Congress had

09:15AM    10   ambitious goals of protecting the integrity of federal funds

11   through the enactment of Section 666.  These broad goals of

12   preventing corruption are evidenced through the statute's broad

13   application and interpretation.  Congress felt it necessary

14   then to include the phrase 'series of transactions' indicating

09:16AM    15   that it recognized and explicitly authorized stream-of-benefits

16   prosecutions under this statute.  Given that congress

17   contemplated the existence of these stream-of-benefits bribery

18   schemes through its express inclusion of a," quote, "'series of

19   transactions' within the gambit of 666, it is simply

09:16AM    20   unthinkable that congress did not intend to protect the

21   integrity of federal funds from corruption by limiting complex

22   and continuous schemes only to individual acts."  That is the

23   end of the quote.

24          As the 9th Circuit held in *United States versus*

09:16AM    25   *Mancuso* at 728 F.3d, the Court's task at this time is not to

review the evidence that the Government will present at trial

to determine whether it would support charging several crimes

rather than one but rather to solely assess whether the

Indictment itself can be read to charge only one violation in

09:17AM   each count.  And the Court concludes that the First Superseding

Indictment can be read to charge only one violation in each

count.

For example, the counts can be read to allege

that the stream of benefits from October 28, 2015, to December

09:17AM   of 2018 including casino gambling chips, accommodations, travel

expenses, and the $575,000 used as collateral to secure

Mr. Huizar's personal loan from Bank 1 were cumulatively

offered with the intent to influence Mr. Huizar in connection

with the L.A. Grand Hotel project as opportunities arose.  The

09:17AM   evidence may even show, for example, that there was a single

offer or solicitation of items of value even if those items of

value were split up over time.

Given that the Court must resolve doubt as to

congressional intent, the Court concludes that counts -- given

09:18AM   that the Court must resolve doubt against turning single

transactions into multiple offenses, the Court concludes that

Counts 22 and 23 can be read to charge only one violation in

each count and therefore are not duplicitous.  However, after

hearing the evidence at trial, the Court may provide a specific

09:18AM   unanimity instruction to the jury if necessary or require the

1    Government to make an election.

2              The defendants next argue that many of the quids

3    and pros in Counts 22 and 23 are barred by the statute of

4    limitations citing conduct that occurred in 2013 and 2014.

09:18AM    5    Defendants' argument fails to recognize that in Counts 22 and

6    23 the Government specifically alleges that the offending

7    conduct occurred between October 28, 2015, and December of

8    2018.

9              With respect to Mr. Huizar, who was named in the

09:19AM   10    original Indictment returned on July 31st of 2020, this entire

11    time period is within the five-year statute of limitations.

12    Defendant Huizar does not dispute that the calculation of the

13    statute of limitations as to Count 22 is based on the original

14    Indictment.  As such, given that Count 22 limits itself to

09:19AM   15    conduct occurring within the statute of limitations, Count 22

16    is timely as to Mr. Huizar.

17              Shen Zhen, however, and Chan, however, were not

18    named in the original Indictment, and the First Superseding

19    Indictment was not returned until November 12 of 2020.  As to

09:19AM   20    these defendants, for the reasons stated in the *Polanco* case,

21    P-o-l-a-n -c-o, at 2008 WL 2891076, the Court concludes that

22    any bribes occurring more than five years before the First

23    Superseding Indictment was returned on November 12, 2020, are

24    time-barred.

09:20AM   25              Although the Government argues in footnote at

page 42, note 17, that the continuing violations doctrine may

be applicable based upon the 9th Circuit's decision in the

*Morales* case at 11 F.3d 915, to encompass conduct occurring

more than five years prior to the return of the First

09:20AM  Superseding Indictment, the Court concludes that, at least when

considering the statute of limitations, the 7th Circuit's

analysis in the *Yaahar* case is persuasive.  There the

7th Circuit held that prosecution may not extend the statute of

limitations by charging a continuous course of conduct under

09:20AM  666.

In any event, as the 9th Circuit stated in

*Mancuso*, the statute of limitations does not bar the

introduction of evidence for acts that occurred outside the

limitation period.  Such evidence may be relevant for the

09:21AM  purposes of interpreting post-limitation conduct.

Accordingly, the Court will not strike the

language in the First Superseding Indictment but, rather, will

provide clear instructions to the jury that any conviction with

respect to Counts 22 and 23 must rest or rely on

09:21AM  post-limitation conduct.

There is another issue that is similar, and that

is Defendant Huizar's Motion to Dismiss Count 29 as duplicitous

and move to strike from Count 29 Company M's so-called third

contribution because it is not supported by a clear and

09:22AM  unambiguous quid pro quo.

          Count 29 charges Mr. Huizar with federal program

bribery in violation of Section 666.  The First Superseding

Indictment, that count reads as follows:

          "Between in or about January of 2018 and in or

about November of 2018, Mr. Huizar, an agent of the City of

Los Angeles, corruptly solicited and demanded for the benefit

of himself and others and agreed to accept something of value

from a person intending to be influenced and rewarded in

connection with a business transaction and a series of

transactions of the City of Los Angeles having a value of

$5,000 or more.

          "Specifically, Defendant Huizar solicited,

demanded, and agreed to accept from Company M $100,000 in

contributions to the Political Action Committee, referred to in

the Indictment as 'PAC A,' and intending to be influenced and

rewarded in connection with Project M including scheduling

Project M on the PLUM committee agenda, voting to deny labor

union's appeal against Project M in the PLUM committee, and

voting to approve Project M in the PLUM committee and city

council."

          Overt acts 262 through 300 detail the allegations

supporting Count 29.  In essence, the Government alleges -- or

the First Superseding Indictment alleges that in March of 2018,

in exchange for Mr. Huizar's assistance in getting Project M

approved, Executive M agreed to make a $50,000 contribution to

PAC A to be paid in two installments: $25,000 as soon as possible and another $25,000 by the end of the year after Project M had been approved.

However, before the second installment of payment -- I'm sorry -- the second installment was paid Mr. Huizar requested an additional $50,000 commitment to PAC A because, in approving Project M in the PLUM committee, Mr. Huizar would have to vote against a labor union's appeal which he considered an ally, and his vote could have a negative -- could have negative implication on Mr. Huizar's relative's campaign which is alleged at overt act 279.

In other words, because approving Project M and the PLUM committee -- in the PLUM committee, Mr. Huizar increased the amount of the bribe.  Ultimately Company M committed to provide $100,000 in total in contributions in exchange for Huizar's assistance with Project M.

So, Mr. Snyder, if you have anything you want to add, I will hear from you.  Otherwise, I am prepared to rule.

MR. SNYDER:  Just very briefly because it is somewhat similar.

I do want to just note two things about the idea that the Government can aggregate under one header these multiple contributions.  First of all, the aggregation cases that the Court referred to were interpreting a different part of the statute.  They were interpreting the embezzlement part

of the statute.  What those courts said was that you can

aggregate up to the $5,000 threshold, but once you pass that,

each count has to be separated out.  So *Newell* actually

resolved in a way that is favorable to us.  So I think that is

an important point.  It applies to this count but also to the

other two.

        And the only other thing I will say just very

briefly is that the reason why *Fitzgerald* is the dramatic

outlier and it proves the point you can't find a district court

case to say anything is because it's focusing on the wrong part

of the statute.  The language in the statute that says series

of transactions has nothing to do with the actual offenses, the

offenses committed when a person makes a corrupt solicitation,

demand, agreement, or offer regardless of what happens in the

future.

        So if Mr. Huizar had said, you know, I will do

this corrupt thing in exchange for, you know, one act or

multiple acts and then he either did those things or he didn't,

it doesn't matter.  The crime is already committed.  So that

focuses on the language of multiple transactions is a

misunderstanding of what the actual offense is.  And I think

that's what led the *Fitzgerald* case astray, and I think that's

why it's one of the only cases I know -- the only case that

interprets Section 666 in a way that can allow for this type of

aggregation theory.  So it is the same issue.

1          Otherwise, I don't have anything else.

2          THE COURT:  All right.  The Court makes the

3     following ruling:

4          I conclude that Count 29 is not duplicitous.  As

09:27AM  5     stated in ruling on Counts 22 and 23, the Court concludes that,

6     even though Section 666 might allow the Government to charge

7     each separate payment as to an individual count, it is not

8     necessarily required that the Government do so.  Instead,

9     depending upon the facts and circumstances, the Court concludes

09:27AM  10    that the Government may elect to charge a series of acts as to

11    one ongoing scheme in a single count.

12         With respect to the $100,000 contribution to

13    PAC A that Mr. Huizar allegedly agreed to accept from Company M

14    intending to be influenced and rewarded in connection with

09:27AM  15    Project M, the Court concludes that those contributions were

16    part of a single course of conduct and were appropriately

17    charged in one count.  The contributions and transactions were

18    intertwined, and the allegations support the conclusion that

19    there was, in effect, one bribe consisting of $100,000 in

09:28AM  20    exchange for Huizar's assistance with Project M.  However,

21    after hearing the evidence at trial, the Court may provide a

22    specific unanimity instruction to the jury, if necessary.

23         As to overt acts 262 to 275, the defendants also

24    argue that the Government fails to allege clear and unambiguous

09:28AM  25    quid pro quo with respect to the $50,000 contribution solicited

1   by Mr. Huizar between January 2018 and June of 2018 as alleged

2   in overt acts 262 through 275, what the defendants refer to as

3   the third contribution relating to Project M.  The Court

4   disagrees.

09:29AM  5          In *McCormick* at 500 U.S. 257, the Supreme Court

6   held that the receipt of campaign contributions would violate

7   the Hobbs Act only if the payments are made in return for an

8   explicit promise or undertaking by the official to perform or

9   not perform an official act.  To the extent defendants argue

09:29AM  10  that this explicit, necessary requirement cannot be met unless

11  an official has specifically stated that he will exchange

12  official action for a contribution, the Court disagrees.

13          As the 9th Circuit stated in the *Carpenter* case

14  at 961 F.2d 824 -- and I quote -- "To read *McCormick* as

09:29AM  15  imposing such a requirement would allow officials to escape

16  liability under the Hobbs Act with winks and nods even when the

17  evidence as a whole proves that there has been a meeting of the

18  minds to exchange official action for money."  And that's the

19  end of the quote.

09:30AM  20          Instead, the 9th Circuit interpreted *McCormick* in

21  the following manner -- and I quote -- "In our view, what

22  *McCormick* requires is that the quid pro quo be clear and

23  unambiguous, leaving no uncertainty about the terms of the

24  bargain.  The explicitness requirement serves to distinguish

09:30AM  25  between contributions that are given or received with the

anticipation of official action and contributions that are
given or received in exchange for a promise of official action.
When a contributor or an official clearly understands the terms
of the bargain to exchange official action for money, they have
moved beyond anticipation and into an arrangement that the
Hobbs Act forbids.  This understanding need not be verbally
explicit.  The jury may consider both direct and circumstantial
evidence, including the context in which the conversation took
place to determine if there was a meeting of the minds on a
quid pro quo.  As we read *McCormick*, the explicitness
requirement is satisfied so long as the terms of the quid pro
quo are clear and unambiguous."  That's the end of the quote.

The First Superseding Indictment adequately
alleges a clear and unambiguous quid pro quo regarding the
$50,000 contribution solicited by Huizar between January 2018
and June of 2018.  Overt act 264 alleges that Defendant Huizar
asked if Company M would help with PAC -- the PAC in the same
conversation that Mr. Goldman conveyed Company M's request for
Mr. Huizar 's position on height and affordability levels with
respect to Project M.

The Court agrees with the Government that the
context and timing of the conversations between those dates
support a clear and unambiguous quid pro quo, i.e., in exchange
for the campaign contribution to the PAC A.  Mr. Huizar agreed
to approve Project M in the PLUM committee and the city council

1  with favorable affordable housing requirements and height

2  requirements as set forth or alleged in overt acts 264 through

3  275.

4           Accordingly, there is no basis to strike the

09:32AM  5  third contribution overt acts as alleged in Count 29.  Of

6  course, it will be for the jury to decide based upon the

7  evidence at trial whether a clear and unambiguous quid pro quo

8  existed based upon the Court's instructions.

9           The next series of issues relate to the -- that

09:33AM 10  are raised in the motion relate to the Travel Act, and those

11  appear in Counts 18 through 21 of the First Superseding

12  Indictment.  Those charge defendants with violating the

13  Travel Act which is -- the statute is 18 United States Code

14  Section 1952(a)(3) by committing bribery in violation of

09:33AM 15  California law, specifically, Penal Code Sections 67, 67.5, and

16  68.

17           The Travel Act makes it a crime to travel in

18  interstate or foreign commerce or use the mail or any facility

19  in interstate or foreign commerce with the intent to promote,

09:34AM 20  manage, establish, carry on, or facilitate the promotion,

21  management, establishment, or carry on of any unlawful activity

22  and thereafter perform or attempt to perform an act to do so.

23  Unlawful activity is defined, in relevant part, as bribery in

24  violation of the laws of the state in which committed or of the

09:34AM 25  United States.

```
 1              The defendants argue that the Travel Act

 2    Counts 18 through 21 should be dismissed because the California

 3    bribery statutes that I just referred to are broader than the

 4    generic meaning of the term bribery as used in the Travel Act

 5    and thus cannot serve as predicates for the Travel Act

 6    offenses.

 7              I found this motion to be very interesting, but

 8    my tentative is -- or this portion of the motion.  My tentative

 9    is to deny it.

10              So, Mr. Snyder, if you have anything you want to

11    add to your papers, I will hear from you.

12              MR. SNYDER:  This one -- Mr. Steingard is going

13    to take this one and Ms. Alé if she has anything to add.

14              THE COURT:  You will have to speak into the

15    microphone because I'm not hearing you.

16              MR. SNYDER:  For this one Mr. Steingard is going

17    to take the lead, and Ms. Alé will add anything if he misses

18    it.

19              THE COURT:  Okay.  Mr. Steingard.

20              MR. STEINGARD:  Your Honor, I appreciate what you

21    said.  You commented you found the motion interesting, and it

22    sounds like --

23              THE COURT:  Well, interesting because I think the

24    Chi case is very helpful.  I struggled with the ruling in the

25    Chi case when that -- that issue is different obviously because
```

of the money laundering -- when that issue was litigated in

that case which was ultimately affirmed by the 9th Circuit.  So

I find it interesting because of the complexity of the

analysis.  In any event, for what that is worth.

09:36AM          MR. STEINGARD:  Well, I appreciate that.

          THE COURT:  And I thought everybody has done a

good job on these papers.  The papers were helpful.

          MR. STEINGARD:  This is a very, very complex area

of the law trying to figure out the categorical approach.  I

09:36AM  tend to simplify it quite a bit.  And that is simply -- just

simply -- there is a beeping going on.  I hope that's not me.

I'm sorry.  The simplest way I look at it is whether the state

statute is broader or the same act or less broad than the

federal statute.

09:37AM          There's no doubt the California courts have said

that the federal bribery and state statutes are different.  I

think there's a federal case *Frega* that sort of affirms that

comment.

          If you begin with the proposition that they're

09:37AM  different, I think you have to conclude that the state statute

is broader.  The way it is drafted, the wording, the cases that

have interpreted have all been far more expansive than the

federal cases.

          The one area, when I was prepping for this motion

09:38AM  hearing today, the one area that I wanted to talk about briefly

was the Government's Indictment which actually alleges a quid

pro quo.  And it doesn't appear that that necessarily requires

under the state statute, but it is contained in the Indictment.

So the question is whether the Indictment can narrow the scope

of the state statute such that it falls within the federal

parameters.  The short answer is I don't think it can do that.

I don't think the categorical approach allows for those kind of

modifications.

SPEAKER The other thing I want to say is I'm concerned at

trial the Government does not prove up an official act -- and

we have said over and over again that there is no official act

in this case.  The Government is relying on the

proposition that eventually Mr. Huizar would have done

something, put his hands beyond the justice, so to speak, to

benefit the L.A. Grand Hotel project.  Not that it happened.

In all the other schemes you are hearing about, the Government

is alleging something happened.  In this one the Government is

saying that something would have happened down the road.

There's no firm evidence of an agreement implicit or explicit.

SPEAKER So what if this scenario happens, the Government

doesn't prove up an official act, and then says to Your Honor,

for purposes of the Travel Act counts, we didn't have to prove

that up, and then you do have a situation in which the state

statute is broader than the federal statute.  There is no quid

pro quo requirement under state law.

1          So I don't believe that the Indictment can narrow

2     the -- necessarily narrow the scope of the state statute such

3     that it falls within the parameters of the federal statute.

4          If Your Honor disagrees, then we would ask the

09:40AM  5     Government be held to that, that they alleged a quid pro quo in

6     the Travel Act counts and that they must prove up a quid pro

7     quo in the Travel Act counts, and they can't back out of it at

8     the end of the trial if they simply say, well, we didn't prove

9     up an official act, but we don't need to with respect to the

09:40AM 10     Travel Act counts.  So those are the positions I wanted to

11     advance to the Court.  Thank you.

12          THE COURT:  All right.  The Court makes the

13     following ruling:

14          In order to resolve the defendant's Motion to

09:41AM 15     Dismiss Counts 18 through 21, the Court must determine whether

16     bribery in violation of the California Penal Code Sections 67,

17     67.5, and 68 falls within the meaning of bribery as

18     contemplated by the Travel Act.  Congress did not define the

19     term "bribery" in the Travel Act.

09:41AM 20          As the Supreme Court stated in the *Perrin* case,

21     P-e-r-r-i-n, at 444 U.S. 37 -- and I quote -- "A fundamental

22     canon of statutory construction is that, unless otherwise

23     defined, words will be interpreted as taking their ordinary,

24     contemporary, common meaning.  Therefore, we look to the

09:41AM 25     ordinary meaning of that term bribery at the time congress

enacted the statute in 1961."  And that's the end of the quote.

In other words, and as the parties agree, the Court must apply the categorical approach to determine whether the California state bribery statutes qualify as bribery as that term is used in the Travel Act.  Under the categorical approach, the predicate state bribery statutes are compared to the generic federal definition of bribery at the time the Travel Act was enacted to determine whether they are a categorical match.  If the state statutes are a categorical match, i.e., require the same essential elements or are narrower than the generic federal definition of bribery, they are appropriate predicate offenses for the Travel Act.

In determining what the general -- in determining what the generic federal definition of bribery was at the time of the travel -- at the time the Travel Act was enacted in 1961, the Court looks at any relevant sources in effect at the time.

In 1961 Black's Law Dictionary 4th Edition defined bribery as "the offering, giving, receiving, or soliciting of anything of value to influence actions as an official or in discharge of legal or public duty;

"The corrupt tendering or receiving of a price for official action;

"The receiving or offering of any undue reward by or to any person concerned in the administration of public

justice or a public officer to influence his behavior in office"; and,

"The taking or giving of reward for public office."

The Model Penal Code was not yet published in 1961 but was first published shortly thereafter in 1962 after a ten-year drafting period.  It defined bribery as "offering, conferring, or agreeing to confer upon another or soliciting, accepting, or agreeing to accept from another any pecuniary benefit as consideration for the recipient's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant, party official, or voter, or any benefit as consideration of a known legal duty as a public servant or party official."

Defendants contend that the Court should look -- should also look to the federal bribery statute which is codified at 18 United States Code Section 201 to determine what congress meant by the term bribery in the Travel Act.  Like the Model Penal Code, the current version of 201 was not enacted until 1962 after the Travel Act.

However, from 1948 until the current version of 18 United States Code Section 201 was enacted in 1962, there was a predecessor Section 201 statute which provided in relevant part as follows -- and I quote -- "Whoever promises, offers, or gives any money or thing of value or makes or

tenders any check, order, contract, undertaking, obligation,
gratuity, or security for the payment of money or for the
delivery or conveyance of anything of value to any officer or
employee or person acting for or on behalf of the United States
with intent to influence his decision or action in any
question, matter, cause, or proceeding which may at any time be
pending or which may by law be brought before him in his
official capacity or his place of trust or profit or to induce
him to do or omit to do any act in violation of his unlawful
duty shall be fined not more than three times the amount of
such money or value of such thing or imprisoned not more than
three years or both."

Section 202, in effect from 1948 to 1962, covered
the acceptance or solicitation by officer or other person and
provided -- and I quote -- "Whoever, being an officer or
employee of or person acting for or on behalf of the
United States in any official capacity asks, accepts, or
receives any money or any check, order, contract, promise,
undertaking, obligation, gratuity, or security for the payment
of money or for the delivery or conveyance of anything of value
with the intent to have his decision or action on any question,
matter, cause, or proceeding which may at any time be pending
or which may by law be brought before him in his official
capacity or his place of trust or profit influenced thereby
shall be fined not more than three times the amount of the

value of such thing or imprisoned not more than three years or
both."  And there is a provision of forfeiture of his office.

The current version of Section 201 is very
similar.  It defines bribery in relevant part as directly or
indirectly corruptly giving, offering, or promising anything of
value to any public official with the intent to influence any
official act or corruptly demanding, seeking, receiving,
accepting, or agreeing to accept anything of value in return
for being influenced in the performance of any official act.

The term "official act" is defined in Section 201
as any decision or action on any question, matter, cause, suit,
proceeding, or controversy which may at any time be pending or
which may by law be brought before any public official in such
official's official capacity or in such official's place of
trust or profit.

Although the predecessor version of 201 does not
use the term "official act," it similarly covered an intent to
influence the decision or action on any question, matter,
cause, or proceeding which may at any time be pending or which
may by law be brought before him in his official capacity or
his place of trust or profit.

Although the Court agrees with the defendants
that Section 201's definition of bribery is at least helpful in
determining what the ordinary contemporary common meaning of
bribery meant in 1961, the Court declines to adopt the exact or

specific elements of bribery as defined in Section 201 and

certainly does not incorporate the Supreme Court's

interpretation of the elements set forth in *McDonnell versus*

*the United States*, a decision that was issued over 50 years

09:49AM   after the Travel Act was enacted.

In *McDonnell* the Supreme Court interpreted the

statutorily defined term "official act" in Section 201, and

that interpretation was principally based on the express and

specific terms of that statute as well as on accepted canons of

09:49AM   statutory construction.  Importantly, it was not based upon the

generic or common meaning of bribery.

The 9th Circuit's recent decision in

*United States versus Chi* which is at 936 F.3d 888 which I

indicated I'm very familiar with since I presided over that

09:49AM   case is helpful.  In that case the 9th Circuit examined the

generic definition of bribery as it existed in 2001 in

interpreting a different statute which is the 18 United States

Code Section 1956(c)(7)(b) which was enacted in 2001.  The

9th Circuit looked to both Black's Law Dictionary and the Model

09:50AM   Penal Code as they existed in 2001.

The definition of bribery in Black's Law

Dictionary in 2001 had a similar definition to the definition

in Black's Law Dictionary in 1961.  The Model Penal Code in

2001 defined bribery exactly as it had in 1962.

09:50AM   After examining Black's Law Dictionary and the

Model Penal Code, the 9th Circuit summarized the common understanding of the term bribery in 2001 as follows -- and I quote -- "These sources demonstrate that, based on the common understanding of the term at the time the statute was enacted, bribery contained several elements.  First, it required two parties, one who paid, offered, or conferred the bribe and one who received, solicited, or agreed to accept it.  Second, it required something to be given to the bribe-giver, either a private favor, a pecuniary benefit, or any benefit.  And, third, it required something to be given by the bribe-taker, either official action, the recipient's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant or a violation of a known legal duty as a public servant."

Notably the 9th Circuit in *Chi* rejected the defendant's argument that the use of the term bribery of a public official in the statute 1956 was a reference to section 201 or that incorporated the elements from that statute.  The 9th Circuit rejected that argument because the money laundering statute did not include a specific reference to Section 201 while other language within that section included references to other specific federal laws.

Moreover, the 9th Circuit noted that, even if a bribery of a public official were interpreted as a reference to a specific federal statute, it's not clear to which statute it

would refer.  Section 201 is merely one strand of an intricate web of regulations, both administrative and criminal, governing the acceptance of gifts and other self-enriching actions by public officials.

09:52AM          Faced with this web of regulations, Section 1956(c)(7)(B) gives no indication which, if any, federal law should define the meaning of bribery of a public official.  Hence, absent a statutory basis to refer to and adopt the elements of Section 201, the 9th Circuit interpreted bribery of a public official per *Perrin's* instruction in accordance with ordinary, contemporary, common meaning.

          This Court similarly interprets bribery as used in the Travel Act in accordance with its ordinary contemporary common meaning and not as defined in Section 201.  In 1961, just as in 2001, there was a web of various federal statutes that govern bribery and graft including Section 201 through Section 223.  Congress could have but did not reference any of these sections in defining bribery as it was used in the Travel Act.

          Moreover, there is even less of a reason to specifically apply 201 as the Travel Act, unlike the money laundering statute at issue in *Chi,* does not simply cover bribery of a public official but rather bribery in all of its forms if it is in violation of the laws in the state in which it is committed or of the United States.

Even so, defendants contend that the Court must limit the interpretation of the term "bribery" in the Travel Act based upon the constitutional considerations raised in *McDonnell*.  The Court rejects that argument as the constitutional concerns raised in *McDonnell* arose out of the specific statute at issue Section 201 and, in particular, out of the Government's proposed expansive and limitless interpretation of official act in that case.

Moreover, with respect to the federalism concerns raised in *McDonnell* as well as the case *Rewis*, R-e-w-i-s, at 401 U.S. 801, the Court finds that those concerns are not applicable here.  As the Court stated in *Perrin* -- and I quote -- "Reliance on federalism principles articulated in *Rewis* to dictate a narrow interpretation of bribery is misplaced.  Our concern there was with the tenuous interstate commerce element.  Looking at congressional intent in that light, we held that congress did not intend that the Travel Act should apply to criminal activity within one state solely because that activity was sometimes patronized by persons from another state.

"Here the sufficiency of the interstate nexus is no longer at issue.  Rather, so long as the requisite interstate nexus is present, the Travel Act reflects a clear and deliberate intent on the part of congress to alter the federal-state balance in order to reinforce state law

1    enforcement.  In defining an unlawful activity, congress has

2    clearly stated its intention to include violations of state as

3    well as federal bribery law."  That's the end of the quote.

4         In *United States versus Nader* at 542 F.3d 713,

09:55AM    5    the 9th Circuit likewise concluded that the Travel Act did not

6    offend the principles of federalism stating -- and I quote --

7    "The Travel Act establishes only concurrent federal

8    jurisdiction over what are already state and local crimes.  The

9    federal government cannot usurp state authority via the

09:55AM   10    Travel Act because the state must first decide the conduct at

11    issue is illegal.  The Travel Act also does not render state or

12    local law enforcement agencies any less capable -- any less

13    able to fight crime.  It supplements, not supplants, their

14    capabilities.  While there may be a valid question as to the

09:56AM   15    wisdom of drafting such a broad statute, these are policy

16    issues within the discretion of the other branches, and they

17    raise no federalism concerns."  That's the end of the quote.

18         For the foregoing reasons, absent a statutory

19    basis to refer and adopt the specific elements of Section 201

09:56AM   20    and the Supreme Court's interpretation of those specific

21    elements of *McDonnell,* the Court interprets bribery in

22    accordance with its ordinary, contemporary, common meaning in

23    1961.

24         The Court concludes like the 9th Circuit that

09:56AM   25    there were essentially three elements.  First, it required two

parties, one who paid, offered, or conferred the bribe and one who received, solicited, or agreed to accept it.  Second, it required something to be given by the bribe-giver, either a private favor, a pecuniary benefit, or any benefit.  And, third, it required something to be given by the bribe-taker, either official action, the recipient's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant or in violation of a known legal duty as a public servant.

The Court also concludes that the bribery statutes at issue, California Penal Code Section 67, 67.5, and 68 are consistent with the generic definition of bribery as contemplated by the Travel Act.

California Penal Code Section 67 makes it unlawful for a person to give or offer any bribe to any executive officer in this state with the intent to influence him with respect to any act, decision, vote, opinion, or other proceedings as such an officer.

Penal Code Section 67.5 makes it unlawful for a person to give or offer as a bribe any -- to any ministerial officer, employee, or appointee of the State of California, county or city therein, or any political subdivision anything.

Penal Code Section 68 makes it unlawful for an executive or ministerial officer, employee, or appointee of the State of California, county or city therein, or political

subdivision thereof to ask, receive, or agree to receive any

bribe upon any agreement or understanding that his or her vote,

opinion, or action upon any matter then pending or that may be

brought before him or her in his official capacity shall be

09:58AM  influenced thereby.

Bribe is defined in each of -- actually, bribe is

defined in Penal Code Section 7 as anything of value or

advantage, present or prospective, or any promise or

undertaking to give any, asked, given, or accepted with corrupt

09:59AM  intent to influence unlawfully the person to whom it is given

in his or her -- in his or her action, vote, or opinion in any

public or official capacity.

In essence, as analyzed in the state case -- the

last name is G-a-i-o -- at 81 Cal App. 4 at 919, the statutes

09:59AM  define bribery as the giving or receipt of something of value

with the intent that the recipient be influenced in his or her

vote, action, or opinion in an official capacity and in the

case of a recipient with respect to any matter then pending or

which may be brought before him.

09:59AM  The Court agrees with the Government that these

three bribery statutes thus include the three essential

elements of bribery as identified by the 9th Circuit in *Chi*.

Based upon the plain language of the statutes, the statutes

require two parties, one who gave or offered the bribe and one

10:00AM  who asked, received, or agreed to receive it.  Two, the

1   statutes require something to be given by the bribe-giver,

2   anything of value or advantage.  And, three, they required

3   something to be given by the bribe-taker, example -- for

4   example, an action, vote, or opinion in any public or official

10:00AM  5   capacity.

6          In my view, these statutes fall comfortably

7   within the generic definition of bribery as it existed in 1961.

8          Defendants argue that the California statutes are

9   broader than the generic definition of bribery because they do

10:00AM  10   not require identification of a specific official act as the

11   object of the bribe citing the *Gaio* case.  Specifically in that

12   case, the California Court of Appeal concluded that bribery

13   does not require that a specific official action be pending

14   when the bribe is given or that they -- or that there be proof

10:01AM  15   that the bribe was intended to influence any such act.  Rather,

16   it is sufficient that the evidence reflect that there existed

17   subjects of potential action by the recipient and the bribe was

18   given or received with the intent that some action be

19   influenced.

10:01AM  20          In other words, bribery under California law does

21   not require identification of the specific official action, but

22   it still requires that the bribe was given or received with the

23   intent that some official action be influenced.

24          The generic definition of bribery, like the

10:01AM  25   California definition of bribery, does not require the

1    identification of a specific official act as the object of the

2    bribe.  Defendants base their argument on the Supreme Court

3    decision in the *Sun-Diamond* case at 526 U.S. 398 interpreting

4    the illegal gratuity statute and *McDonnell* interpreting the

10:02AM    5    federal bribery statute Section 201(b).

6           The Supreme Court's interpretations, however,

7    depended upon the specific statutory language at issue and not

8    on the generic definition of bribery, and thus the Court finds

9    them not applicable.

10:02AM    10          Accordingly, the Court concludes that California

11   Penal Code Section 67, 67.5, and 68 may serve as predicate

12   offenses for the violation of the Travel Act and denies that

13   portion of the Motion to Dismiss.

14          In the alternative, defendants argue that

10:02AM    15   Counts 18 through 21 should be dismissed because the

16   Government, through its allegations in those counts, required

17   itself to prove a quid pro quo, an official act, and a linkage

18   between them even if the California bribery statutes do not

19   require those elements.

10:03AM    20          As a result, they argue that the Court should

21   dismiss these counts because the four Travel Act counts fail to

22   identify a specific official action that Mr. Huizar allegedly

23   performed or agreed to perform in exchange for the alleged

24   benefits.

10:03AM    25          In Counts 18 through 21 of the First Superseding

Indictment, the Government alleges that defendants Huizar and

Shen Zhen committed the identified acts in exchange for

Defendant Huizar agreeing to perform official acts to benefit

the L.A. Grand Hotel project.

Accordingly, the defendants argue at page 42

that, by its own language, the Travel Act counts contain a quid

pro quo and an official act as elements of the charge and a

linkage between the two.  The Court does not believe that the

allegations of the First Superseding Indictment are

inconsistent with the elements of the California bribery

statute or somehow raise the Government's burden with respect

to those counts.

In any event, contrary to defendants' arguments,

the Court concludes that the allegations within the Travel Act

counts as well as the 15-page section labeled "L.A. Grand Hotel

Bribery Scheme" which identifies 84 acts -- overt acts in

furtherance of that scheme adequately inform defendant of the

specific official acts alleged including those alleged in

connection with the Travel Act counts such that the defendants

are able to prepare their defense, defendants are prosecuted on

the basis of facts presented to the grand jury, defendants are

able to plead jeopardy against later prosecution, and the Court

is informed of the facts alleged so it can determine the

sufficiency of the charges.

So that -- to the extent -- to that extent, the

1    motion is also denied.

2              There is also a motion with respect to Count 24.

3    Defendant Huizar argues that the Court should strike the

4    language -- and I quote -- "pressuring Labor Organization A to

10:05AM    5    dismiss its appeal against the 940 Hill project because of an

6    act exerting pressure on a labor union is not capable of

7    serving as a predicate for a 66(a)(1)(B) conviction."

8              The Court incorporates its order denying 940 Hill

9    and leaves motion to strike language from Count 25 and denies

10:05AM   10    that portion of the motion.

11             The next issue or group of issues relate to the

12    miscellaneous constitutional issues that have been raised by

13    the defense.

14             Mr. Snyder, I assume this is your area, but quite

10:06AM   15    frankly, I don't need any argument on this -- on these.  If you

16    have something you wish to add, I will hear briefly from you.

17             MS. ALE:  Actually, Your Honor, I was going to

18    cover this section.  I will submit on the papers --

19             THE COURT:  You have to get closer to the

10:06AM   20    microphone because you are not being clear.

21             MS. ALE:  Yes, Your Honor.  Is this better?

22             Your Honor, I will submit on the papers.  I only

23    have one brief reply to the Court's denial of the 940 Hill

24    Motion to Dismiss Section 666 which is that the Court adopted

10:06AM   25    the 2nd Circuit's reasoning in --

```
 1                    THE COURT:  So you're submitting on the papers on
 2   constitutional arguments?
 3                    MS. ALE:  With one brief response, Your Honor.
 4                    THE COURT:  All right,
 5                    MS. ALE:  With the Court's denial of 940's 666
 6   Motion to Dismiss said that it adopted the 2nd Circuit's
 7   analysis of the federalism argument.  I just wanted to -- and I
 8   know we mentioned this in the reply, but I wanted to make sure
 9   that we had on record that that case did not involve the
10   federalism concerns here nor was the federalism issue raised by
11   the parties as to 666.
12                    It was foreign national.  It was a foreign
13   organization.  It did not implicate -- did not implicate the
14   state or local government.  So that reasoning just does not
15   apply in this context and to our federalism claim.
16                    THE COURT:  All right.  The Court makes the
17   following ruling with respect to what I characterized as the
18   miscellaneous constitutional issues that are raised in the
19   motion.
20                    Defendants move to dismiss Counts 22 through 30
21   charging violations of 666(a)(1)(B) and (a)(2) as
22   unconstitutional on the following grounds: 666 is facially
23   unconstitutional under the 5th Amendment due process clause
24   because it is impermissibly vague; the statute is
25   unconstitutional under the 1st Amendment because it is facially
```

10:07AM (line 5)
10:07AM (line 10)
10:07AM (line 15)
10:08AM (line 20)
10:08AM (line 25)

overbroad; and the statute violates the 10th Amendment as
applied in this case because it infringes on traditional areas
of state power.

As an initial matter, the Court incorporates its
order denying the Lee and 940 Hill motion to strike the
language from Count 25 which rejected similar arguments that
the statute was impermissibly vague and that 666 violated the
10th Amendment.  For similar reasons, as the Court rejected
Lee's arguments that 666 was impermissibly vague, the Court
rejects the defendants' arguments that it is facially
overbroad.

As the Supreme Court stated in *Stevens* at
559 U.S. 460, in the 1st Amendment context, a law may be
invalidated as overbroad if a substantial number of its
applications are unconstitutional, judged in relation to the
statute's plainly legitimate sweep.

As the Supreme Court stated in the *Broadrick* case
at 413 U.S. 601, an application of the overbreadth doctrine as
a strong medicine.  It has been employed by the Court sparingly
and only as a last resort.  Facial overbreadth has not been
invoked when a limiting construction has been or could be
placed on the challenged statute.

As the Court held in the Lee order, congress
imposed certain unique restrictions that apply exclusively to
federal program bribery under 666(a)(2) that limits its breadth

and acts to constrain the unfettered discretion of federal

prosecutors including that there must be a connection with any

business, transaction, or series of transactions of an

organization, government, or agency involving anything of value

10:10AM  of $5,000 or more.

Notably, the Court has not found a single case,

nor have the defendants cited a single case, holding that 666

was facially overbroad in violation of the 1st Amendment.

There are, however, cases concluding that the statute is not

10:11AM  overbroad.  For example, United States versus *Donagher*,

D-o-n-a-g-h-e-r, at 520 F.Supp. 3d at 1034 recently rejected an

overbreadth challenge to Section 666 concluding that the

statutory terms of the statute sufficiently cabin the subject

matter of a bribe or reward to economic transactional activity

10:11AM  and in doing so avoid any overbreadth concerns suggested by

*McDonnell*.

This Court, likewise, concludes that the unique

limitations in 666 sufficiently restrict application of the

statute such that it does not prohibit a substantial amount of

10:11AM  protected speech.  And as the district court stated in the

*Fitzgerald* case -- and I quote -- "Whatever fear that there may

be that innocent people would get caught up by the statute's

broad sweep is mitigated by the express scienter requirement in

the statute that the defendant acted with corrupt intent."  In

10:12AM  any event, even if 666 did prohibit a substantial amount of

1    protected speech, the preferred remedy would be limiting

2    construction, not invalidation of the statute.

3              Accordingly, the Court rejects the defendants'

4    challenge to 666 on 1st Amendment grounds.

10:12AM   5    In addition to the 10th Amendment arguments

6    raised by 940 Hill and Lee, which were rejected by the Court,

7    the defendants argue that 666 violates the 10th Amendment as

8    applied because there is no connection between the bribe and

9    the expenditure of federal funds.

10:12AM   10   As the Supreme Court held in the *Salinas* case at

11   522 U.S. 52, as a matter of statutory construction,

12   Section 666(a)(1)(B) does not require the Government to prove

13   the bribe in question had any particular influence on federal

14   funds and that under this construction the statute is

10:13AM   15   constitutional as applied in this case.

16             The Supreme Court, however, declined to answer

17   whether the statute requires some other kind of connection

18   between a bribe and the expenditure of federal funds because in

19   *Salinas* the bribe was related to the housing of a prisoner in

10:13AM   20   facilities paid for in significant part by federal funds

21   themselves, and that relationship is close enough to satisfy

22   whatever connection that the statute might require.

23             More recently in the *Sabri*, S-a-b-r-i, case at

24   541 U.S. 600, the Supreme Court rejected a related argument

10:13AM   25   that the statute requires a nexus between the bribery

1  prescribed and federal funding to be a valid exercise of

2  congress's authority under Article 1.

3  The Supreme Court reasoned that the federal funds

4  did not have to be directly affected by the bribery scheme

10:14AM  5  because the corruption does not have to be that limited to

6  affect the federal interest.  Money is fungible, and corrupt

7  contractors did not deliver dollar-for-dollar value.  Liquidity

8  is not a financial term for nothing.  Money can be drained off

9  here because a federal grant is pouring it in there.

10:14AM  10  In light of the Supreme Court's decision

11  reasoning in the *Sabri*, surprisingly not cited to or referenced

12  by defendants, and for the reasons already stated in the

13  Court's order denying Lee's motion to strike language from

14  Count 25, the Court rejects the defendant's 10th Amendment

10:14AM  15  federalism arguments.  The Court concludes that no nexus or

16  connection is required between the bribe and the expenditure of

17  federal funds and that 666 is not unconstitutional as applied

18  in this case.

19  Congress enacted Section 666 specifically to

10:15AM  20  bring state and local officials within the scope of the federal

21  criminal theft and bribery law.  As the 2nd Circuit held in the

22  *Seng* case, S-e-n-g, at 934 F.3d 110, by enacting 666, congress

23  expressly recalibrated the federalism balance, and thus 666

24  does not raise the same federalism concerns that underpinned

10:15AM  25  the Supreme Court's reasoning in *McDonnell*.  As the

1    Supreme Court observed in the *Sabri* case at page 608, congress

2    is well within its prerogative to protect spending objects from

3    the menace of local administrators on the take.

4            Accordingly, the motions to dismiss those counts

10:15AM    5    are denied.

6            Reference to the generic bribery and RICO

7    Travel Act and money laundering statutes, the Government argues

8    that those are unconstitutionally vague and the mode of

9    defining bribery through post-hoc judicial interpretation

10:16AM    10    violates the separation of powers and the due process clause.

11           The Court disagrees.  The Court concludes that

12    the generic term "bribery" has had a fairly consistent meaning

13    from the 1960s through today as demonstrated by the unchanged

14    definition in the Model Penal Code since 1962.  As such, the

10:16AM    15    Court finds that the term is not unconstitutionally vague and

16    that reference to generic bribery and the RICO Travel Act and

17    money laundering statute does not violate the separation of

18    powers or the due process clause.

19           Defendants next argue that the honest services

10:16AM    20    statute Section 1346 is unconstitutionally vague on its face or

21    applied.  Defendants concede that the Court is bound by the

22    *Skilling* case at 561 U.S. 358 which concluded that 1346 covers

23    bribes and kickback schemes and that interpreted as such 1346

24    is not unconstitutionally vague.

10:17AM    25           Accordingly, the Court rejects the defendants'

1  argument that the honest services statute is vague on its face.

2  The Court also rejects the defendants' argument that 1346 is

3  vague as applied, especially given the Government -- that the

4  Government seeks to convict defendants in the honest services

10:17AM  5  counts of quid pro quo bribery as set forth in Counts 2 through

6  17.

7              Lastly, the defendants argue that the California

8  bribery statutes are unconstitutional when incorporated into

9  RICO, Travel Act, and money laundering statutes based upon the

10:17AM  10  Supreme Court decision in *McDonnell*.  The Court disagrees.

11             As explained at length in the Court's order

12  denying Mr. Lee's motion to strike language from Count 25, the

13  constitutional concerns in *McDonnell* arose out of the specific

14  statute at issue and the Government's proposed expansive and

10:18AM  15  limitless interpretation of official act.  The Court does not

16  find the same constitutional concerns are raised by

17  incorporating California's bribery statutes into federal law.

18             Indeed, even assuming that the California bribery

19  statutes are broader than bribery under 201 as interpreted by

10:18AM  20  *McDonnell*, defendants do not contend that the definition of

21  bribery under California law is as expansive as the

22  interpretation of 201 as proposed by the Government in

23  *McDonnell*.

24             Moreover, significant federalism concerns raised

10:18AM  25  by the Government's expansive interpretation of official act of

*McDonnell* are simply not raised by the incorporation of the California bribery statutes into federal law.

In *McDonnell*, the Supreme Court stated in relevant part -- and I quote -- "A state defines itself as a sovereign through the structure of its government and the character of those who exercise government authority.  That includes the prerogatives to regulate the permissible scope of interactions between state officials and their constituents.  Here, where a more limited interpretation of an official act are supported by both text and precedent, we decline to construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of good government for local and state officials."  That's the end of the quote.

Here, by contrast, by incorporating California bribery statutes into federal law, the Federal Government is not setting standards of good government for local or state officials but merely enforcing the standards of good government set by the state itself.

So the constitutional issues as raised in the motion, that portion of the motion is denied.

The last two items that I want to discuss and rule on relate to the defendants' supplemental Motion to Dismiss Counts 2 through 17 which appear at docket No. 251 and the motions to sever.  The severance motions were filed back in

August, and they appear as docket No. 200 filed on behalf of

Mr. Lee and 940 Hill and docket No. 201 filed on behalf of

Defendant Shen Zhen.  The Government on September 7th filed its

omnibus opposition to each of those motions which appears as

10:21AM   docket No. 228, and the defendants filed replies that appear at

2 -- at docket Nos. 255 and 256.

In its opposition to the severance motions, the

Government claims that the honest services fraud counts in the

First Superseding Indictment alleged a single scheme to defraud

10:21AM   rather than multiple schemes to defraud.  Until reviewing the

Government's opposition to the motion to sever, defendants and,

quite frankly, the Court had understood that the First

Superseding Indictment charged multiple and separate schemes to

defraud including the L.A. Grand Hotel bribery scheme, the

10:21AM   940 Hill bribery scheme, the Luxe Hotel bribery scheme, the

Project M bribery scheme, and the Businessman A schemes as

alleged in the RICO and honest services fraud counts.

In light of the Government's position that the

honest services fraud counts charge a single scheme, on

10:22AM   September 14th, the defendants filed an unopposed ex-parte

application to file the supplemental Motion to Dismiss which

the Court granted.  And that motion, as I indicated, was

ultimately filed and appears as docket No. 251.

I will first take the supplemental Motion to

10:22AM   Dismiss, and then I want to move to the discussion about

1    severance in this case.

2              So, Mr. Steingard, are you going to take the

3    laboring oar on this Motion to Dismiss?

4              MR. STEINGARD:  Yes, I am, Your Honor.  But I'm

10:23AM    5    prepared to answer any questions.  I think we laid out the

6    arguments, the Government's response.  Obviously the *Kotteakos*

7    case, I believe, rebuts the suggestion that this is a hub and

8    spoke situation.  So if you have questions, I'm happy to answer

9    them and my co-counsel as well.  Otherwise, I will submit on

10:23AM   10    what we gave you.

11              THE COURT:  All right.  Then I'm going to make

12    the following ruling:

13              On the supplemental Motion to Dismiss 2 through

14    17, defendants argue that the First Superseding Indictment

10:23AM   15    alleges multiple schemes to defraud rather than one and that 2

16    through 17 must be dismissed pursuant to *Kotteakos* at

17    328 U.S. 750.  Although *Kotteakos* was a conspiracy case, the

18    parties agree that the *Kotteakos* principles apply to the scheme

19    to defraud counts.

10:24AM   20              In *Kotteakos* the Indictment named 32 defendants

21    in a single conspiracy to obtain loans under federal housing

22    administration program based upon fraudulent applications.  One

23    defendant, Brown, was the common and key figure in all the

24    transactions proven while various other defendants had obtained

10:24AM   25    loans through Brown.  Although the various defendants or spokes

1    were all connected to Brown, the hub, in many cases the other

2    defendants did not have any relationship with one another other

3    than Brown's connection with each transaction.

4              At trial the Government presented evidence of at

10:24AM    5    least eight separate conspiracies with Brown at the center of

6    each.  The trial court instructed the jury that they can

7    only -- that they could convict only if they found a single

8    overarching conspiracy between the defendants.

9              The Supreme Court reversed the defendants'

10:25AM    10    convictions holding that a single hub-and-spoke conspiracy had

11    not been established because there was no proof -- there was no

12    rim of the wheel to enclose the spokes.  The proof therefore

13    made out a case, not of a single conspiracy but of several,

14    notwithstanding only one was charged in the Indictment.

10:25AM    15              As the 11th Circuit summarized the holding of

16    *Kotteakos* in the *Chandler* case at 388 F.3d 796 where the spokes

17    of the conspiracy have no knowledge of or connection with any

18    other dealing independently with the hub conspirator, there is

19    not a single conspiracy but rather as many conspiracies as

10:25AM    20    there are spokes.

21              Defendants argue, like *Kotteakos*, the allegations

22    in the First Superseding Indictment do not support a single

23    scheme to defraud but rather multiple schemes to defraud and,

24    thus, Counts 2 through 17 must be dismissed based upon the

10:26AM    25    Government's recently announced position that the First

1    Superseding Indictment alleges a single scheme.

2         However, in ruling on the defendants'

3    supplemental Motion to Dismiss, the Court must decide the

4    sufficiency of the First Superseding Indictment based upon the

5    facts alleged within the four corners of the Indictment.

6         As the 9th Circuit held in *Jensen* at 93 F.3d 667,

7    a defendant may not properly challenge an Indictment sufficient

8    on its face on the grounds that the allegations are not

9    supported by adequate evidence.  A Motion to Dismiss an

10   Indictment cannot be used as a device for summary trial of the

11   evidence.

12        In this case, the First Superseding Indictment in

13   Counts 2 through 17 alleges the existence of a single scheme.

14   For example, paragraph 44 of the Indictment alleges that,

15   beginning on an unknown date but no later than February of 2013

16   and continuing to the present, the defendants, together with

17   others known and unknown to the grand jury, knowingly and with

18   the intent to defraud devised, participated, and executed a

19   scheme to defraud the City of Los Angeles and its citizens of

20   the right to the honest services of their public officials

21   through bribery, kickbacks, materially false and fraudulent

22   pretenses and representations and the concealment of material

23   information which violations affected at least one financial

24   institution.

25        Of course it is the Government's burden to prove

the existence of a single scheme at trial.  Indeed as the

Court is going to discuss in a moment, the Government will have

to prove there is an independence between the hub and the

spokes and that those who form the spokes such as Lee,

940 Hill, Shen Zhen were aware of each other, that their

benefits were probably dependent upon the success of the entire

operation, and that they shared not just the same goal but a

common goal.

In its omnibus opposition at page 28, the

Government represents that it will introduce direct evidence at

trial which will establish that the developer defendants and

other developers named in the Indictment knew about each other,

had a common goal to keep Defendant Huizar in power through

bribes.

In addition, the Government contends that direct

evidence will establish and the jury can draw the inference

that the consultants who moved with Defendant Huizar from spoke

to spoke informed their respective developer clients about such

common scheme.

Although the Court is obviously not aware of the

full extent of the Government's evidence, the Court has doubts

that the Government will be able to establish a single scheme

to defraud rather than separate schemes to defraud.  However,

as the district court in the *Weiner* case, W-e-i-n-e-r, at

2009 WL 1911286 stated, "*Kotteakos* and its prodigy made clear

1  that the existence of a single conspiracy or multiple

2  conspiracies hinges on factual issues that arise at trial."

3          Accordingly, as the district court concluded in

4  that case, I conclude that the defendants' supplemental Motion

10:29AM  5  to Dismiss Counts 2 through 17 based on *Kotteakos* is premature

6  because it necessarily involves the evaluation of evidence that

7  will be presented by the Government at trial.

8          As the district court in *Vargas* stated which was

9  quoted in *United States versus Barrett* at 824 F.Supp. 2d 419,

10:30AM  10  the question of whether one or more conspiracies existed is one

11  to be resolved at trial by a properly instructed jury.

12  Accordingly, the supplemental motion is denied.

13          The Court also notes that defendants were

14  prepared to defend this case based upon their collective belief

10:30AM  15  or understanding that the First Superseding Indictment alleged

16  separate schemes to defraud in Counts 2 through 17 and that

17  this supplemental Motion to Dismiss was only filed in response

18  to the Government's position and in its opposition to the

19  motion to sever that the First Superseding Indictment alleged a

10:30AM  20  single scheme.

21          It appears that this belief or understanding was

22  based upon the fact that Count 1 labeled each scheme separately

23  and that Counts 2 through 17 separated the counts by projects

24  and only charged the direct participants relating to each

10:31AM  25  product in the relevant counts.

1          The most important issue, however, is whether the

2     Government can prove a -- let me strike that -- whether the

3     Government can prove a single scheme to defraud or multiple

4     schemes, however, is also relevant to the motions to sever.

10:31AM   5     The defendants Lee and Shen Zhen seek severance under

6     Rule 14(a).

7          The Federal Rule of Criminal Procedure 8(b)

8     provides that the Indictment or Information may charge two or

9     more defendants if they are alleged to have participated in the

10:31AM   10    same act or transaction or in the same series of acts or

11    transactions constituting an offense or offenses.  The

12    defendants may be charged in one or more counts together or

13    separately.  All defendants need not be charged in each count.

14          As the Supreme Court stated in the *Zafiro* case,

10:32AM   15    Z-a-f-i-r-o, at 506 U.S. 534 -- and I quote -- "There is a

16    preference in the federal system for joint trials of defendants

17    who are indicted together.  Joint trials play a vital role in

18    the criminal justice system.  They promote efficiency and serve

19    the interests of justice by avoiding the scandal and inequity

10:32AM   20    of inconsistent verdicts."

21          However, when joinder is proper under Federal

22    Rule of Criminal Procedure 8(b), Rule 14 recognizes that

23    joinder may prejudice either a defendant or the Government.

24          The Supreme Court explained -- and I quote --

10:32AM   25    "When defendants properly have been joined under 8(b), the

1   district court should grant severance under 14 only if there is

2   a serious risk that a joint trial would compromise a specific

3   trial right of one of the defendants or prevent the jury from

4   making a reliable judgment about guilt or innocence.  Such a

5   risk might occur when evidence that the jury should not

6   consider against the defendant and that would not be admissible

7   if the defendant were tried alone is admitted against the

8   co-defendant.

9          "For example, evidence of a co-defendant's

10  wrongdoing in some circumstances erroneously would lead a jury

11  to conclude that a defendant was guilty.  When many defendants

12  are tried together in a complex case and they have markedly

13  different degrees of culpability, this risk of prejudice is

14  heightened.  The risk of prejudice will vary with the facts in

15  each case and district courts may find prejudice in situations

16  not discussed here.  When the risk of prejudice is high, a

17  district court is more likely to determine that separate trials

18  are necessary but less drastic measures such as limiting

19  instructions often will suffice to cure any risk of prejudice."

20  That's the end of the quote.

21          As the 9th Circuit stated in *Fernandez* at

22  388 F.3d 1199 -- and I quote -- "Inquiry into the prejudicial

23  effect of joint trial involves consideration of several factors

24  including whether the jury may reasonably be expected to

25  collate and appraise the individual evidence against each

1   defendant; the judge's diligence in instructing the jury in the

2   limited purpose for which certain evidence may be used; whether

3   the nature of the evidence and the legal concepts involved are

4   within the competence of the ordinary juror; and, four, whether

10:34AM  5   the defendants can show with some particularity a risk that a

6   joint trial would compromise a specific trial right of the

7   defendants or prevent a jury from making a reliable judgment

8   about guilt or innocence.  The first two factors are the most

9   important in this inquiry."

10:34AM  10          In this case, if the Government fails to prove a

11  single scheme to defraud with respect to Counts 2 through 17,

12  the Court is concerned that the risk of prejudice to 940 Hill

13  and Lee and Shen Zhen will be particularly high if they are

14  tried jointly with the defendants Huizar and Chan.  In that

10:35AM  15  event, one of the very risks of prejudice heightened by the

16  Supreme Court -- I'm sorry.  One of the very -- one of the very

17  risks of prejudice highlighted by the Supreme Court would be

18  present.  Specifically, a substantial amount of evidence would

19  be admitted against co-defendants Huizar and Chan but which

10:35AM  20  would be inadmissible against 940 Hill and Lee and Shen Zhen.

21          As the 9th Circuit held in the *Lothian*,

22  L-o-t-h-i-a-n, case at 976 F.2d 1257, because an essential

23  element of mail and wire fraud is a fraudulent scheme, mail and

24  wire fraud are treated like conspiracy in several respects.

10:36AM  25  Similar evidentiary rules apply.  Just as acts and statements

1  of co-conspirators are admissible against other

2  co-conspirators, so too are the statements and acts of

3  co-participants in a scheme to defraud admissible against other

4  participants.

10:36AM  5          Accordingly, pursuant to Federal Rule of Evidence

6  801(d)(2)(E) and the 9th Circuit's decision in *Lothian*, a

7  statement is not hearsay if it is offered against the opposing

8  party and it was made by the party's co-schemer during and in

9  furtherance of the conspiracy.  The Supreme Court in *Bourjaily*

10:36AM  10  at 483 U.S. 171 held that, before admitting evidence of a

11  co-conspirator's, or by analogy of co-schemer, statement, a

12  Court must be satisfied that the statement actually falls

13  within the definition of the rule.  The Government must

14  establish the prerequisites for admissibility under

10:37AM  15  801(d)(2)(E) by a preponderance of the evidence.

16          Thus, for example, in order for hearsay

17  statements regarding a scheme or a project other than 940 Hill

18  project to be admissible against 940 Hill and Lee, the

19  Government must establish by a preponderance of the evidence

10:37AM  20  that 940 Hill and Lee were members or participants in the

21  broader single scheme conspiracy.

22          Similarly, in order for hearsay statements

23  regarding a schemer project other than the L.A. Grand Hotel

24  project to be admissible against Shen Zhen, the Government must

10:37AM  25  establish by a preponderance of the evidence that Shen Zhen was

a member or participant in the broader single scheme to defraud.

If the Government cannot satisfy the Court by a preponderance of the evidence that such single scheme to defraud exists of which Lee, 940 Hill, and Shen Zhen were participants, those statements would only be admissible against the relevant participants in that particular scheme but would not be admissible against any co-defendants that were not participants in that particular scheme.

As the 9th Circuit stated in the case -- the last name is spelled B-i-b-b-e-r-o at 749 F.2d 581, in determining whether 940 Hill and Lee and Shen Zhen were participants in a single scheme to defraud, the Court considers such factors as the nature of the scheme, the identity of the participants, the quality, frequency, and duration of each participant's transactions and the commonalty of the time and goals.

In addition, as the 9th Circuit stated in the *Singh,* S-i-n-g-h, case at 979 F.3d 697, to determine whether a single conspiracy or multiple conspiracies have been proven, the 9th Circuit employs the following test: A single conspiracy can only be demonstrated by proof that an overall agreement existed among the conspirators.  Furthermore, the evidence must show that each defendant knew or had reason to know that his benefits were probably dependent upon the success of the entire operation.

Typically the influence of an overall agreement is drawn from proof of a single objective or from proof that the key participants and the method of operation remained constant throughout the conspiracy.  The inference the defendant had reason to believe that his benefits were dependent upon the success of the entire venture may be drawn from proof that the conspirators knew of each other's participation or actually benefited from the activities of his co-conspirators.

In other words, as the 11th Circuit stated in the *Chandler* case at 388 F.3d 796 quoting the *Levine* case at 546 F.2d 658, for a wheel conspiracy to exist, those people who formed the wheel's spokes must have been aware and must do something in furtherance of some single illegal enterprise.  If not, there is no rim to enclose the spokes.  A single conspiracy is not established in absence of any evidence that a common goal overlapping membership among various spokes of the conspiracy or interdependence of the spokes.  Indeed, in order for a single conspiracy or scheme to exist, the co-conspirators or co-schemers must not only share the same goal but must share a common goal.

Although the Government cites some evidence in its omnibus opposition at pages 27 and 28 in support of a potential single scheme, the Court tentatively concludes that such evidence does not support a finding that 940 Hill, Lee,

1   and Shen Zhen were participants in the alleged single scheme by

2   a preponderance of the evidence.

3           For example, the evidence does not appear to

4   demonstrate that the spokes were interdependent or that the

10:41AM  5   developers share a common goal or that the developers relate to

6   one particular project benefited from the activities of the

7   other developers relating to other projects.  Unless the

8   Government can establish by a preponderance of the evidence

9   that 940 Hill, Lee, and Shen Zhen were members of a single

10:41AM  10  scheme, the statements and acts of the co-defendants with

11  respect to the schemes unrelated to their particular projects

12  would not be admissible against them.

13          If the Government is unable to satisfy the Court

14  that 940 Hill, Lee, and Shen Zhen were participants in a single

10:41AM  15  scheme, the Court will have to determine whether severance is

16  appropriate.  Much of the evidence regarding the projects other

17  than the 940 Hill project will be inadmissible against 940 Hill

18  and Lee, and much of the evidence regarding the projects other

19  than L.A. Grand Hotel will be admiss -- would be inadmissible

10:42AM  20  against Shen Zhen.

21          Although the Court recognizes that there is a

22  preference for a joint trial in federal court, it appears that

23  there may be a serious risk that a joint trial would compromise

24  a specific trial right of one of the defendants in this case or

10:42AM  25  would prevent the jury from making a reliable judgment about

1   guilt or innocence.

2              As the Supreme Court stated, evidence of

3   co-defendant's wrongdoing could erroneously lead a jury to

4   conclude that another defendant was guilty and as here, when

5   many defendants are tried together in a complex case and they

6   have markedly different degrees of culpability, the risk of

7   prejudice is heightened.

8              The risk of prejudice is particularly high as to

9   940 Hill and Lee because the testimony and evidence that

10  relates to those defendants is relatively straightforward.  It

11  mainly includes the testimony of two cooperating witnesses,

12  Mr. Kim and Mr. Esparza, relatively limited number of

13  documents, two after the fact conversations recorded by Mr. Kim

14  with -- recordings with Mr. Kim and Mr. Lee, and the testimony

15  of witnesses involved in the attempted development of 940 Hill.

16             The Court is concerned that the limiting

17  instructions in a joint trial may not be a realistic option as

18  counsel would be continuously requesting the Court to instruct

19  the jury not to consider the majority of the Government's

20  evidence.  The Court is also concerned as to whether or not it

21  is reasonable to expect the jury to be able to compart -- I'm

22  not going to be able to say that word -- to view the evidence

23  in this case because of the complexity of the trial and the

24  counts.  There may be a real danger that the jury will infer

25  that, because other developers paid Huizar bribes to benefit

their projects, that Shen Zhen, 940 Hill, and Mr. Lee also paid
Huizar bribes to benefit their respective projects.

As the 11th Circuit stated in *Blankenship* at
382 F.3d 1110, there is an exception of joinder when the sheer
number of defendants and charges with different standards of
proof and culpability along with the massive volume of evidence
may make it nearly impossible for a jury to juggle everything
properly and assess guilt or innocence of each defendant
independently.  Although there are only six defendants charged
in this case, there are many unindicted co-schemers.  And in
light of the complexity of the 41-count First Superseding
Indictment, the Court is concerned that the jury will not be
able to assess the guilt or innocence of each defendant
independently.

We went a long time this morning.  I am concerned
about this issue, Mr. Jenkins.  And I will hear from you
briefly.  But what I'm intending to do this morning is to -- in
order to preliminarily determine whether the Government will be
able to establish by a preponderance of the evidence the
existence of a single scheme in order to better assess the
potential prejudice imposed by a joint trial, I'm going to
order the Government to file an offer of proof regarding the
existence of a single scheme.  And in that offer of proof, the
Government is ordered to set forth all of the evidence it
intends to offer to establish that 940 Hill, Lee, and Shen Zhen

1    were participants in the alleged single scheme.

2              So I will hear from you, Mr. Jenkins, if you wish

3    to be heard.

4              MR. JENKINS:  Your Honor, AUSA Dragalin actually

5    is responsible for this portion.  So she will be heard briefly.

6              THE COURT:  That's fine.  Wave your hand so I can

7    see where you are.  There you are.  Okay.

8              MS. DRAGALIN:  Good morning, Your Honor.  Thank

9    you.

10             I think in this case, as the Court knows, this

11   really becomes an evidentiary issue with respect to trial.

12   Unlike in cases where we have one large conspiracy in which

13   defendants have been charged but there is a risk that they're

14   actually going to be found guilty of this larger conspiracy as

15   opposed to smaller sub-conspiracies, here, there is no such

16   danger that a jury would find these defendants guilty of some

17   giant, massive conspiracy that they're not charged in because

18   of the way the counts are laid out.

19             So although the Government alleges one single

20   scheme to defraud the citizens of Los Angeles of their right to

21   honest services, the counts that the jury is going to be asked

22   to give finding on each only pertain to a set number of

23   combined defendants.

24             And so there is no danger, unlike in a conspiracy

25   case where the jury can ultimately find the defendants guilty

of that massive conspiracy, here each -- the jury will have to

make a decision with respect to each defendant on each count.

But from the evidence side of things, we do

believe that the Indictment alleges one scheme that operated in

10:48AM   the same manner.  It was the same pattern.  It involved

overlapping participants.  And it is not just Jose Huizar alone

who is one of -- the single common hub to all of the spokes.

We have multiple people touching different sub-agreements or

projects.  So, for example, David Lee, his only connection to

10:48AM   the whole conspiracy is not just Jose Huizar.  It includes

co-schemers George Esparza and Justin Kim.

THE COURT:  Yeah.  But let me interrupt you there

because we're -- I have to give the court reporter a break at

some point in time.

10:48AM   My problem is that -- and the sense that I had in

all of the briefing, the Government is very careful when it --

on this issue to limit your discussion of the evidence -- for

example, for Mr. Lee and 940 Hill, you are very careful in

limiting the evidence that you attribute or that you're going

10:49AM   to put on at trial with respect to Hill and Lee in a very

limited -- very limited in terms of the conversations I

referred to before.

You never tried to tie the other projects to

940 Hill or to Mr. Lee.  And that's what I'm missing because it

10:49AM   appeared to me this was a carefully constructed argument or

1    carefully constructed pleadings, and I'm just uncomfortable

2    with the state of the record now because I have to make a

3    determination earlier than later with respect to whether or not

4    a severance is going to be appropriate in this case.

10:50AM   5          So that's why I think an offer of proof at this

6    point in time is going to be appropriate because you and I can

7    sit here all day and you can tell me what all the evidence is

8    but I can -- obviously now I have a very good understanding of

9    at least what you are alleging in the Indictment.  But until I

10:50AM   10   start seeing the evidence against -- that you're going to put

11   on or that you intend to put on, I have to make a determination

12   by a preponderance of the evidence as to the existence of a

13   single scheme which is going to drive the admissibility of the

14   hearsay statements.  It seems to me we've got to do that

10:51AM   15   earlier than later.

16          MS. DRAGALIN:  Yes.  And on that point,

17   Your Honor, I think what might be helpful to think about it

18   this way is even in -- let's say we had a severed trial just

19   David Lee and 940 Hill.  At that trial we would not -- the

10:51AM   20   Government would not be limited to putting on solely evidence

21   about 940 Hill and David Lee's corrupt state of mind.  It would

22   become -- it would be relevant to also show Jose Huizar's

23   corrupt intent and state of mind because what the Government

24   has alleged is a quid pro quo that had a meeting of the minds.

10:51AM   25          So in other words, the jury is going to be asked

1    to believe George Esparza and Justin Kim when they say that

2    Jose Huizar made a corrupt demand for a bribe.  Normally a jury

3    would be shocked to hear that something like that would have

4    happened.  So it is relevant that Jose Huizar had done those

10:52AM    5    types of demands in the past to other people because that makes

6    it more likely that he actually did demand cash in this case.

7              So the wrongdoing of the co-schemers here is

8    relevant to the culpability of the defendant that's on trial.

9    So this distinguishes this particular case from the ones that

10:52AM    10    defendants rely on where what we are talking about is murder by

11    one -- by some defendants and something like witness tampering

12    or false statements by a separate defendant.

13              We're not talking about acts by a co-schemer Jose

14    Huizar that are beyond the types of charged conduct.  It's the

10:52AM    15    same scheme is what our position is which is he did the same

16    type of thing over and over with multiple people.  There's

17    nothing inflammatory or gruesome about this other evidence.

18    It's, in fact, evidence of his corrupt state of mind which is

19    relevant to determining whether the witnesses at trial are

10:53AM    20    telling the truth about the fact this was indeed a bribe and

21    not just an innocent business transaction.

22              THE COURT:  All right.  Mr. Neuman?

23              MR. NEUMAN:  Thank you, Your Honor.

24              It seems to me what Ms. Dragalin has just

10:53AM    25    identified is really an evidentiary issue in a separate trial,

1    whether evidence of Mr. Huizar's alleged corrupt intent is

2    admissible against our client and is relevant against our

3    client.  We can talk about that.  But that -- what she's

4    talking about really focused on the 940 Hill project.

10:53AM    5         The problem here is that, when we look at this

6    supposed single scheme -- and I hear the Court's concerns.  I

7    think the Court's concerns are exactly on point.  We are

8    talking about potentially eight years where our client was

9    supposedly involved for about three months, talking about

10:54AM   10   trips -- 18 trips to Vegas, lawsuits regarding sexual

11   harassment, real estate reports, school applications.

12         I mean, I went through it last night again and

13   reread this Indictment.  I hadn't done that in a while.  And

14   it's striking how much prejudicial spillover evidence is in

10:54AM   15   there and will directly impact our client's ability to get a

16   fair determination of the guilt or innocence and of the

17   entity's guilt or innocence.

18         This is a case where our client wasn't even

19   alleged to be involved for a lot of the time that the supposed

10:54AM   20   single scheme was going on.  2013 to arguably late 2016 or

21   early 2017 our client wasn't even involved in this.  There is

22   no mention of it.  The Government is relying -- I would agree

23   with the Court -- on really unsupported allegations that he

24   knew anything about any of these other schemes, that he had any

10:54AM   25   common goal with anybody else.  His goal, if you believe the

1    Government's allegations, was to get his project approved, and

2    that's it.

3         I don't see how the Court's concerns, which are

4    our concerns and the same concerns that have been addressed

10:55AM   5    numerous times in other cases, in a complex case like this

6    where there's going to be weeks and weeks if not months of

7    evidence presented that have nothing to do with him, the jury

8    is going to have an incredibly difficult time separating out.

9         And the Government says -- on the one hand it

10:55AM   10    says, well, you're going to be able to -- the jury is going to

11    be able to separate them out.  They're going to be able to say

12    he's only charged with 940 Hill.  We only need to make a

13    determination based on 940 Hill.  But in the next sentence they

14    say, but evidence of what Huizar did on all these other

10:55AM   15    projects is directly relevant and is going to impact the jury

16    and should impact the jury's determination as to what Mr. Lee

17    intended and knew.  I think that is an important distinction

18    here.

19         What the Government seems to gloss over is the

10:56AM   20    key facts for us are what Mr. Lee knew and intended, not what

21    Mr. Huizar knew and intended.  It may be relevant.  That's what

22    I'm saying.  It is an evidentiary issue.  We can talk about

23    whether what Mr. Huizar knew and intended as to 940 Hill is

24    relevant.  But what he intended as to any of these other

10:56AM   25    projects had nothing to do with what Mr. Lee knew or intended

1    during the operative time.

2         So I just don't see the Government's argument as

3    persuasive.  I think the Court's analysis is on point.  I think

4    the Court's suggestion is a good way to move forward at this

10:56AM    5    point.  We will be able to respond in full to the evidentiary

6    proffer and deal with it that way.

7         THE COURT:  How long will the Government need for

8    a proffer?

9         MS. DRAGALIN:  Your Honor, if I understand that

10:56AM    10    correctly, it is essentially asking the Government to summarize

11    all of its trial evidence.  And it is something we are working

12    towards obviously in terms of preparing for trial, but I do

13    think it would take a significant amount of time to be able to

14    summarize all of the evidence.  So I would imagine it would

10:57AM    15    take at least 60 days to be realistic.

16         THE COURT:  Well, I was going to say three weeks.

17    You know what your evidence is.  That was one of the problems I

18    had with the briefing is that you're very careful in terms of

19    describing the evidence that was going to prove the charges

10:57AM    20    with respect to, for example, 940 Hill and Mr. Lee.  But that

21    description did not include the evidence related to the other

22    projects.  I don't know if that was by design or why, but

23    that's why I think it's important that we resolve this issue.

24         So today is January 7th.  So I would think you

10:58AM    25    would be able to have such an offer of proof done by

1    January 28th.

2              MS. DRAGALIN:  Your Honor, just one additional

3    point to respond to what Mr. Neuman said in terms of the issue

4    of -- it is an issue about -- it is an evidentiary issue.  But

5    the point is, if Jose Huizar --

6              THE COURT:  I don't disagree it is an evidentiary

7    issue, but it is also an issue which I think that, as long as

8    I'm going to have to -- you are going to have to convince me by

9    a preponderance of the evidence that there is a single scheme

10   in order to address the evidentiary issue, it is also going to

11   give me a better understanding of the nature and extent of the

12   evidence with respect to specifically Shen Zhen and Hill and

13   Lee so I can then make a proper ruling on the motion to sever

14   because right now I don't find the record to be sufficient to

15   make the motion -- the ruling on the motion to sever.  I'm

16   going to defer that until I see what is in the offer of proof.

17             MS. DRAGALIN:  And, Your Honor --

18             THE COURT:  But for the reasons that I just

19   articulated.

20             MS. DRAGALIN:  And one point of clarification.  I

21   do think that, even if -- as we set forth in the papers and as

22   the law says, even if there is not a single scheme, the remedy

23   here that the Supreme Court talks about is not severance.  Here

24   limiting instructions and bifurcating or putting on the trial

25   in a manner that keeps the evidence separated would be the

 1    proper remedy.  So is that something that should be addressed

 2    in the Government's proffer?

 3                THE COURT:  I will give you a further opportunity

 4    to address any -- if after reviewing -- and I'm going to order

 5    the Government to file the offer of proof by January 28th, and

 6    the defendant is going to respond by February 14th.  And if I

 7    decide based upon what I see in those pleadings that I'm

 8    inclined to grant the motion to sever, I will let counsel know,

 9    and I will ask for some supplemental briefing which will be

10    directed toward the issues that have arisen based upon my

11    review of the offer of proof.

12                I understand the limiting instructions.  I

13    understand co-defendants.  I very early in my career had an

14    opportunity to try a -- it was an 80-defendant gang case, and

15    we ended up trying 15 defendants.  But in those cases, the

16    single scheme is a lot easier to see because in the -- in those

17    cases, everybody has a common goal of either selling drugs or

18    beating up other gang members.  In this case, they're much more

19    sophisticated issues.

20                I certainly recognize the cases suggest they can

21    be cured by limiting instructions, but that is always the

22    prosecutor's fallback position.  I'm not sure that limiting

23    instructions -- obviously they're helpful, but I'm not sure how

24    much attention in a case like this that the jury is going to

25    pay.  More importantly, they're going to be able to compart --

1    I still can't say that word.

2              Mr. Steingard, what is the word I'm looking for?

3              MR. STEINGARD:  Compartmentalize, Your Honor.

4              THE COURT:  Yes.  For some reason I'm

11:02AM    5    tongue-tied.

6              In any event, I'm not sure the jury can do that

7    given what I understand the evidence that the Government

8    intends to put on in this case.

9              In any event, I think this will give us -- will

11:02AM   10    move the ball forward so I can have a better understanding and

11    I can more appropriately rule on the severance motion.

12             All right.  That's all I have for today except I

13    have a couple questions on the timeline.

14             Has the Government disclosed -- I believe my

11:02AM   15    notes indicate the Government's experts were due to be

16    disclosed on December 15th.

17             MS. DRAGALIN:  Yes, Your Honor.  We sent an

18    expert disclosure letter on December 15th.  We have received

19    some follow-up questions from the defense on that to which we

11:03AM   20    will respond.  We are already having those conversations.

21             THE COURT:  How many experts?

22             MS. DRAGALIN:  I believe it was four categories

23    and we -- the Government's position is that not all of them are

24    actually experts.  We are, in an abundance of caution, giving

11:03AM   25    notice.  For example, on something like the City process and

how developmental approval process works in the City, we
designated a particular person who we think would be the
competent witness to walk the jury through that.  But it is not
really expert testimony per se.  It just so happens that that

11:03AM   person is not a percipient witness to other issues.

THE COURT:  I'm more concerned with the number of
expert/nonexperts that you disclosed.  What's the number?

MS. DRAGALIN:  Just one second, Your Honor.  I
can pull it up.

11:03AM   We also anticipate we will have stipulations or
agreements on various things so we don't need experts in court.
For example, the CART technician that generate an extraction
report, we hope to be able to agree with the defense that he
knows which expert needs to actually be put on.  So at the end

11:04AM   of the day in terms of the number of experts we expect would
actually testify at a trial would be somewhere between three
and five.

THE COURT:  What is your estimate today in terms
of how long this trial is going to take?

11:04AM   MS. DRAGALIN:  I believe a joint trial for all
defendants our estimate is still about what it was originally
which I think it was between 25 and 30 court days.

THE COURT:  The motions to the -- the replies to
the motions to suppress, I granted the extension of time.

11:05AM   Those are due on the 15th now?

```
 1                    MS. ALE:  That's correct, Your Honor.

 2                    THE COURT:  We have a hearing on the 31st.

 3                    MS. ALE:  Yes, Your Honor.

 4                    MS. DRAGALIN:  That's correct.

 5                    THE COURT:  In connection with the replies, do

 6          you anticipate any under-seal filings in connection with the

 7          reply briefs?

 8                    MS. ALE:  No, Your Honor.

 9                    THE COURT:  Okay.  Good because the -- I have

10          spent an enormous amount of time trying to figure out what has

11          been filed under seal in terms of what -- how they connect to

12          which motions.  So I just want to make sure that, if there are

13          going to be any additional under-seal filings, that you comply

14          with the Court's prior orders.

15                    Let me ask a general question.  When the defense

16          files an under-seal filing or requests the filing under seal

17          and it ultimately goes to Shannon, Shannon would approve it,

18          and it's then filed under seal, and then the docketing clerks

19          docket it.  Is it correct that the attorneys who are parties to

20          the case cannot view the under-seal filing?

21                    MS. DRAGALIN:  That is correct, Your Honor.

22                    THE COURT:  Then how do you cite to an under-seal

23          filing in the -- in any pleadings?

24                    MS. DRAGALIN:  We get service copies of the

25          under-seal filings.  So that is what we are relying on is our
```

service copy that we have.  And then we know the docket

number just by the docket text, but we cannot get a copy of the

actual under-seal document from the docket.

THE COURT:  Okay.  So my concern is and why I --

the issue that we have on these under-seal filings and why I

asked for the table of contents is because the docketing clerks

don't meaningfully docket or describe the under-seal filings.

So that's why the table of contents is so important so we

have -- in a case of 50 exhibits that are filed under seal, I

have a table of contents so that -- what I typically do is

print off that table of contents so that, when I'm reading the

brief and there is a citation to a particular exhibit, I can

then, if I don't have the courtesy copy which is also very

important but I can then at least -- on the docket I can click

on that particular exhibit without having to go through all of

the 50 exhibits to try to figure out which exhibit it is.

So those table of contents are especially

important -- they're important in all pleadings but especially

important in the under-seal filings so that we can have a

clear -- I can have a clear record especially working as we

have unfortunately in the past two years remotely and not

having to lug boxes of things home with me.  I can easily find

those exhibits.

That is what I was trying to accomplish with the

recent e-mails and striking -- or text entries and striking of

1    these under-seal documents.

2              The same is important for courtesy copies to make

3    sure that the courtesy copies are complete in and of

4    themselves.  And I had problems with several of the courtesy

11:09AM    5    copies because they just were not -- just put yourself in my

6    position of trying to read all this -- all these materials

7    and -- when you put together the courtesy copies and the

8    filings, and you will maybe have a new appreciation of how to

9    do it.

11:09AM   10              All right.  Anything else?

11              MS. DRAGALIN:  Nothing else from the Government,

12    Your Honor.

13              THE COURT:  Anything else from the defense?

14    Hearing nothing, thank you very much.

11:10AM   15              This is obviously not my preferred method of

16    conducting hearings.  I have always tried to conduct in-person

17    hearings, especially in this case.  But given the recent

18    outbreak, and also the courthouse has just been devastated with

19    the number of employees.  We're down to basically unfortunately

11:10AM   20    a very limited staff.  I don't know what the future holds, but

21    I'm going to try to hold the motion to suppress hearing on

22    January 31st in person.  If we continue along the same way that

23    we're going now, I just don't -- unfortunately I may have to go

24    back to video.  By then Mr. Steingard will be the expert in how

11:10AM   25    to participate by video.

1        MR. STEINGARD:  That is correct.  I have learned

2    how to use the mute button on my phone.  So I can learn to use

3    the computer sooner or later.

4        THE COURT:  What I suggest you do is find some

11:11AM  5    tech who -- that's what I rely on because I'm -- I think I'm of

6    your same skill level in terms of technology.  Fortunately I

7    have Shannon who needs a special note of recognition setting

8    all this up today because it was very time-consuming and very

9    technical.

11:11AM  10       And, Mr. Neuman, I also appreciate your client

11    waiving his appearance because that would have meant that we

12    would have had to have two Korean interpreters.  Given the

13    nature of the materials today, it would have taken quite a bit

14    longer.  So I appreciate that.

11:11AM  15       MR. NEUMAN:  On that point, Your Honor, I expect,

16    given that the suppression motions don't involve us, our waiver

17    can stand as needed for that hearing as well; correct?

18       THE COURT:  Okay.

19       MR. NEUMAN:  Thank you.

11:12AM  20       THE COURT:  I want to wish everybody a happy new

21    year, and hopefully at some point in time in 2022 we will get

22    back to -- hopefully get back to normal because I'm sure all of

23    you folks are as frustrated and tired of trying to do our

24    respective jobs under these conditions.  It's just been awful.

11:12AM  25    All right.

1           Hearing nothing else, we will then close the

2    record.

3           MR. SNYDER:  Thank you, Your Honor.

4           MS. ALE:  Thank you, Your Honor.

11:12AM   5           (Proceedings concluded at 11:12 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5         I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6 COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7 THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8 PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9 FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10 STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11 ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12 CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13 THE UNITED STATES.

14

15             DATED THIS  20TH  DAY OF JANUARY, 2022.

16

17

18             /S/ MIRANDA ALGORRI

19             MIRANDA ALGORRI, CSR NO. 12743, CRR
             FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25