CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
CAREL ALE (Bar No. 283717)
Email: Carel_Ale@fd.org
CHARLES J. SNYDER (Bar No. 287246)
Email: Charles_Snyder@fd.org
ADAM OLIN (Bar No. 298380)
Email: Adam_Olin@fd.org
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
Jose Huizar

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSE HUIZAR,<br><br>Defendant. | Case No. CR-20-326-JFW<br><br>**EX PARTE APPLICATION FOR ORDER ISSUING EARLY-RETURN SUBPOENA DUECES TECUM** |

Jose Huizar, through counsel, applies for an order issuing an early-return subpoena for documents and an audio recording possessed by Steve Meister, Morrie Goldman's counsel.

Respectfully submitted,
CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: February 1, 2022     By  /s/ *Charles J. Snyder*
CHARLES J. SNYDER
Attorneys for Jose Huizar

**TABLE OF EXHIBITS**

| Ex. 1 | FD-302 from Morrie Goldman Interview dated December 5, 2018 | 2:4-3:28 |

| | |
|---|---|
| 1 | **MEMORANDUM OF POINTS AND AUTHORITIES** |
| 2 | This application seeks an early-return subpoena for an audio recording and |
| 3 | documents. Rule 17(c) provides that a subpoena issued pursuant to Rule 17(b) can |
| 4 | command not only the appearance of a witness, but also the production of documents |
| 5 | and objects. See Fed. R. Crim. P. 17(c). Rule 17(c) further authorizes the Court to |
| 6 | order pretrial production. By this application, Jose Huizar requests that his subpoena |
| 7 | be issued with early return so that he may timely develop his defense, reciprocally |
| 8 | produce items that he intends to seek to admit, and streamline a trial that he expects to |
| 9 | be complicated and involve large volumes of evidence. The attached declaration |
| 10 | provides further justification for the requested subpoena. |

Respectfully submitted,
CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: February 1, 2022      By  /s/ *Charles J. Snyder*
                                                  CHARLES J. SNYDER
                                                  Attorneys for Jose Huizar

1

**DECLARATION OF CHARLES J. SNYDER**

I, Charles J. Snyder, declare as follows:

1. I am a California-licensed DFPD and one of the lawyers appointed to represent Jose Huizar in this matter. I make this declaration based on personal knowledge, the filings in this case, discovery produced by the government, and information available online and through public sources.

**The alleged bribe involving Company M is supported by the testimony of a single cooperator, Morrie Goldman, who reversed his factual account in exchange for leniency. Everyone else supposedly involved in the bribe denies that it occurred and no documents memorialize a quid pro quo.**

2. The FSI alleges that Jose Huizar solicited political contributions from Executive M in exchange for agreeing to take favorable action on Company M's Arts District project. FSI at 63:21-77:15. It's an unambiguous charge, requiring proof of a "clear and unambiguous" bribe, United States v. Carpenter, 961 F.2d 824, 827 (9th Cir. 1992), for which there exists little direct proof. Among other things:

    a. the supposed bribee, Huizar, categorically denies it;

    b. the supposed briber, Executive M, categorically denied it in multiple meetings with the government and in surreptitiously-recorded stings;

    c. every other Company M executive or employee involved in Project M categorically denied knowledge of a bribe;

    d. Company M signed a NPA with no admission of criminal liability;

    e. the government declined to prosecute any Company M executive or employee with bribery, § 1001, or obstruction; and

    f. there are no documents or recordings memorializing a quid pro quo.

3. Indeed, the only direct evidence that the government has of the alleged quid pro quo is the anticipated testimony of Morrie Goldman. Yet, to paraphrase former Presidential candidate John Kerry, even Goldman was against the bribery theory before he was for it.

///

1

**During Goldman's first voluntary proffer in December 2018, which his lawyer recorded, Goldman categorically denied that Huizar engaged in the crimes charged in the FSI, including bribery involving Company M.**

4.     On December 5, 2018, roughly a month after the FBI raided Huizar's home and office, Goldman and his lawyer sat for a multi-hour interview with the government. According to the 302 from that interview, which is attached as Exhibit 1, Goldman consistently rejected any suggestion that Huizar had engaged in bribery, including with Company M. Among other things, he said that:

  a.    "People contributed so they could get into a room with Huizar and could explain their project directly to Huizar."[1]

  b.    "Huizar knew that Goldman had clients with projects in the district, and Goldman knew that it was about building relationships with offices, with no expectations of the elected officials. Every office did business that way."

  c.    "[T]here were no ramifications for not contributing when Huizar or Esparza asked for something."

  d.    "[He] did not think there was anything wrong with a company whose project was in front of PLUM donating to a PAC created by Huizar, because it was about access, not about getting something specific in return. What would cross the line was if Huizar said the only way that a consultant's client would get Huizar's vote was if the client contributed to Huizar's PAC or donate to Monica Garcia for school board. Huizar did not do that."

  e.    "Huizar never said that the only way he would schedule a project on PLUM would be if that project donated."

  f.    "Huizar and Goldman had dinner with [Company M]. Huizar sent a text message to Goldman, asking what the meeting was about. Goldman texted Huizar that [Executive M] wanted to talk about the [Arts District] project. Specifically,

---

[1] Donating to gain access and influence is not only not criminal, it is protected by the First Amendment. McCutcheon v. Fed. Election Comm'n, 572 U.S. 185, 192 (2014); Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 360 (2010); see also McCormick v. United States, 500 U.S. 257, 272 (1991).

2

[Executive M] wished to discuss the height and affordability levels. Goldman worked with [Executive M] for years. Huizar sent a text message asking Goldman if [Company M] was going to support the PAC. Goldman replied to Huizar and asked if they could discuss the support for the PAC in a different thread. Goldman was uncomfortable with the conversation. To Goldman, it was not a quid pro quo situation, because it was a project that Huizar was going to support anyway, and [Company M] would have supported any cause of Huizar's."[2]

    g.   "When specifically asked whether he was aware of criminal conduct by Huizar or anyone else or anything that violated ethics rules or made Goldman uncomfortable, Goldman stated that he heard a rumor that [a downtown developer other than Wei Huang] had paid the Godoy settlement for Huizar. Goldman did not know of any other situations that were 'close to the line.'"[3]

    5.   Unbeknownst to the government, Goldman's lawyer, Steve Meister, was recording the interview, including Goldman's repeated denials of the crimes charged in the FSI (the "Meister recording"). At some point during the proffer, the government became aware that Meister was recording. At that point, according to the 302, he agreed to stop and provide a copy of the recording to the government. Although the 302 states that the recording was "entered into evidence," the government later told the defense that it had never actually received the recording.

---

[2] At the time of this text message conversation, Goldman had organized and was helping to coordinate the operations of PAC A. The defense has learned that, wise or not, it is not uncommon in Los Angeles for lobbyists or consultants to lawfully establish or assist campaign committees, including political-action and independent-expenditure committees, that have a close relationship to elected officials, candidates for office, or issues that are seen as important to elected officials or candidates for office. Because Goldman was both involved with the PAC and lobbying on behalf of developers in Huizar's district, Huizar and Goldman would discuss both issues. This portion of the 302 refers to one text message exchange over the course of multiple years where the issue of a development meeting with Company M and contributions by Company M came up in the same text thread, rather than in separate conversations.

[3] It is indisputable that this rumor was false. When pressed further about "whether there was anything that violated ethics rules or made Goldman uncomfortable," Goldman, upon government prodding, eventually identified an event involving another councilmember in a different district, but nothing involving Huizar.

3

**Roughly a month after Goldman's first interview, following communications with the government, Goldman sat for a second interview, contradicted his earlier statements, and claimed that Huizar took a bribe from Company M. After further meetings with the government, Goldman signed a detailed, government-drafted factual basis diametrically opposed to his initial proffer as part of a cooperation plea deal.**

6.  In mid-January 2019, roughly a month after his initial proffer, Goldman sat for a second interview with the government. During that interview, Goldman reversed course from his earlier statements and claimed that Huizar explicitly agreed to approve Company M's project in exchange for contributions to PAC A.

7.  According to the 302 from that interview, Goldman stated that he "had a 'change in tone' from his first interview because looking back [he] originally viewed and recalled situations through his 'own prism' and presented information as he perceived it to be, but not from a bigger perspective. Goldman's attorney advised [him] to conduct a more critical analysis from a bigger picture and from the FBI's view point." Goldman further stated that, "viewing the situations from that perspective, [he] understood things to be differently than originally perceived. Goldman did not want to minimize his role, but wanted it understood that he simply viewed the situation differently." Unlike the first interview, where Goldman rebuffed the government's narrative, there is no recording of the second interview, just as there are no recordings of any later meetings with the government during which Goldman's story was further refined.

8.  In August 2020, Goldman signed a cooperation agreement that included a 21-page government-drafted factual basis. Although, by the logic of his own statements, Goldman lied during his initial interview, the plea agreement did not require him to plead guilty to § 1001 or obstruction, which would have undermined his reliability as a trial witness, or substantive bribery, which carries a 20-year maximum term. Instead, the agreement required Goldman to plead guilty to a single count of § 371 conspiracy, which carries a five-year maximum sentence. The plea agreement further prohibited the government from prosecuting Goldman for anything disclosed

during his interviews so long as, among other things, he testified consistently with the government-drafted factual basis. See United States v. Goldman; CR-20-369-JFW, Docket No. 9 ¶¶ 6, 2.b.

9. I am aware from practicing in this district that prosecutors and agents commonly communicate with counsel for witnesses, subjects, and targets – and especially cooperators – before and after interviews and proffers. During those communications, prosecutors and agents may indicate what information they are seeking, what they believe the facts to be, whether they believe that statements made during an earlier interview were fulsome or accurate, and the consequences of failing to cooperate or adhering to certain facts. Given the tremendous power prosecutors wield over witnesses, subjects, targets, and defendants, these communications can, consciously or not, influence witness testimony, especially in the case of cooperators.

10. I am further aware that the prosecutors and agents in this case have engaged in this practice. See, e.g., Docket No. 282-1, Declaration of Vicki Podberesky ¶¶ 8-14. I have requested, but not received, documents reflecting all communications between Meister and/or Goldman and the prosecution team, which would shed light on how the Meister recording was handled, as well as other factors or messages that may have influenced Goldman's dramatically-shifting narrative.

**After initially agreeing to produce the Meister recording, the government failed to do so and claimed not to possess it.**

11. In January 2021, I asked the government to produce the Meister recording, and the government initially agreed. The government stated that it needed additional time, however, because Meister had produced the recording (via filesharing link) with attorney-client conversations and asked the government to redact them, a task which the government was in the process of completing. Upon learning this, I expressed my position that, by knowingly and voluntarily producing the privileged portions of the recording, the privilege had been waived, so the government should just produce the entire thing.

5

12. After I communicated that position, I had a phone call with the government. During the call, the government said that, upon receiving my email about privilege, it had deleted the filesharing link containing the recording so as not to be exposed to privileged material, and that the link was now "dead." I stated that that fact didn't change my position because, regardless of whether the government had reviewed the file, Meister had still intentionally produced the purportedly-privileged portions to the government and thereby waived privilege. Following further disagreement, we eventually decided that the government would have Meister re-produce a copy of the recording without the disputed portions – which the government could demand under the terms of the cooperation plea agreement, see Case No. CR-20-369-JFW, Docket No. 9 ¶ 3 – and that the privilege issue could be addressed later.

13. Immediately after the call, the government sent an email stating that, contrary to its earlier statements, it had never received a filesharing link in the first place. I responded that the government had now told me three different things – that it was in the process of redacting the recording, that the link containing the recording had been received but was now "dead," and that it had never received a link at all – and that the statements changed every time I responded with a legal position that would result in a waiver. Nonetheless, I asked that the government honor the agreement that we just struck and send me the version of the recording that it believed was proper, stating that we could take up the privilege issue at a later time.

14. Immediately after sending my final email to the government, I sent Meister a preservation letter asking him to preserve the recording and all of his communications with the government. Meister acknowledged the preservation letter.

15. The government has not produced any version of the Meister recording. To my knowledge, Meister is currently the only person with a copy of the recording.

**The requested subpoena.**

16. I am requesting an early-return subpoena for the Meister recording, as well as all documents reflecting communications from any member of the prosecution team

6

to Meister and/or Goldman, and from Meister and/or Goldman to any member of the prosecution team, including emails, text messages, voicemails, and nonprivileged notes from conversations.  This is core exculpatory material because, as discussed above, all of Company M's employees and executives deny the existence of a bribe; Company M denies criminal wrongdoing; Huizar denies the existence of a bribe; there is no documentation of an explicit quid pro quo; and the only witness who will say that a bribe occurred is Goldman, who said the exact opposite on the Meister recording before completely reversing his story under government pressure.

17.　I am not seeking in camera treatment for this application or subpoena because I have already communicated with the government in detail about the Meister recording and related materials.  As a result, the government already knows that I want these records and why I want them, so neither this application nor the subpoena will reveal undisclosed trial strategy.

18.　On January 25, 2022, I advised the government of my intent to seek this subpoena by way of a public ex parte application.  The government did not object to the ex parte filing.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  Executed February 1, 2022 at Los Angeles, California.

　　　　　　　　　　　　　　　　　　　/s/ Charles J. Snyder
　　　　　　　　　　　　　　　　　　　Charles J. Snyder

7