1          **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3        **HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE**

4

5    UNITED STATES OF AMERICA,          )

6              PLAINTIFF,          )          CASE NO.

7              vs.          )          CR 20-326-JFW

8    JOSE LUIS HUIZAR, et al.,          )

9              DEFENDANTS.          )          PAGES 1 TO 57

10

11

12

13                **REPORTER'S TRANSCRIPT OF**
                      **MOTION TO COMPEL**
14                **MONDAY, APRIL 25, 2022**
                        **9:02 A.M.**
15                **LOS ANGELES, CALIFORNIA**

16

17

18

19

20

21

22

23    _____

24          **MIRANDA ALGORRI, CSR 12743, RPR, CRR**
          FEDERAL OFFICIAL COURT REPORTER
                350 WEST 1ST STREET, SUITE 4455
25          LOS ANGELES, CALIFORNIA 90012
                MIRANDAALGORRI@GMAIL.COM

1                    **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4        NICOLA T. HANNA
         UNITED STATES ATTORNEY
5        BY:  MACK JENKINS
         BY:  VERONICA DRAGALIN
6        BY:  CASSIE PALMER
         Assistant United States Attorneys
7        United States Courthouse
         312 North Spring Street
8        Los Angeles, California 90012

9

    **FOR THE DEFENDANT HUIZAR:**
10
         HILARY L. POTASHNER
11       FEDERAL PUBLIC DEFENDER
         BY:  CAREL ALÉ
12       BY:  CHARLES SNYDER
         BY:  ADAM OLIN
13       Deputy Federal Public Defenders
         Central District of California
14       321 East Second Street
         Los Angeles, California 90012

15

16  **FOR DEFENDANT CHAN:**

17       BRAUN & BRAUN, LLP
         BY:  HARLAND BRAUN
18       10880 Wilshire Boulevard
         Suite 1020
19       Los Angeles, California 90024

20

    **FOR THE DEFENDANT SHEN ZHEN NEW WORLD I:**
21
         LAW OFFICES OF RICHARD M. STEINGARD
22       BY:  RICHARD M. STEINGARD
         800 Wilshire Boulevard
23       Suite 1050
         Los Angeles, California 90017

24

25

1          **APPEARANCES OF COUNSEL CONTINUED:**

2

3    FOR THE DEFENDANTS LEE AND 940 HILL:

4        BIRD MARELLA BOXER WOLPERT NESSIM DROOKS LINCENBERG & RHOW
         BY:  ARIEL A. NEUMAN
5        1875 Century Park East
         23rd Floor
6        Los Angeles, California 90067

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              LOS ANGELES, CALIFORNIA; MONDAY, APRIL 25, 2022

 2                              9:02 A.M.

 3                                ---

 4

 5              THE CLERK:  Calling item 3, CR 20-326(A)-JFW,

 6    United States of America versus Jose Luis Huizar, et al.

 7              Counsel, please state your appearances.

 8              MR. JENKINS:  Good morning, Your Honor.

 9    Mack Jenkins, Veronica Dragalin, Special Agent Andrew Civetti,

10    and Cassie Palmer on behalf of the United States.

11              MS. ALÉ:  Good morning, Your Honor.  Carol Alé,

12    Adam Olin, Charles Snyder from the Office of the Federal Public

13    Defender's Office on behalf of Mr. Huizar who is present at

14    counsel table.

15              MR. BRAUN:  Good morning, Your Honor.

16    Harland Braun, B-r-a-u-n.  I'm alone with Mr. Ray Chan who is

17    present.

18              MR. NEUMAN:  Good morning, Your Honor.

19    Ariel Neuman for Dae Yong Lee whose waiver is on file and

20    940 Hill, LLC.

21              MR. STEINGARD:  Good morning, Your Honor.

22    Richard Steingard for Shen Zhen New World I, LLC.

23              THE COURT:  Good morning to all.  We have on

24    calendar this morning the defendant's Motion to Compel

25    production of cooperator devices and accounts, communications
```

09:01AM (line 5)
09:02AM (line 10)
09:02AM (line 15)
09:02AM (line 20)
09:03AM (line 25)

between the Government and cooperators and/or their counsel. That motion was filed on March 3rd of 2022, and it appears as docket No. 381.  The Government filed its opposition which appears as docket No. 418.  And the defendants filed a reply which appears as docket No. 430.  The parties also filed pursuant to my request a joint statement regarding the defendant's Motion to Compel.  That was filed on April 18th and appears as docket No. 431.

In the motion, the defendants move for an order to compel the Government to disclose exact duplicate forensic copies of the imaged devices and e-mail cloud storage and any accounts in the Government's possession belonging to the nine individuals that are identified or named in the motion.  I will refer to that portion of the motion as the motion directed to the witness and cooperator devices.

The second category, the defendant moves to compel production of all communications and evidence of communications including scheduling notices, nonprivileged notes, or other documentation of communications between the Government and -- in this section there are 14 named individuals, and I will refer to this portion of the motion as the witness and cooperator communications.

The defendants argue that the information they seek is subject to disclosure under Rule 16 and *Brady versus Maryland*.  They claim that the requested materials

are in the possession, custody, and control of the Government and material to their defense.  The Government argues that the witness and cooperator devices are not within its possession, custody, or control for purposes of Rule 16.  The defendants have not met their burden of demonstrating the materiality.

With respect to the witness and cooperator communications, the Government argues that the defendants have failed to establish materiality, and that the Government has already provided discoverable materials and will continue to do so consistent with their obligations under *Brady* and *Giglio*.

The legal standard applicable to this motion is undisputed.  Although there is no general constitutional right to discovery in a criminal case, there are three sources establishing the Government's disclosure obligations.

Federal Rule of Criminal Procedure 16 establishes guidelines for pretrial production of certain limited materials including items material to preparing a defense.  In addition, under *Brady* and *Giglio*, the Government must disclose to the defense evidence in its possession that is exculpatory or favorable to the defense or that may be used for impeachment purposes.  Such evidence includes material that bears on the credibility of a significant witness in the case.

In addition, under Section 3500, the *Jencks* act statements made by a Government witness that relate to the subject matter of the witness's testimony are required to be

```
 1   disclosed after the witness has testified.

 2               I will hear argument from counsel.  The items

 3   that -- I don't think I need any argument.  I think the papers

 4   adequately cover the witness and cooperator devices.  But I

 5   will hear from the defense with respect to the other category

 6   of items which are the cooperator communications with respect

 7   to the 14 identified individuals in the motion.

 8               Who's going to argue the motion on behalf of the

 9   defense?

10               MS. ALÉ:  I am, Your Honor.

11               THE COURT:  All right.  I can tell you that I had

12   a very difficult time following the motion, and specifically on

13   page 14 where you argue the existing discovery illustrates how

14   cooperator and witnesses' testimony changed throughout the

15   investigation.  And you go on to explain or use citing to two

16   examples, one with respect to the interviews of Morrie Goldman

17   and, two, the interviews with respect to Businessperson A.  Is

18   Businessperson A -- I can never remember whether we're still

19   operating under these acronyms or --

20               MS. DRAGALIN:  For now, yes, Your Honor, we would

21   still like to use Businessperson A.

22               THE COURT:  What are the initials of

23   Businessperson A?

24               MS. DRAGALIN:  A.W.

25               THE COURT:  That's what I thought.
```

1           All right.  The difficulty I have is there -- you

2 cite to the Goldman 302.  There's apparently -- in support of

3 your argument I represent -- I understand this is just one

4 example to support your argument, but it's probably the most

09:09AM   5 important one.  You don't attach the December 5th, 2018, 302

6 which is, as I understand it, the first proffer by Mr. Goldman

7 to the Government.  You do cite to 365, Exhibit 1, which is the

8 ex parte application for the Rule 17 subpoenas.

9           In any event, I was able to find the 302.  It was

09:10AM  10 actually attached but not attached to the motion.  But what I

11 was not able to find is the comparison and the quotes or the

12 characterization of the second proffer which took place in

13 January -- it looks like it's January 16th of 2019.

14           The then 302 was not only not attached to the

09:10AM  15 motion, but I could not find anywhere where the January 16th

16 302 -- if it is part of this record.  In addition, you didn't

17 attach a copy of the transcript of the partial recording that

18 was made by Mr. Goldman's attorney during the course of the

19 first proffer on December 15th, 2018.  I was able to locate

09:11AM  20 that which was not at 341, Exhibit 1, but was the -- attached

21 to the reply in support of the motion to suppress

22 attorney/client which was filed in January which looks like

23 it's docket No. 349.

24           In addition, you argue that the various proffers

09:11AM  25 show how the -- your argument is how the witness's testimony

was apparently shaped, but you refer to the plea agreement that

was entered into by Mr. Goldman.  But again, the plea agreement

is not attached to the motion.

So I had a difficult time trying to figure out

what -- because I wanted to obviously check the accuracy of

your representations made in paragraph 14.  And I did check

them, and I found that some of them, at least in my view, are

not accurate and certainly overstated that, for example, you

indicate that, when the Government interviewed Mr. Goldman on

December 5th of 2018, Goldman was unequivocal that there was no

quid pro quo.  He consistently rejected any suggestion that

Huizar engaged in bribery including with Company M.  I have

read that 302, and I understand your argument, but I don't

think it is entirely accurate.

So I will hear from you.  And I can also tell you

that, in my search for these various documents, I had occasion

to review Mr. Snyder's declaration which was filed on

February 2nd of 2022 and appears as docket No. 65.  And this

was in support of the ex parte application for an order issuing

early return of subpoena duces tecum.  And my memory serves me

this was the efforts to obtain the recording that Mr. Meister,

who was representing Mr. Goldman during the course of the

initial proffer, had made.  Or at least it's a partial

recording.  I guess I can't find that we ever ruled on this

ex parte application.  I assume that that issue was resolved

```
 1  and everybody now has a copy of the audio recording?
 2                  MR. SNYDER:  No.
 3                  THE COURT:  Pardon me?
 4                  MR. SNYDER:  No.  It wasn't resolved.
 5                  THE COURT:  It wasn't resolved?
 6                  MR. SNYDER:  No.
 7                  THE COURT:  You still don't have a copy of it?
 8                  MR. SNYDER:  No.
 9                  THE COURT:  You have a transcript.
10                  MR. SNYDER:  We have a transcript of the second
11  half of the interview that the Government recorded.  We don't
12  have a transcript of the part that -- the missing audio.
13                  THE COURT:  Okay.  And Mr. Meister, he has
14  possession of it?
15                  MR. SNYDER:  Yes.
16                  THE COURT:  Is he refusing to give it to you?
17                  MR. SNYDER:  So here -- the issue that occurred
18  was --
19                  THE COURT:  You're going to have to get to the
20  mic.  Why don't you remain seated and just pull the microphone
21  to you.  I have a hard time with the sound system in this
22  courtroom understanding you.
23                  MR. SNYDER:  So the issue that occurred was
24  there's a full recording which, according to the Government,
25  Mr. Meister believes has privileged portions on it.  And we
```

asked the Government for that recording, and ultimately there
was a breakdown because the Government said that it was going
to redact the privileged portions of the recording that
Mr. Meister had turned over to it.

09:15AM    And our position was, well, since he turned it
over to you and he said, why don't you guys redact these
privileged portions, and since they're not actually part of the
same team, he had waived privilege as to those.  So we wanted
the full recording.  And it's our understanding that he's not

09:16AM  willing to turn over the full recording.  So that's why we
applied for a subpoena to the Court.

THE COURT:  And so what is Exhibit 1 that's
attached to docket No. 349?

MR. SNYDER:  If that's the transcript -- so what

09:16AM  happened was they started the proffer, and the proffer wasn't
being recorded.  At some point during the proffer --

THE COURT:  At least the Government didn't think
it was being recorded.

MR. SNYDER:  Right.  Right.  It wasn't being

09:16AM  openly recorded.  Obviously I wasn't there, so, you know,
either Mr. Jenkins or Ms. Dragalin or Mr. Civetti would be the
people to tell you what actually happened.  My understanding is
at some point they realized that the lawyer is recording the
proffer and they say, are you recording?  And so they stop.

09:16AM  And he stops his recording, and he agrees to preserve it and

turn it over to the Government, and then the Government starts
recording at that point in time.  So the transcript that we
have is from the second half.

THE COURT:  All right.  And the -- all right.  So
what's the -- so what's the status of the -- if the Government
takes the position that the portions that Meister claims are
attorney/client privilege shouldn't be disclosed, I assume
there's no problem with editing or preparing a transcript and
providing the defense with the balance of the transcript.

MS. DRAGALIN:  Your Honor, just for the record,
the Government does not have a copy of that recording from
Mr. Meister.  He was going to give it to us, but around that
same time the defense notified us that they took the position
that, if Mr. Meister provided a copy of that recording, he
would be waiving privilege.  So, therefore, Mr. Meister is
still asserting privilege and has not provided a copy of that
first half of the recording to the Government.  So the
Government does not have it in its possession.  Only
Mr. Meister does.

MR. SNYDER:  Right.  And it's laid out in the
declaration.  It looked like we were going to have an agreement
at the time when we made our position --

THE COURT:  I don't want to digress on this
issue.  I assume at some point in time we will have to deal
with that issue.  I was just under the, I guess, mistaken

assumption that the transcript that was attached was the

transcript.

            In any event, I did begin or noted that I had

reviewed in the course of my search for these various 302s and

09:18AM   the transcript Mr. Snyder's declaration.  In reading -- well,

first of all, let me ask.  Is the January 302 somewhere in this

record?

            MS. ALÉ:  Your Honor, I believed that it was, and

I apologize that I did not attach the 302s or transcripts to

09:19AM   the motion.  It was an attempt to cut down on the paper, but I

see now that it created more work for the Court.  So I

apologize.

            THE COURT:  Well, I can't find it anywhere.  It

just doesn't exist in the -- there's no -- there's no citation

09:19AM   to the January 6, 2019, 302.  I just don't see it.

            MS. ALÉ:  I apologize if that's the case,

Your Honor.  I can submit it --

            THE COURT:  Is it the case?

            MS. ALÉ:  I don't know.  I believed that it was

09:19AM   part of the record, but if the Court was not able to find it, I

will submit an exhibit this morning once the hearing is

concluded.

            THE COURT:  All right.  I didn't look at every

document.  I was trying to find these, and I was using the

09:20AM   citations.  And why you're referring me to documents -- other

1  documents such as 365 and 341 to go find these exhibits, you

2  know, I spend enough time in this case.  I don't have time to

3  go looking for documents.

4            You have a copy of the Goldman plea agreement, do

09:20AM  5  you not?

6            MS. ALÉ:  Yes, Your Honor.

7            THE COURT:  All right.  That was not attached

8  either.

9            MS. ALÉ:  Correct.

09:20AM  10            THE COURT:  All right.  So it seems to me, based

11  upon Mr. Snyder's declaration that I just referred to that was

12  filed in February of 2022, I don't agree necessarily with

13  Mr. Snyder's characterization of some of the items he includes

14  in his declaration although, with respect to the second

09:21AM  15  proffer, I have no way of disputing or questioning the

16  statements in the declaration because I have nothing to compare

17  them with.

18            But it seems to me, based upon this declaration

19  back in February -- I guess that's not too long ago -- February

09:21AM  20  of 2022, that the Government with respect to the example that

21  you're using to support the production of this cooperator --

22  cooperator's statements, schedules, whatever else is in the

23  category, has fully complied with its discovery obligations as

24  to Company M, Mr. Goldman, and Executive M.

09:22AM  25            Are we still using the initials and the letters

for those two?

MS. DRAGALIN:  No, Your Honor.  We can use their true identities which is Carmel Partners and Neils, N-e-i-l-s, Cotter.

09:22AM

THE COURT:  C-o-t-t-e-r.

So in the -- in Mr. Snyder's declaration, he begins the declaration by saying the alleged bribe involving Company M, which is Carmel Partners, is supported by the testimony of a single cooperator Morrie Goldman who reversed

09:22AM

his factual account in exchange for leniency.  Everyone else supposedly involved in the bribe denies that it occurred, and no documents memorialize a quid pro quo.

It goes on to say that obviously the supposed bribe by Mr. Huizar categorically denies it.  The supposed

09:23AM

briber, Executive M or Mr. Cotter, categorically denied it in multiple meetings with the Government and in surreptitious recorded stings.

I assume that you have the -- all of the 302s of Mr. Cotter's interviews with the Government and you also have

09:23AM

recordings of -- made by apparently Mr. Cotter in what Mr. Snyder characterized as recorded stings?  You have all those?

MS. ALÉ:  Yes, Your Honor.  We do have those.

THE COURT:  Who are the recordings with?

09:23AM

MS. ALÉ:  I believe they are with Mr. Goldman.

He was the one who was doing -- making the calls.

THE COURT:  All right.  And then it goes on to state every other Company M executive or employee involved in project M, which is the -- which is Mateo Project; correct?

09:24AM    MS. DRAGALIN:  Yes, Your Honor.

THE COURT:  Categorically deny knowledge of a bribe.  So I assume there are documents or 302s or some other form of evidence as to every other Company M executive denying the knowledge of a bribe?  You have all that information?

09:24AM    MS. ALÉ:  We have that information, Your Honor.

THE COURT:  Okay.  And then Company M signed a non-prosecution agreement with no admission of criminal liability.  I take it that you have a copy of the non-prosecution agreement?

09:24AM    MS. ALÉ:  Yes.  We do have that, Your Honor.  But --

THE COURT:  Okay.

MS. ALÉ:  It's everything in between that we don't have.

09:24AM    THE COURT:  It's what?

MS. ALÉ:  It's everything in between from where they started with the denials to when they finally entered a non-prosecution agreement.  We don't have the communications that led to that.  All of a sudden in September 2020, I

09:25AM    believe, four Company M or Mateo Project executives or

Carmel Partners executives sat down for interviews with the

Government.  What prompted those interviews after all four

executives denied any liability, after they refused to speak

with the Government we don't know.  And that's part of what

we're asking for.  We need to tell the story of how --

THE COURT:  Wait a minute.  I'm confused.  So the

Executive M -- you have all the interviews for -- Mr. Cotter

denies in multiple meetings.  You have all the 302s with the

multiple meetings with the Government, and you have the phone

conversations of the transcripts of the recordings with

Mr. Goldman.  You have all that.  In that he apparently,

according to the Snyder declarations, categorically denies

there was a bribe; right?

MS. ALÉ:  That's correct, Your Honor.

THE COURT:  Does he change his position now?

MS. ALÉ:  He doesn't change his position as to

the bribe, but he does enter a non-prosecution agreement.

Excuse me, Your Honor.

THE COURT:  So what happened -- I mean, so what's

the point if -- if you have all this information with respect

to executive -- Mr. Cotter who denies that there were bribes

and they entered into a non-prosecution agreement, what more do

you need?

MS. ALÉ:  I'm sorry, Your Honor?

THE COURT:  I'm curious to know what Mr. Cotter

believed he was paying $100,000 for to the various

contributions that he made to PAC A and PAC B and the result

that the Mateo Project was not only approved at the

PLUM Committee but also it was approved in accordance with the

09:27AM   Carmel Partners's request that the 11 percent low income

housing provision be reduced, and ultimately it was approved I

think at 4 percent.  In any event, that's neither here nor

there.

I just don't understand what it is you're missing

09:27AM   in between these interviews where he denies it was a bribe and

the non-prosecution agreement.  Why do you need that

information?  I mean, you already have a record that he

apparently is going to get on the witness stand and he's going

to testify that the hundred -- whatever it was.  Was it a

09:28AM   hundred thousand dollars that was paid?

MS. ALÉ:  I believe so, yes, Your Honor.

THE COURT:  He is going to testify that, given

the various payments he made -- I think they were 25,000,

25,000, and then there was an additional I think in connection

09:28AM   with the -- at least the allegations in the First Superseding

Indictment when apparently, as Mr. Lee ran into labor union

problems, that the Mateo Project ran into labor union problems,

and there was an additional request or ask for an additional I

believe it was $50,000 in connection with resolving that

09:28AM   particular labor issue with respect to the Mateo Project.

```
 1              So what is it that you think?  That the
 2  Government is going to have some surprise with respect to
 3  Mr. Cotter's testimony at trial?
 4              MR. SNYDER:  Your Honor, do you mind if I say
 5  something about this?  I know Ms. Alé is arguing, but I'm
 6  pretty familiar with Mateo.
 7              So if I can answer your question, so kind of the
 8  history of what happened here, at least as I understand it --
 9  and we're trying to piece this together as best as possible --
10  is that, you know, this investigation --
11              THE COURT:  First of all, it's pretty easy to
12  piece together based upon the allegations of the First
13  Superseding Indictment.
14              MR. SNYDER:  Right.  So that's --
15              THE COURT:  And the First Superseding Indictment,
16  those overt acts in connection with the Mateo Project which
17  begin at 241 are pretty consistent also with the -- as I went
18  back and tried to match some of the items in these various
19  overt acts are consistent with the factual basis for the plea
20  that Mr. Goldman entered into.
21              MR. SNYDER:  If you will just give me a second, I
22  will explain very briefly kind of what's happening.
23              So the First Superseding Indictment and the pleas
24  are the end result of a long process.  As we understand it,
25  what happened here is that this investigation starts and the
```

1    Government starts reaching out to all of the potential

2    witnesses in this case.  I believe -- we don't have

3    communications for everyone, but I believe that the position

4    that each of the Carmel executives took at the outset is, if

09:30AM    5    you bring us into the grand jury or if you bring us to your

6    office, we will refuse to testify under an invocation.

7          At some point between let's say the beginning of

8    2020 and September, there were communications between the

9    Government and the lawyers for each of the executives at

09:31AM   10    Carmel.  These people are represented by extremely talented

11    lawyers, you know, people who are some of the most reputable

12    lawyers in the country or the state.  They're not going to walk

13    their clients into a meeting without knowing what's happening.

14          At some point between, you know, early January of

09:31AM   15    2020 and September when they all show up to meet, there is some

16    sort of understanding.  The way that cooperation works in a

17    case like this is that --

18          THE COURT:  You don't have to tell me how

19    cooperation works because I read your papers, and what you left

09:31AM   20    out of how cooperation works is that, when somebody is asked to

21    or consideration -- considering cooperating with the

22    Government, the flip side of what you argue is that that

23    cooperator would typically go to an initial meeting with the

24    prosecutors and his counsel to get an understanding of what the

09:32AM   25    nature and extent of what the Government is investigating.  And

then that cooperator, who may not have all the information

available to be able to proffer to the Government on that

particular initial meeting goes back, reviews records and text

messages and any other items that may assist to refresh the

memory of the witness, because these events take place several

years ago, and then goes back to a second session with the

Government and is able to more intelligently make a pitch to

the Government that this particular witness does have

information that may be of some value to the Government.

MR. SNYDER:  So I don't think that's how it

worked in this case.

THE COURT:  I'm not -- you're talking -- you were

talking about in general you were going to educate me in terms

of how cooperation with the Government works.  I don't need

that education because I've been on both sides and I fully

understand the process.

MR. SNYDER:  Understood.  I think -- I think the

point is about how it's worked in this case which is the

lawyers for the cooperators and the key witnesses have been

conduits for information before and after the proffer.  So,

yes, we have 302s from the proffers but the 302s, like the plea

agreements, like the First Superseding Indictments are the end

result of a process where, before someone comes in to sit with

the Government, it's not -- it's not like, you know, they don't

have a theory coming in.  Before someone comes in to sit with

1    the Government, there are communications with their lawyers.

2    Those communications exist.  I don't think there's any dispute

3    they exist.  There were phone calls.

4                THE COURT:  Communications with their lawyers,

5    obviously they exist.

6                MR. SNYDER:  Right.

7                THE COURT:  Lawyers communicate with their

8    clients because lawyers need to understand what the facts are

9    that the client has so that client can or cannot be considered

10   as having information that the Government needs or doesn't

11   need.

12               MR. SNYDER:  I mean, communications between the

13   lawyers and the Government.  So in advance of these meetings

14   and then after the meetings.  We have all -- each of us I think

15   in this case have had this experience where someone goes in and

16   they sit down and then there's feedback provided about, well,

17   we think this was right.  We don't think that was right.  There

18   may be a number of calls or e-mails or communications.  That

19   all goes into what then is said next.

20               I will turn it back over to Ms. Alé.  But I think

21   when it comes to the Carmel Project and those executives in

22   particular, I think that the history is very clear that they

23   all initially invoked.  At some point after that invocation, no

24   doubt as a result of communications between the lawyers, they

25   all come in in the fall of 2020, and they all sit for an

interview, and shortly thereafter there is a non-prosecution

agreed to, and none of those people are charged.

That didn't just happen kind of with those being

the only data points.  What must have happened in between there

is that the lawyers were going back and forth both before and

after those proffers.  There were negotiations about the

non-prosecution agreement.  No doubt there was some

conversation about who was going to be charged and who wasn't

going to be charged if they came in and if they talked and what

the Government's view of the case was.  And we don't have any

of that.  Yes, we have the 302s from the proffers.  We have the

First Superseding Indictment.  We have the plea agreement that

the Government drafted for Morrie Goldman.  But that's like

giving us the end result without showing us how the process

happened.

What they want to do is they want to put on the

end result of this cooperation without letting us get into and

show the jury, well, how did that product come about?

THE COURT:  The end result of the process was a

non-prosecution agreement.

MR. SNYDER:  Right.  And the question is --

THE COURT:  So.

MR. SNYDER:  So why -- I mean, I think the

question is, well, if the Government's theory of this case is

Neils Cotter bribed a sitting city councilman, right, and

1   people in this multi-billion dollar private equity firm either

2   knew about or there would be imputed knowledge to the firm, why

3   were none of those people charged?  I think that's a legitimate

4   question to ask.  And I think the Court was even just alluding

09:36AM   5   to that.

6        Well, the reason they're not charged is either

7   there's something else going on behind the scenes or there's a

8   question about the facts or there's a question about the

9   information.  All we have is the end result which the

09:36AM   10   Government wants to present.  And what we're asking to do,

11   which we're entitled to do, is to get at what's going on behind

12   the scenes and to see how that end result was created.

13        THE COURT:  But see, now you're being more

14   factually specific, but none of that is in the motion, and

09:37AM   15   that's the problem I have with the motion.  I'm supposed to be

16   piecing together bits and pieces from missing documents because

17   you have to make a showing.  And there hasn't been any showing.

18   The first time I've heard about these series of executives that

19   have been parading into the U.S. Attorney's Office all

09:37AM   20   represented by superior counsel and whatever you suspect they

21   were doing or not doing, that's not in front of me.  And that's

22   the problem I have with the motion.

23        You continually ask me to rule on things on an

24   inadequate record, and I'm not going to do that.  Your

09:37AM   25   declaration enlightens me in terms of -- I take it Executive M

is going to continue -- Mr. Cotter is going to continually deny

that the hundred thousand dollars that apparently he was the

head of this Mateo Project was contributing to the various PACs

had nothing to do with the bribe.  I guess it was just a normal

09:38AM  way that Carmel Partners did business.

MR. SNYDER:  Well, I think the reality of what's

going to happen is that, when we want to call Neils Cotter to

testify at trial to say exactly that, his lawyer, who is well

qualified, is going to say, if you call Mr. Cotter, he's going

09:38AM  to invoke.

So what ends up happening is through this process

the Government immunized some people.  It leaves some people

out there in the wind like Mr. Cotter who, if called to

testify, would say that he didn't bribe.  He wasn't involved in

09:38AM  a quid pro quo.  And so -- so I think what we're getting at --

and this is, just as we've been talking about, this is just one

example, but it's one example of an overall process which has

gone into shaping the end result which is the First Superseding

Indictment that the Court has seen which is the 302s that we

09:39AM  have.  And what we're trying to get at is, well, what was

behind that product, the end product?  And we're entitled to

that.

THE COURT:  Well, I don't think you are based

upon the showing.  In any event, so why can't you put into

09:39AM  evidence the non-prosecution agreement?

1          MS. ALÉ:  Your Honor, and that was -- again, I

2    drafted the motion, and I apologize about that.

3          Again, my attempt at directing the Court's

4    attention to where the non-prosecution agreements were found

09:39AM   5    was clearly an error but an attempt to limit the number of

6    exhibits and things that would be clouding the record.  So if

7    the Court would like, I can refile the motion with the

8    necessary exhibits for the Court's review.

9          THE COURT:  Well, in my view, you haven't made a

09:39AM   10   sufficient showing.  I mean, you use -- you call to my

11   attention an example which is the Goldman/Mateo Project and

12   Mr. Cotter and Carmel Partners, and I spent a good couple days

13   trying to understand the transaction and relationship to the

14   First Superseding Indictment as well as Mr. Goldman's factual

09:40AM   15   basis for the plea.

16          And uncovering or discovering Mr. Snyder's

17   declaration, I conclude and I continue to conclude that the

18   Government has, up to this point in time, given the information

19   that's included in this declaration, has complied with its

09:40AM   20   discovery obligations.  If there's more out there -- apparently

21   there is more out there that hasn't been presented to the

22   Court, I'm here to rule.  But I'm not going to continue to

23   review these motions and make rulings on an inadequate record.

24          All right.  So does anybody have anything else

09:41AM   25   they want to say because I'm going to rule?

1          MR. NEUMAN:  Can I say something, Your Honor?

2          THE COURT:  Sure.

3          MR. NEUMAN:  This is -- we joined the motion for

4    a variety of reasons.  But it really sort of came to light in

09:41AM  5    the last week why we need these communications between counsel

6    and the Government.

7          We on Friday got a 302 of a March 2019 meeting

8    between Justin Kim, his attorney, and the Government.  And this

9    302 was drafted ten days ago.  We had no record that this

09:41AM  10   meeting occurred prior to receiving this 302.  We would have

11   known about it, presumably, if we had communications between

12   counsel and the Government.  I have my theories of why we got

13   it now.  I think it has to do with the motions in limine that

14   are pending.  But strangely, here we are, you know, a month

09:42AM  15   before trial getting a 302 that is documenting a purported

16   meeting over three years ago for which there is no agent notes

17   we're being told.

18         And it really demonstrates why we need to see

19   that back-and-forth between counsel and -- defense counsel and

09:42AM  20   the Government counsel.  We need to understand what other

21   meetings potentially are out there, what other discussions are

22   out there.  How did Mr. Kim in this case -- this is

23   Justin Kim's, I think, his first, quote/unquote, cooperation

24   meeting with the Government.  You know, where did this come

09:42AM  25   from?  And are there other meetings that we don't know about

that the Government may have forgotten to write a 302 about at the time?

THE COURT:  Well, I assume that the Government has until, what is it, April -- what's today? -- April 29th under the current schedule to provide all the *Brady/Giglio* material under the Lee scheduling order as well as the *Jencks Act* material on April 29th.

Again, to the extent the Government wants to run the risk of not disclosing what they're obligated to disclose, they may end up in the same place that the Government ended up in the Avenatti case, and that is a dismissal.

MR. NEUMAN:  That may be, Your Honor, and I appreciate the comment.  I think the concern here, as I read this 302, I don't think the Government would view this as *Brady*.  I think the Government would say this is potentially inculpatory of our client.

But my concern is what else is out there that is relevant to my case?  I need to know when Mr. Kim was meeting with the Government, what his lawyer was negotiating with the Government.  As the Court knows, he's the central witness against my client, and this sort of three years later production gives me real concern.

THE COURT:  All right.  Mr. Jenkins, what about the more pressing and that is Mr. Neuman, who we're set for a June trial, and Government's obligations -- I don't have all

1    the dates in front of me, but they seem to be coming up fairly

2    soon.

3              MR. JENKINS:  Yes, Your Honor.  And Mr. Neuman's

4    statement is exactly a product of that.  We continue to prepare

09:44AM  5    for, analyze what discovery has been produced, what discovery

6    has not been produced, what's been redacted, what needs to be

7    unredacted.  As the Court just noted, the production he just

8    explained was produced in advance of the Court's deadline.  I

9    believe all other deadlines have been met with and will

09:44AM  10    continue to be met with by the deadline or, if not, in advance.

11              THE COURT:  What about this current 302 that was

12    just recently produced?  What's the history behind that?

13              MR. JENKINS:  So as we prepare for that

14    production of -- what the Government is currently doing is

09:44AM  15    looking for basically everything Justin Kim related.  As the

16    Court may recall, one of the directives from a prior motion to

17    compel related to Justin Kim --

18              THE COURT:  You're going to have to get closer to

19    the microphone.  Your voice is trailing.

09:45AM  20              MR. JENKINS:  So one of the last relevant court

21    directives was related to a prior motion to compel related to

22    Justin Kim because Justin Kim had provided information related

23    to Defendant Huizar, Defendant Lee, and others.  And so there

24    are redactions.  So one of the things the Government has went

09:45AM  25    back and done and reviewed and unredacted a lot of information

consistent with the Court's order and in that same process

reviewing Justin Kim references in other case files.

And one of the things that AUSA Dragalin noticed

was that there was a calendar entry or a meeting that existed

09:45AM   for which there was not a report, and so she identified that

through that diligent process and got a report drafted to

document exactly what Mr. Neuman just pointed out, something

that is what, we would say, is significantly inculpatory.

The existence of the meeting was documented and

09:46AM   provided to them in advance of the deadline of the trial.  We

will continue to, of course -- I think Mr. Neuman is correct

that that highlights the need to go through the exact process

we are doing collectively.  I think Ms. Dragalin's

identification of that meeting is corroborative of those

09:46AM   efforts, Your Honor.

THE COURT:  When was the meeting and who

participated in the meeting?

MR. JENKINS:  The meeting was March 18th --

March 2019.

09:46AM   MR. NEUMAN:  March 19, 2019, according to the

302.  Present were Mr. Kim, his attorney David Vaughn, and

Ms. Dragalin and Mr. Jenkins according to the 302.

MR. JENKINS:  And, in addition, the agent who

authored the report Tony Logan, but otherwise that is correct.

09:46AM   Thank you, Mr. Neuman.

THE COURT:  What was the sum and substance of
that meeting?

MR. JENKINS:  At this point I will similarly hand
off the baton, with the Court's indulgence, to AUSA Dragalin
who located this document.  Or meeting --

THE COURT:  It wasn't a document.  It was some
reference to a meeting somewhere and a document was prepared to
memorialize the meeting?

MR. JENKINS:  That is correct, Your Honor.

THE COURT:  Okay.

MS. DRAGALIN:  Yes, Your Honor.  On March 20th --

THE COURT:  You can remain seated.

MS. DRAGALIN:  On March 20th Justin Kim met with
David Lee and recorded his meeting with David Lee.  Transcripts
of that recorded meeting have been produced.  As we were
preparing for trial, I recalled that, obviously to be able to
record that meeting, Justin Kim must have been given a
recording device, and it reminded me that we met with Mr. Kim
before that recorded meeting to instruct him how to use the
device and to give him instructions about the recorded meeting
that he was to have the very next day.

And so the meeting we had with Mr. Kim and his
counsel was very limited to just the recording device and
instructions on what to say during that recorded meeting the
next day.  And so the report that was drafted reflected the

1    information we learned from Mr. Kim during that short meeting,

2    and it was before he sat down to actually proffer all of the

3    information he subsequently told us about later.

4                    MR. NEUMAN:  And so, Your Honor, that summary by

09:48AM  5    Ms. Dragalin only highlights the point that I'm making because

6    none of what she just said is in that 302.  And so there is a

7    problem between what was going on at the time this calendar

8    entry that exists.  The 302 doesn't say anything about giving

9    him a recording device, instructing him on the recording

09:48AM  10    device.  None of that is in here.

11                    It relates a conversation or a statement by

12    Mr. Kim about conversations he supposedly had with my client.

13    This is old.  And I'm not complaining that it was produced now.

14    They're within -- I'm not saying it's late production.  What

09:48AM  15    I'm saying is they didn't know about it until she happened to

16    see a calendar entry.  We didn't know.  We have been wondering

17    how did this recording come to be, the March 20th recording.

18    And now my concern is what else is out there that they might

19    miss, not necessarily exculpatory in that sense but certainly

09:49AM  20    relevant to the defense and how Justin Kim came to make the

21    statements he makes about my client.

22                    THE COURT:  Well, I'm sure that they're going to

23    continue their efforts in connection with their preparation for

24    trial.

09:49AM  25                    All right.  Anybody want to add anything else

1    before I rule?  Anything for the Government?

2              MS. DRAGALIN:  No, Your Honor.

3              THE COURT:  Defense?

4              MS. ALÉ:  Nothing else.

09:49AM  5              THE COURT:  The Government makes the -- I'm

6    sorry.  The Court makes the following ruling:

7              With respect to the witness and cooperator

8    devices, the defendants, as I indicated, seek imaged copies of

9    the digital devices for the nine cooperating defendants and

09:50AM 10    witnesses identified in their motion.  Specifically, the

11    devices at issue include forensic copies of imaged devices and

12    accounts for seven of these individuals that were searched

13    pursuant to search warrants.  Esparza also consented to the

14    search and imaging of three additional devices provided the

09:50AM 15    search was consistent with the scope of the original omnibus

16    search warrant that was issued in November of 2018.

17              Businessperson A's phone was searched and imaged

18    pursuant to a limited consent.  Moreover, the Government never

19    executed a search warrant or obtained consent to search and has

09:50AM 20    not searched the devices belonging to Mr. Morrie Goldman.  It,

21    therefore, does not have any forensic imaging of his devices or

22    accounts in his possession.

23              The Government contends the defendants fail to

24    establish that it has possession of the devices or that any

09:51AM 25    information contained therein would be material to their

defense.

As to possession, according to the 9th Circuit in the *United States versus Bryan*, B-r-y-a-n, at 868 F.2d 1032, a document is in the possession, custody, or control of the Government if the prosecutor has knowledge of and access to the documents sought by the defendant.

The Government originally obtained search warrants for most of the digital devices and accounts at issue in this motion.  The Government imaged and searched these items for material that fell within the scope of the warrant and later produced all of that data to the defendants.  The Government utilized the same process with respect to the devices imaged and searched pursuant to the consents.

The Government claims it no longer has legal authority to further access and search any of these devices because the warrants have expired and none of the individuals have consented to any further searches or disclosure, and in fact, counsel for those defendants or individuals have submitted written objections which are attached to the Government's opposition.

The Court rejects the defendants' contention that the Government continues to have authority to either search the devices again for discoverable material or simply turn them over to the defendants.  The Court finds the district court's -- district court case *United States versus Collins* at

409 F.Supp. 3d is instructive.  In *Collins* defendants asked the Court to -- asked the Court to order the Government to search an uncharged co-conspirator's nonresponsive iCloud data that has been searched pursuant to a search warrant for *Brady* and Rule 16 material.  The district court denied the motion because the Government does not have the legal authority to go back and search materials that are outside the scope of the search warrant and thus did not have possession.

The Court noted that, as we have in this case, the third party has a privacy interest in the data, the Government obtained that data through the use of a search warrant, and as a result of the Government's possession of and ability to review that data was necessarily circumscribed by the 4th Amendment.

Defendants attempted to distinguish *Collins* by arguing that in that case, unlike here, the Government had initially searched the data for potential *Brady* Rule 16 material.  The *Collins* court however specifically stated that it found the defendant's argument legally flawed even if it assumed that the Government's initial search pursuant to the warrant was insufficient under *Brady* and Rule 16.

Like *Collins,* the basic premise of the defendants' argument is that the *Brady* obligation somehow trumps an individual's 4th Amendment rights, but in my view, that's simply not the case.  The Court concludes that, because

09:54AM

the Government is without the requisite legal authority, it is not in the possession of the data for discovery purposes.  The Government's possession of the devices and the data that were obtained by search warrant is necessarily circumscribed by the 4th Amendment nor have any of the individuals who own the devices searched pursuant to the warrant consented to a further review of their data.

09:54AM

The Court arrives at the same conclusion with respect to the devices that were searched and imaged pursuant to the consent agreements.  The two individuals who consented did so under specific limiting conditions.  Those conditions circumscribed the Government's legal authority over the data, devices, and accounts and do not authorize the wholesale disclosure as sought in this case.

09:54AM

Defendants also argue that the cooperation plea agreements with the cooperating defendants establish the Government's possession of the devices under *Brady* and Rule 16.  The defendants point out that the cooperating defendants entered into plea agreements whereby they agreed to produce all documents, records, and other tangible evidence relating to matters about which the United States Attorney's Office may require.

09:55AM

In support of their argument, defendants cite three district court cases concluding that the Government's ability to require cooperating defendants to produce evidence

1   at its request may establish the requisite possession and

2   control over such evidence.

3          The Court declines to adopt the reasoning of

4   those cases under the circumstances of this case.  Defendants

09:55AM   5   are asking to examine the entirety of the individual phone and

6   e-mail accounts.  These items contain private, personal, and

7   highly sensitive data.  Indeed, the entirety of people's lives

8   in this day and age are typically reflected on their phones,

9   their messages, and e-mails.  A cooperating defendant does not

09:55AM   10   give up and, frankly, should not have to give up the right to

11   protect information of the most personal and private nature

12   when entering into a cooperation agreement with the Government.

13   This is especially true given that the defendants have failed

14   to show in any meaningful way that the information they seek

09:56AM   15   may be material to their defense.

16          As to materiality, a defendant must make a

17   threshold showing of materiality which requires a presentation

18   of facts that would tend to show that the Government is in

19   possession of information helpful to the defense.  Neither a

09:56AM   20   general description of the information sought nor conclusory

21   allegations of materiality suffice.

22          Defendants make a general claim that the

23   requested data on the devices and accounts is material because

24   it may contain information relating to interactions between

09:56AM   25   Esparza and Kim and other key figures that might allow

defendants to develop a defense that cooperators were acting on their own behalf rather than on behalf of the alleged RICO enterprise.

Defendants provide no specific information regarding the other cooperating defendants and witnesses.  They offer only a broad general allegation that, because the Government's case stands or falls on the testimony of numerous individuals engaged in varying levels of cooperation with the Government, they're entitled to examine without limitation the complete devices and accounts of each and every cooperating witness.

The Court concludes that this showing is speculative and falls well below that required to demonstrate materiality.  Defendants have received voluminous and broad discovery from these devices, yet fail to indicate with any particularity what may be missing.

The Court agrees with the Government that what the defendants really seek here is a fishing expedition into each of the witnesses' and cooperating defendants' personal and private information to which they are simply not entitled.

The next category, which is the witness and cooperator communications, the Government represents it has made broad disclosures and produced discovery beyond its obligations in this case including reports of witnesses' interviews, notes from these interviews, and text messages and

e-mails between witnesses and agents.

The Government has also produced certain substantive communications between the Government and counsel for witnesses where appropriate and consistent with its discovery obligations.  Despite this discovery, defendants now request that the Government also produce all communications between the Government and any witnesses or cooperators and their counsel including non-privileged notes, scheduling notices, and all records of communications.  The Government notes that, because it has already produced reports of witness interviews, the material in dispute consists of communications between the Government and third parties and their counsel.

As I indicated, the Court is not entirely clear as to what has already been produced that complies with the defendants' broad discovery request but assumes, based upon the defendants' reply, that, while the Government has produced communications containing the substance of witness statements, it has not produced a full set of the scheduling notices and e-mails.

The Government's letter to the public defender -- federal public defenders dated April 28th to which the Government cites to show what has been produced provides some clarification surrounding the parties' discussion on the matter but does not refer to definitive categories or give the Court the clarity it needs in order to make any ruling.

So for all of the -- the defendant contends that a full set of the requested communications is material in order to attack the character and quality of the investigation including attacking the means by which the Government has handled cooperating witnesses.  In their reply, the defendants argue the timing of the contacts between counsel for cooperating defendants and the Government may help establish how witnesses' testimony was shaped and changed in order to align with the Government's theory and obtain greater benefits for themselves.

The Government claims that it has produced and will continue to produce Rule 16, *Brady/Giglio*, and *Jencks Act* discovery consistent with its duty to make decisions about what falls within this category.

The Court is confident that the Government will continue to comply with all its discovery obligations in this case.  Indeed, the Court has requested and the Government has consented to what the Court considers and has referred to as an open file discovery in this case.  Based upon the prosecution team handling of this case to date, the Court concludes that the prosecutors fully understand and will continue to comply with their discovery obligations.

The Government's understanding and compliance with its obligation is evidenced by the incredibly detailed description defendants were able to make in their motion and

1    reply briefs and in Mr. Snyder's declaration that I have been

2    referring to regarding the alleged changes in Goldman and

3    Businessperson A's testimony which are obviously based on

4    discovery already produced and can and will be used to impeach

10:01AM    5    both witnesses.

6         The Court thus denies the defendants' motion for

7    additional discovery relating to those communications.  Should

8    the defendants believe that the Government is not in compliance

9    with its discovery obligations, the defendants are free to

10:01AM    10    raise these issues at an appropriate later point in time,

11    hopefully with a full record so I can make a determination

12    without spending an enormous amount of time going through all

13    of the documents.

14         So for all the foregoing reasons, the Court

10:01AM    15    denies the defendants' motion to compel.

16         All right.  We have another issue that I wanted

17    to discuss.  Mr. Steingard, this relates to what I discovered

18    this weekend is yet to be ruled on, and that is the pending

19    request for Defendant Shen Zhen New World's second application

10:02AM    20    for issuance of early return of subpoenas duces tecum that was

21    filed March 21st of 2022.  It appears as docket No. 44.  This

22    was filed after I issued in July of last year a minute order

23    denying the ex parte application for issuance of Rule 17

24    subpoenas.  The denial was without prejudice.

10:03AM    25         I also issued a separate minute order that, if

1    defendant was going to file a revised ex parte application and

2    continued to request the gag order, that the parties prepare a

3    joint statement setting forth their respective positions with

4    respect to the gag order.  That appears as docket No. 197.

5            And as I indicated, on March 31st you filed the

6    second ex parte application.  Thereafter, there were requests

7    which I granted for continuances of the joint statement, but

8    that joint statement was filed on March 29th.  That doesn't

9    make any sense with respect to the -- anyway, it was filed.

10   Let me see if I can find it here.  It was filed on March 29th.

11   It appears as docket No. 415.  It was the joint filing re

12   subpoenas.

13           Mr. Steingard, I will hear from you, but it's --

14   I want to know how you want to proceed because I haven't -- I'm

15   not making a final ruling, but my tentative ruling is that I'm

16   not going to issue a nondisclosure order that the parties or

17   the persons or parties who are subpoenaed are not going to be

18   precluded from discussing the subpoena.

19           I'm not sure that you're aware, but I can tell

20   you my normal practice is that, when a Rule 17 -- a return for

21   a Rule 17 subpoena the documents are produced, they're produced

22   to the Court.  And the Court then notifies counsel, and all

23   counsel have an opportunity to review the documents that are

24   produced.  That's my normal practice.  I don't know what you

25   want me to do with the ex parte application.

                    Quite frankly, I don't see how any of the
requested documents -- I know the argument is always that they
reveal trial strategy.  I can't imagine how any of these
documents reveal trial strategy.  There's nothing in your
10:06AM   showing that would give me any indication in terms of what the
trial strategy is save and except for perhaps for paying bribes
with someone else's money.

                    MR. STEINGARD:  I'm not sure what the Court
refers to there, but you have several documents before you.

10:06AM             THE COURT:  Yes.

                    MR. STEINGARD:  One, of course, is the ex parte
application -- the ex parte application for a -- for the
subpoena duces tecum.  And in that document we have included my
declaration, and that is where for the most part we laid out --
10:07AM   I laid out what I believe would have been the basis for the
nondisclosure.  And in the joint filing I referenced that
without getting any more specific because obviously that was
filed in camera.  So you would have to circle back, Your Honor,
to the ex parte filed in camera --

10:07AM             THE COURT:  No.  I have that.

                    MR. STEINGARD:  I understand.  I understand.  And
that -- in response to your question that you don't see any
trial strategy issues, I'm simply saying to you that the
showing that we made or we attempted to make would be contained
10:07AM   in that document.  If you find that inadequate, then there is

1    your answer.  I can't go into that any further in open court,

2    but I would be prepared, of course, to go in chambers with the

3    Court.

4              THE COURT:  I'm not going to go in chambers.  If

5    you want to file some supplemental declaration -- basically one

6    of the thrusts, which I don't know is a trial strategy, is

7    making a more complete record.

8              MR. STEINGARD:  Okay.  I don't disagree with

9    that.

10             THE COURT:  Okay.

11             MR. STEINGARD:  I don't disagree with that as a

12   partial of what we're trying to do, yes.

13             THE COURT:  That's somehow trial strategy?

14             MR. STEINGARD:  Well, let's talk in the

15   hypothetical if that's all right.

16             THE COURT:  Sure.

17             MR. STEINGARD:  In the hypothetical, the

18   Government calls an expert witness who says, I reviewed these

19   ten documents.  And in the hypothetical the defense calls an

20   expert witness that says, I reviewed those ten documents too

21   but they -- they didn't look at these ten documents which shed

22   light on the ten that the -- that the Government did look at.

23   We view that as a trial strategy, vis-à-vis, or in regards to

24   where we have got a prepared witness -- a prepared expert

25   witness where the Government -- which would negate, refute,

1    rebut the Government's witness in that hypothetical.  I guess I

2    would call that a trial strategy.

3                THE COURT:  Well, you can characterize anything

4    as a trial strategy.

10:09AM    5                MR. STEINGARD:  Well, I guess.  But why wouldn't

6    it be?  Why wouldn't it be that we're trying to say we don't

7    want to be the party to prepare the Government's witnesses?

8                THE COURT:  So you're basically saying use the

9    Rule 17 subpoena in order to obtain documents that you believe

10:09AM    10   are necessary for impeachment.

11                MR. STEINGARD:  I don't think that's necessarily

12   impeachment.  It could be impeachment.  Part of it would be

13   impeachment.  If we showed the expert witness the extra ten

14   documents that the Government hadn't looked at and the witness

10:10AM    15   said, gee, I've never seen these before, therefore, I can't

16   comment, that would be impeaching.

17                THE COURT:  Well, if you want to file something

18   else, I will take a look at it.  But those are my tentative

19   views.

10:10AM    20                MR. STEINGARD:  That's fine.  And could I just

21   address one other point, Your Honor?

22                THE COURT:  Sure.

23                MR. STEINGARD:  You mentioned that your normal

24   practice is to, when the materials are received by the Court,

10:10AM    25   to call all counsel, it sounds like, and invite them to come

          1    and inspect the documents.  I would ask that the Court

          2    consider, because this is a defense subpoena, simply providing

          3    those documents to the defense, allowing the defense to make a

          4    determination whether they're going to be used at trial, and if

10:10AM   5    so, of course, the defense has their own obligations under

          6    Rule 16.

          7              THE COURT:  Right.  Because you're ultimately

          8    going to have to give the documents to the Government in any

          9    event.

10:10AM  10              MR. STEINGARD:  Only if they're going to be used.

         11              THE COURT:  Right.  In your hypothetical that

         12    we're talking about, your expert is going to be testifying as

         13    to the missing documents because those ten that the expert

         14    didn't look at, those ten documents are going to have to be

10:11AM  15    turned over to the defense as part of your obligation.

         16              MR. STEINGARD:  What I'm saying is, in the

         17    production to the Court in this hypothetical, 20 documents,

         18    50 documents were produced and the defense selected 10 that

         19    they wanted to use, those, of course, would have to be produced

10:11AM  20    to the Government but not the other 40.

         21              THE COURT:  Right.  That's why all these Rule 17

         22    subpoenas and all this alleged trial strategy, you know,

         23    especially in this case where it's been my effort to make sure

         24    that there are no surprises that occur at the time of trial,

10:11AM  25    obviously it's more slanted toward making sure that the defense

```
  1    doesn't have any surprises but also that there are no surprises
  2    for the Government although that's a different issue.
  3              In any event, I still don't see it.  More
  4    importantly, it seems like many of these documents should be
  5    available without the necessity of a subpoena.
  6              MR. STEINGARD:  I wish that to be true,
  7    Your Honor.  I believe the documents we're talking about are
  8    not available to the defense with just a phone call.  I wish it
  9    was -- I wish it was different, but I can tell you we have made
 10    phone calls.  We haven't --
 11              THE COURT:  Maybe it takes a visit.
 12              MR. STEINGARD:  Well, that would be okay.  That
 13    would be okay with me.
 14              THE COURT:  In any event, then you can have --
 15    you know, you can have all of the boxes of documents, and if
 16    they're voluntarily produced to you, you can do whatever you
 17    want with them.
 18              MR. STEINGARD:  Absolutely right.  If that was
 19    the case, we wouldn't have submitted any kind of an application
 20    to the Court.  May I just suggest, Your Honor, that you sit on
 21    this for two weeks?
 22              THE COURT:  Sure.
 23              MR. STEINGARD:  And give me an effort with
 24    co-counsel --
 25              THE COURT:  We're talking about an October trial
```

```
        1   date.
        2               MR. STEINGARD:  Correct.
        3               THE COURT:  I know these documents are
        4   potentially voluminous, but given -- I think, once they're
10:13AM 5   produced, it should be a fairly easy task to accomplish what I
        6   understand you're trying to accomplish.
        7               MR. STEINGARD:  I agree.
        8               THE COURT:  So you can -- two weeks, three weeks
        9   is fine with me.
10:13AM 10              MR. STEINGARD:  Okay.  You will have it within
       11   two weeks.  Again, that will be filed in camera.  You already
       12   have the joint filing with the Government which lays out our
       13   respective positions.  You will have a full plate then.
       14              THE COURT:  Right.  And then with the -- of
10:13AM 15  course, again, you know, all this Rule 17 stuff is -- you know
       16   exactly what happens, and obviously the request for your gag
       17   order or the nondisclosure order is, as soon as a subpoena is
       18   served, the first call is to the Government saying, guess what,
       19   I got this subpoena.  What do I do with it?  So that's why all
10:14AM 20  of this to me is just -- in any event.
       21              MR. STEINGARD:  I agree the system isn't perfect,
       22   Your Honor, but it's the one we're playing with.  So we have to
       23   go -- I agree with you that may well happen.  In fact, it
       24   likely will happen.  But at least we can take steps to try to
10:14AM 25  prevent it.
```

|       |                                                                              |
|-------|------------------------------------------------------------------------------|
|     1 | THE COURT:  I understand.  Maybe somebody should                             |
|     2 | consider changing Rule 17 to make it work like the defense                   |
|     3 | lawyers want it to work.  I mean, I had a case where I had to                 |
|     4 | put a stop to the practice -- I didn't understand it -- but the              |
|     5 | Federal Public Defender's Office was having Rule 17 subpoenaed               |
|     6 | documents delivered to their office instead of delivered to the              |
|     7 | Court which I found to be -- not in this case and not any of                 |
|     8 | these lawyers, but I found that to be highly unusual and put a               |
|     9 | stop to that practice quickly.                                               |

10:14AM — line 5

10:15AM

10   MR. STEINGARD:  All right.

11   THE COURT:  All right.  Anything else?

12   MS. DRAGALIN:  Your Honor, we do have the

13   stipulation to continue the RICO trial for --

14   THE COURT:  Right.  I was going to sign that

10:15AM 15   today, but I see Mr. Braun is rising and he had some problem

16   with --

17   MR. BRAUN:  I just thought the last thing we

18   needed is another motion or hearing in this case.  There has

19   been some issue raised about my competence and communication

10:15AM 20   with my client in terms of the offers.  So I think the simplest

21   way is for me to just have my client prepare a declaration as

22   to what his knowledge is and file that with the Court.  The

23   Court can then decide whether or not any further inquiry is

24   necessary.

10:15AM 25   He's fully prepared to testify, and he's brought

1    all the documents, but I think it would be better just to file

2    a declaration.

3              THE COURT:  Well, that issue has never been

4    raised with me.

10:16AM   5         MR. BRAUN:  It's been raised by the Government

6    with me, and I think I will just -- if it's okay with the

7    Court, we will file a declaration by my client saying here's

8    what he knows about the case, here's what the offers are, and

9    he's fully aware of them, and that should end that issue.

10:16AM  10              THE COURT:  But you're going to file that in

11   camera.

12              MR. BRAUN:  We can do it in public.  There's no

13   issue.

14              THE COURT:  All right.  Whatever you want, I'm

10:16AM  15   unaware of the issue.  The only issue I was aware of is at one

16   stage of these proceedings the Government had attached several

17   e-mails that were exchanged between you and the Government and

18   the Government rightly was taking offense to some of the

19   statements that were made in those e-mails.

10:16AM  20              MR. BRAUN:  I think they left out some of the

21   better e-mails.  We will put together a declaration,

22   Your Honor.

23              THE COURT:  All right.  Well, I am going to sign

24   that stipulation for a continuance of the trial to February.

10:17AM  25              All right.  Anything else?

1          MR. JENKINS:  Just to clarify, if Mr. Braun's

2    position now is that Mr. Chan is waiving to that date, he just

3    noted it was agreeable, so originally he had objected between

4    January to February, he's agreeing now, just for the record,

10:17AM    5    that would be helpful.

6          MR. BRAUN:  I hate to be technical.  I don't

7    think you can waive.  We can stipulate there's a good cause.  I

8    don't think you have a right to waive a Speedy Trial Act.  We

9    will stipulate to the good cause.

10:17AM    10          THE COURT:  Is that sufficient, Mr. Jenkins?

11          MR. JENKINS:  That is.  Thank you, Your Honor.

12          THE COURT:  Do you want to redo the stipulation?

13          MR. JENKINS:  I definitely do not, Your Honor.

14    But --

10:17AM    15          THE COURT:  The order?

16          MR. JENKINS:  We can amend the order, Your Honor.

17          THE COURT:  Why don't you just submit an amended

18    order.

19          All right.  How many motions in limine are we

10:17AM    20    anticipating in the Lee case?

21          MR. NEUMAN:  I think there's three.

22          THE COURT:  Three?

23          MR. NEUMAN:  Yes.  And two of them are

24    relatively -- I will see what the Government's opposition is.

10:18AM    25    Two of them are relatively short.  One is longer.

1          THE COURT:  All right.  In terms of the time

2    estimate for trial, where are we at?

3          MS. DRAGALIN:  Your Honor, we estimate that the

4    trial -- the Government's case in chief will run approximately

10:18AM  5    five court days.  So we anticipate we would spill it over into

6    the following week of after June 14th.  But we do think we

7    should be finished by the end of that week.

8          THE COURT:  Do you agree, Mr. Neuman?  The

9    reason, I have a custody case that I have to -- I have to try.

10:18AM 10   I want to make sure that this trial doesn't interfere with that

11   custody case.  How long do you anticipate the defense case to

12   take?

13         MR. NEUMAN:  No more than a day or two if there

14   is a defense case.  I haven't had a chance to talk about this

10:18AM 15   with the Government.  There's I think, just from memory, 23 or

16   so witnesses on their list.  I think some of them are

17   cumulative and don't have relevant evidence.  We will discuss

18   that with the Government and, as necessary, raise it with the

19   Court before they testify.

10:19AM 20         THE COURT:  Okay.

21         MR. NEUMAN:  Given the Court's mention of

22   scheduling, does the -- I know the Court had concerns about in

23   custody trials.  Is the June 14th date still looking like it's

24   going to work?

10:19AM 25         THE COURT:  The June 14th date I -- I have

|  | 1 | guarded the June 14th date so we can get this case tried.  I |
|  | 2 | had to set the custody case that I'm referring to to commence |
|  | 3 | after the June 14th date.  It's going to be -- I think we will |
|  | 4 | have sufficient time. |
| 10:20AM | 5 | Again, I'm sure you all realize that we're |
|  | 6 | continuing to operate under this system which I hope we can |
|  | 7 | abolish.  But I have to make a request for a jury panel for a |
|  | 8 | particular day, and there's no assurance that I will be able to |
|  | 9 | have a jury panel on June 14th.  But I'm going to make some |
| 10:20AM | 10 | efforts this week to make sure that I can lock in that date |
|  | 11 | because the timing is going to be such that we're going to |
|  | 12 | be -- I want to make sure that we get this case tried and allow |
|  | 13 | my custody case to go because we're all -- |
|  | 14 | MR. NEUMAN:  I take it this custody case is set |
| 10:21AM | 15 | for June 28th.  Is that -- |
|  | 16 | THE COURT:  Yes. |
|  | 17 | MR. NEUMAN:  So if the Government is talking five |
|  | 18 | days, that goes to the 21st or so.  I think that's probably |
|  | 19 | sufficient to get the case at least to the jury by the end of |
| 10:21AM | 20 | the week. |
|  | 21 | THE COURT:  Right.  That's my -- that was my game |
|  | 22 | plan when I set the custody case for the 28th. |
|  | 23 | MR. NEUMAN:  Is the -- maybe we're too far in |
|  | 24 | advance.  Is the Court anticipating the sort of spread out jury |
| 10:21AM | 25 | that I see here? |

1    THE COURT:  This is the way we have been

2    conducting.  We pick a jury in Courtroom 1 and then -- because

3    we can have a sufficiently -- a larger panel than doing it in

4    here and I don't have to use the video.  And then after we pick

10:21AM    5    the jury and I give them preliminary instructions, then we come

6    back up here, and then we spread out consistent with the

7    numbers that you see which gives us, along with all the

8    plexiglass, some social distancing.

9         That's an issue I can raise with counsel now.  I

10:22AM    10   have been asking for fully vaccinated juries and have done so

11   in the last four or five cases that I have tried.  Does anybody

12   have any objection to that?

13        MS. ALÉ:  Your Honor, are you asking for Huizar?

14        THE COURT:  No.  I'm not asking you.  I'm asking

10:22AM    15   Mr. Neuman who is coming to trial on the 14th.

16        MR. NEUMAN:  Just off the top, no, but I would

17   like to have a moment to think if there is any reason.

18        THE COURT:  Sure.  If you do have an objection,

19   just let us know.  It -- quite frankly, I have noticed that it

10:22AM    20   really has not had any impact on the composition of the panel.

21   Although we all know that vaccination plus booster may not

22   be -- may not be fully protecting everybody, I have noticed,

23   when I speak to the jurors afterwards -- and Shannon, when she

24   speaks to them during the day -- they're much, much more

10:23AM    25   comfortable knowing that the panel -- their fellow jurors are

1    fully vaccinated.  Even if we still separate them like this,

2    they still go on breaks together and it's just -- it makes the

3    jury panel and it makes the Court more comfortable in terms of

4    whatever may be happening on June 14th.

10:23AM    5         MR. NEUMAN:  That's fine.  When does the Court

6    need an answer?  I can get back to you.  I just need time.

7              THE COURT:  The next couple days.

8              MR. NEUMAN:  No problem.  Thank you, Your Honor.

9    We will be a little bit crowded because I anticipate having a

10:23AM    10    translator between me and my client, an attorney from my firm,

11    but she will be serving that role.

12             THE COURT:  We have the benefit of the back row.

13    The interpreter typically works through headphones.

14             MR. NEUMAN:  Right.  I'm not talking about my

10:24AM    15    client understanding what's happening in court.  I'm talking

16    about he and I being able to talk during the proceedings.  My

17    co-counsel Mr. Seilie will be -- it may be a little more

18    crowded than it otherwise might be.

19             THE COURT:  Okay.  All right.  Does the

10:24AM    20    Government have any objection?

21             MR. JENKINS:  Provided that the defense agrees,

22    the Government has no objection.

23             THE COURT:  All right.  Well, I'm obviously not

24    going to do it if there's an objection.  But I just think

10:24AM    25    it's -- for whatever is going on with the -- who knows what

```
 1   variant it may be by June 14th.
 2              MR. NEUMAN:  I take it the Court is not requiring
 3   participants to be masked during the proceedings.
 4              THE COURT:  I am.  The jury -- the last trials
 5   that we have had, the jury has -- the jurors have all worn
 6   masks.  I have counsel wear masks unless they're speaking.  The
 7   witnesses do have not to -- they have to wear masks -- they
 8   don't have to wear masks while testifying.  But you know, we
 9   still have the mask rule in effect.  I see everybody is
10   violating the mask rule this morning.
11              MR. NEUMAN:  Followed Government counsel's leads.
12              THE COURT:  So I will issue sanctions against
13   Mr. Jenkins personally for violating the rules.
14              MR. JENKINS:  I will endeavor to do better next
15   time, Your Honor.
16              MR. NEUMAN:  Thank you, Your Honor.
17              THE COURT:  Thank you very much.  We will be in
18   recess.
19              (Proceedings concluded at 10:25 a.m.)
20
21
22
23
24
25
```

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5                    I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6     COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7     THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8     PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9     FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10    STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11    ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13    THE UNITED STATES.

14

15                    DATED THIS  19TH  DAY OF JUNE, 2022.

16

17

18                    /S/ MIRANDA ALGORRI

19                    _____
                      MIRANDA ALGORRI, CSR NO. 12743, CRR
20                    FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25