STEPHANIE S. CHRISTENSEN
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MACK E. JENKINS (Cal. Bar No. 242101)
Assistant United States Attorney
Chief, Public Corruption & Civil Rights Section
SUSAN S. HAR (Cal. Bar No. 301924)
J. JAMARI BUXTON (Cal Bar. No. 342364)
Assistant United States Attorneys
Public Corruption & Civil Rights Section
1500 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-3289
Facsimile: (213) 894-6436
E-mail: Mack.Jenkins@usdoj.gov
Susan.Har@usdoj.gov
Jamari.Buxton@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

SHEN ZHEN NEW WORLD I, LLC,

Defendant.

No. CR 2:20-326(A)-JFW-4

GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL DISCOVERY FILED ON JULY 19, 2022

Hearing Date: August 8, 2022
Trial Time: 8:00 AM
Location: Courtroom of the Hon. of the Hon. John F. Walter

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Mack E. Jenkins, Susan S. Har, and J. Jamari Buxton, hereby files its Opposition to Defendants Shen Zhen New World I, LLC, Jose Huizar, and Raymond Chan's Motion to Compel Discovery. (Dkt. 613 ["Mot."].)

This opposition is based upon the attached memorandum of points and authorities, the files and records in this case, including the Court's prior orders denying defendants' prior motions to compel, and such further evidence and argument as the Court may permit.

Dated: July 27, 2022

Respectfully submitted,

STEPHANIE S. CHRISTENSEN
Acting United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

/s/
J. JAMARI BUXTON
MACK E. JENKINS
SUSAN S. HAR
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

I. INTRODUCTION....................................................1

II. FACTUAL BACKGROUND.............................................3

A. Esparza Participates in Proffer Interviews with the Government and Details the L.A. Grand Hotel Bribery Scheme Involving Huang, Chan, Huizar, Esparza, and Others.............................................3

B. The Government Prepares and Sends a Proposed Factual Basis Regarding Esparza's Conduct..........................7

C. The Government Provides a Revised Factual Basis...........8

D. Esparza Participates in Another Proffer Interview Before Signing the Revised Factual Basis.................10

E. The Court Denies Defendants' March 2022 Motion to Compel Communications Between the Government and Counsel for Witnesses....................................11

F. The Parties Meet and Confer Regarding the Government's Communications with Esparza's Counsel...................13

III. ARGUMENT......................................................15

A. The Government Has Repeatedly Confirmed That Its Conversations with Esparza's Attorney in March 2020 Produced No Brady Information, and Defendants Have Failed to Otherwise Demonstrate a Brady Violation........15

B. Defendants' Assertion that the Government Deliberately Provided False or Inaccurate Information to Esparza to Improve Its Likelihood of Prevailing at Trial Is Baseless..........................................16

IV. CONCLUSION.....................................................21

# TABLE OF AUTHORITIES

## Cases

Brady v. Maryland, 373 U.S. 83 (1963) .... 14
Giglio v. United States, 405 U.S. 150 (1972) .... 14
Pennsylvania v. Ritchie, 480 U.S. 39 (1987) .... 15
United States v. Bagley, 473 U.S. 667 (1985) .... 15
United States v. Lucas, 841 F.3d 796 (9th Cir. 2016) .... 15

## Statutes

Fed. R. Evid. 602 .... 17
Fed. R. Evid. 612 .... 18

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

As the Court has identified several times on the record,[1] throughout this case, the government has made full, complete, and early discovery productions, including of all witness statements by George Esparza, a cooperating witness. Out of an abundance of caution, the government also produced earlier, draft versions of the Factual Basis for what would ultimately become the final Factual Basis of Esparza's plea agreement. Taking its disclosures further still and continuing to exceed its discovery obligations, the government produced copies of substantive emails between government counsel and Esparza's counsel, Terrence Jones, relating to Esparza's plea agreement and Factual Basis. Collectively, that fulsome discovery presents a clear picture and timeline of the process by which the Factual Basis was finalized. As the government has repeatedly informed defendant Shen Zhen New World I, LLC ("SZNW" or "defendant"), there is no other discoverable Brady information arising from its (unrecorded) conversations with Mr. Jones and there is already a wealth of information previously provided for defense counsel to impeach Esparza on his criminality and his credibility.

Despite the Court's prior rulings stating that Brady motions should not be "speculative" or "fishing expedition[s],"[2] the fulsome productions as described by the Court and above, and the government's unequivocal representations, defendants SZNW, Jose Huizar, and Raymond Chan now move the Court on Brady grounds for a novel order compelling government counsel to generate a detailed summary of these

---

[1] See e.g., 4/25/22 Hr'g Tr. at 38-41.

[2] See e.g., 4/25/22 Hr'g Tr. at 38:12-20.

conversations, claiming, without any credible evidence, that the government sought to inappropriately shape Esparza's testimony by injecting "new" facts, of which Esparza had no recollection, into Esparza's final Factual Basis.

The Court should reject this baseless motion. To be crystal clear: the government is not aware of any information through its conversations with Mr. Jones, or anywhere else, that Esparza adopted and swore to facts in his Factual Basis that he did not believe were accurate or that he did not recall to be true. Indeed, this Court accepted Esparza's plea where he swore under oath that his Factual Basis was accurate and that his entry into his plea agreement was knowing and voluntary. Even further, Esparza has already testified once in this matter, before this Court, and there was no evidence adduced at that trial that any part of his Factual Basis was untruthful. And defendants have not demonstrated that the government has, in fact, improperly withheld favorable evidence, which is unsurprising because they have utterly failed to show such evidence even exists in the first place. This substantial record should be the end of the matter.

Defendants' current claim is reminiscent of a nearly identical, failed motion to compel in this case from several months ago, in which defendants sought "all communications between the government and the cooperators and their counsel." (Dkt. 381 at 23.) The Court rejected that motion and, as part of the basis for that rejection, specifically lauded the government's commitment to its discovery obligations thus far.[3] As was the case then, and continues to be the

[3] See 4/25/22 Hr'g Tr. at 38-41.

case now, defendants have not made the requisite showing that the government has withheld Brady information, particularly in light of the government's full discovery productions and clear and express representation that there is no such other information.

In addition, defendants' factual mischaracterization that the government "spoon-fed" Esparza information the government "wanted, expected, and needed him to say" is both meritless and misleading. (See Mot. at 14.) More fundamentally, it also demonstrates a surprising misapprehension about how plea agreements and factual bases are formed. The factual record instead reflects that Esparza discussed or at least referenced all the so-called "new" information in his Factual Basis during earlier proffer interviews with the government. Then, to assure their accuracy and confirm relevant details, he reviewed corroborating documents of certain specific events regarding those same topics and confirmed they were true in his sworn Factual Basis. This is basic Factual Basis construction that occurs or should occur in every federal criminal case where a defendant is pleading guilty and has the opportunity to review relevant evidence before doing so. There is nothing improper about that.

Put simply, defendants have failed (again) to show they are entitled to relief.

## II. FACTUAL BACKGROUND

### A. Esparza Participates in Proffer Interviews with the Government and Details the L.A. Grand Hotel Bribery Scheme Involving Huang, Chan, Huizar, Esparza, and Others

Between November 2018 and June 2019, Esparza, in the presence of his counsel, Terrence Jones, participated in five proffer interviews with the government. During the interviews, Esparza described

various types of criminal conduct of which he was aware, including a bribery scheme related to the L.A. Grand Hotel involving, among others, Huizar, Esparza, Raymond Chan, SZNW, which owns the hotel, and SZNW's Chairman, Wei Huang.

Specifically, Esparza stated that he and Huizar met Huang in February 2013 through Chan, Huang's close friend, who was then the Interim General Manager of the Los Angeles Department of Building and Safety ("LADBS"). (Def. Ex. A-1 at 2, 14; Def. Ex. A-5 at 1.) At the time, Chan, who is Chinese, was introducing Huizar to numerous affluent Chinese investors/developers, like Huang, with whom Chan had connections. (Def. Ex. A-1 at 11; Def. Ex. A-3 at 2, 4; Def. Ex. A-4 at 3.) Soon after the introduction, in March 2013, Huang, Huang's right-hand man, Ricky Zheng, Huizar, and Esparza traveled on a private jet to Las Vegas, where Huang lavished Huizar and Esparza with various benefits, including thousands of dollars in casino chips. (Def. Ex. A-1 at 2-6.)

Esparza explained that as the Chair of the Planning and Land Use Management ("PLUM") Committee, Huizar had every major development project pass through him. (See Def. Ex. A-1 at 12; Def. Ex. A-5 at 1-2.) This meant that Huizar could stall and/or torpedo projects as he saw fit. (See Def. Ex. A-1 at 12.) Huizar used this power to extract benefits from investors/developers, often through Esparza, who interfaced with the various representatives. (See id.) According to Esparza, if investors/developers did not cooperate, and "pay to play," they did not get any type of treatment from Huizar or his office. (See id.)

According to Esparza, Chan would describe the importance of Huizar and PLUM to the Chinese developers. (See Def. Ex. A-3 at 6.)

This included Huang, SZNW's owner. During a dinner one evening attended by Huang, for example, Chan explained to representatives from another company that Huizar, as the Chairman of PLUM, had the power to (1) put things on the agenda, (2) overturn rules, and (3) change ordinances. (Id.) Chan went on to say, "if you do not have a relationship with Jose [Huizar] your project would be at the end of the list." (Id.) On another occasion, Chan told Huang that that Huizar was the "downtown guy" so that whatever Huang needed, Chan and Huizar could do. (Id. at 5.) Esparza said that on yet another occasion, Chan put it to Huang as follows: "the idea of Huizar is the investment." (Id.)

Huang took Chan's advice and invested in Huizar. In 2014, Huizar and Chan persuaded Huang to supply approximately $600,000 to enable Huizar to settle a lawsuit against him by a former staffer discretely and confidentially, so as not to jeopardize Huizar's 2015 re-election bid. (See Def. Ex. A-1 at 11-12; Def. Ex. A-3 at 2-3.) According to Esparza, the parties structured the transaction to conceal the connection between Huang and Huizar. (See Def. Ex. A-3 at 2-3.) Huizar told Esparza that Huang could not give the $600,000 directly to Huizar because it was a conflict of interest for Huang in that he had a development in Huizar's district. (See Id. at 3.) Zheng, Huang's right-hand guy, separately told Esparza that Huang, who had two hotels in Los Angeles, did not want to be seen giving a gift or a bribe to Huizar. (Id.) Esparza told the government that both Huang and Huizar wanted the payment to look clean and to have no ties to Huang. (Id.)

Esparza also described the various benefits he and Huizar received during approximately nineteen trips Huang, Zheng, Huizar,

and Esparza took to Las Vegas between 2013 and 2018. Esparza said that Huang supplied Huizar with approximately $10,000 to $20,000 in casino chips each trip, the proceeds of which Huizar often concealed when cashing out. (See Def. Ex. A-1 at 4-5.)[4] Esparza said that he and Huizar sometimes rode in private jets and limos, regularly stayed in luxurious villas, played golf, and partied at nightclubs where the bills were regularly in the tens of thousands of dollars, all free of charge for them. (Id. at 3-6.)

Esparza said the benefits Huang gave Huizar came with certain expectations. Specifically, Esparza told the government that because of the settlement payment and the money provided in Las Vegas, there was an expectation that Huizar would be there no matter what if Huang needed something. (See Def. Ex. A-3 at 5.) Esparza said that when Huang told Huizar to jump, Huizar jumped. (See id. at 4.) Esparza said that everyone saw Huang's payment of the settlement as a long-term investment so if Huang needed something from Huizar down the road, Huizar would help.[5] (See Def. Ex. A-5 at 4.)

Along these lines, Esparza told the government during a January 15, 2019 proffer interview that Huang wanted to build "the tallest tower in downtown and West of the Mississippi." (Id. at 5.) Esparza said the topic of Huang's hotel expansion came up many times, including during a meeting at Huizar's office attended by Huang, Chan, LADBS representatives, and other city officials. (Id.)[6]

---

[4] Esparza said he got approximately $2,000 to $5,000 in casino chips each trip. (See id.)

[5] At the same time, Esparza stated during the same proffer interview that he did not know if there was a "quid pro quo" associated with Huang loaning Huizar the settlement funds. (See id.)

[6] Records reflect that this meeting took place on August 4, 2016.

According to Esparza, Huizar told Huang that he would help Huang because "this tallest building would be [Huizar's] penis downtown." (Id.) Huizar said on multiple occasions that the L.A. Grand Hotel "would be the tallest thing there" and this would be his "big dick above the city."[7] (Id.)

**B. The Government Prepares and Sends a Proposed Factual Basis Regarding Esparza's Conduct**

On February 15, 2020, counsel for the government sent Esparza's attorney, Mr. Jones, a proposed Factual Basis to be incorporated into a forthcoming plea agreement. (Def. Ex. B) The first paragraph of the proposed Factual Basis stated that the parties agreed the statement of facts contained therein "is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct." (Id. at 1 (emphasis added).) The proposed Factual Basis described in summary fashion many of the events Esparza discussed during his initial proffer interviews, including certain aspects of the L.A. Grand Hotel bribery scheme.

In particular, the proposed Factual Basis described Huizar's and Esparza's introduction to Huang through Chan (id. at 4-5 ¶ 11); benefits Huang supplied to Huizar and Esparza during trips to Las Vegas between 2013 and 2018 (id. at 5 ¶ 12); Huang, in 2014, supplying $600,000 to enable Huizar to privately and confidentially

[7] Esparza also told the government about a number of smaller asks Huang made of Huizar, including a request that Huizar help get Huang's son into USC; a resolution Huizar provided to Huang; a letter of support addressed to the Chinese government; for a list of land use attorneys to hire; and a request that Huizar get the media to cover a press conference for a school located on the L.A. Grand Hotel property. (See Def. Ex. A-3 at 7-9.)

settle a lawsuit against him (id. at 7 ¶ 16); and the fact that Huang provided benefits to Huizar because Huizar, as the CD-14 Councilmember and the Chair of the PLUM Committee, was poised to help Huang achieve his goal to redevelop the L.A. Grand Hotel into the tallest building west of the Mississippi though official acts at various stages of the City approval process (id. at 8 ¶ 19).

**C. The Government Provides a Revised Factual Basis**

Several weeks later, on March 10, 2020, counsel for the government sent Mr. Jones an email attaching five FBI reports regarding the proffer interviews described above. (Def. Ex. C at 3.) The email went on to state: "As we mentioned on the phone, the particular areas we want [Esparza] to focus on are the . . . settlement and his role in facilitating/arranging that payment, and the concept that [Huang] asked Huizar for favors in return, specifically with regard to the LA Grand hotel redevelopment project. The January 15, 2019 report has the most detail on this latter subject." (Id.)

The parties thereafter communicated over email and attempted to schedule a meeting between the government and Esparza/Mr. Jones to discuss the Factual Basis. (See id. at 1-3.)

Before the parties had settled on a date, counsel for the government on March 23, 2020 sent Mr. Jones an email that contained a revised proposed Factual Basis for Esparza. (See id. at 1.) The email read:

> Mr. Jones – as discussed, please find attached a revised draft Factual Basis for your client. We have gone through it based on conversations with you, and [another AUSA] has identified where particular evidence would help enlighten Mr. Esparza's recollection (those areas are highlighted in yellow). For that same reason and

> based on such evidence, we have added more relevant paragraphs. We also highlight in blue an exchange we would like [Esparza's] further input on.
>
> Please confirm receipt and let us know if we can meet with your client tomorrow or soon thereafter to finalize this. Thanks.

(Id.) (emphasis in original.)

The revised Factual Basis contained seven new paragraphs in the section of the document titled "L.A. Grand Hotel Bribery Scheme." There was corroborating documentation or records for each of the events described in the seven new paragraphs. Those new paragraphs, which the government highlighted in yellow, stated as follows:

> 20. On August 4, 2016 , HUIZAR, CHAN, officials from the Planning Department, and CD-14 staff members met with HUANG and his team to discuss the expansion of the L.A. Grand Hotel, including HUANG's interest in pursuing TOT rebates, TFAR, and other incentives from the City.
>
> 21. On August 15, 2016, defendant ESPARZA texted HUIZAR regarding HUANG's expansion project: "Reminder boss to decide what land use expediters you want to recommend to the Chairman [HUANG]."
>
> 22. On December 16, 2016 , defendant ESPARZA forwarded an e-mail to HUIZAR from SHAWN KUK, the CD-14 Planning Director, listing a number of consultants, writing: "Hi Boss, Here is the list of land use consultants per [KUK]'s past recommendations. Chairman [HUANG] would like us to schedule interviews on Monday."
>
> 23. On April 27, 2017, in a telephone call between defendant ESPARZA and ZHENG, the two discussed a proposed consultant for the L.A. Grand Hotel expansion project. Defendant ESPARZA stated: "So, remember, the Chairman (HUANG] was gonna hire (a specific consultant]? ... JOSE [HUIZAR] wanted me to tell the Chairman [HUANG] not to hire him anymore." When ZHENG asked why, defendant ESPARZA responded: "Because, ah, JOSE [HUIZAR] can't trust him he's too loyal to another elected official, to another person. So JOSE [HUIZAR] doesn't think it's a good idea,

> it's not a good idea to—to put him on the project."
>
> 24. Co-conspirator HUANG brought up the L.A. Grand Hotel expansion project on numerous occasions in the presence of defendant ESPARZA and HUIZAR. HUANG, through translation provided by ZHENG, expressed to HUIZAR that he wanted to build the tallest tower west of the Mississippi. In response, HUIZAR expressed his support of the project.
>
> 25. On May 9, 2017, in a telephone call, defendant ESPARZA and ZHENG discussed the relationship between HUANG and HUIZAR. ZHENG stated that HUANG expected to lay everything in front of HUIZAR at an upcoming trip to Cabo San Lucas, which defendant ESPARZA understood to refer to the assistance HUANG expected from HUIZAR on the L.A. Grand Hotel expansion project. ZHENG added that HUANG was "going to make [HUIZAR] think that, make it, otherwise Chairman [HUANG] ask him to, uh, pay back that $600,000 already. Last night." When defendant ESPARZA stated that "[HUIZAR]'s not going to do that either," ZHENG responded: "Chairman [HUANG ] will push him." According to ZHENG, HUANG raised this issue with HUIZAR the previous evening at the same time that HUANG told HUIZAR that HUANG heard from multiple sources that the FBI was looking into HUIZAR.
>
> 26. On May 9, 2017, in a telephone call between defendant ESPARZA and another HUIZAR staff member, defendant ESPARZA stated: "Chairman [HUANG] should have all the leverage in the world [be]cause of what [HUIZAR] owes [HUANG]." Defendant ESPARZA meant that HUANG expected HUIZAR's assistance on the L.A. Grand Hotel expansion project, or any other requested assistance, from HUIZAR because of the financial benefits HUANG had provided to HUIZAR.

(Def. Ex. D at 8-10 ¶¶ 20-26.)

### D. Esparza Participates in Another Proffer Interview Before Signing the Revised Factual Basis

On March 25, 2020, Esparza and Mr. Jones met again with the government, during which the parties discussed Esparza's Factual Basis. (Def. Ex. A-6 at 1.) At no point during that interview did

Esparza or Mr. Jones express that any of the seven new paragraphs were inaccurate. Esparza also provided additional information to the government. Among other things, Esparza spoke about an August 4, 2016 meeting between Huizar, Huang, Chan, and others regarding the L.A. Grand Hotel redevelopment project, which Esparza discussed during a previous proffer interview (id.; Def. Ex. A-3 at 5), and he said that Huang at one point asked Huizar to recommend a land use attorney, and Esparza explained that Huizar did not want to recommend a certain person for fear they might develop a similar relationship with Huang. (Def. Ex. A-6 at 1.)

That same day, the government sent Mr. Jones an clean, un-highlighted copy of Esparza's revised Factual Basis. (Def. Ex. E.) Several days later, on April 1, 2020, Mr. Jones sent the government a copy of Esparza's revised Factual Basis signed by Esparza and him. (Def. Ex. F.) Each and every page of the Factual Basis was initialed by Esparza, and the final page was signed by both Esparza and Mr. Jones. (Id.)

**E. The Court Denies Defendants' March 2022 Motion to Compel Communications Between the Government and Counsel for Witnesses**

On March 3, 2022, all defendants, including SZNW, moved to compel the government to produce, among other things, "all communications between the government and any witnesses or cooperators and their counsel, including non-privileged notes, scheduling notices, and all records of communications." (Dkt. 381 at 1 (emphasis added).) Defendants argued that such materials were discoverable under Rule 16, Brady, and Giglio. (See id. at 8-11, 13, 23-25.) In particular, defendants argued that because certain cooperating witness' statements had evolved over time, obtaining

communications between the government and the cooperators' counsel, which conversations could have involved whether the government believed the cooperators' testimony, was central to understanding the changing accounts. (See id. at 15.)

In its opposition, the government stated that it will continue to produce Rule 16, Brady/Giglio, and Jencks discovery, consistent with its duty to make prospective decisions about what falls into those categories. (Dkt. 418 at 23.) The government acknowledged that if it learns Brady/Giglio information from a witness' counsel, or if the prosecutors document such information in their notes, the government has a duty to disclose those underlying facts. (Id. at 23-24.) Even so, the government argued that defendants had failed to make a threshold showing of materiality for many of the requested items, for example, communications between the government and counsel for non-testifying witnesses or various non-substantive communications. (See id. at 21-23.)

On April 25, 2022, the Court denied defendants' motion to compel. (See Dkt. 436.) In the Court's order, which it verbally provided at the hearing, the Court said the following:

> Based upon the prosecution team handling of this case to date, the Court concludes that the prosecutors fully understand and will continue to comply with their discovery obligations. The Government's understanding and compliance with its obligation is evidenced by the incredibly detailed description defendants were able to make in their motion and reply briefs and in Mr. Snyder's declaration that I have been referring to regarding the alleged changes in Goldman and Businessperson A's testimony which are obviously based on discovery already produced and can and will be used to impeach both witnesses. The Court thus denies the defendants' motion for additional discovery relating to those communications. Should the defendants believe that the Government is not in compliance with its

discovery obligations, the defendants are free to raise these issues at an appropriate later point in time, hopefully with a full record so I can make a determination without spending an enormous amount of time going through all of the documents.

(4/25/22 Hr'g Tr. at 40:19-41:13.)

Earlier, the Court set the government's deadline to produce Brady/Giglio materials in connection with the Dae Yong Lee/940 Hill, LLC trial for April 29, 2020. On April 29, the government produced a number of materials to defendants, including the fulsome communications between the government and Esparza's counsel, as well as the draft versions of the Factual Basis, that are the subject of the instant motion to compel.

**F. The Parties Meet and Confer Regarding the Government's Communications with Esparza's Counsel**

On May 17, 2022, counsel for defendant SZNW emailed the government and requested "copies of all notes . . . of government counsel's conversation with Mr. Jones" regarding a need to "enlighten Mr. Esparza's recollection," as well as an accounting of that conversation. (Def. Ex. G at 7.) The government responded on June 3, 2022 that it does not believe, based on a reasonably diligent search, that it possessed any notes by government counsel other than what has already been produced and further said the government would maintain that any such communications are not discoverable under Rule 16(a)(2). (See id. at 5.) On June 6, 2022, defense counsel inquired regarding possible agent notes of the conversation and whether the government would, in any event, prepare an accounting of that conversation. (See id.) The government responded several days later, on June 10, 2022. (Id. at 4.) The government told defense

counsel that it is not aware of any Brady/Giglio or Jencks material regarding the conversation, nor is it aware of any authority requiring the government to create such a record. (Id.) Five days later, on June 15, 2022, defense counsel further clarified its request for Brady material and its purported legal basis. Later that day, the government wrote back to defense counsel and stated: "There is no Brady information to produce in response to your below request." (Id. at 3.)

The parties conferred again several weeks later. In a July 14, 2022 email to defense counsel, the government again explained that the conversation with Mr. Jones at issue generated no Brady information:

> We have reviewed and our position is that there is no Brady and I nor any agents have no notes of phone calls with Mr. Jones (as stated below). I am not sure what there is to litigate in that posture. Moreover, the issue of AUSA communications as Brady has already been litigated and resolved (denied absent threshold showing of materiality). So to the extent you seek to further litigate our position is that you should file a motion for reconsideration and specifically identify materiality.

(Id. at 1.)

According to defense counsel, he spoke with Esparza's counsel, Mr. Jones, who stated that he could not recall the substance of his conversations with the government. (See Mot. at 17.) Defendants' motion to compel followed.

## III. ARGUMENT

### A. The Government Has Repeatedly Confirmed That Its Conversations with Esparza's Attorney in March 2020 Produced No Brady Information, and Defendants Have Failed to Otherwise Demonstrate a Brady Violation

Under Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972), the government must turn over evidence in its possession that is favorable to the defense or that may be used by the defense for impeachment purposes. Specifically, Brady, "requires disclosure only of evidence that is both favorable to the accused and material either to guilt or to punishment." United States v. Bagley, 473 U.S. 667, 674 (1985) (citations omitted). The Ninth Circuit has held that "[i]t is the government, not the defendant or the trial court, that decides prospectively what information, if any, is material and must be disclosed under Brady." United States v. Lucas, 841 F.3d 796, 807 (9th Cir. 2016) (emphasis in original). For that reason, "the prosecutor's decision on disclosure is final" unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention. Id. (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 60 (1987)). To challenge the government's representation that it lacks Brady information, a defendant must either make a showing of materiality under Rule 16 or otherwise demonstrate that the government improperly withheld favorable evidence. Lucas, 841 F.3d at 808. Defendants make no such showing here.

Although not entirely clear, defendants' claim seems to be that the unrecorded conversations between government counsel and Mr. Jones would reveal that Esparza agreed to certain facts in the Factual Basis only because it was what prosecutors "wanted, expected, and

needed him to say" and because he was unable to "push-back on [the government's] claimed version of events." (See Mot. at 14.) In other words, defendants apparently claim that the government is withholding information that Esparza adopted facts in the Factual Basis that were false or that he did not believe to be true.

This claim is utterly false. *First* and most importantly, no such information exists. To the contrary, the government's fulsome productions and express representations prove that what defendants insinuate occurred did not occur. (See 4/25/22 Hr'g Tr. at 40:19-22) ("Based upon the prosecution team handling of this case to date, the Court concludes that the prosecutors fully understand and will continue to comply with their discovery obligations.") *Second*, defendants fail to make any threshold showing or point to any evidence that would demonstrate that the government is, contrary to its representations, withholding such Brady information. This is particularly true given not only the government's repeated disclosures, but Mr. Jones' own statements directly to defense counsel that he did not recall the substance of the conversations with the prosecutors, without more. (See Mot. at 17.) And it is likely that had government counsel insisted his client swear under oath to false information that would be something Mr. Jones would remember.

In short, defendants' bald speculation is insufficient to warrant relief.

**B. Defendants' Assertion that the Government Deliberately Provided False or Inaccurate Information to Esparza to Improve Its Likelihood of Prevailing at Trial Is Baseless**

Defendants assert that the government "spoon-fed[] [Esparza] a series of 'facts' and events, none of which he had previously

recounted," by including in his revised Factual Basis references to several dates, communications, and events. (See Mot. at 18.) Defendants go on to allege that the government took these actions so Esparza would say "what the prosecutors wanted, expected, and needed him to say," presumably to improve the government's chances. (Id. at 19.) Defendants' assertion is as fantastical as it is false.

Most importantly, the "new" facts defendants accuse the government of planting are all events of which Esparza has personal knowledge and that are specifically corroborated, including written communications Esparza himself previously sent or received, events Esparza observed, and things Esparza said in recordings. See Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.") What is more, defendants fundamentally misunderstand what a Factual Basis is. It is a statement supporting the plea agreement in which the pleading defendant swears that the facts contained therein are true. There is no requirement that a defendant can only swear to facts that were (a) previously discussed at a proffer session and (b) ones the defendant had a perfect memory of at the time of said initial proffer, as defendants' motion incorrectly and bewilderingly suggests. Indeed, many defendants opt not to cooperate or speak with the government at all, and it is commonplace for the government to offer a plea agreement with a Factual Basis in the absence of a prior conversation. In other occasions, it is also routine for government counsel to meet numerous times with a defendant before s/he agrees to a Factual Basis. Moreover, many defense counsel have repeated conversations with their client during which they go over the

evidence the government has provided before their client enters a plea that discusses such evidence. No credible argument can be made that a defense attorney going over the evidence with his/her client before signing a plea agreement has acted improperly by seeking to improve the client's chances of the plea being accepted.

Nor is there anything nefarious about providing the pleading defendant with corroborating documentation of objective events described in a Factual Basis or drilling down on specific details in finalizing a Factual Basis. Indeed, litigants preparing for trial are routinely required to jog a potential witness' memory of people, places, and events with various items, as are parties engaged in actual trial. See Fed. R. Evid. 612. Defendants' own motion seemingly acknowledges that it would be perfectly permissible for the government to ask Esparza about his recollection of a conversation that occurred three years earlier; plant a seed that might lead Esparza to remember a specific call; or play a recorded call and ask leading questions about Esparza's state of mind at the time. (See Mot. at 14.) Ultimately, if that defendant can recall and truthfully swear to the contents of the Factual Basis, it is properly incorporated therein.

But in any event, the record here reflects that Esparza previously discussed -- or at minimum referenced -- nearly all of the so-called "new" facts contained in Esparza's revised Factual Basis. For example, paragraph 20 of Esparza's revised Factual Basis states that on August 4, 2016, Huang met with Huizar, Chan, and other city officials to discuss Huang's plans to expand the L.A. Grand Hotel project, including his interest in TOT rebates, TFAR, and other incentives from the City. (See Def. Ex. F at 7 ¶ 20.) But

defendants concede that during his January 15, 2019 proffer interview, Esparza stated that on one occasion Huang went to Huizar's office with Chan and representatives of LADBS and LADCP and presented Huang's expansion plans. (See Def. Ex. A-3 at 5.) Likewise, paragraphs 21, 21, and 23 of Esparza's revised Factual Basis reference specific texts, emails, and (recorded) telephone calls Esparza had regarding Huang's request for a list of land use consultants. (See Def. Ex. F at 8 ¶¶ 21-23.) And again, defendants concede that Esparza referenced Huang seeking Huizar's help securing a land use attorney during an earlier proffer session, albeit in a potentially different context. (See Mot. at 3 n.2, 6-7.)[8]

Paragraph 24 of Esparza's revised Factual Basis states that Huang brought up the L.A. Grand Hotel expansion project on numerous occasions in the presence of Huizar and Esparza. (See Def. Ex. F at 8 ¶ 24.) Esparza again talked about this during an proffer interview, a fact defendants acknowledge in the motion. (See Mot. at 7.) And while paragraph 25 of the revised Factual Basis describes that Esparza and Zheng spoke by phone on May 9, 2017 and discussed Huang pressuring Huizar to repay the $600,000 Huang posted as collateral for the loan, including during an upcoming trip to Mexico, (see Def. Ex. F at 8-9 ¶ 25), Esparza stated during multiple earlier proffer interviews that Huang and/or Zheng had expressed their desire for Huizar to repay the money, albeit at somewhat later stages. (See Def. Ex. A-3 at 4; Def. Ext A-5 at 8, 12.)

---

[8] It appears that Esparza did not previously discuss Huizar's disapproval of Huang selecting a particular land use consultant whom Huizar viewed as untrustworthy. (See id. at 12.) But this fact can hardly be said to dramatically affect the government's chances at trial.

Finally, paragraph 26 of Esparza's revised Factual Basis describes a recorded May 9, 2017 telephone call in which Esparza remarked that Huang "should have all the leverage in the world" over Huizar because of what Huizar owes Huang, referring to Huang's payment of the settlement collateral and his payments to Huizar in Las Vegas. (See Def. Ex. F at 9 ¶ 26.) Here, defendants contend that the government simply told Esparza what to say by explaining what Esparza meant by the statement. (See Mot. at 14.) Critically, though, Esparza stated during his January 15, 2019 proffer interview that because of Huang's settlement payment and the money Huang gave Huizar during the Las Vegas trips, there was an expectation that Huizar would be there no matter what if Huang needed something. (See Def. Ex. A-3 at 4.) Esparza further stated during proffer interviews that when Huang told Huizar to jump, Huizar jumped, (see id. at 4), and that Huizar told Huang he would help Huang with the L.A. Grand Hotel redevelopment project, which would be a symbol of Huizar's power in Los Angeles. (See id. at 5.) These previous statements regarding Esparza's understanding of the Huang-Huizar relationship are fully consistent with the language in paragraph 26 of the revised Factual Basis, undermining defendants' claim that the government was telling Esparza what the facts were and "what he was thinking and what he meant." (See Mot. at 9.)

Put simply, defendants' assertion that the government spoon-fed Esparza information and attempted to replace Esparza's understanding of the facts with its own agenda rings hollow. Defendants' claims of inappropriate witness engineering are therefore completely unfounded.

At most, defendants' motion showcases a potential point of cross-examination for Esparza. As this Court has previously

observed, this may be proper impeachment, but it is not a basis to compel government counsel to create a record about conversations with cooperator counsel that it already confirmed did not raise any Brady information. (See 4/25/22 Hr'g Tr. at 40:23-41:05) ("The Government's understanding and compliance with its obligation is evidenced by the incredibly detailed description defendants were able to make in their motion and reply briefs and in Mr. Snyder's declaration that I have been referring to regarding the alleged changes in Goldman and Businessperson A's testimony which are obviously based on discovery already produced and can and will be used to impeach both witnesses.") Moreover, as stated above, due to the government's fulsome discovery production and its requirement that Esparza admit to a robust Factual Basis, impeachment material for his testimony is not lacking. This fact further demonstrates that defendants' instant baseless and confused motion, which seeks to contrive nonexistent Brady material, is unnecessary and unwarranted.

**IV. CONCLUSION**

For the foregoing reasons, the Court should deny defendants' motion to compel.