Richard M. Steingard (SBN 106374)
*rsteingard@SteingardLaw.com*
LAW OFFICES OF RICHARD M. STEINGARD
800 Wilshire Boulevard, Suite 1050
Los Angeles, California 90017
Telephone: (213) 260-9449
Facsimile: (213) 260-9450

Attorney for Defendant
Shen Zhen New World I, LLC

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR-20-326(A)-JFW |
| Plaintiff, | |
| v. | **JOINT MOTION *IN LIMINE* NO. 4: SHEN ZHEN NEW WORLD I, LLC'S MOTION TO EXCLUDE RAYMOND CHAN'S "RADAR SCREENS" AND SIMILAR DOCUMENTS; DECLARATION OF RICHARD M. STEINGARD** |
| SHEN ZHEN NEW WORLD I, LLC, | |
| Defendant. | |

Date:     September 23, 2022
Time:    8:00 a.m.
Crtrm: 7A

Trial Date: October 25, 2022

Assigned to Hon. John F. Walter

# <u>TABLE OF CONTENTS</u>

**Identification of Matters in Dispute** ................................................................1

**SZNW's Motion**...............................................................................................2

I.      INTRODUCTION ..................................................................................2

II.     STATEMENT OF RELEVANT FACTS ................................................2
        A.      Raymond Chan's Radar Screens ................................................2
        B.      The Government's Trial Exhibits ...............................................4
                1.      "Radar Screen," June 17, 2013 .....................................4
                2.      "[Chinese characters] CM Tasks Progress Report,"
                        February 22, 2014 ..........................................................4
                3.      "[Chinese characters]," March 31, 2014 ......................5
                4.      "[Chinese characters]," March 26, 2016 ......................5
                5.      "Radar Screen," July 24, 2016 ......................................6

III.    ARGUMENT ..........................................................................................7
        A.      There is No Foundation for the Admission of these Documents ...........7
        B.      The Documents are Irrelevant......................................................8
        C.      The Documents Constitute Inadmissible Hearsay........................8
        D.      There is No Foundation for Opinion Testimony ..........................9
        E.      The Documents are More Prejudicial than Probative ..........................10

**Government's Opposition** ..........................................................................11

I.      INTRODUCTION ................................................................................11

II.     FACTUAL BACKGROUND ................................................................13
        A.      SZNW, Huang, Huizar, Chan, Esparza, and Zheng Engage
                in the L.A. Grand Hotel Bribery Scheme.....................................13
        B.      The Government Obtains Chan's "Radar Screens" Describing
                Various Aspects of the L.A. Grand Hotel Bribery Scheme .................18
                1.      6/17/13 Radar Screen (Def. Ex. B).............................18
                2.      2/22/14 Radar Screen (Def. Ex. C).............................19
                3.      3/31/14 Radar Screen (Def. Ex. D) ............................20
                4.      3/26/14 Radar Screen (Def. Ex. E).............................21
                5.      7/24/2016 Radar Screen (Def. Ex. F) ..........................21

LAW
OFFICES OF
RICHARD M.
STEINGARD

III.   ARGUMENT ..................................................................................22

    A.   The Radar Screens Are Highly Relevant.................................22

    B.   The Government Can Authenticate the Radar Screens  ...............24

    C.   The Radar Screens Constitute Admissible

        Co-Conspirator/Co-Schemer Statements................................25

        1.   Chan, Huang, Zheng, Huizar, and Esparza Were Engaged

            in the L.A. Grand Hotel Bribery Scheme When Chan

            Produced the Radar Screens ........................................27

        2.   SZNW and Huang Had Knowledge of, and Participated

            in, the L.A. Grand Hotel Bribery Scheme ....................28

        3.   The Radar Screens Were Made in Furtherance of the

            L.A. Grand Hotel Bribery Scheme .............................29

    D.   A Rule 403 Analysis Favors Admitting the Highly Probative

        Radar Screens.................................................................32

**SZNW's Reply**.................................................................................34

    A.   Radar Screen dated June 17, 2013, attached as Exhibit B ...................34

    B.   Radar Screen dated February 22, 2014, attached as Exhibit D ...........36

    C.   Radar Screen dated March 31, 2014, attached as Exhibit E.................36

    D.   Radar Screen dated March 26, 2016, attached as Exhibit F  ...............37

    E.   Radar Screen dated July 24, 2016, attached as Exhibit G ...................38

    F.   Radar Screens dated May 3, 2015, Nov. 22, 2015,

        & May 1, 2016, attached as Exhibits 6, 7, & 8, Respectively..............39

**Declaration of Richard M. Steingard**.................................................................42

LAW
OFFICES OF
RICHARD M.
STEINGARD

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bourjaily v. United States*,
    483 U.S. 171 (1987)...........................................................................................25

*Petrocelli v. Gallison*,
    679 F.2d 286 (1st Cir. 1982)..........................................................................10

*Robinson v. United States*,
    33 F.2d 238 (9th Cir. 1929) ...........................................................................26

*Sandoval v. Cty. of San Diego*,
    985 F.3d 657 (9th Cir. 2021) .........................................................................22

*Sendejas v. United States*,
    428 F.2d 1040 (9th Cir. 1970) .......................................................................26

*United States v. Black*,
    767 F.2d 1334 (9th Cir. 1985) .......................................................................24

*United States v. Cox*,
    633 F.2d 871 (9th Cir. 1980) .........................................................................38

*United States v. Curtin*,
    489 F.3d 935 (9th Cir. 2007) .........................................................................22

*United States v. Dicker*,
    853 F.2d 1103 (3d Cir. 1988)...........................................................................9

*United States v. Fisher*,
    648 F.3d 442 (6th Cir. 2011) .........................................................................10

*United States v. Freeman*,
    730 F.3d 590 (6th Cir. 2013) ...........................................................................9

*United States v. Freeman*,
    498 F.3d 893 (9th Cir. 2007) ..............................................................25, 32, 38

LAW
OFFICES OF
RICHARD M.
STEINGARD

iv

*United States v. Gadson,*
    763 F.3d 1189 (9th Cir. 2014) ........................................................ 24-25, 38

*United States v. Guyton,*
    36 F.3d 655 (7th Cir. 1994) ................................................................26, 29

*United States v. Graciano-Cabanilla,*
    113 Fed. App'x 761 (9th Cir. 2004) ............................................................27

*United States v. Hankey,*
    203 F.3d 1160 (9th Cir. 2000) ....................................................................32

*United States v. Hinkson,*
    585 F.3d 1247 (9th Cir. 2009) ....................................................................10

*United States v. Larson,*
    460 F.3d 1200 (9th Cir. 2006) ....................................................................25

*United States v. Lloyd,*
    807 F.3d 1128 (9th Cir. 2015) ....................................................................26

*United States v. Lothian,*
    976 F.2d 1257 (9th Cir. 1992) ....................................................................26

*United States v. Mende,*
    43 F.3d 1298 (9th Cir. 1995) ......................................................................32

*United States v. Nazemian,*
    948 F.2d 522 (9th Cir. 1991) ................................................................26, 29

*United States v. Payne,*
    437 F.3d 540 (6th Cir. 2006) ......................................................................26

*United States v. Schmidt,*
    881 F.2d 608 (9th Cir. 1989) ............................................................ 9, 27, 29-31

*United States v. Smith,*
    893 F.2d 1573 (9th Cir. 1990) ....................................................................27

LAW
OFFICES OF
RICHARD M.
STEINGARD

v

*United States v. Tank*,
  200 F.3d 627 (9th Cir. 2000) .................................................................7, 24

*United States v. Valles-Valencia*,
  811 F.2d 1232 (9th Cir. 1987) ...................................................................27

*United States v. Yarbrough*,
  852 F.2d 1522 (9th Cir. 1988) ..............................................................8, 26

**FEDERAL RULES OF EVIDENCE**

Fed. R. Evid. 401 .................................................................................8, 22

Fed. R. Evid. 402 ........................................................................................8

Fed. R. Evid. 403 ...........................................................................10, 31-32

Fed. R. Evid. 701 .............................................................................9, 24, 38

Fed. R. Evid. 801 ........................................1, 8, 12, 25-27, 30-31

Fed. R. Evid. 901 .............................................................................7, 24

LAW
OFFICES OF
RICHARD M.
STEINGARD

1
2

**TABLE OF EXHIBITS**

| Exhibit | Description | Page |
|---|---|---|
| A | 7/20/2018 Supplemental Wiretap Affidavit, pp. 44-45 (Casino_2005619) | 3:14 |
| B | 6/17/2013 Radar Screen (Casino_0026681-0026692) | 4:6, 18:16, 18:22, 19:5, 19:9, 34:6 |
| C | 2/22/2014 CM Tasks Progress Report (Casino_2000663) | 4:23 |
| D | 3/31/2014 "[Follow-Up Notice of Construction Issues]" (Casino_2000614) | 5:5, 20:6, 20:16, |
| E | 3/26/2016 Radar Screen (Casino_0028138) | 5:19, 21:1, 21:8, 21:16 |
| F | 7/24/2016 Radar Screen (Casino_0028138) | 6:10, 21:21, 21:26 |
| G | City of Los Angeles Request for Proposal | 35:11 |
| 1 | FBI 302 Report Re: Interview of George Esparza on November 13, 2018 (Casino_0364373) | 13:12, 13:15, 13:20, 13:25, 13:27, 14:19, 15:9 |
| 2 | FBI 302 Report Re: Interview of George Esparza on June 6, 2019 (Casino_0364679) | 13:13, 13:17, 13:24, 15:25 |
| 3 | FBI 302 Report Re: Interview of George Esparza on January 15, 2019 (Casino_0364465) | 13:15, 14:4, 14:19, 14:23, 15:24, 16:28, 17:7 |

| 4 | FBI 302 Report Re: Interview of Ricky Zheng on April 8, 2019 (Casino_0368261) | 14:21 |
| 5 | FBI 302 Report Re: Interview of Ricky Zheng on February 21, 2019 (Casino_0368251) | 15:17, 16:28 |
| 6 | 05/03/2015 Radar Screen (Casino_0027724) | 22:22, 39:8 |
| 7 | 11/22/2015 Radar Screen (Casino_0027982) | 22:24, 39:8 |
| 8 | 05/01/2016 Radar Screen (Casino_0028234) | 22:25, 39:8 |

LAW OFFICES OF RICHARD M. STEINGARD

## **IDENTIFICATION OF MATTERS IN DISPUTE**

**Defendant's Position:** SZNW moves this Court for an order excluding the admission of a series of so-called "Radar Screens," written by Raymond Chan or his son, Jeremy Chan.  These documents ostensibly contain various thoughts, ideas, ruminations, and tasks for Ray Chan to perform at his job or in his personal life.  For the most part, they are written in abbreviations, initials and shorthand and, while the case agent may be able to decode certain entries, there are others that are simply undecipherable.  Most of the entries that purport to be connected to SZNW or Wei Huang will be introduced through other exhibits and witnesses, and the "Radar Screens" are thus cumulative.  Further, their admission has the potential to confuse the jury and are more prejudicial than probative.

**Government's Position:** The "Radar Screens" the FBI seized from the email account of Raymond Chan while he was the General Manager of the Los Angeles Department of Building and Safety are highly relevant to central matters in this case.  The Radar Screens identify some of the people/entities involved in the L.A. Grand Hotel bribery scheme (including defendant, its owner, Wei Huang, and Jose Huizar), the object of the scheme, and how the participants sought to achieve the scheme.  The Radar Screens provide insider context for the various events that occurred and demonstrate a link between the L.A. Grand Hotel redevelopment project and benefits Huizar received from defendant and Huang.

The FBI agent who seized the Radar Screens will authenticate them at trial, and the government will lay the proper foundation for their admission, largely as admissible co-schemer statements under Rule 801(d)(2)(E).

Any potential risk of prejudice or confusion, which is minimal, is far outweighed by the probative value of this important evidence.

1

**JOINT MOTION *IN LIMINE* NO. 4**
**SZNW'S MOTION TO EXCLUDE RAYMOND CHAN'S**
**"RADAR SCREENS" AND SIMILAR DOCUMENTS**

## I.   INTRODUCTION

Shen Zhen New World I, LLC ("SZNW") moves this Court for an order excluding several government exhibits which the government purports to be Raymond Chan's notes, and any testimony about them.  The government asserts that these documents are Chan's method for keeping track of his personal and professional thoughts, ideas, impressions, reminders, obligations, and tasks. Although the discovery contains numerous such documents, the government has selected five to introduce at trial.  The government seeks to admit three documents that bear the title "Radar Screens" and are dated June 17, 2013, March 26, 2016, and July 24, 2016.  In addition, the government seeks to introduce two documents that are entitled "[Chinese characters] CM Tasks Progress Report," dated February 22, 2014, and "[Chinese characters]," dated March 31, 2014.

SZNW submits that the exhibits and any related testimony should be excluded because the documents cannot be authenticated; they appear to be irrelevant to the underlying charges; they constitute inadmissible hearsay; they do not fall within any exception to the hearsay rules; and they are substantially more prejudicial than probative.

## II.   STATEMENT OF RELEVANT FACTS

### A.   Raymond Chan's Radar Screens

Raymond Chan was the General Manager of the LADBS until his retirement in May 2016. Soon thereafter, Mayor Eric Garcetti appointed Chan as Interim Deputy Major, where he worked for approximately one year.  In June 2017, Chan retired from public service and began working as a consultant.

At some unknown point, Chan appears to have begun maintaining an electronic document on his computer which he titled, "Radar Screens."  The

"Radar Screens" usually contain a date in the upper right corner.  Many contain two general titles, "Work" and "Home."[1]  Under each category – "Work" and "Home" – the "Radar Screens" contain headings, subheadings and/or bullet points, followed by entries with a concept, idea, notation, task, or phrase.  Most entries are written in black ink, but a few appear in red.  Some entries on the "Radar Screens" appear to have been carried over from one version to the next; other entries disappear in subsequent versions; some entries have been altered or modified; and still others appear in a light grayish typeface so that they are faintly visible.

The government believes the documents are Chan's recordation of his thoughts, ideas, impressions, reminders, obligations, and tasks for both his business and personal life.  In a July 20, 2018 wiretap application, the government referenced the "Radar Screens" and noted their unique use of cryptic phrases, abbreviations, initials, and shorthand that would only be known to Chan.  (Casino_2005619-66, Supplemental Wiretap Affidavit, pp. 44-45, attached as Exhibit A.)  The affiant, FBI Agent Andrew Civetti, stated that he was able to decipher some of Chan's "coded" or "abbreviated" language by utilizing wiretap intercepted conversations that helped explain what Chan was referring to:

> The intercepted information has provided insight to the context of the e-mails, many of which at first appear to be innocent business relationships. By comparing the e-mail records with the intercepted communications, investigators are better suited to understanding the true nature of the e-mails (and vice versa). For example, in CHAN's account there are multiple documents titled "radar screen." These documents outline CHAN's "to do" list and track the status of various development projects. CHAN used abbreviations and initials to represent individuals and steps in the development process. Due to the intercepted communication, investigators were able to determine some of this "coded" (or abbreviated) language. In one of the radar screens, CHAN had a line item, "BOB Clearances... TT JJ." Based on the intercepted

---

[1]     Notwithstanding the common meaning of those terms, Chan's differentiation between these two categories is entirely unclear.

communications it was determined that "BOB Clearances" was related to Bureau of Engineering and "TT JJ" was related to "Talk To JOEL JACINTO." (*Id.*)

B.    The Government's Trial Exhibits

1. *"Radar Screen," June 17, 2013*

The government seeks to introduce a twelve-page document entitled "Radar Screen," with a date of June 17, 2013. (Govt. Ex. 263, Casino_0026681-0026692, attached as Exhibit B.) The first page of the exhibit contains the words, "Radar Screen – Work" and the date at the top. There are numerous headings and entries ostensibly relating to Chan's work and projects. The second page contains the words "Radar Screen – Home" at the top and also contains various headings and entries. One states the following:

- Chairman: - Parking (meet to apologize w/ proposal  /  CW Harris about proposals  /  Jose delivered letter)
  - China Trip for JH (CW: chairman will prepare invitation letter)
  - Backyard (Chairman to o.k.)
  - School (submit next week  /  2 issues: stairs' width & class corridor)
  - 1st floor remodeling (will have to revise ceiling and electrical  /  get ETL to approve the light)
  - New Hotel (rough revenue (Harris) and cost (Chris) estimations + feasibility study)
  - Union (TT Jerry about the trip set lunch w/ Chairman)

The government's exhibit list reflects that only an agent will testify to this exhibit. There is no indication from the discovery materials that an agent "decoded" this entry based on wiretap interceptions or otherwise, nor has the government noticed any expert designation.

2. *"[Chinese characters] CM Tasks Progress Report," February 22, 2014*

The government seeks to admit a one-page document entitled with Chinese characters at the top and followed by the phrase, "CM Tasks Progress Report," dated February 22, 2014. (Govt. Ex. 270, Casino_2000663, attached as Exhibit C.) The document contains four headings: "Downtown Hotel," "Sheraton," Property," and "Miscellaneous," with bullet points, subheadings and entries under each.

The government's exhibit list reflects that only an agent will testify to this exhibit. As before, there is no indication from the discovery materials that an

agent "decoded" this document based on wiretap interceptions or otherwise, nor has the government noticed any such expert designation.

### 3. "[Chinese characters]," March 31, 2014

The government seeks to admit a two-page document entitled, "[Chinese characters]," with a date of March 31, 2014. (Govt. Ex. 271, Casino_2000614-5, attached as Exhibits D.) The first page of the document is in English and contains headings, "Sheraton Swimming Pool," "AUP School," "Hyatt Phase I," "Hyatt Phase II," "Hyatt Phase III," and "Other Hyatt Construction," with bullet points and entries below each section heading. The second page is in Chinese with a few English phrases in parentheticals, some of which are in black typeface, some in red.

The government's exhibit list reflects that only an agent will testify to this exhibit. As before, there is no indication from the discovery materials that an agent "decoded" this document based on wiretap interceptions or otherwise, nor has the government noticed any such expert designation.

### 4. "Radar Screen," March 26, 2016

The government seeks to admit a three-page document entitled, "Radar Screen" with the date of March 26, 2016. (Govt. Ex. 25, Casino_0028138-40, attached as Exhibit E.) The first page contains the heading "Radar Screen – Work" and is then divided into nine categories: "General Manager," "Executive Officer," "Resource Management Bureau," "Technical Services Bureau," "Case Management Office," "Permit & Engineering Bureau," "Inspection Bureau," "Code Enforcement Bureau," and "Projects." Each category contains its own bullet points, subheadings, and entries. The second page is a continuation of the first page. The third page is entitled "Radar Screen – Home" and also contains a series of bullet points, subheadings, and entries. One bullet point states as follows:

- Huang  - Building (164,840 lot x 6 = 989,027 allow – 447,738 built = 541,289 buildable) [WF Kato's design]
  - District (TT Huang after PLUM about JH's contribution  /  Payment now and collapse loan)

The government's exhibit list indicates that three witnesses will testify to this exhibit: an agent; Shawn Kuk, who was a member of Jose Huizar's staff; and Ricky Zheng, the former Owner's Representative of SZNW.  There is no indication from the discovery materials that (1) an agent has "decoded" this entry based on wiretap interceptions or otherwise, nor has the government noticed any such expert designation; and (2) Kuk and Zheng ever saw this "Radar Screen" or know anything about it.

  5.  *"Radar Screen," July 24, 2016*

The government seeks to admit a four-page document entitled, "Radar Screen" with the date of July 24, 2016.  (Govt. Ex. 26, Casino_0028394-7, attached as Exhibit F.) [2]  The first page of the exhibit contains the phrase, "Radar Screen – Work" and the date at the top.  There are numerous headings and entries ostensibly relating to Chan's work and projects.  The next page of the exhibit (which is actually the fourth page of the full "Radar Screen") contains the words "Radar Screen – Home" at the top and also contains various heading and entries.  One states the following:

- Huang  - Must go thru CEQA  /  use Development Agreement for TFAR
        - Meet w/ JH 8/1—meet w/ Huang and JH 8/4

  The government's exhibit list indicates that four witnesses will testify regarding this exhibit: an agent; Shawn Kuk; Kevin Keller, who worked in the Department of City Planning and has been designated as a government expert on development projects; and Rose Fistrovic, a project manager for Psomas, a construction and engineering firm hired by SZNW to work on the expansion of the LA Grand Hotel.  There is no indication from the discovery materials that (1) an

---

[2]  The actual document is four pages; the government seeks to admit the first and fourth pages, both of which are largely redacted.  Again, for comparison purposes, we have attached the full "Radar Screen"—which the government does not seek to admit—

6

agent "decoded" this entry based on wiretap interceptions or otherwise, nor has the government noticed any such expert designation; or (2) Kuk, Keller, or Fistrovic ever saw this "Radar Screen" or know anything about it.

### III.   ARGUMENT

A.   <u>There is No Foundation for the Admission of these documents</u>

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901.  SZNW understands that the proposed exhibits at issue were seized from Chan's computer, but it is unclear who had access to them, their connection to SZNW, and the source of the information contained within them (*e.g.*, whether the entries were copied or cut-and-pasted from other sources, whether there was original thought or content); similarly, if the entries were taken from other sources, what those sources were and whether they were materially altered from the original.  As the agent noted in his wiretap affidavit, the entries are "coded" or "abbreviated" and require expertise to understand their meaning.  Without the testimony of Raymond Chan to decode the entries, the government cannot authenticate them.  *See*, *e.g.*, *United States v. Tank*, 200 F.3d 627, 629-631 (9th Cir. 2000) (government authenticated chat room logs by calling as witnesses the author of some of the entries and several co-conspirators who testified that the defendant used the name that appeared throughout the printouts, and that when they arranged a meeting with the person who used that name, the defendant showed up.)

Nor has the government designated or noticed an expert witness who can explain how the documents were created, the source of the information within them, what exactly they are intended to say (that is, a translation to plain English), and how they are linked to SZNW.  There is no indication that the agent has been able to decode the entries on the documents, as he claimed to have done with other entries on apparently similar documents.  Given the unknown provenance and

enigmatic nature of the entries, the government cannot lay a proper foundation for these exhibits, and they should be excluded.

### B. The Documents are Irrelevant

For the most part, the innumerable headings and entries on the various Radar Screens are entirely unrelated to this case. Wei Huang or one of SZNE's hotel's name appears in connection with some entries, the meaning and intent of which are, for the most part, entirely unclear. As such, any effort to articulate their relevancy requires guesswork. Further, three of the five documents are dated in 2013 and 2014, well before the expansion project at the LA Grand Hotel was contemplated. Absent clarity and a connection to the charges in the First Superseding Indictment, the documents are irrelevant. FRE 401, 402.

### C. The Documents Constitute Inadmissible Hearsay

The documents are hearsay and do not qualify as co-schemer statements. Fed. R. Evid. 801(d)(2)(E).[3] There is no evidence that a common enterprise or scheme existed that included SZNW and the purported declarant, Ray Chan. In addition, the document entries were not made in the course of or in furtherance of the conspiracy – they do not fall in any of the categories recognized by the Ninth Circuit, such as statements made to induce enlistment in the group's activities, to prompt further action on the part of conspirators, to reassure members of a conspiracy's continued existence, to allay fears, or to keep conspirators abreast of the conspiracy's activities. *United States v. Yarbrough*, 852 F.2d 1522, 1535-36 (9th Cir. 1988). The government may well speculate that the entries contain Chan's personal way of tracking thoughts, ideas, observations and tasks, but there is no indication they were intended for "outside eyes" and, under any interpretation, did not further the alleged scheme.

---

[3] SZNW more fully addresses its objection to the admission of co-schemer statements in MIL No. 7. Those arguments are incorporated here.

In the companion *940 Hill/Lee* case, the Court considered a somewhat similar issue involving George Esparza's notes and cited *United States v. Schmidt*, 881 F.2d 608 (9th Cir. 1989). That case is distinguishable. First, in *Schmidt*, the defendant conceded that there was a conspiracy involving the declarant and the defendant and only challenged whether the tape-recorded statement was made during and in furtherance of the conspiracy. *Id*. at 610, n.1. That is not the case here. Second, the recording in *Schmidt* was easily authenticated and comprehensible; that is, it could be played to the jury and readily understood. *Id*. at 611. This contrasts with the inscrutable nature of the documents at issue. Third, in *Schmidt* and in *940 Hill/Lee*, the creator of the recoding/documents testified to authenticate the item. There is no such witness here. Fourth, the *Schmidt* court appeared to agree that "idle chatter" and "casual admissions of culpability" are not statements in furtherance of a conspiracy, but the defendants in that case failed to narrow their objections to otherwise inadmissible parts. *Id*. at 612. Again, that is not the case here.

### D. There is No Foundation for Opinion Testimony

Rule 701 allows a lay witness to offer opinions that are "(a) rationally based on the witness's perception, (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Given the seemingly indecipherable nature of the documents, any purported "decoding" will be based on speculation, and not helpful to the jury. *United States v. Dicker*, 853 F.2d 1103, 1109-10 (3d Cir. 1988) (reversing conviction where agent was permitted to interpret recorded conversation, ascribing his own illicit meaning to potentially legitimate statements); *United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013) (officer's testimony was inadmissible under Rule 701 as it "spoon-fed his interpretations of the phone calls and the government's theory of the case to the jury").

9

E.      The Documents are More Prejudicial than Probative

Whatever may be the minimal probative value of the documents is substantially outweighed by their prejudicial nature.  FRE 403.  Undoubtedly, the government will ascribe a criminal or nefarious purpose to the documents—in fact, that is surely the reason they seek their admission.  But that is also why they should be excluded.  With limited exceptions, neither the government nor defense can say with any certainty what a various passage means or what Chan, the ostensible author, meant.  For instance, in Exhibit 25, an entry next to Huang's name refers to "JH's contribution," a cryptic phrase that contains endless possibilities.  Another entry mentions "Payment now and collapse loan," an equally ambiguous phrase subject to subjective interpretations.  The unknowable nature of the entries requires guesswork; in the context of a jury, guesswork necessarily creates the potential for prejudice and causes confusion.  *United States v. Fisher*, 648 F.3d 442, 449-450 (6th Cir. 2011) (affirming district court's exclusion of declarant's "voluminous, handwritten, cryptic, and idiosyncratic" notes which even if qualified as business records were "too likely to inject confusion and too voluminous and potentially misleading to be reasonably subject to a limiting instruction."); *United States v. Hinkson*, 585 F.3d 1247, 1267 (9th Cir. 2009) (upholding district court's Rule 403 exclusion of indecipherable military file based on risk of confusing the jury and wasting time); *Petrocelli v. Gallison*, 679 F.2d 286, 290-91 (1st Cir. 1982) (upholding district court's exclusion of a notation in a medical record where the source of the entry was unclear and "could easily have been misconstrued by the jury as definitive opinion testimony on the most critical issue in the entire case").

For this reason as well, the documents should be excluded.

///

///

///

10

## GOVERNMENT'S OPPOSITION

## I.    INTRODUCTION

At trial, the government will establish that defendant Shen Zhen New World I, LLC ("SZNW" or "defendant") engaged with others in a scheme to defraud of City of Los Angeles and its citizens of their right to honest services through bribery.  The evidence will show that, in early-2013, co-defendant Raymond Chan,[4] then the Interim General Manager of Los Angeles Department of Building and Safety ("LADBS"), introduced SZNW's owner, Wei Huang, to CD-14 Councilmember and PLUM Committee Chair Jose Huizar.  Soon after, Huang, who owned a hotel in Huizar's district (the L.A. Grand Hotel) that would later be the subject of an ambitious redevelopment project that would ultimately require Huizar's endorsement, embarked on the first of at least nineteen known trips to Las Vegas with Huizar, during which Huang gave Huizar a total of over $250,000 and other benefits.  Chan was aware of and discussed Huizar's and Huang's Vegas trips with both individuals.  Huizar and Chan also persuaded Huang to supply $600,000 in collateral to enable Huizar to obtain a loan and settle a politically-damaging sexual harassment lawsuit, which transaction Huizar and Huang purposely concealed.  Indeed, Chan later lied to the FBI regarding his help, at least in part, arranging the collateral.

Both Huang and Huizar had the same expectation regarding the bribery scheme -- that Huizar would use his position to help SZNW in exchange for the

---

[4]    In the First Superseding Indictment ("FSI"), Chan is charged with RICO conspiracy (Count 1), Federal Program Bribery (Counts 22, 27, 28), and False Statements (Count 39).  Chan was the General Manager of the LADBS until about May 2016.  From about May 2016 to July 2017, CHAN was the City's Deputy Mayor of Economic Development.  In July 2017, Chan retired from the City and officially began working with George Chiang, consulting and lobbying on behalf of developers in Los Angeles. (FSI ¶ 15.)

benefits Huang bestowed -- and both sides understood what they were doing was improper.  Chan, who originally paired Huang and Huizar, was around for each step of the illegal scheme, often functioning as a go-between and as an advisor to Huang and Huizar.

During a search of Chan's Google account, the FBI uncovered a series of documents Chan labeled "Radar Screens" or "Raydar Screens."  These Radar Screens, besides chronicling the various tasks related to Chan's employment with the City, identify, among other things, some of the people involved in the bribery scheme, the object of the scheme, and how the participants sought to achieve the scheme.  The Radar Screens provide critical context for various events that occurred, and they present, in the government's view, a clear link between and context for the planned L.A. Grand Hotel redevelopment project, Huizar, and benefits Huizar received from Huang.

Likely for these reasons, defendant has moved the Court in limine to exclude the Radar Screens at trial, arguing that the Radar Screens are not relevant, that they cannot be authenticated, that they constitute inadmissible hearsay, and that they are confusing and unfairly prejudicial.  Each claim is baseless, and most go to weight and not admissibility.

As detailed below, the Radar Screens are relevant in that they tend to make facts of consequence, like the corrupt link between Huang, SZNW, the L.A. Grand Hotel, and Huizar, more probable.  An FBI agent will be able to easily authenticate the documents because he personally seized them from Chan's identified Google account and because they also contain myriad pieces of information reflecting that Chan prepared them.  The Radar Screens are not hearsay because they were made during the existence of a conspiracy or scheme, defendants Huang/SZNW were knowing participants in that scheme, and the statements, authored by co-schemer Chan, were made in furtherance of the scheme, thus qualifying as co-conspirator statements under Rule 801(d)(2)(E).  And any potential risk of prejudice or

confusion -- which is minimal, at best -- is far outweighed by their probative value, which, for the reasons discussed above, is substantial.

## II.     FACTUAL BACKGROUND

A.     <u>SZNW, Huang, Huizar, Chan, Esparza, and Zheng Engage in the L.A. Grand Hotel Bribery Scheme</u>

The government will establish at trial that SZNW, Huang, Huizar, Chan, George Esparza, and Ricky Zheng (acting as an agent for defendants SZNW and Huang) engaged in a scheme to defraud the City of Los Angeles and its citizens of their right to honest services through bribery, among other offenses.  Specifically, the evidence will show that in February 2013, Chan, who was then the Interim General Manager of LADBS, introduced Huang, who owns SZNW, to Huizar and Huizar's Special Assistant, Esparza.  (FSI Overt Act ["OA"] 1; Gov. Ex. 1 at 2, 14; Gov. Ex. 2 at 1.)  At the time, Chan, who speaks Chinese, was introducing Huizar to numerous affluent Chinese commercial real estate investors/developers, like Huang, with whom Chan had connections.  (Gov. Ex. 1 at 11; Gov. Ex. 3 at 2, 4.) Esparza will testify that his understanding was that Chan planted the seed of Huang and Huizar going to Las Vegas together.  (<u>See</u> Gov. Ex. 2 at 2).  Soon after, in March 2013, Huang, Zheng, Huizar, and Esparza traveled on a private jet to Las Vegas, where Huang lavished Huizar and Esparza with various benefits, including thousands of dollars in gambling chips.  (FSI OA 3; Gov. Ex. 1 at 2-6.)

As the Chair of the PLUM Committee, every major development project in the City of Los Angeles passed through Huizar, meaning that Huizar could fast-track, stall, and/or torpedo projects at various steps in the extensive City approval process as he saw fit.  (<u>See</u> FSI ¶ 8; <u>see</u> Gov. Ex. 1 at 12; Gov. Ex. 2 at 1-2.)  The evidence will show that Huizar used this power to entice and extract benefits from investors/developers, often through Esparza, who interfaced with the various representatives on Huizar's behalf.  (<u>See</u> Gov. Ex. 1 at 12).  According to Esparza,

if investors/developers did not cooperate, and "pay to play," they did not get favorable treatment from Huizar and may get adverse treatment.  (See id.)

Esparza will testify that Chan advertised the importance of Huizar and PLUM to the Chinese developers, including Huang.  (See Gov. Ex. 3 at 6.) According to Esparza, during a dinner attended by Huang and other Chinese developer representatives, Chan explained that Huizar, as the PLUM Chairman, had the power to (1) put things on the agenda, (2) overturn rules, and (3) change ordinances.  (Id.)  Chan went on to say, "if you do not have a relationship with Jose [Huizar] your project would be at the end of the list."  (Id.)  Esparza will testify that on another occasion, Chan told Huang that Huizar was the "downtown guy," and that Chan and Huizar could do whatever Huang needed.  (Id. at 5.)  Esparza will also testify that, on yet another occasion, Chan explained to Huang: "the idea of Huizar is the investment." (Id.)

The evidence will show that Huang followed Chan's advice and invested in Huizar.  Between 2013 and 2014, Huizar, Chan, and Huang agreed that Huang would supply $600,000 as collateral to enable Huizar to get a loan and settle a sexual harassment lawsuit against him confidentially, so as not to jeopardize Huizar's 2015 re-election bid.  (See FSI OA 25-26, 30, 33, 35, 37, 40-43; see Gov. Ex. 1 at 11-12; Gov. Ex. 3 at 2-3.)  Zheng will testify that he was present during a dinner meeting between Huang and Chan in which Huang and Chan discussed the need to provide the payment for Huizar.  (See Gov. Ex. 4 at 1.)  The evidence will show that the parties deliberately structured the transaction in a convoluted fashion to conceal the connection between Huang and Huizar.  (See Gov. Ex. 3 at 2-3.) Esparza will testify that Huizar said Huang could not give the $600,000 to Huizar directly because it would reveal a conflict of interest for Huang, and that Huizar and Huang wanted the payment to look clean and have no ties to Huang.  (See id. at 3.)  Esparza will testify that Zheng separately told Esparza that Huang did not want to be seen giving a gift or a bribe to Huizar.  (See id.)

14

In addition to the $600,000 supplied by Huang, the evidence will show that the scheme involved at least nineteen documented Las Vegas trips between 2013 and 2017 during which Huang and/or Zheng gave Huizar approximately $259,500 in gambling chips and gave Esparza approximately $38,000 in gambling chips. (FSI OA 4-22.)  Esparza will testify that, during the trips, he and Huizar occasionally rode in private jets, utilized multiple limos, regularly stayed in luxurious villas, played golf, and partied at nightclubs where the bills were regularly in the tens of thousands of dollars, all free of charge for them. (See Gov. Ex. 1 at 3-6.)  The evidence will further show that Huang, Zheng, Huizar, and Esparza traveled to Australia together in January 2016, where Huizar and Esparza received more financial benefits from Huang, including a $10,980 commercial airline ticket for Huizar, hotels, meals, alcohol, and other expenses (FSI OA 361), and that in August 2018, Huang and Huizar traveled to a golf resort in Northern California together, where Huizar again received various additional benefits from Huang.  (Id. OA 77.)

Zheng will testify that Zheng warned Huang he could not provide the $600,000 because Huizar was a government official.  (See Gov. Ex. 5 at 4.)  Zheng will also testify that he warned Huang on multiple occasions not to invite Huizar and Esparza to Las Vegas.  (See id.)

The evidence will show that these benefits came with expectations and that each side understood their end of the bargain.  Esparza will testify that because of Huang's $600,000 payment and the money he provided Huizar during trips, there was an expectation that Huizar would be there no matter what if Huang needed something.  (See Gov. Ex. 3 at 5.)  Esparza will testify that everyone saw Huang's $600,000 payment as a long-term investment so when Huang needed something from Huizar down the road, Huizar would help.  (See Gov. Ex. 2 at 4.)  Thus, when Huang told Huizar to jump, Huizar jumped.  (See id. Ex. A-3 at 4.)

Huang requested a series of favors from Huizar/Esparza, including that Huizar support a visa application for a SZNW affiliate employee (FSI OA 51), that Huizar help Huang's son gain admission to USC (id. OA 52), and that Huizar help negotiate a parking dispute with landowners near the L.A. Grand Hotel (id. OA 54). The evidence will also show that Huang/SZNW also sought Huizar's assistance in facilitating the approval of the L.A. Grand Hotel Project, which could include official acts like "(1) presenting motions and resolutions in various City committees to benefit the L.A. Grand Hotel Project; (2) voting on the L.A. Grand Hotel Project in various City committees, including the PLUM Committee, and City Council; (3) taking action in the PLUM Committee to expedite the approval process of the L.A. Grand Hotel Project; and (4) exerting pressure on other City officials to influence the approval process of the L.A. Grand Hotel Project." (See id. ¶ 50.)

For example, Harris Chan, who served as the Managing Director of SZNW Investment U.S. for most of 2013 and oversaw the L.A. Grand Hotel and Sheraton Universal Hotel during that period, will testify that during at least one dinner he attended in 2013 with Huang, Huizar, and Raymond Chan, Huang asked Huizar and Raymond Chan to support SZNW and ensure everything went smoothly with SZNW's renovations. Huang further stated that he wanted the renovation process expedited. In response, Huizar agreed to the request and stated that he would work with Raymond Chan to ensure it worked out. Raymond Chan also agreed to the request by instructing Huang to provide draft permits/applications to Raymond Chan to review prior to these applications being submitted to the City. At subsequent dinners between Huang, Huizar, Chan, and Harris, Huang provided updates on the renovations.

As another example, Esparza and Zheng will testify that Huang made it well-known he wanted to expand the L.A. Grand Hotel and build "the tallest tower in downtown and West of the Mississippi." (See Gov. Ex. 3 at 5; see Gov. Ex. 5 at

5.)[5]  Zheng will testify that Huang was aware of Huizar's and Chan's power to help the project, and that Huang knew he needed Huizar, who chaired the PLUM Committee, in order to approve the project.  (See id. at 6.)  Esparza will testify that Huizar told Huang he would help with the project because "this tallest building would be [Huizar's] penis downtown," and that on multiple occasions Huizar said the L.A. Grand Hotel "would be the tallest thing there" and his "big dick above the city."  (See Gov. Ex. 3 at 5.)

Chan, like Huang and Huizar, and including while he worked for the City, was intimately involved in the L.A. Grand Hotel bribery scheme.  The evidence will show, for example, that after introducing Huang and Huizar, Chan coordinated with Huang, Huizar, and Esparza to arrange a trip for Huizar and his staff members to visit Huang in China (FSI OA 2); that Chan initially helped facilitate Huang's $600,000 payment in connection with the settlement, as discussed above; that Chan and Huizar discussed scheduling meetings to help negotiate a resolution to the parking dispute involving the L.A. Grand Hotel (id. OA 54); that Chan agreed to meet with SZNW consultants to discuss the L.A. Grand Hotel project and "Chairman Huang's idea ... to test the maximum allowable development" for the property (id. OA 57); that Chan participated in a conference call with Huang and SZNW consultants to discuss the L.A. Grand Hotel project and the City's approvals for the development (id. OA 58); and that, on August 4, 2016, Chan met with Huang, Huizar, and various senior City officials to discuss the expansion of the L.A. Grand Hotel, including Huang's interest in pursuing Transient Occupancy Tax ("TOT") rebates, Transfer of Floor Area Rights ("TFAR"), and other significant incentives from the City (id. OA 59).  At trial, the government will introduce additional evidence, including testimony and documents, showing that

---

[5]     Zheng will testify that Chan advised Huang to build an entirely new tower on the L.A. Grand Hotel site as opposed adding to the existing hotel.  (See id. at 6.)

Chan was an integral member of the scheme who played multiple roles in furthering its success.

B.    The Government Obtains Chan's "Radar Screens" Describing Various Aspects of the L.A. Grand Hotel Bribery Scheme

The FBI obtained a warrant to search Chan's Google account.  That search yielded a number of materials relevant to the L.A. Grand Hotel bribery scheme, including the five "Radar Screens" defendant seeks to exclude in its motion in limine.  Each Radar Screen contains a multitude of information, including lists of projects, properties, people, and/or events and various pieces of information and tasks associated with them.  The metadata for each Radar Screen identifies, among other things, the author of the document, the date the document was created, the date the document was last saved, and the person who last saved the document.  The lead case agent in this matter (FBI Special Agent Andy Civetti) will testify where he personally seized each Radar Screen.  Below is a description of each Radar Screen:

1.    6/17/13 Radar Screen (Def. Ex. B)

Metadata associated with the Radar Screen reflects that it was authored by "RSCHAN," created on June 14, 2013, and last saved by "Raymond Chan" on June 17, 2013.  SA Civetti seized the Radar Screen from Chan's Google email account.

The second page of the Radar Screen contains a bullet point titled "Chairman," which refers to SZWN's owner, Huang.  (Def. Ex. B at 2.)  Next to that bullet point are a number of entries, including an entry stating: "Parking (meet to apologize w/ proposal / CW [check with][6] Harris [Chan] about proposals / Jose

---

[6]    The bracketed information is based on SA Civetti's investigation in this case, including his review numerous Radar Screens, wiretap recordings, electronic communications, and witness interviews, as well as the context of the statements in the Radar Screens.

[Huizar] delivered letter).” (Id.)  This corresponds with records reflecting that Ray Chan coordinated with Huizar to help negotiate and resolve a parking dispute involving the L.A. Grand Hotel.  (See FSI OA 54.)  Below that is an entry stating: “China Trip for JH [Huizar] (CW [check with]: chairman [Huang] will prepare invitation letter).” (Def. Ex. B. at 2.)  This corresponds with records showing that, in mid-2013, Huang, Chan, Huizar, and Esparza planned a trip for Huizar and others to visit Huang in China.  (See FSI OA 2.)  Below this there is an entry stating: “New Hotel (rough revenue (Harris) and cost (Chris) estimations + feasibility study).” (Def. Ex. B at 2.)  This entry appears to signal that as early as mid-2013, a short time after Chan introduced Huang to Huizar and the two began making trips to Las Vegas, Huang and SZNW were considering a significant expansion of the L.A. Grand Hotel, which would require a feasibility study.

    2.    2/22/14 Radar Screen (Def. Ex. C)

Metadata associated with the Radar Screen reflects that it was authored by “Jeremy Chan,” Ray Chan’s son, created on December 27, 2013, and last saved by “Raymond Chan” on February 22, 2014.  SA Civetti seized the Radar Screen from Chan’s Google Drive in a sub-folder titled “Discuss with Chairman” within a folder titled “Chairman.”

The Radar screen, which is one page, contains various detailed entries relating to Huang’s properties, including the “Downtown Hotel,” i.e., the L.A. Grand Hotel, and the Sheraton Universal Hotel, also owned by Huang.  (Def. Ex. C.)  In the “Downtown Hotel” section there is an entry stating: “Parking: Can JH [Huizar] tell Shahram [Delijani] about closure of the hotel during next negotiation? When?” (Id.)  This again corresponds with Chan’s and Huizar’s involvement in negotiating a parking dispute relating to the L.A. Grand Hotel.  (See FSI OA 54.)  Below that, in a section titled, “Property,” there is the following entry: “Studied: Hotel Incentive Program / TFAR / TOT / DTLA Guidelines (>150’ height requirements).” (Def. Ex. C.)  This also signals that Huang and SZNW were

exploring redeveloping the L.A. Grand Hotel, which would implicate various significant City incentive programs, including TOT, and be required to move through the City's lengthy approval process, in February 2014, when Chan and Huizar were still seeking Huang's help with funding Huizar's sexual harassment settlement.

3.    3/31/14 Radar Screen (Def. Ex. D)

Metadata associated with the Radar Screen reflects that it was authored by "Jeremy Chan," created on March 31, 2014, and last saved by "Raymond Chan" on March 31, 2014.  SA Civetti seized the Radar Screen from Chan's Google Drive in a sub-folder titled "Project Issues Resolution Report" within a folder titled "Chairman."

The first page of the Radar Screen contains detailed entries relating to Huang's properties and ongoing projects, including the Sheraton Universal Hotel swimming pool, the AUP School, which was on the L.A. Grand Hotel property, and multiple phases of renovations at the L.A. Grand Hotel, which SZNW was seeking authorization to brand under the Hyatt hotel chain. (Def. Ex. D at 1.)

The second page of the Radar Screen contains a mixture of Chinese characters and English words.  (Id. at 2.)  The name "Jose," referring to Huizar, appears several times.  (See id.)  The government is in the process of transcribing this Radar Screen and will produce the translated version to defendants once it is completed, but placing the Chinese characters on page two of the document into the Google Translate feature at Google.com reveals the following (possible) entry in a section titled "other affairs": "New hotel – tender; Information collected: Exemption of hotel tax / Hotel will be benefited / Land transfer; Downtown Land Design (150ft high)."  (See id. at 2.)  This, as with the other Radar Screens, signals that Huang and SZNW were pursuing a redevelopment of the L.A. Grand Hotel in early-2014.

4.    3/26/16 Radar Screen (Def. Ex. E)

Metadata associated with the Radar Screen reflects that it was authored by "RSCHAN," created on December 28, 2015, and last saved by "Raymond Chan" on March 26, 2016.  SA Civetti seized the Radar Screen from Chan's Google email account.

The three-page Radar Screen contains various detailed entries relating to Chan's work as the General Manager of LADBS, including various branches/offices with whom Chan was dealing.  (Def. Ex. E.)  The final page contains a bullet point titled "Huang."  (Id. at 2.)  Next to that is the following entry: "Building (164,840 lot x 6 = 989,027 allow-447,738 built= 541,289 buildable) [WF Kato's design]."  (Id.)  This references an estimated TFAR calculation for the L.A. Grand Hotel, one of the requirements for the Department of Planning Application that SZNW ultimately filed in June 2018 in connection with redevelopment project.  (See FSI OA 70.)  It also references a design prepared by SZNW's retained architect for the L.A. Grand Hotel project, DiMarzio/Kato.  (Def. Ex. E at 2.)  Below that is an entry referencing Huang, Huizar, the PLUM Committee, and collapsing a loan, approximately seventeen months after Huang paid $600,000 to enable Huizar to obtain a loan to settle his sexual harassment case: "District (TT [talk to] Huang after PLUM about JH's [Huizar's] contribution / Payment now and collapse loan)."  (Id.)

5.    7/24/16 Radar Screen (Def. Ex. F)

Metadata associated with the Radar Screen reflects that it was authored by "RSCHAN," created on July 25, 2016, and last saved by "Raymond Chan" on July 31, 2016.  SA Civetti seized the Radar Screen from Chan's Google email account.

Page four of the Radar Screen contains a bullet point titled "Huang."  (Def. Ex. F at 4.)  Next to that is an entry stating "Must go thru CEQA [California Environmental Quality Act]/ use Development Agreement for TFAR," and another entry stating "Meet w/ JH [Huizar] 8/1-meet w/ Huang and JH [Huizar] 8/4."  (Id.)

This reflects that Chan planned to meet with Huizar three days before Chan, Huang, Huizar, and various City officials met on August 4, 2016 to discuss the hotel expansion project, which involved myriad issues, including environmental approvals, land use, and TFAR.[7] (See FSI OA 59.)

## III.   ARGUMENT

### A.   The Radar Screens Are Highly Relevant

Defendant contends that the relevancy of the five Radar Screens at issue "requires guesswork" and that the Radar Screens appear to be unconnected to the charges. (See Mot. at 7.) This argument fails.

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and the "the fact is of consequence in determining the action. Fed. R. Evid. 401 (emphasis added). Relevance is a "low bar." Sandoval v. Cty. of San Diego, 985 F.3d 657, 666 (9th Cir. 2021). As the Ninth Circuit has explained, "[t]o be 'relevant,' evidence need not be conclusive proof of a fact sought to be proved, or even strong evidence of the same. All that is required is a 'tendency' to establish the fact at issue." United States v. Curtin, 489 F.3d 935, 943 (9th Cir. 2007).

---

[7]      As part of the trial preparation process, the government has recently identified three additional relevant Radar Screens that reference Huang's and SZNW's plans to expand the L.A. Grand Hotel, two of which additionally reference Huang, Huizar, and collapsing a loan. (See Gov. Ex. 6, 05/03/2015 Radar Screen: "DT Hotel - Net Buildable Area = 164,840 lot x 6 (D limit) = 989,027 allow – 447.738 built = 541,289 sq."; Gov. Ex. 7, 11/22/2015 Radar Screen: "TT JH [Huizar] & Huang Wei: Sign & build (164,840 lot x 6 = 989,027 allow – 447,738 built = 541,289 buildable) Payment now and collapse loan"; Gov. Ex. 8, 05/01/2016 Radar Screen: "Huang- Building (164,840 lot x 6 = 989,027 allow – 447,738 built = 541,289 buildable) [WF Kato's design] -District (meeting w/ JH [Huizar] and him to discuss payment 5/6 /   collapse loan)- Junnene Chen (WF documents—TT [talk to] JH [Huizar])." The government plans to add these Radar Screens to its Exhibit List.

The relevance of the Radar Screens here is plainly evident.  Among other things, the Radar Screens tend to show that Huang and SZNW were exploring expanding the L.A. Grand Hotel property –- which is at the center of defendant's bribery charges -- as early as mid-2013 or early-2014, not long after Chan introduced Huang and Huizar and they began traveling to Las Vegas together, where Huang routinely gave Huizar thousands of dollars and treated him to various other benefits.  This also coincides with the period during which Huang agreed to help Huizar's political future by providing a $600,000 collateral payment to enable Huizar to obtain the settlement loan.  The Radar Screens tend to show that the proposed L.A. Grand Hotel expansion was a massive undertaking that would ultimately pass through Huizar and the PLUM Committee and involve various City entitlements and authorizations.  The Radar Screens tend to show that Chan was intimately and uniquely involved in the L.A. Grand Hotel's activities, including during times where had a duty to be acting on behalf of the City, and that he and Huizar sought to leverage their positions to help Huang and SZNW with various items.  The Radar Screens tend to show that Huizar was also deeply involved with the L.A. Grand Hotel expansion project in various ways, and that Chan and Huizar conferred about the project.  And the Radar Screens tend to show that there was a temporal and substantive connection between the L.A. Grand Hotel expansion project, Huizar, and the loan Huizar received after Huang posted $600,000, which speaks to a corrupt relationship between Huang/SZNW and Huizar.  The Radar Screens are thus probative of, among other things, Huang's, SZNW's, and Huizar's motive; the relationships between these co-schemers; Chan's knowledge and facilitation of this motive and these relationships; and the methods, means, and objectives of the L.A. Grand Hotel bribery scheme.  The Radar Screens are relevant.

//

//

23

B.     The Government Can Authenticate the Radar Screens

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a).  Rule 901(a) requires only "a prima facie showing of authenticity so that a reasonable juror could find in favor of authenticity or identification." United States v. Gadson, 763 F.3d 1189, 1203 (9th Cir. 2014) (cleaned up).  The government must also establish a connection between the proffered evidence and the defendant.  United States v. Tank, 200 F.3d 627, 630 (9th Cir. 2000).  "The government may prove that connection by circumstantial, as well as direct, evidence." United States v. Black, 767 F.2d 1334, 1342 (9th Cir. 1985) (cleaned up).  "Once the offering party meets this burden, the probative value of the evidence is a matter for the jury." Gadson, 763 F.3d at 1204 (cleaned up).

At trial, SA Civetti will testify that the government obtained the Radar Screens through a warrant authorizing a search of Chan's Google account.  He will testify that Chan authored or was the last to save each Radar Screen; that the Radar Screens were located in Chan's Google email account or his Google Drive, in sub-folders associated with Huang; that the dates of the Radar Screens and entries in the documents correspond with communications and events in which Chan was involved; and that the Radar Screens contain myriad other pieces of information establishing that Chan made them.

While some of the Radar Screens contain entries that use coded/abbreviated language, that does make them inauthentic, as defendant claims.  (See Mot. at 6). In any event, the majority of the coded/abbreviated language, such as "TT" [talk to], "CW" [check with], and "WF" [wait for] are relatively easy to decipher and are based on SA Civetti's investigation in this matter, and none of the evidence the government will elicit at trial requires expert analysis.  See Fed. R. Evid. 701 (permitting lay witness opinion testimony where it is "(a) rationally based on the

24

1  witness's perception; (b) helpful to clearly understanding the witness's testimony
2  or to determining a fact in issue; and (c) not based on scientific, technical, or other
3  specialized knowledge within the scope of Rule 702."); United States v. Freeman,
4  498 F.3d 893, 904-05 (9th Cir. 2007) (agent's "understanding of ambiguous
5  phrases" based on the "direct perception of several hours of intercepted
6  conversations" along with "direct observation" of defendants and "other facts he
7  learned during the investigation" resulted in testimony that "proved helpful to the
8  jury in determining what the [co-conspirators] were communicating during the
9  recorded telephone calls.")); United States v. Gadson, 763 F.3d 1189, 1210 (9th
10 Cir. 2014) ("the district court had ample grounds to conclude that Officer
11 Thompson based his interpretations on his personal knowledge of facts he learned
12 during the investigation").

13    C.    The Radar Screens Constitute Admissible Co-Conspirator/Co-
14          Schemer Statements

15      Defendant's motion raises many of the issues already addressed by this
16 Court in its ruling related to notes/recordings made by Esparza as part of his
17 participation in the Lee/940 Hill, LLC pay-to-play scheme.  (See 5/13/22 Hr'g Tr.
18 at 13-23.)  Federal Rule of Evidence 801(d)(2)(E) provides that a statement offered
19 against an opposing party is not hearsay if it "was made by the party's
20 coconspirator during and in furtherance of the conspiracy."  Fed. R. Evid.
21 801(d)(2)(E).  To admit a co-conspirator statement for the truth of its contents
22 against a defendant, the government must show by a preponderance that: (1) a
23 conspiracy existed when the statement was made; (2) the defendant had knowledge
24 of, and participated in, the conspiracy; and (3) the statement was made in
25 furtherance of the conspiracy.  United States v. Larson, 460 F.3d 1200, 1211 (9th
26 Cir. 2006); see Bourjaily v. United States, 483 U.S. 171, 175 (1987).  "Just as acts
27 and statements of co-conspirators are admissible against other conspirators, so too
28 are the statements and acts of co-participants in a scheme to defraud admissible

against other participants." United States v. Lothian, 976 F.2d 1257, 1262 (9th Cir. 1992); see Robinson v. United States, 33 F.2d 238, 240 (9th Cir. 1929) ("[I]f a conspiracy exists in fact [as when a scheme to defraud is shared by several], the rules of evidence are the same as where a conspiracy is charged.")

To be "in furtherance," the statements must further the common objectives of the conspiracy or set in motion transactions that are an integral part of the conspiracy. United States v. Yarbrough, 852 F.2d 1522, 1535 (9th Cir. 1988). Examples of admissible co-conspirator statements include, among other things: "statements made to induce enlistment or further participation in the group's activities; statements made to prompt further action on the part of conspirators; statements made to reassure members of a conspiracy's continued existence; statements made to allay a co-conspirator's fears; and statements made to keep co-conspirators abreast of an ongoing conspiracy's activities." United States v. Nazemian, 948 F.2d 522, 529 (9th Cir. 1991) (citations omitted). Likewise, "[s]tatements designed to conceal an ongoing conspiracy are made in furtherance of the conspiracy for purposes of Rule 801(d)(2)(E)." See United States v. Payne, 437 F.3d 540, 546 (6th Cir. 2006). And though the statement must be in furtherance of a conspiracy, it need not be the exclusive, or even primary, purpose of the declaration. See United States v. Guyton, 36 F.3d 655, 659 (7th Cir. 1994).

A co-conspirator statement need not be made in the presence of the defendant, or even made to another conspirator, to be admissible. See Sendejas v. United States, 428 F.2d 1040, 1045 (9th Cir. 1970) ("It is well settled that a conversation between two co-conspirators which takes place out of the presence of a third co-conspirator is admissible into evidence against the third co-conspirator."); United States v. Lloyd, 807 F.3d 1128, 1160-61 (9th Cir. 2015) ("It is not necessary that the statement be made to another member of the conspiracy for it to come under [R]ule 801(d)(2)(E)."). Nor, for that matter, must the statement be communicated to another person at all to qualify as a co-conspirator

statement.  See, e.g., United States v. Schmidt, 881 F.2d 608, 613 (9th Cir. 1989) ("Ledgers, books of record, and notes containing information relevant to the conspiracy may be admissible against coconspirators as statements in furtherance of the conspiracy without evidence they were in fact consulted or otherwise communicated."); United States v. Smith, 893 F.2d 1573 (9th Cir. 1990) (calendar/drug ledger was admissible as coconspirator statement where government established that ledger was made during course and in furtherance of conspiracy, and identity of author of ledger was reasonably certain); United States v. Valles-Valencia, 811 F.2d 1232, 1237 (9th Cir. 1987) (same); United States v. Graciano-Cabanilla, 113 Fed. App'x 761, 762 (9th Cir. 2004) (pay-owe ledger seized from alleged co-conspirator was admissible as non-hearsay co-conspirator's statement).

Against this framework, Chan's Radar Screens unquestionably constitute admissible co-conspirator statements under Rule 801(d)(2)(E) and admitting them as such is consistent with the Court's prior ruling on this topic.

      1.    <u>Chan, Huang, Zheng, Huizar, and Esparza Were Engaged in the L.A. Grand Hotel Bribery Scheme When Chan Produced the Radar Screens</u>

Defendant claims there is "no evidence that a common enterprise or scheme existed that included SZNW and the purported declarant [of the Radar Screens], Ray Chan." (Mot. at 7.)  Not so.

As detailed at length above, the government will present ample evidence to establish a threshold bribery scheme involving Huang, Zheng, Huizar, Esparza, and Chan.  That evidence will show all the components of the scheme <u>as early as 2013</u>, based on Chan's introduction of Huang and Huizar in February 2013; their immediate travel to Las Vegas on Huang's dime; Huang's provision of extravagant benefits to Huizar/Esparza on that trip; and Huang's 2013 ask of Huizar and Chan to support SZNW and its renovations, which Huizar/Chan agreed to do.

Further, bolstering evidence of the scheme will be presented in the years that followed.  Between 2013 and 2014, Huizar, Chan, and Huang crafted a plan for Huang to provide $600,000 in collateral for Huizar to settle a sexual harassment lawsuit, with Zheng and Esparza assisting to conceal the true origin of those funds. Throughout 2013 to 2018, Huang/Zheng continued to shower Huizar/Esparza with benefits, including paid trips to Las Vegas, Australia, and a golf resort and thousands of dollars in gambling chips/money.  Within in this same timeframe, Huang and SZNW, aided by Chan, began exploring the expansion of the L.A. Grand Hotel and Sheraton Universal Hotel, two massive undertakings that would necessarily pass through Huizar and the PLUM Committee.  Chan communicated to Huang, and Huang knew, that SZNW needed Huizar to get the tallest building west of the Mississippi built.  Likewise, there was an expectation that Huizar would be there for Huang at all times, and would jump at Huang's request, based on the various benefits Huizar had received from Huang.  According to Esparza, Huizar ultimately told Huang he would help SZNW with the L.A. Grand Hotel expansion project.

Because the Radar Screens at issue range between June 2013 and July 2016, falling comfortably within the L.A. Grand Hotel bribery scheme, the first requirement is satisfied.

       2.    <u>SZNW and Huang Had Knowledge of, and Participated in, the L.A. Grand Hotel Bribery Scheme</u>

The evidence makes clear that SZNW and its owner, Huang, knowingly participated in the bribery scheme, including by giving Huizar hundreds of thousands of dollars and other benefits with the shared expectation that Huizar would take official acts favoring the L.A. Grand Hotel and its ambitious expansion project.

3.   <u>The Radar Screens Were Made in Furtherance of the L.A. Grand Hotel Bribery Scheme</u>

Defendant argues that Chan's Radar Screens were not made in furtherance of the conspiracy, in part because "there is no indication [the Radar Screens] were intended for 'outside eyes.'"  (<u>See</u> Mot. at 8.)  This argument is legally and factually baseless.

The Radar Screens reflect that Huang and SNZW enlisted Huizar's and Chan's help with various matters, and describe information and upcoming tasks related to those requests.  The Radar Screens also reflect that Huang and SZNW planned to build a massive new L.A. Grand Hotel tower at the site of the L.A. Grand hotel (the object of the bribery scheme) and detail important information regarding that project, including the tower's specifications, studies that needed to be completed, incentive programs the project would implicate, and various approvals that were needed.  The Radar Screens identify certain participants in the scheme, including Huang and Huizar, and help explain their utility to the scheme, for example that Huizar was connected to the PLUM Committee, which would oversee the project.  The Radar Screens additionally document communications and meetings between the co-schemers, and show that there was a clear connection between the L.A. Grand Hotel expansion project, Huizar/the PLUM Committee, and the loan Huang helped Huizar get.

In short, the Radar Screens were clearly made to "prompt further action on the part of conspirators," "reassure members of a conspiracy's continued existence," and "keep co-conspirators abreast of an ongoing conspiracy's activities," establishing that they were made "in furtherance" of the L.A. Grand Hotel bribery scheme, <u>see</u> <u>Nazemian</u>, 948 F.2d at 529, even if that was not the exclusive or even primary purpose of the statements.  <u>See</u> <u>Guyton</u>, 36 F.3d at 659.

Defendant's argument that the Radar Screens had to be made for "outside eyes" is misplaced.  <u>See</u> <u>Schmidt</u>, 881 F.2d at 612.  In <u>Schmidt</u>, two defendants

appealed their convictions for a drug conspiracy, arguing that a tape recording of a co-conspirator's statements and his handwritten notes were improperly admitted. 881 F.2d at 613.  The tape recorded statement described various aspects of a projected "run" to produce methamphetamine, including people involved in the run, logistics, and various risks associated with it.  Id. at 611.  The handwritten notes, in turn, appeared on pages from desk top calendars and bore notations of payments of over $300,000 to "Dad."  Id. at 613.

The Ninth Circuit affirmed the convictions and held that the co-conspirator's tape recorded statements and notes were admissible.  The Court rejected defendants' contention that the tape-recorded statements were not made in furtherance of the conspiracy because there was no proof the tape was played for others or used in any way.  See id. at 612.  The Court noted that the recording "was dictated at a critical juncture" for the enterprise, "catalogued and analyzed factors relevant to" an upcoming decision, and "was preserved with other records of the planning and execution of the enterprise's activities," such that the district court "could infer from the content and context of [the statement] that [the speaker] intended to use it in advancing the common enterprise to produce and distribute methamphetamine."  See id.  The Court also rejected defendants' argument that there was insufficient evidence identifying the author of the ledger entries or the alleged recipient of the payments.  See Id. at 613-14.  The Court explained: "The evidence that [the declarant] was the author of the notations, plus the overwhelming evidence offered at trial that [he] was a participant in the conspiracy, indeed its leader, was sufficient to establish that the notations were made by a coconspirator as required for admission under Rule 801(d)(2)(E)."  Id. at 614.

Like Schmidt, there is overwhelming evidence that Chan participated in the L.A. Grand Hotel bribery scheme and authored the Radar Scans.  There is also substantial evidence that the Radar Screens were made at a critical juncture of the

scheme, when defendant was seeking to expand the L.A. Grand Hotel and giving Huizar various benefits in return, that the Radar Screens catalogued factors relevant to the scheme, and that the Radar Screens were purposely preserved and updated.  See id. at 12.

Notably, this Court drew on Schmidt in ruling that the government had established a sufficient foundation to admit similar evidence in the Lee/940 Hill, LLC trial.  In Lee/940 Hill, defendants moved in limine to exclude as inadmissible hearsay, among other evidence, a series of iPhone notes Esparza authored on his phone that described various aspects of that bribery scheme.  (See Dkt. 42 at 1-3.) Citing Schmidt and related cases, the Court found that the government had sufficiently established the foundational requirements for co-conspirator statements, even though Esparza had not shared the notes with anyone.  (See 5/13/22 Hr'g Tr. at 17:03-09) ("Thus, it is not necessary for the Government to show that Esparza ever shared his iPhone notes with his co-conspirators as long as the statements contained in the notes were made within the time frame and in furtherance of the bribery scheme, which the Court concludes they were, they are admissible under Rule 801(d)(2)(E).")

Defendant's attempts to distinguish Schmidt because defendants there conceded the existence of a conspiracy involving the declarant, the statements were "easily authenticated and comprehensible," and the declarant was available to testify, are unconvincing.  (See Mot. at 8.)  As explained above, the government has clearly established the existence of bribery scheme, the Radar Screens plainly describe aspects of that scheme, and a declarant need not testify for co-conspirator statements to be admissible.

D.    A Rule 403 Analysis Favors Admitting the Highly Probative Radar Screens

Rule 403 authorizes the Court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following:

1  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting

2  time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

3  Exclusion under this rule is "an extraordinary remedy to be used sparingly."

4  United States v. Mende, 43 F.3d 1298, 1302 (9th Cir. 1995) (citation omitted).

5  Because "[r]elevant evidence is inherently prejudicial, [] it is only unfair prejudice,

6  substantially outweighing probative value, which permits exclusion of relevant

7  matter under Rule 403."  United States v. Hankey, 203 F.3d 1160, 1172 (9th Cir.

8  2000) (cleaned up).

9           Here, defendant claims that "the unknowable nature of the [Radar Screen]

10  entries requires guesswork," which "necessarily creates the potential for prejudice

11  and causes confusion," (see Mot. at 9), warranting exclusion under Rule 403.

12  Defendant is wrong.

13          Contrary to defendant's claim, the Radar Screens do not require guesswork

14  or expert opinion (see id. at 8-9); they instead identify the participants in the

15  scheme (Huang, Chan, Huizar, and others), the object of the scheme (the L.A.

16  Grand Hotel redevelopment project), and the methods and means of the scheme

17  (calls, meetings, conferences, requests for favors, approvals), among other things.

18  They also put in greater context the timing of Huang's and SZNW's exploration of

19  the hotel expansion in light of their payments of benefits to Huizar, and reflect that

20  there was a relationship between the project, Huizar, and the loan.  SA Civetti will

21  be able to explain abbreviations based on his review of all the Radar Screens and

22  his personal participation in the investigation.  See Freeman, 498 F.3d at 904-05.

23  For these reasons, the Radar Screens are extremely probative, whereas any risk of

24  confusion is minimal, at best.  Nor is there any meaningful risk of prejudice here.

25  Indeed, the fact that a City official took meticulous notes, some of which describe

26  the bribery scheme in orderly, neutral terms, will not shock or enflame the jury.  At

27  bottom, the probative value of the Radar Screen far eclipses any potential prejudice

28  or confusion.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## **SZNW'S REPLY**

2          Like virtually all the opposition briefs, the government claims that the "radar

3   screens" are "critical" to the case, containing "highly probative" evidence and

4   "provide context for various events that occurred."  We address each "radar

5   screen" below, including the nature of the government's positions.

6          A.    Radar Screen dated June 17, 2013, attached as Exhibit B

7          The government identifies a few entries on this document.  The first entry

8   ("Parking (meet to apologize w/ proposal / CW Harris about proposals / Jose

9   delivered letter")) concerns a dispute between SZNW and the owners of a parking

10  lot that serviced the LA Grand Hotel (then called the Hyatt Hotel).  This is one of

11  the "legal favors" or, in the government's words, "smaller asks" (ECF 619, p. 7

12  n.7) that SZNW requested of Huizar.  The government's exhibit list shows

13  innumerable emails and text messages detailing the parking dispute, including Jose

14  Huizar's involvement in seeking a resolution of the dispute, and several of the

15  government witnesses will testify to the dispute.  Thus, this part of the "radar

16  screen" is, at best, cumulative and unnecessary to provide "critical" context about

17  this event.

18         The second entry ("China Trip for JH (CW chairman will prepare invitation

19  letter") concerns a planned trip to China that, at one point, Huizar and his staff

20  discussed with Huang and Chan.[8]   As with the parking dispute, the government's

21  exhibit list contains numerous emails and text messages detailing the proposed trip,

22  and several government witnesses will testify to the trip.  Thus, this part of the

23  _____

24  [8]    The trip was ultimately cancelled. Years later, Huizar and his office

25  resurrected discussion with Wei Huang about the trip.  When Huang informed
    Huizar that the Shen Zhen government would only pay for Huizar and his staff's

26  travel there, but not for their travel to other cities in China, Huizar eliminated the
    part of the itinerary to the city of Shen Zhen (where Huang resided).  Huizar in fact

27  went on the trip to China but did not go to the city of Shen Zhen or have any
    interactions with Huang.

28

34

"radar screen" is also, at best, cumulative and unnecessary to provide "critical" context about this event.

The third entry ("New Hotel (rough revenue (Harris) and cost (Chris) estimations + feasibility study")" is irrelevant to the case.  Contrary to the government's speculation, this entry does **not** concern the redevelopment of the LA Grand Hotel—which occurred years later.[9]  Rather, it concerned SZNW and Huang's interest in building a new hotel on a vacant property at Pico and Figueroa that the City had put up for sale. In November 2012, the City issued a Request for Proposal, entitled "Property Sale for Future Hotel Development on Corner of West Pico Boulevard and South Figueroa Street" ("RFP"), to sell the Pico and Figueroa property (attached as Exhibit G).[10]  The RFP makes clear that the sale of the land should be for the construction of a new hotel.  *Id.* at p. 2 ("the preferred outcome for the City is to sell the property to a Bidder who will increase hotel rooms in the area").  This is undoubtedly why the Radar Screen referenced this entry as a "New Hotel."

The Court, acting as the gatekeeper, should take note of the government's misinterpretation of this entry.  Indeed, the government's position, claiming—with absolutely no foundation—that the reference to "New Hotel" refers to SZNW's plans to build a 77-story tower at the LA Grand Hotel, is precisely why the Radar Screens should not be admitted into evidence.  Having no basis for the meaning of a particular entry, the government claimed to have "decoded" it to neatly fit their desired narrative.  Thus, an entirely innocuous entry that has nothing to do with the

---

[9]      To counsel's knowledge, the redevelopment of the LA Grand Hotel was never referred to as the "New Hotel" in any "radar screen" or other document, primarily because it was not a "new hotel" but an addition to an existing hotel.

[10]      An even more comprehensive document, which contains the RFP, can be viewed at https://planning.lacity.org/eir/FigPico/FEIR/Appendix%20B%20-%20Supporting%20Documentation%20for%20Comment%20Letter%2011.pdf

underlying charges became, from the government's self-serving standpoint, an early reference to one of the most significant aspects of the case: the redevelopment of the LA Grand Hotel.

      B.    <u>Radar Screen dated February 22, 2014, attached as Exhibit C</u>

According to the government, the metadata for this "radar screen" indicates it was authored by Jeremy Chan (Ray Chan's son) on December 23, 2013.  Jeremy Chan, a practicing attorney, is not alleged as a co-conspirator and, therefore, document is hearsay.  The fact that the metadata shows Ray Chan last saved the document does not mean that the entries are his statements for purposes of the co-conspirator's exception.  For this reason, this exhibit would be inadmissible.

In addition, for the reasons discuss above, the entries that the government identifies—the parking lot dispute and the "New Hotel"—are cumulative and irrelevant, respectively.  This "radar screen" contains separate headers for the "Downtown Hotel," the "Sheraton" and one entitled "Property."  Notably, the "Property" header includes an entry for the "RFP," a "reply" and an "award." There was no RFP for the Redevelopment of the LA Grand Hotel to build the aforementioned tower, much less a "reply" date and an "award" date.

      C.    <u>Radar Screen dated March 31, 2014, attached as Exhibit D)</u>

Like the prior "radar screen," the government advises that the metadata for this "radar screen" shows that it was authored by Jeremy Chan, and saved by Ray Chan.  Because Jeremy Chan is not a co-conspirator, this document is also hearsay.

The government correctly notes that "[t]he first page of the Radar Screen contains detailed entries relating to Huang's properties and ongoing projects, including the Sheraton Universal Hotel swimming pool, the AUP School, which was on the L.A. Grand Hotel property, and multiple phases of renovations at the L.A. Grand Hotel, which SZNW was seeking authorization to brand under the Hyatt hotel chain."  None of the entries under these headings are relevant to the underlying charges; they are simply tasks to be undertaken at the different hotels.

As the government notes, the second page is primarily in Mandarin with a few words in English.  The government believes certain entries concern the aforementioned "New Hotel."  We believe that to be true.  One reference, translated from Mandarin, contains the word "bidding"—it is our understanding that another translation of this word is "RFP."  Either way, this entry refers to the City's requests for proposals or bids for the vacant lot at Pico and Figueroa, which is irrelevant to the case.

    D.    Radar Screen dated March 26, 2016, attached as Exhibit E

The government correctly notes that this "radar screen" "contains various detailed entries relating to Chan's work as the General Manager of LADBS, including various branches/offices with whom Chan was dealing."  These items are irrelevant to the underlying charges.  The government also cites to the entries under the heading "Huang," noting that they reference an estimated TFAR calculation for the LA Grand Hotel and a design proposal by the DiMarzio/Kato architectural firm.  The government's exhibit list includes many documents calculating the TFAR amount and referencing DiMarzio/Kato's architectural plans, and the government's witness list includes several witnesses who will testify to both these subjects, including Jeff DiMarzio and Saturo Kato.  Thus, these entries are, at best, cumulative, and are not needed to provide "critical context" for these events.

The government also notes an entry which references "Huang, Huizar, the PLUM Committee, and collapsing a loan."  Those words appear on the "radar screen" but the meaning of the phrase – "TT to Huang after PLUM about Huizar's contribution / Payment now and collapse loan" – is unknown.  The government does not offer an interpretation about this entry.  Simply because certain words appear that are a part of the case does not make them automatically admissible.

Indeed, the government concedes that "some of the Radar Screens contain entries that use coded/abbreviated language," and that "*the majority* of the

37

coded/abbreviated language, such as "TT" [talk to], "CW" [check with], and "WF" [wait for] are relatively easy to decipher and are based on SA Civetti's investigation in this matter, and none of the evidence the government will elicit at trial requires expert analysis." (Emphasis added.)  But while "TT" may well stand for "talk to" and "WT" may stand for "wait for," the government does not address other coded language like "TT to Huang after PLUM about Huizar's contribution" and "Payment now and collapse loan."   There is no indication the agent has decoded these phrases.

The government cites to *Freeman* and *Gadson* for the proposition that under Rule 701, FRE, an agent may testify to ambiguous statements.  But those cases and others in the Ninth Circuit require that the Court differentiate between when the agent is testifying as an expert or a lay witness and only permit such testimony when the witness can meaningfully interpret it to the jury based on the agent's knowledge of the facts of the case.  *See also United Sates v. Cox*, 633 F.2d 871, 875 (9th Cir. 1980) ("Lay witnesses are normally not permitted to testify about their subjective interpretations or conclusions as to what has been said. Under Rule 701 of the Federal Rules of Evidence, some lay expressions of opinion or inference may be permitted but only if rationally based on perception of a witness and helpful either to an understanding of the testimony of the witness on the stand or to the determination of a fact in issue.") (citations omitted).  Here, the government does not give any indication whether (1) it seeks to have the agent testify as a lay witness or expert, (2) the agent has decoded or deciphered the meaning of the identified entries on the "radar screen," and (3) the agent can provide testimony about such decoding beyond relatively inconsequential phrases like "TT" and "WF."

E.   Radar Screen dated July 24, 2016, attached as Exhibit F

The government points to the entry stating, "Must go thru CEQA / use Development Agreement for TFAR," and "Meet w/ JH  8/1-meet w/ Huang and JH

38

8/4."  The government notes that the latter entry references Huizar's meetings on the redevelopment process on August 1 and August 4, 2016.  As with many of the radar screen entries, the government's exhibit list includes documents reflecting these meetings, including Huizar's calendar, and the government has several witnesses that will testify to these meetings.  Although the government does not address the other entry concerning "CEQA" and "Development Agreements," those matters are also contained in the government's exhibits and will be explained by government's witnesses.  Thus, this radar screen is also cumulative.

      F.    <u>Radar Screens dated May 3, 2015, Nov. 22, 2015, & May 1, 2016, attached as Exhibits 6, 7, & 8, Respectively</u>

By way of a footnote, the government advises that it seeks to introduce three additional radar screens that it located "[a]s part of its trial preparation process."  What the government means is that some time after the date for disclosing its exhibit list to SZNW, it decided to use these documents as well.  The Court is currently considering the government's untimely additional exhibits; as to these three radar screens, the government makes no reference to inadvertence and offers no explanation for their late disclosure.

From an evidentiary standpoint, the documents provide no new information, as they appear to be little more than variations of the entries on prior radar screens, which are themselves indecipherable.  Thus, they too are uniquely both cumulative and irrelevant.

///

///

///

DATED: August 29, 2022

RICHARD M. STEINGARD
Law Offices of Richard M. Steingard


By:  /s/
RICHARD M. STEINGARD
Attorney for Defendant
SHEN ZHEN NEW WORLD I, LLC

DATED: August 29, 2022

TRACY L. WILKINSON
United States Attorney


By:  /s/
MACK JENKINS
SUSAN HAR
CASSIE PALMER
JAMARI BUXTON
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **DECLARATION OF RICHARD M. STEINGARD**

I, Richard M. Steingard, state and declare as follows:

1.     I am an attorney licensed to practice in the state of California and before this Court.  I represent Shen Zhen New World I, LLC ("SZNW") in the above-pending matter and submit this declaration in support of the motion *in limine* to exclude evidence of Jose Huizar and George Esparza's acts of concealment.

2.     SZNW moves this Court for an order excluding the admission of a series of so-called "Radar Screens," written by Raymond Chan or his son, Jeremy Chan.  These documents ostensibly contain various thoughts, ideas, ruminations, and tasks for Ray Chan to perform at his job or in his personal life.  For the most part, they are written in abbreviations, initials and shorthand and, while the case agent may be able to decode certain entries, there are others that are simply undecipherable.  Most of the entries that purport to be connected to SZNW or Wei Huang will be introduced through other exhibits and witnesses, and the "Radar Screens" are thus cumulative.  Further, their admission has the potential to confuse the jury and are more prejudicial than probative.

3.     Counsel for both parties have met and conferred about this motion *in limine*. After discussing the matter, counsel for the government stated that it will seek to introduce such evidence at trial.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 29th day of August, 2022 in Los Angeles, California.

_____
Richard M. Steingard

41

## **LOCAL RULE 5-4.3.4 ATTESTATION**

I attest and certify that all other signatories listed, and on whose behalf this filing is submitted, concur with the filing's content and have authorized the filing.

DATED: August 29, 2022          By: _____

RICHARD M. STEINGARD