# Exhibit A

**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Attorneys for Criminal Justice, et al., | No. CV-17-01422-PHX-SPL |
| Plaintiffs, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| vs. | |
| Doug Ducey, et al., | |
| Defendants. | |

On May 8, 2017, Plaintiffs filed this action challenging the constitutionality of A.R.S. § 13-4433(B). (Doc. 1). In the operative Second Amended Complaint, Plaintiffs allege two counts—(1) violation of the First Amendment, and (2) unconstitutional overbreadth—against Maret Vessella, Chief Bar Counsel of the State Bar of Arizona;[1] Colonel Helston Silbert, Director of the Arizona Department of Public Safety, in his official capacity; and Mark Brnovich, Attorney General of the State of Arizona, in his official capacity. (Doc. 150 ¶¶ 25–27, 87–99; Doc. 203). Plaintiffs seek declaratory and injunctive relief, as well as reasonable costs and attorneys' fees. (Doc. 150 at 20). Defendants timely answered the Second Amended Complaint on May 27, 2022. (Docs. 230, 231, 233).

This case arises under the United States Constitution and is brought pursuant to 42 U.S.C. § 1983. The case is thus within this Court's jurisdiction under 28 U.S.C. §§ 1331

---

[1] Defendant Vessella takes no position on the constitutionality of A.R.S. § 13-4433(B), merely taking a limited position as to the scope of any injunction. (Doc. 243).

and 1343. The Court may grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. Venue is proper in this District pursuant to 28 U.S.C. § 1391. (Doc. 150 ¶¶ 12–15; Doc. 253 at 3–4).

On August 22, 2022, without objection from the parties (Doc. 246), the Court set a consolidated Preliminary Injunction Hearing and Bench Trial pursuant to Fed. R. Civ. P. 65(a)(2). (Doc. 247). The Hearing and Bench Trial was held before this Court on September 22, 2022. (Doc. 258). The Court has carefully considered the briefing of the Motion for Preliminary Injunction (Docs. 238, 240, 242–44); the Joint Pretrial Statement (Doc. 253); the proposed findings of fact and conclusions of law (Docs. 254, 255); the testimony received (Docs. 264, 266); the exhibits admitted into evidence; and the post-trial supplemental briefing (Docs. 267, 268). The Court now makes the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52(a) and LRCiv 52.1:

### FINDINGS OF FACT

#### The Parties

1. Plaintiff Arizona Attorneys for Criminal Justice ("AACJ") is an organization made up of criminal defense attorneys and others associated with criminal defense work in Arizona. (Doc. 264 at 77:7–9). AACJ was formed to represent the interests of the criminal defense bar. (Doc. 264 at 77:9–14).

2. Plaintiff John Canby is a member of the State Bar of Arizona and a practicing attorney. (Doc. 264 at 130:22–24). He is currently employed by the Maricopa County Public Defender's Office and works on capital cases. (Doc. 264 at 132:4–15).

3. Plaintiff Christopher Dupont is a member of the State Bar of Arizona and a practicing attorney. (Doc. 266-2 at 66:16–20). He works in private practice doing "almost entirely" criminal law. (Doc. 266-2 at 70:19–71:1).

4. Plaintiff Jeffrey A. Kirchler is a member of the State Bar of Arizona and a practicing attorney. (Doc. 266-3 at 14:10–13). He is currently employed by the

Maricopa County Public Defender's Office and works on capital cases. (Doc. 266-3 at 17:17–18, 17:24–18:2).

5. Plaintiff Richard L. Lougee is a member of the State Bar of Arizona and a practicing attorney. (Doc. 266-3 at 29:11–15). He has previously worked as a public defender and is currently in private practice doing exclusively criminal defense work. (Doc. 266-3 at 32:19–33:5).

6. Plaintiff Richard D. Randall is a member of the State Bar of Arizona and a practicing attorney. (Doc 266-3 at 54:21–25). He has worked as a public defender since 2005. (Doc. 266-3 at 56:18–23).

7. Plaintiff Rich Robertson is a private investigator licensed by the State of Arizona. (Doc. 264 at 113:15–16). Most of his work involves conducting fact investigations for criminal defense attorneys. (Doc. 264 at 114:16–21). In every criminal defense case that he has worked, he has worked on behalf of and at the direction of the criminal defendant's criminal defense attorney. (Doc. 264 at 126:23–127:6).

8. Defendant Mark Brnovich is the Attorney General and chief legal officer of the State of Arizona (the "State") and is sued in his official capacity. (Doc. 150 ¶ 27; Doc. 230 ¶ 27).

9. Defendant Maret Vessella is the Chief Bar Counsel of the State Bar of Arizona. (Doc. 150 ¶ 25; Doc. 233 ¶ 25).

10. Defendant Heston Silbert is the Director of the Arizona Department of Public Safety ("DPS") and is sued in his official capacity. (Doc. 150 ¶ 26; Doc. 203; Doc. 231 ¶ 26).

**The Statute**

11. In 1991, the Arizona Legislature enacted the Victims' Rights Implementation Act, A.R.S. §§ 13-4401 to -4443. Victims' Rights Implementation Act, ch. 229, 1991 Ariz. Sess. Laws 1137; (Trial Ex. 107).

12. Section 13-4433(B) of the Victims' Rights Implementation Act (the "Statute")—

which is the only provision Plaintiffs challenge in this case—provides as follows:

> The defendant, the defendant's attorney or an agent of the defendant shall only initiate contact with the victim through the prosecutor's office. The prosecutor's office shall promptly inform the victim of the defendant's request for an interview and shall advise the victim of the victim's right to refuse the interview.

13. Other relevant subsections of A.R.S. § 13-4433 state the following:

> (A) Unless the victim consents, the victim shall not be compelled to submit to an interview on any matter, including any charged criminal offense witnessed by the victim and that occurred on the same occasion as the offense against the victim, or filed in the same indictment or information or consolidated for trial, that is conducted by the defendant, the defendant's attorney or an agent of the defendant. . . .

> (C) The prosecutor shall not be required to forward any correspondence from the defendant, the defendant's attorney or an agent of the defendant to the victim or the victim's representative.

> (D) If the victim consents to an interview, the prosecutor's office shall inform the defendant, the defendant's attorney or an agent of the defendant of the time and place the victim has selected for the interview. If the victim wishes to impose other conditions on the interview, the prosecutor's office shall inform the defendant, the defendant's attorney or an agent of the defendant of the conditions. The victim has the right to terminate the interview at any time or to refuse to answer any question during the interview. The prosecutor has standing at the request of the victim to protect the victim from harassment, intimidation or abuse and, pursuant to that standing, may seek any appropriate protective court order. . . .

> (G) This section applies to the parent or legal guardian of a minor child who exercises victims' rights on behalf of the minor child. . . .

///

///

4

14. The Victims' Rights Implementation Act defines "victim" as follows:

> [A] person against whom the criminal offense has been committed, including a minor, or if the person is killed or incapacitated, the person's spouse, parent, child, grandparent or sibling, any other person related to the person by consanguinity or affinity to the second degree or any other lawful representative of the person, except if the person or the person's spouse, parent, child, grandparent, sibling, other person related to the person by consanguinity or affinity to the second degree or other lawful representative is in custody for an offense or is the accused.

A.R.S. § 13-4401(19).

15. The Victims' Rights Implementation Act defines "defendant" as "a person or entity that is formally charged by complaint, indictment or information of committing a criminal offense." A.R.S. § 13-4401(9).

16. A.R.S. § 13-4402(A) provides as follows:

> [T]he rights and duties that are established by this chapter arise on the arrest or formal charging of the person or persons who are alleged to be responsible for a criminal offense against a victim. The rights and duties continue to be enforceable pursuant to this chapter until the final disposition of the charges, including acquittal or dismissal of the charges, all post-conviction release and relief proceedings and the discharge of all criminal proceedings relating to restitution. If a defendant is ordered to pay restitution to a victim, the rights and duties continue to be enforceable by the court until restitution is paid.

The victim's right to refuse a defense interview, however, remains enforceable beyond a final disposition, except in cases involving a dismissal with prejudice or an acquittal. A.R.S. § 13-4433(H).

17. In sum, the Statute on its face prohibits an attorney or other agent working on behalf of a defendant in an ongoing criminal proceeding in Arizona from initiating direct contact with the victim of the alleged crime, including the

parents or guardians of a minor victim and the second-degree relatives of a victim who is killed or incapacitated. Instead, the attorney or agent must initiate contact through the prosecutor, who must promptly inform the victim of the request.

18. The "Legislative intent" section of the Victims' Rights Implementation Act reads as follows:

> The legislature recognizes that many innocent persons suffer economic loss and personal injury or death as a result of criminal acts. It is the intent of the legislature of this state to:
>
> 1. Enact laws that define, implement, preserve and protect the rights guaranteed to crime victims by article II, section 2.1, Constitution of Arizona.
>
> 2. Ensure that article II, section 2.1, Constitution of Arizona, is fully and fairly implemented and that all crime victims are provided with basic rights of respect, protection, participation and healing of their ordeals.
>
> 3. Ensure at all stages of the criminal justice process that the duties established by article II, section 2.1, Constitution of Arizona, are fairly apportioned among all law enforcement agencies, prosecution agencies, courts and corrections agencies in this state.
>
> 4. Ensure that employees of this state and its political subdivisions who engage in the detention, investigation, prosecution and adjudication of crime use reasonable efforts to see that crime victims are accorded the rights established by article II, section 2.1, Constitution of Arizona.

Victims' Rights Implementation Act, ch. 229, § 2, 1991 Ariz. Sess. Laws 1137, 1138; (Trial Ex. 107).

///
///
///

19. Article II, § 2.1 of the Arizona Constitution is the Victims' Bill of Rights, which was approved by Arizona voters in 1990. The Victims' Bill of Rights provides in relevant part as follows:

> (A) To preserve and protect victims' rights to justice and due process, a victim of crime has a right:
>
> 1. To be treated with fairness, respect, and dignity, and to be free from intimidation, harassment, or abuse, throughout the criminal justice process. . . .
>
> 5. To refuse an interview, deposition, or other discovery request by the defendant, the defendant's attorney, or other person acting on behalf of the defendant.

Ariz. Const. art. II, § 2.1. The rights enumerated in the Victims' Bill of Rights do not include the right to not be contacted by the defense or anything else similar to the Statute.

20. The Victims' Bill of Rights further provides that "[t]he legislature . . . [has] the authority to enact substantive and procedural laws to define, implement, preserve and protect the rights guaranteed to victims by this section," and that "[t]he enumeration . . . of certain rights for victims shall not be construed to deny or disparage others granted by the legislature or retained by victims." Ariz. Const. art. II, § 2.1(D)–(E).

### Enforcement of the Statute

21. Defendant Brnovich, as Arizona Attorney General (the "Attorney General"), is the chief legal officer of the State. A.R.S. § 41-192(A). The Attorney General's Office prosecutes many criminal trials, almost all felony direct appeals, and all federal capital habeas corpus litigation in Arizona. (Doc. 150 ¶ 51; Doc. 230 ¶ 51). The Attorney General's Office is also charged by law with supervising all county attorneys in Arizona and, when necessary, assisting county attorneys with their duties. A.R.S. § 41-193(A)(4)–(5).

22. The Attorney General's Office is further charged with maintaining a victims'

rights program by "administer[ing] an annual plan for assisting and monitoring state and local entities that are required to implement and comply with victims' rights," including distributing funds, conducting training and audits, and providing other assistance. A.R.S. § 41-191.06(A); (*see also* Doc. 150 ¶ 56; Doc. 230 ¶ 56).

23. The Attorney General's Office investigates allegations of victims' rights violations and assists victims who believe their rights were violated. (Doc. 150 ¶ 60; Doc. 230 ¶ 60).

24. Moreover, under the Victims' Rights Implementation Act, "the prosecutor may assert any right to which the victim is entitled" upon the victim's request. A.R.S. § 13-4437(C).

25. Defendant Brnovich has expressed an intention to take every action necessary to uphold victims' rights. (Doc. 150 ¶ 57; Doc. 230 ¶ 57).

26. Defendant Brnovich and the prosecutors that he supervises therefore have authority to investigate and assert violations of the Statute, in addition to acting as the conduit for a defense attorney or agent who wishes to contact a victim in cases the Attorney General's Office prosecutes, pursuant to the terms of the Statute.

27. Defendant Silbert, as DPS Director, administers all aspects of private investigator licensing in Arizona. A.R.S. § 32-2402; (*see also* Doc. 150 ¶ 44; Doc. 231 ¶ 44). He has authority to investigate and prosecute private investigators licensed in Arizona for alleged violations of the Statute. A.R.S. § 32-2457(A)(5); (Doc. 150 ¶ 47; Doc. 231 ¶ 47).

28. If a private investigator is found to have violated the Statute, Defendant Silbert may take disciplinary action up to and including the suspension or revocation of the private investigator's license. A.R.S. § 32-2457(B)–(G).

29. Defendant Vessella, as Chief Bar Counsel, has authority to investigate and prosecute members of the State Bar of Arizona for alleged violations of the

Arizona Rules of Professional Conduct. (Doc. 150 ¶ 39; Doc. 233 ¶ 39).

30. Rule 8.4(d) of the Arizona Rules of Professional Conduct provides that "[i]t is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice." (*See also* Doc. 150 ¶ 40; Doc. 233 ¶ 40).

31. The State Bar of Arizona has initiated disciplinary investigations or proceedings against members of Plaintiff AACJ based on allegations that they violated the Statute. (Doc. 264 at 79:18–81:9, 110:8–11).

32. There is at least a perception among criminal defense attorneys, including Plaintiffs, that certain prosecuting agencies in Arizona routinely seek to enforce the Statute when they believe it has been violated. (Doc. 264 at 146:23–147:11).

33. All of these aspects create a credible threat that Defendants will enforce the Statute against the criminal defense team[2] and that a person who violates the Statute will face professional discipline.

**Application and Effects of the Statute**

*Communication of a Defense Contact Request to a Victim*

34. In cases prosecuted by the Attorney General's Office, when the defense attorney contacts the prosecutor with a request to contact a victim, the prosecutor notifies the assigned victim advocate. (Doc. 266-2 at 6:9–15). The advocate then notifies the victim by sending a letter. (Doc. 266-2 at 6:16–20).

35. The Attorney General's Office's victim advocates use a standard template when sending a letter notifying a victim of a request for an interview. In other words, except for case-specific information like the names of the prosecutor, victim, and criminal defendant, the letters sent to victims use identical language. (Doc. 266-2 at 6:21–24, 92:7–13; *see also* Trial Ex. 1). The letter is therefore not tailored in any way to any specific message the defense attorney may wish to convey to the victim.

---

[2] The Court uses "defense team" to refer to the criminal defendant's attorney and those working on the attorney's behalf.

9

36. The form letter used by the Attorney General's Office informs the victim of their right to refuse any discovery request by the defense, including a deposition, and explains that "[i]f you do not want to sit down and be interviewed on tape or sit through a formal deposition with a court-reporter before the trial, you just need to tell this office and we will communicate your wishes to the defense attorneys." (Trial Ex. 1). The letter then asks the victim to mark one of two lines indicating "whether you want to assert your rights to refuse defense discovery requests or whether you wish to be interviewed and/or deposed by the defense prior to trial" and return the letter to the victim advocate. (Trial Ex. 1).

37. The process used by the Attorney General's Office to inform victims of a request by the defense to contact the victim is not required by any law; other prosecuting agencies in Arizona may use other processes. But the Statute *requires* prosecutors to "promptly inform the victim of the defendant's request for an interview."[3] A.R.S. § 13-4433(B).

*The Statute's Chilling Effect*

38. Because of the Statute and Defendants' enforcement of it,[4] Plaintiffs do not initiate contact with victims in ongoing state-court cases in which they represent the criminal defendant without going through the prosecutor. (*See, e.g.*, Doc. 264 at 79:14–17, 115:18–116:1, 139:22–140:4).

39. In the absence of the Statute, Plaintiffs would initiate direct contact with victims in ongoing state-court cases where they represent the criminal defendant. (Doc.

---

[3] Several Plaintiffs testified that they do not believe that prosecutors always communicate their requests for victim contact to the victim, but the minimal evidence supporting those beliefs is anecdotal at best. (*See, e.g.*, Doc. 264 at 91:3–92:13, 144:25–146:3; Doc. 266-3 at 38:1–23). And regardless, a prosecutor's failure to fulfill a statutory duty does not affect the facial validity of that statute.

[4] Defendants argue that the Statute is not the only obstacle to Plaintiff's speech, as Arizona Rule of Criminal Procedure 39(b)(12)(A) contains a similar prohibition. But as the Ninth Circuit held, the Statute is broader than Rule 39(b)(12)(A), so it is possible to violate the Statute without violating the Rule. (Doc. 220-1 at 4–5). Thus, "enjoining Defendants from enforcing [the Statute] would relieve a discrete injury." (Doc. 220-1 at 5).

264 at 84:19–85:1, 140:23–141:1; *see* Doc. 264 at 117:5–17). There are many topics about which they would like to communicate with victims:

    a.  The Plaintiffs in this case wish to speak to crime victims to investigate the facts and circumstances of the alleged criminal offense. (Doc. 264 at 78:9–25, 85:2–14, 117:5–17). Multiple witnesses testified that law enforcement investigations often fail to capture an accurate or complete accounting of the events—especially the background history and surrounding circumstances of a crime—because law enforcement typically investigates the particular act with the purpose of making an arrest. (Doc. 264 at 97:15–21, 117:11–14, 117:23–118:5; *see also* Doc. 264 at 115:3–5 (testimony from Plaintiff Robertson that he finds evidence inconsistent with the police report in "[p]ractically every case" that he investigates)).  Having a fuller picture of the facts allows the defense team to better predict the client's likelihood of success at trial and may help resolve the case prior to trial. (Doc. 264 at 85:15–86:4, 125:12–126:1). Or it may uncover exculpatory information showing that the defendant did not in fact commit the alleged crime. (Doc. 264 at 98:3–8, 118:6–12).

    b.  In capital cases, Plaintiffs often wish to speak to statutory crime victims to gather mitigation evidence—evidence that the defendant should receive a life sentence rather than the death penalty. (Doc. 264 at 141:5–9). In a case where the criminal defendant is charged with killing a relative, the people who hold that mitigation evidence are often covered by the Statute—meaning the defense team can initiate contact with them only through the prosecutor who is seeking the death penalty. *See* A.R.S. § 13-4401(19) (defining "victim" to include first- and second-degree relatives of a deceased victim). Plaintiff Canby offered the following example:

> [A] client who is accused of killing his abusive
> father for instance. His brother who grew up in

> the same home would be covered under the [S]tatute.
>
> And that's a person who would likely have valuable mitigation that would be beneficial to the client, because that person grew up in the same home. Would know about the abuse. May have been subject to the same abuse. Would know about mental health issues. Would know about the neighborhood. Would know about . . . just a wealth of information that other people may not have, and there may not be another person.
>
> And that prohibition against talking to people would extend to the mother, too, who would also have a lot of that same information.

(Doc. 264 at 141:14–142:3). In this way, the Statute may altogether block Plaintiffs' ability to access certain information.[5]

c. Relatedly, Plaintiffs want to speak to victims in order to further truth-seeking within the legal system. Rhonda Neff, the incoming president of Plaintiff AACJ and a member of the Arizona Bar who does almost exclusively criminal defense work, (Doc. 264 at 75:21, 76:11–14), testified:

> [T]he truth seeking function of the criminal justice system, it's not intended to be just about prosecutions and criminal convictions and incarceration. It's intended to be about community and stabilization and people in general.
>
> And when one side of it is blocked from having access to important information of what actually constitutes truth, but the other side is given unfair access to that, we have no ability going into trial to say that in fact truth has been found at the end of it. . . .

---

[5] To the extent Plaintiffs argue that the Statute hinders their ability to effectively represent their clients by limiting their ability to investigate facts, circumstances, mitigation evidence, and the like, (*see, e.g.*, Doc. 238 at 10–11, 21–22), the Court finds that these issues go not to Plaintiff's First Amendment rights but rather to their clients' Sixth Amendment rights, which are not at issue here.

(Doc. 264 at 96:24–97:12; *see also* Doc. 264 at 54:2–25, 126:2–4). Regardless of whether one shares the beliefs that undergird Ms. Neff's testimony, it demonstrates that the conversations that Plaintiffs wish to initiate with victims are deeply intertwined with their personal views about the goals of the criminal legal system and its proper functioning. Thus, the Statute inhibits their ability to communicate those views.[6]

d. Plaintiffs in this case would like the opportunity to share information about the legal process that they believe could be helpful to victims, as well as to themselves and their clients, particularly in capital cases. For example, Plaintiff Canby testified that if he could contact victims directly, he would explain that the process of pursuing the death penalty takes years, involves multiple sets of prosecutors over the various stages, and requires more contact with the legal system—potentially leading victims to conclude that pursuit of the death penalty could cause them additional trauma. (Doc. 264 at 142:13–22, 143:16–144:14). His desire to communicate this message comes from his belief that this information would help victims make a decision that is in their best interest, and incidentally, it would be in his own interest and the interest of his client. (Doc. 264 at 142:23–143:3; *see also* Doc. 264 at 51:12–52:17). Plaintiff Canby testified that in his experience, victims' views are one of the primary factors in the prosecution's decision to seek a death sentence, so if victims drop their support for the death penalty, the defendant is more likely be able to plead to life in prison. (Doc. 264 at 143:2–11; *see also* Doc. 264 at 149:11–150:5). Then, the criminal defendant would avoid a possible death

---

[6] To be sure, Plaintiff have not expressed a desire to communicate such views to victims in an explicit manner (although the Statute would inhibit their ability to do that, as well). But implicit communication of a message is still communication of a message—and a conversation with a crime victim about what happened to them can certainly communicate a message about the concept of truth and its role in a criminal prosecution.

sentence—in line with Plaintiff Canby's personal moral and practical opposition to the death penalty—and Plaintiff Canby would avoid having to litigate a capital trial. (Doc. 264 at 138:21–139:12, 143:1–3). Again, then, the Statute inhibits Plaintiffs' ability to communicate their core beliefs about trauma, punishment, and justice.

   e. Plaintiffs in this case want to be able to communicate with victims who have unresolved questions about the crime committed against them and the criminal defendant in hopes of aiding in the victim's understanding and healing. (Doc. 264 at 94:11–17, 94:24–95:2; *see also* Doc. 264 at 46:25–48:9).

   f. To summarize, Plaintiffs wish to communicate a variety of messages to victims, including but not limited to messages that explicitly or implicitly advance their own personal views on matters of the utmost public concern such as capital punishment, the pursuit of truth in our criminal legal system, and what justice should look like in our society.

40. Obviously, the topics about which Plaintiffs wish to speak with victims go well beyond—and in fact do not include—harassment or intimidation. (*See* Doc. 264 at 88:6–13, 123:17–124:3). They nonetheless fall within the Statute's prohibition on any defense-initiated contact with the victim that does not go through the prosecutor. It bears emphasizing that the prosecutor need not convey any particular message from the defense team to the victim—just the request for an interview—so the defense team's specific messages are unlikely to reach a victim unless the victim consents to speak to the defense based on the prosecutor's correspondence. *See* A.R.S. 13-4433(C); *see supra* Findings of Fact ¶ 35.

41. The Statute also chills speech beyond that which is plainly restricted on the face of the Statute. For example, Ms. Neff, incoming president of Plaintiff AACJ, testified as to her standard practice when she receives a phone call from a victim

14

in a case where she represents the defendant. If she does not answer the call and the victim leaves a message, she does not return the call but instead notifies the prosecutor's office. (Doc. 264 at 81:18–21). This is because of her reasonable concern over the word "initiating" in the Statute; she is uncertain whether she can return a message from a victim, or initiate a second conversation with a victim who initiated the first conversation, without running afoul of the Statute. (Doc. 264 at 82:7–19). But even if she answers the initial call and learns she is speaking to a victim, she tells them that she cannot speak to them and that if they would like to contact her, they must go through the prosecutor or involve independent counsel. (Doc. 264 at 81:22–82:2).

42. Plaintiff Robertson, the private investigator, has been instructed by some criminal defense attorneys not to speak to victims even when the attorney's client has not yet been charged with a crime due to the "radioactiv[ity]" of victims. (Doc. 264 at 119:15–24).

43. Even inadvertent contact with a victim can result in a disciplinary investigation of a criminal defense attorney. (*See* Doc. 264 at 80:7–81:9).

44. In sum, Plaintiffs are exceedingly cautious with respect to the Statute and often avoid *any* contact with victims in cases where they represent the criminal defendant based on the fear of professional discipline. *See supra* Findings of Fact ¶¶ 21–33. (*See generally* Doc. 264 at 146:23–147:6).

*Communication Not Foreclosed by the Statute*

45. There are several forms of speech that the Statute does *not* limit. (*See* Doc. 264 at 25:2–19). First, other provisions of the Victims' Rights Implementation Act make it plain that the Statute applies only from formal charging through final disposition of the charges. *See supra* Findings of Fact ¶¶ 15–17. Although some criminal defense attorneys may choose not to contact a victim prior to the filing of charges, *see supra* Findings of Fact ¶ 42, the Statute is clear in this respect, and there is no evidence that any criminal defense attorney, private investigator,

or other member of a defense team has been reported, investigated, or disciplined for contacting a victim before formal charging or after final disposition.

46. Second, the Statute plainly applies only to criminal defendants and their attorneys or agents; anyone else is free to contact the victim in a case. A.R.S. § 13-4433(B).

47. In addition, when a prosecutor informs a victim of a member of the defense team's request for contact with the victim and the victim agrees to be contacted, then the defense team may freely communicate directly with the victim. (*See* Doc. 264 at 32:23–25, 129:13–16, 137:3–7, 158:1–5; Doc. 266-3 at 23:19–24:7).

48. More broadly, the Statute does not restrict *victim*-initiated contact. Thus, a member of the defense team may freely communicate with a victim when the victim contacts them. (*See* Doc. 264 at 129:9–12, 157:20–25). Still, as explained previously, there is some ambiguity as to what it means to "initiate" contact—for example, it is not clear whether a defense attorney returning a voicemail from a victim is defense-initiated or victim-initiated contact—such that the Statute chills Plaintiffs from communicating with victims even when it may qualify as victim-initiated contact. *See supra* Findings of Fact ¶ 41.

49. Next, criminal defense attorneys may, to an extent, be able to speak to a victim within the context of a court proceeding. In addition to potentially cross-examining a victim, the criminal defense attorney may be able to indirectly deliver a message to a victim who is attending the proceeding by, for example, mentioning the criminal defendant's willingness to plead while addressing the court. (Doc. 264 at 140:4–22). Obviously, the ability to communicate in this manner is contingent on whether the victim is present in the courtroom and is constrained by all of the substantive and procedural limitations of a court proceeding.

50. Finally, Plaintiffs have sought relief from the Statute in individual cases from the state, county, or municipal court where the criminal case is pending. (Doc. 264 at

157:2–5). Such motions are "sometimes" granted, allowing for direct contact with victims. (Doc. 264 at 157:6–8). If the request is denied, Plaintiffs can seek review of that decision through a special action. (Doc. 264 at 157:9–12).

### The State's Interests in the Statute

51. Defendants assert that the Statute serves four compelling interests: (1) implementing and protecting the rights of victims set forth in the Arizona Constitution; (2) regulating the professional conduct of lawyers and their agents during ongoing proceedings; (3) protecting victims from being retraumatized; and (4) leveling the playing field between victims with the means and understanding to obtain counsel and those without counsel. (Doc. 264 at 24:3–25).

*The State's Interest in Implementing and Protecting Victims' Rights Under the Arizona Constitution*

52. Defendants assert that the Statute protects two rights enumerated in the Victims' Bill of Rights: the right to refuse a defense interview and the right to be treated with fairness, respect, and dignity and to be free from intimidation, harassment, or abuse.

53. First, Defendants argue that the Statute protects victims' right to refuse an interview by the defense team. To be sure, at least some criminal defense attorneys and their agents, if allowed to contact victims directly, would not affirmatively inform victims of their right to refuse an interview. (*See* Doc. 264 at 160:18–21).

54. But by existing law, a prosecutor must inform victims of their rights under the Victims' Bill of Rights, its implementing legislation, and court rules within seven days after the prosecutor charges a crime and the defendant is taken into custody or served a summons. A.R.S. § 13-4408(A)(1). Likewise, trial courts are required to "prominently post[ ]" a notice advising victims of their rights, including the right "to choose whether or not to be interviewed by the defendant or the

17

defendant's attorney," and superior court judges must also read the notice aloud before criminal hearings begin. A.R.S. § 13-4438. The victim may also be notified of the right to refuse an interview by law enforcement shortly after the crime is committed and by a victim advocate. *See* A.R.S. § 13-4405(A); (Doc. 264 at 82:24–84:1).

55. Accordingly, victims already receive ample notice of the right to refuse an interview by the defense, and the Statute is not necessary in order to protect that right. (*See also* Doc. 266-1 at 8:2–4 (testimony from Paul Ahler, chief counsel for the criminal division at the Attorney General's Office, that "I don't know if [going through the prosecutor is] the *only* way" to protect the victim's right to decide whether or not to speak to the defense, "but I think it's probably one of the best ways" (emphasis added))).

56. Second, Defendants argue that the Statute protects victims' right to be treated with fairness, respect, and dignity and to be free from intimidation, harassment, or abuse. It is possible that some members of the defense team may be disrespectful to victims if allowed to contact them directly—just as it is possible that any other person would be. (*See* Doc. 266-1 at 95:8–11).

57. There is no evidence, however, that members of the defense team were contacting victims in a disrespectful, harassing, or abusive manner before the Statute was enacted.[7] In fact, the chief counsel for the criminal division at the

---

[7] Plaintiffs *have* presented some evidence of defense attorneys harassing victims via questions asked during interviews. (*See* Trial Ex. 100 at 6; Trial Ex. 101 at 1–2). But victims already have the right to refuse an interview by the defense and—if they consent to an interview—to set conditions for the interview, to refuse to answer any questions, and to terminate the interview at any time. A.R.S. § 13-4433(A), (D). Further, if the victim requests it, the prosecutor has standing to protect the victim from harassment, intimidation, or abuse. *Id.* § 13-4433(D). Thus, the Statute is not necessary to protect a victim from harassment during an interview.

Plaintiffs have also presented evidence of criminal defendants harassing their victims. (*See* Trial Ex. 102 at 2; Trial Ex. 103 at 3). But the Statute's prohibition against direct contact by the defendant is not at issue in this case. *See infra* Conclusions of Law ¶ 43.

Arizona Attorney General's Office testified that he was not even aware of defense teams contacting victims prior to the Statute's passage. (Doc. 266-1 at 11:15-19).

58. The Statute does not apply victims in federal criminal cases, nor does it apply to cases charged in other states with victims who reside in Arizona. (Doc. 264 at 115:22–116:12). There is no evidence that those victims endure disrespectful or harassing conduct from defense attorneys.

59. Moreover, several other regulations already protect victims from harassment. Namely, attorneys and private investigators are subject to discipline for unprofessional conduct. *See* Ariz. Rules of Professional Conduct r. 4.4(a) ("In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden any other person, or use methods of obtaining evidence that violate the legal rights of such a person."); *id.* r. 5.3 (requiring lawyers to make reasonable efforts to ensure that assistance provided by nonlawyers is compatible with the lawyer's professional obligations and holding the lawyer responsible for the nonlawyer's conduct under certain circumstances); A.R.S. § 32-2457(A)(25) (providing that a private investigator is subject to discipline for "[c]ommitting any act of unprofessional conduct"). In addition, a defense attorney may be subject to contempt proceedings or other sanctions by the court if they violate an order to treat the victim with dignity and respect. (Doc. 264 at 88:15–20). Finally, harassment is a crime in Arizona. A.R.S. § 13-2921.

60. There is no reason to believe that members of the defense team will act inconsistently with their professional obligations or the law in the absence of the Statute. (*See, e.g.*, Doc. 264 at 86:15–24, 88:6–20, 116:17–117:4). The defense team has an incentive to treat victims with respect because doing otherwise may alienate the victim, close off the line of communication, and have an adverse effect on the outcome of the case for the criminal defendant—not to mention the

serious risk of State Bar complaints and other professional consequences. (*See* Doc. 264 at 51:17–52:7, 84:6–18, 123:17–124:3). Thus, the Statute is not necessary to protect the rights enumerated in the Victims' Bill of Rights.

*The State's Interest in Regulating Professional Conduct*

61.  Defendants assert that the Statute serves the State's interest in regulating the professional conduct of attorneys and private investigators, "including the pursuit of criminal justice through the proper functioning and administration of the state judicial system." (Doc. 242 at 13). But it is not clear *how* the Statute does so. There is simply no evidence, or even any more specific argument, that the Statute does anything to further the administration of justice or the functioning of the judicial system. And to say that the purpose of a regulation is to regulate, without some other justification, is circular.

62.  Defendants argue that the Statute is merely a "straightforward application" of Rule 4.2 of the Arizona Rules of Professional Conduct ("ER 4.2"), which prohibits lawyers from communicating about a case with someone who is represented by another lawyer in that case. But that ethical rule applies even-handedly to all lawyers in a given case and "contributes to the proper functioning of the legal system" by protecting the lawyer-client relationship. ABA Model Rules of Professional Conduct r. 4.2 cmt. 1.[8] The Statute, on the other hand, restricts only the communications of criminal defense attorneys by requiring them to initiate contact with victims through the defense's adversaries, the prosecutors, who themselves may contact victims without limitation. And as opposed to contributing to the proper functioning of the legal system, there is evidence that the Statute actually detracts from it by inhibiting the defense team's ability to investigate the relevant facts. *See supra* Findings of Fact ¶ 39(a)–(c). Finally, ER 4.2 restricts only communications "about the subject of the

---

[8] ABA Model Rule 4.2 is substantively identical to Arizona ER 4.2.

representation" for which the lawyer has been retained, unlike the Statute which has no such limitation. Thus, the Statute and ER 4.2 are different in several crucial ways.

63. Even when victims have their own counsel, the plain language of the Statute still requires the defense team to go through the prosecutor if the defense team wishes to contact the victim directly; the Statute does not contain an exception for victims with representation. (Doc. 264 at 93:23–94:9). This further emphasizes that although the Statute and ER 4.2 in part have a similar effect as applied to victims in that they prevent the defense team from contacting a victim directly, the regulations are not analogs: ER 4.2 safeguards a victim's relationship with his or her attorney by requiring the defense team to communicate through that attorney, while the Statute skews the adversarial system by requiring the defense team to communicate through the prosecutor, even when a victim has representation.

*The State's Interest in Protecting Victims from Being Retraumatized*

64. Defendants also assert that the Statute furthers the State's interest in protecting crime victims from additional trauma. There is a modicum of conjectural evidence that mere contact by the defense team is harmful to some victims. For example, Amy Bocks, the Attorney General's Office's Advocate Program Manager who supervises victim advocates, testified that in her opinion, "in some situations, direct initial contact with a crime victim by defense counsel could be harmful in some way to some victims" because "some victims associate defense counsel closely with the defendant . . . and may experience an emotional or physical response to what they see as defendant contact rather than just defense counsel contact." (Doc. 266-2 at 12:3–23; *see also* Doc. 266-1 at 6:13–22 (testimony from Mr. Ahler that in his experience prosecuting sex crimes and homicides, in particular, "the victims are really traumatized in these cases, in most instances, and to have to go through and relive this thing and -- especially

. . . from a defendant or defense attorney, can cause those issues to come back up to the surface and cause them emotional pain and suffering.");[9] Doc. 266-2 at 15:22–16:8). Similarly, Richard Burr, a Texas capital defense attorney and an expert on defense-initiated victim outreach, testified that "there is a chance of retraumatization" when the defense team contacts a deceased victim's relative because "we are connected to the person that they believe killed their loved one. And that's frightening." (Doc. 264 at 43:25–44:3. *But see* Doc. 264 at 49:10–14 (testimony from Mr. Burr that he has no direct knowledge of victims being retraumatized by mere receipt of a letter or phone call, though he has "in very rare instances" heard of it)). It is possible that some victims may experience a negative reaction if contacted directly by the defense team.

65. Still, Ms. Bocks acknowledged that the impact of contact with the defense team on a victim varies: "Every one is an individual. It depends on the victim's position in their healing and recovery." (Doc. 266-2 at 16:9–11). In that vein, there is also evidence that some victims may benefit from contact with the defense team. For example, Ms. Neff, the incoming president of Plaintiff AACJ, does some work representing crime victims. (Doc. 264 at 76:8–10). She testified that victims often want answers to questions about why a crime happened that only the defense has. (Doc. 264 at 94:11–17). She further indicated that prosecutors or victim advocates often explain a victims' rights in terms of *not* talking to the defense without conveying any potentially positive outcomes. (Doc. 264 at 94:23–95:2; *see also* Doc. 264 at 46:3–8 (testimony from Mr. Burr that "no matter how honest and forthright prosecutors are, the fact that [a request for contact] comes through a prosecutor suggests to survivors that they shouldn't talk with us")). Ms. Neff emphasized that victims often do not "know what

---

[9] The Court notes that Mr. Ahler's distinguishment of defense attorneys is conclusory and self-serving given his role as a prosecutor, and the Court gives that aspect of his testimony less weight.

1     questions to ask of a prosecutor about contact with the defendant or whether it

2     would be useful," so one of the only ways to get that information is for the

3     defense team to be able to contact the victim. (Doc. 264 at 95:3–13); *see supra*

4     Findings of Fact ¶ 39(d)–(e). It is possible that some victims may benefit from

5     being contacted directly by the defense team.

6   66.   The bulk of the evidence, however, shows that contact with *any* part or

7     participant of the legal system can retraumatize a victim—that there is nothing

8     particularly harmful about contact with the defense team. (*See, e.g.*, Doc. 264 at

9     49:15–50:15 (Mr. Burr's testimony that retraumatization is possible "any time

10     anybody contacts survivors about a murder"); Doc. 264 at 144:4–8 (testimony

11     from Plaintiff Canby that he has seen victims run out of courtrooms from what

12     they hear during trial); Doc. 266-1 at 6:4–11 (testimony from Mr. Ahler that

13     "especially in some of these more serious cases like homicides, sex offenses,

14     aggravated assaults, having to go through that again to be subjected to . . . either

15     cross-examination or interviews by people, I think, did retraumatize people or

16     had the possibility of retraumatizing people"); Doc. 266-2 at 59:16–60:1

17     (testimony from David Cole, a supervisor in the Attorney General's Office

18     criminal appeals and capital litigation groups, that the Statute prevents

19     retraumatization by the defense "where a victim's gone through a horrific event

20     or sometimes chain of events, has already been interviewed by police officers,

21     detectives, prosecutors")). Notably, as Defendants themselves put it, "[s]ocial

22     science research suggests participation in *criminal proceedings* can retraumatize

23     the victim," and "[s]econdary victimization . . . can result from 'interaction with

24     *the criminal justice system* – through contact with law enforcement, defense

25     attorneys, prosecutors, judges and other legal system personnel and processes.'"

26     (Doc. 242 at 14 n.9 (emphasis added) (quoting *Polyvictims: Victims' Rights*

27     *Enforcement as a Tool To Mitigate "Secondary Victimization" in the Criminal*

28     *Justice System*, Nat'l Crime Victim L. Inst. Victim L. Bull. 1, 1 (March 2013))).

*None* of the social science or empirical research that Defendants cite makes any distinction between contact with the defense team and contact with any other facet of the legal system.[10] (*See* Doc. 242 at 14 n.9).

67. Taking all of the evidence together, then, the Court concludes that in general, mere contact with the criminal defense team is no more or less likely to retraumatize a victim than contact with any other participant in the legal system, including prosecutors. (*See also* Doc. 246 at 34:22–24).

*The State's Interest in Leveling the Playing Field Between Victims*

68. Finally, Defendants argue that the Statute furthers the State's interest in minimizing the disparity between victims who have the means and wherewithal to obtain counsel—who thus fall within the scope of ER 4.2's prohibition on direct contact with a person represented by counsel—and those who do not. There is no evidence of the size or severity of this disparity in the absence of the Statute.

69. Plaintiffs counter that the State could achieve this interest without burdening their First Amendment rights by providing crime victims with their own state-funded counsel. (Doc. 264 at 185:18–22; Doc. 267 at 9). This alternative would, at minimum, allow the defense team to directly contact the victim's representative rather than going through the prosecutor, their adversary in the case who does not represent the victim. *See infra* Conclusions of Law ¶ 6. In addition, it would eliminate the discrepancy between the prosecution and defense

---

[10] Defendants cite several such research articles. *See* Judith Lewis Herman, *The Mental Health of Crime Victims: Impact of Legal Intervention*, 16 J. Traumatic Stress 159, 159 (2003) ("[I]nvolvement in the *justice system* may compound the original injury." (emphasis added)); Jim Parsons & Tiffany Bergin, *The Impact of Criminal Justice Involvement on Victims' Mental Health*, 23 J. Traumatic Stress 182, 183 (2010) (defining "secondary victimization" as when "crime victims feel blamed by the *justice system* or experience other negative societal reactions" (emphasis added)); Rebecca Campbell & Sheela Raja, *Secondary Victimization of Rape Victims: Insights from Mental Health Professionals Who Treat Survivors of Violence*, 14 Violence & Victims 261, 268 (1999) (recounting survey results in which 81% of mental health professionals who treated rape victims believed that "[r]eporting a rape *to the criminal justice authorities* can be psychologically detrimental" (emphasis added)).

in terms of their ability to initiate contact with the victim. (*See* Doc. 266-1 at 12:2–7). Thus, there is at least one other way for the State to achieve its interest in leveling the playing field between victims.

## CONCLUSIONS OF LAW

1. The First Amendment of the Constitution of the United States provides that "Congress shall make no law . . . abridging the freedom of speech." It "applies to state laws and regulations through the Due Process Clause of the Fourteenth Amendment." *Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psych.*, 228 F.3d 1043, 1053 (9th Cir. 2000). Plaintiffs here assert that the Statute is unconstitutional on its face and ask the Court to enjoin enforcement of the Statute against criminal defendants' attorneys and their agents. *See infra* Conclusions of Law ¶ 43; *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1174–75 (9th Cir. 2018) (discussing the distinction between facial and as-applied challenges).

2. In the First Amendment context, there are two types of facial challenges. In the first, a plaintiff "must show 'that no set of circumstances exists under which the regulation would be valid' or—although the Supreme Court has acknowledged some uncertainty on this issue—that the regulation 'lacks any plainly legitimate sweep.'" *Prison Legal News v. Ryan*, 39 F.4th 1121, 1129 (9th Cir. 2022) (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)). In the second type of First Amendment facial challenge, "a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to its plainly legitimate sweep." *Id.* (quoting *Stevens*, 559 U.S. at 473).

### The Statute primarily regulates speech, not conduct.

3. The Court first considers whether the Statute is a regulation of speech at all. "If a 'law's effect on speech is only incidental to its primary effect on conduct,' there is no 'abridgement of freedom of speech to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by

means of language, either spoken, written, or printed.'" *Monarch Content Mgmt. LLC v. Ariz. Dep't of Gaming*, 971 F.3d 1021, 1029 (9th Cir. 2020) (quoting *Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1151 (2017)). Specific to this case, the government "may regulate professional conduct, even though that conduct incidentally involves speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra* (*NIFLA*), 138 S. Ct. 2361, 2372 (2018).

4. "[D]rawing the line between speech and conduct can be difficult," and there is no bright-line rule to distinguish them. *Id.* at 2373. With respect to the legal profession, the Supreme Court has stated that "[l]ongstanding torts for professional malpractice, for example, fall within the traditional purview of state regulation of professional conduct." *Id.* (internal quotation marks omitted). On the other hand, the Supreme Court has treated ethical regulations of extrajudicial comments by attorneys on pending cases as regulations of speech, albeit speech that is subject to regulation for reasons discussed *infra* Conclusions of Law ¶¶ 14–18. *See Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1076 (1991) (Rehnquist, C.J.).[11]

5. The Statute's effect on speech is not incidental; rather, the Statute is aimed at speech as speech. *See NAACP v. Button*, 371 U.S. 415, 439 (1963) ("[A] state may not, under the guise of prohibiting professional misconduct, ignore constitutional rights."). Initiating contact with a victim is far more analogous to extrajudicial statements than to professional malpractice. Contacting a victim and making an extrajudicial statement both necessarily involve pure communication through the expression or exchange of ideas, not necessarily related to the client's interests, whereas malpractice goes fundamentally to *how* attorneys practice law on behalf of a client and whether their practice meets professional

---

[11] Justice Kennedy and Chief Justice Rehnquist each, in part, delivered the opinion of the Supreme Court in *Gentile*. 501 U.S. at 1032. This Court cites only to portions of *Gentile* that were joined by a majority of the Supreme Court.

standards. It is true that a criminal defense attorney's contact with a victim may be part of the practice of law, but the same is true of extrajudicial comments, which are nonetheless considered speech.[12]

6. Moreover, unlike professional malpractice, there is no "longstanding" prohibition on or remedy for a defense attorney's mere communication with a victim of a crime. *NIFLA*, 138 S. Ct. at 2373. As noted *supra* Findings of Fact ¶ 62, Defendants argue that the Statute is merely an extension of the traditional prohibition on direct contact with a represented party found in ER 4.2. But ER 4.2 applies even-handedly and serves the administration of justice by protecting

---

[12] Cases involving the practice of medicine also support this Court's conclusions. In *NIFLA*, the plaintiffs challenged a state law that required certain clinics with the primary purpose of providing family planning or pregnancy services to give patients a government-drafted notice about state programs providing access to comprehensive family planning services, prenatal care, and abortion. *NIFLA*, 138 S. Ct. at 2368–69. The Supreme Court found the law was a regulation of "speech as speech" rather than a regulation of professional conduct. *Id.* at 2374. The Court reasoned that the notice was distinct from informed-consent requirements that are "firmly entrenched in American tort law." *Id.* at 2373 (internal quotation marks omitted); *see also Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 884–85 (1992) (upholding an informed-consent requirement for doctors performing abortions as part of the practice of medicine, "no different from a requirement that a doctor give certain specific information about any medical procedure"), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022). The Court further reasoned that the notice was "not tied to a procedure at all" as it applied "to all interactions between a covered facility and its clients, regardless of whether a medical procedure is sought, offered, or performed." *NIFLA*, 138 S. Ct. at 2373. This is analogous to the Statute, which applies to *any* defense-initiated contact with the victim, even if it were unrelated to the pending criminal case. The Court also found the fact that the law required only *some* facilities providing family planning and pregnancy services to provide the notice to be "telling[ ]," suggesting that a regulation that applies selectively to a profession is not a regulation of professional conduct. *Id.* at 2374.

Most recently, in *Tingley v. Ferguson*, the Ninth Circuit held that a state's ban on the practice of conversion therapy on minors was a regulation of professional conduct rather than speech. 47 F.4th 1055, 1064 (9th Cir. 2022). The Ninth Circuit reasoned that "[s]tates do not lose the power to regulate the safety of medical treatments performed under the authority of a state license merely because those treatments are implemented through speech rather than through the scalpel." *Id.* Put another way, the "speech" that the state regulated *was itself* the practice of medicine. This is in alignment with the Supreme Court's statement that legal malpractice law regulates conduct rather than speech; in fact the Ninth Circuit recognized in *Tingley* that a contrary holding would "endanger centuries-old medical malpractice laws." *Id.* at 1082. There is no such danger here, as a criminal defense attorney directly contacting a victim and an attorney committing malpractice are plainly different.

the lawyer-client relationship such that it is not analogous to the Statute. *See supra* Findings of Fact ¶¶ 62–63. Defendants have done nothing to show that the Statute contributes to the proper functioning of the legal system. *See supra* Findings of Fact ¶¶ 61, 63. Specifically, unlike ER 4.2, the Statute does not protect any lawyer-client relationship because the Arizona courts have stated clearly and repeatedly that "a prosecutor does not 'represent' the victim in a criminal trial; therefore, the victim is not a 'client' of the prosecutor." *State ex rel. Romley v. Superior Ct.*, 891 P.2d 246, 250 (Ariz. Ct. App. 1995); *see also Lindsay R. v. Cohen*, 343 P.3d 435, 437 (Ariz. Ct. App. 2015). There is no tradition of limiting the defense team's ability to initiate contact with a crime victim.

7.     The state of the law in other jurisdictions makes the lack of tradition even more clear. A majority of states give victims a constitutional right to be treated with fairness, dignity, and respect and/or to be free from intimidation, harassment, and abuse by the criminal justice system,[13] and even more jurisdictions, including the federal government provide such a right by statute.[14] More than a dozen states give victims the right to refuse an interview, deposition or discovery request by the defense.[15] But no other jurisdiction limits the defense's ability to initiate

---

[13] *See, e.g.*, Alaska Const. art. I, § 24; Cal. Const. art. I, § 28(b)(1); Conn. Const. art. I, § 8(b)(1); Fla. Const. art. I, § 16(b)(1)–(2); Idaho Const. art. I, § 22(1); Ill. Const. art. I, § 8.1(a)(1); Ind. Const. art. I, § 13(b); Ky. Const. art. I, § 26A La. Const. art. I, § 25; Md. Const. Decl. of Rts. art. 47(a); Mich. Const. art. I, § 24(1); Miss. Const. art. 3, § 26A(1); Nev. Const. art. I, §8A(1)(a); N.J. Const. art. I, § 22; N.M. Const. art. II, § 24(A)(1); N.C. Const. art. I, § 37; N.D. Const. art. I, § 25(1)(a)–(b); Ohio Const. art. I, § 10a(A)(1); Okla. Const. art. II, § 34(A); R.I. Const. art. I, § 23; S.C. Const. art. I, § 24(A)(1); S.D. Const. art VI, § 29(1)–(2); Tenn. Const. art. I, § 35(b); Tex. Const. art. I, § 30(a)(1); Utah Const. art. I, § 28(1)(a); Va. Const. art. I, §8-A(2); Wis. Const. art. I, § 9m(2)(a); *see also* Or. Const. art. I, § 42(1); Wash. Const. art. I, § 35.

[14] *See, e.g.*, 18 U.S.C. § 3771(a)(8); D.C. Code § 23-1901(b)(1); Ga. Code § 17-17-1(9); N.H. Rev. Stat. § 21-M:8-k(II)(a); Wyo. Stat. Ann. § 14-6-504(a); *see also* Vt. Stat. tit. 13, § 5303(1).

[15] *See, e.g.*, Ala. Code § 15-23-70; Cal. Const. art. I, § 28(b)(5); Ga. Code § 17-17-8.1(a); Idaho Const. art. I, § 22(8); La. Const. art. I, § 25; Mass. Gen Laws ch. 258B, § 3(m); N.D. Const. art. I, § 25(1)(f); Ohio Const. art. I, § 10a(A)(6); Okla. Const. art. II,

contact with crime victims in the first place.[16]

8. Further, the Statute targets the expression of certain speakers: criminal defense attorneys and those working with them. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) (finding a statute "impose[d] more than an incidental burden on protected expression" where it did "not simply have an effect on speech, but [was] directed at certain content and [was] aimed at particular speakers."). The fact that the Statute restricts only the defense team's communications and not the prosecution's underscores that it is not a regulation of professional conduct because it does not apply to *attorneys* in general but rather to *attorneys who represent criminal defendants*.[17] In other words, the Statute regulates attorneys not based on the fact that they are attorneys but based on who they represent. A statute that does not regulate attorneys equally even within a single case—and in fact, favors one attorney over another by requiring the defense to communicate with the victim *through* the prosecutor—cannot be said to be a regulation of attorneys' professional conduct. *See NIFLA*, 138 S. Ct. at 2374.

9. This point is made clear when one attempts to define precisely what "professional conduct" the Statute regulates. It cannot be "the practice of law" generally—like malpractice regulates—because then prosecutors, too, would be subject to its prohibition. Nor can it be the more specific "contacting of a victim" for the same reason There is no class of "professional conduct" that the Statute

---

§ 34(A); Or. Const. art. I, § 42(1)(c); S.D. Const. art VI, § 29(6); Tenn. Code § 40-38-117; Wis. Const. art. I, § 9m(2)(L).

[16] Texas has a somewhat similar provision, but it is far narrower than the Statute because it applies only to defense-initiated victim outreach specialists in capital felony cases, and the court acts as the conduit for victim contact rather than the prosecutor. *See* Tex. Code Crim. Proc. art. 56A.051(a)(14).

[17] Defendants' argument that "the Statute regulates all attorneys working on behalf of a defendant in the context of criminal proceedings" instead of "singling out defense attorneys as a group" is a distinction without a difference: an attorney working on behalf of a defendant in the context of criminal proceedings *is* a defense attorney, whether or not criminal defense is their primary practice area. (Doc. 268 at 3). Even within a single proceeding, the Statute does not regulate all attorneys—just those representing the criminal defendant.

regulates that does not necessitate the qualifier of "by a criminal defense attorney"—which takes it outside the realm of professional conduct.[18]

10. Finally, to further bolster this Court's conclusion, in Arizona, "the practice of law is a matter exclusively within the authority of the Judiciary." *Home v. Rothschild*, 253 P.3d 1242, 1243 (Ariz. 2011) (quoting *Hunt v. Maricopa Cnty. Emps. Merit Sys. Comm'n*, 619 P.2d 1036, 1038–39 (Ariz. 1980)); *see also Scheehle v. Justs. of the Sup. Ct.*, 120 P.3d 1092, 1100 (Ariz. 2005) (explaining the Arizona Supreme Court's exclusive authority to regulate attorneys pursuant to article 6, section 3 of the Arizona Constitution). This Court will not invade the province of the state courts to decide issues of state law, but the fact that the Statute was promulgated by the Arizona Legislature rather than the Arizona Supreme Court is some evidence that it is not a regulation of the practice of law.[19]

11. If it is not a regulation of professional conduct, the Statute's restriction on communication is plainly a regulation of speech. The Supreme Court has stated that "if the acts of 'disclosing' and 'publishing' information do not constitute

---

[18] It is true, of course, that there are rules of professional conduct that apply only to prosecutors. *See, e.g.*, Ariz. Rules of Professional Conduct r. 3.8. Those rules exist because "[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate," which "carries with it specific obligations to see that the defendant is accorded procedural justice, that guilt is decided upon the basis of sufficient evidence, and that special precautions are taken to prevent and to rectify the conviction of innocent persons." *Id.* r. 3.8 cmt. 1; *see also Pool v. Superior Court*, 677 P.2d 261, 266 (Ariz. 1984) ("[T]he prosecutor is not the representative of an ordinary litigant; he is a representative of a government whose obligation to govern fairly is as important as its obligation to govern at all. . . . It is the prosecutor's duty to refrain from improper methods calculated to produce a wrongful conviction just as it is his duty to use all proper methods to bring about a just conviction."). Prosecutors therefore occupy a "unique role in the justice system," and their special responsibilities are tied directly to that role. *In re Martinez*, 462 P.3d 36, 41 (Ariz. 2020).

[19] To be sure, the Arizona Supreme Court has, in the past, adopted legislative provisions regulating the practice of law. *See Hunt*, 619 P.2d at 1041. And Arizona Rule of Criminal Procedure 39(b)(12)(A), promulgated by the Arizona Supreme Court, is "similar" to the Statute. (Doc. 220-1 at 4; *see* Doc. 242-1 at 32, 53). Still, the Arizona Supreme Court has not adopted the Statute, and the Statute goes further than Rule 39(b)(12)(A). (Doc. 220-1 at 5).

speech, it is hard to image what does fall within that category." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (internal quotation marks omitted). The same can be said of "initiating contact": it is speech through and through.

12. In sum, the Statute's requirement that defense attorneys and their agents "shall only initiate contact with the victim through the prosecutor's office" is plainly a regulation that primarily affects speech. Speech does not become conduct simply because it occurs in the context of one's profession. *See NIFLA*, 138 S. Ct. at 2371–72, 2374–75; *NAACP*, 371 U.S. at 439.

**The Statute is not subject to lesser First Amendment scrutiny as a regulation of professional speech.**

13. In 2018, in *NIFLA*, the Supreme Court held that "[s]peech is not unprotected merely because it is uttered by 'professionals,'" including lawyers. 138 S. Ct. at 2372. Still, the Court acknowledged that is "has afforded less protection for professional speech in two circumstances—neither of which turned on the fact that professionals were speaking." *Id.* First, the Court has "applied more deferential review to some laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech.'"[20] *Id.* This case plainly does not involve commercial speech, so that standard does not apply. Second was the exception for professional conduct, which this Court finds inapplicable. *Id.* Thus, under the test set forth in *NIFLA*, which involved medical professionals, Plaintiffs' speech is accorded the same First Amendment

---

[20] The *NIFLA* Court cited to *Ohralik v. Ohio State Bar Association* as an example of this type of case: one involving commercial speech, which is subject to lesser scrutiny whether it is spoken by a professional or not. *NIFLA*, 138 S. Ct. at 2372 (citing *Ohralik*, 436 U.S. 447, 455–56 (1978) and other cases); *see also Ohralik*, 436 U.S. at 456–57 ("[T]he State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity. . . . In-person solicitation by a lawyer of remunerative employment is a business transaction in which speech is an essential but subordinate component. While this does not remove the speech from the protection of the First Amendment, . . . it lowers the level of appropriate judicial scrutiny."). Thus, Defendant's citation to *Ohralik* as an example of the Court upholding a restriction because it regulates professional conduct, rather than speech, is off base. (Doc. 268 at 2–3).

protection as any other, non-professional speech. *See also Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 634 (1995) ("There are circumstances in which we will accord speech by attorneys on public issues and matters of legal representation the strongest protection our Constitution has to offer.").

14. Nonetheless, this Court recognizes that the Supreme Court previously held in *Gentile* in 1991 that "the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard . . . ." 501 U.S. at 1074 (Rehnquist, C.J.). When evaluating the constitutionality of such regulations, courts must "engage[ ] in a balancing process, weighing the State's interest in the regulation of a specialized profession against a lawyer's First Amendment interest in the kind of speech that was at issue." *Id.* at 1073.

15. *Gentile* involved a lawyer who held a press conference the day after his client was indicted in a highly publicized case. *Id.* at 1063. The Nevada State Bar and the Nevada Supreme Court determined that the lawyer was subject to professional discipline for violating an ethical rule against making extrajudicial statements with a substantial likelihood of materially prejudicing an adjudicative proceeding in which the lawyer is participating. *Id.* at 1064–65. Presented with the lawyer's First Amendment challenge to the regulation, the United States Supreme Court held that the prohibition did not violate the lawyer's First Amendment rights, although it did find that the ethical rule was void for vagueness based on a safe-harbor provision. *Id.* at 1075; *id.* at 1048 (Kennedy, J.).

16. The *Gentile* Court cited a variety of reasons in support of its conclusion that the speech of lawyers representing clients in ongoing proceedings is subject to lesser First Amendment protection, all of which relate to the need to provide fairness and impartial administration of justice. First, the Court explained that a lawyer participating in a case "is an intimate and trusted and essential part of the machinery of justice, an 'officer of the court' in the most compelling sense." *Id.*

at 1072 (Rehnquist, C.J.) (quoting *In re Sawyer*, 360 U.S. 622, 668 (1959) (Frankfurter, J., dissenting) (involving the suspension of an attorney for impugning a judge's integrity)). The Court then noted that courts must be permitted to "protect their processes from prejudicial outside interferences." *Id.* (quoting *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966)). Next, the Court noted that litigants' "rights may be subordinated to other interests that arise in" the setting of litigation and that the Court had repeatedly approved restrictions on the speech of trial participants "where necessary to ensure a fair trial for a criminal defendant." *Id.* at 1073 (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32–33 n.18 (1984)). In the same vein, the Court stated that "as officers of the court, . . . attorneys have a fiduciary responsibility not to engage in public debate that will redound to the detriment of the accused or that will obstruct the fair administration of justice." *Id.* at 1074 (quoting *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 601 n.27 (1976) (Brennan, J., concurring)). The Court further reasoned that a lawyer's extrajudicial comments are particularly threatening to the fairness of pending proceedings due to lawyers' special access to information and position of authority. *Id.*

17. Applying its balancing test to the facts of *Gentile*, the Supreme Court found that the restriction on prejudicial extrajudicial comments was "designed to protect the integrity and fairness of a State's judicial system, and it impose[d] only narrow and necessary limitations on lawyers' speech." *Id.* at 1075. The Court placed particular emphasis on the fact that the restriction targeted comments likely to prejudice the jury pool, noting that "[f]ew, if any, interests under the Constitution are more fundamental than the right to a fair trial by 'impartial' jurors." *Id.*

///
///
///
///

33

18. Ultimately, the final paragraph of the Court's First Amendment analysis in *Gentile* closely resembles an analysis under ordinary First Amendment principles:

> The restraint on speech is *narrowly tailored* to achieve [the state's] objectives. The regulation of attorneys' speech is limited—it applies only to speech that is substantially likely to have a materially prejudicial effect; it is *neutral as to points of view*, applying equally to all attorneys participating in a pending case; and it merely *postpones* the attorneys' comments until after the trial. While supported by the *substantial state interest* in preventing prejudice to an adjudicative proceeding by those who have a duty to protect its integrity, the Rule is limited on its face to preventing only speech having a substantial likelihood of materially prejudicing that proceeding.

*Id.* at 1076 (emphasis added); *see Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("[T]he government may impose reasonable restrictions on the *time*, place, or manner of protected speech, provided the restrictions are justified *without reference to the content* of the regulated speech, that they are *narrowly tailored* to serve a *significant governmental interest*, and that they leave open ample alternative channels for communication of the information." (emphasis added) (internal quotation marks omitted)).

19. To the extent *Gentile* established a lower standard for restrictions on the speech of lawyers representing clients in ongoing proceedings that survives after *NIFLA*, it is inapplicable here. Defendants' interests in the Statute have no connection to protecting the integrity or fairness of the adjudicative process—which was the reason *Gentile* cited for applying a lower standard. *See supra* Conclusions of Law ¶ 16. *Gentile* does not give the government license to more strictly regulate *any* speech by a lawyer during the course of ongoing proceedings; rather, it sets forth a lower standard for regulations of speech that threatens the fairness, integrity, or administration of the judicial system. The Statute is not such a

regulation. *See supra* Findings of Fact ¶¶ 61–62.

20.   Even if the *Gentile* standard did apply here, the Statute would fail. The Statute is notably different from the regulation in *Gentile* because it applies only to defense counsel, it prohibits all defense-initiated contact with a victim while the case is ongoing, and it is not narrowly tailored to the State's interests, as the Court will explain in its later analysis. *See infra* Conclusions of Law ¶¶ 30–33.

**The Statute is a content-based restriction on speech subject to strict scrutiny.**

21.   Having found that the Statute restricts protected speech, the Court must next determine what level of scrutiny applies. "[T]he appropriate level of scrutiny is . . . tied to whether the statute distinguishes between prohibited and permitted speech on the basis of content." *Frisby v. Schultz*, 487 U.S. 474, 481 (1988).

22.   "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Alternatively, even if a law is facially content neutral, it is considered content based if it "cannot be 'justified without reference to the content of the regulated speech,' or . . . [was] adopted by the government 'because of disagreement with the message the speech conveys.'" *Id.* at 164 (quoting *Ward*, 491 U.S. at 791).

23.   Moreover, "[g]overnment discrimination among viewpoints—or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'—is a 'more blatant' and 'egregious form of content discrimination.'" *Id.* at 168 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).

24.   "[T]he fact that a distinction is speaker based does not . . . automatically render the distinction content neutral." *Reed*, 56 U.S. at 170. Rather, "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Id.* (quoting *Turner Broad. Sys., Inc. v. Fed. Commc'ns Comm'n*, 512 U.S. 622, 658 (1994)). This is "[b]ecause 'speech

restrictions based on the identity of the speaker are all too often simply a means to control content.'" *Id.* (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010)).

25. Here, the Statute is facially content neutral, but speaker based: it singles out and disfavors the speech of a category of speakers—members of the criminal defense team—and limits their ability to speak to victims about all topics by requiring that they initiate contact with a victim through the prosecutor, whose own ability to communicate with the victim is unfettered.

26. The Court is particularly suspect of the Statute's speaker-based distinction given the favor it shows to prosecutors, who represent the State itself and are the adversaries of the defense team. This makes it all the more likely that the Statute "reflect[s] the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)." *Turner Broad. Sys., Inc.*, 512 U.S. at 658.

27. The State's justifications for the Statute rely on an assumption that victims need more protection from the criminal defense team's speech than any other person's speech—that the criminal defense team's speech is more likely to cause harm to the victim or violate the victims' rights. *See supra* Findings of Fact ¶ 51. Regardless of whether that is true, a law that regulates speech based on its potential "emotive impact" on the audience is content based. *Boos v. Barry*, 485 U.S. 312, 321 (1988); *see also Turner Broad. Sys., Inc.*, 512 U.S. at 658 (recounting the Supreme Court's prior holding that a law "concerned with the communicative impact of the regulated speech" was subject to strict scrutiny because "the legislature's speaker preference reflects a content preference" (citing *Buckley v. Valeo*, 424 U.S. 1, 17, 48 (1976), *superseded by statute*)). If the Statute were unrelated to the content of expression, "there would have been no perceived need" for the Arizona Legislature to protect victims from the defense team but not from prosecutors or anyone else. *Turner Broad. Sys., Inc.*, 512 U.S.

at 658. Accordingly, the Statute is a content-based regulation of protected speech and is subject to strict scrutiny.[21]

**The Statute fails strict scrutiny.**

28. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163; *see also United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."). "The State must specifically identify an actual problem in need of solving, and the curtailment of free speech must be actually necessary to the solution." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (internal quotation marks and citations omitted). "It is rare that a regulation restricting speech because of its content will ever be permissible." *Playboy Ent. Grp., Inc.*, 529 U.S. at 818.

29. A statute is not narrowly tailored "[i]f a less restrictive alternative would serve the Government's purpose." *Id.* at 813. In addition, "a statute is not narrowly tailored if it is either underinclusive or overinclusive in scope." *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1125 (9th Cir. 2020); *see also Reed*, 576 U.S. at 172 ("[A] 'law cannot be regarded as protecting an interest of the highest order, and

---

[21] The Court also notes that the Statute limits Plaintiffs' ability to speak on "matters of public concern" which are "at the heart of the First Amendment's protection." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–59 (1985) (opinion of Powell, J.)). "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Id.* at 452 (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)). "Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community' . . . ." *Id.* at 453 (quoting *Connick*, 461 U.S. at 146). Topics such as the purpose and functioning of the legal system and the propriety of capital punishment fall squarely within this category. *See supra* Findings of Fact ¶ 39; *Ohlson v. Brady*, 9 F.4th 1156, 1158 (9th Cir. 2021) (finding that "the manner in which . . . evidence is produced and presented in court[ ] is a matter of public concern"); *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1103 (9th Cir. 2011) ("Speech that deals with the functioning of government is a matter of inherent public concern." (internal quotation marks omitted)).

thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited . . . .'" (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002))); *Brown*, 564 U.S. at 804–05 (finding a statute overinclusive because it restricted speech that fell outside the state's asserted interest).

30. The Court will address each of the State's four asserted interests in the Statute in turn. *See supra* Findings of Fact ¶ 51. First, the State has a compelling interest in implementing and protecting the rights of victims as set forth in the Arizona Constitution, but the Statute is not narrowly tailored to serve that interest.

    a. The State of course has a compelling interest in protecting the rights assured to its citizens under its state constitution. But it cannot do so in a manner that violates the rights enshrined in the United States Constitution. *See* U.S. Const. art. VI, cl. 2.

    b. The Statute is not narrowly tailored to protecting victims' right to refuse an interview by the defense team because it is not "actually necessary" to achieving that goal. *See Brown*, 564 U.S. at 799. As this Court found, victims receive ample notice of their right to refuse a defense interview under several other provisions of state law, making the Statute unnecessary.[22] *See supra* Findings of Fact ¶¶ 54–55.

    c. Likewise, the Statute is not narrowly tailored to protecting victims' right to be treated with fairness, respect, and dignity and to be free from

---

[22] Citing examples like the *Miranda* warning and Fed. R. Civ. P. 4(a)(1)(E)'s requirement that a summons provide notice of the consequences of failure to appear, Defendants argue that "[t]he government clearly has an interest in creating prophylactic rules to protect constitutional and other rights." (Doc. 268 at 8 n.7). Not necessarily. In addition to the obvious differences between requiring a speaker to notify the audience of their rights as opposed to prohibiting the speaker from contacting the audience altogether, "[b]road prophylactic rules in the area of free expression are suspect" because "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *Button*, 371 U.S. at 438. Thus, prophylactic rules involving speech—even those aimed at protecting other constitutional rights—are not immune from ordinary First Amendment scrutiny. Because the State has other means of protecting victims' right to refuse an interview, a prophylactic rule that so broadly inhibits speech is not justified.

intimidation, harassment, or abuse. Finding no evidence that members of the defense team were infringing on this right when initiating contact with victims prior to the Statute's enactment or that they would do so in the Statute's absence now, the Court cannot conclude that the Statute solves an "actual problem." *Playboy Ent. Grp., Inc.*, 529 U.S. at 822–23 (finding that the government failed to establish an actual problem where it presented only "anecdote and supposition"); *see supra* Findings of Fact ¶¶ 57–58, 60. Even if there were evidence of an actual problem, less restrictive alternatives—including regulations of professional conduct, the possibility of court sanctions, and the criminalization of harassment—already protect against harassment of victims without burdening Plaintiffs' First Amendment rights. *See supra* Findings of Fact ¶ 59. And unlike the Statute, those regulations are targeted towards speech that would violate the victim's right to be free from harassment; the Statute is overinclusive because it restricts *all* defense-initiated speech to victims regardless of whether it goes to the State's interest in protecting victims' rights—making the Statute exceedingly overinclusive with respect to this interest. *See supra* Findings of Fact ¶ 40.

d. The fact that many other jurisdictions give victims constitutional rights to refuse an interview and to be free from harassment and intimidation without any protections similar to the Statute further supports the conclusion that the Statute is unnecessary to solve any actual problem.[23]

---

[23] It is true, as Defendants note, that this Court has granted motions to enforce the Statute in federal habeas cases. *See, e.g.*, Order at 2, *Bearup v. Ryan*, No. CV-16-03357-PHX-SPL (D. Ariz. Jan. 20, 2017), ECF No. 18 (finding that the Statute "furthers the goal of respecting a crime victim's dignity and privacy without unduly burdening" the criminal defendant). But this Court has also denied such motions. *See, e.g.*, *Burns v. Shinn*, No. CV-21-1173-PHX-SPL, 2021 WL 5280601, at *4 (D. Ariz. Nov. 12, 2021) (finding that the federal victims' rights statute adequately protected state crime victims' right to fairness, respect, and dignity in federal habeas proceedings). The same is true looking at the case law of this District as a whole: sometimes courts grant motions to preclude victim contact, and sometimes they deny them. *Compare, e.g.*, *Gomez v. Shinn*,

*See supra* Conclusions of Law ¶ 7; *McCullen v. Coakley*, 573 U.S. 464, 490 (2014) (stating that the fact that no other state had a law as restrictive on speech as the state law at issue "raise[s] concern that the [state] has too readily forgone options that could serve its interests just as well, without substantially burdening the kind of speech in which petitioners wish to engage").

31. Next, the Statute does not serve the State's compelling interest in regulating professional conduct for the reasons discussed *supra* Findings of Fact ¶¶ 61–63 and Conclusions of Law ¶¶ 5–12. The Statute does not in fact regulate professional conduct, but rather regulates the speech of those representing a criminal defendant.

32. Third, even assuming that the State's interest in protecting victims from being retraumatized is sufficiently compelling to justify infringing on Plaintiffs' free speech rights,[24] the Statute is fatally underinclusive and overinclusive with

---

587 F. Supp. 3d 939, 945–48 (D. Ariz. 2022), *and Reeves v. Shinn*, No. CV-21-1183-PHX-DWL, 2021 WL 5771151, at *4–6 (D. Ariz. Dec. 6, 2021), *with Miller v. Shinn*, No. CV-21-00992-PHX-ROS, 2021 WL 4503461, at *1–4 (D. Ariz. Oct. 1, 2021), *and Armstrong v. Ryan*, No. CV-15-00358-TUC-RM, 2019 WL 1254653, at *2 (D. Ariz. Mar. 19, 2019). Thus, there is no persuasive consensus as to whether the Statute is necessary or even helpful to protecting victims' rights under the Arizona Constitution beyond those provided under the federal Crime Victims' Rights Act, 28 U.S.C. § 3771(a), including "[t]he right to be treated with fairness and respect for the victim's dignity and privacy." Moreover, that issue, and the larger issue of whether the Statute infringes on attorneys' First Amendment rights, is far more flushed out in this case than it has ever been in a federal habeas case in this District.

[24] This may be a generous assumption. "Reactive harms," or those resulting from an emotional or intellectual response to speech, "generally may *not* be used as justifications for regulation of speech." 1 Smolla & Nimmer on Freedom of Speech §§ 4.18–19. "In most circumstances, 'the Constitution does not permit the government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer." *Snyder*, 562 U.S. at 459 (holding picketers near a soldier's funeral with signs expressing views that God kills American soldiers as punishment for the nation's immorality were protected from liability by the First Amendment) (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 210–11 (1975)); *see also id.* at 461 ("As a Nation we have chosen . . . to protect even hurtful speech on public issues to ensure that we do not stifle public debate."); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 574 (1995) ("[T]he point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful."). *But see Cohen v. California*, 403 U.S. 15, 21 (1971) ("The ability of government, consonant with the Constitution, to shut off discourse solely to protect

respect to this interest.

    a.   *Brown* is instructive here. In that case, California passed a law prohibiting the sale of violent video games to minors, which the Supreme Court found was a content-based restriction on speech subject to strict scrutiny. *Brown*, 564 U.S. at 789, 799. The state asserted an interest in "protecting children from portrayals of violence" that "corrupt the young or harm their moral development." *Id.* at 804–05. Initially, the Supreme Court determined that this interest could not justify the law because the state could not "show a direct causal link between violent video games and harm to minors" such that there was evidence of a problem that the law actually solved; the state legislature's "predictive judgment," based on competing evidence, "that such a link exists" did not satisfy strict scrutiny. *Id.* at 799–800. Further, the evidence the state *did* have showing that violent video games produced some effect on children's aggression showed that those effects were "indistinguishable from effects produced by other media," including cartoons, video games rated for young children, and pictures of guns. *Id.* at 800–01. Because California had not prohibited any of those forms of media, the Court determined that the "regulation [was] wildly underinclusive when judged against its asserted justification, which . . . [was] alone enough to defeat it." *Id.* at 801–02. In other words, the law failed strict scrutiny because "California . . . singled out the purveyors of video games for disfavored treatment—at least when compared to booksellers, cartoonists, and movie producers—and [gave] no persuasive

others from hearing it is . . . dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner."); *Fla. Bar*, 515 U.S. at 625 (crediting as substantial, in a case involving attorneys' commercial speech, *see supra* note 20, the state's interest in preventing lawyers from "engaging in conduct that . . . is universally regarded as deplorable and beneath common decency because of its intrusion upon the special vulnerability and private grief of victims or their families" by sending direct-mail personal-injury solicitations within 30 days of an accident or disaster (internal quotation marks omitted)). But the Court need not decide this difficult issue in light of the Statute's underinclusiveness with respect to this interest.

reason why." *Id.* at 802.

    b.  Likewise, here, Defendants have presented only minimal, conjectural evidence that direct contact by the defense team may retraumatize some victims. *See supra* Findings of Fact ¶ 64. When asked directly about the evidence, defense counsel asserted that there is "some evidence" (in the form of the deposition testimony recounted *supra* Findings of Fact ¶ 64) that defense-initiated contact causes a higher likelihood of retraumatization, that "it's a matter of just human nature," and that "it's not unreasonable or irrational for the Arizona Legislature to come to that conclusion in enacting this regulation." (Doc. 264 at 34:22–35:22). But *Brown* is clear that the government must provide "compelling" evidence to meet its burden under strict scrutiny, and that "ambiguous proof" and legislative judgments—as Defendants present here—do not suffice. *Brown*, 564 U.S. at 799–800.

    c.  More importantly still, the bulk of the evidence before the Court shows that contact with the criminal defense team is no more or less likely to traumatize a victim than contact with the prosecutor or any other participant in the legal system. *See supra* Findings of Fact ¶¶ 66–67. Just as California in *Brown* lacked clear reasoning for singling out violent video games, Defendants have given no persuasive explanation for why the Statute singles out criminal defense attorneys. In fact, the Statute is even more egregious by requiring criminal defense teams to initiate contact with victims through prosecutors—whose own contact with the victim, based on the evidence, is no less likely to retraumatize a victim. *See Brown*, 564 U.S. at 802 ("Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint."). Even more so than the law in *Brown*, then, the Statute is "wildly underinclusive" as to the State's asserted interest in preventing additional trauma to victims such that it

cannot be justified by that interest. *Id.*

d. Not only that, but the Statute is overinclusive with respect to this interest, as well. Certainly, not all defense-initiated contact will traumatize victims, and there is evidence that some communication may be helpful to them. *See supra* Findings of Fact ¶¶ 64–65. The Statute nevertheless prohibits *all* such contact and is therefore not narrowly tailored to the State's interest. *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 948 (9th Cir. 2011) (finding an ordinance overinclusive and not narrowly tailored where there were "several obvious examples of prohibited speech that [did] not cause the types of problems that motivated the [o]rdinance" (internal quotation marks omitted)).

e. The Court finds the Statute is both underinclusive and overinclusive with respect to protecting victims from being retraumatized, so the Statute is not narrowly tailored to this interest.

33. Finally, the Statute is not narrowly tailored to the State's interest in leveling the playing field between victims with counsel and those without because it is not the least restrictive means of furthering that interest, even assuming the interest can be considered compelling.[25]

a. The State could provide victims with government-funded counsel such that they would be covered by ER 4.2. *See supra* Findings of Fact ¶ 69. The Court does not doubt that this would come at significant expense to the State, but the fact that an alternative is costly does not make it infeasible or unavailable. *See Underwood v. BNSF Ry. Co.*, 359 F. Supp. 3d 953, 959 (D. Mont. 2018) (stating that a "cost analysis does not supplant the protections of the First Amendment").

---

[25] This is an especially generous assumption given that Defendants presented no evidence regarding the disparity that would purportedly exist in the Statute's absence. *See supra* Findings of Fact ¶ 68.

43

b. It is also true that this alternative would still not allow Plaintiffs to make direct contact with the victim, as ER 4.2 would require them to initiate contact through the victim's attorney. But it would allow Plaintiffs to at least communicate directly with the victim's own representative who has certain fiduciary duties to the victim, including duties of loyalty and obedience. *See Cecala v. Newman*, 532 F. Supp. 2d 1118, 1133–34 (D. Ariz. 2007) (describing a lawyer's fiduciary duties under Arizona law). The prosecutor, in contrast, does not represent the victim and is not the victim's fiduciary. *See supra* Conclusions of Law ¶ 6.

c. More importantly, this alternative would eliminate Plaintiffs' First Amendment injury caused by the Statute, making it less restrictive of their First Amendment rights. *See supra* Findings of Fact ¶ 69; *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2355–56 (2020) (stating that, although the plaintiffs did not receive relief in the form of being permitted to speak in the way they desired, the elimination of unequal treatment addressed their First Amendment injury). Though the constitutionality of ER 4.2 is not before the Court, the Court notes that the ethical rule applies equally to all attorneys in a matter, is limited in scope to communications related to the matter, and aids in the functioning of the legal system by protecting the lawyer-client relationship. *See supra* Findings of Fact ¶ 62; *Gentile*, 501 U.S. at 1075–76.

d. Because the State can further its interest in leveling the playing field between victims equally well in a manner that does not infringe on First Amendment rights, the Statute is not narrowly tailored. *See Playboy Ent. Grp., Inc.*, 529 U.S. at 813 ("If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative.").

///

///

44

34. In sum, the Statute is not narrowly tailored to any compelling government interest and therefore cannot withstand strict scrutiny.[26]

**Even if the Statute has a plainly legitimate sweep, it is overbroad in relation to its legitimate sweep and violates the First Amendment.**

35. Moving to Plaintiffs' overbreadth challenge, "[t]he first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). When construing a state statute, federal courts must "defer to a state court's authority to interpret its own law." *Stevens*, 559 U.S. at 474.

36. Here, there is minimal Arizona case law interpreting the Statute. In one case, the Arizona Court of Appeals held that the trial court did not abuse its discretion by refusing to allow defense counsel to cross-examine a victim about statements that the victim made to counsel when counsel spoke to the victim without going through the prosecutor, in violation of the Statute. *See State v. Jimenez*, No. 1 CA-CR 09-0505, 2010 WL 4969831, at *3–4 (Ariz. Ct. App. Nov. 16, 2010). Several months after the alleged crime, the defense attorney went to the crime scene, near the victim's trailer, to take photos. *Id.* at *3. When he encountered the victim, he identified himself as defense counsel and told the victim that "he had an absolute right not to speak with him" and that the victim could call the prosecutor "to see whether or not he wished to talk to me." *Id.* at *3 (internal quotation marks omitted). Defense counsel also told the victim, however, that if the victim wished to speak with defense counsel, "he could do so while counsel was there taking pictures." *Id.* at *3. The victim indicated that he "had no problem with talking to" defense counsel, who then asked the victim about what had occurred. *Id.* at *3 (internal quotation marks omitted). In affirming exclusion

---

[26] Because the Statute fails strict scrutiny, the Court need not consider Plaintiffs' argument that the Statute is an impermissible prior restraint.

of the evidence, the Arizona Court of Appeals rejected defense counsel's argument that he did not intend to violate the victim's rights because it was "difficult to suppose that counsel would not have had at least some intimation that [the victim] might be there." *Id.* at *5. It also rejected his argument that it would have been "awkward" for him to just ignore the victim while taking photos, explaining that "logic dictates that counsel could have and should have simply explained that he was there to take photographs and refrained from speaking to the victim concerning the actual crime without first contacting the prosecutor." *Id.* (internal quotation marks omitted). *Jimenez* thus shows that the Arizona courts may interpret the Statute with some leniency towards inadvertent, non-case-related contact, but that it does not matter if the victim voluntarily agrees to speak to the defense team when contacted. This Court finds no other useful Arizona case law interpreting the Statute.[27]

37. The existence of relatively little interpretation of the Statute may be a result of the fact that the Statute's text is quite clear. *See supra* Findings of Fact ¶¶ 12, 17. Terms that may otherwise be ambiguous are given specific definitions in other sections of the Victims' Rights Implementation Act. *See supra* Findings of Fact ¶¶ 14–15. Besides perhaps a narrow (and, for purposes of this litigation, unimportant) disagreement about the meaning of "initiate," *see supra* Findings of Fact ¶ 41, the parties—including Defendant Brnovich, the State's chief legal officer—are largely in agreement that the Statute covers exactly what it says it does: direct contact initiated by the defense team to a statutory victim from the time that the criminal defendant is formally charged until final disposition.

38. The next question is whether the Statute "covers a substantial amount of

---

[27] Other cases go to the proper remedy when a prosecutor fails to inform a victim of the defense team's request for an interview, which is not helpful in determining the scope of speech prohibited by the Statute. *See State v. Manez*, No. 1 CA-CR 16-0727, 2017 WL 6627621, at *1–3 (Ariz. Ct. App. Dec. 28, 2017); *State v. Rasch*, 935 P.2d 887, 890–91 (Ariz. Ct. App. 1996).

protected speech, 'not only in an absolute sense, but also relative to [its] plainly legitimate sweep.'" *Marquez-Reyes v. Garland*, 36 F.4th 1195, 1205 (9th Cir. 2022) (quoting *Williams*, 553 U.S. at 292). "An overbroad statute infringes on a substantial amount of constitutionally protected speech when . . . the statute is 'susceptible of regular application to protected expression.'" *United States v. Hansen*, 25 F.4th 1103, 1109–10 (9th Cir. 2022) (quoting *City of Houston v. Hill*, 482 U.S. 451, 467 (1987)).

39.  As the Court determined, the Statute is a regulation of speech as speech, not professional conduct. *See supra* Conclusions of Law ¶¶ 3–12. Even if the Statute has a plainly legitimate sweep with respect to speech that is harassing, intimidating, or abusive, that is but a fraction of what the Statute covers. *See supra* Findings of Fact ¶ 39–40. Given that the Statute covers *all* defense-initiated contact with victims in ongoing proceedings, it is plain that "the presumptively impermissible applications . . . far outnumber any permissible ones." *Stevens*, 559 U.S. at 481 (holding that a statute prohibiting depictions of animal cruelty was facially invalid where it covered protected expression including hunting magazines and videos).

40.  Accordingly, the Statute is impermissibly overbroad and violates the First Amendment.

**Plaintiffs are entitled to declaratory and injunctive relief.**

41.  The Declaratory Judgments Act, 28 U.S.C. § 2201(a), permits federal courts to "declare the rights and other legal relations of any interested party seeking such declaration."[28] Because the Statute violates Plaintiffs' First Amendment rights,

---

[28] In addition, the Declaratory Judgments Act permits relief only "[i]n a case of actual controversy." 28 U.S.C. § 2201(a). That requirement "refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). The issue of Article III standing was litigated extensively at the motion-to-dismiss stage in this case, and on appeal, the Ninth Circuit held that Plaintiffs had sufficiently alleged each element of standing. (Doc. 220-1); *Ariz. Att'ys for Crim. Just. v. Brnovich*, No. 20-16293, 2021 WL 3743888 (9th Cir. Aug. 24, 2021), *cert. denied*, 142 S. Ct. 2648 (2022). This Court now finds that Plaintiffs have proven each

they are entitled to declaratory relief.

42. To obtain a permanent injunction, a plaintiff must show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Plaintiffs have satisfied this test.

    a. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Because the Statute violates Plaintiffs' First Amendment rights, this factor is satisfied.

    b. "[C]onstitutional violations cannot be adequately remedied through damages . . . ." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009) (internal quotation marks omitted). The second factor, too, is satisfied.

    c. When the government is a party, the final two factors—the balance of hardships and the public interest—are considered together. *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018). "Courts . . . have consistently recognized the significant public interest in upholding First Amendment

---

element of standing. First, they have proven injury in fact because they have proven "a credible threat of enforcement" and that "they self-censor due to fear of professional discipline." (Doc. 220-1 at 3); *see supra* Findings of Fact ¶¶ 33, 38, 44. Second, they have proven causation and traceability because Defendants Vessella and Silbert "have the authority to pursue professional discipline for defense attorneys and investigators who violate" the Statute, while Defendant Brnovich "seeks to enforce [the Statute] in proceedings to which he is a party, and because his office can refer alleged violations of [the Statute] for disciplinary investigation." (Doc. 220-1 at 3–4 (citation omitted)); *see supra* Findings of Fact ¶¶ 21–31. Finally, Plaintiffs have proven redressability because "the requested relief [will] stop Defendants from enforcing [the Statute], and thus relieve a discrete injury." (Doc. 220-1 at 4); *see supra* Findings of Fact ¶ 38 and note 4; *infra* Conclusions of Law ¶¶ 42–43.

principles." *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008); *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020) ("It is always in the public interest to prevent the violation of a party's constitutional rights." (internal quotation marks omitted)). Plaintiffs want the opportunity to communicate messages about important issues of public concern—an opportunity protected by the First Amendment. On the other hand, the Court cannot ignore the fact that some victims may have a negative reaction if contacted directly by the defense team. *See supra* Findings of Fact ¶ 64. But, for all of the reasons discussed, the State's asserted interests in protecting victims do not justify the Statute's broad infringement on First Amendment rights. *See supra* Conclusions of Law ¶¶ 30–33. This Court is extremely familiar with the trauma that crime victims too often experience while navigating the legal system. That trauma cannot, however, be attributed primarily or specifically to contact with the defense team, and thus cannot rationalize a regulation that hinders the expression of the defense team alone—particularly given the favor it shows to the prosecution.  Moreover, an injunction will allow those victims who might unknowingly benefit from contact with the defense team to receive those messages, an important First Amendment consideration in its own right. *See supra* Findings of Fact ¶ 39(d)–(e); *Boardman v. Inslee*, 978 F.3d 1092, 1117 (9th Cir. 2020) ("[T]he First Amendment 'protects the right to receive information and ideas.'" (quoting *Stanley v. Georgia*, 394 U.S. 557, 564 (1969))). Finally, the fact that no other state jurisdiction has a prohibition like the Arizona Statute reassures the Court that an injunction is unlikely to have any catastrophic effects on crime victims. *See supra* Conclusions of Law ¶ 7. Given the fundamental nature of the First Amendment right to free speech and the lack of

49

1    persuasive evidence that contact with defense counsel is likely to be more

2    harmful to a victim than contact with the rest of the legal system, the

3    balance of hardships and the public interest favor Plaintiffs.

4        d.  In sum, all four factors favor issuance of an injunction.

5    43.  The only remaining question is the form of the injunction. When specifically

6    asked by the Court at the Bench Trial, Plaintiffs stated that they seek to enjoin

7    enforcement of the Statute only against "attorneys and their agents," not against

8    criminal defendants themselves. (Doc. 264 at 28:21–29:2). Although Plaintiffs'

9    proposed form of injunction provides no such limitation, (Doc. 254-1), in light of

10   that answer and, more importantly, the lack of evidence or argument regarding

11   the First Amendment rights of criminal defendants and the fact that Plaintiffs are

12   composed only of attorneys and a private investigator who works on behalf of

13   attorneys, the Court will limit its injunction to enjoin enforcement of the Statute

14   only against attorneys and their agents.[29]

15   Dated this 2nd day of November, 2022.

16

17                                            _____
                                              Honorable Steven P. Logan
18                                            United States District Judge

19

20

21

22

23
_____

24   [29] The Court notes that the Statute prohibits "[t]he defendant, the defendant's
     attorney *or an agent of the defendant*" from initiating direct contact with the victim.
25   A.R.S. § 14-4433(B) (emphasis added). But in light of Plaintiff Robertson's testimony
     that in criminal defense cases, he always works on behalf of the criminal defense attorney
26   *see supra* Findings of Fact ¶ 7, the Court will enjoin enforcement of the Statute only
     against attorneys and agents of attorneys because such an injunction will relieve
27   Plaintiffs' injuries in full. *See E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280,
     1297 (9th Cir. 1992) (stating that an injunction must be "tailored to eliminate only the
28   specific harm alleged").