# EXHIBIT A

FILED
CLERK, U.S. DISTRICT COURT

05/27/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DM _____ DEPUTY

1 NICOLA T. HANNA
United States Attorney
2 BRANDON D. FOX
Assistant United States Attorney
3 Chief, Criminal Division
MACK E. JENKINS (Cal. Bar No. 242101)
4 Assistant United States Attorney
Chief, Public Corruption & Civil Rights Section
5 VERONICA DRAGALIN (Cal. Bar No. 281370)
Assistant United States Attorney
6 Public Corruption & Civil Rights Section
     1500 United States Courthouse
7    312 North Spring Street
     Los Angeles, California 90012
8    Telephone: (213) 894-2091/0647
     Facsimile: (213) 894-6436
9    E-mail:   mack.jenkins@usdoj.gov
               veronica.dragalin@usdoj.gov
10
Attorneys for Plaintiff
11 UNITED STATES OF AMERICA

12                 UNITED STATES DISTRICT COURT

13            FOR THE CENTRAL DISTRICT OF CALIFORNIA

14 UNITED STATES OF AMERICA,          No. CR 2:20-cr-00208-SVW

15          Plaintiff,                COOPERATION PLEA AGREEMENT FOR
                                      DEFENDANT GEORGE ESPARZA
16              v.

17 GEORGE ESPARZA,

18          Defendant.

19

20      1.   This constitutes the plea agreement between GEORGE ESPARZA

21 ("defendant") and the United States Attorney's Office for the Central

22 District of California ("the USAO") in the above-captioned case.

23 This agreement is limited to the USAO and cannot bind any other

24 federal, state, local, or foreign prosecuting, enforcement,

25 administrative, or regulatory authorities.

26                     DEFENDANT'S OBLIGATIONS

27      2.   Defendant agrees to:

28

a.   Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to a one-count information in the form attached to this agreement as Exhibit 1 or a substantially similar form, which charges defendant with Racketeer Influenced and Corrupt Organization ("RICO") Conspiracy, in violation of 18 U.S.C. § 1962(d).

b.   Not contest the Factual Basis agreed to in this agreement.

c.   Abide by all agreements regarding sentencing contained in this agreement.

d.   Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e.   Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f.   Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

g.   Pay the applicable special assessment at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessment.

3.   Defendant further agrees to cooperate fully with the USAO, the Federal Bureau of Investigation ("FBI"), and, as directed by the USAO, any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authority.  This cooperation requires defendant to:

2

1          a.   Respond truthfully and completely to all questions

2    that may be put to defendant, whether in interviews, before a grand

3    jury, or at any trial or other court proceeding.

4          b.   Attend all meetings, grand jury sessions, trials or

5    other proceedings at which defendant's presence is requested by the

6    USAO or compelled by subpoena or court order.

7          c.   Produce voluntarily all documents, records, or other

8    tangible evidence relating to matters about which the USAO, or its

9    designee, inquires.

10   4.   For purposes of this agreement: (1) "Cooperation

11   Information" shall mean any statements made, or documents, records,

12   tangible evidence, or other information provided, by defendant

13   pursuant to defendant's cooperation under this agreement; and

14   (2) "Plea Information" shall mean any statements made by defendant,

15   under oath, at the guilty plea hearing and the agreed to factual

16   basis statement in this agreement.

17                        <u>THE USAO'S OBLIGATIONS</u>

18   5.   The USAO agrees to:

19         a.   Not contest the Factual Basis agreed to in this

20   agreement.

21         b.   Abide by all agreements regarding sentencing contained

22   in this agreement.

23         c.   At the time of sentencing, provided that defendant

24   demonstrates an acceptance of responsibility for the offenses up to

25   and including the time of sentencing, recommend a two-level reduction

26   in the applicable Sentencing Guidelines offense level, pursuant to

27   U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an

28   additional one-level reduction if available under that section.

6. The USAO further agrees:

a. Not to offer as evidence in its case-in-chief in the above-captioned case or any other criminal prosecution that may be brought against defendant by the USAO, or in connection with any sentencing proceeding in any criminal case that may be brought against defendant by the USAO, any Cooperation Information. Defendant agrees, however, that the USAO may use both Cooperation Information and Plea Information: (1) to obtain and pursue leads to other evidence, which evidence may be used for any purpose, including any criminal prosecution of defendant; (2) to cross-examine defendant should defendant testify, or to rebut any evidence offered, or argument or representation made, by defendant, defendant's counsel, or a witness called by defendant in any trial, sentencing hearing, or other court proceeding; and (3) in any criminal prosecution of defendant for false statement, obstruction of justice, or perjury.

b. Not to use Cooperation Information against defendant at sentencing for the purpose of determining the applicable guideline range, including the appropriateness of an upward departure, or the sentence to be imposed, and to recommend to the Court that Cooperation Information not be used in determining the applicable guideline range or the sentence to be imposed. Defendant understands, however, that Cooperation Information will be disclosed to the United States Probation and Pretrial Services Office and the Court, and that the Court may use Cooperation Information for the purposes set forth in U.S.S.G § 1B1.8(b) and for determining the sentence to be imposed.

c.   In connection with defendant's sentencing, to bring to the Court's attention the nature and extent of defendant's cooperation.

d.   If the USAO determines, in its exclusive judgment, that defendant has both complied with defendant's obligations under paragraphs 2 and 3 above and provided substantial assistance to law enforcement in the prosecution or investigation of another ("substantial assistance"), to move the Court pursuant to U.S.S.G. § 5K1.1 to fix an offense level and corresponding guideline range below that otherwise dictated by the sentencing guidelines, and to recommend a term of imprisonment within this reduced range.

<u>DEFENDANT'S UNDERSTANDINGS REGARDING COOPERATION</u>

7.   Defendant understands the following:

a.   Any knowingly false or misleading statement by defendant will subject defendant to prosecution for false statement, obstruction of justice, and perjury and will constitute a breach by defendant of this agreement.

b.   Nothing in this agreement requires the USAO or any other prosecuting, enforcement, administrative, or regulatory authority to accept any cooperation or assistance that defendant may offer, or to use it in any particular way.

c.   Defendant cannot withdraw defendant's guilty plea if the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1 for a reduced guideline range or if the USAO makes such a motion and the Court does not grant it or if the Court grants such a USAO motion but elects to sentence above the reduced range.

d.   At this time the USAO makes no agreement or representation as to whether any cooperation that defendant has

provided or intends to provide constitutes or will constitute substantial assistance. The decision whether defendant has provided substantial assistance will rest solely within the exclusive judgment of the USAO.

e. The USAO's determination whether defendant has provided substantial assistance will not depend in any way on whether the government prevails at any trial or court hearing in which defendant testifies or in which the government otherwise presents information resulting from defendant's cooperation. That is, whether any other person, after trial, is found guilty or not guilty of any offense will have no effect on the government's sentencing recommendation for defendant.

<u>NATURE OF THE OFFENSES</u>

8. Defendant understands that for defendant to be guilty of the crime charged in count one, that is, RICO Conspiracy, in violation of 18 U.S.C. § 1962(d), the following must be true:

a. First, there was an agreement between two or more persons that: (i) an enterprise, namely, the CD-A Enterprise would exist, as alleged in the Information; and (ii) a member of the agreement associated with the CD-A Enterprise would conduct or participate, directly or indirectly, in the conduct of the CD-A Enterprise affairs through a pattern of racketeering activity, as described in the Information;

b. Second, defendant became a member of the agreement knowing of its purpose and agreeing to further or facilitate it; and

c. Third, the CD-A Enterprise would or did engage in, or its activities would or did affect, interstate or foreign commerce. An "enterprise" includes a group of people associated together for a

common purpose of engaging in a course of conduct over a period of time. "Racketeering activity" refers to the commission of multiple acts chargeable under provisions of federal and state law listed in the RICO Act, including Giving or Offering a Bribe, in violation of California Penal Code § 67, Requesting or Taking a Bribe, in violation of California Penal Code § 68, Honest Services Fraud through Mail and Wire Fraud, in violation of 18 U.S.C. §§ 1346, 1341, and 1343, Money Laundering, in violation of 18 U.S.C. §§ 1956, 1957, and Obstruction of Justice and Witness Tampering, in violation of 18 U.S.C. § 1512. A "pattern of racketeering activity" is at least two racketeering acts, the last of which occurred within ten years of the commission of a prior act of racketeering, that have a relationship to each other and pose a threat of continuity. Conduct forms a pattern if it consists of criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated. Defendant admits that defendant is, in fact, guilty of this offense as described in count one of the Information.

<u>PENALTIES</u>

9. Defendant understands that the statutory maximum sentence that the Court can impose for a violation of 18 U.S.C. § 1962(d) is: 20 years' imprisonment; a 3-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

10. Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements. Defendant understands that

if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

11.  Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.  Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

<u>FACTUAL BASIS</u>

12.  Defendant admits that defendant is, in fact, guilty of the offense to which defendant is agreeing to plead guilty.  Defendant and the USAO agree to the statement of facts attached hereto as <u>Attachment A</u> and agree that this statement of facts is sufficient to support a plea of guilty to the charge described in this agreement and to establish the Sentencing Guidelines factors set forth in paragraph 14 below but is not meant to be a complete recitation of

all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

SENTENCING FACTORS

13.  Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crime of conviction.

14.  Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base Offense Level: | 12 | U.S.S.G. §§ 2E1.1(a)(2); 2C1.1(a)(1) |
| More than 1 Bribe: | +2 | U.S.S.G. § 2C1.1(b)(1) |
| Bribe Value >$550,000: | +14 | U.S.S.G. §§ 2C1.1(b)(2); 2B1.1(b)(1)(H) |
| Elected Official: | +4 | U.S.S.G. § 2C1.1(b)(3) |

Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate.

15.  Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

9

16.   Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

17.   Defendant understands that by pleading guilty, defendant gives up the following rights:

a.   The right to persist in a plea of not guilty.

b.   The right to a speedy and public trial by jury.

c.   The right to be represented by counsel – and if necessary have the Court appoint counsel – at trial.  Defendant understands, however, that, defendant retains the right to be represented by counsel – and if necessary have the Court appoint counsel – at every other stage of the proceeding.

d.   The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

e.   The right to confront and cross-examine witnesses against defendant.

f.   The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

g.   The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

h.   Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

## WAIVER OF APPEAL OF CONVICTION

18. Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty plea was involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's conviction on the offense to which defendant is pleading guilty. Defendant understands that this waiver includes, but is not limited to, arguments that the statute to which defendant is pleading guilty is unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

## LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

19. Defendant agrees that, provided the Court imposes a total term of imprisonment of no more than 87 months, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (e) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (g) any of the following conditions of probation or supervised release imposed by the Court: the conditions set forth in General Order 20-04 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d).

20. The USAO agrees that, provided all portions of the sentence are at or below the statutory maximum specified above, the USAO gives up its right to appeal any portion of the sentence.

11

<u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

21. Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement, including in particular its obligations regarding the use of Cooperation Information; (b) in any investigation, criminal prosecution, or civil, administrative, or regulatory action, defendant agrees that any Cooperation Information and any evidence derived from any Cooperation Information shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, or any federal rule, that any Cooperation Information or any evidence derived from any Cooperation Information should be suppressed or is inadmissible.

<u>EFFECTIVE DATE OF AGREEMENT</u>

22. This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

<u>BREACH OF AGREEMENT</u>

23. Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached. For example, if defendant knowingly, in an interview, before a grand jury, or at trial, falsely

accuses another person of criminal conduct or falsely minimizes defendant's own role, or the role of another, in criminal conduct, defendant will have breached this agreement. All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing. If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then:

a. If defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea.

b. The USAO will be relieved of all its obligations under this agreement; in particular, the USAO: (i) will no longer be bound by any agreements concerning sentencing and will be free to seek any sentence up to the statutory maximum for the crime to which defendant has pleaded guilty; and (iii) will no longer be bound by any agreement regarding the use of Cooperation Information and will be free to use any Cooperation Information in any way in any investigation, criminal prosecution, or civil, administrative, or regulatory action.

c. The USAO will be free to criminally prosecute defendant for false statement, obstruction of justice, and perjury based on any knowingly false or misleading statement by defendant.

d. In any investigation, criminal prosecution, or civil, administrative, or regulatory action: (i) defendant will not assert, and hereby waives and gives up, any claim that any Cooperation Information was obtained in violation of the Fifth Amendment privilege against compelled self-incrimination; and (ii) defendant

13

agrees that any Cooperation Information and any Plea Information, as well as any evidence derived from any Cooperation Information or any Plea Information, shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that any Cooperation Information, any Plea Information, or any evidence derived from any Cooperation Information or any Plea Information should be suppressed or is inadmissible.

## COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES OFFICE NOT PARTIES

24. Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

25. Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 14 are consistent with the facts of this case. This paragraph permits both the USAO and defendant to submit full and complete factual

14

1  information to the United States Probation and Pretrial Services
2  Office and the Court, even if that factual information may be viewed
3  as inconsistent with the Factual Basis agreed to in this agreement.
4      26.  Defendant understands that even if the Court ignores any
5  sentencing recommendation, finds facts or reaches conclusions
6  different from those agreed to, and/or imposes any sentence up to the
7  maximum established by statute, defendant cannot, for that reason,
8  withdraw defendant's guilty plea, and defendant will remain bound to
9  fulfill all defendant's obligations under this agreement.  Defendant
10 understands that no one -- not the prosecutor, defendant's attorney,
11 or the Court -- can make a binding prediction or promise regarding
12 the sentence defendant will receive, except that it will be within
13 the statutory maximum.

14                     <u>NO ADDITIONAL AGREEMENTS</u>

15     27.  Defendant understands that, except as set forth herein,
16 there are no promises, understandings, or agreements between the USAO
17 and defendant or defendant's attorney, and that no additional
18 promise, understanding, or agreement may be entered into unless in a
19 writing signed by all parties or on the record in court.
20 //
21 //
22 //
23 //
24 //
25 //
26 //
27 //
28

1                  PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

2        28.   The parties agree that this agreement will be considered

3   part of the record of defendant's guilty plea hearing as if the

4   entire agreement had been read into the record of the proceeding.

5   AGREED AND ACCEPTED

6   UNITED STATES ATTORNEY'S OFFICE
    FOR THE CENTRAL DISTRICT OF
7   CALIFORNIA

8   NICOLA T. HANNA
    United States Attorney

9

10  _____        5/21/20
    MACK E. JENKINS                    Date
11  VERONICA DRAGALIN
    Assistant United States Attorneys

12

13  _____        5/21/20
    GEORGE ESPARZA                     Date
14  Defendant

15  _____        May 21, 2020
    TERRENCE JONES                     Date
16  Attorney for Defendant
    GEORGE ESPARZA

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety. I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charge and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

GEORGE ESPARZA
Defendant

5/21/20
Date

1

## CERTIFICATION OF DEFENDANT'S ATTORNEY

2      I am GEORGE ESPARZA's attorney.  I have carefully and thoroughly

3  discussed every part of this agreement with my client.  Further, I

4  have fully advised my client of his rights, of possible pretrial

5  motions that might be filed, of possible defenses that might be

6  asserted either prior to or at trial, of the sentencing factors set

7  forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

8  provisions, and of the consequences of entering into this agreement.

9  To my knowledge: no promises, inducements, or representations of any

10  kind have been made to my client other than those contained in this

11  agreement; no one has threatened or forced my client in any way to

12  enter into this agreement; my client's decision to enter into this

13  agreement is an informed and voluntary one; and the factual basis set

14  forth in this agreement is sufficient to support my client's entry of

15  a guilty plea pursuant to this agreement.

16

17  TERRENCE JONES                          Date
     Attorney for Defendant
18  GEORGE ESPARZA

19

20

21

22

23

24

25

26

27

28

## ATTACHMENT A

### FACTUAL BASIS

**A.    The CD-A Enterprise**

1.    Throughout the period described in the attached Information, the Council District A Enterprise ("CD-A Enterprise"), located in the City of Los Angeles ("the City"), is and was a criminal enterprise composed of a group of individuals associated for a common purpose of engaging in a course of conduct, which course includes bribery, extortion, honest services fraud, money laundering, structuring, and obstruction of justice, to achieve the goals of the enterprise.  The goals of the CD-A Enterprise included, but were not limited to:

a.    enriching the members and associates of the CD-A Enterprise;

b.    advancing the political goals and maintaining the control and authority of the CD-A Enterprise by elevating members and associates of the CD-A Enterprise to, and maintaining those individuals' placement in, prominent political positions;

c.    concealing the financial activities of the CD-A Enterprise through money laundering and structuring; and

d.    protecting the CD-A Enterprise by obstructing justice.

2.    The CD-A Enterprise was led by Councilmember A, Councilmember for CD-A, who had jurisdiction over a large number of development projects undergoing the application and approval process in the City.  Members and associates of the CD-A Enterprise conspired with one another to facilitate bribery schemes that would provide Councilmember A and other City officials financial benefits and keep

DEFT. INITIALS *G.E*

Councilmember A in power and maintain the CD-A Enterprise's political stronghold in the City.

3. In exchange, Councilmember A and members and associates of the CD-A Enterprise would take official action to ensure certain development projects and CD-A Enterprise associates received favored treatment from the City and thereby secure their bribe-financed influence. In addition, members and associates of the CD-A Enterprise sought political contributions from developers and their proxies (e.g., lobbyists, consultants, etc.) to benefit Councilmember A and allies in exchange for official acts to benefit those developers and their proxies.

4. In order to protect and hide the financial payments that flowed from the developers and their proxies to the public officials, members and associates of the CD-A Enterprise engaged in money laundering and other illegal activities to conceal monetary transactions and bribe payments.

5. In order to protect the CD-A Enterprise and avoid law enforcement detection, members and associates of the CD-A Enterprise engaged in the following types of obstructive conduct: (1) lying to law enforcement in an effort to impede the investigation into criminal conduct of the CD-A Enterprise; and (2) attempting to corruptly influence the statements of others to law enforcement.

6. As a result of its bribery, extortion, honest services fraud, money laundering, and structuring conduct, throughout the period described in the attached Information, and as known to defendant ESPARZA, CD-A Enterprise members and associates engaged in, and their activities in some way affected, commerce between one state and another state.

DEFT. INITIALS *G.E*                    2

**B.   Defendant's Role in the CD-A Enterprise**

7.   Beginning no later than February 2013, and continuing at least until November 2018, defendant ESPARZA was a member of the CD-A Enterprise.  In that capacity, defendant ESPARZA conspired and agreed with other CD-A Enterprise members that a conspirator would commit at least two racketeering acts, in the form of conspiracy to commit bribery, honest services fraud, and structuring, which acts had a relationship to one another and the CD-A Enterprise, and posed a threat of continued criminal activity.  Defendant ESPARZA became a member of this conspiracy knowing of this object, knowing it was illegal, and intending to help accomplish it.

8.   Defendant ESPARZA was Councilmember A's Special Assistant and an employee of the City from September 2009 until December 31, 2017.

9.   Defendant ESPARZA, along with other members and associates of the CD-A Enterprise, operated and helped to operate a pay-to-play scheme within the City, wherein public officials solicited and demanded direct and indirect financial benefits from developers and their proxies in exchange for official acts.  In exchange for such financial benefits from developers and their proxies, defendant ESPARZA and Councilmember A agreed to perform and performed the following types of official acts, among others: (1) filing motions and voting on projects in various City committees, including City Council; (2) taking, or not taking, action on the Planning and Land Use Management ("PLUM") Committee to influence the approval process and project costs; (3) negotiating with and exerting pressure on labor unions and other City entities to resolve issues on projects; (4) exerting pressure on developers with projects pending before the

DEFT. INITIALS *G.E.*                      3

1  City to affect their business practices; and (5) taking official

2  action to enhance the professional reputation and marketability of

3  businesspersons in the City.

4      10.  Also in furtherance of the racketeering conspiracy,

5  defendant ESPARZA facilitated and participated in at least the

6  following schemes:

7          1.    Project E Bribery Scheme

8      11.  In or around February 2013, Individual 1, then the Interim

9  General Manager of the Los Angeles Department of Building and Safety

10  ("LADBS"), introduced defendant ESPARZA and Councilmember A to

11  Chairman E at a dinner in Los Angeles, California.  Chairman E, a

12  Chinese national and billionaire, owned Company E, one of China's

13  leading real estate development companies.  Chairman E also owned

14  Property E, located in CD-A, and another property, located in another

15  Council District in the City.

16      12.  Between March 2013 and November 2018, Chairman E, aided and

17  abetted by Individual 1 and others, provided financial benefits

18  directly and indirectly to defendant ESPARZA and Councilmember A, in

19  exchange for defendant ESPARZA's and Councilmember A's assistance to

20  Chairman E and Company E in Councilmember A's official capacity as a

21  City Councilmember on an ongoing and as-needed basis and related to

22  specific matters.  Defendant ESPARZA, Councilmember A, Chairman E,

23  Individual 1, and others established a mutually beneficial agreement

24  to exchange a stream of benefits for official acts and to further the

25  CD-A Enterprise's goals.  Specifically, Chairman E provided defendant

26  ESPARZA and Councilmember A financial benefits in over a dozen trips

27  to casinos in Las Vegas and Australia.  Between June 2014 and January

28  2018, defendant ESPARZA personally accepted at least approximately

DEFT. INITIALS *GE*        4

1  $32,000 in gambling chips, plus flights on private jets and

2  commercial airlines, stays at luxurious hotels, expensive meals and

3  alcohol, spa services, event tickets, and escort services from

4  Chairman E.

5      13.  For example, on January 1, 2016, defendant ESPARZA,

6  Councilmember A, Chairman E, and Executive Director E, Chairman E's

7  right hand man, traveled to Australia (the "January 2016 Australia

8  trip"), where defendant ESPARZA and Councilmember A accepted

9  financial benefits from Chairman E, including private jet flights for

10  defendant ESPARZA, a $10,980 commercial airline ticket for

11  Councilmember A, hotels, meals, alcohol, and other expenses.  In

12  addition, Chairman E provided defendant ESPARZA and Councilmember A

13  casino chips, which defendant ESPARZA and Councilmember A cashed out

14  in Australian dollars.

15      14.  After the January 2016 Australia trip, defendant ESPARZA

16  and Councilmember A discussed evading bank reporting requirements in

17  converting Australian dollars to American dollars in an effort to

18  conceal their financial relationship with Chairman E, to avoid law

19  enforcement detection, and to protect the CD-A Enterprise.

20  Specifically, on February 8, 2016 and February 9, 2016, defendant

21  ESPARZA and Councilmember A had a conversation via text message

22  regarding evading bank reporting requirements when converting

23  Australian dollars they received from Chairman E.  Defendant ESPARZA

24  told Councilmember A about the exchange rate, adding: "They are

25  asking me for my drivers license and social security for IRS record.

26  Do you think it's fine to leave my info?"  Councilmember A responded:

27  "No. Maybe we can change a little at a time...under 10 k in future."

28  Councilmember A also wrote: "Don't exchange if they are asking u for

DEFT. INITIALS *G.E*                5

1    all that info." Councilmember A later instructed defendant ESPARZA

2    by text message: "Go to the other place tomorrow and take 9 k. See if

3    they change 9 k without getting your social security number."

4    Councilmember A added: "Even if they take your social security, it

5    doesn't mean that they will report to irs. They probably will just

6    keep it for their records but not do anything with tax reporting."

7    Defendant ESPARZA responded: "Ok cool. I'll go tomorrow." Defendant

8    ESPARZA later wrote: "I exchanged 10k today. Will do another

9    tomorrow. If it's under 10k, they will not report."

10       15.  Between approximately July 2014 and September 2014,

11   Chairman E, at Individual 1's urging and with defendant ESPARZA's

12   knowledge, facilitated the payment of $600,000 to help Councilmember

13   A privately and confidentially resolve a sexual harassment lawsuit

14   filed against Councilmember A during the time Councilmember A was

15   facing re-election.  Specifically, on June 7, 2013, a sexual

16   harassment lawsuit was filed against Councilmember A by a former CD-A

17   employee.  Thereafter, Councilmember A, Chairman E, and Individual 1

18   orchestrated an arrangement whereby Chairman E secured $600,000 in

19   collateral for Councilmember A to obtain a personal loan from a bank

20   for $570,000 to privately pay the sexual harassment settlement and

21   legal fees and resolve it without publicly disclosing details.

22   Defendant ESPARZA and Executive Director E, on behalf of Chairman E,

23   facilitated the arrangement.  Councilmember A expressed to defendant

24   ESPARZA the need to conceal this arrangement, including concealing

25   the fact that Chairman E was the source of the $600,000 collateral.

26       16.  In exchange for the $600,000 collateral for Councilmember

27   A's personal loan, Chairman E asked for a series of benefits from

28   defendant ESPARZA and Councilmember A during the time Chairman E was

DEFT. INITIALS *6.E*                 6

1  also supplying financial benefits to defendant ESPARZA and

2  Councilmember A.

3      17.  For example, in 2014, to benefit Chairman E's reputation in

4  the City's business community, Councilmember A introduced and signed

5  a resolution before the City Council recognizing Chairman E for

6  Chairman E's achievements and contributions to the economy of CD-A,

7  which the City Council signed and adopted.

8      18.  Most significantly, Chairman E provided bribes to defendant

9  ESPARZA and Councilmember A because, as the Chair of the PLUM

10  Committee and CD-A Councilmember, Councilmember A was poised to

11  significantly benefit Chairman E's desire and plans to redevelop

12  Property E and transform it into a 77-story skyscraper, making it the

13  tallest building west of the Mississippi River ("Project E").

14  Project E would require official acts from Councilmember A at various

15  stages of the City approval process.

16      19.  On August 4, 2016, Councilmember A, Individual 1, senior

17  officials from the Planning Department, and senior CD-A staff members

18  met with Chairman E and his team to discuss Project E, including

19  Chairman E's interest in pursuing Transient Occupancy Tax ("TOT")

20  rebates, Transfer of Floor Area Rights ("TFAR"), and other incentives

21  from the City.

22      20.  In or around August 2016, on a private jet flight back from

23  Las Vegas, Chairman E requested Councilmember A's assistance in

24  hiring a consultant on Project E.  Thereafter, on August 15, 2016,

25  defendant ESPARZA texted Councilmember A regarding Project E:

26  "Reminder boss to decide what land use expediters you want to

27  recommend to the Chairman [E]."

28

DEFT. INITIALS *G.E*                 7

1    21.  On December 16, 2016, defendant ESPARZA forwarded an e-mail

2   to Councilmember A from City Staffer A-2, a CD-A staff member,

3   listing a number of consultants, writing: "Hi Boss, Here is the list

4   of land use consultants per [City Staffer A-2]'s past

5   recommendations.  Chairman [E] would like us to schedule interviews

6   on Monday."

7    22.  On April 27, 2017, in a telephone call between defendant

8   ESPARZA and Executive Director E, the two discussed a proposed

9   consultant for Project E.  Defendant ESPARZA stated: "So, remember,

10   the Chairman [E] was gonna hire [a specific consultant]? ...

11   [Councilmember A] wanted me to tell the Chairman [E] not to hire him

12   anymore."  When Executive Director E asked why, defendant ESPARZA

13   responded: "Because, ah, [Councilmember A] can't trust him ... he's

14   too loyal to another elected official....  So [Councilmember A]

15   doesn't think it's a good idea, it's not a good idea to, to put him

16   on the project."

17    23.  Chairman E brought up Project E on numerous occasions in

18   the presence of defendant ESPARZA and Councilmember A.  Chairman E,

19   through translation provided by Executive Director E, expressed to

20   Councilmember A that Chairman E wanted to build the tallest tower

21   west of the Mississippi.  In response, Councilmember A expressed

22   support of the project.

23    24.  On May 9, 2017, in a telephone call, defendant ESPARZA and

24   Executive Director E discussed the relationship between Chairman E

25   and Councilmember A.  Executive Director E stated that Chairman E

26   expected to lay everything in front of Councilmember A at an upcoming

27   trip to Cabo San Lucas, which defendant ESPARZA understood to refer

28   to the assistance Chairman E expected from Councilmember A on Project

DEFT. INITIALS *G.E*              8

1    E.   Executive Director E added that Chairman E was "going to make
2    [Councilmember A] think that, make it, otherwise Chairman [E] ask him
3    to, uh, pay back that $600,000 already. Last night."  When defendant
4    ESPARZA stated that "[Councilmember A]'s not going to do that
5    either," Executive Director E responded: "Chairman [E] will push
6    him."  According to Executive Director E, Chairman E raised this
7    issue with Councilmember A the previous evening at the same time that
8    Chairman E told Councilmember A that Chairman E heard from multiple
9    sources that the FBI was looking into Councilmember A.

10       25.   On May 9, 2017, in a telephone call between defendant
11   ESPARZA and another CD-A staffer, defendant ESPARZA stated: "Chairman
12   [E] should have all the leverage in the world [be]cause of what
13   [Councilmember A] owes [Chairman E]."  Defendant ESPARZA meant that
14   Chairman E expected Councilmember A's assistance on Project E, or any
15   other requested assistance, from Councilmember A because of the
16   financial benefits Chairman E had provided to Councilmember A.

17              2.   Project C Bribery Scheme

18       26.   In the summer of 2016, Labor Organization A filed an appeal
19   requesting to suspend all activity to implement one of Developer C's
20   development projects, Project C, that required City approval until
21   Project C was brought into compliance with the requirements of the
22   California Environmental Quality Act ("CEQA") by correcting certain
23   deficiencies (the "appeal").  The appeal prevented Project C from
24   progressing through the rest of the City approval processes,
25   including approvals by the PLUM Committee and City Council.

26       27.   Between August 2016 and July 2017, Developer C agreed to
27   fund a $500,000 cash bribe designed to benefit Councilmember A,
28   through defendant ESPARZA and Justin Kim ("Kim"), in exchange for

DEFT. INITIALS _G.E_                    9

Councilmember A's assistance on Project C. Developer C, through Kim, initially provided $400,000 in cash that Developer C intended for Councilmember A between February and March 2017. Councilmember A directed defendant ESPARZA to hold on to $200,000 of the total bribe payment for Councilmember A. Defendant ESPARZA and Kim each kept a portion of the remaining $200,000 bribe payment for themselves as kickbacks for facilitating the bribe. In exchange, Developer C, through Kim and defendant ESPARZA, sought to use Councilmember A's influence as the Councilmember of CD-A and Chair of the PLUM Committee to pressure Labor Organization A to withdraw, abandon, or otherwise lose its appeal opposing Project C, thereby allowing the project to move forward in its City approval process.

28. On September 1, 2016, defendant ESPARZA, Kim, and Councilmember A had dinner together and then visited a Korean karaoke establishment in Los Angeles. During the karaoke meeting, Kim asked Councilmember A for assistance with the appeal on Project C, and Councilmember A agreed to help. Kim then called Developer C and asked him to join the group at karaoke, which Developer C did.

29. On September 2, 2016, defendant ESPARZA and Kim met for lunch in Los Angeles. At Councilmember A's direction, defendant ESPARZA expressed to Kim that Councilmember A would not help Project C for free and that Councilmember A's help would require a financial benefit in exchange for help ensuring Project C moved forward through the City approval process.

30. On January 17, 2017, defendant ESPARZA, Councilmember A, Kim, and Developer C's business associates met at Councilmember A's City Hall office to discuss, among other things, Project C. During a private meeting that included only defendant ESPARZA, Councilmember

DEFT. INITIALS _G.E_                10

A, and Kim, Kim again asked Councilmember A for assistance with the appeal, and Councilmember A responded that he could help.

31. In or around January 2017, at the direction of Councilmember A, defendant ESPARZA learned that resolving the appeal on Project C would save Developer C an estimated $30 million on development costs.

32. In or around January 2017, based on conversations with Councilmember A and Lobbyist C, defendant ESPARZA told Kim that it would cost approximately $1.2 million to $1.4 million to get Councilmember A to resolve the appeal and allow Project C to move forward in the City approval process.

33. Between February 2, 2017 and February 10, 2017, defendant ESPARZA had individual text message conversations with Councilmember A and Kim, discussing the negotiation of the bribe payment and the amount of the bribe payment from Developer C to Councilmember A.

34. In approximately February 2017, defendant ESPARZA and Kim had discussions regarding the negotiation of the bribe amount. Kim conveyed a counteroffer of $500,000 cash from Developer C for Councilmember A. Defendant ESPARZA then conveyed this counteroffer to Councilmember A.

35. In approximately February 2017, defendant ESPARZA and Kim met at a restaurant in Los Angeles to discuss the bribe amount. Defendant ESPARZA and Kim discussed that Developer C agreed to pay $500,000 in cash in exchange for Councilmember A's assistance in resolving the appeal so that Project C could move forward in the City approval process, including approvals by the PLUM Committee and City Council. Thereafter, defendant ESPARZA conveyed this agreed-upon bribe payment amount to Councilmember A, stating specifically that

DEFT. INITIALS *G.E*                    11

Councilmember A would get $300,000 total and Kim would get $200,000 total for facilitating the bribery scheme.

36. In approximately February and March 2017, defendant ESPARZA and Councilmember A discussed the appeal. Councilmember A instructed defendant ESPARZA to speak to Lobbyist C, a close associate of the Executive Director of Labor Organization A. Subsequently, Councilmember A told defendant ESPARZA that Councilmember A discussed the appeal with Lobbyist C. Councilmember A conveyed to Lobbyist C that Councilmember A would oppose the appeal in the PLUM committee. Lobbyist C agreed to discuss the issue with the Executive Director of Labor Organization A.

37. On February 14, 2017, defendant ESPARZA had a text message conversation with Lobbyist C about setting up a private meeting between Lobbyist C and Councilmember A. Specifically, defendant ESPARZA wrote: "My boss [Councilmember A] asked if you guys can have a one on one on Tuesday at 830am?... Just you and the Councilman."

38. On February 22, 2017, defendant ESPARZA had a text message conversation with Lobbyist C about another private meeting at Councilmember A's request. Specifically, defendant ESPARZA wrote: "Hi [Lobbyist C], free tomorrow to meet? Councilman asked me to meet with you." Lobbyist C responded: "Yea." Defendant ESPARZA then replied: "I still need to talk to you one on one per my bosses [Councilmember A] request." Lobbyist C responded: "No problem."

39. On March 1, 2017, defendant ESPARZA had a text message conversation with Lobbyist C regarding the appeal. Specifically, defendant ESPARZA asked: "Everything good?" Lobbyist C then replied: "Think so, You?" Defendant ESPARZA responded: "Yes sir.. just checking in."

DEFT. INITIALS _G.E_          12

40.  On March 3, 2017, Lobbyist C sent defendant ESPARZA a text message regarding the appeal on Project C, writing: "Appeal dropped today."  Defendant ESPARZA then informed Kim that Councilmember A had held up Councilmember A's end of the bargain and helped resolve the appeal.

41.  On March 14, 2017, defendant ESPARZA and Councilmember A met at Councilmember A's residence.  Defendant ESPARZA told Councilmember A that Developer C had provided $400,000 in cash to date, and that Developer C would provide the remaining $100,000 later.  Defendant ESPARZA stated that Kim had provided $200,000 of that cash to defendant ESPARZA.  At the meeting, defendant ESPARZA showed Councilmember A a liquor box filled with approximately $200,000 cash.  Councilmember A told defendant ESPARZA to hold on to and hide the money at defendant ESPARZA's residence until Councilmember A asked for it.  Defendant ESPARZA understood this was because Councilmember A wanted to hide the money.  Councilmember A told defendant ESPARZA that defendant ESPARZA could have $100,000 of the $300,000 total amount Councilmember A expected to receive from Developer C.

42.  In or around July 2017, defendant ESPARZA asked Executive Director E to hold on to approximately $250,000 in cash for defendant ESPARZA because defendant ESPARZA feared that law enforcement would search his residence and find the illicit cash.  This cash was comprised of the cash provided by Kim as part of the Project C bribery scheme for Councilmember A and defendant ESPARZA and additional cash defendant ESPARZA received from Chairman E and Businessperson A, as discussed below.  Executive Director E agreed to hide the cash for defendant ESPARZA.

DEFT. INITIALS *G.E*                  13

43.  On December 28, 2017, defendant ESPARZA and Councilmember A met at City Hall and, in Councilmember A's private bathroom, discussed various topics, including defendant ESPARZA's interviews with the FBI, and the cash bribe defendant ESPARZA was holding for Councilmember A.  Specifically, during that conversation, Councilmember A stated: "And secondly, um, look, uh, I have a lot of expenses now that with [Relative A-1] running, [Relative A-1]'s not going to be working anymore.  I'm gonna need money.  Um, that is mine, right?  That is mine."  Defendant ESPARZA understood that Councilmember A was referring to the $200,000 cash bribe payment from Developer C via Kim that Councilmember A had asked defendant ESPARZA to hide at defendant ESPARZA's residence.  Defendant ESPARZA affirmed the bribe money was for Councilmember A.  Defendant ESPARZA and Councilmember A agreed to wait until April 1, 2018, for defendant ESPARZA to provide the $200,000 cash owed to Councilmember A, to allow some cooling off period after defendant ESPARZA's interviews with the FBI in hopes that it would decrease the likelihood of law enforcement discovering the cash.  However, defendant ESPARZA never gave Councilmember A the outstanding $200,000 cash because defendant ESPARZA was concerned about the FBI corruption investigation, so instead defendant ESPARZA gave the money to Executive Director E to hide.

### 3.   Businessperson A Retainer Payment Scheme

44.  Businessperson A was a business owner with businesses operating in CD-A.  Defendant ESPARZA and Councilmember A met Businessperson A in approximately 2016 or 2017 through Chairman E and Executive Director E.  Businessperson A requested assistance from defendant ESPARZA and Councilmember A to enhance Businessperson A's

DEFT. INITIALS _G.E_                     14

1  financial prospects.  Specifically, Businessperson A asked defendant
2  ESPARZA and Councilmember A to use their official positions to make
3  introductions to developers and advocate that such developers use
4  Businessperson A's business.

5      45.  In order to facilitate this scheme, Businessperson A
6  provided defendant ESPARZA retainer payments for his services.
7  Specifically, from approximately January 2017 to June 2017, defendant
8  ESPARZA accepted approximately $8,000 to $10,000 in cash from
9  Businessperson A on a monthly basis in exchange for defendant ESPARZA
10 arranging meetings for Businessperson A with developers in the City.
11 On several occasions, Businessperson A provided the cash to defendant
12 ESPARZA in the bathroom during meetings in restaurants.

13        4.    <u>Businessperson A Funds June 2017 Las Vegas Trip</u>

14     46.  On or around June 1, 2017, defendant ESPARZA traveled to
15 Las Vegas with, among others, Businessperson A, then CD-12
16 Councilmember Mitchell Englander, City Staffer B, Lobbyist A, and
17 Developer A (the "June 2017 Las Vegas trip").  During the June 2017
18 Las Vegas Trip, defendant ESPARZA, Englander, City Staffer B, and
19 others each received at least the following benefits directly or
20 indirectly (via hotel "comps") from Businessperson A: a hotel room at
21 a Las Vegas Casino and Hotel, transportation to and from the hotel,
22 casino chips to gamble, dinner and drinks at the hotel restaurant
23 totaling approximately $2,481 (for the group), bottle service at a
24 nightclub for which Businessperson A paid approximately $25,000 and
25 Developer A paid an approximately additional $10,000 (for the group
26 and others).

27     47.  After the group returned to their hotel in the early
28 morning of June 2, 2017, Businessperson A told defendant ESPARZA and

DEFT. INITIALS *G.E*           15

Englander that Businessperson A was going to order female escorts to come to their hotel. When two escorts arrived to the hotel, Businessperson A paid approximately $300-400 in cash for the escorts' services for Businessperson A and defendant ESPARZA and instructed one of the escorts to go to Englander's hotel room to provide him escort services.

48. On or about June 5, 2017, defendant ESPARZA and Councilmember A discussed the June 2017 Las Vegas trip in a telephone call. Specifically, Councilmember A asked about the use of escorts during the trip, referring to "girls" that defendant ESPARZA and Businessperson A sent to Englander. Defendant ESPARZA confirmed the use of escorts during the trip.

## C. **FBI's Interviews of Defendant ESPARZA**

49. On June 20, 2017, the FBI interviewed defendant ESPARZA regarding a public corruption investigation. At the beginning of this interview, defendant ESPARZA was advised that lying to the FBI was a crime. During the interview, defendant ESPARZA falsely stated that he had no knowledge of any City official helping on a project in exchange for money, gifts, or campaign contributions. During the interview, the FBI told defendant ESPARZA there was a Grand Jury investigation and asked defendant ESPARZA not to reveal the interview to others because it may negatively impact the federal investigation. Defendant ESPARZA told the FBI he understood he should not reveal such information to others.

50. Nevertheless, on June 20, 2017, the same day as his first FBI interview, and in the days shortly thereafter, defendant ESPARZA disclosed to numerous associates, including Councilmember A, Kim, and Executive Director E, that he was interviewed by the FBI. For

DEFT. INITIALS *G.E*                16

example, on June 20, 2017, defendant ESPARZA told Councilmember A about his interview with the FBI. Councilmember A was worried that the FBI would ask questions about Businessperson A and Chairman E. Councilmember A instructed defendant ESPARZA not to tell anyone that defendant ESPARZA disclosed information to Councilmember A about the FBI interview.

51. On July 1, 2017, the FBI again interviewed defendant ESPARZA. At the beginning of this interview, defendant ESPARZA was advised that lying to the FBI was a crime. During the second FBI interview, defendant ESPARZA falsely stated that: (1) other than the June 2017 Las Vegas trip with then-Councilmember Englander, defendant ESPARZA was not aware of any chip sharing with any other councilmember in Las Vegas; (2) Councilmember A told defendant ESPARZA to be cooperative with and not hide information from the FBI; (3) Executive Director E had no City business with defendant ESPARZA; (4) Kim did not have City business with defendant ESPARZA; and (5) defendant ESPARZA did not know of anyone paying money to City officials.

52. On July 12, 2017, defendant ESPARZA and Kim met in person in a car near defendant ESPARZA's residence, and then drove around in the car. During this meeting, defendant ESPARZA and Kim discussed the content of their recent respective FBI interviews, in which both defendant ESPARZA and Kim lied to the FBI and deliberately failed to disclose information regarding the Project C bribery scheme. During this meeting, Kim asked if defendant ESPARZA wanted the remaining $100,000 from Developer C. Due to defendant ESPARZA's concern that the FBI investigation was closing in on him and Councilmember A,

DEFT. INITIALS *G.E*                    17

defendant ESPARZA declined to take possession of the outstanding bribery money at that time.

**D.  Defendant ESPARZA's Concealment of Benefits**

53.  Defendant ESPARZA did not report any of the financial benefits from Chairman E, Developer C, Kim, or Businessperson A as gifts on his applicable Form 700s.