1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

**HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE**


UNITED STATES OF AMERICA,          )
                                   )
          PLAINTIFF,               )     CASE NO.
                                   )
          vs.                      )     CR 20-326(A)-JFW
                                   )
JOSE LUIS HUIZAR,                  )
                                   )     PAGES 1 TO 38
          DEFENDANT.               )
_____)


**REPORTER'S TRANSCRIPT OF**
**MOTION TO VACATE**
**MONDAY, NOVEMBER 21, 2022**
**10:03 A.M.**
**LOS ANGELES, CALIFORNIA**


_____

**MIRANDA ALGORRI, CSR 12743, RPR, CRR**
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, SUITE 4455
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

1                     **APPEARANCES OF COUNSEL:**

2

3  **FOR THE PLAINTIFF:**

4      NICOLA T. HANNA
        UNITED STATES ATTORNEY
5      BY:  MACK JENKINS
        BY:  CASSIE PALMER
6      Assistant United States Attorneys
        United States Courthouse
7      312 North Spring Street
        Los Angeles, California 90012

8

9  **FOR THE DEFENDANT HUIZAR:**

10     HILARY L. POTASHNER
       FEDERAL PUBLIC DEFENDER
11     BY:  CAREL ALÉ
       BY:  CHARLES SNYDER
12     Deputy Federal Public Defenders
       Central District of California
13     321 East Second Street
       Los Angeles, California 90012

14

15  Also Present:

16     Special Agent Andrew Civetti
       Greg Krikorian
17     Natalie Degrati

18

19

20

21

22

23

24

25

**LOS ANGELES, CALIFORNIA; MONDAY, NOVEMBER 21, 2022**

**10:03 A.M.**

**---**

10:03AM

THE CLERK:  Calling item 3, CR 20-326(A)-JFW, United States of America versus Jose Luis Huizar.

Counsel, please state your appearances.

MR. JENKINS:  Good morning, Your Honor. Mack Jenkins, Cassie Palmer, and Special Agent Andrew Civetti on behalf of the United States.

MS. ALÉ:  Good morning, Your Honor.  Carel Alé, Charles Snyder on behalf of Mr. Huizar who is present here at counsel table.  Also in the audience is Greg Krikorian and Natalie Degrati from our office.

THE COURT:  All right.  Good morning to all.  On calendar this morning is the defendant's motion to vacate the Court's order that was entered on July 8th.  It appears as docket No. 704.  The motion was filed on October 11th -- I'm sorry.  The order wasn't docket No. 704.  The motion is docket 704.  Too many matters on calendar this morning.  It was originally set for hearing on November 7th, but due to the Court's involvement in the Shen Zhen New World trial, it was continued to -- for hearing today.

On November 3rd the defendant filed a notice of new authority.  On November 14th the Court ordered the

1   defendant's counsel to file declarations under seal detailing

2   the date, duration, and method of communication with the jurors

3   in the Lee trial.  On November 16th in docket No. 833, counsel

4   for Mr. Huizar filed under seal the declarations of counsel

10:05AM   5   advising that no attorney on the Huizar team had any contact

6   with any juror.  However, the two investigators with the public

7   defender's office submitted declarations describing their

8   efforts to contact the jurors in the Lee case.

9          The Government filed an opposition or response on

10:06AM   10   November 19th of 2022.  It appears as docket No. 836.  How is

11   this response in any way timely?

12          MS. PALMER:  It's not, Your Honor.  And I

13   apologize.  I had this miscalendared.

14          THE COURT:  Even if you miscalendared it, it is

10:06AM   15   still under no stretch of the imagination timely.  Even under

16   the -- I assume you miscalendared it for the hearing on next

17   Monday which is November 28th.

18          MS. PALMER:  Correct, Your Honor.

19          THE COURT:  All right.  The factual basis for --

10:07AM   20   or factual background for this motion is as follows:

21          After the jury or -- on June 27th of 2022, the

22   jury reached a unanimous verdict in the Lee/940 Hill case.

23   Thereafter, the Court became aware that members of the Huizar

24   defense team were attempting to contact the discharged jurors.

10:07AM   25   Specifically, on July 6th the courtroom deputy was contacted by

1    Juror No. 9.  The juror advised the courtroom deputy that,

2    quote, "Something a little odd happened" on that day and wanted

3    to run something by her for a temperature check.  The juror

4    told Shannon obviously that someone from the Federal Public

10:08AM   5    Defender's Office showed up at her parents' home looking for

6    her.  The juror was concerned or troubled that someone showed

7    up at her parents' home when she did not live there.

8            The courtroom deputy advised the juror that

9    attempted contact with jurors was rare but it does happen and

10:08AM   10   advised the juror that she would raise it with the Court and to

11   keep her advised of any additional contacts.

12           Two days later on July 8th of 2022, the same

13   juror contacted the courtroom deputy again and advised she had

14   received another contact via voicemail regarding her jury

10:08AM   15   service.  The juror indicated that she was surprised that no

16   one else had reached out, that she was creeped out by the

17   multiple contacts including one at her parents' house where she

18   does not reside.

19           After being advised that Juror No. 9 felt

10:09AM   20   uncomfortable by multiple contacts including an in-person

21   contact at a house in which she did not reside, the Court

22   issued its July 8th, 2022, text entry prohibiting all counsel

23   from contacting jurors in the Lee/940 Hill case without further

24   order of the Court.  In reaching the -- this decision, I

10:09AM   25   concluded that such an order was appropriate because the

contact with Juror No. 9 was unwelcomed and Juror No. 9 clearly
felt harassed and uncomfortable by the multiple efforts to
contact that juror.

Based upon the declarations that were filed by
the investigators for the federal public defender's office, I
understand why Juror No. 9 felt uncomfortable due to the
multiple efforts to contact her including trying to locate her
at her parents' home where she did not live, and I conclude
that the Court's order was appropriate and proper given the
high profile nature of this case and the complaint that was
received by Juror No. 9.  Although I do not intend to vacate
the order, I will consider modifying that order.

Let me hear from counsel for Mr. Huizar.

MS. ALÉ:  Thank you, Your Honor.

THE COURT:  The first question I have is why do
you believe the order was directed only to the Federal Public
Defender's Office?  The order provides that counsel shall not
contact any of the jurors in *United States versus Lee, et al.*,
without an order of the Court.

MS. ALÉ:  The first -- it was a two-sentence
order, Your Honor, and the first sentence had to do with
Huizar's counsel.  So I read the second.  I think it's
reasonably read as applying to Huizar's counsel.  I believe the
Government, despite its statement on Saturday in its
opposition, had previously also understood it that way because

1   in the number of times we have communicated about it the

2   Government never once said that it also believed it was

3   restricted by that.

4          THE COURT:  Well, why didn't you raise it with

10:12AM   5   the Court?  This is now -- we're October when you filed the

6   motion, and it appears that that was the understanding of

7   Mr. Steingard and Mr. Wilke because they apparently entered

8   into an agreement with the Government with respect to the

9   Shen Zhen trial that they wouldn't contact any of the jurors in

10:12AM   10   that case under the conditions that are set forth in that

11   agreement.  But that agreement was based upon an obvious

12   understanding that counsel that it was directed to was all

13   counsel.

14          I admit it was a two-sentence order.  And the

10:12AM   15   reason that -- what prompted the order was the contact from the

16   public defender's office, but that didn't preclude my concerns

17   with respect to jurors being annoyed or harassed by any other

18   counsel.

19          I, quite frankly, don't know, but I guess there

10:13AM   20   is no evidence, that Mr. Neuman on behalf of his clients made

21   any contact.

22          In any event, it seems to me that, if you had any

23   concerns, you could have raised it with the Court after the

24   order was issued rather than waiting until October to raise it

10:13AM   25   in connection with this motion.

1                    MS. ALÉ:  That is certainly a fair critique,

2     Your Honor.  I think the other concern, which is really the

3     overarching concern, was that the Court was -- the Court's

4     order was overbroad in prohibiting any contact with the jurors,

10:13AM   5     even if we were one of the several counsel referenced in the

6     order.  So that's really where I think our concern lies.

7                    THE COURT:  Well, if it was overbroad, you could

8     have come in and asked me to modify it.

9                    MS. ALÉ:  Yes, Your Honor.

10:13AM  10                    THE COURT:  The problem I have is that I -- I

11    obviously have a concern, given the high profile nature of this

12    case, with respect to jurors who spent -- in the Lee case a

13    significant amount of time and effort hearing that case.  But

14    how do you go about obtaining the names of the jurors in order

10:14AM  15    to conduct an investigation?  You weren't part of the

16    Lee/940 Hill trial.

17                    MS. ALÉ:  Correct.

18                    THE COURT:  So you didn't have access to the

19    juror list.

10:14AM  20                    MS. ALÉ:  The jurors stated their name on the

21    record in the transcripts.

22                    THE COURT:  Okay.  So you got a copy of the

23    transcript.

24                    MS. ALÉ:  Correct.

10:14AM  25                    THE COURT:  You got the names.  How do you get

1    their addresses?

2              MS. ALÉ:  We -- there are several programs that

3    we typically use to locate witnesses, and those are publicly

4    available for the most part, or we get them through licensing

10:14AM  5    programs.  But our investigators are able to use those

6    databases to locate people.

7              THE COURT:  And you also obtained the jurors'

8    phone numbers?

9              MS. ALÉ:  If they're available on the databases.

10:15AM  10             THE COURT:  Did you obtain the jurors' phone

11   numbers in this case?

12             MS. ALÉ:  If I may confer one moment, Your Honor.

13             THE COURT:  Sure.

14             (Counsel conferring.)

10:15AM  15             MS. ALÉ:  Thank you, Your Honor.

16             Yes.  The databases include both the addresses

17   and the -- the publicly-available addresses and phone numbers

18   for the jurors or any witnesses.

19             THE COURT:  So was there -- I have the

10:15AM  20   declarations in response to the Court's order, but there's no

21   reference in either of the declarations in terms of any phone

22   contacts with any of these individuals.

23             MS. ALÉ:  If I may have a moment, Your Honor.

24             THE COURT:  Sure.

10:16AM  25             (Counsel conferring.)

1          MS. ALÉ:  Thank you, Your Honor.

2          We are -- we don't recall if there was a

3     follow-up phone call, but if there was, it would have been on

4     one of the phone numbers that were publicly listed for the

10:16AM   5     juror.  And it would have been after -- having not been told by

6     the juror that she was uncomfortable which, of course, at that

7     point we would have ceased all communication.

8          THE COURT:  I guess the overriding concern that I

9     have is I'm lost to determine -- at a loss to determine what

10:16AM  10     the purpose of the interview of the Lee jurors was.  I assume

11     that -- I just don't understand what the purpose of the

12     interview --

13          MS. ALÉ:  I'm happy to explain that to the Court,

14     Your Honor.  One thing I do want to say is, in terms of the

10:17AM  15     information we are seeking, we are not seeking information

16     about the jury deliberations or juror misconduct.

17          THE COURT:  Okay.  There is no evidence that

18     you're investigating any juror misconduct.

19          MS. ALÉ:  Correct.  I raise that only because

10:17AM  20     that was mentioned in the Government's opposition.

21          THE COURT:  Well, I had done my own independent

22     research when I issued this order over the weekend in

23     preparation for this hearing.  And obviously, if there's an

24     investigation of juror misconduct, that's one issue.  I don't

10:17AM  25     know how you have any standing to assert that --

1              MS. ALÉ:  We don't.

2              THE COURT:  -- because it's the Lee trial that

3    was involved.  So once we conclude or once that I conclude or

4    you represent that there is no juror misconduct issue, then it

10:17AM  5    seems to me that the -- I go back to the purpose of the

6    interview.

7              MS. ALÉ:  I'm happy to explain to the Court what

8    it is that we were seeking.

9              THE COURT:  And how -- okay.  Go ahead and

10:18AM  10   explain to me because I have some other questions.

11             MS. ALÉ:  Yes, Your Honor.

12             The jurors that we contacted, the 12 jurors in

13   the Lee case and/or plus including the alternate jurors, and

14   the 12 jurors in the Shen Zhen case which we have not reached

10:18AM  15   out to at all, of course, they sat through 12 weeks of trial --

16   excuse me -- two weeks of trial.

17             THE COURT:  It felt like 12 weeks.  Trust me.

18             MS. ALÉ:  As people who are completely unfamiliar

19   with this case, they saw the same witnesses that are going to

10:18AM  20   be testifying in our trial.  They saw many of the same exhibits

21   that will be presented in our trial.  How these jurors

22   interpreted the evidence, what their own impressions were of

23   the witnesses, that is highly relevant information to how we're

24   going to present our trial, how we're going to frame our case

10:19AM  25   to the next jury in our case.  So that's what we're asking,

1    what we had been attempting to ask the jurors, simply their own

2    impressions about the witnesses.

3           THE COURT:  But doesn't -- how do you protect --

4    and this is -- do you give scripts to these investigators in

10:19AM  5    terms of what issues they can cover and what issues they can't

6    cover?  It seems to me that it's very difficult to make a

7    determination as to whether or not you're intruding on the

8    deliberation process of the jury when you're asking questions

9    about what did you think about a particular piece of evidence?

10:19AM  10    I mean, that implicates that juror's input to the juror

11    deliberations that they either believed or didn't believe, for

12    example, Mr. Esparza.

13           And I guess the best evidence of that is what did

14    you learn in the 40-minute interview of the juror that did

10:20AM  15    speak?  Was there a report prepared of that interview?

16           MS. ALÉ:  Your Honor, the investigator who

17    conducted that interview is here and can speak to the Court

18    about that.

19           THE COURT:  Well, I'm not interested in

10:20AM  20    prolonging the process.  I'm just concerned that, without

21    strict guidance, that there may -- it's very easy to -- for a

22    juror who is unsophisticated in terms of separating the

23    discussions that were conducted during the jury deliberation

24    with some open-ended questions that somebody may ask.

10:20AM  25           As far as the impressions of the jury with

respect to the Lee case, I mean, you obviously now had or did
have transcripts, and you probably sat through a lot of the
trial.  The impressions of the witnesses that were -- the
impressions that the witnesses made in the Lee case have to be
viewed in the context of what Mr. Neuman did in connection with
the -- with I believe was the defense strategy, and that was he
basically admitted that Mr. Huizar had been conducting a RICO
enterprise for a number of years and was extorting or taking
bribes from developers during the entire course of this RICO
conspiracy.

He never tried to justify Mr. Huizar's conduct or
activities.  His defense was that Mr. Kim didn't know about it.
And when he paid the $500,000 in cash, that he didn't -- I
don't remember precisely, but he didn't remember or he took the
position that he didn't know it was going to Huizar.  He was
just giving it to Mr. Kim because Mr. Kim was going to make the
Creed appeal go away.

So I don't know what it is that you're trying to
get from the jurors in the Lee case with respect to how to try
your case when Neuman basically admitted that Mr. Huizar
committed all the crimes that were charged in the First
Superseding Indictment.

MS. ALÉ:  So if I can explain by way of an
example, Your Honor.  I think the Court -- prior to the
940 Hill case, the Court had said something to the effect that

1    the Government's case really rested on Justin Kim and his

2    credibility.  And following -- 940 Hill was convicted.  And

3    following the trial, the Court mentioned about something how

4    Justin Kim was a terrible witness for the Government, and I

10:22AM   5    think that was the impression of a lot of people who sat

6    through that testimony.  Yet the jury convicted.

7              So what is it about that particular witness's

8    credibility that the -- a juror understood about, you know --

9    took from the case and from his testimony?  Those sorts of

10:23AM   10   things are material to how we understand a witness, how we can

11   present our defense.

12             THE COURT:  But it's -- even if I made that

13   comment, the jury either had no difficulty in believing him

14   even though he was -- and my comment -- I don't remember what

10:23AM   15   it was because I tend to make comments -- I don't write them

16   down, and you guys always -- you folks always have the benefit

17   of the transcripts.  But he was impeached.  I mean -- and he

18   was -- he was thoroughly impeached.  But that wasn't the only

19   witness.  It was also Mr. Esparza.

10:23AM   20             But I can't understand how you can think of

21   asking a juror about the evaluation of a particular witness's

22   testimony without implicating statements that are going to be

23   made during the course of the deliberations because I'm sure

24   that was an issue.  And I don't know, but they go into the jury

10:24AM   25   room and say, okay, we basically have two witnesses.  We have

1    Kim, and we have Esparza.  What are the jurors -- what do my

2    fellow jurors think about Mr. Kim's testimony and Mr. Esparza's

3    testimony?  And that directly implicates the deliberations of

4    the jury.

10:24AM    5          MS. ALÉ:  Your Honor, on that point, I will say

6    that, while the jurors may be unsophisticated, we have very

7    sophisticated investigators who are well trained on

8    interviewing jurors.  One of the investigators on this case is

9    Greg Krikorian who is the lead supervisor for the capital

10:24AM   10   habeas unit in our office.  He conducts juror interviews

11   regularly.  So we do have that sort of training to ensure that

12   those deliberations are not intruded upon.

13          THE COURT:  Well, I just -- maybe the best way of

14   looking at that is you can submit the report that was done of

10:25AM   15   the juror who conducted the 40-minute interview and I can make

16   a determination based on that report as to whether or not I

17   view any of the information relayed by that juror as invading

18   the deliberative process.

19          MS. ALÉ:  I fear that if we submit that -- I fear

10:25AM   20   that is attorney-work product.

21          THE COURT:  Well, it is what it is.

22          MS. ALÉ:  Your Honor, there is a narrower way

23   that the Court could issue an order that would ensure that the

24   Court's concerns are appropriately met which would be to limit

10:25AM   25   the categories of information that we can discuss with the

jurors.  Again, these are not jurors in our case.  These are

simply -- they are people who are now free to talk to anyone

they so choose, not just us or the other counsel in this case.

But they have information that is relevant to us.

THE COURT:  I just don't understand what the

information is that is relevant to you.

MS. ALÉ:  Again, Your Honor -- Your Honor, I

think, perhaps from private practice might recall that there

are trial consulting agencies.  There are mock jury exercises.

Those sorts of things are done for -- to understand how lay

witnesses or lay jurors would perceive evidence and witnesses.

THE COURT:  You and your defense team are highly

experienced defense lawyers.  You obviously have read the

transcript.  You know what the impeachment material was with

respect to Kim.  I can't imagine that you can't make that

determination in terms of how you're going to approach

Mr. Kim's cross-examination in the upcoming trial with respect

to Mr. Huizar without a consultant.  Most of that stuff to me

is just a waste of money, especially when you're experienced

lawyers who know how to try cases.  There's no magic to it.

MS. ALÉ:  I understand that, Your Honor.

THE COURT:  I don't think there's anything that a

juror can tell you that you don't already know.  Either they

believe Kim, they didn't believe Kim, they thought the

impeachment was effective and they thought the Government was

1    able to rehabilitate him.

2              But all those are just normal things that you

3    know as a good trial lawyer to assist you in preparing the case

4    because you have the benefit now of having two trials.  At

10:27AM    5    least two of the schemes out of the five that are alleged in

6    the First Superseding Indictment, you have all of the evidence.

7    You have all of the exhibits.  And you understand the theory of

8    Neuman, and you understand the theory of Mr. Steingard in the

9    Shen Zhen New World case.  Neither of those theories and

10:28AM    10    neither -- and none of the cross-examination in the defense

11    case swayed the jury, and they were found -- and those

12    defendants were found guilty on all counts.

13              MS. ALÉ:  I understand the Court's point that

14    there is other information that we have that will be helpful,

10:28AM    15    and I agree.  But we also are entitled to readily-available,

16    publicly-available information.  We are entitled to the full

17    scope of available information in preparing our defense.

18              THE COURT:  Well, you are.  But I have an

19    obligation to balance that in connection with issues with

10:28AM    20    respect to -- that I raised before with respect to jurors who

21    have made significant sacrifices in sitting on each of these

22    trials being contacted and requested to participate in

23    interviews, especially after they left the courthouse and now

24    you're invading their privacy of their personal residences and

10:29AM    25    personal space.

1           MS. ALÉ:  And certainly, if the juror had told us

2     they were not interested, as others did, we would not have

3     persisted in attempting to contact them.

4           So there is a narrower order that the Court can

10:29AM   5     issue that would prohibit us from discussing or intruding into

6     the jury deliberations, asking about juror misconduct that

7     would still allow us this avenue of information.

8           THE COURT:  Well, I still don't understand what

9     the avenue of information is.  That's what I don't see.

10:29AM  10           MS. ALÉ:  I tried to explain it to the Court, as

11     best I can, that the information about the jurors' impressions

12     of the same witnesses and the same exhibits that will be

13     presented in our trial is helpful and material information in

14     how we choose to construct our own case.

10:30AM  15           THE COURT:  Okay.  Well, I can tell you, from my

16     vantage point, although I wasn't a juror, that the exhibits

17     that were presented by the Government and the Government's

18     witnesses were impressive.

19           MS. ALÉ:  And I appreciate the Court's

10:30AM  20     perspective on that, but the Court has been steeped in this

21     case for years now.  The jurors are more like the jurors that

22     we will have in our own trial, and that's why their perspective

23     is most helpful.

24           THE COURT:  But you have the perspective of how

10:30AM  25     you can present your case.

1          MS. ALÉ:  I have also been in this case for

2     years.

3          THE COURT:  I assume, from your perspective, when

4     it comes time for the 940 Hill scheme, you're not going to take

10:30AM   5     the position that Mr. Neuman took that Mr. Huizar was running a

6     RICO enterprise for a number of years extorting developers.

7          MS. ALÉ:  Correct, Your Honor.

8          THE COURT:  So your focus is going to be

9     different.  I don't know what the focus is going to be with

10:31AM  10     respect to the hundreds of thousands of dollars in benefits

11     that Mr. Huizar received in the -- the evidence indicated that

12     he received in connection with the Shen Zhen New World.  But I

13     don't see how any conversation with the juror that didn't

14     invade the deliberative process would be useful to you.  I

10:31AM  15     mean, you know what you're faced with.

16          MS. ALÉ:  Right, Your Honor.  But I come at the

17     case, at the evidence, at the witnesses from the perspective of

18     an attorney, not a lay person who has no exposure of this case.

19          THE COURT:  Then get a jury consultant and have a

10:32AM  20     mock trial before a jury -- I forget what they call them now.

21     We used to do that when I was in practice, and you assemble

22     12 jurors and you put on a brief snippet of the case and

23     everybody sits back and watches the jury deliberate.

24          MS. ALÉ:  And as the Court might know, at a

10:32AM  25     Federal Public Defender's Office, we are limited in the sorts

1   of outside consultants we may get.  Of course, you know,

2   perhaps we are able to get that.  Ultimately -- this is

3   information that these jurors can already provide to us.

4              THE COURT:  They can't because I'm not going to

10:32AM   5   let you contact and interview jurors which are going to

6   potentially invade in the deliberative process.  I'm just not

7   going to do it because I don't have any guarantees -- I

8   can't -- you obviously take the position it is work product.  I

9   don't have any ability to see the 40-minute report to make any

10:32AM   10   determination as to whether or not there was careful -- they

11   were careful in their conversations.  And, more importantly,

12   there's no scripts that apparently are given to the

13   investigators in order to what they can ask.  And I certainly

14   appreciate that you have experienced investigators, but given

10:33AM   15   the -- given what went on in this case, I'm just not inclined

16   to do that.

17              MS. ALÉ:  I think, Your Honor, the Court's

18   concerns call for a narrower order than the order now which I

19   believe -- which I still believe is impermissibly overbroad.

10:33AM   20              THE COURT:  What would be your proposal in terms

21   of a narrower order?

22              MS. ALÉ:  I think the Court can order us not to

23   discuss jury deliberations, discuss juror misconduct.

24              THE COURT:  But that doesn't give me any idea of

10:33AM   25   what the questions that you want to ask are.

1          MS. ALÉ:  It seems like the Court, perhaps, would

2    entertain if we submitted the questions to the Court ahead of

3    time.

4          THE COURT:  But then how do I -- I don't have any

10:34AM   5    control -- there's no control over the interview unless the

6    Government is going to be present during the interview.

7          MS. ALÉ:  Which we would object to, of course.

8          THE COURT:  Of course you would.  So how would

9    I -- so there is no control.  I can't be there when you're

10:34AM   10   interviewing them.  I can ask you to submit questions, and then

11   if the questions are appropriate or if I think they're

12   appropriate, I can say, okay, you can ask that question.  But

13   then what about the follow-up questions?  And what if the juror

14   doesn't respond precisely to the question and say, by the way,

10:34AM   15   when we were in the jury deliberations, that issue did arise

16   during the course of those deliberations and it was -- half the

17   jurors viewed it this way and the other half of the jurors

18   viewed it that way?

19         MS. ALÉ:  I think, before that response even

10:34AM   20   comes out, our investigators know to stop somebody who is

21   talking about that.

22         THE COURT:  Well, I would hope so, but I don't

23   have the comfort level in knowing that.

24         MS. ALÉ:  I think, Your Honor, we can submit

10:35AM   25   declarations to that effect or, you know, perhaps do additional

1    training specific to what the Court is requesting.  But there

2    is a path forward with a narrower order.

3              THE COURT:  You know, in researching the issue of

4    the propriety of interviewing the jurors after a verdict was

10:35AM  5    entered, I did discover that several district courts have local

6    rules prohibiting such contact without a court order.  And in

7    the *Mitchell* case which is at 958 F.3d 776, there was an

8    Arizona local rule, which is 39.2(b), that was at issue in that

9    case which provided that interviews with jurors after trial by

10:35AM  10   or on behalf of parties involved in the trial are prohibited

11   except on the condition that the attorney or party involved

12   desiring such interview file with the Court written

13   interrogatories proposed to be submitted to jurors together

14   with an affidavit setting forth the reasons for such proposed

10:36AM  15   interrogatories within the time granted for a motion for new

16   trial.

17              And then the rule goes on to say, approval of

18   the -- approval for the interview of jurors in accordance with

19   the interrogatories and affidavit so filed will be granted only

10:36AM  20   upon a showing of good cause.  And they cite to Federal Rule of

21   Evidence 606(b).  But that was in the -- the *Mitchell* court

22   went on to indicate that the 9th Circuit has long imposed

23   restrictions on lawyers seeking access to jurors, and these

24   rules derive their authority from the common law where judges

10:36AM  25   place the veil of secrecy about jury deliberations.  The

9th Circuit went on -- and I'm quoting from the *Mitchell*

opinion -- "Rules restricting lawyers' access to jurors

encourage freedom of discussion in the jury room, reduce the

number of meritless post-trial motions, increase the finality

of verdicts, and further Federal Rule of Evidence 606(b) by

protecting jurors from harassment and the jury system from

post-verdict scrutiny."

The 9th Circuit indicated that it was incumbent

upon the Court to protect jurors from annoyance and harassment

of such conduct.  And the Court cited *Bryson versus*

*United States* at 238 F.2d 657 and stated -- and I quote -- "It

is improper and unethical for lawyers to interview jurors to

discover what was in the course of deliberation of a trial

jury."  "Therefore, in cases," which, again I'm quoting from

the 9th Circuit, where defendant -- "where there has been no

showing of jury misconduct, we have held that a district court

does not abuse its discretion in refusing to allow post-verdict

interrogation of jurors."

The *Mitchell* Court relied on *United States versus*

*Elritt* in 588 F.2d 7 upholding an earlier version of the

district court local rule restricting access to the jurors in

absence of some showing of sufficient reason.  And the

9th Circuit indicated that they have held that the district

court's denial of a motion to interrogate jurors does not raise

a constitutional problem where there has been no specific claim

of juror misconduct.

It went on to talk about the no impeachment rule of Federal Rule of Evidence 606.

Let me hear from the -- if you are concluded, let me hear from -- if you have finished, let me hear from the Government.

MS. ALÉ:  Yes, Your Honor.  I would just note that those cases all involve defendants who have been convicted.  And, again, we are pretrial, and Mr. Huizar stands accused but innocent -- presumed innocent in this case.  Those cases are inapposite because we don't have the same issues of finality as are raised here.

Thank you.

THE COURT:  But the same principle of interfering with the rights of privacy of the jurors comes into play.

MS. ALÉ:  Absolutely, Your Honor.  That's why a narrower order would be appropriate.

THE COURT:  Well, let me hear from the Government.

MS. PALMER:  Thank you, Your Honor.  Just a few points.

So the Government's position has always been that the parties who participate in the trial it's acceptable, and we think it's consistent with case law that those parties can speak with the jurors immediately after the trial.

1          Here we're in a very different situation as

2    defense counsel and the Government agrees where a party that

3    was not --

4          THE COURT:  Let me interrupt you because I'm not

5    going to listen to what you said in your papers because your

6    papers are late.

7          What is the Government's position with respect to

8    a more narrowly tailored order?

9          MS. PALMER:  Well, the one proposed by the

10   defense is problematic for several reasons.

11         THE COURT:  Well, there was one that was

12   proposed?  I didn't see it.

13         MS. PALMER:  Defense counsel just said that the

14   Court could approve questions in advance and then, once the

15   Court approved those questions, could go forward with those.  I

16   think the Court rejected that.  The Government would agree that

17   there are two problems with that.  First of all, a juror's

18   impressions are inextricably intertwined with other jurors'

19   impressions once they have gone through the deliberative

20   process.  So we would be concerned that any interview after

21   this about what their impressions are about a certain witness

22   happening after they have already talked with other jurors

23   would intrude upon that deliberative process.

24         The defense says they are entitled to this

25   because it is publicly available.  Certainly jurors'

1   impressions inside their heads, we would say that is not

2   publicly-available information.  That is something that is

3   within the juror's own mind, and that's not publicly available.

4            But importantly, that sort of thing does not

10:41AM  5   mitigate any of the concerns that were raised by this specific

6   juror.  Here these concerns involve both privacy and

7   harassment.  So even if the questions were pre-approved, if the

8   defense team was going out once again, showing up, showing up

9   at their family members' homes, we think that's problematic.

10:42AM  10   We think that's the sort of constitutional concerns, the

11   compelling interests that has justified the types of rules that

12   circuits have adopted, Local Rules have adopted.  And the

13   defense proposal would not mitigate any of those concerns about

14   privacy or about juror harassment.

10:42AM  15            THE COURT:  All right.  Well, I am not going to

16   vacate the no contact order that I issued.  I'm still on the

17   borderline with respect to whether or not it should be

18   modified.  Given the discussion today, I don't see how an

19   appropriate modification is feasible in this case, but I will

10:43AM  20   certainly allow defendant to brief -- or file a supplemental

21   brief so I can get a better understanding of the proposed

22   modification of the order.  Then I will take another look at

23   it.

24            All right.  The other issue that I wanted to

10:43AM  25   discuss this morning is the stipulation to continue the trial

1    that's currently set for February 21st of 2023.  That

2    stipulation was filed on November 14th.  It seeks to not only

3    continue the trial date but also the various pretrial filing

4    deadlines that are established or were established by the order

10:44AM    5    on -- that was entered on April 27th of 2022, docket No. 441.

6            First, counsel has misrepresented my comments at

7    the pretrial conference in Shen Zhen.  My suggestion for a

8    brief continuance was due to the Government apparently having

9    to meet filing deadlines in both Shen Zhen and Huizar which

10:44AM    10    were precluding Mr. Jenkins from trying the Shen Zhen case, and

11    those concerns no longer exist because the Shen Zhen trial

12    proceeded without Mr. Jenkins, and presumably all of the filing

13    deadlines in the Huizar case have been met.

14            The stipulation also contains an error on page 8,

10:45AM    15    line 8.  I'm sorry.  It's on page 3 at line 15.  You have, "The

16    Court continued the trial in this case from May 24 of 2018."

17    It seems like we have been involved in this case for that

18    period of time.  Obviously that's an incorrect date.

19            The stipulation does correctly note that the last

10:46AM    20    continuance was from the October 18 trial date, and that

21    continuance was a result of the request of the defendant on

22    April 27th.  I continued that October date to the current date

23    and set various pretrial dates as set forth in the order I

24    referred to which is 441.

10:46AM    25            I looked at the trial schedule set forth in the

1    stipulation for the four attorneys who are representing

2    Mr. Huizar who are going to try this case, and the current

3    trial date, with the exception of possibly Mr. Snyder who has

4    two potential conflicts, there is no indication that there are

10:47AM    5    any other conflicts and there's no indication that those cases

6    that Mr. Snyder is involved in can't be continued.  In fact,

7    one of them has another public defender who is assigned to that

8    case.

9              The Court has arranged its trial calendar to

10:47AM    10    proceed with this case which is now estimated to take 30 days

11    on February 21st, and there would be a significant gap in the

12    Court's calendar if the case is continued since the case was

13    continued and I have avoided setting cases that would conflict

14    with that date.  As a result, I'm going to decline to sign the

10:48AM    15    stipulation.  The case is going to proceed on February 21st of

16    2023.

17              I do want to discuss, as long as I have counsel

18    present this morning, the various dates that -- pretrial dates

19    that are coming up, and I want to confirm the exchange of the

10:48AM    20    joint motions in limine were due on November 8th.  Has that

21    been accomplished?

22              MS. ALÉ:  Yes, Your Honor.

23              THE COURT:  And how many motions in limine are

24    there?

10:48AM    25              MS. ALÉ:  We had six motions in limine, and we

1    are -- are reraising some of the motions in limine that were

2    filed in the other cases, but we're not briefing them anew.

3    We're just going to file a notice to preserve the issue.

4                THE COURT:  Well, to the extent that you're going

10:49AM   5    to rely on any of the motions in limine that were filed in

6    either the Lee case or the Shen Zhen case, I want you to

7    indicate what the Court's ruling was on those motions and where

8    I can find that ruling because, as you can well imagine, I have

9    an enormous amount of material.  And simply referring to the

10:49AM  10    Court's ruling -- I have a fairly good memory, but I'm going to

11    need specifics in terms of where I can find the ruling since

12    you obviously all have the transcripts.

13                MS. ALÉ:  Yes, Your Honor.  And we understood the

14    Court's order during the Shen Zhen trial requiring a

10:49AM  15    declaration with that information to apply to all motions going

16    forward.

17                THE COURT:  Right.  Has a conference with respect

18    to the exhibit list that was set to take place on

19    November 15th, has that been accomplished?

10:50AM  20                MS. ALÉ:  That has not, Your Honor.

21                THE COURT:  Okay.  So when is that going to take

22    place?

23                MS. ALÉ:  We will meet and confer with the

24    Government and set a date in order to do that.

10:50AM  25                THE COURT:  How many exhibits does the

|     |     |
| --- | --- |
|   | 1 |
|   | 2 |
|   | 3 |
|   | 4 |
| 10:50AM | 5 |

        1   Government -- the Government has provided the list of exhibits

        2   they intend to offer because that was due on October 11?

        3           MR. JENKINS:  Yes, Your Honor, we have.

        4           THE COURT:  How many exhibits?

10:50AM 5           MR. JENKINS:  Right now the number is over 1,000

        6   exhibits.  There are some -- the way we categorize them, there

        7   are some "intentionally left blank" within there.  So it's

        8   maybe fewer than a thousand.  At the same time, some exhibits,

        9   as we did in the last trial, have various iterations, 1000A,

10:50AM 10  1000B, typically text threads.  So it's both a little bit

        11  higher and a little bit lower.  But a thousand right now is an

        12  accurate estimate, Your Honor.

        13          THE COURT:  With respect to Government's motions

        14  in limine, does the Government have any?

10:51AM 15          MR. JENKINS:  Yes, Your Honor.  We have two.  And

        16  just to put on the record and to show our collaboration between

        17  the parties, we have agreed between the parties to limit -- put

        18  page limitations on the MILs, and that's five pages for a

        19  motion response and three pages for replies.  So the Court is

10:51AM 20  aware, if they look shorter than normal, that is successful

        21  collaboration between the parties.

        22          THE COURT:  That would be delightful because my

        23  eyesight is not getting any better.

        24          So those oppositions to the motions in limine are

10:51AM 25  now due on December 5th.

|  | 1 | MS. ALÉ:  Correct, Your Honor. |
|---|---|---|

1        MS. ALÉ:  Correct, Your Honor.

2        THE COURT:  And the replies are due on the 19th.

3   And the filing deadline is December 19th.  So all those dates

4   are going to be complied with?

10:52AM    5        MR. JENKINS:  Yes, Your Honor.

6        THE COURT:  Okay.  The joint pretrial exhibit

7   stipulation, that's due on January 17th.  Well, it looks

8   like -- I can't make that determination yet, but it looks like

9   we're going to have hopefully an agreement on most of these

10:52AM   10   exhibits.  As counsel know from the Lee trial and from the

11   Shen Zhen trial, my goal is to reach an agreement or at least

12   frame whatever objections may relate to those exhibits because

13   it makes the trial go much quicker.

14        Is the Government going to have any experts?

10:53AM   15        MR. JENKINS:  We currently have one to two

16   proposed experts, Your Honor.

17        THE COURT:  Is the defense going to have any

18   experts?

19        MS. ALÉ:  We're not sure yet, Your Honor.

10:53AM   20        THE COURT:  Okay.

21        MR. JENKINS:  Your Honor, could we be briefly

22   heard just on the date of the trial?

23        THE COURT:  Sure.

24        MR. JENKINS:  It sounds like the Court has made

10:53AM   25   the ruling that it will decline to sign the stipulation.  But

1    just so the record is a little more clear, the communication

2    with the Court, as I recall it, related to the scheduling of

3    the Shen Zhen trial and overlapping deadlines and whether I

4    would participate in that trial and the complications that

10:54AM   5    derived therefrom.

6                    It is accurate that we complied with all of the

7    deadlines, except for the exhibit stipulation, during that

8    trial as I participated in both the trial from the back of the

9    room and then also with Ms. Palmer on ensuring the deadlines

10:54AM   10    were met.

11                    But the downside that we discussed, as I recall

12    it, is that doing sort of split duty -- 1,000 exhibits is a lot

13    to have for an exhibit stipulation meeting, but we had to err

14    on the side of an overabundance because, as I was trying to be

10:54AM   15    in both places at once, we wanted to make sure we weren't

16    eliminating and it was basically just AUSA Palmer herself and

17    Special Agent Civetti, who was also doing double duty both in

18    the trial and preparing for Shen Zhen.

19                    So I think more time would allow us to satisfy

10:55AM   20    the Court's intention, from the last two trials, that ideally

21    putting the trial to be the most efficient trial at the time so

22    a lot of these things are worked out in advance, and it has

23    been successful in both I think Shen Zhen and Lee because we

24    had time and we came in under both of our estimates because of

10:55AM   25    the protocol the Court put us through.

1    So my concern and one we share with the defense

2    and why we ultimately agreed to a continuance is there's still

3    a lot of work to be done because of the just enormity of the

4    evidence that we're still trying to cull through.  So we have

10:55AM  5    75 witnesses on our witness list, over 1,000 exhibits.  I think

6    with additional time we would be better able to not waste time

7    if that makes since.

8    THE COURT:  To me you have plenty of time to

9    accomplish what needs to be accomplished.  I'm not adverse to

10:55AM  10   moving some of the pretrial filing deadlines if you're going to

11   be working toward, for example, on the exhibits, refining the

12   number of exhibits and the meet-and-confer process resolving

13   the objections because, as you know, once I get the joint

14   pretrial exhibit stipulation, as soon as I see that there are a

10:56AM  15   number of outstanding exhibits, what I'm going to do is issue

16   an order requiring counsel to meet and confer and prepare a

17   joint statement setting forth precisely what the objection is

18   and the response to the objection.

19   You know what's coming.  It's not a mystery.  But

10:56AM  20   if you -- as I said, I will entertain a continuance of some of

21   those types of dates, but I'm not going to continue the trial

22   date.  I think we have plenty of time between now and

23   February 21st to resolve these issues.  As I said, if you want

24   to propose a stipulation to continue the exhibit issues or

10:57AM  25   exhibit deadlines, that's fine.

1        None of the other deadlines seem to be that

2   difficult because the motions in limine appear -- it looks like

3   maybe eight motions in limine, those appear to be manageable.

4   But I need enough time to also assist in managing this case.

10:57AM   5   So I don't know if that helps any.

6        MR. JENKINS:  It does some, Your Honor.  I will

7   let Mr. Snyder address it.  I just think the other issue we

8   raised, the holiday time for various holidays, the preparation

9   in the last two trials of a lot of civilian witnesses with

10:58AM  10   lawyers who have their own schedules became very difficult and

11   burdensome for all involved.  People were coming in early at

12   night -- sorry -- early in the morning, weekends, and those

13   were for trials where we called 10 to 15 witnesses, and

14   currently we have 75.  That was just another basis for not just

10:58AM  15   the Government's schedule and not just the public defender's

16   schedule but all the numerous witnesses and lawyers who will be

17   affected by the trial date.

18        THE COURT:  Well, that's the -- that's the

19   problem with complex cases.  It's the nature of the beast.  I

10:58AM  20   don't know what else can be done.  Both sides have a number of

21   lawyers that are working on this case.  In terms of

22   interviewing witnesses, those interviews can be conducted

23   between now and the end of February.  It seems to me there's

24   plenty of time to do those witness interviews.

10:59AM  25        How many witnesses does the defense intend to

1    call?

2              MR. SNYDER:  I think the answer is we don't know

3    at this point.  I will say though --

4              THE COURT:  I have never asked that question of

5    the public defender's office where I actually get an answer.

6              MR. SNYDER:  Well, one of the things too to

7    consider -- and I think Mr. Jenkins said a number of the things

8    I wanted to say, part of the reason that we all agree is that

9    we're on the ground in terms of having a sense of -- I know the

10   Court is deeply enmeshed in these cases, but we have a pretty

11   concrete sense of what it's going to take to put on these

12   trials.  We understand what the Court is expecting of us in

13   terms of efficiency and organization.

14              And just to that point, this is going to be the

15   first case where you have two defendants.  I suspect that at

16   least one, maybe both, will put on significant defense cases.

17   So whatever the numbers that Mr. Jenkins just raised in terms

18   of Government witnesses, you know, 75, 1,000 exhibits, whether

19   those numbers stay stable, you're also talking about the

20   possibility of some, you know, significant number of additional

21   defense witnesses and exhibits.  You're going to have

22   three-handed objections to everything.  The Government is going

23   to be objecting to the exhibit list of both defendants.  You're

24   going to have four sets of objections to a number of things.  I

25   think that, you know, that is the reason why we are -- why

1    we're bringing this up with the Court.

2              And I would also just echo, you know, the point

3    about the holidays, the Court is right.  This is the nature of

4    the beast.  It is a complex trial.  But we have a number of

11:00AM  5    witnesses who need interpreters.  I would say the vast majority

6    of witnesses in this case are represented by counsel.  So if we

7    are going to prepare, let's say, 50 witnesses between the two

8    sides -- more likely it's going to be 75 to 100 -- but if we're

9    going to do that, we are going to be juggling the schedules of

11:01AM  10   interpreters, witnesses, counsel for the witnesses, counsel for

11   the parties, on top of, you know, 1,000 plus exhibits,

12   stipulations, complying with all the court orders during the

13   holidays where we all know there are going to be unexpected

14   events that arise.

11:01AM  15             So, again, we -- I think we all appreciate how

16   much work that the Court and its staff have put into the case

17   and that the Court has blocked out time.  It's our objective to

18   get this case concluded.  I think what you're hearing from us

19   in the slight pushback is that we know what it's going to take,

11:01AM  20   and we just think that the time is necessary not only to do

21   what we want for our cases but having a sense of what the Court

22   wants.  That's why we all joined together.

23             THE COURT:  All right.  Well, it seems to me

24   you've got two of the five schemes that -- that you're fully

11:02AM  25   aware of what the evidence is.  And the other schemes involved

1    in this case, my memory -- I don't have the Indictment in front

2    of me -- Businessman A scheme and the -- what's the other one?

3    The Project M?

4              MR. SNYDER:  There's the Project M and also

5    Project D.  There's also the overarching RICO enterprise which

6    is, you know -- these are executions of what's alleged to be a

7    broad and overarching scheme which, itself, I think adds a lot

8    of volume to the Government's case because it's not just five

9    alleged bribes.  It's -- this is all part of a scheme conducted

10   by an enterprise, all of which they're going to have to prove

11   up as a unified entity.  Then on top of that, there's the last

12   30 pages of the Indictment which themselves, if they were

13   charged, would be a complex, you know, document-heavy trial.

14             So we understand that the Court knows what's

15   happening.  The Court has tried a number of complex cases.

16   It's a lot.  And everybody is working very hard.

17             THE COURT:  It's a lot, but I don't think it's

18   something that can't be accomplished.

19             All right.  So I don't have anything else on my

20   agenda today.  Everybody have a good Thanksgiving, and we will

21   march toward February.

22             MR. JENKINS:  Thank you, Your Honor.

23             MS. ALÉ:  Thank you, Your Honor.

24             (Proceedings concluded at 11:03 a.m.)

25

1              CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5              I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6     COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7     THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8     PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9     FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10    STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11    ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13    THE UNITED STATES.

14

15              DATED THIS  12TH  DAY OF DECEMBER, 2022.

16

17

18              /S/ MIRANDA ALGORRI

19              _____
                MIRANDA ALGORRI, CSR NO. 12743, CRR
20              FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25