CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
CAREL ALE (Bar No. 283717)
Email:  Carel_Ale@fd.org
CHARLES J. SNYDER (Bar No. 287246)
Email: Charles_Snyder@fd.org
ADAM OLIN (Bar No. 298380)
Email: Adam_Olin@fd.org
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone:  (213) 894-2854
Facsimile:  (213) 894-0081

Attorneys for Defendant
Jose Luis Huizar

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>       v.<br><br>JOSE LUIS HUIZAR,<br><br>              Defendant. | Case No. CR-20-326-JFW<br><br>**JOINT MOTION IN LIMINE NO. 2 TO PRECLUDE EVIDENCE AND ARGUMENT REGARDING POST-OFFENSE AND COLLATERAL HARMS**<br><br>**Hearing Date:** January 20, 2023<br>**Hearing Time:** 8:00 a.m.<br>**Location:**      Courtroom of the Honorable John F. Walter |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Mack E. Jenkins, Cassie D. Palmer, Brian Faerstein, and Susan S. Har, and defendant Jose Huizar, by and through his counsel of record, Carel Alé, Charles J. Snyder, and Adam Olin, hereby submit this Joint Motion in Limine No. 2: Defendant's motion to preclude evidence and argument regarding post-offense and collateral harms, including certain testimony anticipated from Kevin Keller.

This Joint Motion in Limine is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and

1    argument as the Court may permit.

2

3                                Respectfully submitted,

4                                CUAUHTEMOC ORTEGA
                                Federal Public Defender

5

6    DATED:  December 19, 2022      By  */s/ Charles J. Snyder*
                                CHARLES J. SNYDER

7                                 CAREL ALÉ
                                ADAM OLIN

8                                 Attorneys for Jose Huizar

9

10

11                                E. MARTIN ESTRADA
                               United States Attorney

12    DATED:  December 19, 2022      By

13                                 MACK E. JENKINS
                                CASSIE D. PALMER

14                                 SUSAN S. HAR
                                Attorneys for United States of America

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

DEFENSE MOTION………………………………………………………………1

    Introduction……………………………………………………………………1

    Argument………………………………………………………………………2

    Conclusion…………………………………………………………………...3

GOVERNMENT OPPOSITION…………………………………………………4

    Introduction……………………………………………………………………4

    Argument………………………………………………………………………4

    Opening the Door……………………………………………………………...7

DEFENSE REPLY…………………………………………………………….....9

DECLARATION OF CHARLES J. SNYDER………………………………….10

# TABLE OF AUTHORITIES

**Federal Cases**

United States v. Cooper,
    591 F.3d 582 (7th Cir. 2010)…………………………………………………...2, 3

United States v. Gonzales-Flores,
    418 F.3d 1093 (9th Cir. 2005)…………………………………………………….2, 3

United States v. Hitt,
    981 F.2d 422 (9th Cir. 1992)…………………………………………………...2

United States v. Sanchez,
    659 F.3d 1252 (9th Cir. 2011)………………………………………………….1

United States v. Yazzie,
    59 F.3d 807 (9th Cir. 1995)………………………………………………….3

1

## **TABLE OF EXHIBITS**

2

| Ex. 1 | December 15, 2021 Government Expert Disclosure | 1:11 |
|-------|------------------------------------------------|------|
| Ex. 2 | May 7, 2020 Kevin Keller FD-302                | 1:11 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## STATEMENT OF ISSUES IN DISPUTE

**Defense Position:** Huizar moves to preclude evidence and argument relating to collateral or post-offense harms allegedly resulting from the charged conduct. As one example, Huizar moves to preclude testimony from Kevin Keller that a reduced affordable-housing covenant on Project M led to a wider loss of affordable housing in the Arts District. Setting aside the disputed merits of this claim, it is irrelevant to whether Huizar engaged in a pay-to-pay bribery scheme, including on Project M. And in a community where no issue has greater political resonance than housing affordability, the danger of unfair prejudice substantially outweighs any notional relevance.

**Government Position:** The defense does not dispute that the government is entitled to introduce evidence supporting the allegations in the First Superseding Indictment regarding the evolution of Carmel Partners' Mateo project. More specifically, that the government should be permitted to demonstrate that , as part of the Mateo bribery scheme, defendant Huizar leveraged and ultimately voted on affordable housing conditions that objectively decreased low-income individuals' access to housing for the project and, in turn, saved millions for Carmel Partners. In addition, should the defense open the door by suggesting the Mato Project was exclusively positive for the community or "universally loved," the government should be further permitted to elicit facts that there were legitimate opponents and concerns about the project to correct any false impression that the Mateo project was an unimpeachable and altruistic one.

**DEFENSE MOTION**

The government intends to call Kevin Keller, a former planning official, to testify as a dual-role fact and opinion witness.  Among other things, it appears that the government will seek to elicit from Keller testimony along the following lines:

1. before Jose Huizar voted to lower the affordable housing percentage on Project M, the City had a uniform policy of requiring 11% very-low-income affordable housing on every new Arts District development;

2. Huizar's supposedly-corrupt decision to reduce the affordable housing percentage on Project M set a new precedent, requiring the City to extend similar terms to later Arts District developers;

3. Huizar's alleged corruption thus led directly to the City's affordable housing and homelessness problems, especially in the Arts District.

See Snyder Decl., Exs. 1-2.

In principle, Huizar takes no issue with the government attempting to elicit part 1 of Keller's testimony.  He also takes no issue with Keller discussing (1) developers' general attitude toward affordable-housing covenants; (2) the history of development in the Arts district; or (3) perceived irregularities in the Project M entitlement process.  But any effort to link Huizar's supposed corruption on Project M to a broader loss of affordable housing in the Arts District is irrelevant to the issues in dispute: whether Huizar orchestrated a pay-to-play bribery scheme, including on Project M.  It would also be likely to inflame the jury in a city where no issue has greater political salience than housing affordability.

The Ninth Circuit has long held that prosecutors "may not point to a particular crisis in our society and ask the jury to make a statement with their verdict." United States v. Sanchez, 659 F.3d 1252, 1256 (9th Cir. 2011).  Because there is no coherent reason why parts 2 and 3 of Keller's testimony are necessary for the government to prove a legitimate point at trial, the Court should preclude him (and any other witness) from testifying about collateral harms allegedly resulting from the charged conduct.  Absent a valid evidentiary basis, the Court should also preclude prosecutors from making collateral-harm arguments to the jury, especially arguments linking the alleged

1

1  offenses with a broader loss of affordable housing.

2  **ARGUMENT**

3  "Where . . . evidence is of very slight (if any) probative value, it's an abuse of

4  discretion to admit it if there's even a modest likelihood of unfair prejudice or a small

5  risk of misleading the jury." United States v. Hitt, 981 F.2d 422, 424 (9th Cir. 1992).

6  For that reason, courts have consistently held that evidence about the collateral or post-

7  offense consequences of a completed crime is inadmissible unless it bears meaningfully

8  on an element of the offense.

9  In United States v. Gonzales-Flores, 418 F.3d 1093 (9th Cir. 2005), for example,

10  the defendant was charged with smuggling noncitizens into the United States. Id. at

11  1098. At trial, the government introduced evidence that two young girls suffered a heat

12  stroke during the journey. Id. The Ninth Circuit held that the heat-stroke evidence was

13  wrongly admitted because it did not affect the probability that the defendant had

14  committed any element of the crime. Id. In so doing, the court explained that the story

15  of the injuries was precisely the kind of emotional evidence that could cause unfair

16  prejudice while having little probative value. Id. at 1099.

17  The Seventh Circuit reached a similar result in United States v. Cooper, 591 F.3d

18  582, 589 (7th Cir. 2010), holding that emotionally-impactful evidence of post-offense

19  harms was wrongly admitted at trial. In Cooper, the defendant was charged only with

20  drug distribution, but the trial court admitted evidence that some of the defendant's

21  customers suffered overdoses as a result. On appeal, the Circuit held that the emotional

22  evidence of overdoses was wrongly admitted since "[e]vidence of what happened to

23  [the defendant's] customers after they bought heroin from him had nothing to do with

24  the [distribution] charges." Id.

25  Here, Keller's testimony does not suggest that later project approvals give rise to

26  an inference of bribery, for example by showing that Huizar treated Company M more

27  favorably that other developers. To the contrary, he admits that later developers

28  received affordable-housing covenants similar to Company M. While this testimony

2

1    might be relevant to establishing a <u>lack</u> of corrupt intent or the nonexistence of the

2    alleged pay-to-play scheme – <u>e.g.</u>, by showing that allegedly-corrupt and non-corrupt

3    developers got the same deal – that would plainly not be the government's purpose in

4    introducing parts 2 and 3 of Keller's testimony.[1]  Instead, the purpose would be to

5    connect the alleged Company M bribe to negative social consequences, thereby inviting

6    the jury to make an decision based on anger and emotion rather than fact and law.

7         As with the heat-stroke and overdose evidence in <u>Gonzales-Flores</u> and <u>Cooper</u>,

8    parts 2 and 3 of Keller's testimony have no logical bearing on the criminal elements

9    that the government will seek to prove at trial.  <u>See</u> <u>Gonzales-Flores</u>, 418 F.3d at 1098

10   ("As a logical matter, the fact that two girls in Gonzalez's group suffered heat stroke

11   does not affect the probability . . . that Gonzalez intended to violate U.S. immigration

12   law by bringing them in").  And they are exactly the type of emotional evidence that

13   could "affect adversely the jury's attitude toward [Huizar] wholly apart from its

14   judgment as to his guilt or innocence." <u>United States v. Yazzie</u>, 59 F.3d 807, 811 (9th

15   Cir. 1995).  As a result, they (and any similar testimony) should be excluded.

### CONCLUSION

17       For the reasons above, the Court should exclude evidence and argument about

18   post-offense or collateral harms, including parts 2 and 3 of Keller's testimony, as

19   irrelevant and unfairly prejudicial.

20

21

22

23

24

25

26
_____

27   [1] To the extent that Huizar offers some portion of this evidence to support an
     argument that he did not engage in the sweeping pay-to-play bribery scheme alleged in
     the FSI, he agrees that the government is entitled to a <u>fair</u> response.  But even in that

28   scenario, the Court should exclude Keller's policy opinions and testimony about
     alleged post-offense harms, which are irrelevant, prejudicial, and likely to confuse,

## GOVERNMENT OPPOSITION

### I.  INTRODUCTION

Defendant Huizar misunderstands certain facts of the testimony that the government seeks to elicit and their clear probative value.  Otherwise, there appears to be little in actual dispute between the parties as to what facts are relevant, probative, and admissible.

### II. ARGUMENT

Defendant Huizar asserts he expects the government "will seek to elicit from Keller testimony along the following lines:

1. before Jose Huizar voted to lower the affordable housing percentage on the [Mateo Project], the City had a uniform policy of requiring 11% very-low-income affordable housing on every new Arts District development;

2. Huizar's supposedly-corrupt decision to reduce the affordable housing percentage on the [Mateo Project] set a new precedent, requiring the City to extend similar terms to later Arts District developers;

3. Huizar's alleged corruption thus led directly to the City's affordable housing and homelessness problems, especially in the Arts District."

(Motion at 1.)  Defendant appears to only take issue with portions of parts 2-3, which he styles as "post-offense or collateral harms." (Motion at 1, 3.)[2]  However, the government has not stated it would seek, and will not seek, to elicit from Keller that defendant Huizar's actions related to the Mateo Project scheme "set a new precedent [related to affordable housing percentage]"[3] (Motion at 1) or that defendant's scheme "*led directly* to the City's affordable housing and homelessness problems." (Motion at

---

[2] "In principle, Huizar takes no issue with the government attempting to elicit part 1 of Keller's testimony.  He also takes no issue with Keller discussing (1) developers' general attitude toward affordable-housing covenants; (2) the history of development in the Arts district; or (3) perceived irregularities in the [Mateo Project] entitlement process."  (MIL at 1.)

[3] Confusingly, defendant Huizar later argues that *he* may intend to introduce this same evidence he now is seeking to exclude.  (MIL at 3 fn.1).  Defendant then concedes, of course, this would open the door to a "fair response" but then nevertheless attempts to limit that response along the same lines of his underlying motion.  (Id.)

4

1) (emphasis added).   Nor will the government seek to elicit "policy opinions" from Keller on this point.  (Motion at 3 fn.1.)

As relevant to this Motion, what the government <u>will</u> seek to introduce through Keller (and any other competent witness) are the following topics, which defendant appears to largely concede are relevant, probative, and not unduly prejudicial:

a.      At the time the Mateo Project was being approved, the City uniformly imposed a requirement on development projects in the Arts District to include 11% "Very Low Income" affordable housing units.  Carmel Partners sought to reduce not only the required quantity of these units (from 11% down to 5%), but also to modify the type of the units (from "Very Low Income" to "Moderate Income") so that the Mateo Project would be more financially profitable. [4]

b.      As part of the Mateo Project scheme, defendant Huizar solicited things of value and bribes, including through Carmel Partners lobbyist Morrie Goldman and a Carmel Partners executive, to defendant Huizar in exchange for his approval of the Mateo Project with the company's requested modifications, including to the affordable housing requirement.  Defendant Huizar voted in PLUM and City Council to approve an affordable housing condition under which the Mateo Project was required to have only 6% "Moderate Income" units, instead of 11% "Very Low Income" units.

c.      Defendant Huizar's approval of this modification objectively decreased low-income individuals' access to housing in the project, while providing an estimated $14 million to $15 million in a financial boon to Carmel Partners.

The government will <u>not</u> argue that Carmel Partners, the Mateo Project, or defendant Huizar created the homelessness crisis in Downtown Los Angeles or the Arts District or that they were the primary drivers of its worsening and current epidemic-like state.  The government will, however, establish the objective and undisputed fact that

---

[4] By increasing the income threshold level that a potential resident would qualify for the affordable housing unit, the financial loss to Carmel Partners would be <u>reduced</u> <u>and thereby be less costly to the company.</u>

5

1   the Mateo Project's requested modifications (as approved by Huizar) were less

2   beneficial to those seeking affordable housing by decreasing the number of available

3   units and increasing the minimum income level for eligibility.   This noncontroversial

4   conclusion is patently relevant to defendant Huizar's motive and leverage for the

5   scheme, as well as to Carmel Partners' incentive and plan to provide defendant

6   Huizar's requested bribes and related solicitations.

7          Specifically, the government expects to argue that given what defendant Huizar

8   concedes is the "great[] political saliency [of] housing affordability" (Motion at 1),

9   defendant Huizar had a substantial and unique political, reputational, and policy interest

10  in taking official acts to <u>benefit</u> (or at least not harm) housing affordability in his

11  district.  Put another way, as will be presented at trial, it would be a "heavy lift" to

12  convince defendant Huizar to take actions that were adverse to homelessness – an issue

13  central to his campaigns.  (<u>See attached</u> Trial Ex. 876B [8/14/2018 Zeff-Goldman text

14  message] (Goldman noting that ***"[i]t is the hit [Huizar] will take with housing***

15  ***advocates and the LA Times***") (emphasis added).)  The "hit" was even more apparent,

16  given that another City entity (the City Planning Commission) had <u>already endorsed the</u>

17  <u>requirements that were more advantageous to affordable housing</u> and thereby shining a

18  spotlight on defendant Huizar as the central City official who was proactively

19  undermining that broadly supported City and public goal.  Such evidence is thus highly

20  probative of defendant Huizar's criminal motive and corrupt intent.  Indeed, the

21  government presented similar evidence of defendant's Huizar's motive, intent, and

22  <u>modus operandi</u> in the David Lee/940 Hill trial.  There, defendant Huizar's political

23  support of labor unions was a central issue, and there was evidence presented that

24  defendant Huizar used his political support as leverage to solicit and negotiate a bribe

25  in exchange for taking action that would appear contrary to his stated policies and

26  public perception (there, his support of unions).

27          The same theory of defendant Huizar's motive and leverage applies to the Mateo

28  Project scheme.  Indeed, it is even more relevant here, where, unlike in Lee/940 Hill

1    when defendant Huizar secretly resolved the CREED appeal issue by using his proxies,

2    for the Mateo Project, he had to go on record and vote in a manner adverse to

3    affordable housing and for the financial benefit of Carmel Partners.  In so doing,

4    defendant Huizar put himself in a disfavored position with many of his constituents and

5    opened himself up to enhanced political attack.  This reality provided defendant Huizar

6    more leverage and motive to solicit a significant bribe from those pushing him to take

7    on this political and personal risk.

8                                        **III. OPENING THE DOOR**

9         As stated above, the government only intends to introduce limited evidence and

10   make tailored arguments regarding the evolution of the affordable housing

11   requirements attached to the Mateo Project and how they provided leverage for

12   defendant Huizar to request bribes and incentivized Carmel Partners to provide them.

13   However, if defendant argues or suggests either to the jury in opening statement or

14   during questioning of government or defense witnesses that the project was

15   "universally loved" or "checked all of the boxes"[5] or other arguments seeking to

16   generate jury sympathy or affinity for Carmel Partners/the Mateo Project, this will

17   fairly open the door to contrary testimony.  Specifically, the government believes this

18   will open the door to what defendant now seeks to exclude, namely, post-offense and

19   collateral harms demonstrating that the Mateo Project, notwithstanding any of its

20   legitimate benefits, was not "universally loved or "checked all the boxes."  For most

21   any major project in Downtown L.A. during this time, there were legitimate opponents

22   and concerns, for example, related to limitations on affordable housing, effects on

23   gentrification and pricing out of other residents, union opposition, and the negative

24   impacts it would have on the neighborhood, including based on the sheer size of the

25   project and thus its impact on traffic, parking, etc.  This testimony is already relevant

26   and probative for the same reasons related to defendant Huizar's motive to solicit a

27   _____

28        [5] These specific arguments were made liberally in the Shen Zhen New World
     trial in this matter, and similar arguments were made in the Lee/940 Hill trial.

                                              7

bribe and Carmel Partners' incentive to bribe; but it would go from probative to
necessary to correct the incomplete and false impression of an altruistic project
benefiting all community members and Arts District stakeholders and one utterly
without contrary views.

8

1

**DEFENSE REPLY**

2          Huizar believes that the existing briefing adequately frames this issue for

3    decision; he will not belabor the point other than to say that: (1) it appears from the

4    Opposition that the government very much intends to run its trial strategy along the

5    third rail of local politics; (2) opening the door does not invite any response

6    whatsoever, especially not an inflammatory one, but instead requires evidence that

7    logically contradicts the point being made.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### DECLARATION OF CHARLES J. SNYDER

I, Charles J. Snyder, declare as follows:

1. I am a California-licensed DFPD appointed to represent Jose Huizar in this matter.  Unless otherwise stated, I make this declaration based on personal knowledge and, if called as a witness, would attest to its contents under oath.

2. I have attached as Exhibit 1 the government's first expert notice, in which it states that Kevin Keller will testify consistently with his May 7, 2020 FD-302.

3. I have attached as Exhibit 2 Kevin Keller's May 7, 2020 FD-302.

4. In response to the Court's repeatedly-expressed concerns about voluminous briefing, both sides agreed to a five-page limit on in limines.  That limit necessarily requires that larger and/or recurring issues (like evidence and argument about post-offense or collateral harms) be addressed through illustrative examples (like Keller's anticipated testimony).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  Executed October 31, 2022 at Los Angeles, California.

/s/ Charles J. Snyder
Charles J. Snyder

1