# EXHIBIT 2

# FEDERAL BUREAU OF INVESTIGATION

Date of entry  05/26/2020

On May 7, 2020, KEVIN KELLER was interviewed by video conference by FBI Special Agent Andrew Civetti and Robert Logan. Also present in the video interview conference was Los Angeles City Attorney Strefan Fauble, Assistant United States Attorney ("AUSA") Mack Jenkins and AUSA Veronica Dragalin. After being advised of the identity of the interviewing Agents and the nature of the interview, KELLER provided the following information:

*[Agent Note: Prior to the interview KELLER was advised that the interview was voluntary. KELLER was instructed that he could end the interview at any time and that he had the right to consult with his attorney. KELLER was advised that lying to the FBI was a federal offense and that lying included omitting information. KELLER affirmatively acknowledged he understood all of these admonishments and that he must be completely truthful.]*

**The below names and topics were discussed during the recording. This report is not intended to be a verbatim account of the recording and does not memorialize all statements made during the recording. The recording captured the actual words spoken. The original recording is being maintained in the ELSUR section of case file 194B-LA-255905, 1D394.**

## BACKGROUND

KELLER worked for the City of Los Angeles ("the City") for twenty years. KELLER started at the Los Angeles Department of City Planning ("DCP") in 1999 as a Planning Deputy. KELLER raised through the ranks and was currently the Executive Officer ("EO"). The Executive Officer was the second in charge and reported directly to the Director of DCP. In 2003, KELLER left DCP and worked for Council District 11 Councilmember CINDY MISCIKOWSKI as Director of Planning. In 2005, KELLER went back to DCP and worked specifically on LA Live and the Sports and Entertainment District [South Downtown Los Angeles]. KELLER went on to supervise the City Planning Commission ("CPC"). In 2013,

---

Investigation on  05/07/2020  at  Los Angeles, California, United States (Phone)

File #  194B-LA-255905                                            Date drafted  05/07/2020

by  Andrew R. Civetti, LOGAN ROBERT ANTHONY

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

KELLER left DCP again and worked for Mayor ERIC GARCETTO as the in-house Planning Advisor. In 2016, KELLER returned to DCP as Deputy Director of Long-Range Planning. In 2017, KELLER became the Executive Office and held that position to at least the time of the interview.

KELLER's responsibilities as EO included overseeing all internal operations. The Director of DCP focused externally, while the EO maintained the day to day operations of DCP. KELLER had four Deputy Directors that directly reported to KELLER. KELLER was familiar with CPC and the Planning and Land Use Management Committee ("PLUM"). KELLER's responsibility was "nothing and everything."

All City departments had a Director or General Manager that was appointed by the Mayor. These positions reported directly to the Mayor. The Mayor had the authority over land-use; however, the City Council was the legislative body that approved changes to land-use. City Council did not control the budget for Planning and although City Council was a part of the planning process, DCP did not report directly to City Council. City Council made decisions to approve or not approve projects, but they did not oversee the operations of DCP which was left to the Mayor's office.

Because the General Manager (LADBS), Director (DCP), and CPC commissioners were appointed by the Mayor, the Mayor's office had leverage on these positions. Each administration handled things different; however, it was understood that the Mayor's office could influence these departments/individuals. Under GARCETTI, it was rare to tell a commission how to vote, but the practice would be to say "the Mayor highly supports this project" or "the Mayor believes this project is strong for the community" which meant that the project needed to be approved. The most leverage was from the Mayor's office on the CPC.

**DEVELOPMENT PROCESS**

Development depended on the zoning and General Plan for a lot. Some development was "by-right" and did not require DCP process. These developments went straight to the Los Angeles Department of Building and Safety ("LADBS"). Example, a residential lot zoned for a residential property and included in the General Plan as a residential property, would not need to go through the DCP process. However, there were thresholds that

194B-LA-255905

Continuation of FD-302 of  (U) 05/07/2020_Kevin Keller  , On  05/07/2020  , Page  3 of 10

automatically initiated the DCP process regardless if a lot was by-right. One of these thresholds was the number of units. If a development was over 50 units (even by-right), this project had to be reviewed by DCP. Some of the other thresholds included historical districts or special designations as outlined in the General Plan.

Other development projects that were not by-right were designated as "relief." The project required some type of "change" that was not allowed by the zone ordinance and General Plan. This could include entitlements, variances, zone change, etc. Relief projects were required to go through the DCP process and were reviewed by a Zoning Administrator ("ZA"). The ZA was a DCP staff position. The ZA was an "elite position" and was quasi-judicial. The ZA did not deal with the public and had the authority to approve some reliefs. The ZA reported to CPC and ultimately City Council. The ZA could approve small scale reliefs.

Larger relief required a more extensive DCP process. Developments that needed zone changes and General Plan Amendments required multiple approvals including ZA, CPC, PLUM, and City Council. This process was necessary for projects seeking Transfer of Floor Area Rights ("TFAR"). General Plan Amendments were needed for any zone changes. California adopted General Plans to prevent "spot zoning." CARMEL PARTNER's Mateo Project was an example of a project that required a General Plan Amendment because they wanted to change an industrial district to include residential. General Plans and Community Plans were the same. The City had thirty-five community plans. Plan amendments were only initiated by a motion from City Council or the Director of Planning.

**JOSE HUIZAR | PLUM**

KELLER knew HUIZAR professionally and had no personal relationship with HUIZAR. KELLER attended PLUM meetings every Tuesday. While HUIZAR was the chairman of PLUM, KELLER interacted with HUIZAR regularly during PLUM. From a land-use policy perspective, HUIZAR was a strong leader. Most if not all projects that were approved by PLUM were also approved by DCP.

KELLER occasionally attended meetings at HUIZAR's office with HUIZAR's Planning Deputy, SHAWN KUK, and Chief of Staff, PAUL HABIB. There was sometimes friction between the Council office and Mayor's office because of

designation of authority. Council did not oversee DCP and therefore there was sometimes "drama" between Council and the Mayor's office.

There were some occasions in which KELLER wondered why a project was not moving forward. PLUM "green lit" or "red lit" projects and some projects DCP approved were stalled or not presented and it would "raise eyebrows" for KELLER. PLUM had the authority to modify or change the dials on a project from what CPC approved. DCP's role at PLUM was to present what CPC approved. DCP did not attend PLUM to provide additional opinions outside of what CPC already approved. "Everything was on the table for PLUM to change." It was however rare to see PLUM make large changes to CPC's approval. DAVID AMBROZ always denied signage, so it was typically that PLUM modified signage decisions.

The PLUM agenda was set by the chairperson of PLUM. For the most part projects moved forward and were scheduled regularly. Because there are always new projects, the process preformed like a conveyor belt. There was one occasion prior to the FBI executing search warrants, that KUK made a concerning request to DCP. KUK requested a list of all projects pending commission hearings. DCP never provided the list. The request was "different and caught people's eyes." The request concerned KELLER because the list could be used to harass people to donate to a campaign or non-profit as a behest payment from the councilmember. This list could be turned into an e-mail blast and people would feel compelled to donate because they had projects pending. CRAIG WEBER ("CRAIG") was also concerned. KELLER believed he had an e-mail with CRAIG regarding the request and subsequent concerns.

**MATEO**

The Mateo project was especially irritating to KELLER because it undermined the DCP's efforts related to affordable housing. During the PLUM hearing for Mateo, KELLER leaned over to his associate, LISA WEBER ("LISA"), and said, "I want to talk to the LA Times." LISA responded, "everyone will have their day." During the hearing, HUIZAR changed the affordable housing from 11% to 6% and did so "very quietly." The Mateo project needed a General Plan Amendment because they wanted to include residential living in an industrial zone. This was a good idea and not a problem from a planning perspective, but Mateo previously agreed to the 11% and not it was suddenly changed during PLUM with a letter from CARMEL PARTNERS that was incorporated into

the ruling. The letter changed the 11% low income housing, to 6% moderate income housing. This change provided an approximate $15 million benefit to CARMEL PARTNERS.

Measure JJJ required affordable housing for any General Plan Amendment. There were approximately sixteen projects seeking a similar General Plan Amendment. Each project had to be dealt with separately, but DCP preemptively coordinated with each project to agree to 11%. The Mateo PLUM hearing undermined the work that DCP did coordinating with each project despite CARMEL PARTNERS previous agreement to the 11%. This change was a "significant lose for Planning" and impacted other projects who also previously agreed to the 11%. Mateo was seen as having received a deal despite DCP enforcing the 11% guideline across the board. This was bad policy and a large monetary value.

CARMEL PARTNERS had a "labor strife" related to their Cumulus project. CARMEL PARTNERS was worried that the labor union issues would affect Mateo. CARMEL PARTNERS wanted the Mateo approval to happen as quickly as possible. It was not uncommon for high-rise buildings to have labor agreements. It was typical for the City to hold things to have developers work with unions. California Environmental Quality Act ("CEQA") law suits were used as leverage from labor unions. City Council was generally pro-labor, but the leverage was from the unions to stall projects with appeals.

**HAZENS**

HAZENS owned the LUXE HOTEL and wanted to redevelop the property. The project requested TFAR. TFAR dated backed to an ordinance from the 70s/80s. The floor area ratio at the time was determined to be 13:1. In 1989 the City Redevelopment Agency ("CRA") changed the ratio to 6:1 which ultimately did not allow much development. The City plan still maintained 13:1 which is the most density possible and is still the standard. However, without TFAR, a project must adhere to the 6:1 ratio. The TFAR ordinance allows a development to purchase "area rights" from another property (primarily the Convention Center). In 2012, Wilshire Grand was the first project to use the TFAR ordinance.

The payment for this purchase is a calculation dependent on the value of the property and the square footage. The payment also includes a public benefit

component. The cost is $5.00/square foot and relays heavily on the developer reporting the correct square footage. The value of the property can be determined by the sale price if done in the last eighteen months or an appraisal. The payment is typically provided 50% for in-kind provisions (on site items) and 50% to a City trust account. Developers typically did not care how the money was spent from the City trust account, but Council offices really wanted to be in control of that money to receive the credit how the money is spent.

HAZENS had an issue with their TFAR calculation because the value of the property included a pre-existing hotel that HAZENS planned to redevelop. TFAR calculations for other developers were usually based off a parking lot or empty lot that did not include an existing building. KELLER was involved to determine how the calculation should be computed. KELLER orchestrated a separate appraisal completed by a third party and paid by HAZENS. This appraisal was used to calculate the TFAR.

KELLER met the chairman of HAZENS on at least a few occasion. RAYMOND CHAN arranged a lunch with the chairman and KELLER. KELLER worked for the Mayor's office at the time. The lunch was a "bizarre meeting." A translator was present because the chairman did not speak English. KELLER expressed that the Mayor's office was excited about the project. The assumption for the Chinese was that the Mayor's office was royalty and the ultimately decision makers, which was not true. CHAN was a proponent for the project to include three towers and was disappointed when it was changed to two towers. During the lunch, the chairman stated he had a billion dollars worth of development in China and now wanted to commit to LA. The chairman really wanted to meet the Mayor. There was a June 2016 follow-up meeting with the chairman and the Mayor. KELLER believe the initial lunch was coordinated by CHAN to drag KELLER to set up the meeting with the Mayor for the chairman. Normally KELLER would say no, but the Mayor did take meetings with GREENLAND and HAZENS.

In addition to the lunch, there was a May 2016 dinner with the chairman and CHAN at a Chinese restaurant. KELLER normally did not do these types of dinner. The dinner was much more elaborate they KELLER anticipated. There was a "bizarre" Chinese alcohol that KELLER took a small drink to not be rude. KELLER felt he "stepped into a different world" and "what am I doing in this situation." Also present was recently retired LADBS employee,

LINCOLN LEE, and Public Works Commissioner JOEL JACINTO. Around this time, CHAN invited JACINTO to attend development meetings with all departments related to projects. JACINTO's attendance was a "departure from the past." Also present at the dinner may have been JOHN VIDOVICH. VIDOVICH was retired or removed from the fire department. KELELR did not fully understand the purpose of the dinner, but it seemed to be CHAN's way of telling the chairman "look at who we all know and who all is here." An additional dinner may have occurred with CHAN, LEE, and the chairman. KELLER did not recall the point of the dinner, but it seemed to be CHAN's why of showing off who he knew in the City.

**RAYMOND CHAN**

KELLER held CHAN in the highest regard and had a lot of respect for CHAN. KELLER met CHAN in 2013 around the time that LADBS and DCP were in the process of merging. Former Mayor ANTONIO VILLARAIGOSA wanted to merge the two departments. MICHAEL LOGRANDE, former Director of DCP, wanted the merger to happen and CHAN was very against the merger. When GARCETTI was elected as Mayor and said he did not want the merger to occurred, CHAN seemed very relieved. CHAN was then appointed General Manager of LADBS. Had the departments been merged, it was expected that LOGRANDE would be appointed General Manager of the new department. KELLER did not know what CHAN would have done, but it would not be longer than necessary that CHAN would find a new job. By preserving the two departments, CHAN confirmed his role as General Manager. CHAN and LOGRANDE did not like each other. KELLER also had friction with LOGRANDE it was for this reason that KELLER initially took the job in the Mayor's office.

CHAN had a close relationship with HUIZAR. CHAN told KELLER, until the departments were potentially merging, CHAN was never political. Because of the proposed merger, CHAN told KELLER he had to get to know PLUM so that he could explain LADBS's purpose. HUIZAR did not speak Chinese and KELLER assumed it was CHAN that interacted between HUIZAR and the Chinese developers. CHAN was interested in bringing Chinese developers into the City. KELLER never thought it was CHAN's personal game, but that it was in the best interest of City development to have Chinese investments. On one occasion while having drinks, CHAN told KELLER that he joined the Hong Kong Chamber of Commerce and the government flew CHAN back between the USA and China to attract development to Los Angeles. The relationship between the

City and China seemed to be CHAN's focus and skill.

The Mayor's office appreciated CHAN early on because he had a well-run department. CHAN had an understanding for economic development and saw a revenue source for the City. Around 2014 or 2015, there was a huge rush of Chinese investment. CHAN emerged as the natural one to dialogue with the Chinese. CHAN spoke Mandarin and helped facilitate discussions with the Chinese companies. GREENLAND and OCEANWIDE were two of the first Chinese developers in Los Angeles. GREENLAND and OCEANWIDE were projects that brought in a lot of money for sites that DCP wanted developed.

KELLER did not believe he interacted with CHAN regarding HAZENS project while CHAN was at LADBS. HAZENS project was a DCP issue so it did not seem normal for CHAN to be involved. KELLER knew that CHAN had dialogue with HAZENS's chairman. CHAN hosted dinners/events constantly with the Chinese developers that seemed like "ceremonial meetings" that KELLER attended. In China the Mayor's office ran everything, so when the Chinese companies came to Los Angeles, there was a large emphasis on obtaining meetings with the Mayor. The companies did not understand that it was DCP and City Council with the authority to approve projects.

When CHAN was Deputy Mayor, CHAN was a big proponent of HAZENS's project. CHAN focused a lot on the planning side. CHAN called KELLER on at least five occasions "behind the scenes" to get information on TFAR and CEQA. CHAN also called KELLER about digital signage and KELLER told CHAN he could not be boasting about signs or telling developers they could have signs. KUK discussed signage at one point and if the City wanted to do revenue sharing. KELLER instructed KUK that DCP did not do revenue sharing and it should not occur from a policy standpoint. Signage was a big deal what KELLER told CHAN to not get involved with. HAZENS decided to pull their signage in PLUM which was baffling to KELLER. It was very odd that HAZENS dropped the signage last minute even though it was approved in CPC.

KELLER would be very concerned and surprised to hear if CHAN had an agreement with these projects to be paid after he left the City. To have any sort of agreement is not okay. An individual could not negotiate their next position when holding a City position because of a conflict of interest. If a developer had pending work and an agreement with a City official to pay them after the official left the City, it would make the official more

inclined to help that developers project. Any such arrangement would be very troublesome. KELLER understand there were City ethics rules that prohibited this behavior and City officials were required to complete Form 700s and received training. City officials also had a one year cooling off period that prohibited them from working on anything with the City.

**SHENZHEN NEW WORLD**

Around August 2016, KELLER recalled at least one meeting with the Chairman of SHENZHEN NEW WORLD, HUIZAR, and CHAN. It was "pretty rare" to have the General Manager of LADBS, Director of Planning and the Councilmember all present. This type of meeting was not completely unheard of, but it was a big deal. This meeting was very ceremonial in nature. The meeting was arranged by CHAN. KELLER described the meeting as "bizarre."

The chairman of SHENZHEN NEW WORLD wanted to build the tallest tower in the City. The land-use attorney from the project was from out of town and not local. The attorney did not know what they were doing. For a project of this scale it was odd that the normal experienced land-use attorneys were not involved. KELLER recalled thinking it was a great project but the developer did not know what they were doing. KELLER offered to do a follow-up meeting, but KELLER did not believe the developer ever followed through or that anything happened with the project.

On at least one occasion, KELLER had drinks with CHAN had SHENZHEN NEW WORLD's hotel on Figueroa. There was no one in the hotel and it seemed to be running as a Chinese dormitory. The whole thing seemed strange. KELLER did not know what relationship existed between CHAN and SHENZHEN NEW WORLD.

**COMPLAINT**

KELLER received a TFAR application that seemed to have the form changed. The square footage for the TFAR calculation was not reported correctly. RYAN LEADERMAN was the land-use attorney for the project (1045 S Olive). LEADERMAN use to work for JERRY NEUMAN. DCP went back and checked a number of projects to ensure TFAR was calculated correctly. DCP identified four projects that seemed to have discrepancies, 1) 1045 S Oliver, 2) 850 S Hill, 3) 744 S. Figueroa, 4) 1020 S. Figueroa.

**FBI INVESTIGATION**

194B-LA-255905

Continuation of FD-302 of  (U) 05/07/2020_Kevin Keller  , On  05/07/2020  , Page  10 of 10


KELLER agreed not to disclose the contents of the interview to anyone. KELLER had not spoken to CHAN for quite some time. KELLER met with CHAN around January 2020 to catch up. CHAN said he was very happy and had a new grandson. KELLER and CHAN did not talk about work or the investigation.