E. MARTIN ESTRADA
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MACK E. JENKINS (Cal. Bar No. 242101)
Assistant United States Attorney
Chief, Public Corruption & Civil Rights Section
CASSIE D. PALMER (Cal. Bar No. 268383)
SUSAN S. HAR (Cal Bar. No. 301924)
BRIAN R. FAERSTEIN (Cal Bar No. 274850)
Assistant United States Attorneys
Public Corruption & Civil Rights Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2091/0363/3289/3819
     Facsimile: (213) 894-6436
     E-mail:    Mack.Jenkins@usdoj.gov
                Cassie.Palmer@usdoj.gov
                Susan.Har@usdoj.gov
                Brian.Faerstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                  UNITED STATES DISTRICT COURT

            FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 2:20-CR-326(A)-JFW-1, 2 |
|---|---|
| Plaintiff, | JOINT STATEMENT RE: DISPUTED JUROR QUESTIONNAIRES; EXHIBITS A-C |
| v. | Trial Date: February 21, 2023 |
| JOSÉ LUIS HUIZAR, RAYMOND SHE WAH CHAN, aka "She Wah Kwong," | Trial Time: 8:00 a.m. Location: Courtroom of the Hon. of the Hon. John F. Walter |
| Defendants. | |

     Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California and Assistant United States Attorneys Mack E. Jenkins,

Cassie D. Palmer, Susan S. Har, and Brian R. Faerstein, and defendant

JOSÉ LUIS HUIZAR, by and through his counsel of record, hereby submit

a Joint Statement Re: Disputed Juror Questionnaires, pursuant to the

1    Court's order during the hearing held on December 16, 2022 in this

2    proceeding.

3        The parties have met and conferred regarding a potential

4    stipulated proposed juror questionnaire and have not reached

5    agreement on a joint approach.  Attached as exhibits are the parties'

6    respective proposed juror questionnaires.  In this filing, the

7    parties also set forth their respective positions with respect to the

8    use of a juror questionnaire at trial in this case.  First, the

9    government provides its position with respect to defendant Huizar's

10   proposed juror questionnaire, which is attached hereto as Exhibit B.

11   Second, defendant Huizar provides his position with respect to the

12   government's proposed juror questionnaire, which is attached hereto

13   as Exhibit A.

14       Counsel for the government contacted counsel to defendant Chan

15   by email to inquire whether defendant Chan would be taking a position

16   with respect to the use of a juror questionnaire in this case.

17   Defendant Chan's counsel responded by email with objections to

18   several of the questions included in defendant Huizar's proposed

19   juror questionnaire.  The parties' email correspondence, including

20   defendant Chan's objections, is attached hereto as Exhibit C.

21   //

22   //

23   //

24

25

26

27

28

1    The parties respectfully reserve the right to modify the

2    attached proposed juror questionnaires as needed.

3    Dated: December 23, 2022          Respectfully submitted,

4                                      E. MARTIN ESTRADA
                                       United States Attorney
5
                                       SCOTT M. GARRINGER
6                                      Assistant United States Attorney
                                       Chief, Criminal Division
7

8                                             /s/
                                       _____
9                                      MACK E. JENKINS
                                       CASSIE D. PALMER
                                       SUSAN S. HAR
10                                     BRIAN R. FAERSTEIN
                                       Assistant United States Attorneys
11
                                       Attorneys for Plaintiff
12                                     UNITED STATES OF AMERICA

13

14
     Dated: December 23, 2022            /s/ with email authorization
15                                     _____
                                       CAREL ALÉ
16                                     CHARLES J. SNYDER
                                       ADAM OLIN
17                                     Deputy Federal Public Defenders
                                       Attorneys for Defendant
18                                     JOSÉ LUIS HUIZAR

19

20

21

22

23

24

25

26

27

28

                                      3

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES...............................................ii

TABLE OF EXHIBITS...................................................v

GOVERNMENT'S POSITION...............................................1

    A.   The Court Has Broad Discretion in Conducting Voir Dire....1

    B.   Defendant Huizar's Proposed Questionnaire Is Unduly
        Complicated and Overbroad, and Poses Irrelevant
        Questions.................................................4

    C.   Defendant Huizar Will Have an Opportunity to Propose
        Voir Dire Questions Through the Court's Pre-Trial
        Schedule..................................................5

DEFENDANT JOSE HUIZAR'S POSITION....................................7

    A.   The Pretrial Publicity Relating to this Case Demands
        "Great Care" During Voir Dire............................7

    B.   The Jury Questionnaire is the Most Efficient Means of
        Determining a Juror's Exposure to Pretrial Publicity.....13

    C.   The Trial's Subject Matter Creates "a Real Possibility
        of Prejudice" and Therefore Requires "Specific Voir
        Dire Questioning."......................................17

    D.   Huizar has No Objections to the Government's Proposed
        Hardship Questions......................................22

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Coppedge v. United States*,
    272 F.2d 504 (D.C. Cir. 1959) ..................................... 8

Dennis v. United States,
    339 U.S. 162 (1950) ............................................. 7

In re Sittenfeld,
    49 F.4th 1061 (6th Cir. 2022) .................................. 18

Irvin v. Dowd,
    366 U.S. 717 (1961) ............................................ 13

Mu'Min v. Virginia,
    500 U.S. 415 (1991) ......................................... 2, 15

Paine v. City of Lompoc,
    160 F.3d 562 (9th Cir. 1998) ................................... 14

Pena-Rodriguez v. Colorado,
    137 S. Ct. 855 (2017) .......................................... 20

Rosales-Lopez v. United States,
    451 U.S. 182 (1981) ............................................. 2

Silverthorne v. United States,
    400 F.2d 627 (9th Cir. 1968) .............................. passim

Skilling v. United States,
    561 U.S. 358 (2010) ..................................... 2, 14, 15

United States v. Bakker,
    925 F.2d 728 (4th Cir. 1991) ............................. 2, 3, 4

United States v. Bonds,
    3:07-cr-00732-SI, Dkt. 304 (N.D. Cal. 2011) ................... 15

United States v. Chaudhry,
    No. C 03-40210 SBA, 2008 WL 2128197 (N.D. Cal. May 20, 2008) ...... 3

United States v. Giese,
    597 F.2d 1170 (9th Cir. 1979) ............................... 8, 13

United States v. Harding,
    273 F. Supp. 2d 411 (S.D.N.Y. 2003) ................................ 4

United States v. Inzunza,
    No. 03cr2434 JM, 2005 WL 8160881 (S.D. Cal. 2005) ........... 15, 16

United States v. Jones,
    722 F.2d 528 (9th Cir. 1983) ............................ 17, 19, 20

United States v. Montes,
    No. 5:12CR29-01-02, 2013 WL 1347284 (N.D. W.Va. Apr. 3, 2013) ..... 4

United States v. Padilla-Valenzuela,
    896 F. Supp. 968 (D. Az. 1995) ................................... 4

United States v. Phibbs,
    999 F.2d 1053 (6th Cir. 1993) ................................ 3, 15

United States v. Polizzi,
    500 F.2d 856 (9th Cir. 1974) ............................. 7, 8, 14

United States v. Powell,
    932 F.2d 1337 (9th Cir. 1991) ................................. 2, 5

United States v. Menendez,
    2:15-cr-00155-WHW, Dkt. 198 (D.N.J. 2017) ....................... 15

United States v. Salameh,
    No. S5 93 Cr. (KTD), 1993 WL 364486 (S.D.N.Y. Sept. 15, 1993) ..... 4

United States v. Shabazz,
    No. CR 97-183-FR, 1998 WL 744057 (D. Ore. Oct. 21, 1998) ......... 3

United States v. Silver,
    1:15-cr-00093-VEC, Dkt. 380 (S.D.N.Y. 2018) ..................... 15

United States v. Singh,
    No. 3:13-cr-0117-LRH-VPC, 2016 WL 6542829 (D. Nev. Nov. 2, 2016) .. 3

United States v. Skelos,
    1:15-cr-00317-KMW, Dkt. 329 (S.D.N.Y. 2018) ..................... 15

United States v. Taylor,
    No. CR-99-3023-MWB, 1999 WL 33656900 (N.D. Iowa Nov. 16, 1999) .... 4

United States v. Toomey,
    764 F.2d 678 (9th Cir. 1985) ............................ 17, 18, 20

<u>United States v. Tsarnaev</u>,
    142 S. Ct. 1024 (2022) ............................................ 16

<u>United States v. Waters</u>,
    627 F.3d 345 (9th Cir. 2010) .................................... 16

**<u>Rules</u>**

Fed. R. Crim. P. 24 ............................................. 2, 6

**TABLE OF EXHIBITS**

| Exhibit | Description | Cite(s) |
|:---:|:---|:---|
| A | Government's Proposed Juror Questionnaire | Pgs. 1:2-16; 22:5-8 |
| B | Defendant Huizar's Proposed Juror Questionnaire | Pgs. 1:17-19; 4:9 – 5:19 |
| C | Email correspondence between the parties from 12/21/22 through 12/23/22 regarding proposed juror questionnaires | Pgs. 5:3-5 |

1

**GOVERNMENT'S POSITION**

2       Consistent with the Court's instruction at the December 16, 2022

3  hearing, the government has attached as Exhibit A a proposed juror

4  questionnaire narrowly tailored to address potential hardships of

5  prospective jurors.[1]

6       During the December 16 hearing, defendants José Luis Huizar

7  ("Huizar") and Raymond She Wah Chan ("Chan") objected to the Court's

8  proposed inclusion of a time qualifying inquiry in the jury summons

9  sent to prospective jurors.  Given the lack of this initial screening

10 measure and the Court's stated intent to employ a brief questionnaire

11 to address hardships that a prospective juror might face due to the

12 estimated length of the trial in this case to avoid wasting the

13 jurors', Court's, and parties' time during the selection process, the

14 government's proposed questionnaire (Exhibit A) will assist the Court

15 in efficiently and effectively identifying jurors whose current

16 circumstances prevent them from serving on the jury.[2]

17      The government objects to the more expansive 11-page juror

18 questionnaire proposed by defendant Huizar (attached as Exhibit B)

19 for the following reasons.

20    **A.   The Court Has Broad Discretion in Conducting Voir Dire**

21      This Court has already successfully and efficiently empaneled

22 two juries (including six alternates for each) in this matter for two

23

24      [1] The government has highlighted in Exhibit A the date and time
   estimates for trial, with the expectation that the parties and the
25 Court will firm up these estimates closer to trial.

26      [2] The government believes the time qualifying inquiry would have
   been sufficient, as an initial measure, to exclude prospective jurors
27 who have serious hardships or time conflicts.  The government thus
   notes for the record its general objection to the use of a juror
28 questionnaire in this case as explained herein.  Given the Court's
   preference to vet hardships initially through a brief questionnaire,
   the government proposes Exhibit A notwithstanding its objection.

trials that focused on charges stemming from the corrupt conduct of defendant Huizar; neither required the use of a lengthy juror questionnaire.  Federal Rule of Criminal Procedure 24, which governs the examination and selection of trial jurors, affords trial courts broad discretion in the conduct of voir dire.  As the Supreme Court has long recognized, "[b]ecause the obligation to impanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct the voir dire."  Rosales-Lopez v. United States, 451 U.S. 182, 189 (1981) (plurality opinion); see also Mu'Min v. Virginia, 500 U.S. 415, 427 (1991) ("[O]ur own cases have stressed the wide discretion granted to the trial court in conducting voir dire in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias."); Skilling v. United States, 561 U.S. 358, 386 (2010) ("Jury selection, we have repeatedly emphasized, is particularly within the province of the trial judge.") (cleaned up).  In fulfilling this broad mandate, "[i]t is wholly within the judge's discretion to reject supplemental questions proposed by counsel if the voir dire is otherwise reasonably sufficient to test the jury for bias or partiality."  United States v. Powell, 932 F.2d 1337, 1340 (9th Cir. 1991).

A criminal defendant has no right to a written juror questionnaire, and circuit courts have affirmed the broad discretion afforded trial judges in denying requests for written questionnaires.  For example, in United States v. Bakker, 925 F.2d 728 (4th Cir. 1991), a fraud prosecution against a well-known "televangelist" with substantial pretrial publicity, the Fourth Circuit affirmed the

district court's refusal to employ a juror questionnaire prepared and requested by the defendant. Id. at 733-34. Recognizing the "trial court has broad discretion to control the scope of questions during voir dire," the court found "the questionnaire was concerned less with ensuring an impartial jury and more with ensuring a jury inclined to acquit." Id. The court also observed that "quite a few of the court's questions during voir dire did come from the written questionnaire submitted by" the defendant such that he "had an opportunity to acquire much of the information he sought." Id. at 734.

Similarly, in United States v. Phibbs, 999 F.2d 1053 (6th Cir. 1993), the Sixth Circuit rejected the defendant's claim that a "written questionnaire created by defendants was necessary to ferret out those prospective jurors whose biases would not be revealed through a collective examination." Id. at 1071. Affirming the lower court's denial of the requested questionnaire, the court found that while information sought by the defendants in the questionnaire "might have aided defendants in identifying sympathetic jurors, it was not needed to compose a fair-minded jury." Id. at 1071-72.

District courts within the Ninth Circuit similarly have exercised their "ample discretion" in denying criminal defendants' requests for written questionnaires. See, e.g., United States v. Singh, No. 3:13-cr-0117-LRH-VPC, 2016 WL 6542829, at *2 (D. Nev. Nov. 2, 2016) (denying questionnaire where the court's "standard voir dire practice will provide sufficient constitutional safeguards to ensure that a fair and impartial jury is selected"); United States v. Chaudhry, No. C 03-40210 SBA, 2008 WL 2128197, at *25 (N.D. Cal. May 20, 2008) (denying questionnaire "as an inefficient method of voir dire"); United States v. Shabazz, No. CR 97-183-FR, 1998 WL 744057,

1  at *1 (D. Ore. Oct. 21, 1998) (denying questionnaire where the "court

2  will inquire as to the general bias of the jurors during voir dire

3  examination"); <u>United States v. Padilla-Valenzuela</u>, 896 F. Supp. 968,

4  972 (D. Az. 1995) (denying questionnaire that was both "unduly

5  invasive [of] the right to privacy of prospective jurors" and

6  "already covered by the standard voir dire procedure").[3]

7      **B.   Defendant Huizar's Proposed Questionnaire Is Unduly
           Complicated and Overbroad, and Poses Irrelevant Questions**

8

9      Defendant Huizar's proposed questionnaire, spanning nearly 60

10  questions including subparts, will only prolong and complicate the

11  jury selection process without adding any benefit that cannot be

12  achieved through the Court's voir dire procedures.  Indeed, many of

13  Huizar's questions are "concerned less with ensuring an impartial

14  jury and more with ensuring a jury inclined to acquit."  <u>Bakker</u>, 925

15  F.2d at 734.  For instance, questions 20 through 25 broadly aim to

16  identify jurors with views on politics, politicians, and policy

17

18         [3] District courts across the country similarly have rejected

19  defense requested jury questionnaires as unnecessary and inefficient.
<u>See</u>, <u>e.g.</u>, <u>United States v. Harding</u>, 273 F. Supp. 2d 411, 429

20  (S.D.N.Y. 2003) (denying questionnaire where defendant "failed to
demonstrate that use of a <u>written</u> questionnaire is necessary or

21  preferable to a proper voir dire conducted by the Court") (emphasis
in original); <u>United States v. Salameh</u>, No. S5 93 Cr. 0180 (KTD),

22  1993 WL 364486, at *2 (S.D.N.Y. Sept. 15, 1993) ("There has been,
however, absolutely no showing that jury questionnaires are of any

23  particular help in the selection of a jury in highly publicized cases
where a searching voir dire is conducted."); <u>United States v. Montes</u>,

24  No. 5:12CR29-01-02, 2013 WL 1347284, at *3 (N.D. W.Va. Apr. 3, 2013)
("[N]ot only can any concern regarding candor of potential jurors be

25  adequately addressed in a traditional voir dire process, but also . .
. the use of a written questionnaire may actually impair this Court

26  and the parties' ability to assess potential jurors' fitness to serve
on the jury in this case."); <u>United States v. Taylor</u>, No. CR-99-3023-

27  MWB, 1999 WL 33656900, at *2 (N.D. Iowa Nov. 16, 1999) (denying
questionnaire, "find[ing] little, if any, specific potential benefit

28  to asking the proposed questions in written form prior to voir
dire").

issues that have no direct bearing on whether jurors can be fair and impartial to the defendants charged in this specific case.  (See Exh. B at 6-7.)  Notably, counsel to defendant Chan also objects to several of these questions for the reasons stated in his email correspondence.  (See Exh. C at 1-2.)  Similarly, questions 27 through 29 effectively preview certain evidence or issues that will arise at trial with the implicit objective of identifying jurors for peremptory strikes.  (Exh. B at 7-8.)  And other questions having to do with media, radio stations, and podcasts preferred by prospective jurors have no bearing on the central objective of selecting a fair and impartial jury.  (Id. at 3.)  Only a single question -- question 36 -- has anything to do with potential hardship based on the estimated length of trial, which was the issue that prompted the Court's instruction to the parties to propose a hardship questionnaire.

In sum, defendant Huizar's proposed juror questionnaire will unnecessarily complicate and substantially lengthen the jury selection process and confuse the issues while adding no value beyond the Court's standard voir dire procedures.

**C.  Defendant Huizar Will Have an Opportunity to Propose Voir Dire Questions Through the Court's Pre-Trial Schedule**

The Court's standard procedure for in-person voir dire will be "reasonably sufficient to test the jury for bias or partiality." Powell, 932 F.2d at 1340.  As illustrated by the numerous cases described herein, the Court will be well within its discretion to employ only in-person voir dire to meet the objective of selecting a fair and impartial jury in an efficient and effective manner, after

5

vetting hardships through a more concise questionnaire such as that proposed by the government in Exhibit A.

Moreover, Rule 24(a)(2)(B) already requires the Court to involve the parties in the questioning of jurors.  <u>See</u> Fed. R. Crim. P. 24(a)(2)(B) ("If the court examines the jurors, it <u>must</u> permit the attorneys for the parties to: . . . submit further questions that the court may ask if it considers them proper.") (emphasis added).  This Court typically satisfies this requirement in two ways.  First, the Court has ordered that the parties may file any proposed voir dire questions by February 9, 2023.  (Dkt. 441 at 3.)  Defendants thus will have the opportunity to propose questions, including those contained in Exhibit B, for the Court's consideration.  Second, consistent with the first two trials in this case, the government expects the Court may permit counsel to suggest additional questions at sidebar during jury selection in response to prospective jurors' answers to the Court's questions.  These procedures are more than adequate to secure a fair and impartial jury.  Thus, defendant Huizar's proposed questionnaire is unnecessary and should not be given.

1

**DEFENDANT JOSE HUIZAR'S POSITION**

2
3
4
5
6
7
8
9
10
11

The Court should issue a questionnaire that, along with hardship inquiries, includes substantive questions relating to jurors' media exposure and potential biases. The overwhelming pretrial publicity surrounding this case, the charged subject matter of the allegations, and alleged misconduct in the Los Angeles City Council more generally requires sequestered questioning of individual jurors. The inclusion of substantive questions imposes a minimal additional burden and is the most efficient method of addressing this case's elevated potential for prejudice and the immense media attention that it has received over the past four years.

12
13

**A.   The Pretrial Publicity Relating to this Case Demands "Great Care" During Voir Dire.**

14
15
16
17
18
19
20
21
22
23
24
25
26

"[W]hen pretrial publicity is great, the trial judge must exercise correspondingly great care in all aspects of the case relating to publicity which might tend to defeat or impair the rights of an accused." *Silverthorne v. United States*, 400 F.2d 627, 637-38 (9th Cir. 1968). "[T]he trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial." *Id.* at 637. "But discretion is not a substitute for duty . . . ." *Id.* "In exercising its discretion, the trial court must be zealous to protect the rights of an accused." *Dennis v. United States*, 339 U.S. 162, 168 (1950); *see also United States v. Polizzi*, 500 F.2d 856, 879 (9th Cir. 1974) ("An accused has an unquestioned right to have jurors decide his guilt or innocence who are not biased by what has appeared in the media.").

27
28

In circumstances involving "voluminous publicity," the district court should "(make) a careful, individual examination of each of the

7

jurors involved, out of the presence of the remaining jurors, as to the possible effect of the [media exposure]." *Silverthorne*, 400 F.2d at 639 (quoting *Coppedge v. United States*, 272 F.2d 504, 508 (D.C. Cir. 1959)); *see also United States v. Giese*, 597 F.2d 1170, 1183 (9th Cir. 1979) (explaining that significant pretrial publicity requires "a careful, individual examination of each prospective juror, preferably out of the presence of the other jurors"). "The voir dire 'must not simply call for the jurors' subjective assessment of their own impartiality, and it must not be so general that it does not adequately probe the possibility of prejudice.'" *Giese*, 597 F.2d at 1183 (quoting *Polizzi*, 500 F.2d at 879). "A general question directed to the entire group of prospective jurors is inadequate." *Id.*[4]

The immense media scrutiny relating to this case and scandals involving the Los Angeles City Council is sufficiently "voluminous" to demand "great care" during voir dire. *Silverthorne*, 400 F.2d at 637, 639. The case has been extensively covered by the Los Angeles Times ("Times"), which reaches more than 40 million unique online visitors each month. *About the Los Angeles Times*, L.A. Times, https://www.latimes.com/about#nt=navsub0-nav23 (last visited Dec. 21, 2022).[5] The Times has published articles addressing the FBI raid of

---

[4] Circumstances in which "few jurors have any knowledge of the case" do not require such intensive procedures. *See Giese*, 597 F.2d at 1183; *Polizzi*, 500 F.2d at 880 (holding pretrial publicity "was not substantial enough to have required the trial judge to interrogate the prospective jurors at length about it").

[5] The Times reaches 4.4 million people each week and is followed by 3.9 million people on Twitter. *Id.*; *@LATimes*, Twitter, available at https://mobile.twitter.com/latimes/ (last visited Dec. 21, 2022).

Huizar's home and offices in 2018,[6] the guilty pleas of individuals connected to Huizar in March[7] and May 2020,[8] as well as October 2022,[9] Huizar's arrest in June 2020,[10] the filing of additional charges in July 2020,[11] and the convictions of co-defendants in June[12] and November[13] of this year. A search of The Times website uncovers nearly 500 articles that include the terms "Jose Huizar" and "investigation."[14]

Other newspapers have also published articles and opinion pieces concerning Huizar. The OC Register, which claims five million monthly

[6] David Zahniser, et al., *FBI raids home and offices of L.A. City Councilman Jose Huizar*, L.A. Times (Nov. 7, 2018).

[7] Joel Rubin, et al., *Political fundraiser admits to delivering bribes in L.A. City Hall corruption probe*, L.A. Times (Mar. 19, 2020).

[8] David Zahniser, et al., *L.A. City Hall corruption: Consultant agrees to plead guilty in bribery scheme*, L.A. Times (May 13, 2020); David Zahniser, et al., *Cash, casinos and a sexual harassment payout: Former Huizar aide agrees to plead guilty*, L.A. Times (May 27, 2020).

[9] Nathan Solis, *Jose Huizar's brother to testify in federal corruption trial of former L.A. councilman after pleading guilty*, L.A. Times (Oct. 12, 2022).

[10] David Zahniser, et al., *L.A. City Councilman Jose Huizar charged in federal corruption probe*, L.A. Times (June 23, 2020).

[11] Emily Alpert Reyes & Joel Rubin, *Feds add bribery and money laundering charges against L.A. Councilman Jose Huizar*, L.A. Times (July 30, 2020).

[12] David Zahniser, *Downtown real estate developer found guilty in Jose Huizar bribery case*, L.A. Times (June 27, 2022).

[13] Michael Finnegan, *Jury finds L.A. skyscraper developer paid Jose Huizar more than $1 million in bribes*, L.A. Times (Nov. 10, 2022).

[14] The Boolean search was conducted at google.com with the following search term: "site:latimes.com 'jose huizar' AND 'investigation.'" In *Silverthorne*, the Ninth Circuit noted that the San Francisco Bay area was "saturated with more than 300 articles" during the year before trial. 400 F.2d at 631. "Words such as 'political donations', 'scandal', 'perjury', 'million dollar losses', etc. commonly appeared." *Id.* at 631 n.4.

readers, published an opinion piece last week discussing Huizar and other embattled councilmembers titled, "The Los Angeles City Council looks like a corrupt racket." Susan Shelley, *The Los Angeles City Council looks like a corrupt racket*, Orange County Register (Dec. 14, 2022). The Los Angeles Daily News, which claims 1.5 million monthly readers, also continues to extensively cover the case. *See, e.g.,* City News Service, *Huizar seeks to split off his corruption trial from co-defendant*, L.A. Daily News (Dec. 15, 2022); Olga Grigoryants, *With City Hall embroiled in scandal, major bribery cases against officials loom over Los Angeles*, L.A. Daily News (Oct. 22, 2022).[15]

The case has also been extensively covered by television media. In June 2020, before the return of any indictment in this case, the then-U.S. Attorney told a room full of reporters that Huizar's conduct represented "a cancer – a disease of elected officials and staff members breaking a series of laws in order to line their own pockets, maintain power, and keep open a spigot of illicit bribes and other benefits. All of this comes at the expense of the City's four million residents who simply want honest government." KTLA 5, *L.A. Councilman Jose Huizar arrested, faces federal charges in 'pay-to-play' corruption probe*, YouTube (June 23, 2020)[16]; *see also* NewsConference, *The Federal Investigation into the Arrest of Councilman Jose Huizar*, NBC Los Angeles (June 28, 2020) (then-U.S.

---

[15] The estimates of monthly readers for both the Orange County Register and the Los Angeles Daily News are provided by the outlets' owner, Southern California News Group. *See* Southern California News Group, https://socalnewsgroup.com/publications (last visited Dec. 21, 2022).

[16] Available at https://www.youtube.com/watch?v=5utcG-lQnrI.

Attorney interviewed by NBC Los Angeles concerning this case)[17]; *Silverthorne*, 400 F.2d at 634 (noting a "newspaper[] quot[ing] the United States Attorney with respect to the indictment of these defendants"). A search of the UCLA Library NewsScape site also shows the immense television exposure.[18] A search of the terms "Jose Huizar" and "investigation" between January 2018 and February 2019 returns approximately 41 broadcast recordings. Television news coverage continues today. *See, e.g.,* Eyewitness News, *LA City Council takes aim on corruption: 'We're at a turning point in the history of this city'*, ABC7 (Nov. 11, 2022)[19]; Eyewitness News, *Brother of former LA Councilman Jose Huizar pleads guilty of lying to feds in bribery case*, ABC7 (Oct. 13, 2022).[20]

The allegations against Huizar have also permeated the Los Angeles public landscape through nontraditional media. An investigative podcast dedicated a seven-episode season to the case. *See "Smoke Screen: The Sellout," New Season of Hit Investigative Podcast Series From Neon Hum, Premieres Today*, Sony Music (Oct. 26, 2021).[21] The podcast was named by The Atlantic as one of the fifty best podcasts of 2021. Laura Jane Standely, et al., *The 50 Best*

---

[17] Available at https://www.nbclosangeles.com/news/politics/newsconference/newsconference-the-federal-investigation-into-the-arrest-of-councilman-jose-huizar/2387504/ (last visited Dec. 22, 2022).

[18] *See* NewsScape, from UCLA Library, available at http://tvnews.library.ucla.edu/about.

[19] Available at https://abc7.com/los-angeles-city-council-paul-krekorian-corruption/12439764/ (last visited Dec. 22, 2022).

[20] Available at https://abc7.com/jose-huizar-salvador-los-angeles-city-council-bribery/12325670/ (last visited Dec. 22, 2022).

[21] Available at https://www.sonymusic.com/sonymusic/smoke-screen-the-sellout-new-season/ (last visited Dec. 21, 2022).

*Podcasts of 2021*, The Atlantic (Dec. 27, 2021).[22] One indie news outlet published a restaurant guide in which readers can eat at dinner locations where Huizar allegedly accepted bribes. Lexis-Olivier Ray, *Counting Cash At Dinner: The L.A. Taco Guide To The Restaurants Jose Huizar Dined At While Allegedly Collecting Bribes*, L.A. Taco (Nov. 23, 2021).[23] A walking tour of downtown Los Angeles is also planned, which will be "launched when the public learns more about how Huizar and his 'City family' cronies reshaped the city for the benefit of corporations, connected non-profits and others yet to be revealed." Esotouric, *Jose Huizar's DTLA: A New True Crime Tour (Coming Soon)*.[24] The investigation also continues to be discussed on social media. Twitter contains nearly 1,000 links with the terms "Jose Huizar" and either "investigation" or "corrupt."[25] The same search of Facebook returns over 500 links.

In addition to this case and related criminal cases, the Los Angeles City Council continues to be battered by highly publicized scandals. A poll published this week shows that 51% of voters in Los Angeles have an unfavorable opinion of the City Council. *See* Strategies 360, *California Community Poll December 2022 Survey*, available at https://www.strategies360.com/landing/californiapolling/. Twenty-five percent of those polled expressed a "very unfavorable"

---

[22] Available at https://www.theatlantic.com/culture/archive/2021/12/best-podcasts-2021-dish-city-sporkful/621118/ (last visited Dec. 21, 2022).

[23] Available at https://www.lataco.com/jose-huizar-corruption-bribe-restaurants-fbi/.

[24] Available at https://esotouric.com/josehuizar/ (last visited Dec. 21, 2022).

[25] The Boolean search was conducted at google.com with the following search term: "site:twitter.com 'jose huizar' AND ('investigation' OR 'corrupt')."

opinion. *Id.* According to the Times, the poll shows that the "City Council is deeply unpopular after several years of scandals, indictments, trials and, this fall, the release of a recording of three councilmembers making racist comments in a private meeting." Benjamin Oreskes, *Scandal-plagued L.A. City Council deeply unpopular; voters have faith in Bass, poll finds*, L.A. Times (Dec. 19, 2022). Earlier this month, Kevin de León, one of the three councilmembers targeted for making racist comments, was recorded on video grabbing a protestor, "throw[ing] him into a table and attempt[ing] to push him out of the room." Gregory Yee, et al., *Violence between L.A. Councilman Kevin de León, activist caught on video, sparks debate*, L.A. Times (Dec. 9, 2022). The immense unpopularity of the City Council due to numerous scandals and criminal investigations further shows the negative publicity attendant to Huizar and this case.

### B. The Jury Questionnaire is the Most Efficient Means of Determining a Juror's Exposure to Pretrial Publicity.

Due to this "voluminous publicity," individual, sequestered questioning of jurors in the venire is required to protect Huizar's Fifth and Sixth Amendment rights. *See Silverthorne*, 400 F.2d at 639; *Giese*, 597 F.2d at 1183. Although a juror may say in a full courtroom "that he would be fair and impartial . . . the psychological impact requiring such a declaration before one's fellows is often its father." *Silverthorne*, 400 F.2d at 639 (quoting *Irvin v. Dowd*, 366 U.S. 717, 728 (1961)). Public discussion of politics, in particular, is fraught. Many jurors are naturally reticent to discuss political topics around others and, when questioned directly, are less likely to respond with the complete honesty voir dire demands. *Cf.* James Lankford & Russel Moore, *The Real Meaning of the Separation of Church*

13

1    *and State*, Time (Jan. 16, 2018) ("We are told that one should avoid
2    discussing two things at the dinner table: religion and politics.").

3          Additionally, the voir dire questions must be specific and
4    elicit answers that permit "objectively assessing the impact caused
5    by . . . pretrial knowledge on the juror's impartiality."
6    *Silverthorne*, 400 F.2d at 638 ("[T]he entire voir dire examination
7    was too general to adequately probe the prejudice issue."). Questions
8    that call upon a juror "to assess their own impartiality" are
9    insufficient. *Id.; see also id.* at 639 ("[W]hether a juror can render
10   a verdict based solely on evidence adduced in the courtroom should
11   not be adjudged on that juror's own assessment of self-righteousness
12   without something more."); *Polizzi*, 500 F.2d at 879 (similar).

13         In light of the particular care that must be taken during voir
14   dire, the jury questionnaire provides the most efficient means of
15   quickly and effectively probing potential prejudices. Rather than
16   call jurors to the bench one by one, the questionnaire permits the
17   Court to question the entire venire simultaneously, while also
18   obtaining individual answers from each juror in a private setting.
19   Although live voir dire will nonetheless be required, the
20   questionnaire will drastically reduce the time needed to speak with
21   jurors individually and assist in "enabling the parties intelligently
22   to exercise their challenges." *See Paine v. City of Lompoc*, 160 F.3d
23   562, 564 (9th Cir. 1998).

24         Substantive jury questionnaires are regularly used in highly
25   publicized cases. In *Skilling v. United States*, the Supreme Court
26   approved of the trial court's use of a jury questionnaire, as well as
27   follow up questions in the courtroom, to address the "widespread
28   community impact" of the defendant's alleged actions. 561 U.S. 358,

384 (2010). The Court noted that the impact of Enron's collapse "necessitated careful identification and inspection of prospective jurors' connections to Enron," and that the questionnaire and follow-up "were well suited to that task." *Id.* The questionnaire "helped to identify prospective jurors excusable for cause and served as a springboard for further questions put to remaining members of the array." *Id.* at 388. The district court also "examined each prospective juror individually, thus preventing the spread of any prejudicial information to other venire members." *Id.* at 389 (citing *Mu'Min v. Virginia*, 500 U.S. 415, 425 (1991)).[26]

In high-profile public corruption cases specifically, questionnaires are commonly used to assess media exposure and potential connections to local politics. *See, e.g.*, *United States v. Inzunza*, No. 03cr2434 JM, 2005 WL 8160881, at *9 (S.D. Cal. 2005) (granting joint motion for juror questionnaire "regarding issues of pretrial publicity" in public corruption case); *United States v. Robert Menendez, et al.*, 2:15-cr-00155-WHW, Dkt. 198 (D.N.J. 2017) (using questionnaire in trial of sitting U.S. senator); *United States v. Dean Skelos, et al.*, 1:15-cr-00317-KMW, Dkt. 329 (S.D.N.Y. 2018) (using jury questionnaire in trial of former Majority Leader of the New York State Senate); *United States v. Sheldon Silver*, 1:15-cr-00093-VEC, Dkt. 380 (S.D.N.Y. 2018) (using jury questionnaire in trial of former New York State Assembly Speaker). District courts in this circuit also regularly use questionnaires to probe media exposure. *See, e.g.*, *United States v. Barry Bonds*, 3:07-cr-00732-SI,

---

[26] The Court also noted that in "other Enron-related prosecutions . . . District Courts, after inspecting venire members' responses to questionnaires, completed the jury-selection process within one day." *Id.*

1   Dkt. 304 (N.D. Cal. 2011); *Inzunza*, No. 03cr2434 JM, 2005 WL 8160881,

2   at *9.[27]

3        Additionally, the need to closely monitor potential juror

4   prejudice stemming from pretrial publicity is heightened by the

5   Court's order prohibiting contact between counsel and jurors from the

6   co-defendants' trials. *See* Dkts. 838, 600. In *United States v.*

7   *Waters*, the Ninth Circuit reversed a guilty verdict after the

8   district court failed to conduct an adequate inquiry into adverse and

9   prejudicial publicity that occurred during jury deliberations. 627

10  F.3d 345, 363-64 (9th Cir. 2010). The Ninth Circuit noted that the

11  district court's "inadequate inquiry" into the jurors' exposure "was

12  exacerbated by the court's later order prohibiting all contact

13  between counsel and the jurors." *Id.* at 364 n.8. Although whether the

14  district court erred in imposing the no-contact order was left

15  undecided, the no-contact order nonetheless meant that defense

16  counsel was "unable to determine whether any juror was affected by

17  the adverse publicity." *Id.* The Court's no-contact order has

18  prevented counsel from determining the potential exposure of jurors

19  to publicity before and during the co-defendants' trials, which

20  heightens the need to carefully question jurors in the upcoming

21  venire.

22

23

24        [27] Questionnaires are also often used in high profile death

25  penalty cases. *See, e.g.*, *United States v. Tsarnaev*, 142 S. Ct. 1024,
    1035 (2022) ("The questionnaire asked prospective jurors what media

26  sources they followed, how much they consumed, whether they had ever
    commented on the bombings in letters, calls, or online posts, and,

27  most pointedly, whether any of that information had caused the
    prospective juror to form an opinion about Dzhokhar's guilt or

28  punishment.").

    **C.**    **The Trial's Subject Matter Creates "a Real Possibility of Prejudice" and Therefore Requires "Specific Voir Dire Questioning."**

The subject-matter of the case also requires specific attention during voir dire. The Ninth Circuit has identified

> three instances in which there is a real possibility of prejudice and a consequent need for specific voir dire questioning: (1) When the case carries racial overtones . . . ; (2) when the case 'involves other matters concerning which either the local community or the population at large is commonly known to harbor strong feelings that may stop short of presumptive bias in law yet significantly skew deliberations in fact' . . .; or (3) when the case involves other forms of bias and distorting influence which have become evident through experience with juries . . . .

*United States v. Toomey*, 764 F.2d 678, 682 (9th Cir. 1985) (quoting *United States v. Jones*, 722 F.2d 528, 529-30 (9th Cir. 1983) (per curiam)). This case involves all three circumstances identified in *Toomey*, and therefore requires "specific voir dire questioning" concerning the following topics. *See id.* (quoting *Jones*, 722 F.2d at 529-30). A substantive jury questionnaire is the most efficient means of privately probing those issues.

First, this is a public-corruption case involving allegations of cash, lavish gifts, campaign contributions, foreign billionaires, large-scale real-estate development, housing affordability, and Chinese investment in Los Angeles, all "matters concerning which . . . the local community or the population at large is commonly known to harbor strong feelings." *Toomey*, 764 F.2d at 682 (quoting *Jones*, 722 F.2d at 529-30). One national poll conducted in 2020 found that 67% of Americans believe "most politicians are corrupt." Richard Wike, et al., *Many in U.S., Western Europe Say Their Political System*

17

1  *Needs Major Reform*, Pew Research Center (Mar. 31, 2021)[28]; *see also*
2  Gallup World Poll, *75% in U.S. See Widespread Government Corruption*,
3  Gallup (Sept. 19, 2015) ("Three in four Americans (75%) [in 2014]
4  perceived corruption as widespread in the country's government.")[29];
5  *In re Sittenfeld*, 49 F.4th 1061, 1068 (6th Cir. 2022) (addressing
6  juror in public corruption trial who asserted that another juror
7  "should not have been on the jury because she hated politicians").
8  Animosity towards the Los Angeles City Council, specifically, was
9  also noted in this week's poll, which found that the "City Council is
10 deeply unpopular." Benjamin Oreskes, *Scandal-plagued L.A. City*
11 *Council deeply unpopular; voters have faith in Bass, poll finds*, L.A.
12 Times (Dec. 19, 2022); *see also* Jeremy B. White, *Los Angeles staggers*
13 *under cascade of scandals*, Politico (Oct. 11, 2022) ("The crush of
14 scandals has tarnished Los Angeles government and eroded public trust
15 . . . prompting angry protesters to pack a council meeting Tuesday
16 and clamor for resignations. ).[30] Given the public's general
17 predisposition to distrust and view politicians as corrupt and the
18 particular radioactivity of the government's allegations in this
19 case, the subject matter requires the Court to carefully explore
20 potential bias.

21      Second, other information likely to be elicited at trial may
22 have a "distorting influence." *Toomey*, 764 F.2d at 682 (quoting

---

24      [28] Available at
25 https://www.pewresearch.org/global/2021/03/31/many-in-us-western-
europe-say-their-political-system-needs-major-reform/ (last visited
26 Dec. 23, 2022).

27      [29] Available at https://news.gallup.com/poll/185759/widespread-
government-corruption.aspx (last visited Dec. 23, 2022).

28      [30] Available at https://www.politico.com/news/2022/10/11/los-
angeles-scandals-city-council-00061295 (last visited Dec. 22, 2022).

*Jones*, 722 F.2d at 529-30). Along with tawdry details concerning cash, trips, and princely gifts that Huizar allegedly received while employed as a public official, the government will seek to introduce evidence concerning his infidelity, sexual-harassment lawsuit, and engagement with escorts. Indeed, in prior trials, the government went to great lengths to highlight these topics. During its opening statement in the SZNW trial, for instance, the government paused its carefully-orchestrated slideshow for emphasis before telling the jury:

> Ladies and gentlemen, there was another aspect to these trips for which there are no photos.  Esparza will testify that on their very first trip together, in March 2013, Wei Huang provided Huizar and Esparza with a lineup of prostitutes for their choosing.  But Wei Huang made sure that Jose Huizar had the first choice for those services that evening.  Esparza will testify that this was their first experience with prostitutes provided by Wei Huang, but not their last, as it would become a recurring theme over the rest of their future trips together.  These bribes were the backbone of this bribery scheme, and the evidence will show that the co-schemers also tried to hide their actions, which brings us to concealment.

10/27/2022 Tr. at 21:4-17. During George Esparza's direct and redirect examinations, the work prostitute or escort appeared 31 times. For Ricky Zheng, after the word prostitute was used 12 times on direct, the government began his redirect with a line of questions that culminated in the following exchange: "Q Now, Chairman Huang's families and Jose Huizar's families were not present in the villa when Chairman Huang and Jose Huizar were having sex with prostitutes, were they?  A No, they were not." 11/7/2022 Tr. at 1694:13-1695:5. Because these topics are likely to provoke distorting emotional responses (especially given the government's intention to call Richelle Rios as a trial witness), the Court must also pose questions

19

concerning a juror's potential bias against someone who allegedly engaged in this behavior.

Third, this "case carries racial overtones." *Toomey*, 764 F.2d at 682 (quoting *Jones*, 722 F.2d at 529-30); *see also Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 868 (2017) (noting that "racial bias" is "a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice"). The government's principal allegation is that Huizar was helping Chinese developers in exchange for bribes. Many Americans see China as a high-corruption country and thus may be more likely to believe that Chinese nationals are willing to engage in corruption. Many Americans are also concerned with Chinese involvement in American domestic politics, which may be based in part on racial bias. *See* Laura Silver, et al., *Negative Views of China Tied to Critical Views of Its Policies on Human Rights*, Pew Research Center (June 29, 2022) (finding 47% of Americans believe China's involvement in American domestic politics is a "very serious" problem), available at https://www.pewresearch.org/global/2022/06/29/negative-views-of-china-tied-to-critical-views-of-its-policies-on-human-rights/ (last visited Dec. 23, 2022); Jennifer Lee, *Confronting the invisibility of anti-Asian racism*, Brookings (May 18, 2022) (noting increase in anti-Asian hate crimes and negative views towards Asian Americans), available at https://www.brookings.edu/blog/how-we-rise/2022/05/18/confronting-the-invisibility-of-anti-asian-racism/ (last visited Dec. 23, 2022).  Huizar is also vulnerable to potential biases against Latinos. Just two months ago, leaked audio of three Latino councilmembers making racist comments became national news. *See, e.g.*, David Zahniser, et al., *Racist remarks in leaked audio of*

*L.A. council members spark outrage, disgust*, L.A. Times (Oct. 9, 2022); Erika D. Smith, *Column: Nury Martinez's racism feeds into Black Angelenos' worst fear. It's us versus them*, L.A. Times (Oct. 9, 2022); Benjamin Oreskes, et al., *Protests, anger, tears roil L.A. City Council meeting over leaked racist recordings*, L.A. Times (Oct. 11, 2022). The recording led President Biden and Governor Newsom to call for the councilmembers' resignation. Eli Stokols, *Biden calls on Nury Martinez, other L.A. councilmembers to resign after audio leak*, L.A. Times (Oct. 11, 2022) ("Biden is now the highest-profile political figure to weigh in on the firestorm that has generated outrage across the city."); Hannah Wiley, *Gov. Newsom calls on L.A. City Councilmen De León and Cedillo to resign over racist audio leak*, L.A. Times (Oct. 23, 2022). As noted above, the councilmembers involved have continued to make headlines. *See* Gregory Yee, et al., *Violence between L.A. Councilman Kevin de León, activist caught on video, sparks debate*, L.A. Times (Dec. 9, 2022). Today, discussions of race are deeply connected to conversations concerning power and political influence in Los Angeles. *See* Jill Cowan & Shawn Hubler, *Los Angeles Confronts Racial Divide Anew After Leak of Racist Comments*, N.Y. Times (Oct. 11, 2022) ("The recorded conversation involving some of Los Angeles's top power brokers exposed the racial and ethnic factions that have come to dominate politics in California."); Strategies 360, *California Community Poll December 2022 Survey* (finding 60% of those polled believed "relations between people of different races" in Los Angeles were "fair" or "poor").

The jury questionnaire provides the most efficient method of addressing these sensitive topics in a streamlined and private

fashion. The Court should therefore adopt the substantive questions provided in Huizar's proposed questionnaire.

### D.   Huizar has No Objections to the Government's Proposed Hardship Questions

Huizar believes that the government's proposed hardship questions are reasonable. He therefore asks that the Court issue a questionnaire combining his substantive questions with the government's hardship questions.