**<u>Exhibit 2</u>**



# United States Department of Justice

## United States Attorney's Office
## Central District of California

---

**Central District of California**
312 North Spring Street, Suite 1200
Los Angeles, California 90012

## NON-PROSECUTION AGREEMENT

The United States Attorney's Office for the Central District of California ("USAO") hereby enters into the following Non-Prosecution Agreement (the "Agreement") with Jia Yuan USA Co., Inc., a Delaware corporation headquartered in Arcadia, California ("the Company"), pursuant to authority granted by the Company's Chairman reflected in <u>Exhibit D</u>, to resolve the federal criminal investigation of violations of, among other statutes, Title 18, United States Code, Sections 666 (federal program bribery), 1343 (wire fraud), 1346 (honest services fraud), and Title 52, United States Code, Sections 30121 (foreign national contributions), 30122 (conduit contributions) arising out of the Company's conduct with City of Los Angeles ("City") public officials in connection with one of the Company's real estate development projects in the City. This Agreement is binding only on the Company and the USAO; it specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities.

## I.   Introduction and Relevant Considerations

1.   The USAO and the Federal Bureau of Investigation ("FBI") have been investigating certain matters relating to the Company's interactions with City public officials in connection with the Company's redevelopment of its Los Angeles Luxe City Center Hotel (the "Luxe Hotel Project") between 2014 and November 2018. Specifically, the USAO and FBI have been investigating conduct by certain individuals acting on behalf of the Company in improperly providing and offering financial benefits to City public officials in exchange for official acts to benefit the Luxe Hotel Project. A summary of certain of the investigative findings is described in the statement of facts attached hereto as <u>Exhibit A</u> ("Statement of Facts").

2.   The USAO enters into this Agreement based on the individual facts and circumstances presented by this case and the Company, including the following factors:

   a.   The nature and seriousness of the offense conduct, including the failure of proper oversight at the highest levels of the Company;

   b.   The Company's timely cooperation, through its Chairman and company counsel, with the USAO's investigation, which has substantially assisted the government's efforts and has included:

      i.   The Company's extensive internal investigative actions in connection with the collection, analysis, and organization of vast amounts of relevant data and evidence, including providing the USAO records located in China and in the

Hazens Companies Non-Prosecution Agreement
USAO-CDCA
Page 2

      personal possession of its Chairman, which were outside the reach of U.S. law enforcement;

  ii. The Company's synthesis and presentation of relevant facts at regular intervals during its investigation, including making factual presentations to the USAO;

  iii. Identifying and organizing voluminous evidence and information for the USAO on requested topics;

  iv. Making the Company's Chairman available for interview via videoconference from Hong Kong while he was located outside the reach of U.S. law enforcement, and agreeing to make other Company employees available for similar interviews; and

  v. Allowing the USAO access to certain additional non-privileged documents outside of the Company's immediate possession.

c. The Company's timely acceptance of responsibility for its conduct, as described in Section II and the Statement of Facts;

d. The Company's undertaking of remedial measures, which have included:

  i. The termination of George Chiang as an outside consultant to the Company on January 15, 2019;

  ii. Amending and implementing the Company's Employee Handbook for U.S. employees to add new provisions including a Company Code of Conduct and Ethics requiring compliance with all federal, state, and local laws; and new policies on conflicts of interest, political activities, and anti-corruption measures prohibiting direct or indirect benefits to public officials and requiring consultation and pre-approval by company counsel for certain political contributions; and

  iii. The enhancement of its compliance program, internal controls, and corporate risk function as detailed in Exhibit F.

e. The USAO's determination, based upon the Company's timely and comprehensive remediation, that an independent compliance monitor is unnecessary; and

f. The Company's agreement (in accordance with Paragraphs 6 through 9 of this Agreement) to continue to cooperate with the USAO and the FBI during the pendency of any prosecution the USAO has instituted and may institute against any individuals based on conduct relating to the Statement of Facts.

Hazens Companies Non-Prosecution Agreement
USAO-CDCA
Page 3

## II.     The Term of the Agreement

3.    This Agreement shall be deemed effective as of the last date of execution by a party to this Agreement (the "Initial Effective Date") and shall continue in effect for a period of 36 months (3 years) from the Initial Effective Date (the "Term"). Notwithstanding the foregoing, the Company's cooperation obligations as described in Paragraphs 6 through 8 of this Agreement shall continue until the conclusion of any criminal investigation or prosecution (through the entry of final judgment) of any individual relating to the Statement of Facts, which will only occur upon a letter from the USAO confirming this obligation has expired.  The Company further agrees that in the event of a breach by the Company, then an extension or extensions of the Term of up to 12 months (1 year), per breach, may be imposed by the USAO, without prejudice to the USAO's right to proceed as provided in Paragraphs 17-21 below. Any extension of the Term extends all terms of this Agreement for an equivalent period.

## III.    The Company's Acceptance of Responsibility

4.    The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents set forth in the Statement of Facts. The Company agrees that the factual statements contained within the Statement of Facts are true and accurate.

5.    The Company shall not, through any of its officers, employees, attorneys, consultants, or agents, or any other person authorized to make statements on behalf of the Company, make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts contained in the Statement of Facts. Any such contradictory statement shall, subject to the rights of the Company described below in Paragraph 19 constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution as set forth in Paragraphs 17 through 21 of this Agreement. If the USAO determines that the Company has made a public statement contradicting its acceptance of responsibility or any fact contained in the Statement of Facts, the USAO shall so notify the Company. Thereafter, the Company may avoid a breach of this Agreement by publicly repudiating the statement within five days after such notification. The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, any statement contained in the Statement of Facts. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Company in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

## IV.    Cooperation

6.    At the request or direction of the USAO, the Company shall cooperate fully with any and all investigations, prosecutions, or civil or administrative enforcement proceedings

Hazens Companies Non-Prosecution Agreement
USAO-CDCA
Page 4

undertaken by the USAO or other federal law enforcement or regulatory authority or agency and relating to the conduct described in the Statement Facts. All such cooperation described in this Paragraph shall include, but not be limited to:

    a.  Timely providing upon oral or written request, and in accordance with federal law, all non-privileged information, documents, records, and other tangible evidence that can be obtained through reasonable efforts, including from the Company, its U.S. affiliates (Hazens Investment, LLC, San Yi US Investment Company, Inc., Hazens Rosemead LLC), and its parent company, Shenzhen Hazens, in China (collectively, the "Hazens Companies");

    b.  Identifying, upon oral or written request, witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation; and

    c.  Upon oral or written request, using its best efforts to make available for interview or testimony, in a timely fashion, any current officer, executive, director, employee, agent, or consultant of the Hazens Companies, including by making such persons available in the Central District of California, at Company expense, regardless of their location of residence.

7.    The Company shall at all times provide complete, truthful, and accurate information to the USAO/FBI. The Company's obligation to cooperate pursuant to the preceding paragraph will no longer apply if a prosecution by the USAO is commenced against the Company as a result of a breach of this Agreement.

8.    With respect to any information, testimony, documents, records, or other tangible evidence provided pursuant to this Agreement (other than any material or information provided pursuant to paragraph 9 below), the Company consents to any and all disclosures, subject to applicable law and regulations, to other governmental and regulatory authorities, including United States authorities and those of a foreign government, of such materials as the USAO, in its sole discretion, shall deem appropriate.

9.    In addition to the obligations in Paragraph 6, during the Term, the Company shall, upon discovery, promptly provide any specified non-privileged information, documents, records, or other tangible evidence of conduct within the Company, that may constitute a violation of federal criminal law and that can be obtained through reasonable efforts. The obligations of this Paragraph apply to conduct that may constitute a violation of federal criminal law regardless of whether that conduct relates to the conduct described in the Statement of Facts. The USAO may use this information to gather additional evidence of such violations.

10.    Nothing in this Agreement is intended to request or require the Company to waive its attorney-client privilege or work product protections, and no such waiver shall be deemed effected by any provision herein.

Hazens Companies Non-Prosecution Agreement
USAO-CDCA
Page 5

11.     To the extent authorized by law, the USAO agrees to bring to the attention of other governmental authorities the nature and quality of the Company's cooperation with the USAO's investigation, upon request of the Company. By agreeing to provide this information to any such authority, the USAO is not agreeing to advocate on the Company's behalf or request any specific outcome, but rather is agreeing to provide facts to be evaluated independently by such authority.

## V.     Payment of Monetary Penalty

12.     The Company agrees to pay a criminal monetary penalty to the United States of $1,050,000 (the "Criminal Penalty") within fourteen (14) calendar days of the Initial Effective Date of the Agreement. The Criminal Penalty shall be paid by certified check, business check, or money order made payable to "United States Department of Justice" and will identify "Op. Casino Loyale NPA" on the "memo" line. The payment can be provided to: United States Attorney's Office, Civil Division, Financial Litigation Section, 300 N. Los Angeles St., Suite 7516, Los Angeles, CA 90012, with email proof of the same provided to the USAO.

13.     The Company and the USAO agree that the Criminal Penalty is appropriate given the facts and circumstances of this case, including the Company's cooperation, its disclosure of relevant facts, including information relating to the individuals involved in the offense conduct, and the Company's extensive remediation in this matter. The Criminal Penalty is final and shall not be refunded. The Company acknowledges that no tax deduction may be sought in connection with the payment of any part of this Criminal Penalty. The Company shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the Criminal Penalty that it pays pursuant to this Agreement.

## VI.    Non-Prosecution

14.     The USAO agrees that if the Company fully complies with all of its obligations under this Agreement, the USAO will not criminally prosecute the Company, or any of its subsidiaries or affiliates, during the Term of this Agreement or thereafter for any crime related to the conduct described in the Statement of Facts. The USAO and the Company intend for this Agreement to resolve the USAO's criminal investigation of the Company relating to the conduct described in the Statement of Facts.

15.     Except as expressly provided in Paragraph 14 above, this Agreement does not preclude or limit the USAO, any other United States Attorney's Office, or the United States Department of Justice from investigating or prosecuting the Company, or for prosecuting any other individual or entity, including any current or former officer, employee, or agent of the Company.

16.     Nothing in this Agreement shall preclude or limit the USAO, any other United States Attorney's Office, or the United States Department of Justice from bringing a criminal prosecution against the Company for making false statements, obstruction of justice,

Hazens Companies Non-Prosecution Agreement
USAO-CDCA
Page 6

perjury, subornation of perjury, or aiding and abetting or conspiring to commit such an offense based on the Company's conduct in performing its cooperation obligations under this Agreement.

## VII.   <u>Breach of Agreement</u>

17.   If, during the Term, (a) the Chairman or any General-Manager-level employee or above of the Company commits any felony under United States law that is within the scope of his or her employment and intending to benefit the Company in whole or in part; (b) the Company provides in connection with this Agreement deliberately false, incomplete, or misleading information, including in connection with its disclosure of information about individual culpability; (c) the Company knowingly fails to cooperate as set forth in Paragraphs 6 through 9 of this Agreement; (d) the Company fails to accept responsibility pursuant to Paragraph 5 of this Agreement; or (e) the Company otherwise knowingly and materially fails to perform or fulfill any of its obligations under the Agreement, the USAO will deem the Company in breach of the Agreement and the Company shall thereafter be subject to prosecution for any federal criminal violation, including, but not limited to, charges arising from the conduct described in the Statement of Facts.

18.   The determination whether the Company has breached the Agreement shall be in the USAO's sole discretion. Any such prosecution may be premised on information provided by the Company. Any such prosecution relating to the conduct described in the Statement of Facts that is not time-barred by the applicable statute of limitations on the Initial Effective Date may be commenced against the Company, notwithstanding the expiration of the statute of limitations, between the Initial Effective Date and the expiration of the Term plus one year. The tolling agreement is attached hereto as <u>Exhibit B</u> and incorporated herein by reference.

19.   Except as otherwise provided in Paragraph 5 above, in the event that the USAO determines that the Company has breached this Agreement, the USAO shall provide the Company with written notice of such determination prior to instituting any prosecution resulting from such breach. Within 30 days of receipt of such notice, the Company shall have the opportunity to address such a breach by providing a response to the USAO to demonstrate that no breach has occurred, to demonstrate that the breach was not a knowing breach, and/or to explain the actions taken to address and remediate the breach. The USAO shall thereafter provide written notice to the Company of its final determination regarding whether to declare the Agreement breached. The Company shall thereafter have 30 days to appeal to a higher authority within the Department of Justice in order to obtain a written finding that, based on a preponderance of the evidence, the Company has not breached the Agreement. In the absence of such a written finding, the USAO's determination of breach shall become final after 30 days following the USAO's written notification.

20.   In the event that the USAO determines to institute a criminal prosecution against the Company after a breach of this this Agreement, then:

Hazens Companies Non-Prosecution Agreement
USAO-CDCA
Page 7

a. All statements made by or on behalf of the Company to the USAO, including the attached Statement of Facts, shall be admissible in evidence in any and all criminal proceedings brought by the USAO against the Company, and the Company shall stipulate to the admissibility into evidence of the Statement of Facts as an admission by the Company, and shall be precluded from offering any evidence or argument that contradicts the Statement of Facts or that suggests those facts are untrue or misleading;

b. The Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements made by or on behalf of the Company prior or subsequent to this Agreement should be suppressed or are otherwise inadmissible; and

c. The USAO shall immediately be free to use the waiver of indictment provided by the Company in Exhibit C attached hereto and to prosecute the Company by way of information for any federal offense arising out of the Statement of Facts.  The Company remains bound by all other waivers expressly made as part of this Agreement.

21.     The Company acknowledges that the USAO has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and any criminal prosecution instituted thereafter proceeds to judgment. The Company further acknowledges that any such sentence would be solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion. Nothing in this Agreement shall be deemed an agreement by the USAO that $1,050,000 is the maximum penalty that may be imposed in any future prosecution, and the USAO is not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the USAO agrees that under those circumstances, it would recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment.

## VIII.   Sale, Merger, or Other Change in Corporate Form of the Company

22.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company agrees that in the event that, during the Term or during the pendency of its cooperation obligations described in Paragraphs 6 through 9, if it sells, merges, or transfers all or substantially all of the assets of the Company, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the USAO's ability to determine a breach under this Agreement is applicable in full force to that entity. The Company agrees that the failure to include these provisions in the transaction will make any such transaction null and void. The Company shall provide notice to the USAO at least 30 days prior to undertaking any such sale, merger, transfer, or other change in corporate form. If the USAO notifies the Company prior to such transaction

7

Hazens Companies Non-Prosecution Agreement
USAO-CDCA
Page 8

(or series of transactions) that it has determined that the transaction(s) has the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined in the sole discretion of the USAO, the Company shall not consummate such transaction(s). In addition, if at any time during the Term or the pendency of the Company's cooperation obligations described in Paragraphs 6 through 9 the USAO determines in its sole discretion that the Company has engaged in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, it may deem it a breach of this Agreement pursuant to Paragraphs 17 through 21 of this Agreement. Nothing herein shall restrict the Company from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the USAO. The sale, merger, or transfer of the Los Angeles Luxe City Center Hotel and/or any portion of the project site by the Company shall not constitute a sale, merger, or transfer of all or substantially all of the assets of the Company within the meaning of this Agreement, provided that the transaction does not cause the Company to relinquish control over potentially relevant records, systems, information, accounts, and officers and employees such that the transaction would have the effect of circumventing or frustrating the enforcement purposes of this Agreement.

## IX.  Certification

23.    Thirty (30) days prior to the end of the Term, the Company will provide to the USAO a certification signed by a Company representative and counsel stating that it has met the conditions set forth in Sections II - IV of this Agreement. Such certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001 (false statement to federal agency) and 18 U.S.C. § 1505 (obstruction of federal proceeding), and it will be deemed to have been made in the Central District of California.

## X.  Notice

24.    Any notice to the USAO under this Agreement shall be provided (1) via email to mack.jenkins@usdoj.gov, veronica.dragalin@usdoj.gov, and melissa.mills@usdoj.gov; and (2) personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to:

Mack E. Jenkins or Chief of Public Corruption & Civil Rights Section
United States Attorney's Office
United States Courthouse
312 North Spring Street, Suite 1500
Los Angeles, California 90012

25.    Any notice to the Company under this Agreement shall be provided via email to:

Hazens Companies Non-Prosecution Agreement
USAO-CDCA
Page 9

Monica Q. Vu
General Counsel
Hazens Real Estate Group
monicavu@hazensgroup.com

-and-

David M. Chaiken
Troutman Pepper Hamilton Sanders LLP
david.chaiken@troutman.com

26.    Notice shall be effective upon actual receipt by the USAO or the Company.

**XI.    Jurisdiction and No Other Agreements**

27.    This Agreement is covered by the laws of the United States. The USAO and the Company agree that exclusive jurisdiction and venue for any dispute arising under this Agreement is in the United States District Court for the Central District of California.

///

///

///

9

Hazens Companies Non-Prosecution Agreement
USAO-CDCA
Page 10

28.    This Agreement, with its attached Exhibits A through F, sets forth all the terms of the agreement between the Company and the USAO. No modifications or additions to this Agreement, or to its attached Exhibits A through F, shall be valid unless they are in writing and signed by the USAO, the Company's attorneys, and a duly authorized agent of the Company.

    Exhibit A – Statement of Facts
    Exhibit B – Statute of Limitations Tolling Agreement
    Exhibit C – Waiver of Indictment
    Exhibit D – Certificate of Corporate Resolutions
    Exhibit E – Certificate of Counsel
    Exhibit F – Corporate Compliance Program

**AGREED:**

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF
CALIFORNIA

NICOLA T. HANNA
United States Attorney

_____        10 . 5 . 2020
MACK E. JENKINS                         DATE
VERONICA DRAGALIN
MELISSA MILLS
Assistant United States Attorneys

_____        5 – 10 – 2020
JIA YUAN USA CO., INC.                  DATE
by:  Fuer Yuan, Chairman

_____        10-5-2020
DAVID M. CHAIKEN                        DATE
Troutman Pepper Hamilton Sanders LLP
Counsel for Jia Yuan USA Co., Inc.

_____        10-5-2020
STEPHANIE YONEKURA                      DATE
Hogan Lovells US LLP
Counsel for Jia Yuan USA Co., Inc.

10

**EXHIBIT A**

**STATEMENT OF FACTS**

Jia Yuan USA Co., Inc. ("the Company") admits, accepts, and acknowledges as true the following facts:

1.        Shenzhen Hazens ("Hazens") was a Chinese company headquartered in Shenzhen, China.  Fuer Yuan, a Chinese national and resident of Shenzhen, China, was the Chairman of Hazens.  Beginning in approximately 2010, Chairman Yuan became interested in expanding his business to the U.S., and ultimately formed the following subsidiaries in the U.S. to acquire and operate several properties in the Los Angeles area: (a) Hazens Investment, LLC to acquire and operate the Sheraton Gateway LAX Hotel in 2013; (b) Jia Yuan USA Co., Inc. to acquire, operate, and redevelop the Luxe Hotel in 2014; (c) San Yi US Investment Company, Inc. to build and operate the Sheraton San Gabriel Hotel in 2015; and (d) Hazens Rosemead, LLC to acquire an office building in Arcadia, California in 2019.  These Hazens domestic subsidiaries were prohibited from making any contribution or expenditure in connection with any election – federal, state, or local – if a foreign national controlled or participated in the decision-making process concerning the making of the contribution or expenditure under 52 U.S.C. § 30121 and 11 C.F.R. § 110.20(i).

2.        In 2014, Jia Yuan USA Co., Inc. (the "Company") acquired a property located in downtown Los Angeles, within Council District 14 ("CD-14"), for more than $100 million and planned a massive redevelopment that would include retail space, residential units, and hotel rooms, valued at approximately $700 million (the "Luxe Hotel Project").  In his capacity as the Chairman of Jia Yuan USA Co., Inc., Chairman Yuan understood that, beginning in early 2015, the Company was seeking approval from various departments and committees of the City of Los

Co. Initials                           A-1

Angeles for the Luxe Hotel Project. At all times relevant to this Statement of Facts, Chairman Yuan acted on behalf of the Company in his capacity as the Chairman of the Company.

3. In or around January 2015, the Company hired George Chiang as a consultant on the Luxe Hotel Project, and paid Chiang approximately $5,000 per month. Thereafter, Chiang acted as an agent of the Company.

4. General Manager D was the Company's General Manager with the responsibility of overseeing the Luxe Hotel Project until approximately January 2017. During his employment, General Manager D, a foreign national, acted as an employee and agent of the Company.

5. At some point during the approval process, Company employees and/or outside consultants and lawyers introduced Chairman Yuan to Jose Huizar, the Councilmember for CD-14. Although Chairman Yuan and Huizar could not directly communicate with each other (Chairman Yuan did not speak English and Huizar did not speak Chinese), Chairman Yuan understood that Huizar was involved in, and important to, the City approval process, including obtaining necessary entitlements.

<u>Early Asks of and Benefits for Jose Huizar</u>

6. On August 21, 2014, Employee D sent an e-mail to Huizar and General Manager D requesting Huizar's assistance regarding an American Disabilities Act ("ADA") compliance issue at one of Hazens' hotels in the City.

7. On August 26, 2014, Employee D sent an e-mail to Huizar, a CD-14 staffer, and General Manager D, stating: "I just got a call from Building and Safety Department of LA City, and a meeting with them is confirmed tomorrow morning to discuss about our ADA challenge. Thanks so much again for Jose [Huizar] and you for helping us with this."

Co. Initials                     A-2

8.      On August 27, 2014, Individual 1 confirmed to Huizar that Individual 1 helped resolve the ADA issue for Hazens, writing in a text message: "I took care of the disabled access issue for the [Hazens] Hotel already. I told them that you asked me to help. They were very appreciative."

9.      On September 19, 2014, Employee D sent three Katy Perry concert tickets valued at approximately $1,000 total for Huizar and his family, by e-mail to George Esparza, Huizar's then Special Assistant, and copying General Manager D.

10.    At some point, Chairman Yuan learned that the Huizar family had medical expenses for a sick child.   Chairman Yuan also learned that Relative A-1 was an attorney. Chairman Yuan learned from Chiang or General Manager D of a request to hire Relative A-1 as a consultant on the Luxe Hotel Project.  Hazens did not approve that request.

<u>Foreign National and Conduit Contributions</u>

11.    On November 4, 2014, Chiang sent an e-mail to Esparza with the subject line "Huizar Fundraising," writing: "Can you get me in touch with [Huizar]? [Individual 1] and I had dinner with Hazens last night regarding pledging their support so I want to discuss this to prepare the Councilman's dinner with them this Thursday."

12.    Between November 2014 and August 2018, several Company employees made individual campaign contributions to U.S. political candidates, including a federal candidate, for which the Company then reimbursed some of these employees.  A number of these reimbursed campaign contributions were made at the request and with the approval of General Manager D.

13.    Between 2015 and 2017, the Company provided in-kind political contributions to several U.S. political candidates, including a federal candidate, in the form of hosting fundraiser events at the Luxe Hotel.  On some occasions, at Chiang's request, General Manager D approved

Co. Initials           A-3

political fundraiser events at the Luxe Hotel at a reduced cost.  On three separate occasions, the

Company hosted political fundraiser events at the Luxe Hotel at no cost, because no invoice for

the event was generated or sent, or no payment was collected, at the time of the event.  The

Company eventually received some payments from the political candidates for these fundraiser

events in 2019, after the political candidates became aware of the Government's criminal

investigation.

Consulting Fees Scheme

14.     On November 11, 2015, Chairman Yuan and General Manager D attended a

dinner with Huizar, Chiang, and Esparza, at a restaurant in Arcadia, California.  Chiang

translated the conversations for Chairman Yuan and Huizar.  During the dinner, Huizar asked

Chairman Yuan to hire one of Huizar's associates as a consultant on the Luxe Hotel Project.

15.     Sometime after the November 2015 dinner, Chiang informed Chairman Yuan that

it would help the Luxe Hotel Project entitlement process if Chairman Yuan could make an

introduction of a Chinese real estate investor to a California company.  At Chairman Yuan's

direction, General Manager D helped facilitate the introduction of a Chinese real estate investor

to a California company, Company A, through Relative D.  Relative D was an employee of a

Canadian Hazens affiliated company until mid-2015, and was previously married to a relative of

Chairman Yuan's daughter-in-law.  In facilitating this introduction, General Manager D

understood that the arrangement was a way to ultimately financially benefit Relative A-1,

Huizar's relative, at Huizar's request.

16.     This introduction resulted in a signed contract between Company A and Relative

D, whereby Relative D paid Company A $11,000 per month for six months for real estate market

research reports, for a total of $66,000 between June 2016 and November 2016.  General

Co. Initials _FY_

A-4

Manager D and Chairman Yuan were aware that the introduction successfully resulted in a signed contract.

17.     Between May 2016 and November 2016, Chiang, acting as an agent of the Company and to benefit the Company, facilitated an arrangement whereby Chiang prepared real estate market research reports and provided them to Huizar, who then provided them to Company A, which in turn collected $66,000 in fees from Relative D for the reports. Chiang understood that the $66,000 in fees from Relative D were intended to be and were indirect bribe payments solicited by Huizar in exchange for Huizar's official acts to benefit the Luxe Hotel Project. Specifically, in exchange for the payment of consulting fees to Company A, on November 22, 2016, Huizar, in his official capacity, presented a written motion in the Economic Development Committee to benefit the Luxe Hotel Project. On December 13, 2016, Huizar voted "yes" in City Council to adopt the Luxe Hotel Project motion he had presented.

<u>Huizar's Receipt of Financial Benefits from Hazens During Trip to China</u>

18.     Between February and April 2017, at Huizar's request, Chiang organized and coordinated a trip for Huizar and his family members to visit Chairman Yuan in China. Chiang coordinated and paid approximately $500 for visa fees, and arranged for transportation for Huizar and his family in Hong Kong.

19.     In April 2017, Huizar and his family arrived at the Hong Kong airport, and were greeted and picked up by a Hazens employee. Chairman Yuan instructed a Hazens employee to make arrangements for Huizar and his family during their visit. During the visit, Hazens employees drove the Huizar family in Hazens cars, including between the Hong Kong airport and their hotel in Shenzhen, China, and various short trips in and around Shenzhen. Hazens also paid for multiple meals for Huizar and his family, entry tickets to two theme parks, and gifts for

Co. Initials *FY*                    A-5

Huizar's children.  These Hazens-paid accommodations for the Huizar family were valued at approximately $1,400 total.  In addition, a Hazens employee made reservations for the Huizar family at a hotel in Shenzhen, China.  Although Hazens has been unable to locate any payment records for the Huizar family's stay at the hotel in Shenzhen, it would not be unusual for Hazens to pay for a visitor's hotel room in this type of circumstance.

<u>Huizar's Additional Official Acts to Benefit the Company</u>

20.     On September 1, 2017, at Chiang's request, Huizar presented a written motion in the Planning and Land Use Management ("PLUM") Committee to benefit the Company, allowing the Luxe Hotel Project to move forward with its application and approval process before the City Planning Commission and City Council.

21.     On September 14, 2017, Huizar confirmed that, at Chiang's request, he and his office exerted pressure on other City officials, writing to Chiang in a text message: "Congrats. Yeah we [CD-14 office] were calling mayors office to tell his commission to calm down. It's expected from cpc [City Planning Commission] they throw a lot of junk at projects these days. Not over but make sure u relay to chairman [Yuan] that we were helpful."

22.     On December 5, 2017, Huizar voted to approve the Luxe Hotel Project in the PLUM Committee.

<u>Request for Chairman Yuan to Contribute $100,000 to Relative A-1's Campaign</u>

23.     Chairman Yuan learned from Chiang that Huizar's relative, Relative A-1, planned to run for Huizar's seat on the Los Angeles City Council after Huizar's term ended.

24.     On January 24, 2018, Chairman Yuan attended a dinner with Huizar, Relative A-1, Chiang, Individual 1, and others.  During the dinner, the topic of Relative A-1 running for

Co. Initials                     A-6

office was mentioned, to which Chairman Yuan responded, "Yes, I would support [Relative A-1]," or words to that effect in Chinese for interpretation.

25.     At some point, Chiang asked Chairman Yuan to make a $100,000 donation to Relative A-1's campaign.  Chairman Yuan was surprised by the high amount and asked Chiang if it would be proper to do so and to confirm that it was permissible for the Company to make such a contribution.  Chiang told Chairman Yuan that he would follow up about whether it was permissible.  Thereafter, Chiang raised this contribution request with Chairman Yuan two or three other times.  Chairman Yuan responded that Chiang should confirm that it was permissible to make the contribution.

26.     At some point in 2018, during an in-person meeting, Individual 1 also asked Chairman Yuan to make the donation to support Relative A-1's election.  Chairman Yuan told Individual 1 the same thing he told Chiang—if they confirmed that it was permissible to make such a donation, Chairman Yuan would consider it.

27.     Based on the repeated requests by Chiang and Individual 1 regarding this donation request to support Relative A-1's election, Chairman Yuan developed the impression that Chiang and/or Individual 1 may have already made a commitment to Huizar that the Company would make the donation, and that Chiang and Individual 1 were trying to get Chairman Yuan to pay it.

28.     Chairman Yuan did not authorize, approve, or make a $100,000 donation to support Relative A-1's election at any time.  Notwithstanding this, Chiang told Huizar that the Company had in fact agreed to contribute $100,000 to a political action committee ("PAC") to benefit Relative A-1's campaign.

Co. Initials                               A-7

<u>Huizar's Additional Official Acts in Exchange for PAC Contribution Agreement</u>

29.     On March 9, 2018, Huizar submitted a resolution in the PLUM Committee to

benefit the Company, allowing the Luxe Hotel Project to move forward in its approval process.

30.     On June 12, 2018, Huizar voted in the City Council to approve the Development

Agreement for the Luxe Hotel Project.  The same day, Huizar wrote to Chiang in a text message:

"Da [Development Agreement] for Hazens just passed council today. Does that mean project has

been fully entitled? Is that our last vote?"  The same day, Huizar wrote to Chairman Yuan via

WeChat: "Congratulations.  The development agreement document was approved in full council

today for the Olympic and Figueroa project.  Hope all is well with you my friend."

31.     On June 18, 2018, Huizar wrote to Chiang in a text message: "When is the

chairman [Yuan] coming in to town? We need to finalize [Relative A-1] pac [contribution] stuff.

Thanks."

32.     On July 30, 2018, the ordinance authorizing the execution of the Development

Agreement for the Luxe Hotel Project went into effect.  The same day, Huizar wrote to Chiang in

a text message: "any news on when [Chairman Yuan] is coming in to town? Hoping to catch

dinner with him and talk about [Relative A-1] campaign." Chiang responded: "Hi Boss,

[Individual 1] is working on it. I let you know after I see him in office tomorrow."

33.     On October 8, 2018, Huizar followed up regarding the Company's $100,000

commitment to the PAC, writing to Chiang in a text message: "Hey George [Chiang]... have time

to meet soon to tie up some loose ends re the [Hazens] project?"

Co. Initials *FY*                                   A-8

**EXHIBIT B**

**STATUTE OF LIMITATIONS
TOLLING AGREEMENT**

This Statute of Limitations Tolling Agreement ("Tolling Agreement") is entered into between Jia Yuan USA Co., Inc. (the "Company") and the United States Attorney's Office for the Central District of California (the "USAO").

1.      The USAO and the Federal Bureau of Investigation have been investigating certain matters relating to the Company's interactions with Los Angeles City public officials in connection with the Company's real estate development project located at the Los Angeles Luxe City Center Hotel between 2014 and November 2018 (the "Investigation").

2.      Contemporaneously with the execution of this Tolling Agreement, the Company and the USAO are entering into a Non-Prosecution Agreement to resolve the Investigation with respect to the Company (the "Non-Prosecution Agreement"). The Non-Prosecution Agreement includes, as Exhibit A, a Statement of Facts.

3.      The Company and the USAO acknowledge that it is their mutual intention for this Tolling Agreement, in accordance with the terms and conditions of the Non-Prosecution Agreement, to effect a waiver and tolling of any federal statute of limitations (including, but not limited to, 18 U.S.C. §§ 3282, 3293, and 3301) for any violation of federal law relating to the conduct described in the Statement of Facts.

4.      This Tolling Agreement applies solely to any federal criminal offenses, and allegations thereof, relating to the Company's conduct as described in the Statement of Facts charged by the USAO following a breach of the Non-Prosecution Agreement as set forth in Paragraphs 17 through 20 of the Non-Prosecution Agreement.  It also applies to all criminal prosecution and civil and criminal forfeiture actions brought by the USAO that may be based on such federal criminal offenses.  It does not apply to any criminal offenses, allegations, prosecutions, or actions brought by any other federal law enforcement or prosecutors' offices.

5.      The parties to this Tolling Agreement hereby agree and stipulate that the period beginning on the execution date of the Non-Prosecution Agreement, and continuing until the conclusion of the Term as defined in the Non-Prosecution Agreement plus one year (the "Tolling Period"), shall be excluded from any calculation of time for purposes of the application of any federal statute of limitations to any violation of federal law relating to the conduct described in the Statement of Facts.

6.      The parties to this Tolling Agreement further agree and stipulate that the running of any federal statute of limitations or any similar equitable doctrine for any alleged violation of federal law shall be tolled during the Tolling Period.

B-1

7.     The Parties to this Tolling Agreement further agree and stipulate that the Tolling Period shall not be considered or assessed against the United States or the USAO for purposes of any constitutional, statutory, or other challenge involving a claim of pre-indictment delay relating to any criminal prosecution brought by the USAO related to the conduct described in the Statement of Facts.

8.     The Company has retained and consulted with outside counsel. The Company, having been advised by its counsel of the potential consequences of this Tolling Agreement to its rights under the Fifth and Sixth Amendments of the United States Constitution, the federal statutes of limitations, and Rule 48(b) of the Federal Rules of Criminal Procedure, expressly waives its right to rely upon the time included in the Tolling Period to support any defense based upon the failure of a federal grand jury or the USAO to charge it with any violation of any relevant federal law relating to the conduct described in the Statement of Facts or the failure to institute civil or criminal  forfeiture proceedings against it or against any of its assets.

9.     The parties to this Tolling Agreement understand that nothing in this Tolling Agreement revives any criminal charges for which the applicable statute of limitations ran prior to the execution date of the Non-Prosecution Agreement.

10.     This Tolling Agreement does not limit or affect the right or discretion of the USAO, or any other component of the United States Department of Justice, to seek or initiate criminal charges or any civil money laundering or civil or criminal forfeiture proceedings against the Company based upon the violation of any federal law at any time, except to the extent set forth in the Non-Prosecution Agreement.

11.     This Tolling Agreement may be executed in counterparts and transmitted by

//

//

//

//

//

//

//

//

B-2

facsimile and/or electronic copy, each of which counterparts will be deemed to be an original and which taken together will constitute the Tolling Agreement.

READ AND AGREED TO:


NICOLA T. HANNA
United States Attorney
Central District of California


_____          10.5 - 2020
MACK E. JENKINS                           _____
VERONICA DRAGALIN                         DATE
MELISSA MILLS
Assistant United States Attorneys


_____          5 - 10 - 2020
JIA YUAN USA CO., INC.                    _____
by:  Fuer Yuan. Chairman                  DATE


_____          10-5-2020
DAVID M. CHAIKEN                          _____
Troutman Pepper Hamilton Sanders LLP      DATE
Counsel for Hazens Real Estate Group


_____          10-5-2020
STEPHANIE YONEKURA                        _____
Hogan Lovells US LLP                      DATE
Counsel for Hazens Real Estate Group


B-3

**EXHIBIT C**

**WAIVER OF INDICTMENT**

In the event that the United States Attorney's Office for the Central District of California institutes a criminal prosecution against Jia Yuan USA Co., Inc., following a determination of a breach of the Non-Prosecution Agreement, in accordance with paragraphs 17 through 20 of that Agreement, Jia Yuan USA Co., Inc., having been advised by counsel of its rights and the nature of potential charges arising out of the Statement of Facts, waives its right to indictment and agrees that criminal proceedings may be by information rather than indictment for any federal offense arising out of the Statement of Facts attached as Exhibit A to the Non-Prosecution Agreement.

JIA YUAN USA CO., INC.
by:  Fuer Yuan, Chairman

5 – 10 – 2020
DATE

DAVID M. CHAIKEN
Troutman Pepper Hamilton Sanders LLP
Counsel for Hazens Real Estate Group

10-5-2020
DATE

STEPHANIE YONEKURA
Hogan Lovells US LLP
Counsel for Hazens Real Estate Group

10-5-2020
DATE

**EXHIBIT D**

**COMPANY OFFICER'S CERTIFICATE**

This Agreement, including Exhibits A-F, has been read to me in Chinese, the language I understand best. I have carefully reviewed every part of the Agreement with outside counsel for Jia Yuan USA Co., Inc. (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted with outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the Chairman for the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

_____          $5-10-2020$
JIA YUAN USA CO., INC.                    DATE
by: Fuer Yuan, Chairman


**CERTIFICATION OF INTERPRETER**

I, Stephanie Huang_____, am fluent in the written and spoken English and Chinese languages.
I accurately translated this entire agreement from English into Chinese to Fuer Yuan on this date.

_____          10/4/2020
INTERPRETER                               Date

**EXHIBIT E**

**CERTIFICATE OF COUNSEL**

The undersigned are counsel for Jia Yuan USA Co., Inc. in the matter covered by this

Non-Prosecution Agreement. In connection with such representation, we have examined relevant

company documents and have discussed the terms of this Non-Prosecution Agreement with

Management for Jia Yuan USA Co., Inc. Based on our review of the foregoing materials and

discussions, we are of the opinion that Chairman Fuer Yuan is duly authorized to enter into this

Non-Prosecution Agreement on behalf of Jia Yuan USA Co., Inc., and that this Non-Prosecution

Agreement has been duly and validly authorized, executed, and delivered on behalf of Jia Yuan

USA Co., Inc., and is a valid and binding obligation of Jia Yuan USA Co., Inc. Further, we have

carefully reviewed the terms of this Non-Prosecution Agreement with the General Counsel of Jia

Yuan USA Co., Inc. We have fully advised her of the rights of Jia Yuan USA Co., Inc., of

possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering

//

//

//

//

//

//

//

//

//

//

E-1

into this Non-Prosecution Agreement. To our knowledge, the decision of Jia Yuan USA Co., Inc.

to enter into this Non-Prosecution Agreement, based on the authorization of the Chairman of Jia

Yuan USA Co., Inc., is informed and voluntary.

DATED: _10/5/2020_                 BY: _____

                                   DAVID M. CHAIKEN
                                   Troutman Pepper Hamilton Sanders LLP

DATED: _10/5/2020_                 BY: _____

                                   STEPHANIE YONEKURA
                                   Hogan Lovells US LLP

E-2

**EXHIBIT F**

**CORPORATE COMPLIANCE PROGRAM**

The Company agrees to revise and address any deficiencies in its compliance code, policies, and procedures regarding compliance with applicable anti-bribery/anti-corruption laws. Indeed, the Company already has initiated substantial additions and changes to its compliance program, policies, and procedures. However, when necessary and appropriate, the Company agrees to adopt new, or to modify its existing, compliance code, policies, and procedures in order to ensure that it maintains a rigorous anti-bribery/anti-corruption compliance code, and policies and procedures designed to detect and deter violations of anti-bribery/anti-corruption laws. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing compliance code, policies, and procedures:

**High-Level Commitment**

1.      The Company will ensure that its executives, directors, and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of the anti-bribery/anti-corruption laws and its compliance code.

**Policies and Procedures**

2.      The Company will develop, memorialize, and promulgate a clearly articulated and visible corporate policy against violations of all anti-bribery/anti-corruption laws.

3.      The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the anti-bribery/anti-corruption laws and the Company's compliance code, and the Company will take appropriate measures to encourage and support compliance by personnel at all levels and locations of the Company. These anti-bribery/anti-corruption policies and procedures shall apply to all executives, directors, officers, and employees regardless of location and, when necessary and appropriate, outside parties acting on behalf of the Company, including but not limited to, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint venture partners (collectively, "agents and business partners"). It shall also apply to other current and future U.S. affiliates of the Company. The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the Company. Such policies and procedures shall address:
   a.      gifts;
   b.      hospitality, entertainment, and expenses;
   c.      customer travel;
   d.      political contributions;
   e.      charitable donations and sponsorships;
   f.      facilitation payments; and
   g.      solicitation and extortion.

F-1

**Periodic Risk-Based Review**

4.      The Company shall review its anti-bribery/anti-corruption compliance policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving industry standards.

**Proper Oversight and Independence**

5.      The Company will designate an officer or employee to serve as the Company's Chief Compliance Officer for the implementation and oversight of the Company's anti-bribery/anti-corruption compliance code, policies, and procedures, including for guidance and advice about compliance with such code, policies, and procedures. The Chief Compliance Officer shall have direct reporting obligations to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

**Training and Guidance**

6.      The Company will implement mechanisms designed to ensure that its anti-bribery/anti-corruption compliance code, policies, and procedures are effectively communicated to all executives, directors, officers, employees, and, when necessary and appropriate, agents and business partners. These mechanisms shall include periodic training for the following employees: (a) all executives, directors, and officers; (b) all employees in positions of leadership or trust; (c) all employees in positions that require such training, such as corporate, community, government and congressional affairs, internal audit, sales, real estate, legal, compliance, and finance; (d) employees of agents and business partners in the above positions, when necessary and appropriate. The Company will also require that all people in the above-described categories annually certify that they have received the necessary training and have complied with the law and the Company's anti-bribery/anti-corruption compliance code, policies, and procedures.

**Internal  Reporting and Investigation**

7.      The Company will maintain, or when necessary establish, an effective system for internal reporting and, when possible, confidential reporting by, executives, directors, officers, employees, and, when appropriate, agents and business partners concerning violations of the anti-bribery/anti-corruption laws or the Company's anti-bribery/anti-corruption compliance code, policies, and procedures. The Company will maintain, or when necessary establish, mechanisms to prevent any personnel action from being taken against any individual making such a report.

8.      The Company will maintain, or when necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the anti-bribery/anti-corruption laws or the Company's anti-bribery/anti-corruption compliance code, policies, and procedures.

### Enforcement and Discipline

9.      The Company will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures, including appropriately incentivizing compliance, disciplining violations, and re-assessing its compliance code, policies, and procedures to identify modifications necessary to ensure that the overall anti-bribery/anti-corruption compliance program is effective. Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the executive, director, officer, or employee. The Company shall implement procedures to ensure that, when misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct and to ensure that appropriate steps are taken to prevent further similar misconduct.

### Third-Party Relationships

10.     The Company will institute risk-based due diligence and compliance requirements pertaining to the retention and oversight of agents and business partners, including:

      a.      conducting properly documented due diligence pertaining to the hiring, and appropriate and regular oversight of, agents and business partners;

      b.      informing agents and business partners of The Company's commitment to abiding by anti-bribery/anti-corruption laws, and of The Company's anti-bribery/anti-corruption compliance code, policies, and procedures; and

      c.      seeking a reciprocal commitment from agents and business partners.

11.     When necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include: (a) representations and undertakings relating to compliance with the anti-bribery/anti-corruption laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of the anti-bribery/anti-corruption laws, the Company's compliance code, policies, or procedures, or the representations and undertakings related to such matters.

### Mergers and Acquisitions

12.     The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate anti-bribery/anti-corruption due diligence by legal, accounting, and compliance personnel. If the Company discovers any corrupt benefits of any kind or inadequate compliance processes as part of its due diligence of newly acquired entities or entities merged with the Company, it shall report such conduct to the United States Attorney's Office for the Central District of California.

13.     The Company will ensure that the Company's compliance code, policies, and procedures regarding the anti-bribery/anti-corruption laws apply as quickly as practicable to newly acquired

businesses or entities merged with the Company and will promptly train the executives, directors, officers, employees, agents, and business partners consistent with Paragraph 6.