**Exhibit 6**

FD-302 (Rev. 5-8-10)

# FEDERAL BUREAU OF INVESTIGATION

Date of entry    10/05/2020

On September 16, 2020, RON ZEFF ("RON"), was interviewed by video conference by FBI Special Agent Andrew Civetti and Special Agent Robert Logan. Also present in the video interview conference was RON's attorneys Josh Cohen and John Potter, Assistant United States Attorney ("AUSA") Mack Jenkins, AUSA Veronica Dragalin, and AUSA Melissa Mills. After being advised of the identity of the interviewing Agents and the nature of the interview, RON provided the following information:

*[Agent Note: Prior to the interview RON was advised that the interview was voluntary. RON was instructed that he could end the interview at any time and that he had the right to consult with his attorneys. RON was advised that lying to the FBI was a federal offense and that lying included omitting information. RON affirmatively acknowledged he understood all of these admonishments and that he must be completely truthful.]*

**The below names and topics were discussed during the recording. This report is not intended to be a verbatim account of the recording and does not memorialize all statements made during the recording. The recording captured the actual words spoken. The original recording is being maintained in the ELSUR section of case file 194B-LA-255905, 1D422.**

## BACKGROUND

RON was the founder and chief executive officer ("CEO") of CARMEL PARTNERS ("CARMEL"). RON was the head of the Executive and Investment committees. RON was very involved with the investors and lenders. RON owned the company, but the investors owned the equity companies.

## CARMEL PARTNERS

CARMEL was comprised of multiple companies including investment, construction, and development services. CARMEL had projects across the

---

Investigation on   09/16/2020   at   Los Angeles, California, United States (Phone)

File #   194B-LA-255905      Date drafted   09/16/2020

by   Andrew R. Civetti, LOGAN ROBERT ANTHONY

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Casino_2007206

country and predominately in New York, Washington D.C., Denver, Seattle, and Los Angeles. As head of the investment committee, RON approved each investment including each of the investments in Los Angeles. RON also attended a monthly development meeting and received an updated on the various projects. RON was not very involved with hiring decisions. Hiring was handled by DAN GARIBALDI. Consultants, lobbyists, and sub-contractors were hired on the local level. For Los Angeles, this was handled by NEILS COTTER. The MATEO PROJECT ("MATEO") was in Los Angeles and on of the top valued projects for CARMEL.

**POLITICAL CONTRIBUTION**

CARMEL had a compliance process and all political contributions were required to be approved by compliance. RON had a role in approving all political contributions after they were cleared by compliances. RON wanted to make sure every contribution was legal and in alignment with a business purpose. RON approved contributions to candidates, political action committees ("PAC"), and non-profits.

Contributions went through an e-mail and verbal process. RON could not remember the number of times he denied a contribution but it was done before. It was possible that contributions were denied by another department and RON was never aware of the contribution. RON made his position clear. RON denied contributions if they did not align with business purposes or affected CARMEL's ability to raise money for an investment fund.

[Agent Note: RON was shown **Exhibit 33** – CARMEL ethics training.]

RON was sure that CARMEL did not allow any type of bribery. CARMEL had a gift policy. RON did not think anyone that worked for CARMEL would bribe a public official. No one would ask for a donation in exchange for a vote. The contribution process required compliance's approval. CARMEL did not need a specific policy against bribery because it was obvious not to bribe a public official. RON did not know of any training or guidance regarding benefits around the time of official acts. RON was a part of the decision to not contribute due to timing.

RON was not familiar with conduit contributions. RON did not know if conduit contributions ever happened. CARMEL absolutely did not reimburse anyone for contributions.

## UNIONS

A project labor agreement ("PLA") was unusual for CARMEL. Some projects were bought that already had a PLA in place, but CARMEL did not voluntarily enter PLAs. Using union labor was more costly. CARMEL experienced pressure from unions throughout California. California was unique because union opposition could not be tied to signing a PLA but was attributed to California Environmental Quality Act ("CEQA") violations. Unions had to appeal through the entitlement process in order to exhaust the unions administrative actions before a lawsuit could be filed.

Unions typically prepared a letter giving notice to CARMEL that they intended to litigate. Such notice delayed projects and cause the project more money. Sometimes CARMEL let the union appeal and other times CARMEL engaged in negotiations. "Sometimes a PLA will kill a project" and the project wont pencil in to be worth it for CARMEL. Council offices may play a role in union negotiations. RON did not know if JOSE HUIZAR specifically got involved in any union issues with CARMEL in Los Angeles.

*[Agent Note: RON was shown **Exhibit 27** - November 2, 2015 e-mail from DUANE CARLSON (Head of Construction) to BOB ROBINSON.]*

"Dev." could mean "development" but it was not RON's e-mail and RON was not included on the e-mail. No one at the company was named "DEVIN" or "DEV."

*[Agent Note: RON was shown **Exhibit 25** - November 18, 2015 e-mail between GARIBALDI, ROBINSON, COTTER, and CARLSON.]*

Generally, it was possible that a union opposition could affect the entitlement process for a project.

## CONSULTANTS | LOBBYISTS

RON did not personally know CARMEL had a lobbyist in Los Angles. RON never heard the name MORRIE GOLDMAN and never met GOLDMAN. RON did not recall any conversations mentioning GOLDMAN or involved GOLDMAN. It was up to the local project manager to hire lobbyists or consultants as needed. In general CARMEL hired such individuals to help navigate the local process of approvals and permits.

## MATEO

RON was familiar with the MATEO project from a conceptual and economics perspective. The project evolved over time. MATEO was a "covered land play" meaning that even if the entitlement was not successful, the property could still be sold at an appreciated value. CARMEL would still make a profit regardless if the entitlement was successful.

The project's design changed over time. The project was original proposed as a wood frame building, but after discussions with the community, CARMEL agreed to a concrete structure. CARMEL was confident that the project would be approved because it was "done the right way" and had approval from the community.

### UNIONS

The carpenters and laborers unions filed appeals on the project. CARMEL was not concerned about the appeals and union appeals were normal for projects such as MATEO. CARMEL made it clear that they would not back down and would not sign a labor agreement for complete labor on the project. A lawsuit was filed by the unions but it was settled. It did not appear as though CARMEL received any help from anyone regarding the lawsuits.

Delays on projects had adverse financial consequences. Carry costs were not as painful to a project. Litigation could take over a year and could be costs, but at the same time the rental market could be increasing. RON was not stressed about the project or any delays because he could have sold the project for a profit at any time.

### NEILS COTTER

RON may have interviewed COTTER, but COTTER was ultimately hired by GARIBALDI. GARIBALDI was COTTER's direct supervisor. COTTER was in charge and the lead on the MATEO project. COTTER never expressed any negative views about the project. RON did not know why COTTER would tell GOLDMAN that things were disastrous. RON did not know of any reason to provide a false narrative to GOLDMAN.

### MAX ZEFF

MAX ZEFF ("MAX") was RON's son. RON had four sons and MAX was the oldest. MAX was the only son that worked for CARMEL. Shortly after MAX graduated

from college MAX started a business in New York. The business failed and MAX joined CARMEL's New York office. MAX then left the New York office to work for LUCKY BRAND JEANS in Los Angeles. MAX did not enjoy retail and interviewed with CARMEL's Los Angeles office. COTTER hired MAX. RON told MAX he would have to "work twice as hard for half the pay and half the credit." RON had an understanding with COTTER that RON would not have backdoor conversations with MAX and that MAX reported to COTTER.

MAX came to CARMEL with limited experience. COTTER acted as a mentor to MAX. MAX started with COTTER in approximately 2016. MAX worked on the MATEO project with COTTER.

**FIRST $25,0000 CONTRIBUTION**

RON did not remember the specific name COMMUNITY SUPPORT PAC, but was aware of the name of the PAC now. RON recalled the $25,000 request and the approval. RON recalled conversations with COTTER and/or compliance regarding the request. RON understeer that the PAC was for a homelessness initiative and came from HUIZAR. RON understood at the time that HUIZAR was the councilmember for the downtown district. It was a positive factor that the request was from HUIZAR because it added credibility that the money would be spent downtown and for the homeless issues around CARMEL's projects.

*[Agent Note: RON was shown **Exhibit 31** – October 14, 2016 e-mail from GOLDMAN to COTTER, "Huizar & Homeless Bond Campaign."]*

RON was not aware that the contribution request came from GOLDMAN. The request was present to RON from HUIZAR.

*[Agent Note: RON was shown **Exhibit 12** – October 20, 2016 e-mail between COTTER, BRIAN SMITH, and CHRISTINE CHEN.]*

SMITH was the head of compliance and CHEN was also on the compliance team. RON did not specifically remember the allocation of the contribution but it would not surprise RON to have the contribution split amongst different entities that would benefit from the initiative.

RON did not know what SMITH meant when he referred to "pay-to-play." The compliance process involved consultation with outside counsel to vet the donations and approve whether the donation was legal or not.

*[Agent Note: RON was shown **Exhibit 13** – October 20, 2016 e-mail between COTTER, SMITH, and CHEN.]*

RON did not recall conversations about the PAC supporting HUIZAR's campaign. RON did not think this topic came up in the discussions about the PAC. RON did not recall that the conversation included that the PAC was initiative based and not candidate based. RON only recalled that the contribution was for homelessness. It would be a different set of questions if the PAC were to support a candidate. It would certainly be something to explore if a request came around the same timing as a vote on a project or was in exchange for an official act. RON was not sure but assumed that compliance was aware that HUIZAR could vote or complete an official act on a matter for CARMEL. RON did not recall any conversations about the fact that HUIZAR had to vote on pending projects of CARMEL's.

*[Agent Note: RON was shown **Exhibit 14** – October 27, 2016 e-mail between COTTER and BRIAN SMITH.]*

RON did not think he discussed with COTTER about delivering checks in person and talking "big picture" about a project. It would be concerning if COTTER was delivering checks and also talking about a project with HUIZAR but was not concerning that COTTER was simply delivering checks related to homelessness. One thing of concern to RON was the appearance of conflict. If a conversation is general, there would not be an issue, but if conversation related to the specifics of a project, the need for approval, and the request for a contribution, then this would be a concern to RON. RON understood now that perception either way is not okay because the appearance on a reputational standpoint, even if the subject of a discussion is completely fine, could be an issue.

The concern is the appearance of connecting a payment in exchange for support or a vote on a project. RON analyzed the situation by asking whether RON would want the information on the front cover of the Los Angeles Times. Regardless if the actions were legal or illegal, the perception was always a concern. CARMEL did not have any training on how to interact with public officials related to project approvals and contributions. Since the investigation, RON enacted a freeze on all political and PAC donations. RON did not think it was worth it nor made an influence on CARMEL's work.

**SECOND $25,000 CONTRIBUTION**

RON recalled the second request and approved the request for the second $25,000 to COMMUNITY SUPPORT PAC. This request was similar to the first contribution and RON did not remember anything differently for this request.

*[Agent Note: RON was shown **Exhibit 15** – February 24, 2017 e-mail between COTTER, SMITH, and CHEN and a CC to RON and GARIBALDI.]*

RON did not recall this e-mail.

*[Agent Note: RON was shown **Exhibit 35**.]*

RON did not know what COTTER meant by "CP Development." RON had discussions about the allocation of the contribution but did not recall the specifics. RON knew the request was from HUIZAR but COTTER did not disclose the contribution was for HUIZAR mailers.

*[Agent Note: RON was shown **Exhibit 16** – March 20, 2017 e-mail.]*

RON had not seen this document before. "Holland" may have referred to another development group. It would be a concern to RON if the contribution was linked to the status of CARMEL or CARMEL's project for HUIZAR. RON did not recall an inquiry from the LA Times about this contribution.

*[Agent Note: RON was shown **Exhibit 17** – May 9, 2018 e-mail.]*

RON did not remember this issue about the contribution being used to support a specific candidate. RON remember the contribution was to support homelessness. If the contribution was spent otherwise, it would not be a good fact.

**JUNE 2018 CONTRIBUTION**

FAMILIES FOR A BETTER LOS ANGELES ("FAMILIES PAC") sounded familiar to RON. COTTER wanted a contribution to the FAMILIES PAC and described it as a newly formed PAC that was going to support a pro-development candidate and initiatives in Los Angeles. COTTER said the PAC would likely support HUIZAR's wife's campaign. COTTER told RON that HUIZAR's wife was likely to run for HUIZAR's council position. This contribution followed the same process as all contributions and went through compliance.

*[Agent Note: RON was shown **Exhibit 19** – March 27, 2018 e-mail.]*

SEC rules related to the appointment of investment positions. RON did not know what the term "covered official" referred to. RON remembered hearing about the FAMILIES PAC from COTTER. RON did not recall discussing the PAC with MAX.

*[Agent Note: RON was shown **Exhibit 18** – June 11, 2018 e-mail.]*

RON did not recall if conversations about the FAMILIES PAC happened in person or on the phone. RON was in the same office as compliance. RON believed the contribution was fully vetted through outside counsel and RON was comfortable making the contribution. RON was not concerned about the contribution at the time.

**SEPTEMBER 2018 CONTRIBUTION**

RON recalled the discussion regarding the September 2018 contribution to the FAMILIES PAC because the contribution was discussed with lawyers. RON could not recall any conversations exclusively with COTTER. RON could not recall any conversations with anyone outside of the lawyers. RON did not know whether the decision to not make an addition contribution to the FAMILIES PAC was communicated to GOLDMAN or HUIZAR. RON did not know if the decision was ever convey to GOLDMAN or HUIZAR in any way. RON would have expected the decision to be conveyed to HUIZAR. RON expected COTTER to convey the decision. RON did not recall any conversations with COTTER that COTTER did or did not convey the decision to anyone.

RON was aware that COTTER was going to meet privately with HUIZAR. RON recalled the discussion because COTTER told RON that it was "odd" that HUIZAR wanted to meet one-on-one with COTTER. COTTER felt the request was "unusual." COTTER said he knew CARMEL had this thing pending before HUIZAR but did not understand why the discussion needed to be one-on-one. COTTER did not know the topics that HUIZAR wanted to discuss other than a decision not being made yet on the project. COTTER wanted to communicate to RON that the dinner was happening and that it seemed odd that the meeting was to occur at a restaurant and not at HUIZAR's office.

After the dinner, COTTER told RON that there was nothing substantive discussed at the dinner and the conversation was just about their families.

194B-LA-255905

Continuation of FD-302 of  (U) 09/16/2020_Ron Zeff  ,On  09/16/2020  ,Page  9 of 10

COTTER did not seem to understand what the purpose of the dinner was about. COTTER did not mention talking about the MATEO project. COTTER did not share that he made a presentation to HUIZAR about the MATEO project. COTTER did not mention that HUIZAR made a request for a fundraiser for his wife. COTTER did not mention that HUIZAR made a request for background research. RON was not aware of the background research at any point.

RON thought COTTER would have disclosed the above to him but there could be reasons that COTTER did not if it was not very specific or not worthwhile to report. If COTTER did commit to helping HUIZAR fundraise, it "would be a lot to think about." RON was aware that COTTER and MAX attended a fundraiser in October 2018. RON did not know if COTTER solicited others to give contributions and this would be something COTTER would definitely need to tell RON. COTTER knew or should have known that he must report such activity. RON expected COTTER would disclose all of this information if COTTER made these commitments to HUIZAR.

**BACKGROUND CHECKS**

CARMEL did use firms to conduct background reports. The reports were typical for hiring employees, litigation, or some type of business purpose. The background reports were not for personal matter. Approval was required to request a background report. RON would have said not to do the background research for HUIZAR. RON would not have approved the report.

**OCTOBER FUNDRAISER**

RON was aware that COTTER and MAX attended a fundraiser for HUIZAR's wife on October 11, 2018. RON did not believe that neither COTTER nor MAX made a contribution. RON did not remember any follow up conversations about the event. COTTER did not say he delivered a background report to HUIZAR. COTTER never disclosed that HUIZAR asked for $250,000 and would lower the public benefit payment. RON expected COTTER to disclose this information if it happened. COTTER did not disclose HUIZAR asking to be hired by CARMEL as a consultant or lawyer. RON thought that fact was ridiculous and funny. RON was not aware that HUIZAR was an attorney or that he practiced land-use prior to becoming a councilmember. If any of the things happened (opposition research, RICHELLE fundraising, $250,000, and job) RON expected that COTTER disclose this to CARMEL. RON never heard of COTTER getting employment for

any City officials or their families. All of this information was concerning to RON.

**FBI INVESTIGATION**

No one outside of counsel knew that RON was being interviewed by the FBI. RON did not recall the dates of when CARMEL employees were requested by the FBI to be interviewed. RON remember finding out about the investigation after CARMEL was subpoenaed. RON never met or spoke to HUIZAR. RON never met or spoke to GOLDMAN.