ATTACHMENT A/FACTUAL BASIS

A.   **The CD-14 Enterprise**

1.   Throughout the period described in the First Superseding Indictment, the Council District 14 Enterprise ("CD-14 Enterprise"), located in the City of Los Angeles ("the City"), was a criminal enterprise composed of a group of individuals associated for a common purpose of engaging in a course of conduct, which course includes bribery, mail and wire fraud, including through the deprivation of the honest services of City officials and employees, extortion, interstate and foreign travel in aid of racketeering enterprises, money laundering, structuring transactions to evade reporting requirements, and obstruction of justice, to achieve the goals of the enterprise.  The CD-14 Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.  The goals of the CD-14 Enterprise included, but were not limited to:

a.   enriching the members and associates of the CD-14 Enterprise through means that included bribery, extortion, and mail and wire fraud, including through the deprivation of the honest services of City officials and employees;

b.   advancing the political goals and maintaining the control and authority of the CD-14 Enterprise by elevating members and associates of the CD-14 Enterprise to, and maintaining those individuals' placement in, prominent elected office, through means that included bribery and mail and wire fraud, including through the deprivation of the honest services of City officials and employees;

DEFT. INITIALS

1

## ATTACHMENT A/FACTUAL BASIS

c.   concealing the financial activities of the CD-14 Enterprise, through means that included money laundering and structuring; and

d.   protecting the CD-14 Enterprise by concealing the activities of its members and associates and shielding the CD-14 Enterprise from detection by law enforcement, the City, the public, and others, through means that included obstructing justice.

2.   Defendant JOSE HUIZAR, Councilmember for CD-14, who had jurisdiction over hundreds of development projects undergoing the application and approval process in the City, was a leader and member of the CD-14 Enterprise.  Members and associates of the CD-14 Enterprise also consisted of lobbyists, consultants, and other City officials and staffers, who sought to personally enrich themselves and their families and associates through a pay-to-play scheme within the City, wherein public officials demanded and solicited financial benefits from developers and their proxies in exchange for official acts.

a.   Specifically, through the bribery scheme, defendant HUIZAR, RAYMOND CHAN, GEORGE ESPARZA, and other City officials demanded, solicited, accepted, and agreed to accept from developers and their proxies, some combination of the following types of financial benefits, among others: (1) cash; (2) consulting and retainer fees; (3) favorable loans; (4) gambling chips at casinos; (5) political contributions; (6) flights on private jets and commercial airlines; (7) stays at luxury hotels; (8) expensive meals; (9) spa services; (10) event tickets to concerts, shows, and sporting events; (11) escort and prostitution services; and (12) other gifts.

DEFT. INITIALS

## ATTACHMENT A/FACTUAL BASIS

1    b.    Members and associates of the CD-14 Enterprise

2  conspired with one another to facilitate bribery schemes that would

3  provide defendant HUIZAR and other City official allies financial

4  benefits and keep defendant HUIZAR and his allies in power and

5  maintain the CD-14 Enterprise's political stronghold in the City.

6  This bribery included members and associates of the CD-14 Enterprise

7  raising and soliciting funds from developers and their proxies with

8  projects in CD-14 to be paid to defendant HUIZAR's desired accounts

9  and Political Action Committees ("PACS"), including to benefit

10  HUIZAR's Relative 1's campaign for the CD-14 seat.

11    c.    In exchange for such financial benefits from

12  developers and their proxies, defendant HUIZAR, CHAN, ESPARZA, and

13  other City officials agreed to perform and performed the following

14  types of official acts, among others: (1) presenting motions and

15  resolutions in various City committees to benefit projects; (2)

16  voting on projects in various City committees, including the PLUM

17  Committee, and City Council; (3) taking, or not taking, action in the

18  PLUM Committee to expedite or delay the approval process and affect

19  project costs; (4) exerting pressure on other City officials to

20  influence the approval and/or permitting process of projects; (5)

21  using their office to negotiate with and exert pressure on labor

22  unions to resolve issues on projects; (6) leveraging voting and

23  scheduling power to pressure developers with projects pending before

24  the City to affect their business practices; and (7) introducing or

25  voting on City resolutions to enhance the professional reputation and

26  marketability of businesspersons in the City.

27

28

DEFT. INITIALS 

3

ATTACHMENT A/FACTUAL BASIS

3.   As a result of its bribery, extortion, honest services fraud, money laundering, and structuring conduct, throughout the period described in the First Superseding Indictment, and as known to defendant HUIZAR, CD-14 Enterprise members and associates engaged in, and their activities in some way affected interstate and foreign commerce.

B.   **Defendant's Role in the CD-14 Enterprise**

4.   Beginning no later than February 2013, and continuing at least until July 30, 2020, defendant HUIZAR was a leader of the CD-14 Enterprise.  In that capacity, defendant HUIZAR conspired and agreed with other CD-14 Enterprise members and close associates, including CHAN, ESPARZA, GEORGE CHIANG, JUSTIN KIM, MORRIE GOLDMAN and others, that a conspirator would commit at least two acts of the above-described racketeering activity, which acts had a relationship to one another and the CD-14 Enterprise, and posed a threat of continued criminal activity.  Defendant HUIZAR became a member of this conspiracy knowing of this object, knowing it was illegal, and intending to help accomplish it.

5.   Also in furtherance of the racketeering conspiracy, defendant HUIZAR facilitated and participated in at least the following bribery schemes:

(a)   **L.A. Grand Hotel Bribery Scheme**

6.   In or around February 2013, CHAN, then the Interim General Manager of the Los Angeles Department of Building and Safety, introduced defendant HUIZAR and ESPARZA to WEI HUANG at a dinner in Los Angeles, California.  HUANG, a Chinese national and billionaire, owned and was Chairman of Shen Zhen New World Group, which included

DEFT. INITIALS

4

## ATTACHMENT A/FACTUAL BASIS

1   SHEN ZHEN NEW WORLD I, LLC ("SHEN ZHEN COMPANY"), one of China's

2   leading real estate development companies.  HUANG also owned the L.A.

3   Grand Hotel, located in CD-14, and the Sheraton Universal Hotel,

4   located in CD-4.

5        7.   Between March 2013 and November 2018, HUANG, aided and

6   abetted by CHAN and others, provided financial benefits directly and

7   indirectly to defendant HUIZAR, in exchange for defendant HUIZAR's

8   assistance to HUANG and SHEN ZHEN COMPANY in defendant HUIZAR's

9   official capacity as a City Councilmember on an ongoing and as-needed

10  basis related to specific matters.  Defendant HUIZAR, HUANG, CHAN,

11  and others established a mutually beneficial agreement to exchange a

12  stream of benefits for official acts and to further the CD-14

13  Enterprise's goals.

14              *(1)   Benefits to defendant HUIZAR at Casinos*

15       8.   In March 2013, defendant HUIZAR, ESPARZA, HUANG, and

16  Executive Director E, an associate of HUANG and the Executive

17  Director of SHEN ZHEN COMPANY, traveled on a private jet to the Wynn

18  Hotel and Casino in Las Vegas, Nevada (the "March 2013 trip").

19       9.   During the March 2013 trip, defendants HUIZAR and ESPARZA

20  accepted financial benefits in the form of flights on private jets, a

21  stay in a luxurious five-bedroom villa at the Wynn casino, meals,

22  alcohol, and casino chips from HUANG.  Specifically, defendant HUIZAR

23  accepted approximately $10,000 in casino gambling chips from HUANG.

24  ESPARZA accepted approximately $2,000 in casino gambling chips from

25  HUANG.

26       10.  Between March 2013 and February 2017, defendant HUIZAR

27  traveled to Las Vegas casinos with HUANG on at least the following

28
DEFT. INITIALS

5

## ATTACHMENT A/FACTUAL BASIS

dates, and accepted benefits in the form of expenses including flights, hotel rooms, spa services, meals, alcohol, prostitution/escort services, and casino gambling chips in the following approximate amounts:

| Trip No. | Date | Hotel | Group Benefit | Chips Huizar |
|---|---|---|---|---|
| 1 | March 22 - 24, 2013 | Wynn | $56,231 | $10,000 |
| 2 | December 30, 2013 - January 2, 2014 | Wynn | $53,293 | $10,000 |
| 3 | June 7 - 8, 2014 | Palazzo \| Wynn | $61,635 | $10,000 |
| 4 | June 14 - 15, 2014 | Palazzo \| Wynn | $17,844 | $10,000 |
| 5 | August 22 - 25, 2014 | Palazzo | $138,233 | $13,500 |
| 6 | March 13 - 14, 2015 | Palazzo | $30,953 | $10,000 |
| 7 | March 28 - 30, 2015 | Palazzo | $39,185 | $10,000 |
| 8 | May 1 - 3, 2015 | Palazzo | $2,676 | -- |
| 9 | July 7 - 8, 2015 | Palazzo | $32,683 | $10,000 |
| 10 | October 28 - 30, 2015 | Cosmopolitan | $96,772 | $10,000 |
| 11 | December 11 - 13, 2015 | Caesars | $60,803 | $10,000 |
| 12 | February 12 - 13, 2016 | Cosmopolitan | $60,799 | $10,000 |
| 13 | February 26 - 28, 2016 | Caesars | $40,095 | $10,000 |
| 14 | April 30 - May 2, 2016 | Cosmopolitan \| Palazzo | $159,054 | $10,000 |
| 15 | May 5 - 6, 2016 | Caesars \| Palazzo | $17,334 | $10,000 |
| 16 | May 13 - 16, 2016 | Palazzo \| Wynn | $83,823 | $10,000 |

DEFT. INITIALS 

### ATTACHMENT A/FACTUAL BASIS

| Trip No. | Date | Hotel | Group Benefit | Chips Huizar |
|---|---|---|---|---|
| 17 | July 13 – 16, 2016 | Caesars | $6,606 | $10,000 |
| 18 | August 5 – 7, 2016 | Cosmopolitan | $64,197 | $11,000 |
| 19 | January 29 – 31, 2017 | Caesars / Palazzo | $73,839 | $10,000 |
| 20 | February 4 – 5, 2017 | Caesars / Cosmopolitan | $15,738 | $10,000 |
| | | **TOTAL** | **$1,111,793** | **$194,500** |

      (2)   *Defendant HUIZAR Helps Save CHAN's Job and then Receives $600,000 from HUANG to Settle Defendant HUIZAR's Sexual Harassment Lawsuit During His Reelection Campaign*

11.   On June 7, 2013, an administrative complaint was filed against defendant HUIZAR by a former CD-14 employee.  On October 17, 2013, the former CD-14 employee filed a civil sexual assault lawsuit against defendant HUIZAR.  Thereafter, defendant HUIZAR and CHAN strategized on how to acquire funds to settle the lawsuit and save defendant HUIZAR's career.  In return for defendant HUIZAR saving CHAN's job by preventing the consolidation of the Planning Department and the LADBS, CHAN orchestrated and facilitated an arrangement whereby HUANG provided $600,000 in collateral for defendant HUIZAR to obtain a personal loan from East West Bank for $570,000 to pay the sexual harassment settlement and legal fees.  HUANG and defendant HUIZAR routed the money through various entities to disguise the source of the funds.  On September 26, 2013, defendant HUIZAR used the money provided by HUANG to pay $600,000 to settle the suit with the former CD-14 employee.

DEFT. INITIALS

7

### ATTACHMENT A/FACTUAL BASIS

12.   On December 12, 2018, after defendant HUIZAR failed to make interest payments on the loan for three consecutive months, East West Bank applied the collateral provided by HUANG to the amount defendant HUIZAR owed on the loan, totaling $575,269, which meant that defendant HUIZAR no longer had to pay this amount to the bank, thereby enriching him in the amount of $575,269.

*(3)   Official Acts by Defendant HUIZAR*

13.   In exchange for the $600,000 collateral for defendant HUIZAR's personal loan and during the time HUANG was also supplying financial benefits to defendant HUIZAR, HUANG asked for a series of benefits from defendant HUIZAR.

14.   On May 17, 2013, an employee of SHEN ZHEN COMPANY emailed ESPARZA requesting a "favor" from defendant HUIZAR on behalf of HUANG, relating to a visa application for another SHEN ZHEN COMPANY employee.  Defendant HUIZAR complied with the request and signed a letter on official letterhead addressed to the United States Consulate General in Guangzhou, China, supporting a visa application for the director of Finance for SHEN ZHEN COMPANY.

15.   Between June 2013 and December 2013, HUANG, through CHAN, enlisted defendant HUIZAR's help to negotiate and resolve a parking lot dispute with the owners of a plot of land adjacent to HUANG's property in CD-14, the L.A. Grand Hotel.

16.   Between July 2013 and October 2013, HUANG asked for defendant HUIZAR to arrange a meeting with the head of the labor union, which had a dispute related to the L.A. Grand Hotel.

17.   On April 23, 2014, to benefit HUANG's reputation in the business community, defendant HUIZAR introduced and signed a

DEFT. INITIALS 

## ATTACHMENT A/FACTUAL BASIS

1   resolution before the City Council recognizing HUANG for his

2   achievements and contributions to the economy of CD-14, which the

3   City Council signed and adopted.

4      18.   On June 27, 2017, ESPARZA put a SHEN ZHEN COMPANY employee

5   in touch with a defendant HUIZAR staff member, to discuss and

6   facilitate resolving union issues at HUANG's two hotels in Los

7   Angeles.

8      19.   Most significantly, HUANG provided bribes to defendant

9   HUIZAR because, as the Chair of the PLUM Committee and CD-14

10   Councilmember, defendant HUIZAR was poised to significantly benefit

11   HUANG's desire and plans to redevelop the L.A. Grand Hotel and

12   transform it into a 77-story skyscraper, making it the tallest

13   building west of the Mississippi River.   This project would require

14   official acts from defendant HUIZAR at various stages of the City

15   approval process.

16      20.   From January 1 – 10, 2016, HUANG provided defendant HUIZAR

17   an all-expense paid trip to Australia including a business class

18   flight worth more than $10,000 and $32,800 in Australian dollars.

19      21.   On August 4, 2016, defendant HUIZAR, CHAN, senior officials

20   from the Planning Department, and senior CD-14 staff members met with

21   HUANG and his team to discuss the expansion of the L.A. Grand Hotel,

22   including HUANG's interest in pursuing Transfer of Floor Area Rights,

23   Transient Occupancy Tax rebates, and other incentives from the City.

24      22.   In or around August 2016, on a private jet flight returning

25   to Los Angeles from Las Vegas, HUANG requested defendant HUIZAR's and

26   ESPARZA's assistance in hiring a consultant on the L.A. Grand Hotel

27   Project.   Defendant HUIZAR agreed to help.

28

DEFT. INITIALS 

## ATTACHMENT A/FACTUAL BASIS

23.   On June 11, 2018, SHEN ZHEN COMPANY filed two applications with the Planning Department to expand and redevelop the L.A. Grand Hotel and the Sheraton Universal Hotel.   According to the L.A. Grand Hotel application, "[t]he Project will consist of a conversion of an existing 13-story hotel to 224 apartment units with the addition of a 77-story tower that will provide 599 new hotel rooms, 242 condominium units, 28,704 SF of commercial, & 36,674 SF of hotel amenities."   The application listed four specific requested actions/entitlements: (1) vesting tentative tract map; (2) specific plan project permit compliance; (3) transfer of floor area of greater than 50,000 square feet; and (4) master conditional use permit for on-site sale and consumption of alcohol for 5 establishments.   Each of these entitlements required approvals in the PLUM Committee and City Council.

24.   In or around August 2018, HUANG provided defendant HUIZAR an all-expense paid trip to a golf resort in Northern California, including a round-trip on a private jet, accommodations, meals, and other costs.   During the trip and in the months thereafter, HUANG agreed to support defendant HUIZAR Relative 1's campaign for the CD-14 seat, including by hosting a fundraiser in November 2018 and pledging to raise or contribute $50,000 to benefit her campaign.

25.   On or about November 7, 2018, defendant HUIZAR possessed approximately $129,000 in cash hidden at his residence, which was made up of cash derived from casino chips provided by Huang to defendant HUIZAR along with cash defendant HUIZAR received from Businessperson A.

DEFT. INITIALS

10

ATTACHMENT A/FACTUAL BASIS

(b)   **David Lee and 940 Hill Bribery Scheme**

26.   Between August 2016 and July 2017, DAE YONG LEE, also known as "David Lee," a real estate developer and majority owner of 940 HILL, LLC, agreed to provide a $500,000 cash bribe to defendant HUIZAR, ESPARZA and JUSTIN KIM, in exchange for defendant HUIZAR's assistance on one of LEE's development projects, the 940 Hill Project.  The 940 Hill Project was a planned 20-story residential complex on the corner of Hill Street and Olympic Boulevard in CD-14. The development was to contain 232 residential units and 14,000 square feet of commercial floor area.

27.   On August 8, 2016, Labor Organization A, a labor organization, filed an appeal (the "appeal") with the Central Los Angeles Area Planning Commission, requesting to "suspend all activity to implement the [940 Hill Project] that requires City approval until the project is brought into compliance with the requirements of CEQA [California Environmental Quality Act] by correcting the deficiencies identified in the appeal."  The appeal prevented the 940 Hill Project from progressing through the rest of the City approval processes, including approvals by the PLUM Committee and City Council.

28.   On September 1, 2016, defendant HUIZAR, ESPARZA, and KIM had dinner together and then visited a Korean karaoke establishment in Los Angeles.  During the karaoke meeting, KIM asked defendant HUIZAR for assistance with the appeal on the 940 Hill Project, and defendant HUIZAR agreed to help.  KIM then called LEE and asked him to join the group at karaoke, which LEE did.

29.   On January 17, 2017, defendant HUIZAR, ESPARZA, KIM, and LEE's business associates met at defendant HUIZAR's City Hall office

DEFT. INITIALS

11

## ATTACHMENT A/FACTUAL BASIS

1  to discuss, among other things, the 940 Hill Project.  During a

2  private meeting that included only defendant HUIZAR, ESPARZA, and

3  KIM, KIM again asked defendant HUIZAR for assistance with the appeal,

4  and defendant HUIZAR responded that he could help.

5       30.  [*Intentionally left blank.*]

6       31.  In approximately February 2017, ESPARZA conveyed to

7  defendant HUIZAR an offer of $500,000 cash from LEE for defendant

8  HUIZAR to resolve the appeal, on behalf of 940 HILL, as represented

9  by KIM to ESPARZA, to be split among defendant HUIZAR, ESPARZA, and

10  KIM.

11       32.  In approximately February and March 2017, defendant HUIZAR

12  and ESPARZA discussed the appeal.  Defendant HUIZAR instructed

13  ESPARZA to speak to Lobbyist C, a lobbyist for Labor Organization A

14  and a close associate of the Executive Director of Labor Organization

15  A.  Defendant HUIZAR also discussed the appeal with Lobbyist C.  At

16  some point, defendant HUIZAR conveyed to either ESPARZA or Lobbyist C

17  that defendant HUIZAR would oppose the appeal in the PLUM committee.

18  Subsequently, Lobbyist C communicated to defendant HUIZAR, through

19  ESPARZA, that Labor Organization A would drop its appeal on the 940

20  Hill Project.  On March 2, 2017, Labor Organization A dropped its

21  appeal.

22

23

24

25       33.  On March 14, 2017, defendant HUIZAR and ESPARZA met at

26  defendant HUIZAR's residence.  ESPARZA told defendant HUIZAR that LEE

27  had provided $400,000 in cash to date, and that LEE would provide the

28

DEFT. INITIALS

12

## ATTACHMENT A/FACTUAL BASIS

remaining $100,000 later.  ESPARZA stated that KIM had provided $200,000 of that cash to ESPARZA.  On two occasions, ESPARZA showed defendant HUIZAR a liquor box filled with approximately $100,000 cash (for a total of $200,000).  Defendant HUIZAR told defendant ESPARZA to hold on to and hide the money at ESPARZA's residence until defendant HUIZAR asked for it.  Defendant HUIZAR told ESPARZA that ESPARZA could have $100,000 of the $300,000 total amount defendant HUIZAR expected to receive from LEE.

34.  On December 28, 2017, defendant HUIZAR and ESPARZA met at City Hall and, in defendant HUIZAR's private bathroom, discussed various topics, including ESPARZA's interviews with the FBI, and the cash bribe ESPARZA was holding for defendant HUIZAR.  Specifically, during that conversation, defendant HUIZAR stated: "I have a lot of expenses now that with [HUIZAR Relative 1] running, [HUIZAR Relative 1] not going to be working anymore.  I'm gonna need money.  Um, that is mine, right?  That is mine."  Defendant HUIZAR was referring to the $200,000 cash bribe payment from LEE via KIM that defendant HUIZAR had asked ESPARZA to hide at ESPARZA's residence.  ESPARZA affirmed the bribe money was for defendant HUIZAR.  Defendant HUIZAR and ESPARZA agreed to wait until April 1, 2018, for ESPARZA to provide the $200,000 cash owed to defendant HUIZAR, to allow a cooling off period after ESPARZA's interviews with the FBI in hopes that it would decrease the likelihood of law enforcement discovering the cash.

### (c)  Luxe Hotel Bribery Schemes

#### (1)  *Early Corrupt Relationship with Hazens*

35.  On March 24, 2014, CHAN facilitated the introduction of

DEFT. INITIALS 

## ATTACHMENT A/FACTUAL BASIS

1  defendant HUIZAR to Chinese developer Fuer Yuan and Yuan's

2  development company Hazens via an email to ESPARZA.

3      36.  In August 2014, CHAN, at defendant HUIZAR's direction,

4  helped resolve an American Disabilities Act ("ADA") compliance issue

5  at the Hazens' Luxe Hotel located in CD-14.

6      37.  On September 19, 2014, at defendant HUIZAR's direction,

7  ESPARZA obtained and then forwarded to defendant HUIZAR an email from

8  Employee D that attached three Katy Perry concert tickets valued at

9  approximately $1,000 total for defendant HUIZAR and his family.

10     38.  On November 4, 2014, CHAN sent a text message to defendant

11 HUIZAR, writing: "I will be having dinner with chairman [Fuer Yuan]

12 tonight.  I also knew that you will have dinner with him Thursday.  I

13 just want to touch base with you as to what George CHIANG and I

14 should tell him."

15     39.  On November 4, 2014, CHIANG sent an email to ESPARZA with

16 the subject line "HUIZAR Fundraising," writing: "Can you get me in

17 touch with [defendant HUIZAR]? [Defendant CHAN] and I had dinner with

18 [Hazens] last night regarding pledging their support so I want to

19 discuss this to prepare the Councilman's dinner with them this

20 Thursday."

21     40.  On November 26, 2014, defendant HUIZAR, ESPARZA, and CHIANG

22 met with Chairman Fuer Yuan and HUIZAR Relative 1 over dinner at the

23 Luxe Hotel, where defendant HUIZAR and Yuan discussed Hazens's

24 support for defendant HUIZAR and defendant HUIZAR's support for the

25 Luxe Hotel Project.

26     41.  In September 2015, CHAN discussed with defendant HUIZAR and

27 CHIANG that CHAN was organizing meetings with various City

28

DEFT. INITIALS                        14

## ATTACHMENT A/FACTUAL BASIS

1   departments to help the Luxe Hotel Project and that the HAZENS

2   Chairman wanted to expedite City approvals on this project.

3       42.   In approximately 2016, at a meeting that included defendant

4   HUIZAR, CHIANG, and Fuer Yuan, defendant HUIZAR asked CHIANG to relay

5   to Yuan that: (1) there was no need to involve the City's Mayor in

6   the approval process of the Luxe Hotel Project because defendant

7   HUIZAR was the one in control of the PLUM committee; (2) the City's

8   Mayor could not provide help to Yuan because it was defendant HUIZAR

9   who drove the project; and (3) as far as the success of the Luxe

10  Hotel Project was concerned, Yuan did not need anyone else in the

11  City but defendant HUIZAR.

12            (2)   *Consulting Fees in Exchange for Official Acts*

13      43.   On November 11, 2015, defendant HUIZAR, CHIANG, and ESPARZA

14  met with Fuer Yuan and General Manager D, the General Manager of the

15  Luxe Hotel Project, over dinner at a restaurant in Arcadia,

16  California.   Defendant HUIZAR and Yuan discussed defendant HUIZAR's

17  support for the Luxe Hotel Project.   In the same conversation,

18  defendant HUIZAR asked Yuan to hire one of defendant HUIZAR's

19  associates, who later turned out to be HUIZAR Associate 1, on the

20  Luxe Hotel Project.   Yuan told defendant HUIZAR to discuss the

21  details with General Manager D.

22      44.   In December 2015, defendant HUIZAR and CHIANG had multiple

23  communications regarding Yuan's agreement to hire HUIZAR Associate 1.

24  CHIANG told defendant HUIZAR that General Manager D would work with

25  defendant HUIZAR on retaining HUIZAR Associate 1.

26      45.   On or about December 16, 2015, defendant HUIZAR caused

27  HUIZAR Relative 1 to meet with Fuer Yuan's relative, who had traveled

28  DEFT. INITIALS 

### ATTACHMENT A/FACTUAL BASIS

1   to Los Angeles at General Manager D's direction, to discuss an

2   arrangement whereby Yuan's relative's company would pay a company

3   affiliated with HUIZAR Associate 1, purportedly for real estate

4   advice.

5      46.  In April 2016, defendant HUIZAR and CHIANG had several

6   communications confirming their plan to get the HUIZAR Relative

7   1/HUIZAR Associate 1 agreement with Hazens under way.  On April 26,

8   2016, defendant HUIZAR confirmed his interest to CHIANG stating:

9   "Cool.  The more I think about our project, the more I get excited

10   about it.  Let's meet every two weeks or so to see how things are

11   going.... I think it'll be great!"

12      47.  In May 2016, defendant HUIZAR caused Company A (HUIZAR

13   Associate 1 affiliated company) and Yuan's relative's company to

14   execute an agreement whereby Company A would purportedly "provide

15   marketing analysis for Real Estate and Land Development Opportunities

16   in the Greater Southern California Area in the total amount of

17   $11,000.00 per month for services rendered."  In reality, CHIANG

18   prepared the monthly marketing analysis reports and delivered them to

19   defendant HUIZAR, who then provided them to HUIZAR Associate 1, who

20   collected the $11,000 monthly retainer.  Defendant HUIZAR, CHIANG,

21   and General Manager D understood that the monthly retainer payments

22   were intended to be and were in fact indirect bribe payments to

23   defendant HUIZAR in exchange for defendant HUIZAR's official acts to

24   benefit the Luxe Hotel Project.

25      48.  From May 31, 2016, to November 3, 2016, CHIANG delivered to

26   defendant HUIZAR six real estate reports that were intended to be

27   passed off as being created by Company A pursuant to its $11,000 per

28

DEFT. INITIALS 

## ATTACHMENT A/FACTUAL BASIS

month consulting agreement with Fuer Yuan's relative.  During this same time period, defendant HUIZAR delivered to HUIZAR Associate 1 these six real estate reports and HUIZAR Associate 1 then subsequently caused Company A to collect $11,000 from Yuan's relative's company each month (for a total of $66,000) as a consulting fee for the reports.

### (3)   *Official Acts by Defendant HUIZAR*

49.   On November 22, 2016, defendant HUIZAR presented a written motion in the Economic Development committee to benefit the Luxe Hotel Project.

50.   On December 13, 2016, defendant HUIZAR voted "yes" in the City Council to adopt the Luxe Hotel Project motion defendant HUIZAR had presented.

51.   On December 13, 2016, after the City Council vote, defendant HUIZAR and CHIANG met with General Manager D at the Luxe Hotel to discuss the Luxe Hotel Project and defendant HUIZAR's agreement to expedite the project going forward.

### (4)   *Additional Benefits from CHIANG for Defendant HUIZAR's Official Acts*

52.   In or around April 2017, at defendant HUIZAR's request, CHIANG organized and coordinated a trip for defendant HUIZAR and his family members to visit Fuer Yuan in China, including paying approximately $500 for visa fees and arranging for transportation for defendant HUIZAR and his family in Hong Kong.

53.   Between April 15, 2017 and April 23, 2017, when defendant HUIZAR and his family visited Fuer Yuan in Hong Kong and China, defendant HUIZAR and his family members accepted benefits valued at

DEFT. INITIALS

## ATTACHMENT A/FACTUAL BASIS

approximately $1,400 from Yuan, including for certain transportation, meals, and lodging.

54. On April 27, 2017, at defendant HUIZAR's request, CHIANG provided concert tickets to defendant HUIZAR worth approximately $1,572 total.

55. On May 2, 2017, in a telephone call, CHIANG and ESPARZA discussed the mutually beneficial financial relationship between Chinese developers and defendants HUIZAR and CHAN. Specifically, ESPARZA told CHIANG: "Looking from your perspective, you bank on [CHAN], and [defendant HUIZAR]'s office to do, one of the main points with [defendant HUIZAR], for your Chinese clients for example, 'entitlements, PLUM,' you got to use that and we gotta keep making his motherfucking, him happy."

56. On May 19, 2017, at defendant HUIZAR's request, CHIANG paid approximately $1,000 for alcohol for a party for a HUIZAR relative.

57. On June 19, 2017, at defendant HUIZAR's request, CHIANG provided concert tickets to defendant HUIZAR worth approximately $1,670.

58. On June 22, 2017, during a telephone call, CHAN and CHIANG discussed defendant HUIZAR's request for benefits from CHIANG. Specifically, CHIANG explained that defendant HUIZAR asked him to coordinate a trip to Cuba for defendant HUIZAR. Defendant CHAN then asked: "So he just wanted you to do what, to ... pay for all the trips, is that what he wants?" CHIANG then stated that defendant HUIZAR would have to get special visas and explained that this would risk potentially exposing their corrupt relationships: "I told [HUIZAR], I said look, we're all gonna be on record and if something

DEFT. INITIALS

18

## ATTACHMENT A/FACTUAL BASIS

1   happens, everything, everyone's dead."

2       59.   On August 24-25, 2017, CHIANG asked for defendant HUIZAR's

3   help on the Luxe Hotel Project.

4       60.   On September 1, 2017, at CHIANG's request, defendant HUIZAR

5   presented a written motion in the PLUM committee to benefit Hazens,

6   allowing the Luxe Hotel Project to move forward with its application

7   and approval process before the CPC and City Council.

8       61.   On September 14, 2017, defendant HUIZAR confirmed that he

9   and his office exerted pressure on other City officials, writing to

10  CHIANG in a text message: "Congrats.  Yeah we [CD-14 office] were

11  calling mayors office to tell his commission to calm down.  It's

12  expected from cpc they throw a lot of junk at projects these days.

13  Not over but make sure u relay to chairman [Fuer Yuan] that we were

14  helpful."

15      62.   On September 14, 2017, in a telephone call, defendant

16  HUIZAR told CHIANG: "You know, whatever it was, we'll fix it in

17  PLUM.... Did the boss [Fuer Yuan], you call the boss already? ... Did

18  you tell him that my office was helpful?"  CHIANG responded: "I told

19  [Yuan] everything."  Defendant HUIZAR then stated: "Okay, cool, cool,

20  cool. Good, good.... Do we have a schedule for PLUM already?"

21      63.   In or around November 2017, defendant HUIZAR asked CHIANG

22  to make a commitment on behalf of Hazens to contribute $100,000 to

23  HUIZAR Relative 1's campaign in exchange for continued favorable

24  official acts by defendant HUIZAR to benefit the Luxe Hotel Project.

25  CHIANG, on behalf of Hazens, told defendant HUIZAR he could confirm

26  Fuer Yuan's commitment of $100,000 to a PAC.

27      64.   On December 5, 2017, defendant HUIZAR voted to approve the

28

DEFT. INITIALS

## ATTACHMENT A/FACTUAL BASIS

1  Luxe Hotel Project in the PLUM Committee.

2      65.  On January 24, 2018, defendants HUIZAR and CHAN and CHIANG

3  met with Fuer Yuan and HUIZAR Relative 1 for dinner at Yuan's hotel

4  in San Gabriel, California, where Yuan pledged his commitment and

5  support for HUIZAR Relative 1's campaign for the CD-14 seat.

6      66.  On March 9, 2018, defendant HUIZAR submitted a resolution

7  in the PLUM Committee to benefit Hazens, allowing the Luxe Hotel

8  Project to move forward in its approval process.

9      67.  In March and April 2018, defendant HUIZAR and CHIANG met at

10  defendant HUIZAR's residence to discuss defendant HUIZAR's continued

11  support for the Luxe Hotel Project in exchange for Hazens's agreement

12  to contribute $100,000 to a PAC to benefit HUIZAR Relative 1's

13  campaign.

14      68.  On May 18, 2018, defendants HUIZAR and CHAN met with CHIANG

15  for breakfast at a restaurant in Boyle Heights, where defendant

16  HUIZAR stated that he needed the PAC contribution as soon as possible

17  and that he wanted the contribution now so that when HUIZAR Relative

18  1 announced her candidacy, she would have money to pour into the

19  campaign and scare other potential candidates from running against

20  her.  Defendant HUIZAR stated that other developers already

21  contributed in amounts of $50,000, $100,000, and $200,000.  CHAN and

22  CHIANG told defendant HUIZAR that Hazens agreed to his request and

23  would contribute $100,000 to the PAC after HUIZAR Relative 1's formal

24  announcement in September 2018.

25      69.  On June 12, 2018, defendant HUIZAR voted in the City

26  Council to approve the Development Agreement for the Luxe Hotel

27  Project, and wrote to CHIANG in a text message: "Da [Development

28
DEFT. INITIALS 

### ATTACHMENT A/FACTUAL BASIS

Agreement] for [Hazens] just passed council today.  Does that mean project has been fully entitled? Is that our last vote?"

70.  On June 18, 2018, defendant HUIZAR wrote to CHIANG in a text message: "When is the chairman [Fuer Yuan] coming in to town? We need to finalize pac stuff.  Thanks."

71.  On or about July 9, 2018, CHAN created a document titled "Synergy/CCC Action Items," to document, among other things, the political contributions he had solicited for and promised to defendant HUIZAR.  Defendant CHAN included the following entry under a subsection titled "[Hazens] – Chairman Yuan": "PAC (After announcement in Sep ([talked to] JH [JOSE HUIZAR] 5/18)) / Nonprofit ([wait for] Yuan's arrival ([talked to] JH [JOSE HUIZAR] 5/18))."

72.  On July 30, 2018, after the ordinance authorizing the execution of the Development Agreement for the Luxe Hotel Project went into effect, defendant HUIZAR wrote to CHIANG in a text message: "any news on when [Fuer Yuan] is coming in to town? Hoping to catch dinner with him and talk about [HUIZAR Relative 1] campaign."  CHIANG responded: "Hi Boss, [CHAN] is working on it.  I let you know after I see him in office tomorrow."

#### (d)   Mateo Project Bribery Scheme

##### (1)   $25,000 Contribution to PAC B

73.  On August 18, 2016, defendant HUIZAR met with GOLDMAN and Executive M at defendant HUIZAR's City Hall office to discuss developer Carmel Partner's Mateo Project.  At the meeting, GOLDMAN and Executive M asked defendant HUIZAR to file a motion to initiate a General Plan Amendment for Mateo Project.  Defendant HUIZAR agreed to

DEFT. INITIALS

## ATTACHMENT A/FACTUAL BASIS

initiate the General Plan Amendment, either by exerting pressure on the Planning Department to do so or by filing a motion.

74.   On or about August 26, 2016, defendant HUIZAR and his staff urged the Planning Department to approve the General Plan Amendment initiation for Mateo Project, which the Planning Department did.

75.   In September 2016, less than a month after defendant HUIZAR had provided significant assistance to Carmel Partners and Executive M, defendant HUIZAR asked GOLDMAN for contributions to PAC B from GOLDMAN's clients with projects pending in CD-14, including from Executive M on behalf of Carmel Partners.   GOLDMAN agreed to convey the request to his clients.

76.   On October 26, 2016, GOLDMAN received an email from Executive M about the $25,000 PAC B contributions, which stated: "I should have checks by tomorrow. All I need is the letter. Would it be worth setting up a quick drink or coffee with JOSE [HUIZAR] when we deliver? Could be good to talk big picture, etc."

77.   On or about October 27, 2016, defendant HUIZAR caused Carmel Partners to send three checks from three separate entities, payable to PAC B in the amount of $8,333.33 for a total of $25,000, by U.S. Mail to the Carmel Partners office in Los Angeles, California.

78.   On October 31, 2016, GOLDMAN sent a text message to ESPARZA, writing: "When can I get [Executive M] in with JOSE [HUIZAR] to deliver the checks?"

**79.   Additional $25,000 Contribution to PAC B**

80.   On February 15, 2017, defendant HUIZAR met GOLDMAN for lunch in downtown Los Angeles to discuss various projects.   At the

DEFT. INITIALS 

## ATTACHMENT A/FACTUAL BASIS

1  lunch, defendant HUIZAR asked GOLDMAN for an additional $25,000

2  contribution to PAC B from Carmel Partners, which GOLDMAN agreed to

3  convey to Executive M.

4      81.  On February 15, 2017, at a dinner at a Los Angeles

5  restaurant for which Carmel Partners paid approximately $1,778,

6  defendant HUIZAR requested and Executive M committed to paying

7  $25,000 to PAC B on behalf of Carmel Partners.

8      82.  On or about March 2, 2017, defendant HUIZAR caused Carmel

9  Partners to send a check for $25,000 made payable to PAC B by U.S.

10  Mail to PAC B in Sacramento, California.

11      83.  On March 20, 2017, GOLDMAN received an email from Executive

12  M, which stated: "Do you think we are in a more favored status with

13  JOSE [HUIZAR] compared to [another developer]?"

14      84.  On May 5, 2017, in a telephone call, defendant HUIZAR and

15  GOLDMAN discussed Carmel Partners' contribution to PAC B at defendant

16  HUIZAR's direction.  GOLDMAN stated: "When I told George [ESPARZA], I

17  said, look, my two things that I gotta protect you know ... [Carmel

18  Partners] and gotta protect you."

19          (2)  *$25,000 Contribution and Additional $25,000*

20                *Commitment to PAC A*

21      85.  In or around January 2018, defendant HUIZAR spoke with

22  GOLDMAN regarding Mateo Project's approval in the PLUM Committee and

23  City Council.  Specifically, they discussed that Carmel Partners

24  wanted the City to approve Mateo Project with a 5% affordable housing

25  requirement, while defendant HUIZAR initially insisted on 11%

26  affordable housing.  GOLDMAN told defendant HUIZAR that Executive M

27  was concerned he would suffer significant professional consequences,

28  DEFT. INITIALS 

ATTACHMENT A/FACTUAL BASIS

1   including the loss of his job with Carmel Partners, if Mateo Project

2   was not approved, and that if Mateo Project did not obtain its

3   preferred affordable housing requirements it would threaten the

4   viability of the project altogether.

5       86.  On January 8, 2018, defendant HUIZAR and GOLDMAN had a

6   discussion via text message regarding Mateo Project and Carmel

7   Partners' willingness to contribute to their newly established PAC,

8   PAC A.  Specifically, defendant HUIZAR wrote: "Let's do the pac stuff

9   later this week. See u there at 6. What's purpose of tonight's

10  meeting? Are they [Carmel Partners] gonna help with pac?"  GOLDMAN

11  replied: "[Executive M] wants to talk about their [Mateo Project] and

12  see if you're comfortable with the height and affordability levels."

13  Defendant HUIZAR answered: "Are they gonna help with pac?"  GOLDMAN

14  replied: "I'm sure they will, however - as your friend - let's

15  discuss this in a different text thread" in order to avoid

16  documenting defendant HUIZAR's conditioning his official assistance

17  with Mateo Project on Carmel Partners' financial support for PAC A.

18      87.  On February 23, 2018, defendant HUIZAR and GOLDMAN had a

19  discussion via text message regarding PAC A.  Specifically, GOLDMAN

20  wrote: "Are you checking the Confide App for texting on your iPhone?"

21  GOLDMAN further wrote: "I was going to text you about your meeting

22  with [PAC A's attorney]. Wanted to see if we got any clarification.

23  Confide is good for texting because it is like Snap Chat...message

24  disappears."

25      88.  On March 1, 2018, defendant HUIZAR met with GOLDMAN and

26  discussed Carmel Partners' contributions to PAC A.  Specifically,

27  defendant HUIZAR asked for a $50,000 contribution to PAC A to be paid

28

DEFT. INITIALS 

## ATTACHMENT A/FACTUAL BASIS

in two installments, $25,000 as soon as possible and another $25,000 by the end of the year, after Mateo Project was approved.  GOLDMAN agreed to convey the request to Executive M.

89.  On March 14, 2018, at approximately 4:00 p.m., defendant HUIZAR met with GOLDMAN to discuss PAC A, including the fact that Executive M agreed to have Carmel Partners contribute to PAC A.

90.  On April 13, 2018, defendant HUIZAR sent an email to GOLDMAN, attaching a document titled "[PAC A]" that included, among other things, an entry for Carmel Partners for $50,000, with the note: "B/4 June. 2 checks. 2 Entities."

91.  On May 8, 2018, defendant HUIZAR caused City Staffer A-2 to advocate CD-14's position and encourage the Planning Department official to approve Mateo Project to allow the project to proceed to a hearing before the City Planning Commission.

92.  On or about June 13, 2018, defendant HUIZAR caused Carmel Partners to send two checks from two separate entities, each made payable to PAC A, in the amount of $12,500 each for a total of $25,000, by U.S. Mail to the Carmel Partners office in Los Angeles, California, around the same time that the City Planning Commission approved Mateo Project, allowing it to move forward to a hearing before the PLUM Committee and ultimately City Council.

> (3)  *Additional $50,000 Commitment to PAC A in Exchange for Defendant HUIZAR's Help on Mateo Project*

93.  On September 4, 2018, defendant HUIZAR met with GOLDMAN regarding the labor union issue Carmel Partners was facing on Mateo Project.  During the meeting, GOLDMAN requested on behalf of

DEFT. INITIALS 

## ATTACHMENT A/FACTUAL BASIS

1  Executive M for defendant HUIZAR to vote against the labor union's

2  appeal by approving Mateo Project in the PLUM Committee.  Defendant

3  HUIZAR explained that voting against the labor union, which he

4  considered an ally, could have negative ramifications on HUIZAR

5  Relative 1's campaign.  Because of this risk, defendant HUIZAR told

6  GOLDMAN that if he were to vote against the labor union in the PLUM

7  Committee, then Carmel Partners would have to make it worthwhile,

8  which GOLDMAN understood to mean that defendant HUIZAR expected a

9  financial benefit from Carmel Partners in exchange for his efforts

10  with the labor union.

11      94.  On September 6, 2018, GOLDMAN and Executive M met to

12  discuss Mateo Project and resolving its labor union issue.  During

13  the meeting, GOLDMAN discussed with Executive M that they needed to

14  make it worthwhile for defendant HUIZAR's intervention with the labor

15  union.  Executive M and GOLDMAN agreed that Carmel Partners should

16  offer to make an additional $50,000 contribution to PAC A.  Carmel

17  Partners had previously agreed to contribute $50,000, and paid the

18  first installment in June 2018.  This additional $50,000 contribution

19  would bring the total agreed-upon contributions on behalf of Carmel

20  Partners to PAC A to $100,000 in exchange for defendant HUIZAR's

21  assistance with Mateo Project.

22      95.  On September 6, 2018, defendant HUIZAR and GOLDMAN met

23  outside a restaurant in Boyle Heights to discuss the new arrangement

24  with Executive M.  At the meeting, GOLDMAN conveyed the offer of an

25  additional $50,000 contribution to PAC A, bringing the total to

26  $100,000, and defendant HUIZAR agreed to accept the contribution in

27  exchange for voting to approve Mateo Project over objections by the

28

DEFT. INITIALS

## ATTACHMENT A/FACTUAL BASIS

1  labor union.  Defendant HUIZAR also requested a private meeting with

2  Executive M.

3      96.  On September 10, 2018, in a text message, GOLDMAN asked

4  defendant HUIZAR: "Re: [Carmel Partners] & [Mateo Project]. You are

5  meeting with [Executive M] on 9-25 to negotiate public benefits

6  package. Could we target PLUM on 10-02 with the clear understanding

7  that the item gets pulled from agenda with no deal? [City Staffer A-

8  2] is waiting for direction from you before scheduling."

9      97.  On September 12, 2018, while defendant HUIZAR was

10  negotiating the additional financial benefit he sought from Executive

11  M and Carmel Partners, defendant HUIZAR used his official position as

12  PLUM Committee Chair to postpone the committee's hearing on Mateo

13  Project to October 2, 2018, thereby causing the project to be delayed

14  until after he met with Executive M.

15      98.  On September 28, 2018, defendant HUIZAR and Executive M met

16  to discuss defendant HUIZAR's support for Mateo Project, its approval

17  in the PLUM Committee, and Carmel Partners' support for the PAC to

18  benefit HUIZAR Relative 1's campaign.  During the same conversation,

19  Executive M offered to provide opposition research to defendant

20  HUIZAR on a former CD-14 staffer who planned to file a lawsuit

21  against defendant HUIZAR, and defendant HUIZAR accepted this offer.

22  As part of their negotiation to help Mateo Project, defendant HUIZAR

23  and Executive M also discussed Carmel Partners hiring defendant

24  HUIZAR after he left office.

25      99.  On September 28, 2018, defendant HUIZAR sent a text message

26  to GOLDMAN, writing: "Good meeting with [Executive M]. He is willing

27  to help [HUIZAR Relative 1] committee. He will collect from

28

DEFT. INITIALS 

## ATTACHMENT A/FACTUAL BASIS

1  consultant/contractors. We didn't discuss amount. Please enlist him

2  for your event and ask him to collect 15-20 k for your event."

3      100. On October 2, 2018, defendant HUIZAR used his official

4  position as the PLUM Committee Chair to postpone his committee's

5  hearing on Mateo Project to October 16, 2018.

6      101. On October 11, 2018, defendant HUIZAR, Executive M,

7  Employee M, and GOLDMAN attended a fundraiser for HUIZAR Relative 1

8  hosted by GOLDMAN.  At the fundraiser, Executive M provided defendant

9  HUIZAR the opposition research against the staffer he had promised as

10  part of their agreement for defendant HUIZAR to help Mateo Project.

11      102. Following the fundraiser, defendant HUIZAR asked Executive

12  M for additional opposition research on two other CD-14 employees

13  that had filed complaints against defendant HUIZAR.

14      103. On October 16, 2018, defendant HUIZAR voted to deny the

15  union appeal and to approve Mateo Project in the PLUM Committee,

16  including accepting certain modifications requested by Carmel

17  Partners.  Specifically, the PLUM Committee accepted Carmel Partners'

18  preferred modifications to the affordable housing restrictions,

19  thereby undoing the more stringent requirements recommended by the

20  City Planning Commission.  As a result of defendant HUIZAR's approval

21  and undoing the CPC recommendations, Carmel Partners obtained

22  significant reductions to Mateo Project's affordable housing

23  requirements, from 11% "Very Low Income" units to 6% "Moderate

24  Income" units.  Specifically, defendant HUIZAR's approval of Carmel

25  Partners' modifications decreased low-income individuals' access to

26  the project while ensuring Carmel Partners obtained an estimated $14

27  million in net savings to Carmel Partners.

28

DEFT. INITIALS

28

### ATTACHMENT A/FACTUAL BASIS

104. On October 31, 2018, defendant HUIZAR voted to approve Mateo Project in City Council, which caused Executive M to write an email to the owners of Carmel Partners and other employees: "Great news, we just received final unanimous approval for [Mateo Project] by city council.  Although today is bit of a formality (PLUM is where the discretion usually happens), this is the final step."  Executive M highlighted the benefits Carmel Partners was able to secure in PLUM from defendant HUIZAR, writing: "our obligations related to rent [affordable housing] restrictions and union involvement are minimal compared to other future projects in the area."  Executive M also touted "the entitlement of the tallest building in the arts district by 3 times (35 stories) in a wealthy opinionated hipster community" as a "truly amazing" accomplishment.

    **(e)   Businessperson A Schemes**

        *(1)   Financial Benefits for Business Opportunities with Developers*

105. On or about at least the following dates, in exchange for defendant HUIZAR using his official position to make introductions to developers with projects pending before defendant HUIZAR and to advocate that such developers use Businessperson A's business to enhance Businessperson A's financial prospects, defendant HUIZAR accepted financial benefits from Businessperson A, including cash, hotel rooms, prostitution/escort services, meals, and other gifts in the following approximate amounts:

| Date | Financial benefit | Amount |
|------|-------------------|--------|
| 06/13/2016 | Suit and Shirts | $3,000 |
| 11/18/2016 | Meal | $1,210.88 |

DEFT. INITIALS 

29

### ATTACHMENT A/FACTUAL BASIS

| Date | Financial benefit | Amount |
|------|-------------------|--------|
| 11/18/2016 | Golf | $1,869.03 |
| January 2017 | Cash | $10,000 |
| 01/13/2017 | Hotel Accommodation | $286.13 |
| 01/19/2017 | Hotel Accommodation | $483.36 |
| 01/30/2017 | Meal | $539.57 |
| February 2017 | Cash | $10,000 |
| 02/20/2017 | Meal | $2,594.02 |
| March 2017 | Cash | $10,000 |
| 03/15/2017 | Hotel Accommodation | $561.10 |
| 03/25/2017 | Resort Accommodation | $298.36 |
| 03/25/2017 | Golf Club Accommodation | $432.75 |
| April 2017 | Cash | $10,000 |
| 04/06/2017 | Hotel Accommodation | $311.12 |
| 04/24/2017 | Hotel Accommodation | $423.58 |
| 04/28/2017 | Hotel Accommodation | $572.61 |
| May 2017 | Cash | $10,000 |
| 05/03/2017 | Hotel Accommodation | $549.34 |
| 05/09/2017 | Hotel Accommodation | $381.64 |
| 05/15/2017 | Hotel Accommodation | $968.87 |
| 05/17/2017 | Hotel Accommodation | $346.75 |
| 05/19/2017 | Hotel Accommodation | $273.64 |
| 05/22/2017 | Hotel Accommodation | $335.66 |
| 05/24/2017 | Hotel Accommodation | $810.88 |
| 05/26/2017 | Meal | $4,950.16 |
| 05/30/2017 | Hotel Accommodation | $519.56 |
| June 2017 | Cash | $10,000 |
| 06/02/2017 | Hotel Accommodation | $419.02 |
| 06/05/2017 | Hotel Accommodation | $79.75 |

DEFT. INITIALS 

## ATTACHMENT A/FACTUAL BASIS

| Date | Financial benefit | Amount |
|------|-------------------|--------|
| 06/08/2017 | Hotel Accommodation | $475.20 |
| 06/12/2017 | Statue | $920.00 |
| 06/12/2017 | Shoes | $449.32 |
| 06/12/2017 | Suits | $10,451.75 |
| 06/19/2017 | Hotel Accommodation | $1,513.49 |
| 06/26/2017 | Hotel Accommodation | $322.33 |
| | TOTAL: | $96,349.87 |

(2)   *$25,000 Contribution to PAC B in Exchange for City Resolution*

160. On or about March 11, 2018, defendant HUIZAR met with Businessperson A, who, unbeknownst to defendant HUIZAR, was then acting at the direction of the FBI, on a golf course in the City. Defendant HUIZAR asked Businessperson A to contribute to HUIZAR Relative 1's campaign.  Businessperson A stated that he would support the campaign, but that he needed help from defendant HUIZAR to provide an official resolution from the City recognizing Businessperson A's business.  Defendant HUIZAR agreed to provide a City resolution and asked Businessperson A to contribute $25,000 to HUIZAR Relative 1's campaign.

161. On or about March 23, 2018, defendant HUIZAR caused Businessperson A to send a check in the amount of $25,000 made payable to PAC B by U.S. Mail from Los Angeles County to PAC B in Sacramento, California, intended to benefit HUIZAR Relative 1's campaign.

162. On or about April 10, 2018, defendant HUIZAR caused the CD-14 office to issue a City resolution in the form of a certificate of

DEFT. INITIALS

31

## ATTACHMENT A/FACTUAL BASIS

1  recognition signed by all City Council members, recognizing
2  Businessperson A to promote Businessperson A's business and
3  reputation in the City.

4      163. On or about May 31, 2018, defendant HUIZAR met with
5  Businessperson A, who was acting at the direction of the FBI, at
6  defendant HUIZAR's City Hall office.  As promised when Businessperson
7  A agreed to contribute $25,000 to HUIZAR Relative 1's campaign,
8  defendant HUIZAR delivered the City resolution recognizing
9  Businessperson A.  At this meeting, defendant HUIZAR confirmed the
10  PAC received Businessperson A's $25,000 contribution, adding that
11  "the people who have the PAC, they know ... you're interested in
12  helping [HUIZAR Relative 1].  So it's sitting there for the right
13  time."

14          (3)   *Cash Payment for Pressure on Developer to Hire*
15                *Businessperson A*

16      164. On August 25, 2018, defendant HUIZAR met with
17  Businessperson A, who was acting at the direction of the FBI, at a
18  golf course in the City.  During the meeting, defendant HUIZAR asked
19  Businessperson A for additional contributions to benefit HUIZAR
20  Relative 1's campaign.  During the same conversation, defendant
21  HUIZAR stated: "I'll go down a list of people that I could start
22  introducing you to ...  people ... that I know need my help.... Like
23  for example, right now, [Carmel Partners] needs me.... So I could re-
24  introduce them to you."  Businessperson A asked, regarding these
25  meetings, whether HUIZAR could "push" the developers to hire
26  Businessperson A.  Defendant HUIZAR responded: "Yeah ... for right
27  now they feel pressure, but they need me."

28
DEFT. INITIALS 

32

## ATTACHMENT A/FACTUAL BASIS

165. On September 24, 2018, defendant HUIZAR met with Businessperson A, who was acting at the direction of the FBI, at a restaurant in the City.  During the meeting, defendant HUIZAR accepted $15,000 in cash from Businessperson A, who provided the cash concealed in an envelope, which defendant HUIZAR then covered with a napkin.  During this meeting, defendant HUIZAR stated that he had a meeting with Carmel Partners the following day and that Carmel Partners' project was coming up for approval soon.  Defendant HUIZAR stated that Carmel Partners "need[s] a lot of help from my office," by which defendant HUIZAR meant that Carmel Partners would feel pressure to hire Businessperson A at defendant HUIZAR's request because Carmel Partners needed defendant HUIZAR to perform favorable official acts in support of Carmel Partners' project and not take adverse official acts in opposition to the project.  Defendant HUIZAR assured Businessperson A that he would make sure Carmel Partners scheduled a meeting with Businessperson A.  At the end of the meeting, after Businessperson A had departed, defendant HUIZAR counted the cash inside the envelope.

### (f)   Additional Pay-to-Play Conduct

> (1)   *CD-14 Developers/Proxies' PAC Contributions to Benefit HUIZAR Relative 1's Campaign and CD-14 Enterprise*

166. In or around May 2017, defendant HUIZAR, ESPARZA, GOLDMAN, and HUIZAR Associate 3 agreed to establish a PAC that publicly was purported to benefit a broad array of candidates and causes but was, in fact, primarily intended to benefit HUIZAR Relative 1's campaign to succeed defendant HUIZAR as Councilmember for CD-14.  Defendant

DEFT. INITIALS 

33

## ATTACHMENT A/FACTUAL BASIS

1  HUIZAR agreed with ESPARZA, GOLDMAN, and HUIZAR Associate 3 to

2  pressure developers with projects in CD-14 to contribute to the PAC

3  in exchange for favorable treatment and to avoid adverse action

4  against their projects in the PLUM Committee, Economic Development

5  Committee, and City Council.

6      167. On May 10, 2017, in a telephone call, ESPARZA and CHIANG

7  discussed how defendant HUIZAR was using a PAC to obtain additional

8  financial benefits from developers in exchange for not taking adverse

9  action against them.  Specifically, ESPARZA told CHIANG: "[Defendant

10  HUIZAR's] approach is that he's going to um, strong arm everyone ...

11  to the PAC.  [Hazens], [Company F].  'This is what I want right now.

12  This is my [relative], this is what we are doing.'  So his idea in his

13  mind is that okay, people are going to support us because they don't

14  want people to fuck with projects, you know."

15      168. On May 11, 2017, in a telephone call, ESPARZA and Executive

16  Director E discussed punishing a developer who was not providing

17  financial benefits to defendant HUIZAR by withholding approvals for

18  the developer's project.  Specifically, ESPARZA said: "[Company G]

19  has not come through with any other commitments to us, to you, so you

20  know, why even be helpful to them, you know, that's my thing... So

21  I'm going to tell [defendant HUIZAR] that I spoke to you and let's

22  just continue to ignore them, you know.  We are not going to help

23  them."  Executive Director E then added: "And even [CHAN] doesn't

24  want you guys to work with [Company G]."

25      169. On June 22, 2017, defendant HUIZAR met with ESPARZA,

26  GOLDMAN, and Justin KIM and discussed establishing a PAC to raise

27  money for HUIZAR Relative 1's campaign.  During this meeting,

28

DEFT. INITIALS

34

## ATTACHMENT A/FACTUAL BASIS

defendant HUIZAR suggested having KIM find an associate to serve as the "face" of the PAC to disguise defendant HUIZAR's involvement and the PAC's connection to CD-14.

170. On September 14, 2017, defendant HUIZAR and ESPARZA had a text message conversation regarding compiling a list of donors to target for fundraising for HUIZAR Relative 1's campaign, which they referred to as the "Executive 2" strategy meetings, focusing on developers with upcoming hearings before the PLUM Committee, which defendant HUIZAR chaired.  Defendant HUIZAR instructed ESPARZA via text message: "Please get the [City Staffer A-2] list that he gave u about projects going to cpc and plum and let's discuss me and u at every Thursday exec.#2 meeting."

171. In October 2017, defendant HUIZAR and ESPARZA had conversations about targeting developers with projects pending before committees on which defendant HUIZAR sat in order to obtain financial benefits from them, including contribution to PACs to benefit HUIZAR Relative 1's campaign before taking favorable actions on the projects in the Economic Development and PLUM Committees.

172. On December 4, 2017, defendant HUIZAR created a spreadsheet titled "Initial Commitments to PAC," listing companies, consultants, and contribution amounts, totaling $500,000.  Several of those listed had pending projects in defendant HUIZAR's district or before a committee that defendant HUIZAR chaired, including the following:

| Company | Commitment | Notes |
|---|---|---|
| [Company H] | $25,000 | [Lobbyist C] |
| [Company I] | $25,000 | [Lobbyist I] |
| [Company J] | $50,000 | [Lobbyist J] |

DEFT. INITIALS 

35

## ATTACHMENT A/FACTUAL BASIS

173. On March 26, 2018, defendant HUIZAR caused Company H to make a contribution of $10,000 to PAC B.

174. On June 19, 2018, defendant HUIZAR caused Company J to make a contribution of $25,000 to PAC A.

> (2)   *CD-14 Developers/Proxies' Contributions to*
>       *Defendant HUIZAR Campaigns and Officeholder*
>       *Accounts*

175. On May 18, 2015, at defendant HUIZAR's direction, ESPARZA created a document titled "HUIZAR Debt Finance Plan," which documented defendant HUIZAR's solicitation efforts of contributions from developers, consultants, and allies towards defendant HUIZAR's 2015 re-election campaign debt, including many developers and consultants who had projects in CD-14 and/or were going through the City approval process.  The plan included: (1) $40,000 from Justin Kim; (2) $20,000 from HUANG; (3) $20,000 from Company G through Executive Director E; (4) $10,000 from Hazens; and (5) $10,000 from CHAN.

> (3)   *CD-14 Developers/Proxies' Contributions to School*
>       *that Employed HUIZAR Relative 1 as a Fundraiser*

176. Beginning in or around March 2015, at defendant HUIZAR's direction, ESPARZA solicited donations to a high school's annual gala event from developers and consultants with projects pending in defendant HUIZAR's district.

177. On or around September 28, 2015, defendant HUIZAR attended the high school's annual gala, which, at defendant HUIZAR's request, was sponsored by the following companies, among others, in the

DEFT. INITIALS 

ATTACHMENT A/FACTUAL BASIS

following amounts: (1) $25,000 by Company L; (2) $10,000 by Hazens; (3) $10,000 by Company F; and (4) $5,000 by Company K.

(4)  *Steering CD-14 Developers to Preferred Firms*

178. In or around 2012, defendant HUIZAR pressured Developer N to hire HUIZAR Associate 3 as a consultant on Developer N's development project in CD-14.  Developer N complied with the request.

179. In or around May 2013, defendant HUIZAR organized a dinner between Developer N, HUIZAR Associate 3, and a partner of Law Firm A, which paid HUIZAR Relative 1 a bi-weekly salary of $2,500.  Developer N understood that defendant HUIZAR was asking Developer N to hire Law Firm A because it paid HUIZAR Relative 1 and in exchange for defendant HUIZAR's support on the development project pending in CD-14.

180. In or around March 2014, defendant HUIZAR organized a meeting with Hazens and HUIZAR Associate 1, and encouraged Hazens to hire HUIZAR Associate 1 as a consultant on the Luxe Hotel Project.

181. On February 25, 2016, defendant HUIZAR instructed ESPARZA by text message: "Please work it out with George [CHIANG] ... to set up a meeting with [Developer K] and [Law Firm A partner] ... Let them know that [HUIZAR Relative 1] works at [Law Firm A] and we want to make introduction to see if [the company] ever needs legal defense. Please keep me posted."

182. In or around 2017, defendant HUIZAR caused Company O, which had projects pending in CD-14 and before defendant HUIZAR's committees, to hire HUIZAR Associate 3 as a consultant with a monthly retainer of $10,000.

DEFT. INITIALS

37

ATTACHMENT A/FACTUAL BASIS

**(g) Defendant's Concealment of Illicit Benefits**

      *(1) Transporting of Cash into United States and Structuring to Avoiding Reporting Requirements*

183. On January 1, 2016, defendant HUIZAR and ESPARZA traveled with HUANG and Executive Director E to Australia, where defendant HUIZAR and ESPARZA accepted financial benefits from HUANG, including a $10,980 commercial airline ticket for defendant HUIZAR, private jet flights for ESPARZA, hotels, meals, alcohol, and other expenses. In addition, defendant HUIZAR and ESPARZA accepted casino gambling chips from HUANG, which defendant HUIZAR and ESPARZA cashed out in Australian dollars.

184. After the Australia trip, defendant HUIZAR and ESPARZA discussed evading bank reporting requirements by converting Australian dollars to American dollars.

185. On February 9, 2016, at defendant HUIZAR's direction, ESPARZA exchanged 10,000 Australian dollars into American dollars. ESPARZA then reported to defendant HUIZAR in a text message: "I exchanged 10k today. Will do another tomorrow. If it's under 10k, they will not report." Defendant HUIZAR then told ESPARZA to ask for a better exchange rate the next day.

186. On February 10, 2016, at defendant HUIZAR's direction, ESPARZA exchanged another 10,000 Australian dollars into American dollars.

187. On February 14, 2016, defendant HUIZAR asked ESPARZA via text messages: "(1). U back? How did chairman [HUANG] do? (2). For last batch to exchange, I think it is 12,800 (correct?). ...see if u can bargain with either of two places in dtla for more than .68. The

DEFT. INITIALS 

### ATTACHMENT A/FACTUAL BASIS

1  Australian dollar has gotten stronger and is close to .72 official

2  exchange."  ESPARZA responded: "I came home. Chairman [HUANG] is up

3  2mil. Ok. I'll see if I can get close to .72."

4  188. On February 17, 2016, at defendant HUIZAR's direction,

5  ESPARZA exchanged another 12,800 Australian dollars into American

6  dollars and confirmed the exchange to defendant HUIZAR by text

7  message: "I was able to get you .69 exchange rate" and that "chairman

8  [HUANG] won 3 mil."  Defendant HUIZAR responded: "Wow. Wow. Wow."

9  *(2)  Money Laundering Through Family Members*

10  189. From in or about July 2013 through in or about November

11  2017, on approximately 45 separate occasions, in order to conceal and

12  disguise the nature, source, ownership, and control of proceeds from

13  defendant HUIZAR's pay-to-play scheme, defendant HUIZAR caused HUIZAR

14  Relative 2 to deposit cash into HUIZAR Relative 2's checking account

15  and thereafter pay defendant HUIZAR directly or indirectly a total of

16  approximately $130,346.

17  190. From in or about November 2013 through in or about March

18  2017, on at least 28 separate occasions, in order to conceal and

19  disguise the nature, source, ownership, and control of proceeds from

20  defendant HUIZAR's pay-to-play scheme, defendant HUIZAR provided cash

21  to HUIZAR Relative 3 and caused HUIZAR Relative 3 to pay defendant

22  HUIZAR directly or indirectly a total of approximately $156,993.

23  191. From in or about April 2016 through in or about June 2017,

24  over at least 17 separate occasions, in order to conceal and disguise

25  the nature, source, ownership, and control of proceeds from defendant

26  HUIZAR's pay-to-play scheme, defendant HUIZAR caused HUIZAR Relative

27  1 to deposit cash into HUIZAR Relative 1's checking account, and

28
DEFT. INITIALS

### ATTACHMENT A/FACTUAL BASIS

1  thereafter pay for household expenses for a total of approximately

2  $7,800.

3         (h)   **Additional Concealment of Pay-to-Play Scheme**

4              *(1)   Defendant HUIZAR's Failure to Report on Forms 700*

5                  *and Tax Returns*

6      192. On or about the following dates, in an effort to conceal

7  the benefits defendant HUIZAR received from developers as part of the

8  pay-to-play scheme, defendant HUIZAR failed to report any of the

9  financial benefits discussed above on his Forms 700 or tax returns

10  for the calendar years 2014, 2015, 2016, and 2017.

11         (i)   **Total Bribes**

12      As part of defendant HUIZAR's pay-to-play scheme operated

13  through the CD-14 enterprise, defendant HUIZAR obtained or sought to

14  be obtain, directly and indirectly, at least $1,857,679 in bribe

15  payments.

16  C.   **Defendant HUIZAR's Obstructionist Conduct**

17         (a)   **Defendant HUIZAR's Witness Tampering**

18      193. On June 20, 2017, after ESPARZA told defendant HUIZAR that

19  he was interviewed by the FBI and defendant HUIZAR asked ESPARZA

20  about the FBI's questions, and whether the FBI asked questions about

21  Businessperson A and HUANG, defendant HUIZAR instructed ESPARZA not

22  to tell anyone that ESPARZA disclosed the content of his FBI

23  interview to defendant HUIZAR.

24      194. On December 28, 2017, in a conversation in defendant

25  HUIZAR's private bathroom in City Hall, after ESPARZA referred to his

26  FBI interviews the prior summer and stated that he did everything to

27  make sure defendant HUIZAR was protected, defendant HUIZAR stated:

28  DEFT. INITIALS

## ATTACHMENT A/FACTUAL BASIS

"Yeah, and that's why I said we are both in this together.... We're in it together."

195. On October 27, 2018, defendant HUIZAR instructed Businessperson A not to disclose incriminating information to the FBI, including instructing Businessperson A not to mention anything about parties or "dessert," meaning defendant HUIZAR's use of escort/prostitution services, which Businessperson A had provided at parties Businessperson A hosted.

### (b)   Defendant HUIZAR's False Statements to the USAO/FBI

196. On April 10, 2019, during an interview with the U.S. Attorney's Office and FBI during which defendant HUIZAR was advised, in the presence of counsel, that lying to the government was a crime, defendant HUIZAR falsely stated that: (a) he told ESPARZA that the hundreds of thousands of dollars cash payment KIM provided to ESPARZA was "yours, I do not want it"; and (b) he did not discuss ESPARZA giving defendant HUIZAR the money from KIM in April 2018.

### D.   Defendant HUIZAR's 2017 Tax Evasion

197. From in or about January 1, 2017 through in or about December 31, 2017, defendant HUIZAR willfully attempted to evade and defeat income tax due and owing by him and his spouse to the United States of America, for the calendar 2017, by causing to be prepared, and by signing and causing to be signed, a false and fraudulent U.S. Individual Income Tax Return, Form 1040, which was submitted to the Internal Revenue Service.  On that tax return, defendant HUIZAR falsely reported and caused to be reported his and his spouse's joint taxable income, by omitting approximately $60,000 cash that defendant HUIZAR accepted from Businessperson A as retainer fees.  Defendant

DEFT. INITIALS

41

## ATTACHMENT A/FACTUAL BASIS

1    HUIZAR knew that the federal tax law imposed a duty on defendant to

2    accurately report his income and intentionally and voluntarily

3    violated that duty.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFT. INITIALS

42