1              **UNITED STATES DISTRICT COURT**

2        **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3          **HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE**

4

5   UNITED STATES OF AMERICA,        )
                                     )
6              PLAINTIFF,            )        CASE NO.
                                     )
7              vs.                   )        CR 20-326(A)-JFW
                                     )
8   JOSE LUIS HUIZAR,               )
                                     )        PAGES 1 TO 78
9              DEFENDANT.            )
    _____)

10

11

12

13                   REPORTER'S TRANSCRIPT OF
                         CHANGE OF PLEA
14                  FRIDAY, JANUARY 20, 2023
                           8:02 A.M.
15                  LOS ANGELES, CALIFORNIA

16

17

18

19

20

21

22   _____

23          **MIRANDA ALGORRI, CSR 12743, RPR, CRR**
                FEDERAL OFFICIAL COURT REPORTER
24              350 WEST 1ST STREET, SUITE 4455
                LOS ANGELES, CALIFORNIA 90012
25                 MIRANDAALGORRI@GMAIL.COM

1                          **APPEARANCES OF COUNSEL:**

2

3     **FOR THE PLAINTIFF:**

4          MARTIN ESTRADA
           UNITED STATES ATTORNEY
5          BY:  MACK JENKINS
           BY:  CASSIE PALMER
6          BY:  SUSAN HAR
           BY:  BRIAN FAERSTEIN
7          Assistant United States Attorneys
           United States Courthouse
8          312 North Spring Street
           Los Angeles, California 90012
9

10    **FOR DEFENDANT HUIZAR:**

11         HILARY L. POTASHNER
           FEDERAL PUBLIC DEFENDER
12         BY:  CAREL ALÉ
           BY:  CHARLES SNYDER
13         BY:  ADAM OLIN
           Deputy Federal Public Defenders
14         Central District of California
           321 East Second Street
15         Los Angeles, California 90012

16    Also Present:

17         Special Agent Andrew Civetti

18

19

20

21

22

23

24

25

**LOS ANGELES, CALIFORNIA; FRIDAY, JANUARY 20, 2023**

**8:02 A.M.**

---

08:02AM   THE CLERK:  Calling CR 20-326(A)-JFW, United States of America versus Jose Luis Huizar.

Counsel, please state your appearances.

MR. JENKINS:  Good morning, Your Honor. Mack Jenkins, Cassie Palmer, Susan Har, and Brian Faerstein on behalf of the United States.  Also at counsel table to my right is Special Agent from the FBI Andrew Civetti.

MS. ALÉ:  Good morning, Your Honor.  Carel Alé, Adam Olin, and Charles Snyder on behalf of Jose Huizar.

THE COURT:  Good morning to all.

Is Mr. Braun and Mr. Chan here?  All right.  We will have their appearance after I take Mr. Huizar's plea.

On calendar this morning we had scheduled the hearing on various motions in limine, Motions in Limine Nos. 1 through 8.  However, late yesterday afternoon I received a plea agreement which was filed yesterday, and it appears as Docket No. 910 from Mr. Huizar.  So I intend to take Mr. Huizar's guilty plea first.

So who is going to represent Mr. Huizar during the course of the plea?

MS. ALÉ:  I am, Your Honor.

```
 1              THE COURT:  All right.  Then I assume you are
 2    prepared to go forward with the plea this morning.  Is that
 3    correct?
 4              MS. ALÉ:  Yes, Your Honor.
 5              THE COURT:  All right.  Let me indicate for the
 6    record that the -- Mr. Huizar will be entering a plea of guilty
 7    to Counts 1 and 41 of the First Superseding Indictment, and the
 8    plea is being offered pursuant to a plea agreement that I just
 9    referred to, Docket No. 910.  The plea agreement is entered
10    into pursuant to Federal Rule of Criminal Procedure
11    11(c)(1)(C), and the plea agreement will be incorporated and
12    made a part of this proceeding as if the entire agreement had
13    been read into the record.
14              Let me ask counsel, do you object to the
15    prosecutor rather than the Court advising your client of the
16    elements of the offenses, penalties for the offenses to which
17    your client offers his pleas of guilty, the provisions of the
18    plea agreement relating to your client's waiver of his right to
19    appeal, and the constitutional rights that your client will be
20    giving up or waiving by pleading guilty today?
21              MS. ALÉ:  No, Your Honor.
22              THE COURT:  All right.  Then let me advise
23    Mr. Huizar, if you have a microphone close to you, good
24    morning, sir.
25              THE DEFENDANT:  Good morning, Your Honor.
```

```
 1                    THE COURT:  Before I accept your plea of guilty,
 2    I must satisfy myself that you have been fully informed of your
 3    rights and that you fully understand both your rights and the
 4    nature of this proceeding.  In order to do so, I'm going to ask
 5    you a series of questions, and you will be advised of certain
 6    rights.  If at any point in time you did not understand a
 7    statement that has been made or a question that has been asked,
 8    please tell me, and I will try to make it clearer for you.
 9    Also, at any point in time this morning, if you want to stop
10    and have a conversation with your lawyer, just let me know, and
11    I will allow you to do so.
12                    Do you understand that?
13                    THE DEFENDANT:  I do, Your Honor.
14                    THE COURT:  All right.  I'm going to ask the
15    courtroom deputy to place the defendant under oath.
16                    THE CLERK:  Please raise your right hand.
17                    Do you solemnly swear to answer truthfully the
18    questions the Court will ask you, so help you God?
19                    THE DEFENDANT:  I do.
20                    THE COURT:  All right.  Do you understand you are
21    now under oath and if you answer any of my questions falsely,
22    your answers may be used against you later in another
23    prosecution for perjury or for the making of a false statement?
24                    THE DEFENDANT:  I do.
25                    THE COURT:  What is your true and correct full
```

08:05AM (lines 5, 10, 15, 20, 25)

```
 1   name?
 2               THE DEFENDANT:  Jose Luis Huizar.
 3               THE COURT:  How old are you?
 4               THE DEFENDANT:  54.
 5               THE COURT:  How many years of school have you
 6   completed?
 7               THE DEFENDANT:  I received -- I completed high
 8   school.  I received a Bachelor's, a Master's, and a law degree.
 9               THE COURT:  All right.  Are you a United States
10   citizen?
11               THE DEFENDANT:  Yes.
12               THE COURT:  Have you taken any medication, drugs,
13   or alcohol within the past 72 hours?
14               THE DEFENDANT:  No.
15               THE COURT:  Do you suffer from any mental
16   condition that would prevent you from understanding fully the
17   charges against you or the consequence of any guilty plea you
18   may enter to those charges?
19               THE DEFENDANT:  Can you repeat that, please?
20               THE COURT:  Sure.  Do you suffer from any mental
21   condition that would prevent you from understanding fully the
22   charges against you or the consequences of any guilty plea you
23   may enter to those charges?
24               THE DEFENDANT:  No, I do not.
25               THE COURT:  Is there any reason at all why we
```

08:06AM (lines 5, 10, 15, 20, 25)

```
 1    can't go forward this morning in taking your pleas of guilty?
 2                THE DEFENDANT:  No, there isn't.
 3                THE COURT:  Counsel, have you had an opportunity
 4    to speak with your client prior to this hearing?
 5                MS. ALÉ:  Yes, Your Honor.
 6                THE COURT:  Do you have any reason to believe
 7    your client is not competent to enter his guilty plea at this
 8    time?
 9                MS. ALÉ:  I do not.
10                THE COURT:  Is there any reason why we can't go
11    forward this morning in taking his pleas?
12                MS. ALÉ:  No, Your Honor.
13                THE COURT:  Is it your opinion your client is in
14    full possession of his faculties?
15                MS. ALÉ:  It is, Your Honor.
16                THE COURT:  Now, Mr. Huizar, you have a number of
17    constitutional rights that you will be giving up if you plead
18    guilty this morning.
19                Do you have a copy of the plea agreement there?
20                THE DEFENDANT:  We do, Your Honor.
21                THE COURT:  All right.  And those rights are set
22    forth in paragraph 22 of the -- of your plea agreement.  I'm
23    going to ask the prosecutor to advise you of those
24    constitutional rights.
25                MR. JENKINS:  Yes, Your Honor.
```

1       Defendant understands that by pleading guilty

2  defendant gives up the following rights:

3       The right to persist in a plea of not guilty;

4       The right to a speedy and public trial by jury;

08:07AM  5       The right to be represented by counsel and, if

6  necessary, have the Court appoint counsel at trial.  Defendant

7  understands, however, that defendant retains the right to be

8  represented by counsel and, if necessary, have the Court

9  appoint counsel at every other stage of the proceeding;

08:08AM  10       The right to be presumed innocent and to have the

11  burden of proof placed on the Government to prove defendant

12  guilty beyond a reasonable doubt;

13       The right to confront and cross-examine witnesses

14  against defendant;

08:08AM  15       The right to testify and to present evidence in

16  opposition to the charges including the right to compel the

17  attendance of witnesses to testify;

18       The right not to be compelled to testify and, if

19  defendant chose not to testify or present evidence, to have

08:08AM  20  that choice not be used against defendant;

21       Any and all rights to pursue any affirmative

22  defenses, 4th Amendment or 5th Amendment claims, and other

23  pretrial motions that have been filed or could be filed.

24       THE COURT:  All right.  Mr. Huizar, have you

08:08AM  25  discussed each of these rights with your attorney?

1          THE DEFENDANT:  Yes, I have.

2          THE COURT:  Would you like to have any additional

3     time to discuss any of these rights with your attorney?

4          THE DEFENDANT:  No.

08:08AM    5          THE COURT:  Do you understand you have these

6     rights and if you enter a plea of guilty and I accept your

7     plea, you will be giving up the right to a trial and the other

8     rights the prosecutor just described to you?

9          THE DEFENDANT:  Yes, I do.

08:08AM   10          THE COURT:  Do you give up each of these rights?

11          THE DEFENDANT:  Yes, I do.

12          THE COURT:  Counsel, are you satisfied that each

13    of your client's waivers are knowingly and voluntarily made,

14    and do you join in and concur in each of the waivers made by

08:09AM   15    your client?

16          MS. ALÉ:  I do, Your Honor.

17          THE COURT:  Now, you have been charged in Count 1

18    with a RICO conspiracy in violation of Title 18 United States

19    Code Section 1962(d) and in Count 41 with tax evasion in

08:09AM   20    violation of 26 United States Code Section 72 --

21          MR. JENKINS:  7201, Your Honor.

22          THE COURT:  Yes.  I want to confirm that's

23    correct in the plea agreement.  7201.

24          Both of those charges are felonies, and I'm going

08:09AM   25    to ask the prosecutor to tell us what the elements of each of

the offenses are.

If you want to follow along in the plea agreement, they appear at paragraphs 8 and 9.

MR. JENKINS:  Yes, Your Honor.

Defendant understands that, for defendant to be guilty of the crime charged in Count 1, that is, RICO conspiracy, the following must be true:

First, there was an agreement between two or more persons that an enterprise, namely, the Council District 14 or CD-14 Enterprise, would exist as alleged in the First Superseding Indictment and a member of the agreement associated with the CD-14 Enterprise would conduct or participate, directly or indirectly, in the conduct of the CD-14 Enterprise affairs through a pattern of racketeering activity as described in the First Superseding Indictment or FSI;

Second, defendant became a member of the agreement knowing of its purpose and agreeing to further or facilitate it; and,

Third, the CD-14 Enterprise would or did engage in or its activities would or did affect interstate or foreign commerce.

An enterprise includes a group of people associated together for a common purpose for engaging in a course of conduct over a period of time.

Racketeering activity refers to the commission of

1 multiple acts chargeable under provisions of federal and state
2 law listed in the RICO Act including giving or offering a bribe
3 or requesting or taking a bribe in violation of California
4 Penal Code Sections 67.5, 85, and 165; honest services fraud
5 through mail and wire fraud in violation of 18 USC Sections
6 1346, 1341, and 1343; money laundering in violation of 18 USC
7 Sections 1956 and 1957; and obstruction of justice and witness
8 tampering in violation of 18 USC Section 1512.

9 A pattern of racketeering activity is at least
10 two racketeering acts, the last of which occurred within ten
11 years of the commission of a prior act of racketeering that
12 have a relationship to each other and pose a threat of
13 continuity.

14 Conduct forms a pattern if it consists of
15 criminal acts that have the same or similar purposes, results,
16 participants, victims, or methods of commission or otherwise
17 are interrelated by distinguishing characteristics and are not
18 isolated.

19 Defendant understands for the defendant to be
20 guilty of the crime charged in Count 41, that is, tax evasion,
21 the following must be true:

22 First, the defendant owed more federal income tax
23 for the calendar year 2017 than was declared on defendant's
24 income tax return for that calendar year;

25 Second, defendant knew that more federal income

tax was owed than was declared on defendant's income tax
return;

       Third, defendant made an affirmative attempt to
evade or defeat such additional tax; and,

       Fourth, in attempting to evade or defeat such
additional tax, defendant acted willfully.

       THE COURT:  All right.  Mr. Huizar, do you
understand the nature of each of the charges?

       THE DEFENDANT:  Yes, I do, Your Honor.

       THE COURT:  Has your attorney discussed with you
each of the elements of the offenses?

       THE DEFENDANT:  Yes, they have.

       THE COURT:  Do you have any questions about the
charges against you?

       THE DEFENDANT:  No, I do not.

       THE COURT:  Have you been advised of the maximum
penalty provided by law for the offenses to which you now offer
your pleas of guilty?

       THE DEFENDANT:  Yes.

       THE COURT:  I will ask the prosecutor to tell us
what the statutory maximum punishment is for each of these
offenses including the authorized term of supervised release,
all applicable mandatory fines and special assessments, whether
or not any of these charges carry a mandatory minimum sentence,
and whether or not a restitution or forfeiture order is

1    possible in this case.

2              MR. JENKINS:  Yes, Your Honor.  There are no

3    mandatory minimums that apply.

4              The statutory maximum sentence that the Court can

08:14AM   5    impose for a violation of Count 1, which is the RICO

6    conspiracy, is 20 years' imprisonment, a three-year period of

7    supervised release, a fine of $250,000 or twice the gross gain

8    or gross loss resulting from the offense, whichever is

9    greatest, and a mandatory special assessment of $100.

08:14AM  10              Defendant understands that the statutory maximum

11    sentence that the Court can impose for a violation of the tax

12    evasion count, 41, is five years' imprisonment, a three-year

13    period of supervised release, a fine of $100,000, the cost of

14    prosecution, and a mandatory special assessment of $100.

08:14AM  15              Therefore, the total maximum sentence for all

16    offenses to which defendant is now pleading guilty is 25 years'

17    imprisonment, a three-year period of supervised release, a fine

18    of $350,000 or twice the gross gain or gross loss resulting

19    from the offenses, whichever is greatest, the cost of

08:15AM  20    prosecution, and a mandatory special assessment of $200.

21              As it relates to restitution, defendant

22    understands and agrees that the Court may order defendant to

23    pay restitution in the form of any additional taxes, interest,

24    and penalties that defendant owes to the United States based

08:15AM  25    upon the count of conviction and any relevant conduct and, B,

```
 1    must order defendant to pay the cost of prosecution which may

 2    be in addition to the statutory maximum fine I previously

 3    stated.

 4              Supervised release is a period of time following

 5    imprisonment during which defendant will be subject to various

 6    restrictions and requirements.  Defendant understands that if

 7    he violates one or more of the conditions of any supervised

 8    release imposed, he may be returned to prison for all or part

 9    of the term of supervised release authorized by statute for the

10    offense that resulted in the term of supervised release which

11    could result in defendant serving a total term of imprisonment

12    greater than the statutory maximum I just noted.

13              THE COURT:  And as to forfeiture?

14              MR. JENKINS:  There's both forfeiture and

15    restitution, Your Honor.

16              THE COURT:  All right.  We have already talked

17    about restitution.  What about the forfeiture?

18              MR. JENKINS:  The Court will order forfeiture of

19    the property described in paragraph 43, overt act No. 445 of

20    Count 1 of the First Superseding Indictment, or substitute

21    assets up to the value of that property, and specifically that

22    property is $129,000 in cash that was seized during the

23    execution of a search warrant on November 7, 2018.

24              THE COURT:  All right.  Mr. Huizar, do you

25    understand there is no parole and if you are sentenced to
```

1    prison, you will not be released on parole?

2              THE DEFENDANT:  Yes, I do, Your Honor.

3              THE COURT:  As the prosecutor said, you will be

4    subject to supervised release for a number of years after your

08:16AM  5    release from any prison sentence.  Do you understand that if

6    you violate the terms and conditions of supervised release, you

7    can be given additional time in prison?

8              THE DEFENDANT:  Yes, I do.

9              THE COURT:  Now, you will be sentenced under the

08:17AM  10   Sentencing Reform Act of 1984.  However, I want to advise you

11   that I'm not required to impose a sentence within the range

12   established by the United States Sentencing Guidelines.  The

13   guidelines are now merely advisory, and I'm free to exercise my

14   discretion to impose any sentence I deem appropriate up to the

08:17AM  15   maximum sentence set by statute for the crimes of conviction.

16              Do you understand that?

17              THE DEFENDANT:  Yes, I do, Your Honor.

18              THE COURT:  Do you also understand that in

19   determining your sentence, I will calculate and consider the

08:17AM  20   applicable sentencing guideline range, any possible upward or

21   downward departures authorized under the sentencing guidelines,

22   and certain other statutory sentencing factors set forth in

23   Title 18 United States Code Section 3553(a).

24              Do you understand that?

08:17AM  25              THE DEFENDANT:  I understand, Your Honor.

1       THE COURT:  Have you discussed the sentencing

2   guidelines and other factors that I will consider in

3   determining your sentence with your attorney?

4       THE DEFENDANT:  Yes, I have.

08:18AM    5       THE COURT:  Has your attorney explained how the

6   sentencing guidelines and other factors will be used to

7   determine your sentence?

8       THE DEFENDANT:  Yes, they have.

9       THE COURT:  Do you understand that I will not be

08:18AM   10   able to determine the applicable sentencing guideline range or

11   the actual sentence for your case until a presentence report

12   has been prepared by the probation department and you and the

13   Government have had an opportunity to review the presentence

14   report and file any objections you may have to the report?

08:18AM   15       Do you understand that?

16       THE DEFENDANT:  I understand, Your Honor.

17       THE COURT:  Do you also understand that for all

18   of these reasons, neither your attorney nor I can tell you

19   today what your sentence will be?

08:18AM   20       THE DEFENDANT:  I understand.

21       THE COURT:  Do you understand that if I impose a

22   sentence that is more severe than you anticipate, you will not

23   be able to withdraw your guilty plea?

24       THE DEFENDANT:  I understand, Your Honor.

08:18AM   25       THE COURT:  Do you understand the maximum

```
 1   sentence that you can receive, the restitution order that may

 2   be entered, and the forfeiture orders that may be entered in

 3   this case?

 4              THE DEFENDANT:  I understand.

 5              THE COURT:  Now, a plea agreement has been filed

 6   in this case.  Have you read the plea agreement and discussed

 7   all of the terms of your plea agreement with your attorney?

 8              THE DEFENDANT:  Yes, I have, Your Honor.

 9              THE COURT:  Did you sign the plea agreement?

10              THE DEFENDANT:  Yes, I did, Your Honor.

11              THE COURT:  Did you understand the plea agreement

12   and all of its terms?

13              THE DEFENDANT:  Yes, I did, Your Honor.

14              THE COURT:  Now, the plea agreement in

15   paragraph 21 of the plea agreement filed in this case, you and

16   the Government have agreed that the Court should impose a

17   sentence of between 108 and 156 months of imprisonment, three

18   years' supervised release with conditions to be fixed by the

19   Court, and a $200 special assessment.

20              If I accept the plea agreement, that means that

21   you will be sentenced to prison for at least 108 months but not

22   more than 156 months.  Is that your understanding of the plea

23   agreement and the potential sentence that you will receive?

24              THE DEFENDANT:  I understand, Your Honor.

25              THE COURT:  However, I want to advise you that I
```

08:18AM (line 5)
08:19AM (line 10)
08:19AM (line 15)
08:19AM (line 20)
08:20AM (line 25)

        1    will not make any decision whether or not I will be bound or

        2    accept your plea agreement until after I review the presentence

        3    report that will be prepared by the Government -- by the

        4    probation office in this case.

08:20AM 5                    Do you understand that?

        6                    THE DEFENDANT:  Yes, Your Honor.

        7                    THE COURT:  Do you also understand that if I

        8    decide not to follow the plea agreement, I will give you an

        9    opportunity to withdraw your pleas of guilty.  However, if you

08:20AM 10   decide not to withdraw your guilty pleas, I may impose a more

        11   severe sentence than contemplated by your plea agreement.

        12                   Do you understand that?

        13                   THE DEFENDANT:  I understand.

        14                   THE COURT:  Now, paragraphs, I believe, 23 and 25

08:20AM 15   contain a waiver of your right to appeal.  Paragraph 24

        16   contains a waiver of your right to bring a post-conviction

        17   collateral attack.  I'm going to ask the prosecutor to read

        18   into the record the provisions of each of those paragraphs, and

        19   then I'm going to ask you some questions about your appellate

08:21AM 20   waiver.

        21                   MR. JENKINS:  Yes, Your Honor.  Defendant agrees

        22   that, provided the Court imposes a total term of imprisonment

        23   on all counts of conviction of no more than 156 months,

        24   defendant gives up the right to appeal all of the following:

08:21AM 25                   The procedures and calculations used to determine

1    and impose any portion of the sentence;

2              The term of imprisonment imposed by the Court;

3              The fine imposed by the Court provided it is

4    within the statutory maximum;

08:21AM    5              To the extent permitted by law, the

6    constitutionality or legality of defendant's sentence provided

7    it is within the statutory maximum;

8              The amount in terms of any restitution order

9    provided it requires payment of no more than $1,857,679;

08:22AM   10              The term of probation or supervised release

11   imposed by the Court provided it is within the statutory

12   maximum; and,

13              Any of the following conditions of probation or

14   supervised release imposed by the Court, the conditions set

08:22AM   15   forth in second amended General Order 20-04 of this Court, the

16   drug testing conditions mandated by 18 USC Sections 3563(a)(5)

17   and 3583(d).

18              In return, the U.S. Attorney's Office agrees that

19   provided the Court imposes a sentence within the range with a

08:22AM   20   term of imprisonment specified in paragraph 21, the

21   U.S. Attorney's Office waives its right to appeal any portion

22   of the sentence.

23              THE COURT:  What about paragraph 23?

24              MR. JENKINS:  Yes, Your Honor.

08:22AM   25              Defendant understands that with the exception of

an appeal based on a claim that defendant's guilty pleas were involuntary, by pleading guilty, defendant is waiving and giving up any right to appeal defendant's convictions on the offenses to which defendant is pleading guilty.

08:23AM    Defendant understands that the waiver includes but is not limited to arguments that the statutes to which defendant is pleading guilty are unconstitutional and any and all claims that the statement of facts provided in Attachment A is insufficient to support defendant's pleas of guilty.

08:23AM    Defendant also gives up any right to bring a post-conviction collateral attack on the convictions or sentence including any order of restitution except a post-conviction collateral attack based on a claim of ineffective assistance of counsel, a claim of newly discovered

08:23AM evidence, or an explicitly retroactive change in the applicable sentencing guidelines, sentencing statutes, or statutes of conviction.

    Defendant understands that this waiver includes but is not limited to arguments that the statutes to which

08:23AM defendant is pleading guilty are unconstitutional and any and all claims that the statement of facts provided herein is insufficient to support defendant's pleas of guilty.

    THE COURT:  All right.  Mr. Huizar, do you understand that by entering into this plea agreement and

08:24AM pleading guilty this morning, you have agreed to give up your

```
 1   right to appeal in accordance with the terms of your plea
 2   agreement?
 3                THE DEFENDANT:  I understand, Your Honor.
 4                THE COURT:  Did you discuss waiving your right to
 5   appeal with your attorney?
 6                THE DEFENDANT:  Yes, I did.
 7                THE COURT:  Based on the advice of your attorney
 8   and having considered the matter, do you wish to give up your
 9   right to appeal on the terms and conditions set forth in your
10   plea agreement?
11                THE DEFENDANT:  Yes, I do.
12                THE COURT:  Counsel, are you satisfied that your
13   client's waiver of his right to appeal is knowingly and
14   voluntarily made, and do you join in and concur in your
15   client's decision to waive his right to appeal?
16                MS. ALÉ:  I do, Your Honor.
17                THE COURT:  Mr. Huizar, do you understand your
18   guilty plea may deprive you of valuable government and valuable
19   civil rights such as the right to vote, the right to hold
20   public office, the right to serve on a jury, and the right to
21   possess any kind of firearm or ammunition?
22                THE DEFENDANT:  Yes, I do, Your Honor.
23                THE COURT:  Now, have any promises,
24   representations, or guarantees been made to you in exchange for
25   your guilty pleas other than those that appear in your plea
```

1    agreement?

2            THE DEFENDANT:  No.

3            THE COURT:  Has anyone made any threats or used

4    any force against you or any member of your family in order to

08:25AM   5    get you to plead guilty?

6            THE DEFENDANT:  No.

7            THE COURT:  Are you pleading guilty voluntarily

8    and of your own free will?

9            THE DEFENDANT:  Yes, I am.

08:25AM  10            THE COURT:  Other than what is contained in the

11   written plea agreement and other than a general discussion with

12   your attorney of the sentencing guidelines and other factors

13   that I will consider in determining your sentence, has anyone

14   made you any promises of leniency, a particular sentence,

08:25AM  15   probation, or any other inducement of any kind in order to get

16   you to plead guilty?

17            THE DEFENDANT:  No, Your Honor.

18            THE COURT:  Have you been told by anyone what

19   specific sentence the Court will impose in the event I accept

08:25AM  20   your guilty pleas?

21            THE DEFENDANT:  No, Your Honor.

22            THE COURT:  Now, I'm going to ask the prosecutor

23   to make an offer of proof as to what facts the Government would

24   prove if this case went to trial on Counts 1 and 41 of the

08:25AM  25   First Superseding Indictment, and those facts are set forth in

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 08:26AM | 5 |

1   Attachment A, the factual basis of your plea, so you can follow

2   along.  I'm going to ask you to listen very carefully because

3   I'm going to ask you questions about what the prosecutor says

4   in his offer of proof.

08:26AM  5          All right.  Mr. Jenkins, are we going to read the

6   whole thing?

7          MR. JENKINS:  That would be our request,

8   Your Honor.

9          THE COURT:  You can remain seated or go to the

08:26AM  10  lectern, whichever you prefer.

11         MR. JENKINS:  I will go to the lectern,

12  Your Honor.

13         THE COURT:  All right.  I take it, however, when

14  you come to these paragraphs with respect to payments, we're

08:26AM  15  not going to go through each one of those.  We're just going to

16  do totals?

17         MR. JENKINS:  That is correct, Your Honor.  I

18  will follow that guidance, and that is our intention.

19         THE COURT:  All right.  You may proceed.

08:26AM  20         MR. JENKINS:  Beginning on page 1 of

21  Attachment A, the CD-14 Enterprise.

22         Throughout the period described in the First

23  Superseding Indictment, the Council District 14 Enterprise,

24  otherwise known as the "CD-14 Enterprise," located in the city

08:27AM  25  of Los Angeles, also known as "The City," was a criminal

1   enterprise composed of a group of individuals associated for a

2   common purpose of engaging in a course of conduct, which course

3   includes bribery, mail and wire fraud, including through the

4   deprivation of honest services of city officials and employees,

08:27AM   5   extortion, interstate and foreign travel in aid of racketeering

6   enterprises, money laundering, structuring transactions to

7   evade reporting requirements, and obstruction of justice to

8   achieve the goals of the enterprise.

9            The CD-14 Enterprise constituted an ongoing

08:27AM   10   organization whose members functioned as a continuing unit for

11   a common purpose of achieving the objectives of the enterprise.

12   The goals of the CD-14 Enterprise included but were not limited

13   to:

14            Enriching the members and associates of the CD-14

08:27AM   15   Enterprise through means that included bribery, extortion, mail

16   and wire fraud, including through the deprivation of honest

17   services of city officials and employees;

18            B, advancing the political goals and maintaining

19   the control and authority of the CD-14 Enterprise by elevating

08:28AM   20   members and associates of the CD-14 Enterprise to and

21   maintaining those individuals' placement in prominent elected

22   office through means that included bribery and mail and wire

23   fraud including through the deprivation of honest services of

24   city officials and employees;

08:28AM   25            C, the concealing -- concealing of financial

activities of the CD-14 Enterprise through means that included

money laundering and structuring; and,

D, protecting the CD-14 Enterprise by concealing

the activities of its members and associates and shielding the

CD-14 Enterprise from detection by law enforcement, the city,

the public, and others through means that included obstructing

justice.

Defendant Jose Huizar, Councilmember for CD-14,

who had jurisdiction over hundreds of development projects

undergoing the application and approval process in the city was

a leader and member of the CD-14 Enterprise.  Members and

associates of the CD-14 Enterprise also consisted of lobbyists,

consultants, and other city officials and staffers who sought

to personally enrich themselves and their families and

associates through a pay-to-play scheme within the city wherein

public officials demanded and solicited financial benefits from

developers and their proxies in exchange for official acts.

Specifically, through the bribery scheme,

Defendant Jose Huizar, Raymond Chan, George Esparza, and other

city officials demanded, solicited, accepted, and agreed to

accept from developers and their proxies some combination of

the following types of financial benefits, among others:

One, cash;

Two, consulting and retainer fees;

Three, favorable loans;

1          Four, gambling chips at casinos;

2          Five, political distributions;

3          Six, flights on private jets and commercial

4    airlines;

08:30AM   5          Seven, stays at luxury hotels;

6          Eight, expensive meals;

7          Nine, spa services;

8          Ten, event tickets to concerts shows and sporting

9    events;

08:30AM   10         Eleven, escort and prostitution services; and,

11         Twelve, other gifts.

12         Members of the CD-14 Enterprise conspired with

13   one another to facilitate bribery schemes that would provide

14   Defendant Huizar and other city officials -- other city

08:30AM   15   official allies financial benefits and keep Defendant Huizar

16   and his allies in power and maintain the CD-14 Enterprise's

17   political stronghold in the city.  This bribery included

18   members and associates of the CD-14 Enterprise raising and

19   soliciting funds from developers and their proxies with

08:30AM   20   projects in CD-14 to be paid to Defendant Huizar's desired

21   accounts and Political Action Committees, or PACs, including to

22   benefit Huizar Relative 1's campaign for the CD-14 seat.

23         In exchange for such financial benefits from

24   developers and their proxies, Defendant Huizar, Chan, Esparza,

08:31AM   25   and other city officials agreed to perform and performed the

following types of official acts, among others:

One, presenting motions and resolutions in various city committees to benefit projects;

Two, voting on projects in various city committees including the PLUM Committee and City Council;

Three, taking or not taking action in the PLUM Committee to expedite or delay the approval process and affect project costs;

Four, exerting pressure on other city officials to influence the approval and/or permitting process of projects;

Five, using their office to negotiate with and exert pressure on labor unions to resolve issues on projects;

Six, leveraging voting and scheduling power to pressure developers with projects pending before the city to affect their business practices; and,

Seven, introducing or voting on city resolutions to enhance the professional reputation and marketability of businesspersons in the city.

As a result of its bribery, extortion, honest services fraud, money laundering, and structuring conduct throughout the period described in the FSI and as known to Defendant Huizar, CD-14 Enterprise members and associates engaged in and their activities in some way affected interstate and foreign commerce.

1    Defendant's role in the CD-14 Enterprise.

2    Beginning no later than February 2013 and

3 continuing at least until July 30, 2020, Defendant Huizar was a

4 leader of the CD-14 Enterprise.  In that capacity,

08:32AM 5 Defendant Huizar conspired and agreed with other

6 CD-14 Enterprise members and close associates including

7 Raymond Chan, Esparza, George Chiang, Justin Kim,

8 Morrie Goldman, and others that a conspirator would commit at

9 least two acts of the above-described racketeering activity,

08:32AM 10 which acts had a relation to one another and the

11 CD-14 Enterprise and posed a threat of continued criminal

12 activity.  Defendant Huizar became a member of this conspiracy

13 knowing of its object, knowing it illegal, and intending to

14 help accomplish it.

08:33AM 15    Also in furtherance of the racketeering

16 conspiracy, Defendant Huizar facilitated and participated in at

17 least the following bribery schemes:

18    L.A. Grand Hotel bribery scheme.

19    In or around February 2013, Raymond Chan, then

08:33AM 20 the interim general manager of the Los Angeles Department of

21 Building and Safety, also known as LADBS, introduced

22 Defendant Huizar and Esparza to Wei Huang at a dinner in

23 Los Angeles, California.  Huang, a Chinese national and

24 billionaire, owned and was chairman of Shen Zhen New World

08:33AM 25 Group which included Shen Zhen New World 1, LLC, also known as

1    Shen Zhen Company, one of China's leading real estate

2    development companies.  Huang also owned the L.A. Grand Hotel

3    located in CD-14 and the Sheraton Universal Hotel located in

4    CD-4.

08:34AM    5                Between March 2013 and November 2018, Huang,

6    aided and abetted by Chan and others, provided financial

7    benefits directly and indirectly to Defendant Huizar in

8    exchange for Defendant Huizar's assistance to Huang and

9    Shen Zhen Company in Defendant Huizar's official capacity as a

08:34AM    10   city councilmember on an ongoing and as needed basis related to

11   specific matters.  Defendant Huizar, Huang, Raymond Chan, and

12   others established a mutually beneficial agreement to exchange

13   a stream of benefits for official acts and to further the CD-14

14   Enterprise's goals.

08:34AM    15               Benefits to Defendant Huizar at casinos.

16               In March 2013 Defendant Huizar, Esparza, Huang,

17   and Executive Director E, an associate of Huang and the

18   executive director of Shen Zhen Company, traveled on a private

19   jet to the Wynn Hotel and Casino in Las Vegas, Nevada, the

08:34AM    20   March 2013 trip.

21               During the March 2013 trip, Defendants Huizar and

22   Esparza accepted financial benefits in the form of flights and

23   private jets, a stay in a luxurious five-bedroom villa at the

24   Wynn Casino, meals, alcohol, and casino chips from Huang.

08:35AM    25   Specifically, Defendant Huizar accepted approximately $10,000

in casino gambling chips from Huang.  Esparza accepted

approximately $2,000 in casino gambling chips from Huang.

                    Between March 2013 and February 2017,

Defendant Huizar traveled to Las Vegas casinos with Huang on at

least the following occasion -- on at least the following

dates, and accepted benefits in the form of expenses including

flights, hotel rooms, spa services, meals, alcohol,

prostitution and escort services, and casino gambling chips in

the amounts set forth in the chart on pages 6 and 7 and for a

total amount in group benefits of $1,111,793 and chips to

Huizar, approximately a total of $194,500.

                    Defendant Huizar helps save Raymond Chan's job

and then receives $600,000 from Huang to settle

Defendant Huizar's sexual harassment lawsuit during his

re-election campaign.

                    On June 7, 2013, an administrative complaint was

filed against Defendant Huizar by a former CD-14 employee.  On

October 17, 2013, the former CD-14 employee filed a civil

sexual assault lawsuit against Defendant Huizar.  Thereafter,

Defendant Huizar and Raymond Chan strategized on how to acquire

funds to settle the lawsuit and save Defendant Huizar's career.

                    In return for Defendant Huizar saving

Raymond Chan's job by preventing the consolidation of the

Planning Department and the LADBS, Raymond Chan orchestrated

and facilitated an arrangement whereby Huang provided $600,000

in collateral for Defendant Huizar to obtain a personal loan
from East West Bank for $570,000 to pay the sexual harassment
settlement and legal fees.  Huang and Defendant Huizar routed
the money through various entities to disguise the source of
funds.  On September 26, 2013, Defendant Huizar used the money
provided by Huang to pay $600,000 to settle the suit with the
former CD-14 employee.

On December 12, 2018, after Defendant Huizar
failed to make interest payments on that loan for three
consecutive months, East West Bank applied the collateral
provided by Huang to the amount Defendant Huizar owed on the
loan totaling $575,269 which meant that Defendant Huizar no
longer had to pay this amount to the bank, thereby enriching
him in the amount of $575,269.

In exchange for the 600,000 collateral for
Defendant Huizar's personal loan and during the time Huang was
also supplying financial benefits to Defendant Huizar, Huang
asked for a series of benefits from Defendant Huizar.

May 17, 2013, an employee of Shen Zhen Company
e-mailed Esparza requesting a, quote, "favor" from
Defendant Huizar on behalf of Huang relating to a visa
application for another Shen Zhen Company employee.
Defendant Huizar complied with the request and signed a letter
on official letterhead addressed to the United States Consulate
General in Guangzhou, China, supporting a visa application for

1     the director of finance for Shen Zhen Company.

2               Between June 2013 and December 2013, Huang,

3     through Raymond Chan, enlisted Defendant Huizar's help to

4     negotiate and resolve a parking lot dispute with the owners of

08:38AM  5     a plot of land adjacent to Huang's property in CD-14, the

6     L.A. Grand Hotel.

7               Between July 2013 and October 2013, Huang asked

8     for Defendant Huizar to arrange a meeting with the head of the

9     labor union which had a dispute related to the

08:39AM  10    L.A. Grand Hotel.

11              On April 23rd, 2014, to benefit Huang's

12    reputation in the business community, Defendant Huizar

13    introduced and signed a resolution before the City Council

14    recognizing Huang for his achievements and contributions to the

08:39AM  15    economy of CD-14 which the City Council signed and adopted.

16              On June 27, 2017, Esparza put a Shen Zhen Company

17    employee in touch with a Defendant Huizar staff member to

18    discuss and facilitate resolving union issues at Huang's two

19    hotels in Los Angeles.

08:39AM  20              Most significantly, Huang provided bribes to

21    Defendant Huizar because, as chair of the Planning and Land Use

22    Management Committee and CD-14 councilmember, Defendant Huizar

23    was poised to significantly benefit Huang's desire and plans to

24    redevelop the L.A. Grand Hotel and transform it into a 77-story

08:39AM  25    skyscraper making it the tallest building west of the

1    Mississippi River.  This project required official acts from

2    Defendant Huizar at various stages of the city approval

3    process.

4              From January 1st to January 10, 2016, Huang

08:40AM  5    provided Defendant Huizar an all-expense paid trip to Australia

6    including a business class flight worth more than $10,000 and

7    32,800 in Australian dollars.

8              On August 4, 2016, Defendant Huizar,

9    Raymond Chan, senior officials from the Planning Department,

08:40AM 10   and senior CD-14 staff members met with Huang and his team to

11   discuss the expansion of the L.A. Grand Hotel including Huang's

12   interest in pursuing Transfer of Floor Area Rights, or TFAR,

13   Transient Occupancy Tax, or TOT, rebates and other incentives

14   from the city.

08:40AM 15             In or around August 2016 on a private jet flight

16   returning to Los Angeles from Las Vegas, Huang requested

17   Defendant Huizar's and Esparza's assistance in hiring a

18   consultant on the L.A. Grand Hotel.  Defendant Huizar agreed to

19   help.

08:40AM 20             June 11, 2018, Shen Zhen Company filed two

21   applications with the Planning Department to expand and

22   redevelop the L.A. Grand Hotel and Sheraton Universal Hotel.

23   According to the L.A. Grand Hotel application, quote, "the

24   Project will consist of a conversion of an existing 13-story

08:41AM 25   hotel to 224 apartment units with the addition of a 77-story

tower that will provide 599 new hotel rooms, 242 condominium

units, 28,704 square feet of commercial, and 36,674 square feet

of hotel amenities."  The application listed four specific

requested actions/entitlements:

08:41AM      1.  Vesting tentative tract map;

2.  Specific plan project permit compliance;

3.  Transfer of floor area of greater than 50,000

square feet; and

4.  Master conditional use permit for on-site

08:41AM sale and consumption of alcohol for five establishments.  Each

of these entitlements required approvals in the PLUM Committee

and City Council.

In or around August 2018, Huang provided

Defendant Huizar an all-expense paid trip to a golf resort in

08:42AM Northern California, including a round-trip on a private jet,

accommodations, meals, and other costs.  During the trip and in

the months thereafter, Huang agreed to support Defendant Huizar

Relative 1's campaign for the CD-14 seat, including by hosting

a fundraiser in November 2018 and pledging to raise or

08:42AM contribute $50,000 to benefit her campaign.

On or about November 7, 2018, Defendant Huizar

possessed approximately $129,000 in cash hidden at his

residence, which was made up of cash derived from casino chips

provided by Huang to Defendant Huizar along with cash

08:42AM Defendant Huizar received from Businessperson A.

David Lee and the 940 Hill Bribery Scheme.

Between August 2016 and July 2017, Dae Yong Lee, also known as "David Lee," a real estate developer and majority owner of 940 Hill, LLC, agreed to provide a $500,000 cash bribe to Defendant Huizar, Esparza, and Justin Kim, in exchange for Defendant Huizar's assistance on one of Lee's development projects, the 940 Hill Project.  The 940 Hill Project was a planned 20-story residential complex on the corner of Hill Street and Olympic Boulevard in CD-14.  The development was to contain 232 residential units and 14,000 square feet of commercial floor area.

On August 8, 2016, Labor Organization A, a labor organization, filed an appeal (the "appeal") with the Central Los Angeles Area Planning Commission, requesting to, quote, "suspend all activity to implement the 940 Hill Project that requires City approval until the project is brought into compliance with requirements of CEQA (California Environmental Quality Act) by correcting the deficiencies identified in the appeal," unquote.  The appeal prevented the 940 Hill Project from progressing through the rest of the City approval processes, including approvals by the PLUM Committee and City Council.

September 1st, 2016, Defendant Huizar, Esparza, and Kim had dinner together and then visited a Korean karaoke establishment in Los Angeles.  During the karaoke meeting, Kim

1    asked Defendant Huizar for assistance with the appeal on the

2    940 Hill Project, and Defendant Huizar agreed to help.  Kim

3    then called Lee and asked him to join the group at karaoke,

4    which Lee did.

08:44AM    5            On January 17th, 2017, Defendant Huizar, Esparza,

6    Kim and Lee's business associates met at Defendant Huizar's

7    City Hall offices to discuss, among other things, the 940 Hill

8    Project.  During a private meeting that included only

9    Defendant Huizar, Esparza, and Kim, Kim again asked

08:44AM    10   Defendant Huizar for assistance with the appeal, and

11   Defendant Huizar responded that he could help.

12            In approximately February 2017, Esparza conveyed

13   to Defendant Huizar an offer of $500,000 cash from Lee for

14   Defendant Huizar to resolve the appeal, on behalf of 940 Hill,

08:45AM    15   as represented by Kim to Esparza, to be split among

16   Defendant Huizar, Esparza, and Kim.

17            In approximately February and March 2017,

18   Defendant Huizar and Esparza discussed the appeal.

19   Defendant Huizar instructed Esparza to speak to Lobbyist C, a

08:45AM    20   lobbyist for Labor Organization A and a close associate of the

21   Executive Director of Labor Organization A.  Defendant Huizar

22   also discussed the appeal with Lobbyist C.  At some point,

23   Defendant Huizar conveyed to either Esparza or Lobbyist C that

24   Defendant Huizar would oppose the appeal in the PLUM Committee.

08:45AM    25   Subsequently, Lobbyist C communicated to Defendant Huizar,

through Esparza, that Labor Organization A would drop its
appeal on the 940 Hill Project.  On March 2nd, 2017, Labor
Organization A dropped its appeal.

March 14, 2017, Defendant Huizar and Esparza met
at Defendant Huizar's residence.  Esparza told Defendant Huizar
that Lee had provided $400,000 in cash to date and that Lee
would provide the remaining $100,000 later.  Esparza stated
that Kim had provided $200,000 of that cash to Esparza.  On two
occasions, Esparza showed Defendant Huizar a liquor box filled
with approximately $100,000 cash (for a total of $200,000).
Defendant Huizar told Defendant Esparza to hold on to and hide
the money at Esparza's residence until Defendant Huizar asked
for it.  Defendant Huizar told Esparza that Esparza could have
$100,000 of the $300,000 total amount Defendant Huizar expected
to receive from Lee.

On December 28, 2017, Defendant Huizar and
Esparza met at City Hall and, in Defendant Huizar's private
bathroom, discussed various topics, including Esparza's
interviews with the FBI, and the cash bribe Esparza was holding
for Defendant Huizar.  Specifically, during that conversation,
Defendant Huizar stated, quote:  "I have a lot of expenses now
that with Huizar Relative 1 running, Huizar Relative 1 not
going to be working anymore.  I'm gonna need money.  Um, that
is mine; right?  That is mine," unquote.  Defendant Huizar was
referring to the $200,000 cash bribe payment from Lee via Kim

that Defendant Huizar had asked Esparza to hide at Esparza's

residence.  Esparza affirmed the bribe money was for

Defendant Huizar.  Defendant Huizar and Esparza agreed to wait

until April 1st, 2018, for Esparza to provide the $200,000 cash

owed to Defendant Huizar, to allow a cooling off period after

Esparza's interviews with the FBI in hopes that it would

decrease the likelihood of law enforcement discovering the

cash.

The Luxe Hotel Bribery Schemes.

Early Corrupt Relationship with Hazens.

March 24, 2014, Chan facilitated the introduction

of Defendant Huizar to Chinese developer Fuer Yuan and Yuan's

development company Hazens via an e-mail to Esparza.

In August 2014, Chan, at Defendant Huizar's

direction, helped resolve an Americans with Disabilities Act,

or "ADA," compliance issue at the Hazens' Luxe Hotel located in

CD-14.

On September 19, 2014, at Defendant Huizar's

direction, Esparza obtained and then forwarded to

Defendant Huizar an e-mail from Employee D that attached three

Katy Perry tickets valued at approximately $1,000 total for

Defendant Huizar and his family.

On November 4, 2014, Chan sent a text message to

Defendant Huizar, writing, "I will be having dinner with the

Chairman Fuer Yuan tonight.  I also knew that you will have

dinner with him Thursday.  I just want to touch base with you

as to what George Chiang and I should tell him."

On November 4, 2014, Chiang sent an e-mail to

Esparza with the subject line "Huizar Fundraising," writing:

08:48AM "Can you get me in touch with Defendant Huizar?  Defendant Chan

and I had dinner with Hazens last night regarding pledging

their support so I want to discuss this to prepare the

Councilman's dinner with them this Thursday."

On November 26, 2014, Defendant Huizar, Esparza,

08:49AM and Chiang met with Chairman Fuer Yuan and Huizar Relative 1

over dinner at the Luxe Hotel, where Defendant Huizar and Yuan

discussed Hazens' support for Defendant Huizar and

Defendant Huizar's support for the Luxe Hotel Project.

In September 2015, Chan discussed with

08:49AM Defendant Huizar and Chiang that Raymond Chan was organizing

meetings with various city departments to help the Luxe Hotel

Project and that the Hazens Chairman wanted to expedite City

approvals on this project.

In approximately 2016, at a meeting that included

08:49AM Defendant Huizar, Chiang, Fuer Yuan, Defendant Huizar asked

Chiang to relay to Yuan that:

1.  There was no need to involve the City's Mayor

in the approval process of the Luxe Hotel Project because

Defendant Huizar was the one in control of the PLUM Committee;

08:50AM 2.  The City's Mayor could not provide help to

1    Yuan because it was Defendant Huizar who drove the project; and

2            3.  As far as the success of the Luxe Hotel

3    Project was concerned, Yuan did not need anyone else in the

4    city but Defendant Huizar.

08:50AM   5            (2) Consulting Fees in Exchange for Official

6    Acts.

7            On November 11, 2015, Defendant Huizar, Chiang,

8    and Esparza met with Fuer Yuan and General Manager D, the

9    general manager of the Luxe Hotel Project, over dinner at a

08:50AM   10    restaurant in Arcadia.  Defendant Huizar and Yuan discussed

11    Defendant Huizar's support for the Luxe Hotel Project.  In the

12    same conversation, Defendant Huizar asked Yuan to hire one of

13    Defendant Huizar's associates, who later turned out to be

14    Huizar Associate 1, on the Luxe Hotel Project.  Yuan told

08:50AM   15    Defendant Huizar to discuss the details with General Manager D.

16            In December 2015, Defendant Huizar and Chiang had

17    multiple communications regarding Yuan's agreement to hire

18    Huizar Associate 1.  Chiang told Defendant Huizar that General

19    Manager D would work with Defendant Huizar on retaining Huizar

08:51AM   20    Associate 1.

21            On or about December 16, 2015, Defendant Huizar

22    caused Huizar Relative 1 to meet with Fuer Yuan's relative, who

23    had traveled to Los Angeles at General Manager D's direction,

24    to discuss an arrangement whereby Yuan's relative's company

08:51AM   25    would pay a company affiliated with Huizar Associate 1,

 1    purportedly for real estate advice.

 2              In April 2016, Defendant Huizar and Chiang had

 3    several communications confirming their plan to get the Huizar

 4    Relative 1/Huizar Associate 1 agreement with Hazens underway.

08:51AM  5   On April 26, 2016, Defendant Huizar confirmed his interest to

 6    Chiang, stating:  "Cool.  The more I think about our project,

 7    the more I get excited about it.  Let's meet every two weeks or

 8    so to see how things are going...I think it'll be great."

 9              In May 2016, Defendant Huizar caused Company A

08:51AM 10   (Huizar Associate 1's affiliated company) and Yuan's relative's

11    company to execute an agreement whereby Company A would

12    purportedly "provide marketing analysis for Real Estate and

13    Land Development Opportunities in the Greater Southern

14    California Area in the total amount of $11,000 per month for

08:52AM 15   services rendered."  In reality, Chiang prepared the monthly

16    marketing analysis reports and delivered them to

17    Defendant Huizar, who then provided them to Huizar Associate 1,

18    who collected the $11,000 monthly retainer.  Defendant Huizar,

19    Chiang, and General Manager D understood that the monthly

08:52AM 20   retainer payments were intended to be and were in fact indirect

21    bribe payments to Defendant Huizar in exchange for

22    Defendant Huizar's official acts to benefit the Luxe Hotel

23    Project.

24              From May 31st, 2016, to November 3rd, 2016,

08:52AM 25   Chiang delivered to Defendant Huizar six real estate reports

that were intended to be passed off as being created by
Company A pursuant to its $11,000 per month consulting
agreement with Fuer Yuan's relative.  During this same time
period, Defendant Huizar delivered to Huizar Associate 1 these

08:53AM  six real estate reports, and Huizar Associate 1 then
subsequently caused Company A to collect $11,000 from Yuan's
relative's company each month (for a total of $66,000) as a
consulting fee for the reports.

                    Official Acts by Defendant Huizar.

08:53AM               On November 22nd, 2016, Defendant Huizar
presented a written motion in the Economic Development
committee to benefit the Luxe Hotel Project.

                    On December 13, 2016, Defendant Huizar voted
"yes" in the City Council to adopt the Luxe Hotel Project

08:53AM  motion Defendant Huizar had presented.

                    On December 13, 2016, after the City Council
vote, Defendant Huizar and Chiang met with General Manager D at
the Luxe Hotel to discuss the Luxe Hotel Project and
Defendant Huizar's agreement to expedite the project going

08:53AM  forward.

                    Additional Benefits from Chiang for
Defendant Huizar's Official Acts.

                    In or around April 2017, at Defendant Huizar's
request, Chiang organized and coordinated a trip for

08:54AM  Defendant Huizar and his family members to visit Fuer Yuan in

China, including paying approximately $500 for visa fees and arranging for transportation for Defendant Huizar and his family in Hong Kong.

Between April 15th, 2017, and April 23rd, 2017, when Defendant Huizar and his family visited Fuer Yuan in Hong Kong and China, Defendant Huizar and his family members accepted benefits valued at approximately $1,400 from Yuan, including for certain transportation, meals, and lodging.

On April 27, 2017, at Defendant Huizar's request, Chiang provided concert tickets to Defendant Huizar worth approximately $1,572 total.

On May 2nd, 2017, in a telephone call, Chiang and Esparza discussed the mutually beneficial financial relationship between Chinese developers and Defendants Huizar and Raymond Chan.  Specifically, Esparza told Chiang:  "Looking from your perspective, you bank on Raymond Chan and Defendant Huizar's office to do -- one of the main points with Defendant Huizar, for your Chinese clients, for example, 'entitlements, PLUM,' you got to use that and we gotta keep making his motherfucking -- him happy."

On May 19, 2017, at Defendant Huizar's request, Chiang paid approximately $1,000 for alcohol for a party for a Huizar relative.

On June 19, 2017, at Defendant Huizar's request, Chiang provided concert tickets to Defendant Huizar worth

1    approximately $1,670.

2              On June 22nd, 2017, during a telephone call, Chan

3    and Chiang discussed Defendant Huizar's request for benefits

4    from Chiang.  Specifically, Chiang explained that

08:55AM   5    Defendant Huizar asked him to coordinate a trip to Cuba for

6    Defendant Huizar.  Defendant Raymond Chan then asked:  "So he

7    just wanted you to do what, to...pay for all the trips?  Is

8    that what he wants?"  Chiang then stated that Defendant Huizar

9    would have to get special visas and explained that this would

08:55AM   10   risk potentially exposing their corrupt relationships:  "I told

11   Huizar, I said, 'Look, we're all gonna be on record and if

12   something happens, everything, everyone's dead.'"

13             On August 24th to 25th, 2017, Chiang asked for

14   Defendant Huizar's help on the Luxe Hotel Project.

08:56AM   15             On September 1st, 2017, at Chiang's request,

16   Defendant Huizar presented a written motion in the

17   PLUM Committee to benefit Hazens, allowing the Luxe Hotel

18   Project to move forward with its application and approval

19   process before the CPC and City Council.

08:56AM   20             On September 14th, 2017, Defendant Huizar

21   confirmed that he and his office exerted pressure on other City

22   officials, writing to Chiang in a text message, quote:

23   "Congrats.  Yeah we (CD-14 office) were calling mayors office

24   to tell his commission to calm down.  It's expected from cpc

08:56AM   25   they throw a lot of junk at projects these days.  Not over but

1    make sure u relay to chairman (Fuer Yuan) that we were

2    helpful," unquote.

3              On September 14, 2017, in a telephone call,

4    Defendant Huizar told Chiang:  "You know, whatever it was,

08:56AM   5    we'll fix it in PLUM...  Did the boss (Fuer Yuan) -- you call

6    the boss already?  Did you tell him that my office was

7    helpful?"  Chiang responded:  "I told Yuan everything."

8    Defendant Huizar then stated:  "Okay.  Cool, cool, cool.  Good,

9    good.  Do we have a schedule for PLUM already?"

08:57AM  10              In or around November 2017, Defendant Huizar

11   asked Chiang to make a commitment on behalf of Hazens to

12   contribute $100,000 to Huizar Relative 1's campaign in exchange

13   for continued favorable official acts by Defendant Huizar to

14   benefit the Luxe Hotel Project.  Chiang, on behalf of Hazens,

08:57AM  15   told Defendant Huizar he could confirm Fuer Yuan's commitment

16   of $100,000 to a PAC.

17              On December 5th, 2017, Defendant Huizar voted to

18   approve the Luxe Hotel Project in the PLUM Committee.

19              On January 24th, 2018, Defendants Huizar and

08:57AM  20   Raymond Chan and Chiang met with Fuer Yuan and Huizar

21   Relative 1 for dinner at Yuan's hotel in San Gabriel,

22   California, where Yuan pledged his commitment and support for

23   Huizar Relative 1's campaign for the CD-14 seat.

24              On March 9th, 2018, Defendant Huizar submitted a

08:58AM  25   resolution in the PLUM Committee to benefit Hazens, allowing

the Luxe Hotel Project to move forward in its approval process.

In March and April 2018, Defendants Huizar and Chiang met at Defendant Huizar's residence to discuss Defendant Huizar's continued support for the Luxe Hotel Project in exchange for Hazens' agreement to contribute $100,000 to a PAC to benefit Huizar Relative 1's campaign.

On May 18, 2018, Defendants Huizar and Raymond Chan met with Chiang for breakfast at a restaurant in Boyle Heights, where Defendant Huizar stated that he needed the PAC contribution as soon as possible and that he wanted the contribution now so that when Huizar Relative 1 announced her candidacy, she would have money to pour into the campaign and scare other potential candidates from running against her. Defendant Huizar stated that other developers already contributed in amounts of 50,000, 100,000, and $200,000. Raymond Chan and Chiang told Defendant Huizar that Hazens agreed to his request and would contribute $100,000 to the PAC after Huizar Relative 1's formal announcement in September of 2018.

On June 12, 2018, Defendant Huizar voted in the City Council to approve the Development Agreement for the Luxe Hotel Project and wrote to Chiang in a text message: "DA (development agreement) for Hazens just passed council today. Does that mean project has been fully entitled? Is that our last vote?"

On June 18, 2018, Defendant Huizar wrote to Chiang in a text message:  "When is the chairman (Fuer Yuan) coming to town?  We need to finalize pac stuff.  Thanks."

On or about July 9, 2018, Raymond Chan created a document titled "Synergy/CCC Action Items" to document, among other things, the political contributions he had solicited for and promised to Defendant Huizar.  Raymond Chan included the following entry under a subsection titled "Hazens - Chairman Yuan":  "PAC (After announcement in September ([talked to] JH [Jose Huizar] 5/18)) / Nonprofit ([wait for] Yuan's arrival ([talked to] JH [Jose Huizar] 5/18))."

On July 30, 2018, after the ordinance authorizing the execution of the Development Agreement for the Luxe Hotel Project went into effect, Defendant Huizar wrote to Chiang in a text message:  "Any news on when (Fuer Yuan) is coming to town?  Hoping to catch dinner with him and talk about (Huizar Relative 1's) campaign."  Chiang responded:  "Hi Boss, Raymond Chan is working on it.  I let you know after I see him in office tomorrow."

Mateo Project Bribery Scheme.

$25,000 Contribution to PAC B.

On August 18, 2016, Defendant Huizar met with Morrie Goldman and Executive M at Defendant Huizar's City Hall office to discuss developer Carmel Partners' Mateo Project.  At the meeting, Goldman and Executive M asked Defendant Huizar to

1   file a motion to initiate a General Plan Amendment for Mateo

2   Project.  Defendant Huizar agreed to initiate the General Plan

3   Amendment, either by exerting pressure on the Planning

4   Department or to do so by filing a motion.

09:01AM   5   On or about August 26, 2016, Defendant Huizar and

6   his staff urged the Planning Department to approve the General

7   Plan Amendment initiation for Mateo Project, which the

8   Planning Department did.

9   In September 2016, less than a month after

09:01AM   10   Defendant Huizar had provided significant assistance to

11   Carmel Partners and Executive M, Defendant Huizar asked Goldman

12   for contributions to PAC B from Goldman's clients with projects

13   pending in CD-14, including from Executive M on behalf of

14   Carmel Partners.  Goldman agreed to the request -- to convey

09:01AM   15   the request to his clients.

16   On October 26, 2016, Goldman received an e-mail

17   from Executive M about the $25,000 PAC B contributions, which

18   stated:  "I should have checks by tomorrow.  All I need is the

19   letter.  Would it be worth setting up a quick drink or coffee

09:02AM   20   with Jose Huizar when we deliver?  Could be good to talk big

21   picture, et cetera."

22   On or about October 27, 2016, Defendant Huizar

23   caused Carmel Partners to send three checks from three separate

24   entities, payable to PAC B in the amount of $8,333.33 for a

09:02AM   25   total of $25,000 by U.S. Mail to Carmel Partners' office in

L.A., California.

On October 31st, 2016, Goldman sent a text message to Esparza, writing:  "When can I get Executive M in with Jose Huizar to deliver the checks?"

Additional $25,000 Contribution to PAC B.

On February 15th, 2017, Defendant Huizar met Goldman for lunch in downtown L.A. to discuss various projects. At the lunch, Defendant Huizar asked Goldman for an additional $25,000 contribution to PAC B from Carmel Partners, which Goldman agreed to convey to Executive M.

On February 15th, 2017, at a dinner at a Los Angeles restaurant for which Carmel Partners paid approximately $1,778, Defendant Huizar requested and Executive M committed to paying $25,000 to PAC B on behalf of Carmel Partners.

On or about March 2nd, 2017, Defendant Huizar caused Carmel Partners to send a check for $25,000 made payable to PAC B by U.S. Mail to PAC B in Sacramento, California

On March 20, 2017, Goldman received an e-mail from Executive M, which stated:  "Do you think we are in a more favored status with Jose Huizar compared to another developer?"

On May 5th, 2017, in a telephone call, Defendant Huizar and Goldman discussed Carmel Partners' contribution to PAC B at Defendant Huizar's direction.  Goldman stated:  "When I told George Esparza, I said, 'Look, my two

1    things that I've gotta protect, you know, Carmel Partners and

2    gotta protect you.'"

3                    $25,000 Contribution and Additional $25,000

4    commitment to PAC A.

09:04AM  5                    In or around January 2018, Defendant Huizar spoke

6    with Goldman regarding Mateo Project's approval in the PLUM

7    Committee and City Council.  Specifically, they discussed that

8    Carmel Partners wanted the City to approve Mateo Project with a

9    5 percent affordable housing requirement, while

09:04AM  10   Defendant Huizar initially insisted on an 11 percent affordable

11   housing.  Goldman told Defendant Huizar that Executive M was

12   concerned he would suffer significant professional

13   consequences, including the loss of his job with

14   Carmel Partners, if Mateo Project was not approved and that, if

09:04AM  15   Mateo Project did not obtain its preferred affordable housing

16   requirements, it would threaten the viability of the project

17   altogether.

18                    On January 8, 2018, Defendant Huizar and Goldman

19   had a discussion via text message regarding Mateo Project and

09:04AM  20   Carmel Partners' willingness to contribute to their newly

21   established PAC, PAC A.  Specifically, Defendant Huizar wrote:

22   "Let's do the PAC stuff later this week.  See u there at 6.

23   What's purpose of tonight's meeting?  Are they

24   (Carmel Partners) gonna help with the pac?"  Goldman replied:

09:05AM  25   "Executive M wants to talk about their Mateo Project and see if

you're comfortable with the height and affordability levels."

Defendant Huizar answered:  "Are they gonna help with the pac?"

Goldman replied:  "I'm sure they will, however -- as your

friend -- let's discuss this in a different text thread" in

09:05AM order to avoid documenting Defendant Huizar's conditioning his

official assistance with Mateo Project on Carmel Partners'

financial support for PAC A.

On February 23rd, 2018, Defendant Huizar and

Goldman had a discussion via text message regarding PAC A.

09:05AM Specifically, Goldman wrote:  "Are you checking the Confide app

for texting on your phone?"  Goldman further wrote:  "I was

going to text you about your meeting with PAC A's attorney.

Wanted to see if you got any clarification.  Confide is good

for texting because it's like Snapchat.  The message

09:05AM disappears."

On March 1st, 2018, Defendant Huizar met with

Goldman and discussed Carmel Partners' contributions to PAC A.

Specifically, Defendant Huizar asked for a $50,000 contribution

to PAC A to be paid in two installments, $25,000 as soon as

09:06AM possible and another $25,000 by the end of the year, after

Mateo Project was approved.  Goldman agreed to convey the

request to Executive M.

On March 14th, 2018, at approximately 4:00 p.m.,

Defendant Huizar met with Goldman to discuss PAC A, including

09:06AM the fact that Executive M agreed to have Carmel Partners

1    contribute to PAC A.

2              On April 13, 2018, Defendant Huizar sent an

3    e-mail to Goldman, attaching a document titled "PAC A" that

4    included, among other things, an entry for Carmel Partners for

09:06AM  5    $50,000 with the note:  "B/4 June.  2 checks.  2 entities."

6              On May 8, 2018, Defendant Huizar caused City

7    Staffer A-2 to advocate CD-14's position and encourage the

8    Planning Department official to approve Mateo Project to allow

9    the project to proceed to a hearing before the City Planning

09:06AM  10   Commission.

11             On or about June 13th, 2018, Defendant Huizar

12   caused Carmel Partners to send two checks from two separate

13   entities, each made payable to PAC A, in the amount of $12,500

14   each, for a total of $25,000, by U.S. Mail to the Carmel

09:07AM  15   Partners' office in L.A., California, around the same time that

16   the City Planning Commission approved Mateo Project, allowing

17   it to move forward to a hearing before the PLUM Committee and

18   ultimately City Council.

19             Additional $50,000 Commitment to PAC A in

09:07AM  20   Exchange for Defendant Huizar's Help on Mateo Project.

21             On September 4th, 2018, Defendant Huizar met with

22   Goldman regarding the labor union issue Carmel Partners was

23   facing on Mateo Project.  During the meeting, Goldman requested

24   on behalf of Executive M for Defendant Huizar to vote against

09:07AM  25   the labor union's appeal by approving Mateo Project in the PLUM

Committee.  Defendant Huizar explained that voting against the labor union, which he considered an ally, could have negative ramifications on Huizar Relative 1's campaign.  Because of this risk, Defendant Huizar told Goldman that if he were to vote against the labor union in the PLUM Committee, then Carmel Partners would have to make it worthwhile, which Goldman understood to mean that Defendant Huizar expected a financial benefit from Carmel Partners in exchange for his efforts with the Labor Union.

On September 6, 2018, Goldman and Executive M met to discuss Mateo Project and resolving its labor union issue.  During the meeting, Goldman discussed with Executive M that they needed to make it worthwhile for Defendant Huizar's intervention with the labor union.  Executive M and Goldman agreed that Carmel Partners should offer to make an additional $50,000 contribution to PAC A.  Carmel Partners had previously agreed to contribute $50,000 and paid the first installment in June 2018.  This additional $50,000 contribution would bring the total agreed-upon contributions on behalf of Carmel to PAC A to $100,000 in exchange for Defendant Huizar's assistance with Mateo Project.

On September 6, 2018, Defendant Huizar and Goldman met outside a restaurant in Boyle Heights to discuss the new arrangement with Executive M.  At the meeting, Goldman conveyed the offer of an additional $50,000 contribution to

PAC A, bringing the total to $100,000.  And Defendant Huizar
agreed to accept the contribution in exchange for voting to
approve Mateo Project over objections by the labor union.
Defendant Huizar also requested a private meeting with
Executive M.

On September 10, 2018, in a text message, Goldman
asked Defendant Huizar:  "Regarding Carmel Partners and Mateo
Project.  You are meeting with Executive M on 9/25 to negotiate
public benefits package.  Could we target PLUM on 10/2 with the
clear understanding that the item gets pulled from agenda with
no deal?  City Staffer A-2 is waiting for direction from you
before scheduling."

On September 12, 2018, while Defendant Huizar was
negotiating the additional financial benefit he sought from
Executive M and Carmel Partners, Defendant Huizar used his
official position as PLUM Committee Chair to postpone the
committee's hearing on Mateo Project to October 2nd, 2018,
thereby causing the project to be delayed until after he met
with Executive M.

On September 28, 2018, Defendant Huizar and
Executive M met to discuss Defendant Huizar's support for Mateo
Project, its approval in the PLUM Committee, and
Carmel Partners' support for the PAC to benefit Huizar
Relative 1's campaign.  During the same conversation,
Executive M offered to provide opposition research to

1 Defendant Huizar on a former CD-14 staffer who planned to file

2 a lawsuit against Defendant Huizar, and Defendant Huizar

3 accepted this offer.  As part of their negotiation to help

4 Mateo Project, Defendant Huizar and Executive M also discussed

09:10AM 5 Carmel Partners hiring Defendant Huizar after he left office.

6 On September 28, 2018, Defendant Huizar sent a

7 text message to Goldman, writing:  "Good meeting with

8 Executive M.  He is willing to help Huizar Relative 1

9 committee.  He will collect from consultant and contractors.

09:10AM 10 We didn't discuss amount.  Please enlist him for your events

11 and ask him to collect 12-20K for your event."

12 On October 2nd, 2018, Defendant Huizar used his

13 official position as the PLUM Committee Chair to postpone his

14 committee's hearing on Mateo Project to October 16, 2018.

09:10AM 15 On October 11, 2018, Defendant Huizar,

16 Executive M, Employee M, and Goldman attend a fundraiser for

17 Huizar Relative 1 hosted by Goldman.  At the fundraiser,

18 Executive M provided Defendant Huizar the opposition research

19 against the staffer he had promised as part of their agreement

09:11AM 20 for Defendant Huizar to help Mateo Project.

21 Following the fundraiser, Defendant Huizar asked

22 Executive M for additional opposition research on two other

23 CD-14 employees that had filed complaints against

24 Defendant Huizar.

09:11AM 25 On October 16, 2018, Defendant Huizar voted to

deny the union appeal and to approve Mateo Project in the PLUM

Committee, including accepting certain modifications requested

by Carmel Partners.  Specifically, the PLUM Committee accepted

Carmel Partners' preferred modifications to the affordable

09:11AM housing restrictions, thereby undoing the more stringent

requirements recommended by the City Planning Commission.  As a

result of Defendant Huizar's approval and undoing the CPC

recommendations, Carmel Partners obtained significant

reductions to Mateo's affordable housing requirements, from

09:11AM 11 percent "Very Low Income" units to 6 percent "Moderate

Income" units.  Specifically, Defendant Huizar's approval of

Carmel Partners' modifications decreased low-income

individuals' access to the project while ensuring

Carmel Partners obtained an estimated $14 million in net

09:12AM savings to Carmel Partners.

On October 31st, 2018, Defendant Huizar voted to

approve Mateo Project in City Council, which caused Executive M

to write an e-mail to the owners of Carmel Partners and other

employees, quote:  "Great news, we just received final

09:12AM unanimous approval for Mateo Project by City Council.  Although

today is bit of a formality (PLUM is where the discretion

usually happens), this is the final step," unquote.

Executive M highlighted the benefits Carmel Partners was able

to secure in PLUM from Defendant Huizar, writing, quote:  "Our

09:12AM obligations related to rent (affordable housing) restrictions

and union involvement are minimal compared to other future

projects in the area," unquote.  Executive M also touted "the

entitlement of the tallest building in the arts district by 3

times (35 stories) in a wealthy opinionated hipster community"

09:13AM as a "truly amazing" accomplishment.

Businessperson A Schemes.

Financial Benefits for Business Opportunities

with Developers.

On or about the following dates set forth in the

09:13AM chart on page 29, 30, and 31, in exchange for Defendant Huizar

using his official position to make introductions to developers

with projects pending before Defendant Huizar and to advocate

that such developers use Businessperson A's business to enhance

Businessperson A's financial prospects, Defendant Huizar

09:13AM accepted financial benefits from Businessperson A, including

cash, hotel rooms, prostitution/escort services, meals, and

other gifts in the amounts set forth in the charts on pages 29,

30, and 31, for a total amount of those benefits of

approximately $96,349.87.

09:14AM $25,000 Contribution to PAC B in Exchange for

City Resolution.

On or about March 11, 2018, Defendant Huizar met

with Businessperson A, who, unbeknownst to Defendant Huizar,

was then acting at the direction of the FBI, on a golf course

09:14AM in the city.  Defendant Huizar asked Businessperson A to

1    contribute to Huizar Relative 1's campaign.  Businessperson A
2    stated that he would support the campaign but that he needed
3    help from Defendant Huizar to provide an official resolution
4    from the City recognizing Businessperson A's business.
09:14AM  5    Defendant Huizar agreed to provide a City resolution and asked
6    Businessperson A to contribute $25,000 to Huizar Relative 1's
7    campaign.
8             On or about March 23rd, 2018, Defendant Huizar
9    caused Businessperson A to send a check in the amount of
09:14AM 10    $25,000 made payable to PAC B by U.S. Mail from L.A. County to
11    PAC B in Sacramento, California, intended to benefit Huizar
12    Relative 1's campaign.
13             On or about April 10, 2018, Defendant Huizar
14    caused the CD-14 office to issue a City resolution in the form
09:15AM 15    of a certificate of recognition signed by all City Council
16    members, recognizing Businessperson A to promote
17    Businessperson A's business and reputation in the city.
18             On or about May 31st, 2018, Defendant Huizar met
19    with Businessperson A, who was acting at the direction of the
09:15AM 20    FBI, at Defendant Huizar's City Hall office.  As promised, when
21    Businessperson A agreed to contribute $25,000 to Huizar
22    Relative 1's campaign, Defendant Huizar delivered the City
23    resolution recognizing Businessperson A.  At this meeting,
24    Defendant Huizar confirmed the PAC received Businessperson A's
09:15AM 25    $25,000 contribution, adding "the people who have the PAC, they

1  know you're interested in helping Huizar Relative 1.  So it's

2  sitting here for the right time."

3             Cash Payment for Pressure on Developer to Hire

4  Businessperson A.

09:16AM  5             On August 25th, 2018, Defendant Huizar met with

6  Businessperson A, who was acting at the direction of the FBI,

7  at a golf course in the city.  During the meeting,

8  Defendant Huizar asked Businessperson A for additional

9  contributions to benefit Huizar Relative 1's campaign.  During

09:16AM  10  the same conversation, Defendant Huizar stated, quote:  "I'll

11  go down a list of people that I could start introducing you to,

12  people that I know need my help.  Like, for example, right now

13  Carmel Partners needs me, so I could reintroduce them to you,"

14  unquote.  Businessperson A asked, regarding these meetings,

09:16AM  15  whether Huizar could "push" the developers to hire

16  Businessperson A.  Defendant Huizar responded, "Yeah.  For

17  right now they feel pressure, but they need me."

18             On September 24th, 2018, Defendant Huizar met

19  with Businessperson A, who was acting at the direction of the

09:16AM  20  FBI, at a restaurant in the city.  During the meeting,

21  Defendant Huizar accepted $15,000 in cash from

22  Businessperson A, who provided the cash concealed in an

23  envelope, which Defendant Huizar then covered with a napkin.

24  During this meeting, Defendant Huizar stated that he had a

09:17AM  25  meeting with Carmel Partners the following day and that

Carmel Partners' project was coming up for approval soon.
Defendant Huizar stated that Carmel Partners, quote, "needs a
lot of help from my office," unquote, by which Defendant Huizar
meant that Carmel Partners would feel pressure to hire
Businessperson A at Defendant Huizar's request because Carmel
Partners needed Defendant Huizar to perform favorable official
acts in support of Carmel Partners' project and not take
adverse official acts in opposition to the project.
Defendant Huizar assured Businessperson A that he would make
sure Carmel Partners scheduled a meeting with Businessperson A.
At the end of the meeting, after Businessperson A had departed,
Defendant Huizar counted the cash inside the envelope.

Additional pay-to-play conduct.

CD-14 Developers/Proxies' PAC Contributions to
Benefit Huizar Relative 1's Campaign and CD-14 Enterprise.

In or around May 2017, Defendant Huizar, Esparza,
Goldman, and Huizar Associate 3 agreed to establish a PAC that
publicly was purported to benefit a broad array of candidates
and causes but was, in fact, primarily intended to benefit
Huizar Relative 1's campaign to succeed Defendant Huizar as
Councilmember for CD-14.  Defendant Huizar agreed with Esparza,
Goldman, and Huizar Associate 3 to pressure developers with
projects in CD-14 to contribute to the PAC in exchange for
favorable treatment and to avoid adverse action against their
projects in the PLUM Committee, Economic Development Committee,

1    and City Council.

2         On May 10, 2017, in a telephone call, Esparza and

3    Chiang discussed how Defendant Huizar was using a PAC to obtain

4    additional financial benefits from developers in exchange for

09:18AM  5    not taking adverse action against them.  Specifically, Esparza

6    told Chiang:  "Defendant Huizar's approach is that he's going

7    to, um, strong arm everyone...to the PAC.  [Hazens],

8    [Company F].  'This is what I want right now.  This is my

9    relative, this is what we are doing.'  So his idea in his mind

09:19AM  10   is that, okay, people are going to support us because they

11   don't want people to fuck with the projects, you know."

12        On May 11, 2017, in a telephone call, Esparza and

13   Executive Director E discussed punishing a developer who was

14   not providing financial benefits to Defendant Huizar by

09:19AM  15   withholding approvals for the developer's project.

16   Specifically, Esparza said:  "Company G has not come through

17   with any commitments to us, to you, so, you know, why even be

18   helpful to them, you know, that's my thing.  So I'm going to

19   tell Defendant Huizar that I spoke to you and let's just

09:19AM  20   continue to ignore them, you know.  We're not going to help

21   them."  Executive Director E then added:  "And even

22   Raymond Chan doesn't want you guys to work with Company G."

23        On June 22nd, 2017, Defendant Huizar met with

24   Esparza, Goldman, and Justin Kim and discussed establishing a

09:19AM  25   PAC to raise money for Huizar Relative 1's campaign.  During

this meeting, Defendant Huizar suggested having Kim find an associate to serve as the "face" of the PAC to disguise Defendant Huizar's involvement and the PAC's connection to CD-14.

09:20AM   On September 14th, 2017, Defendant Huizar and Esparza had a text message conversation regarding compiling a list of donors to target for fundraising for Huizar Relative 1's campaign, which they referred to as the "Executive 2" strategy meetings, focusing on developers with upcoming hearings before the PLUM Committee, which Defendant Huizar chaired.  Defendant Huizar instructed Esparza via text message:  "Please get the (City Staffer A-2) list that he gave u about projects going to cpc and plum and let's discuss me and u at every Thursday exec.#2 meeting."

In October 2017, Defendant Huizar and Esparza had conversations about targeting developers with projects pending before committees on which Defendant Huizar sat in order to obtain financial benefits from them, including contribution to PACs to benefit Defendant Huizar Relative 1's campaign before taking favorable actions on the projects in the Economic Development and PLUM Committees.

On December 4th, 2017, Defendant Huizar created a spreadsheet titled "Initial Commitments to PAC," listing companies, consultants, and contributions totaling $500,000. Several of those listed had pending projects in

1  Defendant Huizar's district or before a committee that

2  Defendant Huizar chaired, including the following listed in

3  Chart 3 related to Companies H, I, and J.

4          On March 26, 2018, Defendant Huizar caused

09:21AM  5  Company H to make a contribution of $10,000 to PAC B.

6          On June 19, 2018, Defendant Huizar caused

7  Company J to make a contribution of $25,000 to PAC A.

8          CD-14 Developers/Proxies' Contributions to

9  Defendant Huizar Campaigns and Officeholder Accounts.

09:21AM  10         On May 18, 2015, at Defendant Huizar's direction,

11  Esparza created a document titled "Huizar Debt Finance Plan,"

12  which documented Defendant Huizar's solicitation efforts of

13  contributions from developers, consultants, and allies towards

14  Defendant Huizar's 2015 re-election campaign debt, including

09:21AM  15  many developers and consultants who had projects in CD-14

16  and/or were going through the City approval process.  The plan

17  included:

18          1.  $40,000 from Justin Kim;

19          2.  $20,000 from Wei Huang;

09:22AM  20         3.  $20,000 from Company G through Executive

21  Director E;

22          4.  $10,000 from Hazens; and

23          5.  $10,000 from Raymond Chan.

24          CD-14 Developers/Proxies' Contributions to School

09:22AM  25  that employed Huizar Relative 1 as a Fundraiser.

Beginning in or around March 2015, at Defendant Huizar's direction, Esparza solicited donations to a high school's annual gala event from developers and consultants with projects pending in Defendant Huizar's district.

On or around about September 28, 2015, Defendant Huizar attended the high school's annual gala, which, at defendant's request, was sponsored by the companies in the below chart, among others, in the following amounts:

$25,000 by Company L;

$10,000 by Hazens;

$10,000 by Company F; and

$5,000 by Company K.

4.   Steering CD-14 Developers to Preferred Firms.

In or around 2012, Defendant Huizar pressured Developer N to hire Huizar Associate 3 as a consultant on Developer N's development project in CD-14.  Developer N complied with the request.

In or around May 2013, Defendant Huizar organized a dinner between Developer N, Huizar Associate 3, and a partner of Law Firm A, which paid Huizar Relative 1 a biweekly salary of $2,500.  Developer N understood that Defendant Huizar was asking Developer N to hire Law Firm A because it paid Huizar Relative 1 in exchange for Defendant Huizar's support on the development project pending in CD-14.

In or around March 2014, Defendant Huizar

organized a meeting with Hazens and Huizar Associate 1 and
encouraged Hazens to hire Huizar Associate 1 as a consultant on
a Luxe Hotel Project.

On February 25th, 2016, Defendant Huizar
instructed Esparza by text message:  "Please work it out with
George Chiang to set up a meeting with Developer K and Law
Firm A partner.  Let them know that Huizar Relative 1 works at
Law Firm A and we want to make introduction to see if the
company ever needs legal defense.  Please keep me posted."

In or around 2017, Defendant Huizar caused
Company O, which had projects pending in CD-14 and before
Defendant Huizar's committees, to hire Huizar Associate 3 as a
consultant with a monthly retainer of $10,000.

Defendant's Concealment of Illicit Benefits.

Transporting of Cash into the United States and
Structuring to Avoiding Reporting Requirements.

On January 1st, 2016, Defendant Huizar and
Esparza traveled with Huang and Executive Director E to
Australia, where Defendant Huizar and Esparza accepted
financial benefits from Huang, including a $10,980 commercial
airline ticket for Defendant Huizar, private jet flights for
Esparza, hotels, meals, alcohol, and other expenses.  In
addition, Defendant Huizar and Esparza accepted casino gambling
chips from Huang, which Defendant Huizar and Esparza cashed out
in Australian dollars.

1            After the Australia trip, Defendant Huizar and

2    Esparza discussed evading bank reporting requirements by

3    converting Australian dollars to American dollars.

4            On February 9th, 2016, at Defendant Huizar's

09:25AM  5    direction, Esparza exchanged 10,000 Australian dollars into

6    American dollars.  Esparza then reported to Defendant Huizar in

7    a text message:  "I exchanged 10K today.  Will do another

8    tomorrow.  If it's under 10K, they will not report."

9    Defendant Huizar then told Esparza to ask for a better exchange

09:25AM  10   rate the next day.

11           On February 10, 2016, at Defendant Huizar's

12   direction, Esparza exchanged another 10,000 Australian dollars

13   into American dollars.

14           On February 14, 2016, Defendant Huizar asked

09:25AM  15   Esparza via text message:

16           1.  "You back?  How did Chairman Huang do?"

17           2.  "For last batch to exchange, I think it is

18   12,800; correct?  See if you can bargain with either of two

19   places in Downtown L.A. for more than .68.  The Australian

09:25AM  20   dollar has gotten stronger and is close to .72 official

21   exchange."

22           Esparza responded:  "I came home.  Chairman is up

23   2 mil.  Okay.  I'll see if I can get it close to .72."

24           On February 17, 2016, at Defendant Huizar's

09:26AM  25   direction, Esparza exchanged another 12,800 Australian dollars

1    into American dollars and confirmed the exchange to

2    Defendant Huizar by text message:  "I was able to get you .69

3    exchange rate" and that "Chairman Huang won 3 mil."

4    Defendant Huizar responded:  "Wow.  Wow.  Wow."

5                        Money Laundering Through family Members.

6                        From in or about July 2013 through in or about

7    November 2017, on approximately 45 separate occasions, in order

8    to conceal and disguise the nature, source, ownership, and

9    control of proceeds from Defendant Huizar's pay-to-play scheme,

10   Defendant Huizar caused Huizar Relative 2 to deposit cash into

11   Huizar Relative 2's checking account and thereafter pay

12   Defendant Huizar, directly or indirectly, a total of

13   approximately $130,346.

14                        From in or about November 2013 through in or

15   about March 2017, on at least 28 separate occasions, in order

16   to conceal and disguise the nature, source, ownership, and

17   control of proceeds from Defendant Huizar's pay-to-play scheme,

18   Defendant Huizar provided cash to Huizar Relative 3 and caused

19   Huizar Relative 3 to pay Defendant Huizar, directly or

20   indirectly, a total of approximately $156,993.

21                        From in or about April 2016 through in or about

22   June 2017, over at least 17 separate occasions, in order to

23   conceal and disguise the nature, source, ownership, and control

24   of proceeds from Defendant Huizar's pay-to-play scheme,

25   Defendant Huizar caused Huizar Relative 1 to deposit cash into

```
         1    Huizar Relative 1's checking account and thereafter pay for
         2    household expenses for a total of $7,800.
         3              Additional Concealment of Pay-to-Play Scheme.
         4              Defendant Huizar's Failure to Report on Forms 700
09:27AM  5    and Tax Returns.
         6              On or about the following dates, in an effort to
         7    conceal the benefits Defendant Huizar received from developers
         8    as part of the pay-to-play scheme, Defendant Huizar failed to
         9    report any of the financial benefits discussed above on his
09:27AM 10    Forms 700 or tax returns for the calendar years 2014, 2015,
        11    2016, and 2017.
        12              Total bribes.
        13              As part of Defendant Huizar's pay-to-play scheme
        14    operated through the CD-14 Enterprise, Defendant Huizar
09:28AM 15    obtained or sought to obtain, directly and indirectly, at least
        16    $1,857,679 in bribe payments.
        17              Defendant Huizar's Obstruction Conduct.
        18              Defendant Huizar's Witness Tampering.
        19              On June 20th, 2017, after Esparza told
09:28AM 20    Defendant Huizar that he was interviewed by the FBI and
        21    Defendant Huizar asked Esparza about the FBI's questions and
        22    whether the FBI asked questions about Businessperson A and
        23    Huang, Defendant Huizar instructed Esparza not to tell anyone
        24    that Esparza disclosed the content of his FBI interview to
09:28AM 25    Defendant Huizar.
```

On December 28, 2017, in a conversation in Defendant Huizar's private bathroom in City Hall, after Esparza referred to his FBI interviews the prior summer and stated that he did everything to make sure Defendant Huizar was protected, Defendant Huizar stated, quote: "Yeah, and that's why I said we are both in this together. We're in this together," unquote.

On October 27, 2018, Defendant Huizar instructed Businessperson A not to disclose incriminating information to the FBI, including instructing Businessperson A not to mention anything about parties or, quote, "dessert," unquote, meaning Defendant Huizar's use of escort/prostitution services, which Businessperson A had provided at parties Businessperson A hosted.

(b), Defendant Huizar's False Statements to the U.S. Attorney's Office and FBI.

On April 10th, 2019, during an interview with the United States Attorney's Office and the FBI during which Defendant Huizar was advised in the presence of his then counsel that lying to the Government was a crime, Defendant Huizar falsely stated that: (a) he told Esparza that the hundreds of thousands of dollars cash payment Kim provided to Esparza was "yours, I don't want it"; and (b) he did not discuss Esparza giving Defendant Huizar the money from Kim in April 2018.

1          Finally, Defendant Huizar's 2017 Tax Evasion.

2          From in or about January 1st, 2017, through in or

3     about December 31st, 2017, Defendant Huizar willfully attempted

4     to evade and defeat income tax due and owing by him and his

09:30AM   5     spouse to the U.S.A. for the calendar year 2017 by causing to

6     be prepared and by signing and causing to be signed a false and

7     fraudulent U.S. Individual Income Tax Return, Form 1040, which

8     was submitted to the IRS.  On that tax return, Defendant Huizar

9     falsely reported and caused to be reported his and his spouse's

09:30AM   10    joint taxable income by omitting approximately $60,000 cash

11    that Defendant Huizar accepted from Businessperson A as

12    retainer fees.  Defendant Huizar knew that the federal tax law

13    imposed a duty on defendant to accurately report his income,

14    and he intentionally and voluntarily violated that duty.

09:31AM   15         THE COURT:  All right.  Mr. Huizar, did you

16    understand everything the prosecutor just said?

17         THE DEFENDANT:  Yes, I do, Your Honor.

18         THE COURT:  Is everything the prosecutor said

19    about you and about your conduct and intent true and correct?

09:31AM   20         THE DEFENDANT:  Yes, Your Honor.

21         THE COURT:  Did you do what the prosecutor said

22    in his offer of proof?

23         THE DEFENDANT:  Yes, I did, Your Honor.

24         THE COURT:  Are you pleading guilty because you,

09:31AM   25    in fact, did the acts charged in Counts 1 and 41 of the First

|  | 1 | Superseding Indictment? |
|---|---|---|
|  | 2 | THE DEFENDANT:  I am pleading guilty, Your Honor. |
|  | 3 | THE COURT:  Are you pleading guilty because |
|  | 4 | you're, in fact, guilty? |
| 09:31AM | 5 | THE DEFENDANT:  Yes, Your Honor. |

THE COURT:  Counsel, have you reviewed the facts of this case and all the discovery that was provided to you by the Government?

MS. ALÉ:  Yes, Your Honor.  There was some additional discovery provided last week.  But other than that, we have reviewed everything.

THE COURT:  All right.  And have you reviewed the facts of the case and the discovery with your client?

MS. ALÉ:  Yes, Your Honor.

THE COURT:  Have you advised your client concerning the legality or admissibility of any statements or confessions or other evidence the Government has against him?

MS. ALÉ:  Yes, Your Honor.

THE COURT:  Is your client pleading guilty because of any illegally obtained evidence in the possession of the Government that you are aware of?

MS. ALÉ:  No, Your Honor.

THE COURT:  Did you explore with your client any possible defenses he may have?

MS. ALÉ:  Yes, Your Honor.

1          THE COURT:  Do you believe there is a factual

2    basis for the pleas your client is entering?

3          MS. ALÉ:  Yes.

4          THE COURT:  Do you believe the pleas are being

09:32AM  5    made freely and voluntarily with a full understanding of the

6    charges and the consequence of the pleas?

7          MS. ALÉ:  I do, Your Honor.

8          THE COURT:  Now, the plea agreement indicates

9    that it was signed on January 18 by you and your client.  Is

09:32AM 10    that correct?

11          MS. ALÉ:  Yes, Your Honor.

12          THE COURT:  And did you discuss the contents of

13    the plea agreement with your client prior to his signing it?

14          MS. ALÉ:  Yes, Your Honor.

09:32AM 15          THE COURT:  Have there been any promises,

16    representations, or guarantees made to either you or your

17    client other than what's contained in the written plea

18    agreement in exchange for your client's pleas of guilty?

19          MS. ALÉ:  No, Your Honor.

09:32AM 20          THE COURT:  Other than what's contained in the

21    written plea agreement and other than a general discussion with

22    your client of the advisory sentencing guidelines and other

23    factors that I will consider in determining his sentence, have

24    you made any indication to your client of what specific

09:32AM 25    sentence the Court would impose or conveyed to your client any

```
 1   promise of a particular sentence in the event I accept his

 2   pleas of guilty?

 3                  MS. ALÉ:  No, Your Honor.

 4                  THE COURT:  Is it your judgment -- in your

 5   judgment, is it in your client's best interest and the interest

 6   of justice for me to accept his pleas of guilty?

 7                  MS. ALÉ:  Yes, Your Honor.

 8                  THE COURT:  Do you know of any reason why the

 9   Court should not accept your client's pleas?

10                  MS. ALÉ:  I do not.

11                  THE COURT:  Do you join in the waiver of jury

12   trial and concur in the pleas?

13                  MS. ALÉ:  I do, Your Honor.

14                  THE COURT:  Let me ask the prosecutor.

15                  Other than what is expressly contained in the

16   written plea agreement, has the Government made any other

17   promises, representations, or guarantees, either to the

18   defendant or his counsel, in exchange for his -- in exchange

19   for defendant's pleas of guilty?

20                  MR. JENKINS:  Nothing outside the plea agreement,

21   Your Honor, no.

22                  THE COURT:  Mr. Huizar, I'm going to ask you some

23   final questions.

24                  Are you fully satisfied with the advice and

25   representation your lawyer has provided you in this matter?
```

1          THE DEFENDANT:  Yes, I am, Your Honor.

2          THE COURT:  Has your attorney reviewed the facts

3     of this case and the discovery provided by the Government with

4     you?

09:33AM  5          THE DEFENDANT:  Yes, they have, Your Honor.

6          THE COURT:  Do you feel your attorney has fully

7     considered any defenses you may have to the charges?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Do you believe your attorney has

09:33AM  10    fully advised you concerning this matter?

11         THE DEFENDANT:  Yes.

12         THE COURT:  Now, has anyone told you you had to

13    answer any of my questions in a particular way in order for the

14    Court to accept your guilty pleas?

09:34AM  15         THE DEFENDANT:  No, Your Honor.

16         THE COURT:  Have you answered all my questions

17    this morning truthfully?

18         THE DEFENDANT:  Yes, Your Honor.

19         THE COURT:  Do you feel that you understand

09:34AM  20    everything happening here today, the consequences to you, and

21    do you believe you're competent to make the decision to plead

22    guilty?

23         THE DEFENDANT:  Yes, Your Honor.

24         THE COURT:  Do you understand all that's left in

09:34AM  25    your case in the event I accept your pleas of guilty is the

1    imposition of sentence, which will include imprisonment under

2    the federal guidelines?

3                   THE DEFENDANT:  Yes, Your Honor.

4                   THE COURT:  Having in mind all we have discussed

09:34AM    5    regarding your pleas of guilty, the rights you will be giving

6    up, the maximum sentence you might receive, is it still your

7    desire to enter a plea of guilty?

8                   THE DEFENDANT:  Yes, Your Honor.

9                   THE COURT:  How do you now plead to Count 1 of

09:34AM   10    the First Superseding Indictment?  Guilty or not guilty?

11                   THE DEFENDANT:  Guilty.

12                   THE COURT:  How do you plead to Count 41 of the

13    First Superseding Indictment?  Guilty or not guilty?

14                   THE DEFENDANT:  Guilty.

09:34AM   15                   THE COURT:  I'm going to make certain findings.

16    If you don't understand what I say or disagree with what I say,

17    please ask your attorney to interrupt me.

18                   The Court having questioned the defendant and his

19    counsel on his offered plea of guilty to Counts 1 and 41 of the

09:35AM   20    First Superseding Indictment; the defendant and his counsel

21    having advised the Court that they have conferred concerning

22    the offered pleas of guilty and all aspects of the charges

23    against the defendant and any defenses he may have; the Court

24    having observed the defendant's intelligence, demeanor, and

09:35AM   25    attitude while answering questions; and the Court having

|  | 1 | observed the defendant does not appear to be under the |
|---|---|---|
|  | 2 | influence of any medicine, drug, or other substance or factor |
|  | 3 | which might affect his actions or judgment in any manner; the |
|  | 4 | Court finds there is a factual basis for the defendant's pleas; |
| 09:35AM | 5 | the Court finds that the defendant has entered his pleas freely |
|  | 6 | and voluntarily with a full understanding of the charges |
|  | 7 | against him and the consequences of his plea; the Court finds |
|  | 8 | the defendant understands his constitutional and statutory |
|  | 9 | rights and wishes to waive those rights. |
| 09:35AM | 10 | Accordingly, the defendant's pleas of guilty to |
|  | 11 | Counts 1 and 41 of the First Superseding Indictment are |
|  | 12 | accepted and entered. |
|  | 13 | Now, the clerk is going to give you a date for |
|  | 14 | sentencing, and I direct you to appear on that date and time |
| 09:36AM | 15 | without further order of the Court. |
|  | 16 | THE CLERK:  April 3rd, 2023, at 8:00 a.m. |
|  | 17 | THE COURT:  Is that date and time acceptable to |
|  | 18 | counsel's calendars? |
|  | 19 | MS. ALÉ:  Yes, Your Honor. |
| 09:36AM | 20 | MR. JENKINS:  Yes, Your Honor. |
|  | 21 | THE COURT:  All right.  That will be the date. |
|  | 22 | As to the pending dates that we have in this |
|  | 23 | case, those dates will be vacated as to Mr. Huizar.  And as to |
|  | 24 | any pending motions, those motions are denied as moot. |
| 09:36AM | 25 | Anything else from the Government? |

1           MR. JENKINS:  Nothing else from the Government,

2  Your Honor.  Thank you.

3           THE COURT:  Anything else from the defense?

4           MS. ALÉ:  Nothing else from the defense.  Thank

09:36AM   5  you, Your Honor.

6           THE COURT:  All right.  We will take a brief

7  recess, and then I want to address counsel for the Government

8  and Mr. Braun on some pretrial issues.

9           MR. JENKINS:  Yes, Your Honor.

09:37AM  10           (Proceedings concluded at 9:37 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7   THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8   PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10  STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11  ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13  THE UNITED STATES.

14

15          DATED THIS  29TH  DAY OF JANUARY, 2023.

16

17

18          /S/ MIRANDA ALGORRI

19          MIRANDA ALGORRI, CSR NO. 12743, CRR
            FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25