E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS (Cal. Bar No. 242101)
Assistant United States Attorney
Chief, Criminal Division
CASSIE D. PALMER (Cal. Bar No. 268383)
SUSAN S. HAR (Cal. Bar No. 301924)
BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Public Corruption & Civil Rights Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2091/0363/3289/3819
     Facsimile: (213) 894-6436
     E-mail:    Mack.Jenkins@usdoj.gov
                Cassie.Palmer@usdoj.gov
                Susan.Har@usdoj.gov
                Brian.Faerstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 20-326-JFW-1 |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING MEMORANDUM RE: DEFENDANT JOSE HUIZAR |
| v. | Hearing Date: January 26, 2024 |
| JOSE LUIS HUIZAR, | Hearing Time: 8:00 a.m. |
| Defendant. | Location:   Courtroom of the Hon. John F. Walter |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Mack E. Jenkins, Cassie D. Palmer, Susan S. Har, and Brian R. Faerstein, hereby files its sentencing memorandum.

//

//

This sentencing memorandum is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: December 28, 2023

Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

_____/s/_____
MACK E. JENKINS
CASSIE D. PALMER
SUSAN S. HAR
BRIAN R. FAERSTEIN
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION                                                                   PAGE

TABLE OF AUTHORITIES.................................................iii

MEMORANDUM OF POINTS AND AUTHORITIES...................................1

I.   INTRODUCTION.....................................................1

II.  STATEMENT OF FACTS...............................................4

     A.   L.A. Grand Hotel Bribery Scheme............................5

     B.   Luxe Hotel Bribery Scheme..................................8

     C.   Mateo Project Bribery Scheme...............................8

     D.   Businessperson A Scheme....................................9

     E.   David Lee/940 Hill Bribery Scheme.........................10

     F.   Additional Pay-to-Play Conduct............................11

     G.   Tax Evasion and Obstruction...............................11

III. THE PLEA AGREEMENT..............................................12

IV.  THE GUIDELINES CALCULATION......................................13

V.   THE GOVERNMENT'S SENTENCING RECOMMENDATION......................15

     A.   The Nature and Circumstances of the Offense...............16

          1.   The Breadth and Scope of Defendant's Conduct.........16

          2.   Defendant's Corrupt Solicitation of Others...........18

          3.   Damage to the City of Los Angeles That Defendant
               Was Entrusted to Serve...............................18

     B.   History and Characteristics of Defendant..................20

     C.   General and Specific Deterrence...........................23

     D.   Need to Reflect Seriousness of Offense, Promote
          Respect for the Law, and Provide Just Punishment..........25

     E.   Avoidance of Sentencing Disparities.......................26

VI.  FINE...........................................................27

VII. RESTITUTION.....................................................28

i

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                                 PAGE

   A.    Payment to the City of Los Angeles.......................28

   B.    Payment to the IRS.......................................32

VIII.    CONCLUSION...............................................33

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                                                    <u>PAGE</u>

**CASES**

<u>United States v. Spano</u>,
    411 F. Supp. 2d 923, 940 (N.D. Ill 2006).......................24

<u>United States v. Martin</u>,
    455 F.3d 1227 (11th Cir. 2006)...............................24

<u>United States v. Morgan</u>,
    635 F. App'x 423 (10th Cir. 2015)...........................26

<u>United States v. Musgrave</u>,
    761 F.3d 602 (6th Cir. 2014)................................24

<u>United States v. Spano</u>,
    411 F. Supp. 2d 923 (N.D. Ill. 2006)........................24

<u>United States v. Stefonek</u>,
    179 F.3d 1030 (7th Cir. 1999)...............................25

**REGULATIONS**

28 U.S.C. § 994(d)..............................................22


U.S.S.G. §§ 5H1.2...............................................22

iii

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Former longtime Los Angeles City Councilmember defendant Jose Huizar was a powerful career politician who swore an oath to defend the Constitution, faithfully discharge the duties of his office, and serve the interests of his constituents.  Instead, time and time again, defendant violated that oath and duty, choosing instead to place his own lust for money and power above the rights and interests of the people he was elected to serve.  Through an astoundingly brazen and long-running RICO conspiracy that defendant led, he corrupted himself and other powerful developers and city officials at the public's expense.  Paramount for the racketeering enterprise defendant orchestrated were three key goals: financial enrichment, maintain political power, and avoid law enforcement.

For years, defendant operated his pay-to-play scheme in the City of Los Angeles (the "City") to monetize his public position and leverage his political clout for over $1.5 million dollars in cash bribes, gambling chips, luxury trips, political contributions, prostitutes, extravagant meals, services, concerts, and other gifts. If anyone dared rebuff his call to pay bribes, he punished them and their City projects, threatening developers with indefinitely delayed projects and financial peril.  To secure his political position, defendant--with the help of his co-conspirators--extracted campaign contributions from lobbyists and developers and even obtained a $600,000 bribe payment, disguised in the form of a sham loan that he never intended to pay back, from one China-based billionaire developer.  Defendant covered his tracks with layers of concealment, including by shamelessly exploiting his elderly mother, brother, and

1

wife to launder his illicit proceeds.  Finally, when defendant felt the walls of the instant federal investigation closing in on him, he made the calculated decision to obstruct justice by tampering with witnesses and lying to government prosecutors and agents.

In the wake of his criminal activity, defendant has helped gut the public's confidence in the integrity of its local government -- and beyond--and eroded a sense of fair play therein.  As this Court aptly observed during the sentencing of co-defendant Shen Zhen New World I, LLC:

> Political corruption is a unique and infectious crime with rippling and enormous consequences to society.  Keeping political corruption in check has been a matter of public urgency throughout our nation's history.  The crushing weight of corruption on the integrity of every democratic element of our government has been and will continue to be a constant concern.

(5/12/23 Hr'g Tr. at 16.)  The government wholeheartedly agrees and believes a significant sentence in this case is crucial to punish defendant and send the appropriate message of accountability, justice, and deterrence.

At the same time, there is reason to not lose all hope in this defendant.  Before he lost his way along a path that found him far afield from his original path, defendant overcame serious obstacles in pursuit of noble callings: education at the highest levels, a career in public service, and family.  Although it took substantial time (and resources) for defendant to reach a place of acceptance, defendant deserves credit for his uniquely expansive acceptance of responsibility, most notably his 42-page factual basis, stipulation to a comprehensive Guidelines calculation, and, at least in his sworn

and entered plea agreement, commitment to pay full restitution.[1]  And since being charged, defendant has taken small but meaningful steps to refocus on what matters, including caring for his children and his mental health.  On balance, a 13-year term of imprisonment -- the high end of the parties' stipulated sentencing range pursuant to the plea agreement -- will serve as just punishment, promote respect for the law, and send a strong message of deterrence, while also taking into account defendant's history, characteristics, and potential for future rehabilitation.

Accordingly, the government respectfully recommends the following sentence: (1) **a 13-year (156-month)** term of imprisonment; (2) a **three-year term** of supervised release; (3) an order to pay **$1,019,174** in restitution; (4) a high-end fine of **$350,000**; and (5) a special assessment of **$200**.

---

[1] Plea Agreement ¶¶ 3.i, 16 ("Defendant agrees to make full restitution to the victims of the offenses to which defendant is pleading guilty. In particular, defendant agrees that, in return for the USAO's compliance with its obligations under this agreement, the Court may order restitution to the City of Los Angeles . . . . [discussing possible restitution amounts]").  On December 27, 2023, the day before the instant position was due, counsel for defendant informed government counsel that, after multiple attempts by the parties to meet and confer on the issue, "It doesn't look like we'll be able to reach an agreement [on a restitution amount] pre-filing. For the reasons we described in our prior phone calls, we don't believe there is a victim that suffered a financial loss to whom restitution would be owed under the MVRA. But if there were, we don't see how that conclusion could be limited only to Mr. Huizar as opposed to, e.g., Mr. Esparza or SZNW. We recognize that Mr. Esparza is yet to be sentenced, but the tenor of the phone call suggests to us that the government is seeking to treat Mr. Huizar uniquely with respect to restitution."  Given this late hour email the day before both parties' sentencing papers are due and because defendant Huizar has not yet provided any other relevant information on an agreeable amount despite government requests, it is presently unclear what, if any, restitution defendant will now pay, notwithstanding his written commitment in his plea agreement.

## II.   STATEMENT OF FACTS[2]

From 2005 to 2020, defendant was the Councilmember for Council District 14 ("CD-14") and owed a fiduciary duty to the City and to his constituents.  Defendant was also the Chair of the Planning and Land Use Management ("PLUM") Committee, which afforded defendant immense power and discretion to streamline or stall all major development projects not just in his district but all across the City.  Starting no later than 2013, defendant was also the leader of the Council District 14 Enterprise ("CD-14 Enterprise"), which was an ongoing criminal organization that continuously operated to achieve three shared goals: (1) obtain financial benefits through bribery, extortion, honest services fraud, and other illicit means; (2) maintain and advance the enterprise's political power, including by holding onto the CD-14 Council seat for defendant and, later, for his selected successor, his wife ("Richelle Rios"); and (3) avoid detection through various acts of concealment and obstructing justice.

Defendant and other members and associates of the CD-14 Enterprise operated a pay-to-play scheme in the City, by which they sought financial benefits in exchange for official acts.  While the scheme itself was at times sophisticated, its overall message was simple and well-known: Pay defendant what he wants, and he will use his uniquely powerful elected office to reward the development project favorably; deny defendant's demands, and he will use the same powers of his office to punish.  Each step of the development project

---

[2] Unless indicated otherwise, all facts are based on the Factual Basis of the Plea Agreement (Dkt. No. 910-1) and Presentence Investigation Report ("PSR") (Dkt. No. 1213).

4

was another opportunity for defendant to wield his authority and influence and to extract more benefits.  Better yet, defendant would embed his allies, including consultants and lobbyists, within projects to facilitate even more benefits with less resistance and scrutiny.  For developers seeking to build in the City of Los Angeles, defendant was king, and he and his cronies made sure developers got that message.

As uncovered by this investigation, defendant facilitated at least five bribery schemes and engaged in multiple other pay-to-play acts.  Through each scheme, defendant willfully and unapologetically engaged in brazen criminal acts to further the goals of the CD-14 Enterprise, which, as its leader, aligned with his personal agenda. With each scheme, defendant grew more emboldened and ultimately obtained (or sought to obtain) nearly $2 million in benefits, effectively selling out his constituents and trampling on their rights to his honest services.

### A.    L.A. Grand Hotel Bribery Scheme

The L.A. Grand Hotel bribery scheme arose out of a more than five-year-long corrupt relationship between defendant and Chairman Wei Huang ("Huang") billionaire owner of the China-based Shen Zhen New World Group ("SZNW"), facilitated in significant part by co-defendant Raymond Chan ("Chan").  Defendant and Huang were a convenient and corrupt pair: Huang was massively wealthy with expensive tastes and ambitions and, most importantly, willing to pay bribes to achieve those ambitions; defendant was a massively powerful public official with expensive tastes and avarice demands and, most importantly, willing to sell the official acts Huang needed for his future massive transformation of the L.A. Grand Hotel into one of the

largest skyscrapers in the United States.  For years, defendant luxuriated in Huang's lavish bribes: all-expense-paid trips to Las Vegas, complete with a sprawling hotel villa with private pools, every imaginable amenity, nearly $200,000 in gambling chips, black car and limo services, extravagant food and alcohol, and prostitutes. These trips often meant defendant paid little mind to not only his Councilmember duties but also, as a father to four young children, his significant family obligations.  (See, e.g., 11/1/22 Trial (SZNW Trial) Tr. at 764-65.)  Defendant also received from Huang a similarly extravagant all-expense-paid international trip to Australia, including business class airfare worth over $10,000 and gambling chips worth 32,800 in Australian dollars.

Because of defendant's desire to avoid detection, he engaged in additional racketeering activities to conceal these bribes, by laundering the cash from the gambling chips using his elderly mother, brother, and wife, and structuring his exchange transactions to evade reporting requirements.  Even still, years later, when the FBI executed search warrants at defendant's home, he had approximately $129,000 in cash hidden in a closet, which was made up of corrupt payments from gambling money from Huang-funded trips and illicit cash from Businessperson A, who was providing defendant money and other gifts to further his own business interests in the City.  Throughout this scheme, defendant engaged in other acts of concealment, like giving fake names when taking paid-for private jets and leaving behind thousands of dollars in chips after refusing to complete a Politically Exposed Person form seeking to document the source of his gambling funds when identified by Palazzo security.  (See, e.g., 11/1/22 Trial (SZNW Trial) Tr. at 805-10.)

Because of defendant's corrupt relationship with Huang, he was able to cling to power and fend off challengers when his political career was in peril.  In 2013, a former staffer sued defendant for sexual harassment, threatening defendant's upcoming re-election for the CD-14 Council seat.  (See, e.g., 11/1/22 Trial (SZNW Trial) Tr. at 827-29.)  Defendant, with Chan's critical help, turned to Huang for the money he needed to settle the lawsuit; Huang agreed.  Like with all the bribes defendant received, he needed to conceal Huang as the source of the funds.  Defendant and Huang, with Chan's assistance, concocted a convoluted plan whereby Huang provided $600,000 in collateral, funneled through intermediary entities to disguise the source of funds, that allowed defendant to take out a $570,000 loan from East West Bank to help quietly settle the sexual harassment lawsuit and win re-election in 2015.  When defendant ultimately defaulted on the loan -- whose principal amount defendant never intended to pay back (11/1/22 Trial (SZNW Trial) Tr. at 838-39) -- the collateral Huang had provided was used to settle defendant's outstanding $575,269 balance on the loan, further enriching defendant in that amount.  In effect, as was always the parties' intent, Huang paid to settle the sexual harassment suit against defendant to ensure defendant would remain in power for Huang's benefit.

Indeed, consistent with the pay-to-play scheme, Huang provided these lucrative benefits to defendant in exchange for official acts benefitting the approval of the redevelopment of his L.A. Grand Hotel.  Among other things, defendant introduced and signed a City resolution honoring Huang and agreed to present motions, vote, take action in the PLUM Committee, and take other official acts for the redevelopment of the L.A. Grand Hotel.

### B.  Luxe Hotel Bribery Scheme

Defendant's bribery scheme with Hazens and the Luxe Hotel project operated in a similar pay-to-play fashion.  With co-defendants Chan and George Chiang's help, defendant developed a corrupt relationship with Fuer Yuan and his development company Hazens.  Because Chan and Chiang were also members of the CD-14 Enterprise, they understood and facilitated the pay-to-play scheme to keep defendant happy.  Hazens showered various benefits onto defendant, including concert tickets, campaign contributions and commitments, paid expenses for a trip to China, and even alcohol for a party.  Defendant solicited and accepted these benefits in exchange for his multiple official acts benefiting the approval process for the redevelopment of the Luxe Hotel.

Defendant also used Hazens to obtain fake consulting fees for his associate to funnel benefits indirectly to himself.  Through yet another convoluted scheme designed to evade detection, defendant arranged for Chiang to prepare sham real estate reports, which defendant then passed onto his associate, who provided them to Yuan's relative's company in exchange for a total of $66,000.

### C.  Mateo Project Bribery Scheme

From the developer of the Mateo project, Carmel Partners, defendant sought over $150,000 in campaign contributions starting in 2016.  By this time, defendant had forged his plan to place Rios in the CD-14 Council seat in 2020 after his final term expired, and he used the pay-to-play scheme to extract campaign contributions that would allow him to maintain power through her.

The Mateo Project bribery scheme operated like clockwork.  Each time the project required a motion, a hearing, or a vote, defendant

solicited campaign contributions for Rios' campaign from the developer.  Each time, the developer agreed and caused different entities to transmit the payments.  In exchange, defendant performed the official act at issue benefitting the Mateo project.  At least once, defendant stalled a vote on the project in the PLUM Committee because he was still negotiating illicit benefits with Carmel Partners.  In addition to the campaign contributions, defendant also requested and received opposition research and discussed a potential job as a consultant for Carmel Partners to commence after defendant left the City.

The votes defendant took for the Mateo Project highlight how willingly he betrayed the rights of the City and the community in order to serve himself, his rapacious greed, and his criminal enterprise.  Voting against a union appeal, defendant approved modifications to the approval package that significantly reduced the project's affordable housing requirements -- hurting the homeless to benefit Carmel's bottom line.  Specifically, defendant's vote had the effect of both decreasing the ratio of affordable housing units and eliminating access entirely for the lowest-income individuals -- contrary to the stringent requirements recommended by a City body earlier in the approval process.  Carmel Partners, on the other hand, benefited by way of $14 million in net savings.

**D.   Businessperson A Scheme**

Starting in 2016, defendant developed a corrupt relationship with Businessperson A.  In exchange for cash, hotels, prostitutes, meals, and other gifts totaling nearly $100,000, defendant wielded his power as the CD-14 Councilmember to push developers--with pending projects before him--to use Businessperson A's services.  In a

particularly blatant move, defendant accepted $15,000 in cash from
Businessperson A (then acting under the direction of the FBI) in a
restaurant, which defendant concealed with a napkin.

Defendant also took an official act for Businessperson A:
defendant solicited and obtained a $25,000 contribution for Rios'
campaign in exchange for a City resolution, signed by the entire City
Council, purporting to recognize Businessperson A for his
contributions to the City.

**E.    David Lee/940 Hill Bribery Scheme**

Finally, in one of defendant's most brazen schemes, he agreed to
accept a $500,000 cash bribe for himself and two co-conspirators in
exchange for taking an official act to benefit the $170 million 940
Hill project.

While the 940 Hill project was progressing through the City
approval process, it hit a roadblock when a labor organization filed
an appeal against the project.  As a result of the appeal,
development on the 940 Hill Project was delayed indefinitely, which
meant not just increased costs for the developer but also threatened
the project's future. (CR 1027 (LEE PSR) ¶¶ 36, 37.)  Indeed,
opposition from unions to development projects in Los Angeles could
result in the death of a project altogether. (Id. ¶ 37.)  Facing
such uncertainty, wealthy DTLA real estate magnate David Lee turned
to defendant, who agreed to assist with the appeal but for a price:
$500,000 in cash to resolve the appeal, which defendant would split
with two other co-conspirators facilitating the negotiations.  Lee
agreed and paid the cash--$200,000 of which was to go directly into
defendant's pockets.  As promised, defendant used his official
position to influence the labor organization to drop its appeal, by

vowing to vote against the union when the appeal vote came before him.

By this point, defendant was keenly aware that the FBI was circling, and so he instructed his right-hand man and de facto corruption coordinator, George Esparza, to hold and hide the money on his behalf.  Defendant delayed collecting the money from Esparza in the hopes that the FBI would not discover the cash, and the two discussed dates for when Esparza would hand off the money to defendant.[3]

**F.    Additional Pay-to-Play Conduct**

Defendant's pay-to-play conduct extended beyond the five schemes described above.  Defendant pressured other developers with projects in his district to contribute to Rios' campaign in exchange for favorable treatment (and to avoid adverse consequences) on their projects.  When he was not soliciting contributions for Rios, defendant would seek contributions to his own campaign and officeholder accounts or for the high school he had attended and where Rios was employed as a fundraiser.  Defendant also pressured developers to hire his associates as consultants, thereby stacking the projects with his loyalists and benefitting those loyalists with consulting fees.

**G.    Tax Evasion and Obstruction**

In addition to the acts of concealment described above, defendant sought to conceal his criminal activity by omitting all of

---

[3] Despite initially having qualms about taking possession of the cash while the federal investigation was heating up, defendant later doggedly pursued the cash from Esparza, including texting and calling and showing up unannounced at Esparza's grandfather's home.  The FBI later recovered $250,000 of the cash paid by Lee; it has since been administratively forfeited by the FBI.

the illicit financial benefits he obtained vis-à-vis the pay-to-play scheme on his Form 700s or tax returns from 2014-2017.  With respect to the 2017 tax return (the basis for Count Forty-One), defendant falsely omitted approximately $60,000 in cash that he accepted from Businessperson A as purported retainer fees to help Businessperson A's business interests.

Defendant also sought to tamper with two separate witnesses.  In 2017, after Esparza told defendant that he had interviewed with the FBI, defendant asked for details of that interview and then instructed Esparza, his subordinate, not tell anyone that Esparza had disclosed the content of his interview to defendant.  Similarly, defendant instructed Businessperson A not to disclose incriminating information to the FBI, including information about the prostitutes and parties Businessperson A funded for defendant.

In April 2019, when defendant was interviewed by AUSAs and FBI agents, he falsely claimed that he told Esparza he did not want the cash payment from Lee and denied discussing plans to ever retrieve the money from Esparza; however, uncontroverted evidence, including multiple recordings of defendant, proved defendant was insistent on getting his corrupt cut from Lee.

**III.  THE PLEA AGREEMENT**

On January 19, 2023, the parties entered into a plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(c).  (Dkt. No. 910.)  On January 20, defendant pled guilty to Racketeer Influenced and Corrupt Organization Conspiracy (Count One) and Tax Evasion (Count Forty-One) of the First Superseding Indictment.  (Dkt. No. 912.)

1   Under the plea agreement, defendant agreed, among other things,
2   to recommend a term of imprisonment no less than nine years, or 108
3   months.  (Dkt. No. 910 ¶ 3.h.)  He admitted to a 42-page factual
4   basis that described in detail defendant's extensive criminal acts.
5   He stipulated to a comprehensive calculation of the Guidelines,
6   including five different enhancements, that yielded a total offense
7   level of 39; he further agreed not to seek other adjustments or
8   departures under the Guidelines.  (Dkt. No. 910 ¶ 20.)

9   Additionally, defendant agreed to cooperate with the Internal
10   Revenue Service ("IRS") in determining his tax liability for 2017,
11   including by paying all taxes, penalties, and interest assessed by
12   the IRS.  (Id. ¶ 5.)  He agreed to forfeit $129,000 in cash and not
13   contest any administrative forfeiture proceedings.  (Id. ¶ 6.)  And
14   he agreed to make "full restitution to the victims of the offenses to
15   which defendant is pleading guilty," including to the City of Los
16   Angeles as ordered by the Court.  (Id. ¶¶ 3.i, 16.)

17   In turn, the government agreed (among other things) to recommend
18   a custodial sentence no greater than 13 years, or 156 months,
19   provided defendant complies with all terms of his agreement.  (Id.
20   ¶ 7.e.)

21   **IV.  THE GUIDELINES CALCULATION**

22   On December 15, 2023, the United States Probation Office
23   ("USPO") issued the PSR and a disclosed recommendation letter.  (Dkt.
24   Nos. 1212, 1213.)  The PSR found that the following sentencing
25   Guidelines factors applied:
26   ///

27

28

13

| Base Offense Level: | 14 | U.S.S.G. §§ 2E1.1(a)(2); 2C1.1(a)(1) |
|---|---|---|
| More than 1 Bribe: | +2 | U.S.S.G. § 2C1.1(b)(1) |
| Bribe Value >$1,500,000: | +16 | U.S.S.G. §§ 2C1.1(b)(2); 2B1.1(b)(1)(I) |
| Elected Official: | +4 | U.S.S.G. § 2C1.1(b)(3) |
| Organizer/Leader | +4 | U.S.S.G. § 3B1.1(a) |
| Obstruction | +2 | U.S.S.G. § 3C1.1 |
| Acceptance of Responsibility | -3 | U.S.S.G. § 3E1.1 |
| Total Offense Level: | **39** | |

(PSR ¶¶ 179-198.)

The PSR found that defendant had no criminal history points, yielding a criminal history category of I.  (Id. ¶ 203.)[4]  Based on the foregoing, the USPO initially calculated defendant's resulting advisory Guidelines range as 262-327 months.  (Id. ¶ 257.)  Because of the 25-year statutory maximum, USPO adjusted the Guidelines range down to **262-300 months.**  (Id. (citing U.S.S.G. § 5G1.2(b)).)

The USPO's letter recommended a 240-month or 20-year sentence of imprisonment, which reflects a one-level downward variance.  (Dkt. No. 1212 at 2, 7-8.)  The letter described the seriousness of defendant's offense, including that he "displayed a pervasive pattern of corrupt activities and practices among developers and investors over a number of years."  (Id. at 7.)  In mitigation, the letter also recognized defendant's "lifelong productive life," "close family ties," lack of "prior law enforcement contacts or history of violence," and health issues.  (Id.)

---

[4] Because defendant received an aggravating role enhancement under § 3B1.1, he is not eligible for the zero-point offender adjustment.  See U.S.S.G. § 4C1.1(a)(10).

14

The government concurs with the PSR's calculation of a 262-300-month Guidelines range prior to any variance.  As explained below, however, the government respectfully requests a 5-level Booker[5] variance based on defendant's history and characteristics and other mitigating factors.  The government also asks the Court provide defendant the benefit of his bargain of his plea agreement -- with respect to the stipulated sentencing range – on which the parties expended significant resources negotiating numerous discussions and many months.  And the government maintains its recommended sentence is supported by the individual facts of this case.  If the Court adopts the government's recommended 5-level variance, the adjusted total offense level will be 34, resulting in a Guidelines range of **151-188 months.**  The government recommends a sentence near the low-end of that adjusted range; that is, **156 months' imprisonment.**

**V.    THE GOVERNMENT'S SENTENCING RECOMMENDATION**

The government's recommended sentence of 156 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing.  A 156-month term of imprisonment is a lengthy and serious sentence that accounts for the egregiousness of defendant's crimes, furthers the need for deterrence, promotes respect for the law, and provides just punishment.  At the same time, the recommended sentence appropriately accounts for mitigating facts and circumstances in defendant's personal history and characteristics.

---

[5] United States v. Booker, 543 U.S. 220 (2005).

**A.**   **The Nature and Circumstances of the Offense**

1.   <u>The Breadth and Scope of Defendant's Conduct</u>

Defendant's criminal conduct is undeniably aggravating by every metric.  Indeed, it can be difficult to fathom the breadth and scale of defendant's corruption, which was fueled by his repeatedly and successfully commodifying his elected office for profit and power for a wide range of willing bribe payors.  Defendant's actions were an incredible breach of trust that escalated over time.

For over half a decade, defendant shamelessly and eagerly exploited his position as the powerful CD-14 Councilmember and PLUM Committee Chair, betraying and deterring honest developers, other City officials, the people of Los Angeles, and even his family.  His motive was naked greed--he cashed in on the public trust for his own personal wealth, extravagant experiences, and political power and advancement.  After choosing the path of corruption, defendant was all in, and he never looked back.  His crime was not a one-off bribe or even a series of bribes.  He devised a complex criminal scheme that was purposefully structured around systematically abusing his public office.  He set up the machinery of the CD-14 Enterprise, setting its goals and dictating how it would run.  He recruited, strong-armed, and trained others to be members and associates of the enterprise to facilitate financial benefits and corrupt acts.  He fashioned various means of concealment, ranging from the pedestrian (fake names on private jets) to the sophisticated (routing a $600,000 bribe payment through an overseas shell company and shrouding it as collateral for a loan) to the predictable (tax evasion).

When faced with his impending final term in office, defendant refused to yield the CD-14 seat to someone who finally might honestly

16

serve the interests of the public.  Instead, he plotted to maintain power (and his access to continued illicit financial benefits) by redirecting focus of the pay-to-play scheme to extract campaign contributions to install his wife, whom he believed he could control, in his valuable Council seat.  Defendant also looked for ways to parlay his political position and clout to slide into a profitable private career as a consultant that would continue to lead and operate the CD-14 Enterprise from the other side.

There were dozens of moments that could have served as a belated wake-up call to defendant, reminding him that his illicit conduct could bear serious consequences legally and personally.  When defendant was flagged by security at the Palazzo casino; when he saw the state of his low-income mother's home as he picked up another check to launder his bribes; or every time he blew off spending time with his children to run off to Las Vegas at Huang's beckoning; or even when law enforcement began closing in on him, including interviewing him multiple times with counsel present--each served as an opportunity for defendant to reflect on his actions and question whether this criminal life was truly the one he wished live.  He never did, and instead resolutely pursued his corrupt plans and doggedly abused his position at every turn to advantage himself to the direct and immediate detriment of the public he served.

Even when the time came and defendant was caught, he did not exhibit remorse for what he had done.  He doubled down and acted out of self-preservation, tampering with witnesses to cover his tracks and lying to the FBI and the USAO.  Had it not been for the government's disruption, it is clear that defendant would have kept his criminal enterprise running, long after he left public office.

### 2.   Defendant's Corrupt Solicitation of Others

Corruption is an infectious cancer and defendant's criminal plan required others to join in.  He was active in that regard, training and recruiting other City officials, including his own young and impressionable staffer (who had once been defendant's intern and considered defendant father figure), and private lobbyists, consultants, and developers to join, corruptly, the enterprise's causes.  To date, there have been convictions of eight other defendants in this case.[6]  While every other co-defendant and unindicted co-conspirator in this case is responsible for their own actions, there can be no question that defendant played an integral role in facilitating their corrupt decisions and incentivizing them. Defendant's classification as an organizer and leader of criminal activity thus is well-deserved and reflective of his paramount position in the enterprise and conspiracy.  See U.S.S.G. § 3B1.1.

### 3.   Damage to the City of Los Angeles That Defendant Was Entrusted to Serve

It is axiomatic, and has been repeatedly recognized by courts, academics, and policy makers, that public confidence in government suffers with every instance of corruption:

> Government corruption breeds cynicism and mistrust of elected officials.  It causes the public to disengage from the democratic process because . . . the public begins to think of politics as 'only for the insiders.'  Thus corruption has the potential to shred the delicate fabric of democracy by making the average citizen lose respect and trust in elected officials and give up any hope of participating in government though legitimate channels.

---

[6] The convicted defendants are David Lee, 940 Hill, LLC, Shen Zhen New World I, LLC, Morris Goldman (Case No. CR 20-369-JFW), George Chiang (Case No. CR 20-203-JFW), George Esparza (Case No. CR 20-208-JFW), Justin Kim (Case No. CR 20-154-JFW), and Salvador Huizar (Case No. CR 22-471).

United States v. Ganim, 2006 WL 1210984, at *5 (D. Conn. May 5, 2006).  Defendant's egregious crimes were no exception; they further contributed to the erosion of the public's confidence in government and government officials and in the fairness of the system.  Public corruption is not a victimless crime.  The victim is our democratic system of government, the integrity of which is further weakened with every revelation that yet another public official's influence and official acts are for sale.  Defendant's brazen and extensive corruption has further degraded an already cynical American public's trust in the fairness and integrity of government.  Here, defendant's crimes were doubly pernicious because of the way he traded his votes and official influence for campaign contributions, infecting the election system with illicit proceeds and crowding out First Amendment-protected votes in favor of those purchased by the highest bidder.

The harm defendant inflicted on the City was not merely abstract or academic.  Defendant was an incredibly influential public official with real power.  As the Councilmember for CD-14, as well as the Chair of PLUM, he was the elected local representative for approximately a quarter of a million people.[7]  For years, those constituents were deprived of their right to the honest services of the official they had elected to serve them and their interests above his own.  Because defendant's district included downtown Los Angeles, he had an outsized influence on shaping its makeup and securing public benefits packages to support labor unions, create access to affordable housing units, and positively impact the environment.  But

---

[7] https://controllerdata.lacity.org/dataset/Population-by-Council-Districts/2ybs-mbdp.

for a campaign contribution here, or cash in a bag there, defendant happily sold those public benefits down the L.A. River and chose to benefit himself instead.

The operation of the pay-to-play scheme also harmed honest developers who played by the rules.  Developers who refused to acquiesce to defendant's demands were swiftly punished, resulting in their projects--and all their attendant public benefits—being held in abeyance or being killed off.  Defendant deprived the rights of honest businesspeople and made decisions on their projects based on the payment of bribes (or lack thereof) instead of on merit, which further harmed the City and its citizens.

The nature and circumstances of defendant's offenses reflect not just significantly aggravating conduct but tangible and generational public harm that urges the lengthy 13-year custodial sentence recommended by the government.

### B.   History and Characteristics of Defendant

Notwithstanding his egregious criminal offenses, defendant's history and characteristics present some mitigation and, importantly, hope for rehabilitation and redemption.

A first and important step in defendant's redemption was his fulsome admission of guilt.  While it took quite some time, defendant eventually reached a place of acceptance for his criminal actions. In addition to saving the government time and resources and serving judicial economy in avoiding a multi-month trial, defendant admitted to a robust 42-page factual basis that described at length his criminal conduct.  Defendant and his counsel did not raise frivolous and time-consuming objections to specific facts that were supported by evidence and known to defendant.  This fulsome factual basis was

an important statement, from defendant's own mouth, to the public about what actually happened and what defendant actually did, thereby providing finality on this topic for the public in a way that a disputed corruption trial often does not.  The thorough factual basis, a comprehensive Guidelines calculation, including five enhancements that collectively added 28-levels to the total offense level.  Defendant additionally agreed to forgo other adjustments or departures, preserving only his ability to argue a Booker variance within the allotted 108- to 156-month range.  This level of acceptance warrants favorable consideration beyond the typical Guidelines adjustment.

Aside from his acceptance, the PSR describes other meaningful and productive steps defendant taken since his arrest, consistent with this theme of acceptance and towards rehabilitation and repair. Defendant now serves as the primary caretaker for his youngest child, about whom the government understands the defense has provided the Court with information, and who is sure to further suffer with defendant's impending incarceration; defendant also has three other children.  (PSR ¶¶ 218-219.)  Defendant also has reportedly re-devoted himself to his mother and cares for her by running errands, acting as her translator, and assisting with doctor appointments and medical decisions.  (Id. ¶ 209.)  He has proactively sought out mental health treatment to learn healthier ways of coping.  (Id. ¶¶ 225-227.)  He has confronted other personal demons, including by stopping gambling and marijuana use, and he is making efforts (admittedly, a struggle) to accept and control his alcohol abuse-- none of which defendant was required to do.  (Id. ¶ 224, 228-30.) And defendant maintains hope: he aspires to work with a public

1  interest organization to aid others in navigating the health

2  insurance system and obtaining health care benefits.  (Id. ¶ 237.)

3      Growing up, defendant knew little of privilege.  After being

4  born in a rural Mexican village, defendant immigrated with his family

5  to Los Angeles.  (PSR ¶ 211.)  Defendant grew up in a gang-infested

6  neighborhood marred by violence but remarkably avoided participation

7  or conscription.  (Id. ¶ 212.)  From the time he was a child,

8  defendant juggled both school and work, including laboring in

9  strawberry fields and later taking odd jobs recycling metal,

10  delivering newspapers, working at shops, and shining shoes.  (Id.

11  ¶ 213.)  Despite the dearth of available opportunities, defendant

12  applied himself and even paid for his own education.  (Id. ¶ 213.)

13  He successfully completed high school, then college at U.C. Berkeley,

14  before getting both a master's degree at Princeton and juris

15  doctorate at UCLA.  (Id. ¶¶ 232-35.)  With his story, extensive

16  academic pedigree, and personal drive, it is clear that defendant

17  could have chosen various lucrative business pursuits; he chose none

18  of them.  Instead, he committed himself to a career in public

19  service, starting on the Los Angeles Unified School District Board

20  before becoming a Councilmember.  (Id. ¶¶ 238-239.)

21      In describing these facts, the government ascribes no value on

22  defendant's socioeconomic status, education, or vocational skills.

23  See 28 U.S.C. § 994(d) (requiring sentencing guidelines to be

24  "entirely neutral as to ... socioeconomic status of offenders);

25  U.S.S.G. §§ 5H1.2 ("[e]ducation and vocational skills are not

26  ordinarily relevant in determining whether a departure is

27  warranted"); 5H1.5 ("[e]mployment record is not ordinarily relevant

28  in determining whether a departure is warranted"); 5H1.10.  But

defendant's demonstrated history of overcoming significant obstacles, serving as a productive member of society, and furthering the public good--at one point in his past life--is laudable and speaks to his potential for reform and salvaging his ability for positive public impact after a significant term of custody.

The government submits that defendant's history, characteristics, and circumstances support a five-level variance.

### C.   General and Specific Deterrence

As is evident from a wide, and widely reported, swath of misconduct by public officials that has been exposed in numerous federal cases charged in this district, public corruption in the Los Angeles area is of paramount concern.  The endemic nature of public corruption in a particular area is a factor that weighs heavily in favor of a substantial custodial sentence.  See United States v. Hill, 645 F.3d 900, 911 (7th Cir. 2011) (finding that "widespread corruption in East St. Louis and the need to deter future public corruption" were appropriately considered in support of sentence).

The strong need for both general and specific deterrence in this case support the government's recommended sentence.  Public corruption cases such as this one demand strong general deterrence. As one court noted:

> *Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable*.  The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct, many of whom have specialized legal training or experiences.  Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants. *It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all* —

not only to the average citizen, but to all elected and
appointed officials.

United States v. Spano, 411 F. Supp. 2d 923, 940 (N.D. Ill. 2006),
*affirmed*, 477 F.3d 517 (7th Cir. 2006) (emphasis added).  General
deterrence is a particularly effective tool in corruption and other
white-collar cases, as white-collar criminals often premeditate their
crimes and engage in a cost-benefit analysis.  See, e.g., United
States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because
economic and fraud based crimes are more rational, cool, and
calculated than sudden crimes of passion or opportunity, these crimes
are prime candidates for general deterrence.  ***Defendants in white
collar crimes often calculate the financial gain and risk of loss,
and white collar crime therefore can be affected and reduced with
serious punishment.***") (emphasis added).  That was certainly the case
here, where defendant carefully built up a criminal enterprise to
blatantly leverage his official position to extract lucrative
financial benefits--and believed all the while he would not be
caught.

A 13-year sentence is appropriate here and will aid in achieving
the critical need for general deterrence, while also rejecting the
notion of a two-tier system of justice--a more flexible and lenient
tier for well-known or well-heeled white-collar defendants, and a
more rigid, severe, and guidelines-oriented tier for "other"
criminals.  See United States v. Musgrave, 761 F.3d 602, 609 (6th
Cir. 2014) ("[O]ne of the central reasons for creating the sentencing
guidelines was to ensure stiffer penalties for white-collar crimes
and to eliminate disparities between white-collar sentences and
sentences for other crimes." (citation omitted)).  That dichotomy is

inconsistent with the Constitution, with fundamental fairness, and with the statutory goals of sentencing, and it has been repeatedly repudiated by the courts.  See United States v. Stefonek, 179 F.3d 1030, 1038 (7th Cir. 1999) (White-collar criminals are "not to be treated more leniently than members of the 'criminal class'").  A 13-year sentence in this closely watched national case will thus serve an important public purpose.

This case also reflects a strong need for specific deterrence. For years, defendant acted with impunity and believed he would get away with his crimes.  He acted willfully and strategically, and even made plans to continue his pay-to-play scheme after he left public office.  Even when the writing was on the wall, defendant repeatedly sought to obstruct justice by concealing his illicit proceeds, tampering with witnesses and brazenly lying to the FBI. Nevertheless, as explained above in assessing defendant's history and characteristics, the government recognizes defendant has the capacity for a future positive impact given the life and career he built before losing his way.  Still, a strong custodial sentence is needed to deter defendant from veering off course again into future criminal activity, particularly since any work defendant performs in the future, even in the private sector will likely draw on his past government work and place him in industries adjacent to government.

**D.  Need to Reflect Seriousness of Offense, Promote Respect for the Law, and Provide Just Punishment**

The public has suffered as a result of defendant's self-serving greed, and it is important that the public observe the imposition of an appropriate sentence reflecting the seriousness of his admitted crimes.  Even a cursory Internet search yields a slew of articles

opining on the public's dwindling trust--and increasing skepticism--in its local public institutions and government as a whole.  A strong sentence is necessary to reflect the serious nature of defendant's crimes, punish defendant's conduct, promote respect for the law, and restore public faith in the system.  As one court has observed: "***The judicial response to demonstrated corruption by the political elite and the lapse of duty, honor, and integrity it represents is as important as the corruption itself.***"  United States v. Morgan, 635 F. App'x 423, 447 (10th Cir. 2015) (emphasis added).  Here, the appropriate judicial response to defendant's brazen and self-serving criminal conduct is a substantial custodial sentence of 13 years.

### E.   Avoidance of Sentencing Disparities

While defendant is entitled to some leniency for the reasons described herein, any sentence less than 13 years would lead to sentencing disparities and place defendant on equal footing with less culpable defendants.  The Guidelines range of 262-300 months is appropriately high because it captures the multiple aggravating circumstances warranting a stiffer sentence.  Many run-of-the-mill corruption cases involve low- or mid-level government employees who took a bribe or two to augment their modest public salaries.  There are a smattering of cases involving public officials who lie or even obstruct justice to conceal a damaging fact.  But defendant is in his own class, having led and operated a RICO enterprise as a high-ranking public official in City government for seven years, devised a criminal marketplace rooted in trading official acts and abusing his elected office for bribes, obtained dozens of bribes collectively worth over $1.5 million dollars, actually received financial benefits

worth over $1 million dollars, and obstructed justice in multiple ways.

It is for good reason that defendant is often seen as the face of corruption in Los Angeles--even as news of the latest public official misdeed comes to light on a seemingly weekly basis. Defendant is in a league of his own because the breadth, longevity, and egregiousness of his criminal acts are in a league of their own.

At the same time, the government's proposed sentence is not too lenient as compared to other similarly situated defendants across this country; indeed, as expected to be set forth in defendant's sentencing papers – many public officials and white collar defendants are regularly sentenced significantly below the Guidelines, sometimes even probation, and double digit sentences for a public official indicted while in office (like defendant here) can be rare.  As to this specific case, the only other individual defendant to be sentenced – developer David Lee – received a sentence (6 years) that represents under half of what the government recommends here.  Lee refused to plead guilty or accept responsibility; he was the architect of the $500,000 cash bribe to Huizar; he had been previously raided by the FBI who seized millions of dollars in cash from the same business he used to bribe Huizar;[8] and he bragged of his exploits of outsmarting the government and potentially fleeing prosecution.

## VI.  FINE

Based on the government's recommended five-level variance and resulting total offense level of 34, the fine range should be $35,000

---

[8] The cash was later returned to Lee.

to $350,000.  U.S.S.G. § 5E1.2(c)(3).  The PSR found that defendant

has assets in his retirement account and personal checking account

and a positive net worth, with an immediate ability to pay

approximately $175,000 at the time of sentencing.[9]  (PSR ¶¶ 242,

254.)

The government recommends a high-end fine of $350,000, in light

of the serious nature, scope, and length of the offense conduct, the

lucrative financial benefits defendant obtained through the criminal

offense, the personal and greed-driven motivations for defendant's

crime, and the USPO's supported finding that defendant has at least

some ability to pay a meaningful amount.

**VII. RESTITUTION**

**A.    Payment to the City of Los Angeles**

Pursuant to his plea agreement, defendant has agreed to "pay any

restitution ordered by the Court" "pursuant to a schedule to be fixed

by the Court."  (Plea ¶¶ 3i, 21.)  Specifically, defendant agreed to

"make full restitution to the victims of the offenses to which

defendant is pleading guilty." (Plea ¶ 16.)  Defendant further agreed

that "the Court may order restitution to the City of Los Angeles or

any other victim" for losses suffered as a result of defendant's

conduct.  (Id.)  The plea agreement also noted that the government

believed the restitution amount to be not greater than $1,857,679.

(Id.; see also Factual Basis ¶ 192 ("[D]efendant HUIZAR obtained or

sought to [] obtain, directly and indirectly, at least $1,857,679 in

bribe payments.").)

---

[9] Although defendant claimed to owe $600,000 to Huang, the PSR
did not credit this purported loan as an allowable liability.  (Id.
¶¶ 242, 252.)

1    As detailed herein, and as the government has repeatedly

2    observed throughout this case, defendant's conduct has caused

3    substantial harm to the public and to the City of Los Angeles.  Both

4    the Supreme Court and the Ninth Circuit have recognized that a

5    restitution order is proper for this type of harm inflicted by public

6    servants who abuse their elected positions to enrich themselves.

7    The Ninth Circuit has directly spoken to this issue.

8    Specifically, United States v. Gaytan, 342 F.3d 1010 (9th Cir. 2003),

9    is on all fours with the facts here.  There, defendant Gaytan and his

10   conduct was similar to Huizar in many material respects.  Gaytan was

11   the mayor and councilmember for the City of Colton who accepted

12   bribes intended to influence his vote on land use issues.  Id. at

13   1010-11.  After Gaytan pled guilty to federal program bribery in

14   violation of 18 U.S.C. § 666, the district court imposed a

15   restitution order in the amount of the bribe money the Gaytan

16   received.  Id. at 1011.

17   The Ninth Circuit affirmed.  The Court held that the City of

18   Colton suffered an actual loss subject to restitution because it

19   "lost the honest service of a public servant whose vote was purchased

20   by developers[.]" Id.  Citing United States v. Carter, 217 U.S. 286,

21   305-06 (1910), the Court reasoned that a public official was but an

22   "agent" to his "principal" (the City) and that the "larger interests

23   of public justice will not tolerate, under any circumstances, that a

24   public official shall retain any profit or advantage which he may

25   realize through the acquirement of an interest in conflict with his

26   fidelity as an agent." Id.  Accordingly, a public official obtaining

27   such benefits "in violation of his duty" "must account to his

28   principal for all he has received." Id.  In such cases, the City, as

the public official's employer, "suffers a loss in the amount of secret profits accepted by its agent and is entitled to restitution in that amount." Id. at 1012.  Similarly, under California Labor Code rules, an elected official is deemed an "employee" of the City, and all that an employee acquires by virtue of his employment, except his salary, "belongs to the employer, whether acquired lawfully or unlawfully." Id. at 1012 n.3 (citing Cal. Lab. Code § 2860); see also United States v. Gamma Tech Indus., Inc., 265 F.3d 917, 929 (9th Cir. 2001) (affirming restitution order to defendant's employer in the amount of secret kickbacks the defendant received from two subcontractors).

Likewise here, the Court should impose a restitution order to the City of Los Angeles in the amount of secret bribes that defendant actually received.  Because defendant received such benefits in violation of his duty as the City's agent, he must account to his employer for his ill-gotten gains, which rightfully belong to the City under California agency law, consistent with Supreme Court and Ninth Circuit precedent.

The government submits that the appropriate restitution amount is **$1,019,174**, which consists of the following:

///

| Scheme | Description | Amount |
|---|---|---|
| **LA Grand Hotel Bribery Scheme** | Gambling Chips (Factual Basis ¶ 10) | $194,500 |
| | Vegas Group Benefits Pro-Rated by 10 (Factual Basis ¶ 10) | $111,793 |
| | Sexual Harassment Lawsuit Settlement Money (Factual Basis ¶ 12) | $575,269 |
| | 32,800 Australian Dollars of Gambling Chips (Based on 0.68 USD Conversion Rate in 2016) (Factual Basis ¶¶ 20, 185-188) | $22,304 |
| | Value of Roundtrip Flight to Australia (Factual Basis ¶¶ 20, 183) | $10,980 |
| **Luxe Hotel Bribery Scheme** | Katy Perry Concert Tickets (Factual Basis ¶ 37) | $1,000 |
| | China Trip Benefits (Factual Basis ¶¶ 52-53) | $1,900 |
| | The Weeknd Concert Tickets (Factual Basis ¶ 54) | $1,572 |
| | Alcohol for I. Huizar (Factual Basis ¶ 56) | $1,000 |
| | Kendrick Lamar Concert Tickets (Factual Basis ¶ 57) | $1,670 |
| **Businessperson A Scheme** | Cash, Hotels, Gifts Benefits (Factual Basis ¶ 105) | $82,186 |
| | Cash (Factual Basis ¶ 165) | $15,000 |
| | **Total** | $1,019,174 |

The PSR concurs and recommends the same amount for the restitution order.  (PSR ¶¶ 164, 271, 273.)

The foregoing reflects a <u>conservative</u> calculation of the financial benefits that defendant actually received by abusing his position as a City official.  Because the group benefits for the Vegas trips under the LA Grand Hotel Bribery Scheme were shared, the government pro-rated the total by ten; that is, the calculation assumes there were ten participants per trip.  That calculation inures to defendant's benefit because there were less than ten

participants for most of the trips, and defendant typically expensed a higher proportion of the total charges to Wei Huang's account and because Huizar was often the primary catalyst for Huang's self-interested largesse.  With respect to shared meals and golf expenses paid for defendant by Businessperson A (totaling approximately $9,952), the government omitted these amounts in full.

The plea agreement also required defendant to forfeit without contest $129,000 in cash, consisting of cash from casino chips from co-defendant Wei Huang and cash from Businessperson A, which was seized from his home in November 2018.  (Plea ¶ 6; Factual Basis ¶ 25.)  Defendant has complied with this specific aspect of the plea agreement, and the government has already administratively forfeited that sum.[10]  Per the plea agreement, the government (subject to certain conditions) will submit a restoration request to the Money Laundering and Asset Recovery Section of the Department of Justice for the $129,000 to be restored to the City of Los Angeles.  (Plea ¶ 6i.)  If the request is granted by the Attorney General, this may satisfy a part of the restitution order.  (Id.)

B.    **Payment to the IRS**

As part of his plea agreement, and in recognition of his guilty plea to the Tax Evasion count, defendant also agreed to cooperate with the Internal Revenue Service in the determination and payment of defendant's tax liability for 2017.  (Plea ¶ 5.)  In the Factual Basis, defendant admitted that he "willfully attempted to evade and defeat income tax due and owing by him and his spouse to the United States of America, for the calendar year 2017," by submitting a

---

[10] Accordingly, the government does not require an order of forfeiture, including a forfeiture money judgment, from this Court.

32

"false and fraudulent" tax return that "omitted approximately $60,000 cash that defendant [] accepted from Businessperson A as retainer fees." (Factual Basis ¶ 197.)  As a result of his understated income for 2017, the IRS has calculated that defendant's balance due for 2017 is $16,744, plus a fraud penalty of $12,558 and interest (estimated as of December 29, 2023) of $9,283.21, for a total current liability of $38,585.21.[11]  The plea agreement requires defendant, among other things, to pay this amount at or before sentencing, subject to any additional interest that will accumulate after December 29, 2023.  (Plea ¶ 5.a.)  The government has provided to counsel for defendant documentation prepared by the IRS reflecting these calculations and which defendant (and his wife) will be required to execute and provide to the IRS as part of closing out his 2017 tax year liabilities.

**VIII.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court impose the following sentence: (1) a 13-year (156-month) term of imprisonment; (2) a three-year term of supervised release; (3) an order to pay $1,019,174 in restitution to the City of Los Angeles (payable before the fine amount due); (4) a high-end fine of $350,000; (4) and (5) a special assessment of $200.

---

[11] Because he filed jointly with his wife, she also is technically subject to this tax liability.

33