E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS (Cal. Bar No. 242101)
Assistant United States Attorney
Chief, Criminal Division
CASSIE D. PALMER (Cal. Bar No. 268383)
SUSAN S. HAR (Cal. Bar No. 301924)
BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Public Corruption & Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2091/0363/3289/3819
    Facsimile: (213) 894-6436
    E-mail:   Mack.Jenkins@usdoj.gov
           Cassie.Palmer@usdoj.gov
           Susan.Har@usdoj.gov
           Brian.Faerstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>       v.<br><br>JOSE LUIS HUIZAR,<br><br>       Defendant. | No. CR 20-326-JFW-1<br><br>GOVERNMENT'S REPLY TO DEFENDANT JOSE LUIS HUIZAR'S SENTENCING MEMORANDUM<br><br>Hearing Date: January 26, 2024<br>Hearing Time: 8:00 a.m.<br>Location:    Courtroom of the<br>            Hon. John F. Walter |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Mack E. Jenkins, Cassie D. Palmer, Susan S. Har, and Brian R. Faerstein, hereby files its reply to defendant Jose Luis Huizar's sentencing memorandum (Dkt. No. 1228).

//

//

This sentencing reply is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: January 12, 2024                    Respectfully submitted,

                                           E. MARTIN ESTRADA
                                           United States Attorney


                                                  /s/
                                           _____
                                           MACK E. JENKINS
                                           CASSIE D. PALMER
                                           SUSAN S. HAR
                                           BRIAN R. FAERSTEIN
                                           Assistant United States Attorneys

                                           Attorneys for Plaintiff
                                           UNITED STATES OF AMERICA

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES...................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES...................................1

I.   INTRODUCTION.....................................................1

II.  CONTRARY TO DEFENDANT'S CONTENTIONS, THE GOVERNMENT'S
     RECOMMENDATION OF 13 YEARS' IMPRISONMENT ACHIEVES THE GOALS
     OF SENTENCING...................................................2

     A.   A 5-Level Downward Variance Is Warranted...................2

     B.   Defendant's Arguments Questioning the Relative
          Seriousness of His Misconduct Should Be Rejected..........3

          1.   Defendant's Corrupt Abuse of His Singularly
               Powerful Position at the Center of the RICO
               Conspiracy Stands Alone..............................3

          2.   Defendant's Corruption Degraded the Public Trust
               and Undermined the Fair and Honest Discharge of
               His Duties...........................................6

          3.   Defendant's Corrupt Conduct Extended Beyond the
               Five Schemes Detailed in the Factual Basis...........9

     C.   Affording Adequate Deterrence and Promoting Respect
          for the Law Are Critical Sentencing Objectives Here
          Despite Defense Claims to the Contrary...................10

     D.   There is No Risk of an Unwarranted Sentencing
          Disparity................................................13

III. CONCLUSION.....................................................17

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

United States v. Bistline,
   665 F.3d 758 (6th Cir. 2012) ..................................... 11

United States v. Blagojevich,
   No. 08-CR-888-1 (N.D. Ill. 2011) ........................... 15, 16

United States v. Booker,
   543 U.S. 220 (2005) .............................................. 3

United States v. Jacobs,
   431 F.2d 754 (2d Cir. 1970) ...................................... 7

United States v. Lothian,
   976 F.2d 1257 (9th Cir. 1992) .................................... 4

United States v. Mangano,
   No. 16-CR-00540-JMA-1 (E.D.N.Y. 2022) ........................... 7

United States v. Muntain,
   610 F.2d 964 (D.C. Cir. 1979) .................................... 7

United States v. Prosperi,
   686 F.3d 32 (1st Cir. 2012) ..................................... 11

**Guidelines**

U.S.S.G. Ch. 1, Pt. A ............................................. 12

U.S.S.G. § 2C1.1 ................................................. 14

U.S.S.G. § 3B1.1 .................................................. 5

U.S.S.G. § 5K1.1 ................................................. 14

**Other Authorities**

S. Rep. No. 98-225, 1984 U.S.C.C.A.N. 3182 ....................... 12

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3       In his sentencing position, defendant Jose Huizar asks

4  rhetorically, "what necessary purpose of sentencing would be served

5  by incarcerating Mr. Huizar for 13 years that would not sufficiently

6  be served by 9?"  (Dkt. No. 1228 ("Def. Memo") at 3 (emphasis in

7  original).)  The supposed sufficiency of defendant's 9-year

8  sentencing recommendation, however, rests on several flawed premises,

9  and does not adequately achieve the necessary goals of sentencing

10 that a 13-year sentence would.

11      Defendant stood alone at the center of power within the pay-to-

12 play RICO conspiracy to which he pled guilty, despite his allusions

13 that others were equally culpable or abused their positions to the

14 same degree as defendant's commodification of his high public office.

15 Defendant's sprawling web of corruption requires a substantial

16 custodial sentence at the high end (13 years) of the parties'

17 proposed binding sentencing range to afford adequate deterrence and

18 promote respect for the law, despite his illogical claim that four

19 additional years will have no deterrent impact on other public

20 officials or like-minded wrongdoers in this closely followed case.

21 And contrary to defendant's misguided reliance on inapposite national

22 statistics and disparately situated defendants, a 13-year sentence

23 will not cause unwarranted sentencing disparities.

24      As the government respectfully submits in its sentencing

25 recommendation, a 5-level variance below the advisory Guidelines

26 range -- and nothing more -- is appropriate.  Defendant's history and

27 characteristics and the other mitigating circumstances described in

28 his sentencing position provide support for such a variance.  However,

1  they do not justify further leniency below a 13-year term of custody.

2  Defendant's brazen and prolonged betrayal of the public trust in

3  abusing his powerful position within the City of Los Angeles for his

4  own benefit distinguishes him from all others within the RICO

5  conspiracy he led.  To borrow from the thematic thread in defendant's

6  sentencing position, defendant oversells the good that came out of

7  the bad and underestimates the bad that came out of any good.

8      Accordingly, the government maintains the following sentencing

9  recommendation: (1) a 13-year (156-month) term of imprisonment;

10 (2) three years of supervised release; (3) total restitution of

11 $443,905 to the City of Los Angeles;[1] (4) a high-end fine of

12 $350,000; and (5) a special assessment of $200.

13 **II.  CONTRARY TO DEFENDANT'S CONTENTIONS, THE GOVERNMENT'S
       RECOMMENDATION OF 13 YEARS' IMPRISONMENT ACHIEVES THE GOALS OF
14     SENTENCING**

15     **A.  A 5-Level Downward Variance Is Warranted**

16     As an initial matter, the government acknowledges the mitigating

17 circumstances defendant details regarding his determined rise from

18 poverty, his achievements through higher education, his public

19 service and accomplishments while working for the City (albeit while

20 monetizing his powerful position for personal gain for years), and

21 his rededication to his family and efforts at self-improvement since

22 his arrest.  (See generally Def. Memo at 6-44.)  The government

23 credited these mitigating aspects of defendant's history and

24 characteristics, along with his significant and fulsome admission of

25

26 _____

27      [1] Pursuant to the Court's order in this case, the parties
   reached agreement on a revised proposed restitution amount of
   $443,905 owed to the City.  (See Dkt. No. 1239.)  The government
28 understands that the City intends to submit a victim impact statement
   in advance of sentencing.

guilt in this sprawling corruption case, in recommending a 5-level Booker[2] variance in its sentencing position.  (See Dkt. No. 1226 ("Gov't Memo") at 20-23.)  The government maintains that a 5-level downward variance -- from an offense level 39 (with a corresponding effective Guidelines range of 262 to 300 months) to an offense level 34 (with a corresponding Guidelines range of 151 to 188 months) -- is appropriate under the unique facts and circumstances of this case, especially in light of the additional personal information and letters of support provided by defendant.

However, as discussed further below, defendant's arguments for further leniency should be rejected.  Whether in the form of a 9-year term of imprisonment or the corresponding 8-level variance from the effective Guidelines range, defendant's request is unwarranted, given the multiple aggravating factors present here and the goals of sentencing that defendant distorts or glosses over in his position.

**B.   Defendant's Arguments Questioning the Relative Seriousness of His Misconduct Should Be Rejected**

While paying heed to his acceptance of responsibility and the truth of the detailed 42-page factual basis to which he attested, defendant makes several arguments aimed at diminishing the relative seriousness of his misconduct.  The Court should reject defendant's efforts to dilute the seriousness of his crimes.

1.   Defendant's Corrupt Abuse of His Singularly Powerful Position at the Center of the RICO Conspiracy Stands Alone

Defendant attempts to deflect attention away from his own misconduct and preeminent role in the criminal racketeering

---

[2] United States v. Booker, 543 U.S. 220 (2005).

conspiracy to other so-called "offstage actors," including
cooperators and other charged and uncharged individuals.  (Def. Memo
at 4.)  Defendant suggests enterprise members "worked independently
and at cross-purposes" (id.), and even devotes an entire appendix to
airing allegations and grievances against other participants in the
pay-to-play scheme -- often drawing inapt comparisons and false
equivalencies between their misdeeds and his own.  (See generally
Def. Memo, App'x A.)

Defendant's attempts to distance himself from the vital and
singular role he played at the center of the pay-to-play scheme
fails.  Defendant was the indispensable leader, lifeblood, and prime
lever of power upon which the CD-14 Enterprise survived and thrived.
No one else was a City Councilmember.  No one else was the
Councilmember for CD-14, which was at the center of a commercial
development boom with hundreds of millions of dollars pouring into
the City from foreign and domestic developers.  And no one else was
the Chairman of the high-powered PLUM Committee through which all
major development projects had to pass.  Without defendant and his
unique ability to kindle or kill any given project in downtown Los
Angeles -- and his insatiable thirst to monetize that power for
bribes -- the CD-14 Enterprise and pay-to-play scheme would not have
existed.  Defendant also fails to appreciate that even if other co-
conspirators spun off and committed racketeering acts without his
direct knowledge, he still would be liable for those reasonably
foreseeable acts in furtherance of the scheme that he set up, led,
and promoted.  See United States v. Lothian, 976 F.2d 1257, 1262-63
(9th Cir. 1992).

4

As even defendant is forced to acknowledge, the CD-14 Enterprise was premised on <u>defendant's role</u> as "the leader" and "that other participants worked loyally and collectively toward the common goal of advancing <u>his</u>, and thus their, political power so that they could extract bribes and benefits."[3]  (Def. Memo at 70 (emphases added).)  By virtue of his CD-14 Councilmember position, defendant had "jurisdiction over hundreds of development projects" seeking discretionary approvals in the City.  (Dkt. No. 910-1 (Factual Basis) ¶ 2.)  Defendant was the only member of the CD-14 Enterprise with the power to take <u>all</u> of the official acts that typified and propelled the racketeering conspiracy, including presenting motions and resolutions, voting on projects, taking or not taking action in the PLUM Committee, and leveraging voting and scheduling power in various City committees.  (<u>See id.</u> ¶ 2.c.)  And in fact, defendant admitted that he told the Chairman of Shenzhen Hazens, Fuer Yuan, that "there was no need to involve the City's Mayor in the approval process" for the Luxe Hotel project because defendant controlled the PLUM Committee and drove the project, and "as far as the success of the Luxe Hotel project was concerned, Yuan did not need anyone else in the City but defendant Huizar."[4]  (<u>Id.</u> ¶ 42.)

---

[3] Defendant also agreed to the four-level upward adjustment under U.S.S.G. § 3B1.1(a) for being an organizer/leader of the RICO conspiracy.  (Dkt. No. 910 (Plea Agreement) ¶ 20.)

[4] Defendant Raymond Chan also wielded immense power within the RICO conspiracy through his positions as General Manager of the Los Angeles Department of Building and Safety and, later, Deputy Mayor for Economic Development.  Defendant Chan similarly played a critical role in enabling, propelling, and protecting the pay-to-play scheme, including through aiding and abetting defendant Huizar's bribes (and helping save defendant Huizar's career), corruptly soliciting bribes for himself, and orchestrating bribes to other powerbrokers within the City.  Nonetheless, defendant Huizar's blatant abuse of his positions as the CD-14 Councilmember and PLUM Committee Chairperson
*(footnote cont'd on next page)*

1    This case is not, as defendant would have it, one that risks

2    "hanging one man for the sins of another."  (Def. Memo at 5.)

3    Defendant was the epicenter of corruption within the racketeering

4    conspiracy.  All of the other corrupt actors, and the actors whom

5    defendant corrupted, orbited around him and advanced the objectives

6    of the CD-14 Enterprise to serve defendant's, and then parasitically

7    their own, desires and needs.  Defendant's uniquely powerful and

8    public-facing position within the RICO conspiracy requires the

9    substantial 13-year sentence, recognizing his rampant abuse of the

10   high office he alone inhabited.

11          2.    Defendant's Corruption Degraded the Public Trust and
                  Undermined the Fair and Honest Discharge of His Duties
12

13   Defendant next seeks to minimize the impact of his crimes by

14   claiming that even though he "accepted bribes, he did so in

15   connection with projects that he and others independently supported,

16   which were good for the [C]ity, rather than pushing harmful

17   legislation or wasting public funds."  (Def. Memo at 3.)  Defendant

18   similarly claims that he did not act with "malicious intent to hurt

19   the [C]ity by advancing negative policies that he didn't believe in

20   or greenlighting projects that he felt were bad for the community."

21   (Id. at 65 (emphasis in original).)

22   Defendant again misses the mark with this argument, both

23   factually and legally.  He ignores the monumental harm he inflicted

24   when he abused in the most fundamental way his public position and

25   obligation to act honestly and solely for the public good -- he

26   commodified his public office and monetized his immense sway for his

27   _____

28   was the key to the prolonged success of the racketeering conspiracy,
     which was principally designed to benefit defendant Huizar above all
     others.

                                       6

own enrichment.  The degradation of the public's trust in its elected officials is the entrenched harm that defendant left in the tracks of his web of corruption, regardless of any debatable "merits" of a given decision or project for which his support was purchased through bribes.  It is because of the obvious evils of corruption and "the aftermath suffered by the public when an official is corrupted and thereby perfidiously fails to perform his public service and duty" that the law cares not about the virtues of the object of the bribe.  United States v. Jacobs, 431 F.2d 754, 759 (2d Cir. 1970).  "It is the corruption of official decisions through the misuse of influence in governmental decision-making which the bribery statute makes criminal."  United States v. Muntain, 610 F.2d 964, 968 (D.C. Cir. 1979).

In any event, defendant's admissions in his factual basis paint a different picture of his intentions and the effect of his corrupt decisions.  As one example, with respect to the Mateo project, defendant admitted that he expected Carmel Partners "to make it worthwhile" -- that is, provide a significant financial benefit -- for him to vote in the PLUM Committee against a labor union that he viewed as an ally.  (Factual Basis ¶ 93.)  Defendant voted to approve the Mateo project over the objections of the union in exchange for an additional $50,000 contribution to the Political Action Committee ("PAC") established for the benefit of Richelle Rios's City Council campaign.  (Id. ¶¶ 95, 103.)  In so doing, defendant also agreed to accept project modifications requested by Carmel Partners, including significant reductions to the affordable housing conditions for low-income individuals required by the City Planning Commission, saving the developer an estimated $14 million in costs -- despite

7

1    defendant's initial insistence on significantly higher affordable

2    housing conditions.[5]  (Id. ¶¶ 85, 103-04.)

3         Defendant's pay-to-play scheme only worked because of what it

4    threatened: the failure to pay meant no play, without qualification.

5    Nothing in the scheme spared from punishment developers who refused

6    defendant's solicitation for benefits but had projects serving the

7    public interest; had defendant made such exceptions, the scheme would

8    have been feckless.  The very nature and operation of defendant's

9    scheme was therefore fundamentally inconsistent with defendant's

10   impudent claims now of no harm, no foul.  The factual basis is

11   replete with other examples where defendant prioritized his own next

12   direct or indirect payday over an independent consideration of the

13   merits of any particular project.  (See, e.g., ¶¶ 166 (planning to

14   pressure developers with projects needing approvals to contribute to

15   Richelle Rios PAC), 170-74 (same), 176-77 (targeting developers with

16   projects pending in CD-14 to contribute to high school for which

17   Richelle Rios was a fundraiser).)

18        What defendant gets right is his recognition that "his conduct

19   was and is corrosive to the health of our democratic society because

20   it dissuades people from believing and participating in government,

21

22        [5] Defendant claims that the government's interpretation of
     defendant's corrupt acts on the Mateo project reflects a "recurring"
23   "false insinuation" that the project damaged the goal of affordable
     housing in Los Angeles.  (Def. Memo at 68-69.)  Defendant points,
24   among other things, to a $2 million payment Carmel Partners was
     required to make to an affordable housing trust fund.  (Id.)  That $2
25   million was a fraction of the estimated $14 million in savings Carmel
     Partners secured by purchasing defendant's vote in the PLUM
26   Committee.  But more to the point, as reflected in defendant's
     communications with Morris Goldman and defendant's actions regarding
27   the Mateo project, defendant was more immediately concerned about
     extracting contributions from Carmel Partners than he was about
28   solving Los Angeles's low-income housing crisis.  (See, e.g., Factual
     Basis ¶¶ 75, 80, 84, 86, 88-90, 93, 95, 97, 99-100, 103-04.)

causing them to become atomized and cynical and believe that government as a whole is irretrievably corrupt." (Def. Memo at 72.) Indeed, that is the lasting impact of defendant's sprawling criminal conduct here. Whether defendant actually believed he was doing good on any particular project, while simultaneously monetizing his vote and selling his influence, is beside the point in evaluating the seriousness and enduring harm of his offenses.

          3.   <u>Defendant's Corrupt Conduct Extended Beyond the Five Schemes Detailed in the Factual Basis</u>

Finally, in addressing the scope of his criminal conduct, defendant largely focuses on the five pay-to-play bribery schemes detailed in the First Superseding Indictment and summarized in his factual basis.[6] (<u>See</u> Def. Memo at 69-72; <u>see</u> <u>also</u> <u>id.</u>, App'x A.) But the RICO conspiracy was exemplified by, though not limited to, those five bribery schemes. Defendant admitted to targeting more broadly bribes from "developers with projects pending before committees on which defendant [] sat in order to obtain financial benefits from them." (Factual Basis ¶ 170.) Extracting such bribes through misuse of his Council and committee positions was the essence of the pay-to-play scheme and extended beyond the four developers and one businessperson that were the focus of the charges.

Thus, for instance, defendant agreed to "pressure developers with projects in CD-14 to contribute to the PAC [established to benefit Richelle Rios] in exchange for favorable treatment and to avoid adverse action against their projects in the PLUM Committee,

---

[6] Those five bribery schemes center on the L.A. Grand Hotel Project, the 940 Hill Project, the Luxe Hotel Project, the Mateo Project, and Businessperson A.

Economic Development Committee, and City Council." (Id. ¶ 166.) And such extortionate fundraising was employed for multiple financial ends, whether to benefit the Richelle Rios PAC, defendant's officeholder account, his high school alma mater, or sources directly or indirectly furthering his personal financial interests. (See generally id. ¶¶ 166-182.)

Defendant's dedication to developing and maintaining this deliberative and cynical pay-to-play scheme, all to serve his own benefit, best captures the seriousness of defendant's central role in the racketeering conspiracy and the damage it has inflicted upon the public's trust.

### C. Affording Adequate Deterrence and Promoting Respect for the Law Are Critical Sentencing Objectives Here Despite Defense Claims to the Contrary

Defendant's contention that a 9-year sentence is sufficient for deterrent purposes in this case also should be rejected. Defendant principally draws upon the perceived collateral consequences of his public fall as supposedly "satisfy[ing] any conceivable deterrent effect that any prosecution possibly could," including the negative media attention, loss of career and professional license, and impact on his family. (Def. Memo at 58-59.)[7]

But what defendant disregards is that when an official abuses his position in the shameless fashion he did, his own actions are the reason that his fall will be just as public and consequential as the

_____

[7] Defendant's reliance on the collateral consequences suffered by his family (including his mother and brother) is especially craven because defendant sought to shield himself from culpability by hiding behind and putting in harm's way those who trusted him, including his mother and brother. (Def. Memo at 59.) Indeed, defendant is the person who selfishly chose to draw his mother and brother into his web of corruption in order to use them to launder his bribes and attempt to evade law enforcement detection.

crimes he committed.  Section 3553 demands that the <u>sentence</u> imposed by the Court afford adequate deterrence, as well as reflect the seriousness of the offense, promote respect for the law, and provide just punishment.  The natural consequences of engaging in a sprawling, multi-year RICO conspiracy do not obviate the need for the criminal justice system to send a stern message to other public officials and like-minded offenders that significant custodial consequences will await them as well.

Moreover, the necessary deterrent effect of defendant's sentence should not be weighed differently because his position of power afforded him more to lose than criminals at the other end of the spectrum.  As one court observed, collateral consequences "related to a defendant's humiliation before his community, neighbors, and friends . . . would tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along these lines.  And '[w]e do not believe criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose.'" <u>United States v. Bistline</u>, 665 F.3d 758, 765-66 (6th Cir. 2012) (citation omitted); <u>see</u> <u>also</u> <u>United States v. Prosperi</u>, 686 F.3d 32, 47 (1st Cir. 2012) ("It is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction.").

Defendant also relies upon purported "empirical research" by academics and "moral questions about the fairness [of] deterrent sentencing" in advocating for capping his sentence at 9 years.  (Def. Memo at 56-57, 61-62.)  Whatever scholars and philosophers have

opined about the supposed limits of the prospect of incarceration in
warding off criminal conduct by others, countless courts have
concluded just the opposite.  The government cited a number of these
cases in its sentencing position and will not repeat them here.  (See
Gov't Memo at 23-25.)  But it is worth adding that, contrary to
defendant's misleading suggestion that the U.S. Sentencing Commission
condones short prison terms for "serious economic crimes,"[8] (Def.
Memo at 57), Congress recognizes that deterrence is "particularly
important in the area of white collar crime."  S. Rep. No. 98-225, at
76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259.  This Court
recognized the same in sentencing co-defendant David Lee, explaining
that general deterrence is "a particular concern for white-collar
crimes because they are often perceived as carrying substantially
lesser punishment than other comparable crimes," "send[ing] the wrong
message to other similarly situated individuals who maybe
contemplated similar crimes."  (Dkt. No. 1173 at 59:3-6, 59:10-11.)

It is vital to send a message in this case that courts will hold
powerful public officials to account for their substantial and
prolonged breach of the public trust.  The government's recommended
sentence of 13 years -- which already reflects a meaningful 5-level
downward variance from the Guidelines range -- accomplishes that

---

[8] Defendant cites to Guidelines commentary for the proposition
that "'the definite prospect of prison, even though the term may be
short, will serve as a significant deterrent' to serious economic
crimes."  (Def. Memo at 57 (quoting U.S.S.G. Ch. 1, Pt. A § 4(d)
(2018) (emphasis in Def. Memo)).)  However, the commentary defendant
cites pertains to consideration of offenses "for which probation
previously was frequently given," not much more serious public
corruption and racketeering cases where defendants face substantial
terms of imprisonment.

critical goal of deterrence.  Defendant's low-end recommendation of a 9-year term does not.

Finally, defendant hyperbolically suggests that a sentence of 13 years, instead of 9, will undermine respect for the law by purportedly exposing a "criminal justice system seen as furiously destroying the unlucky few while letting similar offenders walk free, or blindly layering punishment upon punishment without regard for mitigation or contrition."  (Def. Memo at 73.)  Not so.  The government's sentencing recommendation accounts for a (warranted) 5-level variance from the applicable advisory Guidelines range.  And the recommended 13-year term is measured within the context of the facts and circumstances of this case.  Nor can the government catch and prosecute every public wrongdoer or act of corruption.  Indeed, that is the very point of general deterrence, especially in cases garnering substantial public attention such as this one.  In any event, the government did charge seven other individuals (including cooperators) and two corporate entities, in addition to defendant, within the scope of this case.

Defendant stands for sentencing as one of the supposed "unlucky few" because of his blatant betrayal of the public trust from the highest levels of power in the City.  The government's recommended term of 13 years in prison will promote, not undermine, respect for the law by helping to restore the public's faith that no one is above the law.

**D.   There is No Risk of an Unwarranted Sentencing Disparity**

Defendant posits several grounds for why any sentence over 9 years in prison would cause unwarranted sentencing disparities, all of which are without merit.

First, with respect to national statistics for public corruption cases, defendant draws upon misleading data having no bearing on the facts and circumstances here.  (Def. Memo at 50-51.)  Specifically, he cites the Sentencing Commission's "Interactive Data Analyzer," which simply pools statistics from bribery or corruption cases where U.S.S.G. § 2C1.1 was the primary Guideline chapter applied <u>without reference to any specific offense characteristics or upward adjustments</u>.  Thus, the supposed median and average terms of imprisonment (22 and 31 months, respectively) are untethered to any particular offense level or identifiable scope of conduct.  Nor do these statistics differentiate cooperating defendants who received departures pursuant to U.S.S.G. § 5K1.1, which likely accounts for substantial assistance reductions that are not relevant here.  In short, the statistics defendant cites provide no basis for an informed comparison to the facts of this case, and they certainly do not support defendant's claim that even a 9-year sentence here would be a "high-end [] outlier."  (Def. Memo at 51.)

More telling is the Sentencing Commission's metric for national statistics through the "Judiciary Sentencing Information" ("JISN") database, which filters cases by primary guideline, specific offense level, <u>and</u> criminal history category.[9]  When selecting 2C1.1 as the primary guideline and the advisory Guideline range applicable here (262-327, at offense level 39 and criminal history category I), the database reports that there were an insufficient number of defendants falling into this specific category over the last five years to

_____

[9] Available at https://jsin.ussc.gov/analytics/saw.dll?Dashboard. This database also excludes defendants who received a § 5K1.1 substantial assistance departure unlike the data cited by the defense.

provide a statistically informed basis for comparison.  Indeed, as
the government explained in its sentencing position, defendant is in
"a league of his own" and cannot be conveniently compared to an
undefined pool of corruption defendants across the country.[10]  (Gov't
Memo at 27.)

Second, defendant attempts to point to other "high-profile
public corruption prosecutions" across the country resulting in
sentences less than nine years.  (Def. Memo at 51-54.)  Those cases
are factually disparate, given defendant's sprawling and calculated
pay-to-play scheme over the course of more than half-a-decade, while
he was one of the most powerful people (if not the most powerful
person) for development in the City of Los Angeles.

Defendant's conduct is far more analogous to that of former
Governor Rod Blagojevich of Illinois (14-year sentence), whose case
defendant cites.[11]  As the defense recognizes, Blagojevich commodified
his seat of power in brash fashion similar to defendant's flagrant
monetization of his position here.  See United States v. Blagojevich,
No. 08-CR-888-1 (N.D. Ill.), Dkt. Nos. 231, 847, 904 (convictions for
honest services wire fraud, attempted extortion, federal program
bribery, and conspiracy in scheme to use Office of the Governor for

_____

[10] The JSIN database also generally supports the application of a
variance in these cases, although without further specificity.  A
review of the statistics for chapter 2C1.1 defendants in the JSIN
database with CHC I and an offense level between 32 and 38 all
reflect average sentences with downward variances from the applicable
Guidelines range.  For the reasons stated in the government's
sentencing memoranda, five levels is the appropriate variance here.

[11] Defendant also neglects other corruption cases with sentences
given to public officials comparable to the government's 13-year
recommendation here.  See, e.g., United States v. Edward Mangano, No.
16-CR-00540-JMA-1 (E.D.N.Y.), Dkt. Nos. 402, 463, 469, 471 (top
elected official in Nassau County convicted of honest services wire
fraud, federal program bribery, and conspiracy to obstruct justice
sentenced to 12 years).

appointments, awarding of business, enactment of legislation, and appointment of a U.S. senator in exchange for illicit financial benefits and campaign contributions).

Defendant attempts to distinguish Blagojevich as having contested the charges against him through trial and appeal, whereas defendant pled guilty and admitted to a fulsome factual basis.  (Def. Memo at 60.)  That is true, and part of the reason why, in addition to the usual 3-level deduction for acceptance of responsibility, the government is recommending a 5-level downward variance, with a sentencing recommendation toward the lower end of what would be the resulting advisory Guidelines range.

Finally, defendant's arguments (and 36-page appendix) purportedly detailing "true distribution of culpability" within this case gloss over the critical distinguishing factor between defendant and any other wrongdoer.  That is, defendant held the power, entrusted solely to him by the public, upon which the entire RICO conspiracy rested, and he blatantly abused and corrupted it time and time again.  The cooperators who defendant attacks in his sentencing appendix also have yet to be sentenced and their mitigating and aggravating circumstances are not presently before the Court.

The only other individual defendant to be sentenced in this case, David Lee, provides the most appropriate baseline for considering the reasonableness of the Court's sentence here.  The government's recommended sentence of 13 years for defendant is more than double the 6-year sentence that Lee -- a non-public-official who participated in a single bribery scheme with defendant -- received, and strikes the right balance given the respective nature and circumstances of their misconduct.  It also appropriately accounts

16

for their fulsome acceptance of responsibility (defendant) or lack

thereof (Lee).  Defendant's recommended sentence of 9 years -- a term

of imprisonment that falls within even Lee's Guidelines range of 97-

121 months -- would be insufficient to achieve the goals of

sentencing in this case.

**III. CONCLUSION**

Defendant's brazen criminal acts and their lasting corrosive

impact on the public warrants a substantial sentence.  The

government's recommended sentence of 13 years' imprisonment is

sufficient, but not greater than necessary, to achieve the goals of

sentencing in this case.