# APPENDIX B

Scheme M involves a mixed-use project being developed by Carmel Partners at 520 Mateo St. in the Arts District.  As alleged in the FSI, the scheme can be briefly summarized as follows:

> Two PACS affiliated with Mr. Huizar accepted a number of contributions or commitments from entities affiliated with Carmel between 2016 and 2018.  Much of that activity was legal under controlling law, which criminalizes accepting campaign contributions only in cases of clear-and-unambiguous quid pro quos.  But the FSI alleges that Mr. Huizar solicited $100,000 in contributions from Carmel in 2018 – of which $25,000 was actually paid – in exchange for (1) scheduling the Mateo project on the PLUM agenda, (2) voting to deny a labor union's appeal against the Mateo project in the PLUM Committee, and (3) voting to approve the Mateo project in the City Council.  FSI ¶ 56; see also Docket No. 235-1 ¶ 2 & Ex. 1.  The most specific admission underlying this allegation appears at ¶ 95 of the factual basis, which recounts an unrecorded, late-2018 conversation between Mr. Huizar and Morrie Goldman during which Mr. Huizar conditioned voting against a union appeal on an additional $50,000 contribution from Carmel.  Ultimately, that contribution was never made; Mr. Huizar voted against the appeal and in favor of a revised community-benefits package; and the project was approved unanimously with overwhelming community support.

While those basics are sufficient to understand the government's allegations and the admitted criminal conduct, to truly appreciate what happened with the Mateo project and the project's impact on the community, the Court needs to understand the players, the project, Los Angeles zoning, the planning process, other concurrent approvals in the Arts District, and the multifaceted community-benefits package that was ultimately approved.[1]

---

[1] As discussed in more detail below, the approved project included not only as much affordable housing as Carmel's original proposal, but a $2.25 million dollar payment dedicated to affordable housing in CD-14, and numerous specific items requested by the community, including a unique agreement on affordable-commercial space to be marketed for artists.  Now referred to as Alloy, this project is also the first large-scale vertical development in the Arts District and is seen by many as the vanguard of positive development in the area.  See, e.g., Urbanize, Here are 10 L.A. projects to watch in 2024 (Jan. 2, 2024), https://la.urbanize.city/ post/here-are-10-la-projects-watch-2024 ("The project is notable of course because of its height relative to its surroundings (and perhaps some of the shenanigans that went into its approval, but that's another story). However, it also is a sign of things to come for the Arts District, particularly following the adoption of DTLA 2040.

\*\*\*

The Mateo developer, Carmel, is a multibillion-dollar private-equity firm based in the Bay Area specializing in developing or acquiring mixed-use residential properties in major cities across the county.[2]  It has developed multiple properties in L.A., including, in DTLA specifically, the Atelier project at 8th/Olive, as well as Eighth and Grand, which houses the Whole Foods Market on the edge of South Park.  Carmel also has several other luxury projects throughout the city.

By far its most-notable development is the Cumulus district at the Jefferson/La Cienega intersection in CD-10.  Carmel's crown jewel for L.A., Cumulus involved a massive redevelopment of the site previously owned by Cumulus media on a parcel straddling Culver City and West Adams.  With both retail and residential components, Cumulus is many times larger and more lucrative than Mateo.  Cumulus was also in the planning-approval process and post-approval permitting process at the same time as many of the events in this case.

As discussed in Appendix A, Carmel and its executives are politically savvy, well-connected, and have a history of contributing prolifically to numerous politicians and political causes.  These contributions were understood to be an integral part of the entitlement process, which Carmel's chief lobbyist in L.A., Morrie Goldman, likened to a political campaign.

---

Several similar high-rise developments are already in the permitting or entitlement stages nearby, and more could follow as city officials try to steer 20 percent of L.A.'s projected growth through 2040 into Downtown.").

[2] For the sake of accuracy, Carmel Partners, LLC, which is one of several affiliated entities, appears to be an investment advisor to numerous pooled investment vehicles, which in turn invest in various development projects, each of which is separately incorporated.  As of Carmel's most recent Form ADV filing, the pooled investment vehicles have a value of $5.7 billion.  See SEC, Carmel Partners Form ADV Dated April 28, 2023 at 10, https://rb.gy/prg5p3.

Mr. Goldman, for his part, began working with Carmel in the early 2010s. By the time of the events in this case, he was the sole principal of the lobbying firm Urban Solutions, LLC.  He represented a number of prominent companies with business throughout the city, including some of the premier developments inside and outside of CD-14.  Ex. B-1.[3]  He also had close relationships with nearly all of the council offices, including several councilmembers and key staffers.

As discussed in Appendix A, the Council office with which Carmel's executives were closest, and the official to whom they donated the most in L.A., was not CD-14 and Mr. Huizar.  With that said, Carmel, Mr. Goldman, and Neils Cotter also had a good relationship with Mr. Huizar, including a history of mutual support.

That history began not with the Mateo project, but several years earlier, around the time Carmel was entitling and opening Eighth and Grand.  Then, as now, Eighth and Grand was feted as an important step for DTLA because it added not only housing, but a second grocery store that made the urban core a more livable, walkable, and attractive destination.  Mr. Huizar cut the ribbon at the Whole Foods opening, and, during the approval process, got to know more about Carmel's future plans for Los Angeles.  Ex. B-2.

It was during that time – approximately late 2014 – that Carmel first began discussing a project at the Mateo site in the Arts District.  From a housing perspective, the Arts District was underdeveloped at the time, and Mr. Huizar hoped to in-fill many of the vacant lots with housing and commercial activity. Based on his interactions with Carmel on Eighth and Grand, Mr. Huizar saw Carmel as a good developer and a partner willing to work with the local community.  Even though the original proposal for the site was smaller, less dense,

---

[3] Exhibit 20 is the missing exhibit referenced at the top of page 32 of Appendix A.

cheaper, and had fewer community elements, Mr. Huizar supported it as far back as the original discussions.

Of course, developing the Mateo site was not as easy as shaking hands, securing a construction loan, and erecting a tower with new housing and commercial space. Building a major new project in the Arts District came with structural and project-specific difficulties.

At the most basic level, the city has a General Plan and 35 Community Plans that dictate permissible uses of property on a parcel-by-parcel basis. With certain caveats, if a property owner seeks to develop a parcel consistent with the Plans – or "by-right" – the approval process is relatively straightforward. But if a property owner seeks to deviate from these Plans in any significant way, which was the case for nearly all major construction in the Arts District, it must first obtain support for a General Plan Amendment, either from the Council office or Department of City Planning.

After obtaining that support and submitting an application to the DCP, property owners must then work with career planners in DCP who come up with their own recommendations for the project. Depending on the circumstances, a project may then proceed to the City Planning Commission, which is staffed by unelected temporary Mayoral appointees who are not democratically accountable but nonetheless interject their own opinions. From there, a project may then proceed to the PLUM Committee and/or the full City Council, which are staffed by democratically-accountable elected officials. Along the way, there are multiple roadblocks, sources of delay, and opportunities to appeal, particularly based on California's strict environmental law, CEQA.[4]

---

[4] This is only the planning side. Depending on the project, there were often approvals needed from other city departments. And large projects often had other components, like TFAR and Development Agreements.

Within this byzantine system plagued by red tape, perhaps the standout deficiency during the relevant time period were the General and Community Plans. Often decades out of date, these Plans prevented or delayed construction on countless projects citywide – including untold units of market-rate and affordable housing – by requiring virtually all significant developments to obtain individualized GPAs.

In the Arts District, for example, many lots were and remain zoned for heavy-industrial uses. While that designation may have reflected reality 40 years earlier, however, there was little heavy industry in the Arts District in the mid-2010s. Indeed, at the relevant times in this case, the Arts District was already home to a burgeoning set of high-end boutiques, hip galleries, creative offices, and loft apartments leasing for thousands of dollars a month. Realistically, the days of heavy industry in the Arts District were gone and not coming back. Yet, throughout the 2010s, the Arts District was zoned mostly for industrial uses, preventing and delaying the construction of new buildings containing housing and commercial space. And the Mateo parcel specifically, like many dirt lots sitting fallow in the area, fell within that designation.[5]

In addition to impeding the construction of new housing, many informed observers also attribute another pernicious problem – pay-to-play corruption – to L.A.'s outdated zoning maps. If every major project requires discretionary action by a single decisionmaker, the argument goes, officials can use wield the decision

---

[5] There was a belief by some in the city's planning bureaucracy that the Arts District's community plan was not out of date, and that the area should continue to be reserved for heavy industry. The question of whether to update the plans or, in the meantime, initiate GPAs to convert vacant lots to residential uses, was thus part of a longstanding debate. Mr. Huizar's view was that the days of heavy industry in the Arts District were gone and not coming back, which is why many of the lots were vacant by the mid-2010s. Ultimately, that view prevailed, not only in the case of Mateo and several other projects, but after he left office in the proposed update to the community plan covering the Arts District called DTLA 2040.

over developers' heads to extract benefits.  And while using this leverage to exact public benefits is an accepted and lawful part of planning and zoning in the United States, Dolan v. City of Tigard, 512 U.S. 374 (1994), it can be misused to extract impermissible private ones as well.  This concept should be familiar to the Court because it is bedrock to the government's characterization of how Mr. Huizar ran his office.

Given that, the Court might be surprised to learn that Mr. Huizar was one of the principal advocates for code reform during the key periods in this case, including an ordinance requiring Plans to be updated every six years.  Ex. 12.  The goal of that initiative was to ensure that both the General and Community Plans would reflect current needs – especially related to housing construction – and make substantially more development subject to predictable light-touch approval.  By reducing the discretionary role of council offices in the planning process, that reform also addressed concerns about pay-to-play activity.[6]

Mr. Huizar was also one of the principal backers of another initiative with even more direct relevance to Mateo, the Hybrid-Industrial Ordinance.  Debated for years before finally passing in in early 2016, the H-I Ordinance provided that, so long as developments in formerly industrial areas adhered to certain preestablished guidelines, they would be treated as essentially by-right.[7]  This

---

[6] The proposed updates to the DTLA and Arts District Community Plans – which DCP has referred to as DTLA 2040 – largely carry on Mr. Huizar's vision and priorities.  See L.A. Dep't of City Planning, DTLA 2040, https://rb.gy/z1st5h.

[7] See DT News, Council Approves Controversial Live/Work Ordinance (Feb. 18, 2016), https://www.ladowntownnews.com/news/council-approves-controversial-live-work-ordinance/article_391a171a-d4d8-11e5-95e4-abef7f35ae43.html ("After years of discussion and debate in the Arts District, the City Council last week approved a policy to incentivize and regulate housing development in industrial areas.  The Citywide Hybrid Industrial Live-Work Ordinance stemmed from an Arts District-focused initiative and would apply to significant portions of that community and the Industrial District.  On Wednesday, Feb. 10, the council approved the measure that eases zoning restrictions on housing development in return for affordable housing quotas, pedestrian activation, green spaces and public art.  New housing must also be designed as live/work units, with

6

proposal, like code reform, sought to eliminate most discretionary approvals, cut red tape, and accelerate the construction of housing in formerly-industrial places like the Arts District.

When Carmel first raised the prospect of developing the Mateo site, Mr. Huizar, as one of the H-I Ordinance's backers, asked Carmel to submit a proposal to the DCP consistent with the H-I guidelines.  At the same time – and still well before the first Carmel-related allegation in the FSI – he made a corresponding commitment to initiate a GPA if the H-I Ordinance failed or if planning stalled the development.

Ultimately, both of those things happened.  NIMBY opposition to the H-I Ordinance blossomed into litigation, which ultimately blocked the H-I Ordinance's implementation under CEQA.  The DCP, meanwhile, which supported the H-I Ordinance, sat on several proposed projects in the Arts District, including Mateo, refusing to initiate GPAs and delaying housing construction absent financially-infeasible conditions.

It was in light of these circumstances that Carmel returned to Mr. Huizar's office in late 2015 with a request that he make good on his prior commitment to initiate a GPA.  As set forth in the first of many dedicated briefings on the project, Mr. Huizar's planning deputy, Shawn Kuk, wrote:

> Shawn met with Morrie Goldman and Neils Cotter on 11/24 to discuss planning entitlements issues regarding Carmel's proposed new project at 520 Mateo in the Arts District . . . . Developer is concerned regarding lack of clarity with HI ordinance approval process in the near-term . . . . Vacant site has been sitting idle and Carmel must file entitlements by Jan/2016.  Have been working with Arts District

---

at least a 750-square-foot average to accommodate in-house jobs and businesses. Additionally, the ordinance demands that developers set aside space for non-residential uses, with only 50% of that allocated for retail (it could also be used for artists' studios, tech incubator space, etc.).  'This ordinance has the potential to reimagine and revitalize our aging industrial zones throughout the city,' 14th District City Councilman José Huizar, who led the effort, said in a prepared statement.").

> players . . . EIR has been prepared and ready to submit to Planning. Carmel wants help getting Planning to accept their application and start review, however, Planning/Logrande is unwilling to initiate a General Plan Amendment (GPA) at this time with the pending approval of the HI Ordinance . . . . Carmel will be asking you today about the possibility of you initiating the GPA in the event there is further delay or legal complications that arise with the approval of the HI Ordinance in early 2016.

Ex. 16-1.  On August 11, 2016, with the Arts District pipeline still stalled, and with frustration growing, Mr. Kuk wrote to Paul Habib, Mr. Huizar's Chief of Staff, and summarized the situation:

> Planning is still holding up projects or otherwise asking that projects be reduced in density ( # of units).  Met with Dale Goldsmith on another project today and he informed me that Planning's new policy/approach in the AD is to require that the desire density be filled in with affordab1e units using a special conditional use permit.  This would be in excess of what's required by the HI Ordinance.
> Camden is now moving through their application review process and anticipating a hearing date in the next month or so.
> But Carmel's project is still waiting for Planning to initiate the GPA.  We asked Vince on multiple occasions now to initiate but Carmel is now being asked to go from 200 du/acre to 100 du/acre, essentially cutting their density by half and rendering the project infeasible.  Planning's position, at least at the staff level, is that they are not willing to do GPA's to Regional Commercial which would be the only way for projects with high density like Carmel to move forward as designed and consistent with HI.
> I know I included Carmel's project as one of those that the CM could potentially ask for a DA in exchange for initiating but I met with Carmel today on one of their new projects and they reminded me that he committed to initiating their GPA himself if Planning balked.  Additionally, their project is already programmed with a robust community benefit package as required by HI. Basically, I would take Carmel off the list of DA-GPA projects and recommend the CM demand Planning initiate the GPA with Regional Commercial ASAP or that he'll initiate by motion (at least threaten to).

Ex. 16-3.

On August 18, 2016 – the first Carmel-related date in the FSI – Mr. Huizar met with Mr. Goldman and Mr. Cotter to discuss the Mateo project.  In advance of that meeting, Mr. Huizar received a memo from Mr. Kuk that recounted much of the information from Mr. Kuk's email to Mr. Habib, including:

> Carmel is requesting that you initiate the GPA at this point due to their concerns over the pending ballot initiatives.  They are insistent that their project has been designed to meet HI standards but if they

> are limited to Community Commercial, that will force them to go from 200 du/acre to 100 du/acre, essentially reducing their density by half and rendering the project infeasible.  Planning's position to deny GPA's to Regional Commercial would hurt other projects with high density like Carmel even if designed to HI standards.

The memo concluded with the following recommendation: "Take Carmel off the list of DA-GPA projects and demand Planning initiate the GPA with Regional Commercial ASAP or initiate by motion (at least threaten to)."  Ex. B-3.  Five days later, August 23, 2016, DCP initiated a GPA for the Mateo project.

At that point, Carmel intensified an already robust outreach campaign to Arts District stakeholders, which was headed by Max Zeff, the son of Carmel's CEO.  At the same time, through various consultants, it began working in detail with planners in DCP to come up with an acceptable project configuration.

Meanwhile, Mr. Huizar was in the midst of one of the most-significant fundraising pushes of his career.  In May 2016, he hosted a quarter-million-dollar event for Hilary Clinton on short notice.  Then, between July 2016 and May 2017, he was tasked with raising hundreds of thousands of dollars for at least the following candidates and causes: Measure HHH, Measure H, No on S, Measure JJJ, El Grito, Altamed, Monica Garcia, Maria Teresa Santillan-Beas, Paul Koretz, Curren Price, Gil Cedillo, Mitch O'Farrell, John Chiang, Make-A-Wish Foundation, Los Angeles County High School for the Arts, Gabriel Buelna, Denise Diaz, Salesian High School, Monica Rodriguez, Wendy Carillo, Jimmy Gomez, Janice Hahn, and his own Officeholder account.

Two of the most prominent fundraising campaigns during this time involved Mr. Huizar's support for Measures HHH and H, major homelessness initiatives for which he committed to raise hundreds of thousands of dollars.  As part of his support for HHH, and as the architect of the measure, Mr. Huizar was personally responsible for raising at least $300,000 into a joint PAC created with Mayor Eric Garcetti, Mr. Wesson, and Councilmember Marqueece Harris-Dawson.  In

addition, he also raised money into another PAC, Community Support PAC (PAC B in the FSI), managed by Michael Trujillo, with the aim of sending mailers related to HHH and H to constituents in CD-14.

In October 2016, roughly two months after DCP initiated the Mateo GPA, Mr. Goldman asked Carmel to make a $25,000 contribution to Community Support PAC in connection with Measure HHH.  After securing approval from counsel and Carmel's CEO, Ron Zeff, Carmel agreed to make the contribution in an even split among the entities associated with its three DTLA properties.  Ex. B-4.[8] According to Mr. Goldman, the amount that Carmel contributed was in line with that of other major developers.  Ex. B-5.  It was also in line with other contributions to other Councilmembers and affiliated PACs that Carmel had made in the past.  And not only was the money not for Mr. Huizar personally, or for any candidate campaign, it was made to a PAC controlled by a third party for mailers related to a homelessness initiative.

As alleged in the FSI, Mr. Cotter asked Mr. Goldman whether it made sense to set up a meeting with Mr. Huizar to deliver the contribution checks and "talk big picture, etc."  It is not clear from the message what exactly Mr. Cotter meant by "big picture."  At the time, the Mateo project was in the early stages of the DCP process and likely would not reach Mr. Huizar's desk for over a year.  Cumulus, on the other hand, had been approved by the Council, but was potentially under threat due to a construction moratorium proposed by Measure S.  Carmel also had other projects in Los Angeles, and Mr. Huizar was the Chair of the PLUM Committee.

In early February 2017, while Carmel was working independently with the

---

[8] The FSI implies a connection between Mr. Huizar's decision to support a GPA for Mateo and Carmel's months-later contribution to Community Support PAC.  If correct, that would imply accounting, wire, tax, and possibly securities fraud by Carmel, as well as obstruction, given that Carmel invoiced the contributions equally among the separate legal vehicles associated with its three DTLA properties.  Nobody from Carmel has been charged.

community and DCP on the Mateo project, Mr. Huizar asked the company to donate another $25,000 to Community Support PAC for mailers related to Measure H. As before, Mr. Cotter sought approval from legal counsel and Ron Zeff, all of whom signed off after receiving information from Mr. Goldman. This second contribution was made entirely by CP V Cumulus, LLC, the holding vehicle for Cumulus. Exs. B-6-7.

As alleged in the FSI, Mr. Cotter sent Mr. Goldman an email shortly after making the contribution to ask whether Carmel was "in a more favored status with Jose compared to Holland [Partners]," another of Mr. Goldman's lobbying clients. Mr. Goldman's response was: "Hmmm. Can you be more specific?" There is no evidence of what happened after that.

Over the ensuing months, Carmel continued to work with DCP while meeting with members of the Arts District community. As part of that process, Carmel agreed to make a number of changes to the initial project proposal, and struck explicit deals with community stakeholders in exchange for agreements not to challenge the project. Throughout this process, the principal concern being voiced was not housing, but the availability of affordable commercial space for artists or other creative professions. See, e.g., Ex. B-8.

In May 2017, one of Carmel's earlier contributions led to a P.R. problem. Mr. Trujillo, who ran Community Support PAC, used PAC funds to print flyers supporting Monica Rodriguez, a candidate in CD-7. On May 9, a reporter from the L.A. Times contacted Carmel to ask why "the developers of a South LA lot [we]re supporting a Valley candidate?" Following a flurry of activity and handwringing over optics, Mr. Goldman called Mr. Esparza and said that he "probably will get fired over this," warning that he would "not go to [his] clients for another Mike Trujillo thing." Ex. B-9-11.

It is not clear how concerned Mr. Goldman actually was about getting fired

given that the very next day he solicited a $15,000 contribution from Carmel for Gil Cedillo's runoff election (Mr. Cedillo was also on PLUM).  Ex. B-12.  Either way, Mr. Goldman successfully leveraged the issue to convince Mr. Huizar that he should create a new PAC unaffiliated with Mr. Trujillo.[9]  In the fall of 2017, with the assistance of counsel, Families for a Better Los Angeles (PAC A in the FSI) was formed.

Originally, the plan was for Mr. Goldman to serve as an advisor, and for Mr. Huizar's principal fundraiser, Christina Kegeyan, to act as the chief fundraiser for the PAC.  After it was later determined that Ms. Rios would run for Mr. Huizar's seat and that Ms. Kegeyan would be her fundraiser, Ms. Kegeyan was disaffiliated to avoid conflicts of interest.  At that point, Mr. Goldman took over as the PAC's de facto head of fundraising.

This arrangement put Mr. Goldman in a structurally compromised position. On the one hand, as an advisor to the PAC who promised to help it raise money, he spoke frequently with Mr. Huizar about how and from whom to maximize incoming contributions.  On the other hand, because Mr. Goldman represented several major developers, Mr. Huizar was often seeking to raise money from Mr. Goldman's own clients.   An example of the problems created by this arrangement appears at Overt Act 264 in the FSI, where Mr. Huizar messaged Mr. Goldman about fundraising and, at the same time, asked about the purpose of an upcoming meeting with Carmel; Mr. Goldman responded to the latter question but not the former; Mr. Huizar repeated his initial query; and Mr. Goldman responded by

---

[9] Mr. Goldman was not the only person to propose this idea.  A few days earlier, upon hearing that Mr. Rios might run, lobbyist Chris Modrzejewski said in a call with Mr. Esparza: "I'll tell you what I would be doing right now is let's go create an independent committee . . . [a]nd let's go fucking load it up with dough while he's in office now, and nobody can run for-or nobody can even file for what, three years? Two and a half years?"

saying that, "as a friend," they should have the conversations at different times.[10]

In the spring of 2018, as the DCP process neared its conclusion, Carmel and members of the Arts District community pushed the career planners to approve a version of the project (Alternative 4) with a 5% affordable-housing percentage along with a large affordable-commercial set-aside for artists. Ex. 16-5. In emails justifying the request, Max Zeff described some of the many reasons why this proposal should be approved, including that it would result in the same number of affordable units as earlier versions of the project. Ex. 16-7. In an April 2018 letter summarizing the issue, Carmel's development representatives wrote that any other configuration would render the Mateo project infeasible in light of the affordable-commercial space prioritized by the local stakeholders:

> Our meetings and collaboration with the community have resulted in unanimous support in a letter from both Los Angeles River Artists & Business Association (LARABA} and Historic Cultural Neighborhood Council (HCNC) for Alternative #4 described in the DEIR which includes: a taller structure with fewer live/work units (475 units versus 600) and commercial Floor Area (125,000 square feet of creative office, retail and restaurant space versus the original 60,000 square feet). The support letters from LARABA and HCNC commenting on the DEIR and requesting the pursuit of Alternative #4 also included support for a 5% limit of the units to be restricted affordable. The community has expressed strong support for Alternative #4 and as a result the Planning Department has instructed us to prepare detailed supplemental plans for and to pursue Alternative #4 as the preferred project. In an effort to meet the City's direction to fulfill the community's wishes we will pursue Alternative #4 despite significant economic and risk implications.
> The added complexity to the project results in a higher cost and risk. The higher cost of the project is due in part to the increase in height, type of construction and structural coordination. The higher cost,

---

[10] According to the FSI, Mr. Goldman told Mr. Huizar in January 2018 that Mr. Cotter "was concerned he would suffer significant professional consequences, including the loss of his job with Company M, if Project M was not approved, and that if Project M did not obtain its preferred affordable housing requirements it would threaten the viability of the project altogether." Mr. Huizar does not doubt that Mr. Goldman said something to this effect or that he would have discounted it significantly, just as he did when other lobbyists attempted to push sky-is-falling narratives. In reality, Carmel's executive team referred to Mr. Cotter, who had just entitled Cumulus, as a "franchise player," and the CEO expressed his pride in Mr. Cotter, describing him as a "rockstar" during the key time periods in this case.

combined with the loss of 125 live/work units, in addition to the incorporation of the proposed publicly accessible pedestrian paseo and substantial investment to build it out (paseo links Mateo and Santa Fe Ave.), has required us to examine the measures that need to be taken to make the project economically viable.  We have concluded, consistent with our commitment to include affordable housing in this project but at a number to be defined upon the final configuration of the project, that 5% of the total live/work units (24 units), for Very Low income households (to the extent permissible by law a preference for leasing to artists) can be accommodated within the revised project.  Any greater number of affordable units would likely render the project financially infeasible.

Ex. 16-8.

In April 2018, Mr. Huizar sent Mr. Goldman a spreadsheet indicating that, among other things, he hoped to raise $50,000 from Carmel before June of that year.  During the same month, Mr. Goldman told Mr. Cotter that he could "skip [a] Huizar dinner," but should do a dinner for "Wesson and Monica Rodriguez."  A few weeks later, Carmel made its third and final contribution to a Huizar-affiliated PAC.  The contribution was for $25,000, rather than $50,000, and was split evenly between the vehicles for Cumulus and Mateo.  Exs. B-13-14.

Around the same time, Carmel had a meeting with DCP to discuss the final configuration of the Mateo project.  To Mr. Cotter's dismay, Mr. Huizar not only didn't participate in the meeting, but was not even in town at the time.  Ex. B-15.  Nonetheless, according to a later memo drafted by Mr. Kuk, the career planners in DCP agreed with Carmel and the community stakeholders and recommended approval with 5% affordable housing.  [Exhibit 16-13[11] ("Planning recommended 5% VLI and compliance with HI development standards (community workspace, expanded floor-to-ceiling heights, limited retail, etc.)")].  When the project came up for CPC review in July, however, the unelected body of Mayoral appointees overrode both DCP and the wishes of the community by insisting on an 11%

---

[11] The Table of Contents to Exhibit 16 incorrectly described Exhibit 16-13 as a memo dated August 9, 2018.  The date of the memo was September 28, 2018.

14

affordable-housing covenant to run for 55 years.[12]

At times during this case, the government has suggested that, in arriving at this conclusion, CPC was adhering to a previously-established precedent for affordable housing in the Arts District.  Setting aside that development standards for the Arts District were in flux at the time, this suggestion is simply untrue.

After the failure of the H-I Ordinance, the first major project from the Arts District to pass through CPC was a project referred to as Camden, located at 1525 Industrial St.  That project – which, unlike Mateo, faced significant community opposition and passed CPC by a narrow 5-4 vote – was approved with ~6% affordable housing.  Ex. 16-4.  Unlike Carmel, Camden also was not required to set aside affordable commercial space or make a multimillion-dollar payment to the CD-14 Affordable Housing Trust Fund.

Following the CPC vote, two labor unions filed CEQA appeals against the Mateo project, a practice routinely employed for major projects without an existing labor agreement.  Sometimes referred to as "greenmail," the undeniable motivation for filing these appeals was not concern for environmental conditions, or even a concern for the merit of the appeals themselves.  The purpose was simply to throw sand in the gears of project approvals pending labor negotiations.

While in some ways unseemly, these negotiations are the heart of real-world political dealmaking.  Politicians are not required to act as unbiased arbiters.  They are allowed to play favorites, choose sides, and express partisan and policy preferences through their actions.  They are also allowed to broker deals – between affordability and growth, between competing factions, between idealistic demands

---

[12] Interestingly, Cumulus passed out of the CPC with a 5% affordable-housing set aside, but, after an amendment supported by Mr. Wesson, the affordable-housing component was eliminated entirely.  See Exs. B-16-17; Urbanize, A lot of apartments plus a Whole Foods on the ground floor (Aug. 30, 2022) ("Cumulus does not include deed-restricted affordable housing").

and budgetary realities.  This is why winning elections is important.

In L.A., no special interest wields more power than organized labor.  In part, that is because many local politicians genuinely believe in the value of unions.  Mr. Huizar, for example, had two parents who achieved the American dream by virtue of union membership.  And he grew up admiring Latino politicians involved in the American labor movement.  While he strongly supported development, therefore, he also genuinely believed that the benefits of economic progress should be shared throughout the community.  He thus considered it part of his job – particularly as the representative of a working-class district – to encourage the use of union labor on large developments and hotels.

Support for labor was also grounded in a political calculation.  In a deep-blue city in a deep-blue state, unions were and are the single largest source of political contributions.  And, given the nature of organized labor, a motivated union was able to marshal unparalleled numbers of people to vote, to canvass, and to otherwise to support or oppose electoral campaigns.

Because of these dynamics, it was often the case that council offices would respond to CEQA appeals by pushing for meetings between developers and union representatives.  Indeed, in the case of the Cumulus project, Mr. Wesson and Mr. Goldman coordinated a February 2016 meeting inside of Mr. Wesson's council office between Carmel and CREED.  Ex. B-18.  Mr. Huizar did not go that far for Mateo, but he did ask Carmel to meet with union representatives in an effort to come up with a labor accord before the project was finally approved.

The FSI alleges that this union issue, not the community-benefits package, was at the heart of the Mateo scheme.  As admitted in Mr. Huizar's plea agreement and factual basis, he stated to Mr. Goldman in a late-2018 meeting that, in light of his wife's impending campaign, he would only take the political hit of voting against the labor unions if Carmel made an additional contribution to the Families

PAC.  Even under the forgiving standard applied to campaign contributions, this was admittedly a bribe.

Ultimately, even though Carmel did not make any further contributions to the PAC, Mr. Huizar nonetheless voted down the union appeals.[13]  In the process, he also approved a revised community-benefits package – based in part on a publicly-filed appeal submitted by Carmel (Ex. 16-16) – that included a 6% affordable housing covenant, a unique affordable-commercial covenant prioritized by the local community, and a $2.25 million payment to the CD-14 affordable housing trust fund.

This package, which had strong community support and was unanimously approved both in PLUM and Council, deviated from the one approved by CPC in at least two salient ways.  First, it included a reduced affordable-housing component, which took the 55-year set aside down from 11% to 6%.  Second, it required a multimillion-dollar payment to the CD-14 affordable-housing trust fund that was intended to be used for affordable-housing initiatives throughout Mr. Huizar's district.[14]  As mentioned, Mateo also had a unique affordable-commercial set aside that was both prioritized by the local community and, like an affordable-residential set aside, reduced the available floor area that Carmel could rent out at market rates, negatively impacting the economic viability of the project.

Memos and text messages from Mr. Kuk show how this community-benefits

---

[13] Following Council approval, the unions sued Carmel, resulting in various settlements.  Notably, this was all happening against the backdrop of ongoing labor negotiations on the larger Cumulus project, and the two were tied together.  Ex. B-22 at 2 (describing labor issues on Mateo as "[t]ied to cumulus low rise project").

[14] Mr. Huizar's office asked for these payments for two reasons.  First, they sought to ensure that the benefits of affordable housing would be realized even if, as was often the case, developers did not build after entitling a property, but instead sought to sell it for increased value.  Second, it allowed him to balance affordability and growth in certain areas with stability and community in others – for example, by applying money generated by a new development in a formerly-industrial area of the Arts District to expiring rent covenants in a stable community with a unique identity like Boyle Heights.

package came about, and that nothing about it was particularly unusual.  They also
reveal the individualized, sliding-scale approach to community benefits that Mr.
Huizar's office took, in which he sought to balance different community benefits –
affordable commercial, affordable residential, trust-fund payments, other public
improvements – based on feedback from the community, the developer, and
planning staff, along with his own priorities and vision.

In an August 1, 2018 memo attached as Exhibit B-22, Mr. Kuk summarized
the project history and Carmel's affordable-housing arguments, writing that
Carmel was asking for a 5% set aside, which was the same as Camden (see Exhibit
16-4), that a 5% set aside on the current configuration would result in the same
total number of units as the initial proposal but with nicer apartments (see Exhibit
16-7), and that Carmel had tried submitting a planning application with 5% in
2016, but that it was rejected by planning, which was pushing the H-I Ordinance,
so Carmel instead submitted one proposing "up to 11%" affordable housing (see
Exhibit 16-9).  Writing that CD-14 "needs to weigh in on what we need/want," Mr.
Kuk tentatively suggested, among other things, a 5% residential set aside for
extremely-low income tenants.  Ex. B-22.

A week later, during a text-message exchange about a different project
(Avalon Bay), Mr. Kuk explained the process for coming up with a payment to the
CD-14 Affordable Housing Trust Fund.  Ex. 16-12.  As Mr. Kuk wrote, Mr.
Huizar's office did not have the ability to determine exactly how much it would
cost developers to set aside apartments for low-income tenants, so, on Avalon Bay,
Mateo, and other projects, Mr. Kuk relied on "feel" and past precedent to make his
trust-fund payment recommendations.  In the case of Avalon Bay – which, just like
Mateo, was a 475-unit project in the Arts District approved at the same time – Mr.
Kuk recommended a lower payment to the CD-14 Affordable Housing Trust Fund

18

than that ultimately required for Mateo.[15]

On September 28, 2018, Mr. Kuk wrote another memo summarizing the history of the Mateo project – including that the career planners had approved 5% affordable housing which was revised upward to 11% by the noncareer Mayoral appointees on CPC – and setting forth a range of community-benefit options. Ex. 16-13. The range of options reflected the tradeoff approach that Mr. Kuk and Mr. Huizar typically employed when fashioning community benefits: more affordable-residential space would result in a reduced lump-sum payment and vice-a-versa. The options also acknowledged the unique affordable-commercial component of the project, which was the same in all scenarios because it was the key priority for the community.

On October 2, DCP staff recommended denying the union appeals as lacking merit. Ex. 16-15. On October 10, Carmel submitted a public motion requesting an adjustment to the affordable-housing percentage. Ex. 16-16. On October 16, with neither a PAC contribution nor a labor agreement in place, Mr. Huizar agreed with DCP's recommendation to deny the labor union appeals, voted them down, and approved a community-benefits package that was roughly equivalent to the fourth option set forth in Mr. Kuk's September 28 memo. In so doing, he read from text drafted by Mr. Kuk, who had independently advocated for the project since 2016:

> This is yet another major development for the Arts District, and I'm very much looking forward to seeing this new mixed-use project, particularly with the unique and innovative public benefits being proposed.

---

[15] The Avalon Bay approval further undercuts the suggestion that Mr. Huizar's actions on the Mateo project were uniquely favorable. In mid-2018, the career planners in DCP recommended that Avalon Bay be approved with 5% of the residential units set aside for very-low-income tenants. As with Mateo, the unelected Mayoral appointees in CPC then overrode the career planners and sought to require that 11% of the residential units be set aside for very-low-income tenants. As with Mateo, Mr. Huizar then overrode CPC, changing the income mix for the affordable-housing units and requiring a payment to the CD-14 Affordable Housing Trust Fund (though not requesting affordable-commercial space).

> I understand the project will be providing a portion of its commercial
> space as affordable to artists and local businesses. As Downtown has
> continued to develop, many local businesses and small business
> owners are finding it harder to keep up with rising commercial rents.
> Our legacy businesses are anchors of our community, and to have
> them leave our neighborhoods is a tragedy. With innovative solutions
> like these, we can ensure that all of our community institutions can
> share in our district's continued development.
> I'd like to request the applicant implement an affirmative marketing
> plan for artists and local businesses that includes the designation of an
> identified outreach coordinator who will be responsible for ensuring
> that local businesses and artists are adequately recruited for these
> affordable commercial spaces, and that the plan be submitted to the
> City prior to the start of leasing.
> Additionally, I'd like to request that the applicant provide $2.25M to
> the CD14 Public Benefits Trust Fund for affordable housing within
> the district, with a portion to be provided prior to the issuance of
> building permits. This would ensure that we can continue to
> implement public improvements in the 14th District even if this
> project were to be delayed in its construction for whatever reason.

Ex. 16-17.  At the end of the hearing, the project was unanimously approved with

wide community support.

On October 29, Mr. Goldman texted Mr. Cotter to let him know that Mr.

Huizar still wanted a meeting between Mr. Cotter, Mr. Huizar, and "the laborers so

you can shake hands in front of him."  Ex. B-23.  On October 30, the day before

the Council hearing, Mr. Goldman texted Mr. Cotter: "No meeting with Laborers is

necessary.  All good for tomorrow in Council on Mateo.  Jose is asking that in your

communications with the Laborers you let them know you're brining them to the

table because of a mutual friend."  Id.  On October 31, the revised project was

unanimously approved in Council.  Following Council approval, various unions

sued Carmel, and Carmel entered into settlements.  Exs. B-19-21.  The Mateo

project is currently under construction with an anticipated completion date some

time in 2024.

***

Against this backdrop, the government zeroed in a single change to a single

component of a single project at a single step in the planning process – the decision

to revise upward the affordable housing percentage on Mateo made by unelected

20

Mayoral appointees on CPC who have no loyalty to CD-14 or accountability to constituents – to suggest that the 475-unit project being built on a former dirt lot was somehow detrimental to the cause of housing in Los Angeles generally, and affordable housing specifically.  In reality, this project created hundreds of new housing units on a lot that sat fallow for decades due to planning and zoning dysfunction, created dozens of affordable-reserved units in line with other concurrent project approvals in the Arts District, created a unique affordable-commercial component prioritized by the local community, generated a multimillion-dollar lump-sum payment to the CD-14 Affordable Housing Trust Fund,[16] resulted in hundreds of construction jobs, economic activity and vitality, and intangible benefits (like increased public safety, environmental remediation, and the elimination of blight), and is the first of its kind to do all of these things in an area that every informed observer agrees will benefit from high-density growth.

Bottom line, as with many other things in this case, the Mateo project is much more complicated than it has at times been made out to be.  And, on the merits, the project represents a positive step forward.  Any suggestion that Mr. Huizar's tenure in CD-14 was detrimental to housing generally, or affordable housing specifically, is inconsistent with objective reality.

---

[16] The time value of this payment should also be considered.  Affordable-housing covenants typically run for 55 years.  Compounded at the current fed funds rate, $2.25 million over 55 years is the same as $39.1 million at the end of the period.  Also, as mentioned above, developers are not obligated to build after receiving entitlements, and many do not.  An immediate payment ensures that progress on affordable housing is actually made.

# EXHIBIT B-1

# Lobbying Registrations

Note: This report is filtered by search term used

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2020 | Firm | Urban Solutions, LLC (01/07/2020 - 08/31/2020) | Urban Solutions, LLC | (see clients) | (see clients) |
| 2020 | Lobbyist | Goldman, Morrie (01/07/2020 - 08/31/2020) | Urban Solutions, LLC | (not reported on Lobbyist Registration) | ANY CITY AGENCY |
| 2020 | Lobbyist | Vizcarra, Knarik (01/01/2020 - 12/31/2020) | Urban Solutions, LLC | (not reported on Lobbyist Registration) | City Council; Neighborhood Councils; Planning, City |
| 2020 | Client | Anastasi Development Company (01/07/2020 - 08/31/2020) | Urban Solutions, LLC | Proposed Residential Project /Washington & Oak | ANY CITY AGENCY |
| 2020 | Client | Clear Channel Outdoor, LLC (01/07/2020 - 07/09/2020) | Urban Solutions, LLC | Digital Signage (CF12-1611) | ANY CITY AGENCY |
| 2020 | Client | Holland Partner Group (01/07/2020 - 06/30/2020) | Urban Solutions, LLC | Taix /1911 Sunset Blvd.: Proposed multi-family residential project | ANY CITY AGENCY |
| 2020 | Client | Lightstone (01/07/2020 - 08/31/2020) | Urban Solutions, LLC | Proposed Hotel /Pico & Figueroa (CF 16-0073) | ANY CITY AGENCY |
| 2020 | Client | Los Angeles Chinatown Business Council (01/07/2020 - 08/31/2020) | Urban Solutions, LLC | General Government Affairs re: Chinatown | ANY CITY AGENCY |
| 2020 | Client | Los Angeles Professional Managers Association (01/07/2020 - 06/30/2020) | Urban Solutions, LLC | Government Efficiency Issues | ANY CITY AGENCY |
| 2020 | Client | Naim Associates (01/07/2020 - 08/31/2020) | Urban Solutions, LLC | Northeast LA Plaza /3800 Pasadena Avenue: Mixed Use Residential Project | ANY CITY AGENCY |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2020 | Client | Panorama City I and II, LLC (01/07/2020 - 08/31/2020) | Urban Solutions, LLC | Proposed Development / Removal of Q-Conditions /14541 W. Terra Bella Street: <br><br> Mixed Use Development Project | City Council |
| 2020 | Client | PayLock (01/07/2020 - 08/31/2020) | Urban Solutions, LLC | Digital Permitting - Demonstration Project: <br><br> Potential demonstration project of digital permitting system for LA DOT. | ANY CITY AGENCY |
| 2020 | Client | Red Hook Capital Partners (01/07/2020 - 07/02/2020) | Urban Solutions, LLC | Development of Charter Schools /Various: <br><br> Liaison with City in relation to entitlements and approval of Charter Schools. | ANY CITY AGENCY |
| 2020 | Client | Rise City Properties (01/07/2020 - 08/31/2020) | Urban Solutions, LLC | Multi-Family Residential Project /743-749 S. Grammercy: <br><br> Proposed 47-Unit TOC Project | ANY CITY AGENCY |
| 2020 | Client | The Ketter Group (01/07/2020 - 08/31/2020) | Urban Solutions, LLC | Orange Grove /1551-1557 Orange Grove Project: <br><br> Proposed TOC Project | ANY CITY AGENCY |
| 2020 | Client | The Related Companies (01/07/2020 - 06/30/2020) | Urban Solutions, LLC | Grand Avenue Project /Parcel Q (CF 13-1694): <br><br> Proposed Equinox Hotel. | ANY CITY AGENCY |
| 2020 | Client | Triumph Management Company (01/07/2020 - 08/31/2020) | Urban Solutions, LLC | Proposed Multi-Family Residential Project /905 Beacon Avenue: <br><br> Proposed TOC project | City Council |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2020 | Client | Watt Communities (01/07/2020 - 08/31/2020) | Urban Solutions, LLC | Coolidge Avenue Project /3022 Coolidge Avenue (DIR-2016-585-DB):<br><br>30-unit condominium project. | ANY CITY AGENCY |
| 2019 | Firm | Urban Solutions, LLC (01/10/2019 - 12/31/2019) | Urban Solutions, LLC | (see clients) | (see clients) |
| 2019 | Lobbyist | Goldman, Morrie (01/10/2019 - 12/31/2019) | Urban Solutions, LLC | (not reported on Lobbyist Registration) | ANY CITY AGENCY |
| 2019 | Lobbyist | Vizcarra, Knarik (01/10/2019 - 12/31/2019) | Urban Solutions, LLC | (not reported on Lobbyist Registration) | ANY CITY AGENCY |
| 2019 | Client | Anastasi Development Company (01/10/2019 - 12/31/2019) | Urban Solutions, LLC | Proposed Residential Project /Washington & Oak | ANY CITY AGENCY |
| 2019 | Client | Clear Channel Outdoor, LLC (01/10/2019 - 12/31/2019) | Urban Solutions, LLC | Digital Signage (CF12-1611) | ANY CITY AGENCY |
| 2019 | Client | Holland Partner Group (01/10/2019 - 12/31/2019) | Urban Solutions, LLC | Taix /1911 Sunset Blvd.:<br><br>Proposed multi-family residential project | ANY CITY AGENCY |
| 2019 | Client | Ketter & Associates (03/12/2019 - 12/31/2019) | Urban Solutions, LLC | Orange Grove /1551-1557 Orange Grove Project:<br><br>Proposed TOC Project | ANY CITY AGENCY |
| 2019 | Client | Lightstone (01/10/2019 - 12/31/2019) | Urban Solutions, LLC | Proposed Hotel /Pico & Figueroa (CF 16-0073) | ANY CITY AGENCY |
| 2019 | Client | Los Angeles Chinatown Business Council (01/10/2019 - 12/31/2019) | Urban Solutions, LLC | General Government Affairs re: Chinatown | ANY CITY AGENCY |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2019 | Client | Los Angeles Professional Managers Association (01/10/2019 - 12/31/2019) | Urban Solutions, LLC | Government Efficiency Issues | ANY CITY AGENCY |
| 2019 | Client | Mitsui Fudosan America, Inc. (01/10/2019 - 07/31/2019) | Urban Solutions, LLC | Proposed Residential Project /Figueroa & Eighth Street, DTLA: Multi-Family Residential Building. | ANY CITY AGENCY |
| 2019 | Client | Naim Associates (01/10/2019 - 12/31/2019) | Urban Solutions, LLC | Northeast LA Plaza /3800 Pasadena Avenue: Mixed Use Residential Project | ANY CITY AGENCY |
| 2019 | Client | Panorama City I and II, LLC (07/29/2019 - 12/31/2019) | Urban Solutions, LLC | Proposed Development / Removal of Q-Conditions /14541 W. Terra Bella Street: Mixed Use Development Project | City Council |
| 2019 | Client | PayLock (01/10/2019 - 12/31/2019) | Urban Solutions, LLC | Smart Booting: Self-Release booting program with LA-DOT. | ANY CITY AGENCY |
| 2019 | Client | Ratner Property Management (07/15/2019 - 12/31/2019) | Urban Solutions, LLC | Highway Dedication /8101 N. San Fernando Road: Seek reduction in dedication/street improvements in relation to proposed multi-family residential project. | City Council |
| 2019 | Client | Red Hook Capital Partners (10/01/2019 - 12/31/2019) | Urban Solutions, LLC | Development of Charter Schools /Various: Liaison with City in relation to entitlements and approval of Charter Schools. | ANY CITY AGENCY |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2019 | Client | Rise City Properties (08/01/2019 - 12/31/2019) | Urban Solutions, LLC | Multi-Family Residential Project /743-749 S. Grammercy:<br><br>Proposed 47-Unit TOC Project | ANY CITY AGENCY |
| 2019 | Client | The Related Companies (01/10/2019 - 12/31/2019) | Urban Solutions, LLC | Grand Avenue Project /Parcel Q (CF 13-1694):<br><br>Proposed Equinox Hotel. | ANY CITY AGENCY |
| 2019 | Client | Watt Communities (01/10/2019 - 12/31/2019) | Urban Solutions, LLC | Hubbard Street Project /13245 Hubbard Street:<br><br>Multi-Family Residential Project | ANY CITY AGENCY |
| 2018 | Firm | Urban Solutions, LLC (01/02/2018 - 12/31/2018) | Urban Solutions, LLC | (see clients) | (see clients) |
| 2018 | Lobbyist | Goldman, Morrie (01/02/2018 - 12/31/2018) | Urban Solutions, LLC | (not reported on Lobbyist Registration) | ANY CITY AGENCY |
| 2018 | Lobbyist | Vizcarra, Knarik (11/25/2018 - 12/31/2018) | Urban Solutions, LLC | (not reported on Lobbyist Registration) | ANY CITY AGENCY |
| 2018 | Client | 4000 Chevy Chase LLC (01/02/2018 - 12/31/2018) | Urban Solutions, LLC | Creative Office Project /4000 Chevy Chase | ANY CITY AGENCY |
| 2018 | Client | 6th & Alameda, LLC (01/02/2018 - 12/31/2018) | Urban Solutions, LLC | 6AM Project /6th & Alameda Streets:<br><br>Proposed Mixed Use Project, including residential, hotel and commercial. | ANY CITY AGENCY |
| 2018 | Client | 9355 Culver Associates, LLC (01/02/2018 - 12/31/2018) | Urban Solutions, LLC | CUB /9355 Culver Blvd.:<br><br>On-site alcohol sales at proposed Food Hall, in both City of Culver City and City of Los Angeles. | City Council |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2018 | Client | Anastasi Development Company (01/02/2018 - 12/31/2018) | Urban Solutions, LLC | Proposed Residential Project /Washington & Oak | ANY CITY AGENCY |
| 2018 | Client | Angels Landing Partners, LLC (01/02/2018 - 12/31/2018) | Urban Solutions, LLC | Angels Landing Development Project /361 S. Hill Street (CF 14-0425-S4): Mixed Use Project, including hotel, residential and retail, based on City RFP. | ANY CITY AGENCY |
| 2018 | Client | Cahuenga Investors (07/01/2018 - 12/31/2018) | Urban Solutions, LLC | Cahuenga Restaurant /1518 Cahuenga Blvd.: Restaurant & Roof Top Bar | ANY CITY AGENCY |
| 2018 | Client | Carmel Partners, Inc. (01/02/2018 - 12/31/2018) | Urban Solutions, LLC | Arts District-Mateo Project /520,524,528 & 532 S. Mateo: 533,274-square feet live/work mixed-use development. | ANY CITY AGENCY |
| 2018 | Client | Commonwealth Land Title Insurance Company (01/02/2018 - 12/31/2018) | Urban Solutions, LLC | Broadway & 4th - Encroachment /400 S. Broadway: Underground, Alley Encroachment | ANY CITY AGENCY |
| 2018 | Client | Holland Partner Group (01/02/2018 - 12/31/2018) | Urban Solutions, LLC | Apex - Tower Two /Ninth & Figueroa (DIR-2015-97-SPR-1A; VTT-62367-M3-1A) | ANY CITY AGENCY |
| 2018 | Client | iHeartMedia, Inc., Clear Channel Outdoor, and Affiliated Entities (01/02/2018 - 12/31/2018) | Urban Solutions, LLC | Digital Signage (CF12-1611) | ANY CITY AGENCY |
| 2018 | Client | Lightstone (01/02/2018 - 12/31/2018) | Urban Solutions, LLC | Proposed Hotel /Pico & Figueroa (CF 16-0073) | ANY CITY AGENCY |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2018 | Client | Lizard Capital (01/02/2018 - 12/31/2018) | Urban Solutions, LLC | Spring Street Hotel /631, 633 & 635 S. Spring Street: <br><br> TFAR, Master CUB, DOT issues | City Council |
| 2018 | Client | Los Angeles Chinatown Business Council (01/02/2018 - 12/31/2018) | Urban Solutions, LLC | General Government Affairs re: Chinatown | ANY CITY AGENCY |
| 2018 | Client | Los Angeles Professional Managers Association (01/02/2018 - 12/31/2018) | Urban Solutions, LLC | Government Efficiency Issues | ANY CITY AGENCY |
| 2018 | Client | Mitsui Fudosan America, Inc. (01/02/2018 - 12/31/2018) | Urban Solutions, LLC | Proposed Residential Project /Figueroa & Eighth Street, DTLA: <br><br> Multi-Family Residential Building. | ANY CITY AGENCY |
| 2018 | Client | Naim Associates (09/01/2018 - 12/31/2018) | Urban Solutions, LLC | Northeast LA Plaza /3800 Pasadena Avenue: <br><br> Mixed Use Residential Project | City Council |
| 2018 | Client | Palisades Capital Partners LLC (01/02/2018 - 12/31/2018) | Urban Solutions, LLC | 1111 Sunset Boulevard /1111 Sunset Boulevard: <br><br> Proposed Mixed Use Development. | ANY CITY AGENCY |
| 2018 | Client | PayLock (01/02/2018 - 12/31/2018) | Urban Solutions, LLC | Smart Booting: <br><br> Self-Release booting program with LA-DOT. | ANY CITY AGENCY |
| 2018 | Client | The Related Companies (01/02/2018 - 12/31/2018) | Urban Solutions, LLC | Grand Avenue Project /Parcel Q (CF 13-1694): <br><br> Proposed Equinox Hotel. | ANY CITY AGENCY |
| 2018 | Client | United American Properties, Inc. (01/02/2018 - 06/20/2018) | Urban Solutions, LLC | Hotel & Apartment Project /7th & Bixel (ZA 2015-3926 CU-CUB-SPPA-SPP) | ANY CITY AGENCY |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2017 | Lobbyist | Goldman, Morrie (01/04/2017 - 12/31/2017) | Urban Solutions, LLC | (not reported on Lobbyist Registration) | ANY CITY AGENCY |
| 2017 | Client | 4000 Chevy Chase LLC (01/04/2017 - 12/31/2017) | Urban Solutions, LLC | Creative Office Project /4000 Chevy Chase | ANY CITY AGENCY |
| 2017 | Client | Anastasi Development Company (01/04/2017 - 12/31/2017) | Urban Solutions, LLC | Proposed Residential Project /Washington & Oak | ANY CITY AGENCY |
| 2017 | Client | Carmel Partners, Inc. (01/04/2017 - 12/31/2017) | Urban Solutions, LLC | Arts District-Mateo Project /520,524,528 & 532 S. Mateo: 533,274-square feet live/work mixed-use development. | ANY CITY AGENCY |
| 2017 | Client | Catalina Heights, LLC (01/04/2017 - 03/31/2017) | Urban Solutions, LLC | Residential Project /416 S. Catalina Street: Density Bonus and Historical Designation Issues. | ANY CITY AGENCY |
| 2017 | Client | Commonwealth Land Title Insurance Company (05/01/2017 - 12/31/2017) | Urban Solutions, LLC | Broadway & 4th - Encroachment /400 S. Broadway: Underground, Alley Encroachment | ANY CITY AGENCY |
| 2017 | Client | DP-1726/1756 Spring Street LLC (05/01/2017 - 12/31/2017) | Urban Solutions, LLC | Conditional Use Permit /1726 Spring Street: CUP for full-line of alcohol for proposed restaurant. | ANY CITY AGENCY |
| 2017 | Client | Holland Partner Group (01/04/2017 - 12/31/2017) | Urban Solutions, LLC | Apex - Tower Two /Ninth & Figueroa (DIR-2015-97-SPR-1A; VTT-62367-M3-1A) | ANY CITY AGENCY |
| 2017 | Client | iHeartMedia, Inc., Clear Channel Outdoor, and Affiliated Entities (01/04/2017 - 12/31/2017) | Urban Solutions, LLC | Digital Signage (CF12-1611) | ANY CITY AGENCY |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2017 | Client | JWDA (03/31/2017 - 12/31/2017) | Urban Solutions, LLC | Hotel /2005 W. James Wood Blvd.: <br><br> General Plan Amendment/Zone Change | ANY CITY AGENCY |
| 2017 | Client | Lightstone (01/04/2017 - 12/31/2017) | Urban Solutions, LLC | Proposed Hotel /Pico & Figueroa (CF 16-0073) | ANY CITY AGENCY |
| 2017 | Client | Listen to the River, LLC (01/04/2017 - 12/31/2017) | Urban Solutions, LLC | Baby's On Spring /1726-1746 North Spring Street: <br><br> CUB, Live Music Venue | ANY CITY AGENCY |
| 2017 | Client | Lizard Capital (04/15/2017 - 12/31/2017) | Urban Solutions, LLC | Spring Street Hotel /631, 633 & 635 S. Spring Street: <br><br> TFAR, Master CUB, DOT issues | City Council |
| 2017 | Client | Los Angeles Chinatown Business Council (01/04/2017 - 12/31/2017) | Urban Solutions, LLC | General Government Affairs re: Chinatown | ANY CITY AGENCY |
| 2017 | Client | Los Angeles Professional Managers Association (01/04/2017 - 12/31/2017) | Urban Solutions, LLC | Government Efficiency Issues | ANY CITY AGENCY |
| 2017 | Client | Mitsui Fudosan America, Inc. (01/04/2017 - 12/31/2017) | Urban Solutions, LLC | Proposed Residential Project /Figueroa & Eighth Street, DTLA: <br><br> Multi-Family Residential Building, | ANY CITY AGENCY |
| 2017 | Client | Oxley Place LLC (04/13/2017 - 12/31/2017) | Urban Solutions, LLC | Multi-Family Residential Project /1400 S. Flower Street: <br><br> TFAR under 50,000 s.f., Site Plan Review and VTTM. | City Council |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2017 | Client | Palisades Capital Partners LLC (01/04/2017 - 12/31/2017) | Urban Solutions, LLC | 1111 Sunset Boulevard /1111 Sunset Boulevard: Proposed Mixed Use Development. | ANY CITY AGENCY |
| 2017 | Client | PayLock (01/04/2017 - 12/31/2017) | Urban Solutions, LLC | Smart Booting: Self-Release booting program with LA-DOT. | ANY CITY AGENCY |
| 2017 | Client | The Related Companies (01/04/2017 - 12/31/2017) | Urban Solutions, LLC | Grand Avenue Project /Parcel Q (CF 13-1694): Proposed Equinox Hotel. | ANY CITY AGENCY |
| 2017 | Client | Trammell Crow Residential (01/04/2017 - 12/31/2017) | Urban Solutions, LLC | Proposed residential development. /850 S. Hill Street | ANY CITY AGENCY |
| 2017 | Client | United American Properties, Inc. (01/04/2017 - 12/31/2017) | Urban Solutions, LLC | Hotel & Apartment Project /7th & Bixel (ZA 2015-3926 CU-CUB-SPPA-SPP) | ANY CITY AGENCY |
| 2016 | Lobbyist | Goldman, Morrie (01/09/2016 - 12/31/2016) | Urban Solutions, LLC | (not reported on Lobbyist Registration) | ANY CITY AGENCY |
| 2016 | Client | 4000 Chevy Chase LLC (05/14/2016 - 12/31/2016) | Urban Solutions, LLC | Potential Residential Project /4000 Chevy Chase | City Council |
| 2016 | Client | 511 West Grand LLC (01/09/2016 - 05/31/2016) | Urban Solutions, LLC | 511 West Grand /West Grand & Cesar Chavez.: Proposed condominium project. | City Council |
| 2016 | Client | 5750 Hollywood Boulevard LLC (01/09/2016 - 12/31/2016) | Urban Solutions, LLC | Proposed Mixed Use Project /5750 Hollywood Boulevard (CF 15-0343) | City Council |
| 2016 | Client | Anastasi Development Company (01/09/2016 - 12/31/2016) | Urban Solutions, LLC | Proposed Residential Project /Washington & Oak | City Council |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2016 | Client | Apotheke East LA, LLC (07/29/2016 - 12/31/2016) | Urban Solutions, LLC | Conditional Use Permit /1746 North Spring Street (ZA-2016-2558-CUB): <br><br>Full line of alcohol, outdoor music and outdoor films. | City Council; Planning, City |
| 2016 | Client | Carmel Partners, Inc. (01/09/2016 - 12/31/2016) | Urban Solutions, LLC | Mixed Use Project /Cumulus Media Site (ENV 2014-4755-EIR) | ANY CITY AGENCY; City Council |
| 2016 | Client | DP-1726/1756 Spring Street LLC (07/29/2016 - 12/31/2016) | Urban Solutions, LLC | Conditional Use Permit /1726 Spring Street: <br><br>CUP for full-line of alcohol for proposed restaurant. | City Council; Planning, City |
| 2016 | Client | Grand Avenue L.A. (The Related Companies) (01/09/2016 - 12/31/2016) | Urban Solutions, LLC | Grand Avenue Project /Parcel Q (CF 13-1694): <br><br>Proposed Equinox Hotel. | ANY CITY AGENCY |
| 2016 | Client | Holland Partner Group (01/09/2016 - 12/31/2016) | Urban Solutions, LLC | Apex - Tower Two /Ninth & Figueroa (DIR-2015-97-SPR-1A; VTT-62367-M3-1A) | ANY CITY AGENCY |
| 2016 | Client | iHeartMedia, Inc., Clear Channel Outdoor, and Affiliated Entities (01/09/2016 - 12/31/2016) | Urban Solutions, LLC | Digital Signage (CF12-1611) | ANY CITY AGENCY |
| 2016 | Client | Lightstone (01/09/2016 - 12/31/2016) | Urban Solutions, LLC | Proposed Hotel /Pico & Figueroa (CF 16-0073) | City Council |
| 2016 | Client | Los Angeles Chinatown Business Council (01/09/2016 - 12/31/2016) | Urban Solutions, LLC | General Government Affairs re: Chinatown | ANY CITY AGENCY |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2016 | Client | Los Angeles Professional Managers Association (01/09/2016 - 12/31/2016) | Urban Solutions, LLC | Government Efficiency Issues | ANY CITY AGENCY |
| 2016 | Client | Mitsui Fudosan America, Inc. (03/15/2016 - 12/31/2016) | Urban Solutions, LLC | Proposed Residential Project /Figueroa & Eighth Street, DTLA: Multi-Family Residential Building. | City Council |
| 2016 | Client | Palisades Capital Partners LLC (01/09/2016 - 12/31/2016) | Urban Solutions, LLC | 1111 Sunset Boulevard /1111 Sunset Boulevard: Proposed Mixed Use Development. | ANY CITY AGENCY |
| 2016 | Client | PayLock (01/09/2016 - 12/31/2016) | Urban Solutions, LLC | Smart Booting: Self-Release booting program with LA-DOT. | ANY CITY AGENCY |
| 2016 | Client | Seventh Street Warehouse LLC (05/01/2016 - 12/31/2016) | Urban Solutions, LLC | River Gateway Project /2155 & 2185 East Seventh Street: Proposed LA River Development | City Council |
| 2016 | Client | Trammell Crow Residential (01/09/2016 - 12/31/2016) | Urban Solutions, LLC | Proposed residential development. /850 S. Hill Street | ANY CITY AGENCY |
| 2016 | Client | United American Properties, Inc. (01/09/2016 - 12/31/2016) | Urban Solutions, LLC | Hotel & Apartment Project /7th & Bixel (ZA 2015-3926 CU-CUB-SPPA-SPP) | City Council |
| 2015 | Lobbyist | Goldman, Morrie (01/01/2015 - 12/31/2015) | Urban Solutions, LLC | (not reported on Lobbyist Registration) | ANY CITY AGENCY |
| 2015 | Client | 5750 Hollywood Boulevard LLC (01/09/2015 - 12/31/2015) | Urban Solutions, LLC | Proposed Mixed Use Project /5750 Hollywood Boulevard | ANY CITY AGENCY |
| 2015 | Client | Anastasi Development Company (01/09/2015 - 12/31/2015) | Urban Solutions, LLC | Proposed Residential Project /Washington & Oak | ANY CITY AGENCY |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2015 | Client | ASB/Blatteis Palmetto LLC (01/09/2015 - 12/31/2015) | Urban Solutions, LLC | At Mateo (CF15-0979) | City Council |
| 2015 | Client | Astani Enterprises, Inc. (01/09/2015 - 12/31/2015) | Urban Solutions, LLC | Mixed Use Project /1501 Wilshire Blvd. (CF13-0761) | ANY CITY AGENCY |
| 2015 | Client | Carmel Partners, Inc. (01/09/2015 - 12/31/2015) | Urban Solutions, LLC | Mixed Use Project /Cumulus Media Site | ANY CITY AGENCY |
| 2015 | Client | Chrysler Group Realty Company LLC (01/09/2015 - 12/31/2015) | Urban Solutions, LLC | Proposed auto dealership. | ANY CITY AGENCY |
| 2015 | Client | City Market of Los Angeles (01/09/2015 - 10/31/2015) | Urban Solutions, LLC | Mixed Use Project/Master Plan /11th & San Pedro (CPC2013-4050) | ANY CITY AGENCY |
| 2015 | Client | Grand Avenue L.A. (The Related Companies) (01/09/2015 - 12/31/2015) | Urban Solutions, LLC | Grand Avenue Project /Parcel Q | ANY CITY AGENCY |
| 2015 | Client | Holland Residential (01/09/2015 - 12/31/2015) | Urban Solutions, LLC | Apex - Tower Two /Ninth & Figueroa | ANY CITY AGENCY |
| 2015 | Client | iHeartMedia, Inc., Clear Channel Outdoor, and Affiliated Entities (01/09/2015 - 12/31/2015) | Urban Solutions, LLC | Digital Signage (CF12-1611) | ANY CITY AGENCY |
| 2015 | Client | LA Lofts Chinatown LLC (01/09/2015 - 12/31/2015) | Urban Solutions, LLC | LA Lofts Chinatown LLC /1101 N. Main Street (VTT62781-CN ENV-2005-1843-EIR) | ANY CITY AGENCY |
| 2015 | Client | Lightstone (11/01/2015 - 12/31/2015) | Urban Solutions, LLC | Proposed Hotel /Pico & Figueroa | City Council |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2015 | Client | Los Angeles Chinatown Business Council (01/09/2015 - 12/31/2015) | Urban Solutions, LLC | General Government Affairs re: Chinatown | ANY CITY AGENCY |
| 2015 | Client | Los Angeles Professional Managers Association (01/09/2015 - 12/31/2015) | Urban Solutions, LLC | Government Efficiency Issues | ANY CITY AGENCY |
| 2015 | Client | Palisades Capital Partners LLC (07/31/2015 - 12/31/2015) | Urban Solutions, LLC | 1111 Sunset Boulevard /1111 Sunset Boulevard | ANY CITY AGENCY |
| 2015 | Client | Park Plaza Hotel (01/09/2015 - 12/31/2015) | Urban Solutions, LLC | Permitting Issues. | ANY CITY AGENCY |
| 2015 | Client | PayLock (01/09/2015 - 12/31/2015) | Urban Solutions, LLC | Smart Booting | ANY CITY AGENCY |
| 2015 | Client | Streetline Networks (01/09/2015 - 12/31/2015) | Urban Solutions, LLC | Parking Technologies | ANY CITY AGENCY |
| 2015 | Client | Trammell Crow Residential (01/09/2015 - 12/31/2015) | Urban Solutions, LLC | Proposed residential development. /850 S. Hill Street | ANY CITY AGENCY |
| 2015 | Client | United American Properties, Inc. (09/15/2015 - 12/31/2015) | Urban Solutions, LLC | Hotel & Apartment Project /7th & Bixel | City Council |
| 2014 | Lobbyist | Goldman, Morrie (01/01/2014 - 12/31/2014) | Urban Solutions, LLC | (not reported on Lobbyist Registration) | ANY CITY AGENCY |
| 2014 | Client | 5750 Hollywood Boulevard LLC (02/20/2014 - 12/31/2014) | Urban Solutions, LLC | Proposed Mixed Use Project /5750 Hollywood Boulevard | ANY CITY AGENCY |
| 2014 | Client | Anastasi Development Company (01/07/2014 - 12/31/2014) | Urban Solutions, LLC | Proposed Residential Project /Washington & Oak | ANY CITY AGENCY |
| 2014 | Client | Astani Enterprises, Inc. (01/07/2014 - 12/31/2014) | Urban Solutions, LLC | Mixed Use Project /5550 Hollywood Blvd. (DIR2012-3534) | ANY CITY AGENCY |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2014 | Client | C & C International LLC (01/07/2014 - 03/07/2014) | Urban Solutions, LLC | Certificate of Occupancy /3855 Wilshire Boulevard (PLAN CHECK10016-10000-20723) | ANY CITY AGENCY |
| 2014 | Client | Carmel Partners, Inc. (01/07/2014 - 12/31/2014) | Urban Solutions, LLC | Mixed Use Project /8th & Grand (CF12-0444) | ANY CITY AGENCY |
| 2014 | Client | Chrysler Group Realty Company LLC (01/07/2014 - 12/31/2014) | Urban Solutions, LLC | Chrysler Dealership/Street Vacation /2025 South Figueroa (CF07-3313) | ANY CITY AGENCY |
| 2014 | Client | City Market of Los Angeles (01/07/2014 - 12/31/2014) | Urban Solutions, LLC | Mixed Use Project/Master Plan /11th & San Pedro (CPC2013-4050) | ANY CITY AGENCY |
| 2014 | Client | Clear Channel Outdoor (01/07/2014 - 12/31/2014) | Urban Solutions, LLC | Digital Signage (CF12-1611) | ANY CITY AGENCY |
| 2014 | Client | Forest City Enterprises (01/07/2014 - 12/31/2014) | Urban Solutions, LLC | 11th & Hill. 12th & Broadway /Mixed Use Development (ZA2006-6513) | ANY CITY AGENCY |
| 2014 | Client | Grand Avenue L.A. (The Related Companies) (06/09/2014 - 12/31/2014) | Urban Solutions, LLC | Grand Avenue Project /Parcel Q | ANY CITY AGENCY |
| 2014 | Client | Holland Residential (01/07/2014 - 12/31/2014) | Urban Solutions, LLC | Mixed Use Projects /6th & Bixel, 1111 Wilshire (CF07-3825) | ANY CITY AGENCY |
| 2014 | Client | Los Angeles Chinatown Business Council (01/07/2014 - 12/31/2014) | Urban Solutions, LLC | General Government Affairs re: Chinatown | ANY CITY AGENCY |
| 2014 | Client | Los Angeles Professional Managers Association (01/07/2014 - 12/31/2014) | Urban Solutions, LLC | Government Efficiency Issues | ANY CITY AGENCY |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2014 | Client | Modern Parking, Inc. (01/07/2014 - 12/31/2014) | Urban Solutions, LLC | LA-DOT Parking Operator RFP | ANY CITY AGENCY |
| 2014 | Client | PayLock (05/15/2014 - 12/31/2014) | Urban Solutions, LLC | Smart Booting | ANY CITY AGENCY |
| 2014 | Client | Priority Dispatch Corp. (02/27/2014 - 04/30/2014) | Urban Solutions, LLC | Medical Priority Dispatch System | ANY CITY AGENCY |
| 2014 | Client | Streetline Networks (01/07/2014 - 12/31/2014) | Urban Solutions, LLC | Parking Technologies | ANY CITY AGENCY |
| 2014 | Client | T.A. Patty Development (01/07/2014 - 12/31/2014) | Urban Solutions, LLC | LA Lofts Chinatown LLC /1101 N. Main Street (VTT62781-CN ENV-2005-1843-EIR) | ANY CITY AGENCY |
| 2014 | Client | United Pacific Waste & Recycling Services (01/07/2014 - 12/31/2014) | Urban Solutions, LLC | Multifamily Solid Waste Franchise Collection (CF 10-1797-S16) | ANY CITY AGENCY |
| 2013 | Lobbyist | Goldman, Morrie (01/01/2013 - 12/31/2013) | Urban Solutions, LLC | (not reported on Lobbyist Registration) | ANY CITY AGENCY |
| 2013 | Client | American Communities (01/01/2013 - 12/31/2013) | Urban Solutions, LLC | Affordable Housing Project /1907 W. 6th Street (CF12-1915) | ANY CITY AGENCY |
| 2013 | Client | Anastasi Development Company (01/01/2013 - 12/31/2013) | Urban Solutions, LLC | Proposed Residential Project /Washington & Oak | ANY CITY AGENCY |
| 2013 | Client | Astani Enterprises, Inc. (01/01/2013 - 12/31/2013) | Urban Solutions, LLC | Mixed Use Project /5550 Hollywood Blvd. (DIR2012-3534) | ANY CITY AGENCY |
| 2013 | Client | C & C International LLC (10/01/2013 - 12/31/2013) | Urban Solutions, LLC | Certificate of Occupancy /3855 Wilshire Boulevard (PLAN CHECK10016-10000-20723) | ANY CITY AGENCY |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2013 | Client | Carmel Partners, Inc. (01/01/2013 - 12/31/2013) | Urban Solutions, LLC | Mixed Use Project /8th & Grand (CF12-0444) | ANY CITY AGENCY |
| 2013 | Client | Chrysler Group Realty Company LLC (01/01/2013 - 12/31/2013) | Urban Solutions, LLC | Chrysler Dealership /6110 Van Nuys Blvd. | ANY CITY AGENCY |
| 2013 | Client | City Market of Los Angeles (01/01/2013 - 12/31/2013) | Urban Solutions, LLC | Mixed Use Project/Master Plan /11th & San Pedro (CPC2013-4050) | ANY CITY AGENCY |
| 2013 | Client | Clear Channel Outdoor (01/01/2013 - 12/31/2013) | Urban Solutions, LLC | Digital Signage (CF12-1611) | ANY CITY AGENCY |
| 2013 | Client | Delson Investment Company (02/01/2013 - 12/31/2013) | Urban Solutions, LLC | Parking Structure /1159 W. Huntley Drive | ANY CITY AGENCY |
| 2013 | Client | Forest City Enterprises (10/21/2013 - 12/31/2013) | Urban Solutions, LLC | 11th & Hill. 12th & Broadway /Mixed Use Development (ZA2006-6513) | City Council |
| 2013 | Client | Globe Theatre (11/18/2013 - 12/31/2013) | Urban Solutions, LLC | Permitting new theater entrance on Broadway. (DIR2009-0004) | ANY CITY AGENCY |
| 2013 | Client | Holland Residential (01/01/2013 - 12/31/2013) | Urban Solutions, LLC | Mixed Use Project /915 N. LaBrea (CF11-1684-S1) | ANY CITY AGENCY |
| 2013 | Client | LaeRoc Partners, Inc. (01/01/2013 - 12/31/2013) | Urban Solutions, LLC | El Pueblo Visioning Plan /Olvera Street (CF07-3859) | City Council |
| 2013 | Client | Logan Capital Advisors (06/01/2013 - 12/31/2013) | Urban Solutions, LLC | TEFRA Hearing, Alexandria Hotel /501 S. Spring Street (CF12-0780-S2) | ANY CITY AGENCY |
| 2013 | Client | Los Angeles Chinatown Business Council (01/01/2013 - 12/31/2013) | Urban Solutions, LLC | General Government Affairs re: Chinatown | ANY CITY AGENCY |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2013 | Client | Los Angeles Professional Managers Association (09/09/2013 - 12/31/2013) | Urban Solutions, LLC | Government Efficiency Issues | ANY CITY AGENCY |
| 2013 | Client | Modern Parking, Inc. (01/01/2013 - 12/31/2013) | Urban Solutions, LLC | LA-DOT Parking Operator RFP | ANY CITY AGENCY |
| 2013 | Client | NBCUniversal Media, LLC (01/01/2013 - 12/31/2013) | Urban Solutions, LLC | NBCUniversal Evolution Plan /Universal City (CF12-1657) | City Council |
| 2013 | Client | Park Plaza Hotel (01/01/2013 - 12/31/2013) | Urban Solutions, LLC | Facade Improvements /607 South Park View Street (CF11-1156) | ANY CITY AGENCY |
| 2013 | Client | Streetline Networks (01/01/2013 - 12/31/2013) | Urban Solutions, LLC | Parking Technologies | City Council |
| 2013 | Client | Urban Housing Communities (01/01/2013 - 12/31/2013) | Urban Solutions, LLC | Proposed Affordable Housing Project /Amigo Avenue, Reseda | Mayor, Office of; City Council; Planning, City |
| 2012 | Lobbyist | Goldman, Morrie (01/01/2012 - 12/31/2012) | Urban Solutions, LLC | (not reported on Lobbyist Registration) | ANY CITY AGENCY |
| 2012 | Client | 1111 Sunset LLC (02/28/2012 - 12/31/2012) | Urban Solutions, LLC | Proposed Residential /1111 Sunset Blvd. | ANY CITY AGENCY |
| 2012 | Client | 6th & Bixel Partners LLC (01/03/2012 - 12/31/2012) | Urban Solutions, LLC | Multi-Family Residential /6th & Bixel | ANY CITY AGENCY |
| 2012 | Client | Anastasi Development Company (01/01/2012 - 12/31/2012) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2012 | Client | Astani Enterprises, Inc. (01/01/2012 - 12/31/2012) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2012 | Client | Barlow Respiratory Hospital (01/03/2012 - 02/29/2012) | Urban Solutions, LLC | Barlow Hospital Expansion | City Council |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2012 | Client | Chrysler Group Realty Company LLC (01/01/2012 - 12/31/2012) | Urban Solutions, LLC | Chrysler Dealership /2025 South Figueroa | ANY CITY AGENCY |
| 2012 | Client | City Market of Los Angeles (01/01/2012 - 12/31/2012) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2012 | Client | Clear Channel Outdoor (01/01/2012 - 12/31/2012) | Urban Solutions, LLC | | City Council |
| 2012 | Client | Delson Investment Company (01/01/2012 - 12/31/2012) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2012 | Client | Gebr. Heinemann KG dba Heinemann Duty Free (01/03/2012 - 12/31/2012) | Urban Solutions, LLC | LAX Duty Free RFP | ANY CITY AGENCY |
| 2012 | Client | LaeRoc Funds, Inc. (01/01/2012 - 12/31/2012) | Urban Solutions, LLC | Residential /Topanga Blvd., Chatsworth | City Council |
| 2012 | Client | LocalConstruct, Inc. (01/01/2012 - 12/31/2012) | Urban Solutions, LLC | Proposed Subdivision /Echo Park | ANY CITY AGENCY |
| 2012 | Client | Los Angeles Chinatown Business Council (01/01/2012 - 12/31/2012) | Urban Solutions, LLC | General Government Affairs | City Council |
| 2012 | Client | Modern Parking, Inc. (01/01/2012 - 12/31/2012) | Urban Solutions, LLC | LA-DOT Parking Operator RFP | ANY CITY AGENCY |
| 2012 | Client | NBCUniversal Media, LLC (10/01/2012 - 12/31/2012) | Urban Solutions, LLC | | City Council |
| 2012 | Client | Next Century Associates, LLC (09/01/2012 - 12/31/2012) | Urban Solutions, LLC | Century Plaza Project | City Council |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2012 | Client | Park Plaza (01/01/2012 - 12/31/2012) | Urban Solutions, LLC | Park Plaza Hotel /607 South Park View Street (2004-4624) | ANY CITY AGENCY |
| 2012 | Client | RAO's Los Angeles, LP (02/21/2012 - 12/31/2012) | Urban Solutions, LLC | RAO's Restaurant /1006 N. Seward Avenue | ANY CITY AGENCY |
| 2012 | Client | RECAP/Holland 1111 Wilshire Investors, LP (01/03/2012 - 12/31/2012) | Urban Solutions, LLC | Multi-Family Residential /1111 Wilshire Blvd. | ANY CITY AGENCY |
| 2012 | Client | Streetline Networks (01/01/2012 - 12/31/2012) | Urban Solutions, LLC | Parking Technologies | City Council |
| 2012 | Client | Urban Housing Communities (01/01/2012 - 12/31/2012) | Urban Solutions, LLC | | Mayor, Office of; City Council; Planning, City |
| 2011 | Lobbyist | Goldman, Morrie (01/01/2011 - 12/31/2011) | Urban Solutions, LLC | (not reported on Lobbyist Registration) | ANY CITY AGENCY |
| 2011 | Client | American Communities (01/01/2011 - 12/31/2011) | Urban Solutions, LLC | Affordable Housing Project /6th & Bonnie Brae | City Council |
| 2011 | Client | Anastasi Development Company (01/01/2011 - 12/31/2011) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2011 | Client | Astani Enterprises, Inc. (01/01/2011 - 12/31/2011) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2011 | Client | Barlow Respiratory Hospital (01/01/2011 - 12/31/2011) | Urban Solutions, LLC | Barlow Hospital Expansion | City Council |
| 2011 | Client | Chrysler Realty Company LLC (01/01/2011 - 12/31/2011) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2011 | Client | City Market of Los Angeles (07/19/2011 - 12/31/2011) | Urban Solutions, LLC | | ANY CITY AGENCY |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2011 | Client | Clear Channel Outdoor (01/01/2011 - 12/31/2011) | Urban Solutions, LLC | | City Council |
| 2011 | Client | Coalition for Safe Trails (02/14/2011 - 12/31/2011) | Urban Solutions, LLC | City Bicycle Plan (10-2385) | City Council |
| 2011 | Client | Creative Outdoor Advertising of America (01/01/2011 - 12/31/2011) | Urban Solutions, LLC | Bus Bench RFP | ANY CITY AGENCY |
| 2011 | Client | Genton Property Group (01/01/2011 - 12/31/2011) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2011 | Client | Group 7, LLC (02/24/2011 - 12/31/2011) | Urban Solutions, LLC | CUP Application/Haas Building /219 West 7th Street | City Council |
| 2011 | Client | HK Professional Building (05/16/2011 - 12/31/2011) | Urban Solutions, LLC | Proposed Street Vacation /2560 W. Olympic Blvd. (05-2637) | City Council |
| 2011 | Client | Holland Development (01/01/2011 - 12/31/2011) | Urban Solutions, LLC | "Good Sam" residential /6th & Bixel | City Council |
| 2011 | Client | LaeRoc Funds, Inc. (01/01/2011 - 12/31/2011) | Urban Solutions, LLC | Residential /Topanga Blvd., Chatsworth | City Council |
| 2011 | Client | Little Tokyo Service Center (01/01/2011 - 12/31/2011) | Urban Solutions, LLC | Senior Housing Project /900-906 S. Crenshaw Blvd. | ANY CITY AGENCY |
| 2011 | Client | LocalConstruct, Inc. (10/24/2011 - 12/31/2011) | Urban Solutions, LLC | Proposed Subdivision /Echo Park | ANY CITY AGENCY |
| 2011 | Client | Los Angeles Chinatown Business Council (01/01/2011 - 12/31/2011) | Urban Solutions, LLC | General Government Affairs | City Council |
| 2011 | Client | Modern Parking, Inc. (06/22/2011 - 12/31/2011) | Urban Solutions, LLC | LA-DOT Parking Operator RFP | ANY CITY AGENCY |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2011 | Client | Park Plaza (02/03/2011 - 12/31/2011) | Urban Solutions, LLC | Park Plaza Hotel /607 South Park View Street (2004-4624) | ANY CITY AGENCY |
| 2011 | Client | Streetline Networks (01/01/2011 - 12/31/2011) | Urban Solutions, LLC | Parking Technologies | City Council |
| 2011 | Client | The Amerland Group, LLC (01/01/2011 - 12/31/2011) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2011 | Client | Urban Housing Communities (01/01/2011 - 12/31/2011) | Urban Solutions, LLC | | Mayor, Office of; City Council; Planning, City |
| 2010 | Lobbyist | Goldman, Morrie (01/01/2010 - 12/31/2010) | Urban Solutions, LLC | (not reported on Lobbyist Registration) | ANY CITY AGENCY |
| 2010 | Client | Anastasi Development Company (01/01/2010 - 12/31/2010) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2010 | Client | Astani Enterprises, Inc. (01/01/2010 - 12/31/2010) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2010 | Client | Barlow Respiratory Hospital (08/20/2010 - 12/31/2010) | Urban Solutions, LLC | Barlow Hospital Expansion | City Council |
| 2010 | Client | Chrysler Realty Company LLC (01/01/2010 - 12/31/2010) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2010 | Client | Clear Channel Outdoor (01/01/2010 - 12/31/2010) | Urban Solutions, LLC | | City Council |
| 2010 | Client | Creative Outdoor Advertising of America (09/27/2010 - 12/31/2010) | Urban Solutions, LLC | Bus Bench RFP | ANY CITY AGENCY |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2010 | Client | Delson Investment Company (01/01/2010 - 12/31/2010) | Urban Solutions, LLC | Broadway Theaters /Broadway | City Council |
| 2010 | Client | Genton Barth Real Estate Group, LLC (01/01/2010 - 12/31/2010) | Urban Solutions, LLC | Wetherly Project (09-1246) | City Council |
| 2010 | Client | Group 7, LLC (06/15/2010 - 12/31/2010) | Urban Solutions, LLC | CUP Application/Haas Building /219 West 7th Street | City Council |
| 2010 | Client | HMS Host (04/28/2010 - 12/31/2010) | Urban Solutions, LLC | LAWA Concessions | ANY CITY AGENCY |
| 2010 | Client | Holland Development (01/01/2010 - 12/31/2010) | Urban Solutions, LLC | "Good Sam" residential /6th & Bixel | City Council |
| 2010 | Client | LaeRoc Funds, Inc. (01/01/2010 - 12/31/2010) | Urban Solutions, LLC | Residential /Topanga Blvd., Chatsworth | City Council |
| 2010 | Client | Los Angeles Chinatown Business Council (01/01/2010 - 12/31/2010) | Urban Solutions, LLC | General Government Affairs | City Council |
| 2010 | Client | Park Plaza (02/03/2010 - 12/31/2010) | Urban Solutions, LLC | Park Plaza Hotel /607 South Park View Street (2004-4624) | ANY CITY AGENCY |
| 2010 | Client | reRubber (01/01/2010 - 10/01/2010) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2010 | Client | Streetline Networks (01/01/2010 - 12/31/2010) | Urban Solutions, LLC | Parking Technologies | City Council |
| 2010 | Client | The Amerland Group, LLC (01/01/2010 - 12/31/2010) | Urban Solutions, LLC | Alexandria Hotel - Bond Issuance /501 S. Spring Street | City Council; Community Redevelopment Agency (CRA) |
| 2010 | Client | United No. 1, LLC (01/01/2010 - 12/31/2010) | Urban Solutions, LLC | Remodel/Expansion of Gas Station | ANY CITY AGENCY |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2010 | Client | Urban Housing Communities (01/01/2010 - 12/31/2010) | Urban Solutions, LLC | | Mayor, Office of; City Council; Planning, City |
| 2009 | Lobbyist | Goldman, Morrie (01/01/2009 - 12/31/2009) | Urban Solutions, LLC | (not reported on Lobbyist Registration) | ANY CITY AGENCY |
| 2009 | Client | Anastasi Development Company (01/01/2009 - 12/31/2009) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2009 | Client | Astani Enterprises, Inc. (01/01/2009 - 12/31/2009) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2009 | Client | ATP, LLC (01/01/2009 - 12/31/2009) | Urban Solutions, LLC | Housing Project /695 S. Santa Fe Avenue (07-4099-S1) | Community Redevelopment Agency (CRA) |
| 2009 | Client | BRE Properties, Inc. (09/15/2009 - 12/31/2009) | Urban Solutions, LLC | Wilshire-LaBrea (008-9909-GPA-ZC-HD-BL-CUB) | City Council |
| 2009 | Client | CalBek Management (10/12/2009 - 12/31/2009) | Urban Solutions, LLC | Modified Ceritifcate of Occupancy /4705 Franklin Avenue (2007-3497-ZAA-1 A) | Building and Safety |
| 2009 | Client | Clear Channel Outdoor (01/01/2009 - 12/31/2009) | Urban Solutions, LLC | | City Council |
| 2009 | Client | Delson Investment Company (01/01/2009 - 12/31/2009) | Urban Solutions, LLC | Broadway Theaters /Broadway | City Council |
| 2009 | Client | Discount Tire Centers (02/13/2009 - 12/31/2009) | Urban Solutions, LLC | Conditional Use Permit /6511 Foothill Blvd. | City Council |
| 2009 | Client | Festival Development Partners (01/01/2009 - 12/31/2009) | Urban Solutions, LLC | | City Council |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2009 | Client | Genton Barth Real Estate Group, LLC (06/09/2009 - 12/31/2009) | Urban Solutions, LLC | Wetherly Project (09-1246) | City Council |
| 2009 | Client | Holland Development (01/01/2009 - 12/31/2009) | Urban Solutions, LLC | "Good Sam" residential /6th & Bixel | City Council |
| 2009 | Client | LaeRoc Funds, Inc. (01/01/2009 - 12/31/2009) | Urban Solutions, LLC | Residential /Topanga Blvd., Chatsworth | City Council |
| 2009 | Client | Latrobe Street, LLC (04/15/2009 - 12/31/2009) | Urban Solutions, LLC | Private Street Application /3938 N. Latrobe Street (PS-1413) | City Council |
| 2009 | Client | Los Angeles Chinatown Business Council (01/01/2009 - 12/31/2009) | Urban Solutions, LLC | General Government Affairs | City Council |
| 2009 | Client | MAK Center for Art and Architecture (07/15/2009 - 12/31/2009) | Urban Solutions, LLC | Mackey Apartments /1137 South Cochran Avenue (2008-1628) | City Council |
| 2009 | Client | Next Century Associates, LLC (07/29/2009 - 12/31/2009) | Urban Solutions, LLC | Century Plaza Hotel Development /2025 Avenue of the Stars (09-1676) | City Council |
| 2009 | Client | reRubber (07/30/2009 - 12/31/2009) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2009 | Client | Streetline Networks (01/01/2009 - 12/31/2009) | Urban Solutions, LLC | Parking Technologies | City Council |
| 2009 | Client | The Amerland Group, LLC (01/01/2009 - 12/31/2009) | Urban Solutions, LLC | Alexandria Hotel - Bond Issuance /501 S. Spring Street | City Council; Community Redevelopment Agency (CRA) |
| 2009 | Client | Urban Housing Communities (01/01/2009 - 12/31/2009) | Urban Solutions, LLC | | Mayor, Office of; City Council; Planning, City |
| 2008 | Lobbyist | Goldman, Morrie (01/01/2008 - 12/31/2008) | Urban Solutions, LLC | (not reported on Lobbyist Registration) | ANY CITY AGENCY |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2008 | Client | Anastasi Development Company (01/01/2008 - 12/31/2008) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2008 | Client | Astani Enterprises, Inc. (01/01/2008 - 12/31/2008) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2008 | Client | ATP, LLC (02/05/2008 - 12/31/2008) | Urban Solutions, LLC | Housing Project /695 S. Santa Fe Avenue (07-4099-S1) | Community Redevelopment Agency (CRA) |
| 2008 | Client | CalBek Management (01/01/2008 - 04/04/2008) | Urban Solutions, LLC | Modified Ceritifcate of Occupancy /4705 Franklin Avenue | City Council |
| 2008 | Client | Chrysler Realty Company LLC (03/13/2008 - 12/31/2008) | Urban Solutions, LLC | Off-premises pole sign /2023-27 S. Figueroa | Mayor, Office of; City Council |
| 2008 | Client | Clear Channel Outdoor (07/18/2008 - 12/31/2008) | Urban Solutions, LLC | | City Council |
| 2008 | Client | Delson Investment Company (01/01/2008 - 12/31/2008) | Urban Solutions, LLC | Broadway Theaters /Broadway | City Council |
| 2008 | Client | Discount Tire Centers (01/01/2008 - 12/31/2008) | Urban Solutions, LLC | Conditional Use Permit /6511 Foothill Blvd. | City Council |
| 2008 | Client | Holland Development (01/01/2008 - 12/31/2008) | Urban Solutions, LLC | "Good Sam" residential /6th & Bixel | City Council |
| 2008 | Client | LA Lofts Chinatown LLC (01/02/2008 - 12/31/2008) | Urban Solutions, LLC | Condo Project /Chinatown (07-3868) | City Council |
| 2008 | Client | LaeRoc Funds, Inc. (01/01/2008 - 12/31/2008) | Urban Solutions, LLC | Residential /Topanga Blvd., Chatsworth | City Council |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2008 | Client | Los Angeles Chinatown Business Council (01/01/2008 - 12/31/2008) | Urban Solutions, LLC | General Government Affairs | City Council |
| 2008 | Client | National Housing Ventures, LLC (01/07/2008 - 12/31/2008) | Urban Solutions, LLC | Affordable Housing project /Sixth Street, MacArthur Park | City Council |
| 2008 | Client | Norman Family Ltd. Partnershp (01/02/2008 - 12/31/2008) | Urban Solutions, LLC | Housing Project /233 W. Washington Blvd. | ANY CITY AGENCY |
| 2008 | Client | Streetline Networks (01/01/2008 - 12/31/2008) | Urban Solutions, LLC | Parking Technologies | City Council |
| 2008 | Client | The Amerland Group, LLC (01/01/2008 - 12/31/2008) | Urban Solutions, LLC | Alexandria Hotel - Bond Issuance /501 S. Spring Street | City Council; Community Redevelopment Agency (CRA) |
| 2008 | Client | Union Partners, LLC (01/01/2008 - 12/31/2008) | Urban Solutions, LLC | Monument Sign /7th & Union | City Council |
| 2008 | Client | Urban Housing Communities (01/01/2008 - 12/31/2008) | Urban Solutions, LLC | | Mayor, Office of; City Council; Planning, City |
| 2008 | Client | Wokcano (01/02/2008 - 12/31/2008) | Urban Solutions, LLC | Electrical Inspection /700 W. 7th Street | Building and Safety |
| 2007 | Lobbyist | Goldman, Morrie (01/01/2007 - 12/31/2007) | Urban Solutions, LLC | (not reported on Lobbyist Registration) | ANY CITY AGENCY |
| 2007 | Client | 1111 Wilshire, LLC (01/01/2007 - 12/31/2007) | Urban Solutions, LLC | Proposed Condo Project /1111 Wilshire Blvd. | CD 01 |
| 2007 | Client | 1816 West Sixth, LP (04/01/2007 - 12/31/2007) | Urban Solutions, LLC | Proposed commercial/Roll-Down Doors /1816 West Sixth Street | CD 01 |
| 2007 | Client | 420 Pine Limited Partnership (03/27/2007 - 12/31/2007) | Urban Solutions, LLC | Proposed historical designation /3390 San Marino Street (07-0860) | CD 01; CD 10 |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2007 | Client | Anastasi Development Company (03/29/2007 - 12/31/2007) | Urban Solutions, LLC | | None/Not Yet Assigned |
| 2007 | Client | Apex Realty (01/01/2007 - 12/31/2007) | Urban Solutions, LLC | Bixel Court Apartments /1311 W. Fifth Street (2005-2155-SPE-ZAD-SPP) | CD 01 |
| 2007 | Client | Astal Development Corporation (02/01/2007 - 12/31/2007) | Urban Solutions, LLC | Proposed Subdivision /Mount Washington | None/Not Yet Assigned |
| 2007 | Client | Astani Enterprises, Inc. (01/01/2007 - 12/31/2007) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2007 | Client | Bo-Far, LLC (01/02/2007 - 12/31/2007) | Urban Solutions, LLC | | None/Not Yet Assigned |
| 2007 | Client | CalBek Management (04/01/2007 - 12/31/2007) | Urban Solutions, LLC | Modified Ceritifcate of Occupancy /4705 Franklin Avenue | CD 04 |
| 2007 | Client | Chrysler Realty Company LLC (01/01/2007 - 12/31/2007) | Urban Solutions, LLC | Off-premises pole sign /2023-27 S. Figueroa | Mayor, Office of; CD 09 |
| 2007 | Client | Discount Tire Centers (05/14/2007 - 12/31/2007) | Urban Solutions, LLC | Conditional Use Permit /6511 Foothill Blvd. | CD 02 |
| 2007 | Client | Festival Development Partners (11/26/2007 - 12/31/2007) | Urban Solutions, LLC | Proposed Monument Sign /Union & 7th | CD 01 |
| 2007 | Client | Fox Investment Company (01/01/2007 - 12/31/2007) | Urban Solutions, LLC | | CD 01; CD 14; Planning, City |
| 2007 | Client | LA River Lofts, LLC (01/01/2007 - 12/31/2007) | Urban Solutions, LLC | Proposed Subdivision /2943 Gleneden Street | CD 13 |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2007 | Client | LAEROC Partners, Inc. (01/01/2007 - 12/31/2007) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2007 | Client | Los Angeles Chinatown Business Council (01/25/2007 - 12/31/2007) | Urban Solutions, LLC | | CD 01 |
| 2007 | Client | New Century Financial Corporation (01/01/2007 - 03/31/2007) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2007 | Client | Norman Family Ltd. Partnershp (07/24/2007 - 12/31/2007) | Urban Solutions, LLC | Proposed Mixed Use Project /233 West Washington Blvd. | None/Not Yet Assigned |
| 2007 | Client | Parkeon (01/01/2007 - 03/09/2007) | Urban Solutions, LLC | | Mayor, Office of; City Council & Staff |
| 2007 | Client | Roofian, Michael (07/20/2007 - 12/31/2007) | Urban Solutions, LLC | Certitificate of Occupancy /242 South Anita Avenue | Building and Safety |
| 2007 | Client | Streetline Networks (11/13/2007 - 12/31/2007) | Urban Solutions, LLC | Parking Monitoring Program | City Council |
| 2007 | Client | T.A. Patty Development (01/01/2007 - 12/31/2007) | Urban Solutions, LLC | Proposed Condo Project /1101 N. Main Street | CD 01 |
| 2007 | Client | Tatou Supper Club, LLC (01/05/2007 - 12/31/2007) | Urban Solutions, LLC | Plan Approval /333 S. Boylston St. (2003-6244 (CUB)(CUX)) | CD 01 |
| 2007 | Client | The Amerland Group, LLC (01/01/2007 - 12/31/2007) | Urban Solutions, LLC | Alexandria Hotel - Bond Issuance /501 S. Spring Street | City Council & Staff; Community Redevelopment Agency (CRA) |
| 2007 | Client | Twin Cherry, Inc. (04/16/2007 - 12/31/2007) | Urban Solutions, LLC | Conditional Use Permit - Beer & Wine /808 South Western Avenue (2007-2172 CUB) | City Council |
| 2007 | Client | Urban Housing Communities (01/01/2007 - 12/31/2007) | Urban Solutions, LLC | | Mayor, Office of; City Council; City Council & Staff; Area Planning Cmsn (Any); Planning, City |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2007 | Client | Volcano Grill, Inc. (02/15/2007 - 12/31/2007) | Urban Solutions, LLC | Wokcano Restaurant/Grease Interceptor & Sewer Connecton Fee /818 W.7th Street | CD 09; Public Works, Sanitation |
| 2006 | Lobbyist | Goldman, Morrie (01/01/2006 - 12/31/2006) | Urban Solutions, LLC | (not reported on Lobbyist Registration) | ANY CITY AGENCY |
| 2006 | Client | 748 Hartford, LLC (02/01/2006 - 12/31/2006) | Urban Solutions, LLC | Proposed Condo Project /748 Hartford Avenue | CD 01 |
| 2006 | Client | Andrews + Chapman (01/01/2006 - 12/31/2006) | Urban Solutions, LLC | Granada Street - Subdivision /Mount Washington | City Council & Staff |
| 2006 | Client | Apex Realty (01/01/2006 - 12/31/2006) | Urban Solutions, LLC | Bixel Court Apartments /1311 W. Fifth Street (2005-2155-SPE-ZAD-SPP) | CD 01 |
| 2006 | Client | Astal Development Corporation (01/01/2006 - 12/31/2006) | Urban Solutions, LLC | Proposed Subdivision /Mount Washington | None/Not Yet Assigned |
| 2006 | Client | Astani Enterprises, Inc. (01/01/2006 - 12/31/2006) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2006 | Client | Central American Relief Foundation (10/01/2006 - 12/31/2006) | Urban Solutions, LLC | REAP /1883 W. 20th Street (5075029015) | CD 01; Housing (LAHD, DOH) |
| 2006 | Client | Century Supper Club, L.P. (07/25/2006 - 12/31/2006) | Urban Solutions, LLC | Proposed Restaurant /311 S. Boylston (2003-6244 (CUB) (CUX)-1A) | CD 01 |
| 2006 | Client | Chrysler Realty Company LLC (01/01/2006 - 12/31/2006) | Urban Solutions, LLC | Off-premises pole sign /2023-27 S. Figueroa | Mayor, Office of; CD 09 |
| 2006 | Client | Delson Investment Company (01/01/2006 - 12/31/2006) | Urban Solutions, LLC | | None/Not Yet Assigned |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2006 | Client | Festival Development Partners (01/01/2006 - 12/31/2006) | Urban Solutions, LLC | 7 & Union - Street Improvements /1551 W. Seventh St. (2004-0903) | City Council & Staff |
| 2006 | Client | Holland Partners (05/01/2006 - 12/31/2006) | Urban Solutions, LLC | Proposed Condo Project /1111 Wilshire Blvd. | CD 01 |
| 2006 | Client | Innovative Construction, Inc. (01/01/2006 - 12/31/2006) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2006 | Client | LA River Lofts, LLC (04/01/2006 - 12/31/2006) | Urban Solutions, LLC | Proposed Subdivision /2943 Gleneden Street | CD 13 |
| 2006 | Client | LAEROC Partners, Inc. (01/01/2006 - 12/31/2006) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2006 | Client | LLR Investments LLC (01/01/2006 - 12/31/2006) | Urban Solutions, LLC | 2323 Olympic Galleria /2323 W. Olympic Blvd. (2005-3219 (CUB) (CU) (ZV) (SPR)) | CD 01 |
| 2006 | Client | Major Properties (07/17/2006 - 12/31/2006) | Urban Solutions, LLC | Supplemental Use District /3912 Grand Avene | CD 09 |
| 2006 | Client | New Century Financial Corporation (01/01/2006 - 12/31/2006) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2006 | Client | Norman Family Ltd. Partnershp (07/17/2006 - 12/31/2006) | Urban Solutions, LLC | Proposed Apartment Project /1313 W. 11th Place | CD 01 |
| 2006 | Client | Parkeon (01/01/2006 - 12/31/2006) | Urban Solutions, LLC | | Mayor, Office of; City Council & Staff |
| 2006 | Client | T.A. Patty Development (07/27/2006 - 12/31/2006) | Urban Solutions, LLC | Proposed Condo Project /1101 N. Main Street | CD 01 |
| 2006 | Client | The Amerland Group, LLC (03/01/2006 - 12/31/2006) | Urban Solutions, LLC | Alexandria Hotel - Bond Issuance /501 S. Spring Street | City Council & Staff; Community Redevelopment Agency (CRA) |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2006 | Client | Urban Housing Communities (01/01/2006 - 12/31/2006) | Urban Solutions, LLC | | Mayor, Office of; City Council; City Council & Staff; Area Planning Cmsn (Any); Planning, City |
| 2006 | Client | Wilbur Smith Associates (01/01/2006 - 12/31/2006) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2005 | Lobbyist | Goldman, Morrie (01/01/2005 - 12/31/2005) | Urban Solutions, LLC | (not reported on Lobbyist Registration) | ANY CITY AGENCY |
| 2005 | Client | Acevedo Group (01/01/2005 - 02/28/2005) | Urban Solutions, LLC | Subdivision /10819 San Fernando Mission Blvd., Northridge | CD 12; Neighborhood Councils |
| 2005 | Client | Andrews + Chapman (05/22/2005 - 12/31/2005) | Urban Solutions, LLC | Granada Street - Subdivision /Mount Washington | City Council & Staff |
| 2005 | Client | Astal Development Corporation (10/11/2005 - 12/31/2005) | Urban Solutions, LLC | Proposed Subdivision /Mount Washington | None/Not Yet Assigned |
| 2005 | Client | Bixel Court (07/27/2005 - 12/31/2005) | Urban Solutions, LLC | Bixel Court Apartments /1311 W. Fifth Street (2005-2155-SPE-ZAD-SPP) | CD 01 |
| 2005 | Client | Chrysler Realty Company LLC (04/04/2005 - 12/31/2005) | Urban Solutions, LLC | Off-premises pole sign /2023-27 S. Figueroa | Mayor, Office of; CD 09 |
| 2005 | Client | City of Beverly Hills (06/09/2005 - 12/31/2005) | Urban Solutions, LLC | Police Dept. Radio Tower /14250 W. Mulholland Drive | CD 05; Area Planning Cmsn, W LA; Mullholland Design Review Bd; Neighborhood Councils; Planning, City; Water & Power (DWP) |
| 2005 | Client | Club Safari, Inc. (11/15/2005 - 12/31/2005) | Urban Solutions, LLC | Conditional Use Permit /731 S. Alvarado | ANY CITY AGENCY |
| 2005 | Client | Delson Investment Company (10/27/2005 - 12/31/2005) | Urban Solutions, LLC | | None/Not Yet Assigned |
| 2005 | Client | Festival Development Partners (01/05/2005 - 12/31/2005) | Urban Solutions, LLC | 7 & Union - Street Improvements /1551 W. Seventh St. (2004-0903) | City Council & Staff |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2005 | Client | Innovative Construction, Inc. (10/17/2005 - 12/31/2005) | Urban Solutions, LLC | haul route, environmental clearance /Bronholly Drive | CD 07; Building & Safety Cmsn; Building and Safety; Planning, City |
| 2005 | Client | LA Plaza Holdings LLC (01/05/2005 - 12/31/2005) | Urban Solutions, LLC | Proposed development /4th & Los Angeles | City Council & Staff |
| 2005 | Client | Lambert Smith Hampton (02/15/2005 - 12/31/2005) | Urban Solutions, LLC | Condominium Conversion /620 South Gramercy | City Council & Staff; Planning, City |
| 2005 | Client | LLR Investments LLC (08/25/2005 - 12/31/2005) | Urban Solutions, LLC | 2323 Olympic Galleria /2323 W. Olympic Blvd. (2005-3219 (CUB) (CU) (ZV) (SPR)) | CD 01 |
| 2005 | Client | New Century Financial Corporation (01/01/2005 - 12/31/2005) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2005 | Client | North Hollywood Swap Meet (01/01/2005 - 02/28/2005) | Urban Solutions, LLC | | Building and Safety; Zoning Admin, Ofc Of |
| 2005 | Client | Ortiz Investments, Inc. (05/20/2005 - 12/31/2005) | Urban Solutions, LLC | Certificate of Appropriateness /127 S. Avenue 55 | CD 01; Area Planning Cmsn, E LA |
| 2005 | Client | Parkeon (05/26/2005 - 12/31/2005) | Urban Solutions, LLC | | Mayor, Office of; City Council & Staff |
| 2005 | Client | Urban Housing Communities (01/01/2005 - 12/31/2005) | Urban Solutions, LLC | | Mayor, Office of; City Council; City Council & Staff; Area Planning Cmsn (Any); Planning, City |
| 2005 | Client | Wilbur Smith Associates (01/01/2005 - 12/31/2005) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2004 | Lobbyist | Goldman, Morrie (07/28/2004 - 12/31/2004) | Urban Solutions, LLC | (not reported on Lobbyist Registration) | ANY CITY AGENCY |
| 2004 | Client | Acevedo Group (10/07/2004 - 12/31/2004) | Urban Solutions, LLC | Subdivision /10819 San Fernando Mission Blvd., Northridge | CD 12; Neighborhood Councils |

| Year Registered | Type | Lobbying Entity | Firm/Employer | Project(s) | Agencies Authorized to Lobby |
|---|---|---|---|---|---|
| 2004 | Client | Foster Pepper Tooze LLP (11/12/2004 - 12/31/2004) | Urban Solutions, LLC | Wilshire Court /Wilshire & Bixel (03-0149) | City Council & Staff; Community Redevelopment Agency (CRA) |
| 2004 | Client | Lambert Smith Hampton (11/22/2004 - 12/31/2004) | Urban Solutions, LLC | 1234 Wilshire Blvd. /Wilshire & Witmer (04-2101) | City Council & Staff |
| 2004 | Client | New Century Financial Corporation (07/01/2004 - 12/31/2004) | Urban Solutions, LLC | | ANY CITY AGENCY |
| 2004 | Client | North Hollywood Swap Meet (11/08/2004 - 12/31/2004) | Urban Solutions, LLC | | Building and Safety; Zoning Admin, Ofc Of |
| 2004 | Client | Urban Housing Communities (07/15/2004 - 12/31/2004) | Urban Solutions, LLC | | Mayor, Office of; City Council; City Council & Staff; Area Planning Cmsn (Any); Planning, City |
| 2004 | Client | Wilbur Smith Associates (07/01/2004 - 12/31/2004) | Urban Solutions, LLC | | ANY CITY AGENCY |

# EXHIBIT B-2



# EXHIBIT B-3

**Mtg w/ Neils Cotter, Morrie Goldman re 520 Mateo GPA Request**
**3:15 PM, 8/18/16**

Briefing by:     Shawn Kuk
Location:      CD14, City Hall Office

**Summary:**
You have requested this meeting to discuss Carmel Partners' GPA initiation request for their new Arts District mixed-use project at 520 Mateo (Mateo/4th Pl). This is a mixed-use project located on a 2-acre site, including 300-400 residential units, approx 40,000 sf retail/restaurant space, and small co-work space on the ground floor. The project site is currently zoned M3 with a Heavy Manufacturing land use designation.

Carmel has been waiting for Planning to initiate the GPA request for Regional Center (ZC to C2) for the past several months. You have asked Vince Bertoni on more than one occasion to initiate the GPA for this and other Arts District projects if consistent with HI standards. Staff was informed this week by Morrie that Planning has decided to deny their GPA request to Regional Center and instead is offering Community Commercial with CM zoning.

Carmel is requesting that you initiate the GPA at this point due to their concerns over the pending ballot initiatives. They are insistent that their project has been designed to meet HI standards but if they are limited to Community Commercial, that will force them to go from 200 du/acre to 100 du/acre, essentially reducing their density by half and rendering the project infeasible. Planning's position to deny GPA's to Regional Commercial would hurt other projects with high density like Carmel even if designed to HI standards.

Staff's prior recommendation included Carmel's project as one of those that you could potentially ask for a DA in exchange for initiating but Carmel insists that you had previously committed to initiating their GPA by Council motion if Planning denied the initiation request. They have indicated to staff that they would not be able to meet any additional public benefits demands because their project is already programmed with a robust community benefit package above and beyond what is required under the HI Ordinance.

***Recommendation:*** Take Carmel off the list of DA-GPA projects and demand Planning initiate the GPA with Regional Commercial ASAP or initiate by motion (at least threaten to).

# EXHIBIT B-4

SEAL

# EXHIBIT B-5

SEAL

# EXHIBIT B-6

SEAL

# EXHIBIT B-7

SEAL

# EXHIBIT B-8

SEAL

# EXHIBIT B-9

SEAL

# EXHIBIT B-10

SEAL

# EXHIBIT B-11

**Linesheet - Minimization Details**   User:   Andrew Civetti

| Case: | 194B-LA-255905 | Target: | George Esparza | Line: | ▮▮5579 | File Number: | |

## Comments

## Synopsis 1

| Minimization Event | | | Time | | | | |
|---|---|---|---|---|---|---|---|
| Minimize On (System) | | | 10:55:02 PDT | | | | |

| Session: | 3187 | Times minimized: | 1 | Associate DN: | ▮▮▮▮ |
|---|---|---|---|---|---|
| Start Time: | 10:58:06 PDT | Duration minimized: | 00:00:00 | Monitor ID: | ddwong2 |
| Stop Time: | 11:01:52 PDT | Duration monitored: | 00:03:46 | In/Out Digits: | |
| Date: | 05/09/2017 | Total Duration: | 00:03:46 | Subscriber: | |
| Direction: | Outgoing | Language: | Unknown | Classification: | Pertinent |
| Content: | Audio | Complete: | Completed | Participants: | Esparza, George |
| | | | | | Goldman, Morrie |

## Comments

## Synopsis 1

Morrie Goldman to GE

Donation to carmel? Cumulious showing up as major donor, LA times wants to know why cumulous is spending money on behalf of Monica Rodriguez. MG's client is pissed off. GE says its suppose to go through measure H. MG wants to know where's the mailer. GE says he's talk to council member. Morrie is worried he's going to get fired over this

MG: We may need to loop Jose into this as well

GE: Ok

MG: So you, do you remember way back when, when we were talking about measure H and Jose got this idea courtesy of Mike Trijio?

GE: [Laughs]

MG: And I said don't do it, but he wanted to do it anyway.

GE: Oh the, uh, the donation from

MG: From Carmel

GE: From Carmel to no on H

MG: Right, no to yes on H

GE: Yeah, to yes on H

MG: Yeah

GE: yeah to the I.E.

MG: Right, so now um Carmel, Cumulous is showing up as a major donor to the committee and Dakotah Smith from the LA Times is writing an article wanting to know why Cumulous which is a project in South LA is spending money on behalf of Monica Rodriguez which has my client...

GE: Ohhh my God fuckin Mike

MG: Which has my client really pissed off and you know their gonna throw Trujillo under the bus ...

GE: They should

MG: They're gonna basically say, they're gona say its Trujillo's committee um but you know I don't wanna say that Jose asked for the contribution

GE: Fuckin Mike, that was suppose to go through measure H, well see like thats like a lesson I guess for

**Linesheet - Minimization Details**

User: Andrew Civetti

| Case: 194B-LA-255905 | Target: George Esparza | Line: ░░░55579 | File Number: |
|---|---|---|---|

you and I too to know like we need to ask my boss where exactly is this funds going to right?

GE: We were told it was gonna go to some mailer remember?

MG: Yeah, and that's what I was calling you for was is this money you know where is the mailers so we can give it to the LA Times.

GE: What we were told was that we're also by Mike that the mailer was already sent out or was ready just waiting for us, that was the message that was sent to me by you know by end right.

MG: Yeah

GE: So for me to tell you and so, yeah that's not cool, thats not good for you guys. Um, alright let me talk to the council member then and let me know, so its on the, on the report right? On the I.E. report?

MG: It's on tv, its on the report, its on the mail, and now the Dakotah Smith is asking, asking questions why is Cumulous you know...

GE: Fuck

MG: Why is carmel doing this?

MG: Yeah, let Jose know I will not  go to my clients for anther Mike Trujillo thing.

GE: Ok

GE: I think thats one of the reasons...

MG: I mean, I mean I might get fired over this

GE: Yeah thats not good

MG: Yeah I mean, I  mean I probably will get fired over this, so I'm really, so they're gonna, so I'm gonna tell, I"m gonna tell them to throw Mike under the bus, that, that, that, Dakotah should call Mike and you know our answer is we were asked to make a contribution and we did.

GE: Alright let me talk to my boss first um I'm gonna go get him cause he just went back into council

MG: Ok

GE: Sooo um that this is pretty urgent um before you have them respond to that maybe he may have an idea or something.

MG: Yeah, I just, I, my thing is I wanna protect my client and I wanna protect Jose.

GE: No, but that's just not cool man, because you and I were told something totally different

MG: Yeah, you know he's a fucking liar, you know this why, I mean he's a fucking sleaze bag I mean I don't wanna go there...

GE: No

MG: But its true and this is why you know every time Jose get this like Mike plants these ideas in his head well lets do it you know its like he fuckin lies to Jose I mean where's the

GE: Yeah

MG: I mean where's the mailer

GE: We were told, yeah, yeah, that's what you and I, that's what I was told and that's what yeah

GE: Alright Morrie let me talk to my boss that's not fuckin cool man and especially..

MG: Yeah

GE: And especially if Monica Rodriguez stuff that's not cool either, so alright let me uh, let me talk to the council member

GE: So Dakotah Smith is the one that's inquiring to Carmel why they gave to this I.E. that's doing something for Monica Rodriguez.

MG: Yeah, yeah why are they, why is a developer with a project in South LA a major donor.

GE: Ok, alright

MG: Alright, and like call me back right away ok.

GE: I will, I will, I will, I will

MG: Thanks ok bye

GE: Ok bye

# EXHIBIT B-12

SEAL

# EXHIBIT B-13

SEAL

# EXHIBIT B-14

SEAL

# EXHIBIT B-15

4/19/18, 11:08 AM

3 mins

4/30/18, 1:41 PM

Sorry, I'm in a meeting.  Can I call you back?

Sure

5/4/18, 2:18 PM

Sorry, on a conference call.  Can I call you back?

Yes please

Just tried you back.

5/8/18, 11:12 AM

Sorry, on a conference call.  Can I call you back?

Very important that Shaun calls Kevin letting them know he supports the height etc.  please please make sure this happens prior

Yes.  I have a call into Shawn.

Critical.  Would be a huge issue otherwise with those people
Attending

Maybe Jose would be willing to call Kevin

?

Jose is traveling.  Not around this week.

Can't he put in a call?

I'm just really concerned

Me too.  That's why I sent you the list of invited attendees.

It might be a good idea for Brad to join us.

Can you hound Shaun?

Yes.

And why can't Huizar put in a call?  Takes 5 mins

He's in Caribbean on family vacation.

I'd rather have the call come from Shawn.  He is in the weeds on the project.

Can he come to meeting?

He's not going to go to a meeting in Planning Department.  Shawn will let them know their position, and then make the changes in PLUM.

Ok.  When are you off call?

Can we speak at 1230?

I can call you in a few minutes.   I have a meeting @ Noon, until 2:30.

Ok.  I may be on a call.  But we need to speak before noon.  Or please pickup around noon.

This would be a disaster if they took a position to deny

This meeting seems to be a really bad idea now.

When does Jose get back?

Spoke with Shawn.  He will speak with Kevin, and then call me to report back prior to our meeting.

5/8/18, 2:17 PM

Thanks very much.  Can you see if he had feedback?

5/8/18, 3:55 PM

Max and I are in 525

Ok.  5 mins

Waking in now

5/22/18, 3:24 PM

Can you do tomorrow @ 11:30 AM...call with Jeff

Casino_2008374

# EXHIBIT B-16



Los Angeles
Department
of City Planning

# PLANNING DEPARTMENT TRANSMITTAL
## TO THE CITY CLERK'S OFFICE

| CITY PLANNING CASE: | ENVIRONMENTAL DOCUMENT: | COUNCIL DISTRICT: |
|---|---|---|
| CPC-2015-2593-GPA-ZC-HD-ZAA-SPR | ENV-2014-4755-EIR | 10 - Wesson |

| PROJECT ADDRESS: |
|---|
| 3321, 3351 South La Cienega Boulevard; 5707-5735 West Jefferson Boulevard |

| APPLICANT/REPRESENTATIVE: | TELEPHONE NUMBER: | EMAIL ADDRESS: |
|---|---|---|
| CP V Cumulus, LLC. Brad Rosenheim, Rosenheim & Associates | 818-716-2780 | brad@raa-inc.com |

☐ New/Changed

| APPELLANT/REPRESENTATIVE: | TELEPHONE NUMBER: | EMAIL ADDRESS: |
|---|---|---|
| William Dickey La Cienega Heights Assoc. Inc. 5670 Spokane Street Los Angeles, CA 90016 | William Dickey 424-400-4084 Rep.: Jamie T. Hall 310-347-0050 | w.dickey@mail.com jamie.hall@channellawgroup.com |

| PLANNER CONTACT INFORMATION: | TELEPHONE NUMBER: | EMAIL ADDRESS: |
|---|---|---|
| Sergio Ibarra | 213-978-1333 | Sergio.Ibarra@lacity.org |

| APPROVED PROJECT DESCRIPTION: |
|---|

Mixed-Use Development of 1,218 dwelling units with a 5% set aside (55 dwelling units) for workforce housing (80 to 120% AMI), and 300,000 square feet of commercial and office floor area. The commercial space would include 200,000 square feet of office space, 50,000 square feet of grocery store, 20,000 square feet of restaurant space, and 30,000 square feet of general retail. Parking would be provided within a combination of above ground and subterranean parking levels for the project, in accordance with Los Angeles Municipal Code (LAMC). The project will have an FAR of 3.9:1.

The project includes demolition and removal of all existing structures to be replaced with an approximately 1,900,000-square-foot transit-oriented, mixed-use structures consisting of podium style buildings, ranging in height from 110 feet for the podium buildings and up to approximately 320 feet for the tower.

**COMMISSION ACTION(S) / ZONING ADMINISTRATOR ACTION(S): (CEA's PLEASE CONFIRM)**

On March 10, 2016, the City Planning Commission:

1. Certified and Adopted the EIR, Mitigation Measures, Mitigation Monitoring Program, CEQA findings, and Statement of Overriding Considerations;
2. Recommended that the City Council Approve a project with a by-right residential density of 1,090 dwelling units. In exchange for a 5% set aside (55 dwelling units) for workforce housing (80 to 120% AMI), the project will be granted a density bonus of 73 dwelling units for a total allowable density of 1,218 dwelling units.
3. Recommended that the City Council Adopt a General Plan Amendment from Limited Manufacturing to Community Commercial.
4. Recommended that the City Council Adopt a Zone Change and Height District Change from MR1-1VL to [T][Q]C2-2D with an FAR of up to 3.9:1.
5. Approved a Site Plan Review for a project which creates or results in an increase of 50 or more dwelling units and 50,000 gross square feet of nonresidential floor area.
6. Denied the Zoning Administrator's Adjustment for an increase of no more than 20% (8 dwelling units) to the density (lot area per unit) set by the R4 regulations.

**ENTITLEMENTS FOR CITY COUNCIL CONSIDERATION:**

1. Certify and adopt the EIR, Mitigation Measures, Mitigation Monitoring Program, CEQA findings, and Statement of Overriding Considerations
2. Adoption of a General Plan Amendment from Limited Manufacturing to Community Commercial.
3. Adoption of a Zone Change and Height District Change from MR1-1VL to [T][Q]C2-2D.

**FINAL ENTITLEMENTS NOT ADVANCING:**

**ITEMS APPEALED:**

ZAA, SPR

| ATTACHMENTS: | REVISED: | ENVIRONMENTAL CLEARANCE: | REVISED: |
|---|---|---|---|
| ✓ Letter of Determination | ☐ | Categorical Exemption | ☐ |
| ✓ Findings of Fact | ☐ | Negative Declaration | ☐ |
| ✓ Staff Recommendation Report | ☐ | Mitigated Negative Declaration | ☐ |
| ✓ Conditions of Approval | ☐ | ✓ Environmental Impact Report | ☐ |
| ✓ Ordinance | ☐ | Mitigation Monitoring Program | ☐ |
| ✓ Zone Change Map | ☐ | Other _____ | |
| ✓ GPA Resolution | ☐ | | |
| ✓ Land Use Map | ☐ | | |
| ✓ Exhibit A - Site Plan | ☐ | | |
| Mailing List | ☐ | | |
| Land Use | ☐ | | |
| ✓ Other Exhibit E | ☐ | | |

**NOTES / INSTRUCTION(S):**

EIR is available at the following web address:
http://planning.lacity.org/eir/jeffersonlacienega/jeffersonlacienegacoverpg.html

**FISCAL IMPACT STATEMENT:**

[✓] Yes          [ ] No

*If determination states administrative costs are recovered through fees, indicate "Yes".

**PLANNING COMMISSION:**

[✓] City Planning Commission (CPC)          [ ] North Valley Area Planning Commission
[ ] Cultural Heritage Commission (CHC)      [ ] South LA Area Planning Commission
[ ] Central  Area Planning Commission       [ ] South Valley Area Planning Commission
[ ] East LA Area Planning Commission        [ ] West LA Area Planning Commission
[ ] Harbor Area Planning Commission

| PLANNING COMMISSION HEARING DATE: | COMMISSION VOTE: |
|---|---|
| March 10, 2016 | 6 -0 |

| LAST DAY TO APPEAL: | APPEALED: |
|---|---|
| April 14, 2016 | Yes |

| TRANSMITTED BY: | TRANSMITTAL DATE: |
|---|---|
| James K. Williams | APR 15 2016 |

# LOS ANGELES CITY PLANNING COMMISSION

200 N. Spring Street, Room 272, Los Angeles, California, 90012, (213) 978-1300
**www.planning.lacity.org**

### LETTER OF DETERMINATION

**Mailing Date:** ˈMAR 3 0 2016

**Case No: CPC-2015-2593-GPA-ZC-HD-ZAA-SPR**
**CEQA:** ENV-2014-4755-EIR,
SCH No. 2015031047
**Related Case:** VTT-73656-CN-1A

**Location:** 3321, 3351 S. La Cienega Boulevard,
5707-5735 W. Jefferson Boulevard
**Council District:** 10 - Wesson
**Plan Area:** West Adams-Leimert Park-Baldwin
Hills
**Request:** General Plan Amendment, Zone
Change, Height District Change, Zoning
Administrator's Adjustment, Site Plan Review

**Applicant:** CP V. Cumulus, LLC
**Representative:** Brad Rosenheim, Rosenheim & Associates, Inc.

**At its meeting on March 10, 2016, the Los Angeles City Planning Commission took the following
action:**

1.  **Certified** and adopted the EIR, Mitigation Measures, Mitigation Monitoring Program, CEQA findings, and Statement of Overriding Considerations.
2.  **Approved** a **General Plan Amendment** to the West Adams-Baldwin Hills-Leimert Park Community Plan to change the land use designation from Limited Manufacturing to **Community Commercial**.
3.  **Approved** a **Zone Change and Height District Change** from MR1-1VL to **[T][Q]C2-2D**. Changing the Height District from 1VL to 2D which permits a floor area ratio (FAR) of up to 3.9:1 and an unlimited height limit in lieu of an FAR of 1.5:1 and a 3-story or 45-foot height limit currently permitted.
4.  **Approved** a project with a by-right density of 1,090 dwelling units with an option for a density bonus of 73 dwelling units in exchange for a 5% set aside (55 dwelling units) for workforce housing (80 to 120% AMI), for a total allowable residential density of 1,218 dwelling units.
5.  **Approved** a **Site Plan Review** for a project which creates or results in an increase of 50 or more dwelling units and/or 50,000 gross square feet or more of nonresidential floor area.
6.  **Denied** the **Zoning Administrator's Adjustment** for an increase of no more than 20% (8 dwelling units) to the density (lot area per unit) set by the R4 zone regulations.
7.  **Adopted** the attached modified **Conditions of Approval**.
8.  **Adopted** the attached **Findings**.
9.  **Advised** the applicant that, pursuant to California State Public Resources Code Section 21081.6, the City shall monitor or require evidence that mitigation conditions are implemented and maintained throughout the life of the project and the City may require any necessary fees to cover the cost of such monitoring.
10. **Advised** the applicant that pursuant to State Fish and Game Code Section 711.4, a Fish and Game Fee is now required to be submitted to the County Clerk prior to or concurrent with the Environmental Notice of Determination (NOD) filing.

### RECOMMENDATION TO CITY COUNCIL:

1.  **Recommend** the City Council **certify** and **adopt** the EIR, Mitigation Measures, Mitigation Monitoring program, CEQA findings, and Statement of Overriding Considerations.
2.  **Recommend** the City Council **adopt** a **General Plan Amendment from** Limited Manufacturing to Community Commercial.
3.  **Recommend** the City Council **adopt** a **Zone Change** and **Height District Change** from MR1-1VL to **[T][Q]C2-2D.** Changing the Height District from 1VL to 2D which permits a floor area ratio (FAR) of up to 3.9:1 and an unlimited height limit in lieu of an FAR of 1.5:1 and a 3-story or 45-foot height limit currently permitted.

Fiscal Impact Statement: There is no General Fund impact as administrative costs are recovered through fees.

This action was taken by the following vote:

Moved:       Perlman
Seconded:    Katz
Ayes:        Ahn, Millman, Padilla, Dake-Wilson
Absent:      Ambroz, Choe, Mack

Vote:        6 - 0

James K. Williams, Commission Executive Assistant II
Los Angeles City Planning Commission

Appeals: This action of the City Planning Commission will be final within 15 days from the mailing date on this determination unless an appeal is filed within that time to the City Council. The Zoning Administrator's Adjustment and Site Plan Review are both appealable to the City Council by any party.

FINAL APPEAL DATE:  APR 1 4 2016

All appeals shall be filed on forms provided at the Planning Department's Public Counters at 201 North Figueroa Street, 4th Floor, Los Angeles, or at 6262 Van Nuys Boulevard, Suite 251, Van Nuys.  Forms are also available on-line at http://planning.lacity.org/.

If you seek judicial review of any decision of the City pursuant to California Code of Civil Procedure Section 1094.5, the petition for writ of mandate pursuant to that section must be filed no later than the 90th day following the date on which the City's decision became final pursuant to California Code of Civil Procedure Section 1094.6. There may be other time limits which also affect your ability to seek judicial review.

Attachment: Modified Conditions of Approval and Findings
City Planning Associate: Sergio Ibarra

## CONDITIONS FOR EFFECTUATING TENTATIVE
## (T) CLASSIFICATION REMOVAL

Pursuant to Los Angeles Municipal Code Section 12.32 G, the "T" Tentative Classification shall be removed by the recordation of a final tract map or by posting guarantees satisfactory to the City Engineer to secure the following without expense to the City of Los Angeles, with copies of any approval or guarantees provided to the Planning Department for attachment to the subject City Plan Case.

### BUREAU OF ENGINEERING - SPECIFIC CONDITIONS

1.   Prior to recordation of the final map, satisfactory arrangements shall be made to satisfy the recommendations of the Bureau of Engineering.

     a.   That a 2-foot wide public sidewalk easement be provided along La Cienega Boulevard adjoining the tract.

     b.   That a 5-foot wide public right-of-way be dedicated along Jefferson Boulevard adjoining the tract to complete a 40-foot wide half right-of-way, including a 20-foot radius property line return at the intersection with La Cienega Boulevard or 15-foot by 15-foot property line corner cut. In addition a 5-foot wide public sidewalk easement be provided, including a 20-foot radius easement line at the intersection with La Cienega Blvd.

     c.   That the subdivider make a request to the Central District Office of the Bureau of Engineering to determine the capacity of existing sewers in this area.

     d.   That a set of drawings for airspace lots be submitted to the City Engineer showing the followings:
          i. Plan view at different elevations.
          ii. Isometric views.
          iii. Elevation views.
          iv. Section cuts at all locations where air space lot boundaries change.

     e.   That the owners of the property record an agreement satisfactory to the City Engineer stating that they will grant the necessary private easements for ingress and egress purposes to serve proposed airspace lots to use upon the sale of the respective lots and they will maintain the private easements free and clear of obstructions and in safe conditions for use at all times.

Notes:
Any questions regarding this report should be directed to Mr. Georgic Avanesian of the Land Development Section, located at 201 North Figueroa Street, Suite 200, or by calling (213) 202-3438.

### DEPARTMENT OF BUILDING AND SAFETY, GRADING DIVISION

2.   Prior to issuance of a grading or building permit, or prior to recordation of the final map, the subdivider shall make suitable arrangements to assure compliance, satisfactory to the Department of Building and Safety, Grading Division's letter dated September 25, 2015; LOG # 89939.

**DEPARTMENT OF BUILDING AND SAFETY, ZONING DIVISION**

3.   <u>Prior to recordation of the final map</u>, the Department of Building and Safety, Zoning Division shall certify that no Building or Zoning Code violations exist on the subject site. In addition, the following items shall be satisfied:

   a.   Residential uses are not allowed in the MR1 Zone.  Obtain Zone Change approval from the Department of City Planning.

   b.   Zone Change must be recorded prior to obtaining Zoning clearance.

   c.   Show compliance to the Zone Change requirements as applicable.

   d.   Provide a copy of CPC case CPC-2015-2593-GPA-ZC-HD-ZAA-SPR.  Show compliance with all the conditions/requirements of the CPC case(s) as applicable.

   e.   Provide a copy of affidavit AF-91-1898036-OB and AF-91-1674847-LT.  Show compliance with all the conditions/requirements of the above affidavits as applicable.  Termination of above affidavit(s) may be required after the Map has been recorded.  Obtain approval from the Department, on the termination form, prior to recording.

   f.   Show all street dedication(s) as required by Bureau of Engineering and provide net lot area after all dedication. "Area" requirements shall be rechecked as per net lot area after street dedication.  A minimum of 487,200 SF of lot area after dedication is required or as granted by Case No. CPC-2015-2593-GPA-ZC-HD-ZAA-SPR for the proposed 1,218 residential units or City Planning approval is required.

   g.   The submitted Map does not comply with the maximum density (400 s.f. of lot area/dwelling unit) requirement of the (proposed) C2-2 Zone.  Revise the Map to show compliance with the above requirement or as granted by Case No. CPC-2015-2593-GPA-ZC-HD-ZAA-SPR or obtain approval from the Department of City Planning.

   h.   The submitted plot plan is not complete.  Provide a plot plan drawn to scale that accurately dimensions the proposed property lines, building footprint along the lot line after required street dedications are taken on the site.  If building footprints or required parking spaces are projecting into the public ways, then either obtain a building permit from LADBS to remove the portion of the use/building or obtain a Revocable Permit from BOE to allow it to remain.

   i.   Record a Covenant and Agreement to treat the buildings and structures located in an Air Space Subdivision as if they were within a single lot.

**Notes:**

   Each Air Space lot shall have access to a street by one or more easements or other entitlements to use in a form satisfactory to the Advisory Agency and the City Engineer.

The submitted Map may not comply with the number of parking spaces required by Section 12.21 a 4 (a) based on number of habitable rooms in each unit. If there are sufficient numbers of parking spaces, obtain approval from the Department of City Planning.

Any proposed structures or uses on the site have not been checked for and shall comply with Building and Zoning Code requirements. Plan check will be required before any construction, occupancy or change of use.

An appointment is required for the issuance of a clearance letter from the Department of Building and Safety. The applicant is asked to contact Laura Duong at (213) 482-0434 to schedule an appointment.

## DEPARTMENT OF TRANSPORTATION

4. Prior to recordation of the final map, satisfactory arrangements shall be made to satisfy the recommendations of the Department of Transportation. (MM)

   a. Install New Traffic Signal on La Cienega Boulevard North of Jefferson Boulevard at the Project Driveway
   All signal design and construction work shall be performed in accordance with LADOT's Signal Design standards and shall include all conduits for interconnects, traffic signal hardware and software and other applicable worked deemed necessary. The location of the signal will be determined by LADOT. Restripe pavement as needed.

   b. Fairfax Avenue & Pico Boulevard (Intersection 2)
   Implement peak hour parking restrictions along Pico Boulevard to provide an additional through lane westbound in the morning peak period and eastbound in the afternoon peak period. Modify pavement striping as needed. If the parking cannot be prohibited during the peak periods, a significant project impact would remain at this location.

   c. La Cienega Boulevard & Venice Boulevard (Intersection 10)
   Design and implement a westbound dual-left-turn operation. Restripe pavement and modify traffic signal equipment as needed. Because Venice Boulevard is a designated State Highway, the project applicant shall be responsible for securing final design approval from Caltrans.

   d. Fairfax Avenue & I-10 Freeway Ramps / Electric Drive (Intersection 13)
   Design and implement a northbound dual-left turn operation. Restripe pavement and modify traffic signal equipment as needed. The feasibility of this proposal is contingent upon Caltrans approval to remove the carpool designation from the lane that this second left-turn operation would need to feed into.

   e. La Brea Avenue & Jefferson Boulevard (Intersection 28)
   Design and implement an exclusive southbound right-turn lane. This could require the purchase of additional right-of-way to provide sufficient pavement width to accommodate the right-turn lane. If this right-of-way cannot be purchased, a significant project impact would remain at this location.

   Notes: **Should any improvement be deemed infeasible at the time of reconciliation, the City may substitute an alternative measure of equivalent**

**effectiveness.**

That applicant shall be responsible for the cost and implementation of any necessary traffic signal equipment modifications, bus stop relocations and lost parking meter revenues associated with the proposed transportation improvements described above. Unless otherwise noted, all transportation improvements and associated traffic signal work within the City of Los Angeles must be guaranteed through the B-permit process of the Bureau of Engineering, prior to issuance of any building permits and completed prior to the issuance of any certificates of occupancy. Temporary certificates of occupancy may be granted in the event of any delay through no fault of the applicant, provided that, in each case, the applicant had demonstrated reasonable efforts and due diligence to the satisfaction of DOT. Prior to setting the bond amount, BOE shall require that the developer's engineer or contractor contact DOT's B-Permit Coordination Engineer at (213) 928-9663, to arrange a pre-design meeting to finalize the plan(s) needed for the project.

## FIRE DEPARTMENT

5. Prior to recordation of the final map, satisfactory arrangements shall be made to satisfy the recommendations of the Fire Department.

    a. Submit plot plans for Fire Department approval and review prior to recordation of Tract Action.

    b. Adequate off-site public and on-site private fire hydrants may be required. Their number and location to be determined after the Fire Department's review of the plot plan.

    c. Fire lane width shall not be less than 20 feet. When a fire lane must accommodate the operation of Fire Department aerial ladder apparatus or where fire hydrants are installed, those portions shall not be less than 28 feet in width.

    d. Where above ground floors are used for residential purposes, the access requirement shall be interpreted as being the horizontal travel distance from the street, driveway, alley, or designated fire lane to the main entrance of individual units.

    e. Adequate public and private fire hydrants shall be required.

    f. Access for Fire Department apparatus and personnel to and into all structures shall be required.

    g. Any required fire hydrants to be installed shall be fully operational and accepted by the Fire Department prior to any building construction.

    h. All parking restrictions for fire lanes shall be posted and/or painted prior to any Temporary Certificate of Occupancy being issued.

    i. Plans showing areas to be posted and/or painted, "FIRE LANE NO PARKING" shall be submitted and approved by the Fire Department prior to building permit

Case 2:20-cr-00326-JFW Document 1244-3 Filed 01/12/24 Page 97 of 358 Page ID
Case No. CPC-2015-2593-GPA-ZC-HD-SPR #:29134

T-5

application sign-off.

j.      Where rescue window access is required, provide conditions and improvements
        necessary to meet accessibility standards as determined by the Los Angeles Fire
        Department.

k.      Building designs for multi-storied residential buildings shall incorporate at least
        one access stairwell off the main lobby of the building; But, in no case greater
        then 150ft horizontal travel distance from the edge of the public street, private
        street or Fire Lane. This stairwell shall extend unto the roof.

l.      Entrance to the main lobby shall be located off the address side of the building.

m.      Any required Fire Annunciator panel or Fire Control Room shall be located within
        50ft visual line of site of the main entrance stairwell or to the satisfaction of the
        Fire Department.

        **Notes**: The applicant is further advised that all subsequent contact regarding
        these conditions must be with the Hydrant and Access Unit. This would include
        clarification, verification of condition compliance and plans or building permit
        applications, etc., and shall be accomplished BY APPOINTMENT ONLY, in order
        to assure that you receive service with a minimum amount of waiting please call
        (213) 482-6504. You should advise any consultant representing you of this
        requirement as well.

## BUREAU OF STREET LIGHTING

6.      If new street light(s) are required, then prior to the recordation of the final map or
        issuance of the Certificate of Occupancy (C of O), street lighting improvement plans
        shall be submitted for review and the owner shall provide a good faith effort via a ballot
        process for the formation or annexation of the property within the boundary of the
        development into a Street Lighting Maintenance Assessment District.

## BUREAU OF SANITATION

7.      Satisfactory arrangements shall be made with the Bureau of Sanitation, Wastewater
        Collection Systems Division for compliance with its sewer system review and
        requirements. Upon compliance with its conditions and requirements, the Bureau of
        Sanitation, Wastewater Collection Systems Division will forward the necessary
        clearances to the Bureau of Engineering. (This condition shall be deemed cleared at the
        time the City Engineer clears Condition 1)

## INFORMATION TECHNOLOGY AGENCY

8.      That satisfactory arrangements be made in accordance with the requirements of the
        Information Technology Agency to assure that cable television facilities will be installed
        in the same manner as other required improvements. Refer to the LAMC Section 17.05-
        N. Written evidence of such arrangements must be submitted to the Information
        Technology Agency, 200 North Main Street, 12th Floor, Los Angeles, CA 90012, 213
        922-8363.

**DEPARTMENT OF RECREATION AND PARKS**

**9.**     That the Quimby fee or Recreation and Park Fee be based on the C2 zone. (MM)

## D LIMITATIONS

Pursuant to Section 12.32 of the Municipal Code, the following limitations are hereby imposed upon the use of the subject property, subject to the "D" limitation classification.

1.      **Floor Area Ratio (FAR).** The project Floor Area Ratio shall be limited to a maximum 3.90:1; thereby allowing an approximately 1,900,000 square foot project.

2.      **Height.** The podium building shall be limited to a height of 110 feet and the tower shall be limited to a height of 320 foot height as shown on elevation in "Exhibit A".

## (Q) QUALIFIED CONDITIONS OF APPROVAL

Pursuant to Section 12.32 of the Municipal Code, the following limitations are hereby imposed upon the use of the subject property, subject to the "Q" Qualified classification.

1.  **Site Development.** Except as modified herein, the project shall be in substantial conformance with the plans and materials submitted by the applicant, stamped "Exhibit A," and attached to the subject case file. No change to the plans will be made without prior review by the Department of City Planning, and written approval by the Director of Planning. Each change shall be identified and justified in writing. Minor deviations may be allowed in order to comply with the provisions of the Municipal Code or the project conditions.

    a.  Public Restrooms at Zocalo Park. The project will include restrooms available to the public, to remain open during the hours of operation consistent with the retail uses.

    b.  Maintenance of Zocalo Park. The property owner or property owner's association(s) will maintain the Zocalo park free of debris and graffiti, and in a safe, clean, and acceptable condition for the life of the project through a covenant as follows:

        i.  Prior to the issuance of any permits relative to this matter, an agreement concerning all the information contained in this Condition No. 1(b) shall be recorded in the County Recorder's Office. The agreement shall run with the land and shall be binding on any subsequent property owners, heirs or assigns. A copy of the recorded agreement, bearing the Recorder's number and date shall be submitted to the Department of City Planning's for attachment to the case file.

    c.  Façade. The facades of the buildings shall include a variation of materials and proportions in a manner consistent with and consisting of the materials identified, on the attached "Exhibit A" and "Exhibit E".

    d.  **Development Services Center.** Prior to sign-off on building permits by the Department of City Planning's Development Services Center, the Department of City Planning's Major Projects Section, shall confirm, via signature, that the project's building plans substantially conform to the conceptual plans stamped as "Exhibit A" and "Exhibit E", as approved by the City Planning Commission.

2.  **Density.**

    a.  The project shall be limited to a maximum of 1,090 dwelling units. In exchange for a 5% setaside for households earning 80 to 120% AMI, the project shall be granted an addition 73 units.

    b.  The project shall include up to 200,000 square feet of office space, and 100,000 square feet of grocery, restaurant, and retail space.

3.  **Residential Automobile Parking.** Parking would be provided in accordance with Los Angeles Municipal Code (LAMC) parking requirements.

    a.  Twenty percent (20%) of the project's code required parking spaces are to have access to power for the future installation of charging stations for vehicles, including newer transportation charging technologies that may supersede the current electric vehicle requirements.

4.    **Solar Panels.**  Solar Panels will be provided in accordance with the roof plan stamped "Exhibit B".

5.    **Calculation of Residential Density.** The Project's Residential Density is based upon a by-right density of 1,090 dwelling units.  In exchange for a 5% set aside (55 dwelling units) for workforce housing (80 to 120% AMI), the project may receive a density bonus of 73 dwelling units for a total residential density of 1,218 units. The project shall be limited to 1,218 residential units.

     a.    Prior to the issuance of a building permit, the owner shall execute a covenant to the satisfaction of the Los Angeles Housing and Community Investment Department (HCIDLA) to make 55 units available to families earning more than 80% of the area median income and less than 120%, for sale or rental as determined to be affordable to such households by HCIDLA for a period of 55 years.  Enforcement of the terms of said covenant shall be the responsibility of HCIDLA.  The Applicant will present a copy of the recorded covenant to the Department of City Planning for inclusion in this file.  The project shall comply with any monitoring requirements established by HCIDLA.

## Other Entitlement Conditions of Approval

6.    **Use.**  The use of the subject property shall be limited to those uses permitted in the C2 Zone as defined in Section 12.16.A of the L.A.M.C.

7.    **Commercial Parking.**  Provide parking for commercial use in compliance with L.A.M.C. Section 12.21-A,4.

8.    **Bicycle Parking.** Bicycle parking shall be provided consistent with LAMC 12.21 A.16.  Long-term bicycle parking shall be provided at a rate of one per dwelling unit or guest room.  Additionally, short-term bicycle parking shall be provided at a rate of one per ten dwelling units or guest rooms, with a minimum of two short-term bicycle parking spaces.  Based upon the number of dwelling units, 1,218 long-term and 121 short-term bicycle parking spaces shall be provided onsite for residential uses.  For commercial uses, long-term bicycle parking shall be provided at 1 space per 2,000 square feet of retail, 1 space per 2,000 square feet of restaurant, and 1 space per 5,000 square feet of office.  Based upon the square footage of commercial uses, 90 long-term bicycle spaces shall be provided.  For short-term bicycle parking, 1 space per 2,000 square feet of retail and restaurant shall be required and 1 space per 10,000 square feet of office shall be required.  Based upon the square footage of commercial uses, 70 short-term commercial bicycle spaces shall be provided.

9.    **Building Articulation.**  The building façade shall include large windows, balcony openings, variation of façade plans and rooflines as shown on the project plans labeled "Exhibit A" stamp-dated March 3, 2016.

## ADMINISTRATIVE CONDITIONS OF APPROVAL

10.   **Approval, Verification and Submittals.** Copies of any approvals, guarantees or verification of consultations, review or approval, plans, etc., as may be required by the subject conditions, shall be provided to the Department of City Planning for placement in the subject file.

11. **Code Compliance.** Area, height and use regulations of the zone classification of the subject property shall be complied with, except where herein conditions are more restrictive.

12. **Covenant.** Prior to the issuance of any permits relative to this matter, an agreement concerning all the information contained in these conditions shall be recorded in the County Recorder's Office. The agreement shall run with the land and shall be binding on any subsequent property owners, heirs or assigns. The agreement shall be submitted to the Department of City Planning's Development Services Center for approval before being recorded. After recordation, a copy bearing the Recorder's number and date shall be provided to the Department of City Planning for attachment the file.

13. **Definition.** Any agencies, public officials or legislation referenced in these conditions shall mean those agencies, public officials, legislation or their successors, designees or amendment to any legislation.

14. **Enforcement.** Compliance with these conditions and the intent of these conditions shall be to the satisfaction of the Department of City Planning and any designated agency, or the agency's successor and in accordance with any stated laws or regulations, or any amendments thereto.

15. **Building Plans.** Page 1 of the grants and all the conditions of approval shall be printed on the building plans submitted to the City Planning Department and the Department of Building and Safety.

16. **Corrective Conditions.** The authorized use shall be conducted at all times with due regard for the character of the surrounding district, and the right is reserved to the City Planning Commission, or the Director of Planning, pursuant to Section 12.27.1 of the Municipal Code, to impose additional corrective conditions, if in the decision makers opinion, such actions are proven necessary for the protection of persons in the neighborhood or occupants of adjacent property.

17. **Project Plan Modifications.** Any corrections and/or modifications to the Project plans made subsequent to this grant that are deemed necessary by the Department of Building and Safety, Fire Department, or other City Agency for Code compliance, and which involve a change in site plan, floor area, parking, building height, yards or setbacks, building separations, or lot coverage, shall require a referral of the revised plans back to the Department of City Planning for additional review and final sign-off prior to the issuance of any building permit in connection with said plans. This process may require additional review and/or action by the appropriate decision making authority including the Director of Planning, City Planning Commission, Area Planning Commission, or Board.

18. **Indemnification.** Applicant shall do all of the following:

(i) Defend, indemnify and hold harmless the City from any and all actions against the City relating to or arising out, in whole or in part, of the City's processing and approval of this entitlement, including but not limited to, an action to attack, challenge, set aside, void, or otherwise modify or annul the approval of the entitlement, the environmental review of the entitlement, or the approval of subsequent permit decisions, or to claim personal property damage, including from inverse condemnation or any other constitutional claim.

(ii) Reimburse the City for any and all costs incurred in defense of an action related to or arising out of, in whole or in part, the City's processing and approval of the entitlement,

including but not limited to payment of all court costs and attorney's fees, costs of any judgments or awards against the City (including an award of attorney's fees), damages, and/or settlement costs.

(iii) Submit an initial deposit for the City's litigation costs to the City within 10 days' notice of the City tendering defense to the Applicant and requesting a deposit. The initial deposit shall be in an amount set by the City Attorney's Office, in its sole discretion, based on the nature and scope of action, but in no event shall the initial deposit be less than $25,000. The City's failure to notice or collect the deposit does not relieve the Applicant from responsibility to reimburse the City pursuant to the requirement in paragraph (ii).

(iv) Submit supplemental deposits upon notice by the City. Supplemental deposits may be required in an increased amount from the initial deposit if found necessary by the City to protect the City's interests. The City's failure to notice or collect the deposit does not relieve the Applicant from responsibility to reimburse the City pursuant to the requirement in paragraph (ii).

(v) If the City determines it necessary to protect the City's interest, execute an indemnity and reimbursement agreement with the City under terms consistent with the requirements of this condition.

The City shall notify the applicant within a reasonable period of time of its receipt of any action and the City shall cooperate in the defense. If the City fails to notify the applicant of any claim, action, or proceeding in a reasonable time, or if the City fails to reasonably cooperate in the defense, the applicant shall not thereafter be responsible to defend, indemnify or hold harmless the City. The City shall have the sole right to choose its counsel, including the City Attorney's office or outside counsel. At its sole discretion, the City may participate at its own expense in the defense of any action, but such participation shall not relieve the applicant of any obligation imposed by this condition. In the event the Applicant fails to comply with this condition, in whole or in part, the City may withdraw its defense of the action, void its approval of the entitlement, or take any other action. The City retains the right to make all decisions with respect to its representations in any legal proceeding, including its inherent right to abandon or settle litigation.

For purposes of this condition, the following definitions apply:

"City" shall be defined to include the City, its agents, officers, boards, commissions, committees, employees, and volunteers.

"Action" shall be defined to include suits, proceedings (including those held under alternative dispute resolution procedures), claims, or lawsuits. Actions includes actions, as defined herein, alleging failure to comply with any federal, state or local law.

Nothing in the definitions included in this paragraph are intended to limit the rights of the City or the obligations of the Applicant otherwise created by this condition.

19.  **Environmental Mitigation Conditions**

Prior to the recordation of the final map, the subdivider shall prepare and execute a covenant and Agreement (Planning Department General Form CP-6770) in a manner satisfactory to the Planning Department, binding the subdivider and all successors to the following:

This Mitigation Monitoring Program ("MMP") has been prepared pursuant to Public Resources Code Section 21081.6, which requires a Lead Agency to adopt a "reporting or monitoring program for changes to the project or conditions of project approval, adopted in order to mitigate or avoid significant effects on the environment." In addition, Section 15097(a) of the State CEQA Guidelines requires that:

> *In order to ensure that the mitigation measures and project revisions identified in the EIR or negative declaration are implemented, the public agency shall adopt a program for monitoring or reporting on the revisions which it has required in the project and measures it has imposed to mitigate or avoid significant environmental effects. A public agency may delegate reporting or monitoring responsibilities to another public agency or to a private entity which accepts the delegation; however, until mitigation measures have been completed the lead agency remains responsible for ensuring that implementation of the mitigation measures occurs in accordance with the program.*

The City of Los Angeles is the Lead Agency for the Project and therefore is responsible for administering and implementing the MMP. Where appropriate, the Project's Draft and Final EIRs identified mitigation measures and project design features to avoid or to mitigate potential impacts identified to a level where no significant impact on the environment would occur, or impacts would be reduced to the extent feasible. This MMP is designed to monitor implementation of the Project's mitigation measures as well as its project design features.

As shown on the following pages, each required mitigation measure and proposed project design feature for the Project is listed and categorized by impact area, with an accompanying identification of the following:

- **Enforcement Agency:** The agency with the power to enforce the Mitigation Measure/Project Design Feature.
- **Monitoring Agency:** The agency to which reports involving feasibility, compliance, implementation and development are made.
- **Monitoring Phase:** The phase of the Project during which the Mitigation Measure/Project Design Feature shall be monitored.
- **Monitoring Frequency:** The frequency at which the Mitigation Measure/Project Design Feature shall be monitored.
- **Action Indicating Compliance:** The action of which the Enforcement or Monitoring Agency indicates that compliance with the required Mitigation Measure/Project Design Feature has been implemented.

The Project's MMP will be in place throughout all phases of the Project. The Project applicant will be responsible for implementing all mitigation measures unless otherwise noted. The applicant shall also be obligated to provide a certification report to the appropriate monitoring agency and the appropriate enforcement agency that compliance with the required mitigation measure or project design feature has been implemented. The City's existing planning, engineering, review, and inspection processes will be used as the basic foundation for the MMP procedures and will also serve to provide the documentation for the reporting program.

The certification report shall be submitted to the Project Planner at the Los Angeles Department of City Planning. Each report will be submitted to the Project Planner

annually following completion/implementation of the applicable mitigation measures and project design features and shall include sufficient information and documentation (such as building or demolition permits) to reasonably determine whether the intent of the measure has been satisfied. The City, in conjunction with the Applicant, shall assure that Project construction and operation occurs in accordance with the MMP.

After review and approval of the final MMP by the City, minor changes and modifications to the MMP are permitted, but can only be made by the Applicant subject to the approval by the City. The City, in conjunction with any appropriate agencies or departments, will determine the adequacy of any proposed changes or modification. The flexibility is necessary due to the nature of the MMP, the need to protect the environment in the most efficient manner, and the need to reflect changes in regulatory conditions, such as but not limited to changes to building code requirements, updates to LEED "Silver" standards, and changes in Secretary of Interior Standards. No changes will be permitted unless the MMP continues to satisfy the requirements of CEQA, as determined by the City.

**Mitigation Measures & Project Design Features**

**MM A.1 Cultural Resources (Archaeological Resources).**  If any archaeological materials are encountered during the course of Project  development, all further development activity shall be halted in the area of the discovery and:

a.      The services of an archaeologist shall then be secured by contacting the South Central Coastal Information Center located at California State University Fullerton, or a member of the Society of Professional Archaeologists (SOPA), or a SOPA-qualified archaeologist, who shall assess the discovered material(s) and prepare a survey, study, or report evaluating the impact.

b.      The archaeologist's survey, study, or report shall contain a recommendation(s), if necessary, for the preservation, conservation, or relocation of the resource.

c.      The applicant shall comply with the recommendations of the evaluating archaeologist, as contained in the survey, study, or report.

d.      Project development activities may resume once copies of the archaeological survey, study, or report are submitted to the South Central Coastal Information Center at California State University Fullerton.

e.      Prior to the issuance of any building permit, the applicant shall submit a letter to the case file indicating what, if any, archaeological reports have been submitted, or a statement indicating that no material was discovered.

f.      A covenant and agreement binding the applicant to this condition shall be recorded prior to issuance of a grading permit.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: If materials are encountered
**Action Indicating Compliance**: Field inspection sign-off

**MM A-2 Cultural Resources (Paleontological Resources).** If any paleontological materials are encountered during the course of Project development, all further development activities shall be halted in the area of the discovery and:

a.   The services of a paleontologist shall then be secured by contacting the Center for Public Paleontology – USC, UCLA, California State University Los Angeles, California State University Long Beach, or the Los Angeles County Natural History Museum – who shall assess the discovered material(s) and prepare a survey, study, or report evaluating the impact.

b.   The paleontologist's survey, study, or report shall contain a recommendation(s), if necessary, for the preservation, conservation, or relocation of the resource.

c.   The applicant shall comply with the recommendations of the evaluating paleontologist, as contained in the survey, study, or report.

d.   Project development activities may resume once copies of the paleontological survey, study, or report are submitted to the Los Angeles County Natural History Museum.

e.   Prior to the issuance of any building permit, the applicant shall submit a letter to the case file indicating what, if any, paleontological reports have been submitted, or a statement indicating that no material was discovered.

f.   A covenant and agreement binding the applicant to this condition shall be recorded prior to the issuance of a grading permit.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: If materials are encountered
**Action Indicating Compliance**: Field inspection sign-off

**MM A-3 Cultural Resources (Human Remains).** In the event that human remains are discovered during excavation activities, the following procedure shall be observed:

a.   Stop immediately and contact the County Coroner.

b.   The coroner has two working days to examine human remains after being notified by the responsible person. If the remains are Native American, the coroner has 24 hours to notify the Native American Heritage Commission.

c.   The Native American Heritage Commission will immediately notify the person it believes to be the most likely descendant of the deceased Native American.

d.   The most likely descendant has 48 hours to make recommendations to the owner, or representative, for the treatment or disposition, with proper dignity, of the human remains and grave gods.

e.   If the descendant does not make recommendations within 48 hours, the owner

shall reinter the remains in an area of the property secure from further disturbance.

f.   If the owner does not accept the descendant's recommendations, the owner or the descendant may request mediation by the Native American Heritage Commission.

**Enforcement Agency**: Los Angeles Department of Building and Safety, Los Angeles County Coroner
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: If human remains are encountered
**Action Indicating Compliance**: Coroner or Native American Heritage Commission sign-off

### Aesthetics

**MM B.1** All mechanical and electrical equipment that is located on the rooftops would be screened from public view.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**MM B.2** The maximum height of any building constructed as part of the Project would be 320 feet.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**MM B.3** The maximum square footage of the proposed tower would be 480,000 square feet.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**MM B.4** The Project shall conform to the general layout shown on the site plan dated January 6, 2016.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check

**Action Indicating Compliance**: Plan approval

**MM B.5** Utility equipment would be placed underground, screened from public view, or incorporated into the design of the Project.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**MM B.6** All exterior lighting would be designed with internal and/or external glare control and would be designed, arranged, directed, or shielded to contain direct illumination on-site.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**MM B.7** The exterior of the proposed structures shall be constructed of materials such as, but not limited to, high-performance and/or non-reflective tinted glass (no mirror-like tints or films) and pre-cast concrete or fabricated wall surfaces to minimize glare and reflected heat.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

### Air Quality

**MM C.1** All diesel-powered off-road construction equipment greater than 50 horsepower shall meet USEPA Tier 3 or higher emissions standards. In addition, all construction equipment shall be outfitted with BACT devices certified by CARB. Any emissions control device used by the contractor shall achieve emissions reductions that are no less than what could be achieved by a CARB-defined Level 3 diesel emissions control strategy for a similarly sized engine as defined by CARB regulations.

**Enforcement Agency**: Los Angeles Department of Building and Safety; SCAQMD
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Periodic field inspection
**Action Indicating Compliance**: Field inspection sign off

**MM C.2** Require the use of 2010 and newer diesel haul trucks (e.g., material delivery trucks and soil import/export) and if the Lead Agency determines that

2010 model year or newer diesel trucks  cannot be obtained, the Lead Agency shall require trucks that meet U.S. EPA 2007 model year NOx emissions requirements.

**Enforcement Agency**: Los Angeles Department of Building and Safety; SCAQMD
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Periodic field inspection
**Action Indicating Compliance**: Field inspection sign off

**MM C.3**  At the time of mobilization of each applicable unit of equipment, a copy of each unit's certified  tier specification, BACT documentation, and CARB or SCAQMD operating permit shall be provided.

**Enforcement Agency**: Los Angeles Department of Building and Safety; SCAQMD
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Once, during field inspection
**Action Indicating Compliance**: Field inspection sign off

**MM C.4**  Encourage construction contractors to apply for SCAQMD "SOON" funds. Incentives could be provided for those construction contractors who apply for SCAQMD "SOON" funds. The  "SOON" program provides funds to accelerate clean up of off-road diesel vehicles, such as heavy duty construction equipment. More information on this program can be found at: http://www.aqmd.gov/home/programs/business/business-detail?title=off-road-diesel-engines&parent=vehicle-engine-upgrades.

**Enforcement Agency**: Los Angeles Department of Building and Safety; SCAQMD
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Periodic field inspection
**Action Indicating Compliance**: Field inspection sign off

**MM C.5**  Hearths and fireplaces shall be excluded from residential units.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-Construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Issuance of building permits

**MM C.6** Construction activities shall comply with SCAQMD Rule 403, including the following measures:

- Apply water to disturbed areas of the site three times a day

- Require the use of a gravel apron or other equivalent methods to reduce

mud and dirt trackout onto truck exit routes

- Appoint a construction relations officer to act as a community liaison concerning on-site construction activity including resolution of issues related to PM generation.

- Limit soil disturbance to the amounts analyzed in the Final EIR.

- All materials transported off-site shall be securely covered.

- Apply non-toxic soil stabilizers according to manufacturers' specifications to all inactive construction areas (previously graded areas inactive for ten days or more).

- Traffic speeds on all unpaved roads to be reduced to 15 mph or less.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Periodic field inspection
**Action Indicating Compliance**: Field inspection sign off

**MM C.7** All diesel-fueled commercial heavy- and medium-duty vehicles shall comply with CARB's regulations limiting idling (Title 13 Section 2485). This includes no idling of primary diesel engines for more than five minutes and not using diesel-fueled auxiliary power systems to power cab functions (e.g., heating, air conditions) for more than five minutes when within 100 feet of restricted areas.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Periodic field inspection
**Action Indicating Compliance**: Field inspection sign off

**MM C.8** Architectural coatings and solvents applied during construction activities shall comply with SCAQMD Rule 1113, which governs the VOC content of architectural coatings.

**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Field inspection
**Action Indicating Compliance**: Field inspection sign off

**MM C.9** Any stationary sources of emissions shall comply with SCAQMD rules and regulations, including Regulation XIII, which governs New Source Review for major stationary sources.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety

**Monitoring Phase**: Construction
**Monitoring Frequency**: Field inspection
**Action Indicating Compliance**: Field inspection sign off

**MM C.10**  Any restaurants that include chain-driven charbroilers shall comply with SCAQMD Rule 1138, which requires use of catalytic oxidizer controls.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Field inspection
**Action Indicating Compliance**: Field inspection sign off

## Geology & Soils

**MM D.1**  The Project shall comply with the conditions contained within the Department of Building and Safety's Geology and Soils Report Approval Letter for the proposed project, and  as it may be subsequently amended or modified.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Prior to the issuance of grading or building permits
**Monitoring Frequency**: Ongoing during construction
**Action Indicating Compliance**: Field inspection sign-off

**MM D.2**  All structures and buildings shall be constructed to industry standards and agency regulations for all geotechnical considerations, including seismic, soil excavation, de-watering requirements, grading, foundation design, settlement, pavement recommendations, retaining walls, drainage, shoring, and any other relevant recommendations within the Geotechnical Investigation.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Ongoing during construction
**Action Indicating Compliance**: Field inspection sign-off

**MM E-1  Greenhouse Gas Emissions.**  To encourage carpooling and the use of electric vehicles by Project residents and visitors, the Applicant shall provide panel capacity and conduit for future installation of electrical outlets, designed to accommodate the future installation, and simultaneous charging, of a minimum number of 208/240 V amp, grounded AC outlets, that is equal to 20 percent of the total number of parking spaces. The conduit shall terminate within the parking area. When the application of the 20 percent results in a fractional space, round up to the next whole number.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Field inspection
**Action Indicating Compliance**: Field inspection sign-off

### Hazards & Hazardous Materials

**MM F.1** Prior to issuance of a grading permit, the Project Applicant shall prepare a Soil Management Plan (SMP) for the Project. The SMP should address the delineation of the vertical and lateral extent of identified TPH and metals impacts in Project Site soil. Soil management procedures shall be described so that hazardous soil can be separated from non-hazardous soil during excavation tasks.

Soil management procedures outlined in the SMP shall be followed during the Project's excavation and development phases to properly manage the various classes of soil and to minimize risk to workers and the public during construction.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**:    Grading and excavation
**Monitoring Frequency**: Periodic, during grading
**Action Indicating Compliance**: Issuance of grading permit

**MM F.2** The soils is the areas on Parcels A and B with the potential for elevated concentrations of lead will be excavated prior to the start of construction and the excavated material will be stockpiled and characterized for disposal prior to shipment off-site. Soil samples will be collected from the bottom and sidewalls of the excavation to confirm the lead impacted soil has been removed.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Grading and excavation
**Monitoring Frequency**: Periodic, during grading
**Action Indicating Compliance**: Soil samples indicating that lead impacted soil has been removed.

**MM F.3** If an underground storage tank on Parcel D is encountered during grading and excavation for the proposed subterranean parking structure, it shall be removed under permit and in accordance with LAFD regulations.

**Enforcement Agency**: Los Angeles Fire Department.
**Monitoring Agency**: Los Angeles Fire Department.
**Monitoring Phase**: During grading and excavation
**Monitoring Frequency**: Periodic during grading and excavation
**Action Indicating Compliance**: Issuance of underground storage tank removal approval letter

**MM F.4** Prior to the issuance of any permit for the demolition or alteration of the existing structures, the Applicant shall provide a letter to the Department of Building and Safety from a qualified asbestos abatement consultant indicating that no Asbestos-Containing Materials (ACM) are present in the building. If ACMs are found to be present, it will need to be abated in compliance with the South Coast Air Quality Management District's Rule 1403 as well as all other applicable State and Federal rules and regulations.

**Enforcement Agency**: Los Angeles Department of Building and Safety.
**Monitoring Agency**: Los Angeles Department of Building and Safety.
**Monitoring Phase**: Prior to demolition activities
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Issuance of a building permit

**MM F.5**   Prior to issuance of any permit for the demolition or alteration of the existing structures, a lead-based paint survey shall be performed to the written satisfaction of the Department of Building and Safety. Should lead-based paint materials be identified, standard handling and disposal practices shall be implemented pursuant to OSHA regulations.

**Enforcement Agency**: Los Angeles Department of Building and Safety.
**Monitoring Agency**: Los Angeles Department of Building and Safety.
**Monitoring Phase**: Prior to demolition activities
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Issuance of a building permit

**MM F.6**   Prior to the issuance of a building permit, the Applicant shall develop an emergency response plan in consultation with the Fire Department. The emergency response plan shall include but not be limited to the following: mapping of emergency exits, evacuation routes for vehicles and pedestrians, location of nearest hospitals, and fire departments.

**Enforcement Agency**: LAFD; Los Angeles Department of Building and Safety
**Monitoring Agency**: LAFD; Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-operation; Operation
**Monitoring Frequency**: Once, for Plan approval prior to operation
**Action Indicating Compliance**: Plan approval prior to operation (Pre-operation)

### Hydrology & Water Quality

**MM G.1**   Prior to issuance of a grading permit, the Applicant shall obtain coverage under the State Water Resources Control Board National Pollutant Discharge Elimination System General Permit for Storm Water Discharges Associated with Construction and Land Disturbance Activities (Order No. 2009-0009-DWQ, National Pollutant Discharge Elimination System No. CAS000002) (Construction General Permit). The Applicant shall provide the Waste Discharge Identification Number to the City of Los Angeles to demonstrate proof of coverage under the Construction General Permit. A Storm Water Pollution Prevention Plan shall be prepared and implemented for the proposed Modified Project in compliance with the requirements of the Construction General Permit. The Storm Water Pollution Prevention Plan shall identify construction Best Management Practices to be implemented to ensure that the potential for soil erosion and sedimentation is minimized and to control the discharge of pollutants in stormwater runoff as a result of construction activities.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-grading

**Monitoring Frequency**: Once, at permit application submittal
**Action Indicating Compliance**: Issuance of grading permit

**MM G.2** If required, any dewatering activities during construction shall comply with the requirements of the Waste Discharge Requirements for Discharges of Groundwater from Construction and Project Dewatering to Surface Waters in Coastal Watersheds of Los Angeles and Ventura Counties (Order No. R4-2008-0032, National Pollutant Discharge Elimination System No. CAG994004) or subsequent permit. This will include submission of a Notice of Intent for coverage under the permit to the Los Angeles Regional Water Quality Control Board at least 45 days prior to the start of dewatering and compliance with all applicable provisions in the permit, including water sampling, analysis, and reporting of dewatering-related discharges.

**Enforcement Agency**: Los Angeles Regional Water Quality Control Board
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: 45 days prior to dewatering, if required
**Monitoring Frequency**: Once, at permit application submittal
**Action Indicating Compliance**: Submittal of Notice of Intent

**MM G.3** Prior to issuance of grading permits, the Applicant shall submit a Low Impact Development Plan and/or Standard Urban Stormwater Mitigation Plan to the City of Los Angeles Bureau of Sanitation Watershed Protection Division for review and approval. The Low Impact Development Plan and/or Standard Urban Stormwater Mitigation Plan shall be prepared consistent with the requirements of the Development Best Management Practices Handbook.

**Enforcement Agency**: Los Angeles Bureau of Sanitation
**Monitoring Agency**: Los Angeles Bureau of Sanitation
**Monitoring Phase**: Pre-grading
**Monitoring Frequency**: Once, at LID Plan submittal
**Action Indicating Compliance**: Issuance of grading permit

**MM G.4** The Best Management Practices shall be designed to retain or treat the runoff from a storm event producing 0.75 inch of rainfall in a 24-hour period, in accordance with the Development Best Management Practices Handbook Part B Planning Activities. A signed certificate from a licensed civil engineer or licensed architect confirming that the proposed Best Management Practices meet this numerical threshold standard shall be provided.

**Enforcement Agency**: Los Angeles Bureau of Sanitation
**Monitoring Agency**: Los Angeles Bureau of Sanitation
**Monitoring Phase**: Pre-grading
**Monitoring Frequency**: Once, at submittal of Best Management Practices certificate
**Action Indicating Compliance**: Issuance of grading permit

**MM G.5** The Project Applicant shall comply with all mandatory storm water permit requirements (including, but not limited to NPDES, SWPPP and SUSMP, and LID requirements) at the Federal, State and local level.

**Enforcement Agency**: Los Angeles Department of Building and Safety.
**Monitoring Agency**: Los Angeles Department of Building and Safety.
**Monitoring Phase**: Prior to construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Issuance of a building permit

### Noise

**MM I.1** The Project shall comply with the City of Los Angeles Building Regulations Ordinance No. 178048, which requires a construction site notice to be provided that includes the following information: job site address, permit number, name and phone number of the contractor and owner or owner's agent, hours of construction allowed by code or any discretionary approval for the site, and City telephone numbers where violations can be reported. The notice shall be posted and maintained at the construction site prior to the start of construction and displayed in a location that is readily visible to the public.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Once, during field inspection
**Action Indicating Compliance**: Field inspection sign-off

**MM I.2** Two weeks prior to commencement of construction, notification shall be provided to the off-site residential and studio uses within 500 feet of the Project site that discloses the construction schedule, including the types of activities and equipment that would be used throughout the duration of the construction period.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Two weeks prior to construction
**Monitoring Frequency**: Once, at notification
**Action Indicating Compliance**: Contractor sign-off

**MM I.3** A combination of temporary sound barriers that are capable of achieving a sound attenuation of up to 20 dBA as outlined in the EIR (including Appendix B to this Final EIR) and as determined by the Department of Building and Safety ), and capable of blocking the line-of-sight from ground level construction equipment powered by internal combustion engines to the adjacent studios and other commercial properties to the immediate north of the Proposed Project site shall be installed as feasible.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Once, during field inspection
**Action Indicating Compliance**: Field inspection sign-off

**MM I.4** Temporary sound barriers that are capable of achieving a sound attenuation of up to 5 dBA as determined by the Department of Building and

Safety , and capable of blocking the line-of-sight from ground level construction equipment powered by internal combustion engines to the residences east of La Cienega Boulevard shall be installed as feasible.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Once, during field inspection
**Action Indicating Compliance**: Field inspection sign-off

**MM I.5** All powered construction equipment shall be equipped with exhaust mufflers or other  suitable noise reduction devices.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Once, during field inspection
**Action Indicating Compliance**: Field inspection sign-off

**MM I.6**  All construction areas for staging and warming-up equipment shall be located as far as feasibly possible from adjacent recording studios to the north of the Project site.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Periodic field inspection
**Action Indicating Compliance**: Field inspection sign-off

**MM I.7** Portable noise sheds for smaller, noisy equipment, such as air compressors, dewatering pumps, and generators shall be provided.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Once, during field inspection
**Action Indicating Compliance**: Field inspection sign-off

**Public Services – Fire Protection**

**MM K.1-1** The Project shall comply with the 2014 Fire Code and any subsequent codes at the  time of building permits, including the requirements for automatic fire sprinkler systems and any other fire protection devices deemed necessary by the Fire Chief (e.g., fire signaling  systems, fire extinguishers, smoke removal systems, etc.).

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-Construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Issuance of building permits

**MM K.1-2** The following recommendations of the LAFD relative to fire safety shall be incorporated into the building plans, which includes the submittal of a plot plan for approval by the LAFD either prior to the recordation of a final map or the approval of a building permit.  The plot plan shall include the following minimum design features: fire lanes, where required, shall be a minimum of 20 feet in width; all structures must be within 300 feet of an approved fire hydrant, and entrances to any dwelling unit or guest room shall not be more than 150 feet in distance in horizontal travel from the edge of the roadway of an improved street or approved fire lane.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-Construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Issuance of building permits

**MM K.1-3** The Project Applicant shall submit a plot plan to the LAFD prior to occupancy of the Project, for review and approval, which shall provide the capacity of the fire mains serving the Project Site. Any required upgrades shall be identified and implemented prior to occupancy of the Project.

**Enforcement Agency**: LAFD
**Monitoring Agency**: LAFD
**Monitoring Phase**: Pre-operation
**Monitoring Frequency**: Once, prior to operation
**Action Indicating Compliance**: Plan approval prior to operation (Pre-operation)

**MM K.1-4** The Project Applicant shall submit an emergency response plan to Los Angeles Fire Department prior to occupancy of the Project for review and approval. The emergency response plan would include but not be limited to the following: mapping of emergency exits, evacuation routes for vehicles  and pedestrians, location of nearest hospitals, and fire stations. Any  required modifications shall be identified and implemented prior to occupancy of the Project.

**Enforcement Agency**: LAFD; Los Angeles Department of Building and Safety
**Monitoring Agency**: LAFD; Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-operation; Operation
**Monitoring Frequency**: Once, for Plan approval prior to operation
**Action Indicating Compliance**: Plan approval prior to operation (Pre-operation)

**MM K.1-5** The construction contractors and work crews shall properly maintain the mechanical equipment according  to  best  practices  and  the manufacturers' procedures, ensure proper  storage of flammable materials, and cleanup of spills of flammable liquid.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Periodic field inspection

**Action Indicating Compliance**: Field inspection sign-off

**MM K.1-6** If there are partial closures to streets surrounding the Project Site, flagmen shall be used to facilitate the traffic flow until the street closure around the construction is complete.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Demolition and construction
**Monitoring Frequency**: Periodic field inspection
**Action Indicating Compliance**: Field inspection sign-off

**MM K.1-7** During demolition and construction, LAFD access from major roadways shall remain clear and unobstructed.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Demolition and construction
**Monitoring Frequency**: Periodic field inspection
**Action Indicating Compliance**: Field inspection sign-off

**MM K.1-8** The design of the Project Site shall provide adequate access for LAFD equipment and personnel to the structure.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-Construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Issuance of building permits

### Public Services – Police Protection

**MM K.2-1** Temporary construction fencing shall be placed along the periphery of the active construction areas to screen as much of the construction activity from view at the local street level and to keep unpermitted persons from entering the construction area.

The perimeter fence shall have gates installed to facilitate the ingress and egress of equipment and the work force. The bottom of the fence, where necessary, shall have filter fabric to prevent silt run off. Straw hay bales shall be utilized around catch basins when located within the construction zone. The perimeter and silt fence shall be maintained while in place. Where applicable, the construction fence shall be incorporated with a pedestrian walkway. Temporary lighting shall be installed and maintained at the pedestrian walkway. Should sections of the site fence have to be removed to facilitate work in progress, barriers and or K – rail shall be utilized to isolate and protect the public from unsafe conditions.

**Enforcement Agency**: Los Angeles Department of building and Safety
**Monitoring Agency**: Los Angeles Department of building and Safety
**Monitoring Phase**: Construction

**Monitoring Frequency**: Periodic field inspections during construction
**Action Indicating Compliance**: Field inspection sign-off

**MM K.2-2** The Project Applicant shall provide for the deployment of a private security guard to monitor and patrol the Sites, appropriate to the phase of construction throughout the construction period. The patrol shall be deployed at times that are typical within the local-area construction industry for a Project of this size.

**Enforcement Agency**: Los Angeles Department of building and Safety
**Monitoring Agency**: Los Angeles Department of building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Periodic field inspections during construction
**Action Indicating Compliance**: Field inspection sign-off

**MM K.2-3** The plans shall incorporate the design guidelines relative to security, semi-public and private spaces, which may include but not be limited to access control to building, secured parking facilities, walls/fences with key systems, well-illuminated public and semi-public space designed with a minimum of dead space to eliminate areas of concealment, location of toilet facilities or building entrances in high-foot traffic areas, and provision of security guard patrol throughout the project site if needed. Please refer to "Design Out Crime Guidelines: Crime Prevention Through Environmental Design", published by the Los Angeles Police Department. Contact the Community Relations Division, located at 100 W. 1st Street, #250, Los Angeles, CA 90012; (213) 486-6000. These measures shall be approved by the Police Department prior to the issuance of building permits.

**Enforcement Agency**: Los Angeles Police Department
**Monitoring Agency**: Los Angeles Department of building and Safety
**Monitoring Phase**: Pre-Construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Issuance of building permits

**MM K.2-4** The Project Applicant shall provide the LAPD with a diagram of each portion of the Project Site, showing access routes and additional access information as requested by the LAPD, to facilitate police response.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-Occupancy
**Monitoring Frequency**: Once, prior to occupancy
**Action Indicating Compliance**: Police Department confirmation of receiving diagram

**MM K.2-5** Emergency access shall be maintained to the Project Site during construction through marked emergency access points approved by the LAPD.

**Enforcement Agency**: Los Angeles Police Department
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction

**Monitoring Frequency**: Periodic field inspection
**Action Indicating Compliance**: Field inspection sign-off

**MM K.2-6** The Project shall provide for on-site security measures and controlled access systems for residents and tenants to minimize the demand for police protection services. These measures include, but are not limited to, the following:

*   Perimeter lighting to supplement the street lighting and to provide increased visibility and security;
*   On-Site security personnel, commensurate to similar/comparable residential and retail projects of its size, as needed.
*   Parking Structure Access Control; and
*   Residential Units Access Control.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-Construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Issuance of building permits

**Public Services – Schools.**

**MM K.3-1** Prior to issuance of a building permit, the General Manager of the City of Los Angeles, Department of Building and Safety, or designee, shall ensure that the Applicant has paid all applicable school facility development fees in accordance with California Government Code Section 65995.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Unified School
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once, at payment
**Action Indicating Compliance**: Receipt of payment; issuance of certificate of occupancy

**Public Services – Parks.**

**MM K.4-1** (Subdivision) Pursuant to Section 17.12-A or 17.58 of the Los Angeles Municipal Code, the applicant shall pay the applicable Quimby fees for the construction of dwelling units.

(Apartments) Pursuant to Section 21.10 of the Los Angeles Municipal Code, the applicant shall pay the Dwelling Unit Construction Tax for construction of apartment buildings.

**MM K.4-2** Pursuant to Section 12.33 of the Los Angeles Municipal Code, the applicant shall pay the applicable fees for the construction of dwelling units.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once, at payment

**Action Indicating Compliance**: Receipt of payment; issuance of certificate of occupancy

**Transportation – Traffic**

**MM L.1** Prior to issuance of a Certificate of Occupancy, the Project Applicant shall prepare and implement a TDM Plan to the satisfaction of LADOT with a cumulative target goal of 10 percent reduction in Project traffic. A determination of the types of strategies that would most reduce the Project's dependency on the automobile would be developed in coordination with LADOT. The final plan could be enforced by LADOT through an annual monitoring to ensure that traffic levels are consistent with the TDM target of 10 percent. As noted in Table 4.L-5, the AM and PM net total number of trips was projected to be 737 and 849, respectively. Therefore, the trip cap threshold for both the AM and PM peak hours shall be 663 and 764 trips, respectively.

The TDM Plan should include a variety of measures to reduce single occupant vehicles trips by increasing the number of walking, bicycling, carpool, vanpool, and transit trips. The Project shall also comply with Section 12.26-J (Ordinance 168,700) of the Los Angeles Municipal Code (City of Los Angeles, March 2015), which requires specific TDM and trip reduction measures before the issuance of any building permit. The TDM program could include, but is not limited to, the following strategies:

- Provide an Internal Transportation Management Coordination Program with on-site transportation coordinator;

- Implement enhanced pedestrian connections (e.g., improve sidewalks, widen crosswalks adjacent to the Project, install wayfinding signage and pedestrian level lighting, etc.);

- Design the Project to ensure a bicycle, pedestrian, and transit friendly environment;

- Provide parking as an option only for all residential unit leases (i.e., unbundle the parking);

- Include a provision in all leases requiring compliance with the state parking cash-out law;

- Coupled with the unbundled parking, provide on-site car share amenities;

- Provide rideshare program and support for Project employees and tenants;

- Allow for subsidized transit passes for eligible Project employees and tenants;

- Coordinate with LADOT to determine if the site would be eligible for one or more of the services to be provided by the future Mobility Hubs

program (secure bike parking, bike share kiosks, and car-share parking
spaces);

- Provide on-site transit routing and schedule information;

- Provide a program to discount transit passes for residents/employees
  possibly through negotiated bulk purchasing of passes with transit
  providers;

- Contribute a one-time fixed fee into the City's Bicycle Plan Trust Fund to
  implement bicycle improvements within the area of the Project (amount of
  fee to be determined in consultation with LADOT and Council District 10
  staff); and

- Guaranteed Ride Home Program.

- A Draft TDM Plan should be prepared by a registered traffic engineer and
  submitted to LADOT prior to the issuance of the first building permit for
  the Project. The TDM Plan must be approved by LADOT prior to the
  issuance of the first Certificate of Occupancy.

- The TDM Plan must include a Monitoring Program, which should
  include the following considerations:

- The measurement of actual trips and monitoring will be conducted using
  an automated detection and surveillance monitoring system. In addition to
  providing hourly vehicular count tabulations, the monitoring system must
  also be designed in a manner that will permit direct data access to
  LADOT staff. The installation and maintenance of the monitoring system
  will be at the Project's expenses. The monitoring system will continue
  until such time that the Project has shown, for five consecutive years, at a
  minimum of 85 percent occupancy, achievement of the peak hour trip
  volume requirements as listed.

- Should the review show that the peak hour trip cap threshold has been
  exceeded, the

- Project will be subject to the following penalty program:

- A grace period of one year will be provided to correct a reporting of non-
  compliance.

- If on the subsequent year of reporting, the reported trips continue to
  exceed the established trip cap, then financial penalties will be assessed.

- Financial penalties for two consecutive reporting periods of non-
  compliance will pay the equivalent cost of providing a Metro transit pass
  for one year for each vehicle trip over the cap.

- Financial penalties for three consecutive reporting periods of non-compliance will pay twice the equivalent cost of providing a Metro transit pass for one year for each vehicle trip over the cap.

- Financial penalties for four consecutive reporting periods of non-compliance will pay three times the equivalent cost of providing a Metro transit pass for one year for each vehicle trip over the cap.

- LADOT may determine that the financial penalty (or portion thereof) may be better used by the applicant/developer to fund improvements or enhancements to one or more of the ongoing TDM Plan components to increase the effectiveness in meeting the trip reduction performance goals.

**Enforcement Agency**: LADOT
**Monitoring Agency**: LADOT
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once; prior issuance of Certificate of Occupancy
**Action Indicating Compliance**: LADOT approval

**MM L-2** Prior to issuance of a Certificate of Occupancy, the Project Applicant shall prepare and implement a TSM Plan to the satisfaction of LADOT. TSM strategies include modifications to traffic signals and improvements to circulation flow without construction of additional automobile travel lanes. Typical TSM strategies include improved signal controllers, advanced detection systems, left-turn restrictions, peak hour parking restrictions, one-way couplets, scramble crosswalks, etc.

Some of the signalized intersections in the area surrounding the Project require an upgrade to the traffic signal equipment and hardware. Many of the traffic signals at these intersections currently operate using a Type 170 traffic signal controller. Newer controllers (Type 2070) provide for enhanced and real-time operation of the traffic signal timing. Also, when supplemented by additional roadway system loops and closed circuit television cameras, LADOT can identify the causes of delay and implement instant signal timing remedies to improve the flow of vehicles and buses.

Additionally, the ATSAC communications center (Hub) at Fire Station No. 68 (5023 Washington Boulevard) is in need of upgrades and repairs. All traffic signals within the West Adams ATSAC system are connected to the hub through communication fiber. The repairs are needed to ensure that the West Adams system continues to operate remotely and that signal timing is adjusted in real-time to allow maximum efficiency. Collectively, these traffic signal upgrades provide a system-wide benefit by reducing delays experienced by motorists at the study intersections.

The applicant should meet with LADOT staff to define the signal system upgrade package that will serve as a measure to increase the efficiency of the areawide signal system. The ultimate TSM plan will require coordination and approval by LADOT.

**Enforcement Agency**: LADOT Monitoring Agency: LADOT
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once; prior issuance of Certificate of Occupancy
**Action Indicating Compliance**: LADOT approval

**MM L-3** La Cienega Boulevard, north of Jefferson Boulevard (Project Driveway) – Prior to issuance of a Certificate of Occupancy, a traffic signal shall be installed at the Project driveway on La Cienega Boulevard, north of Jefferson Boulevard. All signal design and construction work shall be performed in accordance with LADOT's Signal Design standards and shall include all conduits for interconnects, traffic signal hardware and software, and other applicable work deemed necessary. The location of the signal will be determined by LADOT. Pavement shall be restriped as needed.

**Enforcement Agency**: LADOT Monitoring Agency: LADOT
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once; prior issuance of Certificate of Occupancy
**Action Indicating Compliance**: LADOT approval

**MM L-4** Fairfax Avenue & Pico Boulevard (Int. #2) – During the Project's operational phase, peak hour parking restrictions shall be implemented along Pico Boulevard to provide an additional through lane westbound in the morning peak period and eastbound in the afternoon peak period. Pavement striping shall be modified as needed. If the parking cannot be prohibited during the peak periods, a significant impact would remain at this location.

**Enforcement Agency**: LADOT Monitoring Agency: LADOT
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once; prior issuance of Certificate of Occupancy
**Action Indicating Compliance**: Field inspection sign-off

**MM L-5** La Cienega Boulevard & Venice Boulevard (Int. #10) – Prior to issuance of a Certificate of Occupancy, a westbound dual left-turn operation shall be designed and implemented. The pavement shall be restriped and the traffic signal equipment shall be modified as needed. Because Venice Boulevard is a designated State Highway, the Project Applicant shall be responsible for securing final design approval from Caltrans.

**Enforcement Agency**: LADOT Monitoring Agency: LADOT
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once; prior issuance of Certificate of Occupancy
**Action Indicating Compliance**: LADOT approval

**MM L-6** Fairfax Avenue & I-10/Electric Drive (Int. #13) – Prior to issuance of a Certificate of Occupancy, a northbound dual left-turn operation shall be designed and implemented. The pavement shall be restriped and the traffic signal equipment shall be modified as needed. The feasibility of this proposal is contingent upon Caltrans approval to remove the carpool designation from the lane that this second left-turn operation would need to feed into.

**Enforcement Agency**: LADOT Monitoring Agency: LADOT
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once; prior issuance of Certificate of Occupancy
**Action Indicating Compliance**: Field inspection sign-off

**MM L-7**  La Cienega Boulevard & Fairfax Avenue (Int. #21) – Prior to issuance of a Certificate of Occupancy, a westbound dual left-turn and one left-turn/through/right-turn lane operation shall be designed and implemented. The pavement shall be restriped and the traffic signal equipment shall be modified as needed.

**Enforcement Agency**: LADOT
**Monitoring Agency**: LADOT
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once; prior issuance of Certificate of Occupancy
**Action Indicating Compliance**: Field inspection sign-off

**MM L-8** Washington Boulevard & National Boulevard (Int. #22) – Prior to issuance of a Certificate of Occupancy, the northbound right-turn lane shall be converted to a through/right-turn lane. The pavement shall be restriped and the traffic signal equipment shall be modified as needed.  This measure may be replaced with a mitigation measure involving the use of transportation system management at this intersection that is agreed to by Culver City and the project applicant.

**Enforcement Agency**: LADOT
**Monitoring Agency**: LADOT
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once; prior issuance of Certificate of Occupancy
**Action Indicating Compliance**: Field inspection sign-off

**MM L-9** La Brea Avenue & Jefferson Boulevard (Int. #28) – Prior to issuance of a Certificate of Occupancy, an exclusive southbound right-turn lane shall be designed and  implemented. This could require the purchase of additional right-of-way to provide sufficient pavement width to accommodate the right-turn lane. If this right-of-way cannot be purchased, a significant impact would remain at this location.

**Enforcement Agency**: LADOT
**Monitoring Agency**: LADOT
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once; prior issuance of Certificate of Occupancy
**Action Indicating Compliance**: Field inspection sign-off

**MM L-10** LADOT recommends that a construction work site traffic control plan be submitted to LADOT's Hollywood District Office for review and approval prior to the start of any construction work. The plan should show the location of any roadway or sidewalk closures, traffic detours, haul routes, hours of operation, protective devices, warning signs, and access to abutting properties. LADOT also recommends that construction related traffic be restricted to off-peak

hours. LADOT shall consult with Culver City regarding the review of the construction work site traffic control plan.

**Enforcement Agency**: LADOT
**Monitoring Agency**: LADOT
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan submittal
**Action Indicating Compliance**: LADOT approval

**MM L-11** A detailed Construction Management Plan, including street closure information, detour plans, haul routes, and staging plans would be prepared and submitted to the City for review and approval. The Construction Management Plan would formalize how construction would be carried out and identify specific actions that would be required to reduce effects on the surrounding community. The Construction Management plan shall be based on the nature and timing of the specific construction activities and other projects in the vicinity of the Project Site, and should include the following elements as appropriate:

- Prohibition of construction worker parking on adjacent residential streets

- Provisions to prohibit construction equipment or material deliveries within the public right- of-way

- Provisions for temporary traffic control during all construction activities adjacent to public right-of-way to improve traffic flow on public roadways (e.g., flag men)

- Scheduling of construction activities to reduce the effect on traffic flow on surrounding arterial streets

- Rerouting construction trucks to reduce travel on congested streets to the extent feasible

- Construction-related vehicles shall not park on surrounding public streets

- Provisions of safety precautions for pedestrians and bicyclists through such measures as alternate routing and protection barriers

- Provisions to accommodate the equipment

- Scheduling of construction-related deliveries to reduce travel during commuter peak hours as identified in this study

- Obtaining the required permits for truck haul routes from the City prior to issuance of any permit for the Project

- LADOT shall consult with Culver City regarding the review of the Construction Management Plan.

**Enforcement Agency**: Los Angeles Department of Building and Safety; LADOT

**Monitoring Agency**: LADOT
**Monitoring Phase**: Construction
**Monitoring Frequency**: Ongoing during construction
**Action Indicating Compliance**: Field inspection sign-off

**MM L-12** The Project Applicant shall consult with the Department of City Planning for any additional requirements pertaining to pedestrian walkability and connectivity, as described in the Walkability Checklist.

**Enforcement Agency**: Los Angeles Department of City Planning
**Monitoring Agency**: Los Angeles Department of City Planning
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Planning Department sign-off

**MM L-13** LADOT's determination letter does not include approval of the Project's driveways, internal circulation, and parking scheme. In order to minimize and prevent last minute building design changes, the Project Applicant shall contact LADOT early in the design process for access and circulation requirements so that such traffic flow considerations are designed and incorporated early in the building and parking layout plans. Final LADOT approval shall be obtained prior to issuance of any building permits. This should be accomplished by submitting detailed site/driveway plans, at a scale of at least 1" = 40', separately to LADOT's WLA. Coastal Development Review Section at 7166 West Manchester Avenue, Los Angeles 90045, as soon as possible but prior to submittal of building plans for plan check to the Department of Building and Safety.

**Enforcement Agency**: LADOT
**Monitoring Agency**: LADOT
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at submittal of site/driveway plans to LADOT, prior to plan check
**Action Indicating Compliance**: LADOT approval

**MM L-14** Vehicle access for the Project shall be accommodated via four driveways. One driveway, which is proposed to include a traffic signal, would be located on La Cienega Boulevard, north of Jefferson Boulevard. On Jefferson Boulevard, there would be two driveways for public access as well as a third driveway for loading purposes.

**Enforcement Agency**: LADOT Monitoring Agency: LADOT
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once
**Action Indicating Compliance**: LADOT approval

**Utilities and Service Systems – Wastewater**

**MM M.1-1** The Project shall comply with City Ordinance No. 179,820 (Green Building Ordinance), which establishes a requirement to incorporate green building practices into projects that meet certain threshold criteria.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**MM M.1-2** As part of the normal construction/building permit process, the Project Applicant shall confirm with the City that the capacity of the local and trunk lines are sufficient to accommodate the Project's wastewater flows during the construction and operation phases. If the public sewer has insufficient capacity, then the Project Applicant shall be required to build sewer lines to a point in the sewer system with sufficient capacity. A final approval for sewer capacity and connection permit shall be made at that time. The construction phase of the Project shall need a sewer connection permit and Sewer Capacity Availability Review (SCAR) application. The Project shall also pay any required sewer connection fees.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**MM M.1-3** In the event of full or partial public street closures, such as during the construction of new wastewater lines, the Construction Traffic Management Plan shall be in implemented.

**Enforcement Agency**: Los Angeles Department of Building and Safety; LADOT
**Monitoring Agency**: LADOT
**Monitoring Phase**: Construction
**Monitoring Frequency**: Ongoing during construction
**Action Indicating Compliance**: Field inspection sign-off

### Utilities and Service Systems – Water

**MM M.2-1** The Project Applicant shall consult with the LADBS and LAFD to determine fire flow requirements for the Proposed Project, and will contact a Water Service Representative at the LADWP to order a SAR. This system hydraulic analysis will determine if existing LADWP water supply facilities can provide the proposed fire flow requirements of the Project. If water main or infrastructure upgrades are required, the Applicant would pay for such upgrades, which would be constructed by either the Applicant or LADWP.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check Action Indicating Compliance: Plan approval

**MM M.2-2** The Project shall implement all applicable mandatory measures within the LA Green Building Code that would have the effect of reducing the Project's water use.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**MM M.2-3** The project shall comply with Ordinance No. 170,978 (Water Management Ordinance), which imposes numerous water conservation measures in landscape, installation, and maintenance (e.g., use drip irrigation and soak hoses in lieu of sprinklers to lower the amount of water lost to evaporation and overspray, set automatic sprinkler systems to irrigate during the early morning or evening hours to minimize water loss due to evaporation, and water less in the cooler months and during the rainy season).

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**MM M.2-4** The Project shall comply with the City of Los Angeles Low Impact Development Ordinance (City Ordinance No. 1818,99) and to implement Best Management Practices that have stormwater recharge or reuse benefits for the Project (as applicable and feasible).

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check Action Indicating Compliance: Plan approval

**MM M.2-5** As part of the normal construction/building permit process, the Project Applicant shall confirm with the City that the capacity of the existing water infrastructure can supply the domestic needs of the Project during the construction and operation phases. The Project Applicant shall implement any upgrade to the water infrastructure serving the Project Site that is needed to accommodate the Project's water consumption needs. If a deficiency or service problem is discovered during the permitting process that prevents the Project from an adequate level of service, the Project Applicant shall fund the required upgrades to adequately serve the Project.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**MM M.2-6** In the event of full or partial public street closures, such as during the construction of new water lines, the Construction Traffic Management Plan shall be in implemented.

**Enforcement Agency**: Los Angeles Department of Building and Safety; LADOT
**Monitoring Agency**: LADOT
**Monitoring Phase**: Construction
**Monitoring Frequency**: Ongoing during construction
**Action Indicating Compliance**: Field inspection sign-off

**Utilities and Service Systems – Solid Waste**

**M.3-1** In compliance with Los Angeles Municipal Code, the Project shall provide readily accessible areas that serve the entire building and are identified for the depositing, storage, and collection of nonhazardous materials for recycling, including (at a minimum) paper, corrugated cardboard, glass, plastics, and metals.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**M.3-2** In order to meet the diversion goals of the California Integrated Waste Management Act and the City of Los Angeles, which was 70 percent in 2013, the Applicant shall salvage and recycle construction and demolition materials to ensure that a minimum of 70 percent of construction- related solid waste that can be recycled is diverted from the waste stream to be landfilled. Solid waste diversion would be accomplished though the on-site separation of materials and/or by contracting with a solid waste disposal facility that can guarantee a minimum diversion rate of 70 percent. In compliance with the Los Angeles Municipal Code, the General Contractor shall utilize solid waste haulers, contractors, and recyclers who have obtained an Assembly Bill (AB) 939 Compliance Permit from the City of Los Angeles Bureau of Sanitation.

**Enforcement Agency**: Los Angeles Bureau of Sanitation
**Monitoring Agency**: Los Angeles Bureau of Sanitation
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, prior to construction
**Action Indicating Compliance**: AB 939 Compliance Permit issuance

**M.3-3** In compliance with AB341, recycling bins shall be provided at appropriate locations to promote recycling of paper, metal, glass and other recyclable material. These bins shall be emptied and recycled accordingly as a part of the Project's regular solid waste disposal program. The Project Applicant shall only contract for waste disposal services with a company that recycles solid waste in compliance with AB341.

**Enforcement Agency**: Los Angeles Department of Building and Safety

**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Prior to occupancy
**Monitoring Frequency**: Once, prior to occupancy
**Action Indicating Compliance**: Issuance of Certificate of Occupancy

**M.3-4** To the maximum extent feasible, demolition and construction debris including concrete, asphalt, wood, drywall, metals, and other miscellaneous and composite materials shall be recycled and salvaged.

**Enforcement Agency**: Los Angeles Bureau of Sanitation
**Monitoring Agency**: Los Angeles Bureau of Sanitation
**Monitoring Phase**: Demolition and construction
**Monitoring Frequency**: Ongoing during construction
**Action Indicating Compliance**: Field inspection sign-off

### Utilities and Service Systems – Energy Conservation

**M.4-1** The Project shall comply with City Ordinance No. 179,820 (Green Building Ordinance), which establishes a requirement to incorporate green building practices into projects that meet certain threshold criteria.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**M.4-2** The Project shall implement all applicable mandatory measures within the LA Green Building Code that would have the effect of reducing the Project's energy use.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction Monitoring Frequency: Once, at plan check
**Action Indicating Compliance**: Plan approval

**M.4-3** The Project shall comply with the lighting power requirements in the California Energy Code, California Code of Regulations (CCR), Title 24, Part 6.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**M.4-4** The Project shall use Energy Star appliances where available.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-Construction
**Monitoring Frequency**: Once, at plan check

**Action Indicating Compliance**: Issuance of building permits

## Other Conditions

20.  **Graffiti Removal.** All graffiti on the site shall be removed or painted over to match the color of the surface to which it is applied within 24 hours of its occurrence.

21.  **Aesthetics.** The structure, or portions thereof shall be maintained in a safe and sanitary condition and good repair and free of graffiti, trash, overgrown vegetation, or similar material, pursuant to Municipal Code Section 91,8104.  All open areas not used for buildings, driveways, parking areas, recreational facilities or walks shall be attractively landscaped and maintained in accordance with a landscape plan, including an automatic irrigation plan, prepared by a licensed landscape architect to the satisfaction of the decision maker.

ORDINANCE NO. _____

An ordinance amending Section 12.04 of the Los Angeles Municipal Code by amending the zoning map.

THE PEOPLE OF THE CITY OF LOS ANGELES DO ORDAIN AS FOLLOWS:

**Section 1.** Section 12.04 of the Los Angles Municipal Code is hereby amended by changing the zone classifications of properties shown upon a portion of the Zoning Map incorporated therein and made a part of Article 2, Chapter 1 of the LAMC, so that such portion of the Zoning Map shall conform to the zoning on the map attached hereto and incorporated herein by this reference.



LA CIENEGA PL

BODEN ST

[T][Q]C2-2D

APN 4205033007
APN 4205033015

LA CIENEGA BLVD

JEFFERSON BLVD

THE INTENT OF THIS ORDINANCE
IS FOR THE BOUNDARIES OF THIS
ZONE CHANGE TO COINCIDE WITH
THOSE OF RECORDED TR. 73656.

City of Los Angeles

West Adams

0    75    150         300
Feet

dcp

C.M. 120 B 173          CPC-2015-2593-GPA-ZC-HD-ZAA-SPR

AA/CVE                                      022216

Data Sources: Department of City Planning, Bureau of Engineering

## FINDINGS

### General Plan/Charter Findings

1.   **General Plan Land Use Designation.** The subject property is located within the West
     Adams-Baldwin Hills-Leimert Park Community Plan (Effective Date May 6, 1998), which
     designates the project site as Limited Manufacturing in the MR1-1VL Zone.

     The project has been approved for a Plan Amendment to Community Commercial with a
     corresponding zone of [T][Q]C2-2D. The General Plan Framework identifies Community
     Commercial as a function of Community Centers, described a mixed-use centers that
     encourage "the development of housing in concert with multi-use commercial uses." The
     project's proposed zone of C2 is a corresponding zone for a Community Commercial
     designation under the General Plan Framework. The General Plan Framework identifies
     Community Centers as having a scale and density that is greater than the neighborhood
     districts, generally with building heights ranging from two- to six-stories depending on the
     character of the surrounding area. In this case, the proposed project is predominantly 6
     stories in height with a 30 story residential tower on the northwestern end of the site.

     The Framework Element further recommends that Community Centers be planned for
     both night and day use. Major transportation hubs (rail, bus, or both) are encouraged to
     develop in each community center to facilitate improved access to and from the
     remainder of the City. In addition, centralized parking structures should be integrated
     with private and public development within Community Centers. The proposed project
     proposes a mixed-use project with centralized parking within walking distance of a
     transportation hub, in this case the La Cienega and Jefferson light rail transit stop and
     therefore meets this goal.

     Community Centers are encouraged to incorporate the integration and mixing of uses in
     order to increase opportunities for employees to live near their jobs and residents to live
     near shopping. To the extent that this is accomplished, the length and number of
     vehicular trips would be reduced and pedestrian/bicycle activity would be increased,
     which in turn will reduce air pollution.

     The proposed project, as a mixed-use development providing 1,218 dwelling units and
     300,000 square feet of commercial and office floor area within walking distance to a rail
     transit station, is consistent with the Framework Element's designation of a Community
     Center.

2.   **General Plan Text.** The West Adams Community Plan text includes the following
     relevant land use goals, objectives, and policies:

          *Purpose: This Community Plan was developed in the context of promoting a
          vision of the West Adams-Baldwin Hills-Leimert Park area as a community that
          looks at its past with pride and approaches its future with eagerness, while
          maintaining its individual identity by: Maximizing the development opportunity of
          the future rail transit system while minimizing any adverse impacts.*

          *Objective 1-1 To provide for the preservation of existing housing and for the
          development of new housing to meet the diverse economic and physical needs
          of the existing residents and projected population of the Plan area to the year
          2010.*

*Objective 1-2 To locate new housing in a manner which reduces vehicular trips and makes it accessible to services and facilities.*

*Policy 1-1.2: Protect existing single-family and low density residential neighborhoods from encroachment by higher density residential and other incompatible uses.*

*Policy 1-2.1 Locate higher residential densities near commercial centers, light rail transit stations and major bus routes where public service facilities, utilities and topography will accommodate this development.*

*Policy 1-5.1 Promote greater individual choice in type, quality, price and location of housing.*

*Policy 1-5.3 Provide for development of townhouses and other similar condominium type housing units to increase home ownership options.*

*Objective 1-1 To conserve and strengthen viable commercial development.*

*Policy 2-1.1   New commercial uses shall be located in existing, established commercial areas or existing shopping centers.*

*Policy 1.1.3  1.1.3 Commercial areas should be consolidated and deepened to stimulate existing businesses, create opportunities for new development and off-street parking, expand the variety of goods and services, and improve shopping convenience as well as offer local employment.*

*Policy 1-1.5 Require that projects be designed and developed to achieve a high level of quality, distinctive character, and compatibility with existing uses and development.*

*Objective 1-4 To attract uses which strengthen the economic base and expand market opportunities for existing and new businesses.*

*Policy 1-5.2 New development should add to and enhance the existing pedestrian street activity.*

*Policy 1-5.3 Ensure that commercial infill projects achieve harmony with the best of existing development.*

*Policy 1-5.7 Require that the first floor street frontage of structures, including mixed-use projects and parking structures located in Pedestrian Oriented Areas, incorporate commercial uses.*

*Policy 1-4.2: Identify appropriate revitalization/redevelopment areas and encourage uses that would enhance the economic vitality of the Community.*

*Policy 1-6.2: Preserve Community character, scale and architectural diversity.*

The proposed project is a 1,900,000 square-foot mixed-use development consisting of 1,218 residential units and 300,000 square feet of office and commercial retail floor area. The project would provide much-needed jobs and housing to the West Adams Plan area, as well as neighborhood serving retail, grocery and office uses all within walking distance to a light rail station, which would provide local amenities, a high quality designed project and economic vitality to the surrounding area.

Framework Element.    The Framework Element for the General Plan (Framework Element) was adopted by the City of Los Angeles in December 1996 and re-adopted in August 2001. The Framework Element provides guidance regarding policy issues for the entire City of Los Angeles, including the Project site. The Framework Element also sets forth a Citywide comprehensive long-range growth strategy and defines Citywide polices regarding such issues as land use, housing, urban form, neighborhood design, open space, economic development, transportation, infrastructure, and public services.

The project site is currently occupied with an office building, accessory structures, a large parking area and truck storage yard, and two radio towers. Development of this site is an infill on an underutilized manufacturing zoned site that will significantly improve the aesthetic character of the site, while simultaneously providing much-needed housing and job producing commercial and office uses across the street from a major transit stop. By enabling the construction of housing and retail and office uses in close proximity to a light rail transit stop and public transportation, the General Plan Amendment, Zone and Height District Change would be consistent with several goals and policies identified in the Framework Element.

The Land Use chapter of the Framework Element identifies objectives and supporting policies relevant to the Project site. Those objectives and policies seek, in part, to accommodate a diversity of uses that support the needs of the City's existing and future residents, businesses, and visitors.

Housing Element. The project would meet many housing goals, objectives and policies contained in the Housing Element of the General Plan as follows:

**Goal 1:** Provision of an adequate supply of both rental and ownership housing for all income levels is paramount to minimizing housing problems such as overcrowding and overpayment that are common in the City.

> **Objective 1.1:** Produce an adequate supply of rental and ownership housing in order to meet current and projected needs.
>
>> *Policy 1.1.3: Facilitate new construction and preservation of a range of different housing types that address the particular needs of the City's households.*
>>
>> *Policy 1.1.4: Expand opportunities for residential development, particularly in designated Centers, Transit Oriented Districts and along Mixed-Use Boulevards.*

**Goal 2:** Facilitate high quality, healthy housing in neighborhoods that mix incomes and improve accessibility to jobs and services by encouraging residential proximity to these compatible land uses.

> **Objective 2.2:** Promote sustainable neighborhoods that have mixed-income housing, jobs, amenities, services and transit.

*Policy 2.2.1*: *Provide incentives to encourage the integration of housing with other compatible land uses.*

*Policy 2.2.2*: *Provide incentives and flexibility to generate new multi-family housing near transit and centers, in accordance with the General Plan Framework element, as reflected in Map ES.1.*

*Policy 2.2.3*:   *Promote and facilitate a jobs/housing balance at a citywide level.*

*Policy 2.2.5*:   *Provide sufficient services and amenities to support the planned population while preserving the neighborhood for those currently there.*

**Objective 2.4:** Promote livable neighborhoods with a mix of housing types, quality design and a scale and character that respects unique residential neighborhoods in the City.

*Policy 2.4.2*: *Develop and implement design standards that promote quality residential development.*

*Policy 2.4.3*: *Develop and implement sustainable design standards in public and private open space and street rights-of-way. Increase access to open space, parks and green spaces.*

The project will introduce high-quality residential development and office and retail amenities in a transportation-oriented district within two major somewhat dilapidated industrial corridors. By replacing an underutilized site with new investment in housing, office and supportive amenities, the project satisfies several of the Housing Element's objectives of meeting a jobs-housing balance, facilitating a range of housing types that is suitable for various needs of the population, and capitalizes on existing transportation infrastructure within a few feet of a light-rail station.

The project is consistent with the scale and character of the community. The setting in which the project is located is one of low rise commercial and light-industrial development. However, higher density uses are being introduced to the immediate vicinity, such as a 12 story office tower standing 230 feet tall which is currently under construction just a third of a mile away at 5790 Jefferson Boulevard.

Land Use Element. With the introduction of a much-needed housing to the West Adams neighborhood, the Project would meet many Community Center goals, objectives, and policies contained in the Land Use Element of the Los Angeles General Plan as follows:

**GOAL 3**: Pedestrian-oriented, high activity, multi- and mixed-use centers that support and provide identity for Los Angeles' communities.

**Objective 3.10**: Reinforce existing and encourage new community centers, which accommodate a broad range of uses that serve the needs of adjacent residents, promote neighborhood and community activity, are compatible with adjacent neighborhoods, and are developed to be desirable places in which to live, work and visit, both in daytime and nighttime.

*Policies*:

> *3.9.1: Accommodate the development of community-serving commercial
> uses and services and residential dwelling units in areas designated as
> "Community Center" in accordance with Tables 3-1 and 3-5. The ranges
> and densities/intensities of uses permitted in any area shall be identified
> in the community plans.*

> *3.9.3: Determine the appropriateness of centralized and shared parking
> structures, and where suitable and feasible, encourage their
> development.*

> *3.9.5: Promote pedestrian activity by the design and siting of structures in
> accordance with Pedestrian-Oriented District Policies 3.16.1 through
> 3.16.3.*

> *3.9.8: Support the development of public and private recreation and small
> parks by incorporating pedestrian-oriented plazas, benches, other
> streetscape amenities and, where appropriate, landscaped play areas.*

The project is located in an area of the West Adams Community Plan that is within
walking distance of the La Cienega and Jefferson Light Rail Station, within two
industrially zoned corridors and with a surrounding area that is characterized by a mix of
industrial, commercial, retail, and residential uses. The proposed project would enliven
the area by contributing to the area's identity through the replacement of an underutilized
site with the provision of new housing and commercial uses, amenities and employment
opportunities in a high quality development that introduces new height and greater
density to a transit-oriented district.

Health and Wellness Element. The Health and Wellness Element of the General Plan
Framework calls for the promotion of a healthy built environment in a manner that
enhances opportunities for improved health and well-being, and which promotes healthy
living and working conditions. To that end, the proposed project meets the following
policies.

- Policy 2.2:    Promote a healthy built environment by encouraging the design
               and rehabilitation of buildings and sites for healthy living and
               working conditions, including promoting enhanced pedestrian-
               oriented circulation, lighting, attractive and open stairs, healthy
               building materials and universal accessibility using existing tools,
               practices and programs.

- Policy 2.6:    Work proactively with residents to identify and remove barriers to
               leverage and repurpose vacant and underutilized spaces as a
               strategy to improve community health.

- Policy 2.10:   Acknowledge the mental and physical health benefits of social
               connectedness by promoting and valuing public spaces, social
               interaction, relationship building, and resilience in community and
               urban design.

The proposed project expands the available housing opportunities offered in the
community by providing the option of multi-family housing in a location that is readily
served by public transportation  (less than 100 feet from the Metro Expo LRT station at
Jefferson and La Cienega Boulevards) and one that includes a myriad of local serving

retail, restaurant and commercial uses, thereby encouraging walking or biking. The project is also proximate to the Baldwin Hills Recreation Center and Kenneth Hahn State Recreation Center south and east of the subject property will enable future residents ready access to recreation and parks facilities. The Project will also encourage biking, as it includes approximately 1,500 bicycle parking spaces. Furthermore, the development of this site greatly enhances the pedestrian environment through an attractive design that includes a 0.68 acre park plaza at the center of the site, linked by landscape paseos throughout the ground level of the site, and podium level courtyards. Along the eastern boundary of the site are outdoor patio and plaza areas that will include outdoor gathering and d ining areas for those visiting the on-site restaurants. Moreover, the Health and Wellness Element calls for the promotion of land use policies that reduce GHGs, through the location of jobs, shopping and open spaces in areas that make walking, cycling, and taking transit viable modes of travel. The project is located within the immediate vicinity of the Metro Expo Line (La Cienega/Jefferson Station), and is meeting the required bicycle parking spaces and is located within walking distance to many local and regional bus lines.

Implementation of the Project will meet the Plan for a Healthy LA's vision of a complete neighborhood, which includes access to health-promoting goods and services, including affordable grocery stores, by providing an up to 50,000 square foot grocery store. The immediate area includes residential with mainly single family homes to the north of Rodeo Road, a number of apartments south of Jefferson Boulevard and the large Village Green residential complex south of Rodeo Road. The nearest grocery store to the site is a Superior Market one quarter of a mile to the south on La Brea at Rodeo Road.

Mobility Element. While the project was filed with a Vesting Tentative Tract Map No. 73656 prior to the adoption of the recently approved Mobility Element, the applicant requested that the Mobility Element be applied to the project (December 22, 2015). The Mobility Element of the General Plan will be affected by the recommended action herein. The project includes project design features and mitigation measures, including a Transportation Demand Management Plan, aimed at addressing transportation-related impacts associated with the proposed project. Moreover, the Bureau of Engineering has required a public sidewalk easement along La Cienega Boulevard and a dedication along Jefferson Boulevard to complete a 40-foot wide half right-of-way, including a 20-foot radius property line return at the intersection with La Cienega Boulevard or 15-foot by 15-foot property line corner cut. The project site is well-served by public transit, including regional and local bus lines, as well as the future Wilshire Bus Rapid Transit Project and future Metro Westside Purple Line Extension. The project would also provide bicycle parking spaces in compliance with the Bicycle Parking Ordinance, together with additional bicycle parking and bicycle-friendly amenities that meet the requirements of the Bicycle Ordinance.

Sewerage Facilities Element. Improvements may be required for the construction or improvement of sewer facilities to serve the subject project in order to complete the City sewer system for the health and safety of City inhabitants will assure compliance with the goals of this General Plan Element.

Street Lights. Any City required installation or upgrading of street lights is necessary to complete the City street improvement system so as to increase night safety along the streets which adjoin the subject property.

3.    **Charter Findings – City Charter Sections 555, 556 and 558 (General Plan Amendment).** The proposed General Plan Amendment complies with the procedures as specified in Section 555 of the Charter, including:

   a.    **Amendment in Whole or in Part.** The General Plan Amendment before the City Planning Commission represents an Amendment in Part of the West Adams-Baldwin Hills-Leimert Park Community Plan, representing a change to the physical identity of the project site, which is currently designated as Limited Manufacturing and zoned as MR1-1VL. The proposed C2 Zone is a corresponding zone to the proposed Community Commercial land use designation in the Community Plan. The site has its own physical and economic identity in that it represents a transit-oriented district that pursuant to the General Plan should be planned for a higher density, transit oriented mixed-use development that reduces vehicle trips and provides greater housing and local amenities to the neighborhood. The West Adams-Baldwin Hills-Leimert Park didn't anticipate this particular location to be a light rail station, however it did contain policies supporting higher density near light rail stations. The proposed General Plan Amendment from Limited Manufacturing to the Community Commercial land use designation, and corresponding Zone Change/Height District Change from MR1-1VL to C2-2, will re-designate the subject property to Community Commercial to allow for a higher density, transit oriented mixed-use development, allowing it to be used for the purpose of providing 1,218 units of much needed multi-family housing and commercial uses within close proximity to the La Cienega/Jefferson Metro Rail Line Station. The project will also provide a 50,000 grocery store contributing healthy and affordable food options in according with the Health Element of the General Plan.

   Redesignating the land use of the project site reinforces an area that has its own economic and physical identity in the form of: 1) contributing to the available housing stock within the City and towards the affordable housing crisis in the city, as well as the Mayor's initiative to build 100,000 homes by 2020, 2) furthering the General Plan Land Use Element's Goal of Transit stations functioning as primary focal points of the City's development, 3) furthering the General Plan Land Use Element's Objective of focusing mixed commercial/residential uses, neighborhood-oriented retail, employment opportunities in the form of 200,000 square feet of commercial and quasi-public uses around urban transit stations, and 4) protecting and preserving surrounding low-density neighborhoods from the encroachment of incompatible land uses and the General Plan Amendment is necessary to provide compatible land uses for a transit oriented district which supports the provisions of the West Adams-Baldwin Hills-Leimert Park Community Plan.

   b.    **Initiation of Amendments.** In compliance with this sub-section, the Director of Planning initiated the amendment to West Adams-Leimert Park-Baldwin Hills Community Plan (General Plan-Land Use Element), pursuant to the Memo issued by the Department of City Planning March 18, 2014. The request was submitted on June 7, 2015 and was initiated, via signature by the Director's designee, on June 9, 2015.

   c.    **Commission and Mayoral Recommendations.** The noticing and hearing requirements of the General Plan Amendment were satisfied, pursuant to LAMC Section 12.32-C,3. The hearing was scheduled, duly noticed, and held in City Hall on January 6, 2016. The City Planning Commission shall make its

recommendation to the Mayor upon a recommendation of approval, or to the City Council and the Mayor upon a recommendation of disapproval.

This action is further subject to the following sections of Charter Section 555:

d.   Council Action. The Council shall conduct a public hearing before taking action on a proposed amendment to the General Plan. If the Council proposes any modification to the amendment approved by the City Planning Commission, that proposed modification shall be referred to the City Planning Commission and the Mayor for their recommendations. The City Planning Commission and the Mayor shall review any modification made by the Council and shall make their recommendation on the modification to the Council in accordance with subsection (c) above. If no modifications are proposed by the Council, or after receipt of the Mayor's and City Planning Commission's recommendations on any proposed modification, or the expiration of their time to act, the Council shall adopt or reject the proposed amendment by resolution within the time specified by ordinance.

e.   Votes Necessary for Adoption. If both the City Planning Commission and the Mayor recommend approval of a proposed amendment, the Council may adopt the amendment by a majority vote. If either the City Planning Commission or the Mayor recommends the disapproval of a proposed amendment, the Council may adopt the amendment only by a two-thirds vote. If both the City Planning Commission and the Mayor recommend the disapproval of a proposed amendment, the Council may adopt the amendment only by a three-fourths vote. If the Council proposes a modification of an amendment, the recommendations of the Commission and the Mayor on the modification shall affect only that modification."

The proposed General Plan Amendment Complies with Section 556 and 558 in that the plan amendment promotes an intensity and pattern of development that is consistent with the proposed Community Commercial General Plan Framework designation which encourages density around light rail transit stations, density in Community Centers, transit use, reduced vehicle dependency, and improved air quality. Moreover, the framework further promotes the development of multi-family housing and community serving commercial uses, and which enhances the pedestrian environment. The General Plan Amendment would change the land use designation of the project site from Limited Manufacturing to Community Commercial, and further many of the City's land use policies and addresses the dire need for housing and jobs. It will also create consistency between the current land uses of the area with the General Plan and protect nearby single-family homes from incompatible uses currently allowed in the MR1 zone. The requested amendment will help promote the general welfare and reflects good zoning practices by supporting many of the land use policies, and objectives identified in the West Adams-Leimert Park-Baldwin Hills Community Plan, including locating increased residential density near jobs, creating density in a transit-rich area, providing enhanced landscaping and open space, and supporting the La Cienega and Jefferson Light Rail station as a destination along the Exposition Line.

The project will be an in-fill development, which is compatible with other development in the immediate vicinity. The setting in which the project is located is one of low rise commercial, creative office and light-industrial development. However, higher density uses are being introduced to the immediate vicinity, such as a 12 story office tower standing 230 feet tall which is currently under construction just a third of a mile away at

5790 Jefferson Boulevard. The General Plan Amendment would allow for the project to intensify the uses on an underutilized site within a 100 feet of a light rail station, and reflect the existing and proposed scale of development in the surrounding area, while providing housing, employment and retail in the West Adams-Leimert Park-Baldwin Hills area that would accommodate the growing population of the surrounding area, provide local amenities and balance the jobs-to-housing ratio.

The project vicinity is highly urbanized and generally built out. The project is an infill development located within an area characterized by a mix of industrial, commercial, retail, and residential uses contained in low-rise (1- to 2-story) structures, which are physically separated from the Project Site by major highways, secondary streets, and arterial roadways. The Metro Expo Line station parking structure is 4 stories and directly across the street from the project site.

The project is consistent with the scale and character of the community. The setting in which the project is located is one of low rise commercial and light-industrial development. However, higher density uses are being introduced to the immediate vicinity, such as a 12 story office tower standing 230 feet tall which is currently under construction just a third of a mile away at 5790 Jefferson Boulevard.

The project's height and massing would be softened by varying architectural details, roof heights, facades, landscaping, and open spaces which will lessen the scale, create visual interest and therefore be compatible with existing and future development on adjacent and neighboring properties.

The General Plan, which includes the Housing Element, and the Land Use Element (i.e., the West Adams-Leimert Park-Baldwin Hills Community Plan), encourages mixed-use and multifamily projects with housing and pedestrian-oriented commercial uses along major transit corridors and near light rail transit stations. As a result, the proposed project's mixed use nature is consistent with the General Plan because it provides an array of uses in an underutilized, industrially-zoned property located along two major transit corridors and within walking distance (less than 200 feet away) of a high-capacity transit station (the La Cienega and Jefferson Light Rail station), and bus service, including the Metro 217, Metro 38, Metro 10, and Metro Express & Rapid lines.

The proposed project would replace an underutilized industrial site with much-needed housing and employment, as well as a mix of retail and restaurant amenities along two major transit corridors and within a quarter-mile radius of a high-capacity, light rail transit station, including the Metro Rapid and Express bus. According to the City's recently adopted Housing Element: "It is the overall housing vision of the City of Los Angeles to create for all residents a city of livable and sustainable neighborhoods with a range of housing types, sizes and costs in proximity to jobs, amenities and services." The development of the project site, which replaces low-scale office and warehouse with 1,218 dwelling units will help address the City's housing crisis.

The area involved has a significant physical identity. At 11 plus acres it is the largest parcel under one ownership in the area. The property is currently underutilized unlike other fully occupied industrial parcels in the area. It contains two radio towers, a 43,000 square foot building used for radio broadcasting which is being abandoned by the current radio station users for another site, a parking lot, a truck storage yard and four small industrial buildings.

With a location directly across Jefferson Boulevard from a Metro Expo Line Station, the proposed project and the site has the ability to provide significant economic identity to

the area by providing the first major grocery store in the area to the south of the 10 freeway approximately one half-mile to the north of the site and one mile to the west of the nearest major grocery store at La Brea Avenue. It will provide both jobs in 200,000 square feet of office space and an additional 100,000 square feet of retail and restaurant space. These findings further incorporate by reference the description of the applicable land use policies and the analysis of the proposed project's consistency with those policies found in Chapter 4.H (Land Use and Planning) of the Environmental Impact Report for the proposed project.

The City Planning Commission finds that development of new market rate housing has a direct negative impact on the City's ability to provide affordable housing. Rising land prices have been a key factor in preventing development of new affordable housing. New market-rate housing uses available land, thereby driving up the price of remaining land. New development without affordable units reduces the amount of land development opportunities available for the construction of affordable housing. New residents of market-rate housing place demands on services provided by both public and private sectors, creating a demand for new employees. Some of these public and private sector employees needed to meet the needs of the new residents earn incomes only adequate to pay for affordable housing. Because affordable housing is in short supply in the City, such employees may be forced to live in less than adequate housing within the City, pay a disproportionate share of their incomes to live in adequate housing in the City, or commute ever increasing distances to their jobs from housing located outside the City. These circumstances harm the City's ability to attain employment and housing goals articulated in the City's general plan and place strains on the City's ability to accept and service new market-rate housing development.

**Zone and Height District Change Findings**

a.    **Pursuant to LAMC Section 12.32.C.7, and based on these Findings, the recommended action is deemed consistent with public necessity, convenience, general welfare and good zoning practice.**

The subject property is located within the West Adams-Baldwin Hills/Leimert Community Plan (the "Community Plan") area. The Community Plan designates the subject property for Limited Industrial land uses corresponding to the CM, MR1, and M1 Zones. The West Adams-Baldwin Hills-Leimert Park Community plan foresaw future transit lines and encourages greater residential densities near light rail stations, commercial centers and major bus routes. The Community Plan however did not anticipate that the project area would be the site of a future light rail station however. Therefore the proposed General Plan Amendment from Limited Manufacturing to the Community Commercial land use designation, and corresponding Zone Change/Height District Change from MR1-1VL to C2-2, will re-designate the subject property to allow for a higher density, transit oriented mixed-use development, allowing it to be used for the purpose of providing 1,218 units of much needed multi-family housing and commercial uses within close proximity to the La Cienega/Jefferson Metro Rail Line Station. Redesignating the zoning and land use of the project site provides good zoning practice in the form of: 1) contributing to the available housing stock within the City, 2) furthering the General Plan Land Use Element's Goal of Transit stations functioning as primary focal points of the City's development, 3) furthering the General Plan Land Use Element's Objective of focusing mixed    commercial/residential    uses,    neighborhood-oriented    retail,    employment

opportunities and quasi-public uses around urban transit stations, and 4) protecting and preserving surrounding low-density neighborhoods from the encroachment of incompatible land uses.

The proposed [T][Q]C2-2D zone is consistent with the zoning pattern of properties in the immediate vicinity, where surrounding uses include creative office uses, and a mix of residential and neighborhood serving commercial uses. Properties immediately to the east along La Cienega Boulevard are designated as General Commercial within the C2-1 and R4-1 zones. The proposed C2 zone is consistent with this proposed land use designation of Community Commercial and is in keeping with the goals and objectives of the General Plan Framework, which calls for community centers to range generally from FAR 1.5:1 to 3:1 with the scale and density to be greater than the neighborhood districts, generally with building heights ranging from two- to six-stories depending on the character of the surrounding area. To that end, the project would create an inviting, safe pedestrian environment, replacing an underutilized industrial site with a transit-oriented, mixed-use development providing 1,218 residential units, 100,000 square feet of retail/restaurant uses and 200,000 square feet of office, providing publicly accessible open space and attractive mid-block paseos throughout the site that provide access to services and open space for project residents and area visitors alike.

**b.      The zone change will conform to public necessity, convenience and general welfare of the City of Los Angeles.**

The proposed project will replace what has been up until now, underutilized industrial land used for the broadcasting of two radio stations, offices for the parent media company, and antiquated woodworking, upholstery and recycling storage and warehouse buildings, with a quality, fully modernized and improved podium-style-mixed use, transit-oriented development. The Project will include varying roof heights, public plaza areas, publicly accessible open space amenities, and enhanced landscaped features. The Proposed Project will enhance the neighborhood by contributing 1,218 new multi-family housing units and up to 300,000 square feet of retail, restaurant, commercial, and office space proximate to transit corridors and transit station to the benefit and convenience of the community and region.

The project would provide much-needed housing to the West Adams-Baldwin Hills-Leimert Park area, while simultaneously facilitating a development that recognizes the La Cienega and Jefferson Light Rail Station as a focal point and major transit line for the surrounding area. The development of the project is consistent with the proposed zone and land use designation, thereby furthering the goals and objectives of the West Adams Community Plan, while conforming to the public necessity, convenience and general welfare of the City of Los Angeles.

The project site is located less than 100 feet from the La Cienega/Jefferson Mid-City Exposition Light Rail Transit (Expo LRT) station. The proposed project will improve the quality of life for all those who live, work, travel to, and recreate in the immediate and surrounding area by reducing the necessity for automobile dependence and improving the built environment through better pedestrian orientation, bicycle and vehicular accessibility, as well as enhancement of desirable neighborhood character.

In addition to expanding available housing opportunities, the proposed project expands commercial opportunity with ground floor, pedestrian-oriented, local serving

retail/commercial uses along the project site's Jefferson and La Cienega frontages. The proposed 300,000 square feet of commercial floor area will include up to:

- 200,000 square feet of office space;
- 50,000 square feet of grocery store;
- 20,000 square feet of restaurant space; and
- 30,000 square feet of generally local serving retail.

The proposed new housing will be proximate to parks and recreation facilities, including the Baldwin Hills Recreation Center and the Kenneth Hahn State Recreation Area. The project also proposes an approximately .68 acre park plaza area at the center of the project site with public access from La Cienega Boulevard, identified as the "Zocalo". Ballona Creek is located just west of the project site.

The proposed General Plan Amendment and corresponding Zone Change/Height District Change will allow for a higher density, transit oriented mixed-use development that will provide much needed housing, employment, open space and retail opportunities within close proximity to a light rail station stop and is therefore consistent with the public necessity, convenience, general welfare and good zoning practice.

7.    **Zoning Administrator Adjustment Findings**

a.    **That while site characteristics or existing improvements make strict adherence to the zoning regulations impractical or infeasible, the project nonetheless conforms with the intent of those regulations.**

The C2 zone allows for residential dwelling units to be developed per the R4 development standards, and as such the minimum lot area per dwelling unit is 400 SF/du. A request to increase the density of the subject property, in order to develop the site with 1,218 dwelling units both apartments and condominiums, would essentially be a request to reduce the required lot area per dwelling unit to 393 square feet (which is within the 20% adjustment standard in Section 12.28A).

In this instant case, the strict adherence to the zoning regulations would result in 1,210 dwelling units, instead of the proposed 1,218 dwelling units, representing a difference of 8 units. There are no noteworthy characteristics of the site that make strict adherence to zoning regulations impractical or infeasible.

b.    **That in light of the project as a whole, including any mitigation measures imposed, the project's location, size, height, operations and other significant features will be compatible with and will not adversely affect or further degrade adjacent properties, the surrounding neighborhood, or the public health, welfare, and safety.**

While strict adherence to the zoning regulations is neither impractical or infeasible, the project will be compatible with the surrounding neighborhood and adjacent properties and promote the public health and welfare and safety of the area by providing much needed housing, commercial retail and office space, in the form of 1,218 new multi-family housing units and up to 300,000 square feet of retail, restaurant, commercial, and office space proximate to transit corridors and a light rail transit station. The Project Site's surrounding uses include two public rights-of-way, creative office uses, and a mix

of residential and neighborhood serving commercial uses. The mixed office, retail and
residential uses provided by the Project will be compatible with those uses. Furthermore
the project will not encroach upon the nearby existing single-family uses east of La
Cienega and south of Jefferson Boulevard and will further help protect those single-
family neighborhoods from encroachment by other development that may not be
compatible with the neighborhood. Furthermore, the project will promote the public
welfare and health by providing publicly accessible open space in the form of the 0.68
"Zocalo" and public space at the corner of the Jefferson and La Cienega frontages.

The project's location, size and height is compatible with the surrounding neighborhood
and adjacent properties. The setting in which the project is located is one of low rise
commercial and light-industrial development. However, higher density uses are being
introduced to the immediate vicinity, such as a 4 story parking structure that is part of the
La Cienega and Jefferson light rail transit station. Furthermore, a 12 story office tower
standing 230 feet tall is currently under construction just a third of a mile away at 5790
Jefferson Boulevard.

The project's perceived size is reduced by varying the height and building rooflines,
providing building articulation and design variation, and locating pedestrian plazas
throughout the project, breaking up the massing of the buildings.

The project is appropriate for the location as it provides commercial retail components
along La Cienega Boulevard and Jefferson Boulevard, two existing commercial corridors
and maximizes the residential density on the site in response to the subject property's
adjacency to the Metro Expo LRT Station.

c.    **That the project is in substantial conformance with the purpose, intent and
      provisions of the General Plan, the applicable community plan and any applicable
      specific plan.**

      The site's characteristics and existing improvements does not make strict adherence to
      the zoning regulations impractical or infeasible, however the proposed project has been
      designed to provide a use that will be consistent with the purposes, intent and provisions
      of the General Plan. The project is seeking a General Plan Amendment to change the
      entire project site under the Limited Manufacturing designation to Community
      Commercial, consistent with the uses proposed for the site, which in this case includes
      1,218 dwelling units, 200,000 square feet of office space and 100,000 square feet of
      commercial space.

      The General Plan Framework identifies Community Centers as mixed-use centers that
      encourages the development of housing in concert with the multi-use commercial uses.
      The project's proposed zone of C2 is a corresponding zone for a Community Center
      under the General Plan Framework. The General Plan Framework identifies Community
      Centers as physically having a scale and density that is greater than the neighborhood
      districts, generally with building heights ranging from two- to six-stories depending on the
      character of the surrounding area. In this case, the proposed project is predominantly 7
      stories in height with a 30 story residential tower on the northwestern end of the site.

      The Framework Element further recommends that Community centers be planned for
      both night and day use. Major transportation hubs (rail, bus, or both) are encouraged to
      develop in each community center to facilitate improved access to and from the

remainder of the City. In addition, centralized parking structures should be integrated with private and public development within Community Centers. The proposed project proposes a mixed-use project with centralized parking within walking distance of a transportation hub, in this case the La Cienega and Jefferson light rail transit stop and therefore meets this goal.

The location of the Jefferson/La Cienega Metro Expo LRT station within the West Adams-Baldwin Hills/Leimert Community Plan Area make location of a mixed-use commercial and multi-family residential development on the project site highly desirable, and would directly support the quality of life for the future residents of the proposed project, as well as current residents within the Community Plan area and the larger City area.    The West Adams-Baldwin Hills/Leimert Community Plan advocates for maximizing the development opportunities of the future rail transit system while minimizing any adverse impacts. In this case, the "future rail transit system" is now in place and the proposed project will redevelop an underutilized property that is in a prime location adjacent to the Metro Expo line and more specifically located within 100' of the Jefferson/La Cienega Station. An opportunity exists to increase ridership on the light rail line by placing a higher density of 1,218 residential units within close walking and biking distance to the Station, making it accessible and more attractive to existing and potential riders. In addition, the proposed 100,000 square feet of commercial floor area adds necessary and convenient retail and restaurant options, as well as up to 200,000 of office space, for those on their way to or from the Metro Expo rail line. The mixed-use project provides both opportunities for jobs and housing and would promote livability benefits in the area.

Further, the proposed mixed-use development preserves surrounding low-density neighborhoods from encroachment of incompatible land uses that would typically be allowed in an MR1 zone. The proposed Project will bring much needed neighborhood serving commercial uses and opportunities for jobs to the area, and provide opportunities for those using the Metro station that are on their way to and from work or home. The Project Site is also is also within convenient walking distance (i.e., approximately 1,500 feet) of the five Local/Limited, and Commuter Express Bus line routes.

**8.    Site Plan Review Findings**

**a.    The Project is in substantial conformance with the purposes, intent and provisions of the General Plan, applicable community plan, and any applicable specific plan.**

The overall goals of the General Plan are to promote an arrangement of land uses, circulation, and services that will encourage and contribute to the economic, social, and physical health of the City, and to guide the development of communities to meet existing and anticipated needs of this population. The location of the Jefferson/La Cienega Metro Expo LRT station within the West Adams-Baldwin Hills/Leimert Community Plan Area make location of a mixed-use commercial and multi-family residential development on the subject property compatible with the General Plan Framework in that it provides mixed commercial/residential uses, neighborhood-oriented retail, employment opportunities, and civic and quasi-public uses around an urban transit station, while protecting and preserving surrounding low-density neighborhoods from the encroachment of incompatible land uses (Goal 3K). Furthermore, the project increases the density within one quarter mile of a transit station, improving the station's viability as

a new transit route and station (Policy 3.1.6).

Further, the proposed mixed-use development preserves surrounding low-density neighborhoods from encroachment of incompatible land uses that would typically be allowed in an MR1 zone. The proposed Project will bring much needed neighborhood serving commercial uses to the area and provide opportunities for those using the Metro station that are on their way to and from work or home. The subject property is also within convenient walking distance (i.e., approximately 1,500 feet) of the following Local/Limited, and Commuter Express Bus line routes: 217 (Metro Local–Culver City Transit Center), 38 (Metro Local – Downtown Los Angeles via Jefferson Bl); 105 (Metro Local-Crenshaw), and Metro Express & Rapid.

Regarding the arrangement of land uses, the subject property is located at the northwest corner of two public rights-of-way, La Cienega Boulevard (to the east), a Modified Boulevard II, and Jefferson Boulevard (to the south), a Modified Avenue II, with a newly repurposed creative office campus to the north (formerly an industrial park), light industrial/warehouse uses (to the west) neighborhood commercial uses (to the east) at the northeast corner of La Cienega and Jefferson Boulevards, and an established single-family residential neighborhood further north and east of the Jefferson/La Cienega corner.  As such, and as re-designated land, the proposed transit oriented mixed-use development is positioned to complement the existing and established uses of the area and provide high intensity uses within proximity to the Metro Expo LRT Station located at Jefferson and La Cienega

The Project addresses many of the relevant issues and opportunities identified in the Community Plan.   Among the identified residential and commercial issues and opportunities are:

- Need to preserve established single-family neighborhoods.
- Compatibility between residential and other uses.
- The potential for appropriately scaled new housing in proximity to public transit nodes.
- Potential for residential and mixed-use development along commercial corridors.
- Undeveloped or underdeveloped land may allow opportunities for clustered development.
- Lack of continuity of complementary uses and cohesiveness along commercial frontages.
- Inadequate transition between commercial and residential uses.
- The flight of quality commercial enterprises and of consumer dollars from the area.
- Create pedestrian/friendly shopping areas by incorporating street trees, benches, convenient parking/access, and maintain retail frontages at ground level.

Consistent with the issues and opportunities above, the proposed project protects the stable single-family neighborhood east of the subject property across La Cienega Boulevard, and addresses the potential for appropriately scaled new housing in proximity to public transit nodes by providing a compatible mixed-use development on a formerly industrially zoned site within walking distance to a light rail station. Furthermore, the project follows good planning principles by locating community serving commercial services along the La Cienega and Jefferson Boulevard frontage.

The proposed project is consistent with the relevant goals, objectives, policies, and programs of the adopted West Adams-Baldwin Hills/Leimert Community Plan. The West

Adams-Baldwin Hills/Leimert Community Plan map identifies the C2 Zone as a corresponding zone to the Community Commercial land use designation. The West Adams-Baldwin Hills/Leimert Community Plan under the section titled Purpose of the Community Plan acknowledges the desirability and appropriateness of locating multi-family residential development proximate to transit corridors (as is the case in the instant request) with the following statement: "Areas around transit stations and transit corridors would realize any changes in densities as existing properties zoned for multi-family development and containing a mix of densities continue to build out to their maximum potential." In accordance with this purpose, the proposed project will redevelop a significantly underutilized, industrially zoned property that is in a prime location within 100' of the Jefferson/La Cienega Light Rail Station. A unique opportunity exists to provide housing, jobs, and retail and local serving uses, directly adjacent to this new, high capacity transit infrastructure; all within a single, high quality, master-planned development.

Objective 1-2 of Goal 1 of the Community Plan is, "to locate new housing in a manner which reduces vehicular trips and makes it accessible to services and facilities." Policy 1-2.1 of this objective is to, "locate higher residential densities near commercial centers, light rail transit stations and major bus routes where public service facilities, utilities and topography will accommodate this development." The proposed project, located less than 100 feet from the Jefferson/La Cienega Metro Expo LRT station, consists of consists of a mixed use project providing increased residential and commercial density in the form of 200,000 square feet of office, 100,000 square feet of commercial and 1,218 residential units easily accessible to major bus routes and within a few hundred feet of a light rail transit Furthermore the project will provide community amenities and services near several adjacent neighborhoods to the east and south, with the nearest commercial center currently existing being about a mile east of the site.

In summation, the Project is in substantial conformance with the purposes, intent and provisions of the General Plan, and West Adams-Baldwin Hills-Leimert Park Community Plan.

**b.** **That the project consists of an arrangement of buildings and structures (including height, bulk and setbacks), off-street parking facilities, loading areas, lighting, landscaping, trash collection, and other such pertinent improvements, that is or will be compatible with existing and future development on adjacent properties and neighboring properties;**

The subject property is comprised of a combination of building types including 7-story mixed-use podium style buildings with groundfloor commercial along the Jefferson and La Cienega frontages, over two levels of subterranean parking and one approximately 30-story mixed-use building (including 5-stories of podium parking levels and ground floor retail with residential units on floors 6-24) over two subterranean levels of parking. The 200,000 square foot office component is located along the northwestern portion of the podium building within two levels of office uses. The podium style buildings surround a .68 acre outdoor public park space on the interior of the subject property. With the exception of the 30-story mixed-use building, the maximum average height of the buildings is approximately 110 feet. The 30-story mixed-use building has a maximum height of approximately 320 feet pursuant to Section 12.21.1 B3.

Along Jefferson Boulevard within the 7-story mixed-use building is a ground floor bike hub, which is adjacent to two levels of above-ground parking, and a service and loading area. Residential dwelling units are located on levels 3-7 connected by podium level

outdoor courtyards and an indoor amenity space. Wrapping the corner from Jefferson to La Cienega and continuing to just south of the main vehicular driveway of the subject property is the portion of the 7-story mixed use building that fronts La Cienega. This building comprises the majority of the ground floor retail space. Residential dwelling units area located on levels 3-7 connected by the podium level outdoor courtyard area. Given its close proximity to a Metro Light Rail Station, the 7-story structure is an appropriate height and scale for greater density and place-making along the rail line.

Beneath the 7-story podium buildings are two levels of subterranean parking, which provide for the residential parking component, accessed through the ingress/egress driveway at the southwest corner of the subject property and through the main driveway at La Cienega Boulevard and Boden Street. Parking is fully concealed from the public right of way, making it pedestrian friendly and compatible with the character of a mixed-use, transit oriented district.

The proposed project's maximum height of approximately 320 feet for the high-rise tower atop a 5-level podium parking structure with ground floor retail, is located at the subject property's northeastern corner, which abuts La Cienega Boulevard to the east, and industrial warehouse, associated parking and a creative space office park to the north.

The building height immediately steps down from the high-rise tower to a maximum height of approximately 110 feet for the podium buildings on the remainder of the subject property.

The project follows good planning and design principles by varying the height and building rooflines, providing building articulation and design variation, locating pedestrian plazas and commercial retail components along La Cienega Boulevard and Jefferson Boulevard and maximizing the residential density on the site in response to the subject property's adjacency to the Metro Expo LRT Station, making it compatible with existing or future development.

The building's design addresses massing in a number of ways. Building height varies from approximately 110 feet for the 7-story mixed-use podium style buildings to a maximum height of approximately 320 feet for the high-rise residential tower, creating significant breaks in the building facades. The design elements of the podium buildings and the building's façade work together to create a unified design, having a distinct rhythm of massing. There is a balance of transparency and solid walls and the length of the façade is modulated by introduction of vertical and horizontal reveals that create distinct elements in its form. In addition, the varying rooflines create variation, which is echoed in the balconies, all of which enhance the visual appeal of the proposed Project.

Within the centralized park plaza area, two-story townhome units with ground floor access line the parking structure in the northwest corner of the subject property, which also creates variation in the front façade, while forming a distinct pedestrian friendly building base fronting a public space.

The podium building's design utilizes complementary and contrasting materials on upper floors for residential uses that will denote the commercial storefronts on the ground floor. These materials create visual interest both vertically and horizontally on all building facades, further serving to break up visual massing.

Visual massing is further diminished through the use of landscaped public plazas, courtyards, podium level terraces and balconies throughout the subject property. The proposed podium building's east elevation includes ground level boxed landscaping and

outdoor dining furniture. The 6th floor podium level terrace of the high-rise tower creates further additional varied planes in the building façade and the overall design scheme.

The project is consistent with the scale and character of the community. The setting in which the project is located is one of low rise commercial and light-industrial development. However, higher density uses are being introduced to the immediate vicinity, such as a 12 story office tower standing 230 feet tall which is currently under construction just a third of a mile away at 5790 Jefferson Boulevard. Additionally, the project's height and massing would be softened by varying architectural details, roof heights, facades, landscaping, and open spaces which will lessen the scale, create visual interest and therefore be consistent with the scale and character of the community.

The project's setbacks will be compatible with existing and future surrounding uses. The project will exceed the setback requirements of the LAMC, consistent with a transit-oriented district. The proposed project generously observes an approximately 35-foot rear yard depth along the subject property's westerly property line (a 19-foot minimum yard depth is required per C2 Zone using the R4 development standards). This setback is enhanced with landscaping, a bike path and entrance to the parking structure at the northwest corner of the subject property. Additionally, 10-foot side yard setbacks are provided at the first residential level along the south property line abutting Jefferson Boulevard, and at the north property line abutting the private alley. As depicted on Exhibit A on sheet A-2.0, La Cienega Boulevard provides for approximately 21-foot (variable) ground floor public plaza area separating the building face from La Cienega Boulevard public right-of-way, where the code allows for a minimum 0-foot front yard for commercial uses. Although existing nearby development does not exceed code required setbacks, it is anticipated that the project will contribute to pedestrian activity with generous sidewalks and landscaping, as well as making walking from the light rail transit station to the project a safer and more stimulating experience.

With regard to off-street parking facilities, a minimum of LAMC required off-street automobile parking spaces are provided for the project's proposed uses, which in this case is 2,397 spaces after accounting for the replacement bicycle parking allowed by LAMC Section 12.21.A.4. Additionally, 1,308 long-term bicycle stalls (1,218 residential and 90 commercial) and 192 short-term bicycle stalls (122 residential and 70 commercial) are also provided within the various parking structures above and below ground.

Off-street automobile parking is provided at-grade and within above grade and subterranean parking structures. The entrance and exit to the subject property for residents, employees and guests is provided through three ingress/egress driveways. The first driveway access is provided at a proposed signalized intersection of La Cienega and Boden Street. The other two driveways are located along Jefferson Boulevard and provide access to parking in the above and below grade parking structures. An automated security gate will provide access to the subterranean residential parking.

Parking for the commercial retail components of the proposed project, is located on the ground floor and second levels of the 7-story podium building within a portion located in the southwest quadrant of the subject property, and within the 5-story podium parking structure at the northeast corner of the subject property. Parking for the residential component of the proposed project, is located within the 2 levels of subterranean parking garage beneath the 7-story podium building accessed from Jefferson Boulevard and the

La Cienega/Boden Street driveway. Residential parking for the high-rise tower is located within the 5-story podium structure and within the 2 levels of subterranean parking garage directly beneath the 5-story podium building.

The proposed plans provide an approximately 13,149-square foot loading area located at grade adjacent to the proposed anchor grocery, accessible via a driveway on Jefferson Boulevard and furthest away from the commercial portion of the Jefferson façade, thereby not interrupting pedestrian flow. An additional 1,102-square foot loading area is located at grade adjacent to the retail within the high-rise tower building is accessible via a driveway on La Cienega Place along the north side of the subject property and is separated from the Zocalo by the La Cienega Place, thereby buffering pedestrian traffic. The separate driveways will minimize pedestrian traffic impacts associated with loading.

Per the City's plan check process, all lighting will meet Green Building Code requirements and will not impact adjacent properties. The project will provide perimeter lighting to supplement the street lighting and provide increased visibility and security of the project site. The project's exterior lighting would also be designed with internal and/or external glare control and would be designed, arranged, directed, or shielded to contain direct illumination on the project site. The project's lighting will be reviewed as part of the City's plan process and will also comply with the lighting power requirements in the California Energy Code, California Code of Regulations, Title 24, Part 6.

The proposed project provides at a minimum the code required landscaping of 16,669 square feet, which accounts for 12.5% of the required common open space area. Additionally, as shown on the landscape plans submitted with the instant application, extensive landscaped areas are provided throughout the subject property, including the .68 acre park plaza area referred to as the Zocalo, accessible to the public, ground floor plazas along La Cienega, shaded walking paths, seating areas, roof decks, planted balconies, and other common gathering areas.

The proposed project includes courtyards and roof terraces throughout the residential podium buildings. Level 6 for the high-rise tower and Level 3 for the residential podium buildings (i.e. the podium level), provides courtyards interior to the building footprint that is open to the sky and accessible to the residences.

Included in the common area landscape areas described above, it should be noted that the proposed project provides 305 trees, inclusive of proposed street trees. Pursuant to 12.21 G.2(a)(3), at least one 24-inch box size (1,218 units ÷ 4 = 304.5 trees). The proposed project provides 305 trees with a box size of 24 inches or greater.

Enclosures for trash and recycling collection for all uses are provided on the ground-floor level of the podium and tower buildings, within the building footprint, and accessible from the ground floor parking level. Trash and recycling areas are fully enclosed and shielded from public view.

c.  **That any Project containing residential uses provides its residents with appropriate type and placement of recreational facilities and services amenities in order to improve habitability for the residents and minimize impacts on neighboring properties where appropriate.**

The project proposes up to 1,218 residential units with associated recreational facilities and service amenities for its residents. As such, per LAMC Section 12.21 G.2, the project must provide a minimum of 133,350 square feet of Open Space. The Project will

provide the code required open space, with a combination of podium courtyards, a park plaza area, landscaped paseos, and public plaza areas.

On the Podium Levels, the project provides outdoor open space amenities for residents of the project Site. Four distinct areas are offered on these levels; "Tower Scape," "Commune Garden," "Pool Garden," and "Garden Rooms, as described further." The "Tower Scape" is located on the podium level of the high-rise tower and offers landscaped gardens, outdoor sitting areas, and a pool and deck. The "Commune Garden" provides outdoor garden and sitting areas for the residents. The "Pool Garden" and "Garden Rooms" are physically connected and flow from one area to the other. A pool and outdoor deck is provided in the "Pool Garden", while landscaped sitting areas and walking paths are provided in the "Garden Rooms." Each of these areas on the Podium Levels, incorporate distinctive plant materials specific to their "Room", but all offer shade structures, wood decking, poured in place concrete, pavers on pedestal, and iconic outdoor furniture.

Finally, the proposed project offers commercial/retail/service amenities through the inclusion of approximately 100,000 square feet of ground-floor commercial/retail floor area. It is anticipated that the commercial spaces along the proposed project's eastern frontage will provide neighborhood and community serving uses for residential and office tenants of the proposed project as well as the neighborhood and community at large. Together with the open space and amenities provided as part of the project, these features would improve habitability for residents and would minimize impacts on neighboring properties.

**d.**      **The Project incorporates feasible mitigation measures, monitoring measures when necessary, or alternatives identified in the environmental review that would substantially less the significant environmental effects of the Project, and/or any additional findings as may be required by CEQA.**

The project has been conditioned herein to comply with all project design features and mitigation measures of environmental impact report, ENV-2014-4755-EIR (SCH No. 2015031047), which are hereby identified as Q Conditions 19 through 37.

## FINDINGS OF FACT (CEQA)

## I. INTRODUCTION

### Summary
The City of Los Angeles' ("City") consideration of the requests and environmental review is for the construction and operation of a new mixed-use and transit-oriented development ("Project" or "Proposed Project") on an 11.19 acre-site (the "Project Site") in the West Adams-Baldwin Hills-Leimert Community Plan Area in the City. The Project Applicant is CP V Cumulus, LLC. A Draft and Final Environmental Impact Report ("EIR") were prepared for the City to evaluate the environmental impacts of the Proposed Project. The City is the lead agency for the Proposed Project under the California Environmental Quality Act ("CEQA") (California Pub. Resources Code Sections 21000 et seq.).

The Final EIR identifies significant and unmitigated project-specific and/or cumulative impacts for the Proposed Project related to regional air quality and traffic impacts. The City finds these significant and unavoidable impacts are acceptable due to overriding considerations.

## II.    ENVIRONMENTAL DOCUMENTATION BACKGROUND

Based on the nature and scope of the Project, the City determines, based on substantial evidence, that the Project may have a significant effect on the environment and prepared an EIR for the Proposed Project. The EIR was prepared, noticed, published, circulated, reviewed, and completed in full compliance with CEQA and the CEQA Guidelines (California Code of Regulations, Title 14, sections 1500 et seq.), as follows:

A Notice of Preparation ("NOP") of an EIR for review and comment by the public, responsible, and reviewing agencies, was circulated by the City on April 13, 2015 for a thirty-day comment period. A public scoping meeting was also held on March 25, 2015 at the New Life Christian Center located at 2600 S. La Brea Avenue to obtain the public's initial views about the Project's potential environmental impacts. During the NOP comment period or at the scoping meeting, the City received comments from six agencies and organizations (Baldwin Hills Estates Homeowners Association, City of Culver City, Los Angeles County Metropolitan Transportation Authority, South Coast Air Quality Management District, Southern California Association of Governments, and the State Clearinghouse) and from 10 individuals.

An Initial Study ("IS") was prepared for the Project in conjunction with the NOP in March 2015 pursuant to CEQA Guidelines section 15063. The Initial Study assisted the preparation of the EIR by focusing the EIR on the effects determined to be significant, identifying the effects determined not to be significant, explaining the reasons for determining that potentially significant effects would not be significant, and identifying whether a program EIR, tiering, or another appropriate process can be used for analysis of the project's environmental effects.

A Notice of Completion and Availability ("NOA") and copies of the Draft EIR were circulated for review and comment on July 23, 2015 to those public agencies that have jurisdiction by law with respect to the Project, or which exercise authority over resources that may be affected by the Project, and to other interested parties and agencies as required by law. Comments from such persons and agencies and the general public were sought on the Draft EIR from July 23, 2015 to September 6, 2015.

The NOA described the Project, the requested permits and approvals, and the anticipated significant environmental effects. The NOA also stated that a complete copy of the Draft EIR was made available online at the Department of City Planning's website at http://planning.lacity.org and in person at the following locations:

> The City's Department of City Planning at 200 N. Spring Street, City Hall, Room 750, Los Angeles, CA 90012

> Los Angeles Central Library at 630 W. 5th Street, Los Angeles, CA 90071

> Baldwin Hills Branch Library, 2906 S. La Brea Avenue, Los Angeles, CA 90016

> Jefferson-Vassie D. Wright Memorial Branch Library, 2211 W. Jefferson Boulevard, Los Angeles 90018

> Memorial Branch Library, 4625 W. Olympic Boulevard, Los Angeles, CA 90019

> Washington Irving Branch Library, 4117 W. Washington Boulevard, Los Aneles,

CA 90018

The City received 13 comment letters on the Draft EIR.

Following closure of the public comment period, all comments received on the Draft EIR during the comment period, the City's written responses to the significant environmental points raised in those comments and additional information added by the City were added to the Draft EIR to produce the Final EIR.

## III.   FINDINGS REQUIRED TO BE MADE BY LEAD AGENCY UNDER CEQA

Section 21081 of the California Public Resources Code and Section 15091 of the CEQA Guidelines require a public agency, prior to approving a project, to identify significant impacts of the project and make one or more of three possible findings for each of the significant impacts. The possible findings are:

- "Changes or alterations have been required in, or incorporated into, the project which avoid or substantially lessen the significant environmental effect as identified in the final EIR." (State CEQA Guidelines, § 15091, subd. (a)(1))
- "Such changes or alterations are within the responsibility and jurisdiction of another public agency and not the agency making the finding.  Such changes have been adopted by such other agency or can and should be adopted by such other agency." (State CEQA Guidelines, § 15091, subd. (a)(2))
- "Specific economic, legal, social, technological, or other considerations, including provision of employment opportunities for highly trained workers, make infeasible the mitigation measures or project alternatives identified in the final EIR." (State CEQA Guidelines, § 15091, subd. (a)(3))

The findings reported in the following pages incorporate the facts and discussions of the environmental impacts that are found to be significant in the Final EIR for the project as fully set forth therein.  Although Section 15091 of the CEQA Guidelines does not require findings to address environmental impacts that an EIR identifies as merely "potentially significant," these findings would nevertheless fully account for all such effects identified in the Final EIR for the purpose of better understanding the full environmental scope of the project.  For each of the significant impacts associated with the project, either before or after mitigation, the following sections are provided:

- a) Description of Significant Effects - A specific description of the environmental effects identified in the EIR, including a judgment regarding the significance of the impact.
- b) Mitigation Measures - Identified mitigation measures or actions that are required as part of the project (numbering of the mitigation measures corresponds to the Mitigation Monitoring and Reporting Program, which is included as Section IV of the Final EIR).
- c) Finding - One or more of three specific findings in direct response to CEQA Section 21081 and CEQA Guidelines Section 15091.
- d) Rationale for Finding - A summary of the reasons for the finding(s).
- e) Reference - A notation on the specific section in the Draft and Final EIR which includes the evidence and discussion of the identified impact.

## IV. DESCRIPTION OF PROPOSED PROJECT

The Project Site is located within the West Adams – Baldwin Hills – Leimert Community Plan Area (the West Adams CP) of the City of Los Angeles (the City), at the northwest corner of La Cienega and Jefferson Boulevards (3321, 3351 South La Cienega Boulevard and 5707, 5717, 5727, 5733, 5735 West Jefferson Boulevard). Culver City is located to the north and west of the Project Site, at a variable distance of approximately 300 to 500 feet. Ballona Creek is located approximately 500 feet to the west. The Project Site is generally rectangular-shaped with light industrial and warehouse uses to the north and west.

### Regional and Local Access

Regional access to the project site and area is provided by the Santa Monica Freeway (I-10) located approximately 0.5 mile north of the Project Site at Washington Boulevard. Local access is provided by Fairfax Avenue, La Cienega Boulevard, Jefferson Boulevard, and National Boulevard.

### Public Transit

The Los Angeles County Metropolitan Transportation Authority (Metro) provides bus and rail service to the project site. Service along La Cienega Boulevard is provided by Metro Bus Lines 35, 105, 217, and Rapid 705, while service along Jefferson Boulevard is provided by Metro Bus Lines 35 and 217. The Metro Expo Line Light Rail's La Cienega/Jefferson Station is located directly south of the Project Site. Culver City Bus Line 4 (Jefferson Boulevard) provides service on La Cienega and Jefferson.

### Project Site Characteristics

The total area (pre-dedication) is approximately 487,535 square feet (or 11.19 acres). The Project Site is zoned MR1-1VL (Restricted Industrial Zone, Height District 1 Very Limited), has a General Plan land use designation of Limited Manufacturing, and is within the areas affected by Zoning Information ZI-2374 Los Angeles State Enterprise Zone, ZI-2412 Fast Food Establishment, and ZI-1117 MTA Project (APN 4205-033-015 only).1 The existing zoning allows for a floor-area-ratio (FAR) of 1.5:1 and a maximum height of 45 feet and three stories.

### Existing Uses on the Project Site

The Project Site is improved with an existing office building, accessory structures, and four light industrial structures (totaling approximately 63,313 square feet of occupied floor area), and two existing radio tower structures. The existing FAR of the buildings at the Project Site is 0.13:1.

### Project Characteristics

The Project includes demolition and removal of all existing structures from the Project Site and development of the Site with an approximately 1,900,000-square-foot transit-oriented, mixed-use structure consisting of podium style buildings, varying in number of stories and height up to approximately 320 feet for the tower (including 20 feet for mechanical equipment) and 110 feet for the podium buildings (including 10 feet for mechanical equipment).

The Project includes 1,218 multi-family residential units (1,600,000 square feet of residential floor area) and 300,000 square feet of commercial floor area on the lower ground floors. The residential units may include 122 studio units, 634 1-bedroom units, and 462 2- bedroom units. The commercial space may include 200,000 square feet of office space, 50,000 square feet of grocery store, 20,000 square feet of restaurant space, and 30,000 square feet of general retail. The tower would contain 480,000 square feet. Parking would be provided within a combination of aboveground and subterranean parking levels and in accordance with Los Angeles Municipal Code (LAMC) parking requirements.

The transit-oriented development Project includes the development of offices, residential, retail, restaurant, amenity, and ancillary areas and parking. It is the intention of the Project to provide jobs and residences for a broad range of workers and to promote livability benefits in the area. These benefits include access to mobility, a mix of land uses (housing and employment) that work to reduce trips, provide public space and entertainment, as well as economic development.

FAR and Density

Subject to Case No. CPC-2015-2593-GPA-ZC-HD-ZAA-SPR, the Project's FAR would be 3.9:1 (1,900,000 square feet) with 1,600,000 square feet of residential floor area (FAR is 3.28:1) and 300,000 square feet of commercial floor area (FAR is 0.62:1). The Project's residential density is 1 dwelling unit (DU) per 400 square foot of area.

Access

Vehicle access for the Project would be accommodated via four driveways. One driveway, which is proposed to include a traffic signal, would be located on La Cienega Boulevard, north of Jefferson Boulevard. Two driveways would be provided on Jefferson Boulevard for public access and a third driveway would be provided on Jefferson Boulevard for loading purposes. Pedestrian access would be provided at several points along La Cienega Boulevard and also along Jefferson Boulevard. There would also be a pedestrian paseo on La Cienega just south of Boden Street.

Vehicle Parking

The Project would provide parking per the requirements of LAMC Section 12.21. Parking would be provided on the Site within a combination of above ground and subterranean parking levels. LAMC 12.21.A.4 allows replacement of 1 auto parking space per 4 bicycle parking stalls provided. For residential, 320 auto spaces can be replaced. For commercial uses, 40 auto spaces can be replaced.

Bicycle Parking

LAMC Section 12.21 A.16(a)(2) requires new projects to provide bicycle parking spaces. Commercial uses (retail stores) require one short-term and one long-term bicycle space per 2,000 square feet of floor area. Office uses require one short-term per 10,000 square feet and one long-term bicycle space per 5,000 square feet of floor area. Multi-family residential units require one long-term bicycle parking space per unit and one short-term bicycle parking space per 10 units. Short-term bicycle parking shall consist of bicycle racks that support the bicycle frame at two points. Long-term bicycle parking shall be secured from the general public and enclosed on all sides and protect bicycles from inclement weather.  The Project would provide

1,500 bicycle spaces (192 short-term spaces and 1,308 long-term spaces).

### Transit Access

The Project Site is located directly north of the La Cienega/Jefferson Metro Expo Line Station. The Expo line provides access to the other transit lines operated by Metro, and it is anticipated that the proximity of the Project Site to the Expo Line Station would encourage the use of transit by on-site residents and their guests, retail and restaurant patrons, and office employees.

### Open Space

The Project would provide at least the code-required open space of approximately 133,350 square feet, in the form of various common open space areas and private open space (balconies) to allow for greater flexibility in unit mix.

### Environmental Design Features

The Project would comply with the City of Los Angeles' Green Building Ordinance standards and would incorporate several design elements and programs that would reduce the Project's carbon footprint through reductions in energy use, water use, and solid waste generation.

### Construction

Construction of the Project would be completed in approximately 35 months, with operation beginning in 2018. Construction of the Project would generally be undertaken in six phases, although some of these phases would overlap during the construction period: (1) demolition; (2) site preparation; (3) grading; (4) construction; (5) paving; and (6) architectural coatings.

Excavation would be required for the preparation of foundations, installation of utilities, and the construction of subterranean parking levels. It is estimated that the Project would require the export of approximately 195,000 cubic yards of soil during the excavation phase.

### Haul Route

Truck haul routes are expected to utilize the most convenient access to freeway ramps with destinations to Long Beach and Adelanto during the demolition phase, and Scholl Canyon and Adelanto during the grading phase. The truck haul routes would comply with the approved truck routes designated within the City and/or adjacent jurisdictions. Trucks traveling to and from the Project Site must travel along the designated routes. Ultimate routes would be determined through the Construction Management Plan (see Mitigation Measure L-11, in Section 4.L., Transportation/Traffic of the Draft EIR).

### Project Objectives

#### Redevelopment of Underutilized Site
1. Redevelop a currently underutilized, industrial site into an iconic mixed-use development that combines complementary uses, such as community serving retail, office, and residential uses.

Transit

2. Further local and regional objectives of reducing vehicle miles traveled and greenhouse gas emissions by providing a mix of uses and increased density in close proximity to existing bus and transit systems, including the La Cienega/Jefferson Expo Line Station.

Pedestrian and Bicycle Activity

3. Activate the La Cienega and Jefferson Boulevard corridors by attracting residents and visitors, both day and night by providing publicly accessible open and green spaces, walkways, plazas, and other gathering spaces.

4. Encourage pedestrian and bicycle activity by providing bicycle parking and pedestrian linkages within the Project, as well as an attractive pedestrian experience on La Cienega and Jefferson Boulevards.

Architecture/Design

5. Through inclusion of architecturally significant elements, create an iconic design identity at the intersection of La Cienega and Jefferson Boulevards.

6. Improve the aesthetic quality of the site by removing older structures and developing new efficient buildings that are more sensitive to adjacent uses.

Energy Conservation Features

7. Incorporate sustainable and green building design and construction to promote resource conservation, including waste reduction, efficient water management techniques, and conservation of electricity and energy.

Job Creation

8. Create a significant amount of new permanent jobs.

Public Safety

9. Improve public safety by creating a development that provides the level of density and mix of uses necessary to activate the area both day and night.

Housing Needs

10. Provide a reasonably significant amount of housing along a major public transportation corridor in furtherance of City's goals and policies, and in close proximity to the La Cienega/Jefferson Metro Expo Line Station.

**V.   ENVIRONMENTAL IMPACTS FOUND NOT TO BE SIGNIFICANT**

The City determined through the preparation of an Initial Study (included as Appendix A to the Draft EIR) that the development and the operation of the Project would not result in potentially significant impacts in the following substantive impact areas. Pursuant to CEQA Guidelines

section 15128, the City determined there was no evidence that the Project would cause environmental effects in the following areas and that no further environmental review of these issues was necessary.

The City, having reviewed and considered the information contained in the Draft EIR and Final EIR, finds pursuant to Public Resources Code section 21081, subdivision (a)(1) and CEQA Guidelines section 15091, subdivision (a)(1), that changes or alterations have been required in, or incorporated into, the Project which would mitigate, avoid, or substantially lessen to below a level of significance the following potential significant effects identified in the Final EIR. The Project would lead to significant and unmitigated project-specific and/or cumulative significant impacts with respect to air quality and traffic. The City first summarizes the findings for the environmental impacts for which no further environmental review was necessary based on the Initial Study and then summarizes the findings for each environmental impact analyzed in the Project's Draft and Final EIR. The basis for the finding for each impact is set forth below.

## Agricultural and Forestry Resources

A. *Finding – No Impact.* The Proposed Project would lead to no impacts on agricultural or forestry resources.

B. *Facts in Support of Finding.* Under the CEQA Guidelines, a project may have a significant impact on agricultural or forestry resources if it were to result in (a) the conversion of state-designated agricultural land from agricultural use to another non-agricultural use; (b) the conversion of land zoned for agricultural use or under a Williamson Act contract from agricultural use to another non-agricultural use; (c) the rezoning of forest land or timber land; or (d) other changes in the existing environment that could result in conversion of Farmland to non-agricultural use. The Project Site is currently developed with an office building, light industrial structures, and surface towers. The Project Site does not contain any agricultural uses, and is not delineated as such on any maps prepared pursuant to the state's Farmland Mapping and Monitoring Program. The Site is zoned Industrial (MR1). No Williamson Act Contract applies to the Project Site. Therefore, no impact would occur.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with agricultural or forestry resources have been identified.

## Biological Resources

A. *Finding – No Impact.* The Proposed Project would lead to no impacts on biological resources.

B. *Facts in Support of Finding.* Under the CEQA Guidelines, a project may have a significant impact on biological resources if it (a) has a substantial adverse effect, either directly or through habitat modification, on any species identified as a candidate, sensitive, or special status species in local or regional plans, policies, or regulations by the California Department of Fish and Game or the U.S. Fish and Wildlife Service; (b) has a substantial adverse effect on any riparian habitat or other sensitive natural community identified in the City or regional plans, policies, or regulations by the California Department of Fish and Game or the U.S. Fish and Wildlife service; (c) has a substantial adverse effect on federally protected wetlands as defined by Section 404 of the Clean Water Act through direct removal, filling, hydrological interruption, or other

means; (d) may interfere substantially with the movement of any native resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors, or impede the use of native wildlife nursery sites; (e) may conflict with any local policies or ordinances protecting biological resources, such as a tree preservation policy or ordinance; or (f) may conflict with the provisions of an adopted Habitat Conservation Plan, Natural Community Conservation Plan, or other approved local, regional, or state habitat conservation plan.

The Project Site is located in an urbanized area of the City and is currently developed with buildings, paving, and minimal landscaping. The Project Site does not contain any natural open spaces, act as a wildlife corridor, or possess any areas of significant biological value. No hydrological features are present on the Site and there are no sensitive habitats present. Due to the lack of biotic resources, no candidate, sensitive, or special status species identified in local plans, policies, or regulations by the California Department of Fish and Wildlife, the California Native Plant Society, or the U.S. Fish and Wildlife Service would be expected to occur on the Project Site. There are also no riparian areas located on or adjacent to the Project Site. While the Ballona Creek is located to the west, it is not identified by the U.S. National Wetlands Inventory as Riparian. The Ballona Creek to the west of the Project Site is identified as a Wetland-Riverine, but the wetland is a channelized area completely surrounded by urban uses, including light industrial uses. The intervening buildings and distance to the Site ensure that the Project would have a less than significant impact on the nearby wetland. Additionally, the nearest location that contains vegetation with the potential for supporting migratory bird and/or wildlife use is the Baldwin Hills and Kenneth Han State Recreation Areas located one mile to the south. The Project would not involve changes in the existing environment that could interfere with the movement of migratory birds or other wildlife species. No bodies of water exist on the Project Site to provide habitat for fish. The Project Site is also not located in or adjacent to an existing or proposed Significant Ecological Area, with the nearest located at the Baldwin Hills and Kenneth Hahn State Recreation Areas one mile south of the Project Site. Additionally, there is no adopted Habitat Conservation Plan, Natural Community Conservation Plan, or other approved local, regional, or state habitat conservation plan that applies to the Project Site. Based on the conditions on and surrounding the Project Site and the proposed work on the Project Site, the Project will have no impact on biological resources with respect to candidate, sensitive, or special status species, riparian habitat, wetlands, migratory fish or bird species, or adopted conservation plans.

Local ordinances protecting biological resources are limited to the City of Los Angeles Protected Tree Ordinance, as modified by Ordinance 177404. The Protected Tree Ordinance provides guidelines for the preservation of all Oak trees indigenous to California (excluding the Scrub Oak or Quercus dumosa) as well as the following tree species: Southern California Black Walnut (Juglans californica var. californica); Western Sycamore (Platanus racemosa); and California Bay (Umbellularia californica). The Project would remove trees on the Project Site and provide replacement trees in compliance with the City's Protected Tree Ordinance and the requirements in the LAMC Chapter IV, Article 6, Section 46 (Preservation of Trees). Compliance with the regulations for tree replacement would ensure the Project has no conflict with local policies or ordinances protecting biological resources, such as trees. Therefore, impacts would be less than significant.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with biological resources have been identified.

## Cultural Resources

A. *Finding – Less Than Significant Impact.* Compliance with Regulatory Compliance Measures RCM-A-1 through RCM-A-3 would ensure that the Proposed Project would not cause a significant impact to a historical resource, archaeological resource, paleontological resource, or distribute human remains. Impacts to cultural resources would be less than significant.

B. *Facts in Support of Finding.* Under the CEQA Guidelines, a project may have a significant impact on cultural resources if it (a) will cause a substantial adverse change in significance of a historical resource as defined in CEQA Guidelines section 15064.5; (b) will cause a substantial adverse change in significance of an archaeological resource pursuant to CEQA Guidelines section 15064.5; (c) will directly or indirectly destroy a unique paleontological resource or site or unique geologic feature; or (d) will disturb any human remains, including those interred outside of formal cemeteries.

For historical resources, the State Office of Historic Preservation recommends that properties over 45 years of age be evaluated for their potential as historic resources. The Project Site contains buildings that are older than 45 years. However, none of the existing buildings are listed or are eligible to be listed in an historic register. For archaeological resources, there is a recorded archaeological site within the Project Site boundaries according to the South Central Coastal Information Center. Therefore, the excavation for the subterranean parking levels has the potential to affect this archaeological site and other unknown archaeological resources. Complying with the City's regulations through Regulatory Compliance Measure RCM-A-1 will ensure impacts with respect to archaeological resources are less than significant. For paleontological resources, according to the Natural History Museum of Los Angeles County, the entire Project area contains surface deposits of younger Quaternary Alluvium, derived as fluvial deposits Ballona Creek that flow immediately to the west. These deposits typically do not contain significant vertebrate fossils, at least in the uppermost layers, but at relatively shallow depth in the area there are older Quaternary sediments around Ballona Creek (immediately west of the southwest boundary of the Project area). Therefore, the excavation of the subterranean parking levels has the potential to affect unknown paleontological resources. Complying with the City's regulations through Regulatory Compliance Measure RCM-A-2 will ensure that impacts with respect to paleontological resources are less than significant. For human remains, the Project Site is located in a heavily urbanized area, and is currently developed with an auto dealership and service center. The likelihood of encountering human remains on the Project Site is minimal. According to the Native American Heritage Commission, the Sacred lands File search did not indicate the presence of any resources within the Project Site. However, during the construction and excavation of the Project Site, there is a possibility that human remains could be encountered. Compliance with the City's regulations through Regulatory Compliance Measure RCM-A-3 will ensure that impacts with respect to human remains are less than significant.

C. *Mitigation Measures.* No mitigation measures required, as the Project will not lead to significant impacts related to cultural resources. However, since the Proposed Project could impact archaeological resources, paleontological resources, or human remains,

the following Regulatory Compliance Measures RCM-A-1 through RCM-A-3 shall be required to ensure those potential impacts to a less than significant level.

*Regulatory Compliance Measures*

- **RCM-A-1** – If any archaeological materials are encountered during the course of Project development, all further development activity shall be halted in the area of the discovery and:
    - The services of an archeologist shall then be secured by contacting the South Central Coastal Information Center located at California State University Fullerton, or a member of the Society of Professional Archaeologists ("SOPA"), or a SOPA-Qualified archeologist, who shall assess the discovered material(s) and prepare a survey, study, or report evaluating the impact.
    - The archaeologist's survey, study, or report shall contain a recommendation(s) if necessary, for the preservation, conservation, or relocation of the resource.
    - The applicant shall comply with the recommendations of the evaluating archaeologist, as contained in the survey, study, or report.
    - Project development activities may resume once copies of the archaeological survey, study, or report are submitted to the South Central Coastal Information Center at California State University Fullerton.
    - Prior to the issuance of any building permit, the applicant shall submit a letter to the case file indicating what, if any, archaeological reports have been submitted, or a statement indicating that no material was discovered.
    - A covenant and agreement binding the applicant to this condition shall be recorded prior to the issuance of a grading permit.

- **RCM-A-2** – If any paleontological materials are encountered during the course of Project development, all further development activities shall be halted in the area of discovery and:
    - The services of a paleontologist shall then be secured by contacting the Center for Public Paleontology – USC, UCLA, California State University Los Angeles, California State University Long Beach, or the Los Angeles County Natural History Museum – who shall assess the discovered material(s) and prepare a survey, study, or report evaluating the impact.
    - The paleontologist's survey, study, or report shall contain a recommendation(s), if necessary, for the preservation, conservation, or relocation of the resource.
    - The applicant shall comply with the recommendations of the evaluating paleontologist, as contained in the survey, study, or report.
    - Project development activities may resume once copies of the paleontological survey, study, or report are submitted to the Los Angeles County Natural History Museum.
    - Prior to the issuance of any building permit, the applicant shall submit a letter to the case file indicating what, if any, paleontological reports have been submitted, or a statement indicating that no material was discovered.
    - A covenant and agreement binding the applicant to this condition shall be recorded prior to the issuance of the grading permit.

- **RCM-A-3** – In the event that human remains are discovered during construction activities, the following procedure shall be observed:
    - Stop immediately and contact the County Coroner.
    - The coroner has two working days to examine human remains after being notified by a responsible person. If the remains are Native American the coroner has 24 hours to notify the Native American Heritage Commission.
    - The Native American Heritage Commission will immediately notify the person it believes to be the most likely descendant of the deceased Native American.
    - The most likely descendant has 48 hours to make recommendations to the owner, or representative, for the treatment or disposition, with proper dignity, of the human remains and grave gods.
    - If the descendant does not make recommendations within 48 hours, the owner shall reinter the remains in an area of the property secure from further disturbance.
    - If the owner does not accept the descendant's recommendations, the owner of the descendant may request mediation by the Native American Heritage Commission.

### Mineral Resources

A. *Finding – No Impact.* The Proposed Project would lead to no impacts to mineral resources.

B. *Facts in Support of Finding.* Under the CEQA Guidelines, a project may have an impact to mineral resources if it will (a) result in the loss of availability of a known mineral resource that would be of value to the region and the residents of the state; or (b) result in the loss of availability of a locally-important mineral resource recovery site delineated on a local general plan, specific plan, or other land use plan.

The Project Site is not located within a City-designated oil field or oil drilling area, or a City-designated Mineral Resource Zone 2 Area (MRZ-2). The nearest oil area is the Inglewood Oil Field to the south around Baldwin Hills. Additionally, according to the Conservation Element of the City of Los Angeles General Plan, sites that contain potentially significant sand and gravel deposits which are to be conserved followed the Los Angeles River flood plain, coastal plain, and other water bodies and courses and lie along the flood plain from the San Fernando Valley through downtown Los Angeles. Much of the area identified has been developed with structures and is inaccessible for mining extraction. Furthermore, the Project Site is developed and located in an urbanized area. Therefore, the Project would have no impact with respect to loss of availability of a known regionally-important mineral resource or locally-important mineral resource. Therefore, no impacts would occur.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts related to mineral resources have been identified.

## VI.   IMPACTS FOUND NOT TO BE SIGNIFICANT PRIOR TO MITIGATION

**Aesthetics**

Under CEQA's Guidelines (Appendix G), a project could have a potentially significant impact related to aesthetics if it were to: (a) have a substantial adverse effect on a scenic vista; (b) substantially damage scenic resources, including, but not limited to, trees, rock outcroppings, and historic buildings within a state scenic highway; or (c) substantially degrade the existing visual character or quality of the site and is surroundings.

Under the L.A. CEQA Thresholds Guide, the determination of significance for the Project's impacts on visual resources and views shall be made on a case-by-case basis, considering factors related to visual resources and views.

**Scenic Vistas**

A. *Finding – Less Than Significant Impact.*  The Proposed Project's impacts with respect to scenic vistas would be less than significant.

B. *Facts in Support of Finding.* The Project would consist of podium-style buildings, varying in number of stories and heights, but with a height of 110 feet for the podium buildings (including 10 feet for mechanical equipment) and a tower with a height of 320 feet (including 20 feet for mechanical equipment). Therefore, the Project would increase building heights on the Project Site when compared to existing conditions.

The Baldwin Hills Scenic Overlook is located approximately one mile from the Project Site and provides a panoramic view of the Los Angeles basin, the Pacific Ocean, and surrounding mountains. The Project would be viewable from the Baldwin Hills Scenic Overlook. However, the Project's tower would only block a small portion of the view and the remainder of the Los Angeles basin would still be viewable from the scenic overlook. Further, the Baldwin Hills Scenic Overlook contains a large viewing area. Therefore, as a person stands at different locations at the scenic overlook, different portions of the Los Angeles basin would be in view. Additionally, the Los Angeles basin contains many other buildings of the same height as the proposed tower, which are also viewable from the Baldwin Hills Scenic Overlook. As the majority of the Los Angeles basin would remain viewable from the Baldwin Hills Scenic Overlook, even with development of the Project, the Project's impacts with respect to scenic vistas would be less than significant.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with scenic vistas have been identified.

**Scenic Resources**

A. *Finding – No Impact.*  The Proposed Project would not substantially damage scenic resources, including, but not limited to, trees, rock outcroppings, and historic buildings within a state scenic highway. Therefore, no impact would occur.

B. *Facts in Support of Finding.* A project may have a significant impact on scenic resources if the project would damage or remove scenic resources. The Project Site does not contain trees with scenic significance or rock outcroppings and is not located within a state scenic highway according to the California Scenic Highway Mapping System for

Los Angeles County. In addition, according to the City's SurveyLA Resource, there are no eligible individual resources, historic districts, Historic Cultural Monuments (HCMS), or California or National Register properties near the Project Site. Therefore, as no scenic resources would be damaged or removed by the Project, no impact would occur with respect to a scenic resource.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with scenic resources have been identified.

### Visual Character of the Project Site During Construction

A. *Finding – No Impact.* No impacts associated with visual character would occur during the Proposed Project's construction.

B. *Facts in Support of Finding.* Construction activities at the Project Site would be mostly visible from the surrounding uses, and are estimated to occur over a maximum of approximately 35 months. Construction of the Project would involve six phases: (1) demolition; (2) site preparation; (3) grading; (4) construction; (5) paving; and (6) architectural coatings. Construction activity would vary on a weekly basis, depending largely on the number of workers and construction trucks needed for the activities during each time period. Temporary fencing would be installed around the Project Site during construction, which would partially shield views of construction activities and equipment. Although construction activities would be visible from adjacent public and private vantage points, changes to the appearance of the Project Site would be temporary in nature. Temporary construction changes are necessary for the development of the Project Site and would not rise to the level of a change that would substantially degrade the existing visual character. Therefore, no aesthetic impacts would occur during construction.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with visual character of the Project Site during construction have been identified.

### Views and Viewsheds

A. *Finding – Less Than Significant Impact.* The Proposed Project's impacts to views and viewsheds would be less than significant.

B. *Facts in Support of Finding.* The Baldwin Hills Scenic Overlook is located approximately one mile from the Project Site and provides a panoramic view of the Los Angeles basin, the Pacific Ocean, and surrounding mountains. The Project would be viewable from the Baldwin Hills Scenic Overlook and there is the possibility that the proposed tower could block a portion of the view of the Los Angeles basin as viewed from that location. However, the Project's tower would only block a small portion of the view and the remainder of the Los Angeles basin would still be viewable from the scenic overlook (see Figure 4.B-1 in Draft EIR). As the majority of the Los Angeles basin would remain viewable from the Baldwin Hills Scenic Overlook even with development of the Project, the Project's impacts with respect to views would be less than significant.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with views and viewsheds have been identified.

### Shade and Shadows

A. *Finding – No Impact.*  The Proposed Project would not lead to impacts with respect to shading or shadows.

B. *Facts in Support of Finding.* Under the L.A. CEQA Thresholds Guide, a project may have a significant shadow impact if shadow-sensitive uses would be shaded by project-related structures for more than three hours between the hours of 9:00 AM and 3:00 PM Pacific Standard Time (between October and early April) or for more than four hours between the hours of 9:00 AM and 5:00 PM Pacific Daylight Time (between early April and late October). Shadow effects are dependent on several factors, including local topography, the height and bulk of a project's structural elements, sensitivity of surrounding uses, season, and duration of shadow projection. In determining the effects of shading, the locations of sensitive uses (such as residential uses and recreational areas) in the surrounding area are identified and the shading effects are considered according to standard criteria. Impacts are determined according to the proposed building heights and the distance from the light obstructing structures to the sensitive uses.

For the Project's summer shadows, no sensitive uses would be shaded for more than four hours between the hours of 9:00 AM and 5:00 PM (see Figure 4.B-2 in Draft EIR). For the spring/fall shadows, no sensitive uses would be shaded for more than four hours between the hours of 8:00 AM and 4:00 PM (see Figure 4.B-3 in Draft EIR). For the Project's winter shadows, no sensitive uses would be shaded for more than three hours between the hours of 9:00 AM and 3:00 PM (see Figure 4.B-4 in Draft EIR). As such, the Project would have no impacts with respect to summer shadows, shadows during the spring and fall equinox, or with respect to winter shadows.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with shadows have been identified.

### Cumulative Impacts

A. *Finding – Less Than Significant Impact.*  The Proposed Project, in conjunction with the Related Projects, would not have significant cumulative impacts associated with aesthetics.

B. *Facts in Support of Finding.* With respect to the visual character of the Project Site, the Related Projects are subject to applicable development standards and environmental review. The closest related project is No. LA 22, which proposes a 16-story, 137,687-square-foot building approximately 135 feet southwest of the Project Site. While the Project buildings and Related Project No. LA 22 would be more visually prominent when compared to the existing buildings, they would create an urban environment designed to encourage people to live, work, and walk around the area. As such, cumulative impacts with respect to visual character would be less than significant. With respect to views from the Baldwin Hills Scenic Overlook, the Project's tower and Related Project No. LA 22 (see Figure 4.B-1 of Draft EIR) would only block a small portion of the view and the remainder of the Los Angeles basin would still be viewable from the scenic overlook. A view would also be available between the two buildings. Further, the Baldwin Hills Scenic Overlook contains a large viewing area. Therefore, as a person stands at different viewing locations at the scenic overlook, different portions of the Los Angeles

basin would be in view. As such, cumulative impacts with respect to scenic views would be less than significant.

Further, the development of the Related Projects is expected to occur in accordance with adopted plans and regulations, which would result in individual review of the visual character of each project to ensure consistency and design standards are compatible with existing land uses. Similar to the Project, the Related Projects would be required to submit a landscape plan to the City for review and approval. Therefore, no cumulative impacts would occur with respect to consistency with applicable aesthetic policies or regulations.

With respect to shading, development of the Project in combination with the Related Projects could result in an increase of shading impacts of various land uses in an already urbanized area of the City. The nearest related project is No. LA 22, which is located approximately 135 feet to the southwest. However, that related project would not combine with the Project to create additional shadow impacts (see Figures 4.B-5 through 4.B-7 of Draft EIR). Therefore, cumulative impacts would be less than significant with respect to shading.

With respect to nighttime light, the Project Site is in an urbanized area of the City that currently maintains an elevated level of ambient light and glare. The potential increase in nighttime light resulting from the Project would not be bright enough to substantially affect nearby sensitive uses. In addition, light resulting from Related Project No. LA 22 would be further removed from the nearby sensitive uses, including the single-family residences on Spokane Avenue, and as such, would not contribute nighttime light that would affect these uses. La Cienega Boulevard acts as a buffer between the Project and Related Project No. LA 22 and the single-family residences on Spokane Avenue. Therefore, the contribution of the Project to this potential cumulative impact would not be substantial, and a less than significant impact would occur.

With respect to daytime glare, the Project's architectural features would not be constructed of highly reflective materials and the Project's sources of glare that would be introduced into the Project area would not result in hazardous conditions due to the various features and designs to minimize glare-related impacts. Therefore, the Project's contribution to cumulative glare would not be substantial and a less than significant impact would occur.

C. *Mitigation Measures.* No mitigation measures are required, as no significant cumulative impacts associated with aesthetics have been identified.

## Air Quality

Under CEQA's Guidelines, a project may have a significant air quality impact if the project would cause any of the following: (a) conflict with or obstruct implementation of the applicable air quality plan; (b) violate any air quality standard or contribute substantially to an existing or projected air quality violation; (c) result in a cumulatively considerable net increase of any criteria pollutant for which the project region is in non-attainment under an applicable federal or State ambient air quality standard; (d) expose sensitive receptors to substantial pollutant concentrations; or (e) create objectionable odors affecting a substantial number of people.

The City has not adopted specific citywide significance thresholds, but instead relies on regional significance thresholds identified by the South Coast Air Quality Management District ("SCAQMD") in its CEQA Air Quality Handbook ("SCAQMD CEQA Handbook") as revised in November 1993 for construction and operational emissions impacts.

### Construction Phase Impacts –Toxic Air Contaminants

A. *Finding – No Impact.* The Proposed Project's construction would lead to no impacts related to toxic air contaminants.

B. *Facts in Support of Finding.* For Toxic Air Contaminants ("TAC"), the greatest potential for TAC emissions during construction would be diesel particulate emissions associated with heavy-duty equipment operations. Health effects from carcinogenic air toxics are usually described in terms of individual cancer risk, which is the likelihood that a person continuously exposed to concentrations of TACs over a 70-year lifetime will contract cancer based on the use of standard risk assessment methodology. Given the short-term construction schedule of approximately 35 months, construction of the Project would not represent a long-term (i.e., 70 years) source of TAC emission. No residential emission and corresponding individual cancer risk are anticipated after construction. Because there is such a short-term exposure period during construction, Project-related construction TAC emission would not produce chronic exposure to TACs, and no impact would occur.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts related to toxic air contaminants from the Project's construction have been identified.

### Construction Phase Impacts – Odors

A. *Finding – No Impact.* The Proposed Project's construction would lead to no impacts related odors.

B. *Facts in Support of Finding.* Potential sources that may emit odors during construction activities include equipment exhaust and architectural coatings. Odors from these sources would be localized and generally confined to the immediate area surrounding the Project Site. Given the current density of residential and commercial development and auto traffic from major and minor arterials adjacent to La Cienega and Jefferson Boulevards, any odor impacts from the construction phase would likely not adversely impact local residents or sensitive receptors. The Project would utilize typical construction techniques, and odors would be typical of most construction sites and temporary in nature. Because construction of the Project is not expected to cause an odor nuisance, no impact would occur.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts related to odors from the Project's construction have been identified.

### Operational Phase Impacts – Local Impacts

A. *Finding – Less Than Significant Impact.* The Project's localized emissions would not approach the SCAQMD's localized significance thresholds that signal when there could be human health impacts at nearby sensitive receptors during long-term operations. Impacts would be less than significant.

B. *Facts in Support of Finding.* With regards to local air quality impacts, the Project would emit minimal emission of NO2, CO, PM10, and PM2.5 from area and energy sources on-site. The localized emission would not approach the SCAQMD's localized significance thresholds that signal when there could be human health impacts at nearby sensitive receptors during long-term operations. Therefore, Project impacts related to local operational emission would be less than significant.

With respect to sensitive receptors, the Project does not include emission sources that would generate substantial long-term emissions on-site. Because those emissions would not exceed the SCAQMD's localized significance thresholds for operation, the Proposed Project would not substantially increase pollutant concentrations of CO, NO2, or PM10 at sensitive receptors. However, PM2.5 emissions could exceed the SCAQMD's daily localized significance thresholds and potentially result in local exceedance of health-based standards for particulates. Therefore, Project impacts from on-site activities on local sensitive receptors would be significant before implementation of mitigation measures. For off-site impacts, long term operations would generate substantial increases in vehicle traffic throughout the area. However, these increases would not result in exceedances of CO air quality standards at roadways in the area.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts related to localized air emissions from the Project's operation have been identified.

### Operational Phase Impacts –Toxic Air Contaminants

A. *Finding – Less Than Significant Impact.* The Project's operation will not include typical sources of acutely and chronically hazardous toxic air contaminants such as industrial manufacturing processes or automotive repair facilities. Impacts related to toxic air contaminants would be less than significant.

B. *Facts in Support of Finding.* With regards to TAC emissions, the Project is not expected to result in significant TAC emission because the Project does not include typical sources of acutely and chronically hazardous TACs, such as industrial manufacturing processes and automotive repair facilities. The Proposed Project is also not anticipated to generate a substantial number of truck trips. Based on the limited activity of TAC sources, any minimal TAC impacts from the Project would be less than significant.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts related to toxic air contaminants from the Project's operation have been identified.

### Operational Phase Impacts – Odors

A. *Finding – Less Than Significant Impact.* The Project's operation would introduce new retail, restaurants, offices, and residences to the area, but would not result in activities that create objectionable odors. Any unpleasant odors from future restaurant uses would be addressed by the SCAQMD's Rule 402, which governs nuisances. Impacts related to odors from the Project's operation would be less than significant.

B. *Facts in Support of Finding.* For odors, the Project would not include land uses and industrial operations typically associated with odor complaints, such as agricultural uses, wastewater treatment plants, good processing plants, chemical plants, composting,

refineries, landfills, dairies, and fiberglass molding. The Project would introduce new retail, restaurant, offices, and residences to the area and would not result in activities that crate objectionable odors. Any unpleasant odors from the restaurants can be addressed by SCAQMD's Rule 402, which governs nuisances. If any future restaurants were to charbroil, emissions would be controlled by SCAQMD's Rule 1138 and would be controlled with the use of catalytic oxidizers controls to help reduce odors. Therefore, the Project would have no impact with respect to odors.

Additionally, any potential impact of development that may alter the dispersion of any odors from Ballona Creek is likely to be negligible. The Western Regional Climate Center's predicted wind rose for the area (LAX, 5 miles away) confirms the predominant wind direction is from the west (33%), WSW (18%) at an average of 10 mpg. Any odors from Ballona Creek would continue to disperse eastward toward the Project Site, which is about 515 feet east of the creek. Odors would substantially disperse over that distance, at which point any plume of odors would be impacted by no closer than 230 feet east, where any odor concentrations would be further dispersed. As such, the likelihood that any odors from Ballona Creek would be substantially altered downwind (east) of the Project Site is unlikely, as those residential receptors are over 745 feet east of the odor source.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts related to odors from the Project's operation have been identified.

## Geology and Soils

Under CEQA's Guidelines, a project may have a significant impact to geology and soils if the project would result in one or more of the following: (a) expose people or structures to potential substantial adverse effects, including risk of loss, injury, or death involving – (i) rupture of a known earthquake fault, (ii) strong seismic ground-shaking, (iii) seismic-related ground failure, including liquefaction, or (iv) landslides; (b) result in substantial soil erosion or the loss of topsoil; (c) be located on a geologic unit or soil that is unstable, or that would become unstable as a result of the project, and potentially resulting in on- or off-site landslide, lateral spreading, subsidence, liquefaction, or collapse; (d) be located on expansive soil, creating substantial risks to life or property; or (e) have soils incapable of adequately supporting the use of septic tanks or alternative wastewater disposal systems where sewers are not available for the disposal of wastewater.

The L.A. CEQA Thresholds Guide requires the geotechnical analysis to address the following areas of study (1) geologic hazards; (2) sedimentation and erosion; (3) landform alternation; and (4) mineral resources. The City concluded in the initial study that the Project would not result in impacts related to mineral resources, as discussed further above in Section 4.1.4.

### Liquefaction

A. *Finding – Less Than Significant Impact.* The Proposed Project's impacts with respect to liquefaction would be less than significant.

B. *Facts in Support of Finding.* Liquefaction is a form of earthquake-induced ground failure that occurs primarily in relatively shallow, loose, granular, water-saturated soils. Liquefaction can occur when these types of soils lose their inherent shear strength due

to excess water pressure that builds up during repeated movement from seismic activity. Low groundwater table and the presence of loose medium dense sand and silty sand are factors that could contribute to the potential for liquefaction. The Project Site is identified as being within a liquefaction zone. A site-specific liquefaction analysis was performed through a geotechnical investigation in June 2015. The seismically-induced settlement analyses indicated that the alluvial soils underlying the Project Site would not be prone to liquefaction as a result of the Design Earthquake ground acceleration (2/3 PGAM) or as a result of the Maximum Considered Earthquake peak ground acceleration (PGAM). Therefore, impacts with respect to liquefaction would be less than significant.

C. *Mitigation Measures.* No mitigation measures are required since the Project's impacts with respect to liquefaction would be less than significant.

### Landslide

A. *Finding – No Impact.* The Proposed Project would not lead to impacts related to landslides.

B. *Facts in Support of Finding.* A significant adverse effect may occur if a project is located in a hillside area with soil conditions that would suggest high potential for sliding. Landslides can occur on slopes under normal gravitational forces and during earthquakes when strong ground motion can cause failure. Landslides tend to occur in loosely consolidated, wet soil, and/or rock on unstable sloping terrain. The Project Site is relatively flat and not near any hillside areas. The Project Site is not classified as a landslide hazard zone in the State Seismic Hazards Zones Map. The Project Site is also not identified by ZIMAS as being within a landslide hazard zone. Finally, the City of Los Angeles Seismic Safety Element shows that the Site is not within a landslide area. Therefore, no impact with respect to landslides would occur.

C. *Mitigation Measures.* No mitigation measures are required since the Project would not lead to impacts related to landslides.

### Substantial Soil Erosion or Loss of Topsoil

A. *Finding – Less Than Significant Impact.* The Proposed Project's impacts to substantial erosion or the loss of topsoil would be less than significant.

B. *Facts in Support of Finding.* A project may have a significant impact if it exposes large areas to the erosional effects of wind or water for a protracted period of time. The Project Site is nearly entirely covered with impervious surface, either from surface parking or buildings, and therefore is not subject to erosion. There are small areas of vegetation for decorative purposes on the Project Site that are negligible when compared to the impervious surface on the entire Project Site. Any topsoil that may exist on the Project Site was previously blended with other on-site soils during previous Site preparation/grading activities. Therefore, development of the Project would not result in substantial loss of topsoil.

The Project's construction activities such as grading and excavation could create the potential for soil erosion. Yet the potential for soil erosion on the Project Site is low due to the general level topography of the Project Site and the presence of existing off-site drainage facilities. Project construction would require the removal of existing pavement

and grading earth and excavation. Conformance with the City Building Code Sections 91.7000 through 91.7016, which include construction requirements for grading, excavation, and use of fill, would reduce the potential for wind or waterborne erosion. Additionally, the City's Building Code requires an erosion control plan to be reviewed by the Department of Building and Safety prior to construction if grading exceeds 200 cubic yards and occurs during the rainy season. As the Project would comply with all mandatory Code requirements, project impacts related to soil erosion during construction would be minimal. The potential for soil erosion during operation would be relatively low due to the urban nature of the Project area and the general level of topography of the Project Site. The Project would develop the entire Project Site with new buildings, paving, and surface treatment. As such, no impacts would occur.

C. *Mitigation Measures.* No mitigation measures are required since the Project would not lead to impacts related to substantial soil erosion or loss of topsoil.

### Soil Stability

A. *Finding – Less Than Significant Impact.* The Proposed Project's impacts on soil stability will be less than significant.

B. *Facts in Support of Finding.* A project may have a significant impact related to soil stability if the Project is built in an unstable area without proper site preparation or design features to provide adequate foundations for the project buildings, thus posing a hazard to life and property. The Project's construction activities must comply with the City's Building Code, which is designed to ensure safe construction, including building foundation requirements appropriate to site conditions. The Project Site is not at risk for landslides, as the Project Site is relatively level with very little elevation change. The potential for slope stability hazards is considered low.

Some seismically-induced settlement of the proposed structures should be expected as a result of strong ground-shaking. However, due to the uniform nature of the underlying geologic materials, excessive differential settlements are not expected to occur. Neither the soil nor geologic conditions would preclude construction of the Project provided the recommendations of the Geotechnical Investigation are followed and implemented during design and construction. Therefore, impacts with respect to soils stability would be less than significant.

C. *Mitigation Measures.* No mitigation measures are required, as the Project's impacts related to soil stability would be less than significant.

### Expansive Soils

A. *Finding – No Impact.* The Project would not lead to significant impacts related to expansive soils.

B. *Facts in Support of Finding.* The upper five feet of soils encountered during site exploration are considered to have a "medium" expansive potential and are classified as "expansive" based on the 2013 California Building Code Section 1803.5.3. The recommendations presented in the Geotechnical Investigation assume that foundations and slabs constructed near the ground surface will derive support in these materials. The Project would comply with the recommendations and the City's Department of

Building and Safety requirements. Therefore, no impact with respect to expansive soils would occur.

C. *Mitigation Measures.* No mitigation measures are required since the Project would have no impacts related to expansive soils.

### Septic Tanks

A. *Finding – No Impact.* The Proposed Project would not lead to impacts related to septic tanks.

B. *Facts in Support of Finding.* A project may have a significant impact related to septic tanks if the project is located in an area not served by an existing sewer system. The Project Site is located in a developed area of the City, which is served by a wastewater collection, conveyance, and treatment system operated by the City. No septic tanks or alternative disposal systems are necessary, nor are they proposed. Therefore, no impacts would occur.

C. *Mitigation Measures.* No mitigation measures are required, as the Project would have no impacts related to septic tanks.

### Cumulative Impacts

A. *Finding – Less Than Significant Impact.* The Proposed Project's impacts in conjunction with the Related Projects related to geology and soils would be less than significant.

B. *Facts in Support of Finding.* Geotechnical impacts related to the Related Projects in the development area would involve hazards related to site-specific soil conditions, erosion, and ground-shaking during earthquakes. The impacts on each site would be specific to that site and its users and would not be common or contribute to (or shared with, in an additive sense) the impacts on other sites. Thus, the Project, together with the Related Projects would not create an impact that is cumulatively considerable.

None of the Related Projects has elements or activities that would cause or accelerate geologic hazards offsite that would contribute to increased geological hazards on the Project Site. None of the Related Projects is in close proximity to the Project Site, with the nearest Related Project located approximately 0.5 miles to the southwest (No. CC 15). The design and construction of the Project and all the Related Projects within the City must conform to the Uniform Building Code seismic standards as approved by the Department of Building and Safety. The Related Projects in the City of Culver City shall also conform to the Uniform Building Code seismic standards as approved by the Building Safety Division. In addition, development on each related project site would be subject to uniform site development and construction standards that are designed to protect public safety, which includes a geotechnical report. Therefore, incremental impacts related to soils would not be cumulatively considerable.

C. *Mitigation Measures.* No mitigation measures are required, as the Project would have less than significant cumulative impacts related to geology and soil.

**Hazards and Hazardous Materials**

Under CEQA's Guidelines, a project could have a potentially significant impact on hazards and hazardous materials if it would result in one or more of the following: (a) create a significant hazards to the public or the environment through the routine transport, use, or disposal of hazardous materials; (b) create a significant hazard to the public or the environment through reasonably foreseeable upset and accident conditions involving the release of hazardous materials into the environment; (c) emit hazardous emission or handle hazardous or acutely hazardous materials, substances, or waste within one-quarter mile of an existing or proposed school; (d) be located on a site which is include on a list of hazardous materials sites; (e) the project would result in a safety hazard for people residing or working in the project area for a project located within an airport land use plan, or where such plan has not been adopted, within two miles of a public airport; (f) for a project located within the vicinity of a private airstrip, if the project would result in a safety hazard for people residing or working the project area; (g) impair implementation of or physically interfere with an adopted emergency response plan or emergency evacuation plan; and (h) expose people or structures to a significant risk of loss, injury or death involving wildland fires.

The L.A. CEQA Thresholds Guide requires the hazardous analysis to address (1) risk of upset/emergency preparedness and (2) human health hazard.

### Transport, Use, or Disposal of Hazardous Materials

A. *Finding – No Impact.* The Proposed Project will not result in impacts related to the transport, use, or disposal of hazardous materials.

B. *Facts in Support of Finding.* The Project's construction would involve the temporary transport, use, or disposal of potentially hazardous materials, including paints, adhesives, surface coatings, cleaning agents, fuels, and oils. All of those materials would only be used in a short-term nature during construction activities. All potentially hazardous materials would be used and stored in accordance with manufacturers' instructions and handled in compliance with applicable standards and regulations, which would ensure that impacts would be less than significant. Any emission from the use of such materials would be minimal and localized to the Project Site. Since the Project's construction would comply with applicable regulations and would not expose persons to substantial risk resulting from the release of hazardous materials or exposure to health hazards in excess of regulatory standards, no impacts associated with the potential release of hazardous substances during the Project's construction would occur.

The Project's operation would include the development of retail, restaurant, office, grocery, and residential uses that would involve the limited use of hazardous materials. Operation of the residential uses would involve the use and storage of small quantities of potentially hazardous materials in the form of cleaning solvents, paints, and pesticides for landscaping. Hazardous materials to be used, stored, and disposed of by the Project's commercial uses would vary depending on the commercial use but could include cleaning solvents, waxes, dyes, toners, paints, bleach, grease, and petroleum products. With implementation of hazardous waste reduction efforts on-site (i.e., the City's Green Building Ordinance and through source reduction, recycling, on-site treatment, etc.) as well as the proper treatment and disposal of such wastes at licensed

resource recovery facilities, the Project would not generate significant amounts of hazardous wastes.

The transport of any hazardous materials and wastes during the Project's operation would occur in accordance with federal and state regulations, including the Resource Conservation and Recovery Act ("RCRA"), Title 49 of the Code of Federal Regulations, the California Vehicle Code, and the California Health and Safety Code. In accordance with those regulations, the transport of hazardous materials and wastes would only occur with transporters who have received training and appropriate licensing, and hazardous waste transporters would be required to complete and carry hazardous waste manifests. As a result, there would be no impact to the transport of hazardous materials. During the Project's operation, hazardous waste releases through use or disposal may result in potential injury if exposure takes place, and, if not mitigated, result in soil and/or groundwater impacts. Compliance with applicable City, state, and federal regulations related to the handling, storage and disposal of hazardous waste would ensure that such impacts would be less than significant. Additionally, implementation of the Project could incrementally decrease the transport of hazardous materials and waste to/from the Project Site when compared to existing conditions, since the existing auto-related service uses would not be included as part of the Project.

Overall, with compliance with federal, state, and local regulations, the transport of hazardous materials and wastes during Project construction and operation would not create a hazard to the public or the environment through the routine transport, use, or disposal of hazardous materials consistent with existing regulatory framework.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with the transport, use or handling of hazardous materials have been identified.

### Emergency Response Plan or Emergency Evacuation Plan

A. *Finding – Less Than Significant Impact.* The Proposed Project's construction and operation would not lead to significant impacts related to an emergency response plan or evacuation plan. Any required partial closures of street rights-of-way or lanes during the Project's construction would be temporary and would not impede emergency access. The Project will have an emergency response plan annually inspected by the Los Angeles Fire Department. Compliance with Regulatory Compliance Measure RCM-F-6 would ensure the Project's impacts associated with emergency response or evaluation plans remain less than significant. Impacts would be less than significant.

B. *Facts in Support of Finding.* During the Project's construction, removal of the existing buildings and construction of the new structures would occur within the property boundaries of the Project Site. Temporary pedestrian or vehicular public right-of-way closures may be necessary during the construction phase for construction staging, equipment access, and pedestrian safety. Yet partial lane closures would not significantly affect emergency vehicles, as those vehicles have options for navigating traffic (i.e., use of sirens to clear path of travel, driving in lanes of opposing traffic, etc.). If there are partial street closures surrounding the Project Site, flagmen would be used to facilitate the traffic flow until such temporary street closures are complete.

The Project's operation would include retail, restaurant, office, and residential land uses and would be required to establish, implement, and maintain on file an emergency response plan. The Los Angeles Fire Department would inspect the emergency response plan annually, which would require that evacuation signs be located in every elevator lobby above and below ground, in other conspicuous floor locations, and in each office and restaurant area as required by Code. As formally required in Regulatory Compliance Measure RCM-F-6, all emergency plans, procedures, and evacuation signs would be submitted to the Los Angeles Fire Department for inspection and approval prior to their implementation and would be properly maintained. In sum, the Project's construction would not substantially impede public access, travel upon a public right-of-way, or interfere with an adopted emergency response or evacuation plan, and impacts would be less than significant.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with emergency response plans or emergency evacuation plans have been identified. However, compliance with Regulatory Compliance Measure RCM-F-6 will be required to ensure the Project's impacts related to emergency response or evacuation plans remain less than significant.

   *Regulatory Compliance Measure*

   **RCM-F-6 –** Prior to the issuance of a building permit, the Applicant shall develop an emergency response plan in consultation with the City's Fire Department. The emergency response plan shall include but not be limited to the following: mapping of emergency exits, evacuation routes for vehicles and pedestrians, location of nearest hospitals, and fire departments.

   **Release of Hazardous Materials Within One-Quarter Mile of Schools**

A. *Finding – Less Than Significant Impact.* The Project's operation would at most involve minimal amounts of hazardous materials, and structures and roadways currently act as a buffer between the Project Site and the one school located within 0.25 miles of the Project Site. Impacts would be less than significant.

B. *Facts in Support of Finding.* The Project Site is located within 0.25 miles of one school: Echo Horizon School, 3430 McManus Avenue (approximately 950 feet to the west). The Willows Community School, located at 8509 Higuera Street, is also nearby the Project Site (approximately 2,000 feet to the southwest). While the Project would be operational during school hours, the Project would use, at most, minimal amounts of hazardous materials for routine cleaning and maintenance. There are also intervening structures and roadways between the schools and the Project Site. Therefore, the Project would not pose a significant risk involving the routine transport, use, and disposal of hazardous materials or the accidental release of hazardous materials, and impacts associated with the emission of hazardous materials near an existing or proposed school would be less than significant.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with the release of hazardous materials within 0.25 miles of existing or proposed schools have been identified.

### Airport Land Use Plan, Or Two Miles Of A Public Airport Or Vicinity Of Private Airstrip

A. *Finding – No Impact.* The Proposed Project is not within two miles of a public airport or within the vicinity of a private airstrip. The Project would not have impacts related to an airport land use plan or nearby public airports or private airstrips.

B. *Facts in Support of Finding.* A project may have a significant impact if a project is located within two miles of a public airport, and subject to a safety hazard or within the vicinity of a private airstrip. The closest public airport is Santa Monica Airport, which is approximately 4 miles west of the Project Site. The Project Site is also not located in the vicinity of a private airstrip. Therefore, no impacts would occur.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with a public or public use airport have been identified.

### Wildland Fires

A. *Finding – No Impact.* The Project Site is not located in proximity to wildland areas and does not pose a potential fire hazard. No impacts related to wildland fires would occur.

B. *Facts in Support of Finding.* A project may have a significant impact related to wildland fires if the project is located in proximity to wildland areas and poses a potential fire hazard, which would affect persons or structures in the area in the event of a fire. The Project Site is not located in a Very High Fire Hazard Severity Zone as identified through the City's ZIMAS Parcel Profile Report. The project Site is also not located within a designated Fire Buffer Zone or Mountain Fire District as identified in the Safety Element of the City's 1996 General Plan. Therefore, no impact would occur.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with wildland fires have been identified.

### Cumulative Impacts

A. *Finding – Less Than Significant Impact.* The Proposed Project, in conjunction with the Related Projects, would not result in a significant cumulative impact related to hazards and hazardous materials.

B. *Facts in Support of Finding.* The City considered the cumulative growth in the Project area, including the known development projects on the Related Projects list as well as the general ambient growth projected to occur. Some of the growth in the Project area is anticipated to occur on or around properties known to contain hazardous or potentially hazardous conditions, such as hazardous waste generation or handling, or the presence of leaking underground storage tanks ("LUSTs"). While impacts associated with hazards and hazardous materials are typically site-specific and do not cumulatively affect off-site areas, conditions such as contaminated groundwater can affect down-gradient properties. Operation of many of the Related Projects can also reasonably be expected to involve the limited use of potentially hazardous materials typical of those used in residential and commercial developments, including cleaning agents, paints, pesticides, and other materials used for landscaping. Some of the Related Projects may also propose auto dealerships and gas station uses that may also utilize, hand, store, or

generate hazardous materials. However, regardless of the number and location of the Related Projects, the Project together with the Related Project would not create an impact that is cumulatively considerable. Each development project would have to comply with site specific development standards and state hazardous materials handling and transporting regulations. Compliance with these standards would ensure that the related projects would further the objectives of applicable community and regional plans. Therefore, cumulative impacts related to hazards and hazardous materials for the concurrent development of the Project and Related Projects would be less than significant, and the Project's overall contribution would not be cumulatively considerable.

C. *Mitigation Measures.* No mitigation measures are required, as no significant cumulative impacts associated with hazards and hazardous materials have been identified.

## Hydrology and Water Quality

Under the CEQA Guidelines, a project may have a significant impact if the project would result in one or more of the following: (a) violate any water quality standards or waste discharge requirements; (b) substantially deplete groundwater supplies or interfere substantially with groundwater recharge such that there would be a net deficit in aquifer volume or a lowering of the local groundwater table level; (c) substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, in a manner which would result in substantial erosion or siltation on-or offsite; (d) substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, or substantially increase the rate or amount of surface runoff in a manner which would result in flooding on- or off-site; (e) create or contribute runoff water which would exceed the capacity of existing or planned stormwater drainage systems or provide substantial additional sources of polluted runoff; (f) otherwise substantially degrade water quality; (g) place housing within a 100-year flood hazard area as mapped on a federal Flood Hazard Boundary or Flood Insurance Rate map or other flood hazard delineation map; (h) place within a 100-year flood hazard area structures which would impede or redirect flood flows; (i) expose people or structures to a significant risk of loss, injury, or death involving flooding, including flooding as a result of the failure of a levee or dam; or (j) expose people or structures to a significant risk of loss, injury or death involving inundation by seiche, tsunami, or mudflow.

Under the L.A. CEQA Thresholds Guide, the hydrology analysis must address: (1) surface water hydrology; and (2) groundwater level.

### Water Quality

A. *Finding – Less Than Significant Impact.* The Proposed Project would not violate any water quality standards, waste discharge requirements, or otherwise substantially degrade water quality. The impact would be less than significant.

B. *Facts in Support of Finding.* Runoff from the Project Site does not directly discharge into Ballona Creek (or any other water body). Accordingly, runoff from the Project Site is considered a non-point source discharge for potential pollutants. Thus, the Proposed Project would not result in any impacts related to point-source discharge that could violate water quality standards.

The Project Site is also entirely covered with impervious surface, either from surface parking or buildings. Some existing undeveloped areas of the Project Site, including the paved parking areas and small areas of vegetation, would be replaced by new buildings and surfaces. The Project Site would be required to obtain a National Pollutant Discharge Elimination System ("NPDES") water quality permit from the Los Angeles Regional Water Quality Control Board. Implementation of appropriate project design features and compliance with local, state, and federal regulations, code requirements, and permit provisions would prevent both short term (construction) and long-term (operational) impacts to water quality.

During the Project's construction, sediment is usually the constituent of greatest potential concern, especially for construction activities during wet weather periods. The greatest risk of soil erosion during the construction phase occurs when the site disturbance peaks due to grading activity and removal and re-compaction or replacement of fill areas. Other pollutants that could affect surface-water quality during the Project construction phase include petroleum products (gasoline, diesel, kerosene, oil, and grease), hydrocarbons from asphalt paving, paints and solvents, detergents, fertilizers, and pesticides (including insecticides, fungicides, herbicides, and rodenticides). The Project Applicant would comply with the applicable requirements of the City's Building Code, which requires wet weather erosion control measures for construction during the rainy season. To further minimize potential water quality impacts during the construction phase, the Project Applicant would be required to prepare and implement a Stormwater Pollution Prevention Plan ("SWPPP") in accordance with the NPDES General Permit for Discharges of Stormwater Associated with Construction Activity and Land Disturbance Activities. The SWPPP would include Best Management Practices ("BMPs") and erosion control measures to prevent pollution and avoid creating substantial additional sources of polluted runoff in storm water discharges during construction. The SWPPP would be subject to review and approval by the City for compliance with the City's Best Management Practices Handbook. All Project construction activities must also comply with the City's grading, excavation, and fill regulations, which require the implementation of grading and dust control measures. Since the Project's construction would disturb more than one acre of land, the Project Applicant would also be required to obtain coverage under the General Construction Activity Storm Water Permit ("GCASP"), which requires development and implementation of a SWPPP. Construction projects that include grading during the rainy season must also develop a Wet Weather Erosion Control Plan ("WWECP"). Through compliance with NPDES requirements and City Grading regulations, Project impacts related to water quality during construction would be less than significant.

With respect to the Project's operation, the Project's urban runoff could include the contaminants typically associated with urban development, including trace metals from pavement runoff and landscape maintenance debris that may be mobilized in storm runoff from driveway areas and landscaping, and in dry-season "nuisance flows" from landscape irrigation. Under the existing conditions, storm water runoff from the Project Site contains similar types of urban pollutants and is currently uncontrolled and under treated. Under the post-Project conditions, in accordance with NPDES requirements, the Project Applicant would be required to have a Project-specific storm water quality plan in place during the operational life of the Project to address the management of urban runoff from the Project Site. The storm water quality plan would include site design, source control, low-impact development, and treatment control BMPs. Final selection of BMPs in the plan would be coordinated with the City. The storm water quality plan would

also be subject to the City's review and approval for compliance with the City's Development Best management Practices Handbook, Part B, Planning Activities. Given that the Project Site likely does not currently meet water quality standards because of the site's current uses, the quality of storm water drainage would likely improve at the Project Site with the Project's development. In sum, implementation of the storm water quality plan, and overall compliance with NPDES requirements would ensure that the Project's water quality impacts during operation would be less than significant.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with water quality have been identified. However, compliance with Regulatory Compliance Measures RCM-G-1 and RCM-G-5 (as described below) will be required to ensure the Project will not lead to significant impacts related to water quality.

### Groundwater

A. *Finding – No Impact.* The Proposed Project would not substantially deplete groundwater supplies or interfere substantially with groundwater recharge such that there would be a net deficit in aquifer volume or a lowering of the local groundwater table level. No impact would occur.

B. *Facts in Support of Finding.* Since the Project Site is nearly completely impervious, there is limited to no groundwater recharge currently occurring on the Project Site. The Project would not substantially change the impervious surface of the Project Site. Additionally, if the subterranean portion of the Project's parking structure is not designed for full hydrostatic pressure and buoyancy, a permanent dewatering system will be required to relieve and mitigate the water pressure. The Project will also be served by the municipal water and sewer system and no production wells as a water source would be installed. The Project would also not substantially deplete groundwater supplies or interfere substantially with groundwater recharge, yields, or flow directions. Therefore, no impacts to groundwater would occur.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with groundwater have been identified.

### Drainage

A. *Finding – No Impact.* The Proposed Project would not substantially alter the existing drainage pattern of the Project Site or area that would result in substantial erosion or siltation on- or off-site. No impact would occur.

B. *Facts in Support of Finding.* The Project Site does not contain any water features, streams, or rivers. Similarly, runoff from the Project Site discharges to the local existing storm drain infrastructure and does no directly discharge to a stream or river. The Project would not alter the course of any stream or river. The Project would alter the on-site drainage patterns due to the development of buildings, podiums, and open space areas that would modify the elevations of the Project Site. However, this alteration would not result in on-site erosion or siltation because all runoff would be directed to areas of BMPs and/or storm drain infrastructure. The current drainage pattern from the Project Site includes the discharge of storm water runoff from the paved areas directly to the sidewalk and street via surface flow. The Project would not substantially alter the existing drainage pattern of the surrounding area in a manner that would result in

substantial flooding on- or off-site. Therefore, no impacts related to drainage would occur.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated drainage have been identified.

### Place Housing Or Structure Within A 100-Year Flood Hazard Area

A. *Finding – No Impact.* The Proposed Project would not place housing within a 100-year flood hazard area as mapped on a federal Flood Hazard Boundary or Flood Insurance Rate Map or other flood hazard delineation map. No impact would occur.

B. *Facts in Support of Finding.* The Project Site is not located within an area identified by the Federal Emergency Management Agency ("FEMA") as potentially subject to 100-year floods. The Project Site is not located within a City-designated 100-year or 500-year flood plain. The Project would not introduce people or structures to an area of high flood risk. Therefore, the project would not contain any significant risks of flooding and would not have the potential to impede or redirect floodwater flows, and no impact would occur.

C. *Mitigation Measures.* No mitigation measures are required, as no impacts associated with placing housing within a 100-year flood hazard area have been identified.

### Flooding, Including From Failure Of A Levee or Dam

A. *Finding – No Impact.* The Proposed Project would not expose people or structures to a significant risk of loss, injury or death involving flooding, including flooding as a result of a failure of a levee or dam. The impact would be less than significant.

B. *Facts in Support of Finding.* The Project Site is located approximately 6.5 miles southwest of the Hollywood Reservoir. The Project Site is within the City-designated potential inundation area of the Reservoir, as is much of Hollywood, mid-Wilshire area, and South Los Angeles areas. The Project Site and the surrounding areas could be inundated with flood waters if the dam failed, which is a remote possibility. Dams and reservoirs are monitored during storms and measures are instituted in the event of potential overflow under the Safety Element of the City's General Plan. The Los Angeles Department of Water and Power operates and maintains the Reservoir and inspects and surveys the reservoir and dam periodically to ensure the safety of the structures. Additionally, at least once per year, State Division of Safety of Dams inspectors accompany LADWP's Reservoir and Surveillance personnel to inspect each dam and reservoir. Flooding from other sources is not expected. Therefore, the minimal risk of flooding from potential dam or levee failure will not be exacerbated by the Project's development. The failure of the dam is considered remote and does not present a significant risk of loss, injury or death to people or structures. Therefore, no impact related to risk of loss involving failure of a dam would occur.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with flooding as a result of a failure of a levee or a dam have been identified.

### Inundation by Seiche, Tsunami, or Mudflow

A. *Finding – No Impact.* No impact would occur related to inundation by seiche, tsunami, or mudflow.

B. *Facts in Support of Finding.* A significant impact may occur if a project is sufficiently close to the ocean or other water body to be potentially at risk of the effects of seismically-induced tidal phenomena (i.e., seiche and tsunami) or if the project site is located adjacent to a hillside area with soil characteristics that would indicate potential susceptibility to mudslides or mudflows. The Project Site is not located in a Tsunami Hazard Area as identified in the Safety Element of the City's General plan. The Project Site is also not located in a Tsunami Inundation Zone as identified in the City's ZIMAS Parcel Profile Report, and is located approximately six miles inland from the Pacific Ocean and not near nay other major water bodies. Therefore, risks associated with seiches or tsunamis would be considered extremely low at the Project Site. The Site is also not in or near a hillside area that could become a mudflow. No impact would occur.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with inundation by seiche, tsunami, or mudflows have been identified.

### Cumulative Impacts

A. *Finding – Less Than Significant Impact.* The Proposed Project, in conjunction with the Related Projects, would not result in a cumulative hydrology, water quality, and groundwater impact.

B. *Facts in Support of Finding.* The Project would have a less than significant impact with respect to all hydrology and water quality issues and its associated incremental impacts are therefore not considered cumulatively considerable. The project would implement new BMPs that would control storm water runoff quantity and quality. Other Related Projects in the area would also be required to adhere to regulatory requirements that control storm water and pollutant discharges and would be required to prepare and implement a SWPPP and/or Standard Urban Stormwater Mitigation Plan ("SUSMP") and undergo a preliminary review by the City or the City of Culver City to determine what drainage improvements and BMPs would be required to ensure no significant water quality issues. Compliance with these standards would ensure that the Related Projects would further the objectives of applicable regional water quality plans. Further, the Project Site and surrounding areas are serviced by an MS4 system that is designed with capacity to handle 50 year storm flows from all areas in the developed condition. While the Project and Related Projects may change the onsite land uses, they would remain urban developments planned or by the existing MS4 system. Also, future development projects within the Project area are likely to be subject to more stringent BMPS than what are in use under the existing conditions, and generally improve existing stormwater flows that discharge from currently vacant parcels or surface parking lots. As such, cumulative impacts to hydrology and water quality would not be cumulatively considerable.

C. *Mitigation Measures.* No mitigation measures are required, as no significant cumulative impacts associated with hydrology, water quality, and groundwater impact have been identified.

## Land Use and Planning

Under CEQA's Guidelines, a project could have a potentially significant impact related to land use and planning if it were to: (a) physically divide an established community; b) conflict with any applicable land use plan, policy, or regulation of an agency with jurisdiction over the project adopted for the purpose of avoiding or mitigating an environmental effect; or (c) conflict with any applicable habitat conservation plan or natural community conservation plan.

Under the L.A. CEQA Thresholds Guide, a project's potential impacts related to land use and planning must be made on a case-by-case basis considering the project's consistency with applicable land use plans and compatibility with the type of land uses within the project area.

### Physically Divide An Established Community

A. *Finding – No Impact.* The Proposed Project would not physically divide an established community. No impact would occur.

B. *Facts in Support of Finding.* A significant impact may occur if a project is sufficiently large enough or otherwise configured in such a way as to create a physical barrier within an established community. For example, a project could divide an established community if it involved a continuous right-of-way such as a roadway which would divide a community and impeded access between parts of the community. The Project is not of a size or type to physically divide a community. Therefore, no impact would occur.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with dividing an established community have been identified.

### Habitat Conservation Plan Or Natural Community Conservation Plan

A. *Finding – No Impact.* The Project would not conflict with a habitat conservation plan or natural community conservation plan. No impact would occur.

B. *Facts in Support of Finding.* The Project Site has been previously developed and is located in an urbanized area. There is no adopted Habitat Conservation Plan, Natural Community Conservation Plan, or other approved local, regional, or state habitat conservation plan that apply to the Project Site. Therefore, implementation of the Project would not conflict with any habitat conservation plans and no impacts would occur.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with an applicable habitat conservation plan or natural community conservation plan have been identified.

### Compatibility Analysis

A. *Finding – No Impact.* The Project would be compatible with its surrounding environment. Therefore, no impact would occur.

B. *Facts in Support of Finding.* The physical compatibility of the Project with its surrounding enviorns is based on an analysis of proposed uses and improvements and their potential

for on- and off-site impacts. As described in the findings for those substantive areas elsewhere in this document, the Project is physically compatible with its enviorns. A project's functional compatibility is defined as the capacity for adjacent, yet dissimilar land uses to maintain and provide services, amenities, and/or environmental quality associated with such uses. Potentially significant functional land use compatibility impacts may be generated when a project hinders the functional patterns of use and relationships associated with existing land uses. While the Project would change the land use character of the Project Site by replacing the office building, accessory structures, and industrial structures that exist on the Project Site, the Project would increase both the housing and employment opportunities in the area and would provide greater density near transit services. The surrounding area is characterized by a mix of industrial, commercial, retail, and residential uses. The Project will not hinder the functional patterns of use and relationships associated with the existing land uses. Therefore, there will be no impact.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with the Project's compatibility have been identified.

### Cumulative Impacts

A. *Finding – Less Than Significant Impact.* The Proposed Project, in conjunction with the Related Projects, would not result in a significant cumulative land use impact.

B. *Facts in Support of Finding.* Cumulative land use impacts could occur if the other Related Projects would result in incompatible land uses, or result in land uses that are inconsistent with adopted land use plans when combined with the impacts of the Project. Given the build-out conditions of the greater Los Angeles region, including the Project area, cumulative development likely would convert existing underutilized properties in the Los Angeles/Culver City area to revitalized higher-density development to respond to the need for housing, sources of employment, and associated retail land uses. The Project would implement important local and regional goals and policies for the Los Angeles area, which would assist the City in achieving short- and long-term planning goals and objectives. Likewise, future development associated with the Related Projects would support the furtherance of the build out of Los Angeles and the surrounding area. This is consistent with SCAG and other regional policies for promoting more intense land uses adjacent to transit stations and job centers, providing a variety of housing options, and increasing the number of retail and commercial uses. Further, all related projects in the City would be subject to the same local development and mitigation standards as the Projects, while the Related Projects in Culver City would be subject to that City's development and mitigation standards. Finally, the Proposed Project would not combine with any of the Related Projects to create a cumulatively significant land use impact and cumulative impacts would therefore be less than significant.

C. *Mitigation Measures.* No mitigation measures are required, as no significant cumulative impacts associated with land use have been identified.

## Noise

Under CEQA's Guidelines (Appendix G), a project would have a significant impact on noise if it would cause any of the following conditions to occur: (a) exposure of persons to or generation of noise levels in excess of standards established in the local general plan or

noise ordinance, or applicable standards of other agencies; (b) exposure of persons to or generation of excessive groundborne vibration or groundborne noise levels; (c) a substantial permanent increase in ambient noise levels in the project vicinity above levels existing without the projects; (d) a substantial temporary or periodic increase in ambient noise levels in the project vicinity above levels existing without the project; (e) for a project located within an airborne land use plan, or where such a plan has not been adopted, within two miles of a public airport or public use airstrip, expose people residing or working in the project area to excessive noise levels; or (f) for a project within the vicinity of a private airstrip, expose people residing or working in the project area to excessive noise levels.

Under the L.A. CEQA Thresholds Guide, a project would normally have a significant impact on noise levels from construction if the following occurs: (a) construction activities lasting more than one day would exceed existing ambient exterior noise levels by 10 dBA or more at a noise sensitive use; (b) construction activities lasting more than ten days in a three-month period would exceed existing ambient exterior noise levels by 5 dBA or more at a noise sensitive use; or (c) construction activities would exceed the ambient noise levels by 5dBA at a noise sensitive use between the hours of 9:00 PM and 7:00 AM Monday through Friday, before 8:00 AM or after 6:00 PM on Saturday, or anytime on Sunday. Additionally, a project would normally have a significant impact on noise levels from project operations if the project causes the ambient noise levels measured at the property line of affected uses to increase by 3dBA in Community Noise Equivalent Level ("CNEL") to or within the "normally unacceptable" or "clearly unacceptable" category, or any 5 dBA or greater noise increase.

### Operational Noise

A.  *Finding – Less Than Significant Impact.* The Project's operation will not expose persons to or generate noise levels in excess of applicable standards of the applicable CEQA thresholds of significance. Impacts would be less than significant.

B.  *Facts in Support of Finding.* The Project's operations would produce both direct and indirect noise impacts on the Project Site from residential-related activities, as well as direct noise impacts from stationary noises associated with building operations, such as heating, ventilation, and air conditioning (HVAC) systems, and indirect noise impacts from vehicles traveling on local roads to access the Project Site.

For direct noise, section 41.40 and Chapter XI, Articles 1 through 6, of the LAMC require that noise generated by mechanical equipment not exceed 5 dBA ambient noise levels at adjacent property lines. Large ground level heating, ventilation, and HVAC systems typically generate noise levels between 50 and 65 dBA at 50 feet. Rooftop equipment typically produces noise levels of up to approximately 56 dBA at 50 feet. Based on the distance from the Project Site to nearby receptors, the ambient noise levels, and the relatively quiet operation of HVAC systems, the Project would not increase the ambient noise levels from these on-site noise sources. Therefore, the Project's stationary noise impacts would be less than significant.

For indirect noise, the noise generated from cars traveling to and from the Project would also be negligible at nearby receptors given their distance from the entrances to the garage located long La Cienega Boulevard. The Project Site would include subterranean parking that currently produces auto-related noise at the Project Site from vehicles

entering and exiting from La Cienega Boulevard. Any increases in ambient noise from
on-site parking would be negligible. The majority of operational noise impacts would be
from indirect noise impacts associated with the estimated 10,136 new net vehicle trips
each weekday. However, the greatest Project-related noise increases would be 1.8 dBA
Leq along westbound Rodeo east of La Cienega Boulevard in the AM peak hour, and
2.3 dBA Leq at the southwest corner of Venice and Culver Boulevards during the PM
peak hour. These increases would be inaudible, far below the 5dBA increase considered
noticeable by the public at large. Mobile noise generated by the Project would not cause
the ambient noise level measured at the property line of the affected uses to raise to the
"normally unacceptable" or "clearly unacceptable" category as defined by the 2003
California General Plan Guidelines or result in any 5 dBA or more increase in noise
level. Therefore, Project impacts related to mobile noise would be less than significant.

C. *Mitigation Measures.* No mitigation measures are required, as no significant noise
impacts associated with the Project's operation have been identified.

### Construction Groundborne Vibration

A. *Finding – Less Than Significant Impact.* The Project's construction would not generate
vibration levels that would expose persons to excessive groundborne vibration or
groundborne noise levels. The impact would be less than significant.

B. *Facts in Support of Finding.* The Project's construction activities would generate
groundborne vibration. The vibration velocities and levels at off-site sensitive uses were
determined based on an equation from the *Federal Transit Administration's Transit
Noise and Vibration Impact Assessment, Final Report.* Under the FTA's guidance, non-
engineered timber and mason buildings can be exposed to groundborne vibration levels
of 0.2 inches per second without experiencing structural damage, while reinforced-
concrete, steel, or timber buildings can be exposed to groundborne vibration levels of
0.5 inches per second. Neither the City nor Los Angeles County has adopted policies or
guidelines relative to groundborne vibration. As a result, the FTA and California
Department of Transportation's adopted vibration standards for buildings are used to
evaluate potential impacts related to project construction. Based on these standards,
impacts relative to groundborne vibration would be considered significant if the following
were to occur: (i) construction activities would cause a peak projected velocity ("PPV")
groundborne vibration level to exceed 0.5 inches per second at any off-site reinforced-
concrete, steel, or timber structure; (ii) construction activities would cause a PPV
groundborne vibration level to exceed 0.2 inches per second at any non-engineered
timber and masonry building (i.e., "fragile" buildings); and (iii) construction activities
would cause a PPV groundborne vibration level to exceed 0.12 inches per second at any
building that is extremely susceptible to vibration damage (i.e., "extremely fragile"
buildings).

Vibration velocities projected to occur at or nearest off-site sensitive receptors would
produce a peak projected velocity at the recording studios adjacent to the north of the
Project Site that is below those thresholds that are considered potentially harmful levels
of vibration for a non-engineered timber and masonry building. Other potential types of
construction equipment would produce less vibration and have lesser potential impacts
on neighboring sensitive receptors. Residences east of La Cienega would have virtually
no impact from any construction on the Project Site. The peak particle velocity and
vibration levels that would occur at these on- and off-site sensitive uses during

construction would be less than the thresholds associated with building damage under the applicable thresholds. The Project's construction would not result in any significant vibration impacts to any sensitive receptors. Therefore, Project impacts related to groundborne vibration would be less than significant.

The FTA has also established guidelines that provide thresholds for sensitive uses and human annoyance analyses. For categories of sensitive land uses, the FTA manual states that "Category 1" land uses typically include vibration-sensitive research and manufacturing uses, hospitals with vibration-sensitive equipment, and university research operations. For Category 1 sensitive land uses, the manual states that the vibration limits are based on acceptable vibration for moderately vibration-sensitive equipment such as optical microscopes and electron microscopes. The FTA manual further clarifies that for Category 1 land uses, the degree of sensitivity to vibration will depend on the specific equipment that will be affected by the vibration. Further, Category 1 does not include most computer installations or telephone switching equipment, and it is rare for computer or other electronic equipment to be particularly sensitive to vibration. The Project Site is not surrounded by Category 1 land uses. However, some surrounding land uses, including the "The Mill" Studio (digital audio and video studio) located at 3233 La Cienega Boulevard, may fall within the FTA's "Vibration Category 3." Category 3 includes schools, churches, other institutions, and quiet offices that do not have vibration-sensitive equipment, but have the potential for activity interference. Category 3 land uses could be interpreted to include non-recording and/or non-vibration-sensitive media production and land uses. Under the FTA's manual, Category 3 thresholds are 75 VdB for frequent events (more than 70 vibration events of the same source per day), 78 VdB for occasional events (between 30 and 70 events per day), and 83 VdB for infrequent events (fewer than 30 events per day).

Construction vibration levels of up to 81 VdB could occur at the Mill Studio and Bandito Brothers Studio, and vibration levels of up to 56 VdB could occur at the residence located at 3001 Genesee Avenue. However, pile placement activities capable of producing this off-site vibration level would be considered infrequent, occurring less than 30 times per day. As a result, construction vibration impacts would not exceed the FTA's 83 VdB threshold for infrequent events for those surrounding uses. Additionally, construction vibration was measured using a conservative approach. For example, vibration analysis in the Draft EIR assumed a 40-foot distance from the Project boundary to the Mill Studio when calculating potential off-site vibration levels to that receptor. In actuality, the nearest pile placement activities capable of producing maximum off-site vibration levels at the Mill Studio would occur at a distance of approximately 60 feet, as indicated by setback figures in the Project's plans. At that distance, the Mill Studio would experience maximum vibration levels of 76 VdB. Therefore, even occasional events (those occurring between 30 and 70 times per day) capable of producing such a 76 VdB vibration level at the Mill Studio would be considered less than significant. Further, since some pile placement activity would occur at distances greater than 60 feet from the Mill Studio, construction-related vibration levels experienced at the Mill would likely not exceed the 75 VdB threshold for frequent vibration events. Given the FTA thresholds, infrequency of vibration-causing events, and the distance of off-site receptors from the Project's construction, construction-related vibration impacts using the FTA's categories of sensitive land uses would be less than significant.

With respect to the FTA's guidance for human annoyance analysis, Table 7-1 of the FTA manual indicates that a threshold of 75 VdB is an approximate dividing line between

"barely perceptible and distinctly perceptible." The FTA manual further explains that many people find transit vibration at that level to be annoying. This can be interpreted as an FTA threshold for human annoyance. However, this threshold is intended to apply to long-term operational vibration from transit projects, not from temporary events such as construction activities. While the same thresholds are applied to construction activities when analyzing potential impacts of vibration-producing activities, exceeding them on a temporary, short-term basis is not necessarily a cause for a significant impact as it would be for long-term operational vibration impacts. Since the Project will not involve a long-term transit-related operation, the FTA's human annoyance analysis was not applied to the Project.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with vibration from the Project's construction have been identified.

### Operational Vibration Levels

A. *Finding – Less Than Significant Impact.* The Project's operation would not generate vibration levels that would expose persons to excessive groundborne vibration or groundborne noise levels. The impact would be less than significant.

B. *Facts in Support of Finding.* The Project's operation would not involve significant stationary sources of groundborne vibration, such as heavy equipment operations. Operational groundborne vibration in the Project vicinity would be generated by vehicular travel on the local roadways. Yet road vehicles rarely create enough groundborne vibration to be perceptible to humans unless the road surface is poorly maintained and there are potholes or bumps. If traffic, typically heavy trucks, induces perceptible vibration in buildings, such as window rattling or shaking of small loose items, then it is most likely an effect of low-frequency airborne noise or ground characteristics. Project-related traffic would expose nearby residential land uses and other sensitive receptors during long-term operations to a vibration level far less than Federal Transportation Administration's established decibel notation (75 VdB). Therefore, Project impacts related to operation vibration would be less than significant.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with vibration from the Project's operation have been identified.

### Noise Associated with an Airport Land Use Plan

A. *Finding – Less Than Significant Impact.* The Proposed Project would not expose people working or residing in the project area to excessive noise associated with an airport land use plan or within two miles of a public airport. No impact would occur.

B. *Facts in Support of Finding.* The Proposed Project site is not located within an airport land use plan. The nearest airport to the Proposed Project Site is the Santa Monica Airport, located approximately 4 miles west of the Project Site. Due to the distance from the nearest airport, the Proposed Project would not expose people working or residing in the project area to excessive noise.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with excessive noise associated with an airport land use plan have been identified.

**Excessive Noise Associated with Private Airstrip**

A. *Finding – Less Than Significant Impact.* The Proposed Project would not expose people working or residing in the project area to excessive noise associated with a private airstrip. No impact would occur.

B. *Facts in Support of Finding.* The Proposed Project site is not located near a private airstrip. Therefore, no impacts associated with a private airstrip would occur.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with excessive noise associated with a private airstrip have been identified.

## Population and Housing

Under CEQA's Guidelines (Appendix G), a project may have a significant environmental impact if the project would result in one or more of the following: (a) induce substantial growth in an area, either directly (for example, by proposing new homes and businesses) or indirectly (for example, through extension of roads or other infrastructure); (b) displace substantial numbers of existing housing, necessitating the construction of replacement housing elsewhere; or (c) displace substantial numbers of people, necessitating the construction or replacement housing elsewhere.

Under the L.A. CEQA Thresholds Guide, the determination of significance for a project's impacts on population, housing, and employment shall be determined on a case-by-case basis considering the following factors: (a) the degree to which the project would cause growth (i.e., new housing or employment generators) or accelerate development in an undeveloped area that exceeds projected/planned levels for the year of project occupancy/buildout, and that would result in an adverse physical change in the environment; (b) whether the project would introduce unplanned infrastructure that was not previously evaluated in the adopted Community Plan or General Plan; (c) the extent to which growth would occur without implementation of the project; (d) the total number of residential units to be demolished, converted to market rate, or removed through other means as a result of the project, in terms of net loss of market-rate and affordable units; and (e) the current and anticipated housing demand and supply of market rate and affordable housing in the project area.

### Construction

A. *Finding – No Impact.* The Proposed Project's construction would not induce substantial population or housing growth, either directly or indirectly. There would be no impacts.

B. *Facts in Support of Finding.* The Project's construction would result in increased employment opportunities in the construction field, which could potentially result in increased permanent population and demand for housing in the vicinity of the Project Site. However, the employment patterns of construction workers in Southern California are such that it is not likely that they would relocate their households as a consequence of the construction employment associated with the Project. The construction industry differs from most other industry sectors. For example, there is no regular place of work in the construction industry, many construction workers are highly specialized and move between job sites as dictated by demand for their skills, and workers remain at a job site

only for the time frame in which their specific skills are needed to complete a particular phase of the construction process. Therefore, Project-related construction workers would not be likely to relocate their place of residence as a consequence of working on the Project. The Project-related construction would not represent a permanent or substantial new employment generator that would cause growth. There would be no significant housing or population impacts from the Project's construction. Therefore, no impact related to construction-related population growth would occur.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with substantial population or housing growth related to the Project's construction have been identified.

### Operation

A. *Finding – Less than Significant.* The Proposed Project would not induce substantial population or housing growth, either directly or indirectly. The impact would be less than significant.

B. *Facts in Support of Finding.* The Project would not induce substantial growth that exceeds growth forecasted for the area, nor would it introduce unplanned infrastructure or accelerate development in an undeveloped area that would result in an adverse physical change in the environment. Construction of potential growth-inducing roadways or other infrastructure extensions would not be required, as the Project Site is currently developed with several buildings and is located within an urbanized area in the City.

With respect to project employee and population generation, it is estimated that the Project would generate approximately 3,289 residents, using the Community Plan's rate of 2.7 persons per unit (renter-occupied). Using the bedroom counts provides a lower population generation estimate (approximately 1,949 residents). However, to provide a conservative analysis, the City considered the higher population generation figure. The Project represents a negligible percent of the estimated population and housing growth in the City when considered with the growth projection provided by SCAG, the 2010 Census data, and the City's 2013-2021 Housing Element. The Project represents approximately 1.65% of the population and 5.3% of the housing units growth forecasts for 2014-2020. The Project percentage of the growth forecast is 0.8% and 0.63% for population and housing, respectively, when compared to the growth forecast for 2014-2035. The Project's residents and housing units would be within the estimates and SCAG's Regional Housing Needs Assessment Allocation. Thus, the Project does not represent a substantial or significant growth as compared to the existing characteristics. Therefore, no impact would occur.

The Project would also add approximately 1,218 dwelling units to the West Adams Community Plan, where several hospitals, colleges, and other regional employers are concentrated. The Project is an infill development in an already urbanized area. It is located near Century City and Westwood, which are among the region's largest areas for employers. In addition to being consistent with household growth forecast for the City of Los Angeles, the Project would be consistent with the housing policies set forth in the Community Plan. The Project would provide opportunities for a range of housing choices by providing a new, high-quality residential development with a variety of market rate housing prices and unit types. The Project would also make an important contribution to expanding the regional housing supply at an infill location near existing jobs, community

resources, and transit infrastructure (Metro Expo Line). The Project responds to the unmet housing demand in both the West Adams Community Plan and the City of Los Angeles General Plan. The Project would help achieve a portion of the household growth forecast for the City, while also being consistent with urban policies to reduce urban sprawl, efficiently utilize existing infrastructure, reduce regional congestion, and improve air quality through the reduction of vehicle miles traveled. The Project does not include new infrastructure (i.e., roads, energy plants, etc.) that could directly or indirectly induce housing or population growth. The Project's housing impacts would be beneficial rather than adverse and would have less than significant impacts related to directly inducing substantial population throughout the development of new homes.

It is also estimated that the Project would generate approximately 1,120 employees (net after the removal of the existing uses). The Project represents approximately 1.4% of the City's employee growth forecast for 2014-2020. The immediate area to the south of the Project Site is comparably jobs richer (higher job density than housing) while the area to the east has a higher housing density. The Project would generate jobs and provide housing, which could help to equalize jobs/housing balance in the local area. The addition of employees to the Project Site could come from the Project area and other areas in the City, especially since the types of land uses (grocery store, retail, restaurant and office) are not specialized to compel a net increase in employees from a region outside the local area. Thus, the employees are assumed to be housed in the local area or the City, and can access the Site through multiple modes of transit, including the Metro Expo Line. Accordingly, no impact would occur.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with substantial population or housing growth related to the Project's operation have been identified.

### Displace Housing or Persons

A. *Finding – No Impact.* The Proposed Project would not displace substantial numbers of existing housing, necessitating the construction of replacement housing. No impact would occur.

B. *Facts in Support of Finding.* The Project Site does not include existing residential uses and would not displace a substantial number of existing housing or displace a substantial number of people. Therefore, no impact would occur.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with displacing existing housing or requiring new housing have been identified.

### Cumulative Impacts

A. *Finding – Less Than Significant Impact.* The Proposed Project, in conjunction with the Related Projects, would not contribute to significant cumulative impacts associated with population and housing or employment growth.

B. *Facts in Support of Finding.* The City analyzed the Project's cumulative impacts on population and housing considering the Related Projects located within the City, since that is the jurisdiction where the Project is located. The Related Projects within the City

in conjunction with the Project would generate approximately 9,304 residents and 3,650 housing units, using the Community Plan's rate of 2.7 persons per unit (renter-occupied), 3.0 persons per unit (owner occupied), and 1 person per unit for the beds/senior units. That population growth will not cause a significant impact within the City of Los Angeles. For informational purposes, the City also reviewed the population growth within the City of Culver City. The Related Projects within the City of Culver City would exceed SCAG's Regional Housing Needs Assessment Allocation. However, the Project is not within Culver City and would not contribute to Culver City's Regional Housing Needs Assessment allocation. Therefore, the Project would not have a cumulatively considerable impact on Culver City's population and housing.

Related Projects will also generate employees, as those Projects also include the following employee-generating uses: retail, office, restaurant, grocery store, hotel, theater, museum, gas station, school, and college. It is estimated that the Project in conjunction with the Related Projects would generate approximately 8,382 employees in the City of Los Angeles. The analysis for the impacts on employees is for the City of Los Angeles only, since that is the jurisdiction where the Project is located. Analysis of the Related Projects impacts within the City of Culver City is for informational purposes only. The Project's cumulative growth with the Related Projects within the City of Los Angeles would represent a negligible percent of the estimated population, housing, and employment growth in the City. The cumulative growth represents 4.7% of the population and 16% of the housing units growth forecast from 2014 to 2020. The cumulative increase of residents and housing units would be within the estimates and Regional Housing Needs Allocation, and thus does not represent a substantial or significant growth as compared to the existing characteristics. SCAG focuses on concentrating growth in existing urbanized centers, particularly those that are proximate to transit. The project would fulfill this by providing housing near the Metro Expo Line.

C. *Mitigation Measures.* No mitigation measures are required, as no significant cumulative impacts associated with housing or employment growth have been identified.

## Public Services – Police Services

Under CEQA's Guidelines (Appendix G), a project could have a significant environmental impact if the project would result in substantial adverse physical impacts with the provision of new or physically altered police protection facilities, need for new or physically altered police protection facilities, the construction of which would cause significant environmental impacts, in order to maintain acceptable service ratios, response times, or other performance objectives for police protection.

Under the L.A. CEQA Thresholds Guide, the determination of significance for the Project's impacts on police protection shall be made on a case-by-case basis, considering the following factors: (a) the population increase resulting from the proposed project, based on the net increase of residential units or square footage of non-residential floor area; (b) the demand for police services anticipated at the time of project buildout compared to the expected level of service available; (c) whether the project includes  security and/or design features that would reduce the demand for police services.

**Cumulative Impacts**

A. *Finding – Less Than Significant Impact.* The Proposed Project, in conjunction with the Related Projects, would not result in cumulatively considerable adverse physical impacts associated with the provision of new or physically altered police protection facilities in order to maintain acceptable service rations, response times, or other performance objectives. The impact would be less than significant.

B. *Facts in Support of Finding.* Implementation of the Project in conjunction with the Related Project would increase demand for police protection services based on an increase in resident population. The increase in population from the Project and the Related Projects located within the City of Los Angeles would require the need for 17 additional officers to maintain the existing officer to population ratio. Most of the Related Projects in the City of Los Angeles are served by the same police station serving the Project Site. However, due to the large geographic scope of the locations of the Related Projects within the City, some would be served by additional LAPD stations. The addition of 17 officers to the Southwest Community Police Station would not require the expansion, consolidation, or relocation of the station. Any new or expanded police station required from the cumulative population growth and increase in commercial square footage from the Project and Related Projects would be funded via existing mechanisms (e.g., property and sales tax revenue) to which the Project and Related Projects would contribute. Each of the Related Projects within the City would be individually subject to LAPD review, and would be required to comply with all applicable safety requirements of the LAPD and the City to adequately address police protection service demands. The Related Projects would also contribute to funding police protection services in the area by generating annual revenue from property taxes that would be deposited into the City's General Fund and could potentially be used to fund the construction of future police protection facilities and support hiring more officers. Since the Project would not result in a substantial incremental contribution to the cumulative demand for police protection services, the Project would not have a cumulatively considerable impact on police protection services.

The Related Projects in the City of Culver City are served by the Culver City Police Department ("CCPD"). The Project is not within Culver City and would not directly require service from CCPD. The Related Projects in Culver City would be subject to that city's municipal code, building and safety requirements, and CCPD building and design requirements. Therefore, the Project would not have a cumulatively considerable impact on Culver City's police services.

C. *Mitigation Measures.* No mitigation measures are required, as no cumulatively significant impacts associated with police services have been identified.

## Transportation and Traffic

Under CEQA's Guidelines (Appendix G), a project would have a significant impact on traffic or transportation if it would cause any of the following conditions to occur: (a) conflict with an applicable plan, ordinance or policy establishing measures of effectiveness for the performance of the circulation system, taking into account all modes of transportation including mass transit and non-motorized travel and relevant components of the circulation system, including but not limited to intersections, streets, highways, and freeways, pedestrian and bicycle paths, and mass transit; (b) conflict with an applicable congestion

management program, including but not limited to level of service standards and travel demand measures, or other standards established by the county congestion management agency for designated roads or highways; (c) result in a change in air traffic patterns, including either an increase in traffic levels or a change in location that results in substantial safety risks; (d) substantially increase hazards due to a design feature (e.g., sharp curves or dangerous intersections) or incompatible uses (e.g., farm equipment); (e) result in inadequate emergency access; or (f) conflict with adopted policies, plans, or programs regarding public transit, bicycle, or pedestrian facilities, or otherwise decrease the performance or safety of such facilities.

Under the L.A. CEQA Thresholds Guide, a project would have significant impacts on traffic or transportation if it would cause any of the following conditions to occur: (a) would the project cause an increase in traffic which is substantial in relation to the existing traffic load and capacity of the street system (i.e., result in a substantial increase in either the number of vehicle trips, the volume to capacity ratio on roads, or congestion at intersections); (b) would the project exceed, either individually or cumulatively, a level of service standard established by the county congestion management agency for designated roads or highways. The City's CEQA Thresholds Guide requires the transportation analysis to address the following areas of study: (1) intersection capacity; (2) street segment capacity; (3) freeway capacity; (4) neighborhood intrusion impacts; (5) project access; (6) transit system capacity; (7) parking; and (8) in-street construction impacts.

The Study Area for the Project's potential impacts to traffic encompassed a geographic area approximately six miles (north-south) by approximately three miles (east-west) bounded by Olympic Boulevard to the north, Robertson Boulevard to the west, Centinela Avenue tot eh south, and Crenshaw Boulevard to the east. A traffic analysis Study Area usually comprises those intersections with the greatest potential to experience significant traffic impacts due to the project, as defined by the Los Angeles Department of Transportation ("LADOT"), including intersections that are: (1) immediately adjacent or in close proximity to the project site; (2) in the vicinity of the project site that are documented to have current or projected future adverse operational issues; (3) in the vicinity of the project site that are forecast to experience a relatively greater percentage of project-related vehicular turning movements (e.g., at freeway ramp intersections). The Study Area for the Project was established in consultation with LADOT and the City of Culver City, based on that list of criteria, as well as peak-hour Project trip generation, the anticipated distribution of Project traffic, and the existing intersections/corridor operations. The Study Area comprises those intersections with a reasonable potential to experience significant traffic impacts due to the Project. The Study Area was reviewed to ensure that all potentially significantly impacted intersections, prior to mitigation, were analyzed, and that the boundary of the Study Area was extended, as necessary, to confirm that there were no significant impacts at or beyond the Study Area periphery. The Study intersections on the Study Area periphery are not anticipated to be significantly impacted by the Project and thus, the analyzed locations are considered to be adequate such that no additional significant impacts are anticipated to occur beyond the Study Area. A total of 58 intersections (as listed in Chapter 4.L and Appendix J-1 of the EIR) as identified during the Memorandum of Understanding process with the Los Angeles Department of Transportation were reviewed in the Project's Traffic Study.

The Traffic Study also evaluated the Project's potential traffic impacts by considering the following traffic conditions, consistent with the LADOT's Traffic Study Policies and Procedures:

Existing Conditions (Year 2015) – the analysis of existing traffic conditions provides a basis for the assessment of future traffic conditions.

Existing with Project Conditions (Year 2015) – this analysis evaluates the potential Project-related traffic impacts as compared to Existing Conditions.

Future without Project Conditions (Year 2018) – This analysis condition projects the potential intersection operating conditions that could be expected as a result of regional growth and related project traffic in the Study Area by the year 2018.

Future with Project Conditions (Year 2018) – This analysis condition projects the potential intersection operating conditions that could be expected if the Project were occupied in the projected buildout year.

### Neighborhood Intrusion Impacts

A. *Finding – Less Than Significant Impact.* Although the Project may add some daily trips to adjacent routes or other potential cut-through streets, the Project would not significant impact those streets. The impact would be less than significant.

B. *Facts in Support of Finding.* The significance of potential neighborhood intrusion impacts by a project are determined by the magnitude of project traffic utilizing residential streets. The criteria used to establish intrusion impacts are set forth in LADOT's Traffic Study Policies and Procedures (May 2012). To evaluate a project's neighborhood intrusion impacts, LADOT recommends conservatively assuming that residential streets carry an average daily traffic ("ADT") volume of 1,000 trips. Under LADOT's Traffic Study Policies and Procedures, a project will have an impact on a local residential street carrying an ADT of 1,000 trips if it will increase the ADT by 12 percent, or by 120 trips. As such, neighborhood traffic corridors that expect more than 120 Project trips have the potential for intrusion impacts prior to medication.

LADOT's policy also states that three conditions must be met to create conditions under which there could be a significant impact on local streets in a neighborhood:

1. There must be sufficient Project traffic that would be added to an arterial corridor such that the volume that may shift to an alternative route could exceed the minimum significance thresholds. The majority of vehicles on an arterial corridor tend to remain on that corridor even under congested conditions, as only a small portion of motorists are inclined to seek alternative routes.

2. There must be sufficient congestion on arterial corridors selected above such that motorists traveling along the corridor may desire to divert to a parallel route through a residential neighborhood. Unless congestion is severe, travel along arterial streets is generally faster than through neighborhoods, since arterial streets typically provide greater capacities, higher travel speeds, less driveway access, fewer stop signs, etc.

3. There must be available local neighborhood street(s) providing a parallel route of travel.

If one or more of these factors is absent, significant neighborhood traffic impacts would not occur.

Based on access routes to/from the Project, along with the perception of neighborhood residents that cut-through traffic is currently occurring through specific local streets, the City considered nine segments as appropriate for evaluating potential neighborhood intrusion impacts (see full list in Chapter 4.L of Final EIR). Automatic 24-hour machine traffic counts for those street segments were conducted in April 2015. Those counts showed all local streets currently carry less than 3,000 ADT and operate within the normal thresholds of a residential street. To forecast future traffic conditions at the analyzed street segments, the existing 2015 24-hour volume was increased through the year 2018 to account for background traffic and related projects that could potentially utilize these roadway segments.

The Traffic Study determined ADT generation for the Project is 10,136 vehicles. To meet LADOT's intrusion impact methodology of adding 120 trips to a typical residential road, the Project's contribution would require an assignment of slightly more than 1.0 percent of the Project's overall traffic (i.e., 10,136 ADT x 1% = 101 ADT). Based on the location of the Project and proximity to these potential cut-through routes, less than 1.0 percent is expected to utilize adjacent residential routes.

Although the Project may add some daily trips to adjacent routes or other potential cut-through streets, applying the City's threshold criteria, the Project would not significantly impact those streets. Therefore, impacts related to neighborhood intrusion would be less than significant.

C. *Mitigation Measures.* No mitigation measures are required, as no significant traffic impacts associated with neighborhood intrusion have been identified.

### Congestion Management Program

A. *Finding – Less Than Significant Impact.* The Proposed Project would not conflict with an applicable congestion management program ("CMP"). The impact would be less than significant.

B. *Facts in Support of Finding.* The Los Angeles County Congestion Management Program requires that a traffic impact analysis be performed for all CMP arterial monitoring intersections where a project would add 50 or more trips during either the weekday morning or afternoon peak hours. A significant impact requiring mitigation occurs if project traffic causes an incremental increase in intersection volume to capacity ("V/C") ratio of 0.02 or greater to a facility projected to operate at level of service ("LOS") F after the addition of project traffic. The CMP identifies the following arterial monitoring intersections within approximately three miles of the Study Area: (i) La Cienega Boulevard & Venice Boulevard (Study Intersection 10); (ii) La Cienega Boulevard & Jefferson Boulevard (Study Intersection 26); (iii) La Cienega Boulevard & Stocker Street (Study Intersection 33); (iv) La Cienega Boulevard & Centinela Avenue (Study Intersection 50); (v) La Cienega Boulevard & Wilshire Boulevard; (vi) Venice Boulevard & Overland Avenue. The majority of those intersections were already analyzed in the within the Study Area. Morning and afternoon peak-hour traffic for all those intersections was calculated based on the number of trips entering and leaving the Study Area in the direction of the outlying CMP arterial monitoring intersections, conservatively assuming

there would be no diverging trips. No additional CMP intersections were identified outside of the Study Area, and no additional analysis was required for CMP intersection impacts.

The CMP also requires that a traffic impact analysis be performed for all CMP mainline freeway monitoring locations where a project would add 150 or more trips (in either direction) during the weekday morning or afternoon peak hours. Similar to arterial monitoring intersections, a significant impact requiring mitigation occurs if project traffic causes an incremental increase in intersection V/C ratio of 0.02 or greater to a facility projected to operate at LOS F after the addition of project traffic. The CMP identifies the following mainline freeway monitoring locations within the vicinity of the Project Site: (i) I-10 east of Overland Avenue; (ii) I-10 at La Brea Avenue; (iii) I-405 north of Venice Boulevard. The Project would not add 150 trips in either direction during either peak hour to those three identified freeway segments.

Although the Project may not meet the thresholds of CMP analyses, a separate Caltrans analysis was conducted along freeway segments and ramp terminals. The results of that analysis are provided in Appendix D of the traffic study (attached to the Draft EIR as Appendix-J-1). The Caltrans analysis studied three freeway segments along interstate 10, nine freeway ramps to interstate 10, and 10 signalized intersections. Under the Existing with Project Conditions and Future with Project Conditions, the Project would not change the level of service at any of the three freeway intersections analyzed. Under the Existing with Project Conditions, the Project would not change the level of service at any of the 10 signalized intersections analyzed. Under the Future with Project Conditions, the level of service would change from C to D for peak morning hours at the following two intersections: (i) La Cienega Boulevard and 1-10 Westbound on David Avenue (in Los Angeles); and (ii) Fairfax Avenue and I-10/Electric Drive (in Los Angeles). Under the Existing with Project Conditions, the Project would not change the level of service at any of the nine freeway ramps analyzed. Under the Future with Project Conditions, the level of service would change from E to F at one freeway ramp for afternoon peak hours – at the I-10 Eastbound on-ramp from La Cienega Boulevard.

The CMP also requires that a transit system analysis be performed to determine whether a project would increase transit ridership beyond the current capacity of the transit system. The CMP provides a methodology for estimating the number of transit trips expected to result from a project based on the number of vehicle trips. The methodology assumes an average vehicle occupancy ("AVO") factor of 1.4 in order to estimate the number of person trips to and from the Project. The CMP guidelines estimate that approximately 10 percent of the total Project person trips may use public transit to travel to and from the Project Site.

The Project is anticipated to generate approximately 737 morning peak-hour trips and 849 afternoon peak-hour trips. Assuming an AVO of 1.4, the Project's vehicle trips result in an estimated increase of 1,032 person trips during morning peak hour and 1,189 person trips during the afternoon peak hour. Using the 10 percent mode split suggested in the CMP, the Project would generate approximately 103 net new transit trips in the morning peak hour and 119 net new transit trips in the afternoon peak hour. Since the Study Area is served by numerous established transit routes, the total residual capacity of the Metro and Culver City bus lines within the Study Area during the morning and afternoon peak hours is approximately 3,015 and 2,913 transit trips, respectively. The Project's morning and afternoon peak-hour person trips by transit are projected at 103

and 119 trips, respectively, or approximately 4% in the morning peak hour or approximately 4% in the evening peak hour of the total residual capacity of the Metro and Culver City bus lines within the Study Area. The adjacent Expo Line provides further transit capacity within the Study Area, which is not included in that calculation. Therefore, the Project impact to the regional transit system would be less than significant.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with a congestion management plan have been identified.

### Conflicts with Public Transit, Bicycle, or Pedestrian Facilities

A. *Finding – Less than Significant Impact.* The Proposed Project will not conflict with public transit, bicycle, or pedestrian facilities. Impacts would be less than significant.

B. *Facts in Support of Finding.* The total residual capacity of the Metro and Culver City bus lines within the Study area during the morning and afternoon peak hours is approximately 3,015 and 2,913 transit trips, respectively. The Project's morning and afternoon peak-hour person trips by transit are projected to be 103 and 119 trips, respectively, or approximately 4% in the morning peak hour and 4% in the evening peak hour of the total residual capacity of the Metro and Culver City bus lines within the Study Area. The adjacent Expo line provides further transit capacity within the Study Area, which is not included in this calculation. Under the Bicycle Lane Network in the City's draft Mobility Plan 2035 in the project vicinity, a bike lane is proposed on (i) Fairfax Avenue from Pico Boulevard to La Cienega Boulevard, (ii) La Cienega Boulevard from Fairfax Avenue to Jefferson Boulevard, and (iii) Washington Boulevard from La Cienega Boulevard to Crenshaw Boulevard. For pedestrian activity, the sidewalks that serve as routes to the Project Site provide proper connectivity and adequate widths for a comfortable and safe pedestrian environment. The sidewalks provide connectivity to pedestrian crossings at intersections within the Study Area, including crosswalks leading to/from the Expo Line rail station. Given the Project's percentage of trips generated for transit and that the Project will not interfere with the proposed bike lanes or sidewalks that connect the Project Site to the surrounding area for pedestrians (including to the Expo Line rail station), the Project will not conflict with public transit, bicycle, or pedestrian facilities.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with potential conflicts with public transit, bicycle, or pedestrian faculties have been identified.

## Utilities and Service Systems – Wastewater

Under CEQA's Guidelines, a project would have a potentially significant wastewater impact if it were to result in one or more of the following: (a) exceed wastewater treatment requirements of the applicable Regional Water Quality Control Board; (b) require or result in the construction of new wastewater treatment facility or expansion of existing facilities, the construction of which would cause significant environmental effects; (c) require or result in the construction of new storm water drainage facilities or expansion of existing facilities, the construction of which would cause significant environmental effects; or (d) result in a determination by the wastewater treatment

provider which serves or may serve the project that it has adequate capacity to serve the project's projected demand in addition to the provider's existing commitments.

Under the L.A. CEQA Thresholds Guide, a determination of significance with respect to wastewater should consider the following: (a) whether the project would cause a measurable increase in wastewater flows at a point where, and at a time when, a sewer's capacity is already constrained or that would cause a sewer's capacity to become constrained; and (b) whether the project's additional wastewater flows would substantially or incrementally exceed the future scheduled capacity of any one treatment plant by generating flows greater than those anticipated in the Wastewater Facilities Plan or General Plan and its amendments.

### Stormwater

A. *Finding – Less Than Significant Impact.* The Project would not require or result in the construction of new stormwater drainage facilities or expansion of existing facilities, the construction of which could cause significant environmental effects. The impact would be less than significant.

B. *Facts in Support of Finding.* The Project would not create or contribute to runoff water that would result in the need for any additional storm water drainage facilities. In 2011, the City amended the City's Stormwater Ordinance (LAMC 64.70) and expanded on the City's existing Standard Urban Stormwater Mitigation Plan ("SUSMP") to implement Low Impact Development ("LID"), a storm water management strategy that seeks to prevent impacts of runoff and storm water pollution as close to its source as possible. Since the Project will add more than 500 feet of square feet of impervious area, it must comply with the LID Ordinance, including the LID's Best management Practices as determined on a case by case basis by public works. If the LID's Best Management Practices are not feasible, the City's SUSMP Best Management Practices would apply. The Project would also be required to obtain a National Pollution Discharge Elimination System ("NDPES") water quality permit from the LARWQCB. Further, implementation of appropriate project design features and compliance with local, State, and federal regulations, code requirements, and permit provisions would prevent significant impacts related to the release of potentially polluted discharge into surface water. The Project's construction activities would also be subject to the City's inspection and implementation of storm water Best management Practices. The Project would also comply with the California Building Standards Commission requirements for irrigation systems. Based on its compliance with all those requirements, the Project would not result in construction of new storm water drainage facilities or expansion of existing facilities. Therefore, impacts would be less than significant.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with new storm drainage facilities or expansion of existing facilities have been identified.

### Cumulative Impacts

A. *Finding – Less Than Significant Impact.* The Project, in conjunction with the Related Projects, would not contribute to a significant cumulatively considerable impact associated with wastewater or stormwater. Impacts would be less than significant.

B. *Facts in Support of Finding.* Implementation of the Project in conjunction with the Related Projects would increase demand for wastewater services provided by the City's sewer system. The Related Projects within the City are served by the same sewer system as the Project Site, and thus are counted as part of the cumulative analysis. The Related Projects in the City of Culver City are served by the separate Culver City Public Works Department.

The Related Projects within the City in combination with the Project would generate approximately 776,915 gpd of wastewater, with the Project accounting for approximately 25 percent of that projected increase in wastewater generation. The Related Projects in the City of Culver City would generate an additional 359,010 gpd. The Related Projects would rely on the wastewater treatment services provided by the HTP, since all Related Projects are within the HTP service boundaries. The HTP has a capacity of 450 million gpd, and currently has an average wastewater flow of 362 million gpd. Therefore, the HTP has a remaining capacity of approximately 88 million gpd. The cumulative sewage generation would be well within the design capacity of the HTP, representing about 1.29 percent of the HTP's remaining capacity. Therefore, the Project's incremental effect on cumulative impacts to wastewater treatment capacity would not be cumulatively considerable.

C. *Mitigation Measures.* No mitigation measures are required, as no significant cumulative impacts associated with wastewater or storm water drainage have been identified.

## Utilities and Service Systems – Water Supplies

Under CEQA's Guidelines (Appendix G), a project would have a significant impact on water if: (a) the project would require or result in the construction of new water facilities or expansion of existing facilities, the construction of which could cause significant environmental effects; or (b) there were insufficient water supplies available to serve the Project from existing entitlements and resources, and new or expanded facilities were needed.

Under the L.A. CEQA Thresholds Guide, the determination of impact significance on water must be made on a case-by-case basis, considering the following factors: (a) the total estimated water demand for the project (b) whether sufficient capacity exists in the water infrastructure that would serve the project, taking into account the anticipated conditions at project buildout; (c) the amount by which the project would cause the projected growth in population, housing, or employment for the Community Plan area to be exceeded in the year of the project completion; and (d) the degree to which scheduled water infrastructure improvements or project design features would reduce or offset service impacts.

### Cumulative Impacts

A. *Finding – Less Than Significant Impact.* The Project, in conjunction with the Related Projects, would not contribute to a significant cumulatively considerable impact associated with water supplies. Impacts would be less than significant.

B. *Facts in Support of Finding.* Implementation of the Project in conjunction with the Related Projects would increase demand for water services provided by the City's water supply system. The Related Projects within the City are served by the same system as the Project Site (LADWP), and thus are counted as part of the cumulative analysis. The

Related Projects within the City of Culver City are served by the separate Golden State Water Company for locations east of the 405 Freeway and by LADPW for locations east of the 405 Freeway. For a conservative analysis, the City analyzed all of the Related Projects. Based on a cumulative estimated water demand, the Related Projects in the City in combination with the Project would demand approximately 943,612 gpd of water, with the Project accounting for approximately 25 percent of that projected increase in water demand. The Related Projects in the City of Culver City would demand an additional 449,610 gpd.

Through its UWMP, the LADWP anticipates its projected water supplies will meet demand through the year 2035, including anticipated growth projections and demographic changes. In terms of the City's overall water supply condition, the water requirement for any Related Project that is consistent with the City's' General Plan has been accounted for in the planned growth of the City's water system. Additionally, any Related Project that conforms to the demographic projections from SCAG's Regional Transportation Plan ("RTP") and is located in the service area is considered to have been included in LADWP's water supply planning efforts. Therefore, projected water supplies would meet projected demands. Similar to the Project, each Related Project would also be required to comply with City and state water code and conservation programs for both water supply and infrastructure. All Related Projects would also comply with the Governor's Executive Order on drought conditions. Further, each of the Related Projects is required to be consistent with the SCAG RTP projections in order to be accounted for the City's 2010 Urban Water Management Plan's current and projected available water demands. As the Related Projects must be consistent with and accounted for in those projections, no significant cumulative water supply impact is anticipated from development of the Project and the Related Projects, and the LAAFP would have adequate capacity to treat the cumulative water demand from the Project and Related Projects.

In addition, the potential need for the Related Projects to upgrade water lines to accommodate their water needs is site-specific and there is little, if any, relationship between development of the Project and the Related Projects in relation to this issue. Therefore, no cumulative water infrastructure impacts or water treatment facilities impacts are anticipated for the development of the Project and the Related Projects. Also, Citywide water conservation efforts would be expected to partially offset the cumulative demand for water. For example, LADWP undertakes expansion or modification of water services infrastructure to serve future growth in the City as required in the normal process of providing water service. For all of those reasons, the Project would not contribute to a cumulatively considerable effect on water service and supply. Therefore, the cumulative impacts of the Related Projects in combination with the Project would be less than significant.

C. *Mitigation Measures.* No mitigation measures are required, as no significant cumulative impacts associated with water service and supply have been identified.

## Utilities and Service Systems – Solid Waste

Under CEQA's Guidelines (Appendix G), a project could have a significant environmental impact if the project would result in the following: (a) be served by a landfill with insufficient permitted capacity to accommodate the project's solid waste disposal needs; or (b) an

impact related to compliance with federal, state, and local statutes and regulations related to solid waste.

Under the L.A. CEQA Thresholds Guide, a determination of significance relative to solid waste and infrastructure shall be made on a case-by-case basis, considering the following factors: (a) amount of projected waste generation, diversion, and disposal during demolition, construction, and operation of the project, considering proposed design and operational features that could reduce typical waste generation rates; (b) need for an additional solid waste collection route, or recycling or disposal facility to adequately handle project-generated waste; and (c) whether the project conflicts with solid waste policies and objects in the City's Source Reduction and Recycling Element ("SRRE") or its updates, the City Solid Waste Management Policy Plan ("CiSWMPP"), Framework Element or Curbside Recycling Program, including consideration of the land-use specific waste diversion goals contained in Volume 4 of the SRRE.

### Compliance with Applicable Federal, State, and Local Statutes and Regulations

A. *Finding – Less Than Significant Impact.* The Project would comply with federal, state, and local statutes and regulations related to solid waste. The impact would be less than significant.

B. *Facts in Support of Finding.* Solid waste generated by the Project would be disposed of in accordance with all applicable federal, state, and local regulations and policies related to solid waste. In California, solid waste management is guided by the California Integrated Waste Management Act of 1989, which emphasizes resource conservation through reduction, recycling, and reuse of solid waste. The Act requires that localities conduct a Solid Waste Generation Study ("SWGS") and develop a Source Reduction Recycling Element ("SRRE"). The City adopted a Solid Waste Management Policy Plan in 1994. The Project would comply with AB 939, the City's Solid Waste management Policy Plan, the Source Reduction Recycling Element, the City's Ordinance No. 171687, and the Framework Element of the City's General Plan. The Project developer would provide clearly marked, durable source sorted recycling bins throughout the Project Site to facilitate recycling in accordance with Ordinance No. 171687. Given its compliance, with the applicable federal, state, and local statutes and regulations related to solid waste, the Project's impacts would be less than significant.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with solid waste have been identified.

### Cumulative Impacts

A. *Finding – Less Than Significant Impact.*  The Proposed Project, in conjunction with Related Projects, would not contribute to a significant cumulatively considerable impact associated with solid waste.

B. *Facts in Support of Finding.* Implementation of the Project in conjunction with the Related Projects would increase solid waste generation. All of the Related Projects are served by the same landfills as the Project (Puente Hills MRF and Sunshine Canyon). The Related Projects in combination with the Project would generate approximately 42,367,058 pounds of construction waste, with the Project accounting for approximately 19.5 percent of that projected increase in construction solid waste generation. It is

reasonable to assume that cumulative construction of the Related Projects could happen over two years (at a minimum, given the sizes of some of the larger projects). The total square footage of all the related projects was added together and multiplied by a solid waste generation factor. The total tons were then divided by a reasonable number of working days over a two year period. Using that calculation, construction would generate approximately 44 tons per day of cumulative construction waste. The Mesquite landfill would have adequate capacity to accept the cumulative project's construction waste. The cumulative construction debris generated by the Project combined with the Related Projects would constitute a small percentage of remaining inert landfill capacity. Therefore, cumulative impacts related to disposal of demolition and construction debris would not be cumulatively considerable.

With respect to operation, the Related Projects in combination with the Project would generate approximately 46.178 tons per day of solid waste, with the Project accounting for approximately 19 percent of that projected increase in operation solid waste generation. Similar to the Project, the Related Projects would participate in regional source reduction and recycling programs pursuant to AB 939, further reducing the amount of solid waste to be disposed of at the landfills serving the City. Related Projects would also be required to participate in recycling programs, thus reducing the amount of solid waste to be disposed of at the landfills servicing the City and Culver City. To provide a conservative estimate, the City assumed that all solid waste generated by the Related Projects would be delivered to the Sunshine Canyon Landfill, which can accommodate the additional daily increase in solid waste resulting from the cumulative projects.

The County has also supported State legislation that encourages the development of waste conversion technologies (i.e. AB 1939 in 2000 and AB 2770 in 2002). The ongoing process of improving solid waste facilities and advancing disposal techniques and strategies would further minimize the already less than significant impact on cumulative solid waste generation and disposal. The Related Projects would also act to implement the applicable City and County Waste diversion goals and policies, including the City's Solid Waste Management Policy Plan, the Source Reduction Recycling Element, the Framework Element, the Solid Resources Infrastructure Strategy Facilities Plan, the City's Municipal Code, and the County's Integrated Waste Management Plan, and Source Reduction Recycling Element.

For all of those reasons, cumulative impacts associated with solid waste will be less than significant.

C. *Mitigation Measures.* No mitigation measures are required, as no significant cumulative impacts associated with solid waste have been identified.

## Utilities and Service Systems – Energy Conservation

Under CEQA's Guidelines (Appendix F), an EIR should include the following: (a) the project's energy requirements and its energy use efficiencies by amount and fuel type for each stage of the project including construction, operation, maintenance and/or removal. If appropriate, the energy intensiveness of materials may be discussed; (b) the effects of the project on local and regional energy supplies and on requirements for additional capacity; (c) the effects of the project on peak and base period demands for electricity and other forms of energy; (d) the degree to which the project complies with existing energy

standards; (e) the effects of the project on energy resources; and (f) the project's protected transportation energy use requirements and its overall use of efficient transportation alternatives.

Under the L.A. CEQA Thresholds Guide, the determination of significance shall be made on a case-by-case basis, considering the following: (a) the extent to which the project would require new (off-site) energy supply facilities and distribution infrastructure, or capacity enhancing alterations to existing facilities; (b) whether and when the needed infrastructure was anticipated by adopted plans; and (c) the degree to which the project design and/or operations incorporate energy conservation measures, particularly those that go beyond City requirements. Based on those factors, a project would have a significant impact if: (i) the project would result in an increase in demand for electricity or natural gas that exceeds available supply or distribution infrastructure capacities; or (ii) the design of the project fails to incorporate energy conservation measures that go beyond existing requirements.

### Construction

A. *Finding – Less Than Significant Impact.* The Project's construction would not require new energy supply facilities; would not lead to wasteful, inefficient, or unnecessary consumption of energy; would comply with all applicable energy conservation measures; and would incorporate energy conservation measures. Impacts related to energy conservation and energy resources from the Project's construction would be less than significant.

B. *Facts in Support of Finding.* The Project's demolition, site clearing, grading, excavation, and trenching would last for approximately 10.5 months. Heavy-duty construction equipment associated with these activities would include diesel fuel haul trucks, excavators, skid steer loaders, tractors, and water trucks. It is estimated that up to 250 haul truck trips would be required to haul the material to off-site reuse and disposal facilities. The Project would require the use of haul trucks with double trailers to increase the overall average capacity per trip, which would minimize the total number of trips and fuel required to transport the debris. Heavy-duty construction equipment associated with building construction would include air compressors, concrete pumps, forklifts, lifts, and welders. Heavy-duty construction equipment associated with outdoor hardscape and landscaping would include air compressors, backhoes, dozers, forklifts, lifts, loaders, and rollers. The majority of the equipment will likely be diesel-fuels; however, smaller equipment such as air compressors and lifts may be electric-, gas-, or natural-gas fuels. Construction equipment fuels (diesel, gas, or natural gas) would be provided by local regional suppliers and vendors. The transportation fuel required by construction workers would depend on the total number of worker trips estimated for the duration of construction activity. Assuming construction worker vehicles have an average fuel economy consistent with a Caltrans study, based on the maximum projected number of workers during each phase, the Project would use approximately 8,376 gallons of gasoline and 165,093 gallons of diesel, assuming heavy-duty construction equipment (such as haul trucks) is primarily diesel-fuelled. This would represent 0.0002 percent of the statewide gasoline consumption and 0.009 percent of the statewide diesel consumption. The expected construction gasoline and diesel fuel gas for the Project would be negligible compared with statewide supplies and would be accommodated by local or regional suppliers and vendors. Therefore, gas impacts during construction would be less than significant.

The Project would have short-term construction impacts, as construction activities would consume relatively minor quantities of electricity, including temporary use of lighting and small power tools. These tools and lighting would be powered with charging stations supplied by portable generators. There would be no use of any permanent infrastructure for the delivery of electricity until after construction of the buildings. The electrical demand generated by these tools and lighting is substantially less than the Project's operational demand. Electricity for the Project's construction, when needed, would be supplied by the local utility provider (LADWP) via existing on-site connections. This would be consistent with suggested measures in the L.A. CEQA Thresholds Guide to reduce air pollution by using electricity from power poles rather than from temporary diesel or gasoline powered generators. Electricity used to provide temporary power for lighting and electronic equipment (e.g., computers, etc.) inside temporary construction trailers and for lighting when necessary for general construction and renovation activity would generally not result in a net increase in on-site electricity use over existing conditions since the Project Site is occupied. Therefore, electricity impacts during construction would be less than significant.

Further, the Project would use construction contractors who demonstrate compliance with applicable California Air Resources Board ("CARB") regulations governing the accelerated retrofitting, reporting, or replacement of heavy-duty diesel on- and off-road equipment. Compliance with CARB's anti-idling and emission regulations would result in efficient use of construction-related energy and the minimization or elimination of wasteful and unnecessary consumption of energy.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with energy conservation have been identified from the Project's construction.

### Cumulative Impacts

A. *Finding – Less Than Significant Impact.*  The Project, in conjunction with Related Projects, would not contribute to a significant cumulatively considerable impact associated with energy conservation.

B. *Facts in Support of Finding.* The Project in conjunction with the Related Projects would increase demand for electricity. The Project and Related Projects combined would demand approximately 95,687,972 kw-h/year of electricity, with the Project accounting for approximately 13 percent of that projected increase in electricity demand. LADWP will service the Related Projects within the City and some of the Related Projects in Culver City. The combined increase in electricity demand represents approximately 0.42 percent of LADWP's forecasted electricity demand in 2018. Therefore, the cumulative impacts projects are within the anticipated demand of the LADWP system. Each Related Project would also be required to comply with Title 24 of the California Code of Regulations ("CalGreen") requiring building energy efficiency standards and would be in compliance with the City's Green Building Code. Each Related Project would also be consistent with how the LADWP serves each location with its existing infrastructure. Therefore, impacts would be less than significant.

Implementation of the Proposed Project in conjunction with the Related Projects would also increase demand for natural gas. Southern California Gas will service all Related Projects in the City and in Culver City. That increase in natural gas demand would

account for approximately 17 percent of the projected increase by Southern California Gas of natural gas demand. These estimates do not account for energy reduction features employed by the Project or Related Projects. Each Related Project would also be required to comply with Title 24 of the California Code of Regulations, the City's Green Building Code or the Culver City Building Code, and with how Southern California Gas serves each location with its existing distribution infrastructure. There would be sufficient statewide supplies to accommodate statewide natural gas requirements from 2018-2030. Therefore, impacts would be less than significant.

C. *Mitigation Measures.* No mitigation measures are required, as no significant cumulative impacts associated with energy conservation have been identified.

## VII. IMPACTS FOUND LESS THAN SIGNIFICANT PRIOR TO MITIGATION WHERE MITIGATION NONETHELESS PROVIDED REDUCTION OF IMPACTS

### Aesthetics

#### Visual Character of the Project's Design

A. *Finding – Less Than Significant Impact.* Incorporation of Project Design Features PDF-B-1 through PDF-B-5 would ensure the Proposed Project's impacts with respect to visual character of the Project's design remain less than significant. Impacts to visual character of the Project's design would be less than significant.

B. *Facts in Support of Finding.* Under the L.A. CEQA Thresholds Guide, there are no aesthetic standards that apply to all areas of the City given the size and diversity of the City, including an extraordinary range of aesthetic characteristics and contrasts. The L.A. CEQA Thresholds Guide defers to the LAMC, community plans, and other applicable local land use plans for specific guidelines and requirements related to aesthetics. Under the L.A. CEQA Thresholds Guide, aesthetic impact assessments should generally address the issue of visual contrast, or the degree to which elements of the environment differ visually. The L.A. CEQA Thresholds Guide also states that a degree of discretionary judgment may be required to determine the "value" of an aesthetic resource and potential project impacts.

With respect to architecture, the Project would be designed in a modern architectural style, with articulated building facades and accent colors to provide visual interest. Building materials would be complementary and appropriate to the scale of the Project and adjacent existing buildings. The Project would include materials such as concrete, brick, metal and wood siding, glass, fiber cement siding, and plaster. The use of these different materials, with variations in color and orientation, provide a rich texture to the buildings, enhancing a modern approach. The Project's compliance with the design features listed below will provide further guidance to ensure that the Project includes variations in façade treatment and the use of high quality materials that add scale, texture, and variety. All mechanical and electrical equipment that is located on rooftops would be screened from public view. Areas of landscaping, outdoor park/plaza space, a landscaped bike path, and other open spaces and amenities would provide visual breaks in the view of the Project from La Cienega and Jefferson Boulevards. The ground floor would contain retail and restaurant spaces to serve the existing neighborhood, Project residents, and employees. The Project would provide welcoming pedestrian access via promenades and landscaped open spaces and connections to the existing surrounding

uses and nearby public transportation. Overall, the Project would result in less than significant impact with respect to architectural design.

With respect to height and massing, the maximum height of the tower building would be 320 feet (including 20 feet for mechanical equipment). Other Project buildings would have a maximum height of 110 feet (including 10 feet for mechanical equipment). The maximum square footage of the Project's tower would be 480,000 square feet. The massing of the Project buildings would be substantially greater than the Project Site's existing uses. However, the massing of the Project buildings would be softened by varying façade relief, articulation, and windows. The proposed courtyards, park/plaza, and landscaped walkways would provide a visual break between the buildings, and the perimeter landscaping would soften the appearance from surrounding uses. The tower building would be located in the northwest corner of the Project Site, along La Cienega Boulevard, and adjacent to existing commercial uses. The proposed building heights and massing would represent a substantial change in the visual character of the Project Site when compared to existing conditions. However, considering the existing visual character of the Project Site, the architectural detail, building configuration, and design that would be constructed with development of the Project would represent a benefit to the visual character and compatibility of the Project Site. Overall, development of the Project would result in less than significant impacts with respect to height and massing.

The Project will also include landscaping and open space throughout the Project Site, including areas between the proposed buildings, a landscaped bike path along the western border of the Project Site, in courtyards, and on external roadway frontages. The Project proposes a park/plaza area in the center of the Project Site that could include gathering spaces and seating areas surrounded by trees and other plantings. The Project would provide appropriate landscaping and open spaces that would support pedestrian activity and access between its components and the surrounding area. The surrounding existing developments along La Cienega and Jefferson Boulevards do not currently provide comparable amounts of landscaping and open space as would be provided under the Project. In sum, the proposed landscaping and open space would complement the visual character of the Project Site and surrounding area, and no impacts would occur.

The Proposed Project will also be consistent with the policies related to visual character in the West Adams Community Plan and the design policies contained in the Community Plan.

C. *Mitigation Measures.* No mitigation measures are required, as the Project's impacts to visual character will be less than significant. However, the Project must comply with the following Project Design Features PDF-B-1 through PDF-B-5 to ensure that the Project's impacts related to height and views remain less than significant. The Project would have no other impacts related to visual character and views.

*Project Design Features*

- **PDF-B-1** – All mechanical electrical equipment that is located on the rooftops would be screened from public view.

- **PDF-B-2** – The maximum height of any building constructed as part of the Project would be 320 feet.

- **PDF-B-3** – The maximum square footage of the proposed tower would be 480,000 square feet.

- **PDF-B-4** – The Project shall conform to the general layout shown on the site plan (included as Figure 2-9 of the Draft EIR).

> **PDF-B-5** – Utility equipment would be placed underground, screened from public view, or incorporated into the design of the Project.

**Nighttime Light**

A. *Finding – Less Than Significant Impact.* Incorporation of Project Design Feature PDF-B-6 would ensure the Proposed Project's potential impacts to nighttime light remain less than significant. Impacts related to nighttime light would be less than significant.

B. *Facts in Support of Finding.* Under the CEQA Guidelines, a project could have a significant impact related to light and glare if it would create a new source of substantial light or glare which would adversely affect the day or nighttime views the area. Under the L.A. City CEQA Thresholds Guide, a project's potential impacts related to light and glare should be made on a case-by-case basis considering the following two factors: (1) the change in ambient illumination levels as a result of project sources; and (2) the extent to which project lighting would spill off the project site and affect adjacent light-sensitive areas.

The nearest light-sensitive uses to the Project Site are the single-family residences located approximately 225 feet east of the Project Site on Spokane Avenue and 280 feet east of the Project Site on Genesee Avenue, both separated from the Project Site by La Cienega Boulevard. The Project would include lighting designed to highlight architectural elements of the structures and security lighting would be installed to deter criminal activity on the Project Site. The lights associated with the Project would be directed toward the interior of the Project Site so as not to create impacts to surrounding land uses or motorists traveling on surrounding roadways. All exterior lighting would be designed with internal and/or external glare control and would also be designed, arranged, directed, or shielded to contain direct illumination on-site, thereby preventing excess illumination and light spillover into adjacent land uses and/or roadways. Blinking, flashing, or oscillating lights would be prohibited.

Due to its scale in relation to existing development in the Project vicinity, light generated from the interior of the proposed buildings could potentially be seen from substantial distances from the Project Site. However, the increase in light that would be generated would not be out of character with the existing light sources within the vicinity. Furthermore, the light generated from the Project would not be bright enough to affect the nearby single-family residences and La Cienega Boulevard acts as a buffer between the Project Site and these residential uses.

The Project does not propose any off-site signage, but includes on-site signage related to commercial uses included as part of the Project. All signage included as part of the Project would comply with the requirements of the LAMC.

C. *Mitigation Measures.* No mitigation measures are required, as nighttime views within the Project vicinity would not be affected by the Project and impacts would be less than

significant. However, Project Design Feature PDF-B-6 shall be required to ensure that nighttime views would not be substantially affected and that potential nighttime light impacts associated with the Project remain less than significant.

*Project Design Feature*

- **PDF-B-6** – All exterior lighting would be designed with internal and/or external glare control and would be designed, arranged, directed, or shielded to contain direct illumination on-site.

### Daytime Glare

A. *Finding – Less Than Significant Impact.* Incorporation of Project Design Feature PDF-B-7 would ensure the Proposed Project's potential impacts to daytime glare remain less than significant. Impacts related to daytime glare would be less than significant.

B. *Facts in Support of Finding.* Under the CEQA Guidelines, a project could have a significant impact related to light and glare if it would create a new source of substantial light or glare which would adversely affect the day or nighttime views the area. Under the L.A. City CEQA Thresholds Guide, a project's potential impacts related to light and glare should be made on a case-by-case basis considering the following two factors: (1) the change in ambient illumination levels as a result of project sources; and (2) the extent to which project lighting would spill off the project site and affect adjacent light-sensitive areas.

The Project's architectural features and facades would not be constructed of highly reflective materials. The exterior of the proposed buildings would be constructed of materials such as concrete, brick, metal and wood siding, glass, fiber cement siding, and plaster, which would not be expected to affect daytime views. Design guidelines that the Project must follow require avoidance of highly reflective glass. The Project's source of glare that would be introduced into the Project area would not result in hazardous conditions to motorists or result in substantial glare due to the various features designed to minimize glare-related impacts, and impacts would be less than significant.

C. *Mitigation Measures.* No mitigation measures are required, as daytime glare within the Project vicinity would not be affected by the Project, and impacts would be less than significant. However, Project Design Feature PDF-B-7 shall be required to ensure that the Project's impacts with respect to glare remain less than significant.

*Project Design Feature*

- **PDF-B-7** – The exterior of the proposed structures shall be constructed of materials such as, but not limited to, high-performance and/or non-reflective tinted glass (no mirror-like tints or films) and pre-case concrete or fabricated wall surfaces to minimize glare and reflected heat.

### Geology & Soils

### Fault Rupture

A. *Finding – No Impact.* The Proposed Project would not lead to impacts related to fault rupture.

B. *Facts in Support of Finding.* Fault rupture is defined as the surface displacement that occurs along the surface of a fault during an earthquake. According to the Geotechnical Investigation prepared for the City for the Draft EIR in June 2015, the Project Site is not within the boundaries of a blind thrust fault zone. The Project would comply with the California Geological Survey Special Publications 117, Guidelines for Evaluating and Mitigating Seismic Hazards in California (1997), which provides guidance for the evaluation and mitigation of earthquake-related hazards, and with the seismic safety requirements in the Uniform Building Code and LAMC. The City's Building Code, with which the Project must comply, contains construction requirements to ensure that structures are built to a level such that they can withstand acceptable seismic risk. Therefore the Project would not expose people or structures to substantial adverse effects associated with fault rupture, and no impact would occur.

C. *Mitigation Measures.* No mitigation measures are required since the Project will not lead to significant impacts related to fault rupture. However, compliance with Regulatory Compliance Measure RCM-D-1 and Project Design Feature PDF-D-2 (as described below) will be required to ensure the Project leads to no impacts related to fault rupture.

**Strong Seismic Ground Shaking**

A. *Finding – No Impact.* Compliance with Regulatory Compliance Measure RCM-D-1 and Project Design Feature PDF-D-2 will ensure that the Proposed Project would have no impacts related to strong seismic ground shaking. No impacts would occur.

B. *Facts in Support of Finding.* A significant impact may occur if a project represents an increased risk to public safety or destruction of property by exposing people, property or infrastructure to seismically induced ground shaking hazards that are greater than the average risk associated with locations in the Southern California region. Although the Project Site is not within an Alquist-Priolo Zone, as with all properties in the seismically active Southern California region, the Project Site is susceptible to ground shaking during a seismic event. The main seismic hazard affecting the Project Site is moderate to strong ground shaking on one of the local regional faults. As the Project Site is located in a seismically active region, the Project would conform to all applicable provisions of the City's Building Code, the California Building Code, and the Uniform Building Code with respect to new construction. Adherence to current building codes and engineering practices would ensure that the Project would not expose people, property or infrastructure to seismically induced ground shaking hazards that are greater than the average risk associated with locations in the Southern California region and would minimize the potential to expose people or structures to substantial risk, loss, or injury. Therefore, no impacts related to seismic round shaking would occur.

C. *Mitigation Measures.* No mitigation measures are required since the Project will not lead to impacts related to strong seismic shaking. However, the following Regulatory Compliance Measure RCM-D-1 and Project Design Feature PDF-D-2 will be required to ensure the Project leads to no impacts related to seismic shaking:

*Regulatory Compliance Measure*
    **RCM-D-1** – The Project shall comply with the conditions contained with the Department of Building and Safety's Geology and Soils Report Approval Letter for the proposed project, and as it may be subsequently amended or modified.

*Project Design Feature*

**PDF-D-2** – All structures and buildings shall be constructed to industry standards and agency regulations for all geotechnical considerations, including seismic, soil excavation, dewatering requirements, grading, foundation design, settlement, pavement recommendations, retaining walls, drainage, shoring, and any other relevant recommendations within the Geotechnical Investigation.

## Greenhouse Gas Emissions

Under CEQA's Guidelines, as amended in 2010, a project could have a significant impact related to greenhouse gases ("GHGs") if it would: (1) generate GHG emissions, either directly or indirectly, that may have a significant impact on the environment; or (2) conflict with an applicable plan, policy, or regulation adopted for the purpose of reducing the emissions of GHGs.

CEQA's Guidelines section 15064.4 further states that a lead agency should consider specific factors, among others, when assessing the significance of GHG emission on the environment, including: (a) the extent to which the project may increase or reduce GHG emissions as comparted to the existing environmental setting; (b) whether the project emissions exceed a threshold of significance that the lead agency determines applies to the project; and (c) the extent to which the project complies with regulations or requirements adopted to implement a statewide, regional, or local plan for the reduction or mitigation of GHGs.

Given the evolving nature of GHGs, there are no quantitative standards for judging the significance of a project's impacts on climate change in the South Coast Air Basin. The City recognizes that the state's AB 32 Scoping Plan, which calls for a return to 1990 levels of GHG emissions by 2020, represents the most significant plan for reducing GHG emissions. Demonstrating consistency with AB 32 Statewide targets is considered to be conservative, as other plans are less aggressive.

The California Environmental Protection Agency updated the AB 32 Scoping Plan in May 2014 in a document called the "First Update to the Climate Change Scoping Plan" ("2014 Scoping Plan Update"). The 2014 Scoping Plan Update forecasts that the state's $CO_2e$ emission inventory in 2020 will be approximately 509 million metric tons. This estimate incorporates growth forecasts for population, housing, and jobs, along with growth in emissions from the range of industries that produce greenhouse gas emissions. However, the estimate does not assume implementation of AB 32 and SB 375-related programs.

Goals and targets within the 2014 Scoping Plan Update call for a 15.3 percent reduction in 2020 forecasts emissions from 509 to 431 million metric tons of $CO_2e$ emissions. These reductions are necessary to achieve the state's objective of ensuring that 2020 emissions meet the 1990 statewide levels. These reductions are to come from a variety of sectors, including energy, transportation, high-global warming potential sources, waste, and the state's cap-and-trade emissions program. In the energy sector, the recommended actions include reducing the state's electric and energy utility emissions, reducing emissions from large industrial facilities, controlling fugitive emissions from oil and gas producing, and reducing leaks from industrial facilities. In the transportation sector, the recommended actions include implementing phase 2 heavy-duty truck GHG

standards, the zero-vehicle emission action plan for trucks, constructing the High Speed rail system from San Francisco to Los Angeles, coordinating land use planning, and implementing a sustainable freight strategy. With respect to high global warming potential sources, the recommended actions include reducing the high global warming potential compounds from refrigeration, air conditioning, and aerosols. In the waste sector, the recommended actions include eliminating disposal of organic materials at landfills, developing in-state infrastructure, addressing challenges with composting and anaerobic digestion, and implementing additional methane control at landfills. With respect to the cap-and-trade emissions program, the recommended actions include reducing emissions from regulated entities through performance-based targets.

Under the 2014 Scoping Plan Update, nearly all of the reductions are to come from sources that are controlled at the statewide level by state agencies, including the Air Resources Board, Public Utilities Commission, High Speed Rail Authority, and California Energy Commission. The few actions that are directly or indirectly associated with local government control are in the transportation sector, which is charged with reducing 4.5% of baseline 2020 emissions. Of those recommended actions to reduce emissions in the transportation sector, the 2014 Scoping Plan Update specifically identifies local and governments as the responsible agency for one action —reducing GHG emissions through coordinated planning.

The Southern California Association of Governments ("SCAG") recommends reduction targets at even lower levels than the 2014 Scoping Plan Update, at approximately eight to 13 percent below the "business-as-usual" emissions.

### Project Operation

A.  *Finding – Less Than Significant Impact.* Compliance with Regulatory Compliance Measures RCM-E-1 would ensure GHG emission impacts from the Proposed Project's operation remain less than significant. Impacts would be less than significant.

B.  *Facts in Support of Finding.* The Proposed Project is excepted to lead to both one-time emission and indirect emissions each year after the buildout of the Project. The one-time emission from the Project's construction and vegetation removal were amortized over a 30-year period because no significant threshold has been adopted for such emissions. The Project will also have emissions reductions as a result of the Project's commitments and regulatory changes, including implementation of the Renewable Portfolio Standard ("RPS") of 33 percent, the Pavley regulation and Advanced Clean Cars program mandating higher fuel efficiency standards for light-duty vehicles, and the Low Carbon Fuel Standard ("LCFS").

GHG emissions were calculated for area source, energy, mobile vehicle, waste, and water operations. Based on those results, the Project is expected to reduce reductions from a "business as usual" scenario by approximately 31 percent, more than double the reduction target of 15.3 percent as set forth in the AB 32 2014 Scoping Plan Update. The "business as usual" comparison of the Project's impacts against the AB 32 Scoping Plan's cumulative statewide objectives is appropriate because the proposed Project would contribute to the statewide goals in the 2014 Scoping Plan Update. Specifically, the Project's mixed-use nature and location in an existing urban setting provides opportunities to reduce transportation-related emissions. First, the Project would capture vehicle travel on-site that would have normally been destined for off-site locations. This

produces substantial reductions in the amount of vehicle trips and vehicle miles traveled that would no longer be made.

Second, the Project would eliminate many vehicle trips because travel to and from the Project Site could be captured by public transit and pedestrian travel instead. The Project provides substantial reductions beyond the trend growth forecasts that were assumed in the state's baseline 2020 emissions inventory. As detailed in the Final EIR and the Project's Traffic Study, the daily vehicle travel reductions associated with the Project for the following uses include: (i) for general office uses, reduction from internal capture of approximately 26% and reduction from transit/walk-in trips of approximately 25%; (ii) for apartment uses, reduction from internal capture of approximately 20% and reduction from transit/walk-in trips of approximately 25%; (iii) for general retail uses, reduction from internal capture of approximately 28% and reduction from transit/walk-in trips of approximately 25%; (iv) for grocery uses, reduction from internal capture of approximately 27% and reduction from transit/walk-in trips of approximately 25%; (v) for quality restaurant uses, reduction from internal capture of approximately 25% and reduction from transit/walk-in trips of approximately 25%; (vi) for high-turnover, sit-down restaurant uses, reduction from internal capture of approximately 46% and reduction from transit/walk-in trips of approximately 25%; (vii) for high-turnover, sit-down restaurant uses, reduction from internal capture of approximately 50% and reduction from transit/walk-in trips of approximately 25%. The Project's profile as an urban infill, mixed-use project with proximity to substantial public transit will produce substantial reductions over land uses that are located in a more typical community that has not coordinated its land use and transportation planning.

The projected reductions in vehicle trips and VMT would range from 20-50% for the proposed land uses from internal capture rates alone, with another 25% in reductions from the substantial mode share from public transit. These would result in concomitant reductions in $CO_2e$ emissions that far exceed the state's AB 32 2014 Scoping Plan Update goal of a 4.5% reduction from the overall transportation sector by 2020. Accordingly, the Final EIR's analysis concludes that the proposed project would meet and exceed its contribution to statewide climate change obligations that local governments can control in their decision-making. The Project's contribution to global climate change is not cumulatively considerable and is considered less than significant.

Further, the $CO_2e$ estimates from mobile sources associated with the Project (particularly $CO_2$, $CH_4$, and $N_2O$ emissions) are likely much greater than the emission that would actually occur. The methodology used assumes that all emissions sources are new sources and that emission from these sources are 100 percent additive to existing conditions, which is a standard approach taken for air quality analyses. Yet because the effects of GHGs are global, a project that shifts the location of a GHG-emitting activity (e.g. where people live, where vehicles drive, or where companies conduct business), would result in no net change in global GHG emissions levels. It is impossible to know at this time whether Project residents, employees, and visitors would have longer or shorter trips relative to their destinations; whether they would walk, bike, and use public transportation more or less than under existing circumstances; or whether their overall driving habits would result in higher or lower vehicles miles traveled. Much of the vehicle-generated $CO_2$ emissions attributed to the Project could simply be from vehicles at an existing location moving to the Project Site, and not from new vehicle emissions sources relative to global climate change. Therefore, although it is not possible to calculate the net contribution of vehicle-generated $CO_2$, $CH_4$, and $N_2O$

emissions from the Project, the net contribution would likely be much less than the estimated emissions. Overall, the Project would have a less than significant impact related to GHG emissions.

The Project would also comply with the City's Green Building Ordinance standard and will be consistent with AB 32 Scoping Plan's recommendations for communities to adopt building codes that go beyond the state's codes. The Project will incorporate several design elements and programs that will reduce the carbon footprint through reductions in energy use, water use, and solid waste generation, including, but not limited to: (i) storm water drainage and retention during construction; (ii) use of equipment and fixtures that comply with certain energy use restrictions; (iii) installing appliances that meet the ENERGY STAR designation where applicable; (iv) providing space for a future electrical solar system installation; (v) installing plumbing fixtures and fixture fittings that will reduce overall use of potable water within he building by at least 20 percent; (vi) installing a maximum flow rate when multiple showerheads serve on showers; (vii) installing irrigation system controllers for landscaping that meet specified criteria; (viii) enhancing durability to reduce maintenance of gas, plumbing, and electrical lines; (ix) providing guidance on building plans summarizing industry standards for installing windows, doors, roof valley, and chimneys to roof intersections; (x) protecting building materials delivered to the construction site from rain or other sources of moisture; (xi) following the LAMC to reduce, recycle, and dispose of construction waste; (xii) covering duct openings and protect mechanical equipment during construction to reduce the amount of dust or debris that may collect in the system; (xiii) providing interior moisture control through concrete slab foundations; (xiv) installing a capillary break to provide interior moisture control; (xv) avoiding installing building materials with visible signs of water damage.

C. *Mitigation Measures.* No mitigation measures are required, as the Project's operation will have a less than significant impact related to GHG emissions. However, the following Regulatory Compliance Measure RCM-E-1 will be required to ensure the Project's impacts to GHG emissions remain less than significant.

Regulatory Compliance Measure

**RCM-E-1** – The Project shall provide electric vehicle charging stations as required by Code and the City of Los Angeles. Additionally, the Project shall have conduit or other similar means in place to allow for a future wiring and installation of additional charging stations, the combined totals of which may constitute up to 25% of the total parking spaces required by Code.

**Cumulative Impacts**

A. *Finding – Less Than Significant Impact.* The Proposed Project, in conjunction with the Related Projects, would not result in significant cumulative GHG emissions impacts.

B. *Facts in Support of Finding.* Given the global nature of GHG emissions, the analysis of GHG emissions is by its nature a cumulative impacts analysis. The Project would be consistent with a number of relevant plans and policies that govern climate change. For example, the Project is consistent with the State's Executive Order S-3-05, which calls for reducing GHG emissions statewide to 1990 levels, including 15 percent reductions by 2020. The Project is also consistent with SCAG's 2012-2035 RTP/SCS, which calls for regional growth and transportation emissions to be consistent with regional and state air

pollution objectives. The Project would also comply with the City's Green Building Ordinance standards that reduce emissions beyond a "business-as-usual" scenario. Finally, as discussed further above, the Project would be consistent with and will help achieve all feasible and applicable strategies as recommended in the AB 32 Scoping Plan, which provides the basis for policies that will reduce cumulative GHG emission within California to 1990 levels by 2020. As a result, the Project's cumulative impact on climate change is considered less than significant.

C.  *Mitigation Measures.* No mitigation measures are required, as no significant cumulative impacts associated with GHG emissions impacts have been identified.

## Hazards & Hazardous Materials

### Underground Storage Tank

A.  *Finding – Less Than Significant Impact.* With a potential abandoned underground storage tank ("UST") on the Project Site, the Proposed Project could have a potential impact related to underground storage tanks. Compliance with Regulatory Compliance Measure RCM-F-3 would ensure removal of any discovered UST would be under permit and in accordance with applicable regulations. Impacts would be less than significant.

B.  *Facts in Support of Finding.* There is a record of abandonment of a 2,000-gallon UST on one parcel of the Project Site ("Parcel D") in 1963. Records do not contain information on the contents of the UST or information on whether the tank was physically removed or only abandoned in-place. Based on the lack of specific information, the UST is considered a Recognized Environmental Concern ("REC"). The UST may be present within the area of the Project Site that would be excavated for the subterranean parking structure. If the UST is encountered during grading, it should be removed under permit and in accordance with Los Angeles Fire Department regulations.

C.  *Mitigation Measures:* No mitigation measures are required, since no significant impacts associated with underground storage tanks have been identified. However, compliance with Regulatory Compliance Measure RCM-F-3 will be required to ensure the Project's impacts related to underground storage tanks remain less than significant.

Regulatory Compliance Measure
  **RCM-F-3** – If an underground storage tank on Parcel D is encountered during grading and excavation for the proposed subterranean parking structure, it shall be removed under permit and in accordance with Los Angeles Fire Department regulations.

### Asbestos Containing Materials

A.  *Finding – Less Than Significant Impact.* Since the existing buildings on Project Site may contain asbestos containing materials ("ACMs"), the Proposed Project would have a potential impact related to ACMs. Compliance with Regulatory Compliance Measure RCM-F-5 would ensure the removal of any discovered ACMs would be in accordance with applicable federal, state, and local regulations. Impacts would be less than significant.

B.  *Facts in Support of Finding.* Since the structures on the Project Site were constructed
    prior to 1989, it is possible that the structures might contain ACMs. Exposure to such
    materials during demolition or construction activities could be hazardous to the health of
    the demolition workers, as well as area to area residents, employees, and future
    occupants. Federal regulations and the SCAQMD control asbestos removal. Asbestos
    removal in a building is not unusual and can be safely accomplished. In accordance with
    EPA's National Emission Standards for Hazardous Air Pollutants ("NESHAP") regulation
    and the SCAQMD, all materials identified as ACMs would be removed by a trained and
    licensed asbestos abatement contractor. Prior to issuance of any demolition permit, the
    applicant would provide a letter to the Department of Building and Safety from a qualified
    asbestos abatement consultant that no ACMs are found to be present. If ACMs are
    found, they would be abated in compliance with SCAQMD Rule 1403 and with other
    state and federal rules and regulations, including CAL-OSHA Asbestos for the
    Construction Industry Standard, EPA rules and regulations, and industry standards.

    Generally, asbestos removal is a low risk operations, as the possibility of exposure to
    airborne asbestos fibers from asbestos removal projects is limited if all asbestos-related
    regulations are followed. Provided that the removal and disposal of ACMs from the
    Project Site follows the various required guidelines, which are formally provided as
    Regulatory Compliance Measure RCM-F-4, hazardous materials impacts relative to
    exposure of sensitive receptors and workers to asbestos would be less than significant.

C.  *Mitigation Measures.* No mitigation measures are required, since no significant impacts
    associated with ACMs have been identified. However, compliance with Regulatory
    Compliance Measure RCM-F-4 will be required to ensure the Project's impacts related to
    ACMs remain less than significant.

    Regulatory Compliance Measure
        **RCM-F-4** – Prior to the issuance of any permit for the demolition or alteration of the
        existing structures, the Applicant shall provide a letter to the Department of
        Building and Safety from a qualified asbestos abatement consultant indicating
        that no Asbestos-Containing Materials ("ACMs") are present in the building. If
        ACMs are found to be present, it will need to be abated in compliance with
        SCAQMD's Rule 1403 as well as other applicable state and federal rules and
        regulations.

    **Lead-Based Paint**

A.  *Finding – Less Than Significant Impact.* Since the existing buildings on the Project Site
    may contain lead-based paint ("LBP"), the Proposed Project would have a potential
    impact related to LBP. Compliance with Regulatory Compliance Measure RCM-F-5
    would ensure the removal of any discovered LBP would be in accordance with
    applicable federal, state, and local regulations. Impacts would be less than significant.

B.  *Facts in Support of Finding.* Since the structures on the Project Site were constructed
    prior to 1978, it is likely that the structures contain LDP.  Demolition of the existing
    structures on the Project Site could release lead-based paint containing materials
    present in the structure. To ensure minimal exposure to sensitive receptors and workers,
    lead-based paint found in the buildings shall be removed and disposed of as
    recommended by a qualified Department of Health Services lead consultant and in
    accordance with applicable federal, state, and local regulations. Those regulations

include Construction Safety Orders 1532.1 (pertaining to lead) from Title 8 of the
California Code of Regulations, and lead exposure guidelines provided by the U.S.
Department of Housing and Urban Development ("HUD"). Provided the abatement rules
and regulations are followed as necessary, as formally required under Regulatory
Compliance Measure RCM-F-5, hazardous materials impacts to sensitive receptors and
workers caused by exposure to lead paint would be less than significant.

C. *Mitigation Measures.* No mitigation measures are required, since no significant impacts
associated with LBP have been identified. However, compliance with Regulatory
Compliance Measure RCM-F-4 will be required to ensure the Project's impacts related to
LBP remain less than significant.

Regulatory Compliance Measure

**RCM-F-5** – Prior to the issuance of any permit for the demolition or alteration of the
existing structures, a lead-based paint survey shall be performed to the written
satisfaction of the Department of Building and Safety. Should lead-based paint
materials be identified, standard handling and disposal practices shall be
implemented pursuant to Occupational Safety & Health Administration ("OSHA")
regulations.

## Hydrology & Water Quality

### Runoff

A. *Finding – Less Than Significant Impact.* The Proposed Project would not create or
contribute to runoff water which would exceed the capacity of existing or planned storm
water drainage systems or provide substantial additional sources of polluted runoff.
Compliance with Regulatory Compliance Measures RCM-G-1 through RCM-G-5 would
ensure the Project's impacts associated with runoff remain less than significant. The
impact would be less than significant.

B. *Facts in Support of Finding.* A significant impact may occur if a project would increase
the volume of storm water runoff to a level that exceeds the capacity of the storm drain
system serving a Project Site. A Project-related significant adverse effect would also
occur if a project would substantially increase the probability that polluted runoff would
reach storm drains.

There are three general sources of potential short-term construction-related storm water
pollution association with the Project: (1) the handling, storage, and disposal of
construction materials containing pollutants; (2) the maintenance and operation of
construction equipment; and (3) earth-moving activities which, when not controlled, may
generate soil erosion and the transportation of pollutants via storm runoff or mechanical
equipment. Earth-moving activities that can greatly increase erosion processes are
another source of stormwater pollution contamination. Generally, routine safety
precautions for handling and storing construction materials can effectively mitigate the
potential pollution of stormwater by these materials. Two general strategies are
recommended to prevent construction silt from entering local storm drains. First, erosion
control procedures should be implemented for those areas that must be exposed,
including applying water or other dust palliatives as necessary and reducing runoff into
the storm drains through temporary diversions and barriers. Second, the area should be
secured to control off-site migration of pollutants. These BMPs are formally described as

Regulatory Compliance Measures RCM-G-1 through RCM-G-4. When properly designed and implemented, these "good-housekeeping" practices would reduce short-term construction-related impacts to a less than significant level by controlling dust and erosion that may occur onsite and leaks from any construction equipment. The Project is also required to comply with the City's Low Impact Development BMPs, which are determined on a case by case basis by the Department of Public Works. Approval for development project and building/grading permits would not be granted or issued until appropriate and applicable stormwater BMPs are incorporated into the Project design plans.

With respect to the Project's operation, the Project would generate substances that could degrade the quality of water runoff. For example, chemical deposits by cars in the parking area could have the potential to contribute to metals, oil and grease, solvents, phosphates, hydrocarbons, and suspended solids to the storm drain system. However, impacts to water quality would be reduced, as the Project must comply with water quality standards and wastewater discharge BMPs set forth by the County of Los Angeles and State Water Resources Control board. Design criteria would also be incorporated into the Project to minimize the off-site conveyance of pollutants. Compliance with existing regulations would ensure that water quality impacts remain less than significant.

The Project is required to comply with the NPDES program as well as the requirements set forth in the LAMC. These regulations control water pollution by regulating point sources that discharge pollutants. Therefore, with compliance through Regulatory Compliance Measure RCM-G-5, the Project's impacts to runoff would be less than significant.

C.  *Mitigation Measures.* No mitigation measures are required, as no significant impacts related to runoff have been identified. However, compliance with Regulatory Compliance Measures RCM-G-1 through RCM-G-5 will be required to ensure the Project's impacts related to runoff remain less than significant.

Regulatory Compliance Measures

**RCM-G-1 – National Pollutant Discharge Elimination System General Permit –** Prior to issuance of grading permit, the Applicant shall obtain coverage under the State Water Resource Control Board National Pollutant Discharge Elimination System General Permit for Storm water Discharges Associated with Construction and Land Disturbance Activities (Order NO. 2009-0009-DQW, National Pollutant Discharge Elimination System No. CAS000002) (Construction General Permit) for Phase 1 of the purposed Modified Project. The Applicant shall provide the Waste Discharge Identification Number to the City of Los Angeles to demonstrate proof of coverage under the Construction General Permit. A Storm Water Pollution Prevention Plan shall be prepared and implemented for the proposed Modified Project in compliance with the requirements of the Construction General Permit. The Storm Water Pollution Prevention Plan shall identify construction Best Management Practices to be implemented to ensure that the potential for soil erosion and sedimentation is minimized and to control the discharge or pollutants in stormwater runoff as a result of construction activities.

**RCM-G-2 – Dewatering –** If required, any dewatering activities during construction shall comply with the requirements of the Waste Discharge Requirements for Discharges of Groundwater from Construction and Project Dewatering to Surface

Waters in Coastal Watersheds of Los Angeles and Ventura Counties (Order NO. R4-2008-0032, National Pollutant Discharge Elimination System No. CA994004) or subsequent permit. This will include submission of a Notice of Intent for coverage under the permit to the Los Angeles Regional Water Quality Control Board at least 45 days prior to the start of dewatering and compliance with all applicable provisions in the permit, including water sampling, analysis, and reporting of dewatering-related discharges.

**RCM-G-3 – Low Impact Development Plan** – Prior to issuance of grading permits, the Applicant shall submit a Low Impact Development Plan and/or Standard Urban Stormwater Mitigation Plan to the City of Los Angeles Bureau of Sanitation Watershed Protection Division for review and approval. The Low Impact Development Plan and/or Standard Urban Stormwater Mitigation Plan shall be prepared consistent with the requirements of the Development Best Management Practices Handbook.

**RCM-G-4 – Development Best Management Practices** – The Best Management Practices shall be designed to retain or treat the runoff from a storm event producing 0.75 inches of rainfall in a 24-hour period, in accordance with the Development Best Management Practices Handbook Part B, Planning Activities. A signed certificate from a licensed civil engineer or licensed architect confirming that the proposed Best Management Practices meet this numerical thresholds standard shall be provided.

**RCM-G-5** – The Project Applicant shall comply with all mandatory storm water permit requirements (including, but not limited to NPDES, SWPPP and SUSMP, and LID requirements) at the federal, state, and local level.

Land Use and Planning

### Consistency With Applicable Land Use Plans, Policies, And Regulations

A. *Finding – Less Than Significant Impact.* The Proposed Project would not conflict with any applicable land use plan, policy, or regulation of an agency with jurisdiction over the project (including, but not limited to the general plan, specific plan, local coastal program, or zoning ordinance) adopted for the purpose of avoiding or mitigating an environmental effect. Incorporation of Project Design Feature PDF-B-4 would also ensure the Project will conform to the general layout shown on the site plan. The impact would be less than significant.

The legal standard that governs consistency determinations with applicable land use plans states that a project must only be in "harmony" with the applicable land use plan to be consistent with that plan. (See *Sequoyah Hills Homeowners Assn. v. City of Oakland* ("*Sequoyah Hills*") (1993) 23 Cal.App.4th 704, 717-18.) As the Court explained in *Sequoyah Hills*, "state law does not require an exact match between a proposed subdivision and the applicable general plan." (*Id.* at p. 717.) To be "consistent" with a general plan, a project must be "compatible with the objectives, policies, general land uses, and programs specified in the applicable plan," meaning, the project must be "in agreement or harmony with the applicable plan." (*Id.* at pp. 717-18; see also *Greenbaum v. City of Los Angeles* (1984) 153 Cal.App.3d 391, 406; *San Franciscans Upholding the Downtown Plan v. the City and County of San Francisco* (2002) 102 Cal.App.4th 656,

678.) Further, "[a]n action, program, or project is consistent with the general plan if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment." (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 817.)

B. *Facts in Support of Finding*. The Proposed Project will be consistent with the following applicable policies and/or regulations:

    4.    *Southern California Association of Governments ("SCAG") Compass Blueprint Growth Vision/Compass Blueprint 2% Strategy Areas ("Compass Blueprint 2% Strategy)*. The Proposed Project is consistent with all of the applicable policies in the Compass 2% strategy, including the following: (i) encouraging transportation investments and land use decisions that are mutually supportive; (ii) encouraging transit-oriented development; (iii) promoting a variety of travel choices; (iv) promoting in-fill development and redevelopment to revitalize existing communities; (v) promoting developments that provide a mix of uses; (vi) promoting "people-scaled" walkable communities; (vii) supporting the preservation of stable neighborhoods; (viii) developing strategies to accommodate growth that uses resources efficiently, and minimizes pollution and GHG emissions; (ix) focusing development in urban centers and existing cities; (x) using "green" development techniques. The Project will provide mixed-use residential, commercial, and office development in close proximity to existing public transit options, including existing bus lines and the Metro Station at Jefferson and La Cienega. The Project will also provide a pedestrian-friendly environment, including promenades and landscaped open spaces. By providing residential uses near the existing transit opportunities, the Project will also increase compatibility with nearby single-family residential uses as compared to the existing industrial development. The Project also accommodates growth that will use resources efficiently and focus development in urban centers, as the Project is an infill development in a highly urbanized area and will reduce vehicle miles traveled by enhancing walkability and connectivity in close proximity to existing public transit opportunities. Further the Project will incorporate sustainable building practices to eliminate pollution and reduce waste and will comply with CalGreen requirements of the California Building Code. Therefore, no impact would occur.

    5.    *SCAG Regional Comprehensive Plan*. The Project is consistent or partially consistent with every applicable policy in the SCAG Regional Comprehensive Plan, including policies related to (i) land use and housing; (ii) open space and habitat; (iii) water; (iv) energy; and solid waste. The applicable land use and housing policies state that local governments should provide for new housing to accommodate their fair share of forecast regional growth and integrate green building measures into project design and zoning. The Project will provide 1,218 dwelling units, which would accommodate a share of the forecasted regional growth and the construction will incorporate the green and conservation features embedded in the CalGreen requirements of the California Building Code. The Open Space and Habitat policies state that local governments should promote infill development to revitalize existing communities, incorporate green building principles into new projects, promote water-efficient land use, and mitigate projects' impacts to open space. The Project is an infill development in an existing community that will incorporate sustainable building practices and

eliminate pollution and reduce waste. The Project will also avoid significant impacts to regionally significant open space resources, as the Project Site does not include agricultural, recreational or environmentally sensitive areas. The Project will also pay either Quimby Fees and would be subject to the Finn Fees.

The applicable water policies state that local governments should consider potential climate change and hydrology impacts on available water supplies, should encourage urban development and land uses to make greater use of existing and upgraded facilities, should reduce exterior uses of water in public areas and encourage drought-tolerant native landscape plants, and should pursue water management practices that avoid energy waste and create energy savings/supplies. The Project will comply with CalGreen requirements of the California Building Code to reduce the Project's energy and water use and will implement regulatory compliance measures to promote efficient water use (see RCM.M.2-2 through RCM.M.2-4). The Los Angeles Department of Water and Power has also confirmed that the department can accommodate the Project's water needs. The Project Applicant will also implement any upgrades to the water infrastructure serving the Project Site that is needed to accommodate the Project's water distribution needs. The Project's Regulatory Compliance Measures RCM.M.2-1 through RCM.M.2-4 and Project Design Features PDF.M.2.5 and PDF.M.2-6 also require water efficiency in landscaping.

With respect to energy, the applicable policies state that local governments should promote land use principles that use resources efficiently, eliminate pollution, and significantly reduce waste. Local governments should also include energy analyses in environmental documentation and general plans and should integrate green building measures into project design and zoning. Under the applicable energy policies, developers and local governments should also complete any infrastructure improvements needed for electricity and natural gas demand according to the specifications of the energy provider and should encourage new projects to incorporate solar panels into roofing or tapping into other renewable energy sources. The Project will encourage biking with its inclusion of approximately 1,500 bicycle parking spaces and will promote the use of mass transit given its proximity to existing transit opportunities. The Project will also exceed the U.S. Title 24 building standards through its compliance with the City's Green Building Ordinance. The Project is also coordinating with the LADWP and the Southern California Gas Company and will complete any required infrastructure improvements required per the specifications of those respective energy providers. The Project is not required to include solar panels, but will receive electricity supply from the LADWP, which obtains a portion of its electricity supplies from renewable sources. With respect to solid waste, the applicable policies state that local governments should integrate green building measures into project design and zoning. The Project will include a demolition and construction waste recycling program and an operational recycling program. Therefore, no impact would occur.

6.   *SCAG Regional Transportation Plan/Sustainable Communities Strategy ("SCAG 2012-RTP/SCS").* The SCAG 2012-2035 RTP/SCS plans to concentrate future development and provide higher intensity development in proximity to transit hubs to reduce vehicle miles traveled and GHG emissions from personal vehicles. The Project's approximately 1,218 residential units fit within the

strategy's growth allocation for the City. The Project will also reduce vehicle miles traveled by including a balanced mix of uses that enhance walkability and connectivity in close proximity to bus lines and the Metro Station at Jefferson Boulevard and La Cienega Boulevard. Therefore, no impact would occur.

7.  *City of Los Angeles General Plan – Framework Element Land Use Policies.* The Project is consistent with all of the applicable policies in the Framework Element Land Use Policies, including (i) developing a diversity of uses that serve the needs of existing and future residents; (ii) allowing amendments to further refine the General Plan Framework Element land use boundaries to reflect local conditions, existing land uses, public input and accounting for the changes in location or introduction of new transit routes or stations; (iii) provide a pattern of development consisting of distinct districts, centers, boulevards, and neighborhoods; (iv) improve the integration of housing with commercial uses; (vi) emphasize pedestrian and bicycle access in appropriate locations; (vii) provide for the siting and design of the City's stable residential neighborhoods and enhance the character of commercial and industrial districts; and (viii) conserve existing stable residential neighborhoods. The Project is consistent with those policies, as it will introduce a mixed-use residential, retail/restaurant, and office development to the Project Site in close proximity to the Metro Station and Jefferson Boulevard and La Cienega and the major thoroughfares along Jefferson Boulevard and La Cienega Boulevard that provide bus lines and commercial and retail opportunities. The Project will increase compatibility with nearby single-family residential uses as compared to the existing industrial land uses on the Project Site. Therefore, no impact would occur.

8.  *City of Los Angeles General Plan – Health and Wellness Element.* The Project is consistent with all of the policies in the Health and Wellness Element, including the policies to: (i) promote healthy communities; (ii) improve Angelenos' health and well-being by incorporating a health perspective into land use; (iii) increasing the availability of and access to affordable goods and services that promote health and healthy environments, with a priority on low-income neighborhoods; (iv) promote a healthy built environment by encouraging the design and rehabilitation of buildings and sites for healthy living and working conditions; (v) eliminate barriers for individuals with permanent and temporary disabilities; (vi) promoting infrastructure improvements that support active transportation; (vii) develop new and innovative active spaces and strategies to increase the number of people who engage in physical activity; (viii) reduce air pollution from stationary and mobile sources; (ix) reduce exposure to second-hand smoke by promoting smoke-free environments; (x) protect communities' health and well-being from exposure to noxious activities that emit odors, noise, toxic hazardous, or contaminant substances, materials, or vapors; (xi) promote policies that reduce per capita GHG emissions and improve air quality; (xii) promote policies that foster safe passages in neighborhoods. The Project will be consistent with those polices by developing a mixed-use project in proximity to the Metro Station at Jefferson Boulevard and La Cienega, thereby helping to reduce dependence of vehicles and the air pollutants generated by car traffic. The Project also includes approximately 133,350 square feet of various common open space areas and includes various design elements to promote pedestrian circulation and connectivity to surrounding areas. The Projects would be required to comply with Americans with Disabilities Act requirements and will include a publicly

accessible park area in the center of the Project Site. Further, the Project will reduce exposure to second-hand smoke in accordance with applicable law. The Project's compliance with Mitigation Measures MM-C-1 through MM-C-5 would also ensure that the Project's air quality impacts related to nearby sensitive receptors would remain less than significant. Finally, the Project would include adequate lighting to ensure safe lighting for pedestrian paths and the Project Applicant would be required to coordinate with the Los Angeles Police Department to incorporate all safety features into the design of the Project. Therefore, no impact would occur.

9.     *West Adams-Baldwin Hills Leimert Community Plan*. The Project Site is designated for Limited Manufacturing land uses. Since the Project would include a mix of residential, office, retail, grocery, and restaurant uses, the Project would be inconsistent with the existing Limited Manufacturing land use designation. Therefore, as part of the Project, the Applicant is seeking a General Plan Amendment to change the land use designation from Limited Manufacturing to Community Commercial. Of the 34 applicable policies in the Community Plan, the Project would be inconsistent with the following five policies: (i) Residential policy 1-1.1, which designates specific lands to provide for adequate multi-family residential development; (ii) Residential policy 1-6.1, which limits development according to the adequacy of the existing and assured street circulation system within the Plan Area and surrounding areas; (iii) Industrial policy 1-1.1, which designates lands for the continuation of existing industry and development of new industrial parks, research and development uses, light manufacturing, and similar uses that provide employment opportunities; (iv) Circulation policy 7-1.1, which states streets should maintain a certain level of service; and (v) Circulation policy 7-2.1, which states no increase in density shall be effected by zone change, plan amendment, subdivision or other discretionary action, unless it is determined that the transportation infrastructure serving the property can accommodate the traffic generated. While the Project would result in significant and unavoidable traffic impacts at eight of the 58 study intersections, the Project would implement traffic mitigation measures that would reduce the Project's impact on traffic flow and congestion throughout the study area. The Project is consistent with the remaining 29 applicable Community Plan policies, including policies concerning residential development, commercial development, industrial uses, police protection, and circulation.

Although the Project would be inconsistent with the above-referenced policies, the Project would be substantially consistent with the applicable polices of the Community Plan. Given that the Project is consistent with 29 of the 34 applicable policies in the Community Plan, the Project's impacts related to consistency with the Community Plan would be less than significant.

10.    *West Adams-Baldwin Hills-Leimert Community Plan – Design Policies*. The Project would also implement and be consistent with the applicable Community Plan design policies, including the applicable commercial, multiple residential, and community design and landscaping policies. Therefore, no impact would occur.

11.    *City of Los Angeles General Provisions and Zoning Code*. The Project Site is located in the MR1 (Limited Manufacturing) zone. Uses allowed in that zone

include, among others: restaurants, business and professional offices, medical clinics and laboratories, grocery stores, retail and service stores, pharmacies, drugstores, manufacturing and industrial activities, research and development, storage, and parking. The Project would include a mix of residential, office, retail, grocery, and restaurant uses that would be inconsistent with the existing MR1 zoning for the Project Site because of the proposed residential uses. Therefore, as part of the Project, the Applicant is seeking a Zone Change to C2 Commercial, which would allow for the Project's proposed mix of commercial and residential uses. With approval of that request, the Project would conform to the zoning for the Project Site and no impact would occur. With respect to setback and lot requirements, the Project Applicant is also requesting a Zoning Administrator's Adjustment to increase the Project Site's density to develop the site with 1,218 dwelling units, which is essentially a request to reduce the required lot area per dwelling unit to 393 square feet (which is within the 20% adjustment standard contained in LAMC Section 12.28A). The C2 zone has no front yard requirement, and side and rear yards are not required for buildings used for commercial purposes. If the residential use is contained in a mixed-used building, LAMC section 12.22.A.18(c)(3) permits the residential floors of the structure to not have yard setbacks as long as the residential portion of the structure abuts a street, private street, or alley and the first floor of the building is used for commercial uses or residential access. For Residential uses not in a mixed-use building, the C2 zone defers to the R4 zone for side and rear yard requirements, which requires a 5-foot side yard plus 1 foot for each story above the second story (not to exceed 16 feet), and a 15-foot rear yard plus 1 foot for each story above the second story (not to exceed 16 feet) and a 15-foot rear yard plus 1 foot for each story above the third story (not to exceed 20 feet). Development of the Project would therefore be required to provide a 10-foot side yard (5 feet + 1 foot for each story above the second story) and a 19-foot rear yard (15 feet + 1 foot for each story above the third story). With approval of the Zoning Administrator's Adjustment regarding lot area, the Project would be consistent with the setback and lot requirements of the proposed C2 zone and as such, no impacts would occur. With respect to height and density limitations, the Project would be limited to a height of 320 feet and a Floor Area Ratio ("FAR") of 3.9:1. The Project Applicant is requesting a Zone Change/Height District change to C2-2 pursuant to LAMC section 12.32(Q). The C2 zone does not contain any height restrictions. The "2" Height District designation would allow a maximum FAR of 6:1 and no height limit. With approval the Applicant's request, the Project's height and FAR would be consistent with the zoning for the Proposed Project Site, and no impact would occur. The Project is also designed to provide the number of vehicle and bicycle parking spaces required under LAMC sections 12.21 and 12.24. LAMC section 12.21(A)(4) requires 2,730 vehicle spaces before any reductions. However, LAMC section 12.21(Y) allows a reduction of 10 percent of the required number of vehicle spaces for commercial uses within 1,500 feet of a portal to a fixed-rail transit station. Since the Project would be approximately 500 feet from the Metro Line La Cienega Station, the required vehicle parking spaces could be reduced by 10%. LAMC section 12.21(A)(16) also allows reductions in the number of required vehicle spaces at a ratio of one vehicle space reduced for every four bicycle spaces provided, up to a 15% reduction in the required vehicle spaces for residential uses and a 30% reduction of the required vehicle spaces for non-residential uses. The Project will provide 1,500 bicycle parking spaces (192 short-term and 1,308 long-term), which can

reduce the required vehicle parking spaces by 504 spaces. With that reduction and the 10 percent transit credit applied to the commercial portion of the Project the total required vehicle parking spaces could be reduced to 2,234 spaces. The Project would be designed and constructed to meet the Code required vehicular and bicycle parking spaces, and as such, no impact would occur with respect to the parking.

12.    *Walkability Checklist.* The Project would be consistent with all of the guidelines in the walkability checklist, including the guidelines related to sidewalks, building orientation, off-street parking and driveways, on-site landscaping, building façade, and building signage and lighting. Therefore, no impact would occur.

13.    *Citywide Design Guidelines.* The Project would be consistent with all of the City's Citywide Design Guidelines, including the guidelines related to site planning, building orientation, entrances, relationship to adjacent buildings, building façade, building materials, sidewalks, crosswalks and street crossings for large-scale development, on-street parking, off-street parking and driveways, on-site landscaping, open space and recreation activities, building signage, lighting and security, and utilities. Therefore, no impact would occur.

14.    *City of Los Angeles Do Real Planning Principles.* The Project is compatible with the applicable good-planning practices set forth in the City's Do Real Planning publication. The Do Real Planning publication sets forth a number of objectives for building neighborhoods and communities that preserve a neighborhood's character and promote good planning initiatives. The Project would be consistent with all of the Do Real Planning principles, including the principles to: (i) demand a walkable city; (ii) require density around transit; (iii) locate jobs near housing; (iv) produce green buildings; and (v) identify smart parking requirements. The Project will be consistent with those principles, as it would provide a mixed-use development in close walking proximity to the Metro Station at Jefferson Boulevard and La Cienega Boulevard and in close proximity to existing bus lines and other commercial uses located on Jefferson Boulevard and La Cienega Boulevard. The Project will also provide both jobs and housing and promote livability benefits in the area. Further, the Project will incorporate sustainable building practices to eliminate pollution and reduce waste. The Project will also provide the required vehicle parking spaces and approximately 1,500 bicycle parking spaces that would encourage alternative modes of transportation to and from the Project Site.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with applicable land use plans, policies, or regulations have been identified. However, compliance with Project Design Feature PDF-B-1 and PDF-B-4, which require that the Project screen mechanical and electrical equipment on the roof from public view and that the Project conform to the general layout shown on the site plan, will be required to ensure the Project remains consistent with the Community Plan's multiple residential design policies and the City's Citywide Design Guidelines related to utilities.

## Public Services – Fire Protection Facilities

Under CEQA's Guidelines (Appendix G), a project would have a significant impact if the project would result in substantial adverse physical impacts associated with the provision of

new or physically altered governmental facilities, or the need for new or physically altered governmental facilities, the construction of which could cause significant environmental impacts, in order to maintain acceptable service ratios, response times, or other performance objectives for fire protection.

Under the L.A. CEQA Thresholds Guide, the determination of significance levels for a project's impact on fire protection services shall be made on a case-by-case basis considering whether the project would require the addition of a new fire station or the expansion, consolidation, or relocation of an existing facility to maintain service.

### Construction

A. *Finding – Less Than Significant Impact.* The Proposed Project's construction would not result in substantial adverse physical impacts associated with the provision of new or physically altered fire protection facilities in order to maintain acceptable service ratios, response times, or other performance objectives. Compliance with Regulatory Compliance Measures RCM-K.1-1 through RCM-K-1.4 and Project Design Features PDF-K.1-5 through PDF-K.1-8 would ensure that the Project site construction impacts on fire protection and emergency medical services would be less than significant. Impacts would be less than significant.

B. *Facts in Support of Finding.* The Project's construction may temporarily increase demand for fire protection and emergency medical services and may cause the occasional exposure of combustible materials, such as wood, plastics, sawdust, coverings and coatings. However, in compliance with Occupational Safety and Health Administration and Fire and Building Code requirements, construction managers and personnel would be trained in fire prevention and emergency response. Fire suppression equipment specific to construction would be maintained on-site. Additionally, Project construction would comply with applicable existing codes and ordinances related to the maintenance of mechanical equipment, handling of storage of flammable materials, and cleanup of spills of flammable materials. Compliance with Regulatory Compliance Measures RCM-K.1-1 through RCM-K-1.4 and Project Design Features PDF-K.1-5 through PDF-K.1-8 would ensure that the Project Site construction impacts on fire protection and emergency medical services would be less than significant.

Construction activities could also have the potential to affect fire protection services, such as emergency vehicle response times, by adding construction traffic to the street network and by necessitating partial lane closures during street improvements and utility installations. These impacts, while potentially adverse, are considered to be less than significant because construction activities are temporary in nature and do not create continuing risks. General "good housekeeping" procedures employed by the construction contractors and the work crews would minimize these hazards, and partial lane closures would not significantly affect emergency vehicles because drivers of those vehicles normally have a variety of options for dealing with traffic (i.e. using their sirens to clear a path of travel or driving in lanes of opposing traffic). Impacts on traffic that could cause delays in emergency response times would be addressed through a Construction Traffic Management Plan, which includes traffic management strategies for Project operations and construction.

Overall, the construction itself is not considered to be a high-risk activity, and the Los Angeles Fire Department is equipped and prepared to deal with construction-related

traffic and fires should they occur. Project construction would not be expected to tax firefighting and emergency services to the extent that there would be a need for new or expanded fire facilities in order to maintain acceptable service ratios, response times, or other performance objectives of the LAFD, due to the limited duration of construction activities and compliance with applicable codes. Therefore, impacts associated with construction of the Project would remain less than significant.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with fire protection facilities from the Project's construction have been identified. However, compliance with Regulatory Compliance Measures RCM-K.1-1 through RCM-K-1.4 and Project Design Features PDF-K.1-5 through PDF-K.1-8 would ensure that the Project site construction impacts on fire protection and emergency medical services would be less than significant.

Regulatory Compliance Measures

**RCM-K.1-1** – The Project shall comply with the 2014 Fire Code and any subsequent codes at the time of building permits, including the requirements for automatic fire sprinkler systems and any other fire protection devices deemed necessary by the Fire Chief (e.g., fire signaling systems, fire extinguishers, smoke removal systems, etc.).

**RCM-K.1-2** – The following recommendations of the LAFD relative to fire safety shall be incorporated into the building plans, which includes the submittal of a plot plan for approval by the LAFD either prior to the recordation of a final map or the approval of a building permit. The plot plan shall include the following minimum design features: fire lanes, where required, shall be a minimum of 20 feet in width all structures must be within 300 feet of an approved fire hydrant, and entrances to any dwelling unit or guest room shall not be more than 150 feet in distance in horizontal travel from the edge of the roadway of an improved street or approved fire lane.

**RCM-K.1-3** – The Project Applicant shall submit a plot plan to the LAFD prior to occupancy of the Project, for review and approval, which shall provide the capacity of the fire mains serving the Project Site. Any required upgrades shall be identified and implemented prior to occupancy of the Project.

**RCM-K.1-4** – The Project Applicant shall submit an emergency response plan to LAFD prior to occupancy of the Project for review and approval. The emergency response plan would include but not be limited to the following: mapping of emergency exits, evacuation routes for vehicles and pedestrians, location of nearest hospitals, and fire stations. Any required modifications shall be identified and implemented prior to occupancy of the Project.

Project Design Features

**PDF-K.1-5** – The construction contractors and work crews shall properly maintain the mechanical equipment according to best practices and the manufacturers' procedures, ensure proper storage of flammable materials, and cleanup of spills of flammable liquid.

**PDF-K.1-6** – If there are partial closures to streets surrounding the Project Site, flagman must be used to facilitate the traffic flow until the street closure around the construction is complete.

**PDF-K.1-7** – During demolition and construction, LAFD access from major roadways shall remain clear and unobstructed.

**PDF-K.1-8** – The design of the Project Site shall provide adequate access for LAFD equipment and personnel to the structures.

### Operation

A. *Finding – Less Than Significant Impact.* The Project's operation would not result in substantial adverse physical impacts associated with the provision of new or physically altered fire protection facilities in order to maintain acceptable service ratios, response times, or other performance objectives. Compliance with Regulatory Compliance Measure RCM-K.1-1 would ensure the Project's operational impacts related to fire protection services remain less than significant. Impacts would be less than significant.

B. *Facts in Support of Finding.* The Project would generate new residents, visitors, and employees and would also increase the amount of developed square footage on the Project Site. Therefore, the Project could result in an increased need for fire protection and emergency medical services at the Project Site. However, the Project would not create the need for new or physically altered fire protection facilities. Further, an analysis of the criteria for determining a Project's impacts to fire protection services (e.g. fire flow, response distance and time, and emergency action) demonstrated that the Project's operation will have less than significant impacts. With respect of fire flow, the Los Angeles Department of Water and Power's Water Operations Division would perform a detailed fire flow study at the time of permit review to determine whether further water system or site-specific improvements would be necessary. Hydrants, water lines, and water tanks would be installed per Division 7, Section 57.09.06 of the Fire Code requirements for the Project. The Project Applicant would also be required to submit the proposed plot plans for the Project for the LAFD to review for compliance with the City's Fire Code, California Fire Code, City's Building Code, and National Fire Protection Association standards to ensure the Project would not create any undue fire hazard. The Project Site is not located within an Inadequate Fire Hydrant Service Area recognized by the City. As such, with respect to fire flows, fire protection services would be adequate and the associated impact would be less than significant.

With respect to response distance and time, the nearest fire station with an engine is Station No. 68, approximately 1.8 miles away. The nearest fire station with a truck company (such as a Light Force), is Station No. 94, approximately 2.0 miles away. If the LAFD's response distance standard cannot be achieved for the Project Site, the Project will be required to install a fire sprinkler system pursuant to Regulatory Compliance Measure RCM – K.1-1. Additionally, LAFD has been and continues to implement a number of steps to improve their systems, processes, and practices to improve emergency response times, considering the changing development patterns throughout the Projects area (including nearby Culver City), the need for fire protections services, and existing and future traffic congestion. Upgrades include: installation of automated vehicle locating systems on all LAFD apparatus; replacement of fire station alerting systems that control fire station dispatch audio, signal lights, and other fire station

alerting hardware and software; development of a new computer aided dispatch system
to manage fire and emergency medical service incidents from initial report to conclusion
of an incident; and use of traffic pre-emption systems. A traffic pre-emption system
allows the normal operation of traffic lights to be preempted by an emergency vehicle to
improve response times by stopping conflicting traffic in advance, providing the
emergency vehicle the right-of-way. Emergency response is also routinely facilitated,
particularly for high priority calls, through use of sirens to clear a path of travel, driving in
the lanes of opposing traffic, use of alternate routes, and multiple station response. With
these mobility features that can reduce traffic delays, Project impacts on response times
are considered less than significant.

Additionally, LAFD participates in the California Fire Service and Rescue Emergency
Mutual Aid System, as managed by the Governor's Office of Emergency Services
("OES"). The OES Mutual Aid Plan outlines procedures for establishing mutual aid
agreements at the local, operational, regional, and state levels, and divides the state into
six mutual aid regions to facilitate the coordination of mutual aid. Through the
Emergency Mutual Aid system, the OER is informed of conditions in each geographic
and organizational area of the state, and the occurrence of imminent threat of disaster.
All OES Mutual Aid participants monitor a dedicated radio frequency for fire events that
are beyond the capabilities of the responding fire department and provide aid in
accordance with the management direction of the OES.

For emergency access, the Project Applicant is required to submit the proposed plot
plans for the Project to LAFD for review and compliance with the City's Fire Code, the
California Fire Code, the City's Building Code, and National Fire Protection Association
standards to ensure that the Project would not create an undue fire hazard. The Project
Applicant would consult with neighboring land uses and the emergency response plan
would include but not be limited to the following: mapping of emergency exits,
evacuation routes for vehicles and pedestrians, location of nearest hospitals, and fire
departments. Additionally, the Project Site is located within 1 mile drive of the following
hospital, which house 24-hour emergency departments (Kaiser Permanente Medical
Center located at 6041 Cadillac Avenue).

The Project also would not conflict with, or impede implementation of, any of the policies
or goals related to fire protection described in the Los Angeles Fire Protection and
Prevention Plan, or the West Adams Community Plan, which describes the planning of
facilities. The Project will also generate revenue into the City's General Fund, which
would help the LAFD achieve progress toward its goal to ensure adequate fire facilities
and protective services for existing and future population and land uses.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts
associated with fire protection facilities from the Project's operation have been identified.
However, compliance with Regulatory Compliance Measures RCM-K.1-1 would ensure
that the Project's operational impacts on fire protection and emergency medical services
remain less than significant.

**Cumulative Impacts**

A. *Finding – Less Than Significant Impact.* The Proposed Project would not result in
cumulatively considerable adverse physical impacts associated with the provision of new
or physically altered fire protection facilities in order to maintain acceptable service

ratios, response times, or other performance objectives. Cumulative impacts would be less than significant.

B. *Facts in Support of Finding.* Development of the Project in conjunction with the Related Projects would increase demand for fire protection services based on an increase in residential population and employees in the Project area. However, due to the large geographic scope of the location of the Related Projects, some would be served by additional LAFD stations that differ from the Project. Cumulative development requires LAFD to continually evaluate the need for new or physically altered facilities in order to maintain adequate service ratios. Similar to the Project, the Related Projects within the City would also be required to consult with the LAFD and would be subject to the requirements of the City's Fire Code, including the requirement to install automatic fire sprinkler systems if a project is located at a distance to the nearest fire station that exceeds the LAFD required response distance. The Related Projects would also contribute to funding fire protection services in the area by generating annual revenue to be deposited into the City's General Fund. While the Related Projects may create demand on fire protection staffing, equipment, or facilities such that a new station would be required, since the Project does not create such demand, its contribution to those impacts is not cumulatively considerable.

The Related Projects located in the City of Culver City are served by the Culver City Fire Department ("CCFD"). The Project is not within Culver City and would not directly require service from the CCFD. Therefore, the Project would not have a cumulatively considerable impact on Culver City's fire services.

*Mitigation Measures.* No mitigation measures are required, as no cumulative significant impacts associated with fire protection facilities have been identified.

## Public Services – Public Schools

Under CEQA's Guidelines (Appendix G), a project may have a significant environmental impact related to schools if it will result in substantial adverse physical impacts associated with the provision of new or physically altered school facilities, need for new or physically altered school facilities, the construction of which would cause significant environmental impact, in order to maintain acceptable service ratios or performance objectives for the school district.

Under the L.A. CEQA Thresholds Guide, the determination of a project's impacts on schools must be made on a case-by-case basis considering the following factors: (a) the population increase resulting from the proposed project, based on the increase in residential units or square footage of non-residential floor area; (b) the demand for school services anticipated at the time of project buildout compared to the expected level of service available, considering (as applicable) scheduled improvements to Los Angeles Unified School District ("LAUSD") services (facilities, equipment and personnel) and the project's proportional contribution to the demand; (c) whether (and the degree to which) accommodation of the increased demand would require construction of new facilities, a major reorganization of students or classrooms, major revisions to the school calendar (such as year-round sessions), or other actions which would create a temporary or permanent impact on the schools; and (d) whether the project includes features that would reduce the demand for school services (e.g., on-site school facilities or direct support to LAUSD).

#### Construction

A. *Finding – No Impact.* Construction of the Project would not result in substantial adverse physical impacts associated with the provision of new or physically altered school facilities in order to maintain acceptable service ratios or other performance objectives. No impacts would occur.

B. *Facts in Support of Finding.* The Project is not in close proximity to any schools. The nearest school is Echo Horizon School, which is located approximately 925 feet to the west. Intervening buildings and the Ballona Creek would ensure that construction does not affect the school. Since the Project Site is accessed via a heavily used transportation corridor (La Cienega) and near the 10-Freeway, haul trucks would use those access points and would not pass by any nearby school. No construction impacts are expected near any schools. Therefore, no impact during construction would occur.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with school facilities from the Project's construction have been identified.

#### Operation

A. *Finding – Less Than Significant Impact.* Operation of the Proposed Project would not result in substantial adverse physical impacts associated with the provision of new or physically altered school facilities in order to maintain acceptable service ratios or other performance objectives. Compliance with regulatory compliance measure RCM-K.3-1 would ensure the Project's impacts associated with school facilities would remain less than significant. Impacts would be less than significant.

B. *Facts in Support of Finding.* The increase in number of residents and employees resulting from the Project and the potential need to enroll any school-aged children into LAUSD schools would increase the demand for school services. Based on LAUSD demographic analysis, the Project would result in approximately 1,154 additional LAUSD students (659 elementary students, 165 middle school students, and 330 high school students). It is possible that some of the future residents of the Project already reside within the service boundaries of the LAUSD, with their school-aged children currently enrolled in the LAUSD schools near the Project Site. However, to provide for a conservative analysis, the City assumed that all of the students generated as a result of the Project would not have previously enrolled in the LAUSD schools near the Project Site and would enroll in existing LAUSD (as opposed to private or newly built LAUSD) schools. Assuming the Project buildout year is expected to be 2018, with the addition of the Project-generated students to potential/eligible school enrollments, Marvin Elementary would operate over capacity by 638 students, Webster Middle School would operate under capacity by 190 students, and Hamilton High would operate over capacity by 203 students.

The LAUSD controls the strategies to accommodate the additional students generated by the Project. Those strategies include changes in attendance boundaries, grade reconfigurations, use of portable classroom buildings, and/or additions to existing schools. The increase in elementary and high school overcrowding above the school capacity at Marvin Elementary and Hamilton High could lead to potentially significant impacts. However, the Project would be required to pay school facilities fees pursuant to SB 50, which would be used to construct facilities that are necessary to serve overall

student enrollment growth district-wide associated with new development according to LAUSD. SB 50 amended Government Code section 65995(a) to provide that only those fees expressly authorized by Education Code section 17620 or Government Code sections 65970 could be levied or imposed in connection with a local agency's adjudicative act related to the development of real property. Subdivision (h) of Government Code section 65995 declares that the payment of development fees authorized by Education Code section 17620 is "full and complete mitigation of the impacts of any legislative or adjudicative act . . . on the provision of adequate school facilities." Therefore, mandatory compliance with the provisions of SB 50 regarding payment of school fees is deemed to provide full and complete mitigation of school impacts and no mitigation is required.

The Project's operation would also not conflict with, or impede implementation of, any policies or goals related to schools described in the Framework Element of the City's General Plan or the West Adams Community Plan, which describe planning of facilities. Through payment of fees, the Project would help LAUSD achieve progress toward its goal to ensure adequate school facilities for existing and future population. Impacts would be less than significant.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with school facilities from the Project's operation have been identified. However, the Project will be required to compliance with the following regulatory compliance measure RCM-K.3-1 to ensure the Project's impacts related to public schools remain less than significant:

Regulatory Compliance Measure

> **RCM-K.3-1** – Payment of School Development Fee – Prior to issuance of a building permit, the General Manager of the City of Los Angeles, Department of Building and Safety, or designee, shall ensure that the Applicant has paid all applicable school facility development fees in accordance with California Government Code section 65995.

### Cumulative Impacts

A. *Finding – Less Than Significant Impact.* The Proposed Project, in conjunction with the Related Projects, would not contribute to significant cumulative impacts associated with population and housing or employment growth.

B. *Facts in Support of Finding.* LAUSD's facility planning assumptions are based on overall demographic trends and are intended to address changes in student enrollment arising from area population trends from various sources, including new development. It is estimated that the Project in conjunctions with the Related Projects would generate approximately 9,304 residents, 3,650 housing units, and 7,723 employees in the City of Los Angeles only. All of the Related Projects within the City of Los Angeles are served by the LAUSD and may be impacting the same schools as the Project. According to the LAUSD's estimates, the residential portions of the Project and Related Projects are expected to generate a total of approximately 2,555 students (1,460 elementary, 365 middle, and 730 high school students) in the City of Los Angeles. The commercial uses of the Project and Related Projects are expected to generate an additional 8,382 employees, which would generate an additional 2,256 students (1,289 elementary, 322 middle, and 645 high school students). Depending on their location, the Related Projects

within the City would be served by a variety of LAUSD schools located in the area. Additionally, all future projects, like the Project, would be required to pay a school fee to the LAUSD to help reduce cumulative impacts that those projects may have on school services. Compliance with the provisions of SB 50 is deemed to provide full and complete mitigation of school facilities impacts. Therefore, with the full payment of all applicable school fees, the Project, coupled with the expected cumulative growth, would reduce potential cumulative impacts to schools. As the Project would not result in a substantial incremental contribution to the cumulative demand for school services, the Project would not have a cumulatively considerable impact to schools.

The Related Projects in the City of Culver City are served by the Culver City Unified School District ("CCUSD") and would not impact schools in the LAUSD, which serves the Project Site.

C. *Mitigation Measures.* No mitigation measures are required, as no significant cumulative impacts associated with school facilities have been identified.

## Public Services – Parks

Under CEQA's Guidelines (Appendix G), a project may have a significant environmental impact if it were to: (a) result in substantial adverse physical impacts associated with the provision of new or physically altered governmental facilities, need for new or physically altered governmental facilities, the construction of which could cause significant environmental impacts, in order to maintain acceptable service ratios, response times or other performance objectives for parks; (b) increase the use of existing neighborhood and regional parks or other recreational facilities such that substantial physical deterioration of the facility would occur or be accelerated; and (c) include recreational facilities or require the construction or expansion of recreational facilities which might have an adverse physical effect on the environment.

Under the L.A. CEQA Thresholds Guide, the determination of significance for a Project's impacts on parks and recreation shall be made on a case-by-case basis, considering the following factors: (a) the net population increase resulting from the project; (b) the demand for recreation and park services anticipated at the time of project buildout compared to the expected level of service available, considering (as applicable) scheduled improvements to recreation and park services (renovation, expansion, or addition) and the project's proportional contribution to the demand; and (c) whether the project includes features that would reduce the demand for recreation and park services (e.g., on-site recreation, facilities, land dedication or direct financial support to the Department of Recreation and Parks).

### Operation

A. *Finding – Less Than Significant Impact.* The Proposed Project would not result in substantial adverse physical impacts associated with the provision of new or physically altered parks and recreational facilities. Compliance with regulatory compliance measures RCM-K.4-1 through RCM-K.4-2 would ensure the Project's impacts associated with parks remain less than significant. Impacts would be less than significant.

B. *Facts in Support of Finding.* The Project's impacts with respect to parks and recreational facilities are determined based on the ability of existing parks and recreational facilities

in the Project area to accommodate the Project's need for such facilities. The Project would generate approximately 3,289 residents and approximately 1,120 employees (net after removal of the existing uses). Under the City's Public Recreation Plan ("PRP") within the City's General Plan, the City's standard ratio of neighborhood and community parks to population is four acres per 1,000 persons and the City's standard ratio of regional parks to population is six acres per 1,000 persons. Based on those ratios, the Project would generate a demand of approximately 13.16 acres of new neighborhood and community parkland and 19.73 acres of regional parkland. However, the demand for new parks and recreational facilities would not constitute a potentially significant impact to parks and recreational facilities because the Project includes features, such as green spaces and plazas and other publicly accessible areas that would otherwise reduce or offset the additional demand for recreation and park services. The Project includes a park/plaza within the Project Site, a landscaped path connecting Jefferson Boulevard with the rear alley, and courtyards and podium amenity spaces for residents, including pools. The Project would also provide at least the open space required under LAMC section 12.21(G) of approximately 133,350 square feet in the form of residential recreation rooms, green spaces and plazas, other publicly accessible areas on the Project Site, and private open space (balconies). That provision of open space amenities would serve to reduce the Project's demands and use upon existing recreation and park facilities in the local area.

Employees generated by the Project's office/retail/commercial uses would not typically enjoy long periods of time during the workday to visit parks and/or recreational facilities, and would therefore not contribute to the future demand on park services. The Project would also include a park/plaza in the center of the site that would provide park uses for employees to enjoy on breaks or before or after work.

Additionally, through the payment of fees pursuant to the Quimby Act, or the Finn Fees required under the LAMC, the Project would help the Los Angeles Department of Parks and Recreation achieve its goal to ensure adequate park facilities for existing future population. The Project's compliance with those requirements collectively address the Project's future demand upon recreation and park facilities by requiring the dedication of parkland or contribution of funds to be placed in a City-controlled account to be used to acquire and develop new parkland areas within the Project's service area. The formulas for calculating the required fees and/or land dedication are established to ensure that the provision of new park and recreation facilities is commensurate with the level of development that is built. The Project would also not conflict with, or impede implementation of, any of the policies or goals related to parks described in the Framework Element of the City's General Plan or West Adams Community Plan. In sum, the Project's impacts related to parks would be less than significant.

Additionally, the Project is in close proximity to following existing neighborhood and community parks that can service the Project: Reynier Park, Westside Neighborhood Park, Baldwin Hills Recreation Center, Gilliam Recreation Center, and Rancho Cienega Sports Complex. The Project is also in close proximity to the following parks in Culver City: Syd Kronenthal Park and Blair Hills Park. The Project is also in close proximity to the following state parks: Baldwin Hills Scenic Overlook and Kenneth Hahn State Recreation Area. Due to driving/walking distances and the amount of amenities, the Los Angeles City Parks are closer and have more facilities than the closet Culver City park.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with parks and recreational facilities have been identified. However, implementation of the following regulatory compliance measures RCM-K.4-1 through RCM-K.4-2 would ensure the Project's potential impacts related to parks would remain less than significant.

*Regulatory Compliance Measures*

**RCM-K.4-1 – Increased Demand for Parks or Recreational Facilities**
- (Subdivision) Pursuant to Section 17.12-A or 17.58 of the Los Angeles Municipal Code, the applicant shall pay the applicable Quimby Fees for the construction of dwelling units.
- (Apartments) Pursuant to Section 21.10 of the Los Angeles Municipal Code, the applicant shall pay the Dwelling Unit Construction Tax for construction of apartment buildings.

**RCM-K.4-2 – Increase Demand for Parks or Recreational Facilities** – Zone Change. Pursuant to Section 12.33 of the Los Angeles Municipal Code, the applicant shall pay the applicable fees for the construction of dwelling units.

**Cumulative Impacts**

A. *Finding – Less Than Significant Impact.* The Proposed Project would not result in significant cumulative impacts associated with the provision of new or physically altered parks and recreational facilities. Impacts would be less than significant.

B. *Facts in Support of Finding.* Implementation of the Project in conjunction with the Related Projects would increase demand for parks based on an increase in resident population. It is estimated that the Project in combination with the Related Projects would generate approximately 9,304 residents, 3,650 housing units in the City, and approximately 8,382 employees in the City of Los Angeles only. The increase in residential population of the area is estimated to generate a need for 37 acres of additional community/neighborhood park area under the City's Public Recreation Plan ratio for neighborhood parks. All of the Related Projects listed in the City are served by the Los Angeles Department Recreation and Parks and may be impacting the same park facilities as the Project.

The extent to which the residential Related Projects include parks or recreational amenities s unknown. However, each residential project in the City will be required to comply with the City's Quimby Ordinance and/or Dwelling Unit Construction Tax payment. Compliance with these ordinances would mitigate potential park and recreational facility impacts associated with the construction of these projects. Additionally, the City can use General Fund revenues from these projects to help meet its target parkland planning ratios in order to meet the needs of existing and future development.

Employees generated by the Project and Related Projects would not typically enjoy long period of time during the workday to visit parks and/or recreational facilities, and would therefore not contribute to the future demand on park services.

The Related Projects in the City of Culver City are served by Culver City Parks, Recreation and Community Services. However, residents of residential projects are able

to use parks in the local area and could cross jurisdictional boundaries between Culver City and Los Angeles. The Culver City Related Projects include 669 housing units and could generate an estimated 1,646 residents. Culver City imposes fees that apply to new development projects such as its In-Lieu Parkland Fee (Quimby Fee) and New Development Impact Fee that would fund a fair share contribution to park and recreation uses.

Under CEQA Guidelines section 15130(a)(3), a project's contribution to cumulative impacts is less than cumulatively considerable if the project is required to implement or fund its fair share of a mitigation measure designed to alleviate the cumulative impact. Since the Project would be required to mitigate its impacts upon public recreation and park facilities by paying mandatory Quimby/Park fees and/or Recreation and Park Fees in addition to providing the mandatory code-required open space areas and on-site recreational amenities, the Project's impacts would not be considered cumulatively considerable. Those fees are mandatory and proportionate based on the Project's residential density.

C. *Mitigation Measures.* No mitigation measures are required, as no significant cumulative impacts associated with parks and recreational facilities have been identified.

**Public Services – Libraries**

Under CEQA's Guidelines, a project may have a significant environmental impact if the project would: (a) result in substantial adverse physical impacts associated with the provision of new or physically altered governmental facilities, need for new or physically altered governmental facilities, the construction of which could cause significant environmental impacts, in order to maintain acceptable service ratios, response times or other performance objectives for library services.

Under the L.A. CEQA Thresholds Guide, the determination of significance shall be made on a case-by-case basis, considering the following factors: (a) the net population increase resulting from the project; (b) the demand for library services anticipated at the time of project buildout compared to the expected level of service available, considering (as applicable) scheduled improvements to library services (renovation, expansion, or addition) and the project's proportional contribution to the demand; and (c) whether the project includes features that would reduce the demand for library services (e.g., on-site library facilities or direct support to the  Los Angeles Public Library).

**Operation**

A. *Finding – Less Than Significant Impact.* The Proposed Project would not result in substantial adverse physical impacts associated with the provision of new or physically altered library facilities in order to maintain acceptable service ratios or other performance objectives. Impacts would be less than significant.

B. *Facts in Support of Finding.* The Project would generate approximately 3,289 residents and approximately 1,120 employees (net after removal of existing uses). Employees generated by the Project's office/retail/commercial uses would not typically enjoy long periods of time during the workday to visit libraries during work hours, as they are more likely to use libraries near their homes during non-work hours, and so are not included for purposes of determining the Project's service impact to libraries.

The Project is served by three nearby Los Angeles Public library branches with a combined 33,804 square feet, as well as the Culver City Julian Dixon Library. The library service population areas overlaps, so the City did not conduct discrete population analysis for library services. The Los Angeles Public Library has confirmed that there is no need for planned improvements, either under its Strategic Plan or otherwise, to add capacity through expansion to any identified branch or to build any new libraries in the area. It is likely that the Project's residents would have individual access to internet service, which provides information and research capabilities that studies have shown reduce demand at physical library locations. Further, Measure L has provided funds to restore adequate services to the existing library system. For those reasons, it is not anticipated that the Project would result in substantial adverse physical impacts associated with the provision of new or physically altered library facilities or need for new or physically altered library facilities to maintain acceptable service ratios or other performance objectives for library services. Therefore, impacts to library services would be less than significant.

The Project would also not conflict with, or impede implementation of, any of the policies or goals related to libraries described in the City's General Plan, Los Angeles Public Library Strategic Plan 2007-2010, or the West Adams Community Plan. Through the generation of revenue into the City's General Fund, the Project would help the Los Angeles Public Library achieve Objective 9.21, which seeks to ensure library service for current and future residents and businesses, achieve progress toward Goal 1 (which seeks to improve communities by updating the Library Facilities Master Plan, planning new libraries, and increasing service hours, among other activities), and achieve progress toward its goal to ensure adequate library facilities and service (including new libraries or expansion of existing libraries).

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with library facilities have been identified.

### Cumulative Impacts

A. *Finding – Less Than Significant Impact.* The Project, in conjunction with the Related Projects, would not result in a significant cumulative impacts associated with library facilities.

B. *Facts in Support of Finding.* Implementation of the Project in conjunction with the Related Projects would generate approximately 9,304 residents, 3,650 housing units, and 8,382 employees within the City. The increase in demand for library facilities as a result of these residents would be spread among the many libraries that are within two miles of the Related Projects. Specifically, the following libraries would serve some of the Related Projects: (1) Palms-Rancho Park Branch; (2) Angeles Mesa Branch; (3) Playa Vista Branch; (4) Mar Vista Branch. The Los Angeles Public Library has confirmed that there is no determination of need for planned improvements to add capacity through expansion to any identified branch or to build any new libraries in the relevant geographic area. Also, Measure L has provided funding to restore adequate services to the existing library system. Further, Related Projects would generate revenue for the City's General Fund, which would help the Los Angeles Public Library achieve progress toward its goal to ensure adequate library facilities and service, including new libraries or expansion of existing libraries.

The Related Projects in the City of Culver City are served by the Los Angeles County Public Library system, including the Julian Dixon Library. The Culver City Related Projects include 669 housing units and could generate an estimated 1,646 residents and approximately 9,181 employees. The City residential projects in Culver City would be analyzed within the County library system, not the Los Angeles Public Library System. Therefore, the Project itself would not create a cumulatively considerable impact on the County library system.

In sum, the Project's cumulative impacts would be less than significant.

C. *Mitigation Measures.* No mitigation measures are required, as no significant cumulative impacts associated with library facilities have been identified.

## Utilities & Service Systems – Wastewater

### Wastewater Generation and Infrastructure

A. *Finding – Less Than Significant Impact.* The Project would not require or result in the construction of new water or wastewater treatment facilities, the construction of which would cause significant environmental impacts. Compliance with Regulatory Compliance Measures RCM-M.1-1 through RCM-M.1.2 and incorporation of Project Design Feature PDF-M.1-3 would ensure the Project's impacts associated with wastewater infrastructure remain less than significant. The impact would be less than significant.

B. *Facts in Support of Finding.* During the Project's construction, a negligible amount of wastewater would be generated by construction employees. It is anticipated that portable toilets would be provided by a private company and the waste would be disposed of off-site. No new connections to the public sewer system would be required for the construction employees. The limited potential impacts on sewer facilities would not cause an increase in flows beyond the available capacity of the existing conveyance and treatment systems.

The Project would require sewer connection and related infrastructure upgrades, but that connection and the upgrades would not be expected to create a significant impact to the physical environment because: (1) existing service would not be disrupted; (2) replacement of the sewer lines, if required, would be within public and private rights-of-way; and (3) the existing infrastructure (sewer lines and connectors) would be replaced with improved infrastructure in areas that have already been significantly disturbed. The replacement or addition of infrastructure could potentially result in temporary road closures. However, the construction would be of short duration and would implement best practices such as use of a flagman during work in the public right-of-way. Further, incorporation of project design feature PDF-M.1-3, traffic flow will be facilitated during the potential wastewater upgrade activities near the Project Site and impacts would be less than significant.

The Project's operation is estimated to generate a net total of approximately 190,372 gallons per day (gpd) of wastewater. This total was reduced by the generation of the existing uses, which would be removed. It is assumed that the office portion of the Project (approximately 43,313 square feet) generates the bulk of the onsite employment

and the small light industrial buildings light industrial buildings have a much lower wastewater generation rate.

The Project Site is currently developed and adequately served by the existing wastewater conveyance system. As part of the building permit process, the City would confirm and ensure that there is sufficient capacity in the local and trunk lines to accommodate the Project's wastewater flows. If it is determined that the public sewer has insufficient capacity, the Project Applicant would be required to build sewer lines to appoint in the sewer system with sufficient capacity. A final approval for sewer capacity and connection permit would be made at that time. The Project's construction phase would need a sewer connection permit and Sewer Capacity Availability Review ("SCAR") application. The Project would also pay any required sewer connection fees. The Project's wastewater and sewage flow would be conveyed to the City's Hyperion Treatment Plan ("HTP"), which has sufficient capacity for the Project as shown through the City's 2006 Integrated Resources Plan ("IRP"). The wastewater generated by the Project would be similar to residential, office, and retail uses in the area. No industrial discharge into the wastewater or drainage system would occur.

Since the HTP complies with the state's wastewater treatment requirements and the Project's wastewater generation is well within the existing capacity, the Project would not exceed the wastewater treatment requirements of the Los Angeles Regional Water Quality Control Board. Additionally, the Projects wastewater flows would not substantially or incrementally exceed the future scheduled capacity at any one treatment plant by generating flows greater than those anticipated in the City's Wastewater Facilities Plan or the City's General Plan and its amendments.

Since the Project's operation will not lead to the potential expansion of existing wastewater treatment facilities, the construction of which could cause significant environmental effects, will not substantially or incrementally exceed the future scheduled capacity of any one treatment, and will not exceed the wastewater treatment requirements of the Los Angeles Regional Water Quality Control Board ("LARWQCB"), the Project's impacts associated with wastewater will be less than significant.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with new water or wastewater treatment facilities have been identified. However, the Project shall comply with the following regulatory compliance measures RCM-M.1-1 through RCM-M.1-2 and Project Design Feature PDF-M.1-3 to ensure the Project's impacts associated with wastewater will remain less than significant.

Regulatory Compliance Measures

- **RCM-M.1-1** – The Project shall comply with City Ordinance No. 179,820 (Green Building Ordinance), which establishes a requirement to incorporate green building practices into projects that meet certain threshold criteria.

- **RCM-M.1-2** – As part of the normal construction/building permit process, the Project Applicant shall confirm with the City that the capacity of the local and trunk lines are sufficient to accommodate the Project's wastewater flows during the construction and operation phases. If the public sewer has insufficient capacity, then the Project Applicant shall be required to build sewer lines to a point in the sewer system with sufficient capacity. A final approval for sewer capacity and connection permit shall be made at that time. The construction

phase of the Project shall need a sewer connection permit and the Sewer
Capacity Availability Review ("SCAR") application. The Project shall also pay any
required sewer connection fees.

Project Design Features

- **PDF-M.1-3** – In the event of full or partial public street closures, such as during
  the construction of new wastewater lines, the Construction Traffic management
  Plan shall be implemented.

## Utilities & Service Systems – Water Supplies

### Water Demand, Supplies, and Infrastructure

A. *Finding – Less Than Significant Impact.* Sufficient water supplies are available to serve
the Project from existing entitlements and resources. Compliance with Regulatory
Compliance Measures RCM.M.2-2 through RCM.M.2-5 and incorporation of project
design feature PDF-M.2-6 would ensure the Project's impacts associated with water
infrastructure remain less than significant. Impacts would be less than significant.

B. *Facts in Support of Finding.* Certain construction activities for the Project would consume
water, such as soil watering (i.e. for fugitive dust control), clean up, masonry, painting,
and other related activities. Typically, fugitive dust watering is provided by private
purveyors and not provided by on-site water sources. Reclaimed water can also be used
for dust control. Since the Project's construction would occur in various stages over an
approximately two year period, construction activities would occur intermittently and
would be short-term and temporary in nature. Further, the activities requiring water
would not create substantial water demand. Overall, construction activities would require
minimal water consumption and would not be expected to have adverse impacts on
available water supplies or existing water distribution systems.

As part of the building permit process, the City would confirm that there is sufficient
capacity in the water supply and infrastructure to accommodate the Project's water
needs. If there is a deficiency that would prevent the Project from receiving an adequate
level of service, the Project Applicant will fund the required upgrades to adequately
serve the Project. The replacement or addition of infrastructure could potentially result in
temporary partial public street closures on La Cienega Boulevard and Jefferson
Boulevard. To reduce that potential impact, Project Design Features PDF.M.2-5 through
PDF.M.2-6 would facilitate the flow of traffic and reduce those impacts to a less than
significant level. Further, potential water main and other infrastructure upgrades would
not be expected to create a significant impact to the physical environment because (1)
any disruption of service would be of a short-term nature; (2) replacement of the water
mains would be within public and private rights-of-way; and (3) the existing infrastructure
would be replaced with larger infrastructure in areas that have already been significantly
disturbed.

The Project's water consumption during operation was estimated from wastewater
generation factors from the Department of Public Works and Bureau of Sanitation. The
Project is estimated to consume a total of approximately 227,476 gpd. This total was
reduced by the demand of the existing uses, which would be removed. It is assumed
that the office portion of the Project (43,414 square feet) generates the bulk of onsite

demand and that the small light industrial buildings have a much lower demand. The Project's water consumption would be consistent with projections anticipated by the Southern California Association of Governments ("SCAG"). The City's 2010 Urban Water Management Plan ("UWMP') included water demand projection that was based on the 2008 Regional Transportation Plan ("RTP") demographic projection by the Southern California Association of Governments using the 2000 U.S. Census for the City. The economic recession of 2007-2009 had a negative impact on the region's population growth, resulting in a decrease in population growth. The City's water demand projection to the year 2035 based on the demographic projection from the 2012 RTP will be lower than the City's water demand projection in the 2010 UWMP. As a result, the City's water supply projections in the 2010 UWMP are sufficient to meet the City's water demand projections based on the 2012 RTRP. Therefore, the Project's water demand is accounted for in the City's future projected demands and the Los Angeles Aqueduct Plant ("LAAP") capacity is estimated to be adequate to accommodate future demands. Therefore, there would be no impacts to utilities and service systems related to the construction or expansion of new water treatment facilities that could cause significant environmental impacts.

The Project would also be required to comply with applicable water conservation ordinances and regulations, such as the California Code of Regulations ("CCR"), Title 20, Section 1604, CCR Title 22, and City Ordinances 165,004 and 166,080. Since the Project will comply with those conservation measures and will only incrementally increase water consumption processed within the Los Angeles Aqueduct Filtration Plant ("LAAFP"), the Project would not require the construction or expansion of new water treatment facilities that could cause a significant environmental effect. Therefore, impacts to water from the Project's operation would be less than significant.

With respect to the water supply available to serve the Project, SB 610, SB 221, and State Water Code Sections 10910-10915 require any proposed residential development with 500 or more dwelling units or a proposed commercial office building of more than 250,000 square feet of floor area space or employing more than 1,000 persons request a Water Supply Assessment ("WSA") from the local water service purveyor. Accordingly, the Project Applicant requested a WSA from the LADWP for the Project. On July 8, 2015, the LADWP Board of Commissioners approved a WSA prepared for the Project. The WSA is attached to the Draft EIR as Appendix K-3. The WSA anticipated that the maximum 381 acre feet per year of total additional annual water demanded from the Project would fall within the City's Urban Water Management Plan's ("UWMP") projected water supplies for normal, single-dry and multiple-dry years through the year 2035 and falls with the UWMP's 25-year water demand growth projection. Therefore, the Project is consistent with the 2010 UWMP, and a less than significant impact would occur.

The Project would also comply with the Governor's Executive Order on drought conditions, which "prohibits new homes and developments from irrigating with potable water unless water-efficient drip irrigation systems are being used and ban watering ornamental grade on public street medians. The Project would also comply with the California Building Standards commission requirement for irrigation systems, the City's Low Impact Development Ordinance (City Ordinance No. 1818,99), and the Project Applicant has committed to implementing Best Management Practices that have stormwater recharge or reuse benefits for the Project (as applicable and feasible). The Project will incorporate regulatory compliance measures RCM M.2.1 to M.2-4 to further ensure that impacts related to the Project's water demand remain less than significant.

C. *Mitigation Measures*. No mitigation measures are required, as no significant impacts associated with impacts to water demand, supply, or infrastructure have been identified. However, compliance with the following Regulatory Compliance Measures RCM.M.2-1 through RCM.M.2-5 and Project Design Feature PDF-M.2-6 will ensure the Project's impacts associated with water demand, supply, or infrastructure remain less than significant:

Regulatory Compliance Measures

- **RCM.M.2-1 – Fire Water Flow –** The Project Applicant shall consult with the LADBS and LAFD to determine fire flow requirements for the Proposed Project, and will contact a Water Service Representative at the LADWP to order a SAR. This system hydraulic analysis will determine if existing LADWP water supply facilities can provide the proposed fire flow requirements of the Project. If water main or infrastructure upgrades are required, the Applicant would pay for such upgrades, which would be constructed by either the Applicant or LADWP.

- **RCM.M.2-2 – Green Building Code –** The Project shall implement all applicable mandatory measures within the LA Green Building Code that would have the effect of reducing the Project's water use.

- **RCM.M.2-3 – Landscape –** The Project shall comply with Ordinance No. 170,978 (Water Management Ordinance), which imposes numerous water conservation measures in landscape, installation, and maintenance (e.g., use drip irrigation and soak hoses in lieu of sprinklers to lower the amount of water lost to evaporation and overspray, set automatic sprinkler systems to irrigate during the early morning or evening hours to minimize water loss due to evaporation, and water less in the cooler months and during the rainy season).

- **RCM.M.2-4 – LID Ordinance and Stormwater BMPs –** The Project shall comply with the City of Los Angeles Low Impact Development Ordinance (City Ordinance No. 1818-99) and to implement Best Management Practices that have stormwater recharge or reuse benefits for the Project (as applicable and feasible).

- **RCM.M.2-5 –** As part of the normal construction/building permit process, the Project Applicant shall confirm with the City that the capacity of the existing water infrastructure can supply the domestic needs of the Project during the construction and operation phases. The Project Applicant shall implement any upgrade to the water infrastructure serving the Project Site that is needed to accommodate the Project's water consumption needs. If a deficiency or service problem is discovered during the permitting process that prevents the Project from an adequate level of service, the Project Applicant shall fund the required upgrades to adequately serve the Project.

Project Design Feature

- **PDF-M.2-6 –** In the event of a full or partial public street closures, such as during the construction of new water lines, the Construction Traffic Management Plan shall be implemented.

**Fireflow**

A. *Finding – Less Than Significant Impact.* The Project would not have significant impacts to the water conveyance system for fireflows. Compliance with Regulatory Compliance Measure RCM-M.2-1 would ensure the Project's impacts associated with fireflows remain less than significant. The impact would be less than significant.

B. *Facts in Support of Finding.* The Project design includes design features to increase the capacity of existing water infrastructure in accordance with LADWP standards, which take into account Los Angeles Fire Department ("LAFD") fire flow and pressure requirements, as incorporated into Regulatory Compliance Measure M.2-1.

Further, The Water Operations Division of the LADWP would perform a detailed fire flow study at the time of permit review to ascertain whether further water system or site-specific improvements would be necessary. The LADWP should be able to provide the domestic needs of the Project from the existing water system. There are no known water service problems or deficiencies. All infrastructure improvements would be built to the LADWP and Los Angeles City Planning Code standards. If necessary, a detailed Project design would include improvements that comply with the LADWP standards and LAFD requirements. The Water Operations Division of the LADWP would also perform a detailed fire flow study at the time of permit review to ascertain compatibility with the water system and site-specific improvements. As part of the building permit process, the City would confirm that there is sufficient capacity in the water supply and infrastructure to accommodate the Project's needs. If there is a deficiency or service problem that would prevent the Project from receiving an adequate level of service, the Project Applicant will fund the required upgrades to adequately serve the Project, as required under Regulatory Compliance Measure RCM.M.1-5.

Further, Hydrants, water lines, and water tanks would be installed per Fire Code requirements for the Project. The Project Applicant would also be required to submit the proposed plot plans for the Project to the LAFD for review for compliance with applicable Los Angeles Fire Code, California Fire Code, City of Los Angeles Building Code, and National Fire Protection Association standards, thereby ensuring that the Project would not create any undue fire hazard. These requirements are incorporated into regulatory compliance measures RCM.K.1-2 and K.1-3 listed above.

*Mitigation Measures.* No mitigation measure are required, as no significant impacts associated with the water conveyance system for water flows have been identified. However, compliance with Regulatory Compliance Measure RCM.M.2-1 – Fire Water Flow will ensure the Project's impacts associated with fireflow remain less than significant.

Utilities & Service Systems – Solid Waste

**Construction**

A. *Finding – Less Than Significant Impact.* The Project would be served by landfills with sufficient permitted capacity to accommodate the solid waste disposal needs from the Project's construction. Compliance with Regulatory Compliance Measures RCM-M.3-1 through RCM-M.3 and incorporation of PDF-M.3-4 would ensure the Project's construction impacts associated with solid waste remain less than significant. The

impact would be less than significant.

B. *Facts in Support of Finding.* The Project's construction would generate waste during demolition and other construction activities. It is anticipated that grading and demolition activities would be completed within the first year of Project construction. Based on demolition and construction waste generation rates estimated by the U.S. EPA's Characterization of Building-Related Construction and Demolition Debris in the U.S., the Project is predicted to generate a total of approximately 5,477 tons of solid waste during demolition and 4,107 tons of solid waste over the construction period.

Demolition, site preparation, grading, and the Project's construction would be completed in approximately 35 months, with operation beginning in 2018. Based on that schedule and the projected total amounts of solid waste generated, the Project demolition and construction would generate approximately 13.70 tons per day of construction waste. The demolition and construction debris associated with the Project would primarily be classified as inert waste and would be recycled in accordance with the City's Ordinance 181,519 at one of the City certified construction and demolition waste processor facilities. The Puente Hills Materials Recovery Facility ("MRF") accepts all kinds of waste for recycling and disposal, including commercial, construction/demolition, and residential wastes. The Puente Hills MRF is permitted to accept 4,400 tons per day and 24,000 tons per week of municipal solid waste. The Puente Hills Intermodal Facility also provides a Materials Recovery Facility/Transfer Station for the Waste to Rails system to the Mesquite Regional landfill in Imperial County. The Mesquite landfill would have adequate capacity to accept the Project's demolition and construction waste.

Compliance with AB 939 would require a minimum of 50 percent of demolition and construction debris to be recycled. The Project would utilize construction and demolition waste haulers in compliance with Ordinance 181,519. Through compliance with applicable City regulations and contracting with the approved waste haulers, the Project would achieve, at a minimum, the required 70 percent source reduction and recycling rate. Additionally, other recycling facilities would be available to receive recyclable construction waste (e.g. American Waste Transfer Station, Compton Recycling and Transfer Station, Carson Transfer Station and Materials Recovery Facility, etc.). Additional recycling facilities and inert waste landfills as listed in the Bureau of Sanitation's Construction and Demolition Recycling Guide would be utilized as needed at the Project Applicant's discretion.

Implementation of Regulatory Compliance Measures RCM-M.3-1 through RCM-M.3-2 and Project Design Feature PDF-M.3-4 would ensure that the Project's short-term construction impacts to landfills and solid waste services would be less than significant.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with solid waste from the Project's construction have been identified. However, compliance with the following Regulatory Compliance Measures RCM-M.3-1 through RCM-M.3-2 and Project Design Feature PDF-M.3-4 would ensure the Project's short-term construction impacts to landfills and solid waste services would remain less than significant.

Regulatory Compliance Measures

- **RCM-M.3-1 – Designated Recycling Area –** In compliance with Los Angeles Municipal Code, the Project shall provide readily accessible areas that serve the entire building and are identified for the depositing, storage, and collection of nonhazardous materials for recycling, including (at a minimum) paper, corrugated cardboard, glass, plastics, and metals.

- **RCM-M.3-2 – Construction Waste Recycling –** In order to meet the diversion goals of the California Integrated Waste Management Act and the City of Los Angeles, which was 70 percent in 2013, the Applicant shall salvage and recycle construction and demolition materials to ensure that a minimum of 70 percent of construction-related solid waste that can be recycled is diverted from the waste stream to be landfilled. Solid waste diversion would be accomplished though the on-site separation of materials and/or by contracting with a solid waste disposal facility that can guarantee a minimum diversion rate of 70 percent. In compliance with the Los Angeles Municipal Code, the General Contractor shall utilize solid waste haulers, contractors, and recyclers who have obtained an Assembly Bill (AB) 939 Compliance Permit from the City of Los Angeles Bureau of Sanitation.

- **RCM-M.3-3 – Commercial/Multifamily Mandatory Recycling –** In compliance with AB341, recycling bins shall be provided at appropriate locations to promote recycling of paper, metal, glass and other recyclable material. These bins shall be emptied and recycled accordingly as a part of the Project's regular solid waste disposal program. The Project Applicant shall only contract for waste disposal services with a company that recycles solid waste in compliance with AB341.

Project Design Feature

- **PDF-M.3-4 –** To the maximum extent feasible, demolition and construction debris including concrete, asphalt, wood, drywall, metals, and other miscellaneous and composite materials shall be recycled and salvaged.

### Operation

A. *Finding – Less Than Significant Impact.* The Project would be served by landfills with sufficient permitted capacity to accommodate the solid waste disposal needs from the Project's operations. Compliance with Regulatory Compliance Measure RCM-M.3-3 would ensure that the Project's operational impacts associated with solid waste remain less than significant. The impact would be less than significant.

B. *Facts in Support of Finding.* The Project is estimated to generate a net total of approximately 8.76 tons per day ("tpd") of solid waste. The total was reduced by the solid waste generation of the existing uses, which would be removed. This total is a conservative, worst-case scenario and does not account for the effectiveness of the recycling efforts that he Project would implement. It is assumed that the office portion would generate the bulk of the onsite generation (approximately 43,414 square feet) and the small light industrial buildings would have a much lower generation.

The City is served by the Sunshine Canyon City/County Landfill and the Chiquita Canyon Landfill. The Sunshine Canyon Landfill currently accepts 9,000 tpd on weekdays and 3,000 tpd on Saturday, but can accept 12,100 tpd. Therefore, the Sunshine Canyon

City Landfill could accommodate the additional estimated 8.76 tons per day increase in solid waste resulting from the Project's operation.

Additionally, pursuant to AB 939, each city and county in the state must divert 50% of its solid waste from landfill disposal through source reduction, recycling, and composting. The City achieved a waste diversion rate of 76.40 percent in FY 2013 and is on track toward its goal to achieve a 90 percent diversion by 2025. Recognizing the importance of recycling, the Project would also incorporate regulatory compliance measures RCM M.3-1 through M.3-4 and Project Design Feature PDF-M.3-4 targeted at the Project's solid waste generation during the Project's construction and operation.

Since the Project would be served by a landfill with sufficient permitted capacity to accommodate the Project's solid waste disposal needs and would not require an additional solid waste collection route or recycling or disposal facility, the impacts associated with solid waste from the Project's operation would be less than significant.

C. *Mitigation Measures*. No mitigation measures are required, as no significant impacts associated with solid waste have been identified. In addition to Regulatory Compliance Measures RCM-M.3-1 through RCM-M.3-2 and Project Design Feature PDF-M.3-4, the Project shall comply with the following Regulatory Compliance Measure RCM-M.3-3 to ensure the impacts associated with solid waste from the Project's operation remain less than significant.

Regulatory Compliance Measure

- **RCM-M.3-3 – Commercial/Multifamily Mandatory Recycling** -- In compliance with AB341, recycling bins shall be provided at appropriate locations to promote recycling of paper, metal glass and other recyclable materials. These bins shall be emptied and recycled accordingly as part of the Project's regular solid waste disposal program. The Project Applicant shall only contract for waste disposal services with a company that recycles solid waste in compliance with AB341.

## Utilities & Service Systems – Energy Conservation

### Operation

A. *Finding – Less Than Significant Impact*. The Project's operation would not require new energy supply facilities; would not lead to wasteful, inefficient, or unnecessary consumption of energy; would comply with all applicable energy conservation measures; and would incorporate energy conservation measures. Compliance with Regulatory Compliance Measures RCM-M.4-1 through RCM-M.4-3 and incorporation of Project Design Feature PDF-M.4-4 would ensure the Project's operational impacts associated with energy conservation remain less than significant. Impacts related to energy conservation and energy resources from the Project's operation would be less than significant.

B. *Facts in Support of Finding*. For the Project's electricity demands, electrical conduits, wiring, and associated infrastructure would be conveyed to the Project from existing LADWP lines in the surrounding streets to the Project during construction. The Project would likely require transformer vaults, which are common for buildings of its size. However, construction of those vaults is part of the overall building construction and

would not constitute unusual or unplanned infrastructure that would cause a significant impact on the environment. The Project would demand approximately 12,987,174 kw-h/year. This total was reduced by demand of the existing uses, which would be removed. It is assumed that the office portion (43,313 square feet) generates the bulk of onsite demand and the small light industrial buildings have much lower demand. The Project's annual electricity consumption would represent approximately 0.056 percent of the forecasted electricity demand in 2018. Thus, the Project is within the anticipated demand of the LADWP system. Further, the Project's estimated electricity consumption is based on usage rates that do not account for the Project's energy conservation features or updates to the Los Angeles Building Code. This represents a conservative, worst-case scenario approach, as the actual electricity consumption from the Project would likely be lower than forecasted. LADWP's current and planned electricity supplies would be sufficient to support the Project's electricity consumption. The Project would be in compliance with Title 24 of the California Code of Regulations (Calgreen) requiring building energy efficiency standards, and would also be in compliance with the LA Green Building Code. Electrical service would be provided in accordance with LADWP's Rules Governing Water and Electric Service. Based on the above analysis, no operational impacts associated with the consumption of electricity would occur.

The Project is estimated to demand approximately 5,392,399 cubic feet/month of natural gas. The total was reduced by the demand of existing uses, which would be removed. It is assumed that the office portion generates the bulk of the onsite demand (approximately 43,313 square feet) and the small light industrial buildings have a much lower generation. The natural gas demand is based on natural gas usage rates from the SCAQMD and without taking credit for the Project's energy conservation features, which would reduce natural gas usage. The Project's natural gas demand would represent approximately 0.005 percent of Southern California Gas Company's peak demand in 2018. As such, there is adequate supply capacity and no impacts. Further, the Project would be responsible for paying connection costs to connect its on-site service meters to existing infrastructure. The Project would not result in the construction of natural gas facilities (i.e., natural gas distribution lines) that would cause significant environmental impacts. Project design features for building efficiency would also help alleviate natural gas demand. Therefore, the Project would not lead to impacts on natural gas infrastructure and Project impacts related to natural gas would be less than significant.

The Project would also not lead to wasteful, inefficient, or unnecessary consumption of transportation energy. The Project's location takes advantage of existing transportation alternatives in the vicinity that could reduce energy (gasoline, electric, or natural gas, depending on the mode of travel). For example, the Metro Expo Line Jefferson/La Cienega is within one block of the Project and a number of Metro and LADOT bus routes are within reasonable walking distance. The increase in land use diversity and mix of uses on the Project Site would also reduce vehicle trips and vehicle miles traveled by encouraging walking, bicycling, and other nonautomotive forms of transportation. Project-related vehicles would require a negligible fraction of the state's total transportation fuel consumption. With compliance with regulatory measures, the Project's operations would not result in wasteful, inefficient, or unnecessary consumption of transportation energy.

The Project's potential to use energy provided by alternative resources to meet the Project's operational demands is constrained by the energy portfolio mix managed by the Los Angeles Department of Water and Power ("LADWP", the Project's service

provider) and by limitations on the availability or feasibility of on-site energy generation. LADWP has committed to meetings the requirements under the California Renewable Energy Resources Act by procuring at least 33 percent of its renewable energy portfolio from renewable sources by 2020 from by the procurement of energy from eligible renewable resources to the extent permitted by fiscal constraints, renewable energy pricing, system integration limits, and transmission constraints. As of 2011, the most recent year for which data is available, LADWP's existing renewable energy resources included small hydro, wind, solar, and biogas, which accounted for 20 percent of its overall energy mix. This represents the available off-site renewable sources of energy that would meet the Project's demand. With respect to on-site renewable energy sources, due to the Project's location, there are no local sources of energy from the following sources: biodiesel, biomass hydroelectric and small hydro, digester gas, fuel cells, landfill gas, municipal solid waste, ocean thermal, ocean wave, and tidal current technologies, or multi-fuel facilities using renewable fuels. Geothermal energy requires the installation of a heat exchanger consisting of a network of below-ground pipes to convey heated or cooled air into a building. Methane can be a renewable derived biogas, but it is not available on the Project Site in commercially viable quantities or form, and its extraction and treatment for energy purposes would result in secondary impacts. Methane is also currently regulated as a hazardous material by the City. Solar and wind power could be used to augment, but not replace, natural gas-fired energy power generation. However, wind-powered energy is not viable on the Project Site due to the lack of sufficient wind in the Los Angeles basin. The Project Site was not identified in a study by the California Energy Commission as an area with wind resource potential. Also, there are no viable sites within the Project Site for placement and operation of a wind turbine. With respect to solar energy, the California Energy Commission determined Los Angeles County has a relatively high photovoltaic potential. However, most of the high potential areas in Los Angeles County are located in the northeastern corner of the County, approximately 45 miles from the Project Site. Additionally, the California Energy Commission determined inland counties are more suitable for large-scale solar power generation.

C. *Mitigation Measures.* No mitigation measures are required, as no significant impacts associated with energy conservation have been identified from the Project's operation. However, the following regulatory compliance measures RCM-M.4-1 through RCM-M.4-3 and project design feature PDF-M.4-4 shall be required so the Project's impacts associated with energy conservation remain less than significant.

Regulatory Compliance Measures

- **RCM-M.4-1** – The Project shall comply with City Ordinance No. 179,820 (Green Building Ordinance), which establishes a requirement to incorporate green building practices into projects that meet certain threshold criteria.

- **RCM-M.4-2** – The Project shall implement all applicable mandatory measures within the LA Green Building Code that would have the effect of reducing the Project's energy use.

- **RCM-M.4-3** – The Project shall comply with the lighting power requirements in the California Energy Code, California Code of Regulations ("CCR"), Title 24, Part 6.

*Project Design Feature*

• **PDF-M.4-4** – The Project shall use Energy Start appliances where available.

## VIII. ENVIRONMENTAL IMPACTS FOUND TO BE LESS THAN SIGNIFICANT AFTER MITIGATION

The City finds the following impacts will be less than significant with implementation of mitigation measures. Mitigation measures are designed to be implemented to reduce or eliminate a project's potential environmental impacts. (See *Lotus v. Department of Transportation* (2014) 223 Cal.App.4th 645, 656, fn. 8.) Mitigation measures are subsequent actions taken to mitigate any significant effects of a project. (See *Berkeley Hillside Preservation v. City of Berkeley*, 1st App. Dist., Docket No. A131254, 10/15/15.) In contrast to mitigation measures, project design features address components of the project itself and are incorporated into the project design before a lead agency considers that project's potential environmental impacts. Regulatory compliance measures summarize the required statutes, regulations, and local ordinances with which the Project must comply. The City considers whether a project will lead to potential environmental impacts after the project complies with all applicable laws.

### Air Quality

#### Construction Phase Impacts – Regional Impacts

A. *Finding – Less Than Significant Impact with Implementation of Mitigation Measures.* The Proposed Project's construction related air emission impacts related to regional emission impacts would be less than significant with implementation of Mitigation Measures MM-C-1 through MM-C-4. Compliance with Regulatory Compliance Measure RCM-C-6 would also ensure the regional air emission impacts from the Project's construction remain less than significant. The impact would be less than significant.

B. *Facts in Support of Finding.* The Proposed Project's regional emissions for the construction phase were estimated using SCAQMD's CalEEMod 2013.2.2 model using assumptions from the Project's developer, including the Project's construction schedule of 35 months, the export of 195,000 cubic yards of soil, the demolition of 14,600 tons of improvements of asphalt, demolition phase (2.07 months), site preparation (2.07 months), grading phase (5.52 months), building construction phase (28 months), a paving phase (0.46 months), and architectural coatings phase (8 months). The construction of the Project would produce VOC, CO, SOx, PM10, and PM2.5 emissions that do not exceed SCAQMD's regional thresholds. However, NOx emission during any concurrent grading and building construction phases in 2016 would exceed regional thresholds. Therefore, Project impacts related to regional construction emissions would be significant before implementation of mitigation measures.

C. *Mitigation Measures.* Since the Project could result in significant impacts from the Project's construction related to regional emissions impacts, the following Mitigation Measures MM-C-1 through MM-C-4 and Regulatory Compliance Measure RCM-C-6 will be required. With implementation of those measures, regional construction pollutant emissions of NOx would be reduced to below SCAQMD's significance threshold, primarily through the use of CARB-certified Tier IV engines and other best management controls. The Mitigation Measures would also substantially reduce localized emissions of PM2.5, primarily through the application of SCAQMD Rule 403. With implementation of

the following Mitigation Measures and Regulatory Compliance Measures, the Project's regional air emissions impacts related to construction would be less than significant.

Mitigation Measures MM-C-1 through MM-C-4 and Regulatory Compliance Measure RCM-6 will also reduce the Project's local construction emissions related to regional emission impacts to below SCQMD'S significance thresholds for impacts to sensitive receptors. Therefore, Project construction air quality impacts related to sensitive receptors would be less than significant.

Mitigation Measures

- **MM-C-1** – All off-road construction equipment greater than 50 hp shall meet U.S. EPA Tier 4 emission standards, where available, to reduce NOx, PM10, and PM2.5 emission at the Project Site. In addition, all construction equipment shall be outfitted with Best Available Control Technology ("BACT") devices certified by the California Air Resources Board ("CARB"). Any emissions control devise used by the contractor shall achieve emissions reductions that are no less than what could be achieved by a Level 3 diesel emissions controls strategy for a similarly sized engine as defined by CARB regulations.

- **MM-C-2** – Require the use of 2010 and newer diesel haul trucks (e.g., material delivery trucks and soil import/export) and if the Lead Agency determines that 2010 model year or newer diesel trucks cannot be obtained, the Lead Agency shall require trucks that meet U.S. EPA 2007 model year NOx emissions requirements.

- **MM-C-3** – At a time of mobilization of each applicable unit of equipment, a copy of each unit's certified tier specification, BACT documentation, and CARB or SCAQMD operating permit shall be provided.

- **MMC-C-4** – Encourage construction contractors to apply for SCAQMD "SOON" funds. Incentives could be provided for those construction contractors who apply for SCAQMD "SOON" funds. The "SOON" program provides funds to accelerate cleanup of off-road diesel vehicles, such as heavy duty construction equipment. More information on this program can be found at: http://www.aqmd.gov/home/programs/business/business-detail?title=off-road-diesel-engines.

To ensure that construction-related impacts remain less than significant, the Project must also comply with the following Regulatory Compliance Measure:

Regulatory Compliance Measure

- **RCM-C-6** – Construction activities shall comply with SCAQMD Rule 403, including the following measures:
  - Apply water to disturbed areas of the Site three times a day.
  - Require the use of a gravel apron or other equivalent methods to reduce mud and dirt trackout onto truck exit routes.
  - Appoint a construction relations officer to act as a community liaison concerning on-site construction activity including resolution of issues related to PM generation.
  - Limit soil disturbance to the amounts analyzed in the Final MND.

- All materials transported off-site shall be securely covered.
- Apply non-toxic soil stabilizers according to manufacturers' specifications to all inactive construction areas (previously graded inactive for ten days or more).
- Traffic speeds on all unpaved roads to be reduced to 15 mph or less.

### Construction Phase Impacts – Local Impacts

A. *Finding – Less Than Significant Impact with Implementation of Mitigation Measures*. The Proposed Project's construction related air emission impacts related to local impacts would be less than significant with implementation of Mitigation Measures MM-C-1 through MM-C-4. Compliance with Regulatory Compliance Measure RCM-C-6 would also ensure the local air emission impacts from the Project's construction remain less than significant. The impact would be less than significant.

B. *Facts in Support of Finding*. With respect to local air quality, the Project would produce emissions that do not exceed the SCAQMD's recommended localized standards of significance for criteria pollutants NO2 and CO during the construction phase. However, construction activities could produce PM2.5 emissions that exceed localized thresholds recommended by the SCAQMD, primarily from vehicle exhaust and fugitive dust emission from off-road construction vehicles during the site preparation and grading phases. Therefore, Project impacts related to local construction emissions would be significant before implementation of mitigation measures.

C. *Mitigation Measures*. Since the Project could result in significant impacts from the Project's construction related to local impacts, Mitigation Measures MM-C-1 through MM-C-4 and Regulatory Compliance Measure RCM-C-6 will be required. With implementation of the following Mitigation Measures and Regulatory Compliance Measures, the Project's local air emissions impacts related to construction would be less than significant.

### Greenhouse Gas Emissions

#### Project Construction

A. *Finding – Less Than Significant Impact with Implementation of Mitigation Measures*. GHG emission impacts from the Proposed Project's construction would be less than significant assuming implementation of Mitigation Measures MM-C-1 through MM-C-5.

B. *Facts in Support of Finding*. The Project's construction would emit GHG emissions through the combustion of fossil fuels by heavy-duty construction equipment and through vehicle trips generated by construction workers traveling to and from the Project Site. These emission would vary day to day over the 35-month duration of construction activities. The estimated GHG emissions assume implementation of Mitigation Measures MM-C-1 through MM-C-5, which would reduce combustion-related emissions associated with off-road construction equipment. Since there are no defined thresholds of significance for temporary emission of GHGs, construction emissions are considered as part of the long-term GHG impacts of the Proposed Project.

C. *Mitigation Measures*. Assuming compliance with Mitigation Measures MM-C-1 through MM-C-5, no additional mitigation measures are required, as no significant impacts

associated with GHG emissions from the Project's construction activities have been identified.

## Hazards and Hazardous Materials

### Soil Contamination

A. *Finding – Less Than Significant Impact with Implementation of Mitigation Measures.* The Project's construction activity, although temporary, would lead to potential impacts related to soil contamination. With incorporation of Mitigation Measures MM-F-1 through MM-F-2, impacts would be less than significant.

B. *Facts in Support of Finding.* A Phase I environmental assessment recognized some environmental concerns ("RECs") with the Project Site. Evidence of a release of petroleum hydrocarbons to soil was observed on one of the parcels on the Project Site ("Parcel B"). Soil impacted with petroleum hydrocarbons is also present beneath the southwest corner of the Project Site, likely as a result of the auto repair and auto upholstery facilities located on Parcel B. The majority of the impacted soil appears to be present at depths ranging from 6 to 15 feet. The Proposed Project's subterranean parking structure would require exaction in this area of the Project Site to a depth of approximately 20 feet, and petroleum hydrocarbon impacted soil would be excavated and removed during redevelopment of the Site. The concentrations of volatile organic compounds ("VOCs") from samples collected on the Project Site do not exceed thresholds that would classify the material as hazardous waste. If the material is excavated, the soil would be classified as nonhazardous waste based on applicable criteria for disposal purposes.

Elevated concentrations of lead were reported in soil samples collected from certain borings on the Project Site. Soil excavated from those areas would potentially be characterized as hazardous waste based on lead content. The City's geotechnical expert recommends that the soil in these areas be excavated prior to the start of construction so the soil can be characterized prior to shipment off-site. Soil samples should be collected from the bottom and sidewalls of the excavation to confirm the lead impacted soil has been removed.

Due to the potential to encounter soil contamination during the Project's construction phase, Project impacts related to the soil contamination would be potentially significant. With implementation of Mitigation measure MM-F-1 and MM-F-2 and Regulatory Compliance Measure RCM-F-3, impacted related to soil contamination would be reduced to a less than significant level.

During the Project's operation, hazardous waste releases through use or disposal may result in potential injury if exposure takes place, and, if not mitigated, result in soil and/or groundwater impacts. Compliance with applicable City, state, and federal regulations related to the handling, storage and disposal of hazardous waste would ensure that such impacts would be less than significant.

C. *Mitigation Measures.* Since the Proposed Project's construction would cause potential impacts to soil contamination, the following Mitigation Measures MM-F-1 and MM-F-2 will be required to reduce those impacts to a less than significant level. No regulatory compliance or project design features shall be required. With implementation of these

mitigation measures, impacts would be less than significant.

*Mitigation Measures*

> **MM-F-1** – Prior to issuance of grading permit, the Project Applicant shall prepare a Soil Management Plan ("SMP") for the Project. The SMP should address the delineation of the vertical and lateral extent of identified TPH and metals impacts in the Projects Site soil. Soil management procedures shall be described so that hazardous soil can be separated from non-hazardous soil during excavation tasks.
>
> - Soil management procedures outlined in the SMP shall be followed during the Project's excavation and development phases to properly manage the various classes of soil and to minimize risk to workers and the public during construction.

> **MM-F-2** – The soils in the areas on Parcels A and B with the potential for elevated concentrations of lead will be excavated prior to the start of construction and the excavated material will be stockpiled and characterized for disposal prior to shipment off-site. Soil samples will be collected from the bottom and sidewalls of the excavation to confirm the lead impacted soil has been removed.

## Noise

### Construction Noise

A. *Finding – Less Than Significant Impact with Implementation of Mitigation Measures.* The Project's construction-related activities, although temporary, would potentially expose sensitive receptors or the surrounding area to noise levels in excess of the City's CEQA thresholds of significance. With incorporation of Mitigation Measures MM-I-1 through MM-1-7, impacts would be less than significant.

B. *Facts in Support of Finding.* The City identified the following sensitive receptors near the Project Site: (i) single family residence at 3001 Genesee Avenue, approximately 280 feet east; (ii) single family residence at 5674 Spokane Avenue, approximately 225 feet to the east; (iii) multi-family residences on Corbett Street, including 5785 Corbett Street, approximately 455 feet to the south with a side yard that fronts La Cienega Boulevard; (iv) multi-family residences at 5673 Jefferson Boulevard, approximately 315 feet to the east; (v) Bandito Brothers Studio, a media company that has an audio and video studio at 3249 La Cienega Boulevard, approximately 40 feet north; and (vi) "The Mill" Studio, a digital audio and video studio at 3233 La Cienega Boulevard, approximately 40 feet north of the Project Site (collectively, "Sensitive Receptors").

During the demolition on the Project Site, construction, ground clearing, grading, structural, and other noise-generating activities would occur on the Project Site between the hours of 7:00 a.m. and 9:00 p.m. in accordance with the applicable provisions in the LAMC. Construction activities would generate noise that would vary over the 35 months of activity on- and off-site, and would include on-site equipment such as scrapers, tractors, loaders and small equipment such as saws, hammers, and pneumatic tools associated with the Project's construction. However, LAMC Section 112.05 states that between the hours of 7:00 AM and 10:00 PM., in any residential zone of the City or within 500 feet thereof, no person shall operate or cause to be operated any powered equipment or powered hand tool that produces a maximum noise level exceeding 75

dBA at a distance of 50 feet. This limit applies to construction equipment, including crawler-tractors, dozers, rotary drills and augers, loaders, power shovels, cranes, derricks, motor graders, paving machines, off-highway trucks, ditchers, trenchers, compactors, scrapers, wagons, pavement breakers, compressors, and pneumatic or other powered equipment. That limit shall not apply where compliance is technically infeasible. Technical infeasibility shall mean that the noise limit cannot be complied with despite the use of mufflers, shields, sound barriers and/or other noise reduction devices or techniques during the operation of the equipment.

The predicted noise levels at tenants adjacent to the Project Sites were based on computer-based modeling and consider the area's topography, attenuating structures, and other variables. A noise analysis conducted a reconnaissance of the Project Site and surrounding land uses to ascertain existing ambient noise levels. Noise readings were taken at 3249 South La Cienega Place, among other off-site locations. These noise readings were sufficient to ascertain ambient noise levels in the Project area in order to prepare modeling forecasts for future noise levels at nearby sensitive receptors. Given the ambient conditions in the neighborhood and the proximity of nearby receptors, potentially significant temporary and intermittent noise impacts could occur at The Mill Studio directly north of the Project Site, the Bandito Brothers studio directly north of the Project Site, and at the residence located at 5674 Spokane Street. However, with implementation of Mitigation Measures MM I-1 through I-7, construction noise levels would not exceed the significance threshold in LAMC section 112.05 (75 dBA) and would also reduce the noise level associated with construction of the Project to the maximum extent that is technically feasible. As a result, the construction noise levels would be less than significant.

Additionally, through compliance with the mitigation measures listed below, the Project will address potential construction noise impacts through any combination of sound barrier and sound blanket and/or operational strategies (e.g., maximizing distance of equipment from nearby sound studios). There are feasible designs for sound barriers and sound blankets that achieve these industry performance standards. Sound barriers can reduce sound levels by up to 20 dBA. Mitigation Measures MM-I-1 through MM-I-7 focus on reducing the Project's construction-related noise by up to 20 dBA. That performance standard will require a blend of strategies, including the erection of sound barriers that should consider the following:

> Location: In general, barriers should be located as feasibly close to construction equipment and break the line-of-sight to off-site receptors.

> Height: Barriers should break the line-of-sight from ground-level noise sources (e.g., bulldozers, grades) to ground level studio receptors. Each additional meter in height produces up to 1.5 dBA in additional attenuation. Note that construction above the ground level (e.g., framing, buildout) would use smaller equipment (e.g., saws, hammers, pneumatic tools) that generate far less noise and would be further attenuated by the longer distances to the receptors.

> Width: To ensure that noise from the construction site does not come around the ends, the sound barrier should be designed at the appropriate length beyond the distance from the receptor to the barrier.

Materials: Barriers should be made of noise-resistant material sufficient to achieve a Sound Transmission Class ("STC") rating of 30 or greater based on certified sound transmission loss data taken pursuant to ASTM Test Method E90. These barriers should be constructed of 3/4 –inch plywood sheeting or other material having a surface weight of four pounds per square foot or greater and be lined on one side with glass fiber, mineral wool, or other noise-absorbing material that is at least two inches thick. In general, a doubling of a barrier's massing can reduce noise transmission by 5dBA. Using exterior grade acoustical blankets to provide additional sound absorption will be needed.

Those operational controls can produce up to 5-15 dBA and potentially more with an even more aggressive design of sound barriers. Sound barriers can be paired with engineering controls that are applied to noise sources and can produce up to another 5dBA of reductions. Such controls include, but are not limited to: (i) use of mufflers on internal combustion engine exhaust and intakes; (ii) use of rubber tired equipment in place of steel-track equipment; (iii) stage and warm up construction equipment away from off-site receptors.

The loudest construction noise levels occur during the initial construction phase, when grading, excavation, and installation of subterranean building supports occur. The higher noise levels that occur during this phase at ground level are primarily associated with the running of diesel engines in equipment such as bulldozers, trucks, caisson drills, and jackhammers. Installation of the sound barriers/blankets described in the mitigation measures would shield sensitive receptors from the source of the noise, thereby breaking the sound path and attenuating noise levels during construction to the performance standards identified in the Project's EIR. The class of construction equipment used after the initial construction phase and during construction of the upper stories of the structure changes from diesel-engine powered equipment with high noise levels to primarily hand-held devices, such as hammers, drills, and saws that have a much lower noise profile than the construction equipment in the first phase. Also, as construction activities move higher up, the further the noise levels would be from nearby sensitive receptors. The analysis of the construction phase impacts is conservatively based on equipment that would be used during the initial construction phase that would generate the highest noise levels. All construction noise that would occur after the initial construction phase would not generate noise levels in excess of those disclosed in the Project's EIR.

With respect to off-site construction-related noise impacts, about 800 heavy-duty truck trips are expected to haul demolition materials from the Project site to the Adelanto landfill and Long Beach landfill. During the grading phase, about 13,900 haul truck trips are expected to remove up to 195,000 cubic yards of cut materials from the Project Site to the Scholl Canyon landfill and the Adelanto landfill. Streets to the Adelanto and Scholl Canyon landfills are predominantly commercial or industrial areas and generally do not have residential uses or other noise-sensitive uses. Streets to the Long Beach landfill are predominantly commercial and industrial areas and include homes and other noise-sensitive uses. While such vehicle activity would marginally increase ambient noise levels along local roadways, trips would not increase ambient noise levels by 5 dBA at sensitive receptors. Further, under the City's CEQA Thresholds Guide, a 3 dBA increase in roadways noise levels requires an approximately doubling of roadway traffic volume, and the haul trips along La Cienega Boulevard or Fairfax would not approach a doubling of traffic volumes. The haul trips to Long Beach would generate negligible increases in

ambient noise along La Cienega Boulevard. As a result, the Project's impact related to off-site construction-related noise levels would be less than significant.

C. *Mitigation Measures*. Since the Proposed Project could lead to impacts associated with noise in excess of applicable standards, the following Mitigation Measure MM-I-1 through MM-I-7 shall be required to reduce those associated impacts to a less than significant level:

*Mitigation Measures*

**MM-I-1** – The Project shall comply with the City of Los Angeles Building Regulations Ordinance No. 178048, which requires a construction site notice to be provided that includes the following information: job site address, permit number, name and phone number of the contractor and owner or owner's agent, hours of construction allowed by code or any discretionary approval for the site, and City telephone numbers where violations can be reported. The notice shall be posted and maintained at the construction site prior to the start of construction and displayed in a location that is readily visible to the public.

**MM-I-2** – Two weeks prior to commencement of construction, notification shall be provided to the off-site residential and studio uses within 500 feet of the Project site that discloses the construction schedule, including the type of activities and equipment that would be used throughout the duration of the construction period.

**MM-I-3** – A combination of temporary sound barriers that are capable of achieving a sound attenuation of up to 20 dBA as outlined in the EIR (including Appendix B to the Final EIR) and as determined by the Department of Building and Safety, and capable of blocking the line-of-sight from ground level construction equipment powered by internal combustion engines to the adjacent studios and other commercial properties to the immediate north of the Proposed Project Site shall be installed as feasible.

**MM-I-4** – Temporary sound barriers that are capable of achieving a sound attenuation of up to 5 dBA as determined by the Department of Building and Safety and capable of blocking the line-of-sight from ground level construction equipment powered by internal combustion engines to the residences east of La Cienega Boulevard shall be installed as feasible.

**MM-I-5** – All powered construction equipment shall be equipped with exhaust mufflers or other suitable noise reduction devises.

**MM-I-6** – All construction areas for staging and warming-up equipment shall be located as far as feasibly possible from adjacent recording studios to the north of the Project Site.

**MM-I-7** – Portable noise sheds for smaller, noisy equipment, such as air compressors, dewatering pumps, and generators shall be provided.

No regulatory compliance measures or project design features shall be required.

**Cumulative Impacts**

A. *Finding – Less Than Significant Impact with Implementation of Mitigation Measures.* The project, in conjunction with the Related Project, could lead to significant impacts related to noise during the Project's construction. With incorporation of Mitigation Measures MM-I-1 through MM-I-7, impacts would be less than significant.

B. *Facts in Support of Finding.* Construction activities would substantially increase ambient noise levels at off-site locations, particularly sensitive receptors adjacent to the Project Site. The City's 2006 Draft LA CEQA Thresholds Guide suggests that any other construction activities that would occur within 500 feet of noise sensitive uses be considered for further evaluation. One potential related project within 500 feet of the Sensitive Receptors could contribute to cumulative construction noise impacts if built concurrently with the Project (proposed 16-story 137,687-square-foot office complex at 5790 West Jefferson Boulevard approximately 135 feet southwest of the Project Site). While it is not anticipated that construction of these two projects would occur concurrently, the City undertook a conservative analysis to consider a worst-case scenario of concurrent construction. Under that analysis, cumulative construction noise impacts are considered to be potentially significant given the projected increases in ambient noise levels before mitigation. However, Mitigation Measures MM I-1 through MM I-7 would reduce the Project's contribution to cumulative noise impacts from on-site construction activities to less than significant levels. Further, appropriate mitigation of the construction impacts of other related projects in the vicinity of the Project Site would substantially reduce noise impacts below the 5-dBA audible threshold of significance.

Off-site construction-related noise impacts, haul trucks, and other on-road vehicles could generate noise. Yet the addition of any truck trips would marginally increase ambient noise along haul route roads, as the truck deployment that would occur onto local streets would not happen simultaneously, but rather would be phased over the course of site preparation, grading, and construction phases. As such, off-site noise would not increase substantially from cumulative construction traffic, and impacts would be less than significant.

For the Project's operation, the majority of any long-term noise impacts would come from traffic traveling to and from the Project Site. However, the Project's incremental contribution to permanent off-site ambient noise levels along local roads would be negligible. Therefore, the Project's individual and cumulative mobile source noise impacts would be less than significant. Additionally, the Project's on-site operations would produce negligible increases in ambient noise levels at nearby sensitive receptors. As a result, any stationary noise increase impact would be less than significant.

C. *Mitigation Measures.* Mitigation Measures MM-I-1 through MM-I-7 shall be required to ensure the Project's potential cumulative noise impacts related to the Project's construction remain less than significant. With incorporation of those mitigation measures, impacts would be less than significant.

**Public Services – Police Services**

### Construction

A. *Finding – Less Than Significant Impact with Implementation of Mitigation Measures*. The Project's construction could result in adverse physical impacts associated with the provision of new or physically altered police protection facilities in order to maintain acceptable service rations, response times, or other performance objectives. However, incorporation of mitigation Measures MM-K.2-1 through MM-K.2-4 would reduce those impacts to less than significant levels. The impact would be less than significant.

B. *Facts in Support of Finding*. Construction sites could be sources of attractive nuisances, providing hazards and inviting theft and vandalism that could result in an increase in demand for police protection services. However, the Project Site is generally shielded from access on the west side by existing adjacent buildings and an existing fence on the north side adjacent to the alley. The east side along La Cienega is shielded with vegetation and fencing. The south side is shielded with existing buildings that would be removed. Further, fencing and other security features, as necessary, would be provided at the Project Site during construction pursuant to Mitigation Measures MM-K.2-1 and MM-K.2-2. Security measures would ensure that valuable materials and construction equipment are not easily stolen or abused. The Project would also provide security on the Project Site as needed and appropriate during phases and course of the construction process. The security includes perimeter fencing, lighting, and safety guards, thereby reducing the demand for LAPD services. (See Mitigation Measures MM K.2-1 and Mm K.2-2). Construction impacts as they relate to increased on-site demand during construction would be less than significant with implementation of mitigation measures.

Additionally, the Project's construction would not be expected to affect LAPD's ability to respond to emergencies to the extent that there would be a need for any additional new or expanded police facilities. While minor traffic delays due to lane closures would occur during construction, impacts to police response times are considered to be less than significant because (1) emergency access would be maintained to the Project Site during construction through marked emergency access points approved by the LAPD; (2) construction impacts are temporary in nature and do not cause lasting effects; and (3) drivers of emergency vehicles can respond to partial lane closures through a variety of options to avoid traffic, such as using sirens or driving in lanes of opposing traffic.

C. *Mitigation Measures*. Since the Proposed Project's construction could impact on police protection services, the following mitigation measures MM-K-2.1 through MM-F-2.4 shall be required to reduce those impacts to a less than significant level. Project Design Feature PDF-K.2-5 shall also be required to ensure the Project's construction impacts related to police protection services remain less than significant. No regulatory compliance measures shall be required.

Mitigation Measures
- **MM-K.2-1** – Temporary construction fencing shall be placed along the periphery of the active construction areas to screen as much of the construction activity from view at the local street level and to keep unpermitted persons from entering the construction area.

The perimeter fence shall have gates installed to facilitate the ingress and egress of equipment and the work force. The bottom of the fence, when necessary, shall have filter fabric to prevent silt run off. Straw hay bales shall be utilized around catch basins when located within the construction zone. The perimeter and silt fence shall be maintained while in place. Where applicable, the construction fence shall be incorporated with a pedestrian walkway. Temporary lighting shall be installed and maintained at the pedestrian walkway. Should sections of the site fence have to be removed to facilitate work in process, barriers and or K-rail shall be utilized to isolate and protect the public from unsafe conditions.

- **MM-K.2-2** – The Project Applicant shall provide for the deployment of a private security guard to monitor and patrol the Sites, appropriate to the phase of construction throughout the construction period. The patrol shall be deployed at times that are typical within the local-area construction industry for a Project of this size.

- **MM-K.2-3** – The plans shall incorporate the design guidelines relative to security, semi-public and private spaces, which may include but not to be limited to access control to building, secured parking facilities, walls/fences with key systems, well-illuminated public and semi-public space to eliminate areas of concealment, location of toilet facilities or building entrances in high-foot traffic areas, and provision of security guard patrol throughout the project site if needed. Please refer to "Design out Crime Guidelines: Crime Prevention through Environmental Design," published by the Los Angeles Police Department. Contact the Community Relations Division, located at 100 W. 1st Street, #250, Los Angeles, CA 90012; (213) 486 – 6000. These measures shall be approved by the Police Department prior to the issuance of building permits.

- **MM-K.2-4** – The Project Applicant shall provide the LAPD with a diagram of each portion of the Project Site, showing access routes and additional access information as requested by the LAPD, to facilitate police response.

Project Design Feature
- **PDF-K.2-5**: Emergency access shall be maintained to the Project Site during construction through marked emergency access points approved by the LAPD.

#### Operation

A. *Finding – Less Than Significant Impact with Implementation of Mitigation Measures.* The Proposed Project's operation would not result in substantial adverse physical impacts associated with the provision of new or physically altered police protection facilities in order to maintain acceptable service rations, response times, or other performance objectives. Implementation of Project Design Feature PDF-K.2-6 would ensure the Project's operational impacts related to police protection remain less than significant. Impacts would be less than significant.

B. *Facts in Support of Finding.* The Project would generate new residents, visitors, and employees, and would also increase the amount of developed square footage on the Project Site. The LAPD does not maintain minimum officer-to-resident population ratio objectives, however, the data can serve as a useful metric to gauge the effect of a

proposed project on service levels and response times. The Project's additional 3,289 residents would require approximately 7 additional officers to maintain the current ratio of 1 officer per 536 residents. The Southwest Community Police Station approximately 4.5 miles east of the Project Site serves the Project Site and has 356 sworn police officers. The demand for 7 additional officers to maintain current resident service ratios would not require the expansion, consolidation, or relocation of this station.

To address the potential additional crime in the Project area due to the population growth and the employee increase in daytime population, the Project would include security features within the parking facilities and exterior building areas such as appropriate lighting and gated access. The most common crimes in the area served by the Southwest Community Police Station are burglary from vehicles and personal or other theft. By providing natural surveillance (visibility from streets and sidewalks) and natural access control (landscaping buffers and other distinctions between public and private spaces), the Projects can be designed to reduce crime. The Project would have defensible spaces designed to reduce opportunity crimes and ensure safety and security. In addition, the lighting and landscaping design would ensure high visibility, and the Project would provide for on-site security measures and controlled access systems for residents and tenants to minimize the demand for policy protection services. Through Project Design Feature K.2-6, the Project would incorporate crime prevention features into the design.  The Project would also provide the LAPD with a diagram of each portion of the Project Site, showing access routes and additional access information as requested by the LAPD to facilitate police response. Emergency access to the Project Site would be provided by the existing street system.

The Project would also not conflict with, or impede implementation of, any of the policies or goals related to police protection described in the Framework Element of the City's General Plan or the West Adams Community Plan, which describe planning of facilities. Additionally, the Project would contribute to the City's General Fund through the generation of revenue, which would help LAPD achieve progress toward its goal to ensure adequate police facilities and protective services for existing and future population and land uses.

The Project's direct minimal population increase and associated demand for police services, along with the provision of on-site security features, coordination with LAPD, and incorporation of crime prevention features would not require the provision of new or physically altered stations in order to maintain acceptable service ratios or other performance objectives for police protection. Therefore, impacts on the LAPD would be less than significant.

C. *Mitigation Measures.* No additional mitigation measures are required, as no significant impacts associated with police services have been identified. However, compliance with Mitigation Measures MM K.2-3 and K.2-4 shall ensure that the Project's impacts to police services will remain less than significant. Additionally, the Project shall comply with the following Project Design Feature to ensure the Project's impacts to police protection services remain less than significant:

Project Design Feature
- **PDF-K.2-6**: The Project shall provide for on-site security measures and controlled access systems for residents and tenants to minimize the demand for police protection services. These measures include, but are not limited to, the

following:

- Perimeter lighting to supplement the street lighting and to provide increased visibility and security;
- On-site security personnel, commensurate to similar/comparable residential and retail projects of its size, as needed.
- Parking Structure Access Control; and
- Residential Units Access Control.

## Transportation and Traffic

### Construction

A. *Finding – Less Than Significant Impact with Implementation of Mitigation Measures.* The Project's construction could lead to potential traffic impacts on roadway operations curing period curb lane closures along La Cienega Boulevard and Jefferson Boulevard. However, those impacts will be temporary. With incorporation of Mitigation Measures MM-L-10 and MM-L-11, impacts associated with traffic from the Project's construction would be less than significant.

B. *Facts in Support of Finding.* The City's CEQA Thresholds Guide identifies four types of in-street construction impacts, including: (1) temporary traffic impacts – potential impacts on vehicular travelers on roadways; (2) temporary loss of access – potential impacts on visitors entering and leaving sites; (3) temporary loss of bus stops or rerouting of bus lines – potential impacts on bus travelers; (4) temporary loss of on-street parking – potential impacts on parkers. Traffic impacts from construction activities could occur as a result of the following types of activities: (i) increases in truck traffic associated with export of fill materials and delivery of construction materials; (ii) increases in automobile traffic associated with construction workers traveling to and from the site; (iii) reductions in existing street capacity or on-street parking from temporary lane closures necessary for the construction of roadway improvements, utility relocation, and drainage facilities; and (iv) blocking existing vehicle or pedestrian access to other parcels fronting street.

Two separate construction processes were specifically evaluated for the Project's construction traffic impacts: (i) the "grading" component; and the (2) "construction" component. The grading component includes heavy vehicles that are predominantly oriented toward freeway routes. The construction component is comprised of more employee trips in passenger vehicles that have diverse destinations more similar to the Project's distribution assumptions. The Project would follow the LAMC's limits on construction activities, which limits construction to weekdays between 7:00 AM and 9:00 PM and Saturdays between 8:00 AM and 5:00 PM, which no construction activity on Sundays.

*Grading Component*

For purposes of analysis, heavy vehicles are converted into passenger car equivalencies ("PCEs"). Transportation Research Circular NO. 212, Interim Materials of Highway Capacity (Transportation Research Board, 1980) defines PCE for a vehicle as the number of through moving passenger cars to which it is equivalent based on the vehicle's headway and delay-creating effects. Truck destinations for the grading component would be to/from Scholl Canyon and Adelanto. Additionally, the grading phase anticipates 12 employees per day. Based on a factor of 2.0 trips per truck applied to calculate the PCE, truck traffic for the grading period would generate 500 one-way

trips per day (or 1,000 two-way trips). A PCE factor of 2.0 is conservative compared to the Highway Capacity manual ("HCM") standard of using 1.5 for large trucks and buses operating on level terrain, which is consistent with the terrain surrounding the Project Site. With a conservative assumption that each employee arrives during the morning peak hour and leaves during the evening peak hour, this adds a total of 24 trips per day. The vendor would add two inbound trips in the morning and two outbound trips in the evening, for a worst-case construction activity grading day of 1,028 trips.

To evaluate the Project's grading impacts on peak-hour traffic through the Study area, 10 percent of truck traffic was estimated to occur during both the morning and evening peak hours, with 100 percent of the employees and vendors entering into the morning peak hour and exiting in the evening peak hour. That assumption estimated 114 morning peak-hour trips and 102 evening peak-hour trips.

For haul routes, trucks would use the most convenient access to freeway ramps with destinations to Adelanto and Scholl Canyon during the grading task. The truck haul routes would comply with the approved truck routes designed within the City and/or adjacent jurisdictions. Trucks traveling to and from the Project Site must travel along the designated truck route. Ultimate routes would be determined through the construction management plan process pursuant to Mitigation measure MM-L-11.

Significant construction impacts from the Project's grading would occur at three intersections: (i) Fairfax Avenue/Washington Boulevard; (ii) Fairfax Avenue/Adams Boulevard; (iii) La Cienega Boulevard/Fairfax Avenue. The Project's Traffic study already identified these three intersections as having unavoidable significant impacts with completion of the project. Implementation of Mitigation Measures MM-L-10 through MM-L-11, as described below, will reduce those impacts to less than significant levels.

*Construction Component*
Construction activities are planned over a 28-month period and include a maximum of 300 employees per day, and 50 vendor trips per day. Heavy truck traffic would not be required as part of this process.

Using a conservative assumption of 100 percent of all worker vehicles entering the site during morning peak hour and 100 percent exiting during the evening peak hour, the construction component would generate 310 morning peak-hour trips and 310 evening peak-hour trips. Those estimates assume vendor vehicle trips would occur through the day, with 10 percent estimated to occur during both peak periods.

The Project's Traffic Study estimates the Project's operation would generate 319 inbound morning peak-hour trips and 382 exiting peak-hour trips. Thus, the density of traffic from the Project's operation is comparable to the expected construction employee/vendor traffic. The impacts identified in the Traffic Study adequately cover the amount of employee/vendor traffic expected over the 28-month period of construction. No new significant traffic impacts would occur as a result of the construction component of the construction process.

Additionally, through Mitigation Measure MM-L-11, the Project will be required to prepare and implement a Construction Management Plan to control traffic during the Project's construction phase and to minimize construction-related traffic impacts to the maximum extent feasible. The City requires preparation and implementation of Construction

Management Plans for all development in the City that could affect traffic and roadways during construction. Implementation of construction-related traffic control plans as a matter of regulation by the City is the performance standard that must be met by the Project Applicant. It is possible that the City may impose measures that minimize the percentage of the Project's construction employees who travel to and from the Project Site outside of peak traffic periods, thereby minimizing the number of construction employee that could contribute to peak-hour traffic. As part of the Construction Management Plan, no aspect of the Project's construction would be allowed to block access to adjacent users. The Construction Management Plan would indicate where construction staging would occur and a haul route. The complete Construction Management Plan would be presented for approval to LADOT prior to the initial grading permit in accordance with LADOT policy.

With respect to parking during construction, it is anticipated that all construction employees would be required to park on the Project Site and would not be allowed to park on adjacent surface streets. As part of the Construction Management Plan and in consultation with the City's Building and Safety Department, it might be determined that off-site parking and shuttling of construction employees would be a better option for getting construction employees to and from the Project Site. Under either parking option, the Project's impacts related to traffic construction will remain less than significant.

Construction impacts due to the temporary loss of bus stops or rerouting of bus lines and the temporary loss of on-street parking are typically considered short-term adverse impacts to transit riders and parkers. LADOT has not established a significance threshold for such impacts, although these temporary impacts could have the potential to occur. These potential temporary impacts would be mitigated through implementation of a Construction Management Plan pursuant to Mitigations Measure MM-L-11.

With respect to cumulative impacts during the Project's construction, there is one potential related project in close proximity to the Project Site that could result in cumulative construction impacts if built concurrently with the Project. A proposed 16-story, 137,687-square-foot office complex at 5790 West Jefferson Boulevard could lead to concurrent activities approximately 135 feet southwest of the Project Site. However, any possible overlap of construction, and impacts attributable to construction traffic from concurrent construction, would be addressed through the City's ongoing construction management plans (as described below in Mitigation Measure MM-L-11), which would also be required for each of the Related Projects.

C. *Mitigation Measures*. Since the Project's construction could temporarily cause potentially short-term significant impacts, mitigation measures MM-L-10 through MM-L-11 shall be required to ensure the Project's construction impacts related to traffic remain less than significant. No regulatory compliance measures or project design features shall be required. With incorporation of the following mitigation measures MM-L-10 through MM-L-11, impacts will be less than significant:

Mitigation Measures
- **MM-L-10** - LADOT recommends that a construction work site traffic control plan be submitted to LADOT's Hollywood District Office for review and approval prior to the start of any construction work. The plan should show the location of any roadway or sidewalk closures, traffic detours, haul routes, hours of operation, protective devices, warning signs, and access to abutting properties. LADOT also

recommends that construction related traffic be restricted to off-peak hours. LADOT shall consult with Culver City regarding the review of the construction work site traffic control plan.

- **MM-L-11** - A detailed Construction Management Plan, including street closure information, detour plans, haul routes, and staging plans would be prepared and submitted to the City for review and approval. The Construction Management Plan would formalize how construction would be carried out and identify specific actions that would be required to reduce effects on the surrounding community. The Construction Management plan shall be based on the nature and timing of the specific construction activities and other projects in the vicinity of the Project Site, and should include the following elements as appropriate:

  - Prohibition of construction worker parking on adjacent residential streets;
  - Provisions to prohibit construction equipment or material deliveries within the public right-of-way;
  - Provisions for temporary traffic control during all construction activities adjacent to public right-of-way to improve traffic flow on public roadways (e.g., flag men);
  - Scheduling of construction activities to reduce the effect on traffic flow on surrounding arterial streets;
  - Rerouting construction trucks to reduce travel on congested streets to the extent feasible;
  - Construction-related vehicles shall not park on surrounding public streets;
  - Provisions of safety precautions for pedestrians and bicyclists through such measures as alternate routing and protection barriers;
  - Provisions to accommodate the equipment;
  - Scheduling of construction-related deliveries to reduce travel during commuter peak hours as identified in this study; and
  - Obtaining the required permits for truck haul routes from the City prior to issuance of any permit for the Project.

  LADOT shall consult with Culver City regarding the review of the Construction Management Plan.

## VIV.   ENVIRONMENTAL IMPACTS FOUND TO BE SIGNIFICANT AND UNAVOIDABLE

### Air Quality

#### Operational Phase Impacts – Regional Impacts

A. *Finding – Significant and Unavoidable with Implementation of Mitigation Measures.* The Proposed Project's operational emissions would not exceed the SCAQMD's regional significance thresholds for SOx, PM10, or PM2.5 emissions. However the Project's operational emissions would exceed the regional thresholds for VOC, NOx, and CO, primarily from mobile source emissions associated with vehicle travel to and from the Project Site. With implementation of all feasible mitigation measures, impacts would be significant and unavoidable.

B. *Facts in Support of Finding.* With respect to regional emissions, the Project would produce long-term air quality impacts to the region primarily from motor vehicles that

access the Project Site. Based on the added motor vehicle trips, operational emission would not exceed SCAQMD's regional significance thresholds for SOx, PM10, and PM2.5. However, the Project would exceed the regional thresholds for VOC, NOx, and CO, primarily from mobile source emissions associated with vehicle travel to and from the Project Site. Therefore, Project impacts related to regional operational emission would be significant before implementation of mitigation measures.

C. *Mitigation Measures.* Since the Project's operation could result in significant impacts related to regional emissions, the following Mitigation Measure MM-C-5 and Regulatory Compliance Measure RCM-C-7 through RCM-C-10 will be required. With implementation of those measures, local operational emissions of PM2.5 would be reduced to below SCAQMD's significance threshold. However, the mitigation measure and regulatory compliance measures would not reduce the Project's regional operational VOC, NOx, and CO emissions to below SCAQMD's significance thresholds, and Project impacts related to regional operational emissions would be significant and unavoidable. Mitigation Measure MM-C-5 and Regulatory Compliance Measure RCM-7 through RCM-10 would also reduce the Project's operational and construction emissions to below SCAQMD's significance thresholds for impacts to sensitive receptors. Therefore, Project's operational air quality impacts related to sensitive receptors would be less than significant.

Mitigation Measure
 **MM-C-5** – Hearths and fireplaces shall be excluded from residential units.

There are no other feasible mitigation measures to reduce regional VOC, NOx, and CO emissions.

To further ensure that operation-related impacts remain less than significant, the Project must also comply with the following regulatory compliance measures:

Regulatory Compliance Measures

 **RCM-C-7** – All diesel-fueled commercial heavy- and medium-duty vehicles shall comply with CARB's regulations limiting idling (Title 13 Section 2485). This includes no idling of primary diesel engines for more than five minutes and not using diesel-fueled auxiliary power systems to power cab functions (e.g., heating, air conditions) for more than five minutes when within 100 feet of restricted areas.

 **RCM-C-8** – Architectural coatings and solvents applied during construction activities shall comply with SCAQMD Rule 1113, which governs the VOC content of architectural coatings.

 **RCM-C-9** – Any stationary sources of emissions shall comply with SCAQMD rules and regulations, including Regulation XIII, which governs New Source Review for major stationary sources.

 **RCM-C-10** – Any restaurants that include chain-driven charbroilers shall comply with SCAQMD Rule 1138, which requires use of catalytic oxidizer controls.

 **Cumulative Impacts**

A. *Finding – Significant and Unavoidable with Implementation of Mitigation Measures.* The

Proposed Project's impacts in conjunction with the Related Projects would lead to significant and unavoidable impacts with respect to regional operational VOC, NOx, and CO emissions. Other cumulative impacts from the Proposed Projects associated with air quality would be less than significant.

B. *Facts in Support of Finding.* The SCAQMD thresholds are also used to evaluate cumulative impacts because those thresholds take into account the regional conditions of the air basin. SCAQMD recommends that any construction-related emission and operational emissions from individual development projects that exceed the project-specific mass daily emissions thresholds also be considered cumulatively considerable. SCAQMD neither recommends quantified analyses of the emission generated by a set of cumulative development projects nor provides thresholds of significance to be used to assess the impacts associated with those emissions.

Concerning construction-related impacts, the Project would generate regional construction NOx emission and local construction PM2.5 emissions in excess of SCQAMD's significance thresholds. However, with implementation of Mitigation Measures C-1 through C-4 and Regulatory Compliance Measure C-6, the Project's generation of these emissions would fall below the significance thresholds and no significant impacts related to regional and local construction emissions would occur. Therefore, the Project would not contribute to any potential cumulatively considerable construction air quality impacts.

During its long-term operation, the Project would generate regional operational VOC, NOx, and CO emissions and local operational PM2.5 emissions in excess of SCAQMD's significance thresholds. Mitigation Measure C-5 that prohibits wood hearths and fireplaces would reduce combustion-related emissions and would reduce the local operational PM2.5 emissions to below SCAQMD's significance threshold. However, the mitigation measures would not reduce the Project's regional operational VOC, NOx, and CO emission to below SCAQMD's significance thresholds, and Project impacts related to regional operational emission would be significant and unavoidable. Therefore, the Project's contribution to cumulative regional pollutant emission would be significant and unavoidable.

With regards to sensitive receptors, SCAQMD recommends consideration of localized impacts associated with potential "hotspots" of CO, PM 2.5, and NO2 emissions on shared sensitive receptors. The existing or reasonable foreseeable sensitive receptors near the Project Site include: (1) single family residences on Spokane Avenue (approximately 225 feet to the east); (2) multi-family residences on Corbett Street (approximately 455 feet to the south); and (3) multi-family residences at 5673 Jefferson Boulevard (approximately 315 feet to the east). Application of the SCAQMD's localized significance thresholds to each project on the Related Projects list in the local area would help determine whether any Related Projects would produce localized hotspots of CO, PM2.5, PM10, and NO2. The SCAQMD's localized significance threshold recognize the influence of a receptor's proximity. If a project exceeds the SCAQMD's thresholds, then the project would have to perform detailed air dispersion modeling and/or provide mitigation for any significant localized emissions. Since the Project's mitigation emissions of CO, PM2.5, PM10, and NO2 do not exceed the SCQAMD's screening thresholds, each Related Project is required to comply with the requirements of SCAQMD's localized significance threshold program, cumulative impacts associated

with emission of CO, PM2.5, PM10, and NO2 during construction on local sensitive receptors would be less than significant.

Finally, cumulative impacts on regional ozone air quality are judged by a project's consistency with the SCAQMD's 2012 Air Quality Management Plan ("AQMP"). The AQMP works with the Southern California Association of Governments ("SCAG") to forecast population growth for the region and develop a long-term attainment plan to accommodate the air pollution impacts from such growth. While the Project would increase population in the city by approximately 3,289 persons, it would not jeopardize the region's attainment of air quality standards. The Project is consistent with the City's General Plan and with population growth projections used by SCAG to identify future air quality emissions that must be mitigated through the 2012 AQMP. The Project is consistent with regional population growth projections used by SCAG to identify future air quality emissions that must be mitigated through the 2012 AQMP. Population increases from this or any other project are difficult to quantify, but the regional emission inventory for the 2012 AQMP can accommodate some population variation in the actual build out of projected growth. Therefore, the Project is consistent with the SCAQMD's 2012 ACQMP, and would have a less than significant cumulative effect on regional ozone air quality.

C. *Mitigation Measures*. Since the Proposed Project's construction would have cumulative impacts associated with air quality, Mitigation Measures MM-C-1 through MM-C-4 and Regulatory Compliance Measure shall be required to reduce those impacts to a less than significant level. With implementation of those measures, the Project's construction related impacts would fall below the significance thresholds, and no significant impacts related to regional and local construction emissions would occur. Therefore, the Projects would not contribute to any potential cumulatively considerable construction air quality impacts. For the Project's operational emissions, Mitigation Measure MM-C-5 would not reduce the Project's regional operational VOC, NOx, and CO emission to below SCAQMD's significance thresholds, and Project impacts related to cumulative regional operational emissions would be significant and unavoidable. Therefore, the Project's contribution to cumulative regional pollutant emissions would be significant and unavoidable.

## Transportation and Traffic

### Impacts to Existing Conditions With the Project

A. *Finding – Significant and Unavoidable with Implementation of Mitigation Measures.* While the Proposed Project's traffic impacts would exceed the significance threshold at 19 of the 58 intersections studies in the Study Area, with incorporation of Mitigation Measures MM-L-1 through MM-L-9, Regulatory Compliance Measures RCM-L-12 through RCM-L-13, and Project Design Feature PDF-L-14, the Project's impacts will be reduced to less than significant levels at all but eight of those intersections.

B. *Facts in Support of Finding.* The Project's trip generation was estimated using rates published for apartment, shopping center, and high-turnover restaurant developments in the Institute of Transportation Engineer's *Trip Generation, 9th Edition.* Vehicular trip generation rates were also reduced in consultation with LADOT and consistent with its *Traffic Study Policies and Procedures* appropriately to account for public transit usage, walk-ins, and pass-by trips. Due to the Project's proximity to the fixed rail station, a 25

percent credit is allowed for transit/walk-in users. (Culver City uses the same trip credit for transit-oriented development projects located in Culver City.) The Project is a transit-oriented development, since it is located directly across the street from the Metro LRT Station at Jefferson and La Cienega Boulevards, with clear and convenient access to capitalize on the City's shift toward reducing passenger vehicles from the arterial network. LADOT approved the 25% transit reduction prior to analysis. Additionally, due to the mixed-use Project components, vehicle trips will be shared within multiple uses. A person who arrives for an office job may also utilize the grocery store or restaurant, which would not require an additional vehicular trip. This is typically called "internal capture" and accounts for these types of non-vehicular trips. To calculate the appropriate internal capture rate, a spreadsheet developed by the National cooperative Highway Research Program ("NCHRP") was applied to the land use densities for the Project. Mixed-use internal capture output was calculated by the spreadsheet and credited to the Project's trip generation. The NCHRP methodology is included in the Institute of Transportation Engineers Trip Generation Handbook, August 2014 (Chapter 6), and considers many project-specific design features that are deliberately proposed to reduce traffic trips, including (but not limited to) the number and magnitude of complementary land uses, layout of land uses, proximity between land uses, and competing opportunities outside of the development. The NCHRP methodology is supported by the same development network that publishes the Trip Generation Rates used for the analysis and supported by local agencies throughout greater Los Angeles and across the country. The NCHRP methodology is indicative of the progressive movement by many California agencies interested in developing mixed-use projects near transit stations that have the real capability to reduce external vehicular traffic through on-site land-use interaction.

Since some existing uses currently operate on the Project Site (including 20,000 square feet of light industrial and 43,313 square feet of office use), the Project is allowed to apply credit for the traffic currently utilizing the site since these vehicle trips were on the circulation network at the time of the traffic counts. After accounting for those adjustments, the Project would generate a net increase of 10,136 total daily weekday trips, including 737 morning peak-hour trips (319 inbound, 419 outbound) and 849 afternoon peak-hour trips (467 inbound, 382 outbound).

The geographic distribution of the Project's generated trips is dependent on the location of employment and residential centers from which residents and patrons of the Project would be drawn, characteristics of the street system serving the Project Site, and the level of accessibility of the routes to and from the Project Site, existing intersection traffic volumes, the Project ingress/egress availability based on the proposed site access and circulations scheme, the location of the proposed driveway, as well as input from LADOT staff.

The Project would include four driveways: (1) one driveway, which is proposed to include a traffic signal, would be located on La Cienega Boulevard, north of Jefferson Boulevard, approximately opposite Boden Street; (2) two driveways for public access on Jefferson Boulevard; (3) one driveway on Jefferson Boulevard for loading purposes. The Jefferson driveways would be limited to right turns in and out. The traffic study evaluated the access to/from the Project under a "worst-case" condition that assumed the Project would be served by one signalized driveway along La Cienega Boulevard north of Jefferson Boulevard. As the site plan development progressed, the three additional driveways along Jefferson Boulevard were added. The development of those right-turn

in-and-out driveways would not change the conclusions of the Draft EIR traffic study. The additional driveways would serve to distribute and disperse the traffic immediately adjacent to the Project Site, but they would not change the level of Project traffic through the external study intersections as evaluated in the traffic study.

Based on those considerations, traffic entering and existing the Project was assigned to the surrounding street system. The intersection-level trip distribution pattern are as follows: (i) 22% to/from the north; (ii) 26% to/from the south; (iii) 30% to/from the east; (iv) 22% to/from the west. Culver City requested that the City study an alternative distribution from the LADOT circulation pattern to bring a heavier demand south and west. The results of the Culver City distribution changes are included in Appendix G to the Traffic Study, which is included as Appendix J-1 to the Draft EIR. LADOT did not approve the requested distribution from Culver City. To comply with Culver City's request, Project analysis was performed with the suggested distribution that routes more traffic into Culver City. The analyses were otherwise conducted with the same methodologies and thresholds as provided in the main traffic study, with the primary difference using a heavier southbound and westbound distribution. The only significant change between the Culver City suggested distribution and the LADOT-approved distribution shows one new impact: a new significant impact at the intersection of La Cienega Boulevard (South) at Slauson Avenue. This intersection is within the jurisdiction of Los Angeles County.

The existing conditions surrounding the Project Site were defined by the existing traffic volumes, roadways, and intersection configurations that existed at the time of the issuance of the Memorandum of Understanding with the LADOT in March 2015. When comparing the Existing with Project Conditions against the existing conditions, the incremental increase in the volume-to-capacity (V/C) ratio as a result of the Project exceeds the LADOT thresholds of significant impact criteria at 19 of the 58 study intersections. Therefore, the Project's impact on intersection level of service ("LOS") would be significant.

C. *Mitigation Measures.* Since the Project will have significant impacts associated with traffic, the Mitigation Measures MM-L-1 through MM-L-11as described below in the next section shall be required to reduce those impacts. Compliance with Regulatory Compliance Measures RCM-L-12 through RCM-L-13 and Project Design Feature PDF-L-14 as described below in the next section shall further ensure that the Project's impacts related to traffic remain reduced.

### Cumulative Impacts (Future Year 2018 Conditions with Project)

A. *Finding – Significant and Unavoidable Impacts with Incorporation of Mitigation Measures.* The Proposed Project, in conjunction with Related Projects (Future Year 2018 Conditions with Project), was measured against the Future without Project conditions. The incremental increase in the V/C ratios as a result of the Project would exceed the thresholds of the LADOT significant impacts criteria at eight of the 58 study intersections. Cumulative impacts would be significant and unavoidable with mitigation measures at those eight intersections.

B. *Facts in Support of Finding.* The Project's Traffic Study evaluated the future traffic conditions both with and without the Projects to consider cumulative conditions. The existing traffic volumes were factored by an annual ambient growth rate to approximate

regional growth and development until the year 2018. Existing traffic is expected to increase as a result of regional growth and development outside the Study Area. Based on discussions with the LADOT through the MOU process, an ambient growth factor of 1.0 percent per year compounded annually was used to adjust the existing traffic volumes to reflect the effects of regional growth and development by the year 2018. The total adjustment applied over the three-year period was 3.06 percent. This growth factor accounts for increases in traffic due to potential projects not yet proposed or projects outside the Study Area.

In addition to the ambient growth, for purposes of providing a conservative analysis of potential cumulative traffic impacts, the traffic generated by the Related Projects in the Study Area was also added to estimate the Future without Project Conditions. The list of Related Projects is based on information provided by the City's Department of City Planning and LADOT, as well as the City of Culver City to assess the cumulative impact on all on-going development. Although the buildout years of many of these Related Projects are uncertain and may be well beyond the buildout year of the Project, and notwithstanding that some may never be approved or developed, they were all considered as part of this traffic analysis and conservatively assumed to be completed by the Project buildout year 2018 regardless of their buildout date. Additionally, no assumptions were included in the analysis to reflect any roadway or intersection improvements that may be conditioned by any of the related projects.

The development of estimated traffic volumes added to the Study Areas as a result of Related Projects involves the use of a three-step process: (i) trip generation; (ii) trip distribution; and (iii) trip assignment. Trip generation estimates for the Related Projects were provide by LADOT and Culver City or were calculated using a combination of previous study findings and trip generation rates contained in the Institute of Transportation Engineers' *Trip Generation, 9th Edition*. The Related Projects trip generation estimates are conservative because they do not account for either the trips generated by the existing uses to be removed or the likely use of other travel modes (transit, bicycle, walking, etc.) in every case. Further, they do not account for the internal capture trips within a multi-use development, nor the interaction of rips between multiple related projects within the Study Area, in which one Related Project serves as the origin for a trip destined for another Related Project. The geographic distribution of the traffic generated by the Related Projects depends on several factors, including the type and density of the proposed land uses, the geographic distribution of the population from which the employees/residents and potential patrons of the proposed developments are drawn, and the location of these projects in relation to the surrounding street system. The trip generation estimates for the Related Projects were assigned to the local street system using the same trip distribution pattern to evaluate the Project's traffic impacts to existing conditions.

### Future without Project
Based on those assumptions, 37 of the 58 study intersections are projected to operate at LOS E or LOS F during one or both the weekday morning and afternoon peak hours.

### Future with Project
When comparing the Future with Project Conditions against the Future without Project conditions, the incremental increase in the V/C ratios as a result of the Project exceed the LADOT significant impact criteria at 24 of the 58 study intersections. However, with

implementation of Mitigation Measures MM-L-1 through MM-L-11, the significant and unavoidable impacts would be reduced to the following eight intersections:

> (1) National Boulevard & Venice Boulevard (Int. #9)
> (2) La Cienega Boulevard & Washington Boulevard (Int. #16)
> (3) Fairfax Avenue & Washington Boulevard (Int. #17)
> (4) Fairfax Avenue & Adams Boulevard (Int. #18)
> (5) Jefferson Boulevard & National Boulevard (Int. #25)
> (6) La Cienega Boulevard & Jefferson Boulevard (Int. #26)
> (7) Jefferson Boulevard & Duquesne Avenue (Int. #37)
> (8) Jefferson Boulevard & Overland Avenue (Int. 38)

In addition, based on the alternative distribution requested by Culver City, the following additional intersection would be impacted after mitigation: La Cienega Boulevard (South) & Slauson Avenue (Int. #47). Therefore, the Project's cumulative traffic impacts based on the conservative assumptions would be potentially significant and unavoidable.

As part of the mitigation measures that will reduce the Project's traffic impacts to those eight intersections listed above, MM-L-1 will require implementation of a Transportation Demand Management ("TDM") Plan. The TDM Plan will include a trip cap, monitoring of that trip cap, and financial penalties if the Project exceeds the trip cap. The TDM Plan will be presented to LADOT for approval prior to the City's issuance of building and/or occupancy permits. The TDM Plan would include a variety of incentives for residents and tenants to utilize public transit, provide safe convenient pedestrian and bicycle connections, along with fortifying other multi-modal modes (such as car sharing, bike sharing, etc.), all in an effort to meet or exceed any credit provided by the TDM Plan. The TDM Plan would also include other trip-reduction standards that have been applied to the Project's traffic generation. Penalties would be applied for exceeding any trip cap, and LADOT would ensure that the Project meets or exceeds the TDM credit. As described further in Mitigation Measure MM-L-1, the penalty for exceeding the trip cap is not limited to paying for Metro passes. The trip cap would be enforced by LADOT through the Mitigation Monitoring Plan.

With respect to potential delays to bus transit lines or other modes of public transit, there are no approved methodologies or requirements for analyzing travel time delays in Los Angeles or Culver City, nor are there any established thresholds for determining significant impacts on transit travel time. Although some intersections along bus routes will have significant and unavoidable impacts, those intersections represent only a small percentage of the total intersections along the entirety of the bus routes and are not indicative of overall service. Any potential additional intersection delay caused by the Project during peak hours at those limited intersections would not substantially affect bus delay along the overall service. Additionally, the Project would not result in any significant impacts related to capacity on public transit modes, including bus lines in the City and in the City of Culver City.

Additionally, the City's traffic experts conducted additional capacity analysis through Culver City bus corridors using values included in the Draft EIR Traffic Study. To perform that analysis, each analyzed intersections contained in the Draft EIR Traffic Study effected by any of the Culver City bus lines was summarized for their volume to capacity results. The involved intersection volume to capacity results were averaged to provide a general sense of the overall route experience within the study area. The corridor

analysis was conducted for the Future without Project Condition versus the Future with Project Condition after mitigation. That analysis showed that all Culver City bus transit corridors, with the exception of Culver City Line #4, will have improved flow after project mitigation. Culver City Line #4 is expected to experience a slight increase in the morning peak hour, and a larger increase in the evening peak hour. While there is no criterion or threshold established for determining transit corridor impacts within Culver City, Los Angeles, or the state, applying the same criteria used in the Draft EIR for significant impacts at a single intersection, the increase in volume to capacity ratio to Culver City Line #4 would not be considered significant.

C. *Mitigation Measures.* Since the Project will have significant cumulative impacts associated with traffic, the following Mitigation Measures MM-L-1 through MM-L-11shall be required to reduce those impacts. With implementation of those mitigation measures, impacts will remain significant and unavoidable at eight of the 58 study intersections. Compliance with the following Regulatory Compliance Measures RCM-L-12 through RCM-L-13 and Project Design Feature PDF-L-14 shall further ensure that the Project's impacts related to traffic remain significant and unavoidable only at the eight intersections identified.

Mitigation Measures

- **MM-L-1 Transportation Demand Management (TDM)** – Prior to issuance of a Certificate of Occupancy, the Project Applicant shall prepare and implement a TDM Plan to the satisfaction of LADOT with a cumulative target goal of 10 percent reduction in Project traffic. A determination of the types of strategies that would most reduce the Project's dependency on the automobile would be developed in coordination with LADOT. The final plan could be enforced by LADOT through an annual monitoring to ensure that traffic levels are consistent with the TDM target of 10 percent. As noted in Table 4.L-5, the AM and PM net total number of trips was projected to be 737 and 849, respectively. Therefore, the trip cap threshold for both the AM and PM peak hours shall be 663 and 764 trips, respectively.

  The TDM Plan should include a variety of measures to reduce single occupant vehicles trips by increasing the number of walking, bicycling, carpool, vanpool, and transit trips. The Project shall also comply with Section 12.26-J (Ordinance 168,700) of the Los Angeles Municipal Code (City of Los Angeles, March 2015), which requires specific TDM and trip reduction measures before the issuance of any building permit. The TDM program could include, but is not limited to, the following strategies:

  - Provide an Internal Transportation Management Coordination Program with on-site transportation coordinator;
  - Implement enhanced pedestrian connections (e.g., improve sidewalks, widen crosswalks adjacent to the Project, install wayfinding signage and pedestrian level lighting, etc.);
  - Design the Project to ensure a bicycle, pedestrian, and transit friendly environment;
  - Provide parking as an option only for all residential unit leases (i.e., unbundle the parking);
  - Include a provision in all leases requiring compliance with the state parking cash-out law;

- Coupled with the unbundled parking, provide on-site car share amenities;
- Provide rideshare program and support for Project employees and tenants;
- Allow for subsidized transit passes for eligible Project employees and tenants;
- Coordinate with LADOT to determine if the site would be eligible for one or more of the services to be provided by the future Mobility Hubs program (secure bike parking, bike share kiosks, and car-share parking spaces);
- Provide on-site transit routing and schedule information;
- Provide a program to discount transit passes for residents/employees possibly through negotiated bulk purchasing of passes with transit providers;
- Contribute a one-time fixed fee into the City's Bicycle Plan Trust Fund to implement bicycle improvements within the area of the Project (amount of fee to be determined in consultation with LADOT and Council District 10 staff); and Guaranteed Ride Home Program.

A Draft TDM Plan should be prepared by a registered traffic engineer and submitted to LADOT prior to the issuance of the first building permit for the Project. The TDM Plan must be approved by LADOT prior to the issuance of the first Certificate of Occupancy.

The TDM Plan must include a Monitoring Program, which should include the following considerations:

- The measurement of actual trips and monitoring will be conducted using an automated detection and surveillance monitoring system. In addition to providing hourly vehicular count tabulations, the monitoring system must also be designed in a manner that will permit direct data access to LADOT staff. The installation and maintenance of the monitoring system will be at the Project's expenses. The monitoring system will continue until such time that the Project has shown, for five consecutive years, at a minimum of 85 percent occupancy, achievement of the peak hour trip volume requirements as listed.

- Should the review show that the peak hour trip cap threshold has been exceeded, the Project will be subject to the following penalty program:

  o A grace period of one year will be provided to correct a reporting of non-compliance. If on the subsequent year of reporting, the reported trips continue to exceed the established trip cap, then financial penalties will be assessed.
  o Financial penalties for two consecutive reporting periods of non-compliance will pay the equivalent cost of providing a Metro transit pass for one year for each vehicle trip over the cap.
  o Financial penalties for three consecutive reporting periods of non-compliance will pay twice the equivalent cost of providing a Metro transit pass for one year for each vehicle trip over the cap.
  o Financial penalties for four consecutive reporting periods of non-compliance will pay three times the equivalent cost of providing a

Metro transit pass for one year for each vehicle trip over the cap.

○ LADOT may determine that the financial penalty (or portion thereof) may be better used by the applicant/developer to fund improvements or enhancements to one or more of the ongoing TDM Plan components to increase the effectiveness in meeting the trip reduction performance goals.

- **MM-L-2 Transportation Systems Management (TSM)** – Prior to issuance of a Certificate of Occupancy, the Project Applicant shall prepare and implement a TSM Plan to the satisfaction of LADOT. TSM strategies include modifications to traffic signals and improvements to circulation flow without construction of additional automobile travel lanes. Typical TSM strategies include improved signal controllers, advanced detection systems, left-turn restrictions, peak hour parking restrictions, one-way couplets, scramble crosswalks, etc.

  Some of the signalized intersections in the area surrounding the Project require an upgrade to the traffic signal equipment and hardware. Many of the traffic signals at these intersections currently operate using a Type 170 traffic signal controller. Newer controllers (Type 2070) provide for enhanced and real-time operation of the traffic signal timing. Also, when supplemented by additional roadway system loops and closed circuit television cameras, LADOT can identify the causes of delay and implement instant signal timing remedies to improve the flow of vehicles and buses.

  Additionally, the ATSCA communications center (Hub) at Fire Station No. 68 (5023 Washington Boulevard) is in need of upgrades and repairs. All traffic signals within the West Adams ATSAC system are connected to the hub through communication fiber. The repairs are needed to ensure that the West Adams system continues to operate remotely and that signal timing is adjusted in real-time to allow maximum efficiency. Collectively, these traffic signal upgrades provide a system-wide benefit by reducing delays experienced by motorists at the study intersections

  The applicant should meet with LADOT staff to define the signal system upgrade package that will serve as a measure to increase the efficiency of the areawide signal system. The ultimate TSM plan will require coordination and approval by LADOT.

- **MM-L-3 La Cienega Boulevard, north of Jefferson Boulevard (Project Driveway)** – Prior to issuance of a Certificate of Occupancy, a traffic signal shall be installed at the Project driveway on La Cienega Boulevard, north of Jefferson Boulevard. All signal design and construction work shall be performed in accordance with LADOT's Signal Design standards and shall include all conduits for interconnects, traffic signal hardware and software, and other applicable work deemed necessary. The location of the signal will be determined by LADOT. Pavement shall be restriped as needed.

- **MM-L-4 Fairfax Avenue & Pico Boulevard (Int. #2)** – During the Project's operational phase, peak hour parking restrictions shall be implemented along Pico Boulevard to provide an additional through lane westbound in the morning peak period and eastbound in the afternoon peak period. Pavement striping shall

be modified as needed. If the parking cannot be prohibited during the peak periods, a significant impact would remain at this location.

- **MM-L-5 La Cienega Boulevard & Venice Boulevard (Int. #10)** – Prior to issuance of a Certificate of Occupancy, a westbound dual left-turn operation shall be designed and implemented. The pavement shall be restriped and the traffic signal equipment shall be modified as needed. Because Venice Boulevard is a designated State Highway, the Project Applicant shall be responsible for securing final design approval from Caltrans.

- **MM-L-6 Fairfax Avenue & I-10/Electric Drive (Int. #13)** – Prior to issuance of a Certificate of Occupancy, a northbound dual left-turn operation shall be designed and implemented. The pavement shall be restriped and the traffic signal equipment shall be modified as needed. The feasibility of this proposal is contingent upon Caltrans approval to remove the carpool designation from the lane that this second left-turn operation would need to feed into.

- **MM-L-7 La Cienega Boulevard & Fairfax Avenue (Int. #21)** – Prior to issuance of a Certificate of Occupancy, a westbound dual left-turn and one left-turn/through/right-turn lane operation shall be designed and implemented. The pavement shall be restriped and the traffic signal equipment shall be modified as needed.

- **MM-L-8 Washington Boulevard & National Boulevard (Int. #22)** – Prior to issuance of a Certificate of Occupancy, the northbound right-turn lane shall be converted to a through/right-turn lane. The pavement shall be restriped and the traffic signal equipment shall be modified as needed.

- **MM-L-9 – La Brea Avenue & Jefferson Boulevard (Int. #28)** – Prior to issuance of a Certificate of Occupancy, an exclusive southbound right-turn lane shall be designed and implemented. This could require the purchase of additional right-of-way to provide sufficient pavement width to accommodate the right-turn lane. If this right-of-way cannot be purchased, a significant impact would remain at this location.

Regulatory Compliance Measures

- **RCM-L-12 - Pedestrian Connectivity** – The Project Applicant shall consult with the Department of City Planning for any additional requirements pertaining to pedestrian walkability and connectivity, as described in the Walkability Checklist.

- **RCM-L-13 - Site Access and Internal Circulation** – LADOT's determination letter does not include approval of the Project's driveways, internal circulation, and parking scheme. In order to minimize and prevent last minute building design changes, the Project Applicant shall contact LADOT early in the design process for access and circulation requirements so that such traffic flow considerations are designed and incorporated early in the building and parking layout plans. Final LADOT approval shall be obtained prior to issuance of any building permits. This should be accomplished by submitting detailed site/driveway plans, at a scale of at least 1" = 40', separately to LADOT's WLA. Coastal Development Review Section at 7166 West Manchester Avenue, Los Angeles 90045, as soon

as possible but prior to submittal of building plans for plan check to the Department of Building and Safety.

Project Design Feature

- **PDF-L-14** – Vehicle access for the Project shall be accommodated via four driveways. One driveway, which is proposed to include a traffic signal, would be located on La Cienega Boulevard, north of Jefferson Boulevard. On Jefferson Boulevard, there would be two driveways for public access as well as a third driveway for loading purposes.

## X.   ALTERNATIVES TO THE PROJECT

Pursuant to CEQA Guidelines section 15126.6, alternatives to the Project were considered that could mitigate or avoid the significant environmental impacts associated with the Project while still achieving the Project's primary objectives. The City evaluated five alternatives that had the potential to reduce the Project's significant and unavoidable impacts related to air quality (during the Project's operation) and impacts to traffic (at 8 intersections in the City and one intersection in Culver City) while also considering the Project's objectives. The objectives of the Proposed Project are to:

### Redevelopment of Underutilized Site

1. Redevelop a currently underutilized, industrial site into an iconic mixed-use development that combines complementary uses, such as community retail, office, and residential uses.

### Transit

2. Further local and regional objectives of reducing vehicle miles traveled and greenhouse gas emissions by providing a mix of uses and increased density in close proximity to existing bus and transit systems, including the La Cienega/Jefferson Expo Line Station.

### Pedestrian and Bicycle Activity

3. Activate the La Cienega and Jefferson Boulevard corridors by attracting residents and visitors, both day and night by providing publically accessible open and green spaces, walkways, plazas, and other gathering spaces.

4. Encourage pedestrian and bicycle activity by providing bicycle parking and pedestrian linkages within the Project, as well as an attractive pedestrian experience on La Cienega and Jefferson Boulevards.

### Architecture/Design

5. Through inclusion of architecturally significant elements, create an iconic design identity at the intersection of La Cienega and Jefferson Boulevards.

6. Improve the aesthetic quality of the site by removing older structures and developing new efficient buildings that are more sensitive to adjacent uses.

### Energy Conservation Features

7. Incorporate sustainable and green building design and construction to promote resource conservation, including waste reduction, efficient water management techniques, and conservation of electricity and energy.

**Job Creation**

    8. Create a significant amount of new permanent jobs.

**Public Safety**

    9. Improve public safety by creating a development that provides the level of density and mix of uses necessary to activate the area both day and night.

**Housing Needs**

    10. Provide a reasonably significant amount of housing along a major public transportation corridor in furtherance of City's goals and policies, and in close proximity to the La Cienega/Jefferson Metro Expo Line Station.

Under CEQA Guidelines section 15126.6(c), the range of potential alternatives to the project shall include those that could feasibly accomplish most of the basic project objectives and could avoid or substantially lessen one or more of the significant effects. Factors that may be taken into account when addressing feasibility and infeasibility are site suitability, economic viability, availability of infrastructure, and technical feasibility.

## Alternatives Rejected as Infeasible for Further Environmental Review

The City considered two alternatives that were rejected as infeasible during the scoping process. Those two alternatives included an all-commercial or an all-residential project. However, the City determined those alternatives would not provide the necessary mix of uses and density to benefit from proximity to transit. Therefore, those alternatives were considered infeasible.

## Alternative 1 - No Project

Under the No Project Alternative, the Project would not be implemented and the Project Site would remain in its existing conditions. The No Project Alternative assumes the Related Projects would move forward. Future on-site activities would be limited to the continued operation and maintenance of existing land uses. The existing office and light industrial buildings and radio towers would continue to operate on the Project Site.

The No Project Alternative's impact would have no impacts on aesthetics, as the alternative would not create a change or improvement in the visual character of the Project Site, block view sheds, create shadows on adjacent land uses, or create new sources of glare and lighting. Similar to the Project, the No Project Alternative would have no impact to agricultural and forestry resources. This Alternative would also have no impact with respect to air quality and would reduce the Project's significant and unavoidable operational impacts with respect to regional VOC, NOx, and CO emissions, as no demolition, grading, or construction would be required and no new vehicle trips would be generated under the Alternative. Alternative 1 would also have no impact with respect to biological resources, as the Project Site is currently developed and does not contain any natural open spaces, act as a wildlife corridor, contain riparian habitat, wetland habitat, migratory corridors, and does not likely possess any areas of significant biological resources. Alternative 1 would have no impacts to historical resources, as there are no historical resources on the Project Site. Alternative 1 would not have the potential to encounter other unknown cultural resources, as no demolition or construction would occur on the Project Site. Alternative 1 would have greater impacts with respect to geology because this alternative would not have new construction, which would lead to seismically superior buildings on the Project Site due to updates in the Building Code.

Further, this Alternative would not be expected to result in increased GHG emissions, as it would not increase electricity and natural gas consumption, vehicle miles traveled, water use, or solid waste generation and the subsequent disposal into landfills. Like the Proposed Project, Alternative 1 would not lead to significant GHG impacts. Alternative 1 would have no impact to hazards and hazardous materials, since there would be no demolition or construction and the alternative would not have the potential to encounter contaminated soil, asbestos, and lead-based pain at the Project Site. Alternative 1's impacts to hydrology and water quality would be comparable to the Project's less than significant impacts after mitigation. Alternative 1 would result in no impacts to land use and planning, as the alternative would not conflict with the Site's land use or zoning designations. Alternative 1 would have no impact to mineral resources, as the Project Site is not located within a City-designated oil drilling area or a City-designed Mineral Resource Zone. Alternative 1 would have no impact with respect to noise, as no new sources of noise or vibration would be created because no demolition or construction would occur. Alternative 1 would have no impact to population and housing, as the Project would not be developed with new land uses that would add population, housing, or employment to the Project Site. Alternative 1 would have no impact on public services, as no additional demand for public services beyond the existing demand from land uses currently on the Project Site would occur. Alternative 1 would result in no impacts to transportation and traffic, as no traffic would be generated beyond the traffic already associated with land uses currently at the Project Site. Alternative 1, would result in no impact with respect to utilities, as it would not lead to impacts related to wastewater, water, solid waste, electricity, or natural gas beyond the existing demand associated with the land uses currently on the Project Site.

In sum, Alternative 1 would result in less than the Project's significant and unavoidable impacts related to air quality and transportation and traffic. However, Alternative 1 would not satisfy any of the Project's objectives. Specifically, Alternative 1 would not:

- Redevelop a currently underutilized, industrial site into an iconic mixed-use development that combines complementary uses, such as community serving retail, office, and residential uses.
- Further local and regional objectives of reducing vehicle miles traveled and greenhouse gas emissions by providing a mix of uses and increased density in close proximity to existing bus and transit systems, including the La Cienega/Jefferson Expo Line Station.
- Activate the La Cienega and Jefferson Boulevard corridors by attracting residents and visitors, both day and night by providing publicly accessible open and green spaces, walkways, plazas, and other gathering spaces.
- Encourage pedestrian and bicycle activity by providing bicycle parking and pedestrian linkages within the Project, as well as an attractive pedestrian experience on La Cienega and Jefferson Boulevards.
- Through inclusion of architecturally significant elements, create an iconic design identity at the intersection of La Cienega and Jefferson Boulevards.
- Improve the aesthetic quality of the site by removing older structures and developing new efficient buildings that are more sensitive to adjacent uses.
- Incorporate sustainable and green building design construction to promote resources conservation, including waste reduction, efficient water manage techniques, and conservation of electricity and energy.

Therefore, it is found pursuant to CEQA Guidelines section 15126.6 that Alternative 1 would not feasibly obtain most of the Project objectives.

## **Alternative 2 – Reduced Density/Existing Zoning**

Alternative 2 would involve the demolition of all existing buildings on the Project Site. The Project Site would be built-out to the maximum uses allowed under the existing zoning, which is approximately 731,302 square feet of building area. The Alternative was assumed to consist of 731,302 square feet of light manufacturing uses, with a corresponding FAR of 1.5:1. The proposed height would be 45 feet contained in three stories. Parking would be provided in accordance with LAMC requirements at grade and in subterranean parking levels.

Alternative 2's impacts related to aesthetics would be less than the Project, as Alternative 2 would lead to shorter and smaller buildings than the Project. Like the Project, Alternative 2 would have no impact to agricultural and forestry resources, as the Project Site does not contain any agricultural or forestry uses. Like the Project, after implementation of Mitigation Measures MM-C-1 through MM-C-5, construction of Alternative 2 would not produce any significant impacts related to localized or regional air quality. Alternative 2's impacts to regional and localized air quality during operation would also be less than significant. Similar to the Project, Alternative 2 would also have no impact with respect to biological resources, as the Project Site is currently developed and does not contain any natural open spaces, act as a wildlife corridor, contain riparian habitat, wetland habitat, migratory corridors, and does not likely possess any areas of significant biological resources. Alternative 2 would have similar impacts to the Project with respect to cultural resources, as there are no historical resources on the Project Site and Alternative 2 would have the potential to encounter unknown archaeological and paleontological resources or human remains. Alternative 2 would have the same potential impacts to geology and soils, as the Project Site presents the same potential geologic and geotechnical conditions regardless of the type of development and Alternative 2 would be required to conform to the City's building code standards. With respect to GHG emissions, construction of Alternative 2 would emit 33 percent less CO2e by virtue of its small scope. Alternative 2's operation would also produce 67 percent less CO2e emissions on an average basis.

Alternative 2 would have similar impacts as the Project to hazards and hazardous materials, as Alternative 2 would have the potential to result in impacts with respect to contaminated soil, asbestos, and lead-based paint at the Project Site. Alternative 2 would also develop uses on the Project Site that involve the transport, use, or disposal of hazardous materials that are typical for retail use. Alternative 2 would result in less than significant impacts to water hydrology and water quality, like the Proposed Project (with implementation of mitigation measures), as the existing Project Site is improved with nearly 100 percent of impervious surfaces and drainage and runoff would be similar to the Project. Further, since Alternative 2 would be developed in accordance with the existing zoning of the Project Site, Alternative 2 may require different discretionary entitlements as compared to the Proposed Project. However, since this Alternative would not maximize the potential development possibilities at the Project Site to the same extent as the Project, this Alternative would not meet many of the policy objectives relating to walkability, pedestrian activation, and connectivity to the same extent as the Project.

Alternative 2's impacts to noise from construction and operation would be similar to the Proposed Project with implementation of mitigation measures. With respect to population, housing, and employment, Alternative 2 would not propose any housing units and its additional employees could come from the Project area and other areas in Los Angeles. Alternative 2's impacts to public services would be similar to the Proposed Project with respect to fire

protection and police protection. Alternative 2 would have fewer impacts to schools, parks and recreation, and libraries as compared to the Proposed Project. Alternative 2 would also generate fewer daily vehicle trips to and from the Project Site as compared to the Proposed Project. However, after implementation of mitigation measures, Alternative 2 would result in significant and unavoidable traffic impacts to the same number of intersections as the Proposed Project (8 intersections). Alternative 2 would generate a smaller amount of wastewater, demand less water, and generate less solid waste as compared to the Proposed Project.

In sum, Alternative 2 would reduce the significant and unavoidable air quality impacts related to the Project's operation.

Further, when compared to the Proposed Project, Alternative 2 would not provide the critical mass and mix of uses at the same level of density necessary to activate the area. Alternative 2 would only meet some of the Project objectives and to a lesser extent than the Project as discussed further below:

- *Redevelopment of underutilized site* – While Alternative 2 would redevelop the currently underutilized, industrial Site, and therefore, Alternative 2 only includes light manufacturing uses, it would not create a mixed-use development.
- *Transit* – When compared to existing uses, Alternative 2 would provide increased density in close proximity to existing transit, including the La Cienega/Jefferson Expo Line Station. However, the Project would provide a mix of uses (whereas Alternative 2 only includes light manufacturing uses) and a greater density in close proximity to existing transit.
- *Pedestrian and bicycle activity* – Alternative 2 would provide limited activation to the La Cienega and Jefferson Boulevard corridors. This is because Alternative 2 would not provide a mix of uses (including residential uses which would activate the area in the evening hours) and would not include publicly accessible open and green spaces, walkways, plazas, and other gathering spaces in the same manner as the Project. Further, Alternative 2 would not provide the necessary density, height, and mix of uses unnecessary to activate the street, sidewalks, and other public spaces, both day and night.
- *Architecture and design* – Alternative 2 would improve the aesthetic quality of the Site by removing older structures and developing new efficient buildings. However, Alternative 2 would not create an iconic design identity in the same manner as the Project, which includes an iconic tower element.
- *Public safety* – While Alternative 2 would activate the Project area during the day, it would not provide the necessary level of density and mix of uses (including residential uses) in order to activate the area during both the day and night.
- *Housing needs* – As Alternative 2 does not include development of any housing, it would not meet the objective to provide a reasonably significant amount of housing along this major public transportation corridor.

Therefore, it is found pursuant to CEQA Guidelines section 15126.6 that Alternative 2 would not feasibly obtain most of the Project objectives. Further, Alternative 2 would not reduce the Proposed Project's impacts related to traffic to a less than significant level.

**Alternative 3 – Reduced Density**

Alternative 3 would involve demolition of all existing buildings on the Project Site and would consist of 1,128 multi-family residential units, 50,000 square feet of grocery store, 30,000 square feet of general retail, and 20,000 square feet of restaurant uses. Compared to the Project, the difference in Alterative 3 is a reduction of 200,000 square feet of office space. The total amount of development is reduced by 200,000 square feet to 1,700,000 square feet (with FAR of 3.5:1), as compared to 1,900,000 square feet under the Project (with an FAR of 3.9:1). Parking would be provided in accordance with LAMC requirements at grade and in subterranean levels.

Alternative 3 would contain a tower element with a maximum height of 320 feet. Therefore, Alternative 3 would result in similar impacts at the Project with respect to aesthetics (scenic vistas and views, massing, shade/shadow, and lighting and glare). Like the Project, Alternative 3 would have no impact to agricultural and forestry resources, as the Project Site does not contain any agricultural or forestry uses. After implementation of Mitigation Measures MM-C-1 through MM-C-5, construction of Alternative 3 would not produce any localized or regional air quality impacts. Alternative 3's impacts to localized air quality during operation would also be less than significant. However, Alternative 3's impacts to regional air quality impacts would be significant and unavoidable with respect to VOC, NOx, and CO. Similar to the Project, Alternative 3 would also have no impact with respect to biological resources, as the Project Site is currently developed and does not contain any natural open spaces, act as a wildlife corridor, contain riparian habitat, wetland habitat, migratory corridors, and does not likely possess any areas of significant biological resources. Alternative 3 would have similar impacts to the Project with respect to cultural resources, as there are no historical resources on the Project Site and Alternative 3 would have the potential to encounter unknown archaeological and paleontological resources or human remains. Alternative 3 would have the same potential impacts to geology and soils, as the Project Site presents the same potential geologic and geotechnical conditions regardless of the type of development and the Alternative would be required to conform to the City's building code standards.

With respect to GHG emissions, Alternative 3 would emit the same amount of GHGs, as construction activities and scale would be almost identical even though Alternative 3 does propose 200,000 fewer square feet of development. Like the Proposed Project, Alternative 3's contribution to climate change from its operation would not be cumulatively considerable.

Alternative 3 would have similar impacts as the Project to hazards and hazardous materials, as Alternative 3 would have the potential to result in impacts with respect to contaminated soil, asbestos, and lead-based paint at the Project Site. Alternative 3 would also develop uses on the Project Site that involve the transport, use, or disposal of hazardous materials that are typical for retail use. Alternative 3 would result in less than significant impacts to water hydrology and water quality, like the Proposed Project (with implementation of mitigation measures), as the existing Project Site is improved with nearly 100 percent of impervious surfaces and drainage and runoff would be similar to the Project. Further, Alternative 3 would likely require many, if not all, of the same entitlements as the Project. With respect to impacts to land use and planning, Alternative 3 would meet policy objectives related to development, walkability, and pedestrian activation in a similar manner as the Project. Also similar to the Project, with implementation of mitigation measures, Alternative 3's construction and operation impacts related to noise would be less than significant. Alternative 3 would also have similar impacts as compared to the Project related to population, housing, and employment, as it would generate residential units and the employees generated by the non-residential uses are assumed to be housed in the

local area or elsewhere in the City. Alternative 3 would create a lesser demand for fire protection and police services, schools than the Project, but similar impacts to parks and recreation and libraries because Alternative 3 will add the same number of residents and fewer employees to the Project Site. With respect to traffic and transportation impacts, Alternative 3 would result in significant and unavoidable impacts at eight intersections, like the Proposed Project. Alternative 3 would generate a smaller amount of wastewater, demand less water, and generate less solid waste as compared to the Proposed Project.

In sum, Alternative 3, like the Proposed Project, would have significant and unavoidable impacts related to regional operational air emissions and transportation and traffic.

Further, when compared to the Proposed Project, Alternative 3 does not maximum the development potential at the Project Site and reduces the number of employees that could activate the area and support the usage of the existing transit infrastructure. Therefore, Alternative 3 would not meet the Project objectives to the same degree as the Project as discussed further below.

- **Redevelopment of underutilized site** – Like the Project, Alternative 3 would redevelop the currently underutilized, industrial Project Site with an iconic mixed-use development. However, it would not provide as diverse a mix of uses, as Alternative 3 does not include the office component.
- **Transit** – Alternative 3 would provide increased density in close proximity to existing transit, including the La Cienega/Jefferson Expo Line Station. However, because it does not include the office component, it would not provide the same level of density or mix of uses in close proximity to transit.
- **Pedestrian and bicycle activity** – Like the Project, Alternative 3 would activate the La Cienega and Jefferson Boulevard corridors, and would include publicly accessible open and green spaces, walkways, plazas, and other gathering spaces. However, Alternative 3 would provide a lesser density of uses to activate the street, sidewalks, and other public spaces.
- **Job creation** – Because Alternative 3 does not include the office component, it would not result in the same job creation benefits as the Project.
- **Public safety** – Alternative 3 would activate the Project area during the day and night. However, because it provides a lesser density and mix of uses, it would not activate the area to the same extent as the Project.

Therefore, it is found pursuant to CEQA Guidelines section 15126.6 that Alternative 3 would not feasibly obtain most of the Project objectives. Further, Alternative 3 would not reduce the Proposed Project's impacts related to regional air quality and traffic to a less than significant level.

## Alternative 4 – Reduced Height

Alternative 4 would involve the demolition of all existing buildings on the Project Site. Alternative 4 would develop the Project Site with the same uses as the Project (1,218 multi-family residential units, 200,000 square feet of office space, 50,000 square feet of grocery store space, 30,000 square feet of retail, and 20,000 square feet of restaurant use), but with a reduced height. Like the Project, this Alternative would have an FAR of 3.9:1 However, the maximum height would be limited to 110 feet. Parking would be provided in accordance with LAMC requirements, at grade and in subterranean levels.

While Alternative 4 proposes the same uses as the square footages of the Project, this Alternative would be limited to a maximum height of 110 feet (including 10 feet for mechanical equipment) and would not contain a tower element. Because of the reduced height, Alternative 4's impacts to scenic vistas, views, and shade/shadow would be reduced when compared to the Project. However, the massing of Alternative 4 would be greater than the Project, as this Alternative proposes shorter buildings with more coverage on the Project Site. This Alternative would also contain less open to the air, open space and pedestrian pathways and linkages when compared to the Project by virtue of the greater Site coverage. Impacts with respect to light and glare would be similar to the Proposed Project.

Like the Project, Alternative 4 would have no impact to agricultural and forestry resources, as the Project Site does not contain any agricultural or forestry uses. Alternative 4 would result in the same construction and operational air quality impacts as the Project, including the significant and unavoidable operational impacts related to regional VOC, NOx, and CO emissions. Similar to the Project, Alternative 4 would also have no impact with respect to biological resources, as the Project Site is currently developed and does not contain any natural open spaces, act as a wildlife corridor, contain riparian habitat, wetland habitat, migratory corridors, and does not likely possess any areas of significant biological resources. Alternative 4 would have similar impacts to the Project with respect to cultural resources, as there are no historical resources on the Project Site and Alternative 4 would have the potential to encounter unknown archaeological and paleontological resources or human remains. Alternative 4 would have the same potential impacts to geology and soils, as the Project Site presents the same potential geologic and geotechnical conditions regardless of the type of development and the Alternative would be required to conform to the City's building code standards. Alternative 4 would also create the same amount of GHG emissions as the Project.

Alternative 4 would have similar impacts as the Project to hazards and hazardous materials, as Alternative 4 would have the potential to result in impacts with respect to contaminated soil, asbestos, and lead-based paint at the Project Site. Alternative 4 would also develop uses on the Project Site that involve the transport, use, or disposal of hazardous materials that are typical for retail use. Alternative 4 would result in less than significant impacts to water hydrology and water quality, like the Proposed Project (with implementation of mitigation measures), as the existing Project Site is improved with nearly 100 percent of impervious surfaces and drainage and runoff would be similar to the Project. With respect to land use and planning, although Alternative 4 would be limited to a maximum height of 100 feet, this Alternative would still require the same entitlements as the Project. Alternative 4 would have the same impacts with respect to land use and planning as the Proposed Project. Also similar to the Project, with implementation of mitigation measures, Alternative 4's construction and operation impacts related to noise would be less than significant. With respect to population, housing, and employment, Alternative 4 would lead to population, housing, and employment growth within growth forecasts and impacts would be less than significant. Alternative 4's impacts related to public services, traffic and transportation, and utilities would also be the same as the Proposed Project.

In sum, Alternative 4 would have the same significant and unavoidable impacts related to air quality and traffic as the Project.

Alternative 4 provides the same density and mixes of uses as the Proposed Project, but does not include a tower element. Therefore, Alternative 4 would not meet some of the Project objectives to the same degree as the Project, as discussed further below:

- **Redevelopment of underutilized site** – Like the Project, Alternative 4 would redevelop the currently underutilized, industrial Site with a mixed-use development. However, Alternative 4 does not include the iconic tower element, and therefore would only partially meet this objective.
- **Pedestrian and bicycle activity** –While Alternative 4 would activate the La Cienega and Jefferson Boulevard corridors, it would not do so to the same extent as the Project. Since Alternative 4 does not include a tower element, more of the Project Site would be covered with buildings and there would be fewer open and green spaces, walkways, plazas, and other gathering spaces.
- **Architecture and design** – Like the Project, Alternative 4 would improve the aesthetic quality of the Site by removing older structures and developing new efficient buildings. However, because Alternative 4 does not include a tower element, it would not create an iconic design identity in the same manner as the Project.
- **Public safety** – Alternative 4 would activate the Project area during the day and night. However, because it does not contain a tower element, more of the Project Site would be covered with buildings. Therefore, there would be fewer open and green spaces, and pedestrian gathering areas, which would result in less pedestrian activation as compared to the Project.

Therefore, it is found pursuant to CEQA Guidelines section 15126.6 that Alternative 4 would not feasibly obtain most of the Project objectives. Further, Alternative 4 would not reduce the Proposed Project's impacts to air quality or traffic to a less than significant level.

## Alternative 5 – Reconfigured

Alternative 5 would involve the demolition of all existing building on the Project Site. This Alternative would involve developing the same uses as the Project (1,218 multi-family residential units, 200,000 square feet of office space, 50,000 square feet of grocery store, 30,000 square feet of retail space, and 20,000 square feet of restaurant uses), and a FAR 3.9:1. While the Project proposes a tower in the northeast corner of the Project Site, this Alternative examines the placement of the tower in the other three corner of the Project Site (northwest, southwest, and southeast). The placement of the tower in a different location on the Project Site would not affect other aspects of the Project, including access points, inclusion of a park and plaza space, etc. Like the Project, the maximum height of the tower would be 320 feet (including 20 feet for mechanical equipment), and a maximum height of the podium would be 110 feet (including 10 feet for mechanical equipment). Parking would be provided in accordance with LAMC requirements, at grade and in subterranean levels.

Impacts from Alternative 5 related to visual character, views, scenic vistas, architecture, and light and glare would be the same as for the Project. With respect to shadow impacts, the tower placed in the northwest, southwest, or southeast corners would have no impact. Alternative 5's impacts would otherwise be similar to the Proposed Project's impacts with respect to agricultural and forestry resources, air quality, biological resources, cultural resources, geology and soils, cultural resources, geology and soils, GHG emissions, hazards and hazardous materials, hydrology and water quality, land use and planning, noise, mineral resources, noise, population, housing, and employment, public services, traffic and transportation, and utilities.

Since Alternative 5 will have the same uses and square footage as the Project, this Alternative would provide the same critical mass of uses as the Project, as well as the same amenities as

the Project, such as a public park. This Alternative would also include the same iconic tower as the Project, and would result in the same job creation benefits as the Project, As a result, this Alternative would meet all of the Project objectives to the same extent as the Project. However, Alternative 5 will not reduce the Project's significant and unavoidable impacts related to air quality or traffic to less than significant levels.

## Environmentally Superior Alternative

Alternative 1 (No Project Alternative) would have the fewest environmental impacts and would not result in significant and unavoidable impacts. However, the CEQA Guidelines section 15126.6 states that if the No Project Alternative is the environmentally superior alternative, the lead agency must consider another environmentally superior alternative from the remaining list of alternatives considered.

Based on the City's analysis pursuant to section 15126.6 of the CEQA Guidelines, Alternative 2 is the only Alternative that would reduce some of the Project's significant and unavoidable impacts. Specifically, Alternative 2 would reduce the significant operational air quality impacts to less than significant. Accordingly, Alternative 2 could be considered the environmentally superior alternative. However, Alternative 2 would not reduce the Projects unavoidable and significant impacts related to traffic. Further Alternative 2 is infeasible, as it would not meet most of the basic Project objectives.

## XI.    OTHER CEQA CONSIDERATIONS

### Summary of Significant and Unavoidable Impacts

Pursuant to Section 15126.2(b) of the CEQA Guidelines, the City finds that the Project will result in significant and unavoidable environmental impacts with respect to air quality (during operation) and traffic.

### Air Quality

Mitigation Measures MM-C-1 through MM-C-4 are imposed for the Project's construction air quality impacts, and Mitigation Measure MM-C-5 is imposed for the Project's operational impacts. Mitigation Measure MM-C-5 would reduce operational emissions and would reduce the local operational $PM2.5$ emissions to below SCAQMD's significance threshold. Mitigation measures would not reduce the Project's regional operational VOC, NOx, and CO emissions to below SCAQMD's significance thresholds, and Project impacts related to regional operational emissions would be significant an unavoidable. The Project's contribution to cumulative regional pollutant emissions would also be significant and unavoidable.

### Traffic

Mitigation Measures MM-L-1 through MM-L-11 are imposed on the Project, which include a Transportation Demand Management Plan ("TDM Plan"), a Transportation Systems Management Plan ("TSM Plan"), physical improvements, and a Construction Management Plan. After applying the TDM plan, TSM plan, and available physical improvements (collectively, Mitigation Measures MM-L-1 through MM-L-9), the following eight intersections would remain significantly impacted and not fully mitigated:

(1) National Boulevard & Venice Boulevard (Int. #9) – AM & PM
(2) La Cienega Boulevard & Washington Boulevard (Int. #16) – PM
(3) Fairfax Avenue & Washington Boulevard (Int. #17) – AM & PM

(4) Fairfax Avenue & Adams Boulevard (Int. #18) – AM & PM
(5) Jefferson Boulevard & National Boulevard (Int. #25) – AM & PM
(6) La Cienega Boulevard & Jefferson Boulevard (Int. #26) – AM & PM
(7) Jefferson Boulevard & Duquesne Avenue (Int. #37) – AM
(8) Jefferson Boulevard & Overland Avenue (#38) – PM

Additionally, based on the alternative distribution requested by Culver City, the following additional intersection would be impacted after mitigation:

(1) La Cienega Boulevard (South) & Slauson Avenue (Int. #47)

The Project's cumulative traffic impacts for the Future Year 2018 Plus Project conditions in conjunction with the Related Projects would also be significant and unavoidable at certain intersections.

**Significant Irreversible Environmental Changes**

Pursuant to section 15126.2(c) of the CEQA Guidelines, the City considered the potential significant irreversible environmental changes that could result from the Project. The Project would consume limited, slowly renewable and non-renewable resources. This consumption would occur during the Project's construction and would continue throughout its operational lifetime. Development of the Project would require a commitment of resources that would include: (1) building materials; (2) fuel and operational materials/resources; and (3) the transportation of goods and people to and from the Project Site.

Demolition of the buildings on the Project Site would result in production of waste material. However, the Project would recycle and salvage demolition and construction debris, including asphalt, wood, drywall, metals, and other miscellaneous and composite materials. Proper separation of demolition debris would assist environmental clean-up and allow for proper disposal of hazardous materials that may be found within existing buildings. Further, the City passed an ordinance in 2010 that requires all mixed Construction and Demolition ("C&D") waste generated within the City to be taken to certified C&D waste processors. Some of the City's C&D facilities that reuse or recycle C&D waste have already reached a 100 percent recycling rate.

The Project's construction would require consumption of resources that cannot be replenished or which may renew slowly as to be considered non-renewable, including certain types of lumber and other forest products, aggregate materials used in concrete and asphalt, metals, petrochemical construction materials, and water. Fossil fuels, such as gasoline and oil, would also be consumed in the use of construction vehicles and equipment. The commitment of resources required for the type and level of proposed development would limit the availability of these resources for future generations for other uses during operation of the Project. However, this resource consumption would be consistent with growth and anticipated change in the Los Angeles Region.

With respect to operation, the Project would be developed in a densely populated urban area and would provide greater density in close proximity to existing transit, as well as within 500 feet of the Metro Expo Line's Jefferson/La Cienega Station, thereby reducing vehicle miles traveled. This would also potentially reduce, rather than increase, the need for additional infrastructure. Additionally, the Project would incorporate sustainable design features to reduce the Project's environmental impacts.

As a result of the Project's compliance with the applicable conservation and sustainable measures, no significant irreversible environmental changes would result from the Project.

**Growth-Inducing Impacts**

Pursuant to section 15126.2(d) of the CEQA Guidelines, the City considered the Project's potential growth-inducing impacts. Generally, a Project may foster or encourage population growth in a geographic area if it meets any of the following criteria: (i) economic expansion or growth (e.g., changes in revenue base, employment expansion, etc.); (ii) removal of an impediment to growth (e.g., establishment of an essential public service or the provision of new access to an area); (iii) establishment of a precedent-setting action (e.g., an innovation, a change in zoning, or general plan amendment approval); or (iv) development of or encroachment on an isolated adjacent area of open space (being distinct from an "infill" type of encroachment).

Although the Project would provide new residential, commercial, and office uses, it would not necessitate the extension of roads or other infrastructure. The Project would be developed in a densely populated urban area and would provide greater density around existing and planned transit. The Project's location would reduce vehicle miles traveled and would potentially reduce, rather than increase, the need for additional infrastructure. Street access and utilities are fully built-out in the area.

The Project responds to the unmet housing demand in both the West Adams Community Plan Area and the City of Los Angeles as a whole. Specifically, the Project would help achieve a portion of the household growth forecast for the City while also being consistent with regional policies to reduce urban sprawl, efficiently utilize existing infrastructure, reduce regional congestion, and improve air quality through the reduction of vehicle miles traveled. Thus, while the Project does propose additional housing units, it would not substantially induce housing growth beyond forecasted levels.

The Project's addition of employees could come from the Project area and other areas in the City, especially since the types of land uses are not specialized to compel a net increase in employees from a region outside the local area (or Los Angeles). Employees are assumed to be housed in the local area or Los Angeles, and can access the Site through multiple modes of transit, including the Metro Expo Line.

The roadways and other infrastructure associated with the Project would not induce growth because they would only serve the Project. The Project Site is already developed and connected to all local utility infrastructures, including water, wastewater, electricity, and natural gas. Therefore, utility infrastructure would not be expanding into a new area as a result of the Project.

Finally, the Project would not provide for the removal of an impediment to growth and will not develop or encroach on an isolated or adjacent area of open space. The Project would not be a public service or provide access to a new area or encroach on open space. The Project would be located on an already developed site in the City that is densely urban and served by roadways.

For all those reasons, the Project would not result in a direct significant growth-inducing impact in the project area.

## XI.    OTHER CEQA CONSIDERATIONS

1.  The City, acting through the Planning Department, is the "Lead Agency" for the Proposed Project evaluated in the Final EIR. The City finds that the Final EIR was prepared in compliance with CEQA and the CEQA Guidelines. The city finds that it has independently reviewed and analyzed the Final EIR, and that the Final EIR reflects the independent judgment of the City.

2.  The City finds that the Final EIR provides objective information to assist the decision-makers and the public at large in their consideration of the environmental consequences of the Project. The public review period provided all interested jurisdictions, agencies, private organizations, and individuals the opportunity to submit comments regarding the Draft EIR. The Final EIR was prepared after the review period and adequately responds to comments made during the public review period.

3.  The Planning Department evaluated comments on environmental issues received from persons who reviewed the Draft EIR. In accordance with CEQA, the Planning Department prepared written responses describing the disposition of significant environmental issues raised. The Final EIR provides adequate, good faith and reasoned responses to the comments. The Planning Department reviewed the comments received and responses thereto and has determined that neither the comments received nor the responses to such comments add significant new information regarding environmental impacts to the Draft EIR as defined under CEQA. The lead agency has based its actions on full appraisal of all viewpoints, including all comments received up to the date of adoption of these findings, concerning the environmental impacts identified and analyzed in the Final EIR.

4.  The mitigation measures which have been identified for the Project were identified in the text and summary of the Final EIR. The final mitigation measures are described in the Complete Mitigation Monitoring Program. Each of the mitigation measures identified in the complete Mitigation Monitoring Program, and contained in the Final EIR, is incorporated into the Project. The City finds that the impacts of the Project have been mitigated to the extent feasible by the mitigation measures identified in the Complete Mitigation Monitoring Program, and contained in the Final EIR.

5.  CEQA requires the lead agency approving a project to adopt a Mitigation Monitoring Program for the changes to the project which it has adopted or made a condition of project approval in order to ensure compliance with project implementation. The mitigation measures included in the Final EIR as certified by the City and included in the Complete Mitigation Monitoring Program as adopted by the City serve that function. The complete Mitigation Monitoring Program includes all the mitigation measures identified in the Final EIR and has been designed to ensure compliance during implementation of the Project. In accordance with CEQA, the Complete Mitigation Monitoring Program provides the means to ensure that the mitigation measures are fully enforceable. In accordance with the requirements of Public Resources code section 21081.6, the City hereby adopts the Mitigation Monitoring Program.

6.  In accordance with the requirements of Public Resources Code section 21081.6, the City hereby adopts each of the mitigation measures expressly set forth herein as conditions of approval for the Project.

7.  The custodian of the documents or other materials which constitute the record of
    proceedings upon which the City's decision is based is the Department of City Planning,
    City of Los Angeles, **200 N. Spring St. Suite 750 Los Angeles, CA 90012**.

8.  The City finds and declares that substantial evidence for each and every finding made
    herein is contained in the Final EIR, which is incorporated herein by this reference, or is
    in the record of proceedings in the matter.

9.  The citations provided as references in the Final and Draft EIR for each impact area
    discussed in these Findings are for reference purposes only and are not intended to
    represent an exhaustive listing of all evidence that supports these Findings.

10. The City is certifying the EIR for, and is approving and adopting findings for, the entirety
    of the actions described in these Findings and in the Final EIR. It is contemplated that
    there may be a variety of actions undertaken by other State and local agencies (who
    might be referred to as "responsible agencies" under CEQA). Because the City is the
    lead agency for the Project, the Final EIR is intended to be the basis for compliance with
    CEQA for each of the possible discretionary actions by other State and local agencies to
    carry out the Project.

**Consideration and Approval of the Final EIR**
Pursuant to Article 7 of the CEQA Guidelines, these Findings have been prepared for the
consideration and approval of the Final EIR and the analysis contained herein. The Final EIR
was completed in accordance with CEQA; and the decision-making body has reviewed and
considered the information contained in the Final EIR prior to the action. It is recommended that
the Proposed Project, along with the above detailed mitigation measures to reduce identified
significant environmental effect to below a level of significance, be adopted. Since the Project
will result in significant and unavoidable impacts related to air quality (Project's operation) and
transportation and traffic, a Statement of Overriding Considerations will be required.

## XII.   STATEMENT OF OVERRIDING CONSIDERATIONS

The Final EIR for the Proposed Project has identified unavoidable and significant impacts that
will result from implementation of the Project. Section 21081 of the Public Resources Code and
Section 15093(b) of the CEQA Guidelines provide that when a public agency's decision allows
the occurrence of significant impacts identified in a Final EIR that are not at least substantially
mitigated to an insignificant level or eliminated, the lead agency must state in writing the
reasons to support its action based on the completed EIR and/or other information in the record.
Article I of the City of Los Angeles CEQA Guidelines incorporates all of the State CEQA
Guidelines contained in title 15, California Code of Regulations, sections 15000 et seq., and
hereby requires, pursuant to CEQA Guidelines Section 15093(b) that the decision-maker adopt
a Statement of Overriding Considerations at the time of approval of a project if it finds that
significant adverse environmental effects have been identified in the Final EIR that cannot be
substantially mitigated to an insignificant level or be eliminated. These Findings and the
Statement of Considerations are based on the record of proceedings, including, but not limited
to, the Final EIR, and other documents and materials that constitute the record of proceedings.

The following impacts cannot be mitigated to less than significant levels with incorporation of all
feasible mitigation measures:

*Air Quality*
- The Project's regional operational VOC, NOx, and CO emissions.
- The Project's contribution to cumulative regional operational VOC, NOx, and CO emissions.

*Traffic*
Impacts at the following eight intersections would remain significant and unavoidable after implementation of all feasible mitigation measures:

(1) National Boulevard & Venice Boulevard (Int. #9) – AM & PM
(2) La Cienega Boulevard & Washington Boulevard (Int. #16) – PM
(3) Fairfax Avenue & Washington Boulevard (Int. #17) – AM & PM
(4) Fairfax Avenue & Adams Boulevard (Int. #18) – AM & PM
(5) Jefferson Boulevard & National Boulevard (Int. #25) – AM & PM
(6) La Cienega Boulevard & Jefferson Boulevard (Int. #26) – AM & PM
(7) Jefferson Boulevard & Duquesne Avenue (Int. #37) – AM
(8) Jefferson Boulevard & Overland Avenue (#38) – PM

Additionally, based on the alternative distribution requested by Culver City, the following additional intersection would be impacted after mitigation:

(1) La Cienega Boulevard (South) & Slauson Avenue (Int. #47)

The Project's cumulative traffic impacts for the Future Year 2018 Plus Project conditions in conjunction with the Related Projects would also be significant and unavoidable at certain intersections.

Accordingly, the City adopts the following **Statement of Overriding Considerations**.

The City, having (i) adopted all feasible mitigation measures or with respect to measures within the jurisdiction, of other public agencies, finds that such measures should be adopted by such other agencies; (ii) rejected as infeasible the alternatives to the Proposed Project as discussed above; (iii) recognized all significant, unavoidable impacts; and (iv) balanced the benefits of the Project against its significant and unavoidable impacts, the City hereby finds that the benefits outweigh and override the significant unavoidable impacts for the reasons stated below.

The below stated reasons summarize the benefits, goals, and objectives of the Project and provide the rationale for the benefits of the Project. Any one of the overriding considerations of economic, social, aesthetic and environmental benefits individually would be sufficient to outweigh the adverse environmental impacts of the Project and justify its approval and certification of the Final EIR.

- Implementation of the Project will redevelop a currently underutilized, industrial site into an iconic mixed-use development that combines complementary uses, such as community serving retail, commercial, and residential uses. The project will bring a higher density mixed-use development within walking distance to a Light Rail Station, supporting transportation infrastructure in the City.

- Implementation of the Project will further the City's local and regional objective to reduce vehicle miles traveled and greenhouse gas emission by providing a mix of uses and increased density in close proximity to existing bus and transit systems, including the

Exposition Metro Light Transit Station at La Cienega and Jefferson Boulevards.

- Implementation of the Project will activate the La Cienega and Jefferson Boulevard corridors by attracting residents and visitors, both day and night, by providing publicly accessible open and green spaces, walkways, plazas, and other gathering spaces. Such publicly accessible open space includes the "Zocalo," a 0.68 acre community gathering space open to the public as well as a publicly accessible street plaza at the corner of Jefferson and La Cienega Boulevards.

- Implementation of the Project will encourage pedestrian and bicycle activity by providing bicycle parking and pedestrian linkages within the Project, as well as an attractive pedestrian experience on La Cienega and Jefferson Boulevards.

- Implementation of the Project will create an iconic design identity at the intersection of La Cienega and Jefferson Boulevards through inclusion of architecturally significant elements.

- Implementation of the Project will improve the aesthetic quality of the Project Site by removing older structures and developing new efficient buildings that are more sensitive to adjacent uses.

- Implementation of the Project will incorporate sustainable and green building design and construction to promote resource conservation, including waste reduction, efficient water management techniques, and conservation of electricity and energy. Such sustainable and green features include solar panels and the use of energy star appliances.

- During the project's construction phase, planned construction at Jefferson/La Cienega would generate up to 1,720 on-site, full-time employees in person years. At full development, business activities generated at the Project have the potential to generate up to1,120 net on-site, permanent full-time jobs.

- Implementation of the Project would increase the amount of annual tax revenue generated by the Project Site. After the Project's buildout, anticipated in 2018, the Project will generate a net fiscal impact for the City's General Fund of up to $1,640,700 in net recurring revenues per year. This represents an incremental net fiscal impact per year of $1,572,600 above the existing development, as the radio broadcast facility currently generates $61,300 in annual property taxes to the City.

- Implementation of the Project will generate up to $1,546,600 from construction-related one-time revenues to the City, including $872,200 from the residential portion, $154,400 from the retail, $135,900 from the commercial, and $384,100 from the parking. This figure does not include other potential costs paid to the City, including environmental mitigations, LEED certifications, and other public benefit commitments.

- Implementation of the Project will improve public safety by creating a development that provides the level of density and mix of uses necessary to activate the area both day and night. Furthermore, the project will provide for wider sidewalks, with a 15 foot sidewalk along Jefferson Boulevard and a minimum 12 foot sidewalk along La Cienega Boulevard, which would range up to approximately 20 feet.

- Implementation of the Project will meet the Plan for a Healthy LA's vision of a complete neighborhood, which includes access to health-promoting goods and services, which include affordable grocery stores, by providing an up to 50,000 square foot grocery store.

- Implementation of the Project will provide a reasonably significant amount of housing and varied housing types (approximately 1,218 units - 122 studio units, 634 1-bedroom units, and 462 2-bedroom units) along a major public transportation corridor in furtherance of the City's goals and policies, and in close proximity to the Exposition Metro Light Transit Station at La Cienega and Jefferson Boulevards and major bus routes. Furthermore, the project will contribute towards the city's housing crisis and will contribute to the mayor's goal of building 100,000 new housing units by 2021.

## RESOLUTION

WHEREAS, the subject property is located within the area covered by the West Adams-Baldwin Hills-Leimert Park Community Plan ("Community Plan"), which was adopted by the City Council on May 6, 1998 (CF 96-0534); and

WHEREAS, the applicant is proposing to develop a mixed-use project consisting of 1,218 residential units, 55 of which will be for workforce housing (80 to 120% AMI) and 200,000 square feet of office and 50,000 square feet of grocery store, 20,000 square feet of restaurant space and 30,000 square feet of general retail that would provide much needed housing and retail and restaurant amenities for residents and employees in the West Adams-Baldwin Hills-Leimert Park community; and

WHEREAS, to carry out the above-referenced project, the applicant has requested a General Plan Amendment to (a) change the land use designation for the subject property from Limited Manufacturing to Community Commercial within the West Adams-Baldwin Hills-Leimert Park Community Plan ("Community Plan"); and, (b) amend the General Plan Generalized Land Use Map for the Community Plan area to reflect the Community Commercial land use designation; and

WHEREAS, the General Plan Amendment is consistent with Charter Sections 555, 556, and 558, representing an Amendment in Part of the West Adams-Baldwin Hills-Leimert Park Community Plan, necessary to correct a conflict between the zoning and land use designation; and

WHEREAS, the City Planning Commission at its meeting of March 10, 2016, approved the foregoing General Plan Amendment; and

WHEREAS, the General Plan Amendment is necessary to achieve and maintain consistency between zoning and the adopted Community Plan as required by California State law; and

WHEREAS, pursuant to the provisions of the Los Angeles City Charter, the Mayor and the City Planning Commission have transmitted their recommendations; and

WHEREAS, the requested General Plan Amendment is consistent with the intent and purpose of the West Adams-Baldwin Hills-Leimert Park Community Plan to designate land uses in an orderly and unified manner; and

WHEREAS, the subject request would provide for a more logical and uniform pattern of planned land use development that is compatible with surrounding land use designations on the General Plan; and

WHEREAS, the project has been reviewed by Environmental Impact Report, SCH No. 2015031047, in accordance with the City's Guidelines for implementation of the California Environmental Quality Act ("CEQA") by the City Planning Department.

NOW, THEREFORE, BE IT RESOLVED that the Community Plan shall be amended as shown on the attached General Plan Amendment Map.



LA CIENEGA PL

BODEN ST

COMMUNITY COMMERCIAL

APN 4205033007
APN 4205033015

LA CIENEGA BLVD

JEFFERSON BLVD

THE INTENT OF THIS ORDINANCE
IS FOR THE BOUNDARIES OF THIS
GENERAL PLAN LAND USE TO
COINCIDE WITH THOSE OF
RECORDED TR. 73656.





0    75    150         300
            Feet

C.M. 120 B 173 | CPC-2015-2593-GPA-ZC-HD-ZAA-SPR

AA/9ε

West Adams - Baldwin Hills -
Leimert

022216

City of Los Angeles



West Adams

Data Sources: Department of City Planning, Bureau of Engineering

# EXHIBIT B-17

ORDINANCE NO. _____

      An ordinance amending Section 12.04 of the Los Angeles Municipal Code by amending the zoning map.

THE PEOPLE OF THE CITY OF LOS ANGELES DO ORDAIN AS FOLLOWS:

      Section 1.  Section 12.04 of the Los Angeles Municipal Code is hereby amended by changing the zones and zone boundaries shown upon a portion of the zone map attached thereto and made a part of Article 2, Chapter 1 of the Los Angeles Municipal Code, so that such portion of the zoning map shall be as follows:



LA CIENEGA PL

BODEN ST

LA CIENEGA BLVD

**[T][Q]C2-2D**

APN 4205033007
APN 4205033015

JEFFERSON BLVD

THE INTENT OF THIS ORDINANCE
IS FOR THE BOUNDARIES OF THIS
ZONE CHANGE TO COINCIDE WITH
THOSE OF RECORDED TR. 73656.





0    75    150         300
Feet



City of Los Angeles

West Adams

| C.M. 120 B 173 | CPC-2015-2593-GPA-ZC-HD-ZAA-SPR |

AA/CE

022216

Data Sources: Department of City Planning, Bureau of Engineering

Case No. CPC-2015-2593-GPA-ZC-HD-ZAA-SPR                                        Q-1

## (Q) QUALIFIED CONDITIONS OF APPROVAL

Pursuant to Section 12.32 of the Municipal Code, the following limitations are hereby imposed upon the use of the subject property, subject to the "Q" Qualified classification.

1.   **Site Development.** Except as modified herein, the project shall be in substantial conformance with the plans and materials submitted by the applicant, stamped "Exhibit A," and attached to the subject case file. No change to the plans will be made without prior review by the Department of City Planning, and written approval by the Director of Planning. Each change shall be identified and justified in writing. Minor deviations may be allowed in order to comply with the provisions of the Municipal Code or the project conditions.

    a.   <u>Public Restrooms at Zocalo Park</u>. The project will include restrooms available to the public, to remain open at a minimum, from dawn to dusk.

    b.   <u>Maintenance of Zocalo Park</u>. The property owner or property owner's association(s) will maintain the Zocalo park free of debris and graffiti, and in a safe, clean, and acceptable condition for the life of the project through a covenant as follows:

        i.   <u>Prior to the issuance of any permits relative to this matter</u>, an agreement concerning all the information contained in this Condition No. 1(b) shall be recorded in the County Recorder's Office. The agreement shall run with the land and shall be binding on any subsequent property owners, heirs or assigns. A copy of the recorded agreement, bearing the Recorder's number and date shall be submitted to the Department of City Planning's for attachment to the case file.

    c.   <u>Façade</u>. The facades of the buildings shall include a variation of materials and proportions in a manner consistent with and consisting of the materials identified, on the attached "Exhibit A" and "Exhibit E".

    d.   **Development Services Center**. Prior to sign-off on building permits by the Department of City Planning's Development Services Center, the Department of City Planning's Major Projects Section, shall confirm, via signature, that the project's building plans substantially conform to the conceptual plans stamped as "Exhibit A" and "Exhibit E", as approved by the City Planning Commission.

2.   **Density.**

    a.   The project shall be limited to a maximum of 1,210 dwelling units. The applicant shall consider setting aside 55 dwelling units for households earning up to 120% AMI.

    b.   The project shall include up to 200,000 square feet of office space, and 100,000 square feet of grocery, restaurant, and retail space.

3.   **Residential Automobile Parking.** Parking would be provided in accordance with Los Angeles Municipal Code (LAMC) parking requirements.

    a.   Twenty percent (20%) of the project's code required parking spaces are to have conduits for the future installation of charging stations for vehicles, including newer transportation charging technologies that may supersede the current electric vehicle requirements.

4.  **Solar Panels.**  Solar Panels will be provided in accordance with the roof plan stamped "Exhibit B" or in a similar fashion or alternative layout that matches the intended quantities of panels or the magnitude of expected energy output of the arrays shown in "Exhibit B".

5.  **Calculation of Residential Density.** The Project's Residential Density shall be limited to 1,210 dwelling units.

**Other Entitlement Conditions of Approval**

6.  **Use.**  The use of the subject property shall be limited to those uses permitted in the C2 Zone as defined in Section 12.16.A of the L.A.M.C.

7.  **Commercial Parking.**  Provide parking for commercial use in compliance with L.A.M.C. Section 12.21-A,4.

8.  **Bicycle Parking.** Bicycle parking shall be provided consistent with LAMC 12.21 A.16. Long-term bicycle parking shall be provided at a rate of one per dwelling unit or guest room. Additionally, short-term bicycle parking shall be provided at a rate of one per ten dwelling units or guest rooms, with a minimum of two short-term bicycle parking spaces. Based upon the number of dwelling units, 1,210 long-term and 121 short-term bicycle parking spaces shall be provided onsite for residential uses. For commercial uses, long-term bicycle parking shall be provided at 1 space per 2,000 square feet of retail, 1 space per 2,000 square feet of restaurant, and 1 space per 5,000 square feet of office. Based upon the square footage of commercial uses, 90 long-term bicycle spaces shall be provided. For short-term bicycle parking, 1 space per 2,000 square feet of retail and restaurant shall be required and 1 space per 10,000 square feet of office shall be required. Based upon the square footage of commercial uses, 70 short-term commercial bicycle spaces shall be provided.

9.  **Building Articulation.**  The building façade shall include large windows, balcony openings, variation of façade plans and rooflines as shown on the project plans labeled "Exhibit A" stamp-dated March 3, 2016.

**ADMINISTRATIVE CONDITIONS OF APPROVAL**

10.  **Approval, Verification and Submittals.** Copies of any approvals, guarantees or verification of consultations, review or approval, plans, etc., as may be required by the subject conditions, shall be provided to the Department of City Planning for placement in the subject file.

11.  **Code Compliance.** Area, height and use regulations of the zone classification of the subject property shall be complied with, except where herein conditions are more restrictive.

12.  **Covenant.** Prior to the issuance of any permits relative to this matter, an agreement concerning all the information contained in these conditions shall be recorded in the County Recorder's Office. The agreement shall run with the land and shall be binding on any subsequent property owners, heirs or assigns. The agreement shall be submitted to the Department of City Planning's Development Services Center for approval before being recorded. After recordation, a copy bearing the Recorder's number and date shall be provided to the Department of City Planning for attachment to the file.

13. **Definition.** Any agencies, public officials or legislation referenced in these conditions shall mean those agencies, public officials, legislation or their successors, designees or amendment to any legislation.

14. **Enforcement.** Compliance with these conditions and the intent of these conditions shall be to the satisfaction of the Department of City Planning and any designated agency, or the agency's successor and in accordance with any stated laws or regulations, or any amendments thereto.

15. **Building Plans.** Page 1 of the grants and all the conditions of approval shall be printed on the building plans submitted to the City Planning Department and the Department of Building and Safety.

16. **Corrective Conditions.** The authorized use shall be conducted at all times with due regard for the character of the surrounding district, and the right is reserved to the City Planning Commission, or the Director of Planning, pursuant to Section 12.27.1 of the Municipal Code, to impose additional corrective conditions, if in the decision makers opinion, such actions are proven necessary for the protection of persons in the neighborhood or occupants of adjacent property.

17. **Project Plan Modifications.** Any corrections and/or modifications to the Project plans made subsequent to this grant that are deemed necessary by the Department of Building and Safety, Fire Department, or other City Agency for Code compliance, and which involve a change in site plan, floor area, parking, building height, yards or setbacks, building separations, or lot coverage, shall require a referral of the revised plans back to the Department of City Planning for additional review and final sign-off prior to the issuance of any building permit in connection with said plans. This process may require additional review and/or action by the appropriate decision making authority including the Director of Planning, City Planning Commission, Area Planning Commission, or Board.

18. **Indemnification.** Applicant shall do all of the following:

(i) Defend, indemnify and hold harmless the City from any and all actions against the City relating to or arising out, in whole or in part, of the City's processing and approval of this entitlement, including but not limited to, an action to attack, challenge, set aside, void, or otherwise modify or annul the approval of the entitlement, the environmental review of the entitlement, or the approval of subsequent permit decisions, or to claim personal property damage, including from inverse condemnation or any other constitutional claim.

(ii) Reimburse the City for any and all costs incurred in defense of an action related to or arising out of, in whole or in part, the City's processing and approval of the entitlement, including but not limited to payment of all court costs and attorney's fees, costs of any judgments or awards against the City (including an award of attorney's fees), damages, and/or settlement costs.

(iii) Submit an initial deposit for the City's litigation costs to the City within 10 days' notice of the City tendering defense to the Applicant and requesting a deposit. The initial deposit shall be in an amount set by the City Attorney's Office, in its sole discretion, based on the nature and scope of action, but in no event shall the initial deposit be less than $25,000. The City's failure to notice or collect the deposit does not relieve the Applicant from responsibility to reimburse the City pursuant to the requirement in paragraph (ii).

(iv) Submit supplemental deposits upon notice by the City. Supplemental deposits may be required in an increased amount from the initial deposit if found necessary by the City to protect the City's interests. The City's failure to notice or collect the deposit does not relieve the Applicant from responsibility to reimburse the City pursuant to the requirement in paragraph (ii).

(v) If the City determines it necessary to protect the City's interest, execute an indemnity and reimbursement agreement with the City under terms consistent with the requirements of this condition.

The City shall notify the applicant within a reasonable period of time of its receipt of any action and the City shall cooperate in the defense. If the City fails to notify the applicant of any claim, action, or proceeding in a reasonable time, or if the City fails to reasonably cooperate in the defense, the applicant shall not thereafter be responsible to defend, indemnify or hold harmless the City. The City shall have the sole right to choose its counsel, including the City Attorney's office or outside counsel. At its sole discretion, the City may participate at its own expense in the defense of any action, but such participation shall not relieve the applicant of any obligation imposed by this condition. In the event the Applicant fails to comply with this condition, in whole or in part, the City may withdraw its defense of the action, void its approval of the entitlement, or take any other action. The City retains the right to make all decisions with respect to its representations in any legal proceeding, including its inherent right to abandon or settle litigation.

For purposes of this condition, the following definitions apply:

"City" shall be defined to include the City, its agents, officers, boards, commissions, committees, employees, and volunteers.

"Action" shall be defined to include suits, proceedings (including those held under alternative dispute resolution procedures), claims, or lawsuits. Actions includes actions, as defined herein, alleging failure to comply with any federal, state or local law.

Nothing in the definitions included in this paragraph are intended to limit the rights of the City or the obligations of the Applicant otherwise created by this condition.

19. **Environmental Mitigation Conditions**

Prior to the recordation of the final map, the subdivider shall prepare and execute a covenant and Agreement (Planning Department General Form CP-6770) in a manner satisfactory to the Planning Department, binding the subdivider and all successors to the following:

This Mitigation Monitoring Program ("MMP") has been prepared pursuant to Public Resources Code Section 21081.6, which requires a Lead Agency to adopt a "reporting or monitoring program for changes to the project or conditions of project approval, adopted in order to mitigate or avoid significant effects on the environment." In addition, Section 15097(a) of the State CEQA Guidelines requires that:

> *In order to ensure that the mitigation measures and project revisions identified in the EIR or negative declaration are implemented, the public agency shall adopt a program for monitoring or reporting on the revisions which it has required in the project and measures it has imposed to mitigate or avoid significant environmental effects. A public agency may*

*delegate reporting or monitoring responsibilities to another public agency or to a private entity which accepts the delegation; however, until mitigation measures have been completed the lead agency remains responsible for ensuring that implementation of the mitigation measures occurs in accordance with the program.*

The City of Los Angeles is the Lead Agency for the Project and therefore is responsible for administering and implementing the MMP. Where appropriate, the Project's Draft and Final EIRs identified mitigation measures and project design features to avoid or to mitigate potential impacts identified to a level where no significant impact on the environment would occur, or impacts would be reduced to the extent feasible. This MMP is designed to monitor implementation of the Project's mitigation measures as well as its project design features.

As shown on the following pages, each required mitigation measure and proposed project design feature for the Project is listed and categorized by impact area, with an accompanying identification of the following:

- **Enforcement Agency:** The agency with the power to enforce the Mitigation Measure/Project Design Feature.
- **Monitoring Agency:** The agency to which reports involving feasibility, compliance, implementation and development are made.
- **Monitoring Phase:** The phase of the Project during which the Mitigation Measure/Project Design Feature shall be monitored.
- **Monitoring Frequency:** The frequency at which the Mitigation Measure/Project Design Feature shall be monitored.
- **Action Indicating Compliance:** The action of which the Enforcement or Monitoring Agency indicates that compliance with the required Mitigation Measure/Project Design Feature has been implemented.

The Project's MMP will be in place throughout all phases of the Project. The Project applicant will be responsible for implementing all mitigation measures unless otherwise noted. The applicant shall also be obligated to provide a certification report to the appropriate monitoring agency and the appropriate enforcement agency that compliance with the required mitigation measure or project design feature has been implemented. The City's existing planning, engineering, review, and inspection processes will be used as the basic foundation for the MMP procedures and will also serve to provide the documentation for the reporting program.

The certification report shall be submitted to the Project Planner at the Los Angeles Department of City Planning. Each report will be submitted to the Project Planner annually following completion/implementation of the applicable mitigation measures and project design features and shall include sufficient information and documentation (such as building or demolition permits) to reasonably determine whether the intent of the measure has been satisfied. The City, in conjunction with the Applicant, shall assure that Project construction and operation occurs in accordance with the MMP.

After review and approval of the final MMP by the City, minor changes and modifications to the MMP are permitted, but can only be made by the Applicant subject to the approval by the City. The City, in conjunction with any appropriate agencies or departments, will determine the adequacy of any proposed changes or modification. The flexibility is necessary due to the nature of the MMP, the need to protect the environment in the

most efficient manner, and the need to reflect changes in regulatory conditions, such as but not limited to changes to building code requirements, updates to LEED "Silver" standards, and changes in Secretary of Interior Standards. No changes will be permitted unless the MMP continues to satisfy the requirements of CEQA, as determined by the City.

**Mitigation Measures & Project Design Features**

**MM A.1 Cultural Resources (Archaeological Resources).** If any archaeological materials are encountered during the course of Project development, all further development activity shall be halted in the area of the discovery and:

a.      The services of an archaeologist shall then be secured by contacting the South Central Coastal Information Center located at California State University Fullerton, or a member of the Society of Professional Archaeologists (SOPA), or a SOPA-qualified archaeologist, who shall assess the discovered material(s) and prepare a survey, study, or report evaluating the impact.

b.      The archaeologist's survey, study, or report shall contain a recommendation(s), if necessary, for the preservation, conservation, or relocation of the resource.

c.      The applicant shall comply with the recommendations of the evaluating archaeologist, as contained in the survey, study, or report.

d.      Project development activities may resume once copies of the archaeological survey, study, or report are submitted to the South Central Coastal Information Center at California State University Fullerton.

e.      Prior to the issuance of any building permit, the applicant shall submit a letter to the case file indicating what, if any, archaeological reports have been submitted, or a statement indicating that no material was discovered.

f.      A covenant and agreement binding the applicant to this condition shall be recorded prior to issuance of a grading permit.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: If materials are encountered
**Action Indicating Compliance**: Field inspection sign-off

**MM A-2 Cultural Resources (Paleontological Resources).** If any paleontological materials are encountered during the course of Project development, all further development activities shall be halted in the area of the discovery and:

a.      The services of a paleontologist shall then be secured by contacting the Center for Public Paleontology – USC, UCLA, California State University Los Angeles, California State University Long Beach, or the Los Angeles County Natural History Museum – who shall assess the discovered material(s) and prepare a survey, study, or report evaluating the impact.

b.   The paleontologist's survey, study, or report shall contain a recommendation(s), if necessary, for the preservation, conservation, or relocation of the resource.

c.   The applicant shall comply with the recommendations of the evaluating paleontologist, as contained in the survey, study, or report.

d.   Project development activities may resume once copies of the paleontological survey, study, or report are submitted to the Los Angeles County Natural History Museum.

e.   Prior to the issuance of any building permit, the applicant shall submit a letter to the case file indicating what, if any, paleontological reports have been submitted, or a statement indicating that no material was discovered.

f.   A covenant and agreement binding the applicant to this condition shall be recorded prior to the issuance of a grading permit.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: If materials are encountered
**Action Indicating Compliance**: Field inspection sign-off

**MM A-3 Cultural Resources (Human Remains).**  In the event that human remains are discovered during excavation activities, the following procedure shall be observed:

a.   Stop immediately and contact the County Coroner.

b.   The coroner has two working days to examine human remains after being notified by  the responsible person. If the remains are Native American, the coroner has 24 hours to notify the Native American Heritage Commission.

c.   The Native American Heritage Commission will immediately notify the person it believes to be the most likely descendant of the deceased Native American.

d.   The most likely descendant has 48 hours to make recommendations to the owner, or representative, for the treatment or disposition, with proper dignity, of the human remains and grave gods.

e.   If the descendant does not make recommendations within 48 hours, the owner shall reinter the remains in an area of the property secure from further disturbance.

f.   If the owner does not accept the descendant's recommendations, the owner or the descendant may request mediation by the Native American Heritage Commission.

**Enforcement Agency**: Los Angeles Department of Building and Safety, Los Angeles County Coroner
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction

**Monitoring Frequency**: If human remains are encountered
**Action Indicating Compliance**: Coroner or Native American Heritage Commission sign-off

### Aesthetics

**MM B.1** All mechanical and electrical equipment that is located on the rooftops would be screened from public view.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**MM B.2** The maximum height of any building constructed as part of the Project would be 320 feet.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**MM B.3** The maximum square footage of the proposed tower would be 480,000 square feet.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**MM B.4** The Project shall conform to the general layout shown on the site plan dated January 6, 2016.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**MM B.5** Utility equipment would be placed underground, screened from public view, or incorporated into the design of the Project.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**MM B.6** All exterior lighting would be designed with internal and/or external glare control and would be designed, arranged, directed, or shielded to contain direct illumination on-site.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**MM B.7** The exterior of the proposed structures shall be constructed of materials such as, but not limited to, high-performance and/or non-reflective tinted glass (no mirror-like tints or films) and pre-cast concrete or fabricated wall surfaces to minimize glare and reflected heat.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

## Air Quality

**MM C.1** All diesel-powered off-road construction equipment greater than 50 horsepower shall meet USEPA Tier 3 or higher emissions standards. In addition, all construction equipment shall be outfitted with BACT devices certified by CARB. Any emissions control device used by the contractor shall achieve emissions reductions that are no less than what could be achieved by a CARB-defined Level 3 diesel emissions control strategy for a similarly sized engine as defined by CARB regulations.

**Enforcement Agency**: Los Angeles Department of Building and Safety; SCAQMD
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Periodic field inspection
**Action Indicating Compliance**: Field inspection sign off

**MM C.2** Require the use of 2010 and newer diesel haul trucks (e.g., material delivery trucks and soil import/export) and if the Lead Agency determines that 2010 model year or newer diesel trucks cannot be obtained, the Lead Agency shall require trucks that meet U.S. EPA 2007 model year NOx emissions requirements.

**Enforcement Agency**: Los Angeles Department of Building and Safety; SCAQMD
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Periodic field inspection
**Action Indicating Compliance**: Field inspection sign off

**MM C.3**  At the time of mobilization of each applicable unit of equipment, a copy of each unit's certified  tier specification, BACT documentation, and CARB or SCAQMD operating permit shall be provided.

**Enforcement Agency**: Los Angeles Department of Building and Safety; SCAQMD
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Once, during field inspection
**Action Indicating Compliance**: Field inspection sign off

**MM C.4**  Encourage construction contractors to apply for SCAQMD "SOON" funds. Incentives could be provided for those construction contractors who apply for SCAQMD "SOON" funds. The  "SOON" program provides funds to accelerate clean up of off-road diesel vehicles, such as heavy duty construction equipment. More information on this program can be found at: http://www.aqmd.gov/home/programs/business/business-detail?title=off-road-diesel-engines&parent=vehicle-engine-upgrades.

**Enforcement Agency**: Los Angeles Department of Building and Safety; SCAQMD
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Periodic field inspection
**Action Indicating Compliance**: Field inspection sign off

**MM C.5**  Hearths and fireplaces shall be excluded from residential units.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-Construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Issuance of building permits

**MM C.6**  Construction activities shall comply with SCAQMD Rule 403, including the following measures:

- Apply water to disturbed areas of the site three times a day

- Require the use of a gravel apron or other equivalent methods to reduce mud and  dirt trackout onto truck exit routes

- Appoint a construction relations officer to act as a community liaison concerning on-site construction activity including resolution of issues related to PM generation.

- Limit soil disturbance to the amounts analyzed in the Final EIR.

- All materials transported off-site shall be securely covered.

- Apply non-toxic soil stabilizers according to manufacturers' specifications to all inactive construction areas (previously graded areas inactive for ten days or more).

- Traffic speeds on all unpaved roads to be reduced to 15 mph or less.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Periodic field inspection
**Action Indicating Compliance**: Field inspection sign off

**MM C.7**  All diesel-fueled commercial heavy- and  medium-duty vehicles shall comply with  CARB's regulations limiting idling (Title 13 Section 2485). This includes no idling of  primary  diesel engines for more than five minutes and not using diesel-fueled auxiliary power systems to power cab functions (e.g., heating, air conditions) for more than five minutes when within 100 feet of restricted areas.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Periodic field inspection
**Action Indicating Compliance**: Field inspection sign off

**MM C.8**  Architectural coatings and  solvents applied during construction activities shall comply with SCAQMD Rule 1113, which governs the VOC content of architectural coatings.

**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Field inspection
**Action Indicating Compliance**: Field inspection sign off

**MM C.9**  Any stationary sources of emissions shall comply with SCAQMD rules and regulations, including Regulation XIII, which governs New Source Review for major stationary sources.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Field inspection
**Action Indicating Compliance**: Field inspection sign off

**MM C.10**  Any restaurants that include chain-driven charbroilers shall comply with SCAQMD Rule 1138, which requires use of catalytic oxidizer controls.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Field inspection

**Action Indicating Compliance**: Field inspection sign off

**Geology & Soils**

**MM D.1**   The Project shall comply with the conditions contained within the Department of Building and Safety's Geology and Soils Report Approval Letter for the proposed project, and as it may be subsequently amended or modified.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Prior to the issuance of grading or building permits
**Monitoring Frequency**: Ongoing during construction
**Action Indicating Compliance**: Field inspection sign-off

**MM D.2**  All structures and buildings shall be constructed to industry standards and agency regulations for all geotechnical considerations, including seismic, soil excavation, de-watering requirements, grading, foundation design, settlement, pavement recommendations, retaining walls, drainage, shoring, and any other relevant recommendations within the Geotechnical Investigation.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Ongoing during construction
**Action Indicating Compliance**: Field inspection sign-off

**MM E-1   Greenhouse Gas Emissions.**   To encourage carpooling and the use of electric vehicles by Project residents and visitors, the Applicant shall provide panel capacity and conduit for future installation of electrical outlets, designed to accommodate the future installation, and simultaneous charging, of a minimum number of 208/240 V amp, grounded AC outlets, that is equal to 20 percent of the total number of parking spaces. The conduit shall terminate within the parking area. When the application of the 20 percent results in a fractional space, round up to the next whole number.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Field inspection
**Action Indicating Compliance**: Field inspection sign-off

**Hazards & Hazardous Materials**

**MM F.1**  Prior to issuance of a grading permit, the Project Applicant shall prepare a Soil Management Plan (SMP) for the Project. The SMP should address the delineation of the vertical and lateral extent of identified TPH and metals impacts in Project Site soil. Soil management procedures shall be described so that hazardous soil can be separated from non-hazardous soil during excavation tasks.

Soil management procedures outlined in the SMP shall be followed during the Project's excavation and development phases to properly manage the various

classes of soil and to minimize risk to workers and the public during construction.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**:   Grading and excavation
**Monitoring Frequency**: Periodic, during grading
**Action Indicating Compliance**: Issuance of grading permit

**MM F.2**  The soils is the areas on Parcels A and B with the potential for elevated concentrations of lead will be excavated prior to the start of construction and the excavated material will be stockpiled and characterized for disposal prior to shipment off-site. Soil samples will be collected from the bottom and sidewalls of the excavation to confirm the lead impacted soil has been removed.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Grading and excavation
**Monitoring Frequency**: Periodic, during grading
**Action Indicating Compliance**: Soil samples indicating that lead impacted soil has been removed.

**MM F.3**  If an underground storage tank on Parcel D is encountered during grading and excavation for the proposed subterranean parking structure, it shall be removed under permit and in accordance with LAFD regulations.

**Enforcement Agency**: Los Angeles Fire Department.
**Monitoring Agency**: Los Angeles Fire Department.
**Monitoring Phase**: During grading and excavation
**Monitoring Frequency**: Periodic during grading and excavation
**Action Indicating Compliance**: Issuance of underground storage tank removal approval letter

**MM F.4**  Prior to the issuance of any permit for the demolition or alteration of the existing structures, the Applicant shall provide a letter to the Department of Building and Safety from a qualified asbestos abatement consultant indicating that no Asbestos-Containing Materials (ACM) are present in the building. If ACMs are found to be present, it will need to be  abated in compliance with the South Coast Air Quality Management District's Rule 1403 as well as all other applicable State and Federal rules and regulations.

**Enforcement Agency**: Los Angeles Department of Building and Safety.
**Monitoring Agency**: Los Angeles Department of Building and Safety.
**Monitoring Phase**: Prior to demolition activities
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Issuance of a building permit

**MM F.5**  Prior to issuance of any permit for the demolition or alteration of the existing structures, a lead-based paint survey shall be performed to the written satisfaction of the Department of Building and Safety. Should lead-based paint

materials be identified, standard handling and disposal practices shall be implemented pursuant to OSHA regulations.

**Enforcement Agency**: Los Angeles Department of Building and Safety.
**Monitoring Agency**: Los Angeles Department of Building and Safety.
**Monitoring Phase**: Prior to demolition activities
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Issuance of a building permit

**MM F.6** Prior to the issuance of a building permit, the Applicant shall develop an emergency response plan in consultation with the Fire Department. The emergency response plan shall include but not be limited to the following: mapping of emergency exits, evacuation routes for vehicles and pedestrians, location of nearest hospitals, and fire departments.

**Enforcement Agency**: LAFD; Los Angeles Department of Building and Safety
**Monitoring Agency**: LAFD; Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-operation; Operation
**Monitoring Frequency**: Once, for Plan approval prior to operation
**Action Indicating Compliance**: Plan approval prior to operation (Pre-operation)

### Hydrology & Water Quality

**MM G.1** Prior to issuance of a grading permit, the Applicant shall obtain coverage under the State Water Resources Control Board National Pollutant Discharge Elimination System General Permit for Storm Water Discharges Associated with Construction and Land Disturbance Activities (Order No. 2009-0009-DWQ, National Pollutant Discharge Elimination System No. CAS000002) (Construction General Permit). The Applicant shall provide the Waste Discharge Identification Number to the City of Los Angeles to demonstrate proof of coverage under the Construction General Permit. A Storm Water Pollution Prevention Plan shall be prepared and implemented for the proposed Modified Project in compliance with the requirements of the Construction General Permit. The Storm Water Pollution Prevention Plan shall identify construction Best Management Practices to be implemented to ensure that the potential for soil erosion and sedimentation is minimized and to control the discharge of pollutants in stormwater runoff as a result of construction activities.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-grading
**Monitoring Frequency**: Once, at permit application submittal
**Action Indicating Compliance**: Issuance of grading permit

**MM G.2** If required, any dewatering activities during construction shall comply with the requirements of the Waste Discharge Requirements for Discharges of Groundwater from Construction and Project Dewatering to Surface Waters in Coastal Watersheds of Los Angeles and Ventura Counties (Order No. R4-2008-0032, National Pollutant Discharge Elimination System No. CAG994004) or subsequent permit. This will include submission of a Notice of Intent for coverage under the permit to the Los Angeles Regional Water Quality Control Board at

least 45 days prior to the start of dewatering and compliance with all applicable provisions in the permit, including water sampling, analysis, and reporting of dewatering-related discharges.

**Enforcement Agency**: Los Angeles Regional Water Quality Control Board
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: 45 days prior to dewatering, if required
**Monitoring Frequency**: Once, at permit application submittal
**Action Indicating Compliance**: Submittal of Notice of Intent

**MM G.3**  Prior to issuance of grading permits, the Applicant shall submit a Low Impact Development Plan and/or Standard Urban Stormwater Mitigation Plan to the City of Los Angeles Bureau of Sanitation Watershed Protection Division for review and approval. The Low Impact Development Plan and/or Standard Urban Stormwater Mitigation Plan shall be prepared consistent with the requirements of the Development Best Management Practices Handbook.

**Enforcement Agency**: Los Angeles Bureau of Sanitation
**Monitoring Agency**: Los Angeles Bureau of Sanitation
**Monitoring Phase**: Pre-grading
**Monitoring Frequency**: Once, at LID Plan submittal
**Action Indicating Compliance**: Issuance of grading permit

**MM G.4**  The Best Management Practices shall be designed to retain or treat the runoff from a storm event producing 0.75 inch of rainfall in a 24-hour period, in accordance with the Development Best Management Practices Handbook Part B Planning Activities. A signed certificate from a licensed civil engineer or licensed architect confirming that the proposed Best Management Practices meet this numerical threshold standard shall be provided.

**Enforcement Agency**: Los Angeles Bureau of Sanitation
**Monitoring Agency**: Los Angeles Bureau of Sanitation
**Monitoring Phase**: Pre-grading
**Monitoring Frequency**: Once, at submittal of Best Management Practices certificate
**Action Indicating Compliance**: Issuance of grading permit

**MM G.5**  The Project Applicant shall comply with all mandatory storm water permit requirements (including, but not limited to NPDES, SWPPP and SUSMP, and LID requirements) at the Federal, State and local level.

**Enforcement Agency**: Los Angeles Department of Building and Safety.
**Monitoring Agency**: Los Angeles Department of Building and Safety.
**Monitoring Phase**: Prior to construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Issuance of a building permit

**Noise**

**MM I.1** The Project shall comply with the City of Los Angeles Building Regulations Ordinance No. 178048, which requires a construction site notice to be provided that includes the following information: job site address, permit number, name and phone number of the contractor and owner or owner's agent, hours of construction allowed by code or any discretionary approval for the site, and City telephone numbers where violations can be reported. The notice shall be posted and maintained at the construction site prior to the start of construction and displayed in a location that is readily visible to the public.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Once, during field inspection
**Action Indicating Compliance**: Field inspection sign-off

**MM I.2** Two weeks prior to commencement of construction, notification shall be provided to the off-site residential and studio uses within 500 feet of the Project site that discloses the construction schedule, including the types of activities and equipment that would be used throughout the duration of the construction period.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Two weeks prior to construction
**Monitoring Frequency**: Once, at notification
**Action Indicating Compliance**: Contractor sign-off

**MM I.3** A combination of temporary sound barriers that are capable of achieving a sound attenuation of up to 20 dBA as outlined in the EIR (including Appendix B to this Final EIR) and as determined by the Department of Building and Safety ), and capable of blocking the  line-of-sight from ground level construction equipment powered by internal combustion  engines  to the adjacent studios and other commercial properties to the immediate north of the Proposed Project site shall be installed as feasible.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Once, during field inspection
**Action Indicating Compliance**: Field inspection sign-off

**MM I.4** Temporary sound barriers that are capable of achieving a sound attenuation of up to 5 dBA as determined by the Department of Building and Safety , and capable of blocking the line-of-sight from ground level construction equipment powered by internal combustion engines to the residences east of La Cienega Boulevard shall be installed as feasible.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Once, during field inspection
**Action Indicating Compliance**: Field inspection sign-off

**MM I.5** All powered construction equipment shall be equipped with exhaust mufflers or other suitable noise reduction devices.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Once, during field inspection
**Action Indicating Compliance**: Field inspection sign-off

**MM I.6** All construction areas for staging and warming-up equipment shall be located as far as feasibly possible from adjacent recording studios to the north of the Project site.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Periodic field inspection
**Action Indicating Compliance**: Field inspection sign-off

**MM I.7** Portable noise sheds for smaller, noisy equipment, such as air compressors, dewatering pumps, and generators shall be provided.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Once, during field inspection
**Action Indicating Compliance**: Field inspection sign-off

## Public Services – Fire Protection

**MM K.1-1** The Project shall comply with the 2014 Fire Code and any subsequent codes at the time of building permits, including the requirements for automatic fire sprinkler systems and any other fire protection devices deemed necessary by the Fire Chief (e.g., fire signaling systems, fire extinguishers, smoke removal systems, etc.).

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-Construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Issuance of building permits

**MM K.1-2** The following recommendations of the LAFD relative to fire safety shall be incorporated into the building plans, which includes the submittal of a plot plan for approval by the LAFD either prior to the recordation of a final map or the approval of a building permit. The plot plan shall include the following minimum design features: fire lanes, where required, shall be a minimum of 20 feet in width; all structures must be within 300 feet of an approved fire hydrant, and entrances to any dwelling unit or guest room shall not be more than 150 feet in

distance in horizontal travel from the edge of the roadway of an improved street or approved fire lane.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-Construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Issuance of building permits

**MM K.1-3** The Project Applicant shall submit a plot plan to the LAFD prior to occupancy of the Project, for review and approval, which shall provide the capacity of the fire mains serving the Project Site. Any required upgrades shall be identified and implemented prior to occupancy of the Project.

**Enforcement Agency**: LAFD
**Monitoring Agency**: LAFD
**Monitoring Phase**: Pre-operation
**Monitoring Frequency**: Once, prior to operation
**Action Indicating Compliance**: Plan approval prior to operation (Pre-operation)

**MM K.1-4** The Project Applicant shall submit an emergency response plan to Los Angeles Fire Department prior to occupancy of the Project for review and approval. The emergency response plan would include but not be limited to the following: mapping of emergency exits, evacuation routes for vehicles  and pedestrians, location of nearest hospitals, and fire stations. Any required modifications shall be identified and implemented prior to occupancy of the Project.

**Enforcement Agency**: LAFD; Los Angeles Department of Building and Safety
**Monitoring Agency**: LAFD; Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-operation; Operation
**Monitoring Frequency**: Once, for Plan approval prior to operation
**Action Indicating Compliance**: Plan approval prior to operation (Pre-operation)

**MM K.1-5** The construction contractors and work crews shall properly maintain the mechanical equipment according to best practices and the manufacturers' procedures, ensure proper  storage of flammable materials, and cleanup of spills of flammable liquid.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Periodic field inspection
**Action Indicating Compliance**: Field inspection sign-off

**MM K.1-6** If there are partial closures to streets surrounding the Project Site, flagmen shall be  used to facilitate the traffic flow until the street closure around the construction is complete.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety

**Monitoring Phase**: Demolition and construction
**Monitoring Frequency**: Periodic field inspection
**Action Indicating Compliance**: Field inspection sign-off

**MM K.1-7** During demolition and construction, LAFD access from major roadways shall remain clear and unobstructed.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Demolition and construction
**Monitoring Frequency**: Periodic field inspection
**Action Indicating Compliance**: Field inspection sign-off

**MM K.1-8** The design of the Project Site shall provide adequate access for LAFD equipment and personnel to the structure.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-Construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Issuance of building permits

**Public Services – Police Protection**

**MM K.2-1** Temporary construction fencing shall be placed along the periphery of the active construction areas to screen as much of the construction activity from view at the local street level and to keep unpermitted persons from entering the construction area.

The perimeter fence shall have gates installed to facilitate the ingress and egress of equipment and the work force. The bottom of the fence, where necessary, shall have filter fabric to prevent silt run off.   Straw hay bales shall be utilized around catch basins when located within the construction zone. The perimeter and  silt  fence shall be  maintained while in  place. Where applicable, the construction fence shall be incorporated with a pedestrian walkway. Temporary lighting shall be installed and maintained at the pedestrian walkway.  Should sections of the site fence have to be removed to facilitate work in progress, barriers and or K – rail shall be utilized to isolate and protect the public from unsafe conditions.

**Enforcement Agency**: Los Angeles Department of building and Safety
**Monitoring Agency**: Los Angeles Department of building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Periodic field inspections during construction
**Action Indicating Compliance**: Field inspection sign-off

**MM K.2-2** The Project Applicant shall provide for the deployment of a private security guard to monitor and patrol the Sites, appropriate to the phase of construction throughout the construction period. The patrol shall be deployed at times that are typical within the local-area construction industry for a Project of this size.

**Enforcement Agency**: Los Angeles Department of building and Safety
**Monitoring Agency**: Los Angeles Department of building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Periodic field inspections during construction
**Action Indicating Compliance**: Field inspection sign-off

**MM K.2-3** The plans shall incorporate the design guidelines relative to security, semi-public and private spaces, which may include but not be limited to access control to building, secured parking facilities, walls/fences with key systems, well-illuminated public and semi-public space designed with a minimum of dead space to eliminate areas of concealment, location of toilet facilities or building entrances in high-foot traffic areas, and provision of security guard patrol throughout the project site if needed. Please refer to "Design Out Crime Guidelines: Crime Prevention Through Environmental Design", published by the Los Angeles Police Department. Contact the Community Relations Division, located at 100 W. 1st Street, #250, Los Angeles, CA 90012; (213) 486-6000. These measures shall be approved by the Police Department prior to the issuance of building permits.

**Enforcement Agency**: Los Angeles Police Department
**Monitoring Agency**: Los Angeles Department of building and Safety
**Monitoring Phase**: Pre-Construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Issuance of building permits

**MM K.2-4** The Project Applicant shall provide the LAPD with a diagram of each portion of the Project Site, showing access routes and additional access information as requested by the LAPD, to facilitate police response.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-Occupancy
**Monitoring Frequency**: Once, prior to occupancy
**Action Indicating Compliance**: Police Department confirmation of receiving diagram

**MM K.2-5** Emergency access shall be maintained to the Project Site during construction through marked emergency access points approved by the LAPD.

**Enforcement Agency**: Los Angeles Police Department
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Construction
**Monitoring Frequency**: Periodic field inspection
**Action Indicating Compliance**: Field inspection sign-off

**MM K.2-6** The Project shall provide for on-site security measures and controlled access systems for residents and tenants to minimize the demand for police protection services. These measures include, but are not limited to, the following:

- •   Perimeter lighting to supplement the street lighting and to provide increased visibility and security;
- •   On-Site security personnel, commensurate to similar/comparable residential and retail projects of its size, as needed.
- •   Parking Structure Access Control; and
- •   Residential Units Access Control.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-Construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Issuance of building permits

**Public Services – Schools.**

**MM K.3-1** Prior to issuance of a building permit, the General Manager of the City of Los Angeles, Department of Building and Safety, or designee, shall ensure that the Applicant has paid all applicable school facility development fees in accordance with California Government Code Section 65995.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Unified School
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once, at payment
**Action Indicating Compliance**: Receipt of payment; issuance of certificate of occupancy

**Public Services – Parks.**

**MM K.4-1** (Subdivision) Pursuant to Section 17.12-A or 17.58 of the Los Angeles Municipal Code, the applicant shall pay the applicable Quimby fees for the construction of dwelling units.

(Apartments) Pursuant to Section 21.10 of the Los Angeles Municipal Code, the applicant shall pay the Dwelling Unit Construction Tax for construction of apartment buildings.

**MM K.4-2** Pursuant to Section 12.33 of the Los Angeles Municipal Code, the applicant shall pay the applicable fees for the construction of dwelling units.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once, at payment
**Action Indicating Compliance**: Receipt of payment; issuance of certificate of occupancy

**Transportation – Traffic**

**MM L.1** Prior to issuance of a Certificate of Occupancy, the Project Applicant shall prepare and implement a TDM Plan to the satisfaction of

LADOT with a cumulative target goal of 10 percent reduction in Project traffic. A determination of the types of strategies that would most reduce the Project's dependency on the automobile would be developed in coordination with LADOT. The final plan could be enforced by LADOT through an annual monitoring to ensure that traffic levels are consistent with the TDM target of 10 percent. As noted in Table 4.L-5, the AM and PM net total number of trips was projected to be 737 and 849, respectively. Therefore, the trip cap threshold for both the AM and PM peak hours shall be 663 and 764 trips, respectively.

The TDM Plan should include a variety of measures to reduce single occupant vehicles trips by increasing the number of walking, bicycling, carpool, vanpool, and transit trips. The Project shall also comply with Section 12.26-J (Ordinance 168,700) of the Los Angeles Municipal Code (City of Los Angeles, March 2015), which requires specific TDM and trip reduction measures before the issuance of any building permit. The TDM program could include, but is not limited to, the following strategies:

- Provide an Internal Transportation Management Coordination Program with on-site transportation coordinator;

- Implement enhanced pedestrian connections (e.g., improve sidewalks, widen crosswalks adjacent to the Project, install wayfinding signage and pedestrian level lighting, etc.);

- Design the Project to ensure a bicycle, pedestrian, and transit friendly environment;

- Provide parking as an option only for all residential unit leases (i.e., unbundle the parking);

- Include a provision in all leases requiring compliance with the state parking cash-out law;

- Coupled with the unbundled parking, provide on-site car share amenities;

- Provide rideshare program and support for Project employees and tenants;

- Allow for subsidized transit passes for eligible Project employees and tenants;

- Coordinate with LADOT to determine if the site would be eligible for one or more of the services to be provided by the future Mobility Hubs program (secure bike parking, bike share kiosks, and car-share parking spaces);

- Provide on-site transit routing and schedule information;

- Provide a program to discount transit passes for residents/employees possibly through negotiated bulk purchasing of passes with transit providers;

- Contribute a one-time fixed fee into the City's Bicycle Plan Trust Fund to implement bicycle improvements within the area of the Project (amount of fee to be determined in consultation with LADOT and Council District 10 staff); and

- Guaranteed Ride Home Program.

- A Draft TDM Plan should be prepared by a registered traffic engineer and submitted to LADOT prior to the issuance of the first building permit for the Project. The TDM Plan must be approved by LADOT prior to the issuance of the first Certificate of Occupancy.

- The TDM Plan must include a Monitoring Program, which should include the following considerations:

- The measurement of actual trips and monitoring will be conducted using an automated detection and surveillance monitoring system. In addition to providing hourly vehicular count tabulations, the monitoring system must also be designed in a manner that will permit direct data access to LADOT staff. The installation and maintenance of the monitoring system will be at the Project's expenses. The monitoring system will continue until such time that the Project has shown, for five consecutive years, at a minimum of 85 percent occupancy, achievement of the peak hour trip volume requirements as listed.

- Should the review show that the peak hour trip cap threshold has been exceeded, the

- Project will be subject to the following penalty program:

- A grace period of one year will be provided to correct a reporting of non-compliance.

- If on the subsequent year of reporting, the reported trips continue to exceed the established trip cap, then financial penalties will be assessed.

- Financial penalties for two consecutive reporting periods of non-compliance will pay the equivalent cost of providing a Metro transit pass for one year for each vehicle trip over the cap.

- Financial penalties for three consecutive reporting periods of non-compliance will pay twice the equivalent cost of providing a Metro transit pass for one year for each vehicle trip over the cap.

- Financial penalties for four consecutive reporting periods of non-compliance will pay three times the equivalent cost of providing a Metro transit pass for one year for each vehicle trip over the cap.

- LADOT may determine that the financial penalty (or portion thereof) may be better used by the applicant/developer to fund improvements or

enhancements to  one or more of the ongoing TDM Plan components to increase the effectiveness in meeting the trip reduction performance goals.

•        Provide delivery of groceries from the proposed supermarket.

**Enforcement Agency**: LADOT
**Monitoring Agency**: LADOT
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once; prior issuance of Certificate of Occupancy
**Action Indicating Compliance**: LADOT approval

**MM L-2** Prior to issuance of a Certificate of Occupancy, the Project Applicant shall prepare and implement a TSM Plan to the satisfaction of LADOT. TSM strategies include modifications to traffic signals and improvements to circulation flow without construction of additional automobile travel lanes. Typical TSM strategies include improved signal controllers, advanced detection systems, left-turn restrictions, peak hour parking restrictions, one-way couplets, scramble crosswalks, etc.

Fairfax Avenue & Washington Boulevard (Intersection #17) - Culver City has requested this intersection be considered for Transportation Systems Management (TSM) upgrades, which may include signal interconnect, upgraded detectors, etc.

Washington Boulevard & National Boulevard (Intersection #22) - The EIR mitigation for this location recommended converting the right turn on northbound Washington Boulevard to a through/right-turn shared lane. Culver City recommends replacing this recommendation with TSM upgrades, which may include signal interconnect, upgraded detectors, etc.

Some of the signalized intersections in the area surrounding the Project require an upgrade to the traffic signal equipment and hardware. Many of the traffic signals at these intersections currently operate using a Type 170 traffic signal controller. Newer controllers (Type 2070) provide for enhanced and real-time operation of the traffic signal timing. Also, when supplemented by additional roadway system loops and closed circuit television cameras, LADOT can identify the causes of delay and implement instant signal timing remedies to improve the flow of vehicles and buses.

Additionally, the ATSAC communications center (Hub) at Fire Station No. 68 (5023 Washington Boulevard) is in need of upgrades and repairs. All traffic signals within the West Adams ATSAC system are connected to the hub through communication fiber. The repairs are needed to ensure that the West Adams system continues to operate remotely and that signal timing is adjusted in real-time to allow maximum efficiency. Collectively, these traffic signal upgrades provide a system-wide benefit by reducing delays experienced by motorists at the study intersections.

The applicant should meet with LADOT staff to define the signal system upgrade package that will serve as a measure to increase the efficiency of the areawide

signal system. The ultimate TSM plan will require coordination and approval by LADOT.

**Enforcement Agency**: LADOT Monitoring Agency: LADOT/Culver City
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once; prior issuance of Certificate of Occupancy
**Action Indicating Compliance**: LADOT approval

**MM L-3**  La Cienega Boulevard, north of Jefferson Boulevard (Project Driveway) – Prior to issuance of a Certificate of Occupancy, a traffic signal shall be installed at the Project driveway on La Cienega Boulevard, north of Jefferson Boulevard. All signal design and construction work shall be performed in accordance with LADOT's Signal Design standards and shall include all conduits for interconnects, traffic signal hardware and software, and other applicable work deemed necessary. The location of the signal will be determined by LADOT. Pavement shall be restriped as needed.

**Enforcement Agency**: LADOT Monitoring Agency: LADOT
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once; prior issuance of Certificate of Occupancy
**Action Indicating Compliance**: LADOT approval

**MM L-4**     Fairfax Avenue & Pico Boulevard (Int. #2) – During the Project's operational phase, peak hour parking restrictions shall be implemented along Pico Boulevard to provide an additional through lane westbound in the morning peak period and eastbound in the afternoon peak period. Pavement striping shall be modified as needed. If the parking cannot be prohibited during the peak periods, a significant impact would remain at this location.

**Enforcement Agency**: LADOT Monitoring Agency: LADOT
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once; prior issuance of Certificate of Occupancy
**Action Indicating Compliance**: Field inspection sign-off

**MM L-5** La Cienega Boulevard & Venice Boulevard (Int. #10) – Prior to issuance of a Certificate of Occupancy, a westbound dual left-turn operation shall be designed and implemented. The pavement shall be restriped and the traffic signal equipment shall be modified as needed. Because Venice Boulevard is a designated State Highway, the Project Applicant shall be responsible for securing final design approval from Caltrans.

**Enforcement Agency**: LADOT Monitoring Agency: LADOT
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once; prior issuance of Certificate of Occupancy
**Action Indicating Compliance**: LADOT approval

**MM L-6** Fairfax Avenue & I-10/Electric Drive (Int. #13) – Prior to issuance of a Certificate of Occupancy, a northbound dual left-turn operation shall be designed and implemented. The pavement shall be restriped and the traffic signal equipment shall be modified as needed. The feasibility of this proposal is

contingent upon Caltrans approval to remove the carpool designation from the lane that this second left-turn operation would need to feed into.

**Enforcement Agency**: LADOT Monitoring Agency: LADOT
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once; prior issuance of Certificate of Occupancy
**Action Indicating Compliance**: Field inspection sign-off

**MM L-7** La Cienega Boulevard & Fairfax Avenue (Int. #21) – Prior to issuance of a Certificate of Occupancy, a westbound dual left-turn and one left-turn/through/right-turn lane operation shall be designed and implemented. The pavement shall be restriped and the traffic signal equipment shall be modified as needed.

**Enforcement Agency**: LADOT
**Monitoring Agency**: LADOT
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once; prior issuance of Certificate of Occupancy
**Action Indicating Compliance**: Field inspection sign-off

**MM L-8** Washington Boulevard & National Boulevard (Int. #22) – Prior to issuance of a Certificate of Occupancy, the northbound right-turn lane shall be converted to a through/right-turn lane. The pavement shall be restriped and the traffic signal equipment shall be modified as needed. This measure may be replaced with a mitigation measure involving the use of transportation system management at this intersection that is agreed to by Culver City and the project applicant.

**Enforcement Agency**: LADOT
**Monitoring Agency**: LADOT
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once; prior issuance of Certificate of Occupancy
**Action Indicating Compliance**: Field inspection sign-off

**MM L-9** La Brea Avenue & Jefferson Boulevard (Int. #28) – Prior to issuance of a Certificate of Occupancy, an exclusive southbound right-turn lane shall be designed and implemented. This could require the purchase of additional right-of-way to provide sufficient pavement width to accommodate the right-turn lane. If this right-of-way cannot be purchased, a significant impact would remain at this location.

**Enforcement Agency**: LADOT
**Monitoring Agency**: LADOT
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once; prior issuance of Certificate of Occupancy
**Action Indicating Compliance**: Field inspection sign-off

**MM L-10** LADOT recommends that a construction work site traffic control plan be submitted to LADOT's Hollywood District Office for review and approval prior to the start of any construction work. The plan should show the location of any roadway or sidewalk closures, traffic detours, haul routes, hours of operation,

protective devices, warning signs, and access to abutting properties. LADOT also recommends that construction related traffic be restricted to off-peak hours. LADOT shall consult with Culver City regarding the review of the construction work site traffic control plan.

**Enforcement Agency**: LADOT
**Monitoring Agency**: LADOT
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan submittal
**Action Indicating Compliance**: LADOT approval

**MM L-11** A detailed Construction Management Plan, including street closure information, detour plans, haul routes, and staging plans would be prepared and submitted to the City for review and approval. The Construction Management Plan would formalize how construction would be carried out and identify specific actions that would be required to reduce effects on the surrounding community. The Construction Management plan shall be based on the nature and timing of the specific construction activities and other projects in the vicinity of the Project Site, and should include the following elements as appropriate:

- Prohibition of construction worker parking on adjacent residential streets

- Provisions to prohibit construction equipment or material deliveries within the public right- of-way

- Provisions for temporary traffic control during all construction activities adjacent to public right-of-way to improve traffic flow on public roadways (e.g., flag men)

- Scheduling of construction activities to reduce the effect on traffic flow on surrounding arterial streets

- Rerouting construction trucks to reduce travel on congested streets to the extent feasible

- Construction-related vehicles shall not park on surrounding public streets

- Provisions of safety precautions for pedestrians and bicyclists through such measures as alternate routing and protection barriers

- Provisions to accommodate the equipment

- Scheduling of construction-related deliveries to reduce travel during commuter peak hours as identified in this study

- Obtaining the required permits for truck haul routes from the City prior to issuance of any permit for the Project

- LADOT shall consult with Culver City regarding the review of the Construction Management Plan.

**Enforcement Agency**: Los Angeles Department of Building and Safety; LADOT
**Monitoring Agency**: LADOT
**Monitoring Phase**: Construction
**Monitoring Frequency**: Ongoing during construction
**Action Indicating Compliance**: Field inspection sign-off

**MM L-12** The Project Applicant shall consult with the Department of City
Planning for any additional requirements pertaining to pedestrian walkability
and connectivity, as described in the Walkability Checklist.

**Enforcement Agency**: Los Angeles Department of City Planning
**Monitoring Agency**: Los Angeles Department of City Planning
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Planning Department sign-off

**MM L-13** LADOT's determination letter does not include approval of the Project's
driveways, internal circulation, and parking scheme. In order to minimize and
prevent last minute building design changes, the Project Applicant shall contact
LADOT early in the design process for access and circulation requirements so
that such traffic flow considerations are designed and incorporated early in the
building and parking layout plans. Final LADOT approval shall be obtained prior
to issuance of any building permits. This should be accomplished by
submitting detailed site/driveway plans, at a scale of at least 1" = 40', separately
to LADOT's WLA. Coastal Development Review Section at 7166 West
Manchester Avenue, Los Angeles 90045, as soon as possible but prior to
submittal of building plans for plan check to the Department of Building and
Safety.

**Enforcement Agency**: LADOT
**Monitoring Agency**: LADOT
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at submittal of site/driveway plans to LADOT,
prior to plan check
**Action Indicating Compliance**: LADOT approval

**MM L-14** Vehicle access for the Project shall be accommodated via four
driveways. One driveway, which is proposed to include a traffic signal, would be
located on La Cienega Boulevard, north of Jefferson Boulevard. On Jefferson
Boulevard, there would be two driveways for public access as well as a third
driveway for loading purposes.

**Enforcement Agency**: LADOT Monitoring Agency: LADOT
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once
**Action Indicating Compliance**: LADOT approval

**MM L-15** Fairfax Avenue & Adams Boulevard (Intersection #18) - Culver City
has requested this intersection be improved with an eastbound to northbound
left-turn lane.

**Enforcement Agency**: LADOT Monitoring Agency: LADOT/Culver City
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once; prior issuance of Certificate of Occupancy
**Action Indicating Compliance**: LADOT approval

**MM L-16** La Cienega Boulevard & Fairfax Avenue (Intersection #21) – This intersection is shared by the Cities of Los Angeles and Culver City. The EIR mitigation for this location recommended improvements to allow triple westbound left-turn lanes.

**Enforcement Agency**: LADOT Monitoring Agency: LADOT/Culver City
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once; prior issuance of Certificate of Occupancy
**Action Indicating Compliance**: LADOT approval

**MM L-17** Jefferson Boulevard & Duquesne Avenue (intersection #37) –   Culver City recommends widening the west side of the street to add a southbound lane on Duquesne Avenue.

**Enforcement Agency**: LADOT Monitoring Agency: LADOT/Culver City
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once; prior issuance of Certificate of Occupancy
**Action Indicating Compliance**: LADOT approval

**MM L-18**        Jefferson Boulevard & Overland Boulevard (Intersection #38) – Culver City recommends providing dual eastbound left turns on Overland Avenue.

**Enforcement Agency**: LADOT Monitoring Agency: LADOT/Culver City
**Monitoring Phase**: Pre-occupancy
**Monitoring Frequency**: Once; prior issuance of Certificate of Occupancy
**Action Indicating Compliance**: LADOT approval

**Utilities and Service Systems – Wastewater**

**MM M.1-1** The Project shall comply with City Ordinance No. 179,820 (Green Building Ordinance), which establishes a requirement to incorporate green building practices into projects that meet certain threshold criteria.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**MM M.1-2** As part of the normal construction/building permit process, the Project Applicant shall confirm with the City that the capacity of the local and trunk lines are sufficient to  accommodate the Project's wastewater flows during the construction and operation phases. If the public sewer has insufficient capacity, then the Project Applicant shall be required to build sewer lines to a point in the

sewer system with sufficient capacity. A final approval for sewer capacity and connection permit shall be made at that time. The construction phase of the Project shall need a sewer connection permit and Sewer Capacity Availability Review (SCAR) application. The Project shall also pay any required sewer connection fees.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**MM M.1-3** In the event of full or partial public street closures, such as during the construction of new wastewater lines, the Construction Traffic Management Plan shall be in implemented.

**Enforcement Agency**: Los Angeles Department of Building and Safety; LADOT
**Monitoring Agency**: LADOT
**Monitoring Phase**: Construction
**Monitoring Frequency**: Ongoing during construction
**Action Indicating Compliance**: Field inspection sign-off

### Utilities and Service Systems – Water

**MM M.2-1** The Project Applicant shall consult with the LADBS and LAFD to determine fire flow requirements for the Proposed Project, and will contact a Water Service Representative at the LADWP to order a SAR. This system hydraulic analysis will determine if existing LADWP water supply facilities can provide the proposed fire flow requirements of the Project. If water main or infrastructure upgrades are required, the Applicant would pay for such upgrades, which would be constructed by either the Applicant or LADWP.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check Action Indicating Compliance: Plan approval

**MM M.2-2** The Project shall implement all applicable mandatory measures within the LA Green Building Code that would have the effect of reducing the Project's water use.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**MM M.2-3** The project shall comply with Ordinance No. 170,978 (Water Management Ordinance), which imposes numerous water conservation measures in landscape, installation, and maintenance (e.g., use drip irrigation

and soak hoses in lieu of sprinklers to lower the amount of water lost to evaporation and overspray, set automatic sprinkler systems to irrigate during the early morning or evening hours to minimize water loss due to evaporation, and water less in the cooler months and during the rainy season).

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**MM M.2-4** The Project shall comply with the City of Los Angeles Low Impact Development Ordinance (City Ordinance No. 1818,99) and to implement Best Management Practices that have stormwater recharge or reuse benefits for the Project (as applicable and feasible).

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check Action Indicating Compliance: Plan approval

**MM M.2-5** As part of the normal construction/building permit process, the Project Applicant shall confirm with the City that the capacity of the existing water infrastructure can supply the domestic needs of the Project during the construction and operation phases. The Project Applicant shall implement any upgrade to the water infrastructure serving the Project Site that is needed to accommodate the Project's water consumption needs. If a deficiency or service problem is discovered during the permitting process that prevents the Project from an adequate level of service, the Project Applicant shall fund the required upgrades to adequately serve the Project.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**MM M.2-6** In the event of full or partial public street closures, such as during the construction of new water lines, the Construction Traffic Management Plan shall be in implemented.

**Enforcement Agency**: Los Angeles Department of Building and Safety; LADOT
**Monitoring Agency**: LADOT
**Monitoring Phase**: Construction
**Monitoring Frequency**: Ongoing during construction
**Action Indicating Compliance**: Field inspection sign-off

**Utilities and Service Systems – Solid Waste**

**M.3-1** In compliance with Los Angeles Municipal Code, the Project shall provide readily accessible areas that serve the entire building and are identified for the depositing, storage, and collection of nonhazardous materials for recycling, including (at a minimum) paper, corrugated cardboard, glass, plastics, and metals.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**M.3-2** In order to meet the diversion goals of the California Integrated Waste Management Act and the City of Los Angeles, which was 70 percent in 2013, the Applicant shall salvage and recycle construction and demolition materials to ensure that a minimum of 70 percent of construction- related solid waste that can be recycled is diverted from the waste stream to be landfilled. Solid waste diversion would be accomplished though the on-site separation of materials and/or by contracting with a solid waste disposal facility that can guarantee a minimum diversion rate of 70 percent. In compliance with the Los Angeles Municipal Code, the General Contractor shall utilize solid waste haulers, contractors, and recyclers who have obtained an Assembly Bill (AB) 939 Compliance Permit from the City of Los Angeles Bureau of Sanitation.

**Enforcement Agency**: Los Angeles Bureau of Sanitation
**Monitoring Agency**: Los Angeles Bureau of Sanitation
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, prior to construction
**Action Indicating Compliance**: AB 939 Compliance Permit issuance

**M.3-3** In compliance with AB341, recycling bins shall be provided at appropriate locations to promote recycling of paper, metal, glass and other recyclable material. These bins shall be emptied and recycled accordingly as a part of the Project's regular solid waste disposal program. The Project Applicant shall only contract for waste disposal services with a company that recycles solid waste in compliance with AB341.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Prior to occupancy
**Monitoring Frequency**: Once, prior to occupancy
**Action Indicating Compliance**: Issuance of Certificate of Occupancy

**M.3-4** To the maximum extent feasible, demolition and construction debris including concrete, asphalt, wood, drywall, metals, and other miscellaneous and composite materials shall be recycled and salvaged.

**Enforcement Agency**: Los Angeles Bureau of Sanitation
**Monitoring Agency**: Los Angeles Bureau of Sanitation
**Monitoring Phase**: Demolition and construction
**Monitoring Frequency**: Ongoing during construction

**Action Indicating Compliance**: Field inspection sign-off

### Utilities and Service Systems – Energy Conservation

**M.4-1** The Project shall comply with City Ordinance No. 179,820 (Green Building Ordinance), which establishes a requirement to incorporate green building practices into projects that meet certain threshold criteria.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**M.4-2** The Project shall implement all applicable mandatory measures within the LA Green Building Code that would have the effect of reducing the Project's energy use.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction Monitoring Frequency: Once, at plan check
**Action Indicating Compliance**: Plan approval

**M.4-3** The Project shall comply with the lighting power requirements in the California Energy Code, California Code of Regulations (CCR), Title 24, Part 6.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Plan approval

**M.4-4** The Project shall use Energy Star appliances where available.

**Enforcement Agency**: Los Angeles Department of Building and Safety
**Monitoring Agency**: Los Angeles Department of Building and Safety
**Monitoring Phase**: Pre-Construction
**Monitoring Frequency**: Once, at plan check
**Action Indicating Compliance**: Issuance of building permits

### Other Conditions

20.   **Graffiti Removal.** All graffiti on the site shall be removed or painted over to match the color of the surface to which it is applied within 24 hours of its occurrence.

21.   **Aesthetics.** The structure, or portions thereof shall be maintained in a safe and sanitary condition and good repair and free of graffiti, trash, overgrown vegetation, or similar material, pursuant to Municipal Code Section 91,8104. All open areas not used for buildings, driveways, parking areas, recreational facilities or walks shall be attractively landscaped and maintained in accordance with a landscape plan, including an automatic

irrigation plan, prepared by a licensed landscape architect to the satisfaction of the decision maker.

## CONDITIONS FOR EFFECTUATING TENTATIVE
## (T) CLASSIFICATION REMOVAL

Pursuant to Los Angeles Municipal Code Section 12.32 G, the "T" Tentative Classification shall be removed by the recordation of a final tract map or by posting guarantees satisfactory to the City Engineer to secure the following without expense to the City of Los Angeles, with copies of any approval or guarantees provided to the Planning Department for attachment to the subject City Plan Case.

### BUREAU OF ENGINEERING - SPECIFIC CONDITIONS

1.  <u>Prior to recordation of the final map</u>, satisfactory arrangements shall be made to satisfy the recommendations of the Bureau of Engineering.

    a.  That a 2-foot wide public sidewalk easement be provided along La Cienega Boulevard adjoining the tract.

    b.  That a 5-foot wide public right-of-way be dedicated along Jefferson Boulevard adjoining the tract to complete a 40-foot wide half right-of-way, including a 20-foot radius property line return at the intersection with La Cienega Boulevard or 15-foot by 15-foot property line corner cut.  In addition a 5-foot wide public sidewalk easement be provided, including a 20-foot radius easement line at the intersection with La Cienega Blvd.

    c.  That the subdivider make a request to the Central District Office of the Bureau of Engineering to determine the capacity of existing sewers in this area.

    d.  That a set of drawings for airspace lots be submitted to the City Engineer showing the followings:
        i. Plan view at different elevations.
        ii. Isometric views.
        iii. Elevation views.
        iv. Section cuts at all locations where air space lot boundaries change.

    e.  That the owners of the property record an agreement satisfactory to the City Engineer stating that they will grant the necessary private easements for  ingress and egress purposes to serve proposed airspace lots to use upon the sale of the respective lots and they will maintain the private easements free and clear of obstructions and in safe conditions for use at all times.

    Notes:
    Any questions regarding this report should be directed to Mr. Georgic Avanesian of the Land Development Section, located at 201 North Figueroa Street, Suite 200, or by calling (213) 202-3438.

### DEPARTMENT OF BUILDING AND SAFETY, GRADING DIVISION

2.  <u>Prior to issuance of a grading or building permit, or prior to recordation of the final map</u>, the subdivider shall make suitable arrangements to assure compliance, satisfactory to the Department of Building and Safety, Grading Division's letter dated September 25, 2015; LOG # 89939.

## DEPARTMENT OF BUILDING AND SAFETY, ZONING DIVISION

3.   Prior to recordation of the final map, the Department of Building and Safety, Zoning Division shall certify that no Building or Zoning Code violations exist on the subject site. In addition, the following items shall be satisfied:

   a.   Residential uses are not allowed in the MR1 Zone.   Obtain Zone Change approval from the Department of City Planning.

   b.   Zone Change must be recorded prior to obtaining Zoning clearance.

   c.   Show compliance to the Zone Change requirements as applicable.

   d.   Provide a copy of CPC case CPC-2015-2593-GPA-ZC-HD-ZAA-SPR.   Show compliance with all the conditions/requirements of the CPC case(s) as applicable.

   e.   Provide a copy of affidavit AF-91-1898036-OB and AF-91-1674847-LT.   Show compliance with all the conditions/requirements of the above affidavits as applicable.   Termination of above affidavit(s) may be required after the Map has been recorded.   Obtain approval from the Department, on the termination form, prior to recording.

   f.   Show all street dedication(s) as required by Bureau of Engineering and provide net lot area after all dedication.   "Area" requirements shall be rechecked as per net lot area after street dedication.   A minimum of 487,200 SF of lot area after dedication is required or as granted by Case No. CPC-2015-2593-GPA-ZC-HD-ZAA-SPR for the proposed 1,218 residential units or City Planning approval is required.

   g.   The submitted Map does not comply with the maximum density (400 s.f. of lot area/dwelling unit) requirement of the (proposed) C2-2 Zone.   Revise the Map to show compliance with the above requirement or as granted by Case No. CPC-2015-2593-GPA-ZC-HD-ZAA-SPR or obtain approval from the Department of City Planning.

   h.   The submitted plot plan is not complete.   Provide a plot plan drawn to scale that accurately dimensions the proposed property lines, building footprint along the lot line after required street dedications are taken on the site.   If building footprints or required parking spaces are projecting into the public ways, then either obtain a building permit from LADBS to remove the portion of the use/building or obtain a Revocable Permit from BOE to allow it to remain.

   i.   Record a Covenant and Agreement to treat the buildings and structures located in an Air Space Subdivision as if they were within a single lot.

**Notes**:

   Each Air Space lot shall have access to a street by one or more easements or other entitlements to use in a form satisfactory to the Advisory Agency and the City Engineer.

The submitted Map may not comply with the number of parking spaces required by Section 12.21 a 4 (a) based on number of habitable rooms in each unit. If there are sufficient numbers of parking spaces, obtain approval from the Department of City Planning.

Any proposed structures or uses on the site have not been checked for and shall comply with Building and Zoning Code requirements. Plan check will be required before any construction, occupancy or change of use.

An appointment is required for the issuance of a clearance letter from the Department of Building and Safety. The applicant is asked to contact Laura Duong at (213) 482-0434 to schedule an appointment.

## DEPARTMENT OF TRANSPORTATION

4.  Prior to recordation of the final map, satisfactory arrangements shall be made to satisfy the recommendations of the Department of Transportation. (MM)

   a.  Install New Traffic Signal on La Cienega Boulevard North of Jefferson Boulevard at the Project Driveway
       All signal design and construction work shall be performed in accordance with LADOT's Signal Design standards and shall include all conduits for interconnects, traffic signal hardware and software and other applicable worked deemed necessary. The location of the signal will be determined by LADOT. Restripe pavement as needed.

   b.  Fairfax Avenue & Pico Boulevard (Intersection 2)
       Implement peak hour parking restrictions along Pico Boulevard to provide an additional through lane westbound in the morning peak period and eastbound in the afternoon peak period. Modify pavement striping as needed. If the parking cannot be prohibited during the peak periods, a significant project impact would remain at this location.

   c.  La Cienega Boulevard & Venice Boulevard (Intersection 10)
       Design and implement a westbound dual-left-turn operation. Restripe pavement and modify traffic signal equipment as needed. Because Venice Boulevard is a designated State Highway, the project applicant shall be responsible for securing final design approval from Caltrans.

   d.  Fairfax Avenue & I-10 Freeway Ramps / Electric Drive (Intersection 13)
       Design and implement a northbound dual-left turn operation. Restripe pavement and modify traffic signal equipment as needed. The feasibility of this proposal is contingent upon Caltrans approval to remove the carpool designation from the lane that this second left-turn operation would need to feed into.

   e.  La Cienega Boulevard & Fairfax Avenue (Intersection 21)
       Prior to issuance of Certificate of Occupancy, a westbound dual left-turn and one left-turn/through/right-turn lane operation shall be designed and implemented. The pavement shall be restriped and the traffic signal equipment shall be modified as needed.

   f.  Washington Boulevard & National Boulevard (Intersection 22)
       Prior to issuance of a Certificate of Occupancy, the northbound right-turn lane

shall be converted to a through/right-turn lane. The pavement shall be restriped and the traffic signal equipment shall be modified as needed. This measure may be replaced with a mitigation measure involving the use of transportation system management at this intersection that is agreed to by Culver City and the project applicant.

g.    La Brea Avenue & Jefferson Boulevard (Intersection 28)
      Design and implement an exclusive southbound right-turn lane. This could require the purchase of additional right-of-way to provide sufficient pavement width to accommodate the right-turn lane. If this right-of-way cannot be purchased, a significant project impact would remain at this location.

      Notes: **Should any improvement be deemed infeasible at the time of reconciliation, the City may substitute an alternative measure of equivalent effectiveness.**

      That applicant shall be responsible for the cost and implementation of any necessary traffic signal equipment modifications, bus stop relocations and lost parking meter revenues associated with the proposed transportation improvements described above. Unless otherwise noted, all transportation improvements and associated traffic signal work within the City of Los Angeles must be guaranteed through the B-permit process of the Bureau of Engineering, prior to issuance of any building permits and completed prior to the issuance of any certificates of occupancy. Temporary certificates of occupancy may be granted in the event of any delay through no fault of the applicant, provided that, in each case, the applicant had demonstrated reasonable efforts and due diligence to the satisfaction of DOT. Prior to setting the bond amount, BOE shall require that the developer's engineer or contractor contact DOT's B-Permit Coordination Engineer at (213) 928-9663, to arrange a pre-design meeting to finalize the plan(s) needed for the project.

**FIRE DEPARTMENT**

5.    Prior to recordation of the final map, satisfactory arrangements shall be made to satisfy the recommendations of the Fire Department.

      a.    Submit plot plans for Fire Department approval and review prior to recordation of Tract Action.

      b.    Adequate off-site public and on-site private fire hydrants may be required. Their number and location to be determined after the Fire Department's review of the plot plan.

      c.    Fire lane width shall not be less than 20 feet. When a fire lane must accommodate the operation of Fire Department aerial ladder apparatus or where fire hydrants are installed, those portions shall not be less than 28 feet in width.

      d.    Where above ground floors are used for residential purposes, the access requirement  shall be interpreted as being the horizontal travel distance from the street, driveway, alley, or designated fire lane to the main entrance of individual units.

e.      Adequate public and private fire hydrants shall be required.

f.      Access for Fire Department apparatus and personnel to and into all structures shall be required.

g.      Any required fire hydrants to be installed shall be fully operational and accepted by the Fire Department prior to any building construction.

h.      All parking restrictions for fire lanes shall be posted and/or painted prior to any Temporary Certificate of Occupancy being issued.

i.      Plans showing areas to be posted and/or painted, "FIRE LANE NO PARKING" shall be submitted and approved by the Fire Department prior to building permit application sign-off.

j.      Where rescue window access is required, provide conditions and improvements necessary to meet accessibility standards as determined by the Los Angeles Fire Department.

k.      Building designs for multi-storied residential buildings shall incorporate at least one access stairwell off the main lobby of the building; But, in no case greater then 150ft horizontal travel distance from the edge of the public street, private street or Fire Lane. This stairwell shall extend unto the roof.

l.      Entrance to the main lobby shall be located off the address side of the building.

m.      Any required Fire Annunciator panel or Fire Control Room shall be located within 50ft visual line of site of the main entrance stairwell or to the satisfaction of the Fire Department.

**Notes**: The applicant is further advised that all subsequent contact regarding these conditions must be with the Hydrant and Access Unit. This would include clarification, verification of condition compliance and plans or building permit applications, etc., and shall be accomplished BY APPOINTMENT ONLY, in order to assure that you receive service with a minimum amount of waiting please call (213) 482-6504. You should advise any consultant representing you of this requirement as well.

## BUREAU OF STREET LIGHTING

6.      If new street light(s) are required, then prior to the recordation of the final map or issuance of the Certificate of Occupancy (C of O), street lighting improvement plans shall be submitted for review and the owner shall provide a good faith effort via a ballot process for the formation or annexation of the property within the boundary of the development into a Street Lighting Maintenance Assessment District.

## BUREAU OF SANITATION

7.      Satisfactory arrangements shall be made with the Bureau of Sanitation, Wastewater Collection Systems Division for compliance with its sewer system review and

requirements.  Upon compliance with its conditions and requirements, the Bureau of Sanitation, Wastewater Collection Systems Division will forward the necessary clearances to the Bureau of Engineering. (This condition shall be deemed cleared at the time the City Engineer clears Condition 1)

## INFORMATION TECHNOLOGY AGENCY

8.    That satisfactory arrangements be made in accordance with the requirements of the Information Technology Agency to assure that cable television facilities will be installed in the same manner as other required improvements.  Refer to the LAMC Section 17.05-N.  Written evidence of such arrangements must be submitted to the Information Technology Agency, 200 North Main Street, 12th Floor, Los Angeles, CA 90012, 213 922-8363.

## DEPARTMENT OF RECREATION AND PARKS

9.    That the Quimby fee or Recreation and Park Fee be based on the C2 zone. (MM)

Sec. ___.  The City Clerk shall certify to the passage of this ordinance and have it published in accordance with Council policy, either in a daily newspaper circulated in the City of Los Angeles or by posting for ten days in three public places in the City of Los Angeles: one copy on the bulletin board located at the Main Street entrance to the Los Angeles City Hall; one copy on the bulletin board located at the Main Street entrance to the Los Angeles City Hall East; and one copy on the bulletin board at the Temple Street entrance to the Los Angeles County Hall of Records.

I hereby certify that this ordinance was passed by the Council of the City of Los Angeles, at its meeting of _____.

HOLLY L WOLCOTT, City Clerk

By _____
                    Deputy

Approved _____

_____
                    Mayor

Pursuant to Sec. 559 of the City Charter, I **approve** this ordinance on behalf of the City Planning Commission and recommend that it be adopted....

May 24, 2016
See attached report

File No. CF-16-0439-S1
CPC-2015-2593-GPA-ZC-HD-ZAA-SPR

_____
Vincent P. Bertoni
Director of Planning

# EXHIBIT B-18

1/12/16, 10:37 AM

Can we meet at 11:30 AM on Wednesday?  I now need to be in DTLA @ 1:30 PM.

1/13/16, 11:36 AM

I'm here.  Fig restaurant?

Yep

1/13/16, 6:53 PM

Did you move the cedillo meeting. I really don't want to postpone but happy to try and accommodate your schedule.

1/13/16, 9:06 PM

Thank you.  It would very helpful and very much appreciated.

1/14/16, 2:00 PM

Sorry - I tried getting another time from Cedillo and he's booked up...they were squeezing me in for this meeting.  I need him for a vote in committee that Wednesday.

I'm ok as long as we don't push by more than a day or two.

Cumulus is top priority

Kimani prefers not to move it.  I don't need to be there.

Deron and I will talk prior...

Ok.  It's unfortunate you aren't there.

It's the most important meeting for the most important project.  I'm scratching my head why cedillo has no time over the next 2 weeks.

Obviously, had I known about the Cumulus meeting I wouldn't have scheduled the other meeting.  You know that...

I do but it is still unfortunate. You had taken the lead on scheduling

I sent the request to Shawn, his scheduler. Kimani set the date with you.

It doesn't matter...just need to work around it.

So do you think you can still work around it?

I'm REALLY trying.

1/14/16, 4:31 PM

Just heard back regarding what the city wants to do

Can you call me?

1/15/16, 9:12 AM

I'm on a call.

Just tried you back.  Getting on another call at 9:30 AM.  I have spoken to Deron and gave Andrew a head's up on the CPC issue.

Andrew hasn't text me back with instructions for the call...i.e. where to reach him.  Do you have a call in or do you want me to call you and then conference them in?

Call me pls.

I did.  Just got on a conference call.  Will call as soon as I can.

Can you call me

1/20/16, 12:07 PM

Can u pls call at your earliest convenience

1/22/16, 5:49 PM

Spoke with Deron today.  Herb is aware of what happened at the meeting.  He's mad about it.  I'm sure we'll discuss on Monday.

Ok.  Thanks for the update.

Any more detail on derons feedback?  Also, any word from creed?

1/23/16, 7:55 AM

Nothing from CREED.

SMS with +1 (949) 355-5659
1/25/16, 8:51 AM

Are we meeting at the district office this morning 10 o'clock right

iMessage with +1 (949) 355-5659

Yep

SMS with +1 (949) 355-5659

What did you decide about lunch?

iMessage with +1 (949) 355-5659

Right after meeting I think

1/25/16, 3:33 PM

Sorry...on a call.

Can we speak at 430?

Yes.

1/26/16, 1:18 PM

Did you see my note about the Wesson meeting on February 8 at 10:30 AM?

1/28/16, 12:33 PM

I'm at CPC.  These guys are very focused on electric charging stations and solar power.  More focused on that than affordability.

Ok.  Met with union so let's catch up today

Thanks for the heads up

U met with IBEW?

Yep

2/4/16, 4:02 PM

I don't know if you were in loop but forgot to mention, we are meeting creed folks at 9am at city hall.  Sorry for the late notice

No...you didn't tell me.

Meeting in Wesson's Office?

Yep

9 AM - ?

2/17/16, 11:34 AM

Do you want to meet up with Jeff M. and try and seal the deal, perhaps drinks?  We do need to circle back with Herb and/or Deron prior to CPC.

SMS with +1 (949) 355-5659
2/19/16, 8:35 AM

Can you do lunch with me and Deron on Tuesday?

iMessage with +1 (949) 355-5659
2/22/16, 5:27 PM

Where is the noon lunch tomorrow amigo?

I was just getting around to texting Deron with that very same question.

2/23/16, 10:12 AM

Chatted with Deron just now.  We're still on for lunch...he will circle back with time and location.

Sooner the better part

SMS with +1 (949) 355-5659
2/23/16, 11:26 AM

we are meeting at Yxta.  601 S Central Ave, Los Angeles, CA 90021.  They have valet parking.

Noon.

iMessage with +1 (949) 355-5659
2/25/16, 12:01 PM

How much $ are you doing for Englander next week?

10k

Cool

# EXHIBIT B-19

SEAL

# EXHIBIT B-20

SEAL

# EXHIBIT B-21

SEAL

# EXHIBIT B-22

**CM Brief - Mtg with Neils Cotter/Carmel Partners, Morrie Goldman
RE Carmel/520 Mateo
8/1/18, 2:45 pm**


**Briefing:**        Shawn Kuk
**Staffing:**        Paul Habib, Jesse Leon, Kevin Ocubillo

**Location:**      City Hall Office

## <u>SUMMARY</u>

Morrie Goldman requested this meeting on behalf of Carmel Partners in regards to the proposed Arts District project at 520 Mateo. You met with both Ron Miller and Carmel just before recess. You should be getting an update from Carmel on their negotiations with Ron Miller.

Your last direction regarding this project was to hold off on scheduling the entitlements (GPA-Zone Change, Tract Map, EIR) in PLUM until labor considerations have been resolved.

You last met with Ron Miller on 7/3/18 who requested your support in securing an agreement with Carmel.

You also met briefly with Carmel on 6/27/18 at which time they requested PLUM scheduling ASAP. The labor issue was briefly discussed at that time. You made no commitment to a PLUM date.

Carmel, at that time, indicated that there is a handshake agreement with CREED LA on this project. However, Ron Miller is seeking a PLA.

Morrie reported that it is likely that the podium concrete will be a labor contract. Morrie also indicating that 80-90% of the work will be through union labor, however, there are certain job types that Carmel feels is not competitive and even sub-par workmanship wise. Notwithstanding, Ron Miller is insisting on 100% of his group being accounted for in the PLA.

## CARMEL PROJECT BACKGROUND

This project is now a proposed 35-story project (originally a 13-story) mixed-use development in the Arts District at 520 S. Mateo St., along Fourth Place between Santa Fe and Mateo.

It will offer up 475 live-work units, a portion of which will be restricted affordable units. CPC's recent recommendations are to require 11% VLI units.

Your office assisted Carmel in expediting their project to be scheduled for 5/13/18 CPC. Planning wanted to delay at that time as their executive management (Vince Bertoni, Kevin Keller) were not comfortable with the height of Carmel's tower.

## Notes from mtg:

CPC July 18

PLA is deal breaker.

Strong community support due to ability to redesign project.

pedestrianization, type 1 construction. Acquired railroad parcel. Daily dose ish paseo. Took out Verizon agf. HCNC, LARABA, 100+ residents, HOA's

Redesign project post scoping mtg.

-Added office component

-pushed bldg back

@CPC - Atty for carpenters and laborers showed up at CPC. No Ron Miller. Comments have no bearing on EIR.

Counter proposal:

Morrie is brokering written deal with CREED will secure 7 of 16 trades.

Pico/Sepulveda full PLA. Carpenters are pushing.

Tied to cumulus low rise project.

Had always used carpenters.

## Affordable
Staff recommendation - 11% low
Asking for 5% very low (try to reserve artists). Camden did 5%
Same # of units, better quality.
Tried to submit application but planning said no.

## Community Benefits
Pocket park? Public improvements
5% Extremely Low?
Doing something for the bridge?

CD 14 needs to weigh in on what we need/want.

CPC-2016-3853-GPA-VZC-HD-ZAD-SPR

# EXHIBIT B-23

play it through.

10/15/18, 9:53 AM

Where are we meeting?

Oficine Brera @ Noon

Cool

10/15/18, 5:44 PM

👤 Shawn Kuk

Please confirm u got it.  Thanks.

Yep

10/16/18, 4:57 PM

Let's talk tomorrow.  I'm seeing Jose on Thursday, so I know he will bring up follow up on a few items.  Thanks.

Ok

Thanks again

I know that everything was teed up and i's dotted and t's crossed, but I feel horrible about double-booked today; you're the last person that I ever want to stress out that way.

10/29/18, 9:23 AM

I was with Jose on Friday night.  He still wants the meeting with you, he and Laborers so you can shake hands in front of him.  I have a request in for the meeting.  Let's chat about it later today.

10/30/18, 2:29 PM

Okay...so, update.  No meeting with Laborers is necessary.  All good for tomorrow in Council on Mateo.  Jose is asking that in your communications with the Laborers you let them know you're bringing them to the table because of our mutual friend.  Make sense?

10/31/18, 10:38 AM

u around?